# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

MISSISSIPPI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; DR. ANDREA WESLEY; DR. JOSEPH WESLEY; ROBERT EVANS; GARY FREDERICKS; PAMELA HAMNER; BARBARA FINN; OTHO BARNES; SHIRLINDA ROBERTSON; SANDRA SMITH; DEBORAH HULITT; RODESTA TUMBLIN; DR. KIA JONES; ANGELA GRAYSON; MARCELEAN ARRINGTON; VICTORIA ROBERTSON,

　　　　　*Plaintiffs*,

　　　　vs.

STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, *in his official capacity as Governor of Mississippi*; LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON, *in his official capacity as Secretary of State of Mississippi*.

　　　　　*Defendants*.

3:22-cv-734-DPJ-HSO-LHS


**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**THREE-JUDGE PANEL CASE PER 22 U.S.C. § 2284**

**INTRODUCTION**

1.      Plaintiffs bring this action to challenge the Mississippi Legislature's 2022 State Senate and State House redistricting plans (the "2022 maps") on the grounds that they violate Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("VRA") and the Constitution of the United States ("U.S. Constitution"). Specifically, the 2022 maps unlawfully dilute the voting strength of Black Mississippians and deny Black Mississippians a full and fair opportunity to participate equally to white Mississippians in the political process.

2.      Mississippi's 2022 maps illegally dilute the voting strength of Black Mississippians and improperly use voters' race to achieve partisan goals and protect incumbent politicians.  The new maps are only the latest in a long and unfortunate history of manipulating the districting process to undermine Black voters' political power.  Because they violate federal law and the U.S. Constitution, Mississippi's new districting maps should be enjoined, and lawful maps that fairly represent Black voters and all Mississippians should be ordered into place.

3.      Mississippi has the largest Black population percentage of any state in the nation.  Black Mississippians comprise about 38 percent of the State's

2

residents (based on the Census Bureau's "Any Part Black" category) and Mississippi's Black population continues to grow.

4.     Yet, the new state legislative districting maps do not reflect that reality or the reality of Mississippi's changing demographics and growing Black population.  The 2022 maps do not adequately reflect the relative growth and significant size of Mississippi's Black population.  Rather, the 2022 maps water down the political power of Black Mississippians in violation of federal law.

5.     Mississippi's Black population could support at least four additional Black-majority Senate districts and at least three additional Black-majority House districts in several areas across the State, where Black voters, despite their numbers, and despite voting cohesively, have previously been unable to elect candidates of their choice, in large part due to the prevalence of racially polarized voting.  Specifically, new Black-majority Senate districts could have been drawn to prevent vote dilution in (1) the DeSoto County area; (2) the Golden Triangle area; (3) the South-Central Mississippi area near Copiah, Simpson, and Jefferson Davis counties; and (4) the Hattiesburg area.  Black-majority House Districts could have been drawn to prevent vote dilution in (1) the Western Hinds County area, (2) the area north of the Golden Triangle between West Point and Tupelo, and (3) the area between the Cities of Laurel and Meridian, in and around Jasper

and Clarke counties.  (Collectively, these areas where new Black-majority districts could have been drawn are referred to as the "challenged districts."). Instead of taking steps to ensure equal opportunities for Black voters by drawing additional districts where Black voters would have a fair opportunity to elect candidates of their choice, the State drew no new Black-majority Senate districts and no additional Black-majority House districts.

6.     Especially considering Mississippi's legacy of racial discrimination against its Black population and the ongoing, accumulated effects of that legacy, such as the pervasive presence of racially polarized voting, the State's maps will prevent Black Mississippians from exercising political power on an equal playing field with white Mississippians in violation of Section 2 of the VRA.

7.     Moreover, in some areas of the State (including fast-growing DeSoto County and the Gulf Coast region, among others), race was used as a predominant factor in situations where that was not required in order to comply with Section 2 of the Voting Rights Act or to achieve some other compelling interest.  The newly adopted Mississippi State Senate and House maps unnecessarily "pack" Black Mississippians together in some of those places, and also "crack" areas with large, cohesive Black populations in some others—ultimately diminishing Black Mississippians' true voting strength statewide and in the relevant districts.

8.    Mississippi's improper manipulation of the redistricting process and dilution of Black voters' political strength violates the U.S. Constitution and Section 2 of the VRA.

9.    Plaintiffs—including the Mississippi State Conference of the National Association for the Advancement of Colored People and individual voters from across the State whose votes will be diluted under Mississippi's unfair maps— accordingly seek declaratory and injunctive relief blocking the implementation of the unlawful new maps, and ordering the implementation of state legislative maps that fairly represent all Mississippians, in compliance with the U.S. Constitution and laws of the United States, and providing any and all additional relief as appropriate.

## JURISDICTION, COURT TYPE, AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law.  This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1343(a)(4) and 1357 because this is a civil action to secure equitable relief under the VRA, which is an Act of Congress that protects the right to vote.

11.    Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil

Procedure.  Plaintiffs are entitled to relief under, among other provisions of law,

52 U.S.C. § 10301 and 42 U.S.C. § 1983.  Upon prevailing, Plaintiffs will further

be entitled to fees and costs pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C. §

1988.

12.    This Court has personal jurisdiction over the Defendants, who are

citizens of the State of Mississippi and reside within this District.

13.    Venue is proper in this Court under 28 U.S.C. §§ 104(b) and 1391(b)

because a substantial part of the events or omissions giving rise to the claim

occurred in the Southern District of Mississippi, as the Mississippi Legislature

sits within this District.

14.    Because this is an action "challenging the constitutionality of . . .  the

apportionment of any statewide legislative body," a three-judge court should be

convened to preside in this case pursuant to 28 U.S.C. § 2284.

## PARTIES

15.    Plaintiff MISSISSIPPI STATE CONFERENCE OF THE NATIONAL

ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("MS

NAACP") is a subsidiary organization of the National Association for the

Advancement of Colored People, Inc. ("NAACP"), a national non-profit, non-

partisan organization founded in 1909 that has more than 2,200 units across the

nation and is powered by more than two million activists.  The NAACP works to ensure the political, educational, social, and economic equality of all persons and to eliminate racial hatred and racial discrimination, including by removing all barriers of racial discrimination through democratic processes.  Protecting and expanding voting rights and fair representation for Black Mississippians are at the very heart of MS NAACP's mission and have been for decades.

16.   MS NAACP has been at the forefront of major battles for civil rights in Mississippi, particularly from the 1950s to the present day.  The first Mississippi NAACP branch was chartered in Vicksburg, Mississippi in 1918 and re-chartered on April 8, 1940. In 1945, members of branches from across the state came together to charter MS NAACP to coordinate the efforts of local branches and carry out the mission and vision of the national organization statewide.  Since then, MS NAACP has used litigation, policy advocacy, community organizing, and public education to ensure the political, educational, social, and economic equality of rights of all Mississippians.  To achieve its mission, MS NAACP engages in voter education, registration, mobilization, and other civic engagement activities.

17.   MS NAACP is headquartered in Jackson and has dozens of local branch units, college chapters, and youth councils across the State, with members in

many counties throughout Mississippi.  MS NAACP has thousands of members, a large portion of whom are registered voters in the State of Mississippi.  MS NAACP's membership consists largely of Black people and other people of color.  A large segment of MS NAACP's membership lives in the Southern District of Mississippi.

18.    MS NAACP has standing to sue with respect to vote dilution claims on behalf of its members.  MS NAACP's members are injured by the dilution of Black voting strength caused by the 2022 maps, which violates their rights under the VRA.  MS NAACP's members include Black citizens who (1) are registered to vote in, among others, Mississippi Senate Districts in the DeSoto County area, the Golden Triangle area, the South-Central Mississippi area including Copiah, Simpson, and Jefferson Davis counties, and the Hattiesburg area, as well as in Mississippi House Districts in the Western Hinds County area, the area north of the Golden Triangle between West Point and Tupelo, and the area between Laurel and Meridian including in Jasper and Clarke counties; (2) will not have an opportunity to elect a candidate of choice in those particular districts, among others, due to bloc voting by white voters against Black-preferred candidates; but (3) could have and should have been included in alternative Black-majority districts in those areas, in which districts they and other Black Mississippians

would have had a fair opportunity to elect a candidate of choice and participate equally in the political process.

19.   For example, MS NAACP has over 125 members who live in the DeSoto County area, including in areas such as Horn Lake and Southaven in and around Senate District 2 under the 2022 maps.  Under the 2022 maps, those MS NAACP members will not have an opportunity to elect a candidate of choice due to bloc voting by white voters against Black-preferred candidates.  However, the Senate districts in the DeSoto County area, such as Senate District 2, could have been drawn to prevent vote dilution and be consistent with traditional districting principles to include an additional Black-majority Senate district in which Black voters, including MS NAACP's members, have a fair opportunity to elect a candidate of choice.

20.   As a further example, MS NAACP also has around 150 members who live in and around the City of Clinton in and around House District 56 under the 2022 maps.  Under the 2022 maps, those MS NAACP members will not have an opportunity to elect a candidate of choice due to bloc voting by white voters against Black-preferred candidates.  However, the House districts in the Clinton area, particular House District 56, could have been drawn to prevent vote dilution and be consistent with traditional districting principles to include an additional

Black-majority House district in which Black voters, including MS NAACP's members, have a fair opportunity to elect a candidate of choice.

21.   MS NAACP has standing to sue with respect to racial gerrymandering claims on behalf of its members.  MS NAACP's members also include Black citizens (1) who are registered to vote in, among others, Mississippi Senate Districts in the DeSoto County area and the Gulfport area (Districts 2 and 48), as well as Mississippi House Districts in the area north of the Golden Triangle (District 22), the Grenada County area (District 34), and the northeast Jackson area (District 64); and (2) whose constitutional rights were violated by the improper and predominant use of race in drawing those districts' lines, such as by packing or cracking Black voters to achieve particular political ends.

22.   For example, MS NAACP has approximately 300 members who live in the Gulfport area, in and around Senate District 48 under the 2022 maps.  Race predominated in the drawing of district lines in that area, injuring MS NAACP's members in that area, among others.

23.   Plaintiff DR. ANDREA WESLEY is a citizen of the United States and a resident of the State of Mississippi.  She is over the age of 18.  She is a member of MS NAACP and the Forrest County branch of the NAACP.  She is a registered voter in Senate District 45 under the 2022 maps and intends to vote in that district

in future elections.  Dr. Andrea Wesley also resided in Senate District 45 under the previous decade's maps.  Dr. Andrea Wesley identifies as Black.

24.    Plaintiff DR. JOSEPH WESLEY is a citizen of the United States and a resident of the State of Mississippi.  He is over the age of 18.  He is a member of MS NAACP and the Forrest County branch of the NAACP.  He is a registered voter in Senate District 45 under the 2022 maps and intends to vote in that district in future elections.  Dr. Joseph Wesley also resided in Senate District 45 under the previous decade's maps.  Dr. Joseph Wesley identifies as Black.

25.    Plaintiff ROBERT EVANS is a citizen of the United States and a resident of the State of Mississippi.  He is over the age of 18.  He is a member of MS NAACP and the Forrest County branch of the NAACP.  He is a registered voter in Senate District 45 under the 2022 maps and intends to vote in that district in future elections.  Mr. Evans also resided in Senate District 45 under the previous decade's maps.  Mr. Evans identifies as Black.

26.    The 2022 maps dilute the voting strength of Black voters in the Hattiesburg area.  By being placed in Senate District 45 under the enacted 2022 maps, Dr. Andrea Wesley, Dr. Joseph Wesley, and Mr. Evans are among the Black voters whose votes have been diluted because they were placed in a predominantly white district in which Black voters will be denied an opportunity

to elect candidates of choice due to white bloc voting against Black-preferred candidates. Dr. Andrea Wesley, Dr. Joseph Wesley, and Mr. Evans live in census blocks that can be added to a new alternative majority-Black district anchored in Hattiesburg while preserving a version of the existing Black-majority Senate District 34 centered in Jasper County and the City of Laurel. Were Dr. Andrea Wesley, Dr. Joseph Wesley, and Mr. Evans to be placed in this alternative Black-majority district, their votes would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice.

27.    Plaintiff GARY FREDERICKS is a citizen of the United States and the State of Mississippi. He is over the age of 18. He is a member of MS NAACP and the current President of the Gulfport branch of the NAACP. He is a registered voter in Senate District 48 under the 2022 maps. He intends to vote in this district in future elections. Under the previous decade's maps, Mr. Fredericks was also in Senate District 48. Mr. Fredericks identifies as Black.

28.    As enacted under the 2022 maps, Mr. Fredericks is injured by being placed in a district in which the lines were drawn based on race without any proper justification. The 2022 maps crack the City of Gulfport and its growing, diverse population along racial lines. The boundary line between Senate District 48 and Senate District 49 appears to be calibrated to push Black voters out of

Senate District 48 and into Senate District 49. The resulting district lines reduce the Black voting age population ("BVAP") percentage in Senate District 48 from 36.3% in 2012 to 28.6% in 2022.

29.   Plaintiff PAMELA HAMNER is a citizen of the United States and the State of Mississippi. She is over the age of 18. She is a registered voter in the newly enacted Senate District 2. She intends to vote in this district in future elections. Under the previous decade's maps, Ms. Hamner was in Senate District 1. Ms. Hamner identifies as Black.

30.   As enacted under the 2022 maps, Ms. Hamner is injured by being placed in a district in which the lines were drawn based on race without any proper justification. The 2022 maps crack the diverse and growing Memphis suburbs in DeSoto County. The boundary lines between Senate District 2 and Senate Districts 1 and 11 appear to be precisely drawn to push Black voters out of Senate District 2. The resulting district lines, which are less compact than before, reduce the BVAP percentage from 39.6% in 2012 to 32.9% in 2022.

31.   Plaintiff BARBARA FINN is a citizen of the United States and the State of Mississippi. She is over the age of 18. She is a registered voter in Senate District 1 under the 2022 maps and intends to vote in that district in future

elections.  Under the previous decade's maps, Ms. Finn was in Senate District 2. Ms. Finn identifies as Black. 32

32.   The 2022 maps dilute the voting strength of Black voters in the Horn Lake area.  By being placed in Senate District 1 under the enacted 2022 maps, Ms. Finn is among the Black voters whose votes have been diluted because they were placed in a predominantly white district in which Black voters will be denied an opportunity to elect candidates of choice due to white bloc voting against Black-preferred candidates.  Ms. Finn lives in a census block that can be added to a new alternative majority-Black district anchored in Horn Lake, while still preserving the nearby Senate District 11 as a separate, North Delta–based Black-majority district.  Were Ms. Finn to be placed in this alternative Black-majority district, her vote would not be diluted, and she would have a reasonable opportunity to elect her candidate of choice

33.   Plaintiff OTHO BARNES is a citizen of the United States and the State of Mississippi.  He is over the age of 18.  He is a member of MS NAACP and the Jefferson Davis County branch of the NAACP.  He is a registered voter in Senate District 35 under the 2022 maps and intends to vote in that district in future elections.  Under the previous decade's maps, Mr. Barnes was in Senate District 41.  Mr. Barnes identifies as Black.

14

34.    Plaintiff SHIRLINDA ROBERTSON is a citizen of the United States and the State of Mississippi.  She is over the age of 18.  She is a registered voter in Senate District 35 under the 2022 maps and intends to vote in that district in future elections.  Under the previous decade's maps, Ms. Robertson was also in Senate District 35.  Ms. Robertson identifies as Black.

35.    The 2022 maps dilute the voting strength of Black voters in and around the area where Senate District 35 is drawn.  By being placed in Senate District 35 under the 2022 maps, Mr. Barnes and Ms. Robertson are among the Black voters whose votes have been diluted because they have been placed in a predominantly white district in which Black voters will be denied an opportunity to elect candidates of choice due to white bloc voting against Black-preferred candidates.  Mr. Barnes and Ms. Robertson live in census blocks that can be added to a new alternative Black-majority district anchored in Copiah, Simpson, and Jefferson Davis counties.  Were Mr. Barnes and Ms. Robertson to be placed in this alternative Black-majority district, their votes would not be diluted and they would have a reasonable opportunity to elect their candidates of choice.

36.    Plaintiff MARCELEAN ARRINGTON is a citizen of the United States and the State of Mississippi.  She is over the age of 18.  She is a member of MS NAACP.  She is a registered voter in House District 84 under the 2022 maps and

intends to vote in that district in future elections.  Ms. Arrington was in House District 79 under the previous decade's maps. Ms. Arrington identifies as Black.

37.    The 2022 maps dilute the voting strength of Black voters in and around Jasper and Clarke counties.  By being placed in House District 84 under the 2022 maps, Ms. Arrington is among the Black voters whose votes have been diluted because they have been placed in a predominantly white district in which Black voters will be denied an opportunity to elect candidates of choice due to white bloc voting against Black-preferred candidates.  Ms. Arrington lives in a census block that can be added to a new alternative majority-Black House District 84 anchored in Jasper and Clarke counties while preserving a more compact version of existing majority-Black House District 80 based in the City of Laurel.  Were Ms. Arrington to be placed in this alternative majority-Black district, her vote would not be diluted, and she would have a reasonable opportunity to elect her candidate of choice.

38.    SANDRA SMITH is a citizen of the United States and the State of Mississippi.  She is over the age of 18.  She is a registered voter in the newly enacted House District 34.  She intends to vote in this district in the future.  Under the previous decade's maps, Ms. Smith was also in House District 34.  Ms. Smith identifies as Black.

16

39.    As enacted under the 2022 maps, Ms. Smith is injured by being placed in a district in which the lines were drawn based on race without any proper justification.  The 2022 maps cracked Black voting populations in and around Grenada County, packing them into neighboring districts.  For example, the boundary lines between House District 34 and surrounding Districts 30, 47, and 51 appear to be drawn to push Black voters out of House District 34.  The resulting district lines reduce the BVAP percentage from 60.5% to 31.6%.

40.    DEBORAH HULITT is a citizen of the United States and the State of Mississippi. She is over the age of 18.  She is a member of MS NAACP.  She is a registered voter in House District 56 under the 2022 maps and intends to vote in that district in the future.  Under the previous decade's maps, Ms. Hulitt was in also in House District 56.  Ms. Hulitt identifies as Black.

41.    The 2022 maps dilute the voting strength of Black voters in and around the city of Clinton.  By being placed in House District 56 under the 2022 maps, Ms. Hulitt is among the Black voters whose votes have been diluted because they were placed in predominantly white districts in which Black voters will be denied an opportunity to elect candidates of choice due to white bloc voting against Black-preferred candidates.  Ms. Hulitt lives in a census block that can be added to a new alternative majority-Black House District 56 anchored in and around

17

western Madison and Hinds Counties while preserving existing Black-majority House Districts 63 and 70. Were Ms. Hulitt to be placed in this alternative majority-Black district, her vote would not be diluted, and she would have a reasonable opportunity to elect her candidate of choice.

42.    DR. KIA JONES is a citizen of the United States and the State of Mississippi. She is over the age of 18. She is a member of MS NAACP. She is a registered voter in House District 64 under the 2022 maps and intends to vote in that district in the future. Dr. Jones identifies as Black.

43.    Plaintiff ANGELA GRAYSON is a citizen of the United States and the State of Mississippi. She is over the age of 18. She is a registered voter in House District 64 under the 2022 maps. She intends to vote in this district in future elections. Ms. Grayson identifies as Black.

44.    As enacted under the 2022 maps, Dr. Jones and Ms. Grayson are injured by being placed in a district in which the lines were drawn based on race without any proper justification. The 2022 maps suppressed the BVAP of House District 64 by adding white voters from areas that previously belonged to House Districts 65 and 70. The boundary line between House District 64 and House District 65 also appears to be drawn to push Black voters out of House District 64. The resulting district lines reduce the BVAP percentage from 38% to 31%.

45.   VICTORIA ROBERTSON is a citizen of the United States and the State of Mississippi.  She is over the age of 18.  She is a registered voter in Senate District 17 under the 2022 maps and intends to vote in that district in the future.  Under the previous decade's maps, Ms. Robertson was also in Senate District 17.  Ms. Robertson identifies as Black.

46.   The 2022 maps dilute the voting strength of Black voters in and around Oktibbeha, Lowndes, and Clay Counties (i.e., the Golden Triangle area).  By being placed in Senate District 17 under the 2022 maps, Ms. Robertson is among the Black voters whose votes have been diluted because they were placed in predominantly white districts in which Black voters will be denied an opportunity to elect candidates of choice due to white bloc voting against Black-preferred candidates.  Ms. Robertson lives in a census block that can be added to a new alternative majority-Black Senate District 17 anchored in and around Aberdeen and Columbus while preserving Black-majority Senate Districts 16 and 32.  Were Ms. Robertson to be placed in this alternative majority-Black district, her vote would not be diluted, and she would have a reasonable opportunity to elect her candidate of choice.

47.   RODESTA TUMBLIN is a citizen of the United States and the State of Mississippi.  She is over the age of 18.  She is a member of MS NAACP.  She is

a registered voter in House District 22 under the 2022 maps and intends to vote in that district in the future.  Under the previous decade's maps, Ms. Tumblin was also in House District 22.  Ms. Tumblin identifies as Black.

48.    The 2022 maps dilute the voting strength of Black voters in and around the area north of the Golden Triangle, including Chickasaw County.  By being placed in House District 22 under the 2022 maps, Ms. Tumblin is among the Black voters whose votes have been diluted because they were placed in predominantly white districts in which Black voters will be denied an opportunity to elect candidates of choice due to white bloc voting against Black-preferred candidates.  Ms. Tumblin lives in a census block that can be added to a new alternative majority-Black House District 22 anchored in the Chickasaw and Monroe Counties while preserving Black-majority House Districts 16 and 36. Were Ms. Tumblin to be placed in this alternative majority-Black district, her vote would not be diluted, and she would have a reasonable opportunity to elect her candidate of choice.

49.    Defendant THE STATE BOARD OF ELECTION COMMISSIONERS is the state body responsible for overseeing the conduct of its elections and implementing election laws and regulations, including the State House and State

Senate districts at issue in this litigation.  *See Thomas v. Bryant*, 366 F. Supp. 3d 786, 801 (S.D. Miss. 2019).

50.   Defendant TATE REEVES is the Governor of the State of Mississippi and is a member of the State Board of Election Commissioners ("SBEC") pursuant to Miss. Code Ann. § 23-15-211 (Rev. 2018).  He is sued in his official capacity.

51.   Defendant LYNN FITCH is the Attorney General of the State of Mississippi and is a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211 (Rev. 2018).  She is sued in her official capacity.

52.   Defendant MICHAEL WATSON is the Secretary of State of the State of Mississippi and a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211 (Rev. 2018).  He is sued in his official capacity

## LEGAL BACKGROUND

53.   The Voting Rights Act of 1965 (the "VRA") is a landmark federal statute that was enacted to replace the disenfranchisement and racial discrimination of the Jim Crow era with a true multi-racial democracy.

54.   The VRA prohibits any state law or practice "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).   Section 2 of the VRA bars any

redistricting scheme whereby members of a racial minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

55.    As Congress made clear when it amended the VRA in the 1980s, a Section 2 claim may be established based on either discriminatory intent or on discriminatory *results*.  *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Under that latter approach, a court needs determine only whether the *result* of a challenged redistricting plan is the dilution of minority political strength, regardless of any intent.

56.    Courts applying Section 2's results-based standard rely on the test laid out in the Supreme Court's *Gingles* decision.   Under the *Gingles* standard, a plaintiff challenging a redistricting scheme as a dilution of minority voting strength must first show that three preconditions are met:  (1) the racial minority group or groups are sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes as a bloc such that it will usually defeat the minority group's preferred candidate.  478 U.S. at 49–51.

57.    When all three *Gingles* preconditions are established, Section 2 vote-dilution claims require courts to undertake "[a] totality of circumstances" analysis

to determine whether members of a racial minority "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).  The requisite "totality of circumstances" analysis is guided by factors enumerated by Congress in a Senate Report that accompanied the 1982 amendment to the VRA (the "Senate Factors").

58.   The Fourteenth Amendment to the U.S. Constitution separately prohibits the improper use of race in the districting process.  If direct or circumstantial evidence shows that race was the predominant factor in a state's districting decisions, then the district is subject to strict scrutiny whereby such state must "prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end."  *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017).

## FACTUAL BACKGROUND

### A.  MISSISSIPPI'S BLACK POPULATION AND THE HISTORY OF VOTING DISCRIMINATION IN MISSISSIPPI

59.   Mississippi's population is almost 38% Black—the highest percentage of any state in the nation—and sizable Black communities exist throughout the State.  Those communities include several areas in which the Black population is

especially numerous and concentrated, such as the Mississippi Delta, the Jackson Metro area, the DeSoto County area, the Hattiesburg area, and in and around the Golden Triangle area, among others.

60.   Mississippi is also growing more diverse each year.  Over the last decade, according to the 2020 Census, the State's Black population increased by around 20,000, with a BVAP percentage of approximately 36%.  At the same time, the white population declined by around 50,000 overall, to approximately 58% of the voting age population.  The Asian and Hispanic populations in Mississippi have also increased since 2010.  Those changes were particularly notable in, among other areas, the Jackson Metro area, the Memphis suburbs in Northern Mississippi in and around DeSoto County, certain cities in the Golden Triangle area (such as Columbus and Starkville), the Hattiesburg metro area, and the Gulf Coast region—all of which saw increases and/or further concentration of the BVAP over the last decade.  Each of these areas have been impermissibly impacted by the unlawful new maps.

61.   Despite Mississippi's sizable Black population, Black Mississippians have been shut out of political power for most of the State's history.  Before the Civil War, Black Mississippians were enslaved.  After Reconstruction and the passage of Mississippi's 1890 Constitution, Black Mississippians were subject to

a complete prohibition from politics as part of the Jim Crow regime.  Throughout much of this period of total disenfranchisement, from at least the 1830s until the 1930s and the Great Migration, Black Mississippians have comprised most of the State's population.

62.   Even after the passage of the VRA in 1965—landmark legislation for which Mississippians organized, fought, and in some cases died—the State continued to manipulate electoral processes for years to keep Black Mississippians from obtaining the ballot and fair representation, including through discriminatory at-large districting schemes, dual registration systems, unfair candidate qualification requirements, and other mechanisms.  Mississippi has been successfully sued multiple times for violating the voting rights of its Black citizens by using the districting process to dilute Black voting strength and deny Black communities an equal opportunity to elect candidates of their choice.

63.   Due to persistent and overwhelming racial polarization in voting, and notwithstanding the State's sizable Black population, no Black Mississippian has ever been elected to statewide office in the 132 years since the adoption of the State's 1890 Constitution.  No Black Mississippian has ever served as Speaker of the House or President Pro Tempore of the Senate.  Black candidates are rarely elected to legislative office in Mississippi outside of Black-majority districts.

## B. Mississippi's 2021–2022 Redistricting Process

64.    Following the 2020 Census, Mississippi was obligated to draw new legislative district lines.

65.    This redistricting cycle is the first full cycle in over fifty years that will have occurred without advance approval from the United States Department of Justice ("DOJ"), which had previously conducted such oversight pursuant to the preclearance process under Section 5 of the VRA in "covered jurisdictions," such as Mississippi, with significant histories of racial discrimination in voting.

66.    The Mississippi Legislature's Standing Joint Legislative Committee on Reapportionment and Redistricting ("Joint Committee") is the State body responsible for drawing legislative district lines in accordance with the 2020 U.S. Census data.  The Joint Committee first released its re-drawn district maps in summer 2021.

67.    During the ensuing redistricting cycle, the Joint Committee never gave the public any advance opportunity to review or comment on its proposed maps prior to their approval and submission to the Legislature.  The Joint Committee, as a body, held only a total of four official meetings.  These meetings, which lasted approximately fifty-eight minutes in total, were largely perfunctory affairs to announce decisions made behind closed doors.

26

68.   The first Joint Committee meeting, in June 2021, involved administrative formalities.

69.   In November 2021, the Joint Committee held its second official public meeting to vote on and adopt redistricting criteria for the map-drawing process. That meeting lasted about ten minutes.  For State legislative districts, the criteria adopted by the Joint Committee specified that district population deviations should be less than 5% above or below the ideal population of the district, districts should be contiguous, and the redistricting plan should comply with all applicable state and federal laws, including Section 2 of the VRA and the Mississippi Constitution and U.S. Constitution.  The Mississippi Code further specifies that "[e]very district shall be compact and composed of contiguous territory and the boundary shall cross governmental or political boundaries the least number of times possible," and that "[d]istricts shall be structured, as far as possible and within constitutional standards, along county lines; if county lines are fractured, then election district lines shall be followed as nearly as possible." Miss. Code § 5-3-101.

70.   In December 2021 the Joint Committee held its third public meeting to adopt a U.S. congressional redistricting map.  That meeting lasted about fifteen minutes.  The proposed congressional map was approved by the full State House

on January 6, 2022, two days after the beginning of the legislative session.  The State Senate approved the plan the following week, after which Defendant Governor Reeves signed it into law.

71.    Months passed with no meetings or public release of any further information from the Joint Committee regarding state legislative districts.

72.    The 2022 legislative session was calendared to end no later than April 5, 2022.  On Sunday, March 27, 2022, the Joint Committee held its final meeting and revealed to the public proposed maps for both the Mississippi State Senate and State House.

73.    That morning, Defendant Reeves tweeted, "Legislative redistricting maps are scheduled to be unveiled today - for the 1st time publicly! … Any plan that reduces the number of districts where Republicans can compete in favor of more easy Democrat wins should not be proposed - much less approved - by either chamber of the Legislature."

74.    The same day at 5:00 p.m., the Joint Committee held its fourth public meeting.  The Joint Committee voted to adopt a proposed State House map, with Representative Bo Brown, a Black representative, voting against the map.  The Joint Committee also voted to adopt a proposed State Senate map.  The meeting was over in a matter of minutes.

75.    Two days later, on March 29, the full State House voted to adopt the House districting plan, and the full State Senate voted to adopt the Senate districting plan.  Most of the Legislature's Black representatives and senators voted against adoption of these plans and some criticized them in the brief floor debate that was allowed on the issue.

76.    For example, during the March 29 House debate, Representative Robert Johnson introduced an amendment with a proposed map that showed it was possible to have an additional five majority-Black districts in the State House. Representative Johnson explained that the Joint Committee's plan packed the Black population into fewer Black-majority districts and diluted Black Mississippians' voting strength and explained that his amendment demonstrated an alternative that would avoid those results.  Representative Johnson also noted that he had consulted other Black representatives who "constantly feel locked out of the process."   The House did not take the time to review Representative Johnson's amendment.  Instead, after less than fifteen minutes of discussion, the House rejected the amendment by a vote of seventy-seven to thirty-nine.  Shortly thereafter, the House approved the Joint Committee's initial proposed map by a vote of eighty-one to thirty-seven.

77.    During the March 29 Senate debate, Senator Derrick Simmons introduced an amendment with a proposed map that included an additional four majority-Black districts in the State Senate, noting that "a map that maintains the status quo simply dilutes Black voting strength in Mississippi."  In response, Senator Dean Kirby, the vice-chair of the Joint Committee, told the Senate, "this is not a map that this State needs."  Without any further questions, comments, or debate, and after only about two minutes of discussion about this amendment, the Senate voted down the amendment.  The Senate eventually approved the Joint Committee's initial proposed map by a vote of forty-five to seven.

78.    On March 31, 2022, days after the proposed maps were first revealed to the public, the House approved the Senate plan without debate, and the Senate approved the House plan without debate.  Since state legislative redistricting is accomplished through resolutions rather than bills, Defendant Governor Reeves did not need to sign or veto the State House and State Senate plans, which became law, with virtually no transparency or opportunity for public scrutiny, within days of being made public.

### C. MISSISSIPPI'S MAPS DILUTE BLACK VOTING STRENGTH AND VIOLATE THE U.S. CONSTITUTION

#### 1. The Challenged Senate Districts

79.     Mississippi's Black population is sufficiently numerous and geographically compact to comprise most of the voting age population in ***at least*** four additional State Senate districts in areas where the State failed to draw a Black-majority district.  In each of those areas, there is persistent and extreme racial polarization such that, despite Black voters voting cohesively, their candidates of choice will typically be defeated by white bloc voting under the State's enacted Senate plan.  Moreover, in a number of State Senate districts included in the 2022 maps, voters' race was a predominant factor in the district's configuration.

80.     **DeSoto County Area Senate District:**  The Black population in and around DeSoto County and the Memphis suburbs, specifically in and around the area where enacted Senate District ("SD") 2 was drawn, is sufficiently numerous and compact to support an additional Black-majority Senate district.  However, the Mississippi Legislature approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength and deploying

irregular district lines that are inconsistent with traditional redistricting principles.



**SD 2: Previous 2010 Cycle Senate Map shaded by BVAP at the district level**



**SD 2: Enacted 2022 Senate Map shaded by BVAP at the district level**

81.   The enacted 2022 maps include four districts that touch DeSoto County: SDs 1, 2, 11, and 19. That cluster includes one majority-Black district, SD 11—but SD 11 is mostly outside of DeSoto County and is anchored in the North Delta counties of Tate, Tunica, Quitman, and Coahoma, unlike the other SDs in the DeSoto County cluster that are contained entirely within DeSoto County. Under the 2022 maps, the populous, diverse, and growing Memphis suburbs along the Tennessee border are carved up between all four of the districts in the cluster, and, under the 2022 maps, there are no Black-majority districts anchored in diverse and fast-growing DeSoto County. However, one of the

33

DeSoto County–based districts, SD 2, can be drawn as a majority-Black district by uniting precincts in the south and southwest Memphis suburbs and bringing Black voters from SD 1 and SD 11 into SD 2.  Drawing this new Black-majority district would still maintain SD 11 as a separate, North Delta–based Black majority district.

82.    The Senate districts in the DeSoto County area under the 2022 maps are more irregular in shape and less compact compared to the districts under the prior senate plan.  In the 2022 map depicted above, SD 2 runs from the fast-growing, diversifying, Black-plurality City of Horn Lake in the Memphis suburbs up to the City of Southaven, and then east and south, picking up whiter, less densely populated areas.  The BVAP of the resulting SD 2 in the 2022 maps is under 33%.  Notably, and by contrast, under the prior 2012 map, SD 2 was a more compact rectangular shape and the district's BVAP was approaching 40%.  In the new 2022 map, the State drew a less compact district that diminished Black political strength in the area.

83.    Meanwhile, in neighboring SD 11, which was already majority Black, map drawers added more heavily Black precincts from the northwest corner of DeSoto County, stretching SD 11 from Coahoma County and Quitman County in the North Delta region into DeSoto County, and even picking up precincts

34

from Memphis suburbs like Horn Lake as well.  Black voters were also added to SD 1, which is now near the center of DeSoto County and wraps around the southern and western parts of SD 2, and SD 1 also picked up precincts in Horn Lake and surrounding areas.  With the enacted map, map drawers increased the combined BVAP percentage in SD 1 from 20.5% under the old map to 25% in the new map.

84.   As the precinct-level images below show, the 2022 map thus "cracks" growing populations of Black voters in Horn Lake and other areas, splitting them between three different Senate districts (SDs 1, 2, and 11) and making Black voters a less effective minority population within SD 2, and also unnecessarily packing them into SD 11, the BVAP percentage of which exceeds 60%.  In addition to lowering the BVAP percentage of SD 2, map drawers also increased the white voting age population in SD 2 from 50% in the old map to nearly 58% in the new map.



**SD 2: Previous 2010 Cycle Senate Map shaded by BVAP at the precinct level**



**SD2: 2022 Senate Map shaded by BVAP at the precinct level showing cracking of Horn Lake area**

**Table 1: 2012 DeSoto County Area Map Cluster Demographics**

| District | Total Population | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|----------|------------------|----------------------|--------------------------------|-------------------------------------|
| 1 | 58,854 | 42,781 | 71.33% | 20.50% |
| 2 | 58,820 | 41,837 | 50.60% | 39.64% |
| 11 | 58,529 | 41,431 | 25.28% | 72.74% |
| 19 | 54,279 | 39,206 | 61.70% | 29.82% |

**Table 2: 2022 DeSoto County Area Map Cluster Demographics**

| District | Total Population | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|----------|------------------|----------------------|--------------------------------|-------------------------------------|
| 1 | 56,991 | 42,710 | 65.87% | 25.40% |
| 2 | 57,640 | 43,422 | 57.78% | 32.88% |
| 11 | 54,677 | 40,419 | 33.08% | 62.38% |
| 19 | 54,868 | 40,363 | 66.47% | 25.44% |

85.   In this DeSoto County area cluster of districts, including SD 2, past election results indicate that Black voters vote cohesively for candidates of their choice.  Moreover, in recent elections, racially polarized voting in the area around SD 2 usually exceeds 85% (i.e., more than 85% of Black voters vote for Black-preferred candidates, and more than 85% of white voters vote against such candidates), such that Black-preferred candidates will typically be defeated by white bloc voting in SD 2 as configured despite the cohesive voting.  The State's enacted plan thus dilutes the votes of Black voters in and around Horn Lake and

elsewhere in SD 2 by placing them in a district where they are unable to elect their candidate of choice.

86.    By contrast, a new Black-majority State Senate district could have been drawn in the area to avoid diluting Black voting strength while adhering to traditional districting principles.    Specifically, a new Black-majority Senate district could have been drawn that would have been anchored in DeSoto County, in and around where SD 2 was drawn, and could have included Horn Lake as well as immediately neighboring areas in the northern Mississippi Delta, such as Tunica County, while still maintaining a majority-Black SD 11 anchored in the Delta.    Under this alternative configuration, there would be a Black-majority Senate district anchored in DeSoto County in which Black voters would have reasonable opportunity to elect candidates of choice, notwithstanding the existence of racially polarized voting.

87.    The configuration of SD 2 indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles.  As noted, in the new 2022 map the State reconfigured SD 2, cutting Black voters out of the district to diminish Black voters' influence, dividing the most heavily Black precincts among three

different Senate districts, cracking Horn Lake, and making SD 2 visibly less compact in the process.  Map drawers extended the shape of SD2 even though SD 2 was overpopulated according to the 2020 Census (i.e., it needed to reduce population to equalize population across districts).  Notably, these changes, including the cracking of Horn Lake, were made after a Black challenger based in Horn Lake prevailed in a close election against a white incumbent in an overlapping DeSoto County House district in 2019.   The use of race as a predominant factor was not required in order to serve any compelling governmental interest.

88.   **Golden Triangle Area Senate District:**  The Black population in and around the Golden Triangle area, specifically in and around the area where enacted Senate District 17 was drawn, is sufficiently numerous and compact to support an additional Black-majority Senate district.  However, the 2022 maps carve up the large, cohesive Black communities in this region, diluting Black voting strength and deploying irregular district lines that are inconsistent with traditional redistricting principles.



**SD 17: Enacted 2022 Senate Map shaded by BVAP at the district level**

89.    Under the 2022 maps, the area in and around Oktibbeha, Lowndes, and

Clay counties (whose major cities form the so-called "Golden Triangle") includes

SDs 7, 8, 15, 16, and 17.  That cluster includes one majority-Black district, SD

16.  The other districts in the cluster are all majority white.  However, SD 17

could have been drawn as an additional majority-Black district in this cluster to

40

avoid diluting Black voting strength, while adhering to traditional districting principles, by bringing in Black voters from SDs 7 and 16.

90.   SD 16 includes parts of Clay, Oktibbeha, Noxubee, and Lowndes counties.  SD 16 was already a majority Black district in the prior map, and the 2022 maps further pack Black voters into that district, increasing the BVAP percentage of the district by 2.5 percentage points to a total of approximately 63 percentage points.

91.   Because Black voters are packed into SD 16, their voting power in surrounding areas is cracked.  Black voting strength is cracked across SD 7, which covers an adjacent area including the northern, western, and southwestern portions of Monroe County, and SD 17, which includes adjacent areas covering southeastern Monroe and most of Lowndes County—minus a central slice of Columbus, the county seat and a major Black population center.  The combined BVAP percentage in SD 7 under the 2022 maps is approximately 40%.  The combined BVAP of SD 17 is approximately 30%.  White voting age population percentage in SD 17 increased by 2.7 percentage points from 62.77% to over 65% under the 2022 map.

**Table 3: 2022 Senate Plan – Golden Triangle District Cluster Demographics**

| District | Total Population | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|----------|------------------|----------------------|--------------------------------|-------------------------------------|
| 7 | 56,427 | 43,252 | 56.21% | 40.08% |
| 8 | 59,525 | 46,202 | 65.82% | 29.72% |
| 15 | 54,122 | 44,109 | 68.28% | 26.07% |
| 16 | 54,158 | 42,060 | 33.75% | 63.06% |
| 17 | 54,117 | 42,630 | 65.43% | 29.48% |

92.   Recent elections demonstrate that Black voters in the area vote cohesively for preferred candidates.  Moreover, in recent elections, racially polarized voting in the area usually exceeds 85% (i.e., more than 85% of Black voters vote for Black-preferred candidates, and more than 85% of white voters vote against such candidates).  As a result, Black-preferred candidates will typically be defeated by white bloc voting in SD 17 as configured despite the cohesive voting.  The State's enacted plan thus dilutes the votes of Black voters in SD 17 by placing them in a district where they are unable to elect their candidates of choice despite their cohesive voting.

93.   By contrast, an additional Black-majority State Senate district could have been drawn in the area to avoid diluting Black voting strength while adhering to traditional districting principles.  Black voters in that area, including

those in Lowndes, Clay, Oktibbeha, and Noxubee counties and nearby areas, are sufficiently numerous that an additional district with a BVAP percentage of at least 54% could have been drawn there. Such an additional majority-Black Senate district could have been drawn consistent with traditional districting principles by "unpacking" the Black population in the northern portions of SD 16, and by "uncracking" the Black population in SDs 7 and 17, including around Columbus, and in Aberdeen and other communities in and around Tupelo. In Plaintiffs' proposed reconfiguration of the districts in this area, SD 17 can be drawn as a majority-Black district. Notably, this configuration could be achieved in a manner that results in districts that are *more* compact than those drawn by the state in the 2022 map. Such a reconfiguration of SD 17 would provide Black voters in the district with a reasonable opportunity to elect their candidate of choice, notwithstanding the existence of racially polarized voting, while preserving the existing Black-majority SD 16 as well as Black-majority SD 32, which is anchored to the south of the Golden Triangle area but includes parts of Noxubee County.

94. **South-Central Mississippi Senate District:** The Black population in Central Mississippi, in and around Jefferson Davis, Simpson, and Copiah counties and surrounding areas, specifically in and around enacted Senate District

35, is sufficiently numerous and compact to support an additional Black-majority

Senate district.  However, the 2022 maps carve up the large, cohesive Black

communities in this region, diluting Black voting strength.



**SD 35: Enacted 2022 Senate Map shaded by BVAP at the district level**

95.    The enacted 2022 maps include a cluster of five Senate districts in the

area of South-Central Mississippi from Claiborne, Copiah, and Simpson counties

south of the City of Jackson down to the Louisiana state line:  SDs 35, 37, 38, 39,

and 41.  That cluster currently contains two majority-Black districts by voting

age population: SDs 37 and 38, both of which sit on the western end of the cluster

along the Mississippi River and the Louisiana border.  However, an additional

44

majority-Black district could have been drawn in this cluster of districts by creating a Black-majority district anchored in Copiah, Simpson, and Jefferson Davis counties, while preserving the existing Black-majority SDs 37 and 38, thereby avoiding the dilution of Black voting strength while adhering to traditional districting principles.

96.    As depicted above, in the 2022 map, SD 35 is a large district covering all of Jefferson Davis and Simpson counties, as well as eastern Copiah and northern Lawrence counties.  The BVAP percentage in SD 35 is 39% in the 2022 map.

97.    Meanwhile, substantial Black populations in neighboring areas are packed into other adjacent districts; for example, the 2022 maps split majority-Black Copiah County between SD 35 and neighboring SD 37.  At the same time, the 2022 maps also pack the sizable Black populations in neighboring Claiborne, Jefferson, and Franklin counties into SD 37, with a resulting BVAP percentage of over 61%.  The BVAP percentage of SD 38, the other Black-majority district in the cluster as drawn in the 2022 maps, is also over 61%.

Table 4: 2022 Senate Plan – South Central Mississippi District Cluster Demographics

| District | Total Population | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|---|---|---|---|---|
| 35 | 58,139 | 44,759 | 57.72% | 39.38% |
| 37 | 59,040 | 46,589 | 34.81% | 61.30% |
| 38 | 59,405 | 46,096 | 36.02% | 61.45% |
| 39 | 59,727 | 45,749 | 68.52% | 28.52% |
| 41 | 59,406 | 45,090 | 66.80% | 29.96% |

98.     Recent elections demonstrate that Black voters in the area vote cohesively for preferred candidates.  Moreover, in recent elections, racially polarized voting in the area usually exceeds 85% (i.e., more than 85% of Black voters vote for Black-preferred candidates, and more than 85% of white voters vote against such candidates).  As a result, Black-preferred candidates will typically be defeated by white bloc voting in SD 35 as configured despite voting cohesively.  The State's enacted plan thus dilutes the votes of Black voters in SD 35 by placing them in a district where they are unable to elect their candidates of choice despite the cohesive voting.

99.     By "unpacking" the Black population in neighboring Senate districts such as SD 37, the area could support a new Black-majority district, drawn consistent with traditional redistricting principles, in roughly the same region as

46

SD 35 and including Jefferson Davis County.   One example of such a configuration could unite Copiah County and include Jefferson Davis County and parts of Simpson County.  Under such an alternative configuration, Black voters in SD 35 would have a reasonable opportunity to elect their candidates of choice, notwithstanding the existence of racially polarized voting.

100. **Hattiesburg Senate District:**  An additional Black-majority Senate district also could have been drawn in Hattiesburg within Forrest County, in and around the area of SDs 34, 44, and 45 under the 2022 maps, avoiding the dilution of Black voting strength while adhering to traditional districting principles.  The Black population in and around Hattiesburg is sufficiently numerous and compact to support an additional Black-majority Senate district.  However, the 2022 maps carve up the large, cohesive Black communities in this area, diluting Black voting strength.



**SD 34: Enacted 2022 Senate Map shaded by BVAP at the district level**

101.  The enacted 2022 maps include a cluster of Senate districts in the swath of Eastern Mississippi in, around, and between the Cities of Hattiesburg and Laurel:  SDs 33, 34, 42, 43, 44, and 45.  That cluster currently contains only one majority-Black district by voting age population: SD 34, which picks up Black populations stretching from Laurel to Hattiesburg.  However, an additional majority-Black district could have been drawn in this cluster of districts by creating a Black-majority district anchored in the City of Hattiesburg, while

48

preserving the existing Laurel-based Black-majority SD 34, avoiding the dilution of Black voting strength while adhering to traditional districting principles.

102. SD 34 includes all of Jasper County and then extends south along the Jones County border to Forrest County, picking up the centers of Laurel and part of Hattiesburg. The rest of Hattiesburg and its core suburbs are divided among SDs 42, 44, and 45, each of which radiates away from Hattiesburg into largely white areas, thereby diluting the voting strength of Black voters in Hattiesburg. SD 44 extends from West Hattiesburg across central and southern Lamar County with a BVAP percentage of approximately 24%. To its east, SD 45 covers much of the outer ring of Hattiesburg, hooking around the city and jutting into downtown from the west, and then extending out to cover the rest of Forrest County as well as Perry County to the east, with an BVAP percentage of approximately 25%. Finally, SD 42 cuts from the eastern edge of Hattiesburg up past the suburb of Petal and then covers the remaining northern portion of Forrest County, as well as the portion of Jones County that excludes Laurel, with a BVAP percentage of 16%.

**Table 5: 2022 Senate Plan – Hattiesburg District Cluster Demographics**

| District | Total Population | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|----------|------------------|----------------------|--------------------------------|-------------------------------------|
| 33 | 54,883 | 42,632 | 68.02% | 27.93% |
| 34 | 56,556 | 43,070 | 38.72% | 56.48% |
| 42 | 59,769 | 44,999 | 76.42% | 16.60% |
| 43 | 55,114 | 42,216 | 72.56% | 23.48% |
| 44 | 55,654 | 41,668 | 68.83% | 23.61% |
| 45 | 59,502 | 47,539 | 68.10% | 25.42% |

103. Recent elections demonstrate that Black voters in the area vote cohesively for preferred candidates.  Moreover, in recent elections, racially polarized voting in this area usually exceeds 85% (i.e., more than 85% of Black voters vote for Black-preferred candidates, and more than 85% of white voters vote against such candidates).  As a result, Black-preferred candidates will typically be defeated by white bloc voting in SDs 42, 44, and 45 as configured despite the cohesive voting.

104. The State's enacted plan thus dilutes the votes of Black voters by unnecessarily placing some of the Black population of the City of Hattiesburg into SD 34 and then cracking the rest of the population among SDs 42, 44, 45, even though the City of Hattiesburg is a sizable, majority-Black city and the metropolitan area could support its own Black-majority district.

105. Consistent with traditional districting principles, the State could have drawn a contiguous and compact majority-Black district in and around Hattiesburg and northwestern Forrest County and still maintained a version of the prior Black-majority SD 34 centered in Jasper County and the City of Laurel to the north. This reconfiguration would improve the compactness of the districts in the area and would provide voters in the alternative district with a reasonable opportunity to elect their candidate of choice, notwithstanding the existence of racially polarized voting.

106. As indicated in the previous paragraphs, several additional majority-Black senate districts could have been drawn in 2022 consistent with traditional districting principles to prevent vote dilution, but they were not drawn. After the 2010 Census, the State drew fifteen Black-majority Senate districts out of the total number of fifty-two districts. After the 2020 Census, the State kept the level at fifteen even though the BVAP percentage in Mississippi had increased to 36%. Thus, only 29% of the Senate districts have a Black majority. Black senators have been elected in fourteen of the fifteen districts. No Black senators have been elected from the remaining thirty-seven majority-white districts.

107. **Gulfport Senate District:** Race was the predominant factor in the drawing of State Senate District 48 ("SD 48").



**SD 48/49: Previous 2010 Cycle Senate Map shaded by BVAP at the district level**



**SD 48/49: Enacted 2022 Senate Map shaded by BVAP at the district level**

108. As depicted above, under the previous Senate map, SD 48 covered much of the City of Gulfport and was located entirely in Harrison County. By 2020, the district had grown and diversified, with its BVAP percentage rising to over 36%, and its minority VAP percentage (that is, the percentage of the voting age population that is not non-Hispanic white) increasing to almost 47%.

109. In response to this diversification, and to prevent new political competition, the State cracked the City of Gulfport and its diverse population between SD 48 and neighboring Senate District 49 ("SD 49").

110. Even though SD 48 was overpopulated according to the 2020 Census (i.e., it needed to reduce population in order to equalize population across districts), the 2022 map expanded the geographic size of the district, drawing it westward across Harrison County and over the Hancock County line, grabbing up new, largely white precincts in southwestern Harrison County and near Bay Saint Louis in Hancock County. Meanwhile, the 2022 maps also moved multiple predominantly Black precincts from the center of Gulfport into neighboring SD 49. These changes are shown in the below images at the precinct level. The BVAP percentage of the new, more sprawling SD 48 is approximately 29%, a seven-point drop, and the minority VAP percentage was similarly cut back to 39%. Meanwhile, the remainder of Gulfport was subsumed into SD 49, which

53

also has a 29% BVAP percentage. Notably, these changes were made after a Black candidate based in Gulfport narrowly lost a close election against a white incumbent in SD 48 in 2019.



**SD 48/49: Previous 2010 Cycle Senate Map shaded by BVAP at the precinct level**



**SD 48/49: Enacted 2022 Senate Map shaded by BVAP at the precinct level**

**Table 6: 2012 Senate Plan – Gulfport District Cluster Demographics**

| District | Total Population | Population Deviation (%) | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|---|---|---|---|---|---|
| 48 | 58,961 | 3.33% | 43,721 | 53.30% | 36.33% |
| 49 | 57,821 | 1.33% | 43,999 | 67.81% | 21.07% |

**Table 7: 2022 Senate Plan – Gulfport District Cluster Demographics**

| District | Total Population | Population Deviation (%) | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|---|---|---|---|---|---|
| 48 | 58,933 | 3.49% | 45,511 | 60.95% | 29.40% |
| 49 | 59,739 | 4.90% | 46,247 | 59.96% | 28.61% |

111. The precinct-level images below show the removal of more diverse, higher-BVAP precincts from the core of Gulfport out of the district even as the district was drawn westward across county lines.



**SD 48/49: Previous 2010 Cycle Senate Map shaded by BVAP at the precinct level**



**SD 48/49: Enacted 2022 Senate Map shaded by BVAP at the precinct level**

112.   The configuration of SDs 48 and 49 indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters and/or voters from other racial minority groups to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles such as compactness.  This was not a situation where race was properly employed in a manner narrowly tailored to any compelling state interest.

2.   The Challenged House Districts

113.   Mississippi's Black population is sufficiently large and geographically compact to comprise the majority of the voting age population in *at least* three State House districts that the State failed to draw.  Each of the districts challenged under Section 2 of the VRA was drawn in an area where there is persistent and extreme racial polarization such that, despite Black voters voting cohesively, their candidates of choice will typically be defeated by white bloc voting under the State's enacted House plan.  Moreover, in several additional State House districts, as detailed below, voters' race was a predominant factor in the district's configuration and was employed in a manner that was not narrowly tailored to any compelling state interest.

114. **Western Jackson Metro House District near Clinton:** The Black population in and around Western Hinds and Madison counties near Clinton, specifically in and around enacted House District ("HD") 56, is sufficiently numerous and compact to support an additional Black-majority House district. However, the Legislature approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength.



**HD 56: Enacted 2022 House Map shaded by BVAP at the district level along with other Western Hinds County districts**

**Table 8: 2022 House Plan – Western Hinds County District Cluster Demographics**

| District | Total Population | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|---|---|---|---|---|
| 56 | 25,330 | 19,609 | 69.20% | 22.97% |
| 63 | 24,499 | 19,950 | 37.85% | 58.91% |
| 70 | 23,913 | 18,272 | 13.2% | 83.2% |

115.  The enacted 2022 maps include a cluster of House districts anchored in the western portion of majority-Black Hinds County:  HDs 56, 63, and 70. Under the enacted plan, HDs 63 and 70 are majority-Black but HD 56 is not.  However, HD 56 could have been drawn as an additional majority-Black district by bringing in Black voters from surrounding districts—and doing so would have improved the compactness of the districts in the area.

116.  As shown below, under the 2022 map, HD 56 stretches from the diverse and growing City of Clinton in central Hinds County north to the Madison County line, and then crosses the county line and moves east to pick up a number of majority-white precincts in Madison County.  The portion of HD 56 in Hinds County cracks Clinton, which is divided between multiple districts, and then runs up to Madison County while avoiding various majority-Black precincts in Northern Hinds County.  HD 56 has a combined BVAP percentage of about 23%.

Map drawers increased the white voting age population percentage from nearly 65% under the prior map to 69% in the 2022 enacted maps.

117. Meanwhile, substantial Black populations in neighboring areas are packed into other adjacent districts to an extreme extent, especially in adjacent districts HD 70, which includes much of the rest of the City of Clinton and has a BVAP percentage of more than 83%, as well as HD 69, which has more than a 90% BVAP percentage. The enacted 2022 map thereby "cracks" the Black population left in HD 56.



**HD 56: Enacted 2022 House Map shaded by BVAP at the district level**

118. Recent elections demonstrate that Black voters in the area vote cohesively for preferred candidates. Moreover, in recent elections, racially polarized voting in the area regularly exceeds 85% (i.e., more than 85% of Black voters vote for Black-preferred candidates, and more than 85% of white voters vote against such candidates). As a result, Black-preferred candidates will typically be defeated by white bloc voting in HD 56 as configured, despite the cohesive voting. The State's enacted plan thus dilutes the votes of Black voters by placing them in a district where they are unable to elect their candidate of choice.

119. By "unpacking" the Black population in neighboring House districts, the State could have drawn an additional majority-Black House district in the region in and around western Madison and Hinds counties, consistent with traditional districting principles, thereby preventing vote dilution. The failure to draw an additional Black-majority district in this area violates the VRA.

120. For example, the State could have drawn an additional majority-Black HD 56 with a nearly 59% BVAP percentage as part of the Western Hinds cluster, in a more compact shape than under the 2022 maps. Under this alternative configuration, Black voters in HD 56 would have reasonable opportunity to elect

their candidates of choice, notwithstanding the existence of racially polarized voting.

121. **Golden Triangle Area House District:**  The Black population in and around the area north of the Golden Triangle, specifically in and around enacted HD 22 and in, around, and between the Cities of West Point and Tupelo, is sufficiently numerous and compact to support an additional Black-majority House district.  However, the Mississippi Legislature approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength and deploying irregular district lines that are inconsistent with traditional redistricting principles.



**HD 22: Previous 2010 Cycle House Map shaded by BVAP at the district level**



**HD 22: Enacted 2022 House Map shaded by BVAP at the district level**

122.  As shown above, the enacted 2022 maps include a cluster of House districts stacked roughly vertically between West Point and Tupelo, north of the so-called Golden Triangle area:  HDs 16, 17, 22, and 36.  Under the enacted plan, HDs 16 and 36 are majority-Black, but HDs 17 and 22 (like all the other nearby districts in Northeast Mississippi outside this cluster) are majority-white. However, HD 22 could have been drawn as an additional majority-Black district by "unpacking" the surrounding districts, avoiding the dilution of Black voting strength while adhering to traditional districting principles.

123.  In the 2022 map, HD 22 covers southeastern Pontotoc County, western and central Chickasaw County, and western and north central Monroe County. The district noticeably carves up Chickasaw County (compared to the prior maps, which kept the county whole), including a carveout in northeastern Chickasaw County, near the City of Okolona, that stretches north and east toward the Nettleton and Shannon municipalities that are in majority-Black HD 16. HD 22 has a combined BVAP percentage of under 30%.

124. Under the prior House plan, as shown above, HD 22 was a more compact district.  The prior district included eastern Pontotoc County near the Longview area and stretched south to include all of Chickasaw County, with a

BVAP percentage of 37%.  The new district boundaries resulted in a decrease in BVAP of approximately seven percentage points.

125.  The new HD 22 has a white voting age population percentage of approximately 66%, an increase of over seven percentage points from the 2012 map.

126.  Meanwhile, substantial Black populations in neighboring areas are packed into adjacent districts; for example, the State packed the sizable Black populations in the northeastern corner of Chickasaw County, the northwestern corner of Monroe County, and the southern portion of Lee County into HD 16 (a BVAP percentage over 62%).  Similarly, map drawers packed the sizeable populations in southeast Chickasaw County, Clay County and southwest Monroe County into HD 36 (a BVAP percentage over 61%).  The enacted 2022 maps thereby "crack" the Black population left in HD 22.

**Table 9: 2012 House Plan – Golden Triangle Area District Cluster Demographics**

| District | Total Population | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|----------|------------------|----------------------|----------------------------------|--------------------------------------|
| 16 | 23,164 | 16,435 | 34.66% | 60.51% |
| 17 | 23,280 | 17,410 | 67.61% | 25.85% |
| 22 | 23,986 | 17,767 | 58.61% | 37.04% |
| 36 | 23,134 | 17,069 | 32.36% | 65.77% |

**Table 10: 2022 House Plan – Golden Triangle Area District Cluster Demographics**

| District | Total Population | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|----------|------------------|----------------------|----------------------------------|--------------------------------------|
| 16 | 24,962 | 18,884 | 33.49% | 62.29% |
| 17 | 23,560 | 18,177 | 68.37% | 25.10% |
| 22 | 23,854 | 18,263 | 65.88% | 29.86% |
| 36 | 23,869 | 18,815 | 36.80% | 61.18% |

127. The zoomed-in images below show how map drawers carved off largely Black precincts in Chickasaw County from HD 22 while taking the district over the Monroe County line to pick up predominantly white precincts there, dropping the BVAP of the district by over seven percentage points.



**HD 22: Previous 2010 Cycle House Map shaded by BVAP at the precinct level**



**HD 22: Enacted 2022 House Map shaded by BVAP at the precinct level**

128.  The current representative for HD 22 is Jon Lancaster, who was elected to this seat as a Democrat in 2019. Rep. Lancaster changed his party affiliation to Republican in 2021.

129.  Recent elections demonstrate that Black voters in the area vote cohesively for preferred candidates.  Moreover, in recent elections, racially polarized voting in the area usually exceeds 85% (i.e., more than 85% of Black voters vote for Black-preferred candidates, and more than 85% of white voters vote against such candidates).  As a result, Black-preferred candidates will typically be defeated by white bloc voting in HD 22 as configured despite the cohesive voting.  The State's enacted plan thus dilutes the votes of Black voters by extracting Black voters from the district and replacing them with white voters in Monroe and Pontotoc counties, among others, reducing the political strength of Black voters in HD 22.

130.  By "unpacking" the Black population in neighboring districts, the State could have drawn an additional majority-Black district in the region in and around Chickasaw and Monroe counties, consistent with traditional districting principles.  The failure to draw an additional Black-majority district in the area violates the VRA.

131.  One possible reconfiguration of this cluster of districts could include a majority-Black HD 22 with approximately 55% BVAP percentage anchored in Chickasaw and Monroe counties while still maintaining a version of the prior Black-majority HDs 16 and 36 anchored in the areas around the Cities of West Point and Tupelo, respectively.  Under this alternative reconfiguration, Black voters in HD 22 would have reasonable opportunity to elect their candidates of choice, notwithstanding the existence of racially polarized voting.

132.  The current configuration of HD 22 also indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters to advance particular electoral outcomes, in derogation of the U.S. Constitution.  The map drawers did not employ race in a narrowly tailored manner.

133.  **House District between Meridian and Laurel in Jasper and Clarke Counties:**  The Black population in, around, and between the Cities of Meridian and Laurel, specifically in and around enacted House District 84 ("HD 84"), in and around Jasper and Clarke Counties, is sufficiently numerous and compact to support an additional Black-majority Senate district.  However, the Mississippi Legislature approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength.



**HD 84 and surrounding: Enacted 2022 House Map shaded by BVAP at the district level**

134.   The enacted 2022 maps include a cluster of House districts between and

around the Cities of Laurel and Meridian:  HDs 80, 81, 82, 84, and 89. Under the

enacted plan, HDs 80 and 82 are majority-Black, while HDs 81, 84, and 89 (like

all of the other nearby districts in the area outside this cluster) are majority-white.

However, HD 84 could have been drawn as an additional majority-Black district

by "unpacking" HD 80 and creating a more compact, Laurel-based district and a

separate district anchored in Jasper and Clarke counties, thereby avoiding the

dilution of Black voting strength while adhering to traditional districting principles.

135. In the 2022 maps, HD 84 stretches across Jasper and Clarke counties with an offshoot in south-central Newton County. Noticeably, HD 84 curves around HD 80, which includes Black populations in southeast Jasper County and southwest Clarke County and then reaches into Jones County to pick up the core of the City of Laurel. HD 84 has a combined BVAP percentage of approximately 37%, while the neighboring HD 80 has a BVAP percentage of 68%. The enacted 2022 maps thereby "crack" the Black population left in HD 84.

**Table 11: 2022 House Plan – Meridian/Laurel Area District Cluster Demographics**

| District | Total Population | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|---|---|---|---|---|
| 80 | 24,509 | 18,053 | 25.49% | 68.27% |
| 81 | 23,225 | 17,853 | 72.68% | 23.09% |
| 82 | 23,066 | 17,389 | 22.04% | 75.20% |
| 84 | 25,404 | 19,659 | 60.72% | 37.28% |
| 89 | 24,117 | 18,521 | 71.50% | 19.68% |

136. Recent elections demonstrate that Black voters in the area vote cohesively for preferred candidates. Moreover, in recent elections, racially polarized voting in the area usually exceeds 85% (i.e., more than 85% of Black

voters vote for Black-preferred candidates, and more than 85% of white voters vote against such candidates).  As a result, Black-preferred candidates will typically be defeated by white bloc voting in HD 84, as configured.  The State's enacted plan thus dilutes the votes of Black voters by placing them in a district where they are unable to elect their candidate of choice.

137.  By "unpacking" the Black population in neighboring House districts, the State could have drawn an additional majority-Black House district in the region in and around Meridian and Laurel, consistent with traditional districting principles.  The failure to draw an additional Black-majority district in this area violates the VRA.

138.  In one possible reconfiguration of this district cluster, HD 84 could be drawn as a majority-Black district with an approximately 56% BVAP percentage, anchored in Jasper and Clarke counties and without breaking off into Jones County.  Under such a configuration, the existing Meridian-based, Black-majority HD 82 would be substantially unchanged, and HD 80 would also remain majority-Black but could be substantially more compact and centered on the City of Laurel rather than going into multiple neighboring counties, consistent with traditional districting principles.  Under this alternative configuration, Black

voters in HD 84 would have reasonable opportunity to elect their candidates of choice, notwithstanding the existence of racially polarized voting.

139.  Additional majority-Black districts can easily be created consistent with traditional districting principles, and doing so would remedy vote dilution and allow Black voters in the areas discussed above an opportunity to elect candidates of choice despite the prevalence of racially polarized voting in those areas.  Thus, the district lines challenged here curtail and minimize the political power of Black Mississippians in the State House.

140.  **Grenada County House District:**  Race was also the predominant factor in the drawing of State House District 34 ("HD 34") in and around Grenada County.



**HD 34: Previous 2010 Cycle House Map shaded by BVAP at the district level**



**HD 34: Enacted 2022 House Map shaded by BVAP at the district level**

141. As shown above, the 2022 maps draw HD 34 as a "puzzle-piece"–shaped district with a northern node that extends into Lafayette County and a southern node encompassing the Jefferson precinct in Carroll County. Noticeably, map drawers carved out the most heavily Black precincts in and around Grenada, which are included in neighboring HD 30.   HD 34 has a combined BVAP percentage near 32%.

142.   The area was altered significantly by the enacted maps.  Under the prior map, HD 34 was a majority-Black district with an over 60% BVAP percentage. The district had a "C" shape that stretched from Grenada County across Tallahatchie County to Leflore County, curved around parts of Itta Bena and the surrounding area, and stretched into Holmes and Carroll counties, picking up areas closer to the heart of the majority-Black Mississippi Delta.  The new configuration of HD 34 sweeps north from the Grenada, away from the Delta, into areas with more heavily white populations, dropping the BVAP percentage of the district by nearly 30 points.

**Table 12: 2012 House Plan – HD 34 Demographics**

| District | Total Population | Population Deviation (%) | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|---|---|---|---|---|---|
| 34 | 23,571 | -3.09% | 17,188 | 37.05% | 60.49% |

**Table 13: 2022 House Plan – HD 34 Demographics**

| District | Total Population | Population Deviation (%) | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|---|---|---|---|---|---|
| 34 | 25,236 | -4.87% | 20,026 | 65.49% | 31.55% |

143. Meanwhile, map drawers eliminated neighboring HD 33 in Yalobusha, Tallahatchie and Grenada counties—a 42% BVAP percentage district that had been competitive for both political parties. And despite the major changes to HDs 33 and 34, map drawers made no changes to the lines of neighboring HD 46—a 32% BVAP percentage district that cracks Black voting strength and stretches from predominantly white Webster County all the way into the Mississippi Delta to grab white-majority sections of Leflore County and the City of Greenwood—and maintained a packed 80%-plus BVAP percentage HD 32 covering other portions of Leflore County.

144.  The current representative for HD 34 is Kevin Horan, who was elected to this seat as a Democrat in 2016.  Rep. Horan changed his party affiliation to Independent in January 2020, then later changed his party affiliation to Republican.

145.  The 2022 reconfiguration of HD 34 cracked Black voting population in and around Grenada County and added Black voters to HD 30.  The State's enacted plan also packed Black voters previously in HD 34 into other adjacent districts; for example, map drawers packed sizable Black populations in Holmes County into HDs 47 and 51, which have 71% and 80% BVAP percentages, respectively.  Similarly, map drawers packed sizable Black populations in Leflore County into HDs 32 and 51, which have 82% and 80% BVAP percentages, respectively.  HDs 32, 47, and 51 are currently represented by Black Democrats.

146. The current configuration of HD 34 indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles such as compactness.  The use of race as a predominant factor was not required in order to serve any compelling state interest.

147.  **Eastern Hinds and Madison County House District:**  Race was also the predominant factor in the drawing of State House District 64 ("HD 64") in and around Hinds and Madison counties.



**HD 64: Previous 2010 Cycle House Map shaded by BVAP at the district level**



**HD 64: Enacted 2022 House Map shaded by BVAP at the district level**

148.  As shown above, under the 2022 map, HD 64 stretches diagonally from northeast Jackson in Hinds County into the southeast corner of Madison County. The City of Jackson is approximately 80% Black in population.  Hinds County has sizable BVAP percentage of 67%.  Madison County has a 34% BVAP percentage.

149.  Under the 2022 maps, HD 64 has an approximately 31% BVAP percentage.  Under the prior map, HD 64 had an approximately 38% BVAP percentage in the district.

150.  The State added white voters to this district from the Fondren and Woodland Hills area in northeast Jackson, as well as from predominantly white areas of Madison County.  These areas were in nearby HDs 65 and 70 under the prior map, both of which were packed majority-Black districts at approximately 69% and 73% BVAP percentages, respectively.  Map drawers also moved a large, majority-Black precinct (over 4,000 people) from the Tougaloo area in Jackson along the Madison County line out of HD 64 into already-packed HD 65.  The changes to HD 64 increased white voting age population by approximately 6% and decreased BVAP percentage by approximately 7%.

151.  Map drawers did not need to make any changes to this district.  At the time of the 2020 Census, HD 64 had a total population of 24,593 people.  This

was only 320 people above the Legislature's current ideal district size of 24,273, well within the +/-5% district population deviation prescribed by the Joint Committee as one of its redistricting criteria. The changes to HD 64 in the 2022 map caused the district to be underpopulated at 23,958 people, 315 people below the ideal district size.

152. The current representative for HD 64 is Shanda Yates, who was elected to this seat as a Democrat in 2019. Rep. Yates changed her party affiliation to Independent in January 2022.

**Table 14: 2012 House Plan – HD 64 Demographics**

| District | Total Population | Population Deviation (%) | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|---|---|---|---|---|---|
| 64 | 23,662 | -2.71% | 18,571 | 56.57% | 37.93% |

**Table 15: 2022 House Plan – HD 64 Demographics**

| District | Total Population | Population Deviation (%) | Voting Age Population | White Voting Age Population (%) | Any Black Voting Age Population (%) |
|---|---|---|---|---|---|
| 64 | 23,958 | -1.30% | 19,089 | 62.86% | 30.99% |

153. The current configuration of HD 64 indicates that race improperly predominated in the drawing of district lines in this area, with map drawers

packing and cracking Black voters to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles such as compactness. The use of race as a predominant factor was not required in order to serve any compelling state interest.

### 3. Analysis of the Senate Report Factors

154. "When Congress amended Section 2 of the Voting Rights Act in 1982, it sought 'to clearly establish the standards . . . for proving a violation of that section.' " *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 741, n.3 (5th Cir. 1993) (quoting S.REP. No. 417, 97th Cong., 2d Sess., at 2 (May 25, 1982)) ("The Senate Report is the authoritative expression of Congress' intent in amending Section 2 of the Voting Rights Act. . . . the Senate Report . . . should be considered, next to the statute itself, the most persuasive evidence of congressional intent.").

155. The totality of the circumstances confirms that Black voters in Mississippi and in the areas where the challenged districts are located, particularly those challenged under Section 2, have less opportunity than white voters to participate in the political process and elect representatives of their choice. Those include but are not limited to the following factors outlined in the 1982 Senate Report:

***Senate Report Factor 1: History of Official Voting-Related Discrimination***

156.  Mississippi has an extensive, well-documented, and ongoing record of voting discrimination that has placed substantial burdens on the ability of Black and other minority voters to register to vote and otherwise participate in the political process, and it continues to resonate into the present day.  That history of official discrimination in voting has been recognized by federal courts.  *See, e.g.*, *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1399 (5th Cir. 1996) ("The long and unhappy history of discrimination in Mississippi requires no protracted discussion.").

157.  In the period following the end of Reconstruction in 1876, Mississippi enacted a legal regime that completely subordinated Black Mississippians for most of a century.  By 1890, a new Mississippi Constitution was enacted with the explicit intent to disenfranchise Black Mississippians.  After Mississippi's 1890 Constitution was ratified, Mississippi passed countless laws to deny or diminish Black democratic participation, including poll taxes, grandfather clauses, dual registration systems, at-large districts, discriminatory redistricting plans, and educational, property, "character" and other immaterial qualifications on voter registration and voting.  In fact, other states that had been a part of the Confederacy modeled their political systems after Mississippi's, and the

84

comprehensive system of disenfranchisement created in the 1890 Constitution was widely known as the "Mississippi Plan."

158.  Overlaid on these legal rules was a "white primary" system in which Democratic Party nominees were selected through a racially exclusionary all-white primary process that expressly barred all Black political participation.  This system meant that, for the better part of a century, Mississippi was run as an all-white, single-party state.  Even after the Supreme Court outlawed such "white primaries" in cases like *Smith v. Allright*, 321 U.S. 647 (1944), Black people in Mississippi were largely prevented from voting and the system continued as before.

159.  In addition to formal legal rules, white supremacist groups such as the Ku Klux Klan inflicted terror and violence on Black Mississippians to prevent them from voting or participating in the political process.  This terror campaign began during Reconstruction and continued for nearly a century into the 1960s.

160.  In 1964, the year before the passage of the VRA, less than 7% of eligible Black Mississippians were registered to vote despite numerous voter registration drives by civil rights groups.  Applications to register by Black citizens were routinely denied by elections officials on spurious grounds.

161. Even after the passage of the VRA, the State of Mississippi continued to deploy discriminatory election policies. Up until the abrogation of the Section 5 preclearance regime less than ten years ago, the DOJ continuously lodged objections to a wide array of discriminatory voting practices in Mississippi, and private plaintiffs successfully challenged others in court. Mississippi's voting policies that were found to disenfranchise or unfairly burden or dilute the strength of Black voters and were thus invalidated through Section 5 review have included at-large election schemes, onerous candidate qualification requirements, modifications to polling-place locations, dual registration systems, and open primary laws that disadvantaged Black candidates and voters, among others.

162. Mississippi's electoral districting schemes have repeatedly been challenged as unlawful and racially discriminatory. Of the 169 objections to voting changes in Mississippi issued by the DOJ pursuant to Section 5 of the VRA between 1965 and 2009, the vast majority—104—related to redistricting. As recently as 2019, a federal court determined that Mississippi's state legislative lines for SD 22 violated the VRA by diluting the voting strength of Black Mississippians in the State Senate. *See Thomas v. Bryant*, 938 F.3d 134, 166 (5th Cir. 2019), *vacated as moot*, *Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020).

163.     The    State    also    continues    to    maintain    voting    measures    that disproportionately burden Black Mississippians.   For example, Mississippi's felon disenfranchisement scheme was adopted in 1890 for certain specific crimes that the framers believed were committed mostly by Black people, and it operates today to disproportionately disenfranchise them.

### *Senate Report Factor 2: The Extent of Racial Polarization*

164. Racially  polarized  voting  in  Mississippi  is  pervasive  and  extreme. Black  communities  exhibit  substantial  (85%+)  cohesion  in  terms  of  voters' candidate preferences.  For example, in biracial statewide contests in 2015, 2019, and 2020, Black candidates typically garnered over 85% of the support of Black voters (often over 90%).   White voters in Mississippi likewise have tended to vote cohesively against Black-preferred candidates (typically 85% or more) in those contests.   This phenomenon exists in each of the areas at issue in this Complaint, with Black voters tending to vote cohesively as a bloc, and white voters also voting as a bloc against the Black-preferred candidates.  The level of racially polarized voting in those areas where the challenged districts in the 2022 maps  are  located  means  that  the  preferred  candidates  of  Black  voters  will typically  be  defeated  by  a  white  majority  in  white-majority  election  districts under the challenged district lines.

165. Plaintiffs in redistricting cases across the State of Mississippi have repeatedly demonstrated racially polarized voting. *See, e.g.*, *Bryant*, 366 F. Supp. 3d at 807 (Mississippi Delta State Senate district), *aff'd*, 931 F.3d 455 (5th Cir. 2019); *Fairley v. City of Hattiesburg*, 122 F. Supp. 3d 553, 580 (S.D. Miss. 2015), *aff'd*, 662 F. App'x 291 (5th Cir. 2016); *United States v. Brown*, 494 F. Supp. 2d 440, 484 (S.D. Miss. 2007) (Noxubee County), *aff'd*, 561 F.3d 420 (5th Cir. 2009); *Jamison v. Tupelo, Miss.*, 471 F. Supp. 2d 706, 713 (N.D. Miss. 2007); *Teague v. Attala Cnty.*, 92 F.3d 283, 285 (5th Cir. 1996); *Clark*, 88 F.3d at 1395; *Houston v. Lafayette Cnty.*, 20 F. Supp. 2d 996, 1003 (N.D. Miss. 1998); *Ewing v. Monroe Cnty.*, 740 F. Supp. 417, 425 (N.D. Miss. 1990); *Gunn v. Chickasaw Cnty.*, 705 F. Supp. 315, 319 (N.D. Miss. 1989); *Jordan v. City of Greenwood*, 599 F. Supp. 397, 402 (N.D. Miss. 1984).

166. The extent of racial polarization in Mississippi is starkly evidenced by the fact that Mississippi has never elected any Black person to statewide office since Reconstruction, and that, while Mississippi has hundreds of Black elected officials, very few of them represent majority-white districts.

### Senate Report Factor 3: Use of Discriminatory Electoral Devices

167. Mississippi and its subdivisions have historically maintained voting procedures and practices—such as multi-member districts, at-large elections and

unusually large electoral districts—that exacerbate the dilution of political power for Black citizens and historically have "had the effect of precluding black citizens from election to public office," *e.g.*, *Martin v. Allain*, 658 F. Supp. 1183, 1192 (S.D. Miss. 1987).

168.  Multi-member districts and at-large elections have effectively blocked Black candidates in the past from gaining fair representation on state-level and local election bodies and as state trial-court judges.  Most of these practices were abandoned only after extensive litigation.

169.  Until very recently, Mississippi also maintained a state constitutional provision requiring candidates for statewide office to win both the popular vote and a majority of Mississippi's 122 House districts to win statewide election to state-level offices.  Black voters sued Mississippi to enjoin enforcement of that requirement, which posed a significant hurdle for Black candidates to overcome given the composition of the state's house districts (a large majority of which are majority-white) as well as persistent racial polarization in voting.  In the face of active litigation, the State placed a constitutional amendment on the ballot that passed in 2020.

***Senate Report Factor 5: Ongoing Effects of Mississippi's History of Discrimination***

170. Black Mississippians and others also face the continued burden of discrimination and disparities on other fronts, including health, housing, education, employment, and treatment in the criminal justice system. These disparities, which exist both statewide and in the areas where the challenged districts are located, are the legacy of intentional policy choices made by the State whose effects continue to operate into the present day. And all of these socioeconomic disparities are correlated with increased burdens on effective political participation.

171. With respect to income, Black Mississippians on average earn significantly less than white Mississippians and experience poverty at nearly three times the rate of white Mississippians. Black Mississippians are also more likely to be unemployed or underemployed and to suffer from employment discrimination. Income and economic security are correlated with political participation.

172. With respect to housing, the legacy of decades of redlining policies and continued discrimination in lending continues to disproportionately lock Black Mississippians out of homeownership. As of 2019, the mortgage denial rate for

Black residents in Mississippi earning more than $150,000 was higher than the denial rate for white residents earning between $30,000 and $50,000.  In addition to being less likely to own a home, Black Mississippians move more frequently. Homeownership and housing stability are correlated with political participation.

173.  With respect to education, some of Mississippi's school districts are still operating under desegregation orders stemming from a failure to adequately desegregate.   Moreover, public schools in majority-Black areas are more regularly under-resourced and their performance is negatively affected. Education is highly correlated with political participation, and the lack of access to quality education further restricts Black Mississippians' engagement with the political process.

174. With respect to health, Black Mississippians also have significantly worse health outcomes compared to white Mississippians, including higher rates of obesity, invasive cancer, renal disease, infant mortality, HIV, heart disease, hypertension, stroke, diabetes, and cancer.  Relatedly, Black Mississippians also have less access to and worse healthcare coverage than white Mississippians. Health and access to healthcare are correlated with political participation.

175.  These disparities have detrimental effects on the political participation of Black Mississippians, who participate in elections at lower rates than white Mississippians.

***Senate Report Factor 6: Use of Racial Appeals in Political Campaigns***

176.  For more than a century, candidates have been making racial appeals in Mississippi elections and such tactics continue to the present day.

177.  Such appeals were commonplace in the pre-VRA era.  For example, Theodore Bilbo, a Ku Klux Klan member who had a long political career in Mississippi, including as a State Senator, Governor, and U.S. Senator, urged "every red-blooded white man to use any means to keep the n-----s away from the polls" as part of his 1946 U.S. Senate reelection campaign.

178.  While sometimes less overt in form, racial appeals in campaigns continue to this day.  Only recently, during a ballot initiative campaign related to education funding, sitting State Representative Lester "Bubba" Carpenter was recorded campaigning against the initiative by arguing that "[i]f 42 passes in its form, a judge in Hinds County, Mississippi (which is) predominantly Black—it's going to be a Black judge—they're going to tell us where the state of education money goes."   As another example, in 2019, a Mississippi Election Commissioner, Gail Welch, expressed concern in a social media comment that

"the Blacks are having lots [of] events for voter registration."  As another example, during the 2018 U.S. Senate campaign between the white Republican candidate Cindy Hyde-Smith and Black Democratic candidate Mike Espy, Hyde-Smith sent mailers to Mississippi voters with Espy's face, emphasizing his race. Some of the mailers also wrongly insinuated that Espy was convicted of crimes of which he had been acquitted.  During the same campaign, Hyde-Smith at one point told voters that she would attend a public hanging in the "front row."

### Senate Report Factor 7: Lack of Success of Black Candidates for Office

179. Black Mississippians have historically been and continue to be underrepresented in the State government.  The first Black state legislator since Reconstruction was not elected to the State House until 1967, shortly after the passage of the VRA.  It was 1975 before three others were elected to the House as the result of district changes ordered because of federal-court litigation.  In January 1979, another Black representative was elected because of a special election from a court-ordered redistricting plan.  No Black Senator was elected to the Mississippi State Senate until January 1979 in another special election from a court-ordered district.  In April of 1978, after thirteen years of litigation, the Mississippi legislature adopted a single-member redistricting plan that was utilized in the November 1979 statewide elections.  Fifteen Black candidates

were elected to the Mississippi House in that election.  Two were elected to the Mississippi Senate.  This still only represented 10% of the Legislature.

180.   Even today, only 29% of the districts in the 2022 State Senate map are majority-Black, while the State's BVAP percentage is approximately 36%.

181.   Even with the largest Black population percentage of any state in the nation (approximately 38%), no Black candidate has been elected to statewide office in Mississippi since Reconstruction.   Mississippi has a single Black Congressman, serving in a Black-majority district that originally was created because of federal-court litigation and that even today was drawn by court order. Black candidates rarely prevail in Mississippi outside of Black-majority districts.

### Senate Report Factor 9: Tenuous Policy Justification for the Challenged Practice

182.   There is no non-tenuous rationale for the decision to draw State House and State Senate maps that dilute Black political power in Mississippi.  The State held no public meetings at all where the public was able to comment on and address the draft maps prior to their passage or hear the State's explanation for why these maps served reasonable goals.  The State then rushed them into law in a matter of days.

183.  In sum, the 2022 maps unlawfully dilute the voting strength of Black Mississippians in violation of Section 2 of the VRA.  The new maps could have—and should have—been drawn to give the Black population in Mississippi a full and fair opportunity to elect representatives of their choice and participate in politics on equal footing with white citizens.  Instead, the State drew maps that diluted and weakened the Black vote.  The broader context—including Mississippi's long history of official discrimination against Black voters, racially polarized voting, discriminatory voting practices, and other disparities that reflect the legacy of discrimination and that continue to disproportionately burden Black political participation—further supports the conclusion that Mississippi's unfair new redistricting scheme improperly and unlawfully dilutes the vote of Black citizens in Mississippi.

### COUNT I:
### 52 U.S.C. § 10301 and 42 U.S.C. § 1983
### SECTION 2 OF THE VOTING RIGHTS ACT

184.  Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

185.  The 2022 maps violate Section 2 of the VRA, as amended, 52 U.S.C. § 10301, which is enforceable both via a private right of action and via 42 U.S.C. § 1983.

186.  As detailed in the prior paragraphs of this Complaint, the 2022 maps dilute the voting strength of Black Mississippians in violation of the VRA, particularly with respect to the configuration of Senate Districts in (1) the DeSoto County area, (2) the Golden Triangle area, (3) the South-Central Mississippi area near Copiah, Simpson, and Jefferson Davis counties, and (4) the Hattiesburg area, and with respect to the configuration of House Districts in (1) the Western Hinds County area, (2) the area north of the Golden Triangle between West Point and Tupelo, and (3) the area between Laurel and Meridian in and around Jasper and Clarke counties.  The 2022 maps do not afford Plaintiffs an equal opportunity to participate in the political process and to elect representatives of their choice, and they deny Plaintiffs the right to vote in elections without discrimination on account of their race and color, all in violation of 52 U.S.C. § 10301.

**COUNT II:**
**42 U.S.C. § 1983**
**RACIAL GERRYMANDERING IN VIOLATION OF THE FOURTEENTH AMENDMENT**
**TO THE U.S. CONSTITUTION**

187.  Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

188.  The Fourteenth Amendment of the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 2. Under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, racial classifications are prohibited unless narrowly tailored to serve a compelling state interest.

189.  The 2022 maps violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

190.  Race was the predominant factor in the creation of SDs 2 and 48, and HDs 22, 34, and 64.  Moreover, the use of race as the predominant factor with

respect to these districts was not narrowly tailored to serve any compelling state interest.

191.  Plaintiffs have no adequate remedy at law other than the judicial relief sought here.  The failure to enjoin enforcement of the 2022 maps will irreparably harm Plaintiffs' statutory and constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

192.  Declare the 2022 maps to be in violation of Section 2 of the VRA and the U.S. Constitution;

193.  Enjoin Defendants and their agents from holding elections under the 2022 maps;

194. Set a reasonable deadline for State authorities to enact or adopt redistricting plans for the Mississippi State House and State Senate that do not abridge or dilute the ability of Black voters to elect candidates of choice or otherwise violate the U.S. Constitution and, if State authorities fail to enact or adopt valid redistricting plans by the Court's deadline, order the adoption of specific court-ordered remedial redistricting plans that do not abridge or dilute the ability of Black voters to elect candidates of choice or otherwise violate the U.S. Constitution;

195. Award Plaintiffs their costs, expenses, and disbursements, and reasonable attorneys' fees incurred in bringing this suit, pursuant to and in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988;

196. Retain jurisdiction over this matter until Defendants have complied with all orders and mandates of this Court;

197. Grant such other and further relief as the Court may deem just and proper.

DATED: March 3, 2023

Respectfully submitted,

/s/ *Joshua Tom*
Joshua Tom, MSB 105392
*jtom@aclu-ms.org*
**ACLU OF MISSISSIPPI**
101 South Congress Street
Jackson, MS 39201
(601) 354-3408

Robert B. McDuff, MSB 2532
*rbm@mcdufflaw.com*
**MISSISSIPPI CENTER FOR JUSTICE**
767 North Congress Street
Jackson, MS 39202
(601) 969-0802

Carroll Rhodes, MSB 5314
**LAW OFFICES OF CARROLL RHODES**
*crhodes6@bellsouth.net*
PO Box 588

Ari J. Savitzky*
*asavitzky@aclu.org*
Kelsey Miller*
*kmiller1@aclu.org*
Ming Cheung*
mcheung@aclu.org
**ACLU FOUNDATION**
125 Broad Street
New York, New York 10004
(212) 549-2500

Patricia Yan*
*pyan@aclu.org*
**ACLU FOUNDATION**
915 15th Street NW
Washington, DC 20005
(202) 457-0800

Ezra D. Rosenberg*

99

Hazlehurst, MS 39083
(601) 894-1464

John P. Lavelle, Jr.*
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:       +1.202.739.3000
Facsimile:       +1.202.739.3001
*john.lavelle@morganlewis.com*

Drew C. Jordan*
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Telephone:       +1.713.890.5000
Facsimile:       +1.713.890.5001
*drew.jordan@morganlewis.com*

James A. Nortey*
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana, Suite 4000
Houston, Texas 77002
Telephone:       +1.713.890.5000
Facsimile:       +1.713.890.5001
*james.nortey@morganlewis.com*

*\* admitted pro hac vice*

*erosenberg@lawyerscommittee.org*
Jennifer Nwachukwu*
*jnwachukwu@lawyerscommittee.org*
David Rollins-Boyd*
*drollins-boyd@lawyerscommittee.org*
**LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW**
1500 K Street NW Suite 900
Washington, DC 20005
(202) 662-8600

*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I, Joshua Tom, hereby certify that on March 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties on file with the Court.

/s/: Joshua Tom
Joshua Tom