# EXHIBIT B

# Deposition of Peter A. Morrison, Ph.D.

# NAACP, et al. v. State Board of Election Commissioners, et al.

# December 1, 2023



**206.287.9066 I 800.846.6989**

1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101

www.buellrealtime.com

email: info@buellrealtime.com



Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MISSISSIPPI STATE CONFERENCE OF )
THE NATIONAL ASSOCIATION FOR THE )
ADVANCEMENT OF COLORED PEOPLE;   )
DR. ANDREA WESLEY; DR. JOSEPH    )
WESLEY; ROBERT EVANS; GARY       )
FREDERICKS; PAMELA HAMNER;       )
BARBARA FINN; OTHO BARNES;       )  No. 3:22-cv-734-DPJ-
SHIRLINDA ROBERTSON; SANDRA      )  HSO-LHS
SMITH; DEBORAH HULITT; RODESTA   )
TUMBLIN; DR. KIA JONES; MARCELEAN)
ARRINGTON; VICTORIA ROBERTSON,   )
                                 )
          Plaintiffs,            )
                                 )
VS.                              )
_____)
STATE BOARD OF ELECTION          )
COMMISSIONERS; TATE REEVES, in   )
his official capacity as Governor)
of Mississippi; LYNN FITCH, in   )
her official capacity as         )
Attorney General of Mississippi; )
MICHAEL WATSON, in his official  )
capacity as Secretary of State of)
Mississippi,                     )
                                 )
          Defendants,            )
                                 )
AND                              )
                                 )
MISSISSIPPI REPUBLICAN EXECUTIVE )
COMMITTEE,                       )
                                 )
          Intervenor-Defendant.  )
_____)


------------------------------------
ORAL DEPOSITION OF
PETER A. MORRISON, PH.D.
DECEMBER 1, 2023
------------------------------------

REPORTED BY:  Stacy L. Jordan, CSR, RPR, CRR, CLR No. 7499

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 2

1          ORAL DEPOSITION of PETER A. MORRISON, PH.D., a

2    witness produced at the instance of the Plaintiffs,

3    taken in the above-styled and numbered cause on the 1st

4    day of December, 2023, from 8:59 a.m. to 3:27 p.m.,

5    before Stacy L. Jordan, a CSR in and for the State of

6    Texas, Registered Professional Reporter and Certified

7    Realtime Reporter, taken in the law offices of Butler

8    Snow, LLP, 2911 Turtle Creek Boulevard, Suite 1400,

9    Dallas, Texas 75219, in accordance with the Federal

10   Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                            A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4          Ms. Casey Smith
           Mr. Ari Savitzky
5          AMERICAN CIVIL LIBERTIES UNION
           125 Broad Street, 18th Floor
6          New York, New York  10004
           212.549.2681
7          csmith@aclu.org
           asavitzky@aclu.org

8

9    FOR THE DEFENDANTS:

10         Mr. Tommie S. Cardin
           Mr. B. Parker Berry
11         BUTLER SNOW, LLP
           1020 Highland Colony Parkway
12         Ridgeland, Mississippi  39157
           601.948.5711
13         601.985.4500 (fax)
           tommie.cardin@butlersnow.com
14         parker.berry@butlersnow.com

15

     ALSO PRESENT (Via Zoom):
16
           Ms. Alecia Richards
17         Mr. Javon Davis
           Mr. Mike Wallace
18         Mr. Ming Cheung
           Mr. Rex Shannon
19

20

21

22

23

24

25

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 4

1                              I N D E X

2                                                           PAGE

3     Appearances..................................... 2

4     PETER A. MORRISON, PH.D.

5
           Examination by Ms. Smith.................. 7
6
      Changes and Signature.................... 245-246
7     Reporter's Certificate....................... 247

8

9                          E X H I B I T S

10    NO.          DESCRIPTION                    PAGE MARKED

11    Exhibit 1    Deposition Notice................... 12

12    Exhibit 2    10/16/23 Morrison Expert Report..... 33

13    Exhibit 3    United States vs. Village of Port
                   Chester Decision.................... 48
14
      Exhibit 4    5/13/07 Morrison Expert Report,
15                 United States v. Village of Port
                   Chester............................. 49
16
      Exhibit 5    NAACP, et al. vs. East Ramapo
17                 Central School District Decision.... 54

18    Exhibit 6    Morrison Los Angeles Times Op-Ed.... 58

19    Exhibit 7    Methodology......................... 79

20    Exhibit 8    Frequently Asked Questions (FAQs)
                   About Voting and Registration....... 86
21
      Exhibit 9    Table 4A, Reported Voting and
22                 Registration for States, November
                   2020................................ 89
23
      Exhibit 10   11/3/20 Official Results, Total
24                 Votes Reported by Counties for
                   2020 General Election.............. 95
25

NAACP, et al. v. State Board of Election Commissioners, et al.                                    Peter A. Morrison, Ph.D.

Page 5

1                   E X H I B I T S (Continued)

2       NO.             DESCRIPTION                    PAGE MARKED

3       Exhibit 11   Thomas v. Bryant Decision.......... 109

4       Exhibit 12   1/7/19 Morrison Expert Report,
                     Thomas v. Bryant Case............. 112
5
        Exhibit 13   Thomas v. Bryant Appeal........... 120
6
        Exhibit 14   Spreadsheets...................... 128
7
        Exhibit 15   Table A-4, Reported Voting and
8                    Registration for Total and Citizen
                     Voting Age Population for
9                    Congressional Elections:  1978 to
                     2022.............................. 177
10
        Exhibit 16   Revisions to the Current Population
11                   Survey Effective in January 2003... 184

12      Exhibit 17   Who Lies on Surveys, and What Can
                     We Do About It?................... 197
13
        Exhibit 18   The Quality of Government Records
14                   and Overestimation of Registration
                     and Turnout in Surveys:  Lessons
15                   from the 2008 ANES Panel Study's
                     Registration and Turnout Validation
16                   Exercises......................... 200

17      Exhibit 19   Validation:  What Big Data Reveal
                     About Survey Misreporting and the
18                   Real Electorate................... 212

19      Exhibit 20   Measuring Voter Registration and
                     Turnout in Surveys:  Do Official
20                   Government Records Yield More
                     Accurate Assessments?............. 217
21
        Exhibit 21   Validating Self-Reported Turnout by
22                   Linking Public Opinion Surveys with
                     Administrative Records............ 219
23
        Exhibit 22   Amended Expert Report of Dr. Byron
24                   D'Andra Orey...................... 229

25

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 6

1                    E X H I B I T S (Continued)

2   NO.            DESCRIPTION                    PAGE MARKED

3   Exhibit 23   Responsive Expert Report of
                 Dr. Byron D'Andra Orey, Ph.D....... 230
4
    Exhibit 24   The Current Population Survey
5                Voting and Registration Supplement
                 Overstates Minority Turnout........ 231
6
    Exhibit 25   Vote Over-Reporting While Black:
7                Identifying the Mechanism Behind
                 Black Survey Respondents' Vote
8                Over-Reporting.................... 238

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 7

1               P R O C E E D I N G S

2               (December 1, 2023, 8:59 a.m.)

3               PETER A. MORRISON, PH.D.,

4     having been first duly sworn, testified as follows:

5                         EXAMINATION

6     BY MS. SMITH:

7          Q.   Good morning, Dr. Morrison.

8          A.   Good morning.

9          Q.   My name is Casey Smith.  I'm an attorney with

10    the ACLU.  I represent the plaintiffs in this matter,

11    which is Mississippi NAACP versus the State Board of

12    Election Commissioners.  Could you please state and

13    spell your name for the record?

14         A.   My name is Peter, middle name Alan, A-l-a-n,

15    Morrison.  And what else did you want?  That's it?

16         Q.   That's fine.

17              MS. SMITH:  Unless you have any concerns

18    about spelling it.  Great.

19         Q.   (BY MS. SMITH)  Okay.  Well, Dr. Morrison,

20    thanks for taking the time to be here today.  I believe

21    you've been deposed before, so a lot of this might be

22    familiar, but just in case, before we get started, I

23    want to go over some ground rules.  Okay?

24         A.   Sure.

25         Q.   Great.  So your answers will be under oath,

Page 8

1    meaning you're swearing to their truthfulness and

2    accuracy.  And the oath you took today has the same

3    effect as if you were testifying in court.  Do you

4    understand that?

5         A.   I do.

6         Q.   And as you can see, this deposition is being

7    transcribed by a court reporter, so it's important that

8    you answer audibly because the court reporter will not

9    be able to record your answer if you just nod or shake

10   your head.  Do you understand that?

11        A.   I do.

12        Q.   Okay.  Great.  And to make it easier for the

13   court reporter, I'll wait until you're finished with

14   your answers to my questions before I start speaking,

15   and if you could do the same, we can just avoid speaking

16   over each other.  Does that sound good?

17        A.   Yes.

18        Q.   Great.  Okay.  And I'm going to be asking

19   questions; you're going to be providing answers.  And

20   you must answer my questions unless your attorneys

21   instruct you not to answer and you choose to follow that

22   instruction.  So do you understand that you must answer

23   my questions unless your attorney instructs you not to

24   answer?

25        A.   I understand.

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 9

1      Q.   Okay.  Great.  And in general, unless your

2  attorney instructs you not to answer because the answer

3  is privileged, you still have to answer the question

4  even though there is an objection.  Do you understand

5  that?

6      A.   Understood.

7      Q.   Okay.  And, of course, it's important in this

8  process that we understand each other.  So if I ask you

9  a question and you don't understand it, please tell me,

10  and I will rephrase it.  Unless you tell me that you

11  don't understand a question that I ask, I'll assume that

12  you understand it.  Is that fair?

13      A.   Fair enough.

14      Q.   Great.  And, of course, if you need to take a

15  break at any time, please just ask; we'll do so.  The

16  only rule is that we cannot take a break while a

17  question is pending.  Does that work?

18      A.   Yes.

19      Q.   Great.  And I also ask that you not discuss

20  your testimony with your attorneys during breaks, unless

21  you need to talk about privileged communications.  Do

22  you understand that?

23      A.   I do, yes.

24      Q.   Great.  And if you realize at any time during

25  the deposition that your answer to a previous question

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 10

1   was not accurate or you want to clarify anything, just

2   let me know, and we can get that corrected on the record

3   today.  Do you understand that?

4        A.   I do.

5        Q.   Okay.  Do you have any questions about these

6   instructions before we get started?

7        A.   No.

8             MR. CARDIN:  Casey, let me ask you --

9             MS. SMITH:  Yeah.

10            MR. CARDIN:  -- in terms of -- would the

11  usual stipulation apply here, all objections except

12  those as to the form of the question will be reserved

13  until such time the deposition is sought to be

14  introduced into evidence?

15            MS. SMITH:  Yes.

16            MR. CARDIN:  Okay.

17       Q.   (BY MS. SMITH)  Okay.  And is there any reason

18  that you cannot provide complete and accurate testimony

19  here today?

20       A.   No, there isn't.

21       Q.   Are you taking any medications or other drugs

22  that might impact your ability to give complete and

23  accurate testimony?

24       A.   No.

25       Q.   And what is your address?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 11

1    A.   My address where I reside is Number 3 Eat Fire

2    Springs Road -- four words -- Nantucket, Massachusetts

3    02554.

4    Q.   And do you currently work?

5    A.   Do you mean am I employed?

6    Q.   Yes.

7    A.   I'm not employed.  I do work as an applied

8    demographer on -- on a -- on projects that I'm requested

9    to work on.

10    Q.   And is that with Peter Morrison & Associates?

11    A.   That's correct.

12    Q.   And what is the address of Peter Morrison &

13    Associates?

14    A.   It's the same address as my home address.

15    Q.   Okay.  And when did you first learn that you

16    were going to give a deposition in this case?

17    A.   I guess that would be when I was first

18    retained in the case, and that would have been sometime

19    in September of 2023, where I was approached to

20    participate in this on behalf of the defendants, and I

21    was told that there would be a deposition and

22    eventually, I'm presuming, trial testimony.

23    Q.   Understood.  So I have with me a deposition

24    notice that plaintiffs' counsel gave to defendants'

25    counsel saying we planned to take your deposition today.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 12

1    I'm going to mark that into the record as Exhibit 1.

2                  (Exhibit 1 marked.)

3         Q.   (BY MS. SMITH)  Have you seen this document

4    before?

5         A.   Truthfully, I don't recall whether I saw it or

6    not, but I -- and I know it's a formality.  I was told

7    that this document has been submitted and that there was

8    going to be a deposition.

9         Q.   Fair enough.

10        A.   I can't say for -- actually whether I got a

11   copy and looked at it.

12        Q.   Okay.  Understood.  But this document says --

13        A.   Yeah.

14        Q.   -- you're taking a deposition today --

15        A.   That's right.

16        Q.   -- under the Federal Rules of Civil

17   Procedure --

18        A.   Right.

19        Q.   -- in the case of NAACP versus State Board of

20   Election Commissioners, right?

21        A.   Correct.

22        Q.   Great.  Okay.  And, of course, without going

23   into the substance of any conversations with your

24   attorneys, what did you do to prepare for your

25   deposition today?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 13

1      A.   Let me think about what I did here, other

2  than -- my initial response was I had requested that the

3  deposition be held virtually because it was a long trip

4  from where I was, and so forth and so forth.   And

5  eventually, it turned out that, logistically, I think it

6  was a real nightmare.  So I did agree to come here for

7  the deposition in person.  What I did to prepare for it

8  was I would say about a week ago, I reviewed the file,

9  and I was -- I reviewed the plaintiffs' expert report,

10  in which I noticed that a reference that I had used,

11  which was a -- a technical study that had been conducted

12  some -- around 2012, I think -- I'm not sure of the

13  exact date, but quite a while ago -- had actually been

14  published in a peer-reviewed journal.  And I noted

15  that that study, that technical study that I had been

16  relying upon, was now in a new form.

17      Q.   Uh-huh.

18      A.   And I definitely wanted to have a copy of

19  that.  And I -- I'd like to say for the record that I

20  looked at it, and it was -- it -- it wasn't an update.

21  It was a study -- a technical study that had been

22  transformed through what's, obviously, a review process

23  by the authors and a lot of rewriting to clarify what

24  they said and brought into conformity with what would be

25  publishable in a well-respected peer-reviewed academic

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 14

1  journal, which I think was Public Opinion Quarterly, or

2  something like that, that I recognized.  So a primary --

3  a primary desire on my part was to get a copy of that

4  study --

5      Q.   Uh-huh.

6      A.   -- so I could see how the final peer-reviewed

7  version had -- had been drafted with all the caveats and

8  everything.  And I looked at it and confirmed that,

9  basically, it was saying what I had heard them say in

10  the technical report --

11     Q.   Uh-huh.

12     A.   -- but it was much, much more clearly

13  explained --

14     Q.   Uh-huh.

15     A.   -- and that it really was the same study, just

16  that they had clarified the exposition probably in the

17  process of several rewrites to get it published in a --

18  in a journal like that.

19     Q.   Okay.  Thank you very much.  So just to go

20  back and walk through that a little bit, you reviewed

21  the plaintiffs' expert report authored by Dr. D'Andra

22  Orey?

23     A.   Whatever his name was, yeah.

24     Q.   Okay.

25     A.   There's one -- yeah, I reviewed -- I

Page 15

1    reviewed -- I reviewed what he -- what that person had
2    said.
3         Q.   Okay.
4         A.   I noted that there had been the publication
5    recently, the earlier report that I had been using.
6         Q.   Okay.  And by the -- the published 2- -- I
7    believe it was a 2011 paper from Berent, Krosnick and
8    Lupia?
9         A.   That's the one.
10        Q.   That's -- so -- so you looked at the fact that
11   they had published those initial report -- reported
12   findings in 2016 in -- I believe it's Public Opinion --
13        A.   Public Opinion Quarterly.
14        Q.   Okay.
15        A.   Right.  That's what I -- that's the --
16        Q.   So you reviewed the 2016 Public Opinion
17   Quarterly --
18        A.   Correct.
19        Q.   -- study by those same authors and
20   concluded -- essentially, reiterated the same
21   conclusions?
22                  MR. CARDIN:  Object to the form.
23                  MS. SMITH:  Okay.
24        A.   I would say that it more clearly stated the
25   conclusions and the -- you know, the qualifications that

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 16

1   one would have, and it was more clearly explained what

2   they knew and what they didn't know.

3        Q.   (BY MS. SMITH)  Okay.  So it more clearly

4   stated their findings from the 2011 --

5        A.   Correct.

6        Q.   -- piece?

7        A.   And I took note of the fact that having been

8   peer-reviewed and published in a -- in a -- in a

9   high-quality journal, it was now something that I could

10  place greater reliance on because it had been

11  peer-reviewed.

12       Q.   Okay.  Did you review any of the other

13  articles cited in the Orey report?

14       A.   I don't -- I -- I can't say that I recall

15  consciously reviewing them, but having seen them

16  footnoted in the report.  But I have, you know, since

17  then reviewed other studies that -- that I -- I

18  discovered had been -- had been conducted, you know,

19  since I last looked at the -- at the file.  I did not do

20  an exhaustive review of political-science literature

21  because I -- I'm a demographer, not a political

22  scientist.  But I did want to get a sense of what the

23  state of knowledge was among political scientists.

24       Q.   Okay.  And do you recall off the top of your

25  head what any of those other articles that you reviewed

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 17

1   in the literature since submitting your report were?

2        A.    There -- I -- I don't recall the -- the

3   details, but I was just scanning through articles to say

4   my -- my -- the important criterion for me was:  Is this

5   an article that was looking at a broad cross-section of

6   elections or was it a single election --

7        Q.    Uh-huh.

8        A.    -- at a point in time --

9        Q.    Uh-huh.

10       A.    -- or possibly a study of a specific set of

11   places or states --

12       Q.    Uh-huh.

13       A.    -- that included Mississippi or not?

14       Q.    Uh-huh.

15       A.    That was kind of my screening criterion.   In

16   other words, if this isn't a study about Mississippi --

17       Q.    Uh-huh.

18       A.    -- and if it's not a study about elections

19   over a long period of time --

20       Q.    Uh-huh.

21       A.    -- I don't have any need to go into the

22   details of what it shows.  So I looked for that, and

23   I -- I -- I don't think I saw anything that -- that

24   qualified under that category.  So my review didn't

25   yield anything of great importance or new that would

Page 18

1   cause me to want to spend any time looking at it.

2       Q.   Okay.  Understood.  And we'll come back to

3   some of that later.

4       A.   Sure.

5       Q.   Thanks for walking me through that.

6            So did you meet with anyone to prepare for

7   your deposition today?

8       A.   Yes, I did.

9       Q.   Who did you meet with?

10      A.   I met with both of the attorneys sitting next

11  to me, and that commenced sometime yesterday midday.

12      Q.   Okay.  And how many meetings would you say you

13  had?

14      A.   One lengthy meeting.

15      Q.   One lengthy meeting?

16      A.   And I guess you could call having dinner

17  together.  Technically, we --

18      Q.   Uh-huh.

19      A.   -- you know, we didn't talk just about dinner.

20      Q.   Well, that's nice.  And for how -- how long

21  did you meet for?

22      A.   I think it was about four hours.

23      Q.   Okay.

24      A.   They -- yeah, it was about four -- all in all,

25  it was probably five hours --

Page 19

1    Q.    Uh-huh.

2    A.    -- of substantive meeting, where we were

3    focusing on something that was about this.

4    Q.    Okay.  And did you meet with anyone else to

5    prepare for your deposition today?

6    A.    No.

7    Q.    Did you speak with anyone else about the

8    deposition?

9    A.    I spoke with my wife about it.

10    Q.    Great.  So how much time, including the review

11    of the literature and the meetings and any other

12    preparation, would you say that you spent preparing for

13    the deposition today?

14    A.    I don't know if I could give you an exact

15    estimate, but I spent -- I -- I'll preface this by

16    saying that this was something that was kind of on the

17    shelf.  It came to life.  I said, "I'm going to get

18    started on this starting on Day X," because I had a lot

19    of other things going on.  And I would say over the

20    course of the last four days, I've probably been

21    spending the primary amount of my work time on this

22    case, and I would say I've probably gone -- you know,

23    refreshed my memory on a lot of aspects of it and

24    reviewed my initial report to -- to refresh my memory

25    about what I had found and what I had -- how I had

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 20

1   reached the conclusion.  And I think the answer to your

2   question is probably several workdays getting back up to

3   speed and then looking at the new literature, screening

4   it, trying to see whether there was anything new I

5   needed to be aware of that I hadn't looked at for

6   several months.

7        Q.   Okay.  Did you jot down any notes while

8   preparing for this deposition?

9        A.   I'm sure I did, yeah.

10        Q.   Okay.  Did you highlight any documents while

11   preparing for this deposition?

12        A.   I highlighted my own report to -- so that when

13   I came back to it a couple of days later, I could

14   remember the key points I had made.  I -- I had looked

15   through -- I -- I -- what I did do with some, you know,

16   degree of thoroughness was look at the original 2012

17   technical report, as I referred to it --

18        Q.   Uh-huh.

19        A.   -- the one that was, as I say, started as a

20   technical report --

21        Q.   Uh-huh.

22        A.   -- in which I had noted what they said they

23   found.

24        Q.   Uh-huh.

25        A.   And the -- mainly things in the abstract.  You

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 21

1    know, I'd just, "They -- they said this in that report."

2         Q.   Uh-huh.

3         A.   And then I looked at the published report, the

4    peer-reviewed one that came out, and I said, "Were they

5    still saying the same thing?"

6         Q.   Uh-huh.

7         A.   And that's the kind of comparison I made.

8         Q.   Uh-huh.

9         A.   And what I noted was, yes, they said the same

10   thing --

11        Q.   Uh-huh.

12        A.   -- but they did it more succinctly and in a

13   way that was clearer to me what they knew they knew and

14   what they knew they didn't know.

15        Q.   And just to go back to the notes you took and

16   the highlighting you did on any documents, did you bring

17   those notes or those highlighted documents with you

18   today?

19        A.   I -- I don't have them here with me in the

20   room today, no.

21        Q.   Okay.  Are you able to provide those notes or

22   that highlighting if requested?

23             MR. CARDIN:  Object to the form.

24             You may answer the question.

25        A.   I understood that my notes are privileged to

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 22

1   myself.  So I would say I'm not -- I was not expecting

2   to do that.  And had I been told beforehand that I would

3   have to turn them over, I would not have taken notes on

4   things.

5        Q.   (BY MS. SMITH)  Okay.

6        A.   I've never -- I've not encountered anywhere

7   I'm told if I took notes on something, I have to turn

8   them over.

9        Q.   Okay.  We can move on, but thanks for walking

10  me through all of that.

11             So you understand that this deposition

12  relates to litigation brought under Section 2 of the

13  Voting Rights Act?

14       A.   Yes, I do.

15       Q.   Okay.  And I believe you said earlier you

16  first learned about this litigation in September

17  of 2023.  Is that right?

18       A.   It was about September, yes.

19       Q.   And how did you learn about it?

20       A.   To the best of my recollection, I got a call

21  from Mr. Cardin, and I -- I asked him, you know, what

22  the schedule was.

23       Q.   And what were you asked to do with respect to

24  this case?

25       A.   I -- I think he just said, "I'm sending you

Page 23

1    the complaint, and look it over."  You know, that --

2    that was, basically, the sum of what he said that --

3    that he wanted me to know and he wanted me to be

4    prepared for.  And I don't -- I don't recall the details

5    that he -- you know, I -- I'm sure I asked him, you

6    know, "Where did this come from?  You know, what do you

7    know about it?

8         Q.    Uh-huh.

9         A.    And I -- I just don't remember any of the

10   details other than I was scheduled -- schedule-oriented.

11   I said, "Just tell me what you need when and let me look

12   at the complaint, and then is there any -- anything else

13   I need to see, you know?"

14        Q.    And what were you asked to do with respect to

15   writing an expert report?

16        A.    I was asked a very specific question as the

17   purpose driving my report, and that was to compare the

18   political participation of Black voters and White voters

19   in the state of Mississippi over time and to ascertain

20   what differences there were, how participation might

21   have changed.  And I immediately recognized that as a

22   demographer, that I've got the perfect dataset for doing

23   this, you know, which I used, and...

24        Q.    That being the Census Current Population

25   Survey --

Page 24

1        A.    That's right.

2        Q.    -- or the CPS?

3        A.    That's right.  I said I've used that before.

4   I know quite a bit about it.  It's going to take some

5   effort to put it together in the form that I want it.  I

6   don't know how far back it goes, but it is -- it has all

7   the attributes of what I would need.  First of all, it

8   is a scientific survey as opposed to administrative

9   record data, which are typically what I find used by

10  political scientists who are looking at an election

11  where they're -- they're working with the kind of data

12  that are collected in conjunction with a -- with an

13  election.  And administrative survey data are collected

14  and used for the purpose of doing something rather than

15  conducting a scientific inquiry; whereas, the Census

16  Bureau is in the business of publishing data that allow

17  one to pose a question and come up with a -- with a

18  scientifically based answer, qualified by the

19  limitations of what is known to be the -- what are known

20  to be limitations of the scientific dataset that has

21  been collected.  That's what the Census Bureau does, and

22  that's the kind of business I'm in.  I'm a demographer

23  who works with those kind of data.

24        Q.    Understood.  And the CPS is the only dataset

25  you relied on in your report?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 25

1      A.   I'm trying to think if there's anything else I

2   relied upon.  I -- I think it's -- well, it certainly is

3   the primary one.  I -- I don't think I relied on any

4   other data other than to possibly -- I guess I did rely

5   on one other source of Census data, which was the

6   American Communities Survey, which allows one to

7   distinguish between the entire voting age population and

8   the citizen voting age population, because I had to be

9   sure that there wasn't a big gap when the Census Bureau

10   changed its method of this four-decade Current

11   Population Survey from studying 18-year-olds to just

12   18-year-olds who were citizens, and I wanted to be sure

13   that I understood that that wasn't a change that was

14   going to affect any of my conclusions.  So I -- I

15   believe just the ACS and the CPS are the only datasets

16   that I -- I used.

17      Q.   And -- got it.  So the ACS you used for that

18   more limited purpose of seeing if the change in

19   categorization --

20      A.   Yeah.

21      Q.   -- of citizenship affected your results; but

22   otherwise, you relied on the CPS; is that right?

23      A.   Correct.

24      Q.   Okay.  Going back to your communications

25   before writing your report, did counsel provide you with

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 26

1    any facts that you considered in forming your opinion,

2    other than the complaint that you just mentioned?

3              MR. CARDIN:  Object to the form.

4              You may answer the question.

5         A.   Well, I -- I know that I -- I -- in

6    conversations with Mr. Cardin, I said, I know the last

7    time I looked at elections in Mississippi on an entirely

8    different case, I was astonished at the very high -- the

9    very high proportion of elected officials in Mississippi

10   who are African-American -- who were African-American in

11   a lot of local elections that I'd looked at.  Not the

12   ones we're talking about in this case, but in a previous

13   case.  I had assembled a large database.  I'm -- we --

14   I'm sure I mentioned that to him, and I think he -- you

15   know, we conversed about that briefly.

16        Q.   (BY MS. SMITH)  Okay.  But that's not

17   reflected in your report or part of the --

18        A.   No.  It --

19        Q.   -- opinions --

20        A.   It -- it doesn't really have anything to do

21   with this report.  It just was -- as I said, I know that

22   I've looked at this before.  I have some experience

23   looking at Mississippi local elections as opposed to the

24   carefully chosen every-two-year elections that the --

25   the CPS does, and I said I was amazed at the number of

Page 27

1   elected officials at the local level who are

2   African-American, and we had a conversation about that.

3        Q.   Okay.  But counsel didn't provide you with any

4   datasets to rely on?

5        A.   No.

6        Q.   Or any articles to rely on?

7        A.   No.  That was simply reminiscing about an

8   earlier case.

9        Q.   Understood.  Did counsel provide any

10  assumptions that you relied on in forming your opinions?

11                MR. CARDIN:  Object to the form.

12                You may answer the question.

13       A.   No, I -- I -- I've -- I've never -- he did not

14  do that, and I've never had anybody say, "Well, I'd like

15  you to make this assumption."  I said, "I'll choose the

16  assumptions I make and tell you what they are."

17       Q.   (BY MS. SMITH)  Great.  Have you had any

18  communications with the defendants themselves?

19       A.   No, not that I can think of.

20       Q.   And did anyone help assist you in your work on

21  the case?

22       A.   I'm trying to think.  Oh, yes, I -- I -- I

23  have a colleague whose name is Thomas Bryan, who is a

24  former Census Bureau statistician.  And he actually is a

25  coauthor on a book that we had written, prepared, and I

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 28

1  rely on him when I want to get an extract of Census data

2  that I know I could do myself, would take me a lot of

3  time that he routinely would have done when he was a

4  Census Bureau employee.  And I said, you know, "Can you

5  get all the, you know, data that I need going back 40

6  years or so?  And where do I go to get it, and is it

7  easy enough for me to get it or can you just get it for

8  me because you can do it more efficiently?"

9              And I know that one of the advantages of

10 dealing with a former Census Bureau statistician is that

11 these people have been trained to Census Bureau

12 standards, so you're getting someone who is like a brain

13 surgeon, and you say, when it's my brain, "Be really

14 careful, be sure it's right, don't make any mistakes."

15 And that's the understanding we have, and I rely on him

16 simply for data assembly.

17     Q.   So Thomas Bryan assembled the Census data that

18 you used in your report?

19     A.   He -- he -- he extracted it from the Census

20 Bureau website so that I would have it in a form that I

21 could use.  And I asked him -- I instructed him how I

22 wanted it displayed in certain graphic forms, and he

23 executed those things for me so that they would be

24 displayed that way.

25     Q.   Okay.  And about how many times did you meet

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 29

1    with Thomas Bryan when you were preparing the report?

2         A.    I never met with him.  I would just deal over

3    the phone or --

4         Q.    Oh.

5         A.    -- you know.  But I would say perhaps three

6    times.  I made a request; he did it.  I said, "Now let's

7    graph it."  Second request, something like that.  I

8    mean, we have a normal procedure.  I'd just say, "I need

9    these data.  Is this something you can get for me, and

10   how long would it take?"  And when he says it would take

11   him an hour, I'd say, "Well, it'd take me a day."  I

12   said, "You do it, and be sure you check it, and we'll go

13   from there."

14        Q.    So did Thomas Bryan make the graphs in your

15   report or the charts in your report?

16        A.    He -- I -- I told him what I wanted to

17   display, and I said, "I want to show a time-series

18   trend, but I don't want to have a big data table.  I

19   want to have a graphic display that makes it clear to

20   just an intelligent reader what's going on and what I'm

21   saying."  And he did it according to my instructions.

22        Q.    Understood.  And we'll talk about this more

23   later, but counsel provided us with a copy of a

24   spreadsheet that you relied upon in forming your

25   opinions in your report.  Did he produce that

Page 30

1   spreadsheet?

2        A.   Yes.

3        Q.   Okay.  Okay.  I think I'll move on.  What is

4   your understanding of the claims brought by the

5   plaintiffs in this case?

6        A.   I can't -- I can't say that I really have an

7   understanding of what it is they're claiming, but I do

8   know what it is that I am stating, and I guess that's

9   because I -- I just didn't understand why they thought

10  what they did.  I -- I haven't paid much attention to

11  their claim.  What I know is what I know, and it seems

12  to contradict what might be claimed by plaintiffs in

13  this case.

14       Q.   Okay.  And you understand that you're being

15  proffered as an expert in this case?

16       A.   Yes.

17       Q.   What are you an expert in?

18       A.   Applied demography.

19       Q.   Okay.  And do you know what the duties of an

20  expert in a federal case are?

21            MR. CARDIN:  Object to the form.

22            You may answer the question.

23       A.   I -- I don't have a detailed understanding of

24  what they are.  I know that this is a case where

25  plaintiffs make a claim.  I know what I have found, and

Page 31

1    I understand that what I have found totally contradicts

2    what plaintiffs are claiming.  I don't know the details

3    of the claim, but I know that, you know, there's --

4    there's, obviously, a claim of, you know, racial --

5    racial discrimination or something under Section 2, and

6    I'm saying all I know here is what the data show, for

7    what it's worth, about the various claims the plaintiff

8    is making.

9         Q.   (BY MS. SMITH)  Okay.  And what's your

10   understanding of what "vote dilution" means?

11                  MR. CARDIN:  Object to the form.

12                  You may answer the question.

13        A.   I -- I know quite a bit about what Section 2

14   says about what constitutes vote dilution, and it's a

15   lot of different direct and indirect things that can be

16   done.  I can't give you the full recitation of it, but

17   practices that directly or indirectly limit the fair

18   participation of voters regardless of race, ethnicity,

19   language and other characteristics.  So anything that

20   kind of -- my plain understanding is anything that kind

21   of tilts the balance against what DOJ recognizes as a

22   protected racial or language minority is something that

23   a plaintiff can make a claim about and say they didn't

24   directly do something, but they did something

25   indirectly.  And I have a lot of experience doing that,

Page 32

1   and that's what the book that I and Thomas Bryan wrote,

2   which is how you address the whole spectrum of these

3   claims under Section 2.  That's -- with -- with

4   demographic data.  That's -- so I -- I have a deep

5   understanding of what it is that can be pointed to as

6   indirectly or directly limiting the -- the voting rights

7   of a protected group.

8        Q.   (BY MS. SMITH)  Thank you.  And you mentioned

9   earlier how, in part of your preparation, was staying

10  up-to-date on the literature on this area.  Would you

11  typically try to stay up-to-date on the literature

12  you're opining on as an expert?

13       A.   Definitely stay up-to-date on what kinds of

14  claims are being made and also what court rulings are

15  saying about the claims and how they're recognizing or

16  refusing to acknowledge or, I should say, refusing to --

17  to rule that something was or was not a violation.  I --

18  I do keep up on that quite directly in the news media,

19  and I have a whole -- I keep a whole file of, you know,

20  just the latest cases that have been, you know, decided.

21  I -- my specialty is more in the local level rather than

22  the state level, but I've -- in the last year or so,

23  there have been so many decisions, I've just kept track

24  of everything.

25       Q.   And what about academic literature?  Would you

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

                                                                 Page 33

1    stay up-to-date on the academic literature that relates

2    to the issues you're opining on?

3         A.   Yes, I especially try to stay up-to-date on

4    the political-science literature because that's where a

5    lot of the most important things are being done.

6    Generally -- well, it -- basically, it's an inter- --

7    it -- you know, it's just an interdisciplinary field.

8    So I keep up on everything that I am aware of.

9         Q.   Understood.  So now I'd like to mark as an

10   exhibit the report that you submitted in this case on

11   October 16th.  That's going to be Exhibit 2 in the

12   record.

13                  (Exhibit 2 marked.)

14        A.   Did you say Exhibit 2?

15        Q.   (BY MS. SMITH)  Yes.  So it says Exhibit 3

16   because that's how it was filed --

17        A.   Oh.  All right.

18        Q.   -- but the Exhibit 2 is marked at the bottom.

19        A.   I see.  Okay.  I gotcha.  Got it.

20        Q.   So do you recognize this -- this document?

21        A.   Yes, I do.

22        Q.   And this is the October 16th, 2023 report that

23   you submitted in this case?

24        A.   That's correct.

25        Q.   Does this report contain all of the opinions

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 34

1   that you're offering as an expert in this case?

2        A.   It contains all of my opinions, and -- and

3   there are some updates that I would like to make, which

4   would be to reference the latest published version --

5        Q.   Uh-huh.

6        A.   -- of the 2012 technical report -- I think it

7   was 2012 -- so that it is part of my report.  I don't

8   quite know how that would come to be, but I'm now

9   relying on that published version, the peer-reviewed

10  version.

11       Q.   Okay.  And other than the update to citing to

12  the 2016 published version of the Berent, Krosnick and

13  Lupia study that you're referring to, are there any

14  other updates to the report that you want to make?

15       A.   No.

16       Q.   Okay.  And we can -- we'll talk more about the

17  2006 piece a bit later.

18            Okay.  So let's turn to Appendix B on

19  Page 10.

20       A.   All right.

21       Q.   Tell me when you're there.  Oh, great.  Is

22  this your CV?

23       A.   Yes, it is.

24       Q.   Is this an accurate and up-to-date CV?  Feel

25  free to --

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 35

1        A.   Yes, it is.  I think the date is at the --

2        Q.   Great.

3        A.   Yes, it's up-to-date.

4        Q.   I'd like to talk a little bit about your

5   background.  What is your educational background?

6        A.   Well, as you see on the top of Page 10, I have

7   a bachelor's degree in sociology from Dartmouth and a

8   Ph.D. in sociology from Brown, and I -- that -- well,

9   that's my academic background.

10       Q.   And can you just describe your work

11  experience?

12       A.   I was -- I was an assistant professor at the

13  University of Pennsylvania for a couple of years, at

14  which point I was invited to join the RAND Corporation's

15  research staff, where I spent several decades of my work

16  career, basically, as their only demographer.  And

17  eventually, they referred to me as senior demographer.

18  And I then began to do work that could not be done under

19  the auspices of RAND as a client but could be done by me

20  as an independent consultant, as an applied demographer,

21  and I began to do that sometime around the 1980s a

22  little bit.  And then the -- my involvement grew, and I

23  became increasingly involved in that.

24            Around 1990 -- 1990, 1995 or so, I changed

25  my status from being an employee at RAND to wanting to

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 36

1  be just a -- a resident consultant, of which they have

2  hundreds.  I shouldn't say hundreds.  They have -- they

3  have some resident consultants and hundreds of

4  consultants.  So the work that I was doing was not a

5  part of -- I -- it was not something that they would be

6  accused of being involved in.

7      Q.   Uh-huh.

8      A.    They didn't want to have anything to do

9  with -- you know, with what I was doing, but they said

10  you can do it as long as it's not directly involved with

11  RAND.  So that became my modus operandi, and I remained

12  a resident consultant for probably 10 or 15 years.  And

13  since then, I have -- my -- my ties with RAND now are as

14  an alumnus, and I do all of the work in the areas of

15  which my expertise lies as part of Peter A. Morrison &

16  Associates, Incorporated.

17      Q.   Understood.  So I'll just quickly walk through

18  that.  So you now have your own consulting firm, and

19  you've had that firm since 2009.  Do I have that right?

20      A.    Oh, that -- it was established -- I think it

21  was established back in the 1990s.  So that firm has

22  existed, and it is now my exclusive point of contact

23  with the workforce, you might say.

24      Q.   Great.  And you worked at the RAND Corporation

25  about 40 years; is that right?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 37

1       A.    Something like that, yeah.

2       Q.    Okay.  And you taught at University of

3    Pennsylvania about two years?

4       A.    Yes.  And then I've -- I've actually -- I

5    mean, I've been involved with academia throughout my

6    career just because I -- I attend the meetings of the

7    professional associations of demographers every year.

8    And I've been part of that group as kind of a person who

9    is -- is engaging in applied demography, which was a

10   tiny field when I entered the field -- the academic

11   field of -- of demography and has now become a much

12   bigger field.  And, in fact, academic demographers are

13   now being trained as applied demographers --

14      Q.    Uh-huh.

15      A.    -- to work outside of academia.  And there's a

16   large overlap, so we sort of all are involved both with

17   academic research and with applied research.

18      Q.    Okay.  Did you teach any classes at Penn?

19      A.    I did.  I taught a class in introductory

20   statistics to undergraduates.

21      Q.    Okay.

22      A.    And I -- throughout my career, I have given

23   presentations at meetings of demographers, and in the

24   last few years, have taken to giving sort of mini

25   courses in, you know, how you go about assembling data

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                                    Peter A. Morrison, Ph.D.

Page 38

1    and addressing a voting rights case so that applied

2    demographers understand what's going on when their data

3    are being used for that purpose.

4         Q.    Have you ever taught a political-science class

5    at any institution, at Penn or --

6         A.    Not a political-science class, but I -- I have

7    coauthored papers with political scientists.  So I --

8    I'd say I have a close connection with political

9    scientists who -- whose skills and interests overlap

10   with demographic data.

11        Q.    And you mentioned you're a demographer.  What

12   does an applied demographer do?

13        A.    Applied demographers are concerned primarily

14   with applying demographic knowledge rather than

15   advancing the frontiers of demographic knowledge.  I

16   think that's the simplest way to explain it.

17        Q.    And you're not a political scientist, you said

18   earlier?

19        A.    I am not a political scientist, no.

20        Q.    Do you have any formal training in political

21   science?

22        A.    I have only the experience that's built up

23   over 30 years of collaborating with political

24   scientists.

25        Q.    So that's not formal training as a --

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 39

1      A.    Not formal training, but --

2      Q.    -- political scientist, but collaboration?

3      A.    Well, I would say it amounts to on-the-job

4  training.  So I -- I would -- I wouldn't agree that I

5  don't have any training.  It's just not formal classroom

6  training.  But I have -- I regularly call upon

7  colleagues who are political scientists with whom I have

8  coauthored papers and say, "Can you fill me in on what's

9  going on with this?"

10     Q.    Understood.  Have you ever held an appointment

11  in a political-science department?

12     A.    No.

13     Q.    What about in a statistics department?

14     A.    Not in a statistics department, no.

15     Q.    Are you an expert in the methods used to

16  analyze surveys?

17     A.    I would say I have -- I'm qualified to work

18  with survey data, but I -- I don't consider that to be a

19  central part of my expertise.  I know -- I know what

20  surveys are, I know what I need to do, you know, to

21  adhere to the standards, but I don't know how to put a

22  survey together from scratch.

23     Q.    Are you an expert in survey design or

24  sampling?

25     A.    I know -- I know about survey design, and I

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 40

1   know about sampling to the extent that users of those

2   data need to know.

3        Q.   Okay.  So as a user of surveys --

4        A.   I'm -- I'm a -- I'm a knowledgeable user of

5   survey data.

6        Q.   Okay.  But not an expert in survey designs

7   specifically?

8        A.   That's not a central part of my expertise, no.

9        Q.   Understood.  Are you an expert in voting

10  behavior?

11       A.   I know enough about voting behavior to study

12  it, but that's not a central part of my expertise.

13       Q.   And are you an expert in assessing voter

14  turnout or participation?

15       A.   I've had quite a bit of applied experience

16  assessing it, and, again, it's not a central part of my

17  expertise, but I have working expertise to -- in using

18  data, those data.

19       Q.   Are you familiar with the term "ecological

20  inference analysis"?

21       A.   Yes, I am.

22       Q.   Do you know how to run an ecological inference

23  analysis?

24       A.   I know how they're run, but I wouldn't know

25  how to do one myself unless I was -- had a political

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 41

1   scientist to take me through step by step.  But I

2   understand how it's run analytically, and I understand

3   what its limitations are and how inferences are drawn

4   from the results of ecological inference.

5        Q.   Have you ever run one yourself?

6        A.   No.

7        Q.   So a few additional questions about your work

8   as an expert.  What's your usual rate that you charge?

9        A.   I'm -- I'm currently charging $375 an hour for

10  the work I do, and I charge something around $500 per

11  hour for any deposition or trial testimony.

12       Q.   And is that the rate you're charging for your

13  work in this case?

14       A.   I believe it is, yes.

15       Q.   How many hours have you spent on your work in

16  this case, about, would you say?

17       A.   I can't give you an honest answer to that.  I

18  mean, I -- I can't give you a -- even an approximate

19  estimate because I -- I haven't had time to put together

20  my billing in the last month and a half.

21       Q.   Okay.  How much have you billed for your work

22  in this case?

23            MR. CARDIN:  Object to the form.

24       A.   I don't recall.  I -- I'd have to look it up.

25       Q.   (BY MS. SMITH)  And what percentage of your

Page 42

1   income every year comes from doing expert work?  Is it

2   all of it, now that you've retired from RAND?

3        A.   You would have to define as what you mean by

4   "income."  And I'm asking that as -- speaking to someone

5   who would say, "Well, the definition of 'income' is."

6   If you want to know do I earn income other than what I

7   live on from my family -- my and my spouse's retirement

8   accounts, that's a major part of our income, and I would

9   say my consulting work is a significant portion of our

10  total annual income.

11       Q.   What about -- you don't have any other

12  employment currently; is that right?

13       A.   Not now, no.  I used to have other employment,

14  though.

15       Q.   Okay.  No, thank you for --

16       A.   Sure.

17       Q.   -- for --

18       A.   Right, right.

19       Q.   -- for helping me clarify my question there.

20            Is payment of your fees contingent on the

21  outcome of the case in any way?

22       A.   Not at all, no.

23       Q.   And do you know who's responsible for paying

24  your bills?

25       A.   The defendant.

Page 43

1     Q.   Okay.  And generally speaking, are you

2  confident in the report that you submitted in this case?

3     A.   I'm very confident in this report.

4     Q.   That it comports with your professional

5  standards?

6     A.   Yes.

7     Q.   Is there any information you would have liked

8  to have but didn't in writing your report, other than

9  the 2016 Berent, Krosnick and Lupia article we've talked

10 about?

11    A.   You mean is there anything that I could have

12 had and wanted but couldn't get my hands on it --

13    Q.   Yeah.

14    A.   -- or -- I mean, I'm not going to dream and

15 say, "I wish, you know, something was this."  But, no,

16 there's nothing -- nothing that I needed that I could

17 not obtain.

18    Q.   Okay.  Let's turn back to Appendix A, Page 9

19 now.  We're going to talk a little more about your other

20 expert work.  So do you recognize this document as a

21 list of your prior expert work --

22    A.   Yes.

23    Q.   -- over the past four years?

24              And it's up-to-date?

25    A.   It's up-to-date as of October 9th, yes.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 44

1      Q.    Has anything changed since October 9th that

2    you know of?

3      A.    Let me think about that.  No, I -- I -- I

4    think had there been anything, I would have added it in.

5    I haven't submitted any reports or testimony since

6    October 9th.

7      Q.    Great.  Across your whole career, I know you

8    may have testified a lot, so I don't -- just give me --

9    could you give me your best estimate of how many times

10   you've testified in a case involving redistricting?

11     A.    If I could say -- let's just say it could have

12   been as many as 100 times.  Probably not quite 100, but

13   just take that as a round number.  It could be 75 times.

14   Of 100 times, I'd say probably 80 times out of 100 --

15   did you say in a voting-rights case or all -- all cases?

16     Q.    In a redistricting case.

17     A.    Oh, redistricting case.

18     Q.    Uh-huh.

19     A.    Probably more like 50 in that case.  And of

20   those, I'd say most were on behalf of the defendant.

21   Some have been on behalf of plaintiffs, but that would

22   be maybe one out of every five, one out of every 10.

23     Q.    Okay.

24     A.    I'm just -- these are ballpark estimates.  I

25   just want you to know that I do not testify exclusively

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 45

1   for defendants.  I have testified for plaintiffs in at

2   least several cases I can point to.

3        Q.   Okay.  Yeah, let's talk a little bit more

4   about those.  So did you testify in a case involving a

5   challenge to county districts here in Dallas, Texas?

6        A.   I think that was one of the cases that I was

7   working for the plaintiffs.

8        Q.   And that's the Harding versus Dallas County

9   case?  I think it's listed here as Number 7.

10        A.   Let's see.  That's what it says, yes.

11        Q.   Was that a -- do you recall if that was a

12   Section 2 case brought by a group of White plaintiffs?

13        A.   I'd have to go back and check my records, but

14   I think -- I think you're correct on that, but I don't

15   want to say I know for sure.  That's -- that's my

16   recollection.  It was quite some time ago.

17        Q.   And do you remember if you drew a remedial

18   plan that would have provided White voters with a White

19   opportunity district in Dallas County?

20        A.   I -- I can't say I recall clearly whether or

21   not I did that, but that -- I -- I don't know -- I mean,

22   I know that there was some boundary drawing or boundary

23   evaluation, but I don't know if it's as you stated it.

24   So I wouldn't want to say yes.  I'd say I don't recall

25   on that.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 46

1        Q.   That's fine.  And did you testify in a case
2   involving a challenge to Maryland's congressional
3   districting plan?  And I believe that's Fletcher v.
4   Lamone.
5        A.   Where have we got that at?
6        Q.   That's actually from more than four years ago.
7   So 2011.
8        A.   Yes, I do recall being involved in that case,
9   as well, and I don't recall very much about it.  I'd
10  have -- I'd have to look back.  That was a long time
11  ago.
12       Q.   Did that case, to your recollection sitting
13  here today, challenge the No Representation Without
14  Population Act, which was a law that was passed in
15  Maryland to address the counting of prisoners as
16  residents in their place of incarceration?
17       A.   I don't recall that as being a part of that,
18  the case you're referring to.  I --
19       Q.   Have you ever --
20       A.   I --
21       Q.   Oh, sorry.
22       A.   Yeah, I -- I just -- I recall there was a case
23  in that state involving something, and it was a long
24  time ago.  I just would have to check the record --
25       Q.   Okay.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 47

1       A.    -- check my own records of what -- what it was

2    about.

3       Q.    Have you ever testified on behalf of a group

4    of Black plaintiffs in a Section 2 Voting Rights Act

5    case?

6       A.    I don't really think of cases that way.  I --

7    I honestly can't answer it.  I don't look to see is the

8    plaintiff here a Black plaintiff.  I just say which side

9    am I working for.  I don't look at the race of the

10   people that they put up as the plaintiffs or the

11   defendants.  So I -- I can't answer that question --

12      Q.    Okay.

13      A.    -- without looking at the caption on the front

14   of the thing.

15      Q.    Okay.  So none that you want to point me to,

16   sitting here today?

17      A.    Nothing -- I can't honestly answer your

18   question for any of them.

19      Q.    Okay.  Have you ever been disqualified from

20   testifying by a Court?

21      A.    Never.

22      Q.    Okay.  I want to talk about another case where

23   you served as an expert, and this time, it's for a

24   defendant.  Do you remember testifying for defendants in

25   the case United States versus Village of Port Chester?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 48

1       A.    I remember the place named Village of Port

2  Chester, but that's about the extent of my recollection.

3  I would -- you can go ahead and ask questions, but I

4  don't think --

5       Q.    Sure.

6       A.    I'd answer them --

7       Q.    Okay.  If I told you the case was an action by

8  the United States against the Village's use of an

9  at-large system to elect its board of trustees, does

10 that sound familiar to you?

11      A.    I can't say it's correct or incorrect.  I

12 would just have to -- have to check back on the file on

13 that to see what it was about.

14      Q.    Yeah.  Great.  I have a copy of that decision

15 here.  Let me mark this for the record as Exhibit 3.

16               (Exhibit 3 marked.)

17      Q.    (BY MS. SMITH)  This is United States of

18 America versus Village of Port Chester.  That's a

19 decision issued by the Court at 704 F. Supp. 2d 411 in

20 the Southern District of New York in 2010.

21      A.    All right.

22      Q.    And I'll just point you to the synopsis of the

23 case, if you want to take a moment to look over it.

24      A.    Yeah.

25      Q.    Does that help you remember the case?  So this

Page 49

1   is the United States filing an action against the

2   Village alleging that the at-large system denied the

3   Hispanic population an equal opportunity to participate

4   in the political process and elect representatives of

5   their choice in violation of the Voting Rights Act.

6           A.    I can see that, yeah.

7           Q.    Great.  Let's go to Page 34 of this document.

8   That's going to be Footnote 11 in the middle of the

9   page.

10          A.    All right.

11          Q.    Do you see that the Court says that you

12  posited that the CVAP data for Port Chester may not be

13  fully accurate because there is some evidence that

14  there's over-reporting of citizenship status by

15  Hispanics in the Census, that is, Hispanic noncitizens

16  will indicate on Census forms that they are, in fact,

17  citizens?

18          A.    Yes.

19          Q.    Do I have that right?

20          A.    Yeah.

21          Q.    Okay.  And I'll go ahead and mark your expert

22  report submitted in that case for the record.

23                    (Exhibit 4 marked.)

24          Q.    (BY MS. SMITH)  This is Exhibit 4, expert

25  report of Peter Morrison for the case of United States

NAACP, et al. v. State Board of Election Commissioners, et al.                                    Peter A. Morrison, Ph.D.

Page 50

1    versus Village of Port Chester, dated May 13th, 2007.

2         A.    All right.

3         Q.    Do you recognize this document?

4         A.    It looks like my report.

5         Q.    An expert report you submitted in the Port

6    Chester case --

7         A.    Correct.

8         Q.    -- in May 2007?

9               Okay.  Let's turn to Page 31.

10        A.    All right.

11        Q.    After "Citizenship Misreporting," you said,

12   quote:  A further consideration here is the body of

13   research by Census Bureau staff and others which

14   documents a tendency for noncitizens, particularly

15   recently arrived ones, to misreport themselves as

16   citizens on the Census.

17               Do I have that right?

18        A.    Yes.

19        Q.    Okay.  Moving to the following paragraph, the

20   last sentence, you state:  Correcting for citizenship

21   over-reporting in Port Chester is justified here.

22               Do I have that right?

23        A.    Yes.

24        Q.    So is it your opinion that you offered in this

25   case that experts should correct for over-reporting in a

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 51

1  Census dataset?

2      A.    The -- the correction is justified here, first

3  of all, because there were so many Hispanics.  Hispanics

4  were a predominant part of the population.  And

5  secondly, at that point in time, which is now -- we're

6  talking about 2007, before the 2010 Census had even been

7  taken, which is, you know, a decade old -- at that point

8  in time, there were a lot of concerns about citizenship

9  misreporting.  And I believe at that time, I -- when I

10  was working with Mr. Bryan, he said, "You know, the

11  Census Bureau looks at this issue, and they actually

12  have studies -- unpublished studies and unpublished data

13  that we could refer to as suggesting that there may be

14  misreporting at the very local level, such as this

15  village.

16            And that's where I got the information,

17  and it was -- I would characterize it as responsive to a

18  circumstance that occurred at a very local level where

19  there was a considerable concern with misreporting on

20  the part of a very sizable Hispanic population about

21  whom there could be some controversy as to whether or

22  not they were all citizens, as reported on the Census.

23  So that was something I looked into, and that was the

24  basis for bringing that issue up at that point in that

25  particular case.

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 52

1      Q.   So would you suggest that experts correct for

2   citizenship over-reporting when evaluating Census data

3   when there is evidence of over-reporting, as you

4   described?

5      A.   I would say when there is substantial evidence

6   of over-reporting, it would be worth looking into the

7   feasibility of doing that, but I would not, as a general

8   rule, say it's something that ought to be done.  As a

9   general rule, I would say just go with the published

10  Census data because at this point in time, which is now,

11  what, about 15 years -- 15 or 18 years ago, we know a

12  lot more about the Census Bureau's robustness of

13  reporting of citizenship and their efforts to deal with

14  problems such as this, which were problems of concern in

15  2007 but are now well accounted for by the practices

16  that the Census Bureau engages in 15, 18 years later.

17     Q.   Okay.  And would you agree that

18  disproportionate over-reporting by one group can lead to

19  inaccurate results on a survey?

20            MR. CARDIN:  Object to the form.

21            You may answer the question.

22     A.   I -- I wouldn't agree with that, no.

23     Q.   (BY MS. SMITH)  And why not?

24     A.   Because I have no evidence that it is

25  something that is of concern and can be corrected.  I'm

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 53

1   not -- let me be clear on what I'm saying here.  I'm not

2   saying that there is no over-reporting.  I'm simply

3   saying that there is no evidence of over-reporting in,

4   I -- I would say, virtually any of the cases I've been

5   involved in since then that would justify saying this is

6   a central concern.  I -- I think it's important to

7   understand that everyone recognizes that all data that

8   the Census Bureau deals with have issues concerning

9   reporting.  They are not 100.000 percent correct.  But

10  the issue of over-reporting of Hispanics -- of Hispanic

11  citizens as a general concern with the Census Bureau is

12  not one that enters into any of the research or any of

13  the studies that I've done in the last 10 years.

14       Q.   Okay.  I think we can move on to -- I want to

15  talk about another case.  Your CV mentions that you

16  worked as an expert for defendants in the case NAACP

17  versus East Ramapo School District; is that right?

18       A.   Yes.

19       Q.   Okay.  And was that a case where --

20            MR. CARDIN:  That's Number 18 on the

21  list; is that --

22            MS. SMITH:  Oh, sorry.

23            MR. CARDIN:  Appendix A.

24            MS. SMITH:  Let me go back to Appendix A.

25  I believe that's right, but just give me a moment.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 54

1    A.   Sure.  East Ramapo, I think it's pronounced.

2    Q.   (BY MS. SMITH)  Ramapo.  Oh, thank you.

3    A.   Yeah.

4    Q.   Yes, Number 18.  Thank you.

5    A.   Right.

6    Q.   And you testified at trial in this case?

7    A.   Correct.

8    Q.   Okay.  And was that a case where the NAACP and

9    minority voters sued a school district alleging an

10   at-large system of electing school board members diluted

11   the votes of Black and Latino communities under Section

12   2?

13   A.   I'd have to go back and see whether every

14   single word in your sentence is correct, but --

15   Q.   Right.

16   A.   -- that's generally what I recall about it.

17   Q.   Great.  Well, let's look at that decision,

18   too.  So I can mark for the record -- this is now

19   Exhibit 5.

20            (Exhibit 5 marked.)

21   Q.   (BY MS. SMITH)  I'm marking for the record

22   National Association for the Advancement of Colored

23   People versus [sic] Spring Valley Branch versus East

24   Ramapo Central School District.  That's 462 F. Supp. 3d

25   368, an SDYN decision from 2020.  Here you are.

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 55

1          A.    Thank you.

2          Q.    Okay.  If you want to take a moment, we can

3     look at the synopsis.  It says:  Interest group and

4     minority-registered voters brought an action against a

5     school district alleging that the election system that

6     the school district used to elect members of its board

7     of education resulted in minority vote dilution in

8     violation of the Voting Rights Act.

9          A.    Yes.

10         Q.    Does that sound right?  Okay.

11                    Let's turn to Page 12 here.  And the page

12    number is at the bottom right.  Looking at the top

13    left-hand corner, the end of that first paragraph, I

14    believe the Court noted that you had, quote, advocated

15    for the use of surname and geocoding analysis to derive

16    racial estimates by geographic unit.  Do I have that

17    right?

18         A.    Yes.

19         Q.    And another name for that would be Bayesian

20    Improved Surname Geocoding?

21         A.    That's correct.

22         Q.    Or BISG?

23         A.    Yeah.

24         Q.    Okay.  Let's turn now to Page 36 of this

25    document, and we're looking at Footnote 33.  And here,

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 56

1    the Court said that, quote, a 2017 paper coauthored by

2    Dr. Morrison cited the Imai -- Imai and Khanna article

3    about BISG methodology.  Do I have that right?

4         A.   Yes.

5         Q.   Is that a reference to Dr. Kosuke Imai?

6         A.   I -- I -- I don't know if it's the same Imai,

7    but I -- I don't dispute that I said that.

8         Q.   Okay.  So you cited Dr. Imai --

9         A.   Yes.

10        Q.   -- in a paper you wrote in 2017?

11        A.   Correct.

12        Q.   Is Dr. Imai reputable in the field of

13   statistical methods, to your knowledge?

14        A.   I -- I don't know anything about the person,

15   the author.  I just know that I cited the article in

16   support of the contention that one could assign a

17   race -- and the quote here is "one could assign a race

18   to registrants in a voter file where this quantity is

19   not present and then aggregate" the individuals and then

20   use it as an EI input.  And what I said was you could

21   do.  I -- I didn't say whether you should do it or

22   whether it would give you an accurate result.  I said

23   you could.  And I think the intention of my statement

24   there was that there was no reason not to try to do it

25   that way.  It was a way to do it that would -- you know,

Page 57

1    could be justified --

2        Q.   Okay.

3        A.   -- based on what I knew about BISG.

4        Q.   But you're not offering any conclusions about

5    BISG in this case?

6        A.   No, I -- I -- I stand behind BISG as a way of

7    dealing with a very complicated problem if it's properly

8    applied and the caveats are recognized and obeyed.  In

9    other words, if you use it correctly, it -- it has been

10   proven to be workable.  I had some experience where

11   people have used BISG and they -- they ignore the

12   caveats, and I say it's too bad because they didn't do

13   it right, and they -- you know, they're going to end up

14   with things I don't know whether they're true or not.

15       Q.   Okay.  But you're not offering opinions about

16   BISG here in this litigation in your --

17       A.   No, I -- I -- I would say if somebody has used

18   BISG properly, I -- my opinion would be I stand behind

19   it.  I haven't directly studied its application in this

20   case.

21       Q.   Understood.

22       A.   But if I'm called upon to do it, I will.

23       Q.   And Dr. Imai, you testified you don't know

24   about him, but you found his article reputable enough to

25   cite in a paper you wrote; is that right?

Page 58

1      A.   I'm assuming here that it was a peer-reviewed

2  publication.

3      Q.   Uh-huh.

4      A.   And if someone has a peer-reviewed

5  publication, I will regard that as meeting the minimum

6  scientific standards that I would want to rely upon.

7      Q.   Okay.  Thank you.  I think we're done with

8  that document.  And I'm going to shift gears a little

9  bit.  I want to pull up one more document while we --

10              MR. CARDIN:  Can we take a break --

11              MS. SMITH:  Oh, yeah.

12              MR. CARDIN:  -- for a second?

13              MS. SMITH:  Of course.  We've been going

14  about an hour.  We can go off the record.  Thank you.

15              (Recess taken from 10:05 to 10:12 a.m.)

16      Q.   (BY MS. SMITH)  Okay.  I want to pull up one

17  more document while we're talking about your past work.

18              MS. SMITH:  Okay.  I'm going to mark this

19  as Exhibit 6 for the record.  It's an op-ed in the LA

20  Times by Dr. Morrison.

21              (Exhibit 6 marked.)

22      Q.   (BY MS. SMITH)  So do you recognize this

23  document?

24      A.   Yeah, I know it's mine.  It's 1995.

25      Q.   So is this an op-ed you published in 1995?

Page 59

1     A.    Yes.

2     Q.    Okay.  And what is it about?

3     A.    '95.  Let me just read it.

4     Q.    Oh, yeah, take a moment.

5     A.    Sure.

6     Q.    Please.

7     A.    Yeah, I think I recall what this is about.

8   Your question?

9     Q.    What is -- what is it about?

10     A.    It's about the Census Bureau's definitions and

11   distinctions among individual ethnic and racial -- and

12   racial identities and the questions they ask.

13     Q.    Great.  Okay.  And it's also about race-based

14   redistricting?

15     A.    Tell me which paragraph you see that in.  I --

16     Q.    Let's --

17     A.    -- didn't read the whole thing.

18     Q.    Sure.  Let's go to Paragraph 6.

19     A.    All right.

20     Q.    I believe you said in the third sentence,

21   quote:  Membership in a given "minority" group means not

22   exclusion but entitlement.

23              What did you mean?

24     A.    I said -- what I said is, "At the same time --

25     Q.    "At the same time."

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 60

1     A.   -- membership" --

2     Q.   Oh.

3     A.   -- et cetera.

4     Q.   Okay.  So:  At the same time, membership --

5     A.   Yeah.

6     Q.   -- in a given "minority" group means not

7  exclusion not entitlement?

8     A.   And the preceding sentence says:  Now the

9  focus is on distinctions that are finer, more numerous

10  and more open to debate.  At the same time, membership

11  in a given "minority" group means not exclusion but

12  entitlement.

13     Q.   Okay.

14     A.   "The stakes remain as always:  privilege and

15  resources, including political empowerment."

16     Q.   Okay.  And when you said "membership in a

17  given 'minority' group means not exclusion but

18  entitlement," specifically, what did -- what did you

19  mean by that?

20     A.   Entitlement to equal opportunity to vote --

21     Q.   Okay.

22     A.   -- at this particular point in our history,

23  which is 1995, which I would say it is a -- a comment on

24  the state of affairs in 1995, which would be, at this

25  point, what, close to three -- three decades ago.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 61

1      Q.   Sure.

2      A.   So it's -- it's -- I -- I would regard this as

3  a commentary -- an opinion piece commenting on the state

4  of affairs three decades ago in the United States with

5  regard to race and entitlement.

6      Q.   Okay.  And then in the next paragraph, you

7  said, quote:  A highly controversial aspect of

8  ethnically based districting is its reinforcement of

9  ethnic separatism.

10              Do you see that?

11     A.   Yes.

12     Q.   And what did you mean by that?

13     A.   Just what I said.  It's highly controversial.

14     Q.   Okay.  Would providing Black-opportunity

15 districts lead to, quote, reinforcement of ethnic

16 separatism, in your view?

17              MR. CARDIN:  Object to the form.

18              You may answer the question.

19     A.   I don't have an opinion on that.

20     Q.   (BY MS. SMITH)  Okay.  One more thing on your

21 background.  Looking at your CV, I see you filed a brief

22 in support of the appellants in the case Evenwel v.

23 Abbott.  Is that right?

24     A.   Yes.

25     Q.   And Dr. Swan- -- David Swanson joined that

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 62

1    brief with you?

2         A.   Yes.

3         Q.   Is he another demographer you've worked with?

4         A.   Yes, he is.

5         Q.   Have you discussed this case with Dr. Swanson?

6         A.   I -- I don't know that I've discussed this

7    case in particular with him.  I have discussed the work

8    that he has been doing on another case, and I -- I can't

9    rule out the possibility that our discussion also

10   include -- included some mention of this case.  I'm

11   trying to think back.  I did not discuss the case itself

12   with him.  I may have discussed data with him that

13   included Mississippi as well as other states.

14        Q.   Okay.  Did any of those discussions affect

15   your conclusions in this October 2023 report?

16        A.   No, we -- they -- I haven't discussed this

17   case with him, as best as I can recall.

18        Q.   Okay.  Great.  And going back to the Evenwel

19   v. Abbott case, what is your understanding of the

20   appellants' argument in that case?

21        A.   Again, I -- I really don't recall the details

22   of what the appellants' argument was.  What I recall is

23   simply that a group of demographers had something to say

24   collectively about what was going on, and that's --

25   that's the -- you know, I'd have to review the whole

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 63

1    thing to see what it was about again.

2        Q.   Okay.  And if I had told you that the

3    appellants were arguing that the equal protection clause

4    requires districting take into account the total number

5    of people eligible to vote as opposed to the total

6    population, would that sound right?  Does that sound

7    familiar?

8        A.   I'm not sure what the distinction between the

9    total number of people and the total population.  To me,

10   that sounds synonymous.

11       Q.   Oh, sorry.  The total number of eligible

12   people to vote --

13       A.   Oh, eligible.

14       Q.   -- as opposed to the total population, which

15   would include, say, not citizens?

16       A.   I honestly don't recall where that distinction

17   entered in.  I mean, I'd have to review the whole thing.

18   I -- it may have entered in.  And what was your question

19   about that?

20       Q.   Just if that sounded familiar to you as to

21   what the appellants argued in that case.

22       A.   I can't say that it sounds familiar because I

23   don't recall what -- what they were arguing.  I only

24   recall what we said.

25       Q.   Okay.  What -- and did you say, to the best of

Page 64

1    your recollection?

2         A.   Again, I'd have to -- I'd have to look at the

3    document to tell you what we said.

4         Q.   Okay.  So why did you file a brief on behalf

5    of the appellants in that case?

6         A.   I think the -- the -- the simple answer to

7    your question was that I felt honored to be called upon

8    to gather together several of the most qualified applied

9    demographers from several different disciplines to agree

10   on what we had to say about a set of -- a subset of the

11   issues in that case and someone who was willing to pay

12   us to do so.  And I said, "If you'd like us to -- to put

13   together what we think of as our consensus opinion, it's

14   a big favor to ask to do it for free, but if you'd like

15   for us to do it, we'll do it."

16        Q.   Okay.  Do you have a view on whether decennial

17   redistricting should be done on the basis of number of

18   people who are eligible to vote as opposed to the total

19   population?

20             MR. CARDIN:  Object to the form.

21             But you may answer the question.

22        A.   Yeah, I -- I don't have an opinion on it.  I

23   acknowledge that it is important both to the eligible

24   voter population and to the total population because it

25   gets at everyone who is represented, which is the total

Page 65

1    population, and those among the persons represented who

2    are entitled to cast a ballot.

3        Q.   (BY MS. SMITH)  So just to be sure I'm clear,

4    do you think decennial redistricting should be done on

5    the basis of number of people eligible to vote?

6                    MR. CARDIN:  Object to the form.

7                    You may answer the question.

8        A.   You're saying do I think it -- it should be

9    done based on the -- state the question again.

10       Q.   (BY MS. SMITH)  Do you think that decennial

11   redistricting should use data that looks at

12   voting-eligible people and not the total population?

13                   MR. CARDIN:  Object to the form.

14                   You may answer the question.

15       A.   I think it should be -- reflect both

16   populations.

17       Q.   (BY MS. SMITH)  And is that the view of -- how

18   would it do that?  Yeah.

19       A.   Operationally?  You mean -- I -- you --

20       Q.   Sure.  How would that work?

21       A.   It would -- it would work by eligible voters

22   electing people who represent the total populations of

23   which the eligible voters are a part.

24       Q.   Okay.  So when drawing district maps and

25   accounting for the one-person-one-vote principle,

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 66

1    would -- would states be using the number of

2    voting-eligible people or the total population?

3                    MR. CARDIN:  Object to the form.

4                    You may answer the question.

5         A.   It's not an either/or situation.  It is a

6    conceptual distinction, and I -- I can't answer the

7    question because it's -- it's not one or the other.

8    It's not -- it's not an either/or.

9         Q.   (BY MS. SMITH)  Do you understand that the

10   appellants were arguing for -- for one of those options

11   and not a hybrid approach in that case?

12        A.   I can't say that I'm clear on what they were

13   arguing.

14        Q.   Okay.  So you submitted --

15        A.   I'm just saying I'm clear on --

16        Q.   It's your testimony that you submitted the

17   amicus brief in that case, but you didn't know what they

18   were arguing?

19        A.   I did know at the time, but I'm saying I don't

20   know at this time.

21        Q.   Okay.

22        A.   I don't clearly recall at this time.

23        Q.   All right.  We talked a little bit earlier

24   about how you worked a fair amount with Thomas Bryan; is

25   that right?

Page 67

1      A.   Yes.

2      Q.   Okay.  Have you ever worked with

3   BryanGeoDemographics, his firm?

4      A.   Yes.  I mean, when I say I worked with Thomas

5   Bryan, he regards it as working with him --

6      Q.   Okay.

7      A.   -- and his firm.

8      Q.   Okay.  I think that concludes your background.

9   Let's -- let's turn to your report again.  That's

10  Exhibit 2, in terms of its location in the record.

11  Although, here's what it looks like.  So I believe you

12  already have it.  Yeah.  That first one.

13     A.   Oh, okay.  Sorry.

14     Q.   No, you're fine.

15     A.   All right.

16     Q.   Okay.  So looking at Page 2 to the first page

17  of the report, I see you were asked to opine on the

18  level of political participation of Black eligible

19  voters in Mississippi relative to White voters.  Is that

20  right?

21     A.   To White eligible voters.

22     Q.   White eligible voters?

23     A.   Right.

24     Q.   And to evaluate political participation, you

25  considered the percentage of people who were registered

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 68

1    and then also the percentage of people who turned out to

2    vote?

3        A.    Correct.

4        Q.    Great.  And what methods did you use in your

5    analysis?

6        A.    I tabulated and displayed the data on the

7    number of people who were eligible to vote and the

8    number who turned out to vote.

9        Q.    Okay.  And you relied on the CPS, as you said

10   earlier.  And what did you conclude in your report?  I

11   believe it's listed on Page -- still on Page 2, at

12   Paragraph 3.

13       A.    Well, I concluded that based on a 42-year-time

14   series of data that is unique to this source of -- to

15   this data source from the Census Bureau, that there is a

16   distinct break that occurred in the historical pattern

17   of political participation by Mississippi voters, and I

18   noted that the distinction -- that -- that the way the

19   break evidenced itself was comparing a period from 1980

20   through 2002 with a period from 2004 onward, where in

21   the latter case, the pattern had reversed and that Black

22   political participation which had trailed that of Whites

23   now exceeded that of Whites in most years, and that it

24   was an authentic break that could be documented only by

25   a scientifically collected source of data over a period

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 69

1    of this length.

2         Q.   Understood.  And you concluded that, quote,

3    irrespective of any apparent over-reporting of

4    registration or turnout on the CPS?

5         A.   Did I say that?

6         Q.   Yes.

7         A.   Yeah, I -- I agree with that --

8         Q.   Great.

9         A.   -- that that's what I said.

10        Q.   Okay.  And then in the next paragraph, you

11   said:  Based upon the entirety of these data and other

12   research.

13             Just to make sure I understand, what is

14   "other research" referring to here?

15        A.   I have followed the political participation of

16   Black voters in Mississippi in more than one instance,

17   and I have taken note in another study that I did that

18   Blacks are a disproportionately high percentage of all

19   locally elected officials in Mississippi in recent

20   years.  And I regard that as -- as a noteworthy

21   observation for just the changes that have occurred over

22   the decades in Blacks' political participation from an

23   earlier period of time to what is now a period of time

24   that I can document from 2004 onward.

25        Q.   Okay.  But you're not offering any opinions as

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 70

1    to the level of Black representation in political office

2    in Mississippi, number of people who've been elected and

3    their race?

4         A.   I'm simply saying that the pattern that I

5    observed of Black versus White participation evidences

6    itself since 2004 in Black participation being certainly

7    equal to if not greater than that of Whites.  I don't

8    know that it's greater for sure, but it looks greater in

9    the graphs, and it certainly establishes without any

10   doubt that participation is equal, if not greater, among

11   Blacks relative to Whites in terms of both registration

12   and turnout.

13        Q.   Okay.  Let's talk more about the Current

14   Population Survey.  So what -- what is the CPS?

15        A.   The CPS is, first and foremost, a long

16   established scientific survey conducted by the Census

17   Bureau for, I think, 42 years now, if not more, as a

18   scientifically conducted survey.  It is uniquely

19   informative relative to administrative by-product data,

20   which most political scientists are using to evaluate

21   elections in a particular year or at a particular point

22   in time or in a particular place --

23        Q.   Uh-huh.

24        A.    -- or state but are always time-specific,

25   place-specific as opposed to a continuous regular

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 71

1   reading of what's going on every two years over a

2   42-year period.

3        Q.   Okay.  In terms of how the survey data is

4   collected, is it accurate to say that the Census

5   Bureau -- and correct me if I have this wrong -- selects

6   a random group of respondents and then asks them a

7   series of questions?

8        A.   I don't know if the word "random" is strictly

9   correct in a statistical sense, but it is

10  representative.  I would say "representative" would be

11  the proper word to use in that sentence.

12       Q.   Understood.  So they select a representative

13  group of respondents and then ask them a series of

14  questions?

15       A.   That's a conceptual overview.  I don't know if

16  that's exactly how they define it, but I wouldn't

17  dispute that.

18       Q.   Okay.  And generally speaking, the group of

19  respondents who answer on the CPS would never be

20  perfectly representative of the population of eligible

21  voters, correct?

22            MR. CARDIN:  Object to the form.

23            You may answer the question.

24       A.   I don't have any basis for saying that that's

25  true, nor do I have any basis for saying it's false.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 72

1      Q.   (BY MS. SMITH)  Okay.  If I use the term
2  "weighting," do you understand what that means?
3      A.   I do.
4      Q.   Okay.  So does the CPS use weighting?
5      A.   I would have to check on the technical
6  details.  If they do use weighting, it's because it was
7  necessary.  If they didn't use weighting, it's because
8  it wasn't warranted.
9      Q.   Okay.
10      A.   But they're the arbiters of whether weighting
11 is used.
12      Q.   Okay.  So to sum up, in a -- in a survey like
13 the CPS, where the group of respondents who answer may
14 not be representative of the population, weights might
15 be used to account for that?
16           MR. CARDIN:  Object to the form.
17           You may answer.
18      A.   Yeah, I -- I can't answer the question as you
19 framed it.
20      Q.   (BY MS. SMITH)  Okay.  Is using weights common
21 with a survey like this?
22      A.   Yes.
23      Q.   Okay.  But you don't know if the CPS uses
24 weighting?
25      A.   I -- I -- I count on the Census Bureau to use

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 73

1   weighting where it's warranted to get data that are

2   representative of the population.

3        Q.   Okay.

4        A.   That's what weighting is used for.

5        Q.   Understood.  And so the CPS data that you're

6   reporting is an estimate of registration and an estimate

7   of turnout.  Do I have that right?

8        A.   Correct.

9        Q.   What does it mean that it's an estimate?

10       A.   In -- in this instance, with the scientific

11  survey, it means that each number or percentage that is

12  shown has a margin of error, a statistical margin of

13  error that is known and is specified by the Census

14  Bureau.

15       Q.   And what is a margin of error?

16       A.   It is a -- it was -- it is a band within which

17  a number lies that is published as the point estimate,

18  and it allows one to draw conclusions with scientific

19  certainty about what the true number would be if you had

20  counted every single person in the population rather

21  than the representative sample.

22       Q.   And how is a margin of error calculated?

23       A.   It is typically a -- a statement that says the

24  number you have is X.XX and you can know with 95 percent

25  certainty statistically that the true value of X.XX is

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 74

1    either a higher limit or -- is -- is higher -- as

2    high as a higher limit or as low as a lower limit.  So

3    it allows one to -- such as myself, to make a statement

4    that I have scientific certainty at the 95 percent

5    confidence level that the number is between X and Y.

6         Q.   Okay.  So the margin of error is what allows

7    an expert such as yourself to -- to report with

8    scientific certainty what the result -- or the estimate

9    of a survey is?

10        A.   Correct.

11        Q.   Okay.  Is 90 percent certainty an acceptable

12   level of certainty?

13             MR. CARDIN:  Object to form.

14             You may answer the question.

15        A.   It certainly is acceptable, yes.

16        Q.   (BY MS. SMITH)  And in terms of how margins of

17   error are calculated, is it based on factors such as the

18   size of the sample or the weighting that the CPS does?

19        A.   It's based on both.

20        Q.   Both?  Thank you.  Just to make sure I

21   understand, when evaluating a survey, I can take the

22   point estimate plus the margin of error, top of a range,

23   the point estimate minus the margin of error, is the

24   bottom, and that gives me an interval, right?

25        A.   Correct.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 75

1      Q.    And given, say, 90 percent confidence level,
2   that interval means 90 percent of the time the survey is
3   run, the actual number will fall within that interval?
4      A.    That's one way of putting it, yes.
5      Q.    Okay.  What would be another way of putting
6   it?
7      A.    How much confidence --
8      Q.    How --
9      A.    I'm 90 percent confident that it falls within
10  this range.  So any statement that is based on this
11  number or a time series of these numbers, I have
12  90 percent confidence in the number that I have used to
13  draw my conclusion is a number that I can believe.
14     Q.    Okay.  So if we know the margin of error and
15  the confidence level, we know how much the estimate CPS
16  reports might differ from the actual result; is that
17  right?
18     A.    When you say "the actual result," you mean
19  the --
20     Q.    Actual level.
21     A.    The actual level, yeah.
22     Q.    Great.  Is the margin of error something
23  you -- you typically want to know when you're analyzing
24  survey results?
25     A.    Yes.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 76

1    Q.   What about the confidence level?

2    A.   Well, the confidence level derives from the

3  margin of error.

4    Q.   Okay.

5    A.   And how I use the data, it is a guide to how

6  one should interpret the data.

7    Q.   So, in other words, the margin of error might

8  guide the scientific -- scientific interpretation of the

9  point estimate?

10    A.   In this case, it guides the interpretation of

11  each point estimate and the trend shown by the

12  collection of point estimates over a 40- or 42-year

13  period.

14    Q.   The margin of error governs that?

15    A.   That's correct.

16    Q.   Okay.  And looking into margins of error would

17  be a typical practice of a demographer?

18    A.   It would be -- when you say "a typical

19  practice," it would be something that I would take into

20  account, yes.

21    Q.   Okay.  Okay.  So applying that -- and you

22  would typically take that into account, you said?

23    A.   In this case, I take it into account.

24    Q.   So let's apply that principle to the CPS

25  estimates.  So lower bound of an estimate would be CPS

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 77

1   estimate minus the margin of error.  Upper bound would

2   be CPS estimate plus the margin of error.  So the actual

3   turnout or actual registration we can be confident falls

4   within the lower --

5        A.   Correct.

6        Q.   -- and upper bound?

7             A little more on the CPS.  So the CPS

8   includes a voting and registration supplement; is that

9   right?

10       A.   I'm not sure what you mean about a "voting and

11  registration supplement."  The -- I'm -- I'm saying that

12  the data that I have here derived from the Current

13  Population Survey annual data, and I -- it is assessed

14  at the website --

15       Q.   Uh-huh.  Okay.

16       A.   -- under Table 1 in my report.

17       Q.   So there's a set of questions they ask about

18  voting and registration when they conduct the survey?

19       A.   Yes, there are a set of questions.

20       Q.   Okay.  And turning back to Paragraph 2, where

21  we just were in your report, you say that the CPS -- one

22  second -- oh, yeah -- the CPS enables you to compare

23  the, quote, self-reported political participation of

24  Black and White Mississippi voters?

25       A.   Correct.

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

                                                                    Page 78

1         Q.    So we're going to talk a little bit about

2    over-reporting today.  In this context, would you agree

3    with me that over-reporting means the phenomenon where

4    some survey respondents say they are registered or that

5    they voted even though they did not register -- or they

6    are not registered or they did not vote?

7         A.    That's what the term means, yes.

8         Q.    All right.  And have you worked with data from

9    the CPS on voting and registration previously in your --

10   in your work as an expert?

11        A.    I'm sure I have in a number of different

12   instances, but not in the way I've used it here as a

13   long-time series, not -- not in a historical approach,

14   but simply a snapshot of what -- what the world is

15   today.

16        Q.    Understood.  Have you written any publications

17   about the CPS voting supplement -- or -- sorry -- the

18   CPS as a measure of voting and -- and registration?

19        A.    I -- I really can't answer the question

20   because it's like saying have you used this particular

21   kind of Census data?  And I'm -- I'm sure I've used it

22   somewhere.  In -- in a published paper?  I don't know.

23   I -- I know I've used it.  I -- I regularly use it.

24        Q.    So you regularly use --

25        A.    Yeah.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 79

1    Q.    -- the CPS in your work?

2    A.    Yeah.  I rely on it, yes.

3    Q.    Okay.  All right.  So in terms of how the CPS

4  survey is conducted, do Census Bureau representatives

5  call people and interview them over the phone?

6    A.    I would have to check the details of how they

7  conduct this.  What I do know and what gives me

8  confidence in the CPS is that the Census Bureau is the

9  recognized source of scientifically collected data for

10  the nation that is relied upon by the government and

11  policymakers in the formulation of laws, and it is the

12  only source that one would go to for data of this kind

13  over a period of time.  It is -- it is more a matter of

14  confidence that one has in the Census Bureau as

15  producing the best quality scientific data that can be

16  had about a phenomenon.

17    Q.    Okay.  So to go back to how the survey is

18  conducted, I'm going to mark an exhibit.  I'll represent

19  to you I went to the Census website linked in your

20  report, and I looked up the methodology and I downloaded

21  it for us to look at.  So this is going to be Exhibit 7

22  in the record.

23              (Exhibit 7 marked.)

24    Q.    (BY MS. SMITH)  Here you are.  So I'm looking

25  here at the second paragraph on the first page, and it

Page 80

1   says that the questionnaire is, quote, administered by

2   Census Bureau field representatives around the

3   country -- or -- sorry -- across the country through

4   both personal and telephone interviews.  Do I have that

5   right?

6        A.   You say the second paragraph?

7        Q.   Yeah.  So --

8        A.   I've got the second paragraph says:  The CPS

9   questionnaire is a completely computerized --

10       Q.   "Document that is administered by" --

11       A.   Oh, I'm sorry.  Yeah.  Okay.  I get you.

12   Okay.

13       Q.   So it's a computerized document -- thank

14   you --

15       A.   Yeah.

16       Q.   -- for correcting me -- that Census Bureau --

17       A.   Correct.

18       Q.   -- field representatives around the country

19   look at as they conduct personal and telephone --

20       A.   Right.

21       Q.   -- interviews.  So as I read this, it says

22   that they're doing the survey through telephone

23   interviews and through personal interviewing.  Do I have

24   that right?

25       A.   Yes.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 81

1       Q.    Okay.  And for the Census -- the CPS' voting

2   and registration data that you use, does anyone go back

3   and check to see if people reporting that they

4   registered or reporting that they voted actually

5   registered or actually voted?

6       A.    Does the Census Bureau say anything about that

7   in this?

8       Q.    No.  I think we're done with this document for

9   now.

10      A.    Okay.  I -- I --

11      Q.    Just generally speaking.

12      A.    I -- I don't know if they do or not.  I

13  would -- I -- I suspect if I called up the people who

14  collected this, I could get the answer.  But if this is

15  not part of their stated methodology, I can't answer

16  whether they do or not.

17      Q.    Okay.  So you don't know whether they go back

18  and check what people said in their responses against

19  their, say, official records of a state?

20      A.    I know -- I know that their -- their -- their

21  usual practice is to evaluate the method that they're

22  using.  So I -- I can't say that they state this

23  explicitly, but I know that their reputation is they

24  don't do this for 40 years and never check to see

25  with -- periodically on their own whether they are

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                     Peter A. Morrison, Ph.D.

Page 82

1    meeting their own scientific quality-control standards.

2         Q.   Uh-huh.

3         A.   I'm sure that -- I'm sure that this is not a

4    question that has been ignored by the Census Bureau.

5    That's what their reputation is.

6         Q.   Sure.

7         A.   So --

8         Q.   So just as a --

9         A.   -- I -- I don't have any direct analogy of it.

10   I can't answer your question.

11        Q.   Just -- just to make sure I understand the

12   data you're relying on, it's based on survey answers,

13   right?

14        A.   That's correct, self-reports.  And the

15   implicit assumption that any researcher, such as myself,

16   makes is that after 40 years of doing it this way, the

17   Census Bureau knows what it's doing to elicit this, and

18   the accuracy of the reports are sufficiently accurate

19   for people like me to use it.

20        Q.   Uh-huh.

21        A.   Otherwise, they wouldn't publish it.  They

22   would say, "We tried to collect the data, and we

23   couldn't get it."

24        Q.   Yeah, I think what I'm trying to get at,

25   taking aside the general gradeability of the survey, if

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 83

1   I answer the survey and I say, "I registered to vote,"

2   for example, do you know if the Census Bureau goes and

3   checks if I actually am in my state's registration

4   system?

5        A.   I don't know for sure, but I can't rule out

6   the possibility that they might randomly check something

7   like that.

8        Q.   Uh-huh.

9        A.   But they don't publish -- they don't publish

10  all the details of what they do.  It would not surprise

11  me if they did do that on some of the records just to

12  assure the quality of the data.

13       Q.   Okay.  So in your review of the CPS and your

14  use of this data in the past, you're not aware of -- of

15  that practice?

16       A.   I am aware of their practices, which,

17  generally speaking, are they don't publish data if it

18  turns out that they're getting garbage in that is not

19  anywhere near what they're representing it to be.

20       Q.   Uh-huh.

21       A.   I -- I would be astonished if they had not at

22  all or were not continuously monitoring the accuracy of

23  this.  That's their normal practice.

24       Q.   Uh-huh.  And to your -- I believe you said

25  earlier you -- you think they might on occasion, but

Page 84

1   not -- but haven't publicly reported that they conduct

2   that kind of validation of a survey result?

3            MR. CARDIN:  Object to the form.

4            You may answer the question.

5       A.   What I'm saying is the Census Bureau is known

6   for validating their data-collection methods, and they

7   continuously improve them.  And so I have confidence in

8   this particular body of data first and foremost because

9   of the Census Bureau's reputation and, secondly, because

10  of the 40 years of experience that they've had in

11  dealing with an obvious quality-control question, which

12  is:  Are people responding?

13      Q.   (BY MS. SMITH)  Uh-huh.

14      A.   If -- if it were a new survey and this was the

15  first year, I would say, well, they may not have looked

16  at that yet.

17      Q.   Uh-huh.

18      A.   But after 40 years, I'm quite confident that

19  they -- that they know what they're doing.  And if there

20  were insurmountable problems, they would say, "We've

21  tried to gather this information, but we can't."  And

22  there are instances where information, they tried to

23  gather it and they couldn't, and they say so.

24      Q.   Okay.  So to make sure I understand, you're

25  not aware of whether the CPS is a validated survey or

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 85

1   not?

2                    MR. CARDIN:   Object to the form.

3                    You may answer.

4        A.   I -- I wouldn't agree with that.  I -- I am

5   aware.

6        Q.   (BY MS. SMITH)   Okay.  And which -- which one

7   is it?

8        A.   I would say that it is -- it is a validated

9   form of collecting data because if they couldn't

10  validate it, they wouldn't -- would not be publishing it

11  for 40 years.

12       Q.   All right.  So you -- you -- okay.  Yeah, so

13  the dataset that you used, does it reflect validation

14  from any state's administrative records or another

15  source?

16       A.   I don't know the details of how the Census

17  Bureau validates its numbers, but I'm sure that they do

18  validate them.

19       Q.   Okay.  So you testified a little earlier that

20  the CPS has known limitations as a survey.  What are

21  those?

22       A.   The confidence intervals.

23       Q.   Okay.  Any other flaws or limitations?

24       A.   Not that -- not that I know of.

25       Q.   So let's turn -- okay.  I want to turn to

Page 86

1    another exhibit, which is a frequently asked questions

2    document that the CPS publishes.

3                    (Exhibit 8 marked.)

4         Q.    (BY MS. SMITH)   I'm marking for Exhibit 8 in

5    the record a document that I'll represent to you I

6    pulled from the Census Bureau's website, and it's called

7    "Frequently Asked Questions, or FAQs, About Voting and

8    Registration."  All right?

9         A.    Uh-huh.

10        Q.    Great.  Okay.  So I want to talk a little bit

11   more about how the CPS describes its own limitations in

12   this document.  All right?

13        A.    All right.

14        Q.    Turning to Page -- the second page, so turning

15   over the document, do you see here that it says, quote,

16   Why might the Census Bureau's voting and registration

17   estimates differ from other data sources?

18        A.    Yes, I do.

19        Q.    Okay.  And so the Census Bureau is saying

20   here, essentially, that the voting and registration

21   estimates might differ from other data sources?

22        A.    Yes.

23        Q.    Okay.  And then looking at the first sentence

24   below that, it references that one of those other data

25   sources that the CPS might differ from would be the

Page 87

1   official counts in an election?

2       A.   Can you tell me what sentence -- what the

3   words are in the sentence that --

4       Q.   Oh, yeah, of course.  So, "Differences between

5   the official" --

6       A.   Yeah.

7       Q.   -- "counts and the CPS" --

8       A.   Right.  Yeah, "may -- may be a combination of

9   an understatement of the official numbers and an

10  overstatement of the CPS estimates."

11      Q.   Yes.

12      A.   Sure, I -- I see that.

13      Q.   So do you dispute that the CPS might differ

14  from official counts reflected in a state's records?

15      A.   No, I do not dispute that.

16      Q.   Okay.  Okay.

17      A.   With the caveat that the state's records are

18  administrative record data.

19      Q.   Uh-huh.  Sure.  So moving a little bit down in

20  that paragraph, I also see the quote:  Respondent

21  misreporting is also a source of error in the CPS

22  estimates.

23           Do I have that right?

24      A.   Yes.

25      Q.   So do you dispute that respondent misreporting

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 88

1   is a source of error in the CPS estimates?

2        A.   No, I don't.

3        Q.   Okay.  Do you dispute the CPS' own description

4   of the limits of its data?

5        A.   No, I don't.

6        Q.   All right.  Why don't we take a quick break

7   now because I'm about to shift gears.  So we're coming

8   to a natural stopping point.

9        A.   Sure.

10       Q.   Thank you.

11             MS. SMITH:  Going off the record.

12             (Recess taken from 10:53 to 11:03 a.m.)

13       Q.   (BY MS. SMITH)  All right.  Dr. Morrison, just

14   before a break, I asked if you dispute the CPS' own

15   views of the limits of its data, and you said you did

16   not.  Do I have that right?

17       A.   Correct.

18       Q.   Okay.  Thank you.  So I want to turn back to

19   your report, looking at Table 1 now.  So I'm on Page 3

20   of your report.

21       A.   Yes.

22       Q.   Okay.  So let's look at -- I just want to walk

23   through this table and make sure I'm understanding it

24   right.  So looking at 2020, you looked at -- here,

25   you're reporting the Census CPS survey data, and you're

Page 89

1    reporting that as one example, in 2020, according to the

2    CPS, Black voter turnout in Mississippi was estimated at

3    72.9 percent.  Do I have that right?

4         A.   Yes.

5         Q.   And White voter turnout was estimated at

6    69.8 percent?

7         A.   That's correct.

8         Q.   For a 3.1 percent difference?

9         A.   Correct.

10        Q.   Okay.  I'll represent to you I went to the

11   link here at the bottom of your Table 1, and I pulled

12   some more CPS -- or the same CPS data in a different

13   table.  So let's mark that Exhibit 9 for the record.

14                  (Exhibit 9 marked.)

15        Q.   (BY MS. SMITH)  And this is Table 4A, which is

16   called "Reported Voting and Registration For States."

17   Okay?

18        A.   Uh-huh.

19        Q.   Great.  So this is data from the CPS voting

20   and registration supplement, which is the same dataset

21   you relied on for Tables 1 and 2.  Okay?

22        A.   Let me make sure that the sources agree.

23        Q.   Sure.  Take your time.  If you want to look at

24   the second page, it says the source there at the bottom.

25        A.   Okay.  Okay.  All right.

Page 90

1      Q.   So what I'm going to try to do next is

2   understand how many people the CPS estimate would lead

3   us to think voted in Mississippi in 2020.  Okay?

4      A.   All right.

5      Q.   And if you're like me, you don't like doing

6   math in your head, potentially, so I did a few basic

7   calculations to just understand what's reported here.

8   And I'll -- I have a calculator for you.  If you want to

9   double-check --

10     A.   Okay.  All right.

11     Q.   -- my math, you have that.  Okay?

12     A.   Before I proceed with this, can I --

13     Q.   Take a moment?  Oh, yeah.

14     A.   No.  What I'm just wondering is I may want to

15   do a calculation and write it down on a napkin --

16     Q.   Sure.

17     A.   -- or a piece of paper, if you --

18     Q.   We can get you paper.

19     A.   I'm sure if I put it on a piece of paper --

20          MR. CARDIN:  Let me hand you a piece of

21   paper.

22          THE WITNESS:  Yeah, yeah, give me a piece

23   of paper.

24     A.   Okay.  I'm all set.

25     Q.   (BY MS. SMITH)  Great.

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 91

1          A.   Just so you know, I'm going to follow your

2     calculation -- your -- your --

3          Q.   Yes.

4          A.   Yeah.  Okay.

5          Q.   By all means.

6          A.   All right.  So the -- we're talking about

7     2020.

8          Q.   Yes.  So let's look at Mississippi, an entry

9     here on the first page.

10         A.   Uh-huh.

11         Q.   Moving all the way over to -- under "Voted" --

12         A.   Right.

13         Q.   -- "Percent Voted (Citizen)" being the column.

14         A.   Uh-huh.

15         Q.   And for Mississippi, I'm seeing 70.3 percent

16    of the citizen voting age population voted in 2020.

17         A.   Where -- where do you see that number?

18         Q.   I'm seeing 70.3 when I look under "Voted" at

19    the top.  "Percent Voted (Citizen)" at the next line

20    from the top.  And then when I go to Mississippi --

21         A.   Oh, I see.  I get you.  Okay.

22         Q.   -- I see 70.3.

23         A.   70.3, yeah.

24         Q.   So that's the CPS estimate.

25         A.   The percent of citizens voting, right.

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 92

1      Q.   Yes.  That's the percent of citizens voting in

2   2020.  Are we on the same page?

3      A.   Yeah.

4      Q.   Great.

5      A.   I see what you're looking at.

6      Q.   Okay.  Perfect.  And like I said, I want to

7   calculate how many people actually voted -- or --

8   sorry -- how many people voted in 2020 as the CPS would

9   have us estimate it in Mississippi.

10      A.   All right.

11      Q.   So are you familiar with the -- you mentioned

12   earlier the American Community Survey issued by the

13   Census.

14      A.   Yes.

15      Q.   And are you aware that it contains data on

16   citizen voting age population --

17      A.   Yes.

18      Q.   -- across jurisdictions?

19              Okay.  So I'll represent to you that using

20   the ACS, that Mississippi's citizen voting age

21   population --

22      A.   Uh-huh.

23      Q.   -- is 2.227795 million.

24      A.   All right.

25      Q.   All right.  Great.

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 93

1     A.   That's the ACS CVAP estimate, 2,227,795.  And

2  do you have a margin of error for them, also?  Because

3  that's the --

4     Q.   Yes, I do.  Sorry.  I don't have it for that

5  number.

6     A.   Oh, be- -- I mean, that -- that's their point

7  estimate.  I need the margin of error.

8     Q.   That's their point estimate?

9     A.   Yeah.  Right.

10     Q.   I believe we can find you the margin of error,

11  if that's helpful.  I wasn't planning to walk through

12  the margin of error for that calculation, but I'm

13  happy --

14     A.   Yeah.

15     Q.   -- to find it.  Maybe we could go off the

16  record just for a moment so I could pull it up, if

17  that's all right.

18             (Recess taken from 11:09 to 11:10 a.m.)

19     Q.   (BY MS. SMITH)  Okay.  Thanks for your

20  patience just now.  So the margin of error is plus or

21  minus 3,481.

22             MR. CARDIN:  And could you identify just

23  the source that you are -- obtained that information

24  from?

25             MS. SMITH:  Yeah.  Data.census.gov.  The

Page 94

1   citizen voting age population by selected

2   characteristics, the American Community Survey filtered

3   by Mississippi, filtered by citizens years 18 -- 18

4   years of age and over.  And this is the 2017 to 2021

5   tabulation.

6           A.   Okay.  Okay.  That's important.

7           Q.   (BY MS. SMITH)  Okay.

8                MR. CARDIN:  And you have accessed that

9   on your laptop, correct?

10               MS. SMITH:  Yes.  I'm happy to try to

11  print it out or anything, if that's helpful.

12               MR. CARDIN:  No, I just want the record

13  to reflect the source and how you got it --

14               MS. SMITH:  Understood.  Yes.

15               MR. CARDIN:  -- just so it's clear.

16          Q.   (BY MS. SMITH)  Are we all clear now?

17          A.   Yeah.

18          Q.   Great.  Okay.  So in order to find number of

19  people who voted in Mississippi in 2020 according to the

20  CPS, I'm going to multiply .703 times 2,227,795.  Does

21  that sound right?

22          A.   I understand -- yeah, I understand exactly

23  what you've done.

24          Q.   Great.  And when I ran that, I found

25  1.57 million people to have voted in Mississippi in 2020

Page 95

1    according to --

2         A.    1.57 million?

3         Q.    Yes.

4         A.    Okay.  And do you want me to comment on that

5    comparison?

6         Q.    I don't think we need --

7         A.    Do you have a question about it?

8         Q.    -- a comparison.  I'm just -- I'm asking:  Do

9    you dispute that 70.3 percent of 2,227,795 is about

10   1.57 million?

11        A.    I -- I -- if -- if you did the calculation

12   correct, I don't dispute that it's 1.57 million.  I'm

13   just asking what is it that you don't understand about

14   the 1.57 million?

15        Q.    Oh, no, I'm just -- I'm trying to -- okay.  So

16   to sum all that up, the CPS estimate of how many people

17   voted in 2020 in Mississippi would be 1.57 million

18   people?

19        A.    I think you've done the calculation correct.

20        Q.    Great.  Okay.  Understood.  So we can mark the

21   next exhibit, which would be official data from the

22   Secretary of State's office from 2020.  This is their

23   report of official results.

24                    (Exhibit 10 marked.)

25        Q.    (BY MS. SMITH)  Okay.  So this is the official

Page 96

1    results of total votes reported by counties for the 2020

2    general election as offered by the Secretary of State.

3    Okay?

4         A.   Uh-huh.

5         Q.   Okay.  So I want to turn to Page 9.  And here,

6    we can see the total number of votes cast for each of

7    the presidential candidates.  Are -- do you see that?

8         A.   Yeah.

9         Q.   Okay.  So I'll represent to you I also

10   calculated -- I added up all of these numbers to get a

11   total number of votes that were actually cast in

12   Mississippi in 2020.  Okay?

13        A.   Votes cast in Mississippi.

14        Q.   In 2020.

15        A.   In 2020.

16        Q.   Uh-huh.  And I did that by adding up all of

17   the numbers here.

18        A.   And the source of this is the Statewide

19   Election Management System?

20        Q.   The source is the Secretary of State's

21   Statewide Election Management System.

22        A.   Secretary of State of Mississippi.

23        Q.   Yes.  Thank you.

24        A.   All right.

25        Q.   All right.  And I added those up to be 1.31 --

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 97

1    3 -- sorry -- 1,000 -- sorry -- 1,300,000 -- 313,759 was

2    the number I got when I added those up.

3         A.   All right.

4         Q.   Okay.  So 1.313759 million.

5         A.   Uh-huh.

6         Q.   So as I read it, the Mississippi Secretary of

7    State's office reports that that's the number of votes

8    that were actually cast --

9         A.   Right.

10        Q.   -- in 2020.  Okay?

11        A.   Yeah.

12        Q.   Do you dispute the calculation I just gave

13   you?

14        A.   I'll take your word for doing the calculation

15   correctly.  And I just want to reiterate that you have

16   the votes cast as sourced from the Secretary of State in

17   Mississippi.

18        Q.   Uh-huh.

19        A.   You had the ACS CVAP five-year estimate as --

20   accessed for the period 2017 to '21.

21        Q.   Uh-huh.

22        A.   And then you started out mentioning my

23   calculation of -- my -- my percentage showing

24   70.3 percent --

25        Q.   Uh-huh.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 98

1       A.    -- of 2177 --

2       Q.    Uh-huh.

3       A.    -- equals 1530.  Those are the numbers you've

4    given me.

5       Q.    Yeah.  So just to sum up there, when I ran the

6    calculation of the CPS estimate of voter turnout in

7    Mississippi, we got 1.57 million, about.  And here, the

8    Mississippi Secretary of State's office is reporting

9    about 1.31 million.

10      A.    Yes.

11      Q.    Is that right?

12            Okay.  So comparing the 1.31 million votes

13   reported by the Mississippi Secretary of State's office

14   with the 1.57 million votes estimated by the CPS, the

15   CPS' report is about 250,000 votes over the actual

16   results reported by the State?

17      A.    Yeah.  If you've done the arithmetic

18   correctly, yeah, that's the difference between the

19   numbers.

20      Q.    Okay.  And that's about 20 percent?

21      A.    I'll take your word for that, yeah.

22      Q.    Okay.  Is it fair to assume that this

23   over-reporting on the CPS might be due to survey

24   respondents saying -- due, in part, let's say, to -- to

25   survey respondents saying they voted when maybe they

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 99

1    didn't actually vote?

2        A.   That's one possibility, but I don't see the

3    two sources of data that you've provided as having any

4    bearing on the CPS number because the CPS is an entirely

5    different survey.  It's -- I -- I wouldn't expect the

6    numbers to be consistent at all.

7        Q.   Why wouldn't you expect these numbers to be

8    consistent?

9        A.   Because the CPS is not based on five-year CVAP

10   data.  It is -- it is based on their own sample design

11   for the CPS, which is an entirely different

12   data-collection enterprise.  And the -- the simple

13   statement I can make is that if you wanted to gain

14   insight into the 2020 CPS value, looking at the

15   five-year ACS CVAP or the administrative record count of

16   votes cast would not inform me at all about the accuracy

17   of the -- of the CPS because these are entirely

18   different universes.

19       Q.   Uh-huh.

20       A.   The -- the latter two sources of data that you

21   have cited really are not comparable to the -- what the

22   CPS does when they collect -- when -- when they do their

23   survey.

24       Q.   Okay.  But the 70.3 percent turnout rate, we

25   got that from the CPS, right?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 100

1      A.   And that's based on the CPS.

2      Q.   Uh-huh.  Okay.  Okay.  So acknowledging that

3    these are different data sources, is it fair to say

4    there's about -- there's -- there's about a gap of

5    255 -- 250,000 voters between the official vote counts

6    and the estimate provided by the CPS?

7      A.   I haven't done the arithmetic, but I would say

8    that there's a -- there would be obvious differences

9    between these three because they're three different

10   forms of data collection.

11     Q.   Uh-huh.

12     A.   And in the comparisons that you've set up

13   here, the ACS CVAP and the administrative record data

14   are -- are -- my simple answer is they're not at all

15   comparable to the CPS frame of data that are being used.

16   They just -- I -- I think any demographer would say you

17   can't -- you can't infer anything from the two other

18   sources about the CPS because it's its own separately

19   designed sample that's drawn from which calculations are

20   made that are internally consistent.

21     Q.   Okay.  So we can't infer anything from

22   differences between the CPS and vote counts as

23   reported --

24     A.   You --

25     Q.   -- by the state?

Page 101

1      A.   You could only say -- no, I mean, they just --

2    they're not comparable.  They don't -- they're just

3    apples and oranges.

4      Q.   Okay.  Turning back to Table 4A -- just give

5    me a moment.  Oh, here we are.

6                    MR. CARDIN:  That's Exhibit 9?

7                    MS. SMITH:  Yes.  Thank you.

8      Q.   (BY MS. SMITH)  So turning back to Table 4A,

9    which is Exhibit 9 in the record, and looking back at

10   Mississippi again.

11     A.   Yes.

12     Q.   And I see that the margin of error listed for

13   the 70.3 percent figure we just spoke about is

14   3.2 percent.  Is that right?

15     A.   That's the column under -- under the heading

16   "Voted," "Margin of Error"?

17     Q.   Yes.

18     A.   Yeah.

19     Q.   So "Voted," "Margin of Error."

20     A.   Right, right.

21     Q.   Margin of error for 70 --

22     A.   Yes.

23     Q.   -- .3 percent, having voted being 3.2 percent?

24     A.   Yes.

25     Q.   Okay.  So as I calculate it, the lower bound

Page 102

1     of the margin-of-error range for the estimate of

2     Mississippians who voted in 2020, being 70.3 percent

3     minus 3.2 percent, multiplied by that overall figure,

4     1.57 million, would put us at about 1.49 million?

5          A.   Just give me the last three.  I have 70.3

6     minus 3.2 --

7          Q.   Yes.

8          A.   -- equals what again?

9          Q.   I don't -- I don't recall off the top of my

10    head.

11         A.   Okay.

12         Q.   I multiplied that by --

13         A.   Okay.  Well, the -- the number the -- the --

14         Q.   -- the CVAP.

15         A.   -- 70.3 minus 3.2 is --

16         Q.   Yeah.

17         A.   -- 67.1.

18         Q.   Yes.

19         A.   And that percent multiplied times -- what are

20    you multiplying it by?

21         Q.   Times the estimated CVAP in Mississippi from

22    the Census being 2,200,000 -- 227,795.

23         A.   Yeah.

24         Q.   So I multiplied --

25         A.   You multiplied that, and --

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                                    Peter A. Morrison, Ph.D.

                                                                    Page 103

1        Q.   -- that.

2        A.   -- and you got that.

3        Q.   Yeah.  So I multiplied 67.1 --

4        A.   Yeah.

5        Q.   -- percent of 2.227795 million, and I got

6   about 1.49 million.

7        A.   All right.

8        Q.   Okay.  So lower bound of the CPS range of

9   possible estimates is 1.49 million, using their margin

10  of error, right?

11       A.   Well, that's what you've calculated.  And as

12  I've said before, it -- I -- I agree with the arithmetic

13  that you've done, but --

14       Q.   Okay.

15       A.   -- I don't agree that it has any bearing on --

16  on anything to do with the CPS.

17       Q.   Uh-huh.

18       A.   That's a number that you would derive trying

19  to estimate something based upon the ACS CVAP and

20  another number that you've -- you've grabbed from this

21  data source.  And as I say, it's an apples -- it's

22  combining apples and oranges, and it yields a number

23  that you said correctly is 1.49 million.

24       Q.   Okay.

25       A.   And if you asked me to interpret it, I have no

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 104

1    idea what it means.

2         Q.   Okay.  So the lower bound of the estimate here

3    provided by the CPS and combining that with the estimate

4    from the Census, so the same institution putting out the

5    survey of the population still puts us over 170,000 more

6    people than the actual vote count that we see from the

7    Secretary of State's office?

8                   MR. CARDIN:  Object to the form.

9                   You may answer the question.

10        A.   It's a hypothetical calculation of apples and

11   oranges, and I don't know what to say about it.  I

12   don't -- it has no meaning to me.

13        Q.   (BY MS. SMITH)  Okay.

14        A.   It -- it -- I can say your calculation has no

15   meaning to me, but I think you've done it correctly.

16        Q.   Okay.  I think we can move on.  So let's look

17   back at your report Page 4 now, and I'm looking at

18   Footnote 5.

19        A.   All right.

20        Q.   So you said here that, quote, studies have

21   documented specific instances where respondents'

22   self-reports appear to have exaggerated actual measured

23   rates of voter registration and/or turnout, right?

24        A.   Yes.

25        Q.   Okay.  When you refer to those, quote,

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 105

1  specific instances where respondents' self-reports might

2  be shown to have exaggerated measured rates of voter

3  registration and/or turnout, what specific instances are

4  you referring to?

5      A.   I'm referring to the political-science

6  literature that -- that -- where studies of particular

7  elections in particular years in particular states have

8  shown, by the standards of the study, that self-reports

9  appear to have exaggerated actual measured voter --

10  voter rates.  So people find exceptions out there in the

11  world of elections based on administrative record data

12  to what is shown in self-reports for those particular

13  instances.  Those are instances that may not be about

14  Mississippi or they may be instances that include many

15  states including Mississippi in one year, but none of

16  them, to my knowledge, covers any span of time on a

17  regular basis.

18      Q.   Uh-huh.

19      A.   So I acknowledge that there is -- this is a --

20  there's a controversy in the political-science

21  literature as to whether or not this is a problem, a

22  measurement problem.  Some say yes; some say not really.

23      Q.   Okay.  Well, we'll -- we'll talk a bit more

24  about that.  But looking now at the fourth full

25  paragraph on Page 4, you say here that -- I'm looking

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 106

1    at -- I believe it's the third sentence.  You say

2    that -- you quote:  Do not disregard the possibility of

3    over-reporting a registration or turnout by Black voters

4    on the CPS.  Do I have that right?

5         A.   That's correct.

6         Q.   So it's your view that there -- there's a

7    possibility of over-reporting on registration or turnout

8    by Black voters on the CPS?

9         A.   Anything is possible here.

10        Q.   Okay.  Okay.  But then you conclude here also

11   on Page 4 that the data strongly suggests an apparent

12   change since 2004 in Black political participation?

13        A.   That's correct.

14        Q.   Okay.  And in the last sentence of this

15   paragraph, you note that you question attributing the

16   historical break you conclude occurred after 2004 to a

17   presumed differential over-reporting on the part of

18   Black voters relative to Whites, right?

19        A.   Correct.

20        Q.   Okay.  So just to make sure I'm clear on your

21   view, is it your view that Black voters differentially

22   over-report registration and voting on the CPS or not?

23        A.   I cannot say -- in answering the question, I

24   cannot say that I have an assumption there.  I'm talking

25   in this paragraph here, where I said specifically

Page 107

1   "attributing this historic break to a presumed

2   differential over-reporting on the part of Black

3   voters" -- that's -- that's -- that's the part I

4   don't -- I -- I question.

5       Q.   Okay.  So just to make sure I'm understanding,

6   you do conclude, based on your review of the literature

7   in this field, that Black voters differentially

8   over-report registration on the CPS, or do you dispute

9   that?

10      A.   I -- I don't have any conclusion about that.

11      Q.   Okay.

12      A.   I have stated here that I do question

13  attributing the historic break.

14      Q.   Uh-huh.

15      A.   That's all I'm referring to, is the break,

16  because that implies something else.

17      Q.   Okay.  But you don't offer a view on whether

18  Black voters are differentially over-reporting

19  registration and voting?

20      A.   I -- I don't have any view on whether voters

21  generally over-report, and I don't have any views on

22  whether Black voters over-report more or less than White

23  voters over-report.  I only have a view that refers to

24  the possible -- to the historical break and whether that

25  can be attributed to differential over-reporting on the

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 108

1   part of Black voters relative to Whites.  That means

2   Black voters started doing something differently but

3   White voters didn't.

4        Q.   Okay.  So in your view --

5        A.   That's what --

6        Q.   -- there's a historical pattern that changes

7   in 2004, and that is that Black voters start to

8   politically participate more than White voters, and that

9   can't be attributed to differential over-reporting?

10       A.   No, that's not my view at all.

11       Q.   Okay.  I'm sorry.  What's your view exactly?

12       A.   What I'm saying is you cannot say that the

13  historic break -- or I should say it is highly

14  implausible that you can attribute the historical break

15  to Black voters over-reporting more than they were

16  before but White voters did not over-report more than

17  they were before.

18       Q.   Great.  Thank you for clarifying that.

19       A.   That's what the word "differential" means in

20  that sentence.

21       Q.   Okay.  Perfect.  Thank you for walking me

22  through all of that.

23            So I want to talk about your testimony as

24  an expert witness for the defendants in a case called

25  Thomas versus Bryant, also here in Mississippi.  And I

Page 109

1    have a copy of -- we can mark that for the record.

2                    (Exhibit 11 marked.)

3         Q.    (BY MS. SMITH)   This is going to be Exhibit 11

4    for the record, and this is Thomas v. Bryant, district

5    court decision from the Southern District of Mississippi

6    at 366 F. Supp. 3d 786 from 2019.   Okay?

7         A.    All right.

8         Q.    Great.   Do you remember offering testimony for

9    the defendants in this case?

10        A.    I -- I recall doing it.   I don't recall the

11   exact details of it.   I just have to remember which case

12   this was.

13        Q.    Sure.   So looking just at the synopsis here,

14   three African-American voters brought an action in

15   Mississippi alleging the boundaries of a Mississippi

16   senate district violated Section 2 of the Voting Rights

17   Act?

18        A.    Yeah, I'm trying to put this in perspective as

19   to what this was about, what my participation was.   I'm

20   still not recalling exactly which case it is, but --

21        Q.    I think -- let's -- let's -- let's talk about

22   that.   So I -- I believe you offered testimony about

23   voting turnout in Mississippi, as well.   And let's turn

24   to Page 9, and we can talk more.

25        A.    That might help refresh --

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 110

1      Q.   Yes.

2      A.   -- my memory on this.

3      Q.   Great.  So turning to Page 9, looking at the

4  right-hand side.  And I'm at the third full paragraph.

5      A.   Right.  Yeah.  Now -- this is coming back to

6  me now.

7      Q.   Great.

8      A.   I've got it.

9      Q.   Great.  So I'm seeing that you, quote,

10  gathered Census data about voter turnout in Mississippi

11  using surveys from even-numbered election years spanning

12  2004 through 2016 to show that African-Americans

13  self-reported higher turnout rates than White voters,

14  and you concluded that, "These data furnish convincing

15  evidence that African-Americans in Mississippi have

16  access to the political process and have participated in

17  that process at ever higher rates in recent years."  Do

18  I have that right?

19      A.   Just -- I -- I -- I think you have it right.

20  Just point to me the paragraph under --

21      Q.   (Indicating.)

22      A.   Okay.  I get you.

23      Q.   Yeah, the --

24      A.   The "finally" --

25      Q.   -- third full paragraph.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 111

1    A.   The one that begins "finally."  Okay.

2    Q.   Yes.

3    A.   Let me just read that.

4    Q.   Okay.  So as I understand it, you gathered --

5    A.   Hold on.  I just want to read --

6    Q.   Oh, yeah.

7    A.   -- the paragraph, just --

8    Q.   Oh, take your time.

9    A.   -- so it will bring it back.

10   Q.   Please.

11   A.   Okay.  I'm set to go.

12   Q.   Okay.  Thank you.  So would you agree with me

13   that your conclusion in this case is similar to your

14   conclusion that you're offering in this case -- in --

15   I'm sorry -- in the -- in the Mississippi versus -- the

16   NAACP versus SBEC case that we're talking about today,

17   your conclusion is similar to the conclusion you offered

18   in the Thomas v. Bryant case here?

19   A.   I wouldn't say they are similar.  I would say

20   the -- the conclusion was drawn in the same way that I

21   draw conclusions, generally, as a demographer looking

22   for patterns in elections.

23   Q.   Okay.  And in this case, you concluded that

24   African-Americans self-reported higher turnout rates

25   than White voters in a period spanning 2004 through

Page 112

1   2016?

2        A.   Yes.

3        Q.   Okay.  And in this case, you're also offering

4   survey data to show that Black voters self-report higher

5   turnout rates since 2004?  In this --

6        A.   Yes, yes, yes, I see it.  I was referring

7   specifically to the time series there of self-reported

8   turnout, right.

9        Q.   Okay.  Okay.  So in your report -- let's

10  actually mark your report from the Thomas v. Bryant

11  case.

12                  (Exhibit 12 marked.)

13       Q.   (BY MS. SMITH)  So I'm marking as Exhibit 12

14  for the record your report from January 7th, 2017 in the

15  case Thomas v. Bryant.  All right?

16       A.   All right.

17       Q.   Great.

18       A.   Thanks.

19       Q.   Okay.  Do you recognize this document as the

20  report you submitted in the Thomas v. Bryant case on

21  January 7th, 2019?

22       A.   Yes, I do.  Let me just take a look through it

23  because I need to refresh my memory --

24       Q.   Sure.

25       A.   -- on how I did this.

Page 113

1     Q.   If it helps, the relevant part that I want to

2   talk about is on Page 3 --

3     A.   All right.

4     Q.   -- at your Table 1.

5     A.   Yeah, that's what I'm looking at.  Right.

6     Q.   Great.  So --

7     A.   Hold -- yeah, hold on.  Let me just -- let me

8   just take a look at this.

9     Q.   Sure.  Perfect.

10    A.   Okay.  What were your questions about this?

11    Q.   Great.  So let's look at Table 1.

12    A.   Yeah.

13    Q.   Would you say that this analysis here in your

14  Thomas v. Bryant expert report on voter registration and

15  voter turnout is similar to the analysis you've done for

16  this case?

17    A.   Well, all I can tell you is that the source

18  here is the Current Population Survey voting and

19  registration tables, and I -- I can't tell you for sure

20  that the table that I got for each one of these years in

21  this study is the identical downloaded table it should

22  be or -- it cert- -- it certainly came from the same

23  source because it's the CPS, the Current Population

24  Survey.

25    Q.   I understand.  So in both -- in both cases,

Page 114

1    you looked at the CPS?

2         A.   That's correct.

3         Q.   And in both cases, you calculated Black voter

4    registration and turnout and you compared it to White

5    voter registration and turnout?

6         A.   Yes.  And I -- I see here there's a -- a note

7    that we're talking about very specific definitions,

8    Black alone than any -- rather than any part Black.

9         Q.   Uh-huh.

10         A.   And we're also talking about -- there was a

11    change in the data from voting age population 2004 to

12    '10 to CVAP from 2010 to '16.

13              So I -- I can't tell you, as we sit here

14    today, whether numbers in this table ought to agree with

15    numbers in my table in the current case that we're

16    talking about in this deposition.

17         Q.   Uh-huh.

18         A.   But the source are the same.

19         Q.   Uh-huh.

20         A.   And in each case, the source in both the study

21    we're discussing here and the one that the deposition is

22    about are sourced from the Current Population Survey,

23    which is a scientific survey.

24         Q.   Fair enough.  So in both cases, you're

25    reporting political participation by race in Mississippi

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 115

1   using the CPS data?

2       A.   Correct.

3       Q.   And do you remember what the Court decided in

4   that case about your conclusions?

5       A.   I remember that the Court ruled in favor of

6   the other party, not -- not the -- not the side that I

7   was engaged on.

8       Q.   And you don't remember what the Court decided

9   about your testimony specifically or what they commented

10  on?

11      A.   I -- I don't have any clear recollection other

12  than I think it was -- I really don't know why.  I -- I

13  don't know how the result came about.

14      Q.   Okay.  That's fine.  So let's turn back to the

15  opinion itself.  Let's turn to Page 14.  And I'm looking

16  at the bottom right-hand corner on the page.  And

17  it's --

18      A.   Okay.  Tell me, again, which one am I looking

19  at?

20      Q.   Oh, you're looking at Exhibit -- it should be

21  11.

22      A.   11.

23      Q.   This is the Thomas v. Bryant opinion.

24      A.   Yeah.  Okay.  Let me get that out.  I think I

25  put that away somewhere.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 116

1    Q.   I think you have it (indicating) --

2    A.   Okay.  There we go.

3    Q.   Great.

4    A.   Now you want me to turn to Page 11?

5    Q.   Sorry.  Page 14 now.

6    A.   Page 14?

7    Q.   Yeah, of Exhibit 11.

8    A.   All right.  Page 14.  All right.

9    Q.   Thanks for your patience there.  So on

10   Page 14, now I'm around the bottom right-hand corner of

11   the page with the sentence starting "the defendants'

12   expert."

13   A.   Uh-huh.  Yes.

14   Q.   And you were the defendants' expert they were

15   referring to here?

16   A.   Correct.

17   Q.   Okay.  So the Court there says, quote:  The

18   defendants' expert sought to minimize the on-the-ground

19   realities by pointing to statewide data showing that

20   African-American Mississippians report higher voter

21   turnout than White Mississippians in even-year

22   elections.

23           Right?

24   A.   Yes.

25   Q.   And then they said, quote:  These data points

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 117

1  fail to persuade.  They look at the wrong jurisdiction,

2  the wrong election years and rely upon known issues with

3  self-reported voting surveys, issues that EI, in

4  contrast, seeks to overcome.

5              Do I have that right?

6       A.   Yes.

7       Q.   Okay.  And just really quickly, because it's

8  mentioned here, I saw no CPS data is reported for

9  odd-numbered years in your -- in your report; it's all

10  even-numbered years.

11       A.   I -- yes, yes.

12       Q.   And the CPS doesn't report data for

13  odd-numbered years?

14       A.   Not that I know of, no.

15       Q.   And Mississippi holds elections in

16  odd-numbered years, right?

17       A.   I'll take your word for that.

18       Q.   Okay.  Let's turn back one page to Page 13,

19  bottom left-hand corner of this document.  I see that

20  the Court says here that you, quote, conceded that the

21  Census explicitly cautions that survey respondents

22  over-report their voting behavior.  Right?

23       A.   Which paragraph is that?  Lower right?

24       Q.   Oh, yeah.  Sure.  So we're on the --

25       A.   Oh, I see.  Okay.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 118

1     Q.   -- fourth full paragraph.

2     A.   Okay.

3     Q.   I'll just --

4     A.   Yeah.  Okay.  I see it.

5     Q.   I'll just read the --

6     A.   Sure.

7     Q.   -- the full quote.

8     A.   All right.

9     Q.   So, quote:  Dr. Morrison is an experienced

10   demographer.  He knows the problems with his testimony.

11           And then I'm moving on to:  He did not

12   look at voter turnout in odd-numbered years, and he

13   conceded that the Census explicitly cautions that survey

14   respondents over-report their voting behavior.

15           Do I have that right?

16   A.   Yes.

17   Q.   Okay.  I guess, what do you think of that

18   assessment?

19           MR. CARDIN:  Object to the form.

20           But you may answer the question.

21   A.   He -- that -- that's -- that's what I said.

22   Q.   (BY MS. SMITH)  Okay.  So you conceded in that

23   case that the Census explicitly cautions that survey

24   respondents over-report their voting behavior?

25   A.   I made that point in this particular context,

Page 119

1    yes --

2         Q.   Uh-huh.

3         A.   -- based -- based -- excuse me -- based on the

4    state of knowledge at that point in time about

5    over-reporting and under-reporting.

6         Q.   Okay.

7         A.   And that point in time, whatever the date

8    was --

9         Q.   So this was --

10        A.   -- was -- yeah, that -- that's what was --

11   that's what political scientists whose work I had

12   consulted -- that was the state of the political-science

13   knowledge as I gleaned it from the political-science

14   literature at that earlier point in time.

15        Q.   But your testimony was that the Census

16   explicitly cautions that survey respondents over-report

17   their voting behavior, right?

18        A.   Yes, I'm sure the Census Bureau explicitly

19   cautions that somewhere in their -- in -- in what they

20   say today since it's one of their --

21        Q.   So would that point change based on --

22   their -- their explicit caution about over-reporting --

23        A.   Yeah.

24        Q.   -- would that change based on any literature

25   since 2019?  I'm just speaking about their

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 120

1    acknowledgment.

2         A.    No, their -- I -- I think they were

3    acknowledging what they knew from the political-science

4    literature.

5         Q.    Okay.

6         A.    And -- and I -- let me take that -- I believe

7    the Census Bureau was saying that they know that when

8    respondents self-report, they can over-report or

9    under-report on anything they ask them about.  That's --

10   that's kind of like a -- they know that for a fact.

11   That's what they watch out for.

12        Q.    All right.  So this issue went up on appeal,

13   as well.  So let's just look at what the Fifth Circuit

14   had to say here.  So I'm going to mark as the next

15   exhibit -- that's going to be Exhibit 13.

16                  (Exhibit 13 marked.)

17        Q.    (BY MS. SMITH)  For the record, this is

18   Thomas v. Bryant Fifth Circuit decision from 2019 at 938

19   F. 3d 134, right?

20        A.    Okay.

21        Q.    All right.  So do you -- let's turn to

22   Page 18.  All right.  And I'm on the first full

23   paragraph on the right-hand side --

24        A.    Uh-huh.

25        Q.    -- starting with the sentence starting

Page 121

1    "however."  It says, quote:  However, the data used by

2    Dr. Morrison had serious problems.  It was self-reported

3    rather than based on official state records.  It was --

4    it came from statewide elections as opposed to District

5    22 elections and from even-numbered years for federal

6    elections as opposed to odd-numbered years for state

7    elections.

8                Do I have that right?

9        A.   Yes.

10       Q.   Okay.  So the Fifth Circuit found that the

11   data you used had serious problems, being the CPS data,

12   in that it was self-reporting rather than based on

13   official state records?

14               MR. CARDIN:  Object to the form.

15               You may answer the question.

16       A.   That -- that's what it says here, yes.

17       Q.   (BY MS. SMITH)  So in -- were you aware that

18   either the Southern District of Mississippi or the Fifth

19   Circuit had commented on your analysis?

20       A.   Oh, yes.  I mean, I was aware -- I was aware

21   what the judge said in the case.

22       Q.   Oh, you were aware?  Okay.

23       A.   Oh, yeah, I've seen this.

24       Q.   You've seen this before?

25       A.   I mean, it's -- I -- I read it.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 122

1      Q.    Okay.

2      A.    It's not a surprise.  I --

3      Q.    You read it at the time?

4      A.    Yeah, yeah.

5      Q.    Okay.

6      A.    He -- he saw -- the -- the judge, who had a

7   lot of familiarity with the locale, saw the limitations

8   of the demographic approach that I took.

9      Q.    Okay.  So after the Southern District of

10  Mississippi and then the Fifth Circuit addressed this

11  issue of over-reporting of Black turnout on the CPS, did

12  you look into the issue further?

13     A.    No, because I have -- demographers have no way

14  of looking into what's over-reported.  We use Census

15  data.  And I'm fully aware, based on this case, that the

16  Census Bureau's data are as they say.  They --

17  they're -- they -- they are what they are.  The Census

18  Bureau, you know, it puts in caveats.

19     Q.    Sorry.  So is it your testimony that

20  demographers can't look into the issue of over-reporting

21  of Black turnout on the CPS?

22     A.    Not -- not in any way that I know how because

23  they -- we rely on the Census Bureau for scientifically

24  accurate data, and we are aware of the caveats that

25  apply.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 123

1    Q.   But you testified earlier that you have

2  followed the political-science literature on --

3    A.   Yes.

4    Q.   -- the CPS?

5              And so you haven't looked at any

6  political-science literature on over-reporting of Black

7  turnout?

8    A.   Oh, no, I've -- I'm -- I'm aware of what the

9  literature says.  And what I'm saying is that the

10  over-reporting that the Census Bureau acknowledges can

11  occur is a given.  And when you look over time, it's one

12  factor you have to consider.  And in this case that

13  we're talking about here, I was assembling data on

14  elections, and the judge called attention to the fact

15  that there's over-reporting, which I don't dispute.  I

16  was not looking at 40 years' worth of time trend in this

17  case.

18    Q.   Okay.  So after the judges made this finding

19  and you reviewed that finding, did you do anything to

20  change your methodology to account for the flaws the

21  Court noted, being the issue of over-reporting --

22              MR. CARDIN:  Object to the form.

23    Q.   (BY MS. SMITH)  -- of Black turnout?

24              MR. CARDIN:  You may answer the question.

25    A.   I was not asked to do that.  And the decision

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 124

1    was already made, so there was -- I can't understand why

2    I would be asked to do it.

3          Q.   (BY MS. SMITH)  Oh, no.  Sorry.  Before you

4    offered a report in this case, did you change any of

5    your methods --

6          A.   No.

7          Q.   -- to account for the over-reporting issue?

8          A.   No.  There was no need to.

9          Q.   Okay.  And when you reviewed the literature

10   about Black voter turnout on the CPS, what did -- what

11   did that literature say happens?

12         A.   You mean in this present case?

13         Q.   So you testified that you have looked into

14   literature about over-reporting of Black voter

15   turnout --

16         A.   Right.

17         Q.   -- on the CPS.  What did -- what did you find

18   when you looked at that literature?  What did it say?

19         A.   The literature has identified it as --

20   over-reporting as a source of concern in using

21   self-reported data.  And the literature also shows that

22   there are different points of view about what the

23   over-reporting means and how it figures in drawing

24   conclusions.  There is -- it -- it is a controversial

25   topic among political scientists, and I'm aware of the

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 125

1    controversy in that field.  And I -- being a

2    demographer, I work with the numbers, and I'm conscious

3    of what -- what is being said about that controversy.

4         Q.   Okay.  So after a federal judge here

5    discounted your report in the Thomas versus Bryant case

6    based on, in part, the limitations of self-reported

7    voting surveys, you continued to use them when you were

8    producing your report in this case?

9                   MR. CARDIN:  Object to the form.

10                  You may answer the question.

11        A.   I used the CPS with full knowledge of its

12   limitations over a long period of time, yes.

13        Q.   (BY MS. SMITH)  Including over-reporting?

14        A.   I -- I was aware of -- I -- I was fully aware

15   of that issue and that concern, yes.

16                  MS. SMITH:  Okay.  I think we can take a

17   break now because I'm about to change topics, and we can

18   go off the record.

19                  (Recess taken from 11:51 to 11:57 a.m.)

20        Q.   (BY MS. SMITH)  All right.  So let's again

21   turn to your report.  I'm on Page 4.  You note here on

22   the first full paragraph each individual percentage in

23   Table 1 is a sample-based measure with a statistical

24   margin of error, right?

25        A.   Correct.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 126

1    Q.   Okay.  So as we talked about earlier, the

2    actual percentage could fall within a range of numbers?

3    A.   That's correct.

4    Q.   And did you report that range of numbers for

5    each of the estimates in Table 1?

6    A.   No, I did not include them, but I have them

7    available.

8    Q.   Okay.  And what about in Table 2; did you

9    report them there?

10   A.   I think the answer is the same.  Yes, I -- the

11   answer is the same.

12   Q.   Okay.  And in thinking about voter turnout or

13   voter registration by certain groups of voters, are you

14   able to say whether voter turnout among one group is

15   higher than the other based on survey estimates without

16   looking at the margin of error?

17   A.   I would not want to make any such statements

18   without assembling the data in a way that I could

19   account for the margins of error and test the -- you

20   know, the significance of change from one year to

21   another.

22   Q.   Okay.  So why would you want the margin of

23   error available?

24   A.   To document with strict precision the exact

25   point at which one could say there was a change in a

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 127

1    40-year trend.

2        Q.   Okay.  And would you want to know it also for

3    an individual year?  Say 2008, would you want to know

4    the margin of error when you're comparing voter turnout

5    among one group in one individual year to voter turnout

6    in another group for an individual year?

7        A.   If I wanted to, that would be how I would do

8    it, but that is not my intent here.

9        Q.   Okay.  So your intent wasn't to compare

10   individual years of voter turnout estimates to one

11   another?

12       A.   No.  I was -- I'm simply concerned with the

13   overall time trend over 40 years, irrespective of the

14   exact statement that one could make and the confidence

15   level of that statement for one year versus another or

16   one group versus another group in a particular year.

17       Q.   Okay.  All right.  Okay.  So you're not

18   contending that Black turnout was higher than White

19   turnout in, say, 2020 on an individual basis?

20       A.   I -- I could do -- I could make such

21   statements, but I haven't -- that -- that's not part of

22   what I intended to do.

23       Q.   Okay.  So your analysis does not report

24   differences in voter turnout between individual years?

25       A.   I -- as I say, I had no need to do that.  I'm

Page 128

1    talking about the overall trend and the change that is

2    apparent starting in about 2002.

3         Q.    Okay.  I think we'll talk more about that

4    change in a minute, but for now, I want to talk about

5    the underlying data that you -- the defendants' counsel

6    represent that you used in producing your report.  So if

7    I could -- the next exhibit, please, I'll mark as

8    Exhibit 14 for the record.

9                   (Exhibit 14 marked.)

10        Q.    (BY MS. SMITH)  I'll represent to you that

11   defendants' counsel e-mailed this to plaintiffs' counsel

12   in the form of an Excel spreadsheet, and I went through

13   and printed out the individual tabs, and I've labeled

14   them for you by year as they were labeled in the

15   spreadsheet.

16        A.    All right.

17        Q.    Does that sound all right?  All right.  Here

18   you are.  So I want to turn to the year 2008.  It should

19   be written at the top, which was the label in the Excel

20   spreadsheet, the tab label.

21        A.    All right.

22        Q.    So I'm looking at the tab of the spreadsheet

23   for CPS estimates of registration and voter turnout by

24   race in 2008, and I don't see a margin of error reported

25   here.  Is that right?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 129

1      A.   I -- I don't see a margin of error, but I'm

2  just trying to see what you have.

3      Q.   Is there a margin of error for the estimates

4  of White non-Hispanic alone turnout and of Black alone

5  or in combination turnout or registration for either

6  group?

7      A.   Let me just see where this came from.  This

8  table is one formatted version of data that provide the

9  numbers -- as far as I can tell here, the numbers apart

10  from the margins of error.  I'm -- I'm -- I don't see

11  the margin of error presented here, but that doesn't

12  mean they don't exist.  There's -- there's a whole

13  separate table for that.

14      Q.   So they -- I'm sorry.

15      A.   And, actually, I realize this is as of 2008,

16  and I don't know if the American Community Survey or any

17  other -- well, I don't know how they -- how -- I don't

18  know how the Census Bureau gathered these data in 2008,

19  but they, apparently, have not in this table shown

20  margins of error.  Let me just read the -- the stuff

21  here.  Current Population Survey.

22      Q.   So I -- I don't want to interrupt your

23  reading.  I'll give you a moment.

24      A.   Yeah.  All right.  Is your question about

25  the -- what the margins of error are?

Page 130

1    Q.   My question is simply:  Is -- is there a

2  margin of error reported here in this -- this document?

3    A.   I would assume there is, yes.

4    Q.   In this, do you see a margin of error

5  reported?

6    A.   Oh, I -- I don't see it reported in this

7  table.  That doesn't mean it -- it -- apparently, in

8  2008, they were not -- they were not presenting the full

9  details of people in 2018 would want to see, let's say,

10  or 2022.  The format of this table is the way they

11  presented it in 2008.  That is not to say that there

12  weren't margins of error that one could obtain by

13  looking for another table showing margins of error.

14    Q.   Okay.  So one might obtain a margin of error

15  by going to the Census and getting it from their data,

16  but it's not in --

17    A.   In the --

18    Q.   -- your spreadsheet?

19    A.   It's -- it's not in the table that you've

20  shown me here.

21    Q.   Okay.  And it's not in your report, either?

22    A.   No.  I -- no.  I -- I know where to get it,

23  but I --

24    Q.   Okay.

25    A.   -- I haven't needed it.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 131

1    Q.   Okay.  That's fine.  So turning to the next

2    page, 2010, I don't see a margin of error here, either.

3    Right?

4    A.   Nor do I.

5    Q.   Okay.  And to 2012, same --

6    A.   No margin of error.

7    Q.   -- question:  No margin of error?

8    A.   No.

9    Q.   2014, I don't see a margin of error.  2016 --

10   A.   No.

11   Q.   -- no margin of error?  Okay.

12        And 2018, also no margin of error, right?

13   A.   Yeah.  In 2020, they show a margin of error.

14   Q.   Yes.  Okay.  So --

15   A.   Yeah.

16   Q.   -- from 2008 until 2018, you didn't report a

17   margin of error for the CPS estimates that you used,

18   right?

19   A.   No.  What -- what's shown here is that the

20   table that you've accessed did not begin to report the

21   margin of error until 2020.  That's not to say that

22   there wasn't a separate table showing margins of error

23   that one could obtain if one looked for them elsewhere.

24   And it may be that they weren't published, but could be

25   obtained upon request.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 132

1    Q.    Okay.  So, yeah, this being the spreadsheet
2  that you provided via defendants' counsel, there's no
3  margin of error here in your underlying spreadsheet for
4  those --
5    A.    In the -- in the --
6    Q.    -- entries, 2008 to 2018?
7    A.    Yeah, in -- in Table 2 of my report, I do not
8  show margins of error in -- for any of the years.
9    Q.    Okay.  And same for the underlying
10 spreadsheet:  For 2008 to 2018, no margin of error is
11 included?
12   A.    In the ones that you got.
13   Q.    Okay.  Yeah.  But if I maybe went to the -- if
14 I went to the Census, I could find it elsewhere?
15   A.    I'm quite sure you could find it elsewhere,
16 yes.
17   Q.    Okay.  Thank you for clarifying that.
18            For 2008 to 2018, do you know whether the
19 turnout and registration differences you report fall
20 within the margin of error, meaning the estimate for
21 Black voter turnout falls within the margin of error in
22 the interval for White voter turnout, for example?
23   A.    I don't -- I don't know for any particular
24 year what the margin of errors are, and it's not a
25 central question to the time trend that I was looking at

Page 133

1   over a 40-year period.

2        Q.   Okay.  So you don't know whether the range of

3   margins of error for Black and White voter turnout for

4   individual years overlap with one another?

5        A.   I don't know for any particular year.

6        Q.   Okay.

7        A.   But I -- I would know where to get the data,

8   and I would probably consult it before I finalized my

9   testimony.

10       Q.   All right.  So let's look at 2020 for a

11   moment.  And here, you do have the margins of error

12   reported, right?

13       A.   Yes.

14       Q.   All right.  And under the table, you've

15   labeled the margin of error -- sorry.  The font is a

16   little bit small, but as I read it, it says:  This

17   figure added to or subtracted from the estimate provides

18   the 90 percent confidence interval.

19            Right?

20       A.   Yes.

21       Q.   All right.  So we're going to do some adding

22   and subtracting again.  If you want to get your paper or

23   your calculator, please take a moment.

24       A.   Okay.  I -- I want to state in advance of this

25   that I will do my best at calculating numbers you give

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 134

1    me.
2         Q.   Okay.  Sure.  Best is all we can all do.
3    So -- all right.  So looking at the "White non-Hispanic
4    alone" row under the column "Percent Registered
5    Citizen" -- are you with me?  It's highlighted in green.
6         A.   Yeah, in -- in green, yes.
7         Q.   Yeah.
8         A.   Okay.
9         Q.   So I see 79.2 there.
10        A.   Right.
11        Q.   And that's the point estimate for percentage
12   of White non-Hispanic alone individuals that is reported
13   by the CPS survey that were registered in 2020, right?
14        A.   Correct.
15        Q.   Okay.  And going to the left of that, I'm
16   seeing under margin of error, 3.6.  Right?
17        A.   Yes.
18        Q.   Okay.  So I just want to walk through how I
19   might calculate the range based on the margin of error
20   that the actual number of White non-Hispanic alone
21   citizens -- what percentage were registered in 2020,
22   according to this data.  Okay?
23        A.   All right.
24        Q.   So I believe 79.2 plus 3.6 would be 82.8.
25        A.   Yes.  Right.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 135

1    Q.   Okay.  And 79.2 minus 3.6 is 75.6?

2    A.   Yes.

3    Q.   Does that sound right?

4    A.   Yes.

5    Q.   Okay.  So the actual percent registered White

6  non-Hispanic alone citizens reporting on the CPS -- as

7  reported on the CPS -- excuse me -- falls somewhere

8  between 82.8 and 75.6?

9    A.   Yes.

10   Q.   And we can be 90 percent confident in that?

11   A.   That's the way the data are used, yes.

12   Q.   Okay.  Great.  And then I'm looking now a few

13  lines below that.  We have Black alone or in

14  combination.

15   A.   Yes.

16   Q.   And moving over to the "Percent Registered

17  Citizen" column, I see 83.4.  So as I read it, the CPS

18  is reporting that 83.4 percent individuals Black alone

19  or in combination would have self-reported being

20  registered?

21   A.   Right.

22   Q.   Okay.  And 4 -- one over -- one to the left

23  over from that, 4.1 margin of error -- 4.1 being the

24  margin of error --

25   A.   Yeah.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 136

1    Q.    -- for that figure?

2              Okay.  So just some math again.  So 83.4

3    plus 4.1 is 87.5?

4    A.    Hold on just a second here.

5    Q.    Sure.

6    A.    As I look at this table, you have margin of

7    error for the total percent registered, but you do not

8    have a margin of error for the percent registered of

9    citizens.  I'm just trying to figure out how this table

10   has been set up.

11   Q.    Oh, okay.  That's helpful.

12   A.    I -- I don't know that the -- what you're --

13   what you're computing here are margins of error for the

14   column entitled "Percent Total Registered."  And it

15   appears to me -- again, I -- I don't like to do instant

16   analysis with a Census --

17   Q.    Sure.

18   A.    -- Bureau table --

19   Q.    Of course.

20   A.    -- but the column headed "Percent Registered

21   Citizen" does not have an accompanied margin of error

22   for citizens only.  Now, that's a -- it may be that you

23   can have the total with the margin of error or you can

24   have the citizens alone without a margin of error.

25   Q.    Uh-huh.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 137

1      A.   And that's one limitation of -- or I should

2   say that's one aspect of this table that would prevent

3   me from applying the margin of error --

4      Q.   Uh-huh.

5      A.   -- for the total to the "Citizen" column

6   instead.  I just would have to -- I would have to study

7   this and read the fine print before I could really kind

8   of follow your calculations along and make any

9   informed --

10      Q.   Of course.

11      A.   -- statement about it.

12      Q.   Okay.  So it's your testimony that you're not

13   sure whether 4.1 being -- or you're not sure whether the

14   figures in the "Margin of Error" column are referring to

15   percent registered for citizens as opposed to percent

16   registered for total?

17      A.   That is correct.

18      Q.   Okay.  Did you make this table?

19      A.   No, I -- I -- I didn't make this table.  You

20   made it.

21      Q.   No.  So I printed this out, but your

22   counsel --

23      A.   Oh.

24      Q.   -- provided it to me.  Do you understand that?

25            MR. CARDIN:  Let's go off the record for

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 138

1    just a second.

2              (Recess taken from 12:15 to 12:16 p.m.)

3         A.   Let me say that what I am looking at here is a

4    version of the tables that the Census Bureau provides

5    for people who want to look at the table for a

6    particular year for a particular place, and they want to

7    see it on a piece of paper.  The Census Bureau also

8    allows one to download a large body of data from -- in a

9    whol- -- in a wholly different way that can be set up as

10   a database.

11        Q.   (BY MS. SMITH)  Uh-huh.

12        A.   And it is the database that, I believe, would

13   allow me to answer the questions that you're asking, but

14   I can't answer them based on these data because these

15   are really for public consumption as opposed to a

16   database for statistical analysis and tabulation and

17   preparing the kind of table that I had here.  And I -- I

18   don't know what to say about it, but it -- the Census

19   Bureau provides data in different forms for different

20   purposes.

21        Q.   Uh-huh.

22        A.   And what we have here is an example of people

23   who want to see a table on a piece of paper as opposed

24   to a data scientist who wants to set up a database to be

25   interrogated by me and put together in a customized way

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 139

1    for analysis, which in this case of Table 2 in my report

2    is designed to show, in the simplest form, a time series

3    over time and a graphic representation in Figure 1 on

4    Page -- Page 5 of my report.  So I just -- that's --

5    that's a caveat I want to make known to you.

6         Q.   Okay.  Sure.  So --

7         A.   And now, continue to ask the questions, and

8    I'll answer them --

9         Q.   Of course.

10        A.   -- as best I can.

11        Q.   So just to make sure I'm clear, this is the

12   data you relied on in producing your report?  That's

13   what you represented to us via defense counsel?  This is

14   the spreadsheet that you provided?

15        A.   This is the spreadsheet that has been

16   provided, yes.

17        Q.   By you?  By you?

18        A.   Yes.

19        Q.   Okay.  And you did not make this table, or you

20   did make this table?

21        A.   This --

22        Q.   Looking at the spreadsheet now.

23        A.   The -- the spreadsheet --

24        Q.   Uh-huh.

25        A.   -- is the table that I believe I would have

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 140

1   accessed if I had gone online and requested it as a

2   table as opposed to as a -- as an element of a database

3   with the full information.

4        Q.   Did you make this spreadsheet, or did Thomas

5   Bryan make this or someone else?

6        A.   I -- I honestly don't recall whether this was

7   mine or whether -- this looks, to me, like this is

8   something that I would have downloaded myself to look at

9   it.

10       Q.   All right.  So you're not sure whether you

11  made this spreadsheet?

12       A.   I'm not sure.  I mean, I -- I don't know.

13  This looks, to me, like the source that you would get if

14  you went to the website --

15       Q.   Uh-huh.

16       A.   -- at the bottom.  That's -- that's one way of

17  getting it.

18       Q.   Okay.  And you're not sure whether the margins

19  of error for percent registered citizen is included

20  here?  You don't know whether --

21       A.   That's correct.  I'd have to check on that.

22       Q.   So I think we can move on from that since --

23  I -- I just wanted to walk through the margin-of-error

24  calculation.  But if you're not sure --

25       A.   Sure.

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 141

1      Q.   -- if that's the right one, I don't want to

2   say anything --

3      A.   All right.

4      Q.   -- misleading.  All right.  So why don't we

5   move on.  So let's actually turn to the tab for the year

6   2016 in this same spreadsheet.

7      A.   All right.

8      Q.   Okay.  And as we talked about earlier, there's

9   no margin of error listed here in -- in your

10  spreadsheet.  So I'll represent to you I -- I looked at

11  the margin of error for some other years when I couldn't

12  find it.

13     A.   Yes.

14     Q.   And I'll represent to you that as the Census

15  Bureau reports it, in 2016 -- and I'm looking at "voter

16  turnout White non-Hispanic alone" -- the figure you

17  reported for "percent voted citizen" here was 67.7.

18  Looking at -- under "Voted," under "percent voted

19  citizen for White non-Hispanic alone," I see 67.7.

20     A.   This is 2016?

21     Q.   Yes.

22     A.   Oh, I'm sorry.  Okay.  Yeah.  I got it.  Okay.

23  I see.

24     Q.   Okay.  67.7?

25     A.   Right.  Yeah.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 142

1      Q.   Great.  All right.  And I'll represent to you,

2   when I looked up -- as you note, the Census Bureau does

3   make this public.  So I looked up the margin of error,

4   and for this figure, it was 3.3.  All right?

5      A.   All right.

6      Q.   All right.  So let's do that calculation

7   again, but this time, we can be -- we can use that 3.3

8   number because I looked it up --

9      A.   All right.

10      Q.   -- and I have it available.

11           Okay.  So the interval for voter turnout

12   would be, at the bottom of the interval, 67.7 minus

13   3.3 --

14      A.   Yeah.

15      Q.   -- which would be 64.4?

16      A.   Yeah.

17      Q.   Okay.  And then the top of the interval would

18   be 67.7 plus 3.3 --

19      A.   Yes.

20      Q.   -- which I calculate to be 71?

21      A.   Right.

22      Q.   Okay.  So the interval for range of possible

23   estimates as reported by the CPS for White non-Hispanic

24   alone voter turnout in 2016 would be 64.4 to 71?

25      A.   That's correct.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 143

1      Q.   Okay.  Let's do the same thing for turnout

2  under Black alone or in combination.  All right?

3      A.   Yeah.

4      Q.   All right.  So the point estimate you report

5  for 2016 is 69.2 for Black alone or in combination

6  percent voted citizen?

7      A.   Yeah.  Yeah, I gotcha.  69.2.

8             MR. CARDIN:  Yeah, object to the form.

9             But you may answer the question.

10             THE WITNESS:  All right.

11      Q.   (BY MS. SMITH)  Okay.  So let's do the range

12  of possible estimates again.  So 69 -- oh, sorry.  I

13  didn't already mention this.  I also looked at the CPS

14  margin of error here for Black alone or in combination

15  percent voted citizen, and that margin of error was 5.2.

16  Okay?

17             MR. CARDIN:  Object to the form.

18             You may answer the question.

19      A.   All right.  I'm -- the answers I'm giving are

20  premised on -- I should say I -- I don't know where you

21  got the margin-of-error-data from, so --

22      Q.   (BY MS. SMITH)  Okay.

23      A.   -- I'm taking the numbers you're giving me and

24  you're representing that -- that you've correctly

25  accessed them.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 144

1       Q.   Yes, I'm representing --

2       A.   And I can't -- I can't validate your numbers,

3   so you're giving me --

4       Q.   No, that's very fair.

5       A.   All right.

6       Q.   So I'll represent to you that I looked up the

7   CPS margins of error that they reported and that I saw

8   5.2.

9       A.   All right.

10      Q.   But I take -- I take your point that you don't

11  know --

12      A.   Sure.  Yeah.

13      Q.   -- the margins of error here.

14      A.   These are the numbers you're giving me --

15      Q.   Yeah.

16      A.   -- and we're talking about a hypothetical --

17      Q.   Right.

18      A.   -- analysis based on numbers you gave me.

19      Q.   Based on numbers I have --

20      A.   Okay.

21      Q.   -- because you don't have them here.

22      A.   Because you -- you accessed them and I didn't

23  access them.  Okay.

24      Q.   That's right.

25              MR. CARDIN:  And -- and my objection is

Page 145

1   objection to the form of the question for this whole

2   line of questioning for that reason.

3                MS. SMITH:  Okay.

4                MR. CARDIN:  But you may go ahead and

5   answer.

6                MS. SMITH:  Fair enough.

7        Q.   (BY MS. SMITH)  So taking my representation of

8   5.2 just for purposes of this --

9        A.   Yeah.

10       Q.   -- discussion, let's do the range of possible

11   estimates for Black voter turnout again.  Okay?

12       A.   Uh-huh.

13       Q.   Okay.  So I -- as I calculate it, 69.2 minus

14   60 -- minus 5.2 would be the bottom of the range of

15   possible estimates --

16       A.   Right.

17       Q.   -- for Black voter turnout in 2016, and that

18   would be 64?

19       A.   64 percent, right.

20       Q.   Okay.  And then the top of the range of

21   possible estimates would be 69.2 plus 5.2?

22       A.   Yeah.

23       Q.   And that would be 74.4?

24       A.   Right.

25       Q.   Okay.  So does a range of 64.4 to 71, which

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 146

1   was the range of White voter turnout possible estimates

2   that we just discussed --

3        A.   Uh-huh.

4        Q.   -- overlap with the range 74.4 to 64?

5        A.   Yes, it does.

6        Q.   Okay.  So is it fair to say that the range of

7   possible estimates that the CPS reports for Black voter

8   turnout in 2016 that you report in Table 1 overlaps with

9   the range of possible estimates the CPS reports for

10  White voter turnout in 2016?

11       A.   Based on your data, yes, that's a correct --

12       Q.   Okay.

13       A.   -- conclusion to draw.

14       Q.   Based on the data that I'm representing to

15  you --

16       A.   Yeah.

17       Q.   -- I pulled --

18       A.   That's right.

19       Q.   -- from CPS?  Okay.

20            Does the point estimate you report for

21  Black voter turnout -- so that's 69.2 -- fall within the

22  range of possible likely estimates of White voter

23  turnout?  So that's 64.4 to 71.

24       A.   The way I would state it is I cannot rule out

25  with scientific certainty that it does not overlap.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 147

1    Q.    Okay.  Does 69.2 fall within 64.4 to 71?

2    A.    Say that again, just so I see --

3    Q.    Yeah, I'm just asking you --

4    A.    Yeah.

5    Q.    -- if 69.2 is between 64.4 and 71.

6    A.    Oh, yes.

7    Q.    Okay.

8    A.    Yeah, yeah.  I see.  Okay.

9    Q.    I just simplified it --

10   A.    Right.

11   Q.    -- a little bit there.

12   A.    All right.

13   Q.    Thanks.  So -- and then vice versa.  So does

14   the estimate of White voter turnout, which you reported

15   as 67.7, fall within the range of possible estimates

16   that we just calculated for Black voter turnout based on

17   the margins of errors that I represented to you, which

18   were 74.4 to 64?

19   A.    Yes, it does fall within that range.

20   Q.    Okay.  And what does it mean for the point

21   estimates for Black turnout to fall within the range of

22   possible estimates for White turnout?

23   A.    The statement that -- the conclusion that I

24   would say it warrants is one cannot rule out with

25   scientific certainty the possibility that there is no

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 148

1  difference in turnout between the two groups or that one

2  group exceeds the other group.  And that could go either

3  way.  It could be the reverse of Whites.  In other

4  words, just -- you can't draw any conclusions from this

5  about the difference.  You can't rule out anything with

6  scientific certainty.

7       Q.   So Black voter turnout could be lower than

8  White voter turnout --

9       A.   It could be.

10      Q.   -- in 2016?

11      A.   You can't rule that out as a possibility from

12 these data.

13      Q.   Okay.  Do you know, for all the other years

14 since 2004 you report and you discuss in your report, if

15 the point estimate for Black voter turnout or

16 registration falls within the range of possible

17 estimates for White voter turnout or registration?

18      A.   I -- I know where to get those data, but that

19 wasn't the basis on which I drew my conclusions.

20      Q.   And sitting here today, do you -- do you know

21 if they overlap?

22      A.   I -- I would -- I would assume there's a

23 reasonable possibility that they overlap quite often.

24      Q.   Okay.  And -- okay.  So you drew your

25 conclusions about the pattern you observed happening

Page 149

1   since 2004 without looking at possible overlap between

2   margins of error for Black voter turnout or registration

3   and White voter turnout or registration?

4       A.   I didn't look at the individual years

5   themselves because that's not -- that's not what I'm

6   basing my opinion on.

7       Q.   Okay.  So you calculated the patterns without

8   looking at the possible range of estimates and whether

9   they overlap?

10      A.   No, that's -- that's not a correct statement.

11  I used a different criterion for evaluating the

12  historical pattern over 40 years, and it's a binary

13  comparison.

14            MS. SMITH:  All right.  I think I'm done

15  for now, and we can -- it's 12:30 -- it's about 12:30.

16  So we can take our break for lunch, if that works.

17            MR. CARDIN:  Okay.

18            (Recess taken from 12:31 to 1:04 p.m.)

19      Q.   (BY MS. SMITH)  All right.  I'm turning back

20  to your report, Page 4, and the third full paragraph.

21      A.   All right.

22      Q.   And I hear you use the -- I see you use the

23  phrase "statistical" -- sorry.  I'm in the second full

24  paragraph, the third paragraph.

25      A.   Uh-huh.

Page 150

1        Q.   Yeah.  I see you use the phrase "statistically

2   insignificant."  What is statistical significance?

3                 MR. CARDIN:  Objection to the form.

4   Could you restate?

5                 MS. SMITH:  Yeah, I can rephrase the

6   question.

7                 MR. CARDIN:  Yeah.  Where are you?

8                 MS. SMITH:  Page 4, the second full

9   paragraph.

10                MR. CARDIN:  Uh-huh.

11                MS. SMITH:  I referenced that

12  Dr. Morrison used the term "statistically

13  insignificant."

14                MR. CARDIN:  Is that in the third line of

15  the second paragraph?

16                MS. SMITH:  Yes, that's right.

17                MR. CARDIN:  Is that what you're

18  referring to?

19                MS. SMITH:  "Statistically

20  insignificant."

21                MR. CARDIN:  Okay.

22                MS. SMITH:  And I'm just --

23       Q.   (BY MS. SMITH)  My question is:  What is

24  statistical significance?

25       A.   The word "significance" refers to the likely

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 151

1   reality of what appears to be a difference between two

2   numbers.  Statistically significant in that context

3   means that when you see a difference between two

4   numbers -- and I use an example here.  Do you have a

5   fever?  You have a -- your temperature is -- should be

6   98.6, and the thermometer says it's 98.7.  You can

7   understand that to be an insignificant difference.  And

8   the term "statistically" would mean it's referring to a

9   population of many people or many instances in which you

10  see that difference.  That's the only way I can explain

11  it to you.

12      Q.   Okay.  So is it a way of demonstrating whether

13  results from a survey are explainable by random chance

14  or whether they're consistent with a researcher's

15  hypothesis?

16      A.   When you -- what did you mean by "it"?  Do you

17  mean statistical significance?

18      Q.   Yeah.  Is statistical significance a way of

19  evaluating whether results are explainable by chance

20  versus whether results are consistent with a research

21  hypothesis?

22      A.   I'd -- I'd say that's a fair statement, yes.

23      Q.   Okay.  So it helps us know whether we can draw

24  conclusions from the difference between two estimates?

25      A.   I would say it's the basis for drawing

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 152

1    conclusions.

2         Q.   Okay.  So would it be fair to say if the

3    difference between two estimates is not statistically

4    significant, you can't conclude with certainty which one

5    is higher and which one is lower?

6         A.   In the hypothetical case that you're

7    describing here, yes.

8         Q.   Okay.  And in your field, is it important to

9    consider whether the difference between two estimates is

10   statistically significant?

11        A.   It depends on what kind of conclusion I'm

12   seeking to draw from a particular year of data.

13        Q.   Okay.  So if you're looking at two estimates,

14   say, for one year, voter turnout by one group and voter

15   turnout by another group, you can look to statistical

16   significance to conclude which one is higher and which

17   one is lower?

18        A.   Not in a -- not necessarily in a particular

19   year.  That -- that's an important point to understand.

20   What you may be able to do is say one number was higher

21   than the other.  With the thermometer analogy, it was

22   98.7, whereas it should have been 98.6.  And that's all

23   you can know from it, is that it is -- it differs in a

24   direction rather than a quantity that would be

25   statistically significant in that particular instance,

Page 153

1    such as 103 versus 98.6, which would be medically

2    significant.

3         Q.   Okay.  So in the example you just used, you

4    would use statistical-significance testing to know

5    whether one temperature -- an estimate of one

6    temperature was a meaningful difference from an estimate

7    of another temperature?  Is that what you're saying?

8         A.   No, that's not what I'm saying.

9         Q.   Okay.  Would you mind --

10        A.   What I'm saying is simply:  Is one number

11   equal to or above or below the other number?

12        Q.   And you use statistical-significance testing

13   to determine that?

14        A.   No.  I -- I'm saying that's what I observe in

15   any particular year.

16        Q.   Uh-huh.

17        A.   It's analogous to flipping a coin, and did it

18   come up heads or tails.  And that's the model I have in

19   mind.

20        Q.   Okay.  Just in terms of telling the difference

21   between two -- individual two estimates -- so taking

22   aside the point about patterns --

23        A.   Yeah.

24        Q.   -- that you've made, how would you tell

25   whether the difference between two numbers is

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 154

1   statistically significant?

2        A.    You take the quantity as shown on the table,

3   and you have to look them up in a statistical table that

4   says:  At what point did the differences attain, let's

5   say, 80 or 90 percent significance statistically or

6   95 percent or 99 percent?  There's a regular way of

7   saying how confident can I be that the numbers differ

8   for this particular year --

9        Q.    Uh-huh.

10       A.    -- by analogy for this particular thermometer.

11       Q.    Okay.  Are there tests that help demographers

12  or statisticians evaluate statistical significance

13  between survey estimates?

14       A.    Oh, yeah.  Yeah, there's -- it's a standard

15  test that one applies.

16       Q.    Would that be a T-test?  Would that be one

17  such type of test?

18       A.    That's one test.  I don't know if that's the

19  one we use here, but there are a number of different

20  tests tailored to the data that one has and the question

21  one is asking.

22       Q.    Okay.  Just so I understand, what -- what

23  kinds of tests might help in different situations to

24  evaluate that?

25       A.    I -- I taught undergraduate statistics about

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                                    Peter A. Morrison, Ph.D.

Page 155

1   three years ago, and I'd have to go back to the textbook

2   with the appendix to see what the test is called now.

3          Q.   Sure.

4          A.   But I know that there is a test that would

5   apply to each particular year that you're referring to

6   in your hypothetical questions to me.

7          Q.   Okay.  So there are tests out there?

8          A.   There are tests for that.

9          Q.   Okay.

10         A.   And then there are other tests that are

11  designed for a series of heads or tails in a coin flip.

12  Did it come up heads or tails?  That is to say, did one

13  group come out with a higher number than the other group

14  over and over and over and over year by year, but before

15  it was a reverse trend.

16         Q.   I --

17         A.   That's the model that I have in mind, so

18  I'm --

19         Q.   I understand.  And what are those tests

20  called?

21         A.   Again, I'd -- I'd have to look back in the

22  textbook that I used when I was teaching the course.

23         Q.   Okay.

24         A.   But there are -- there are tests to do that.

25  I just have -- you know, I -- I don't remember the names

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 156

1    of them.

2         Q.   You don't remember the names of them?

3         A.   But there's -- there is an applicable

4    statistical test that you use to judge a series of

5    binary possibilities.

6         Q.   Okay.  So to make sure I'm understanding,

7    there's a type of statistical test that you can run to

8    determine whether an individual difference between two

9    numbers is statistically significant, right?

10        A.   In this case, in -- in one year, yes.

11        Q.   Okay.  And there's also tests that one can use

12   to determine whether a pattern over time is

13   statistically significant?

14        A.   Yes, a historical pattern over many years,

15   whether there is a statistically significant turning

16   point or reversal.

17        Q.   And did you run any of those tests here in --

18   in your --

19        A.   I haven't yet run them, but I know -- I know

20   for sure that what I see that -- using the

21   flip-of-a-coin test, I can do a simple, you know,

22   calculation that tells me this did not happen by chance.

23        Q.   But you haven't run any tests to do that?

24        A.   I haven't run it.  I -- I intend to run the --

25   I intend to run the formal tests that would document

Page 157

1   what I already know, just from my experience looking at

2   trends like this.

3        Q.   Why didn't you run either of those kinds of

4   tests when you --

5        A.   I wanted to make sure I -- I used the right

6   test.  And there was kind of a time deadline I had to

7   get the report in, and I said the -- the test that will

8   document the statistical significance of this is

9   something I need to perform.  I don't want to use one

10  test when I should use, perhaps, a different test.  I

11  want to confer with a statistician colleague to find out

12  the appropriate test that would be used, and that is a

13  test that I will conduct now that I have some time to do

14  it.

15       Q.   And why didn't you do it in the last, say, six

16  weeks or so since you submitted your report?

17       A.   Because I had other deadlines --

18       Q.   Okay.

19       A.   -- and it was -- it wasn't anything I needed

20  to get done, you know, right away, as far as I was

21  concerned.

22       Q.   And earlier, you testified that when you

23  produced your report, you had all the information

24  available that you needed to produce your report with

25  confidence.  Is that still your testimony?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 158

1    A.    That's still my testimony.  I can tell --

2 without even doing the test, I can tell, looking at it

3 and -- and doing what I would characterize as a simple

4 calculation of a binary coin-flip test, the -- the

5 possibility of getting -- of -- of a simple coin-flip

6 test, which is analogous to what we have here, there's

7 no way that the change in trend that I pointed to could

8 have come about by chance.

9              Let me rephrase that.  There -- I -- I can

10 say with confidence that there has been a change in --

11 and -- and I think I said in my report what I knew about

12 it at the time, which is I said at a point in time

13 starting around -- what was it -- '22 -- 2002 to 2004

14 that there was a change in trend.  I think I -- and I

15 don't know where I stated it specifically, but --

16 actually, it's in -- on Page -- where I stated my --

17 let's see what page -- Page 3.  I've stated it in the --

18 the bottom paragraph.

19    Q.    Okay.  Just give me a moment.  I see -- yeah,

20 I saw your Footnote 4 about 10 flips of the coin.  What

21 is the statistical principle you're relying on when you

22 use this coin flip?

23    A.    I don't -- I don't know what the name is, but

24 it's -- it's kind of like -- you know, it's a real

25 simple thing.  What are the -- what are the odds that

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 159

1    you could get 10 flips of a neutral coin and they would

2    come up heads all 10 times?  The chances of that

3    happening are quite remote.

4         Q.   And --

5         A.   And it's that model that I would be applying.

6    I just want to apply the formal test so that I know what

7    the name of the test is.  It's -- it's kind of like you

8    just think that way, as a statistician, when you've done

9    it this way.  It's a flip -- it's a binary, you know,

10   flip-of-the-coin model.

11        Q.   Okay.  So it's your testimony that you know

12   without doing any kinds of statistical tests whether the

13   differences between Black voter registration and voter

14   turnout and White voter registration and turnout that

15   you report are significant?  Is that what you're saying?

16        A.   No, no, that's not what I'm saying.  What I'm

17   saying is a simple elementary statistical model that I

18   can do just, you know, on the back of an envelope

19   informs me about the conclusion I drew.  Before I commit

20   it to writing, I wanted to find out if there is a more

21   elegant model for dealing with the pattern that I see

22   historically that would reveal even more about it.  So I

23   have not yet done the test, but I know for -- for

24   certain that I can state with -- with -- I -- I can

25   state with a high degree of scientific confidence that

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 160

1   there was a turning point, and that was the conclusion

2   that I had drawn at the time I drafted this report.  And

3   I will supplement it with the formal tests that a

4   statistician would say, "That's what we use today to

5   deal with the simple model that you have called the --

6   the coin-flip model."

7        Q.   Okay.  So --

8        A.   Because there -- there may be more information

9   that can be discerned with a more sophisticated model.

10       Q.   So it's your testimony that you -- for your

11  initial report, you used this coin-flip model and that

12  you plan to offer supplemental expert opinions in this

13  case to do formal -- more formal tests of statistical

14  significance?

15       A.   No.  That's not my -- what I'm saying is I'm

16  going to document it by saying the test here is known

17  among statisticians not as the coin-flip model.  It's

18  known as the -- I don't know if it's called a T-test or

19  an F-test or an L-test, but there is a name for the

20  test.

21       Q.   Uh-huh.

22       A.   I haven't had a chance to dig out a statistics

23  book and look it up, and I haven't had a chance to

24  confer and confirm with a statistician colleague that

25  this is the test one would use in this situation or

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 161

1   there's, perhaps, a more refined one that might reveal

2   even more about it.  But I know that the test that I

3   have used so far is -- is one that I can rely on for

4   scientific certainty to say that there has -- to state

5   the conclusion -- support the conclusion as I've stated

6   it in my report.

7       Q.   And what is the test that you relied on?

8       A.   I call it the coin-flip model.  It's -- it's

9   so elementary that, you know, it -- it's the way -- it's

10  the way you test lots of things that are binary that are

11  either -- it's either above or below.

12      Q.   Okay.  Is there any literature that you can

13  point me to, sitting here today, about the coin-flip

14  model?

15      A.   I would say any introductory statistics

16  textbook.  I don't have one directly on my bookshelf;

17  otherwise, I would have looked it up.

18      Q.   Okay.  And in using the metaphor of a coin

19  flip, is it -- is it -- you're saying that, say, heads

20  would be that Black voter turnout is higher and tails

21  would be that Black voter turnout is lower than White

22  voter turnout?  Is that --

23      A.   Or the reverse --

24      Q.   -- the metaphor?

25      A.   -- yeah.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 162

1    Q.   Okay.

2    A.   You know, one -- one is above the other.

3    Q.   Okay.  All right.  I think we'll get into that

4    a little bit more.

5              Okay.  So still on Page 4 of your report,

6    which is Exhibit 2.  I see you have it there.  On -- you

7    say that, quote -- and this is the same paragraph:

8    Statistically marginal differences appearing over many

9    successive years can substantiate an authentic pattern

10   over time.

11             Right?

12   A.   That's correct.

13   Q.   What is an authentic pattern?

14   A.   A gen- -- it means it really exists.  It's not

15   a mat- -- it's not -- it's not something that is a

16   function purely of Rand and variation.

17   Q.   Okay.  And what's a statistically marginal

18   difference?

19   A.   That would be a difference in which the

20   chances of it happening by chance might be 30 percent,

21   in which case you'd say, "Well, I'm 70 percent sure that

22   it's -- one number is higher than the other number, but

23   there's a 30 percent chance -- or let's make it simpler.

24   I'm 55 percent sure that one number is above the other,

25   but there's a 45 percent chance that it's the reverse of

Page 163

1    that.  So I, basically, know nothing with any certainty.

2    I can just observe it.

3         Q.   Okay.  So looking at Table 1 and Table 2 --

4    Table 1 on the previous page.  Let's start there.  Is it

5    possible that some of the individual differences in

6    White voter registration and Black voter registration

7    and then, of course, White voter turnout and Black voter

8    turnout are statistically marginal?

9         A.   Oh, it's entirely probable, sure.

10        Q.   Entirely probable.  Okay.  But you don't know

11   which -- which ones are, or you haven't run any tests to

12   calculate that?

13        A.   I haven't -- I mean, I've -- I've looked at

14   the confidence intervals around these numbers, and I

15   know that they are -- that they -- they often overlap.

16   And that's the reason that I have avoided making any

17   statement about any particular year, because the margins

18   of error do overlap very often.

19        Q.   Okay.

20        A.   So, I mean, I'm aware -- that's -- that's one

21   of the constraints in looking at the table of data and

22   saying, "Well, in a particular year, what do you know

23   about that year?"  And the answer is the margins of

24   error overlap, and so it makes it very difficult to say

25   anything more than one is above the other.  But we don't

Page 164

1    know if it is really above the other because of the

2    margins of error overlapping.

3         Q.   Okay.  And on Page 4, again.  So you say that,

4    quote:  These yearly differences -- I'm in the same

5    paragraph as before.  Quote:  These yearly differences

6    may disclose a statistically significant historic change

7    across several decades, and short discerning meaningful

8    patterns is an alternative approach for accommodating

9    specific instances where respondent self-reports might

10   be shown to have exaggerated measured rates of voter

11   registration and/or turnout.

12                   Right?

13        A.   That's what I said.

14        Q.   Okay.  And you didn't run any statistical

15   tests other than looking to the kind of coin-flip

16   principle you discussed to discern whether there is a

17   statistically significant historic change across several

18   decades?

19        A.   Well, I did do a statistical test, like I say,

20   a back-of-the-envelope -- you know, the most elementary

21   test you could use.  As a --

22        Q.   Okay.

23        A.   -- an undergraduate student of statistics,

24   you'd say, "Well, is -- is there a discernible trend

25   here?"  And the answer would be -- the only thing you

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 165

1    can make a clear statement about is one is above the

2    other.  But if you look at it over time as a simple --

3    you know, the most elementary test, you can see that the

4    time trend over 40 years reveals a turning point.

5         Q.    Uh-huh.

6         A.    And that -- that -- I know that just from a

7    back-of-the-envelope calculation.  I'd like to make a

8    more formal statement about it using the latest tests

9    that a statistician might say, "Well, this is a -- this

10   is an even more informative test that you should use."

11   As I say, I haven't really put in what that test is yet,

12   but I know -- I know that there is a significant pattern

13   here.

14        Q.    Is it your view that if you aggregate a number

15   of statistically insignificant differences, that can

16   indicate a statistically significant difference across

17   time?

18        A.    If you rephrase that slightly to say if you

19   examined a number of these things over time and said

20   with enough observations, you could make a statistically

21   significant statement about a trend over time, the

22   answer is yes.  I think I phrased it slightly

23   differently than you did, but, yes, that's the whole

24   point of what I'm trying to say here.

25        Q.    Okay.  And what is the statistical principle

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 166

1   by which insignificant individual differences between

2   estimates indicate a significant difference when

3   aggregated?

4        A.    That's what I want to put in the text as a

5   very precise statement of -- of what we can know from a

6   time trend.  And thus far, I have tried to make it

7   comprehensible to the average reader by saying it's the

8   coin-flip test.  How many times can you get heads on a

9   coin before you say the coin, after 30 flips and it

10  always comes up head, you cannot conclude that it's

11  unbiased?

12       Q.    All right.  So back on Page 4.  And I believe

13  we've covered this, but just to make sure I'm clear.

14  The meaningful pattern that you're observing is that,

15  quote, the data in Table 1 strongly suggests an apparent

16  change since 2004 in Black political participation.

17       A.    That's what I said about Table 1.  It strongly

18  suggests it.

19       Q.    Uh-huh.  Is it possible that the meaningful

20  pattern that you're discerning is actually a pattern of

21  over-reporting rather than a pattern in actual voting

22  behavior?

23       A.    I can imagine -- I can imagine someone

24  conjuring up that notion.  It would be quite fanciful.

25  And I also want to point out that Table 1 is a prelude

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 167

1   to Table 2.  I went from Table 1 to Table 2 because I

2   wanted more information.  And it's actually Table 2 on

3   which my final opinion is based.

4        Q.   Okay.  Sure, we can look at Table 2.

5        A.   So we're -- we're talking about Table 1,

6   saying it -- it sort of looks like something is going on

7   here, but you need more years of data.

8        Q.   Uh-huh.

9        A.   Then I went and got more years of data in

10  Table 2.

11       Q.   Okay.  So looking at Table 2, and just to make

12  sure I'm clear, is it possible that the pattern that you

13  discerned is actually a pattern of over-reporting?  Is

14  that a possibility?

15       A.   Anything is a possibility, including that,

16  yes.

17       Q.   Okay.  Rather than a pattern in actual voting

18  behavior?

19       A.   Yes.  There -- there are ways in which that

20  could happen that I could imagine.

21       Q.   Okay.  Would this approach you've described of

22  discerning patterns as opposed to calculating

23  statistical significance allow analysis in a situation

24  where there is a systemic reason where Black voters

25  over-report voting and registration at greater rates

Page 168

1    than White voters?

2         A.   I'm not sure I --

3              MR. CARDIN:  Objection:  form.

4         A.   I -- I think it's kind of a -- I don't

5    understand.

6         Q.   (BY MS. SMITH)  Oh, yeah, I can rephrase.  Of

7    course.

8         A.   Yeah, rephrase it a little.

9         Q.   So you -- you reference in your report -- I

10   believe we talked about that you acknowledged specific

11   instances where Black voters have over-reported turnout

12   at greater rates than White voters, right?

13        A.   Where they -- it appeared to be the case based

14   upon the comparisons year by year with the margins of

15   error.

16        Q.   Okay.  So if there were evidence of systemic

17   over-reporting whereby Black voters over-report voting

18   at greater rates than White voters across multiple

19   elections, would this approach of discerning meaningful

20   patterns account for that possibility?

21        A.   Not if the -- if -- if the -- the scenario

22   you've described, if that remained in place year after

23   year without anything else changing, the answer would be

24   no.

25        Q.   Okay.  As a demographer -- so how can you

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                     Peter A. Morrison, Ph.D.

Page 169

1    distinguish patterns in voting behavioral change from

2    systematic errors due to survey design?

3         A.   Well, I have to -- I -- I have trouble

4    answering your question because I don't know what you

5    mean by systematic errors due to survey design.  And

6    maybe if you try rephrasing the question --

7         Q.   Sure.  Let's -- let's rephrase the question.

8    Let's say:  How can you distinguish patterns in voting

9    behavior from systematic errors due to over-reporting of

10   voting registration or turnout?

11        A.   You can do so by making assumptions about what

12   the systematic errors are and whether they continue year

13   by year at the same level over time.  If you cannot make

14   that assumption, then you have another -- another

15   dilemma.

16        Q.   So did you assume when producing your report

17   that Black voters do not systematically over-report

18   voting and turnout on the --

19        A.   No, I did not make that assumption.

20        Q.   Okay.  All right.  So -- and just going back

21   to the notion of kind of an authentic pattern or a

22   meaningful pattern.  So I'm back on Page 4 now.  Sorry.

23   Actually, let's turn to -- one moment.  Oh, yeah.  So

24   the third full paragraph, you say that:  Black

25   voting-aged citizens report having registered to vote at

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 170

1    a higher rate than their White non-Hispanic counterparts

2    in eight out of the 10 most recent biannual elections.

3              So I take it from that -- and please

4    correct me if I'm wrong -- in your view, eight out of 10

5    is a meaningful pattern?

6        A.   Well, it's meaningful to me.  I -- I don't

7    know whether it is -- whether it attains the level of

8    statistical significance that I would want as shown in

9    Table 1 --

10       Q.   Uh-huh.

11       A.   -- because -- well, I'm sorry -- Table 1 as

12   opposed to Table 2, which is the more comprehensive

13   table.  So Table 1 -- I think I've answered the question

14   about that for Table 1.

15       Q.   Okay.  So for Table 2, is your answer

16   different?

17       A.   I'm trying to remember what -- what it is I --

18   what was the -- what is it that you are --

19       Q.   Yeah, let's --

20       A.   -- asking me --

21       Q.   Let's go back a little bit.

22       A.   All right.

23       Q.   So I'm just -- I'm just trying to understand

24   what constitutes an authentic pattern --

25       A.   All right.

Page 171

1    Q.   -- or a meaningful pattern.

2    A.   All right.

3    Q.   So it sounds like eight out of 10 times,

4    that's a meaningful pattern, in your view?

5    A.   Well, it -- it's -- it's a clue to wanting to

6    have more data.  And eight out of 10 is something

7    where -- which prompted me to want to get the data in

8    Table 2 to say I need more -- more years in which to

9    establish the pattern.  And that's why I'm basically

10   saying Table 1 in -- which I originally put together for

11   one reason, invited me to add on a further historical

12   perspective going back to 1980.

13   Q.   Oh, yeah.

14   A.   That's -- that's the big difference.

15   Q.   Got it.

16   A.   And once I got that, then I have the table in

17   Table 2 on which I base my opinion.

18   Q.   So in Table 2, just to make sure I'm

19   understanding this right, you looked at -- when you say

20   eight out of 10, you're looking at the years from 2004

21   until 2022, and you're saying eight times, according to

22   CPS estimates -- I'm looking at voter registration for

23   now.  According to CPS estimates for voter registration,

24   eight times since 2004, difference between Black and

25   White voter turnout was -- or -- sorry -- Black minus

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 172

1    White voter registration was a positive value eight

2    times?

3         A.   Eight out of whatever it was, yeah.

4         Q.   Out of 10?  Out of 10?

5         A.   That -- that -- yeah --

6         Q.   Okay.

7         A.   -- that's an observation.

8         Q.   Got it.  Okay.

9         A.   But that -- that's -- that's what I observed

10   in Table 1.

11        Q.   Okay.  And what if, let's say, that number

12   were seven times; would that still be a meaningful

13   pattern?

14        A.   When I say "meaningful," what I'm saying is

15   it -- it looks like it might be statistically

16   significant.  "Meaningful" means it's more than just

17   random.

18        Q.   Okay.

19        A.   But it's not -- "meaningful," to me, is it

20   suggests that this might be worth nailing down with more

21   years of data so that one can say it's not only

22   meaningful, but it can -- one can say that it is

23   statistically significant at a certain level, so...

24        Q.   Okay.  And what if that number were four

25   times; would that be a meaningful pattern?

Page 173

1      A.   I'd have to think about it.  I -- I -- four

2  times out of how many did you say?

3      Q.   Out of 10.

4      A.   Out of 10?  No.  That would be pretty much

5  random.

6      Q.   Okay.  And so we talked earlier about how you

7  haven't calculated statistical significance for each

8  individual year, right?

9      A.   Correct.

10      Q.   And you haven't looked at margins of error for

11  any of these years, right?

12      A.   Well, I -- I've -- I've looked at them, and I

13  can tell right away that there -- in any given year, you

14  can't draw any conclusions because -- because the data

15  have margins of error that overlap.  That's -- that's

16  one of the -- that's -- that's one limitation --

17      Q.   Sure.  So taking --

18      A.   -- to looking at any given year.

19      Q.   Taking that into account, let's say the

20  margins of error overlap in four of these individual

21  years.  Would there still be a meaningful pattern over

22  time?

23      A.   I -- I can't answer these off the top of my

24  head because I'd have to do the back-of-the-envelope

25  calculation, but generally -- you know, it depends on

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 174

1  what you think I mean by "meaningful."  My concern is

2  that there are too many comparisons that are not

3  meaningful for me to work off of just the data in

4  Table 1.  So I needed to get the further observations to

5  see whether that remains so or whether that filled in --

6        Q.   Yeah, and that's fine.  We can stay on

7  Table 2.  How are you sure that there is, in fact, a

8  pattern without taking into account statistical

9  significance of these individual differences?

10       A.   If I can modestly say, when you've looked at

11 data like this enough times, you can tell just by

12 looking at it.  The data here could well be attributable

13 to statistical chance.  Certainly, there is not -- it --

14 it appears very dubious that this would pass a

15 recognized, you know, statistical significance test at

16 the 95 percent level.

17       Q.   Okay.  So, in other words, you know --

18       A.   Judgment.  It's like --

19       Q.   -- you know it when you see it?

20       A.   Yeah.  I know it when I see it, yeah.

21       Q.   Okay.  I think that concludes that

22 conversation.  I have some more questions about the

23 pattern you observed after 2004.  Let's turn back to

24 Page 4 of your report.  So your conclusion -- let's

25 actually turn to Page 6, because I think we've -- we've

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 175

1    established that your conclusion is that there's been a

2    change since 2004 in Black political participation.

3    Right?

4         A.   Yes.

5         Q.   Okay.  So on Page 6, you discuss this more.

6    So you note that there's two possible explanations for

7    this pattern.  Do I have that right?

8         A.   Tell me where on Page 6 you're --

9         Q.   Oh, of course.  Yes.  So Paragraph 1, it's

10   labeled under "Basis for Conclusions and Opinions" --

11        A.   Uh-huh.  Okay.

12        Q.   Okay.  So --

13        A.   Yeah.  Okay.  I'm with you.

14        Q.   Great.  So you say the first option is, quote,

15   a genuine break in the historical pattern of Mississippi

16   Black voters' political participation manifested itself

17   in these data starting around 2004.  Do I have that

18   right?

19        A.   Yes.

20        Q.   Okay.  Are you aware of any reasons why Black

21   voters' political behavior would have broken

22   significantly from historical patterns starting around

23   2004?  Any explanations?

24        A.   No.  I'm just observing that around 2004, the

25   data tell me that there was a break -- there was an

Page 176

1   apparent break, and that is all that I'm documenting.

2   And I don't have an explanation for it other than

3   something changed.

4        Q.    Something changed.  Okay.  And then the other

5   option that you note is that the apparent break arose

6   through a behavioral change but only among Black

7   eligible voters, whereby Blacks, but not Whites, began

8   over-reporting that they were registered to vote, and

9   especially, that they have turned out to vote.

10       A.    Right.

11       Q.    Okay.

12       A.    That's what I said.

13       Q.    That's what you said.  Okay.  So those are, in

14  your view, the two possible interpretations for the

15  change you saw in 2004?

16       A.    Those are two possibilities.  I don't know if

17  they're the only possibilities, but those are two

18  contrasting interpretations.

19       Q.    And those are the two that you considered?

20       A.    That's right, the competing -- the competing

21  explanations.

22       Q.    And did you consider any other possible

23  reasons or explanations?

24       A.    Well, you can consider -- you could consider

25  that Whites changed but Blacks didn't change.  Blacks

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 177

1    changed but Whites didn't change.  Blacks and Whites

2    both changed in opposite directions.  I mean, there's

3    some logical possibilities.

4         Q.   Uh-huh.

5         A.   And -- and you can exhaust the logical

6    possibilities, some of which are -- I would describe

7    them as fanciful.

8         Q.   Uh-huh.

9         A.   Or you can imagine them.  But does anybody

10   have any evidence that they might conceivably exist?

11        Q.   Uh-huh.

12        A.   And so this is -- this is how one might

13   speculate thinking most broadly about what -- what could

14   account for this.

15        Q.   Okay.  Did you consider -- other than those,

16   did you consider any other possible explanations?

17        A.   Not that I recall, no.

18        Q.   Okay.  And you conclude that it was Black

19   citizens' actual voting behavior that changed?

20        A.   Yes.

21        Q.   Okay.  I want to introduce another exhibit.

22   All right.  So I'll represent to you -- oh, sorry.  I'm

23   going to mark Exhibit 15.

24                  (Exhibit 15 marked.)

25        Q.   (BY MS. SMITH)  All right.  So, again, I'll

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                      Peter A. Morrison, Ph.D.

Page 178

1    represent to you that I went to the CPS website that you

2    linked in your report below Table 1, so the Census

3    website, and I clicked "historical reporting voting

4    rates," and then I selected Table A-4 called "Reported

5    Voting and Registration for Total and Citizen Voting Age

6    Population for Congressional Elections" be- -- and then

7    this is between 1978 and 2022.  All right?

8         A.    Uh-huh.

9         Q.    So this is CPS data.  Does that sound --

10        A.    All right.

11        Q.    Okay.  Could you turn this paper over for me,

12   and then, could you read for me after the word -- the

13   first time -- after "note because of changes"?  Just

14   read that sentence for me.

15        A.    You're saying at the top of the notes here?

16        Q.    No.  So I guess it's the fifth --

17        A.    Oh, I see.

18        Q.    -- one down.

19        A.    Okay.

20        Q.    "Note because --

21        A.    "Note because" -- I see it.

22        Q.    -- of changes."  Yeah.

23        A.    Yeah, the second paragraph.  "Note" -- okay.

24   Just a second.  Right.  Yeah, I'm -- I'm familiar with

25   this --

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 179

1      Q.    Okay.  So could you --

2      A.    -- change.

3      Q.    -- just read the -- the statement after the

4  word "note" there, "note because of changes"?

5      A.    Sure.  Do you want me to read it out loud?

6      Q.    Yeah, or I can.  So --

7      A.    "Note federal surveys"?

8      Q.    No.  Sorry.  "Note because of changes."

9      A.    "Because of changes in the Current Population

10  Survey, race categories beginning in 2003, 2004 through

11  2022 data on race are not directly comparable with data

12  from earlier years."

13     Q.    Okay.  So would you dispute that here, the

14  Census Bureau is saying that pre-2004/post-2004 data are

15  not directly comparable?

16     A.    That's what they say, yes.

17     Q.    Okay.  Because the race categories changed in

18  2003?

19     A.    That's correct.

20     Q.    And that change started being reflecting --

21  reflected in the 2004 --

22     A.    Yes.

23     Q.    -- data?  Okay.

24            And do you agree with me that here, the

25  CPS -- or the Census is informing people of a limitation

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 180

1  in how you can draw conclusions from its data?

2      A.    They simply said they're not directly

3  comparable.  That doesn't --

4      Q.    Okay.

5      A.    -- mean that you can't draw conclusions.

6  The -- what they're referring to is the respondents who

7  have the option of reporting more than one race.

8      Q.    Uh-huh.

9      A.    And what effect that has is it means that

10 numbers -- the number that would have been collected

11 under the old protocol would not exactly equal the

12 number collected under the new protocol if it had been

13 done in the old way.  That doesn't mean that it

14 invalidates a comparison one makes in a place where

15 multiracial Blacks are a large share of the Black

16 population.  Now, admittedly, that is a -- that is a

17 caveat, and I would not regard that as invalidating the

18 comparisons that I've made.  And if -- if anything, I

19 would say you -- you could -- you could draw a num- --

20 you could probably draw several conclusions from it that

21 might go either way in terms of what I've concluded

22 in my -- in my paper, in my report.

23     Q.    Okay.  So just quickly.  So I believe you

24 didn't agree that this is a limitation in CPS data.

25 Would you call it a caveat?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 181

1      A.   It's a caveat.

2      Q.   It's a caveat?

3      A.   And it -- I mean, it -- it doesn't limit my

4  ability to draw conclusions.  It is a caveat that is

5  worth my noting.

6      Q.   Okay.  And you said earlier that one should

7  consider the Census' own descriptions of its data,

8  right?

9      A.   Say that again.

10      Q.   Earlier, we talked about how one should take

11  the Census' own description of --

12      A.   Yes.

13      Q.   -- its limitations and its caveats, per se,

14  seriously.  Right?

15      A.   Yeah.

16      Q.   Okay.  So did you consider how the race

17  categories changed in 2003 when you conducted your

18  analysis?

19      A.   I didn't at the time, but I can't see how they

20  would -- how they would change my conclusion if they are

21  a more genuine portrait of what's going on today as

22  opposed to what was going on from 1980 to 1996 or -- or

23  from 1980 to 2002.

24      Q.   Okay.  So you didn't consider how changes in

25  the current population -- the CPS race categories

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 182

1   beginning in 2003, whether that might have caused the

2   differences you observed in the pre-2004 and post-2004

3   reported Black voter turnout and registration?

4        A.   Well, in -- in just looking at the table, I

5   can -- I can see what effect it would have.  It would --

6   it would mean that Blacks were equal to or exceeded

7   Whites starting in an earlier point in time.

8        Q.   Did you consider -- I think my question was a

9   little bit different.  Did you consider it when you were

10  producing your report in this case?

11       A.   No, I -- I didn't consider it, no.

12       Q.   Okay.  And did your report acknowledge this

13  caveat from the CPS anywhere?

14       A.    No, I don't believe I did acknowledge it in

15  any footnote anywhere.

16       Q.   Okay.  Would you -- would you say that

17  changing how race is categorized so that people can list

18  more than one race instead of just one is a major change

19  in a survey method?

20       A.   It depends on -- on -- it's a -- it's --

21  it's -- it's a major -- it has a major effect in certain

22  parts of the United States.

23       Q.   Okay.

24       A.    It could have.  In the case of Mississippi,

25  just looking at it now, I would say it doesn't change

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 183

1   my -- my overall conclusion.  And if anything, it would

2   reinforce it further.

3        Q.   And did you consider that this change in race

4   categories might account for the, quote, historic break

5   you observed in 2004?

6        A.   I want to be clear that when I say a "historic

7   break in 2004," I'm not saying it happened in that year.

8   I'm saying it manifests itself in the data in that year.

9   But I'm not saying it happened in 2004.  I'm saying it

10  wasn't there before, and it is there now, ever since,

11  with virtually no exceptions.  And that's my --

12  that's -- that's what I -- what I -- what I mean when I

13  say there was a historic break, and it occurred around

14  2004.

15       Q.   Did you consider whether this manifestation of

16  a historic break is due to the change in race

17  categories?

18       A.   I -- I can consider it right now and say it --

19  it --

20       Q.   But did you consider it --

21       A.   Oh, did I consider it?

22       Q.   -- for -- yeah.

23       A.   No, I did not.

24       Q.   Okay.  All right.  So I want to talk a little

25  bit more about how the race categories changed in 2003.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 184

1   So if I can please mark the next exhibit.  This is going

2   to be Exhibit 16.

3                  (Exhibit 16 marked.)

4        Q.   (BY MS. SMITH)  And this is a publication

5   called "Revisions to the Current Population Survey

6   Effective in January 2003," written by employees of The

7   Bureau of Labor Statistics.  All right?

8        A.   Uh-huh.

9        Q.   Great.  So let's turn to Page 5.  And on the

10  left-hand side, under "Changes in Race and Hispanic

11  Origin Data," it says, "Starting in January 2003,"

12  and -- and then it lists some changes that were made in

13  2003.  All right?

14       A.   Yeah.

15       Q.   And then on the fourth bullet point down, it

16  lists that the following change was made, quote:

17  Individuals are allowed to choose more than one race

18  category.  Prior to January of 2003, individuals who

19  considered themselves to belong to more than one race

20  were required to select a single primary race.

21                  Right?

22       A.   Yeah.

23       Q.   So that's the change?

24       A.   Right.

25       Q.   Okay.  So let's turn to the next page in the

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 185

1    document, in the chart here.  So I'll represent to you

2    the CPS -- sorry -- the -- the Bureau of Labor

3    Statistics reports that this is the CPS questions about

4    race before January 2003 and then starting in January --

5    after January 2003 --

6         A.   Right.

7         Q.   -- right?

8              All right.  So just to sum up, before

9    January of 2003, people could choose one race among

10   these four options:  White, Black, and then

11   American-Indian, Eskimo or Aleut, and then Asian or

12   Pacific Islander.  Those are the four?

13        A.   Right.

14        Q.   Okay.  And then after January 2003, the column

15   to the right of that, people could select multiple.  So

16   they could choose one or more?

17        A.   Show me where the mult- -- oh.

18        Q.   "Choose one or more."  Do you see that?

19        A.   Oh, all right.  Yeah, I see what you're --

20   right, right.

21        Q.   Okay.

22        A.   "Choose one or more."  Okay.  I get you.

23        Q.   Okay.  So they can say they're Black or White

24   after 2003?

25        A.   Uh-huh.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 186

1    Q.   Or they can choose both Black and White?

2    A.   Correct.

3    Q.   Or they could choose any other combination of

4    races?

5    A.   Correct.

6    Q.   Okay.  All right.  So if we could turn back,

7    please, to Exhibit 14, which is your underlying data

8    there.

9    A.   (Handing.)

10   Q.   Oh, I have one, too.

11   A.   Okay.

12   Q.   I was just -- I was just pointing --

13   A.   All right.

14   Q.   -- to it.  If we could look at that.

15   A.   Yeah.

16   Q.   All right.  I just want to flip to 2002.

17   A.   All right.

18   Q.   All right.  In the leftmost column, it looks

19   like in line with what we've just discussed, people are

20   listed as one race or another but not multiple.  Right?

21   A.   That's my understanding, yes.

22   Q.   Okay.  And then you compared among those

23   categories non-Hispanic White with Black, right?  Those

24   are highlighted there?

25   A.   Yes.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 187

1      Q.   Okay.  Now let's look at the next page, which
2    is 2004.
3      A.   Yeah.
4      Q.   Okay.  Here now people are listed as White
5    alone or in combination or Black alone or in
6    combination, right?
7      A.   Yes.
8      Q.   Or Black alone or White alone, right?
9      A.   Right.
10     Q.   So people can be listed as having one race or
11   two or multiple --
12     A.   Yes.
13     Q.   -- in line with that change in survey methods
14   we talked about, right?
15     A.   Right.
16     Q.   Okay.  So I see here White non-Hispanic alone
17   and Black alone or in combination are highlighted,
18   because those are the two categories that you were
19   comparing, right?
20     A.   Yes.
21     Q.   So why did you choose those two categories to
22   compare, White alone versus Black alone or in
23   combination?
24     A.   For the year 2004?
25     Q.   Yeah, so in the year 2004, when it started to

Page 188

1    be possible to have a combination of races.

2         A.   If you look at Table 2 where -- in my report,

3    the top, where it says "% Black (AP)" --

4         Q.   Uh-huh.

5         A.   -- that refers to any part Black.

6         Q.   Uh-huh.

7         A.   And I'm saying it was any part -- in other

8    words, I -- I did include those.

9         Q.   Yeah.

10        A.   Yeah.

11        Q.   Yeah, so you included people who were --

12        A.   Any part Black.

13        Q.   -- any part Black versus people --

14        A.   As soon as the Census -- as -- as soon as I

15   could.

16        Q.   Okay.  Yes, versus people --

17        A.   Right.

18        Q.   -- who were only White?

19        A.   And your --

20        Q.   Right?

21        A.   Now -- and -- and what is your question about

22   why I did it?

23        Q.   Yeah, I suppose to rephrase my question:  Why

24   not compare, let's say, White alone versus Black alone,

25   or in com- -- or, as an alternate, Black alone or in

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 189

1    combination to White alone or in combination?

2          A.    Okay.   Now I see what you're asking.   The

3    answer is very simply that I wanted to remain current

4    with people who reported themselves being Black even

5    though they were multiracial.

6          Q.    Uh-huh.

7          A.    So what we have here is a secular trend over

8    time in which the Census Bureau is starting in -- I

9    think 2002 was the year -- beginning to acknowledge that

10   there are people who are racially Black and are

11   multiracial and they want to express their self-identity

12   to a question that acknowledges the way they see

13   themselves.   And this is exactly the kind of secular

14   change that could account for what -- what I'm

15   displaying here is a transformation in how people

16   envision themselves.   And I would note the -- in the

17   2002 table that you refer to in Exhibit -- what exhibit

18   is this?

19         Q.    14.

20         A.    -- 14.   14.

21         Q.    Yeah.

22         A.    There's a very informative comparison that one

23   could make here just by looking at the table --

24         Q.    Uh-huh.

25         A.    -- which is the -- I'm sorry.   In 2- -- for

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 190

1   the year 2004, when that change was first made, if you

2   look at the "Total" column under "Population 18 and

3   Over," you will see -- that's the left column.

4         Q.    Uh-huh.

5         A.    Black alone, the population that was -- that

6   they -- they included for this particular, you know,

7   weighted sample, 698 Black alone, and there were 700

8   people, two more in their sample, who were identifying

9   as Black alone or in combination.

10        Q.    Uh-huh.

11        A.    So we have two out of 700.  That would make

12  maybe a quarter of 1 percent or a fifth of 1 percent of

13  the respondents were picking up on this.  And I look at

14  the next year, 2006, and I see that the -- the numbers

15  here are Black alone, 718; Black alone or in

16  combination --

17        Q.    Uh-huh.

18        A.    -- 718.

19        Q.    They're the same.  Okay.

20        A.    And so, I mean, there's a -- there's a --

21  that's -- that's a clue as to what's going on.  It's

22  undoubtedly statistically meaningless, but it says that

23  there are some people who are beginning to pick up on

24  the notion that they are multiracial --

25        Q.    Okay.

Page 191

1     A.   -- back in 2002-2004.

2     Q.   Okay.  So just to make sure I'm understanding,

3   let's say someone took the CPS in 2002 and one were

4   mixed race, so identified as Black and White.  They

5   would have had the option to choose Black or White on

6   the CPS, right?

7     A.   Say that again.  I'm --

8     Q.   So if I -- if one is mixed race and

9   identified --

10    A.   Yeah.

11    Q.   -- as Black and White in 2002 --

12    A.   Right.

13    Q.   -- on the CPS, they'd have the option to

14  choose either Black or White, right?

15    A.   Or --

16    Q.   Or another --

17    A.   Yeah, yeah.  Right, right.

18    Q.   But they could choose one?

19    A.   Right.

20    Q.   And then after 2003, so from 2004 on, you can

21  choose both Black and White?

22    A.   That seems to be the way this was set up with

23  the ACS.  I'd -- I'd have to study -- I mean with the

24  CPS.  I'd have to study it more -- more closely, but

25  just as I look at the data, I see evidence that the --

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 192

1    the way the question was reworded starting in that year

2    was consistent with everything that I have said about a

3    developing change at that particular point in time, and

4    it does coincide with this change in definition.  And I

5    haven't looked at the rest of the data, but it --

6        Q.   Yeah.

7        A.   -- it -- it's all consistent with my notion

8    that there was a change in the awareness of Blacks who

9    were being surveyed as to what they -- what they

10   regarded their identity as being.

11       Q.   Okay.  I think we can move on.

12            So you talked earlier about how you've

13   cited and reviewed some studies about over-reporting of

14   voter turnout and registration on surveys, right?

15       A.   I've reviewed the political-science literature

16   that I could readily access and that was -- I deemed to

17   be the most timely and significant.

18       Q.   Okay.

19       A.   And my caveat here is that I'm not a political

20   scientist, but I want to know what political scientists

21   are saying that might afford me a different way of

22   viewing the data that I'm looking at as a demographer.

23       Q.   Okay.  So in your report, you've cited -- and

24   I'm looking at Footnote 7 here on Page 6 still.

25       A.   Okay.  Footnote 7 on Page 6 of my report, did

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 193

1   you say?

2        Q.   Yes.  Page 6 of your report and at Footnote 7.

3        A.   I'm sorry.  I've got -- I've got the other

4   case.

5        Q.   Oh, yeah.  No worries.

6        A.   Sorry.

7        Q.   Take your time.

8        A.   Here we go.

9        Q.   A lot of paper.

10       A.   Okay.  Footnote 7.  Now --

11       Q.   Yeah.

12       A.   Okay.  What's your question?

13       Q.   So you cited -- on the issue of

14   over-reporting, you have cited a piece by Satoshi

15   Kanazawa called, "Who Lies on Surveys, and What Can We

16   Do About It?"  Right?

17       A.   Yes.

18       Q.   And you cite also a series of articles by

19   Abramson and Claggett from 1984 through 1991?

20       A.   Yes.

21       Q.   Okay.  And the Kanazawa piece, that's from

22   2005?

23       A.   Right, right.

24       Q.   Okay.  And then in the following footnote, you

25   cite the Berent, Krosnick and Lupia working paper from

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 194

1    2011 that we talked about a little bit earlier?

2         A.    That's the one that has -- was the basis for

3    the subsequent article that I said was in a

4    peer-reviewed journal.

5         Q.    Okay.  And -- and then you mentioned today

6    that you would additionally like to rely on the 2016

7    piece by those same three authors?

8         A.    Correct.

9         Q.    Okay.  Did you rely on any other literature to

10   draw conclusions about over-reporting on surveys than

11   those that we've just discussed?

12        A.    No.  I -- I want to clarify that I -- the

13   point I was trying to make here was not that I was an

14   authority on what political scientists -- the -- the

15   latest word among political scientists about

16   over-reporting.  What I wanted to make was simply the

17   point that this is a controversial issue, and the

18   controversy extends back to studies that were done a

19   long time ago.  And in the case of Footnote 8, there was

20   a massive study, and now that it's been published, the

21   controversy continues on among academics to this date.

22        Q.    And when you say there's a controversy, are

23   you referring to other studies that are not cited in

24   this report, or are these -- are these reflective of the

25   controversy that you mention --

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 195

1       A.    Well --

2       Q.    -- the ones that you cite?

3       A.    -- I'm -- I'm saying that in my re- -- in my

4    cursory review of the political-science literature,

5    virtually every author acknowledges that some people say

6    this is happening; other people say not.  And then they

7    report that they did a study in a particular place at a

8    particular time, and they found something further to add

9    to the controversy.  So it only makes it an ongoing

10   controversy among political scientists.  Latest word,

11   still controversial.

12      Q.    Late- -- okay.  So --

13      A.    Latest word, still controversial, so...

14      Q.    Okay.  So I --

15      A.    That's what I know.

16      Q.    Here's how I understand the controversy as you

17   described it.  So on one side of the controversy, you

18   have Berent, Krosnick and Lupia saying that there is not

19   systematic over-reporting of voting or turnout or

20   registration, potentially; and on the other side, there

21   are other authors saying that there is.  Can you point

22   me to authors other than Berent, Krosnick and Lupia who

23   would contest the over-reporting on voting surveys --

24   self-reported voting surveys occurs?

25              MR. CARDIN:  Object to the form.

Page 196

1           You can answer the question.

2      A.   I don't profess to be an authority on the

3  political-science literature in this -- on -- on this

4  topic.  What I am convinced of is that it remains

5  controversial based upon the most recent study that I

6  have seen, which is the one that was -- the published

7  version of Berent, Krosnick and Lupia, who acknowledged

8  that there is a controversy.  And they seem to make the

9  case that it's hard to say, but this could -- this

10 doesn't look like it's what other people are saying it

11 is, but we don't know.

12           So my conclusion is this is a healthy

13 discussion of what you find when you look at all the

14 different specific studies of specific elections at

15 specific points in time, and you find that sometimes

16 things occur and sometimes things don't occur, and it

17 leaves you wondering if -- well, maybe there is no

18 constant conclusion you can draw about there being

19 over-reporting or underreporting.

20      Q.   (BY MS. SMITH)  All right.  So just to clarify

21 one point, so the most recent study that you've reviewed

22 on this topic was 2016?

23           MR. CARDIN:  Object to the form.

24           You can answer the question.

25      A.   I -- I would say the most recent study I've

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 197

1   reviewed is the Berent, Krosnick and Lupia study that

2   was published, and I regard that as a most informative

3   study that now is -- if I were to refer someone to what

4   is the current state of the controversy, I would say

5   read their recently published peer-reviewed study.

6   That's kind of where the controversy stands among

7   political scientists today.

8       Q.   (BY MS. SMITH)  Got it.  And then, can you

9   point me to, sitting here today, any other academics

10  that have published articles supporting Berent, Krosnick

11  and Lupia's view in --

12      A.   No, I can't, and I -- I'm not a political

13  scientist.

14      Q.   Okay.  Thank you.  So let's -- I want to walk

15  through some of the articles that you cite here.

16               MS. SMITH:  So if you can please mark the

17  next exhibit.  And this will be Exhibit 17 in the

18  record.

19               (Exhibit 17 marked.)

20      Q.   (BY MS. SMITH)  Okay.  And this is an article

21  called, "Who Lies on Surveys, and What Can We Do About

22  It?" by Satoshi Kanazawa, published in fall 2005.

23      A.   Uh-huh.

24      Q.   All right.  So you cite this article in your

25  report?

Page 198

1      A.   Yes, I do.

2      Q.   As a study suggesting that Black respondents

3  on the CPS over-report registering or turning out to

4  vote, right?  Or for what proposition?

5      A.   My -- my reading of this article is the title

6  says all that I need to know.

7      Q.   Have -- have you read this article?

8      A.   I scanned through it.  I notice that it is now

9  approximately 24 years ago.

10     Q.   Okay.

11     A.   So it's not something that bears directly on

12 what I'm considering here.

13     Q.   But you --

14     A.   I -- I -- I wanted to get the flavor of what

15 the controversy is.  And this is an article that starts

16 with the premise that people do lie on surveys.  And I'm

17 not interested in knowing -- I'm not really terribly

18 interested in knowing much more about it other than that

19 it documents that as of 2005 -- or, actually, before

20 that, when the study was still under review to be

21 published, it was believed that people lie on the

22 surveys.  And then I would say this -- this is probably

23 representative of what political scientists were

24 considering at that time.  It is a -- sort of a

25 historical document, but of no immediate relevance to

Page 199

1    me, other than to flag it as one side of a controversy

2    that traces back to 2005.

3        Q.   All right.  And so you reviewed it when you

4    prepared your report?

5        A.   I reviewed the abstract and I scanned through

6    it.  I didn't see anything of -- of relevance to me in

7    terms of what I was doing.

8        Q.   All right.  Did you find it to be a reputable

9    article on the topic of over-reporting?

10       A.   I can't say I read it with that in mind, so I

11   can't give you an opinion on that.

12       Q.   Okay.  But you relied on it in your report?

13       A.   I cited it as an example.  I didn't -- I

14   didn't re- -- I -- I can't say that I relied upon it.  I

15   simply said this is an example of what political

16   scientists were considering as -- in the controversy

17   over do people lie about things like this.

18       Q.   And do you agree with the author's conclusions

19   here about Black voters over-reporting turnout on

20   surveys?

21       A.   I -- I can't answer the question because I

22   haven't read it carefully enough.

23       Q.   Okay.  And do you disagree with anything that

24   they said in this article that you remember?

25       A.   The same answer.

Page 200

1    Q.   Okay.  I think we're done with that article.

2              Let's talk now about Berent, Krosnick and

3    Lupia's working paper from 2011.  I know that you also

4    looked at the 2016 version, and I believe we'll get to

5    that, as well, but let's start with this one --

6    A.   All right.

7    Q.   -- the one that you cited.

8              All right.  So I'll mark as Exhibit 18 a

9    working paper called "The Quality of Government Records

10   and Overestimation of Registration and Turnout in

11   Surveys:  Lessons from the 2008 ANES Panel Study's

12   Registration and Turnout Validation Exercises."

13             (Exhibit 18 marked.)

14   Q.   (BY MS. SMITH)  There you go.

15   A.   Thank you.

16   Q.   Okay.  So this is a report from 2011, so a

17   little over a decade ago?

18   A.   Yeah.

19   Q.   And it's a working paper, and you know it was

20   eventually published in 2016.  Just to make sure I'm

21   clear on the record, why didn't you rely on the

22   published version in your report initially?

23   A.   Because I was unaware of it having been

24   published until just a matter of days ago, when I was

25   reviewing my file in advance of the deposition, and I

Page 201

1   noticed that there was a reference to this by the same

2   authors as having been published.  And it was now in a

3   peer-reviewed journal as opposed to a lengthy technical

4   report.

5        Q.   Uh-huh.

6        A.   I had studied the lengthy technical report in

7   great detail because I was very impressed by the

8   thoroughness of it.

9        Q.   Uh-huh.

10       A.   The exposition of it in terms of how it was

11  written is -- you know, left something to be desired

12  because it was -- was a whole lot of words for what it

13  found.  And nonetheless, I read it very carefully, and

14  I -- I -- I realized that there were some important

15  conclusions that were derived from this very careful

16  analysis.

17       Q.   Okay.  And this working paper is based on a

18  data source from 2008 to 2009?

19       A.   Yes.  It's some panel study that the -- that

20  political scientists were looking at and was uncommonly

21  useful and informative to a political scientist who had

22  the time to really analyze the data.

23       Q.   Okay.  And that's the American National

24  Election Study survey?

25       A.   That's correct.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 202

1      Q.   And that's another survey, where, like the

2   CPS, people report their voting behavior?

3      A.   I'd have to review the details of it, but I

4   know that it was a very prominent data- -- dataset that

5   was used and it was a study that had great relevance for

6   the questions that I had.

7      Q.   Okay.  And in your report, at Page 7, when you

8   conclude that the historic break in the CPS data that

9   you observe in 2004 whereby Black citizens start to

10  report higher turnout in registration than White

11  citizens, you're citing this paper to conclude that that

12  change, quote, cannot be attributed to just the

13  speculative claim of differential over-reporting by

14  Blacks, right?

15     A.   Tell me what paragraph that is.

16     Q.   Yes.

17     A.   This is on Page 7?

18     Q.   This is on Page 7.  I'm at Paragraph 5.

19     A.   All right.

20     Q.   Quote:  The break itself, though, cannot be

21  attributed just to the speculative claim of differential

22  over-reporting Blacks.

23     A.   Right.  I see where --

24     Q.   I assume "by Blacks" is what --

25     A.   Yeah.  Right.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 203

1    Q.   Okay.  And then you cite to this Berent study?

2    A.   Yes.

3    Q.   Okay.  So it's fair to say that the Berent

4  study at the time you wrote the report was your basis

5  for concluding that the break you observed after 2004

6  was not due to over-reporting?

7              MR. CARDIN:  Object to the form.

8              You may answer the question.

9    A.   What I'm paying attention to is the portion in

10 Paragraph 5 that's italicized:  The apparent success of

11 turnout validation exercises in producing aggregate

12 turnout rates that are closer to reported official

13 turnout rates appears to occur not simply because the

14 exercises weed out liars but because the unrecognized

15 downward bias due to errors in government records is

16 stronger than the unrecognized upward bias in the actual

17 rate of turnout amongst survey participants.

18    Q.   (BY MS. SMITH)  Okay.  So that statement by

19 Berent, et al. was the basis for concluding that, quote,

20 the break itself, though, cannot be attributed just to

21 the speculative claim of differential over-reporting by

22 Blacks?

23              MR. CARDIN:  Object to the form.

24              You may answer the question.

25    A.   It's a succinct statement of a much broader

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 204

1   consideration of that issue.

2        Q.   (BY MS. SMITH)   Okay.

3        A.   I cite that simply because it -- it

4   encapsulates what they -- what they had to say in their

5   original report.

6        Q.   Are there other bases for your conclusion

7   that, quote, the break itself, though, cannot be

8   attributed, just the speculative claim -- claim of

9   differential over-reporting by Blacks cannot be

10  attributed -- sorry.  Are -- are there other bases for

11  that statement cited in your report?

12       A.   Well, certainly, the -- the more elegant

13  statement of the point I just quoted that was in their

14  published report -- if you hand it to me, I can tell you

15  that that further confirmed what they were saying.

16       Q.   Other than -- let me rephrase my question.

17            Other than this working paper and the 2016

18  published version of it, are you relying on any other

19  literature to conclude that over-reporting did not

20  account for that break?

21       A.   I'm -- I'm not relying on anything directly.

22  I am acknowledging the fact that there is a controversy

23  among political scientists.  And my view of the evidence

24  is that the published report by -- published report by

25  Berent and Krosnick and Lupia is probably the most

Page 205

1   informative current study as to what is at issue in that

2   controversy.  And I don't profess to be -- to be an

3   authority on the political science that has been done on

4   both sides, but I know that it is an issue that is

5   controversial among political scientists and that it

6   gives me grounds for having considerable doubts about

7   what some people are attributing this change to other

8   than what I'm attributing it to.

9         Q.   Okay.  In looking at this working paper, does

10   this paper look at whether there is a racial disparity

11   in over-reporting?

12         A.   I'd have to go through the details.  If you're

13   talking about an observed racial disparity in

14   over-reporting -- well, let me -- let me see if I can

15   state this correctly.  We don't know if there is an

16   over-reporting unless we know what the true report was.

17   So I guess I can't answer your question as there is an

18   assertion that there is over-reporting.

19         Q.   So let me rephrase it.  So this article is

20   looking at a method for validating a survey of

21   respondents' answers as to whether they registered or

22   voted against official government records, right?

23         A.   That's not actually what they did.

24         Q.   Okay.

25         A.   That's not the comparison they made.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 206

1      Q.    All right.   Put more simply, does this article

2   address whether Black and White voters might over-report

3   voting at differential rates?   Is that the topic of this

4   article?

5      A.    Say the question again, please.

6      Q.    Whether Black and White voters over-report

7   voting at differential rates, is that the focus of this

8   article?

9      A.    I wouldn't say it's the central focus.

10   It's -- it's an issue that enters in.   And they have

11   addressed the issue as best they can with the data that

12   they have at their disposal.

13      Q.    Where is the -- where is the issue of Black

14   and White voters' over-reporting voting differential

15   rates discussed in this article?   I didn't see it

16   addressed, but if you could point me to anything.

17      A.    The -- I'm not sure that I can point to

18   exactly where they said something about something, but

19   the explanation that -- that they gave for the

20   observation that it appears that there's over-reporting

21   is picked up in the last paragraph of their unpublished

22   report on Page 8.   And I'm going to read it into the

23   record:   Taken together, this evidence suggests that a

24   major factor driving turnout overestimation in Internet

25   surveys may not be respondent lying.   It may be the fact

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 207

1  that people who choose to participate in such surveys

2  also choose to participate in elections at higher rates

3  than do people who do not participate in surveys.

4  Traditional approaches to turnout validation do not

5  solve this problem; they only mask it.

6          Now, that -- that's saying, basically,

7  there's something else very important going on here.

8  And in their published version, they have stated more

9  succinctly what one can conclude.

10     Q.  So I didn't hear anything about race in that

11 passage, right, that you just read?

12     A.  No, not about race.  It's -- it's about

13 differential self-selection of those who report

14 accurately -- or -- or I'm sorry -- who are inclined to

15 report.  This is not the only paragraph I relied on.

16     Q.  So did they evaluate levels of over-reporting

17 by race in their study?

18          MR. CARDIN:  Object to the form.

19          You may answer the question.

20     A.  I don't recall that they addressed it

21 directly.  They -- they addressed the circumstances that

22 might give rise to it and call them into question.

23     Q.  (BY MS. SMITH)  Okay.  Let's move on to

24 Page 29 of this piece now.

25     A.  All right.

Page 208

1        Q.   Looking at the second full paragraph, I see

2   that they looked at government records of registration

3   and turnout from -- I believe it's six states listed

4   here.

5        A.   Yes.

6        Q.   Okay.  And now let's turn to Page 66.

7        A.   All right.

8        Q.   I want to look at the discussion under the

9   subheading "The Impact of Survey Mode."

10        A.   Okay.  I'm with you.

11        Q.   Okay.  So here, it says that their

12   conclusions, quote, might seem to contradict evidence,

13   unquote, by other authors.

14        A.   Where is that?

15        Q.   "Our conclusion" -- just the first sentence --

16        A.   Yeah.  Okay.

17        Q.   -- after --

18        A.   All right.

19        Q.   -- "the impact of survey mode."

20        A.   Oh, I see.  Okay.  "Might seem to contradict

21   evidence."

22        Q.   So "might seem to" --

23        A.   Yeah.

24        Q.   Okay.

25        A.   Right.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 209

1     Q.   And that other report, quote, found that

2  turnout reports were, indeed, intentionally inflated due

3  to social desirability response bias, unquote?

4     A.   Uh-huh.

5     Q.   Okay.  Is that a yes?

6     A.   Yes.

7     Q.   Okay.  The next sentence, it goes on to say,

8  quote:  That evidence came from a telephone survey and,

9  therefore, converges with other evidence suggesting that

10 social desirability pressures can, indeed, distort

11 reports collected by telephone.

12    A.   Yes, I see that.

13    Q.   Okay.  And then the authors say in the next

14 sentence that by contrast, quote, the 2008/2009 ANES

15 panel study, which is the dataset they're relying on,

16 involved data collected exclusively via self-completion

17 on computers and submitted via the Internet, a mode that

18 has been shown to be largely immune to social

19 desirability pressures in reports of turnout.

20    A.   Yes.

21    Q.   So the authors are saying their conclusion

22 showing what they say is high accuracy of the ANES, an

23 Internet-based survey, is actually consistent with other

24 literature about inflated reports of voting and

25 registering in telephone surveys?

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 210

1           MR. CARDIN:   Object to the form.

2           You may answer.

3      A.   It -- I'm -- I'm -- I read this as they're

4  saying this is -- this is one of the things that people

5  are saying based on the research they did.  I can't say

6  that I endorse it or, you know, they're right about it

7  and everything else is wrong, but, yeah, that's what

8  they said.  I -- I --

9      Q.   (BY MS. SMITH)  That's what they said?

10      A.   I don't dispute that they said it --

11      Q.   Okay.

12      A.   -- in this unpublished version.

13      Q.   Okay.  And earlier, we talked about how the

14  CPS is conducted over the phone.  Do you remember that?

15      A.   All right.  If you say that's true, I'll --

16  I'll go with it.

17      Q.   Okay.  Is it fair to say that based on this

18  analysis from Berent and his coauthors, the CPS, which

19  they're not discussing here in this paragraph, is less

20  immune to social desirability bias because it's done

21  over the phone?

22      A.   I would say it's one study that would point

23  in -- point towards that conclusion, but --

24      Q.   All right.

25      A.   -- it doesn't, by any means, mean it's true.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 211

1     Q.   So according to what they say here, that would

2  be the case?

3     A.   Yeah, they're saying this is one -- one point

4  that would be favoring that interpretation.

5     Q.   Okay.  And that's the conclusion of Berent and

6  his coauthors here --

7     A.   That's correct.

8     Q.   -- in the report that you rely on to come to

9  your conclusions --

10    A.   Yes.

11    Q.   -- about over-reporting on the CPS?

12    A.   Right.

13    Q.   All right.  Let's see.  All right.  So since

14 2011, you're aware that other academics have -- are you

15 aware of whether other scholars have looked at Berent

16 and Krosnick's conclusions to see if they're accurate?

17    A.   I have not pursued the political-science

18 literature since my initial foray into it, except to get

19 the published version of the -- whatever the title of it

20 is -- of the Berent, Krosnick and Lupia study, because I

21 found that to be the most comprehensive and informative

22 about what the literature was claiming to know at the

23 point it was published and had been peer-reviewed and

24 condensed down to firm conclusions.

25    Q.   Okay.  Do you know if other methods have

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 212

1   become available to study the same questions?

2       A.   I -- I do not.  I can't say that I'm up to

3   speed on the latest studies.  I'm -- as I say, I don't

4   stay current on political science as my primary field.

5       Q.   Okay.  So you didn't look into whether other

6   reports were more comprehensive than this one?

7       A.   I -- I know that if there had been important

8   studies that had been published, I would have caught

9   them in the last two months, but this is what I worked

10  with when I examined the literature.

11      Q.   All right.  So I want to introduce another

12  article about over-reporting.  All right.  And I'll mark

13  this as Exhibit 20 in the record.  This is an article

14  called --

15               MR. BERRY:  Just to be clear.

16               MS. SMITH:  Of course.

17               MR. BERRY:  I think maybe it's 19.

18               MS. SMITH:  Oh, I'm sorry about that.

19  Yeah, you're absolutely right.  Thank you.

20               (Exhibit 19 marked.)

21      Q.   (BY MS. SMITH)  All right.  So this is an

22  article called "Validation:  What Big Data Reveal About

23  Survey Misreporting and the Real Electorate" by Stephen

24  Ansolabehere and Eitan Hersh at Harvard University and

25  Yale University -- University, respectively, published

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 213

1    in Political Analysis in 2012.  All right?

2         A.   Uh-huh.

3         Q.   Are you familiar with the journal Political

4    Analysis?

5         A.   I am not familiar with it.  I assume it's a

6    reputable journal.

7         Q.   Okay.  Looking at the abstract here, I see

8    that Ansolabehere and Hersh are looking at surveys and,

9    they are, quote -- I'm reading off of the third line:

10   Leveraging developments in technology and improvements

11   in public records, we conduct the first ever 50-state

12   vote validation.  We parse over-reporting due to

13   response by us from over-reporting due to inaccurate

14   respondents.  We find that nonvoters who are politically

15   engaged and equipped with politically relevant resources

16   consistently misreport that they voted.  This finding

17   cannot be explained by faulty registration records,

18   which we measure with new indicators of election

19   administration quality.  Respondents are found to

20   misreport only on survey items associated with socially

21   desirable outcomes.

22              All right?

23        A.   Yes.

24        Q.   All right.  So they're conducting -- looking

25   down here under "Introduction," I see it mentions,

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 214

1    fourth line down, that they're also looking at the 2008

2    national election study.

3         A.   Yes, I see that.

4         Q.   Okay.  So would it be fair to say that, based

5    on what we just looked at, they're using data from all

6    50 states?

7         A.   Well, that's what they appear to say in the

8    abstract, yes.

9         Q.   Okay.  And they're looking at over-reporting

10   and whether it can be attributed to faulty registration

11   records?

12        A.   If that's what it says in the abstract.

13   That's all I know about the study.  I haven't read it.

14        Q.   Okay.  You haven't read this?  Then you didn't

15   come across this in your review?

16        A.   No.  I mean, I can --

17        Q.   Okay.

18        A.   -- only comment -- I can only answer your

19   questions that you're asking me about a paper that I

20   haven't read yet, so...

21        Q.   Okay.  I understand.  Thank you.  And as I

22   read that abstract that we just went over, they conclude

23   that misreporting accounts for evidence of

24   over-reporting, not faulty registration records?

25        A.   If that's what it says, that's what they

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 215

1    found.

2         Q.   Okay.  At the bottom of that page, do you see

3    that they say, quote:  A new era characterized by

4    high-quality public registration records, national

5    commercial voter lists and new technologies for big data

6    management creates an opportunity to revisit survey

7    validation?  Right?

8         A.   Yes.

9         Q.   All right.  And staying on Page 438, where we

10   are now, going to the third full paragraph down --

11        A.   All right.  The one that begins "in

12   demonstrating"?

13        Q.   Yes.

14        A.   Okay.

15        Q.   So I'll just point you to that paragraph and

16   say that they state here, quote:  This analysis reaches

17   different conclusions than a recent working paper of the

18   ANES, which asserts that self-reported turnout is no

19   less accurate than validated turnout and, therefore,

20   that survey researchers continue to rely on reported

21   election behavior.

22              And they're citing the 2011 working paper

23   from Berent, Krosnick and Lupia, right?

24        A.   Yes.

25        Q.   All right.  So they reached different

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 216

1    conclusions than those offered by Berent, Krosnick and

2    Lupia?

3         A.   Yes.

4         Q.   All right.

5         A.   And this study reinforces my conclusion, which

6    is that this is an actively controversial issue among

7    political scientists who are coming up with evermore

8    studies that bear on the controversy.

9         Q.   Uh-huh.  Okay.  And at the beginning of the

10   next paragraph, they say here, quote -- they're using --

11   sorry -- quote, the new validation -- a new validation

12   method that addresses the problems that have plagued

13   past attempts at validating political surveys?

14        A.   Yes.

15        Q.   Okay.  And earlier, we discussed how a 2011

16   working paper from Berent, Krosnick and Lupia used data

17   from six states?

18        A.   I don't remember the details, but I'll take

19   your word for it --

20        Q.   Okay.

21        A.   -- if that's what they said.

22        Q.   Yeah.  And that's what we discussed a moment

23   ago.  And here, they're using data from all 50 states?

24        A.   That's what they say.

25        Q.   And that's more than what Berent, Krosnick and

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 217

1    Lupia did?

2         A.    That -- it's -- this study is including all

3    states, not just a subset of states.

4         Q.    Okay.  Thank you.  So I know we've talked

5    about the 2016 Berent and Krosnick piece where they

6    reiterated some of the same conclusions, right?

7         A.    Yes.

8         Q.    Okay.  So could I mark as the next exhibit,

9    please...

10                    (Exhibit 20 marked.)

11        Q.    (BY MS. SMITH)  All right.  So I'm marking as

12   Exhibit 20 in the record a piece called "Measuring Voter

13   Registration and Turnout in Surveys:  Do Official

14   Government Records Yield More Accurate Assessments?"

15   It's in Public Opinion Quarterly, August 2016, with

16   three authors, Matthew Berent, Jon Krosnick, Arthur

17   Lupia.  Okay?  Here you are.

18                    All right.  I don't think we need to spend

19   long on this one.  I just wanted to give you an

20   opportunity to look over it and confirm this is the 2016

21   paper that you additionally relied on in preparation for

22   your deposition today.

23        A.    Yes, I -- yes.  Let me just make sure this is

24   the one.

25        Q.    Yeah, please.

Page 218

1      A.   Yes, this is the one that I noted came out in

2   a peer-reviewed journal.  I discovered that footnoted

3   last week, and it is the study that I have been

4   referring to as the published version that is -- and

5   when was it published?  August 2016.

6      Q.   Okay.  And they're using the same dataset and

7   offering similar conclusions?

8      A.   The only thing I know about this published

9   version is I've compared it with the original technical

10  study.  And the -- this is a more refined exposition of

11  that original study.  This is not an update of what they

12  did; this is simply a -- transforming a technical report

13  into a publishable journal article that says this is

14  what we found in that technical study framed in a way

15  that it relates to issues that political scientists can

16  understand.  And I would point to the abstract, which

17  begins on the first page and continues onto the second

18  page at the top, where they say:  As a result, when

19  validated turnout estimates appear to be more accurate

20  than self-reports because they produce the -- produce

21  lower turnout estimates, the apparent accuracy is likely

22  an illusion.

23     Q.   Okay.  I think that concludes our discussion

24  on that.  I just wanted to make sure we had an agreement

25  on what the 2016 piece was.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 219

1        A.    Sure.

2        Q.    I want to introduce another article about

3   over-reporting.  This will be Exhibit 21 in the record.

4                (Exhibit 21 marked.)

5        Q.    (BY MS. SMITH)  This is an article called

6   "Validating Self-Reported Turnout by Linking Public

7   Opinion Surveys with Administrative Records" by Ted

8   Enamorado, a professor of political science at the

9   University of North Carolina at Chapel Hill, and Kosuke

10  Imai, a professor of government and statistics at

11  Harvard.  And it's in Public Opinion Quarterly.

12       A.    All right.

13       Q.    And I take it you're not familiar with this

14  article because you mentioned you haven't reviewed

15  anything since 2016?

16       A.    I certainly haven't seen this one.

17       Q.    Okay.  Do you dispute that it was published in

18  2019 in Public Opinion Quarterly?

19       A.    I agree that that's what it says, yes.

20       Q.    Okay.  And I believe you testified earlier

21  that Public Opinion Quarterly is a reputable

22  peer-reviewed academic journal?

23       A.    It is.

24       Q.    Okay.  And that's the same journal that the

25  Berent, Krosnick and Lupia piece was published in?

Page 220

1      A.   I'd have to check, but I'll take your word for
2  it.
3      Q.   Okay.  And we talked earlier about this, but
4  you've cited Dr. Imai before in your 2017 article?
5      A.   I just want to make sure that I gave the
6  correct answer to this.
7      Q.   Oh, yeah.
8      A.   You said it was published in -- I didn't keep
9  track of which journal it was published in, but can
10 you --
11     Q.   Oh, yeah.  So looking back at the Berent --
12     A.   Yeah.
13     Q.   -- piece in Public Opinion Quarterly --
14     A.   Okay.  Yeah, that -- that's the same one.
15 Right.
16     Q.   -- Exhibit 20, if you want to --
17     A.   All right.
18     Q.   All right.
19     A.   Okay.  I'm -- you're correct.
20     Q.   Okay.  Great.
21     A.   Now, what's your question?
22     Q.   Have you cited Dr. Imai before?
23     A.   Not to my knowledge, no.
24     Q.   We talked earlier about how in the East Ramapo
25 School District opinion, the Court referenced that you

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 221

1    cited Dr. Imai in a 2017 article that you published.

2        A.    I may well have cited it.  I -- I don't keep

3    track of everyone I cite.

4        Q.    Okay.

5        A.    If you have a record of that, then I would

6    revise my -- my answer --

7        Q.    Okay.  Sure.

8        A.    -- and say, well --

9        Q.    That was --

10       A.    -- you've proven the point.

11       Q.    That was the article --

12       A.    Yeah.

13       Q.    -- about BISG that we talked about.

14       A.    Oh, the BISG, yeah.

15       Q.    Yeah.

16       A.    Sure.

17       Q.    That's the same person?

18       A.    Right.

19       Q.    All right.  So I want to turn to Page 745

20   here.  We're going to look at the discussion after the

21   word "Conclusion."

22       A.    All right.

23       Q.    So Imai and Enamorado write, starting here:

24   The availability -- over the last decade, the

25   availability of large-scale electronic administrative

Page 222

1    records has enabled researchers to study important

2    questions by creatively merging them with other

3    datasets.

4                 Right?

5         A.   Yes, at least that's what they say.

6         Q.   So new methods of merging large-scale

7    administrative records with other datasets have become

8    available since 2011.  That's what they're saying?

9         A.   Correct.

10        Q.   All right.  And those methods, as I understand

11   this, can be used to evaluate self-reporting on surveys?

12        A.   If -- if you have the right -- if you have the

13   right administrative record data that is proven to be

14   accurate and timely.

15        Q.   Okay.

16        A.   If you merge it with -- with garbage data, you

17   will have garbage in and garbage out.  So that -- I

18   mean, the point here is that it's easier to merge

19   data -- scientific data with administrative record data.

20        Q.   Okay.  Let's turn back a few pages to 742.

21        A.   All right.

22        Q.   And I'm looking at the second full paragraph

23   here, and the last two sentence -- last three sentences

24   of this paragraph.  So do you see that the researchers

25   say, quote, our finding contradicts the claim put forth

Page 223

1   by Berent, Krosnick and Lupia in 2016 that survey

2   respondents do not often over-report turnout?

3              Do I have that right?

4       A.   That's right.

5       Q.   Okay.  And that's because, quote, these

6   authors show that matched respondents tend not to

7   over-report; however, they did not separate matched

8   voters from matched nonvoters and, as a result,

9   overlooked the tendency of matched nonvoters to

10  over-report?

11      A.   I see that.

12      Q.   Okay.  So they're contesting Berent, Krosnick

13  and Lupia's 2016 article because their study did not

14  separate matched voters from matched nonvoters?

15      A.   Yes.

16      Q.   And -- because matched nonvoters do tend to

17  over-report voting.  That's what it says here?

18      A.   That's what it says.

19      Q.   All right.  And you -- you didn't consider

20  this critique of the Berent, Lupia and Krosnick study

21  before you relied on it?

22      A.   I can consider it right now before -- as we

23  speak.

24      Q.   But I'm not -- not asking about right now; I'm

25  just asking about --

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 224

1      A.   Okay.

2      Q.   -- when you were preparing the report.

3      A.   I didn't consider it, but it -- it only

4   reinforces my earlier conclusion that this is an

5   actively controversial topic that is the subject of

6   research among political scientists.

7      Q.   Okay.

8      A.   And it sounds like it is -- it is very

9   controversial, and they are making progress over time.

10     Q.   Making progress over time.  That's what this

11  reflects?

12     A.   In -- in what can be known and what cannot be

13  known.

14     Q.   Okay.  Do you know if Berent, Krosnick and

15  Lupia have responded to this article?

16     A.   I -- I know that if they did respond, it

17  wouldn't yet be in print because the -- the time to

18  respond to a study of this vintage would require another

19  study that could take at least several years to get the

20  study started, the funding for it.  And then it would

21  have to go through the peer-review process.  So if it

22  had been addressed, I would be surprised if there was

23  anything published yet about it.

24     Q.   Do they have any working papers?

25     A.   I haven't -- I haven't really looked to see if

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 225

1   they have any.  As I said, I didn't do the most

2   comprehensive search that a political scientist might

3   have done.

4        Q.   Okay.  And you don't know if they're working

5   on any response to this?

6        A.   No.

7        Q.   All right.

8        A.   I don't have any knowledge about that.

9        Q.   I suppose taking the timing issues aside of

10  getting a survey like this prepared, which I take your

11  point, does not responding in the academic literature to

12  a critique like this imply any concession of its

13  validity?

14       A.   Oh, no.  This is -- this is just another

15  contribution to a controversy.  You know, you -- when

16  you do a study like this by -- in a published --

17  peer-reviewed and published in a reputable journal, it

18  says, "We did a study, and we found something

19  different."

20       Q.   And --

21       A.   And it has the same status that -- the other

22  study that was published that said, "We found something

23  earlier that you didn't find."

24       Q.   And so --

25       A.   And so the ideas compete, and time passes.

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 226

1    And over time, one weighs the evidence and says, "Well,

2    there's -- this is a controversial topic."  And I know

3    from my personal experience that whenever you work with

4    administrative record data, as soon as you're talking

5    about administrative record data for all states, you're

6    getting into a huge problem area where the quality of

7    administrative records on voting behavior varies

8    immensely from state to state.  And I know that from

9    firsthand experience because I have evaluated that.

10   That's within my area of expertise.  And I can say if

11   these two authors think that they have discovered the

12   truth and they have been working with administrative

13   record data, I want to see some kind of a book published

14   on how they know that the administrative records that

15   they have for all of the states for each state have

16   passed muster, because I know that -- I know that that

17   just doesn't -- that doesn't ring true.

18        Q.   Okay.  Sure.  But you didn't read this

19   article?

20        A.   I didn't read it, but the premise here is that

21   there's no problem with the administrative record data

22   we used.  And I say, well, granting -- granting you the

23   most generous, most charitable assumption that you

24   didn't get into any trouble with states that don't do a

25   good job, you -- you haven't -- you haven't discovered

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 227

1   the -- the ultimate truth here.  This is another worthy

2   study that adds to the controversy and informs us, and

3   it --

4        Q.   But you didn't read their discussion of the

5   quality of administrative records?

6                  MR. CARDIN:  Object to the form.

7                  You may answer the question.

8        A.   I -- I didn't read their -- I didn't read what

9   they said about it, but I can tell you that there is no

10  way -- there is no humanly possible way that anybody

11  could certify that all of the administrative records on

12  the elections in all the states that they got their

13  hands on were perfect.  What they did say, apparently,

14  is that there are ways to integrate these that can be

15  done very efficiently.  But it's the quality of the data

16  that I would say -- without even reading this, I can

17  say, "I need to read what you did for quality assurance

18  on the data."

19       Q.   (BY MS. SMITH)  Okay.  So you would need to

20  read the article?

21       A.   I'd need to read this.

22       Q.   Okay.

23       A.   And -- and I don't have any opinion on this

24  other than to say that it's another contribution --

25       Q.   Got it.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 228

1    A.   -- to the debate.

2    Q.   Okay.  I think that concludes our discussion

3    of that article.  And I want to shift gears a little

4    bit.

5              MS. SMITH:  I don't think I have too many

6    more questions, so if anyone needs a break, we can take

7    one, but I want to be mindful of --

8              THE WITNESS:  Sure.

9              MS. SMITH:  -- folks getting to the

10   airport and all.  So I -- I would like to just keep

11   going.

12             MR. CARDIN:  Keep going.

13             THE WITNESS:  Fine with me.

14             MS. SMITH:  Great.

15   Q.   (BY MS. SMITH)  Okay.  So I want to -- you

16   testified earlier that you reviewed the report that

17   Dr. D'Andra Orey submitted in this case?

18   A.   You'll have to refresh my memory on --

19   Q.   Sure.

20   A.   Are -- is he the opposing expert?

21   Q.   Yes.

22   A.   Yes, I -- I scanned through it, yes.

23   Q.   Okay.  So I'm now going to mark the first

24   report that Dr. Orey submitted in this case.

25             MS. SMITH:  If I can please get...

Page 229

1              (Exhibit 22 marked.)

2         Q.    (BY MS. SMITH)   All right.   So I'm marking as

3    Exhibit 22 the amended expert report of Dr. Byron

4    D'Andra Orey, and that's dated -- I actually don't see a

5    date on this, so I apologize, but this is the first

6    amended expert report of Dr. Byron D'Andra Orey.   All

7    right?

8         A.    All right.

9         Q.    And feel free to take a moment to look at it,

10   but is -- is this the report that you reviewed?

11        A.    As best as I can determine from looking at

12   this.

13        Q.    Okay.

14        A.    Let me just take a quick look through it.

15        Q.    Yeah.

16        A.    When -- when was this report submitted?

17        Q.    I believe it would have been August --

18              MR. CARDIN:   Let's -- let's go off the

19   record for a second.

20              MS. SMITH:   Let's go off the record.

21              (Recess taken from 2:57 to 3:05 p.m.)

22        Q.    (BY MS. SMITH)   All right.   So just to

23   clarify, Dr. Morrison, you don't offer any opinions

24   about the conclusions that Dr. Orey came to in his

25   original, first or second amended Senate Factor 5

Page 230

1    report?

2         A.    I -- that's correct.

3         Q.    Okay.  And so you don't offer any opinions in

4    this case about any of the methods Dr. Orey used?

5         A.    Not at this time, no.

6         Q.    Okay.  Okay.  And you didn't review any of

7    those three reports?

8         A.    Not to my knowledge, no.

9         Q.    Okay.  But you did review Dr. Orey's rebuttal

10   report served on November 22nd, 2023?

11        A.    My recollection is I took a cursory look at

12   it, yes.

13        Q.    Great.  So let's mark that into the record.

14                   (Exhibit 23 marked.)

15        Q.    (BY MS. SMITH)  So this is the responsive

16   expert report of Dr. Byron D'Andra Orey.  Here you are.

17        A.    Let me just take a moment to look at this so I

18   can be sure this is the one I looked at.

19        Q.    All right.

20        A.    Okay.  Yes, I remember reviewing this, yes.

21        Q.    Okay.  So you did review this report?

22        A.    Yeah, I gave it a cursory read, and I got

23   the -- the sense of what he was saying about my report.

24   And let me just finish so I can refresh my memory here.

25        Q.    Sure.

Page 231

1     A.   Okay.  I -- I remember reviewing the portion

2  where he was talking about my report, yes.  So I'm --

3  I'm ready.

4     Q.   Thank you.  All right.  I want to pull out

5  another recent academic study on the over-reporting

6  issue.  And I -- I realize you didn't review this, but

7  I'll represent to you that it was cited in Dr. Orey's

8  initial reports.  This is an article called "The Current

9  Population Survey Voting and Registration Supplement

10  Overstates Minority Turnout" by Stephen Ansolabehere

11  from Harvard University, Bernard Fraga from Emory

12  University and Brian Schaffner from Tufts University.

13  I'm going to mark this as Exhibit 24.

14                    (Exhibit 24 marked.)

15     Q.   (BY MS. SMITH)  There you are.

16     A.   Thank you.

17     Q.   Okay.  And you haven't reviewed this article

18  before?

19     A.   No, I've not seen this before.

20     Q.   All right.  Would you agree with me that this

21  was published in 2022 in -- I believe it's The Journal

22  of Politics --

23     A.   Yes.

24     Q.   -- at the bottom?

25     A.   Yes.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 232

1      Q.   Okay.  Do you -- are you familiar with The
2  Journal of Politics?
3      A.   I know of it.  I've heard of it.  It's a
4  reputable journal.
5      Q.   Okay.  Reputable political science journal?
6      A.   Yes.
7      Q.   All right.  Let's turn to -- we're still on
8  Page 1.  I'm just looking at the summary text here.  And
9  on the third line, it says that this -- these authors
10  are, quote, comparing CPS estimates to official voter
11  turnout records from 2008 to 2018 and document
12  consistent significant discrepancies that call into
13  question the reliability of CPS turnout statistics.
14      A.   I see that.
15      Q.   You see that?  Okay.
16           And it concludes in the next sentence
17  that, quote, specifically, the CPS overestimates Black
18  and Hispanic turnout relative to non-Hispanic Whites,
19  whether relying on turnout rates as a share of eligible
20  citizens or the racial/ethnic composition of the voting
21  population.
22           Do you see that?
23      A.   Yes.
24      Q.   All right.  And then turning to the next page,
25  under "Comparing Voter File and CPS Turnout Estimates,"

Page 233

1   I see here it says, quote, we compare turnout for

2   different racial groups as estimated by the CPS with

3   turnout for those same groups based on voter files.

4           All right?

5       A.   Yes.

6       Q.   And then about four lines down from there, it

7   says they relied on data from six southern states?

8       A.   Yes.

9       Q.   Okay.  And then beginning of the following

10  paragraph, it says that they used voter file data

11  collected by a voter file firm that has an established

12  track record of producing estimates of the total number

13  of voters closely aligned with semiofficial statistics?

14      A.   Yes.

15      Q.   And then turning to Page -- the third page in

16  this document, so the next page -- thank you -- the

17  right-hand side at the top reports their findings.  It

18  says, quote, 2016, the turnout rate among Whites was

19  10.8 percentage points higher than the turnout rate

20  among Blacks.  2018, the gap in turnout rates was 8.6

21  percentage points.  Yet, researchers relying on the CPS

22  to examine turnout rates in these six states would find

23  a gap in participation rates of just 3.7 points in 2016

24  and 2.5 points in 2018.

25      A.   Yes.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 234

1          Q.   Do I have that right?  Okay.

2                    Based on their study, then they conclude

3     in the following paragraph, quote, the CPS consistently

4     overstates the participation rate among Blacks and

5     Hispanics while it sometimes underestimates

6     participation among Whites.

7          A.   I see that, yes.

8          Q.   And they're looking specifically at the CPS?

9          A.   Yes.

10         Q.   And just to go back for a moment to our

11    discussion earlier about the literature you cited in

12    your report, do you remember if any of those studies

13    looked specifically at the CPS as opposed to the ANES?

14         A.   I don't recall offhand.  I -- I don't think I

15    can answer your question offhand.  I just -- I'm -- I'm

16    paying attention to what you've got here --

17         Q.   Of course.

18         A.   -- and I'm wondering:  What does this have to

19    do with Mississippi now?

20         Q.   It's a study showing over-reporting.

21         A.   In?

22         Q.   In the CPS, which is the --

23         A.   Right.

24         Q.   -- data source that you relied on in your

25    report.

Page 235

1      A.   But in other states, not Mississippi, though.

2   Is -- have I got that correct?

3      Q.   The authors are making conclusions about the

4   CPS at large.

5      A.   Yeah.  Okay.  But Mississippi was not part of

6   their study.

7      Q.   No, but you used the CPS in your --

8      A.   Yeah, I -- I realize that, but I'm just saying

9   this is about states other than Mississippi.  And so I

10  just want to be clear that there's no direct connection

11  with what's going on in Mississippi as opposed to what's

12  going on in some other collection of states currently.

13     Q.   Earlier, we looked at the states that Berent,

14  Lupia and Krosnick discussed.  Did they look at

15  Mississippi specifically?

16     A.   I -- I don't know.  I'm just -- I'm focusing

17  on this --

18     Q.   Okay.

19     A.   -- particular one.  But anyhow.  Go ahead.

20  I'm just -- I'll answer the questions as best I can.

21     Q.   So you don't know if Berent, Krosnick and

22  Lupia looked at Mississippi specifically?

23     A.   I'd have to look at it, but I'm just saying in

24  this one -- you're asking me about this study, which has

25  the virtue of being current, timely, and they have done

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 236

1   a study about the CPS, and they've looked at it in a

2   half a dozen states, as I -- as I review -- read it.

3        Q.    Would -- would -- just to make sure I'm

4   understanding your point about Mississippi's inclusion

5   in the data source, if Berent, Krosnick and Lupia did

6   not look at Mississippi, would you discount the

7   relevance of that study to your report?

8        A.    I wouldn't discount the relevance.  I would

9   just say it's a qualification that this paper is about

10  what they found occurring in states other than

11  Mississippi and -- which brings into my mind, well,

12  there's a big caveat here.  You know, you have to assume

13  that people in Mississippi behave the same way as the

14  people in these six states.  I'm just saying that's a

15  caveat that I took note of and an important one that

16  would -- would make this a study that I would want to

17  know about, but I wouldn't -- I wouldn't --

18       Q.    But you don't --

19       A.    -- place a whole lot of weight on it, even

20  though it's quite -- quite timely.  And again, I would

21  say it's another contribution to a controversial issue.

22  They're saying in some states that aren't Mississippi,

23  which is my focus, they're finding something that is

24  important and informative about the CPS.  And I also

25  know that, you know, the CPS, unlike any other data

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 237

1    source that anybody has, covers 42 years of history, and

2    none of these studies do.

3          Q.    Okay.

4          A.    So that's what I'm weighing, you know.

5          Q.    Okay.  But you haven't reviewed this before?

6          A.    I -- I haven't -- I haven't reviewed it

7    carefully.  I -- I can just say that I'm -- I -- I guess

8    I'm aware of it now.

9          Q.    You're aware of it now, but you weren't aware

10   of it before now?

11         A.    I --

12         Q.    Or were you aware of it?

13         A.    I don't think I was aware of this.

14         Q.    Okay.  Let's finish up with this article.  The

15   end -- so going to the fifth page, the very last

16   sentence of the article --

17         A.    All right.

18         Q.    -- the author -- the authors say they, quote,

19   suggest that analysts use caution when making inferences

20   about variation in turnout rates by ethnic and rac- --

21   racial and ethnic groups.  Is that right?

22         A.    Yes.

23         Q.    Okay.  Do you agree that reputable scholars

24   here have pointed out that analysts should use caution

25   when making inferences based on the CPS?

Page 238

1        A.    I think that's a -- it's a good conclusion to

2    reach based on what you've shown me here.  To conclude

3    that after doing this research, you ought to use

4    caution.  That's about the right calibration --

5        Q.    Okay.  Understood.

6        A.    -- or an opinion.

7        Q.    Thank you.  Let's talk about one more article.

8    And thank you for your patience today.

9                  (Exhibit 25 marked.)

10       Q.    (BY MS. SMITH)  So marked as Exhibit 25 is an

11   article called "Vote Over-Reporting While Black:

12   Identifying the Mechanism Behind Black Survey

13   Respondents' Vote Over-Reporting."  This is by Clinton

14   Jenkins, Ismail White, Michael Hanmer and Antoine Banks,

15   who are professors at -- or academics at

16   Birmingham-Southern College, Princeton University and

17   University of Maryland.  It was published in American

18   Politics Research in 2021.

19       A.    I see that, yeah.

20       Q.    Okay.  And this was cited in the Orey rebuttal

21   report that you reviewed --

22       A.    Uh-huh.

23       Q.    -- is that right?

24       A.    If you say it's true, I'll -- I'll take your

25   word for it.

Page 239

1      Q.   So we can -- we can take a look, if you'd
2   like.
3      A.   Okay.
4      Q.   And turning back to the Orey rebuttal
5   report --
6      A.   Okay.
7      Q.   -- I'll point to Page 1, Footnote --
8      A.   Yeah.
9      Q.   -- 1.
10      A.   Uh-huh.
11      Q.   Do you see it cited there?
12      A.   Yes.
13      Q.   Okay.  But you haven't read this article
14   before?
15      A.   I -- I guess I'm aware of its existence as a
16   recent article, but I haven't really reviewed it.
17      Q.   Okay.  You haven't reviewed it.  Is that
18   right?
19      A.   That's correct.
20      Q.   Okay.  Do you know of the journal American
21   Politics Research?
22      A.   I don't know of it, but it sounds like it's
23   one of a number of journals that are peer-reviewed.
24      Q.   Okay.  Would you agree that it's a paper in a
25   reputable academic journal for political science?

Page 240

1    A.   I -- I -- I don't have enough knowledge to say

2  if this is, you know, a top journal or, you know, just

3  another journal.  I see it's associated with Sage, which

4  Sage Publications has a lot of journals where academics

5  publish things so they can say, "I published something."

6  But I'll take -- I'll assume it's a reputable journal.

7    Q.   Okay.  Okay.  So looking at the abstract right

8  here --

9    A.   Uh-huh.

10    Q.   -- it says here that this paper is looking at

11  the fact that it -- okay.  Quote:  It is now a

12  well-documented fact of survey research that Black

13  survey respondents over-report turning out to vote at

14  higher rates than many of their peers of other racial

15  and ethnic backgrounds.

16          Is that what --

17    A.   Yes.

18    Q.   Okay.  Quote:  We bring renewed attention to

19  this phenomenon by investigating how the ways in which

20  the race of the interviewer might influence a Black

21  respondent's propensity to over-report turning out to

22  vote?

23    A.   Yes, I see it.

24    Q.   All right.  And then just going to the

25  left-hand side, bottom of that page, about three lines

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 241

1    from the bottom, it says they find, quote, that the need

2    to conform to norms of Black political behavior

3    activated by the presence of Black interviewers appears

4    to be the chief causal mechanism underlying Black

5    respondents over-reporting in the ANES.  Right?

6         A.   Yes.

7         Q.   Okay.  And then they say that these results

8    suggest that the common practice of race-matching Black

9    interviewers with Black respondents may greatly inflate

10   Black voter turnout in surveys?

11        A.   Yes.

12        Q.   Okay.  So these authors in a reputable journal

13   are concluding that a couple mechanisms could lead to

14   differential over-reporting by Black voters --

15        A.   That -- that's what they're saying, yes.

16        Q.   -- on self-reported voting surveys?

17             All right.  We're almost done,

18   Dr. Morrison.  I want to look back at Exhibit 18 for

19   just a moment, which is the 2011 Berent, Krosnick and

20   Lupia working paper that you relied on --

21        A.   Yes.

22        Q.   -- to support your conclusions about

23   over-reporting on surveys.  I'd like to turn to Page 29

24   of that article.

25        A.   All right.  I've got it here.

20215fc4-7d4d-4b32-a8cc-d35b34506151

Page 242

1    Q.   What states' government records did Berent,

2    Lupia and Krosnick evaluate to match voters on the ANES

3    in their study?

4    A.   I -- I can't answer that question, as we sit

5    here, without reading it and figuring out.  What states?

6    Q.   Yeah.  So which six states are listed there?

7    A.   Oh.  Oh, you're asking me what --

8    Q.   Yes.

9    A.   Yeah, it says right here.

10   Q.   Yeah, it says right there.

11   A.   California, Florida, New York, North Carolina,

12   Ohio and Pennsylvania.

13   Q.   Is Mississippi one of those states?

14   A.   No, it's not.

15   Q.   Does that affect the weight that you placed on

16   the survey when you came to your conclusions?

17   A.   No, because -- no, it doesn't.  I mean, it --

18   it has uncovered anomalies that could exist anywhere,

19   and it has offered an alternative explanation for

20   something that is happening.  And this is the -- this is

21   not the published version, so it's not as elegantly

22   explained.  But I take this as -- despite its not

23   including Mississippi being a -- signaling a cautionary

24   note about concluding that what's going on here is as

25   simple as some other published -- published versions are

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 243

1    making out, that it's this -- this is what's causing

2    some problem or that's what causing it.  It's a very

3    complicated thing, and different people are finding

4    evidence of different things.

5         Q.   Okay.  I think --

6         A.   And --

7         Q.   Oh, yeah.  Go on.

8         A.   I mean, so -- and so, you know, each one of

9    these papers kind of contributes to the debate among

10   academics, but none of them has a 42-year continuous

11   record of data that had been scientifically collected

12   and evaluated and whose limitations are understood

13   according to Census Bureau standards, and that's --

14   that's my unique strength in my study.

15        Q.   Okay.  And earlier, you testified that the

16   2022 Ansolabehere article in -- I believe it was

17   published in 2022 -- that we should caveat those results

18   because Mississippi was not one of the states that they

19   specifically looked at?

20        A.   Yes, I -- I would say it -- it -- it's not

21   based on experience in Mississippi, and I -- I would say

22   that Mississippi's experience, I think, is understood

23   among historians.  I'm just speaking as a -- as a

24   layperson.  Historians regard Mississippi's experience

25   as rather distinctive in the United States.

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                    Peter A. Morrison, Ph.D.

Page 244

1    Q.   Does the same caveat apply to the article that
2  you relied on, this working paper by Berent, Lupia and
3  Krosnick?
4              MR. CARDIN:  Object to the form.
5              You may answer.
6    A.   I don't think I can answer that question.
7  I -- I -- I just -- I -- I -- I can't give you an honest
8  answer.  I -- I'm not sure what I would have to say
9  about that at this point.
10   Q.   (BY MS. SMITH)  Okay.  I think that concludes
11  my questions.
12             MS. SMITH:  Do you have any?
13             MR. CARDIN:  We have no questions.
14             MS. SMITH:  All right.  Thank you,
15  Dr. Morrison, for your time today.
16             THE WITNESS:  You're very welcome.
17             MS. SMITH:  That concludes the deposition
18  today.
19             THE REPORTER:  And did you want the
20  witness to read and sign?
21             MR. CARDIN:  Yes.
22             (Deposition concluded at 3:27 p.m.)
23             (Review was requested pursuant to Federal
24              Rule of Civil Procedure 30(e)(1).)
25

20215fc4-7d4d-4b32-a8cc-d35b34506151

NAACP, et al. v. State Board of Election Commissioners, et al.                     Peter A. Morrison, Ph.D.

Page 245

1   STATE OF TEXAS       )

2   COUNTY OF DALLAS    )

3              I, Stacy L. Jordan, Certified Shorthand

4   Reporter, in and for the State of Texas, certify that

5   the foregoing deposition of PETER A. MORRISON, PH.D. was

6   reported stenographically by me at the time and place

7   indicated, said witness having been placed under oath by

8   me; that review was requested pursuant to Federal Rule

9   of Civil Procedure 30(e)(1); and that the deposition is

10  a true record of the testimony given by the witness.

11             I further certify that I am neither counsel

12  for nor related to any party in this cause and am not

13  financially interested in its outcome.

14             Given under my hand on this the 20th day of

15  December, 2023.

16

17                          _____

18                          Stacy L. Jordan, CSR, RPR, CRR, CLR
                            Shorthand Reporter No. 7499
19                          My commission expires 10-31-25
                            Buell Realtime Reporting
20                          1325 Fourth Avenue, Suite 1840
                            Seattle, Washington  98101
21                          800.846.6989

22  Time used by each party:
    Ms. Casey Smith - 5:22
23

24

25