**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

MISSISSIPPI STATE CONFERENCE OF THE
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE; DR.
ANDREA WESLEY; DR. JOSEPH WESLEY;
ROBERT EVANS; GARY FREDERICKS; PAMELA
HAMNER; BARBARA FINN; OTHO BARNES;
SHIRLINDA ROBERTSON; SANDRA SMITH;
DEBORAH HULITT; RODESTA TUMBLIN; DR.
KIA JONES; MARCELEAN ARRINGTON;
VICTORIA ROBERTSON,

*Plaintiffs*,

vs.

STATE BOARD OF ELECTION COMMISSIONERS;
TATE REEVES, *in his official capacity as Governor of
Mississippi*; LYNN FITCH, *in her official capacity as
Attorney General of Mississippi*; MICHAEL WATSON,
*in his official capacity as Secretary of State of
Mississippi*,

*Defendants*,

AND

MISSISSIPPI REPUBLICAN EXECUTIVE
COMMITTEE,

*Intervenor-Defendant.*

**CIVIL ACTION NO.**
**3:22-cv-734-DPJ-HSO-LHS**

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants State Board of Election Commissioners, Governor Tate Reeves, Attorney

General Lynn Fitch, and Secretary of State Michael Watson and Intervenor Defendant, Mississippi

Republican Executive Committee (collectively, "Defendants"), submit this Proposed Findings of Fact and Conclusions of Law.

## **TABLE OF CONTENTS**

I.      Overview of Mississippi Legislative Reapportionment.......................................................... 3
II.     2022 Mississippi Legislative Reapportionment Process...................................................... 4
III.    Parties.................................................................................................................................. 7
        1.      Entity Plaintiff....................................................................................................... 7
        2.      Individual Plaintiffs ............................................................................................. 7
        3.      Defendants ............................................................................................................ 9

IV.     2022 Lawsuit......................................................................................................................... 9
        1.      Challenged Senate Districts ................................................................................. 10
        2.      Challenged House Districts.................................................................................... 11

V.      Voting Rights Act Claims ................................................................................................... 13
        1.      Private Right of Action .......................................................................................... 13
        2.      General Law ........................................................................................................... 14
        3.      *Gingles* Prong 1 ..................................................................................................... 17
                a.      Findings of Fact ........................................................................................ 17
                b.      Conclusions of Law .................................................................................. 22
        4.      Gingles 2 & 3 ......................................................................................................... 28
                a.      Findings of Fact ........................................................................................ 29
                b.      Conclusions of Law .................................................................................. 34
        5.      Totality of the Circumstances ............................................................................... 36
                a.      General Law .............................................................................................. 36
                b.      Drs. Luckett and King............................................................................... 38
                c.      Senate Factor 1 ......................................................................................... 40
                d.      Senate Factor 2 ......................................................................................... 42
                e.      Senate Factor 3 ......................................................................................... 43
                f.      Senate Factor 4 ......................................................................................... 46
                g.      Senate Factor 5 ......................................................................................... 47
                h.      Senate Factor 7 ......................................................................................... 59
                i.      Senate Factor 8 ......................................................................................... 60
                j.      Senate Factor 9 ......................................................................................... 62

VI.     Racial Predominance Claim................................................................................................. 65
        1.      General Law ........................................................................................................... 65
                a.      Findings of Fact ........................................................................................ 66
                b.      Conclusions of Law .................................................................................. 71

VII.    Evidentiary Issues ............................................................................................................... 73
VIII.   Remedy ................................................................................................................................ 77

# FINDINGS OF FACT

## I.   Overview of Mississippi Legislative Reapportionment

1.     The Mississippi Constitution directs that every ten years the Mississippi Legislature must "apportion the state in accordance with the Constitution of the state and of the United States into consecutive numbered senatorial and representative districts of contiguous territory." MISS. CONST. art. XIII, § 254. [1]

2.     Mississippi has a bi-cameral legislature, consisting of the House of Representatives, with 122 representatives, and the State Senate, with 52 senators. Representatives and senators are each elected to four-year terms from their respective geographical districts existing at the time of the elections. Stip. ¶¶ 66, 78.

3.     The practical application of legislative reapportionment is marshaled by the Standing Joint Legislative Committee on Reapportionment and Redistricting (the "Standing Joint Committee"), as established by Sections 5-3-91 through 5-3-103 of the Mississippi Code.[2] Stip. ¶ 56. The Standing Joint Committee drafts reapportionment plans for each chamber and, in addition to such constitutional standards that may apply at the time of reapportionment, the Standing Joint Committee is also guided by the following statutory principles:

> (a) Every district shall be compact and composed of contiguous territory and the boundary shall cross governmental or political boundaries the least number of times possible; and

---

[1] Specifically, Section 254 provides: "The Legislature shall at its regular session in the second year following the 1980 decennial census and every ten (10) years thereafter, and may, at any other time, by join resolution, by majority vote of all members of each house, apportion the state …." MISS. CONST. art. XIII, § 254. The decennial census is conducted by the United States Census Bureau during the first year of each decade and the results are released the following year.

[2] The Standing Joint Committee is established by the Speaker of the House and the Lieutenant Governor and consists of the chairs and vice chairs of the elections committee of both chambers along with ten (10) members from each chamber. Miss. Code Ann. § 5-3-91.

(b) Districts shall be structured, as far as possible and within constitutional standards, along county lines; if county lines are fractured, then election district lines shall be followed as nearly as possible.

Miss. Code Ann. § 5-3-101; Stip. ¶¶ 55.

4.      During the 2012 Regular Session of the Mississippi Legislature, the Standing Joint Committee was formed to reapportion both chambers based on the 2010 census data that was released in 2011. The 2012 Senate Plan contained fourteen (14) majority-minority districts and the 2012 House Plan contained 42 majority-minority districts. Stip. ¶¶ 67, 79. These plans were submitted to the United States Department of Justice (the "DOJ") for preclearance under Section 5 of the Voting Rights Act of 1965. The DOJ interposed no objection to the 2012 Plans thereby preclearing them both.[3]

## II.      2022 Mississippi Legislative Reapportionment Process

5.      In accordance with Section 254 of the Mississippi Constitution, during the 2021 Regular Session of the Mississippi Legislature, the Standing Joint Committee was formed to reapportion both chambers based upon the 2020 census data that was released on August 12, 2021.[4]

6.      The Legislature created the Standing Joint Committee, and the Lieutenant Governor and Speaker of the House called an organizational meeting on June 30, 2021, to elect a Chairman and Vice Chairman. The Standing Joint Committee elected former Representative Charles Jim Beckett as Chairman and Senator Dean Kirby as Vice Chairman. At that meeting the Standing Joint Committee adopted a public records policy, hired and retained counsel, and

---

[3] Preclearance pursuant to Section 5 of the Voting Rights Act of 1965 is no longer applicable. *See Shelby County v. Holder*, 570 U.S. 529 (2013).

[4] The statutory deadline to provide redistricting data was March 31, 2021, but the Census Bureau delayed release until August 12, 2021.

announced the schedule for public hearings.

7.      The Standing Joint Committee conducted nine public hearings and four public meetings during the redistricting process. Stip. ¶¶ 58, 59.

8.      The Standing Joint Committee adopted neutral redistricting criteria at the November 21, 2021, meeting. The Standing Joint Committee adopted the following criteria for all State Legislative Districts:

  a.  Each district's population should be less than 5% above or below the ideal population of the district.

  b.  Districts should be composed of contiguous territory.

  c.  The redistricting plan should comply with all applicable state and federal laws including Section 2 of the Voting Rights Act of 1965, as amended, and the Mississippi and United States Constitutions. Stip. ¶ 60.

9.      For a State Senate district, the ideal district size is 56,948. For a State House district, the ideal size is 24,273. Stip. ¶ 57.

10.     Following the 2020 Census, Mississippi had a total population of 2,961,279. Stip. ¶ 53. That was a decrease of 6,018 people or -0.2% from the prior decade. *Id.* The non-Hispanic white population decreased by 83,210 persons. *Id.* The Any-Part black population increased by 7,812 persons. *Id.*

11.     Based on the 2020 Census, the black population (Any-Part black) in Mississippi constitutes 37.94% of the State's total population and 36.14% of the voting age population.

12.     The 2022 Benchmark Plan consists of the 2012 Plan geography with the 2020 Census results. Although the 2012 Senate Plan was amended in 2019, the Joint Resolution provided that it would be repealed "and the districts as originally configured [in the 2012 Plan]

shall take effect." J.R. 202, Regular Session 2019. Following the vacatur by the Fifth Circuit in *Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020), the geography of the Benchmark reverted to that of the 2012 Plan.

13.     On March 27, 2022, the Standing Joint Committee held an open meeting and adopted the redistricting plans for the Mississippi House and Senate. Thereafter, on March 29, 2022, the Mississippi House of Representatives adopted a House Redistricting Plan ("JR 1").

14.     Two amendments to JR 1 were proposed. The first amendment—made in agreement with two black Democrat Representatives Earle Banks of HD 67 and Zakiya Summers of HD 68 to unpair these incumbents into separate districts—was adopted by voice vote. [JE-10, p. 31, ¶¶ 20-24]. The second amendment failed. *Id.* at p. 46, ¶¶ 20-21.

15.     On March 29, 2022, the Mississippi State Senate adopted a Senate Redistricting Plan ("JR 202").[5] On March 31, the House adopted JR 202 and the Senate adopted JR 1 and upon their signing and enrolling, those maps (the "Enacted Plans") became law.

16.     The 2012 Senate Plan contained 15 majority-black Senate Districts. In the Benchmark Senate Plan there were 14 majority-black State Senate Districts. In the 2019 General Election, the 2019 Senate Plan contained 15 majority-black Senate Districts. The 2022 Enacted Plan contains 15 majority-black Senate Districts.

17.     In the Benchmark House Plan there were 42 majority- black House Districts.

18.     As of January 15, 2024, there are 16 Democrats and 36 Republicans in the Mississippi State Senate. There are 41 Democrats, 79 Republicans, and 2 Independents in the Mississippi State House of Representatives. Stip. ¶ 91.

19.     Once the Enacted Plans became law, the Legislature and the Standing Joint

---

[5] Two amendments to JR 202 were proposed, but both amendments failed.

Committee had no remaining role in redistricting and elections. Enforcement and implementation of the law and administration of elections is the work of various state and local executive officials and state political parties. *See* Miss. Code Ann. § 23-15-211.1 *et seq.*; *Joint Resolution 202, Mississippi Legislature, 2022 Regular Session*, MISS. LEGISLATIVE INFO. SYS., BILL STATUS SYS., https://billstatus.ls.state.ms.us/2022/pdf/history/JR/JR0202.xml.; *Joint Resolution 1, Mississippi Legislature, 2022 Regular Session,* MISS. LEGISLATIVE INFO. SYS., BILL STATUS SYS., https://billstatus.ls.state.ms.us/2022/pdf/history/JR/JR0001.xml.

### III.   <u>Parties</u>

#### 1.   **Entity Plaintiff**

20.     The operative complaint lists one Entity Plaintiff, Mississippi State Conference of the National Association for the Advancement of Colored People ("MS NAACP"). [Dkt. #27], ¶ 15. The Entity Plaintiff is a non-profit corporation. *See Id.*

21.     The MS NAACP has members who are registered voters who reside in Senate Districts 2 and 48 and House Districts 22, 34, and 64. *Id.* Stip. ¶ 2.

#### 2.   **Individual Plaintiffs**

22.     The operative complaint lists fifteen individuals as Plaintiffs: Dr. Andrea Wesley, Dr. Joseph Wesley, Robert Evans, Gary Fredericks, Pamela Hamner, Barbara Finn, Otho Barnes, Shirlinda Robertson, Sandra Smith, Deborah Hulitt, Rodesta Tumblin, Dr. Kia Jones, Angela Grayson, Marcelean Arrington, and Victoria Robertson ("Individual Plaintiffs"). *Id.* at ¶¶ 23 – 48.

23.     Plaintiff Angela Grayson has since voluntarily dismissed her claims. *See* [Dkt. #83].

24.     Drs. Andrea and Joseph Wesley currently reside in enacted SD 45. [Dkt. #27], ¶¶ 23, 24.  Drs Andrea and Joseph Wesley are registered members of the Democratic Party.  Stip. ¶¶ 5, 6.

25.     Robert Evans currently resides in enacted SD 45. [Dkt. #27], ¶ 25.Mr. Evans is a registered member of the Democratic Party. Stip. ¶ 7.

26.     Gary Fredericks currently resides in enacted SD 48. *Id.* at ¶ 27.  Mr. Fredericks is a registered member of the Democratic Party.  Stip. ¶ 8.

27.     Pamela Hamner currently resides in enacted SD 2. *Id.* at ¶ 29.  Ms. Hamner is a registered member of the Democratic Party. Stip. ¶ 9.

28.     Barbara Finn currently resides in enacted SD 1. *Id.* at ¶ 31. Ms. Finn is a registered member of the Democratic Party. Stip. ¶ 10. Ms. Finn resided in SD 2 under the Benchmark Plan. *Id.*

29.     Otho Barnes currently resides in enacted SD 35. *Id.* at ¶ 33.  Mr. Barnes is a registered member of the Democratic Party. Stip. ¶ 11. Mr. Barnes resided in SD 41 under the Benchmark Plan. *Id.*

30.     Shirlinda Robertson currently resides in enacted SD 35. *Id.* at ¶ 34.  Ms. Robertson is a registered member of the Democratic Party. Stip. ¶ 12.

31.     Marcelean Arrington currently resides in enacted HD 84. *Id.* at ¶ 36. Ms. Arrington is a registered member of the Democratic Party. Stip. ¶ 13. Ms. Arrington resided in HD 79 under the Benchmark Plan. *Id.*

32.     Sandra Smith currently resides in enacted HD 34. *Id.* at ¶ 38. Ms. Smith is a registered member of the Democratic Party. Stip. ¶ 14.

33.     Deborah Hulitt currently resides in enacted HD 56. *Id.* at ¶ 40. Ms. Hulitt is a registered member of the Democratic Party. Stip. ¶ 15.

34.     Dr. Kia Jones currently resides in enacted HD 64. *Id.* at ¶ 42.  Dr. Jones is a registered member of the Democratic Party. Stip. ¶ 16.

35.     Victoria Robertson currently resides in enacted SD 17. *Id.* at ¶ 45. Ms. Robertson is a registered member of the Democratic Party. Stip. ¶ 17.

36.     Rodesta Tumblin currently resides in enacted HD 22. *Id.* at ¶ 47.  Ms. Tumblin is a registered member of the Democratic Party. Stip. ¶ 18.

**3.   Defendants**

37.     Defendant State Board of Election Commissioners ("SBEC") is composed of the Governor, the Attorney General, and the Secretary of State. Its respective duties are set forth in Mississippi Code Annotated § 23-15-211 (Rev. 2018). Stip. ¶ 19.

38.     Defendant Tate Reeves is the Governor of the State of Mississippi and is a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211 (Rev. 2018). Stip. ¶ 20.

39.     Defendant Lynn Fitch is the Attorney General of the State of Mississippi and is a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211 (Rev. 2018). Stip. ¶ 21.

40.     Defendant Michael Watson is the Secretary of State of the State of Mississippi and is a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211 (Rev. 2018). Stip. ¶ 22.

41.     Intervenor Defendant the Mississippi Republican Executive Committee intervened in this matter on May 16, 2023. [Dkt. #32]. The motion was granted on May 19, 2023. [Text-Only Order May 19, 2023].

**IV.   2022 Lawsuit**

42.     Plaintiffs filed this civil action on December 20, 2022, challenging the Enacted Plans under the Voting Rights Act and the Fourteenth Amendment to the United States Constitution. *See* Complaint [Dkt. #1]. Plaintiffs subsequently confessed a Motion to Dismiss [Dkt. ## 17, 18, 24] brought by two prior Defendants, State Senator Dean Kirby and State Representative Dan Eubanks, and amended their Complaint [Dkt. #27].

43.     Plaintiffs advocate for the creation of four new majority-minority Senate districts and allege that a fifth Senate district is a racial gerrymander. [Dkt. #27]. As for the House map, Plaintiffs advocate for the creation of three new majority-minority House districts and allege that two other House districts are racial gerrymanders. [Dkt. #27]. Plaintiffs' Illustrative Plans will impact more than 70 districts. [Cooper Report, 8.28.23, PX-1, p. 28, ¶ 53 and p. 60, ¶ 122].

### 1.  Challenged Senate Districts

44.     Plaintiffs allege that the "Black population in and around DeSoto County and the Memphis suburbs, specifically in and around the area where enacted Senate District ("SD") 2 was drawn, is sufficiently numerous and compact to support an additional Black-majority Senate district." [Dkt. #27] at ¶ 80. Plaintiffs also assert that the Legislature "approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength and deploying irregular district lines that are inconsistent with traditional redistricting principles." *Id.* SD 2 has a black voting-age population ("BVAP") of 39.6% in the Benchmark Senate Plan and a BVAP of 32.88% in the Enacted Senate Plan. *See* Stip. ¶ 72. Additionally, Plaintiffs allege that "[r]ace was the predominant factor in the creation of SD[ ] 2." [Dkt. #27] at ¶ 190.

45.     Plaintiffs allege that the "Black population in and around the Golden Triangle area, specifically in and around the area where enacted Senate District 17 was drawn, is sufficiently numerous and compact to support an additional Black-majority Senate district." [Dkt. #27] at ¶ 88. Plaintiffs also assert "the 2022 maps carve up the large, cohesive Black communities in this region, diluting Black voting strength and deploying irregular district lines that are inconsistent with traditional redistricting principles." *Id.* SD 17 has a BVAP of 29.48% in the Enacted Senate Plan. [2022 Full Report Senate Plan JR202].

46.     Plaintiffs allege that the "Black population in Central Mississippi, in and around

Jefferson Davis, Simpson, and Copiah counties and surrounding areas, specifically in and around enacted Senate District 35, is sufficiently numerous and compact to support an additional Black-majority Senate district." [Dkt. #27] at ¶ 94. Plaintiffs also assert "the 2022 maps carve up the large, cohesive Black communities in this region, diluting Black voting strength." *Id.* SD 35 has a BVAP of 39.38% in the Enacted Senate Plan. *Id.*

47.     Plaintiffs also allege that an "additional Black-majority Senate district also could have been drawn in Hattiesburg within Forrest County, in and around the area of SDs 34, 44, and 45 under the 2022 maps, avoiding the dilution of Black voting strength while adhering to traditional districting principles." [Dkt. #27] at ¶ 100. Plaintiffs assert the "Black population in and around Hattiesburg is sufficiently numerous and compact to support an additional Black-majority Senate district." *Id.* Additionally, Plaintiffs allege that "the 2022 maps carve up the large, cohesive Black communities in this area, diluting Black voting strength." *Id.*

48.     Finally, Plaintiffs allege that "[r]ace was the predominant factor in the drawing of State Senate District 48 ("SD 48"). [Dkt. #27] at ¶ 107. Plaintiffs also assert that "the State cracked the City of Gulfport and its diverse population between SD 48 and neighboring Senate District 49 ("SD 49")." *Id.* at ¶ 109. Plaintiffs allege that the "configuration of SDs 48 and 49 indicates that race improperly predominated the drawing of district lines in this area, with map drawers packing and cracking Black voters and/or voters from other racial minority groups to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles such as compactness." *Id.* at ¶ 112. SD 48 had a BVAP of 36.3% in the Benchmark Senate Plan and has a BVAP of 29.4% in the Enacted Senate Plan. *See* Stip. ¶ 75.

### 2.  Challenged House Districts

49.     Plaintiffs allege that the "Black population in and around Western Hinds and

Madison counties near Clinton specifically in and around enacted House District 56, is sufficiently numerous and compact to support an additional Black-majority House district." [Dkt. # 27] at ¶ 114. Plaintiffs also assert that the Legislature "approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength." *Id.* HD 56 has a BVAP of 22.97% in the Enacted House Plan. [2022 Full Report House Plan JR 1].

50.     Plaintiffs allege that the "Black population in and around the area north of the Golden Triangle, specifically in and around enacted HD 22 and in, around, and between the Cities of West Point and Tupelo, is sufficiently numerous and compact to support an additional Black-majority House district." [Dkt. # 27] at ¶ 121. Plaintiffs also assert that the Legislature "approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength and deploying irregular district lines that are inconsistent with traditional redistricting principles." *Id.* Plaintiffs claim the "current configuration of HD 22 also indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters to advance particular electoral outcomes, in derogation of the U.S. Constitution." *Id.* at ¶ 132. HD 22 had a BVAP of 37.1% in the Benchmark House Plan and now has a BVAP of 29.9% in the Enacted House Plan. *See* Stip. ¶ 83. Plaintiffs allege that the "Black population in, around, and between the Cities of Meridian and Laurel, specifically in and around enacted House District 84 ("HD 84"), in and around Jasper and Clarke Counties, is sufficiently numerous and compact to support an additional Black-majority Senate district." [Dkt. # 27] at ¶ 133. Plaintiffs also assert that the Legislature "approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength." *Id.* HD 84 has a BVAP of 37.28%.

51.     Plaintiffs allege that "[r]ace was also the predominant factor in the drawing of State

House District 34 ("HD 34") in and around Grenada County." [Dkt. # 27] at ¶ 140. Plaintiffs also assert that the "current configuration of HD 34 indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles such as compactness." *Id.* at ¶ 146. HD 34 had a BVAP of 60.5% in the Benchmark House Plan and now has a BVAP of 31.6% in the Enacted House Plan. *See* Stip. ¶ 85.

52.     Finally, Plaintiffs allege that "[r]ace was also the predominant factor in the drawing of State House District 64 ("HD 64") in and around Hinds and Madison counties." [Dkt. #27] at ¶ 147. Plaintiffs assert that the "current configuration of HD 64 indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles such as compactness." *Id.* at ¶ 153. HD 64 had a BVAP of 37.9% in the Benchmark House Plan and now has a BVAP of 31% in the Enacted House Plan. *See* Stip. ¶ 87.

## V.   <u>Voting Rights Act Claims</u>

### 1.   Private Right of Action

53.     Congress did not create a private right of action to enforce § 2 of the Voting Rights Act. *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (2023), *reh'g den.*, --- F.4th ---- (8th Cir. Jan. 30, 2024); *contra Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023) (citing *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017)).

54.     In 1982 Congress amended § 2 of the Voting Rights Act to reach by statute circumstances which did not violate the Fifteenth Amendment. Congress did not create a new remedy, leaving unchanged the authority to enforce § 2 granted to the Attorney General in § 12(d) of the Act. 52 U.S.C. § 10308(d). Because of the ambiguity of the non-constitutional reach of § 2,

and because Congress has provided a comprehensive remedy, § 2 may not be enforced under 42 U.S.C. § 1983. *See generally Suter v. Artist M.*, 503 U.S. 347 (1992).

### 2. General Law

55.     Redistricting "'is primarily the duty and responsibility of the State[s],'not the federal courts." *Allen v. Milligan*, 599 U.S. 1, 29 (2023) (quoting *Abbott v. Perez*, 138 S.Ct. 2305, 2324 (2018)).

56.     "'Electoral districting is a most difficult subject for legislatures,' requiring a delicate balancing of competing considerations." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S.Ct. 788, 797 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995)).

57.     This case calls on the Court to determine whether the alleged vote dilution is "on account of race or color," 52 U.S.C. § 10301(a), or caused by some other factor.

58.     Plaintiffs seek to have this Court use Section 2 of the Voting Rights Act to order "more success in place of some." *Johnson v. De Grandy*, 512 U.S. 997, 1012-13 (1994). But if dilution is not happening or if it is not happening on account of race, then there can be no findings for Plaintiffs.

59.     "Unless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." *Cooper v. Harris*, 581 U.S. 285, 335, 137 S.Ct. 1455, 1490 (2017) (Alito, J., concurring in the judgment in part and dissenting in part) (quoting *Miller*, 515 U.S. at 916).

60.     This is because "partisan motives are not the same as racial motives." *Brnovich v. Democratic Nat'l Comm.*, 141 S.Ct. 2321, 2349 (2021). And federal courts are "not responsible for vindicating generalized partisan preferences." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2501

(2019).

61.      Such caution is "especially appropriate . . . where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (*Cromartie II*).

62.      Accordingly, Plaintiffs bear a "heavy" burden of proof on their challenge to the redistricting plan enacted in 2022. *See Cooper*, 137 S.Ct. at 1479; *Cromartie II*, 532 U.S. at 241.

63.      "Section 2 of the Voting Rights Act prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" *Harding v. Cnty. Of Dallas, Texas*, 948 F.3d 302, 308 (5th Cir. 2020) (quoting 52 U.S.C. § 10301(a)).

64.      For a Section 2 claim, (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) "the minority group must be able to show that it is politically cohesive," and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 51-52 (1986). "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines" violate § 2. *Abbott*, 138 S.Ct. at 2331.

65.      "The question which the court must answer in a section 2 case is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991) (citation omitted). The

inquiry "depends upon a searching practical evaluation of the past and present reality" and on a "functional view of the political process." *Westwego*, 946 F.2d at 1120.

66.     "To establish a § 2 vote dilution claim, a plaintiff must show, 'based on the totality of circumstances, . . . that the political processes leading to nomination or election' are 'not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" 52 U.S.C. § 10301(b). "Section 2 does not however, 'establish[ ] a right to have members of a protected class elected in numbers equal to their proportion in the population.'" *Harding*, 948 F.3d at 308 (quoting 52 U.S.C. § 10301(b)).

67.     Here, the challenged Mississippi State House and Senate plans contain 57 majority-black districts. Stip. ¶¶ 69, 80. Plaintiffs are therefore asserting, "not the chance for some electoral success in place of none, but the chance for more success in place of some." *Johnson*, 512 U.S. at 1012-13. Consequently, this case presents "closer calls" than many Section 2 cases. *Id.* at 1013.

68.     In addition to compliance with constitutional requirements, the redistricting standards applicable to the Mississippi Legislature as a matter of law are set forth in Miss. Code Ann. § 5-3-01 (Rev. 2019):

> (a)     Every district shall be compact and composed of contiguous territory and the boundaries shall cross governmental or political boundaries the least number of times possible; and
>
> (b)     Districts shall be structured, as far as possible and within constitutional standards, along county lines; if county lines are fractured, then election district lines shall be followed as nearly as possible.

69.     The separation of incumbents into separate districts is a redistricting standard which the Mississippi Legislature could legally employ.  *Bush v. Vera*, 517 U.S. 952, 964 (1996).

70.     In a case involving multimember districts, the Supreme Court held that, as one of three prerequisites to bringing a claim under § 2 of the Voting Rights Act, a "minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50 (footnote omitted).  The same prerequisite was established for single-member districts in *Growe v. Emison*, 507 U.S. 25 (1993). Neither case even suggested that expert evidence is required to establish this prerequisite, and experience has shown that no such specialized expertise is necessary to the drafting of a plan.  This Court adopted its own plan for Congressional Districts in *Smith v. Clark*, 189 F. Supp. 2d 529 (S.D. Miss. 2002), *aff'd sub nom. Branch v. Smith*, 538 U.S. 254 (2003).  Ten years later, in the same case, this Court ordered the parties to provide it with redistricting software, so that it could devise its own plan.  No. 3:01-CV-855-HTW-DCB, Dkt. #108 (S.D. Miss. Dec. 6, 2011).

### 3. *Gingles* Prong 1

71.     Plaintiffs must demonstrate that a "'minority group' [is] 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district[.]" *Cooper*, 137 S.Ct. at 1470 (quoting *Gingles*, 478 U.S. at 50).

#### a.  Findings of Fact

72.     Plaintiff's expert, Mr. William Cooper, drew an "Illustrative Plan" creating four (4) new majority black Senate districts and three (3) new majority black House districts.

73.     In developing his Illustrative Plans, Mr. Cooper utilized Planning & Development District boundaries as he opined that they "are a useful reference point for constructing electoral districts in the state." [PX-1, p. 15, ¶ 27]

74.     Mr. Cooper "focused on planning districts with substantial Black populations that have experienced double-digit Black population growth since 2000 …, or, conversely, areas with

stable Black populations where there has been a double-digit decline in the White population since 2000." [PX-1, p. 19, ¶ 33]

75.     Mr. Cooper focused on "planning and development districts as regional communities of interest…" [PX-1, p. 21, ¶ 37].

76.     Planning & Development Districts ("PDDs") in Mississippi are private, non-profit Mississippi corporations and are not public civil divisions recognized by the U.S. Census Bureau when conducting the Census.

77.     PDDs contain disparate geographical areas, many of which lack common interests with other areas within the same PDD boundaries.

78.     Miss. Code Ann. § 5-3-101, which sets forth the guidelines and standards that the legislature must follow when developing redistricting plans, makes no mention of using PDD boundaries.

79.     In developing his Illustrative Plans, Mr. Cooper built districts based on precincts. In doing so, he identified precincts that were over 30% BVAP in his software program, Maptitude, and used that data to draw his Illustrative Plans. [PX-1, p. 7, ¶ 12].

80.     Mr. Cooper claims that his Illustrative Senate Plan is "superior or equal to the 2022 Legislative Plans across almost every conceivable race-neutral quantitative measure of community of interest (as defined by splits) – including counties, municipalities, school districts, planning districts, and federally defined regional areas known as core-based statistical areas, which include metropolitan statistical areas ("MSAs") and micropolitan statistical areas ("MPSAs")." [PX-1, p. 21, ¶ 37]. He makes a similar claim as to the Illustrative House Plan. *Id.* at 71-74, ¶ 143-151.

81.     The only geographical boundaries required by Mississippi law to be followed "as nearly as possible" are county, municipal and precinct lines. Miss. Code Ann. § 5-3-101.

82.     Mr. Cooper draws a new Senate District 2 in DeSoto County with an any part black voting-age population ("APBVAP") of 50.91%. He admits that the surrounding Senate districts to the south located in the Mississippi Delta region all lost population from 2010-2020 and were underpopulated in the Benchmark Plan. Accordingly, if these districts were to be maintained as black-majority districts, they had to migrate northward towards DeSoto County since DeSoto County had some of the highest population gains from 2010.  Embedded in the redrawn SD 2 is House District 40, which has a total BVAP of 53.78%.

83.     In drawing a new Senate District 17 in the Golden Triangle area, Mr. Cooper dismantles the existing Senate District 7. Dr. Cooper makes significant changes to the existing Senate District 7, reducing its BVAP from 40.08% to 17.83% and reducing adjacent existing SD 16 from 63.06% to 53.54%. In the 2023 statewide election, voters in SD 7 elected a white Democrat with 54.9% of the vote. The newly redrawn SD 17 increases to 54.18% BVAP from 29.48% BVAP. In redrawing SD17, Mr. Cooper crosses PDD boundaries and he introduces yet another metric to consider – public school district athletic divisions.

84.     Mr. Cooper draws an additional majority black Senate district in the Hattiesburg area, which he designates as SD 9.  He splits the Sheeplo and Sunrise precincts between SD 9 and 42 with a resulting BVAP in SD 9 of 50.95%.

85.     Mr. Cooper redraws SD 35 to be a majority black Senate district in the Copiah, Simpson, Lincoln, Lawrence and Jefferson Davis County areas. Mr. Cooper splits precincts in redrawing SD 35 and splits Lincoln County, crossing the county boundary to go into the City of Brookhaven which he states has a "significant Black population." Mr. Cooper also crosses multiple PDD boundaries in redrawing SD 35.  SD 35 moves from a BVAP under the existing plan of 39.38% to a BVAP of 52.12% in the redrawn district.

86.   Mr. Cooper redraws House District 22 in the Chickasaw and Monroe County areas, changing its BVAP from 29.86% to 55.41%.

87.   Mr. Cooper redraws House District 84 in the Newton, Jasper and Clarke County areas, splitting the City of Quitman, which was whole in the 2022 House Plan. HD 84 has a BVAP of 53.05% vs. 37.28% in the 2022 House Plan.

88.   Mr. Cooper redraws House District 56 in the Hinds, Madison County areas, splitting the City of Clinton. HD 56, at the time of redistricting in 2022, was the Speaker of the House's district. As redrawn, HD 56 has a BVAP of 58.99% vs. 22.97% in the 2022 House Plan.

89.   Defendants offered the testimony of Dr. Thomas Brunell to address certain aspects of Mr. Cooper's testimony. Dr. Brunell analyzed how Mr. Cooper's Illustrative Plans fared when compared to the Enacted Maps in terms of applying traditional redistricting principles. With regard to the traditional redistricting principle of compactness, Dr. Brunell opined that the differences between the compactness scores between and among the plans are small, and in five of the six instances there is no statistically significant difference between Mr. Coopers' plans and the Enacted Maps. [Brunell Amended Report, 11.17.23, pp. 12-14]. Based on this analysis, Dr. Brunell concluded that the difference between Mr. Cooper's maps and the Enacted Maps was marginal. *Id.*

90.   As to incumbent pairings, Dr. Brunell noted that the Enacted Maps only have one (1) pairing in the Senate and three (3) in the House. [Brunell Amended Report, p. 14]. Mr. Cooper's plans have more pairings, but Mr. Cooper claims he did not have complete address information for all incumbents when he drew them. *Id.* Regardless, incumbency protection was obviously an important factor to the Legislature when drawing its plans as the House floor

amendment demonstrates, and the Enacted Plans fare favorably when compared to Mr. Cooper's plans.

91.     Considering relevant political subdivision splits, Dr. Brunell notes modest differences between Mr. Cooper's plans and the Enacted Plans. Dr. Brunell noted that Mr. Cooper's Illustrative Plan for the House has the same number of split counties as the Enacted Plans and then modestly fewer split municipalities and precincts. [Brunell Amended Report, p. 15].  Mr. Cooper's Illustrative Plan for the Senate splits fewer counties, but almost has the same number of total county splits.  *Id.*

92.     Although Mr. Cooper claims the Illustrative Plans are "superior or equal to" the Enacted Plans, a comparison of the relevant boundary splits reveals no material differences in the Illustrative Plans and the legislative plans. [PX-1, p. 21, ¶ 37].

93.     On March 29, Chairman Beckett explained the process the Standing Joint Committee utilized in adopting the redistricting plans. The Chairman explained the factors the Committee considered when drafting the plans included One Person, One Vote, contiguity of the districts, political performance, and compliance with all state and federal laws—such as Section 2 of the Voting Rights Act, compactness, and minimalization of county and precinct splits. [JE-10, pp. 8-14].

94.     The Chairman indicated significant shifts in population throughout the state—a loss of approximately 65,000 people in the Delta, as well as losses in South Mississippi and the Jackson/Hinds County areas—necessitated the collapse of two districts to be moved to the areas with the largest increases in population. [JE-10, pp. 11-14].

95.     Likewise, on March 29, Vice Chairman Kirby explained the process the Standing Joint Committee utilized in adopting the redistricting plans to the Mississippi Senate. The Vice

Chairman identified significant population shifts throughout the state—over 65,000 people in the Delta area either moved to another part of the state or left the state, Southwest Mississippi experienced population loss, and the city of Jackson and Hinds County area also experienced population loss. [JE-11, pp. 3-4].

96.     Vice Chairman Kirby explained the factors the Committee considered when drafting the plans included One Person, One Vote, contiguity of the districts, compliance with all state and federal laws—such as Section 2 of the Voting Rights Act, compactness, minimalization of county and precinct splits—and political performance. [JE-11, pp. 6-11].

97.     Dr. Brunell offered screenshots of the districts at issue redrawn by Mr. Cooper using the Maptitude software, which is the same software used by Mr. Cooper in redrawing the districts.   [Brunell Amended Report, Appx. 2]. These screenshots show the actual precincts comprising the redrawn districts, which Mr. Cooper never provided in a map in any of his voluminous exhibits. *Id.* The precincts are color coded to reflect the degree of black and white voting age population for each precinct.

**b.  Conclusions of Law**

98.     To meet the first *Gingles* precondition, Plaintiffs must show that the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Allen*, 599 U.S.at 18 (quoting *Wisc. Legis. v. Wisc. Elections Comm'n*, 595 U.S. 398, 402 (2022) (*per curiam*)).

99.     "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 433 (2006) ("*LULAC*") (quoting *Vera*, 517 U.S. at 997).

100.    The first precondition also asks whether the proposed district is geographically

compact, meaning whether it is reasonably configured. *See Allen*, 599 U.S. at 18. "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Id.* (citing *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015)).

101.    The Supreme Court and Fifth Circuit both prohibit the separation of the first prong of liability under *Gingles* and the potential remedy. *See Abbott*, 138 S.Ct. at 2333; *Harding*, 948 F.3d at 309-10.

102.    "The Supreme Court held that "[c]ourts cannot find § 2 violations on the basis of *uncertainty*." *Harding*, 948 F.3d at 310 (quoting *Abbott*, 138 S.Ct. at 2333). "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *LULAC*, 548 U.S. at 433-34.

103.    Thus, Plaintiffs must prove that its proposed majority-minority district "is consistent with 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Robinson v. Ardoin*, 37 F.4th 208, 219 (5th Cir. 2022) (quoting *LULAC*, 548 U.S. at 433).

104.    And "[r]ace may predominate even when a reapportionment plan respects traditional principles, the Court explained, if '[r]ace was the criterion that, in the [mapdrawer's] view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill*, 580 U.S. at 189 (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)).

105.    Racial predominance occurs when (1) a mapdrawer "purposefully established a racial target," such as that "African-Americans should make up no less than a majority of the

voting-age population," and (2) the racial target "had a direct and significant impact" on the district's "configuration." *Cooper*, 137 S.Ct. at 1468-69.

106.    Further, a mapdrawer "may not 'assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *LULAC*, 548 U.S. at 433 (quoting *Miller*, 515 U.S. at 912).

107.    In redrawing Senate District 2 (SD 2), Mr. Cooper used a feature on his Maptitude software whereby dots indicated precincts that were 30% and over in BVAP.  He used this feature in developing all of the districts in his Illustrative Plans. Although he claims to have followed natural boundaries when redrawing SD 2, an examination of his redraw reveals otherwise.  [Brunell Amended Report, Appx. 2]. Specifically, Highway 51 is a natural boundary going through DeSoto County and while he follows it for a portion of the eastern boundary of the district, he abruptly abandons it and draws the boundary around the Colonial Hills precinct, which happens to be a majority white populated precinct.  SD 2 as redrawn is underpopulated at -4.27% and the adjacent district, SD 1 is overpopulated by only .55%.  Including the Colonial Hills precinct in SD 1 would be an easy transfer and would improve the overall population deviation for both districts while adhering to natural boundaries.  However, since Colonial Hills contains a total voting-age population ("VAP") of 1,822 persons, 452 (24.8%) of whom are black, that would defeat Mr. Cooper's racial objective by reducing the BVAP in his redrawn SD 2 below 50%.  Also, an examination of precincts on either side of the boundaries of the redrawn SD 2 in DeSoto County shows that most precincts with majority black population are included in SD 2 and those with majority white population are excluded.

108.    In redrawing Senate District 17 (SD 17), Mr. Cooper clearly includes predominantly black populated precincts in and around the Tupelo area and south.  He splits the

City of Amory.  He also violates his own self-imposed recognition of geographic regions by crossing the boundary between two PDDs (Three Rivers and Golden Triangle) to achieve his racial objective.  He introduces yet another criteria—public school athletic divisions—in an effort to provide a race neutral explanation for crossing PDD boundaries.  However, when asked why he did not consider private schools as well, he revealed his motivation: he didn't think black children would be attending private schools so he did not look at them.  Further, Mr. Cooper dismantles the existing SD 7 that most recently elected a white Democrat in 2023 for the sake of creating another majority-minority district for no other reason rather than race. The configuration of the redrawn SD 17 demonstrates that race was the predominant reason in dismantling the existing SD 7 to achieve a racial objective.

109.    In the redrawn Senate District 9 (SD 9), the boundary lines of the district follow remarkably along racial lines with all of the precincts in the City of Hattiesburg and the surrounding area consisting of larger concentrations of black population included within the district and excluding those with larger white population.  Precinct splits are also telling.  The Sheeplo and Sunrise precincts are split between SD 9 and SD 42 with no race-neutral explanation.  The Sheeplo precinct is split with 925 VAP in SD 9 and 966 VAP in SD 42.  The Sunrise split consists of 703 VAP in SD 9 and 3,902 VAP in SD 42.  Given that the BVAP of redrawn SD 9 is 50.95%, making either of these precincts whole would likely alter the delicate BVAP percentage, precluding the racial objective of Mr. Cooper.

110.    In redrawing Senate District 35 (SD 35), Mr. Cooper once again transgresses his own self-imposed criteria and crosses multiple PDD boundaries to achieve his racial objective. In addition, he splits Lincoln County, which was whole in the Adopted Plan, and runs a finger down into Brookhaven which has, according to him, "significant Black population."  This finger can

hardly be considered reasonably compact and includes precincts with predominantly black population. In running the finger into the City of Brookhaven, he splits the city between SD 35 and SD 39. Mr. Cooper's efforts in redrawing SD 35 belie traditional redistricting principles and indicate a predominant racial objective.

111. There were legitimate, race-neutral explanations for the legislature drawing HD 22 as it did. As indicated in the floor presentation of the House Plan, there was population loss in the area in and around HD 22, indicating a need to add population to comply with the one person, one vote requirement. Also, the incumbent, Rep. Jon Lancaster, switched parties from Democrat to Republican. Redrawing HD 22 to achieve compliance with the constitutional requirement of one person, one vote and the political objective of protecting an incumbent who had switched to the majority party are plausible race-neutral reasons for drawing a district. Moreover, when Mr. Cooper's Illustrative HD 22 is examined, once again its boundaries are drawn predominantly along racial lines. Most majority black population precincts are included within the boundaries of the new HD 22 and predominantly white population precincts are excluded.

112. HD 56 was represented by then Speaker Philip Gunn. Preserving the Speaker's district is certainly a legitimate political reason for redrawing HD 56 as it was drawn in the Enacted Plan. When redrawn, Mr. Cooper splits the City of Clinton to achieve a racial objective.

113. Mr. Cooper's Illustrative Plans fail to satisfy the first *Gingles* precondition for several reasons. First, Mr. Cooper set out to determine if he could draw additional majority black districts in various geographic regions of the state. He chose arbitrary boundaries of areas that are not public civil divisions for which Census data is reported and determined that those areas should be the focus of his inquiry. He focused on regions with "substantial Black populations" and he identified precincts with 30% or more BVAP when redrawing districts. This approach

demonstrates that race was the predominant factor that Mr. Cooper considered in redrawing the additional districts. This approach demonstrates targeting race in seeking to draw districts, indicating that race had a direct and significant impact in redrawing the additional districts. *See Cooper*, 137 S.Ct. at 1467-1470.

114.    Second, in most of the districts that Mr. Cooper redraws for both the Senate and House, there is no plausible explanation other than race for the configuration of the districts. Despite creating regions for purposes of demographic analysis where he believed additional majority-black districts could be drawn, Mr. Cooper does not consistently use those regions in drawing districts in his Illustrative Plans.  For example, in redrawing both SD 17 and SD 35, Mr. Cooper crosses multiple PDD boundaries in an effort to achieve a racial objective.  This is in addition to unnecessarily splitting county, municipal and precinct boundaries in order to achieve a racial objective. Further, an examination of the precincts inside and outside the boundaries of each of the redrawn districts reveals the inclusion of predominantly black populated districts within the district boundaries and the exclusion of predominantly white populated precincts.  Dr. Brunell concludes that the configuration of the precincts in most of the redrawn districts indicates race was the predominant factor in redrawing the districts, and we agree.

115.    Third, with regard to applying traditional redistricting principles of compactness, incumbency and political subdivision splits, Mr. Cooper's Illustrative Plans fare no better than the Enacted Plans.  As Dr. Brunell concluded, the differences in compactness scores among the plans are marginal and there are only modest differences in political subdivision splits.  Given the variety of interests that legislative bodies must consider when adopting plans, these differences in traditional redistricting principles are not significant enough to demonstrate that the Illustrative Plans are in any way "superior", as Mr. Cooper claims, to the Enacted Plans.  This is especially

true when we consider that Mr. Cooper had an advantage in developing his plans since he knew the compactness scores and number of political subdivision splits that he had to beat before he started drawing his plans. All in all, the Court concludes that the Illustrative Plans fare no better than the Enacted Plans in applying traditional redistricting principles.

116.     Fourth, Mr. Cooper applies the incorrect standard for determining the compactness requirement of the first precondition. Mr. Cooper is adamant that the compactness requirement refers to the compactness of the district as a whole and not the minority community within the district. The U.S. Supreme Court has made this standard clear: compactness refers to compactness of the minority community within the district. *See LULAC*, 548 U.S. at 402 ("Under § 2, . . ., the injury is vote dilution, so the compactness inquiry considers 'the compactness of the minority population, not . . . the compactness of the contested district.'") (quoting *Vera*, 517 U.S. at 997). Mr. Cooper only computes compactness scores for his redrawn districts and not the minority communities within those districts, thus applying the wrong standard to determine whether the first precondition has been met.

117.     The first *Gingles* precondition is satisfied only "[w]here an election district could be drawn in which minority voters form a majority, but such a district is not drawn." *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). We therefore conclude that Plaintiffs have failed to satisfy the first *Gingles* precondition.

### 4.  Gingles 2 & 3

118.     "Second, the minority group must be 'politically cohesive[ ]' . . . [a]nd third, a district's white majority must 'vote [ ] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper*, 137 S.Ct. at 1470 (quoting *Gingles*, 478 U.S. at 50-51).

      **a.  Findings of Fact**

119.     Plaintiffs' counsel retained Dr. Lisa Handley to analyze "voting patterns by race" to lay "the foundation of two of the three elements of the 'results test' as outlines in *Thornburg v. Gingles*: a racial bloc voting analysis . . . to determine whether the minority group is politically cohesive; and . . . to determine if White voters are voting sufficiently as a bloc to usually defeat the candidates preferred by minority voters." [Handley Report, 12.22.23, PX-4, pp. 2-3].

120.     Plaintiffs offered Dr. Handley as their sole expert to address the second and third preconditions of *Gingles.* In conducting her analyses, Dr. Handley used several statistical methodologies.  Of the four employed, she considers the EI RxC methodology the most sophisticated and likely to be the most accurate in most instances. [PX-4, pp. 3-4].

121.     One of the advantages of EI RxC is that it allows one to report Confidence Intervals, or as Dr. Handley indicated, she has recently adopted the terminology of "Credible Intervals" to describe these.   Credible Intervals tell us that 95% of the simulations drawn in the EI RxC analysis produce means within the specified range. Credible Intervals give us an indication of the uncertainty of the Point Estimate.

122.     Dr. Handley conducted the EI RxC analysis to assess whether there was racially polarized voting in the selected areas of interest. [PX-4, p. 2].

123.     Dr. Handley analyzed a set of nineteen (19) state legislative contests in legislative districts under the 2012 district boundaries that were located within the selected areas of interest. [PX-4, p. 12]. Dr. Handley did not run an EI analysis for each of the Adopted districts at issue. *Id.* Rather, she performed what she calls an "Effectiveness Analysis." *Id.*

124.     These state legislative contests are considered endogenous elections. [PX-4, p. 9]. Endogenous elections are those for the specific offices at issue as opposed to exogenous elections,

or those for offices not at issue. *Id.* Endogenous elections are considered more probative than exogenous elections. *Id.*

125.   Dr. Handley defines racially polarized voting as "if black voters and white voters, considered separately, would have elected different candidates." She does not define political cohesion, preferring to determine whether voters are less cohesive or more cohesive. With regard to determining cohesion, Dr. Handley only examines cohesion among black voters and not white voters.

126.   Dr. Handley testified that she found racially polarized voting in all nineteen (19) of the endogenous elections she analyzed. [PX-4, p. 12]. This was in spite of eight (8) of those elections showing results within Credible Intervals which call into question the reliability of the Point Estimate which she asserts indicates the existence of racially polarized voting. She testified that her Point Estimates in these eight (8) elections were her "best guess".

127.   Dr. Handley admitted that in the nineteen (19) endogenous elections she analyzed, the black Candidate of Choice won in eight (8) of those, or 42% of the time.

128.   Dr. Handley analyzed eight (8) Democratic primary elections using statewide election results, but she did not believe they were particularly probative in her *Gingles* analysis. *Id.* at 10.

129.   Dr. Handley analyzed three (3) judicial elections involving candidates for the Mississippi Supreme Court "specifically with the idea that this is a way to rebut the argument that party is the driver." *Id.* at 13. She found racially polarized voting in two of these elections. She believed these races were non-partisan because her "definition of whether a contest is partisan [is] whether the contest includes the party of the candidates next to the name."

130.    Dr. Handley examined eleven (11) statewide races conducted from 2011 to 2020 to predict voter behavior in the redrawn legislative districts in the Illustrative Plans prepared by Mr. Cooper. The minority preferred candidate of choice in each of those eleven (11) contests was always the Democrat. *Id.* at 1.  In her experience as a political scientist, black voters usually support the Democrat and it was certainly true for the eleven (11) contests she analyzed.  Based on this analysis, Dr. Handley computed an "Effectiveness Score" for each of the redrawn districts to predict whether the minority preferred candidate of choice could be elected in those districts.

131.    Defendants offered Dr. John R. Alford as an expert to address the second and third preconditions of *Gingles,* as well as Senate Factor 2.  Dr. Alford is a tenured full professor of Political Science at Rice University who has testified in many redistricting cases in numerous states across the country. [Alford Report, 10.16.23, p. 2].

132.    Dr. Alford used the same data and methodology to analyze the data that Dr. Handley employed.  The methodology is known as an EI RxC analysis. *Id.* at 3.

133.    Dr. Alford examined the EI RxC results that Dr. Handley performed for seventeen (17) statewide contests analyzed within her geographically defined areas of interest.  Included in these contests were three (3) presidential elections, 2012, 2016 and 2020.  In analyzing the estimated voting behavior of blacks and whites in those contests, Dr. Alford concludes that black and white voters appear to offer very different levels of support to Democratic and Republican candidates, but there is virtually no difference in the levels of support when we focus on the mix between black and white candidates in those contests. What differences do exist do not fall in the order we would expect if race of the candidate was driving the voter behavior. *Id.* at 7.

134.    After examining all of the seventeen (17) statewide general election contests used by Dr. Handley, Dr. Alford opines that the data demonstrate that black voters tend to provide

cohesive support to Democratic candidates, almost always in the 90% range and white voters support republican candidates typically in the 80-90% range.  Dr. Alford opines that this indeed represents partisan polarized voting with black voters providing highly cohesive support to every Democratic candidate and white voters providing clearly cohesive support to every Republican candidate. *Id.* at 7-8.

135.    Another way of summarizing polarization according to Dr. Alford is to compute the difference between black and white voter preferences.  In Dr. Handley's analysis, this gap is very large at 87.6 in the eleven (11) contests with Democratic candidates but is equally large at 86.3 in the five (5) contests with white Democratic candidates.  The difference in voting support among black and white voters in a contest between two white candidates is highly polarized at a mean difference of 86.5% based solely on the party affiliation of the candidates.  When an election is racially contested the difference in voting support among black and white voters in a contest between the white Republican and the black democrat candidate is a nearly identical 86.3%.  Removing the racial cue only reduces the mean difference by one percentage point.  Whether a candidate is a Democrat or a Republican makes a huge, almost 90 percentage point difference to black and white voters in these elections.  Whether a candidate is black or white barely registers at only slightly above a single percentage point, and even that small difference depends, as Dr. Handley notes, on a single contest. *Id.* at 10.

136.    Dr. Alford examined Dr. Handley's analysis of the nineteen (19) endogenous elections, consisting of state legislative contests from 2015 and 2019.  In these contests, she only used racially contested elections, thus preventing the comparison of white and black candidate support that was analyzed in the statewide general elections. While Dr. Handley concludes that all 19 of those elections demonstrated racially polarized voting, her unwillingness to define what she

believes constitutes political cohesion casts doubts on her conclusions. She seems to define political cohesion on a sliding scale of there is either more cohesion or less cohesion. This presents a challenge when trying to determine with any degree of scientific certainty whether an approximate 50% division in either the white vote or black vote in a particular election represents racially polarized voting. Given these divisions in several of her cited contests, Dr. Alford opines that we cannot conclude that the third precondition of *Gingles* is met, i.e., white voters are voting as a block to usually defeat the minority preferred candidate. *Id.* at 11.

137.    While Dr. Handley admits that her analysis of the statewide Democratic primary contests are not probative, Dr. Alford analyzes her results and concludes that they also show the same pattern as the general election contests, viz., while they show a high degree of partisan polarization, they do not indicate that the race of the candidates makes much difference at all. *Id.* at 14-15.

138.    Dr. Alford considered Dr. Handley's analysis of the three judicial contests, all of which were racially contested. In one of the three contests, there was no polarization as black and white voters favored the same candidate. As to the other two, Dr. Alford points out that while they purport to be non-partisan, they are anything but that in reality. Dr. Alford points to several facts pertaining to the candidates as demonstrating the partisan nature of those races. Dr. Alford concludes that the voting patterns in those two elections match those seen in statewide general elections with black voters favoring the Democrat and white voters favoring the Republican. *Id.* at 15.

139.    Dr. Alford opines that based on his analysis of Dr. Handley's results, the high cohesion demonstrated by black voters in the elections analyzed is not a function of black voters coalescing around black candidates but rather is a function of cohesive black voter preferences for

Democratic Party candidates.  Similarly, the tendency of white voters to vote cohesively against Democratic candidates is not reserved for opposition to black Democratic candidates but is instead cohesive support for Republican Party candidates whether the Democratic candidate is white or black. *Id.* at 17.

### b.  Conclusions of Law

140.    Plaintiffs do not establish the second and third preconditions, which require proof that the relevant minority group "is politically cohesive" and that, in the absence of a § 2 remedy, a white voting bloc will usually "defeat the minority's preferred candidate." *Allen*, 599 U.S. at 18. "The second and third *Gingles* preconditions are often analyzed together." *Christian Ministerial All. v. Sanders*, No. 4:19-CV-0042, 2023 WL 4745352, at *16 (E.D. Ark. July 25, 2023). Plaintiffs fail to prove both for several reasons.

141.    Dr. Handley's own analysis of the endogenous elections, which she considers to be the most probative regarding assessment of racially polarized voting, is insufficient to satisfy the second and third preconditions of *Gingles*. With regard to the second precondition, racially polarized voting, of the nineteen (19) endogenous elections she analyzed, when the Credible Intervals are applied to the Point Estimates of the EI RxC analysis, only 12 of the 19 indicate racially polarized voting.  And, of those 12, the black candidate of choice loses 7 times, meaning that in the 19 races she analyzed, the black candidate of choice is defeated approximately 37% of the time.

142.    Given these results, Dr. Handley's EI RxC analysis, as the most credible and sophisticated, is statistically insignificant to support the existence of racially polarized voting in the selected areas of interest. The Court cannot conclude that prongs 2 and 3 of *Gingles* are met

based on Dr. Handley's "best guess".  The Court requires proof of statistically significant racially polarized voting and that is missing in this Record.

143.    Further, to satisfy the third *Gingles* precondition, Plaintiffs must show that white voters are voting as a block to usually defeat the minority preferred candidate in the selected contests.  The winning percentages of the black candidates of choice in the nineteen (19) endogenous elections analyzed are insufficient to support the third precondition and therefore Plaintiffs have failed to satisfy that precondition as well.

144.    If "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens, then there is no "legally significant" racially polarized voting under the third *Gingles* precondition. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). This is so because "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.'" *LULAC, Council No. 4434*, 999 F.2d at 854 (quoting *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992)). Section 2 "is implicated only when Democrats lose because they are black, not where blacks lose because they are Democrats." *Id.* As the Fifth Circuit explained in *LULAC, Council No. 4434*, a majority of Justices in *Gingles* held § 2 liability does not lie where different candidate preferences reflect "interest-group politics." *See id.* at 855-59. In this case, as in *LULAC, Council No. 4434*, the evidence "shows that divergent voting patterns among white and minority voters are best explained by partisan affiliation." *Id.* at 861.

145.    We conclude that Dr. Alford's testimony regarding his analysis of Dr. Handley's data and results is persuasive to explain that voter behavior in those elections is driven by party and not race.  Dr. Alford reaches his conclusions based on analyzing the same empirical data and

methodology used by Dr. Handley. Dr. Alford's conclusions persuade the Court that there is no "legally significant" racially polarized voting under the *Gingles* preconditions. *See LULAC, Council 4434*, 999 F.2d at 850.While Dr. Alford's analysis demonstrates voter behavior being driven by party instead of race, other courts have refused to consider party polarization as relevant to the second and third preconditions of *Gingles*.   Regardless, Dr. Alford's conclusions and opinions are quite relevant to consideration of Senate Factor 2 in the totality of the circumstances analysis as set forth *infra*.

### 5.   Totality of the Circumstances

#### a.   General Law

146.   "[T]he totality of the circumstances inquiry recognizes that application of the *Gingles* factors is 'peculiarly dependent upon the facts of each case." *Allen*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79).

147.   "[T]he Court may not view the totality of the circumstances 'less critically' because the *Gingles* precondition have been met." *Fairley v. Hattiesburg, Miss.*, 122 F. Supp. 3d 553, 567 (S.D. Miss. 2015), *aff'd sub nom* 662 F. App'x 291 (5th Cir. 2016) (quoting *NAACP v. Fordice*, 252 F.3d 361, 373-74 (5th Cir. 2001)).

148.   If the *Gingles* preconditions are met, the totality of the circumstances must be considered "to determine whether members of a racial group have less opportunity than do other members of the electorate." *LULAC*, 548 U.S. at 425-26. As recited by the Senate Report on the 1982 amendments to the Voting Rights Act, the following so-called "Senate Factors," among others, may be used in assessed the totality of the circumstances:

   1)   the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2)   the extent to which voting in the elections of the state or political subdivision is racially polarized;

3)   the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4)   if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5)   the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6)   whether political campaigns have been characterized by overt or subtle racial appeals;

7)   the extent to which members of the minority group have been elected to public office in the jurisdiction.

8)   whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

9)   whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

149.   Finally, in reviewing the totality of the circumstances, not every factor is relevant in every case and not all of the factors must be proved, nor is the Court required to find that a majority of the factors point one way or the other. *See Gingles*, 478 U.S. at 45. However, "the existence of racially polarized voting and the extent to which minorities are elected to public office remain the two most important factors considered in the totality-of-circumstances inquiry." *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996) (citing *Gingles*, 478 U.S. at 48 n.15).

150.    Section 2 violations require "an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality." *Allen*, 599 U.S. at 19. There is "no requirement that any particular number of factors be proved, or that a majority of them point one way or another." S. Rep. at 29.

### b.  Drs. Luckett and King

151.    Plaintiffs have failed to prove by a preponderance of the evidence that the level of black participation in politics in any challenged district is depressed.  Therefore, evidence of disproportionate educational, employment, income level, and living conditions between blacks and whites intended to prove the reason for that depressed participation is inadmissible for lack of foundation.

152.    Plaintiffs have failed to demonstrate by a preponderance of the evidence that their proffered expert Marvin King has specialized knowledge of history that will help this Court to understand the evidence or to determine a fact in issue.

153.    Plaintiffs' proffered expert Marvin King declares that "the conclusions within this report" are drawn from his "years of teaching, writing, and research."  His assertion fails to establish by a preponderance of the evidence that it is more likely than not that his opinions are the product of reliable principles and methods or that he has reliably applied any principles and methods to the facts of this case.

154.    Plaintiffs have failed to demonstrate by a preponderance of the evidence that their proffered expert Robert Luckett has specialized knowledge of history that will help this Court to understand the evidence or to determine a fact in issue.

155.    The report of Plaintiffs' proffered expert Robert Luckett contains no explanation of any principles and methods upon which his opinions are based.  For that reason, Plaintiffs have

failed to establish by a preponderance of the evidence that it is more likely than not that his opinions are the product of reliable principles and methods or that he has reliably applied any principles and methods to the facts of this case.

156.    The Supreme Court in *Shelby County*, 570 U.S. 529, held that factual circumstances prevailing in 1965 were constitutionally insufficient to support the continued application of § 4 of the Voting Rights Act to formerly covered States and political subdivisions.  The Court of Appeals for the Fifth Circuit in *Harness v. Watson*, 47 F.4th 296 (5th Cir. 2022) (*en banc*), *cert. denied*, 143 S.Ct. 2426 (2023), held that the circumstances surrounding the adoption of Mississippi's Constitution of 1890 did not necessarily invalidate voting qualifications currently applied.  With that guidance in mind, this Court finds that no historical, political, or socioeconomic evidence older than 1965 is relevant to whether the challenged legislative district lines result in rendering the political processes leading to nomination or election to the Legislature not equally open to participation by members of a class of citizens protected by § 2(a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

157.    The Enacted Plan, at the time it was adopted, contained only one Senate District in which two incumbents resided and only three such House Districts.  On the House floor, the House plan was amended to separate a pair of incumbents into separate districts.  As a matter of fact, then, a redistricting standard employed by the Legislature was the minimization of conflicts between incumbents.

158.    For the reasons stated in Conclusion of Law No. 70 plaintiffs have failed to establish by a preponderance of the evidence that William Cooper possesses specialized knowledge which will help this Court understand the evidence or determine the fact in issue.

However, because expertise is not necessary to support the submission of maps into evidence, Mr. Cooper's maps have been admitted.

159.    Plaintiffs have failed to prove by a preponderance of evidence that the lines of any legislative district result in rendering the political processes leading to nomination or election to the Legislature not equally open to participation by members of a class citizens protected by Section(a) in that its members have less opportunity than other members of the electorate to participate in the electoral process and to elect representatives of their choice.

### c.  Senate Factor 1

### (a) Findings of Fact

160.    Senate Factor 1 concerns the "extent of any history of official discrimination in state . . . that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

161.    Following adoption of redistricting plans for both the Senate and House after both the 2000 and the 2010 cycles, the United States Department of Justice precleared all plans with no objections. *See* DOJ Preclearance Letters, June 14, 2002, September 17, 2012.

162.    Furthermore, in 2002, this Court found that the legislature did not use race as the predominant factor in redrawing Senate District 45 in the Hattiesburg area during the 2002 redistricting process. *See Woullard v. State*, No. 3:05-CV-97, 2006 WL 1806457 (S.D. Miss. June 29, 2006).

163.    The City of Hattiesburg and surrounding areas are included in Plaintiffs' claim for redrawing SD 9.

### (b) Conclusions of Law

164.    The most relevant question is whether there is "recent evidence of discrimination." *Lopez v. Abbott*, 339 F. Supp. 3d 589, 611 (S.D. Tex. 2018). Plaintiffs failed to present any meaningful *recent* evidence of official discrimination.

165.    "That Mississippi has a long and dubious history of discriminating against blacks is indisputable." *Teague v. Attala County*, 92 F.3d 283, 293-94 (5th Cir. 1996). However, "these discriminatory practices ceased long ago. . . ." *Fairley*, 122 F. Supp. 3d at 567 (quoting *Fairley v. Hattiesburg, Miss.*, No.2:06-CV-167-KS, 2008 WL 3287200, *9 (S.D. Miss. Aug. 7, 2008), *aff'd* 584 F.3d 660 (5th Cir. 2009)).

166.    "Absent an indication that these facts 'actually hamper the ability of minorities to participate,' they are, however, insufficient to support a finding that minorities suffer from unequal access to Mississippi's political process." *Fordice*, 252 F.3d at 368 (quoting *LULAC, No. 4434*, 999 F.2d at 866).

167.    Any evidence Plaintiffs might point to failure to receive preclearance from the Department of Justice "under the now-void Section[s] 4 [and 5] of the VRA does not prove this 'historical' point, because the Section 4 [and 5] test[s] did not deal with actual discrimination in election practices but with the lesser charge of 'backsliding.'" *Fusilier v. Landry*, 963 F.3d 447, 459 n.9 (5th Cir. 2020) (quoting *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 335 (2000)).

168.    Furthermore, "'our country has changed' in its treatment of minorities." *Fusilier*, 963 F.3d at 459 n.9 (quoting *Shelby County*, 570 U.S. at 557).

169.    The Plaintiffs have the burden of proof. We are not convinced that they have met that burden for Senate Factor 1. Accordingly, Senate Factor 1 weighs in favor of the Defendants.

#### d.  Senate Factor 2

##### (a) Findings of Fact

170.    Senate Factor 2 concerns the extent to which voting in the elections of the state or political subdivision is racially polarized. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07). The Findings of Fact pertaining to prongs two and three of *Gingles* set forth in ¶¶ 119-139, *supra*, are relevant to an analysis of the extent of racially polarized voting and are considered by the Court in connection with an assessment of Senate Factor 2.

##### (b) Conclusions of Law

171.    "[T]he existence of racially polarized voting" is one of the "most important factors considered in the totality-of-circumstances inquiry." *Clark*, 88 F.3d at 1397 (quoting *Gingles*, 478 U.S. at 48 n.15); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 747 (5th Cir.), *on reh'g* 999 F.2d 831 (5th Cir. 1993) ("This factor is one of the two most important in the inquiry into the past and present reality of the challenged electoral structure.").

172.    "The scope of the Voting Rights Act is indeed quite broad, but its rigorous protections, as the text of § 2 suggests, extend only to defeats experienced by voters 'on account of race or color.'" *LULAC, Council No. 4434*, 999 F.2d at 850.

173.    "The focus now, at the totality-of-circumstances stage, is on evidence of causation, which looks to 'why' voters cast their ballots for certain candidates. That is to say, 'what appears to be bloc voting on account of race [which is the inevitable result of satisfying the three *Gingles* preconditions], may, instead, be the result of political or personal affiliation of different racial groups with different candidates.'" *Ala. State Conf. of NAACP v. Ala.*, 612 F. Supp. 3d 1232, 1291 (M.D. Ala. 2020) (quoting *Solomon v. Liberty County Com'rs*, 221 F.3d 1218, 1225 (11th Cir.

2000).

174.    "The suggestion that Republican voters are galvanized by a 'white' or 'anti-minority' agenda is plausible only to the extent that the Democratic Party can be viewed as a vehicle for advancing distinctively minority interests, which clearly is not the case." *LULAC, No. 4434*, 999 F.2d at 861.

175.    If "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens, then there is no "legally significant" racially polarized voting under the third *Gingles* precondition. *LULAC, No. 4434*, 999 F.2d at 850. This is so because "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.'" *Id.* at 854 (quoting *Baird*, 976 F.2d at 361). Section 2 "is implicated only when Democrats lose because they are black, not where blacks lose because they are Democrats." *Id.* Here, the evidence "shows that divergent voting patterns among white and minority voters are best explained by partisan affiliation." *Id.* at 861.

176.    Dr. Alford's analysis of the same empirical data set forth by Dr. Handley concluding that it actually shows voter behavior being driven by partisan polarization rather than racial polarization is persuasive. His analysis persuades this Court that voter behavior is now marked by party affiliation more so than race. This Court concludes that based on this intensely local analysis of voter behavior in the areas of interest chosen by the Plaintiffs, Senate Factor 2 weighs in favor of the Defendants.

### e.   Senate Factor 3

#### (a) Findings of Fact

177.    Senate Factor 3 concerns the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions or

other voting practices or procedures that may enhance the opportunity for discrimination against the minority group. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

178.    The State Board of Election Commissioners (the "SBEC") includes the Governor, the Attorney General and the Secretary of State.  *See* MISS. CODE ANN. § 23-15-211. The SBEC meets to review the qualification of candidates to certify them to stand for election and approves the ballot for statewide elections. *Id.*  Beyond that, the SBEC has no other statutory role in or responsibility for conducting elections under Mississippi law.

179.    The Secretary of State is responsible for maintaining the Statewide Election Management System ("SEMS").  SEMS is an electronic database that houses election-related information, including the list of registered voters, their addresses, and their district assignments. Stip. ¶¶ 92.

180.    The Secretary of State trains the various local County Circuit Clerks and County Elections Commissioners on election-related laws and the functionality of SEMS.  The Circuit Clerks and Election Commissioners are elected officials.  Each county has one Circuit Clerk and five Election Commissioners.

181.    The Secretary of State's training for these county election officials includes instructions on how to update address libraries in SEMS when redistricting is done.  This includes presentations and materials throughout the year and at the annual Election Commissioners Association Meeting ("ECAM").

182.    Importantly, SEMS is a dynamic database that it is constantly being updated and changed.  It does not preserve snapshots of the past, but instead updates and overrides old information.

183.    Mississippi's voter file is constantly updated and replicates itself to the current date. In other words, one cannot access the file to review its records from a prior date in time. The file is only current and shows those registered voters as of the date it is accessed.

184.    The Secretary of State maintains a dynamic and interactive website that offers assistance to county election officials, including: (1) My Election Day guides for voters; (2) step-by-step absentee voting requirements; (3) Frequently Asked Questions regarding absentee voting; (4) a voter registration toolkit; and (5) a voter registration "lookup."

185.    The Secretary of State's official role in voter registration is limited to the maintenance of SEMS for use by the local county election commissioners.  But, the Secretary of State performs other services meant to encourage voter registration, including: (1) providing voter registration toolkits to be used in voter registration drives; (2) publishing an elections calendar with all relevant deadlines; (3) using social media to encourage voter registration; (4) conducting voter registration drives on college campuses, including the State's three Historically Black Colleges and Universities; (5) providing funding to counties from grants under the Help America Vote Act; and (6) providing funding to counties from grants under the Mississippi Voting Modernization Act.

186.    In Mississippi, elections are conducted at the county level rather than the state level. This has been described as a "bottom up" election system by the parties and experts.

187.    The phrase "bottom up" refers to a decentralized election process in which the local county election officials are responsible for conducting, implementing and certifying elections.

188.    Each county is responsible for maintaining and updating voter records, including where voters should vote based on their address.

189.    After redistricting occurs at the state, county or municipal level, each county is

responsible for updating those voter records.

190.    Neither the Secretary of State nor the SBEC has regulatory authority or responsibility over county officials in the performance of these responsibilities.

191.    After the Secretary of State creates an election in SEMS, it is the responsibility of these county officials to conduct the elections.  The County Election Commissioners are responsible for acquiring voting machines, printing ballots and operating polling precincts.

192.    The Secretary of State operates a Help Desk on election day to assist the county election officials in the event of a problem and to assist voters who need additional information about their proper precinct.

### (b) Conclusions of Law

193.    "The effects of multi-member districts are a moot question because the electoral districts for [the Legislature] are single member districts." *See Fordice*, 252 F.3d at 371. Also, "a majority vote requirement is not inherently discriminatory." *Id.* (quoting *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1409 (S.D. Miss. 1992), *aff'd* 994 F.2d 1143 (5th Cir. 1993)). Additionally, "Mississippi does not have anti-single shot voting provisions." *Magnolia Bar*, 793 F. Supp. at 1409.

194.    Mississippi does not have a majority vote requirement for legislative elections. There is no reason to believe Mississippi has voting practices or procedures that may enhance the opportunity for discrimination against minority groups. This factor weighs in favor of the Defendants.

### f.   Senate Factor 4

195.    The fourth Senate Factor concerns "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at

36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

196.    "There is no candidate slating process in Mississippi." *Magnolia Bar*, 793 F. Supp. at 1409. Therefore, this factor favors the Defendants.

### g.  Senate Factor 5

### (a) Findings of Fact

197.    Plaintiffs' counsel retained Dr. Byron D'Andra Orey to provide a report regarding Senate Factor 5 under the totality of the circumstances analysis for determining whether a Section 2 violation has occurred. [Orey Report, 11.14.23, PX-8, p. 1]. Senate Factor 5 concerns the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

198.    To first determine whether black Mississippians, as the minority group at issue, bear the effects of discrimination, Dr. Orey examined socioeconomic data in Mississippi comparing blacks and whites utilizing survey information from a single year—the 2021 American Community Survey (ACS). [PX-8, p. 4].

199.    The ACS is a self-reported survey conducted annually by the United States Census Bureau that provides information about our nation and its people. *Available at*, www.census.gov/programs-surveys/acs/about.html, last visited Feb. 7, 2024. Information from the survey generates data that help inform how federal funds are distributed each year. *Id.*

200.    In analyzing the socioeconomic data from the ACS, Dr. Orey prepared twelve (12) tables in efforts to demonstrate the socioeconomic disparities between blacks and whites in

Mississippi. [PX-8, pp. 4-17]. However, in ten (10) of the twelve (12) tables (Tables 1-5 and 8-12),[6] Dr. Orey relied exclusively on data collected by the ACS for only one year (2021) despite the ACS being conducted and available annually. *Id.*

201.    While Dr. Orey's socioeconomic tables appear to show disparities between blacks and whites in Mississippi in 2021, Dr. Orey is relying exclusively upon self-reported survey data to reach his conclusions. Furthermore, the significance of some of the data is questionable. For example, Table 9, entitled "No Vehicle", attempts to demonstrate that blacks in Mississippi are twice as likely to not own a car versus their white counterparts. [PX-8, pp. 13-14]. However, a review of the data demonstrates that 90% of blacks in Mississippi do, in fact, own a car compared to 95.2% of whites. *Id.*

202.    Additionally, Dr. Orey also analyzes felony disenfranchisement and political participation in Mississippi. [PX-8, pp. 18-20]. However, blacks and whites in Mississippi are both subject to the same felony disenfranchisement laws. *See Harness v. Watson*, 47 F.4th 296, 309-10 (5th Cir. 2022) (holding the felony disenfranchisement law was not motivated by discriminatory intent but was an attempt "to eliminate several objections contained in the then-recent findings of the Civil Rights Commission."). Further, Dr. Orey's Table 13, entitled "Suffrage Bills Introduced and Passed on Both Houses" is not broken down by race and provides no information as to whether blacks or whites are more successful in having their voting rights restored following a felony conviction. [PX-8, p. 20].

203.    Merely producing data from a single year of self-reported surveys in efforts to show socioeconomic disparities is not enough to satisfy the requirements of Senate Factor 5. The

---

[6] While Tables 6 and 7 do not rely on ACS data, they do rely on information from the Mississippi Department of Education from a single year—2023. [PX-8, pp. 9-10].

disparities must also establish a correlation or causation that hinders black Mississippians from participating effectively in the political process.

204.   Dr. Orey attempts to establish this correlation utilizing three separate methods to examine black voting turnout: (1) ecological inference (EI); (2) Bayesian Improved Surname Geocoding (BISG); and (3) Cooperative Election Survey (CES). [PX-8, pp. 21-25]. However, despite idiosyncrasies like weather, candidates, and policy issues that can affect turnout in elections differently, Dr. Orey only analyzed one election—the federal 2020 General Election—to prepare his turnout analysis. *Id.*

205.   Dr. Orey's EI analysis attempts to draw conclusions about individual turnout based on characteristics of the entire group that the individuals belong to. [PX-8, p. 22].  The purpose of EI is to estimate individual behavior when it is difficult or impractical to collect information from each personal individually. *Id.* While Dr. Orey's EI analysis shows a gap between black and white turnout in Mississippi it, again, is based solely on one federal election in 2020 for offices that are not the subjection of this litigation.

206.   Next, Dr. Orey conducted a BISG analysis of the 2020 election. BISG is a method used to predict a person's race or ethnicity by looking at their last name and where they live on a map. [PX-8, p. 23]. The BISG dataset was constructed utilizing a snapshot of the Mississippi voter file from June of 2022 to infer individuals' turnout in the 2020 general election—some 20 months prior. *Id.*

207.   As previously stated, Mississippi's voter file is constantly updated and replicates itself to the current date. In other words, one cannot access the file to review its records from a prior date in time. The file is only current and shows those registered voters as of the date it is accessed. Consequently, there were many voters that were on the voter file as registered voters and

turned out to vote in the 2020 election, but subsequently died, moved out of state, or were convicted of a felony and removed from Mississippi's voter file so that by the time Dr. Orey accessed the file in June of 2022, those individuals were not listed on the file despite having previously been on the voter file and voted in the 2020 election. Accordingly, as demonstrated by Defendants' expert Dr. Brunell, when compared to the official turnout numbers from the Mississippi Secretary of State for the 2020 election of 1,334,155, Dr. Orey was missing 70,765 voters in his BISG data set rendering it incomplete.  [Brunell Second Supp. Report, 12.6.23 p. 5].

208.    Additionally, Dr. Orey's BISG method contains no measures of uncertainty to ascertain whether the asserted turnout gap is statistically significant and meaningful. The most common p(robability)-value used for hypothesis testing in social sciences is 0.05 (or some value less than 0.05 such as 0.01). A p-value of 0.05 would indicate that the difference in sample means would only be observed by random chance 5 out of 100 times (or stated otherwise, one can be 95% confident that the observed difference in means is real and not due to sampling error). *See* Jack Levin and James Alan Fox. Elementary Statistics in Social Research, 9th ed.; Chava Frankfort-Nachmias and David Nachmias, Research Methods in the Social Sciences, 6th ed.

209.    Finally, Dr. Orey examined turnout by race estimates using the CES. [PX-8, p. 23]. The CES is a national survey administered by YouGov. *Id.* Dr. Orey, in explaining why he prefers the CES to other surveys, stated that it "includes verification of respondents' registration and voting behavior." [Orey Report, 11.22.23, PX-9, p. 2, ¶ 4].

210.    For Mississippi, the CES survey included 462 respondents, two of which were non-citizens and should be excluded. The CES also supplies weights that should be utilized to address issues with sampling that accompany surveys. Weights are often used to address where certain subpopulations may be under or over-sampled in the data. Thus, the CES Guidebook provides the

proper weighting measures to use when conducting sampling utilizing the CES. In fact, the authors of the CES Guidebook "recommend the use of [the weights] vvweight or vvweight_post any time researchers wish to characterize the opinions, behaviors, or <u>traits of voters or registered voters</u>." [Guide to the 2020 Cooperative Election Study, p. 16] (emphasis added).

211.    Survey data or estimates like the CES, as previously stated, should also be accompanied by tests of statistical significance at the 95% confident levels to determine the reliability of the estimates.  In fact, Dr. Orey admits that a p-value of <0.05 means that one can be 95% confident in the estimates and this is the "more stringently and more commonly" used threshold for tests of statistical significance. [PX-9, p.7, n.4].

212.    For the CES, Dr. Orey estimated turnout for all of Mississippi by counting black and white individuals (from the 460 respondents) whom YouGov validated as 2020 general election voters according to Mississippi's voter file, which yielded 441 observations and an approximate 14 point turnout gap between whites and blacks, as reflected in his Table 16. [PX-8, p. 25].

Table 16. Percent Turnout by Race 2020[59]

|  | Turnout | Observations |
|---|---|---|
| Blacks | 72.5% | 158 |
| Whites | 86.8% | 283 |

213.    However, while Dr. Orey utilized the proper weighting variable of "vv_weight" under the CES Guidebook to characterize the behavior of voters or registered voters for his analysis in Table 16, Dr. Orey failed to provide any measures of uncertainty or confidence intervals around his turnout analysis. *Id.*; *see also* [Orey Responsive Report, 11.22.23, p. 2, n.4]. In fact, as shown below, once tests of statistical significance were performed to Dr. Orey's Table 16 analysis by Dr.

Brunell in his Second Supplemental Expert Report of December 6, 2023, Dr. Orey's turnout analysis actually shows there is no significant relationship between race and turnout at the 95% confident level (i.e., p-val<0.05) regardless of whether "vvweight" or "vvweight_post" is used for the weighting. [Brunell Second Supp. Report, 12.6.23 p. 3 (Tables 3 and 4)] (emphasis added).

Table 3. Linear Regression: Turnout Without Non-Citizens Using "vvweight" for weighting

|          | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|----------|-------|-----------|--------|-------|--------|------|
| Black    | -.143 | .075      | -1.92  | 0.055 | -.290  | .003 |
| Constant | .868  | .032      | 26.79  | 0.000 | .804   | .932 |

N=278, ***p<.001, **p<.01, *p<.05

Table 4. Linear Regression: Turnout Without Non-Citizens Using "vvweight_post" for weighting

|          | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|----------|-------|-----------|--------|-------|--------|------|
| Black    | -.060 | .094      | -0.64  | 0.526 | -.245  | .126 |
| Constant | .820  | .052      | 15.69  | 0.000 | .717   | .923 |

N=227, ***p<.001, **p<.01, *p<.05

214.    Further, in his Responsive Report of November 22, 2023, Dr. Orey attempted to rectify his failure to produce measures of uncertainty for his CES analysis by running a statistical significance test on the two groups of voters: (1) turnout with non-citizens (Table 1), and (2) turnout without non-citizens (Table 2). [Orey Responsive Report, 11.22.23, pp. 3-5].

215.    Again, Dr. Orey's CES analysis fails. First, Dr. Orey's Table 1 in his Responsive Report should carry no weight as he includes non-citizens in his turnout analysis who cannot vote. *Id.* at 4. Second, once you exclude the non-citizens that cannot vote, as Dr. Orey does in his Table

2 of his Responsive Report, turnout and race is again not statistically significant at, in Dr. Orey's own words, the "more stringent and commonly" accepted 95% confidence level. *Id*. at 5 (Table 2); p. 4, n.7.

216.    Finally, and perhaps most critically, for both Tables 1 and 2, Dr. Orey inexplicably uses the improper weighting variable of "commonweight"[7] to weight his analysis instead of using "vvweight" (which he utilized for Table 16 in his 2nd Amended Report) or "vvweight_post"—the very weighting metrics recommended by the authors of the CES Guidebook to use when "characterizing the opinions, behaviors, or traits of voters or registered voters." [Guide to the 2020 Cooperative Election Study, p. 16].[8] And, the "opinions, behaviors, or traits of voters or registered voters" is the very reason why Dr. Orey chose to utilize the CES—because, in his own words, it "includes an independent verification of respondents' registration and voting behavior." [Orey Responsive Report, 11.22.23, p. 2, ¶ 4].]

217.    For clarity, regardless of whether you apply the proper weight of "vvweight" or "vvweight_post" to the turnout with non-citizens or to the turnout without non-citizens, Dr. Brunell demonstrates that there is no statistically significant relationship between turnout and race at the 95% confidence level:

---

[7] Commonweight is recommended any time "researchers wish to characterize the opinions and behaviors of adult Americans." [Guide to the 2020 Cooperative Election Study, p. 16].

[8] "Vvweight" and "vvweight_post" "are missing for all respondents who were not validated as (active) registered voters." [Guide to the 2020 Cooperative Election Study, p. 16].

Table 1. Linear Regression: Turnout With Non-Citizens Using "vvweight" for weighting

------------------------------------------------------------------------------

|  | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|---|---|---|---|---|---|---|
| Black | -.143 | .075 | -1.92 | 0.055 | -.290 | .003 |
| Constant | .868 | .032 | 26.79 | 0.000 | .804 | .931 |

N=278, ***p<.001, **p<.01, *p<.05

Table 2. Linear Regression: Turnout With Non-Citizens Using "vvweight_post" for weighting

---

| | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|---|---|---|---|---|---|---|
| Black | -.060 | .094 | -0.64 | 0.526 | -.245 | .126 |
| Constant | .820 | .052 | 15.69 | 0.000 | .717 | .923 |

N=227, ***p<.001, **p<.01, *p<.05

Table 3. Linear Regression: Turnout Without Non-Citizens Using "vvweight" for weighting

---

| | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|---|---|---|---|---|---|---|
| Black | -.143 | .075 | -1.92 | 0.055 | -.290 | .003 |
| Constant | .868 | .032 | 26.79 | 0.000 | .804 | .932 |

N=278, ***p<.001, **p<.01, *p<.05

Table 4. Linear Regression: Turnout Without Non-Citizens Using "vvweight_post" for weighting

---

| | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|---|---|---|---|---|---|---|
| Black | -.060 | .094 | -0.64 | 0.526 | -.245 | .126 |
| Constant | .820 | .052 | 15.69 | 0.000 | .717 | .923 |

N=227, ***p<.001, **p<.01, *p<.05

[Brunell Second Supp. Report, 12.6.23 p. 3 (Tables 1, 2, 3 and 4)] (emphasis added).

218.    In response to Dr. Orey's attempted efforts to demonstrate disparity in turnout in Mississippi based on one election year, the Defendants submitted evidence from the U.S. Census Bureau and the U.S. Department of Labor's Current Population Survey ("CPS") that provides close to 40 years of registration and turnout rates between blacks and whites in Mississippi.

According to the U.S. Census Bureau, the CPS is "one of the oldest, largest, and most well-recognized surveys in the United States. It is immensely important, providing information on many of the things that define us as individuals and as a society—our work, our earnings, and our education." Available at, https://www.census.gov/programs-surveys/cps/about.html (last accessed, Feb. 12, 2024) (referenced quotation appears at this link).

219.    The following summary table clearly shows an objective change in voter participation between black and white voters in Mississippi beginning in or around 2004. In every year since 2004, black voter registration and turnout in Mississippi have exceeded or been at parity with white voter registration and turnout.

| Political Participation by Race, Mississippi Since 1986 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Voter Registration (Persons 18+) | | | | Voter Turnout (Persons 18+) | | | |
| Year | % White (NH) | % Black (AP) | Black minus White | Year | % White (NH) | % Black (AP) | Black minus White |
| 1986 | 77.3% | 75.9% | -1.4% | 1986 | 45.8% | 40.2% | -5.6% |
| 1988 | 80.5% | 74.2% | -6.3% | 1988 | 64.2% | 60.3% | -3.9% |
| 1990 | 70.8% | 71.4% | 0.6% | 1990 | 35.8% | 32.5% | -3.3% |
| 1992 | 80.2% | 78.5% | -1.7% | 1992 | 69.4% | 61.9% | -7.5% |
| 1994 | 74.6% | 69.9% | -4.7% | 1994 | 46.2% | 41.7% | -4.5% |
| 1996 | 75.0% | 67.4% | -7.6% | 1996 | 59.3% | 48.8% | -10.5% |
| Voter Registration (Citizens 18+) | | | | Voter Turnout (Citizens 18+) | | | |
| 1998 | 75.8% | 71.3% | -4.5% | 1998 | 41.1% | 40.4% | -0.7% |
| 2000 | 72.6% | 73.7% | 1.1% | 2000 | 61.9% | 58.5% | -3.4% |
| 2002 | 72.1% | 67.9% | -4.2% | 2002 | 44.6% | 40.2% | -4.4% |
| 2004 | 73.6% | 76.2% | 2.6% | 2004 | 60.0% | 66.6% | 6.6% |
| 2006 | 71.0% | 72.2% | 1.2% | 2006 | 39.9% | 50.5% | 10.6% |
| 2008 | 75.0% | 81.9% | 6.9% | 2008 | 68.4% | 73.1% | 4.7% |
| 2010 | 74.2% | 73.6% | -0.6% | 2010 | 47.7% | 48.1% | 0.4% |
| 2012 | 82.4% | 90.8% | 8.4% | 2012 | 71.8% | 82.7% | 10.9% |
| 2014 | 72.8% | 83.2% | 10.4% | 2014 | 40.3% | 46.6% | 6.3% |
| 2016 | 78.8% | 81.3% | 2.5% | 2016 | 67.7% | 69.2% | 1.5% |
| 2018 | 71.8% | 77.9% | 6.1% | 2018 | 51.7% | 59.8% | 8.1% |
| 2020 | 79.2% | 83.4% | 4.2% | 2020 | 69.8% | 72.9% | 3.1% |
| 2022 | 74.3% | 72.2% | -2.1% | 2022 | 47.6% | 47.0% | -0.6% |

*See* [Dkt. # 188, Ex. T].

### (b) Conclusions of Law

220.    Senate Factor 5 concerns the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

221.    Notwithstanding past discrimination and socioeconomic disparities, Plaintiffs must prove "that minority voters *in this case* failed to participate equally in the political process." *LULAC v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993) (emphasis in original).

222.    "Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote." *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992).

223.    In 2015, this Court found that African American citizens in the City of Hattiesburg "participate in the political process at the same or higher levels [as the City's other citizens]." *Fairley*, 122 F. Supp. 3d at 569.

224.    Plaintiffs offered the expert opinion of Dr. Orey regarding socioeconomic disparities between whites and blacks in Mississippi in an effort to establish a correlation between black Mississippians bearing the effects of discrimination and their corresponding inability to participate effectively in the political process. Plaintiffs have proven neither half of the correlation.

225.    Dr. Orey's socioeconomic data is based only on the 2021 ACS—one year of self-reported surveys. Additionally, Dr. Orey's turnout analysis suffers from the same limited sample size—one federal election in 2020. We also have serious doubts about the efficacy of Dr. Orey's BISG analysis that is missing over 70,000 voters and fails to include measures of uncertainty, coupled with his CES analysis that is riddled with inconsistencies in using the wrong weighting

variable (after initially correctly using it) and the clear lack of race and turnout showing statistical significance at the commonly accepted 95% confidence level.

226.    Furthermore, the above must be weighed in the balance of almost 40 years of CPS data from the United States Census Bureau and Department of Labor that shows a continual trend in the past 20 years of black registration and turnout in Mississippi exceeding that of white or, at worst, on parity. *See Shelby Co.*, 570 U.S. at 535 (holding "Census Bureau data indicate that African-American voter turnout has come to exceed white voter turnout.").

227.    "'[P]roof of socioeconomic disparities and a history of discrimination without more' does not demonstrate that a group of citizens has less opportunity to participate in the political process." *Fairley v. Hattiesburg, Miss.*, 662 F. App'x 291, 298 (5th Cir. 2016) (quoting *Clark*, 88 F.3d at 1399).

228.    "Testimony regarding depressed political participation relevant to a local election must be grounded in a *local* appraisal of the facts." *Fairley*, 662 F. App'x. at 298 (citing *Fordice*, 252 F.3d at 368). "[T]o support a favorable finding on [whether socioeconomic disparity hampers the ability of minorities to participate], [the plaintiff bears] the burden to demonstrate that the African-American citizens of Mississippi 'do not in fact participate to the same extent as other citizens.'" *Fordice*, 252 F.3d at 368 (quoting *LULAC, No. 4434*, 999 F.2d at 866).

229.    The Court is not required to accept the testimony of Dr. Orey. *See LULAC, No. 4434*, 999 F.2d at 867-68. Plaintiffs' evidence on the "effects of past discrimination" was not "proof that minority voters *in this case* failed to participate equally in the political processes." *Fairley*, 662 Fed. App'x. at 298.

230.    Plaintiffs have failed to produce sufficient evidence establishing that any socioeconomic disparities which exist between blacks and whites has actually hindered the ability

of black citizens to participate effectively in the political process. Mississippi has now reached a point in its history where black voter registration and turnout is essentially at parity.  Accordingly, Senate Factor 5 weighs in favor of the Defendants.

### h.  Senate Factor 7

#### (a) Findings of Fact

231.    Senate Factor 7 concerns the extent to which members of the minority group have been elected to public office in the jurisdiction. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

232.    Plaintiffs' expert Dr. King claims black candidates in Mississippi face substantial barriers to political office outside of majority-black districts. But "Mississippi has the largest number of blacks serving in the legislature and currently leads the nation in the number of black elected officials." "Evolution and Devolution of the Voting Rights Act? Black Descriptive and Substantive Representation" In <u>Minority Voting in the United States.</u> August 2015. Editors: Kyle Kreider and Thomas Balidino (Praeger). Byron D'Andra Orey, Gloria Billingsly and Athena King. "Over the years, Mississippi has consistently possessed the largest percentage of black state legislators in the country." *Id.* Plaintiffs' own expert, Dr. Orey made these findings and lists this professional publication on his Curriculum Vitae. [PX-8, Appx. 1, p. 6].

233.    Dr. Brunell testified that Mississippi is among the states with the highest number of black elected officials. As of 2015, Mississippi elected more black officials at all levels of government than any other state.

#### (b) Conclusions of Law

234.    "[T]here have been 'significant increases in the number of African-Americans serving in elected offices'; more specifically there has been approximately a 1,000 percent increase

since 1965 in the number of African-American elected officials in the six States originally covered by the Voting Rights Act." *Shelby County*, 570 U.S. at 547 (quoting H.R. Rep. 109-478, at 18 (2006), 2006 U.S.C.C.A.N. 618, 527).

235.    This Court concludes that Mississippi elects if not the highest, among the highest, number of black public officials of any state. Accordingly, Senate Factor 7 weighs in favor of Defendants.

### i.    Senate Factor 8

### (a) Findings of Fact

236.    Senate Factor 8 concerns whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

237.    Although both chambers of the Mississippi Legislature are controlled by Republicans, there are numerous Democrat committee chairs in both chambers that have been appointed by Republican leadership.

238.    Democrat Senator Juan Barnett of SD 34, who is black, is Chairman of the Corrections Committee of the Mississippi State Senate.

239.    Democrat Senator Simmons of SD 12, who is black, is Chairman of the County Affairs Committee of the Mississippi State Senate.

240.    Democrat Senator Angela Turner-Ford of SD 16, who is black, is Chairman of the Drug Policy Committee of the Mississippi State Senate.

241.    Democrat Senator David Jordan of SD 24, who is black, is Chairman of the Enrolled Bills Committee of the Mississippi State Senate.

242.     Democrat Senator Sollie B. Norwood of SD 28, who is black, is Chairman of the Executive Contingent Fund Committee of the Mississippi State Senate.

243.     Democrat Senator David Blount of SD 29, who is white, is Chairman of the Gaming Committee of the Mississippi State Senate.

244.     Democrat Senator John Horhn of SD 26, who is black, is Chairman of the Housing Committee of the Mississippi State Senate.

245.     Democrat Senator Hillman Frazier of SD 27, who is black, is Chairman of the Interstate and Federal Cooperation Committee of the Mississippi State Senate.

246.     Democrat Senator Albert Butler of SD 37, who is black, is Chairman of the Investigate State Offices Committee of the Mississippi State Senate.

247.     Democrat Senator Hob Bryan of SD 7, who is white, is Chairman of the Public Health and Welfare Committee of the Mississippi State Senate.

248.     Democrat Representative Carl Mickens of HD 42, who is black, is Chairman of the Housing Committee of the Mississippi House of Representatives.

249.     Democrat Representative Cedric Burnett of HD 9, who is black, is Chairman of the Interstate Cooperation Committee of the Mississippi House of Representatives.

250.     Democrat Representative Karl Gibbs of HD 36, who is black, is Chairman of the State Library Committee of the Mississippi House of Representatives.

251.     Democrat Representative Otis Anthony of HD 31, who is black, is Chairman of the Youth and Family Affairs Committee of the Mississippi House of Representatives.

252.     As stated, *supra*, an amendment to JR 1 was proposed to unpair two incumbents. This amendment was made in agreement with two black Democrat Representatives—Earle Banks of HD 67 and Zakiya Summers of HD 68—to unpair these incumbents into separate districts and

was adopted by voice vote. [JE-10, p. 31, ¶¶ 20-24].

### (b) Conclusions of Law

253.     In applying this factor, the Fifth Circuit has cautioned that "responsiveness cannot be weighed in the abstract" and that "[r]esponsiveness, like many things, is a question of both kind and degree." *Clark*, 88 F.3d at 1401.

254.     Plaintiffs did not introduce any evidence regarding the responsiveness of elected officials to the particularized needs to prove Senate Factor 8. There is no reason to believe that elected officials are unresponsive to the needs of members of the minority group.

255.     The evidence is insufficient to establish that there is a significant lack of representation on the part of elected officials to the particularized needs of the members of the minority group. Accordingly, Senate Factor 8 weighs in favor of Defendants.

### j.   Senate Factor 9

### (a) Findings of Fact

256.     Senate Factor 9 concerns "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

257.     In drafting the redistricting plan, the Standing Joint Committee avoided presumptively unconstitutional race-based redistricting, and it retained the cores of existing districts. These policies are not tenuous.

258.     Compliance with the United States Constitution—and therefore, federal law—cannot be a "tenuous" policy interest. *See Terrazas v. Clements*, 581 F. Supp. 1329, 1357 (N.D. Tex. 1984) ("We cannot conclude that compliance with federal constitutional and statutory

standards are only tenuously related to the district lines as drawn.").

259.     On March 29, Chairman Beckett explained the process the Standing Joint Committee utilized in adopting the redistricting plans. The Chairman explained the factors the Committee considered when drafting the plans included One Person, One Vote, contiguity of the districts, political performance, and compliance with all state and federal laws—such as Section 2 of the Voting Rights Act, compactness, minimalization of county and precinct splits. [JE-10, pp. 8-14].

260.     The Chairman signaled significant shifts in population throughout the state necessitated the collapse of two districts to be moved to the areas with the largest increases in population. [JE-10 pp. 11-14].

261.     Accordingly, HD 20 was moved to DeSoto County and District 33 was redrawn on the Coast to accommodate the significant population growth in those areas. *Id.* at pp. 11-12.

262.     Minority Leader Robert Johnson introduced an amendment to the House Redistricting Plan. *Id.* at pp. 18, 32.

263.     Minority Leader Johnson's proposed amendment added five more majority-minority districts and in 10 districts increased the African American "participation." *Id.* at 34.

264.     Minority Leader Johnson admitted that the amended map was not shared with anyone until the amendment was introduced on the floor. *Id.* at 36.

265.     Speaker Pro Tem Jason White—now Speaker White—questioned Minority Leader Johnson as to the mapdrawers' processes. *Id.* at 42-46.

266.     Specifically, Speaker White asked "did you have a goal when you sat down to draw the plan?" To which Representative Johnson responded: "Yeah, to get as many African American districts as we could get. . . . We can make your district an African American [district]. You can

get black folks to vote for you." *Id.* at p. 44, ¶¶ 5-16.

267.    Speaker White also asked "Was a heat map used?" *Id.* at p. 43, ¶ 15. Minority

Leader Johnson replied: "Absolutely." *Id.* at ¶ 19.

268.    Ultimately, Minority Leader Johnson's amendment failed. *Id.* at ¶¶ 20-21.

269.    Defendants presented extensive evidence regarding the drawing process of the

Enacted Plans that supports a finding that the process used and justifications for the creation of the

districts was not tenuous.

270.    A review of the Enacted Plans demonstrates an effort to comply with Section 2, a

lack of any evidence of packing voters in districts, and a partisan focus on the mapdrawing process,

which is permissible.

### (b) Conclusions of Law

271.    "Under our cases, the States retain a flexibility that federal courts enforcing § 2

lack, both insofar as they may avoid strict scrutiny altogether by respecting their own traditional

districting principles, and insofar as deference is due to their reasonable fears of, and to their

reasonable efforts to avoid, § 2 liability." *Vera*, 517 U.S. at 978.

272.    Thus, considering the entirety of the evidence regarding the justifications of the

plan, the Court finds this factor weighs heavily in favor of the Defendants because the justifications

are not tenuous. The Standing Joint Committee engaged in an extensive process to comply with

Section 2 in an area where it has extensive authority to do so and had partisan motives unlike the

racial motives presented by the Democrats in Minority Leader Johnson's proposed amended plan.

In light of the requirement of presumption of legislative good faith, *Abbott*, 138 S.Ct. at 2324, and

the evidence presented, the Court concludes that the justifications of the Enacted Plans are not

tenuous.

## VI.   __Racial Predominance Claim__

### 1.   General Law

273.    "The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans. It prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper*, 137 S.Ct. at 1463 (quoting *Bethune-Hill*, 580 U.S. at 187). "When a voter sues state officials for drawing . . . race-based lines, … the plaintiff must prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 137 S.Ct. at 1463. "The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 580 U.S. at 189-90.

274.    "[U]ntil a claimant makes a showing sufficient to support th[e] allegation" of "race-based decision-making," "the good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 915. "[T]he burden of proof lies with the challenger, not the State." *Abbott*, 138 S.Ct. at 2324. "This rule takes on special significance in districting cases." *Id.*

275.    "The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. '[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.'" *Abbott*, 138 S.Ct. at 2324 (quoting *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980)). The "ultimate question remains whether a discriminatory intent has been proved in a given case." *Id.* "The 'historical background' of a legislative enactment is 'one evidentiary source' relevant to the question of intent." *Id.* (quoting *Vil. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267

(1977)). "But we have never suggested that past discrimination flips the evidentiary burden on its head." *Abbott*, 138 S.Ct. at 2325.

276.    The Supreme Court has affirmed findings that the lines of a district violate the Equal Protection Clause only where the record contains direct evidence of racially discriminatory intent.  *Abbott v. Perez*, 138 S. Ct. 2305, 2334 (2018); *Cooper*, 137 S.Ct. at 1474–77; *Shaw*, 517 U.S. at 905-06;  *Vera*, 517 U.S. at 960-61 (Opinion of O'Connor, J.); *Miller*, 515 U.S. at 917-18.

### a.  Findings of Fact

277.    Plaintiffs' counsel retained Dr. Jordan Ragusa to opine on whether and to what extent race was a factor in the design of House Districts (HD) 22, 34 and 64 and Senate Districts (SD) 2 and 48. [Ragusa Report, 8.28.23, PX-5, p. 4].

278.    In the prior election cycle leading up to the redistricting in 2022, the incumbent for HD 34 switched from the Democrat Party to the Republican Party.

279.    In the prior election cycle leading up to the redistricting in 2022, the incumbent for HD 22 switched from the Democrat Party to the Republican Party.

280.    In the prior election cycle leading up to the redistricting in 2022, the incumbent for HD 64 switched from the Democrat Party to Independent.

281.    The districts challenged by the Plaintiffs as racial gerrymanders have the following benchmark and enacted APBVAP:

|       | Benchmark APBVAP | Enacted APBVAP | Difference |
|-------|------------------|----------------|------------|
| **SD2**  | 39.64% | 32.88% | 6.76% |
| **SD48** | 36.33% | 29.40% | 6.93% |
| **HD22** | 37.04% | 29.86% | 7.18% |

| | | | |
|-------|--------|--------|---------|
| **HD34** | 60.49% | 31.55% | 28.94% |
| **HD64** | 37.93% | 30.99% | 6.94% |

[Amended Brunell Report, pp. 4-5]

282.    Dr. Ragusa has never authored a peer-reviewed article on redistricting.

283.    Dr. Ragusa has never authored a peer-reviewed article on racial gerrymandering.

284.    Dr. Ragusa has never presented at conferences or seminars on the topics of redistricting or racial gerrymandering.

285.    Dr. Ragusa has not taught a class specifically on redistricting or racial gerrymandering.

286.    Dr. Ragusa has never worked as a consultant or represented a governmental body to draw redistricting maps or plans.

287.    Prior to this case, Dr. Ragusa has only employed his county envelope theory as an expert in one other case.[9]

288.    In performing his analysis, Dr. Ragusa conducted a multivariate analysis that attempted to examine the movements of voters between districts by the Enacted Plan. *Id*. at 5. In this analysis, Dr. Ragusa considered only four variables by census block that he presumed were the most likely considered by the mapdrawers in efforts to determine whether race was a significant factor in the composition of the challenged districts: (1) BVAP; (2) Trump 2020 vote to measure partisan politics for partisan gerrymandering (Trump Vote); (3) Total VAP; and (4) Border Block—which is those blocks on the border of the benchmark district. *Id*. at 8-9.

289.    Dr. Ragusa admitted he does not and cannot know all the variables considered by the mapdrawers in drawing the challenged districts—he can only guess as to which variables were most likely considered. Nevertheless, Dr. Ragusa did not review the criteria adopted by the State of Mississippi, which included a requirement that each district should be within +/- 5% deviation of the ideal district size—a variable that could have been included in the models as certainly considered by the mapdrawers when drawing the challenged districts.

290.    In fact, nowhere did Dr. Ragusa conclude that race was the predominant factor in drawing the districts. He did not use the word "predominance" in any of his reports.

291.    Dr. Ragusa's analysis includes three models for each district based around the inclusion or exclusion of a block in the Enacted Plan. Two of these models include a concept called the "county envelope" whereby all blocks outside the benchmark district but within the same

---

[9]Dr. Ragusa was hired by plaintiffs in *South Carolina State Conf. of NAACP v. Alexander*, 649 F. Supp. 3d 177 (D.S.C. 2023), in a racial gerrymandering suit. This was the first time Dr. Ragusa has been qualified as an expert and the first time he utilized his "county envelope" methodology that is also used in this case. Of note, *South Carolina State Conf. of NAACP v. Alexander* is on appeal to the United States Supreme Court whereby Dr. Ragusa's methodology is being questioned.

county or counties of the benchmark district are considered as equally likely to be included or excluded within the newly enacted district. *Id.* at 6; *see also* [Amended Brunell Report, p. 6].

292.   Defendants' expert, Dr. Brunell, criticizes Dr. Ragusa's county envelope methodology as to purely speculating what the mapdrawers may or may not have considered. [Amended Brunell Report, p. 6].  Dr. Brunell asserts that Dr. Ragusa's county envelope method is over-inclusive by including blocks at the far end of a populous county as just as likely to be included in the enacted district even though doing so could make the district non-contiguous. *Id.* at 6-7. Likewise, Dr. Brunell asserts that the county envelope model is underinclusive by not considering counties adjacent to the benchmark districts that very well may have been considered by the mapdrawers when drawing the new districts. *Id.* This is evident by the fact that over 30 districts changed county composition in the redistricting of Mississippi. *Id.* at 6. Further, it is unknown for how many other districts the mapdrawers considered changing the county composition. *Id.* at 6-7.

293.   To explain how he determined that race was considered a significant factor in the drawing of each challenged district, Dr. Ragusa states: "[i]n the analysis, the BVAP variable will be statistically insignificant if race does not reliably predict how the district lines were reconfigured. In other words, an insignificant BVAP variable would be an inclusive result on the question of racial gerrymandering. Alternatively, a significant BVAP variable would indicate that the racial composition of a block was a reliable predictor of its district assignment under the Enacted Plan. A statistically significant BVAP would therefore constitute evidence of racial gerrymandering." [PX-5, p. 8].

294.   As a result, Dr. Ragusa prepared 15 models (3 for each district at issue) in efforts to determine whether race was a significant factor in the five challenged districts. *Id.* at 30-31.

While Dr. Ragusa concluded that race was a significant factor for each of the districts, his own models coupled with a failure to conduct a substantive significance test for the Trump Vote say otherwise.

295.   In the 15 models:

a.      BVAP and the Trump Vote were significant in 7;

b.      BVAP was not significant, but the Trump Vote was significant in 5;

c.      BVAP was significant, but the Trump Vote was not significant in 2; and

d.      Neither BVAP nor the Trump Vote was significant in 1.

296.   A variable may be statistically significant, but substantively insignificant. Or, in other words, the statistically significant variable may have very little impact on the analysis. That is why a substantive significance test should be performed on those variables that are statistically significant. While Dr. Ragusa performed a substantive significance test for BVAP, he inexplicably failed to do so for the Trump Vote thereby leaving devoid any determination of which variable had a greater effect or was more important on the drawing of the districts.

297.   As a result, HD 22, HD34 and SD 2 have no models that demonstrate that the BVAP variable (i.e., race) had a bigger impact or was more important that the Trump Vote (i.e., party). [PX-5, pp. 30-31].

298.   The remaining two districts, HD 64 and SD 48, each had only one model where BVAP was significant and the Trump Vote was not. *Id.*

299.   Accordingly, Dr. Ragusa's substantive significance test for HD 64 revealed that a block with a 0% BVAP had an approximate 7% chance of being moved in or kept in HD 64 compared to a block with a 100% BVAP with an approximate 3% chance of being moved in or kept in the district—a total change of a mere 4%. *Id.* at 18.

300.     Notwithstanding Dr. Ragusa's models' statistical infirmities, his models also do not consider traditional redistricting criteria for the districts as a whole, nor do they compare the districts to other unchallenged districts in the plan to determine any telling deviations.

301.     Furthermore, Dr. Ragusa's robustness checks to counter Dr. Brunell's claims of over or under-inclusiveness for the county envelope method, continue to reinforce the flaws in such method by artificially limiting the ability of the mapdrawers by restricting the manner in which the districts can be drawn. HD 22 is the example. In the Enacted Plan, the mapdrawers moved HD 22 east into Monroe County and removed some blocks in Pontotoc and Chickasaw Counties, while keeping others from the Benchmark. [Ragusa Amended Rebuttal, 11.27.23, p. 10]. Dr. Ragusa's robustness checks include these counties in the county envelope from which were possible areas that the mapdrawers considered. *Id.* However, Dr. Ragusa failed to include Calhoun County, directly to the west of HD 22, in any of his robustness checks as a county of possible consideration by the mapdrawers despite it being directly adjacent to HD 22.

302.     Finally, Dr. Ragusa presented no alternative maps to disentangle race from party to demonstrate that the challenged districts are not merely a product of partisan politics.

### b.  Conclusions of Law

303.     "The courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." *Miller*, 515 U.S. at 915–16; (citing *Shaw v. Reno*, 509 U.S. 630, 646 (1993)).

304.     Plaintiffs bear a "demanding" burden to prove their racial gerrymandering claim. *Cooper*, 137 S.Ct. 1479 (quoting *e.g., Cromartie II*, 532 U.S. at 241).

305.    To carry this burden, Plaintiffs "must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper*, 137 S.Ct. at 1463 (quoting *Miller*, 515 U.S. at 916).

306.    This requires Plaintiffs to prove that race was the Legislature's "dominant and controlling consideration," *Shaw*, 517 U.S. at 905, such that the Legislature "subordinated" race-neutral districting principles to "racial considerations." *Cooper*, 137 S.Ct. at 1463-64 (quoting *Miller*, 515 U.S. at 916).

307.    Here, the only proof offered by Plaintiffs of a racial gerrymander is circumstantial, consisting of a report and opinion by Dr. Jordan Ragusa applying his "county envelope" method. Dr. Ragusa cannot conclude that race predominated in the drawing of the challenged districts because he simply does not know what was considered by the mapdrawers. Further, Dr. Ragusa's models do not take into account traditional redistricting principles at the district level, nor does he make any comparisons of the challenged district to the other unchallenged districts in the plans, as one would expect under *Miller* and its progeny. *See Miller*, 515 U.S. at 916-17. Dr. Ragusa's methodology is flawed and unreliable to establish the necessary elements for racial predominance.

308.    It is the Plaintiffs' burden to prove their racial gerrymander claims and to disentangle race from political affiliation. *See Cooper*, 137 S.Ct. at 1473. In 12 of Dr. Ragusa's 15 models, the Trump Vote –or the variable measuring partisan politics that could explain the districts' composition—shows up as statistically significant either by itself (5 models) or in conjunction with the BVAP variable (7 models). For the 7 models where BVAP and the Trump Vote are statistically significant, a substantive significance test should also be performed to determine which variable—BVAP or the Trump Vote—was more important or had a greater effect. Or, in this case, which one predominated. However, while Dr. Ragusa performed a

substantive significance test for BVAP, he inexplicably failed to do one for the Trump Vote. If nothing else, in no less than 13 of the 15 models or 87% of the time, Dr. Ragusa methodology tells us that the challenged districts could just as much be the result of partisan politics than anything else.

309.   "[W]here racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles. That party must also show that those districting alternatives would have brought about significantly greater racial balance." *Cromartie II*, 532 U.S. at 258.

310.   So, Plaintiffs must "disentangle race from politics and prove that the former drove a district's lines." *Cooper*, 137 S.Ct. at 1473.

311.   Accordingly, Plaintiffs "need an alternative map" where, as here, they "rely on evidence of forgone alternatives—only maps of that kind could carry the day." *Cooper*, 137 S.Ct. at 1481 (citing *Cromartie II*, 532 U.S. at 258).

312.   Dr. Ragusa's circumstantial evidence is flawed and unreliable.   And, under *Cromartie* and its progeny, Plaintiffs failed to present alternative maps to demonstrate that it was race, not party, that drove the creation of the challenged districts. The Plaintiffs have failed to meet their burden to carry their racial gerrymandering claims in any of the five challenged districts.

## VII.   Evidentiary Issues

313.   Section 2(b) of the Voting Rights Act requires the Court to consider "the totality of circumstances" in considering the legality of a voting standard, practice, or procedure. Construing the statute consistently with FED. R. EVID. 401, this Court may consider only those circumstances which have a tendency to make a fact more or less probable than it would be without the evidence

in determining the ultimate issue under § 2, which is whether the challenged legislative district lines result in rendering the political processes leading to nomination or election to the Legislature not equally open to participation of a class citizens protected by § 2(a) in that its members have less opportunity than other members of the electorate to participate in the electoral process and elect representatives of their choice.

314.    Plaintiffs' proffered experts have testified that the admissibility of much of their evidence is governed by a report of the majority of the Senate Judiciary Committee on the 1982 amendments to the Voting Rights Act. S. Rep. No. 97-417, 97th Cong. 2d Sess. 1982, 1982 U.S.C.C.A.N. 177. This Court may refer to that report in its deliberations, but a committee report is not law. Rule 401 is law.

315.    To the extent that this Court might rely on the Senate Report, it provides that plaintiffs may prove "disproportionate educational employment, income level and living conditions arising from past discrimination" as an explanation "where the level of black participation is depressed." *Id.,* at 29 n.114. Proof of depressed levels of black participation in the challenged districts is a prerequisite to the admission of evidence purporting to explain that depressed participation.

316.    Plaintiffs argue that defendants have waived the right to object to the admission into evidence of all of the reports of their proffered experts for failure to file a motion challenging those experts.  Nothing in the Local Rules or any order of this Court justifies such a result.  Rule 7(b)(11) provides, "Any nondispositive motion served beyond the motion deadline imposed in the Case Management Order may be denied solely because the motion is not timely served."  This Court's orders of May 26 and June 23, 2023, contain no deadline for motions concerning experts. *Hamburger v. State Farm Mut. Auto Ins. Co.*, 361 F.3d 875, 877 (5th Cir. 2004), which addressed

the Court's authority to enforce a pretrial order entered under FED. R. CIV. P. 16(e), does not apply here because no order of any kind has been issued on this subject. By the same token, the standards for amending the scheduling order set forth in *Squyres v. Heico Companies, L.L.C.* 782 F.3d 224, 237 (5th Cir. 2015), do not apply here because there is no order to amend.

317.    Nor is admission of these reports supported by Rule 7(b)(2)(D), which provides, "Unless otherwise ordered by the Case Management Order, all case-dispositive motions and motions challenging an opposing party's expert must be filed no later than fourteen calendar days after the discovery deadline." This rule on its face governs the filing of motions, and it does not state that the failure to file a motion before trial precludes the assertion of those positions at trial. Even where a party does not file "case-dispositive motions" before trial, that party retains the right to move for a directed verdict at trial. "[M]otions challenging an opposing party's expert" should be treated exactly like the "case-dispositive motions" mentioned in the same sentence. Because, under the doctrine of noscitur a sociis, the two types of motions must be treated exactly alike, the failure to file a pretrial motion "challenging another party's expert" does not preclude the adverse party from challenging that expert's testimony at trial.

318.    The only provision of the Local Rules which mentions waiver is Rule 26(a)(3), which provides in relevant part: "Challenges as to inadequate disclosure of expert witness(es) must be made no later than thirty days before the discovery deadline or will be deemed waived." No defendant has objected or could have objected that the three reports by Professor King and Luckett comprising 112 pages inadequately disclose the evidence they hope to present. The absence of such a motion does not entitle plaintiffs to admit the reports in their entirety without having to establish admissibility under Rules 401, 403 and 702.

319.   The Fifth Circuit does not appear directly to have addressed whether objections to expert testimony can be entertained at trial in the absence of a pretrial motion.  However, it did consider that factual situation in the unreported and therefore nonprecedential decision of *United States v. Bates*, 240 F.3d 1073, 2000 WL 1835092 (5th Cir. 2000).  There, defendant had filed a motion challenging the expert, but then withdrew it.  *Id*, at *3.  On cross-examination at trial, defendant's attorney "asked the government's expert witness about the scientific reliability of handwriting analysis," but the Court told him that it was too late to raise the issue.  *Id.*, at *3 & n.2.  The Fifth Circuit explained that the District Court nevertheless had an obligation to determine the admissibility of expert evidence:

However, the trial court has no discretion to abandon its role as gatekeeper.  *See* [*Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167,] 1179 [(1999)]  (Scalia, concurring). When a party objects to an expert's testimony, the court "must adequately demonstrate by specific findings on the record that it has performed its duty … ."  *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).

2000 WL 1835092 at *3.  *Accord, Vargas v. Lee*, 317 F.3d 498, 501 n.4 (5th Cir. 2003) (notwithstanding the late filing of the motion, the trial court had to apply "the evidentiary standard for the admission of the expert testimony under Rule 702").  The Court in *Bates* ruled that the defendant had waived his objection, not because he withdrew his motion before trial, but because he "passed the witness" without "object[ing] to the admission of the evidence." 2000 WL 1835092 at *3.  Other Courts of Appeals have declared that "the appropriate time to raise *Daubert* challenges is at trial," *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996), and that "an objection during trial," *Goebel*, 215 F.3d at 1087, will suffice.  *Goebel* recognizes that a District Court may prescribe a different procedure, *id.*, but this Court has not done so.  Here, although there was no pretrial motion, the Republican Party has properly objected to the reception of expert reports into evidence and to particular aspects of expert testimony at trial.

320.     Particularly under the expedited circumstances of this litigation, which plaintiffs sought, plaintiffs suffer no prejudice by having to establish at trial the admissibility of their proffered expert evidence.  Although Local Rule 7(b)(2)(D) states that such motions, if filed, should be filed "no later than fourteen calendar days after the discovery deadline," here, because of repeated extensions, discovery was not complete until January 12, 2024.  The Republican Party announced its objections in open court thirteen days later, on January 25, 2024.  Up to that point, plaintiffs had no basis for assuming that their reports would be accepted into evidence without objection.

321.     Plaintiffs identify no rule or controlling authority which permits the admission into evidence of an entire expert report under any circumstances. FED. R. EVID. 702 governs the admission of expert testimony, not expert reports. According to the Advisory Committee notes accompanying the 1983 amendment, the purpose of the expert report requirement in FED. R. CIV. P. 26(a)(2)(B) is so "that opposing parties have a reasonable opportunity to prepare for effective cross examination." An opposing party cannot cross-examine a report. The only recourse would be to interrogate the author of an admitted report line by line on its contents. This hardly seems calculated "to secure the just, speedy, and inexpensive determination of every action" as required by FED. R. CIV. P. 1. It is far preferable that the proffering party to question the expert consistent with the relevance requirement of Rule 401 and the limitation on cumulative testimony under FED. R. CIV. P. 403 so that the opposing party need only cross-examine the witness on evidence found admissible.

**VIII.    Remedy**

322.     There is no need for any remedy.  The Enacted 2022 House Plan and the Enacted 2022 Senate Plan are constitutional and enforceable.

323.    In the event the Court determines that one or more House or Senate districts constitutes a violation of Section 2 of the Voting Rights Act or of the Fourteenth Amendment, this Court should afford the State Legislature a reasonable opportunity to cure by drawing new district maps.  *See, e.g., Smith v. Clark*, 189 F. Supp. 2d 503, 507 (S.D. Miss. 2022); *Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022), *cert. granted before judgment*, 142 S.Ct. 2892 (2022), and *cert. dismissed as improvidently granted*, 143 S.Ct. 2654 (2023), and *vacated and remanded*, 86 F.4th 574 (5th Cir. 2023) (citing *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978)).

324.    This Court is not required to order a special election.  Instead, ordering a special election involves an "equitable weighing process" taking into account "what is necessary, what is fair, and what is workable."  *North Carolina v. Covington*, 581 U.S. 486, 488 (2017).

325.    In deciding whether to truncate existing legislator's terms and order a special election, "obvious considerations include the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and the need to act with proper judicial restraint when intruding on state sovereignty." *Covington*, 581 U.S. at 488; *citing Swann v. Charlotte–Mecklenburg Bd. of Ed.,* 402 U.S. 1, 16 (1971).  "These factors … are among the matters a court would generally be expected to consider in its 'balancing of the individual and collective interests' at stake." *Id.*

326.    Here, Plaintiffs cannot demonstrate the severity of any particular constitutional violations.  They have not proved any violation of any nature or severity.

327.    Further, the imposition of a special election will impose likely and significant disruption to the ordinary process of governance.  Special elections are difficult and costly.

328.    Finally, this Court must exercise proper judicial restraint when intruding on state sovereignty.  Respectfully, the Court should use judicial restraint under the circumstance here.

Plaintiffs wasted nearly nine months from passage to bring this lawsuit. The enabling legislation, a pair of Joint Resolutions, passed the Mississippi House and Senate on March 31, 2022. This original Complaint in this matter was filed on December 20, 2022, almost nine months later. Because they included improper Defendants, two State Legislators, and later refused to dismiss them, several additional months were wasted on unnecessary motion practice that the Plaintiffs ultimately confessed. Thereafter they amended their complaint further delaying the scheduling of the Case Management Conference. The Court should not reward such dilatory behavior by imposing unnecessary burdens on Mississippi's state election officials.

329.   However, realizing that this trial setting was meant to accommodate the 2024 statewide general election calendar should the Plaintiffs prevail, in the event that the Court is going to order an election, the Defendants would ask that the Court follow the State's general election calendar and procedures, including primary elections, rather than the State's procedures for a special election, which do not include primaries. *See Watkins v. Fordice*, 791 F. Supp. 646, 648 (S.D. Miss. 1992) (ordering legislative election after redistricting challenge and finding that "for these elections for a three, rather than the usual four, year term, we adopt the regular election format prescribed by Mississippi law, rather than the special election schedule, advocated by the plaintiffs, which does not include party primaries.").

330.   The Mississippi Legislature is in session during and after the trial of this matter. The Legislative calendar is scheduled for *sine die* on May 5, 2024.

This the 12th day of February, 2024.

Respectfully submitted,

STATE BOARD OF ELECTION
COMMISSIONERS; TATE REEVES, IN HIS
OFFICIAL CAPACITY AS GOVERNOR OF
MISSISSIPPI; LYNN FITCH, IN HER OFFICIAL

CAPACITY AS ATTORNEY GENERAL OF
MISSISSIPPI; MICHAEL WATSON, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
STATE, DEFENDANTS

By: */s/ Tommie S. Cardin*

    Tommie S. Cardin (MB #5863)
    ONE OF THEIR COUNSEL

OF COUNSEL:

Tommie S. Cardin (MB #5863)
P. Ryan Beckett (MB #99524)
B. Parker Berry (MB #104251)
J. Dillon Pitts (MB #106399)
**BUTLER SNOW LLP**
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
P.O. Box 6010, Ridgeland, MS 39158-6010
Phone: 601.948.5711
Fax:   601.985.4500
tommie.cardin@butlersnow.com
ryan.beckett@butlersnow.com
parker.berry@butlersnow.com
dillon.pitts@butlersnow.com

Rex M. Shannon III (MB #102974)
**STATE OF MISSISSIPPI**
**OFFICE OF THE ATTORNEY**
**GENERAL**
**CIVIL LITIGATION DIVISION**
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-4184
Fax: (601) 359-2003
rex.shannon@ago.ms.gov

MISSISSIPPI REPUBLICAN EXECUTIVE
COMMITTEE, INTERVENOR-DEFENDANT
By: */s/ Michael B. Wallace*
MICHAEL B. WALLACE (MB #6904)

OF COUNSEL:

Michael B. Wallace (MB #6904)
Charles E. Cowan (MB #104478)
**WISE CARTER CHILD & CARAWAY, P.A.**
401 East Capitol Street, Suite 600
P.O. Box 651, Jackson, MS 39201
Ph: (601) 968-5500
Fax: (601) 968-5519
mbw@wisecarter.com
cec@wisecarter.com

## <u>CERTIFICATE OF SERVICE</u>

I, Tommie S. Cardin, one of the attorneys for the Defendants, do hereby certify that I have this day filed the above and foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 12th day of February, 2024.

*/s/ Tommie S. Cardin*
Tommie S. Cardin

85872398.v1