**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| MISSISSIPPI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; DR. ANDREA WESLEY; DR. JOSEPH WESLEY; ROBERT EVANS; GARY FREDERICKS; PAMELA HAMNER; BARBARA FINN; OTHO BARNES; SHIRLINDA ROBERTSON; SANDRA SMITH; DEBORAH HULITT; RODESTA TUMBLIN; DR. KIA JONES; MARCELEAN ARRINGTON; VICTORIA ROBERTSON, <br><br> *Plaintiffs*, <br><br> vs. <br><br> STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, *in his official capacity as Governor of Mississippi*; LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON, *in his official capacity as Secretary of State of Mississippi*, <br><br> *Defendants,* <br> AND <br><br> MISSISSIPPI REPUBLICAN EXECUTIVE COMMITTEE, <br><br> *Intervenor-Defendant.* | **CIVIL ACTION NO. 3:22-cv-734-DPJ-HSO-LHS** |

**PLAINTIFFS' PRE-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ......................................................................................1

I.      The Redistricting Process ...................................................................................1

II.     Parties.................................................................................................................4

    A.  Plaintiffs and MS NAACP Members ................................................................4

    B.  Defendants .........................................................................................................9

    C.  Intervenor ...........................................................................................................9

III.    Vote Dilution:  *Gingles* I ...................................................................................9

    A.  The Black Population in Mississippi .................................................................9

    B.  The Benchmark and Enacted Plans..................................................................12

    C.  Plaintiffs' Illustrative Plans.............................................................................15

    D.  Numerosity and Compactness of the Black Population as Demonstrated by the Illustrative Plans ....................................................................................................22

IV.     Vote Dilution:  *Gingles* 2 and 3 ......................................................................32

    A.  Dr. Handley's RPV Analysis ...........................................................................33

    B.  Dr. Handley's Effectiveness Analysis .............................................................43

V.      Vote Dilution:  Totality of the Circumstances ..................................................48

    A.  Senate Factor 1:  Mississippi's History of Voting-Related Discrimination Against Black Voters ...............................................................................................48

    B.  Senate Factor 2:  High Levels of Racially Polarized Voting in Mississippi....................55

    C.  Senate Factor 3: Mississippi's Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters .....................................................58

    D.  Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation ...........................................................................................62

    E.  Senate Factor 6:  Racial Appeals in Mississippi Politics................................72

    F.  Senate Factor 7:   Lack of Success for Black Candidates in Mississippi .........................75

    G.  Senate Factor 8:  Lack of Responsiveness to the Needs of Black Mississippians..............77

    H.  Senate Factor 9:  Tenuous Justifications for the Challenged Plans ...................................80

VI.     Racial Gerrymandering......................................................................................82

    A.  Consideration of Racial Data During Redistricting Process............................82

    B.  Dr. Ragusa's Analysis.....................................................................................84

    C.  Racial Predominance ......................................................................................91

VII.    Remedy .............................................................................................................113

PROPOSED CONCLUSIONS OF LAW .........................................................................116

I.      Jurisdiction, Parties, and Standing ...................................................................116

II.     Right of Action to Enforce Section 2 ..............................................................119

III.    Admission of Certain Expert Reports ..............................................................121

    A.  Waiver of the Objections to the Expert Reports of Drs. Luckett and King ....................121

    B.  Admissibility of the Luckett and King Reports .................................................123

IV.     Vote Dilution: The *Gingles* Framework ..........................................................129

V.      *Gingles* I .........................................................................................133

    A.  Numerosity ......................................................................................134

    B.  Compactness and Other Traditional Redistricting Principles ..................................136

    C.  Racial Predominance ...........................................................................143

VI.     *Gingles* II and III ..............................................................................145

VII.    Totality of Circumstances .......................................................................151

    A.  Senate Factor 1: Mississippi's History of Voting-Related Discrimination Against Black Voters ......................................................................................................153

    B.  Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi ....................154

    C.  Senate Factor 3: Mississippi's Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters .......................................157

    D.  Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation ............................................................................................158

    E.  Senate Factor 6: Racial Appeals in Mississippi Politics ......................................160

    F.  Senate Factor 7: Lack of Success for Black Candidates in Mississippi .........................161

    G.  Senate Factor 8: Lack of Responsiveness to the Needs of Black Mississippians ..............162

    H.  Senate Factor 9: Tenuous Justifications for the Challenged Plans ............................162

    I.  Proportionality .................................................................................163

VIII.   Racial Gerrymandering ...........................................................................165

    A.  Legal Standard ..................................................................................165

    B.  Racial Predominance ...........................................................................167

    C.  Strict Scrutiny .................................................................................170

IX.     Remedy ...........................................................................................172

    A.  Remedial Plans ..................................................................................173

    B.  Special Elections ................................................................................174

**PROPOSED FINDINGS OF FACT**

**I.    The Redistricting Process**

1.    The Mississippi State Legislature is responsible for establishing new plans for Mississippi's state legislative districts following each decennial Census. *See* Miss. Const. art. XIII, § 254.

2.    The number of state legislative districts is set by the Mississippi State Constitution. There are 52 State Senate districts and 122 State House districts.

3.    The maps must be approved by the Standing Joint Legislative Committee on Reapportionment ("SJLCR"), and ultimately by the full House and Senate by majority votes.  The boundaries for the state legislative districts are drawn by the Legislature and not subject to gubernatorial veto.

4.    In November 2021, the SJLCR adopted redistricting criteria for the map-drawing process.  That meeting lasted about ten minutes.

5.    For state legislative districts, the criteria adopted by the SJLCR specified that district population deviations should be less than 5% above or below the ideal population of the district, districts should be contiguous, and the redistricting plan should comply with all applicable state and federal laws, including Section 2 of the VRA and the Mississippi Constitution and U.S. Constitution.  *E.g.*, Joint Pre-Trial Order, Stipulated Facts [hereinafter "Stip."] 57, 60; JTX-008. The Mississippi Code further specifies that "[e]very district shall be compact and composed of contiguous territory and the boundary shall cross governmental or political boundaries the least number of times possible," and that "[d]istricts shall be structured, as far as possible and within constitutional standards, along county lines; if county lines are fractured, then election district lines shall be followed as nearly as possible." Mississippi Code Annotated [hereinafter "Miss. Code

1

Ann."] § 5-3-101.

6.      Although the SJLCR held nine public hearings during the redistricting process, no proposed maps were revealed at any of these hearings.  Stip. 58.  The public was never given an opportunity to comment on the maps being considered in secret by the SJLCR.

7.      On Sunday, March 27, 2022, just nine days before the end of the legislative session, the SJLCR revealed to the public, for the first time, proposed maps for both the Mississippi State Senate and State House.  Stip. 63.

8.      The same day at 5:00 p.m., the SJLCR voted to adopt a proposed State House map, with Representative Bo Brown, Senator Angela Turner-Ford, and Senator Derrick Simmons voting against the map.  The SJLCR also voted to adopt a proposed State Senate map, without a recorded vote of the yays and nays.  *See* Stip. 63; JTX-014 at 1-3.

9.      Both Enacted Plans kept the number of Black-majority districts the same from the plans that had been last used for state legislative elections prior to the 2020 Census.  *E.g.*, Stip. 68, 69, 79, 80.

10.      Two days later, on March 29, the full State House voted to adopt the House districting plan with one minor amendment, and the full State Senate voted to adopt the Senate districting plan unaltered.  *See* Stip. 64.

11.      Most of the Legislature's Black representatives and senators voted against adoption of these plans and some criticized them in the brief floor debate that was allowed on the issue.  *See, e.g.*, Joint Ex. 10 Transcript of Video Proceedings, Mississippi House of Representatives, March 29, 2022, at 15:7-18:21, 32:11-35:24 [hereinafter "JTX-010"]; Joint Ex. 11, Transcript of Video Proceedings, Mississippi Senate, March 29, 2022, at 98:9-100:5 [hereinafter "JTX-011"].  For example, during the House debate, Representative Robert Johnson introduced an amendment

with a proposed map that showed it was possible to have an additional five majority-Black districts in the State House. Representative Johnson stated that the Joint Committee's plan packed the Black population into fewer Black-majority districts and diluted Black Mississippians' voting strength and explained that his amendment demonstrated an alternative that would avoid those results. Representative Johnson also noted that he had consulted other Black representatives who "constantly feel locked out of the process." JTX-010 at 43:1-12. The House did not take the time to review Representative Johnson's amendment. Instead, after a brief discussion, the House rejected the amendment by a vote of seventy-seven to thirty-nine. JTX-010 at 47:20-21. Shortly thereafter, the House approved the Joint Committee's initial proposed map by a vote of eighty-one to thirty-seven. JTX-010 at 48:5-6.

12. During the March 29 Senate debate, Senator Derrick Simmons introduced an amendment with a proposed map that included an additional four majority-Black districts in the State Senate, noting that a "map that maintains the status quo simply dilutes [B]lack voting strength in Mississippi." In response, Senator Dean Kirby, the vice-chair of the Joint Committee, told the Senate, "this is not a map that this state needs." JTX-011 at 99:9-100:20. Without any further questions, comments, or debate, and after a very brief discussion, the Senate voted down the amendment. The Senate eventually approved the Joint Committee's initial proposed map by a vote of forty-five to seven. JTX-011 at 194:13-14.

13. On March 31, 2022, four days after the proposed maps were first revealed to the public, the House approved the Senate plan, and the Senate approved the House plan. Stip. 65.

14. The plans [hereinafter, the "Enacted Senate Plan" and the "Enacted House Plan"] became law on March 31, 2022.

## II.   Parties

### A.  Plaintiffs and MS NAACP Members

15.     Plaintiff Mississippi State Conference of the National Association for the Advancement of Colored People, Inc. ("MS NAACP") is a subsidiary organization of the National Association for the Advancement of Colored People, Inc., a national non-profit organization founded in 1909.  Stip. 1.  The mission of the MS NAACP is to ensure the political, educational, social and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination in Mississippi.  The MS NAACP is in turn composed of county and local branches, including in the various areas at issue in this case, such as Clinton, Gulfport, Forrest County (Hattiesburg), and Monroe County.

16.     Protecting the right to vote and securing an equal vote and fair representation for Black Mississippians is and has long been a central mission of the MS NAACP.

17.     The MS NAACP has members who are registered voters who reside in each of the Senate Districts 2 and 48 and House Districts 22, 34, and 64.  Stip. 2.

18.     Plaintiffs Dr. Andrea Wesley, Dr. Joseph Wesley, Robert Evans, Gary Fredericks, Otho Barnes, Marcelean Arrington, Deborah Hulitt, Kia Jones, and Rodesta Tumblin are members of the MS NAACP.  Stip. 5-8, 11, 13, 15, 16, 18.  Mamie Cunningham and Sharon Moman, who testified at trial, are also members of the MS NAACP. Stip. 3-4.

19.     Plaintiff Dr. Andrea Wesley is a citizen of the United States and the State of Mississippi, residing in Forrest County.  She is over the age of 18.  She is a member of the MS NAACP.  She identifies as Black.  She is a registered member of the Democratic Party.  She is a registered voter in Senate District 45 under the Enacted Senate Plan and intends to vote in that district in future elections.  Dr. Andrea Wesley also resided in Senate District 45 under the prior

4

previous decade's maps.  Enacted Senate District 45 is not majority-Black.  In the Illustrative Senate Plan, Ms. Wesley would reside in majority-Black Senate District 9.  Stip. 5.

20.     Plaintiff Dr. Joseph Wesley is a citizen of the United States and the State of Mississippi, residing in Forrest County.  He is over the age of 18.  He is a member of MS NAACP. He identifies as Black.  He is a registered member of the Democratic Party.  He is a registered voter in Senate District 45 under the Enacted Senate Plan and intends to vote in that district in future elections.  Dr. Joseph Wesley also resided in Senate District 45 under the previous decade's maps.  Enacted Senate District 45 is not majority-Black.  In the Illustrative Senate Plan, Mr. Wesley would reside in majority-Black Senate District 9.  Stip. 6.

21.     Plaintiff Robert Evans is a citizen of the United States and the State of Mississippi, residing in Forrest County.  He is over the age of 18.  He is a member of MS NAACP.  He identifies as Black.  He is a registered member of the Democratic Party.  He is a registered voter in Senate District 45 under the Enacted Senate Plan and intends to vote in that district in future elections. Mr. Evans also resided in Senate District 45 under the previous decade's maps.  Enacted Senate District 45 is not majority-Black.  In the Illustrative Senate Plan, Mr. Evans would reside in majority-Black Senate District 9.  Stip. 7.

22.     Plaintiff Gary Fredericks is a citizen of the United States and the State of Mississippi, residing in Harrison County.  He is over the age of 18.  He is a registered member of the Democratic Party.  He is a member of MS NAACP and the current President of the Gulfport branch of MS NAACP.  He is a registered voter in Senate District 48 under the Enacted Senate Plan.  He intends to vote in this district in future elections.  Under the previous decade's maps, Mr. Fredericks was also in Senate District 48.  Mr. Fredericks identifies as Black.  Stip. 8.

23.     Plaintiff Pamela Hamner is a citizen of the United States and the State of

Mississippi, residing in DeSoto County.  She is over the age of 18.  She is a registered member of the Democratic Party.  She is a registered voter in the newly enacted Senate District 2.  She intends to vote in this district in future elections.  Under the previous decade's maps, Ms. Hamner was in Senate District 1.  Ms. Hamner identifies as Black.  Stip. 9.

24.     Plaintiff Barbara Finn is a citizen of the United States and the State of Mississippi, residing in DeSoto County.  She is over the age of 18.  She identifies as Black.  She is a registered member of the Democratic Party.  She is a registered voter in Senate District 1 under the Enacted Senate Plan and intends to vote in that district in future elections.  Under the previous decade's maps, Ms. Finn was in Senate District 2.  Ms. Finn identifies as Black.  Enacted Senate District 1 is not majority-Black.  In the Illustrative Senate Plan, Ms. Finn would reside in majority-Black Senate District 2.  Stip. 10.

25.     Plaintiff Otho Barnes is a citizen of the United States and the State of Mississippi, residing in Jefferson Davis County.  He is over the age of 18.  He is a member of MS NAACP.  He identifies as Black.  He is a registered member of the Democratic Party.  He is a registered voter in Senate District 35 under the Enacted Senate Plan and intends to vote in that district in future elections.  Under the previous decade's maps, Mr. Barnes was in Senate District 41.  Enacted Senate District 35 is not majority-Black.  In the Illustrative Senate Plan, Mr. Barnes would reside in majority-Black Senate District 35.  Stip. 11.

26.     Plaintiff Shirlinda Robertson is a citizen of the United States and the State of Mississippi, residing in Jefferson Davis County.  She is over the age of 18.  She identifies as Black.  She is a registered member of the Democratic Party.  She is a registered voter in Senate District 35 under the Enacted Senate Plan and intends to vote in that district in future elections.  Under the previous decade's maps, Ms. Robertson was also in Senate District 35.  Ms. Robertson identifies

as Black.  Enacted Senate District 35 is not majority-Black.  In the Illustrative Senate Plan, Ms. Robertson would reside in majority-Black Senate District 35.  Stip. 12.

27.     Plaintiff Marcelean Arrington is a citizen of the United States and the State of Mississippi, residing in Jasper County.  She is over the age of 18.  She identifies as Black.  She is a registered member of the Democratic Party.  She is a member of MS NAACP.  She is a registered voter in House District 84 under the Enacted House Plan and intends to vote in that district in future elections.  Ms. Arrington was assigned to House District 79 under the previous decade's maps.  Enacted House District 84 is not majority-Black.  In the Illustrative House Plan, Ms. Arrington would reside in majority-Black House District 84.  Stip. 13.

28.     Plaintiff Sandra Smith is a citizen of the United States and the State of Mississippi, residing in Grenada County.  She is over the age of 18.  She is a registered member of the Democratic Party.  She is a registered voter in the newly enacted House District 34.  She intends to vote in this district in the future.  Under the previous decade's maps, Ms. Smith was also in House District 34.  Ms. Smith identifies as Black.  Stip. 14.

29.     Plaintiff Deborah Hulitt is a citizen of the United States and the State of Mississippi, residing in Hinds County.  She is over the age of 18.  She is a member of MS NAACP.  She identifies as Black.  She is a registered voter in House District 56 under the Enacted House Plan and intends to vote in that district in the future.  Under the previous decade's maps, Ms. Hulitt was also in House District 56.  In the Illustrative House Plan, Ms. Hulitt would reside in majority-Black House District 56.  Stip. 15.

30.     Plaintiff Dr. Kia Jones is a citizen of the United States and the State of Mississippi, residing in Hinds County.  She is over the age of 18.  She is a member of MS NAACP.  She is a registered member of the Democratic Party.  She is a registered voter in House District 64 under

the Enacted House Plan and intends to vote in that district in the future.  Dr. Jones identifies as Black.  Stip. 16.

31.    Plaintiff Victoria Robertson is a citizen of the United States and the State of Mississippi, residing in Lowndes County.  She is over the age of 18.  She identifies as Black.  She is a registered member of the Democratic Party.  She is a registered voter in Senate District 17 under the Enacted Senate Plan and intends to vote in that district in the future.  Under the previous decade's maps, Ms. Robertson was also in Senate District 17.  In the Illustrative Senate Plan, Ms. Robertson would reside in majority-Black Senate District 16.  Stip. 17.

32.    Plaintiff Rodesta Tumblin is a citizen of the United States and the State of Mississippi, residing in Chickasaw County.  She is over the age of 18.  She identifies as Black.  She is a member of MS NAACP.  She is a registered member of the Democratic Party.  She is a registered voter in House District 22 under the Enacted House Plan and intends to vote in that district in the future.  Under the previous decade's maps, Ms. Tumblin was also in House District 22.  Enacted House District 22 is not majority-Black.  In the Illustrative House Plan, Ms. Tumblin would reside in majority-Black House District 22.  Stip. 18.

33.    Mamie Cunningham is a citizen of the United States and the State of Mississippi, residing in Chickasaw County.  She is over the age of 18.  She is a member of MS NAACP. She identifies as Black.  She is a registered voter in Senate District 8 under the Enacted Senate Plan and intends to vote in that district in future elections.  Ms. Cunningham also resided in Senate District 8 under the prior previous decade's maps.  Enacted Senate District 8 is not majority-Black. In the Illustrative Senate Plan drawn by William Cooper (the "Illustrative Senate Plan"), Ms. Cunningham would reside in majority-Black Senate District 17.  Stip. 3.

**B.  Defendants**

34.     Defendant the State Board of Elections Commissioners ("SBEC") is composed of the Governor, the Attorney General, and the Secretary of State. Its respective duties are set forth in Miss. Code Ann. § 23-15-211.

35.     Defendant Tate Reeves is the Governor of the State of Mississippi and is a member of the State Board of Election Commissioners ("SBEC") pursuant to Miss. Code Ann. § 23-15-211.

36.     Defendant Lynn Fitch is the Attorney General of the State of Mississippi and is a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211.

37.     Defendant Michael Watson is the Secretary of State of the State of Mississippi and a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211.

**C.  Intervenor**

38.     Intervenor is the Republican Party of Mississippi.

**III.    Vote Dilution:  *Gingles* I**

39.     The first *Gingles* precondition is whether "the 'minority group [is] sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (alteration and citation omitted); *see Thornburg v. Gingles*, 478 U.S. 30, 46–51 (1986).

**A.  The Black Population in Mississippi**

40.     According to the 2020 Census, non-Hispanic Whites comprise 55.35% of the population in Mississippi.  *See* Pl.'s Ex. 1, Aug. 28, 2023 Report of William Cooper, at 9 [hereinafter "PTX-001"].   African Americans are the next largest racial/ethnic category, representing 37.94% of the population in 2020—the highest proportion of any state in the nation.

*Id*.  The 2020 Census shows that Mississippi's Black population has increased since 2000 (up from 36.62%), while its non-Hispanic White population has decreased since 2000 (down from 60.74%). *Id*.

41.     In absolute terms, Mississippi has grown by 116,621 persons between 2000 and 2020.  Growth in the African-American population, which increased by 81,905, is the single largest driver of overall population growth, along with the growth of other racial minority groups.  Mississippi's non-Hispanic White population fell by 88,831 during that same period.  PTX-001 at 10.

42.     The statewide any-part Black voting age population ("BVAP") has steadily increased over the past two decades—from 33.29% in 2000 to 36.14% in 2020.  During that same period, the Non-Hispanic ("NH") White VAP has dropped by nearly seven percentage points, from 64.16% in 2000 to 57.76% in 2020.  PTX-001 at 10.

43.     Mississippi's Planning and Development Districts ("PDDs") are a useful reference point for considering regional demographics and constructing electoral districts in the state.  In the 1960s, local Mississippi officials created the PDDs as an administrative and governance structure to "allow communities to collectively address problems."   Since then, "each PDD [has] represent[ed] a distinctly different region of the state," and each district's responsibilities span "community and economic development," "health and social services," "small business assistance," "workforce development," "loan assistance," and Medicaid case management, among other "local needs and priorities." As such, PDD boundaries, by definition, delineate parts of Mississippi that share policy interests and preferences.  PTX-001 at 15; *see also, e.g.*, Pl.'s Ex. 3, Mississippi Association of Planning and Development Districts 2022 Directory [hereinafter "PTX-003"].

44.     Between 2000 and 2020, Black population growth at the regional level has been concentrated in four planning districts – Central Mississippi, North Delta, Southern Mississippi, and Three Rivers.  PTX-001 at 17. Taken together, these four planning districts account for a net Black population gain of 120,399 persons since 2000.  The 2000 to 2020 White population loss in these same planning districts is -7,636.  *Id*.  In addition, East Central PDD has seen a double-digit decline in the White population since 2000, while the Black population has remained relatively constant.  *Id*. at 18.

45.     The 2000 to 2020 Black population growth in Central PDD, North Delta PDD, Southern PDD, and Three Rivers PDD (120,399) equals about two 100% Black Senate districts (ideal Senate district size of 56,948) and about five 100% Black House districts (ideal House district size of 24,273).  PTX-001 at 18.

**B. The Benchmark and Enacted Plans**



PTX-001 at 156

46.     The 2019 Senate Plan contained 15 majority-Black districts, as depicted above and set forth in the report of Plaintiffs' expert William S. Cooper.  PTX-001 at 22–23, 177–179; Stip. 68; JTX-002.

12



PTX-001 at 224

**2022 Senate**
☐ Majority_Black
☐ Planning_Districts

0        30        60
Miles

**15 Majority-Black**

47.     The 2022 Enacted Senate Plan also contained 15 majority-Black districts, located

in essentially the same places, as depicted above and set forth in Mr. Cooper's Report.  PTX-001

at 24—25, 244-246; Stip. 69; JTX-004.

13



PTX-001 at 477

48.     The 2012 House Plan contained 42 majority-Black districts, as depicted above and

set forth in Mr. Cooper's Report.  PTX-001 at 54–55, 498–501; Stip. 79; JTX-003; 45–46, 68–70,

14



PTX-001 at 569

49.     Despite significant Black population growth and White population decline throughout the state, the 2022 Enacted House Plan also contains 42 majority-Black districts, located almost entirely in essentially the same places, as depicted above and set forth in Mr. Cooper's Report.  PTX-001 at 56–57, 590-593; Stip. 80; JTX-005.

**C.  Plaintiffs' Illustrative Plans**

50.     Plaintiffs' map-drawing expert, Mr. Cooper, developed illustrative state legislative plans [hereinafter, the "Illustrative Senate Plan" and the "Illustrative House Plan"] to assess whether the Black population in Mississippi is sufficiently large and geographically compact to allow for the creation of additional majority-Black Senate and House districts.

51.     Mr. Cooper is qualified by his extensive experience to testify as an expert witness

15

in redistricting and demographics, including the drawing of electoral maps using Census data and map-drawing software. *See generally, e.g.*, PTX-001 at 2–5, 80–91.

52.    Since 1986, Mr. Cooper has prepared redistricting maps in approximately 750 jurisdictions in 45 states. *See* PTX-001 at 2–5, 80–91. Mr. Cooper has been qualified as an expert witness on redistricting and demographics in federal courts in well over 50 voting rights cases in 20 states. *Id.* Six of these lawsuits resulted in changes to statewide legislative boundaries: *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-05337 (N.D. Ga.); *Thomas v. Reeves*, No. 3:18-cv-441 (S.D. Miss.); *Alabama Legislative Black Caucus v. Alabama*, No. 2:12-cv-691 (M.D. Ala.); *Bone Shirt v. Hazeltine*, No. 3:01-cv-3032 (D.S.D.); *Old Person v. Brown*, No. 4:96-cv-0004 (D. Mont.); and *Rural West Tennessee African American Affairs Council, Inc. v. McWherter*, No. 92-cv-2407 (W.D. Tenn.). *See* PTX-001 at 2, 80–91. Notably, illustrative plans drawn by Mr. Cooper in a Section 2 case were recently reviewed and affirmed by the United States Supreme Court. *See Milligan*, 599 U.S. at 20, 31.

53.    Mr. Cooper has over thirty years of experience in voting cases in Mississippi. *See* PTX-001 at 4–5; *see also* PTX-001 at 80–91. He has served as an expert witness in redistricting and demographics in multiple statewide cases in Mississippi, including *Thomas v. Reeves*, No. 18-cv-441 (S.D. Miss. 2019), a Voting Rights Act case which resulted in the revision of Mississippi State Senate District lines in the Mississippi Delta. In addition to the *Thomas* case, he has testified at trial in two other state-level voting lawsuits in Mississippi: *NAACP v. Fordice,* No. 92-CV-250 (S.D. Miss 1999), which involved the districts used for the Public Service Commission and Transportation Commission, and *Smith v. Clark*, No. 01-CV-855 (S.D. Miss 2002), which involved congressional redistricting in Mississippi. PTX-001 at 4.

54.    He has testified at trial as an expert witness in seven local redistricting cases in

Mississippi since 1990. *See, e.g.*, *Addy v. Newton County*, No. 95-cv-39 (S.D. Miss. 1997); *Gunn v. Chickasaw County*, No. 87-cv-165 (N.D. Miss 1989); *Nichols v. Okolona*, No. 97-cv-00030 (N.D. Miss. 1995); *Fairley v. Hattiesburg*, No. 06-cv-167 (S.D. Miss. 2008); *Boddie v. Cleveland School District*, No. 07-cv-63 (N.D. Miss. 2010), *Jamison v. City of Tupelo*, No. 07-cv-366 (N.D. Miss. 2007); *Fairley v. City of Hattiesburg*, No. 13-cv-18 (S.D. Miss. 2015).  PTX-001 at 5.

55.     He developed election plans that were adopted by local governing bodies in Webster County in the 1990s; in Bolivar County and Webster County in the 2000s; in Bolivar County, Claiborne County, and the City of Grenada in the 2010s; and in Bolivar County and Washington County in 2022.  He is currently developing redistricting plans for the City of Grenada.  PTX-001 at 5.

56.     For this current redistricting cycle, Mr. Cooper has testified at trial as an expert witness in redistricting and demographics in nine cases challenging district boundaries under Section 2 of the Voting Rights Act: *Caster v. Merrill,* No. 21-1356-AMM (N.D. Ala. 2022), *Pendergrass v. Raffensperger,* No. 21-05337-SCJ (N.D. Ga. 2022), *Alpha Phi Alpha Fraternity v. Raffensperger,* No. 21-05339-SCJ (N.D. Ga. 2022), *NAACP v. Baltimore County*, No.21-cv-03232-LKG (D. Md. 2022), *Christian Ministerial Alliance v. Hutchinson,* No. 19-cv-402-JM (E.D. Ar. 2022), *Robinson v. Ardoin*, No. 22-cv-00211-SDD-SDJ (M.D. La. 2022), *Caroline County Branch of the NAACP v. Town of Federalsburg*, No. 23-00484-SAG (D. Md. 2023), *Dickinson Bay Area NAACP Branch v. Galveston County*, No. 22-cv-117-JVB (S.D. Tex. 2023), and *Nairne v. Ardoin*, No. 22-cv-178-SDD (M.D. La. 2023).  PTX-001 at 3–4.

57.     Those courts and numerous others have found him credible. *See, e.g., Nairne v. Ardoin*, No. CV 22-178-SDD-SDJ, 2024 WL 492688, at *12 (M.D. La. Feb. 8, 2024); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, --- F. Supp. 3d ----, No. 1:21-CV-05337-SCJ, 2023 WL

7037537, at *16–17 (N.D. Ga. Oct. 26, 2023); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 977, 1004–1007 (N.D. Ala. 2022), *aff'd sub nom. Milligan*, 599 U.S. 1; *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 778 (M.D. La. 2022).

58.     To develop the Illustrative Plans, Mr. Cooper used (1) population and geographic data from the 1990 to 2020 Censuses, (2) the 1 and 5-year American Community Survey ("ACS") estimates conducted by the U.S. Census Bureau, (3) geographic boundary files created from the U.S. Census and 1990, 2000, 2010, and 2020 Topologically Integrated Geographic Encoding and Referencing (TIGER) files, (4) the Mississippi precinct boundaries produced by the Mississippi Automated Resource Information System (MARIS), and (5) incumbent address information posted on the Mississippi legislature's website and provided by Defendants to counsel.  PTX-001 at 92–94.  He used *Maptitude for Redistricting*, a geographic information system ("GIS") software that many local and state bodies employ for redistricting. *See id*.  The Maptitude program contains several data points, including political boundaries, roads, and geographic features.

59.     Mr. Cooper used population data from the U.S. Census 1990, 2000, 2010, and 2020 PL 94-171 data files.  The PL 94-171 dataset is the complete count population file designed by the Census Bureau for use in legislative redistricting.  *E.g.*, PTX-001 at 92–94.  The file contains basic race and ethnicity data on the total population and voting-age population found in various units of Census geography.  *Id.*  It is published in electronic format.  *Id.*; *see* Joint Ex. 1, "PL 94-171 File" [hereinafter "JTX-001"].

60.     Mr. Cooper also reviewed current and historical demographics of Mississippi, including the socio-economic, employment, education, and health characteristics of the Black, Latino, and non-Hispanic White populations at the state, PDD, county, metropolitan, and municipal levels, as published by the Census Bureau in the ACS.  *E.g.*, PTX-001 at 11–13, 21–22

18

& n.19; *see also* PTX-001 at 977.

61.    Mr. Cooper developed the Illustrative Plans in this case in accordance with traditional redistricting principles, including population equality, compactness; contiguity; communities of interest; traditional political boundaries; and non-dilution of minority voting strength.  PTX-001 at 19–20.  Mr. Cooper also considered incumbent pairings in constructing the Illustrative Plans.  *Id*. at 7.

62.    Mr. Cooper testified that, in constructing the Illustrative Plans, he balanced the various traditional districting principles such that none predominated over any other.  The Court credits Mr. Cooper's testimony regarding his consideration of all the various traditional districting principles in constructing his plans, his balancing approach, and his overarching goal to draw electoral plans with compact, reasonably configured districts.

63.    Mr. Cooper credibly testified that he did not seek to maximize the number of Black-majority districts in the Illustrative Plans, and Defendants do not claim otherwise.  Mr. Cooper also explained the limited manner in which he considered racial demographic information, namely, by using a feature in his mapping software that indicated precincts with a BVAP of greater than 30%.  Mr. Cooper credibly testified that he did not use racial shading or heat maps to construct the plans, and that he followed county and precinct lines where possible.

64.    Mr. Cooper began his inquiry by studying demographic data.  *See* PTX-001 at 9–22. To determine whether additional majority-Black legislative districts could be drawn based on the 2020 Census, Mr. Cooper focused primarily on PDDs with substantial Black populations that have experienced Black population growth since 2000, either in raw numbers or as a share of the population in that PDD.  *See id.* at 18–21.

65.    As depicted below and as set forth in his report, Mr. Cooper's Illustrative Senate

19

Plan includes four additional majority-Black districts: Illustrative Senate District ("SD") 2 in

Tunica and DeSoto Counties; Illustrative SD 9 in Forest and Lamar Counties (Hattiesburg);

Illustrative SD 17 in Clay, Chickasaw, Lee, and Monroe Counties; and Illustrative SD 35 in

Copiah, Lincoln, Simpson, and Jefferson Davis Counties.  PTX-001 at 26–27, 323-325; Stip.  70,

71; JTX-006.



PTX-001 at 302

66.     As depicted below and as set forth in his report, Mr. Cooper's Illustrative House

Plan includes three additional majority-Black districts.  Illustrative House District ("HD") 22 in

Chickasaw and Monroe Counties; Illustrative HD 56 in Hinds County (Clinton); and Illustrative

HD 84 in Newton, Jasper, and Clarke Counties. *Id.* at 58–59, 715-718; Stip. 81, 82; JTX-007.



PTX-001 at 694

67.     As compared to the 2022 Enacted Plan, Mr. Cooper's Illustrative House Plan modifies 33 of the 122 Enacted House districts.  The Illustrative Senate Plan modifies 41 of the 52 Enacted Senate Districts.  PTX-001 at 28, 68.

68.     Mr. Cooper compared the share of Black voters in majority-Black districts to the share of White voters in majority-White districts under both sets of plans.  In the Enacted Senate Plan, 50.36% of Black voters live in majority-Black districts, compared to 84.33% of Whites living in majority-White districts.  In the Illustrative Senate Plan, 58.39% of Black voters live in majority-Black districts, compared to 75.24% of Whites living in majority-White districts.  The Illustrative Senate Plan thus reduces the overall representation gap by 17.13 percentage points.  PTX-001 at 50.  These improvements are consistent across each of the areas of interest.  PTX-001 at 51.

69.     In the Enacted House plan, 62.38% of Black voters live in majority-Black districts,

21

compared to 82.92% of Whites living in majority-White districts.  In the Illustrative House Plan, 64.78% of Black voters live in majority-Black districts, compared to 80.12% of Whites living in majority-White districts.  The Illustrative House plan thus reduces the overall representation gap by 5.19 percentage points.  PTX-001 at 74.  These improvements are consistent across each of the areas of interest.  *Id*. at 75.

70.     The Court finds the above data to be "probative evidence of cracking and packing BVAP in enacted districts." *Nairne*, 2024 WL 492688, at *16 (relying on the same representation gap analysis provided by Mr. Cooper).

71.     As explained in further detail below, the Court finds that each of the additional majority-Black districts in the Illustrative Senate and House Plans is over 50% BVAP, and each is reasonably configured.  Moreover, it is undisputed that Mr. Cooper's Illustrative Plans are comparable to or better than the Enacted Plan with respect to various objective metrics associated with the traditional districting principles, such as mathematical compactness scores, county splits, precinct splits, and splits of communities of interest such as PDDs and municipalities.  The Court finds that the Illustrative Plans' inclusion of four additional, reasonably-configured majority-Black districts in the Mississippi Senate and three additional, reasonably-configured majority-Black districts in the Mississippi House, indicating that the Black population in Mississippi is sufficiently numerous and geographically compact to allow for additional majority-Black Senate and House districts in those identified areas of the state.   PTX-001 at 7–8.

### D. Numerosity and Compactness of the Black Population as Demonstrated by the Illustrative Plans

72.     The Court finds that the Illustrative Plans, and in particular the additional majority-Black districts included in them, are reasonably configured in light of the various traditional

districting principles.  The Court reaches that conclusion based on its own consideration of the Illustrative Plans and its crediting of Mr. Cooper's analysis, as well as supporting witness testimony from voters who reside in the areas of focus.  It is also notable that Defendants offered no expert opinion testimony contesting the bottom-line issue that the Illustrative Plans comport with traditional districting principles.

73.     The Court finds that the Illustrative Plans adhere to the principle of one-person, one-vote.  Consistent with the requirements adopted by the SJLCR, none of the populations of the districts in the Illustrative Plans deviate more than five percent in either direction from the ideal district population.  *E.g.*, PTX-001 at 323-325, 715-718.

74.     The Courts finds that the districts in the Illustrative Plans are all contiguous.

75.     The Courts finds that the districts in the Illustrative Plans are compact.  Mr. Cooper considered mathematical compactness scores generated by the Maptitude software program.  *E.g.*, PTX-001 at 45–46, 68–70.  Mr. Cooper reported three compactness scores: Reock, Polsby-Popper, and Convex Area/Hull.  *Id.*  These measures, particularly Reock and Polsby-Popper, are typically used by *Gingles I* experts in analyzing the mathematical compactness of districts.  *E.g.*, *id.* at 69.  These measures are calculated by the Maptitude software and can be compared across districts.  *Id.*  Using these metrics, the Illustrative Senate and House Plans are each similarly compact or more compact than the Enacted Senate and House plans.  *E.g.*, *id.* at 45–46, 68–70.  On average, the Illustrative Senate Plan districts are slightly more compact than the Enacted Senate plan, and the compactness of the Illustrative House and Enacted House Plans are comparable.  *E.g.*, *id.* at 45–46, 68–70, 399-417, 822-855.  The minimum compactness scores in the Illustrative Plans (*i.e.*, the compactness score of the least compact district in the plans) are also comparable to the minimum scores in the Enacted Plans.  *Id.* at 45–46, 68–70.

76.     A visual assessment and comparison to the Enacted Plans confirms that the majority-Black districts in the Illustrative Plans are geographically compact.  *See, e.g.*, PTX-001 at 27–28, 59–60, 385, 388, 394, 398, 813, 817, 821.  The Illustrative Plan districts largely follow traditional boundaries, corresponding to existing county, precinct, and municipal borders.

77.     The Courts finds that the Illustrative Plans are not only compact but meet the other traditional redistricting criteria.  PTX-001 at 7–8, 18–20.  Mr. Cooper reduced political subdivision splits in both the Illustrative Senate and House plans.  The Illustrative Senate plan scores better than the Enacted Senate Plan on county, precinct (also called "VTD"), municipal, school district, PDD, and MSA splits.  The Illustrative House plan scores better than the Enacted Senate Plan on county, VTD, municipal, school district, and PDD splits, with the same number of MSA splits.  *E.g.*, *id*. at 46–50, 70–74, 418-465, 856-951.

78.     The Courts finds that the Illustrative Plans respect communities of interest.  *E.g.*, PTX-001 at 29–45, 61–68.  The Court credits Mr. Cooper's testimony that he considered communities of interest in assessing and seeking to minimize splits of PDDs, municipalities, and school districts, all of which are existing political communities with specific shared interests capable of legislative representation.  The Court also credits Mr. Cooper's testimony that he considered his prior knowledge and experience in Mississippi, socioeconomic data, geographic information, and other research in seeking to account for communities of interest when drawing the Illustrative Plans.

79.     The Court credits the testimony of individual voters regarding the commonalities and shared interests that connect the communities included in each of the additional majority-Black districts under the Illustrative Senate and House Plans.

80.     The Court also credits Mr. Cooper's testimony that he considered incumbent

information in drafting the Illustrative Plans and sought to avoid pairing incumbents where possible. The Illustrative Plans pair a comparable number of incumbents as compared to the Enacted Plans.

81. The Court specifically finds, based on Mr. Cooper's testimony and the testimony of individual voters from the areas at issue, that the additional majority-Black districts in the Illustrative Senate and House Plans are reasonably configured.

82. Illustrative SD 2 is an additional majority-Black district that can be drawn in Tunica and DeSoto Counties. *E.g.*, PTX-001 at 29–34. Illustrative SD 2 can be drawn by reducing the BVAP of Enacted SD 11 (62.38% BVAP) and adding neighboring areas with substantial Black populations in Enacted SDs 1 and 2. *Id*. Illustrative SD 2 keeps the city of Horn Lake whole, whereas Horn Lake and its substantial Black population is divided between three different Senate districts under the Enacted Senate Plan. *Id*. The Illustrative Senate Plan also eliminates a split of Tate County as compared to the Enacted Senate Plan. *Id*. Illustrative SD 2 has a Black Voting Age Population ("BVAP") of 50.91%. *Id*. at 323-325.



PTX-001 at 385

83.     The Court finds that this district is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black Senate district.  The Court finds that the Illustrative SD 2 is reasonably configured.  The Court finds that Illustrative SD 2 reflects a balanced approach in which race did not predominate over other traditional districting principles.

84.     Illustrative SD 9 is an additional majority-Black district that can be drawn in the metropolitan Hattiesburg area in Forrest and Lamar Counties.  PTX-001 at 38–41.  Unlike Enacted SD 34 (56.48% BVAP), which picks up parts of central Hattiesburg and then extends 65 miles north into Jasper and Quitman counties, Illustrative SD 9 is anchored firmly in Hattiesburg and encompasses only two counties.  *Id*.  In contrast to the Enacted Plan's split of Hattiesburg across four districts, the Illustrative SD 9 keeps Hattiesburg almost entirely whole, with 84% of the

26

Illustrative SD 9's population coming from the city.  *Id*.  Illustrative SD 9 has a BVAP of 50.95%.

*Id*. at 323-325.



85.     The Court finds that this district is visually compact, does not contain excessive

county or precinct splits, and respects communities of interest, uniting areas with common interests

in a majority-Black Senate district.   The Court finds that the Illustrative SD 9 is reasonably

configured.  The Court finds that Illustrative SD 9 reflects a balanced approach in which race did

not predominate over other traditional districting principles.

86.     Illustrative SD 17 is an additional majority-Black district that can be drawn

anchored in the Three Rivers PDD—specifically, in Clay, Chickasaw, Lee, and Monroe Counties.

Illustrative SD 17 brings together nearby, predominantly Black communities along the Highway

45 corridor between West Point and Tupelo, which share various common interests.  PTX-001 at

34–38. Illustrative SD 17 has a BVAP of 54.18%.  *Id*. at 323-325.



PTX-001 at 388

87.     The Court finds that this district is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black Senate district.  The Court finds that the Illustrative SD 17 is reasonably configured.  The Court finds that Illustrative SD 17 reflects a balanced approach in which race did not predominate over other traditional districting principles.

88.     Illustrative SD 35 is an additional majority-Black district that can be drawn in Copiah, Lincoln, Simpson, and Jefferson Davis Counties.  PTX-001 at 42–44.  The extension of Illustrative SD 35 south into Lincoln County from the Central PDD into Southwest PDD follows U.S. Highway 51, linking the majority-White town of Wesson (pop. 1,833; Black pop. 21.3%) in Copiah County with part of majority-Black Brookhaven (pop. 11,674; Black pop. 58.9%).  *Id*.  The communities included in Illustrative SD 35 are united by geography, regional, transportation, and educational connections.  Illustrative SD 35 has a BVAP of 52.12%.  *Id*. at 323-325.

28



PTX-001 at 398

89.    The Court finds that this district is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black Senate district.  The Court finds that the Illustrative SD 35 is reasonably configured.  The Court finds that Illustrative SD 35 reflects a balanced approach in which race did not predominate over other traditional districting principles.

90.    Illustrative HD 22 is an additional majority-Black district that can be drawn in Chickasaw and Monroe Counties.  PTX-001 at 61–64.  Illustrative HD 22 can be drawn by "unpacking" (i.e., decreasing the BVAP of) Enacted HD 36 (61.2% BVAP) and HD 16 (62.3% BVAP) and reducing the geographic extent of Enacted HD 22, yielding a more compact district that contains parts of only two counties.  *Id.*  Like Illustrative SD 17, Illustrative HD 22 follows the Highway 45 corridor and links predominantly Black communities such as Houston, Okolona, and Aberdeen—nearby communities that are split across three districts in the Enacted Plan.  *Id.*

29

Illustrative HD 22 has a BVAP of 55.41%.  *Id*. at 715-718.



91.     The Court finds that this district is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black House district.  The Court finds that the Illustrative HD 22 is reasonably configured.  The Court finds that Illustrative HD 22 reflects a balanced approach in which race did not predominate over other traditional districting principles.

92.     Illustrative HD 56 is an additional majority-Black district that can be drawn in Hinds County.  PTX-001 at 66–68.  Illustrative HD 56 is firmly anchored in Clinton, which has a large and growing Black population.  Illustrative HD 56 unpacks Black populations in Enacted HD 69 (90.36% BVAP) and Enacted HD 70 (83.18% BVAP) to yield an additional majority-Black district.  Illustrative HD 56 has a BVAP of 58.99%.  *Id*. at 715-718.



93.     The Court finds that this district is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black House district.  The Court finds that the Illustrative HD 56 is reasonably configured.  The Court finds that Illustrative HD 56 reflects a balanced approach in which race did not predominate over other traditional districting principles.

94.     Illustrative HD 84 is an additional majority-Black district that could be drawn in Newton, Jasper, and Clarke Counties.  PTX-001 at 64–66.  The Enacted Plan splits both Jasper and Clarke Counties three ways.  By reducing the splits to two, an additional majority-Black district can be drawn.  Using whole precincts, Illustrative HD 84 also keeps the City of Newton mostly whole and avoids removing Newton's majority-Black precincts from the district.  *Id.* Illustrative HD 84 has a BVAP of 53.05%.  *Id*. at 715-718.

31



PTX-001 at 817

95.    The Court finds that this district is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black House district.  The Court finds that the Illustrative HD 84 is reasonably configured.  The Court finds that Illustrative HD 84 reflects a balanced approach in which race did not predominate over other traditional districting principles.

96.    In sum, and crediting the testimony and analysis of Mr. Cooper as well as individual Mississippi voters, the Court finds that the Black population in the areas in and around Illustrative SDs 2, 9, 17, and 35 and HDs 22, 56, and 84 is sufficiently numerous and compact to support an additional, reasonably-configured Black-majority Senate or House district in each of those areas.

## IV.    Vote Dilution:  *Gingles* 2 and 3

97.    The other two *Gingles* preconditions are that minority voters are "politically cohesive" and that "the white majority votes sufficiently as a bloc to enable it... to defeat the

32

minority's preferred candidate." *Milligan*, 599 U.S. at 18 (quoting *Thornburg*, 478 U.S. at 51).

98.     Dr. Lisa Handley conducted a quantitative analysis and provided expert testimony on *Gingles II* and *III*.  Dr. Handley is qualified to serve as an expert witness on racially polarized voting ("RPV") and the statistical analysis of minority vote dilution and redistricting.  Pl.'s Ex. 4, December 22, 2023 Amended Report of Dr. Lisa Handley, at 2–3 [hereinafter "PTX-004"].

99.     Dr. Handley has over 35 years of experience as a voting rights and redistricting expert.  PTX-004 at 2.  She holds a Ph.D. in political science from George Washington University. PTX-004 at 64–70.  She has taught political science courses at both the graduate and undergraduate level at several universities.  *Id*.  Dr. Handley has provided election assistance to numerous countries through the United Nations. *Id*.

100.    Dr. Handley has been accepted as an expert witness in litigation involving voting rights and redistricting scores of times, and courts have routinely credited and relied on her expert testimony, particularly on the analysis of racially polarized voting.  PTX-004 at 2-3, 70; *Nairne*, 2024 WL 492688, at *36 (finding Dr. Handley "credible and her conclusions reliable and well supported"); *Alpha Phi Alpha*, 2023 WL 7037537, at *21 (accepting Dr. Handley as an expert and noting she has routinely been qualified as an expert in cases where she used the same methodology she employed here); *Robinson*, 605 F. Supp. 3d at 840; *Lopez v. Abbott*, 339 F. Supp. 3d 589, 610 (S.D. Tex. 2018) (crediting Dr. Handley's testimony); *United States v. Vill. Of Port Chester*, 704 F. Supp. 2d 411, 427, 441 (S.D.N.Y. 2010) (relying on Dr. Handley as an expert and noting that "[t]he methods employed by Dr. Handley," including ecological inference analysis, "have been accepted by numerous courts in voting rights cases").

**A.  Dr. Handley's RPV Analysis**

101.    To assess RPV in this case, Dr. Handley analyzed voting patterns by race in seven

areas of Mississippi where the Illustrative Plans create additional majority-Black Senate and House districts. *E.g.*, PTX-004 at 6–8.

102.    Dr. Handley's seven areas are:

a.  Area 1: North West and North Central Mississippi (Coahoma, De Soto, Lafayette, Marshall, Panola, Quitman, Tate, Tunica, and Union counties), corresponding to the area in and around Illustrative SD 2.

b.  Area 2: The Greater Golden Triangle Area of Mississippi (Chickasaw, Choctaw, Clay, Itawamba, Lee, Lowndes, Monroe, Montgomery, Noxubee, Oktibbeha, Webster, and Winston counties), corresponding to the area in and around Illustrative SD 17.

c.  Area 3: South Central Mississippi (Adams, Amite, Clairborne, Copiah, Franklin, Hinds, Jefferson, Jefferson Davis, Lawrence, Lincoln, Pike, Simpson and Walthall counties), corresponding to the area in and around Illustrative SD 35.

d.  Area 4: South East Mississippi (Clarke, Forrest, Greene, Jasper, Jones, Lamar, Perry and Wayne counties), corresponding to the area in and around Illustrative SD 9.

e.  Area 5: The Western Jackson Area (Hinds and Madison counties), corresponding to the area in and around Illustrative HD 56

f.  Area 6: The Golden Triangle Area (Chickasaw, Clay, Lee, Lowndes, Monroe, Oktibbeha, and Pontotoc counties), corresponding to the area in and around Illustrative HD 22

g.  Area 7: East Central Mississippi (Clarke, Jasper, Jones, Lauderdale, and

34

Newton counties), corresponding to the area in and around Illustrative HD 84. *E.g.*, PTX-004 at 7–8.

103.    Dr. Handley selected these clusters of counties in order to evaluate the extent of racially polarized voting in areas that contain overlapping sets of districts in the Illustrative and Enacted Plans. *See, e.g.*, PTX-004 at 6 n. 10.  For example, Area 1 includes the counties that contain Illustrative Senate Districts 1, 2, 11, 15, and 19 and Enacted Senate Districts 1, 2, 10, 11, and 19. *See* PTX-004 at 7.  This method, which Dr. Handley has used in other Section 2 cases, allows for an assessment of the level of racial group cohesion in each specific geographic area and the ability of Black voters to elect candidates of choice in such areas. *See, e.g.*, PTX-004 at 6 and n. 11.

104.    Within each area, Dr. Handley employed three commonly used, well-accepted statistical methods to conduct her racially polarized voting analysis: homogeneous precinct analysis, ecological regression, and ecological inference ("EI").  PTX-004 at 3–5; *see also* PTX-004 at 37–63.  With these three statistical methods, she calculated for each of the seven geographic areas estimates of the percentage of Black and White voters who voted for candidates in recent statewide general elections and state legislative general elections, as well as certain statewide democratic primaries and nonpartisan judicial contests. *Id.* at 8–11; *see also* PTX-004 at 37–63.

105.    Dr. Handley focused primarily on contests that were "biracial," *i.e.*, where there was both a Black candidate and a White candidate.  Dr. Handley primarily focused on biracial elections because these are the most probative for measuring racial polarization.  PTX-004 at 8 n. 12; *see also Nairne*, 2024 WL 492688, at *31 ("This Court finds—and both Defendants' expert [Dr. Alford] and additional courts agree—that biracial statewide elections are the "most probative" for determining racial polarization."); *Robinson*, 605 F. Supp. 3d at 801 (crediting Dr. Handley's

opinion that "courts consider election contests that include minority candidates to be more probative than contests with only White candidates, because this approach recognizes that it is not sufficient for minority voters to be able to elect their preferred candidate only when that candidate is White"); *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 610–11 (E.D. Mich. 2019) ("These [white-only] elections are … less probative because the fact that black voters also support white candidates acceptable to the majority does not negate instances in which a white voting majority operates to defeat the candidate preferred by black voters when that candidate is a minority."); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 598 (N.D. Ohio 2008) ("These contests are probative of racial bloc voting because they . . . featured African–American candidates.").

106.    While homogeneous precinct analysis and ecological regression have been used for approximately 40 years, *see, e.g.*, PTX-004 at 3–4; *see also Gingles*, 478 U.S. at 52–53, 80, EI is a more recently developed technique that experts agree produces the most accurate estimates. PTX-004 at 4–5. EI has been accepted in numerous district court proceedings. *See, e.g.*, *Nairne*, 2024 WL 492688, at *31 (noting that "[e]xperts agree and courts recognize that EI produces the most reliable estimates"); *id.* at *33 ("[T]he scientifically accepted method for analyzing whether there is racially polarized voting ('RPV') is the ecological inference analysis ('EI')"); *Alpha Phi Alpha Fraternity*, 2023 WL 7037537, at *40 and n 35 (noting that Dr. Handley and defendant's expert Dr. John Alford agreed that EI RxC is "the best of the statistical methods for estimating voting behaviors"); *Petteway v. Galveston Cnty.*, No. 3:22-CV-57, 2023 WL 6786025, at *47 (S.D. Tex. Oct. 13, 2023), *amended*, No. 3:22-CV-57, 2023 WL 6812289 (S.D. Tex. Oct. 15, 2023) (noting that all experts in the case agreed that "RxC ecological inference is an appropriate method for analyzing the voting patterns of different demographic groups"); *see also Singleton*, 582 F.

Supp. 3d at 967, 981, 991.

107.    Dr. Handley used two forms of EI called "King's EI" and "EI RxC." *E.g.*, PTX-004 at 4–5.  Dr. Handley also uses homogeneous precinct analysis and ecological regression to check the estimates produced by her EI RxC.

108.    The RPV analyses conducted by Dr. Handley utilize a database that combines precinct-level racial demographic information from the Census with precinct-level election return data.  Dr. Handley used election return data from 11 recent (2011-2020) statewide general election and general election runoff contests that included Black candidates, including elections for U.S. Senator, Governor, Attorney General, Secretary of State, Treasurer, and Commissioner of Insurance.  PTX-004 at 8–9.  Additionally, Dr. Handley analyzed data from the 2020 Presidential election contest which included Kamala Harris, a Black candidate.  *Id*.  Dr. Handley also analyzed 5 recent statewide general elections (2016-2020) that did not include Black candidates.  *Id*. at 9. There were no statewide general elections in 2021 or 2022, and at the time of Dr. Handley's report, data from the 2023 statewide general elections was unavailable*. See id.* at 8–9 & n.13.  In total, Dr. Handley analyzed data from 17 statewide general election and general election runoff contests in each of the seven areas of focus.  *See* PTX-004 at 8–9.

109.    Dr. Handley also analyzed data from 19 recent (2015 and 2019) state legislative election contests that included Black candidates in the areas of interest.  PTX-004 at 9–10.  A biracial state legislative election contest was analyzed if the House or Senate district was wholly contained within any areas of interest or if the district overlapped with any of the Illustrative or Enacted districts being compared within the area of interest.  *Id.*

110.    Additionally, because there is typically a two-stage election process in the United States, with a primary election required to produce the party nominee for the general election, Dr.

37

Handley analyzed data from 8 recent (2011-2020) statewide Democratic primaries, including a Democratic primary runoff, that included Black candidates.  PTX-004 at 10–11.

111.    Lastly, in order to rebut potential claims that clear patterns of polarization in Mississippi are a consequence of partisanship rather than racial polarization, Dr. Handley analyzed 3 recent (2012-2020) nonpartisan judicial elections that included both Black and White candidates. *See* PTX-004 at 11.

112.    The Court finds Dr. Handley's methods sound and credits her analysis.

113.    Dr. Handley's analysis demonstrated consistently high levels of racially polarized voting in each of the seven areas of focus.  Dr. Handley found that, in the statewide general election and general election runoff contests, and state legislative contests, in each of the seven areas, Black voters were very cohesive in supporting their preferred candidates and white voters were cohesively bloc voting against Black-preferred candidates. *See, e.g.*, PTX-004 at 11–12 and 36 (statewide contests); PTX-004 at 12 and 36 (state legislative contests); *see also* PTX-004 at 37–60.

114.    Dr. Handley observed extremely stark racial polarization in every statewide and state legislative general election in the dataset, across all seven areas of interest, with the vast majority of Black voters supporting one candidate and the vast majority of white voters opposing that candidate. *See, e.g.*, PTX-004 at 11–12 and 36 (statewide contests); PTX-004 at 12 (state legislative contests); *see also* PTX-004 at 37–60.

115.    For the 11 biracial statewide general and runoff elections, Black-preferred candidates received an average of 94.3% of the Black vote in the seven areas of interest and only an average of 6.9% of the White vote.  PTX-004 at 11.  The percentage of White support for the candidates preferred by Black voters varied only slightly across the seven areas of interest,

exceeding 10% in only one area, Western Jackson (14.0%).  *Id.*

116.   For the statewide general and runoff elections that did not include a Black candidate, the average percentage of White support for the Black-preferred White candidates was slightly higher than that for the Black-preferred Black candidates:  9.1% of the White voters crossed over to vote for White candidates of choice of Black voters (compared to 6.9% for the Black candidates preferred by Black voters).  PTX-004 at 11–12.  This was driven in large measure by support for Jim Hood in the 2019 gubernatorial general election contest (17.7% White support across the seven areas).  *Id.* at 12.

117.   Considering all 17 of the statewide contests in the dataset, the level of racial polarization is stark in each of the seven areas:

> a.   In Area 1, the percentage of Black voter support for the Black-preferred candidate ranged from 96.6% to 73.9% (average 92.29%).  *See* PTX-004 at 37–39.  The percentage of White voter support for the Black-preferred candidate in Area 1 ranged from 20.5% to 6.3% (average 9.67%).  *See id*.

> b.   In Area 2, the percentage of Black voter support for the Black-preferred candidate ranged from 97.4% to 85.3% (average 95.23%).  *See* PTX-004 at 40–42.  The percentage of White voter support for the Black-preferred candidate in Area 2 ranged from 9.8% to 2.9% (average 5.84%).  *See id*.

> c.   In Area 3, the percentage of Black voter support for the Black-preferred candidate ranged from 98.4 % to 89.3% (average 96.61%).  *See* PTX-004 at 43–45.   The percentage of White voter support for the Black-preferred candidate in Area 3 ranged from 17.5 % to 4.2% (average 7.49%).  *See id*.

> d.   In Area 4, the percentage of Black voter support for the Black-preferred

candidate ranged from 96.2 % to 83.2% (average 93.73%).  *See* PTX-004 at 46–48.   The percentage of White voter support for the Black-preferred candidate in Area 4 ranged from 13.1% to 2.8% (average 5.02%).  *See id*.

e.  In Area 5, the percentage of Black voter support for the Black-preferred candidate ranged from 98.3 % to 89.0% (average 96.31%).  *See* PTX-004 at 49–51.   The percentage of White voter support for the Black-preferred candidate in Area 5 ranged from 32% to 5.3% (average 15.68%).  *See id*.

f.  In Area 6, the percentage of Black voter support for the Black-preferred candidate ranged from 96.9 % to 85.2% (average 94.98%).  *See* PTX-004 at 52–54.   The percentage of White voter support for the Black-preferred candidate in Area 6 ranged from 14.8% to 3.1% (average 5.35%).  *See id*.

g.  In Area 7, the percentage of Black voter support for the Black-preferred candidate ranged from 96.6% to 82.9% (average 94.26%).  *See* PTX-004 at 55– 57.  The percentage of White voter support for the Black-preferred candidate in Area 7 ranged from 11.2% to 2.2% (average 3.86%).  *See id*.

118.    Dr. Handley also found racial polarization in the 19 recent, biracial state legislative contests in the areas of focus.  *E.g.*, PTX-004 at 12 and 36.  Dr. Handley found that (1) Black voters were cohesive in supporting Black candidates in these state legislative contests (average 83.3%); (2) White voters cohesively opposed Black-preferred Black candidates (average 18.3%); and (3) the Black-preferred Black candidates won the legislative seats for which they competed only in majority-Black districts.  *Id*.

119.    Dr. Handley also identified racially polarized voting in recent nonpartisan judicial contests that included both Black and White candidates.  *E.g.*, PTX-004 at 13–14.

120.     Dr. Handley reviewed two contests for Position 1 in the Central District of the Supreme Court and one contest for Position 2 in the Southern District of the Supreme Court.  PTX-004 at 13; *see also* PTX-004 at 63.  Dr. Handley's analysis shows that the two contests for Position 1 in the Central District of the Supreme Court were sharply racially polarized, with over 90% of the Black voters supporting the Black candidate and over 90% of the White voters supporting the White candidate in both instances.  PTX-004 at 13.  The third contest analyzed, Position 2 in the Southern District, was not polarized: White voters strongly favored the White candidate, Dawn Beam, as did a slight majority of Black voters.  *Id.*  This polarization found in two-thirds of these judicial contests cannot be explained by party because the election contests were nonpartisan.  *Id.* at 13–14.

121.     Dr. Handley also evaluated the voting patterns of 8 statewide Democratic primaries, including a primary runoff.  PTX-004 at 12–13.  Dr. Handley found that generating reliable statistical estimates in the seven areas proved impossible and therefore reported only statewide estimates.  PTX-004 at 12; 61–62.

122.     In these elections, Dr. Handley found that some of the Democratic primary contests were polarized by race.  PTX-004 at 12–13.  However, because the majority of White voters who cast ballots in primaries choose to vote in Republican primaries, candidates supported by Black voters usually managed to win the Democratic nomination; accordingly, the barrier to elected office for candidates preferred by Black voters is usually not the Democratic primary—it is the general election.  PTX-004 at 13.  Given the limitations of primaries, Dr. Handley based her findings of racially polarized voting in the seven areas of interest in Mississippi on the results of her analysis of voting patterns in recent general election and general election runoff contests— both the statewide and the endogenous (state legislative) elections.  *See* PTX-004 at 12.

123.    The Court credits Dr. Handley's conclusions, based on her analysis, regarding the existence of high levels of racially polarized voting in Mississippi general elections and general election runoffs, across all various types of elections (including state legislative elections) and across all seven areas of focus.

124.    Due to this high degree of racially polarized voting, Dr. Handley further found that, within the seven areas of interest, candidates preferred by Black voters are consistently unable to win elections due to White bloc voting against Black-preferred candidates, unless running in a Black-majority district.  *E.g.*, PTX-004 at 36.  Dr. Handley concluded that the starkly racially polarized voting patterns in the areas that she analyzed "substantially impedes" the ability of Black voters to elect candidates of their choice to the state legislature unless districts are drawn to provide Black voters with this opportunity.  PTX-004 at 2 and 36.  The Court credits this conclusion as well.

125.    The Court also credits the testimony of voters that Black and White Mississippians consistently support different candidates, and that Black candidates tend to be unsuccessful outside of Black-majority districts because they cannot garner White support, which is consistent with Dr. Handley's analysis.

126.    Defendants' expert, Dr. John Alford replicated Dr. Handley's analysis.  His replication further supports Dr. Handley's finding of racial polarization.  Notwithstanding his speculation about the underlying causes of racially polarized voting, Dr. Alford did not dispute that Black voters in Mississippi vote cohesively for preferred candidates, that White voters in Mississippi vote cohesively against Black-preferred candidates, and that this dynamic typically leads to the defeat of Black-preferred candidates except in Black-majority districts.    .

## B.  Dr. Handley's Effectiveness Analysis

127.  Dr. Handley also evaluated whether, given evident racially-polarized voting patterns, Black voters had the opportunity to elect candidates of their choice in the areas of interest under the Illustrative Senate and House Plans as compared to the Enacted Plans. *See, e.g.*, PTX-004 at 14–15.  She did this by looking individually at the performance of comparable, geographically overlapping sets of districts from each plan in each of the seven areas of focus. *E.g., id.* at 14–35.

128.  At the time Dr. Handley performed her analysis in the seven areas of interest there had been no general election results using the Enacted Plans.  PTX-004 at 14.  Further, because the Illustrative Plans are only for demonstrative purposes, they have not been used in any elections either.  *Id*.  Dr. Handley employed an alternative method, recompiled elections analysis, to assess whether Black voters have an opportunity to elect their candidates of choice under both the Enacted and Illustrative Plans.  *Id*. at 14–15.

129.  For her recompiled-elections analysis, Dr. Handley considered the district's demographic composition (*i.e.,* its BVAP) and used recompiled election results with official data from 11 (2011-2019) statewide election contests to determine whether Black voters have an opportunity to elect their candidates of choice in the newly proposed districts in both the Illustrative Plans and the Enacted House and Senate Plans.  PTX-004 at 14–15.  Recompiled-elections analysis has been accepted by courts for the purpose of evaluating Black voters' opportunity to elect their chosen candidates under a districting plan. *See, e.g.*, *Nairne*, 2024 WL 492688, at *31–32; *Robinson*, 605 F. Supp. 3d at 803.

130.  To perform this recompiled-elections analysis, precinct-level election returns from the 11 biracial general election contests in Dr. Handley's dataset were disaggregated down to the

level of the census block and then the block-level election data was reaggregated up, or recompiled, to conform to the boundaries of each of the Enacted and Illustrative Senate and House Districts in the seven areas of interest.  PTX-004 at 14–15.  The recompiled election results were analyzed in light of each district's demographic composition (*i.e.,* its BVAP).  *See, e.g.*, *id.*

131.   Based on this analysis, Dr. Handley calculated an "Effectiveness Score," which is simply the average vote share received by the 11 Black-preferred Black candidates across the 11 contests in each of the individual districts.  PTX-004 at 15.  A score of less than 0.5 means that the average vote share received by the 11 Black-preferred Black candidates is less than 50% and the district is not likely to provide Black voters with an opportunity to elect their candidates of choice. *Id.*

132.   Based on her analysis, Dr. Handley concluded that in each of the seven areas of interest, the only districts that provided Black voters with an opportunity to elect their chosen candidates despite White bloc voting against Black-preferred candidates were districts that were at least 50 percent BVAP.  *E.g.*, PTX-004 at 16–35.

133.   Dr. Handley found that, in each of the seven areas, Black voters would have a greater opportunity to elect their candidates of choice under the Illustrative Plans as opposed to the Enacted Plans, with the Illustrative Plans containing at least one additional opportunity district for Black voters in each of the seven areas.  PTX-004 at 16–35.

  a.   Area of Interest 1 has five Senate districts.  PTX-004 at 16.  Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SDs 2 and 11—had Effectiveness Scores above 50%, and thus would provide Black voters with an

opportunity to elect their candidates of choice. *Id.* But in the Enacted Senate Plan, only Enacted SD 11 had an Effectiveness Score above 50%, while in the other four districts, White bloc voting typically would result in the defeat of Black-preferred candidates. *Id.*

b. Area of Interest 2 has four Senate districts. PTX-004 at 18. Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SDs 16 and 17—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. *Id.* But in the Enacted Senate Plan, only Enacted SD 16 had an Effectiveness Score above 50%, while in the other three districts White bloc voting typically would result in the defeat of the Black-preferred candidates. *Id.*

c. Area of Interest 3 has three Senate districts. PTX-004 at 21. Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SDs 35 and 37—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. *Id.* But in the Enacted Plan, only Enacted SD 37 had an Effectiveness Score above 50%, while in the other two districts White bloc voting typically would result in the defeat of the Black-preferred candidates. *Id.*

d. Area of Interest 4 has four Senate districts. PTX-004 at 24. Taking into account

45

the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SDs 9 and 34—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. *Id.* But in the Enacted Plan, only Enacted SD 34 had an Effectiveness Score above 50%, while in the other three districts White bloc voting typically would result in the defeat of the Black-preferred candidates. *Id.*

e. Area of Interest 5 has three House districts. PTX-004 at 27. Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the three Black-majority districts in the Illustrative House Plan in this area—Illustrative HDs 56, 63, and 70— had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. *Id.* But in the Enacted Plan, only Enacted HDs 63 and 70 had Effectiveness Score above 50%, while in the Enacted HD 56 White bloc voting typically would result in the defeat of the Black-preferred candidates. *Id.*

f. Area of Interest 6 has four House districts. PTX-004 at 30. Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the three Black-majority districts in the Illustrative House Plan in this area—Illustrative HDs 16, 22, and 36—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. *Id.* But in the Enacted Plan,

only Enacted HDs 16 and 36 had Effectiveness Scores above 50% while in the other two districts, White bloc voting typically would result in the defeat of the Black-preferred candidates.  *Id.*

g. Area of Interest 7 has five House districts.  PTX-004 at 33.  Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the three Black-majority districts in the Illustrative House Plan in this area—Illustrative HDs 80, 82, and 84—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice.  *Id*.  But in the Enacted Plans, only Enacted SD 80 and 82 had Effectiveness Scores above 50% while in the other three districts, White bloc voting typically would result in the defeat of the Black-preferred candidates.  *Id.*

134.    Dr. Handley's recompiled-elections analysis demonstrated that, across all seven areas of interest, zero of the districts with less than 50% BVAP provided an effective opportunity for Black voters to elect their candidate of choice and overcome White bloc voting against Black-preferred candidates.  *See* PTX-004 at 16–35.

135.    The Court credits Dr. Handley's recompiled-elections analysis and her bottom-line conclusion, based on both her analyses, that White bloc voting typically results in the defeat of Black-preferred candidates in each of the areas of interest except where a Black-majority district is drawn.

136.    Defendants' expert Dr. Alford does not dispute Dr. Handley's findings.  *See also Nairne*, 2024 WL 492688, at *36 ("[B]oth Dr. Handley and Dr. Alford agree that Louisiana's Black and White voters 'are voting differently,' with Dr. Alford further testifying, '[i]f that's what you

want to call racially polarized voting, then it's racially polarized voting.'").  Nor did Dr. Alford perform any independent assessment of the effectiveness of the Enacted or Illustrative districts.

137.    The Court finds that consistently high levels of racially-polarized voting in the areas where the additional, reasonably-configured Black-majority Senate and House districts could be drawn typically results in the defeat of Black-preferred candidates in those areas.

## V.    Vote Dilution:  Totality of the Circumstances

### A.  Senate Factor 1:  Mississippi's History of Voting-Related Discrimination Against Black Voters

138.    The first Senate Factor is the "extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. 30, 36–37. It accounts for "the history of voting-related discrimination in the State or Political subdivision." *Gingles*, 478 U.S. at 44.

139.    As demonstrated by the analyses of historian and political scientist Dr. Marvin P. King, Jr. and historian Dr. Robert Luckett, among other evidence, the Court finds that Mississippi has an extensive history of voting-related discrimination, from 1890 to the present, including in the areas of focus in this case.  *See* Pl.'s Ex. 13, February 5, 2024 Amended Report of Dr. Marvin King [hereinafter "PTX-013"]; *see also* Pl.'s Ex. 7, February 5, 2024 Amended Report of Dr. Robert Luckett [hereinafter "PTX-007"].

140.    Dr. King is qualified to serve as an expert political scientist and historian, with a focus on Black history and politics.  Dr. King is a tenured professor at the University of Mississippi with a joint position in both Political Science and African American studies.  PTX-013 at 51–52. He has a Ph.D. in political science from the University of North Texas and has written and lectured

extensively on southern history with a particular emphasis on African American politics, including the different political orientations for Black citizens from the Civil War to present day. *Id.*

141.    Dr. Luckett is qualified to serve as an expert historian.  Dr. Luckett is a tenured professor at Jackson State University.  PTX-007 at 59–82.  He has a Ph.D. in history from the University of Georgia, where his studies focused on 20th Century American History and the Modern Civil Rights Movement.  *Id.*  Dr. Luckett has written and lectured extensively on Black history, with a particular emphasis on Southern Black advancement and the Civil Rights Movement, including Mississippi in particular.  *Id.*

142.    The Court finds that Dr. King and Dr. Luckett's analyses of Mississippi's history of discrimination were extensive, consistent with one another, and credible.

143.    Both Dr. King and Dr. Luckett concluded that Mississippi has a long history of racial discrimination, including with respect to the right of Black voters to register, vote, or otherwise participate in the political process, continuing in some forms to the recent past and even the present day.  *See* PTX-013 at 4–5; PTX-007 at 3.  Mississippi's history of voting-related discrimination against African Americans has taken the form of both violent, extra-legal measures and legal means.  *See* PTX-007 at 3.

144.    After the Civil War, the 1868 Mississippi Constitution, written by Black and White delegates, abolished slavery and gave voting rights to Black men.  *E.g.*, PTX-013 at 6; PTX-007 at 9.  Numerous Black Mississippians held political office and positions of leadership during this period of Reconstruction.  However, in response to the enactment of the 1868 Constitution, White Democrats created the so-called "Mississippi Plan," which was an effort to obtain political power through violence, intimidation, and voter suppression.  *E.g.*, PTX-013 at 6–7.  Sadly, those efforts were successful.

49

145.    During the 1875 Clinton Massacre, in Clinton, Mississippi, White Democrats and hostile onlookers created a melee at a political rally hosted by Black Republicans, and an estimated 35 to 50 Black people were killed and others were wounded by White vigilantes.  *E.g.*, PTX-013 at 7; PTX-007 at 12–13.  White residents identified and targeted Black leaders in the community in particular.  PTX-007 at 12.  The Court credits Dr. Luckett's analysis that the Clinton massacre prefaced an era of lynching and foreshadowed its use as a political tool.  *E.g.*, PTX-007 at 13.

146.    Federal troops had occupied the South since the end of the Civil War to protect Black freedpeople, but were removed starting in 1877, after which former Confederate leaders in Mississippi stepped up efforts to consolidate their political power through vigilante violence and lynching.  PTX-007 at 13.  White vigilantes used lynchings as a form of racial terror in Mississippi, including for the purpose of suppressing Black efforts for equality or political rights.  PTX-007 at 14.  Between 1877 and 1950, Mississippi led the nation in lynchings per capita and in raw numbers.  PTX-007 at 14.

147.    Amidst this period of intensifying violence inflicted upon Black Mississippians, by 1886, no Black legislators remained in the State Senate.  PTX-013 at 7.

148.    White leaders convened a new constitutional convention in 1890 to reinvent its legal system; and specifically the President of the constitutional convention declared its purpose was to disenfranchise Black people.  *E.g.*, PTX-007 at 15.  The 1890 Mississippi Constitution eliminated the voting power of Black Mississippians through various mechanisms.  PTX-013 at 7–11; PTX-007 at 15–16.  These included the implementation of felony disenfranchisement, residency requirements, poll taxes, and literacy exams.  *E.g.*, PTX-013 at 8–11; PTX-007 at 15–19.  Black people more frequently could not pay a poll tax due to owing debts in the sharecropping system, and literacy exams were administered by White registrars who often used their discretion

50

to fail Black potential voters. *E.g.*, PTX-007 at 16. Literacy exams had an "understanding clause" included as a mechanism to enable illiterate White people to vote. *E.g.*, PTX-013 at 8–9; PTX-007 at 15–16. So too, the new constitution mandated a two-year residency requirement in the election district to register to vote, which was more difficult for Black people, who frequently had to move because they did not own land. *E.g.*, PTX-007 at 15.

149.    The Mississippi Constitution's Framers also reduced the number of Black Mississippians eligible to vote by barring persons with felony convictions from voting and selecting crimes for disenfranchisement that they believed Black people were most likely to commit. PTX-013 at 10. The Mississippi Supreme Court declared in 1896 that the offenses that led to disenfranchisement were those associated with Black people, further underscoring the intent surrounding the felony disenfranchisement provisions. PTX-007 at 17.

150.    As a result of these mechanisms, voter registration rates among Black men fell from 90% during Reconstruction (prior to the passage of the 1890 Constitution) to less than 6% by 1892. *E.g.*, PTX-013 at 9.

151.    In addition to these various legal barriers to political participation, Mississippi also adopted a pervasive system of racial segregation, a code of racialized social control sanctioned by the Supreme Court's 1896 decision in *Plessy v. Ferguson*. PTX-007 at 10–11. Like some of the most blatant barriers to voting such as poll taxes and literacy tests, segregation persisted in Mississippi into the second half of the Twentieth Century, and remains within the living memory of many older Mississippians even today, as the trial testimony confirmed.

152.    Another method of voting discrimination that developed over the course of the Twentieth Century was the White Primary. The Democratic Party, which was the party of the White South until the parties began realigning around 1968, for decades restricted its membership

based on race and established all-White primaries.  *E.g.*, PTX-007 at 19. Those Black people who were able to register to vote were denied the opportunity to participate in Democratic primaries until the Supreme Court ended the practice of all-White primaries in 1944.  *Id.*  Even after its formal abolition, state-sanctioned discrimination and violence continued to enable exclusion of Black people from Democratic primaries.  *E.g.*, PTX-007 at 23–24.

153.   Black activists who sought to register and turn out voters were often met with violence and opposition.  For example, Medgar Evers mobilized a group of Black veterans to vote in the 1946 election in Decatur, Mississippi and faced an armed White mob.  *E.g.*, PTX-007 at 20. U.S. Senate candidate Theodore Bilbo publicly called for violence against Black people to intimidate them from voting that year.  *Id.* at 19.

154.   During the 1950s and 1960s, the White Citizens' Council, the Mississippi State Sovereignty Commission, and other White groups used violence and intimidation tactics against Black voters seeking political advances.  *E.g.*, PTX-013 at 12–16; PTX-007 at 20–27.  Created in 1956, the State Sovereignty Commission was a department of the state tasked with intimidating civil rights activists and discouraging Black people from registering to vote.  PTX-013 at 14.  The White Citizens' Council also resisted the *Brown v. Board of Education of Topeka*, 349 U.S. 294 (1955), decision, conducting essay writing and competitions on topics such as "Why I believe in social separation of the races of mankind" and "Why the preservation of States rights is important to every American."  PTX-013 at 12–13.

155.   Into the 1960s, when Black Mississippians attempted to register to vote, they continued to face violence and intimidation tactics by White vigilantes.  *E.g.*, PTX-007 at 23–27.

a.  Medgar Evers was assassinated in his driveway by a known Citizens' Council and Ku Klux Klan member in 1963 for his activism and involvement in

52

promoting voting rights.  PTX-007 at 22.

b.  When civil rights activists attempted to register Black voters as part of the "Freedom Summer" in 1964, three were murdered by a White lynch mob aided by the Klan and the local sheriff's office in Neshoba County, Mississippi.  PTX-007 at 22–23.   White law enforcement officials were implicated in these murders, and the State Sovereignty Commission supported their defense.  PTX-013 at 15.

c.  Another NAACP leader, Vernon Dahmer, was assassinated by Klansmen in his home outside Hattiesburg, Mississippi in 1966, after he led efforts to register potential Black voters.  PTX-007 at 26–27.

d.  Also in 1966, James Meredith, a Black civil rights activist, was shot by a White gunman in DeSoto County after he organized a march to register Black people in the state to vote.  *Id.*

156.   Following the passage of the Voting Rights Act, White leaders sought to minimize its impact by creating at-large elections and enacting racial gerrymandering through redistricting. *E.g.*, PTX-007 at 27.  For example, the all-White Mississippi legislature divided the Mississippi Delta (a majority-Black area that had previously been in one congressional district) into three congressional districts after the Voting Rights Act passed, only one of which was majority-Black by a slim margin.  PTX-007 at 28.  Despite having the highest percentage of Black population of any state in the nation, Mississippi did not elect a Black congressman after Reconstruction until 1986, when a federal court ordered a redrawn map bringing the Delta back into one Congressional district.  PTX-007 at 28–29.

157.   From 1985 to 2012, the Civil Rights Division of the U.S. Department of Justice

issued 81 letters to Mississippi and counties and local districts within Mississippi, alleging violations of the Voting Rights Act. *E.g.*, PTX-007 at 31. The Department of Justice objected to local redistricting plans in Chickasaw County, Monroe County, Clinton, and Aberdeen, among others. *Id.* Federal courts also found local redistricting plans in Tupelo and the Delta region to violate Section 2 of the Voting Rights Act because they diluted the power of Black voters. PTX-007 at 33. Following the 2000 and 2010 Census, federal courts drew new congressional districts when Mississippi failed to produce a plan that complied with Section 5 of the Voting Rights Act. PTX-007 at 34.

158. Mississippi maintained a requirement that voters register separately for municipal and federal elections from 1892 until it was struck down in 1987, with a court finding that the law had discriminatory intent and discriminatory results toward Black voters. PTX-007 at 35. Mississippi continued to try to revive the practice, but its efforts faced objections from the Justice Department under Section 5 of the Voting Rights Act. *Id.*

159. In 2011, Mississippi passed a law requiring an approved form of identification to vote, but the U.S. Department of Justice denied preclearance of the law under Section 5 of the Voting Rights Act, preventing it from going into effect. PTX-007 at 36. Black Mississippians were shown to be much less likely to have the required identification. *Id.* After the Supreme Court's *Shelby County v. Holder* decision, Mississippi implemented this voter identification requirement, contributing to voting-related discrimination. *Id*.

160. Today, some methods of state-sanctioned voting-related discrimination persist in Mississippi. Felony disenfranchisement has disenfranchised Black Mississippians by a greater amount than White Mississippians over time, and even as other states trended toward reinstating the right to vote after a felony conviction, Mississippi expanded the list of crimes for which a

citizen to lose the right to vote in 2009. PTX-013 at 11. The present-day effect of the 1890 Constitution's practice of felony disenfranchisement is that an estimated 58% of Mississippians who are disenfranchised due to a felony conviction are Black, even though only 36% of voting age citizens in Mississippi are Black. PTX-013 at 10; *see also* PTX-007 at 18.

161. There is no question that Mississippi in 2024 is different from Mississippi in 1894 or 1964. However, the Court credits the historical analysis offered by Dr. King and Dr. Luckett, as well as the testimony of individual Black Mississippians, all of which demonstrates that Mississippi's sad history of pervasive and often violent racial discrimination and political exclusion is not some distant memory. The Court also credits Dr. King and Dr. Luckett's historical analysis demonstrating how new forms of discrimination and White resistance to Black political equality arose over the course of the Twentieth Century.

**B. Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi**

162. The second Senate Factor is "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37.

163. As demonstrated by the analyses of Dr. Handley and Dr. King, among other evidence, the Court finds that voting in Mississippi and in the specific areas of focus remains extremely polarized along racial lines.

164. As set forth above, Mississippi elections are characterized by stark patterns of RPV. *See supra*, Findings of Fact § IV.A. Without repeating the discussion of Dr. Handley's extensive and highly credible analysis, the Court credits Dr. Handley's characterization that the observed levels of racially polarized voting by Black and White voters are extremely high and extremely consistent—as much as anywhere she has observed in her decades of work conducting such analyses.

165.    The Court finds, consistent with the evidence, that this polarization is genuinely racial in nature, and not merely partisan polarization that happens to coincide with racial lines.

166.    This finding is based in part on Dr. Handley's analysis demonstrating evidence of polarization even within non-partisan contests, where party cannot explain differences in White and Black support.  *See supra*, Findings of Fact ¶¶ 119–120.

167.    It is also based on the evidence and analysis, which this Court credits, that, in Mississippi, contemporary partisan lines formed in response to racial politics, not independently of them.  *See also Nairne*, 2024 WL 492688, at *38.

168.    The Court credits Dr. King's analysis explaining how the racial divide between voters predates the current alignment of the political parties, and how attitudes towards civil rights and racial equality significantly contributed to and continue to drive that alignment.

169.    Following the Civil War, Black Americans were Republican partisans due to President Lincoln and the Republican Congress's measures attempted to address the needs of the Freedman.  *E.g.*, PTX-013 at 20.  The Black vote remained mostly Republican through the 1920s, because the Republican party, for that portion of American history, was deemed to be the political party that would elevate Black interests.  *E.g.*, Pl.'s Ex. 14, November 15, 2023 Report of Dr. Marvin King [hereinafter "PTX-014"] at 8–9; PTX-013 at 20.

170.    The 1964 Civil Rights Act played an outsized role in understanding partisan realignment.  *E.g.*, PTX-013 at 25.  During the 1964 election, Black voters began gravitating to the Democratic Party, because Democratic candidates began to advocate for advancing civil rights, while Republican candidates used race to appeal to White voters dissatisfied with the Democratic Party's promotion of civil rights.  *E.g.*, PTX-013 at 25–29.  The Republican Party became identified as the more racially conservative party, while the Democratic Party became associated

with support for racial progress through the enactment of the 1964 Civil Rights Act, 1965 Voting Rights Act, and the 1968 Fair Housing Act, during periods of Democratic control of government. *E.g.*, PTX-013 at 20-27; PTX-014 at 3-4, 9.

171.    The Court credits Dr. King's analysis, based on political science scholarship, that Black voters tend to vote for political candidates who are perceived as more likely to advance the common good of Black people.  *E.g.*, PTX-014 at 8.

172.    Political science research also indicates that Black voters' preference for a Black candidate may not be observable unless the candidate is viable.  *E.g.*, PTX-014 at 9–10.  Candidate viability refers to the voter's assessment of a candidate's quality, name recognition, money earned, endorsements, incumbent status, prior elected office held, and any other electoral history relevant to the candidate's chance of winning.  PTX-014 at 10.  Black voters may be inclined to vote for a White Democrat over a Black Democrat if Black voters view the Black candidate as a weaker candidate for the general election, even if, all else equal, Black voters would otherwise prefer the Black candidate.  PTX-014 at 9–10.  Thus, the fact that Black voters sometimes vote for White Democrats, standing alone and without controlling for factors such as viability, does not demonstrate that race is an irrelevant consideration for voters.

173.    The Court also credits Dr. King's response to Dr. Alford's claim that the presidential election results in Mississippi fail to show any effect of the race of the candidate on the level of Black support.  *See* PTX-014 at 5–6.  While Dr. Alford argues that each of the Obama/Biden, Clinton/Kaine, and Biden/Harris slates earned similarly high shares of the Black vote in Mississippi and similarly low shares of the White vote, he fails to account for voter turnout and enthusiasm.  *Id.*  As Dr. King's analysis shows, the Democratic presidential ticket earned many more votes—almost certainly from Black Mississippians given the undisputed polarization in

candidate preferences between Black and White voters—when at least one of the nominees was Black.  *Id.*  The tickets headed by Barack Obama earned the highest turnout among Black voters in Mississippi, followed by the ticket with Kamala Harris as the vice-presidential candidate, with Clinton/Kaine trailing the furthest behind—showing precisely the pattern that one would expect if the race of the candidate does influence Black voters' political behavior.  *Id.*

174.    The Court credits Dr. King's analysis that race frequently operates as the driving political issue and has so operated throughout American history, longer than any other issue.  PTX-013 at 29–30.  In Mississippi, a race-based partisan realignment occurred because of decades of action and inaction relating to racial issues by both political parties.  *Id.*  Race-based party polarization has long existed in Mississippi.  *Id.*

175.    As detailed further below, *infra,* Findings of Fact § V.E, political campaigns in Mississippi continue to feature racial appeals designed to appeal to specific racial groups, which have the effect of reinforcing the racial divide between the political parties and ensuring that partisan politics remains racialized.

176.    The Court's finding that the extreme levels of racial polarization in Mississippi are not merely a byproduct of partisanship is further supported by the testimony of individual Mississippians, which confirms that voters respond to the positions taken by parties and candidates, particularly their positions on issues that relate to racial justice and equality.

### C. Senate Factor 3: Mississippi's Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters

177.    The third Senate Factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against

the minority group." *Gingles*, 478 U.S. at 37.

178.    The Court finds that Mississippi has used, and in some cases continues to use, voting practices or procedures that increase the opportunity for discrimination against Black voters, including in the areas at issue in this case, as demonstrated by the analyses of Dr. King and Dr. Luckett, which the Court credits.   Many of those practices and procedures were detailed already. *See supra*, Findings of Fact ¶¶ 148–161.   Past mechanisms include poll-taxes, all-White primaries, literacy tests, and grandfather clauses.   Past and continuing mechanisms include at-large voting, majority-vote requirements, felon disenfranchisement, and restrictions on early voting and absentee voting.

179.    After the passage of the Voting Rights Act, Mississippi authorized at-large elections districts for all manners of elected offices.   By having at-large elections across a city or region, local communities and neighborhoods within those areas that were majority-Black saw their voting power diluted and suppressed, resulting in little to no representation for Black Mississippians. *E.g.*, PTX-007 at 29–30.   As some examples, in 1962, the state legislature required that cities with Boards of Aldermen select those positions in at-large elections, a practice that was struck down by a federal court in 1975. *Id.*   In 1977, the city of Jackson, despite having a 47% Black population, selected White commissioners and a White mayor through city-wide, at-large elections.   PTX-007 at 30.   More recently, in 2004, Black voters in Tupelo (including in one of the areas of interest in this case) contested an at-large system for electing city council members after no Black candidates had been elected to the council for over a decade; a federal court ordered Tupelo to create a ward system.   PTX-007 at 33.

180.    Mississippi also continues to use a majority-vote requirement, holding primary and general election runoffs for many state offices, as well as primary runoffs in state legislative races.

*See* Miss. Code Ann. § 23-15-833; *see also, e.g.*, PTX-013 at 16–17.  These runoffs reduce the ability of Black voters to elect preferred candidates.  *Id.* at 16–18.  The Court credits Dr. King's analysis that Mississippi adopted runoff elections in an effort to minimize Black voting strength. *Id.*

181.    Mississippi holds elections for the state legislature (as well as other state offices) in odd years, in contrast to federal elections, which are held in even years.  Miss. Code Ann. 23-15 193; *see also, e.g.*, PTX-007 at 39.

182.    Mississippi also implemented dual registration in 1892 to make it more difficult for Black Mississippians to vote.  Dual registration required voters to register separately for state elections and federal elections.  *E.g.*, PTX-007 at 35.  The system allowed voters to participate in federal elections pursuant to federal law, and subjected voters to more stringent burdens if they wanted to vote in local elections.  *Id.*  The practice remained in place from 1892 until it was struck down in 1987 because it discriminated in both intent and results.  PTX-007 at 35; *see also Operation Push v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987).

183.    Mississippi also adopted lifetime felon disenfranchisement for certain crimes as part of its 1890 Constitution.  As noted already, this provision, which was expressly adopted to help exclude Black Mississippians from politics, continues to disproportionately disenfranchise Black citizens.  *See supra*, Findings of Fact ¶¶ 148-149.

184.    Following the passage of the Voting Rights Act, the Mississippi legislature and local governments also used redistricting in Mississippi to dilute the impact of the Black vote, leading to multiple federal court orders directing the legislature to redraw the districts and repeated intervention from the United States Department of Justice.  *E.g.*, PTX-007 at 27–36.

185.    In more recent years, Mississippi has imposed new or additional restrictions on

voting that enhance opportunities for discrimination, in effect if not in intent.  *E.g.*, PTX-007 at 36–40.  For example, Mississippi waited until the Section 5 preclearance regime was struck down to impose a strict ID requirement for voters.  *See supra*, Findings of Fact ¶¶ 159.

186.   Mississippi's absentee voting rules are among the most stringent in the Nation. Mississippi restricts absentee voting to voters with one of eight acceptable excuses to vote absentee and requires absentee voters to obtain notarization on the paperwork for both their application and their ballot.   In 2023, Mississippi sought to restrict most eligible assistors for people with disabilities from collecting or transmitting an absentee ballot.  *E.g.*, PTX-007 at 38.  The Court credits Dr. Luckett's conclusion that these restrictions on absentee voting disproportionately impact Black voters who rely on absentee voting in greater proportions than White voters due to financial hardships, work requirements, health disparities, and high incarceration rates.  *Id.*  The Court also credits Mamie Cunningham's testimony as to the impact of the criminalization of ballot assistance on her and her community.

187.   In 2023, Mississippi passed a law that removes registered voters from the voting rolls if they do not participate in a federal election over four years and do not return an address confirmation card.   The Court credits Dr. Luckett's conclusion that this law is likely to disproportionately affect Black citizens because Black Mississippians are more likely to live in poverty and to lack a long-term permanent address or reliable access to mail.  PTX-007 at 38–40.

188.   In 2023, Mississippi passed a law expanding the Capitol Complex Improvement District ("CCID") in Jackson, a city with a high Black population.  The Court credits Dr. Luckett's analysis that the effect of this expansion is to displace democratically elected or accountable judges, prosecutors, and police with appointed officials in parts of majority-Black Jackson.  PTX-007 at 38–40.

189.    The Court also credits the testimony of individual Mississippi voters regarding the burdens on Black voters in particular due to the voting practices and procedures employed in Mississippi.

**D.  Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation**

190.    The fifth Senate Factor considers "the extent to which members of the minority group… bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process," and weighs in Plaintiffs' favor as well. *Gingles*, 478 U.S. at 37.

191.    The Court finds that there are persistent disparities between Black and White Mississippians in such areas as education, employment, and health, which bear on and hinder Black Mississippians' ability to participate equally in politics, as demonstrated by the analysis of Dr. Byron D'Andra Orey, among other evidence. *See, e.g.*, Pl.'s Ex. 8, November 14, 2023 Amended Report of Dr. Byron D'Andra Orey [hereinafter "PTX-008"].

192.    Dr. Orey is a full professor with tenure in the Department of Political Science at Jackson State University and a former chair of the Department of Political Science.  He received his Ph.D in political science from the University of New Orleans and also holds a master's degree in public administration from the University of Mississippi.  PTX-008 at 29–30.  He has taught, published, and conducted significant research in the area of race and political behavior.  PTX-008 at 2, 31–52.  His research has been presented at professional conferences and published in several peer reviewed scholarly journals.  *Id*.  He has also served on the executive committees for the American Political Science Association, the Southern Political Science Association, and the National Conference of Black Political Scientists.  *Id*.

193.    Dr. Orey has previously testified as an expert witness in *Johnson v. Hamrick*, No. 91-CV-02 (N.D. Ga.), a redistricting case involving city council elections in Gainesville, Georgia. PTX-008 at 2, 31–52.  He also served as an expert but did not testify in *Lewis v. Alamance County*, No. 92-CV-614 (M.D.N.C) and *Jackson v. Nassau County Board of Supervisors*, No. 91-CV-3720 (E.D.N.Y.).

194.    In preparing his reports, Dr. Orey relied on sources and methodologies that are consistent with his work as a political scientist, including the use of statistical methods for analyzing populations and political behavior.

195.    The Court finds that Dr. Orey is highly credible and qualified to give expert opinion testimony regarding racial disparities in Mississippi and their effects on voter participation.

196.    The Court credits Dr. Orey's analysis, based on the political science literature, that voting and political participation has an economic "cost," and accordingly whether an individual voter is influenced by their own access to resources, such as financial resources, leisure time, and education.  *See, e.g.*, PTX-008 at 4.

197.    The Court credits Dr. Orey's findings that, as a result of Mississippi's long history of discriminating against Black residents in nearly every aspect of daily life, the Black Mississippians experience socioeconomic disparities that impair their ability to participate in the political process.  *E.g.*, PTX-008 at 2–19.  The Court credits Dr. Orey's analysis, based on data from the U.S. Census' American Community Survey and Mississippi state sources, that Black Mississippians are significantly worse off in terms of income, poverty, unemployment, educational attainment, internet access, vehicle ownership, and health insurance coverage.  *E.g.*, *id.* at 5–19.

198.    Economically, Mississippi continues to be one of the poorest states in the nation. According to the 2021 American Community Survey (ACS), roughly 14.4 percent of

Mississippians lived in poverty.  However, 31 percent of Blacks live below the poverty line compared to only 11.5 percent of Whites.  *E.g.*, PTX-008 at 5.  This racial disparity is evident across a number of other economic indicators as well:

> a.   Median income: Black households earned approximately $33,541, compared to $61,340 for Whites.  *Id.* at 5.
>
> b.   Percentage receiving food stamps: Almost 25 percent of Blacks receive them compared to only 7 percent of Whites.  *Id.* at 6.
>
> c.   Unemployment: 10.5% of Black Mississippians are unemployed, compared to 3.9% of Whites.  *Id.* at 7.

199.   The Court credits Dr. Orey's analysis, based on well-developed political science literature, that there is a strong correlation between financial status and voter turnout.  As Dr. Orey demonstrated, based on the literature as well as his own regression analysis, income and poverty are significant factors influencing voter participation, generally and specifically in Mississippi. The Court finds that the significant economic disparities between Black and White Mississippians hinder Black political participation as compared to their White Mississippians.  PTX-008 at 4–7, 27–28.

200.   The Court also credits Dr. Orey's analysis demonstrating significant racial disparities in Mississippi with respect to educational attainment.  *E.g.*, PTX-008 at 8–12. According to ACS data, 10.3% of White Mississippians did not complete high school, compared to 17.9% of Black Mississippians.  *E.g.*, PTX-008 at 8.  On the other end of the spectrum, 28.5% of White Mississippians have a bachelor's degree or higher, compared to 18.2% of Black Mississippians.  *Id.*  The Court also credits Dr. Orey's analysis that racial disparities are observable in student test scores.  *E.g.*, *id.* at 10–11.  The Court finds that these disparities in educational

attainment in turn contribute to disparities in financial and economic status.

201.    This Court credits Dr. Orey's analysis that these educational disparities can be traced to the long history of both de jure and de facto racial inequality segregation in Mississippi. While de jure segregation has been unlawful for decades, residential patterns among other things have resulted in many school systems being as segregated today as they were decades ago.  *E.g.*, PTX-008 at 9.  As recently as 2023, dozens of school districts in Mississippi remained under federal desegregation orders.

202.    The Court credits Dr. Orey's analysis regarding the numerous negative effects of segregation in housing and education.  Because of the racial economic disparities and resulting variations in local tax bases, residential segregation results in underfunded Black schools compared to predominantly White schools.  In short, poorer, blacker areas can afford fewer educational services.  This resource disparity is exacerbated by the underfunding of Mississippi public schools, which Dr. Orey estimates have been underfunded by $2.3 billion since 2008.  PTX-008 at 12.  Dr. Orey's analysis also indicated that the state has spent tens of billions of dollars less on educating Black students than White students since 1890.  *Id.*

203.    Dr. Orey also explained the significant body of research on the psychological effects of segregation on Black students.  The experience of attending an under-resourced school with limited diversity can lead to feelings of marginalization, low self-esteem, and diminished confidence in academic abilities.  This can create a cycle of underperformance and reduced motivation to excel in academics.  *E.g.*, PTX-008 at 12.

204.    The Court also credits Dr. Orey's original analysis demonstrating a correlation between school segregation and test scores, which demonstrates the negative effects of continued de facto segregation.  *E.g.*, PTX-008 at 11–12.

205.     The Court credits Dr. Orey's analysis, based on an extremely well-developed body of political science literature, that there is a very strong correlation between educational attainment and voter turnout.  Simply put:  Educational disparities affect political participation, with the highest voter turnout occurring among people with the most education.  PTX-008 at 7.  The Court also credits Dr. Luckett's analysis, based on well-developed historical and political science literature, showing that Mississippi's history of discrimination with respect to public education impacts voting turnout and life outcomes, resulting in a hindrance of political participation among Black Mississippians.  PTX-007 at 41–50.  The Court finds that racial disparities in educational attainment hinder Black political participation as compared to White Mississippians.

206.     Dr. Orey identified additional racial disparities based on objective socioeconomic data, and the Court credits his conclusion these may further contribute to the ability of Black Mississippians to participate equally in politics.  For example:

    a.   Orey also identified a gap in the percentage of Black and White Mississippians with access to broadband internet.  The Court credits Dr. Orey's conclusion that lack of access to broadband can limit economic opportunity and opportunities for political engagement.  PTX-008 at 12–13.

    b.   Dr. Orey also identified a gap in the percentage of Black and White Mississippians with access to a vehicle.  The Court credits Dr. Orey's conclusion that lack of access to a vehicle increases the cost of voting and political participation and limits economic opportunities.  PTX-008 at 14.

207.     Dr. Orey also identified racial disparities in health between Black and White Mississippians.  Mississippi ranks last, or near the bottom in the country, in almost every leading health indicator.  And Black Mississippians exhibited the highest mortality rates for numerous

66

health conditions, including hypertension, stroke, diabetes, renal disease, HIV/AIDS, cancer, and homicide; the highest rates of infant mortality rate, and higher rates of prevalence of coronary heart disease, hypertension, obesity, diabetes, current childhood asthma, HIV, and permanent teeth extractions. *E.g.*, PTX-008 at 15–16.

208.    Notably, Dr. Orey also identified significant racial disparities in health insurance coverage, with more Black Mississippians lacking coverage, and more Black Mississippians reliant on public health insurance programs such as Medicaid.  The Court credits Dr. Orey's conclusion that racial disparities in health insurance coverage are reflective of historical and ongoing inequities. *E.g.*, PTX-008 at 16.

209.    Racial disparities in health insurance coverage are reflective of historical and ongoing inequities that have hindered Black individuals' access to essential resources, including quality healthcare.  PTX-008 at 15.  Lack of access to affordable health care, or dependance on public insurance, which can lead to limited choices and potentially restricted access to certain healthcare providers and services, both exacerbate economic disadvantages for Black Mississippians and make political participation much more difficult. *E.g.*, *Id.* at 17.  The Court credits Dr. Orey's analysis that health conditions significantly influence an individual's level of political participation, with both direct and indirect effects on their engagement in the political process.

210.    The Court also acknowledges Dr. Orey's analysis that state policy decisions have exacerbated health inequality.  For example, Mississippi is one of the few states not to expand Medicaid after passage of the Affordable Care Act.  PTX-008 at 18.

211.    The Court also credits Dr. Orey's analysis that disproportionate involvement with the criminal justice system hinders Black Mississippians' ability to participate equally in politics

relative to Whites.  In particular, and as noted already, Mississippi's continuing imposition of permanent disenfranchisement for certain felony offenses disproportionately impedes voting for Black Mississippians due to historical and systemic factors that have led to higher rates of incarceration within the Black community, and higher rates of permanent disenfranchisement. PTX-008 at 19–20.

212.    Dr. Orey also conducted a number of analyses directly measuring voter turnout levels by Black and White Mississippians.  The Court finds Dr. Orey's methods reliable and credits Dr. Orey's conclusion, based on multiple analyses, that Black Mississippians not only face higher burdens on political participation due to these persistent disparities, but actually turn out at lower rates.

213.    Dr. Orey examined Black and White voter turnout in the 2020 general election using three different methods: (1) ecological inference analysis based on precinct-level election results and U.S. Census racial demographic data; (2) Bayesian Improved Surname Geocoding (BISG) of the Mississippi Secretary of State's full voter database (which includes voter history); and (3) reviewing estimates from the Cooperative Election Study (CES), a survey where voters' turnout behavior is independently validated to eliminate the known problem of overreporting voting behavior in polls and surveys.  PTX-008 at 22–24.  Each of these methods showed a significant gap in turnout between Black and White Mississippians.  The Court finds that the use of multiple methods to evaluate a single election renders Dr. Orey's analysis and conclusions regarding that election extremely reliable.

214.    Dr. Orey's EI estimate indicated that White turnout in 2020 was 65.84%, while Black turnout was only 56.03% .  The Court credits Dr. Orey's conclusion, based on the confidence intervals he calculated for his EI analysis, that this estimated 10-point gap reflects a real, significant

disparity in turnout levels.  PTX-008 at 25.

215.    Dr. Orey used BISG to estimate the racial composition of the Mississippi voter file.

BISG is an algorithmic method used to predict a person's race or ethnicity based on their last name

and where they live on a map.  It has been accepted by Courts in redistricting cases nationwide.

*See Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 227 (2d Cir. 2021); *Petteway v.*

*Galveston Cnty.*, No. 3:22-CV-57, 2023 WL 6786025, at *16 (S.D. Tex. Oct. 13, 2023), *aff'd sub*

*nom. Petteway v. Galveston Cnty., Texas*, 86 F.4th 214 (5th Cir. 2023), *reh'g en banc granted,*

*opinion vacated on other grounds*, 86 F.4th 1146 (5th Cir. 2023).  Applying BISG to a copy of the

Mississippi voter file, which contains voter names, addresses, and voting history from 2020 and

prior elections, Dr. Orey estimated a 69.7% turnout rate for White Mississippi registered voters,

compared to 57.3% for Blacks—a 12.4 point gap.  PTX-008 at 25.

216.    The court credits this analysis.  While the voter file used by Dr. Orey was obtained

in 2022, the Court finds that Dr. Orey's analysis was run with voters who registered after October

2020 removed from consideration, and that the voter file he used otherwise accounted for over

98% of the over 1.3 million total votes cast in the 2020 election, making it an extremely robust

form of analysis.  *See, e.g.*, Pl.'s Ex. 9, November 22, 2023 Responsive Expert Report of Dr. Byron

D'Andra Orey, at 6 [hereinafter "PTX-009"].  The fact that a small number of the voter records

from 2020 were not included does not alter the power of the analysis, especially because there

were so few missing that they could not change the bottom-line result of the analysis.

217.    Notably, because the BISG analysis was based on the voter file, it also allowed for

county-level estimates of turnout by race, which show that these racial gaps in actual turnout exist

in the specific areas of focus in this case.  *E.g.*, PTX-008 at 26, 58–60.

218.    Moreover, because the Mississippi voter file contains voting history from years

before 2020, it also allowed for confirmation of racial turnout gaps in prior elections as well.  *E.g.*, PTX-009 at 6.

219.    Lastly, Dr. Orey examined turnout by race estimates using the Cooperative Election Survey (CES), a 50,000+ person national stratified sample survey administered by the polling firm YouGov.  The CES dataset includes "validated vote" information, representing an independent validation of whether a survey respondent voted.  Among registered voters, the CES's validated-vote turnout estimate was 72.5% for Black Mississippians in 2020, compared to 86.8% turnout for Whites, a 14.3 point gap.  PTX-008 at 26.  Among all adults, the validated-vote turnout rates estimated by the CES were 46.1% for Black Mississippians in 2020, compared to 59.6% turnout for Whites, a similar, 13.5% gap.  *Id*. at 25.  The Court credits Dr. Orey's analysis that the racial turnout gaps demonstrated by the CES among all adults and registered voters are statistically significant, and corroborative of the gaps he observed with the EI and BISG methods.

220.    The Court credits Dr. Orey's conclusion that, based on the consistent gap across these three measures of turnout, there was a substantial, roughly 10-point gap in voter turnout between Blacks and Whites in the 2020 election, with Black voters turning out at lower rates. PTX-008 at 26.

221.    In contrast, the Court does not credit survey data from the Current Population Survey (CPS) Voting and Registration Supplement offered by Defendants as an alternative measure of voter turnout in Mississippi.

222.    For one, the Court determines that this data is not judicially noticeable.  The CPS is not population data from the decennial U.S. Census.  It is an unverified, self-reported survey of voting behavior from a random sample of persons.  However, the Census Bureau acknowledges that "respondent misreporting" causes "error in the CPS estimates" and that the CPS estimates

differ from official vote counts.  Pl.'s Ex. 25, U.S. Census Bureau, *Frequently Asked Questions (FAQs) About Voting and Registration*, at 3; *see also Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-CV-5337-SCJ, 2023 WL 5675032, at *2–3 (N.D. Ga. Aug. 23, 2023) (declining to take judicial notice of CPS data because "the Census Bureau expressly states that its voter turnout and registration data has errors").  Courts in the Fifth Circuit have similarly found that the CPS is not reliable as an estimate for voter turnout because of known issues with self-reported voting surveys, namely the known tendency of survey respondents to say they voted even when they did not.  *Thomas v. Bryant*, 938 F.3d 134, 162–63 (5th Cir. 2019) (upholding district court decision to discredit CPS as measure of voter turnout because CPS data has "known issues" as a "self-reported voting survey[]" and finding ecological inference and official voter records more credible); *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 412 (5th Cir. 1991) (affirming district court decision to favor expert analysis of voter registration based on official state records, over Census Bureau survey data due to unreliability of "uncorroborated self-reporting" and to "evidence demonstrating that black respondents to the [census] questionnaire overreported voter registration at a higher rate than white respondents.").

223.    Whether or not judicial notice of the data itself is taken, the Court credits the opinions from both Dr. Orey and political scientist Dr. Jordan Ragusa, another of Plaintiffs' experts, that racial disparities in the overreporting of voting behavior on unverified surveys is a known problem in the political science literature, including with the CPS in particular.  *See, e.g.*, PTX-009 at 2; Pl.'s Ex. 10, January 29, 2024 Second Rebuttal Report of Dr. Jordan Ragusa, including all exhibits and appendices thereto, at 3–4 [hereinafter "PTX-010"]; Pl.'s Ex. 12, Ansolabehere, Fraga, and Schaffner, *The Current Population Survey Voting and Registration Supplement Overstates Minority Turnout*, THE JOURNAL OF POLITICS (2022),

https://www.journals.uchicago.edu/doi/abs/10.1086/717260.   As they explained, it is well established in the literature that, while all persons tend to overreport voting behavior in surveys, Black persons overreport at higher rates.   PTX-009 at 2; PTX-010 at 3–4.   This differential overreporting means that using an unverified survey to examine turnout *by race* is likely to lead to an inaccurate result.

224.   In addition to his analysis of voter turnout by race, Dr. Orey also conducted a regression analysis to examine, empirically, the extent to which Black turnout in Mississippi was in fact driven by the socioeconomic markers discussed already.   *E.g.*, PTX-008 at 26–28.   Dr. Orey used voter turnout data from the BISG voter file analysis, and socioeconomic data from the ACS.

225.   The Court credits this original analysis, which indicated a statistically significant relationship between Black turnout and a number of independent variables, specifically Black educational attainment, food stamp use, and rates of uninsured.   *E.g.*, PTX-008 at 26–28.   This analysis strongly corroborates the finding that the undisputed racial gaps with respect to education, financial status (and poverty in particular), and health between Black and White voters hinders Black Mississippians' ability to participate equally in politics as compared to Whites.

**E.  Senate Factor 6:  Racial Appeals in Mississippi Politics**

226.   The sixth Senate Factor assesses "whether political campaigns have been characterized by overt or subtle racial appeals."   *Gingles*, 478 U.S. at 37.   Both overt racial appeals and subtle, racialized references can be employed to influence voters.   *Id.*

227.   The Court finds that elections in Mississippi have long been marked by both overt and subtle racial appeals, and that the unfortunate use of such appeals by some campaigns has continued into the present.   *See, e.g.*, PTX-013 at 31–40.   The Court finds Dr. King's analysis of racial appeals in Mississippi politics credible.

228.     Overt racial appeals include the use of explicitly racist language.  PTX-013 at 31–
32.  This language was more commonly used through the mid-1960s.  *Id*.  By 1968, candidates
who engaged in racial appeals began using implicitly coded language.  *Id*.  Candidates used subtle
racial appeals, also known as "dog whistles," to signal to White voters their stance on racial issues.
*Id*.  "Dog whistles" allow candidates to use racial appeals to achieve support from racially
conservative voters while denying accusations of racism.  *Id*.  They became more prevalent in
political campaigns following the civil rights movement, when overt racial appeals were less
permissible.  *Id.* at 32.

229.     Dr. King points to numerous examples of such "dog whistles," some more explicit
than others, from the last four decades in Mississippi politics.

a.  In 1986, a White candidate deployed racial appeals in his campaign against the
first Black justice appointed to the Mississippi Supreme Court, Justice Reuben
Anderson.  PTX-013 at 38.  During the campaign, the White candidate stated
he was "running against quota makers" and that he was "running against
reserving a seat on the Mississippi Supreme Court for the NAACP."  PTX-013
at 38–39.

b.  In 1991, Justice Fred Banks, Jr.'s White opponent ran newspaper
advertisements that pictured the two candidates to emphasize their races,
captioning the incumbent as "Fred Banks," and his own as "Judge W.O. 'Chet'
Dillard."  PTX-013 at 39.  In 1996, Justice Banks' opponent used the same
tactics again.  *Id.*

c.  In 2004, when White Rankin County Circuit Judge Samac Richardson ran for
the Supreme Court against Black incumbent Justice James Graves, Richardson

ran on the campaign slogan "One of Us"—the same slogan that a federal district court had previously recognized as a racial appeal in a 1982 congressional Mississippi campaign. PTX-013 at 39–40; *see Jordan v. Winter*, 604 F. Supp. 807, 813 (N.D. Miss. 1984).

d.  In 2014, then-U.S. Senate candidate Chris McDaniel ran a television ad that included a clip of him speaking in front of a Confederate flag, stating "Chris will take this country back to the constitution it was founded on." PTX-013 at 37.

e.  In 2015, a sitting state representative, Lester "Bubba" Carpenter, urged voters to vote down a ballot initiative because, if it passed, a "Black judge" would decide what to do with public school funds. PTX-013 at 37.

f.  In 2018, Cindy Hyde-Smith, a White U.S. Senator, made a seemingly positive reference to public hangings at a campaign event while running against Mike Espy, a Black former Congressman. PTX-013 at 35–36.  Hyde-Smith's campaign also used mailer ads depicting Espy as a criminal, showing his face framed by flashing lights and prison bars. PTX-013 at 38.

g.  In 2023, Governor Tate Reeves sent voters a political mailer attacking his opponent Brandon Presley by depicting Stacey Abrams, a prominent Black politician from Georgia, flanked by White children wearing face masks. PTX-014 at 4–5.

230.   In addition to such instances of racial appeals on the campaign trail, the Court credits Dr. King's analysis that Mississippi lawmakers sometimes advance symbolic political issues as a form of racial appeal.  Prominent examples of this include a successful and controversial

74

2022 effort to ban the teaching of "critical race theory" in Mississippi schools, and the continued official endorsement of Confederate symbols and figures despite the association of the Confederacy with the enslavement of Black people, including the State's continued annual declaration of Confederate Heritage Month, and the continued celebration of Robert E. Lee Day on the same day as the Martin Luther King Day federal holiday. *E.g.*, PTX-013 at 34–35.

231.    The Court also credits testimony from fact witnesses regarding the use of racial appeals in political campaigns in Mississippi.

232.    To be sure, there are reasons to be hopeful, such as the successful effort to change the Mississippi flag in 2020. Nevertheless, the Court finds that political campaigns have been, and in some instances continue to be, characterized by racial appeals. The Court also credits Dr. King's analysis that candidates' and parties' use of racial appeals played a significant role in the partisan realignment that took place in the Twentieth Century, and continues to reinforce the racial polarization of the political parties today. *E.g.*, PTX-014 at 3–5.

### F.  Senate Factor 7:   Lack of Success for Black Candidates in Mississippi

233.    The seventh Senate Factor is "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.

234.    The Court credits the analysis of Dr. King and finds that, since the end of Reconstruction and the adoption of the Constitution of 1890, Black Mississippians have almost never been elected to public office outside of Black-majority districts. *See e.g.*, PTX-013 at 41–45.

235.    No Black Mississippian has ever been elected to any statewide office in the 132 years since the current Mississippi Constitution was adopted in 1890. Stip. 46; *see also* PTX-013 at 41. Outside of a single Black-majority district that was first created in the 1980s by federal

court order, no Black Mississippian has ever been elected to Congress in the 132 years since the current Mississippi Constitution was adopted in 1890.  PTX-013 at 42.  No Black Mississippian has ever served as Speaker of the House or President Pro Tempore of the Senate in the 132 years since the current Mississippi Constitution was adopted in 1890.  Stip. 45, 47.

236.    In the Mississippi legislature, nearly every Black legislator is and has been elected from a majority-Black district, including in the areas of focus in this case.  *See e.g.*, PTX-013 at 43, 45.  In the House, there is one Black legislator representing a district that is not majority-Black: Rep. Rodney Hall, who won an unopposed election in November 2023, making him "the first [and only] Black Republican elected to the Mississippi state legislature since 1894," PTX-014 at 11.  In the Senate, "all but one district represented by a Black State Senator is majority-Black, and the sole other district is 47.98% Black Voting Age Population."  PTX-013 at 43.

237.    No Black Mississippian has ever represented DeSoto County, Simpson County, Chickasaw County, or Monroe County in the State Senate, Stip. 49; and no Black Mississippian has ever represented Chickasaw County or Monroe County in the State House, Stip. 50.

238.    In the areas in the Enacted Plans where plaintiffs claim new Black-majority districts should be drawn to remedy vote dilution, the comparator White-majority districts under the plans in place prior to 2022 all elected White representatives for at least the last three election cycles. *See* Stip. 71, 82, 89.  They did so again in 2023.

239.    Dr. Handley's analysis of biracial state legislative election contests in the areas at issue, which demonstrated that Black-preferred Black candidates only prevailed in Black-majority districts, further supports the Court's finding that Black candidates are not elected to state legislative office in the areas at issue in this case outside of Black-majority districts.  *See* PTX-004 at 12.

240.     The Court also credits Dr. King's analysis that racially polarized voting and racial resentment in Mississippi contribute to the lack of success of Black candidates.   PTX-013 at 41. Dr. King explains that academic researchers have developed methods of measuring racial resentment as demonstrated through survey responses gauging views on Black people, including creation of a racial resentment score; Mississippi ranked sixth on the racial resentment scale.  PTX-013 at 44–45.

241.     Lastly, as this Court has found already, Mississippi voters are racially polarized; White voters tend to coalesce to defeat Black candidates of choice, making it more difficult for Black candidates to win.  PTX-013 at 44–45.

242.     The Court's finding regarding the lack of success for Black candidates is not altered by the claim by Defendants' expert Dr. Thomas Brunell that Mississippi elects more African American politicians compared to other states.  Brunell was not able to reliably support this claim, and the Court does not credit it.  In any case, Dr. Brunell acknowledges, in his own recent scholarship, that the "vast majority" of Black officials in the South, including in Mississippi, have been elected from Black-majority districts.  The evidently undisputed fact that racial demographics of a district are essentially a sine qua non for the election of Black candidates supports the Court's findings regarding the success of Black candidates in Mississippi and in the particular areas at issue.

### G.  Senate Factor 8:  Lack of Responsiveness to the Needs of Black Mississippians

243.     The eighth Senate Factor concerns "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."  *Gingles*, 478 U.S. at 37.

244.     The Court finds that Mississippi's public officials are too often unresponsive to the

particularized needs of Black Mississippians, especially with respect to the longstanding and persistent racial gaps in education and health discussed in the foregoing findings, *see supra* Findings of Fact ¶¶ 197–210.  This Court credits the testimony of individual Black Mississippians as to their personal experiences with these disparities, as well as the analyses of Dr. Orey, Dr. Luckett, and Dr. King.

245.    One important example is Mississippi's decision not to expand Medicaid.  According to Dr. Orey, estimates show that Medicaid expansion would be an economic boon for the state, easily paying for itself through the large federal government subsidies made available under the terms of the federal Affordable Care Act as well as increases in tax revenue from a healthier population.   PTX-008 at 17–18.   By contrast, rejecting Medicaid expansion disproportionately harms Black communities, particularly those in the Mississippi Delta where regional hospitals are on the brink of closure. *Id.*

246.    Another is education.  While Mississippi certainly has had some success stories in terms of education policy, the Court credits Dr. Orey's and Dr. Luckett's analysis that those successes have been unevenly distributed, with predominantly Black schools underfunded and underperforming as compared to predominantly White schools.  PTX-008 at 9; PTX-007 at 47–50.

247.    The Court's finding is supported by the extent to which Mississippi lawmakers have focused their efforts on symbolic, racially divisive issues like banning "critical race theory" rather than working to address challenging policy issues that are of tremendous importance to all, and to Black Mississippians in particular.  PTX-013 at 34–46.

248.    The legislative process that led to the passage of the Enacted Plans also demonstrates a lack of responsiveness to Black Mississippians.  Prior to the public release of the

Enacted Plans in late March 2022, numerous Black Mississippians attended the nine public sessions held by the SJLCR, repeatedly asking for district lines that did not dilute Black voting strength and instead added new minority representation.  *See, e.g.*, Pls.' Ex. 37, Tr. of Public Hearing of the SJLCR, August 6, 2021, Tupelo, Mississippi, at 16:17-19:23, 29:8-31:6 (Charles Moore, representing *inter alia* the NAACP Lee County Branch, highlighting need for fair district boundaries); 20:1-22:7 (Charles Pittson, highlighting need for greater minority representation in Lee County); 24:11-25:21 (Councilwoman Jones highlighting need for fair political boundaries representing Black communities in Lee County); Pls.' Ex. 38, Tr. of Public Hearing of the SJLCR, August 8, 2021, Gulfport, Mississippi, at 14:22-17:23 (James Crowell, representing Biloxi Branch of the NAACP, asking for development of maps that do not discriminate on the basis of race & Reverend Dr. Robert James, representing Mississippi NAACP, asking for maps that do not prevent Black voters from electing candidates of their choice), 22:16-23:20 (Stephanie Piper, registered voter of color, asking for maps that represent the growth of Black population in the state); Pls.' Ex. 40, Tr. of Public Hearing of the SJLCR, August 11, 2021, Itta Bene, Mississippi, at 19:1-21:12 (representative of Mississippi NAACP coalition group asking for fair maps keeping Black communities together); Pls.' Ex. 43, Tr. of Public Hearing of the SJLCR, August 19, 2021, Hattiesburg, Mississippi, at 19:2-20:23 (former Mississippi NAACP board member requesting equity for minority voters in electing candidates); 24:24-26:5 (Toni Johnson, representing Mississippi Black Women's Roundtable, asking for fair redistricting for Black women); 28:11-29:5 (Donald Bentley, representing Black Lives Matter Mississippi, requesting a fair process and concern over larger cities being broken up unfairly); 29:10-31:22 (Robin Wolf, district 4 supervisor for Forrest County, requesting a majority-minority Senate district in Hattiesburg); Pls.' Ex. 44, Tr. of Public Hearing of the SJLCR, August 23, 2021, Jackson, Mississippi at 15:18-22:17

(Representative Hester Jackson McCray requesting majority-minority districts be drawn in areas including DeSoto and Chickasaw Counties). However, the Enacted Plans did not increase the number of Black-majority districts or otherwise create new political opportunities for Black voters. When Representative Robert Johnson, a Black Democrat, offered a proposed map with five additional Black-majority districts, the House rejected it after less than fifteen minutes of debate. *See* JTX-010 at 33:11–47:218; PTX-013 at 47.  Similarly, Senator Derrick Simmons, a Black Democrat, offered a proposed map with four additional Black-majority districts, but after two minutes of discussion, the Senate rejected that proposal as well.  JTX-011 at 99:9–101:5.

### H. Senate Factor 9:  Tenuous Justifications for the Challenged Plans

249.    The ninth Senate Factor concerns "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 37.

250.    Based on the evidence presented the Court finds that the enacted plans are supported by tenuous justifications.  The legislative process minimized the time to offer and deliberate on alternative plans, including dismissing alternatives with little to no substantive discussion.  PTX-013 at 46, 48–49.  To the extent that the Legislature sought to create a partisan advantage, that is not a legitimate policy justification—especially when done by unlawfully diluting Black voting strength.  PTX-013 at 49.

251.    While the SJLCR held public hearings for Mississippians to comment on their redistricting priorities, no proposed maps were displayed or presented at any of these hearings, which all took place before the committee revealed proposed House and Senate maps.  Stip. 58.

252.    The Court finds that both of the Enacted Plans were enacted in a highly abbreviated legislative process, and that little to no public explanation was provided in support of such plans.

PTX-013 at 46–47.   The 2022 legislative session was scheduled to end on April 5, 2022; however, the SJLCR did not hold its final meeting until March 27, 2022.  PTX-013 at 46.  At that meeting, the Committee revealed to the public for the first time the proposed maps for both chambers of the Mississippi legislature, approving them that same day.  PTX-013 at 46–47.

253.    Legislators acknowledged the hurried nature of the process.  During the floor debate immediately prior to passage, State Senator Chris McDaniel stated, "[w]e had no chance to do anything other than what we've done because of the secrecy in this chamber.  Let me be real clear. We asked to see the whole map, begged to see the whole map.  We weren't allowed to see the whole map."  JTX-011 at 106:15-17; PTX-013 at 46–47.

254.    On March 29, 2022, the State House adopted the House redistricting plan, and the State Senate adopted the State redistricting plan, two days after the plans were first revealed to the public.  PTX-013 at 47.  During the House floor debate, Representative Robert Johnson, a Black Democrat, proposed a map with five additional majority-Black districts, noting that the Joint Committee's maps diluted the Black vote.  JTX-010 at 34:10-23; PTX-013 at 47.  The House allowed less than fifteen minutes of debate on Representative Johnson's amendment.  PTX-013 at 47; *see* JTX-010.

255.    During the State Senate floor debate, Senator Derrick Simmons, a Black Democrat, proposed a map with four additional majority-Black districts.  JTX-011 at 99:9-25; PTX-013 at 47.  Senator Dean Kirby, a White Republican and the vice-chair of the Joint Committee, stated that Senator Simmons' map "is not a map that this State needs."  JTX-011 at 100:19-20; PTX-013 at 47.  Following only two minutes of discussion, the Senate voted down the amendment.  PTX-013 at 47.  Two days later, on March 31, the Enacted Plans were enacted into law.  PTX-013 at 47.

256.    The Court also finds that compliance with the Voting Rights Act does not provide a non-tenuous justification for the Enacted Plans.  Despite demographic changes, there was no change in the number of Black-majority districts.  JTX-010 at 19:2-20; PTX-013 at 48.  And officials suggested that the Enacted Plans complied with the Voting Rights Act because they kept the number of Black-majority districts the same, with Chairman Beckett stating, "We went in with 42 and we came out with 42" in reference to the number of Black-majority districts.  JTX-010 at 19:2-3; PTX-013 at 48.  And statements from several state senators indicated that they believed the goal of the redistricting process was to minimize the number of districts where Black voters could elect Black-preferred candidates.  *See* JTX-011 at 188:6-190:22; *see also* PTX-013 at 47–49.

*        *        *

257.    Based on all the foregoing findings of fact, the Court finds that the political process is not equally open Black Mississippians inasmuch as they have less opportunity than White Mississippians to participate in the political process and to elect representatives of their choice to state legislative offices in the particular areas at issue in this case.

## VI.    Racial Gerrymandering

258.    Plaintiffs claim that two Senate districts (SDs 2 and 48) and three House districts (HDs 22, 34, and 64) are racial gerrymanders, violating the Equal Protection Clause of the Fourteenth Amendment.

### A.  Consideration of Racial Data During Redistricting Process

259.    During the redistricting process, the state legislature utilized the PL 94-171 dataset created by the U.S. Census Bureau.  Stip. 24, 25.

260.    The PL 94-171 dataset contains demographic data, including race, at the level of

census blocks.  JTX-001.

261.     A census block is a unit of geography that is smaller than precincts and therefore enables a mapmaker to be more precise when identifying voters, including when splitting precincts between districts.  *E.g.*, Pl.'s Ex. 6, November 27, 2023 Amended Rebuttal Report of Dr. Jordan Ragusa, at 5–6 [hereinafter "PTX-006"] ("[P]recinct splits are relatively common both enacted plans, making Census blocks a more precise and necessary unit of analysis.").

262.     The SJLCR—the legislative committee responsible for the 2022 process—and its staff also obtained electoral data, *i.e.*, vote totals for various candidates, and voter registration data, at the precinct level, from the Secretary of State's office through Madalen Lennep, a contractor who is responsible for operating and extracting data from SEMS, the state's elections database. Pl.'s Ex. 127, Deposition Transcript of Madalen Lennep (Dec. 28, 2023), at 82:22–83:2, 102:15–106:7, 106:10–107:6, 115:7–118:7, 122:15–123:25, 124:7–127:12, 127:17–130:25, 133:17–136:7, 137:16–139:10, 141:11–144:19 [hereinafter "Lennep Dep. Tr."]; *see also* Pl.'s Exs. 98 through 113.

263.     Ted Booth, who is counsel to the SJLCR, requested and received voter registration and electoral data from Ms. Lennep.  Lennep Dep. Tr. at 102:15–106:7, 106:10–107:6, 115:7–118:7; *see also* Pl.'s Exs. 97 through 100.

264.     Ben Collins, who is the Standing Committee's staff person responsible for Geographic Information Systems (GIS) and mapdrawing, also requested and received registration and electoral data from Ms. Lennep.  Lennep Dep. Tr. at 115:7–118:7, 122:15–123:25, 124:7–127:12, 127:17–130:25, 133:17–136:7, 137:16–139:10, 141:11–144:19; *see also* Pl.'s Exs. 101 through 113.

265.     Mr. Booth and Mr. Collins obtained that data for purposes of "design[ing] districts

for the House and Senate," to use in conjunction with the PL 94-171 dataset containing Mississippi voters' racial identification at the block level.   Stip. 62; Pl.'s Ex. 97.

266.    In response to Ms. Lennep's inquiry into the purpose of their information requests, Booth acknowledged that the Standing Committee was looking at "minority voting age population" and that "it would be beneficial to have an understanding of how many persons are actually registered in a precinct" while examining that racial data.  Stip. 62; Pl.'s Ex. 97.

267.    The Standing Committee made various requests for precinct-level registration and turnout data, organized by county, for key election contests in Mississippi, including for U.S. Senate, governor, and attorney general.  *See* Pl.'s Exs. 103 through 113.  Mr. Collins indicated that the precinct-level data provided by Ms. Lennep are of "great utility," and that the Joint Committee needed "the full 82 county record."  Lennep Dep. Tr. at 134:4–135:14.

268.    Based on this record, the Court finds that, for purposes of the 2022 Mississippi House and Senate redistricting, electoral data, reflecting Republican and Democratic turnout, was available only at the precinct level, whereas more granular racial data was available for each census block in the state.

**B.  Dr. Ragusa's Analysis**

269.    Plaintiffs' expert, Dr. Jordan Ragusa, analyzed the effect of race on the design of the five challenged districts, controlling for the effect of traditional redistricting principles and the possibility that the districts were achieved by sorting voters based on their voting history.

270.    Dr. Ragusa is qualified to serve as an expert witness in quantitative methods and analysis, the modeling of electoral districting, and American politics.  He has a Ph.D. in political science from the University of Florida and is an associate professor of political science at the College of Charleston.  Pl.'s Ex. 5, August 28, 2023 Report of Dr. Jordan Ragusa, at 3 [hereinafter

"PTX-005"].  He has held various leadership roles in academia, and he teaches both graduate and undergraduate courses on research methodology and statistical computing, including specifically in the context of elections, voting, and redistricting.  *Id.*  Dr. Ragusa has published over a dozen peer-reviewed articles, including two co-authored books, on elections and other subjects in political science.  *Id.*

271.    Dr. Ragusa previously testified in a racial gerrymandering case in South Carolina: The three-judge panel relied heavily on his analysis disentangling racial sorting from partisan sorting, and found Dr. Ragusa's results "particularly probative" in showing that a congressional district was a racial gerrymander.  *S.C. State Conf. of NAACP v. Alexander*, 649 F. Supp. 3d 177, 192 (D.S.C. 2023).

272.    Dr. Ragusa's opinions reflect a reliable application of statistical methods to the facts of this case.  First, he designed a series of multivariate regressions to determine if the racial composition of a particular census block predicted the block's inclusion or exclusion from a challenged district.  Each of Dr. Ragusa's three regression models controlled for the census block's partisan composition (the number of Trump voters), the block's population size (which also accounts for the possibility that the inclusion/exclusion of certain blocks was caused by a need to balance population), and the block's location on the district's border (which may affect the likelihood of inclusion, because including relatively more proximate blocks is more likely to be consistent with compactness, communities of interest, contiguity, retaining cores of district, or other redistricting principles).  *E.g.*, PTX-005 at 8–9.  Notably, Dr. Ragusa improved upon his methodology from his prior work in South Carolina by including the border variable to control for the effect of a census block's proximity to the district border.  *See id.*  The Court credits Dr. Ragusa's analysis and conclusions based on this approach.

85

273.   Dr. Ragusa applied those three regression models to each of the five challenged districts.  The first ("Model 1") focused on census blocks that could be moved into the challenged district from a nearby district, to determine whether a block's racial composition affected the probability of the block being *added* to the district.  The second ("Model 2") looked at census blocks already within the benchmark version of the challenged district, to determine whether a block's racial composition affected the probability of the block being *removed* from the district, *i.e.*, moved to another district.  The third ("Model 3") combined both approaches by examining which census blocks were moved into or kept within the relevant district in the Enacted Plan.  *See* PTX-005 at 6–7.  The Court acknowledges and credits Dr. Ragusa's explanation that the race variable need not be statistically significant in every model in order to demonstrate racial sorting—the BVAP of a district can be altered by disproportionately moving a certain racial group in *or* out of a district (*or* maybe, but not necessarily, both).  *E.g.*, PTX-006 at 17.  The Court finds that Dr. Ragusa's three models account for each possible mode of racial sorting.

274.   Models 1 and 3 rely on a well-established method developed by Dr. Stephen Ansolabehere, known as the "county envelope," which was described and cited favorably by the U.S. Supreme Court to find racial predominance in *Cooper v. Harris*, 581 U.S. 285, 315 (2017).  *E.g.*, PTX-006 at 7–8; PTX-005 at 6–7.  For a given district, Dr. Ragusa's county envelope consists of the counties that overlapped with the benchmark district, as well as new areas drawn into the district during the 2022 redistricting.  The envelope is therefore an approximate geographic area that is "essentially the region from which mapmakers could have drawn the district's population," *Cooper*, 581 U.S. at 315.  The Court finds that, by design, the county envelope takes into account the traditional redistricting principle of compactness—the county envelope ensures that the potential districts that could be drawn under Models 1 and 3 are not significantly reconfigured

relative to the enacted district, thereby keeping modeled districts about as compact as the enacted ones.  Moreover, Model 2, which only examined the assignment of census blocks that were already within the benchmark district, is limited to the geography of the prior district and does not utilize a county envelope.

275.    For each of the five districts challenged as racial gerrymanders, Dr. Ragusa found that the racial composition of a census block significantly predicted the block's inclusion or exclusion from the challenged district.  Blocks with higher Black populations were significantly less likely to be added to the challenged district, more likely to be moved out of the challenged district, or both, depending on the particular district.  PTX-005 at 10–26, 30–31.

276.    In response to Dr. Brunell's criticism that Dr. Ragusa's county envelopes were either over-inclusive or under-inclusive, Dr. Ragusa conducted a series of robustness checks by expanding or narrowing the county envelopes to see if the change affected the results.  Those robustness checks confirmed that, even after major changes to the county envelopes, the results were the same—"Black voters were excluded from the five challenged districts in a statistically significant fashion."  *E.g.*, PTX-006 at 8–15, 19–30.

277.    Especially in light of Dr. Ragusa's robustness checks, the Court credits his analysis and conclusions regarding the significance of race in determining the likelihood that a given census block was moved in or out of the districts at issue, even when controlling for partisanship.

278.    After finding that race was statistically significant, Dr. Ragusa analyzed the magnitude of the effect of race on a census block's district assignment.  Dr. Ragusa found that the relationship between racial composition and exclusion from a challenged district was not merely statistically significant but also substantively impactful, even when controlling for partisanship.  As detailed below for each of the five challenged districts, by examining the effect size of the race

variable (representing the number of Black adults in the census block), Dr. Ragusa found that as the number of Black adults in a block increased, the likelihood of the block being included in a challenged district dropped markedly in response.  *E.g.*, PTX-005 at 10–26 & figs. 1–9.  The Court credits Dr. Ragusa's analysis that these differences in percentage likelihood of inclusion or exclusion have large effects when multiplied by the many blocks within each district.

279.    In addition to his regression analyses, Dr. Ragusa also examined to which Black voters were over-represented in the populations included or excluded from the challenged districts. He found that Black voters were disproportionately excluded from the challenged districts relative to their share of the population, whether within the county envelope or within the areas bordering the challenged district.  *E.g.*, PTX-005 at 11–25, tbls. 2, 4, 6, 8, 10.  On this basis, he concluded that the racial disparities in the assignment of Black voters cannot be explained by Black voters' proximity to district boundaries.  The Court credits his analysis and conclusions.

280.    In another separate analysis, Dr. Ragusa examined the manner in which the challenged districts split precincts, to see if the splits tracked racial lines.  A precinct split occurs when a precinct is divided between two or districts.  Precinct splits are relatively common under the Enacted House and Senate Plans: The Enacted House Plan splits 255 precincts, while the Enacted Senate Plan split 41 precincts.  PTX-006 at 5.  All but eight House districts (93%) contain at least one split precinct, and over half of the Senate districts (58%) split at least one precinct.  *Id.*

281.    Dr. Ragusa found "a statistically significant pattern whereby precinct splits systematically excluded Black voters from the challenged districts."  PTX-006 at 6; PTX-005 at 26–28.

282.    The Court credits Dr. Ragusa's analysis and conclusion that, when the five challenged districts split a precinct, the part of the precinct with a higher Black population was

significantly more likely to be placed outside of the challenged district, while the part with a higher

White population was more likely to be placed inside the challenged district.  As shown in the

below table, the challenged districts consistently follow this pattern, with the exception of SD 48,

which does not split any precincts.  PTX-005 at 26.

283.    Overall, Dr. Ragusa found that "there is only a 3% chance" that the pattern of racial

disparities in the precinct splits is "due to random variation."  PTX-005 at 27.

| Table 11: VTD Splits in the Challenged Districts (Enacted Plan) | | |
|---|---|---|
| | Challenged Split | Neighboring Split |
| **HD 22** | | |
| BVAP | 763 | 1,258 |
| All Voters | 3,433 | 3,641 |
| BVAP % | 22% | 35% |
| **HD 34** | | |
| BVAP | 708 | 3,131 |
| All Voters | 2,950 | 6,230 |
| BVAP % | 24% | 50% |
| **HD 64** | | |
| BVAP | 684 | 938 |
| All Voters | 3,841 | 1,591 |
| BVAP % | 18% | 59% |
| **SD 2** | | |
| BVAP | 1,336 | 1,828 |
| All Voters | 5,679 | 4,801 |
| BVAP % | 24% | 38% |
| **T-Test** | | |
| Average BVAP % | 23% | 41% |
| Standard Deviation | 18 | 26 |
| Observations | 16 | 16 |
| T-Value | 2.28 | |
| P-Value | 0.03 | |

284.    Dr. Ragusa also determined as part of his analysis that the disparities in BVAP—

between the portions of precincts assigned to the challenged districts and those portions assigned

to neighboring districts—"are not a legacy of the benchmark plan."  PTX-005 at 28–29.  He concluded that the disparate treatment of Black and White voters within the same precinct is instead a "direct consequence of mapmakers' decisions during the most recent round of redistricting."  *See id*.  The Court credits his analysis and conclusions.

285.    The Court finds that the consistent splitting of precincts into a part with more Black voters and a part with fewer Black voters cannot be explained by splitting the precinct along partisan lines, even in a racially polarized environment.  As discussed above, the evidence indicates that the SJCLR's electoral or partisan data consisted only of precinct-level vote totals—those vote totals do not contain any information as to how Republican or Democratic voters are distributed *within a precinct*.

286.    Thus, the Court finds that the only plausible explanation for the racialized pattern of precinct splits is reliance on sub-precinct level racial demographic data from the Census.  Such data was available as part of the PL 94-171 file down to each census block, and allowed the SJCLR to identify the blocks where greater numbers of Black voters lived and then to exclude those blocks from the challenged districts.

287.    The overall effect of the racial disparities in the assignment of voters in and out of the five challenged districts, including the racialized precinct splits, was to lower the Black population within those districts.  It is undisputed that four of the five challenged districts saw their BVAP drop by about seven percentage points, while the fifth, HD 34, saw a decrease of 29 percentage points.  All five districts experienced among the steepest declines in BVAP when compared to the remaining 167 Senate and House districts and are clear outliers (all five challenged districts are to the left of the red reference line on the graph below).  *E.g.*, PTX-006 at 2–3.



288.    Prior to the 2022 redistricting, HD 34 had a BVAP of more than 60%, while SD 2, SD 48, HD 22, and HD 64 had BVAPs between 36–40%.  After the 2022 redistricting, the BVAP of all five districts dropped significantly, all landing between 29–33% BVAP.  The Court credits Dr. Ragusa's analysis of and reliance on academic scholarship showing that districts in the South are more likely to be competitive (50/50) in electing a Black candidate when the BVAP is in the 40-50% range.  PTX-006 at 4.  The changes made to the five challenged districts in 2022 are therefore consistent with keeping the BVAP significantly below 40%, so that those districts do not become competitive over the next decade.

**C. Racial Predominance**

*1. Senate District 2*

289.    Under the Enacted Senate Plan, Senate District 2 ("SD 2") consists of portions of DeSoto County.  The Court finds that the Enacted Plan significantly reconfigured the prior version of SD 2, which was a more compact, rectangular shape.  In the Enacted Plan, SD 2 is more irregular in shape and less compact than the prior 2019 Senate Plan, with the district shaped like a question

mark.

290.    As shown below, the Enacted Plan removed high-BVAP precincts in Horn Lake to

the west and Southaven in the center, avoided other high-BVAP areas in Southhaven and around

Northwest Community College, and added lower-BVAP precincts to the east and south, including

Hernando and Pleasant Hill (blue areas reflect Census blocks removed from the benchmark district

to create the enacted district; purple areas were unchanged and remain in the enacted district; red

areas were added to the benchmark district to create the enacted district; darker shading reflects

higher BVAP in the Census block).  PTX-006 at 28.



291.    After the 2020 Census, the Benchmark SD 2 was overpopulated by 4,144 persons.

Stip. 73.  The Enacted Plan removed 24,574 people from SD 2, retaining just 60% of its core

population.  PTX-005 at 22.  In doing so, mapmakers assigned 35% of the residents drawn out of

SD 2 to SD 11, which increased in BVAP from 61.57% in the Benchmark Plan to 62.88% in the Enacted Plan.  PTX-001 at 177-179, 244-246.

292.   In total, 8,258 Black voting-age residents were moved out of SD 2.  PTX-005 at 22. SD 2 had a BVAP of 39.6% in the Benchmark Senate Plan and has a BVAP of 32.88% in the Enacted Senate Plan, a reduction of 6.8%.  SD 2 had the thirteenth largest reduction in BVAP out of all 172 Senate and House districts.  PTX-006 at 3.

293.   Based on his regression models, Dr. Ragusa concluded that "Black voters were excluded from the redrawn district in a statistically significant and substantively consequential fashion" even when controlling for the possibility of partisan gerrymandering.  PTX-005 at 23. Dr. Ragusa's Model 1 showed that BVAP was statistically significant in predicting the movement of precincts into SD 2 under the Enacted Plan—Census blocks with a larger BVAP were less likely to be moved into SD 2.  PTX-005 at 20.  Conversely, Model 2 reflected a statistically significant finding that Census blocks with a larger BVAP were more likely to be moved out of SD 2. *Id.*

294.   Regarding Model 1, Dr. Ragusa examined the effect size of the BVAP variable to determine the impact that the racial composition of a Census block had on its inclusion in SD 2. Dr. Ragusa found that "blocks with no Black residents of voting age had an 18% chance of being drawn into SD #2.  By comparison, blocks with a BVAP of 50 had a 16% chance of being added to the district, blocks with a BVAP of 100 had a 15% chance of being added to the district, and blocks with 150 Black residents of voting age had less than a 12% chance of being added to SD #2."  PTX-005 at 20.

295.   Similarly, regarding Model 2, Dr. Ragusa's analysis concluded that "blocks with no Black residents of voting age had a 32% chance of being drawn out of SD #2.  By comparison, blocks with a BVAP of 50 had a 43% chance of being removed from the district, blocks with a

BVAP of 100 had a[n] 54% of being removed from the district, and blocks with 150 Black residents of voting age had a 64% chance of being drawn out of SD#2."  PTX-005 at 20.

296.    Although Black voters were only 29% of the voting-age population moved into SD 2 in the Enacted Plan, they were 44% of the voting age population moved out of the district.  PTX-005 at 21–22.

297.    The population moved into SD 2 under the Enacted Plan had fewer Black people than expected based on the demographics of the area around the district, while the population moved out of SD 2 had more Black people than expected based on the demographics of the district near the border.  PTX-005 at 22.

298.    Dr. Ragusa also conducted a robustness check of his multivariate analysis to determine whether altering the county envelope surrounding the challenged district—in response to Defense Expert Dr. Brunell's criticism that the envelope included parts of DeSoto County far from the boundaries of SD 2—would affect his conclusions.  His robustness check of SD 2 found that "even when restricting the analysis to the border of the benchmark district, we again find that race was a significant factor in the blocks added to the redrawn district…the robustness check based on Dr. Brunel's critique provides the same evidence of racial gerrymandering."  PTX-006 at 13–14.

299.    Enacted SD 2 splits precincts in a racially disparate manner.  Dr. Ragusa analyzed the BVAP of the three split precincts in SD 2, finding that "the splits assigned to SD #2 had an average BVAP of 24%, comprising 1,336 Black residents of voting age, compared to 38% for the splits added to a neighboring district, comprising 1,828 Black residents of voting age."  PTX-005 at 23.  He also determined that the mapmakers' decision to do so contributed to the reduction in BVAP% and validated his multivariate statistical analysis findings that race was a significant

factor in the composition of SD 2 in the Enacted Plan. *Id.*

300.     The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience of race in the construction of SD 2.

301.     The Court also credits the analysis provided by Plaintiffs' mapdrawer, Mr. Cooper, who explained that the enacted SD 2 "splits the densely populated areas of Horn Lake and Southaven across three different districts," and that Horn Lake is a majority-Black municipality. PTX-001 at 31.  Indeed, Mr. Cooper demonstrated that the Black population in the area of Horn Lake is sufficiently numerous and concentrated to support a compact Black-majority County Supervisor district.  *See* PTX-001 at 30–31.

302.     The Court finds based on its own visual analysis that the Enacted Senate Plan does conspicuously split Horn Lake across three different Senate Districts, as depicted below.  PTX-001 at 256.



303.    Mr. Cooper has also demonstrated that SD 2 could be configured differently, to become a more compact district while reducing county and municipality splits in the area.  PTX-001 at 32.

304.    The Court also credits the testimony of Plaintiff Pamela Hamner, who resides in enacted SD 2 and campaigned for the SD 2 seat in the November 2023 election, that the enacted SD 2 fails to respect communities of interest in the area and splits the city of Horn Lake in a manner that excludes Black voters there from the district and reduces the electoral competitiveness of the district.

305.    Based upon all relevant evidence and a visual inspection of the enacted SD 2, as compared to the prior 2019 district and the alternative illustrative district drawn by Mr. Cooper, the Court finds that race predominated in the design of SD 2; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of county and municipality splits, were subordinated to race; and that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of census blocks had a significant effect on the block's assignment under the Enacted Plan, even after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted SD 2.

### 2. Senate District 48

306.    Under the Enacted Plan, Senate District 48 ("SD 48") consists of portions of Hancock and Harrison Counties.  The Enacted Plan significantly reconfigures the prior version of SD 48 that was in place in 2019, which was entirely within Harrison County, largely in the Long Beach and Gulfport area communities.

307.  As shown below, the Enacted Plan removes high-BVAP Census blocks in the northeast portion of benchmark SD 48 (the Bel-Aire area precincts in Gulfport), and adds low-BVAP Census blocks to the southeast, reaching into Hancock County to do so.  PTX-006 at 29 (blue blocks were removed; red blocks were added; purple blocks were kept; darker shading reflects higher BVAP).



308.  As a result, SD 48 splits two counties, whereas the benchmark SD 48 was contained entirely within Harrison County.  PTX-006 at 29.

97

309.   After the 2020 Census, SD 48 in the Benchmark Plan was overpopulated by 5,707 persons.  Stip. 76.  However, under the Enacted Plan, mapmakers *added* 12,208 residents to the already over-populated district, ultimately resulting in the unnecessary removal of thousands of additional residents and retaining just 75% of the district's core population.  PTX-005 at 25.

310.   In total, 5,607 Black voting-age residents were moved out of SD 48.  PTX-005 at 25  SD 48 had a BVAP of 36.3% in the Benchmark Senate Plan and has a BVAP of 29.4% in the Enacted Senate Plan, a reduction of 6.9%.  Stip. 75.  SD 48 had the twelfth largest reduction in BVAP out of all 172 Senate and House districts.  PTX-006 at 3.

311.   Based on his regression models, Dr. Ragusa concluded that "Black voters were excluded from the redrawn district in a statistically significant and substantively consequential fashion" even when controlling for the possibility of partisan gerrymandering.  PTX-005 at 26. Dr. Ragusa's Model 1 showed that BVAP was statistically significant in predicting the movement of Census blocks into SD 48 under the Enacted Plan—that Census blocks with a larger BVAP were significantly less likely to be moved into SD 48. *Id.* Conversely, Model 2 showed that Census blocks with a larger BVAP were significantly more likely to be moved out of SD 48. *Id.*

312.   Regarding Model 1, Dr. Ragusa examined the effect size of the BVAP variable, to determine the impact that the racial composition of a Census block had on its inclusion in SD 48. His analysis concluded that "blocks with no Black residents of voting age had a[n] 17% chance of being drawn into SD #48.  By comparison, blocks with a BVAP of 50 had a 9% chance of being added to the district, [b]locks with a BVAP of 100 had a 3% chance of being added to the district, and [b]locks with 150 Black residents of voting age had only a 1% chance of being added to SD#48."  PTX-005 at 23.

313.   Similarly, regarding Model 2, Dr. Ragusa's analysis concluded that "blocks with

98

no Black residents of voting age had a 15% chance of being drawn out of SD #48.  By comparison, blocks with a BVAP of 50 had a 23% chance of being removed from the district, blocks with a BVAP of 100 had a[n] 33% of being removed from the district, and blocks with 150 Black residents of voting age had a 45% chance of being drawn out of SD #48."  PTX-005 at 24.

314.    While Black voters were 17% of the voting-age population moved into SD 48 in the Enacted Plan, they were a far higher 48% of the voting age population moved out of the district. PTX-005 at 25.

315.    The population moved into SD 48 under the Enacted Plan had fewer Black people than expected, based on the demographics of the area around the district, while the population moved out of SD 48 had more Black people than expected based on the demographics of the district near the border.  PTX-005 at 25.   Dr. Ragusa also conducted a robustness check of his multivariate analysis to determine whether altering the county envelope surrounding the challenged district—in response to Defense Expert Dr. Brunell's criticism that the envelope may be under-inclusive— would affect his results. His robustness check of SD 48 found that even when expanding the county envelope to include additional portions of Hancock County, race was a significant factor in the blocks added to the redrawn district, and Dr. Ragusa's models provide the same evidence of racial gerrymandering.  PTX-006 at 14–15.

316.    The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience of race in the construction of SD 48.

317.    The Court also credits the testimony of Plaintiff Gary Fredericks, who resides in enacted SD 48 and who ran for office there in 2019, that the enacted SD 48 fails to respect communities of interest in the area and splits Gulfport and surrounding majority-Black communities in a manner that excludes Black voters there from the district and reduces the

electoral competitiveness of the district. Mr. Fredericks' testimony aligns with Mr. Cooper's finding that a hypothetical majority-minority Senate district could be drawn in Gulfport while avoiding the unnecessary split of Gulfport and extension into Hancock County. PTX-001 at 51–52.

318.     Based upon all relevant evidence and a visual inspection of the enacted SD 48, as compared to the prior 2019 district and the alternative illustrative district drawn by Mr. Cooper, the Court finds that race predominated in the design of SD 48; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of county and municipality splits, were subordinated to race; and that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of census blocks has a significant effect on the block's assignment under the Enacted Plan, even after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted SD 48.

### 3.  House District 22

319.     Enacted House District 22 ("HD 22") consists of portions of Chickasaw, Monroe, and Pontotoc counties. The Enacted Plan significantly reconfigured the prior HD 22, which had included the entirety of Chickasaw County and part of Pontotoc County.

320.     As shown below, the Enacted Plan removes high-BVAP census blocks in Okolona (a municipality in eastern Chickasaw County) and other such blocks in eastern Pontotoc County, before reaching into a part of Monroe County to grab multiple low-BVAP precincts. PTX-006 at 21 (blue blocks were removed from the benchmark; red blocks were added; purple blocks were kept; darker shading reflects higher BVAP).



321.    As a result of those changes, the enacted HD 22 splits three counties, whereas the benchmark HD 22 split only Pontotoc County.  PTX-006 at 21.

322.    After the 2020 Census, HD 22 was underpopulated by 513 residents, with a total population of 23,760.  Stip. 84; PTX-005 at 12 n. 20.  Based on the State's redistricting criteria, it was not necessary to redraw HD 22 at all—its 513-person population deviation from the ideal district size is within the +/- 5% deviation range.  *See* Stip. 57.  However, under the Enacted Plan, the district removed 8,321 of these residents, equivalent to 35% of the district's core population.  PTX-005 at 12.

323.    In total, 3,186 Black voting-age residents were moved out of HD 22.  PTX-005 at

12.  HD 22 had a BVAP of 37.1% in the Benchmark House Plan and now has a BVAP of 29.9%

in the Enacted House Plan, a reduction of 7.2%.  Stip. 83. HD 22 had the ninth largest reduction

in BVAP out of all 172 Senate and House districts.  PTX-006 at 3.

324.    Black voters represent 49% of the voters moved from HD 22 in the Enacted Plan.

PTX-005 at 11. Of the Black voters drawn out of HD 22, 61% were moved into HD 16, which was

already a majority-Black district. *Id.*

325.    Based on his regression models, Dr. Ragusa concluded that "Black voters were

drawn out of the district in a statistically significant and substantively consequential fashion" even

when controlling for the possibility of partisan gerrymandering.  PTX-005 at 13.  The results of

Dr. Ragusa's Model 2 showed that BVAP was statistically significant in predicting the movement

of census blocks out of HD 22—blocks with a larger BVAP were more likely to be moved out to

another district.  PTX-005 at 10.   This finding is statistically significant at a 95% level of

confidence. *Id.* at 30.

326.    Examining the effect size of the BVAP variable in Model 2, Dr. Ragusa concluded

that "blocks with no Black residents of voting age had a 29% chance of being drawn out of HD

#22.  By comparison, blocks with a BVAP of 50 had a 59% chance of being removed from the

district and blocks with a BVAP of 100 had an 84% of being drawn out of HD #22."  PTX-005 at

11.

327.    Dr. Ragusa's robustness check of HD 22, in response to Dr. Brunell's critique that

the county envelope may be under-inclusive, confirms that "Black voters were significantly less

likely to be moved into the redrawn district."  PTX-006 at 10.

328.    The enacted HD 22 splits five precincts, and it does so in a racially disparate

manner.  Dr. Ragusa analyzed the BVAP of these split precincts, finding that "[i]n all five instances, the portions assigned to HD 22 had a lower BVAP% than the portions assigned to neighboring districts."  PTX-005 at 12.

329.    The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience of race in the construction of HD 22.

330.    The Court further credits the analysis provided by Plaintiffs' mapdrawer, Mr. Cooper, who has demonstrated that HD 22 could be configured differently, to become a more compact district while reducing county and municipality splits in the area.  PTX-001 at 63.  Mr. Cooper's Illustrative HD 22 contains only two counties, and, like Illustrative SD 17, it is possible for HD 22 to link together the communities of Houston, Okolona, and Aberdeen along the Highway 45 transportation corridor, instead of splitting them across three districts as the Enacted Plan does.

331.    The Court also credits the testimony of Ms. Mamie Cunningham, a longtime voting rights advocate and MS NAACP member who resides in Chickasaw County, that the enacted HD 22 fails to respect communities of interest in the area and reduces the electoral competitiveness of the district.

332.    Based upon all relevant evidence and a visual inspection of the enacted HD 22, as compared to the benchmark district and the alternative illustrative district drawn by Mr. Cooper, the Court finds that race predominated in the design of HD 22; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of county and municipality splits, were subordinated to race; and that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of Census blocks has a significant effect on the block's assignment under the Enacted Plan, even

after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted HD 22.

### 4. House District 34

333. Under the Enacted Plan, HD 34 consists of the entirety of Yalobusha County and—due to splitting—portions of Lafayette, Grenada, and Carroll Counties. As shown below, the Enacted Plan significantly reconfigured the prior HD 34.

334. The prior plan included portions of Grenada, Leflore County, Holmes, and Carroll Counties, while the Enacted Plan instead reaches up to Yalobusha and Lafayette Counties while dropping significant Black populations in Grenada.  PTX-006 at 22.



335.    As a result of those changes, the enacted HD 34 bears virtually no resemblance to the prior district.  As Dr. Ragusa observed in his report, HD 34 retains "just 27% of the benchmark population" and is "among the most heavily redrawn districts" during this redistricting cycle. PTX-006 at 11.

336.    After the 2020 Census, the benchmark HD 34 was underpopulated by 3,253 persons.  Stip. 86.  The Enacted Plan *removed* 15,286 people from HD 34 and then *added* 19,502

people.  PTX-005 at 15.

337.    In the Enacted Plan, mapmakers moved HD 33 to the southeastern part of the state and, in doing so, assigned the district's population to both HD 30 and HD 34.  The portion assigned to HD 34 had a BVAP of only 35%, while the portion assigned to HD 30 had a BVAP of 53%.  PTX-005 at 15.  The Enacted Plan also adds portions of Carroll and Lafayette Counties, which had a BVAP of 12% and 24% respectively, to HD 34.  *Id.* at 16.

338.    Due to the assignment of the low-BVAP areas to HD 34, the district's BVAP "declined by roughly 30%."  PTX-005 at 15.  HD 34 had a BVAP of 60.5% in the Benchmark House Plan and now has a BVAP of 31.6% in the Enacted House Plan, a reduction of 28.9%.  Stip. 85.  HD 34 had the second largest reduction in BVAP under the Enacted Plan out of all 172 Senate and House districts.  PTX-006 at 3.

339.    Dr. Ragusa concluded that "Black voters were excluded from the redrawn district in a statistically significant and substantively consequential fashion" even when controlling for the possibility of partisan gerrymandering.  PTX-005 at 16.

340.    The results of Dr. Ragusa's Model 1 showed that BVAP was a statistically significant predictor of the movement of Census blocks into HD 34—blocks with a larger BVAP were significantly less likely to be moved into HD 34.  This finding is statistically significant at a 99% level of confidence.  Similarly, Model 3 showed a statistically significant finding that Census blocks with a larger BVAP were less likely to be moved into or kept in HD 34.  This finding is also statistically significant at a 99% level of confidence.  PTX-005 at 13, 30.

341.    Dr. Ragusa then examined the effect size of the BVAP variable, to determine the impact that the racial composition of a Census block had on its inclusion in HD 34.  He found that under Model 1, "blocks with no Black residents of voting age had a 33% chance of being drawn

into HD #34.  By comparison, blocks with a BVAP of 50 had a 6% chance of being added to the district and blocks with 100 Black residents of voting age had less than a 1% chance of being added to HD #34."  PTX-005 at 13. Model 3 yielded similar results. *Id*.

342.    Although Black voters were 32% of the voting-age population moved into HD 34 in the Enacted Plan, they were also 72% of the voting-age population moved ***out*** of the district. PTX-005 at 15.

343.    The population moved into HD 34 under the Enacted Plan had fewer Black people (32%) than expected based on the demographics of the area around the district (51% BVAP), while the population moved out of HD 34 had more Black people (72% BVAP) than expected based on the demographics of the district near the border (60% BVAP).  PTX-005 at 15.  In other words, the population that was moved into HD 34 was disproportionately White, while the population that was moved out was disproportionately Black.

344.    Dr. Ragusa also conducted a robustness check of his multivariate analysis to determine whether altering the county envelope surrounding the challenged district—in response to Defense Expert Dr. Brunell's criticism that the envelope may be overbroad—would affect his results.  The robustness check showed that, even when restricting the envelope to Grenada and Yalobusha Counties, which hold 93% of the district's population in the Enacted Plan, "race was [again] a significant factor" and indicated that "Black voters were significantly less likely to be moved into" HD 34.  PTX-006 at 11.

345.    The enacted HD 34 splits six precincts, and it does so in a racially disparate manner. "In total, the splits assigned to HD #34 had an average BVAP of 24%, comprising of 708 Black residents of voting age, compared to 50% for the splits added to a neighboring district, comprising 3,131 Black residents of voting age."  PTX-005 at 16.  He also determined that the mapmakers'

decision to do so contributed to the reduction in BVAP% and validated his multivariate statistical analysis findings that race was a significant factor in the composition of HD 34 in the Enacted Plan. *Id.*

346.   The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience of race in the construction of HD 34.

347.   The Court further credits the analysis provided by Plaintiffs' mapdrawer, Mr. Cooper, who has demonstrated that HD 34 could be configured differently, to become a more compact district while reducing county splits in the area.  PTX-001 at 77.

348.   Based upon all relevant evidence and a visual inspection of the enacted HD 34, as compared to the benchmark district and the alternative illustrative district drawn by Mr. Cooper, the Court finds that race predominated in the design of HD 34; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of county splits, and core preservation, were subordinated to race; and that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of Census blocks has a significant effect on the block's assignment under the Enacted Plan, even after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted HD 34.

*5. House District 64*

349.   Enacted House District 64 ("HD 64") consists of portions of Hinds County along its northeastern border and a portion of the Ridgeland Recreation Center precinct in Madison County.  As shown below, the Enacted Plan removes (shown in blue) the predominantly Black Northpointe neighborhood and adds areas with lower Black population on the northern and

southern ends of the district.  PTX-006 at 26.



350.    After the 2020 Census, HD 64 was overpopulated by 320 persons, Stip. 88, with a

total population of 24,593.  PTX-005 at 18 n. 30.  Based on the State's redistricting criteria, it was

not necessary to redraw HD 64—its 320-person population deviation from the ideal district size is

within the +/- 5% deviation range.  *See* Stip. 57. However, under the Enacted Plan, the State

removed 18% of the district's previous population, or 4,457 residents.  PTX-005 at 18.  The

Enacted Plan then added 3,822 new residents to the district.  *Id.*

351.    In total, 2,123 Black voting-age residents were moved out of HD 64.   PTX-005 at
18.  HD 64 had a BVAP of 37.9% in the Benchmark House Plan and now has a BVAP of 31% in
the Enacted House Plan, a reduction of 6.9%.  Stip. 87. HD 64 had the eleventh largest reduction
in BVAP out of all 172 Senate and House districts.  PTX-006 at 3.

352.    Black voters represent 59% of the voters moved out of HD 64 under the Enacted
Plan; those voters were moved to HD 65.  PTX-005 at 18, 19.  HD 65 is a majority-Black district
that increased from 76.51% BVAP in the Benchmark Plan to 78.83% BVAP in the Enacted Plan.
PTX-001 at 498-501, 590-593.

353.    Dr. Ragusa found that Black voters were excluded from the redrawn district in a
statistically significant and substantively consequential fashion even when controlling for the
possibility of partisan gerrymandering.   PTX-005 at 19.  The results of Dr. Ragusa's Model 1
showed that BVAP was a statistically significant predictor of the movement of Census blocks into
HD 64—blocks with a larger BVAP were less likely to be moved into HD 64.  This finding is
statistically significant at a 99% level of confidence.  Similarly, Model 3 showed a statistically
significant finding that Census blocks with a larger BVAP were less likely to be moved into and
kept in HD 64.  This finding is statistically significant at a 99% level of confidence.  *Id.* at 16, 30.

354.    Dr. Ragusa then examined the effect size of the BVAP variable, to determine the
impact that the racial composition of a census block had on its inclusion in HD 64.  He found that
under Model 1, "blocks with no Black residents of voting age had a 2.0% chance of being drawn
into HD #64.  By comparison, blocks with a BVAP of 30 had a 1.0% chance of being added to the
district and any block with 70 or more Black residents of voting age had less than a 0.5% chance
of being added to HD #64."  Model 3 had similar results.  PTX-005 at 17.

355.    Black voters were only 19% of the voting age population moved into HD 64 in the Enacted Plan, but they were 59% of the voting age population moved out of the district.  PTX-005 at 19.

356.    The population moved into HD 64 under the Enacted Plan had fewer Black people (19%) than expected based on the demographics of the area around the district (44% BVAP), while the population moved out of HD 64 had more Black people (59% BVAP) than expected based on the demographics of the district near the border (38% BVAP).    PTX-005 at 15.  In other words, the population that was moved into HD 64 was disproportionately White, while the population that was moved out was disproportionately Black.

357.    Dr. Ragusa conducted a robustness check of his multivariate analysis to determine whether altering the county envelope surrounding the challenged district—in response to Defense Expert Dr. Brunell's criticism that the envelope is over-inclusive— would affect his results.  Even after dramatically shrinking the county envelope by 86% (going from all of Hinds County to only the area bordering the benchmark district), the results remained the same—"race was a significant factor in the blocks added to" HD 64, such that "Black voters were significantly less likely to be moved into the redrawn district."  PTX-006 at 12.

358.    The enacted HD 64 splits two precincts, which is one more than the prior district, and does so in a racially disparate manner.   Dr. Ragusa analyzed the BVAP of these split precincts, finding that "in both instances, the portions assigned to HD #64 had a lower BVAP % than the portions assigned to neighboring districts."   PTX-005 at 19. He also determined that the mapmakers' decision to do so contributed to the reduction in BVAP and validated his multivariate statistical analysis findings that race was a significant factor in the composition of HD 64 in the Enacted Plan. *Id.*

359.     The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience of race in the construction of HD 84.

360.     The Court further credits the analysis provided by Plaintiffs' mapdrawer, Mr. Cooper, who has demonstrated that HD 64 could be configured differently, to become a more compact district while reducing municipality and precinct splits in the area.  PTX-001 at 78–79.

361.     Based on all relevant evidence and a visual inspection of the enacted HD 64, as compared to the prior district and the alternative illustrative district drawn by Mr. Cooper, the Court finds that race predominated in the design of HD 64; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of political subdivision splits, and core preservation, were subordinated to race; and that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of census blocks has a significant effect on the block's assignment under the Enacted Plan, even after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted HD 64.

*     *     *

362.     Based on the expert analyses of political scientist Dr. Jordan Ragusa and Mr. Bill Cooper, among other evidence, including testimony from fact witnesses, as well as its own visual assessment, the Court finds that the Enacted Plan moved voters in and out of SD 2, SD 48, HD 22, HD 34, and HD 64 predominantly based on their race, subordinating traditional redistricting principles, "cracking" areas with large Black populations and significantly diminishing the Black population percentage in those districts.  The significance of race in the assignment of voters is demonstrated even when controlling for the possibility that voters were sorted based on their partisan vote history and accounting for traditional redistricting principles and other factors.

**VII.   Remedy**

363.     The 2024 general election is scheduled to take place on November 5, 2024.  Stip. 99.

364.     After new legislative district lines are adopted, counties input any changes in district assignments from the new district lines into the Statewide Election Management System ("SEMS").   Lennep Dep. Tr. at 62:24-63:19; Pl.'s Ex. 116, Deposition Transcript of Kyle Kirkpatrick, at 45:23-467: [hereinafter "Kirkpatrick Dep. Tr."].

365.     SEMS is an electronic database that houses election-related information, including the list of registered voters, their addresses, and their district assignments.  Lennep Dep. Tr. at 54:17-55:8.

366.     The process of implementing new districts in SEMS involves modifying the precinct split and address range boundaries where necessary to reflect any changes to the districting lines.  Lennep Dep. Tr. 62:24-63:19

367.     A "precinct split" exists when district lines run through a particular voting precinct, such that changing district lines may change whether a precinct is split or not.  Lennep Dep. Tr. at 77:9-78:13.

368.     The time it takes to implement new legislative districts in SEMS varies based on several factors, including the extent of the changes to the preexisting district lines, as well as the size and number of counties impacted.  Lennep Dep. Tr. at 66:16-67:23; Kirkpatrick Dep. Tr. at 46:18-47:18.

369.     Depending on those factors, the process of implementing new legislative districts can take anywhere from several days to several weeks.  Lennep Dep. Tr. at 66:16-67:23.  SEMS enables county officials to efficiently and electronically implement new district lines by updating

the precinct assignments for given address ranges (e.g., 100 to 500 Main Street).  Lennep Dep. Tr. at 77:9–78:3; Kirkpatrick Dep. Tr. at 109:21–110:9.

370.   The process of implementing new legislative districts is generally completed in SEMS at least 60 days in advance of a given election day for ballots to be generated, prepared, and shipped by the 45-day deadline provided by the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and to make absentee ballots available 45 days prior to an election. Kirkpatrick Dep. Tr. at 47:25–49:3, 55:17–56:8.

371.   In the 2023 election cycle, it took the Secretary of State's office a few days' worth of work to get the election updated and created in the SEMS database, and to review the names for all of the offices to ensure accuracy.  Kirkpatrick Dep. Tr. at 69:15–70:2.

372.   Based on the foregoing, the Court finds that changes to the legislative district lines could be enacted as late as August 27, 2024, and there would be sufficient time to implement the changes in SEMS in advance of the November general election.

373.   The Court finds that it would not unduly burden election administrators to implement new plans so long as the plans are available at least 70 days before the election.

374.   For state legislative elections, the primary election is typically held on the first Tuesday in August.  For 2024, the state primary election, if it were a state general election year, would occur on August 6, 2024.

375.   The Court finds that, if changes to the legislative district lines were enacted by May 28, 2024, the primary for a November 5, 2024 election could be held on August 6, 2024 without any undue burden.

376.   The Court further finds that, if changes to the legislative district lines were enacted after May 28, 2024, then the primary date for a November 5, 2024 special election could be moved

later to relieve any potential for undue burden on election administrators.

377. In the alternative, a special election could be held without a primary. If no primary were held for the special election, a plan would need to be put into place by August 27, 2024.

378. The Court takes notice of the fact that Mississippi does not have primaries for special elections to the Mississippi House and Senate. Instead, all candidates participate in a non-partisan general election with a runoff for the top two candidates should no candidate earn 50% of the vote. Miss. Code Ann. § 23-15-851; Miss. Code Ann. § 23-15-833.

379. Special elections to the Legislature can be held with as little as 60 days notice, with the candidate qualifying deadline required to be at least 50 days before the general election. Miss. Code Ann. § 23-15-851. The SBEC has the discretion to cancel any scheduled special election should only one candidate qualify. Miss. Code Ann. § 23-15-837.

380. The Court takes notice of the fact that, in 2021, three special elections were called to fill vacancies in the Mississippi House and Senate. All three elections were scheduled to coincide with the November 2, 2021 local elections already occurring throughout the state. *E.g.*, Pl.'s Ex. 123 [hereinafter "PTX-123"]; Pl.'s Ex. 125 [hereinafter "PTX-125"]. For the House election, the vacancy was not created until August 31, 2021, just 63 days before the special election. Pl.'s Ex. 124. Candidate qualifying ended 16 days later on September 13, 2021—exactly 50 days before the general election. PTX-125. The SBEC dispensed with the House election because only one candidate qualified. Pl.'s Ex. 121. The two Senate elections proceeded to the November 2 general election, with one election going to a runoff. *See* PTX-123.

381. The next regularly scheduled general election for state legislative districts is in November 2027, with candidates elected in those elections not taking office until January 2028.

**PROPOSED CONCLUSIONS OF LAW**

**I.    Jurisdiction, Parties, and Standing**

382.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1357; 42 U.S.C. §§ 1983 and 1988; and 52 U.S.C. §§ 10301, 10302, 10308(f), and 10310(e).

383.    This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

384.    A three-judge district court was properly convened in this case pursuant to 28 U.S.C. § 2284(a) because Plaintiffs "challeng[e] the constitutionality of … the apportionment of [a] statewide legislative body."  No argument challenging the application of Section 2284 here has been preserved.

385.    The Voting Rights Act, under which Plaintiffs bring suit, validly abrogates state sovereign immunity.  *Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023); *see OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017).  No sovereign immunity defense has been preserved by the Defendants here.

386.    The State Board of Election Commissioners, as the body that holds final, statewide authority over the placement of candidates on the ballot and the certification of state legislative elections in Mississippi, is a proper defendant against whom relief may be sought in a legislative redistricting case.  *See, e.g.*, *Connor v. Winter*, 519 F. Supp. 1337, 1343 (S.D. Miss. 1981).  No proper party defenses have been preserved by Defendants here.

387.    All potentially necessary parties are joined or otherwise accounted for.  To the extent that any remedy will require the Court to fashion relief that affects the conduct or timing of primary elections in Mississippi, the Mississippi Republican Party is an Intervenor in the case, and the Mississippi Democratic Party has signed a stipulation agreeing to abide by any judgment and

order in the case.  *See* Stipulation, Dkt. No. 184.  No failure-to-join-a-necessary-party defenses have been preserved here.

388.   Plaintiffs have Article III standing because as to each challenged district or area, at least one plaintiff has suffered a cognizable injury that is "fairly traceable to the challenged action" and "redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *see also, e.g.*, *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit.").

389.   An organization has associational standing on behalf of its members if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

390.   With respect to vote dilution claims under Section 2 of the Voting Rights Act, a minority voter is injured when they reside in a White-majority district that is alleged to result in the dilution of the minority group's voting strength due to racially-polarized voting.  *See, e.g.*, *Anne Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 307 (5th Cir. 2020); *see also, e.g.*, *Gingles*, 478 U.S. at 46–57 & n.11 (describing the dilution-by-submergence dynamic).  Some courts have also suggested that Section 2 plaintiffs must demonstrate that they could be included in a reasonably-configured majority-minority district if their claims were to succeed.  *Compare League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 486 (W.D. Tex. 2022) (three-judge panel) (suggesting *Gingles* plaintiffs must show they "would have resided where that Section 2

district should have existed") *with Anne Harding*, 948 F.3d at 307 (suggesting that this approach would "collapse[] standing and merit resolution").

391.    Plaintiffs have standing for their Section 2 vote dilution claims as to each of the challenged districts.  As to each of the areas around Illustrative SD 2, SD 9, SD 35 and Illustrative HD 22, HD 56, and HD 84, at least one of the individual plaintiffs is a Black voter who (1) resides in majority-White district in the Enacted Plan in an area where vote dilution is alleged to be occurring, and (2) can be drawn into a reasonably-configured Black-majority districts as demonstrated by the Cooper Illustrative SDs 2, 9, and 35, and HDs 22, 56, and 84.  As to the area around Illustrative SD 17, at least one MS NAACP member is a Black voter who (1) resides in majority-White district in the Enacted Plan in an area where vote dilution is alleged to be occurring, and (2) can be drawn into a reasonably-configured Black-majority district as demonstrated by the Cooper Illustrative SD 17.

392.    MS NAACP satisfies the other two elements of the associational standing test.  As the Fifth Circuit has previously held, "protecting the strength of votes . . . [is] surely germane to the NAACP's expansive mission." *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 197 (5th Cir. 2012).  The record supports that conclusion here as well.  Moreover, participation of individual members is not required because in this action MS NAACP seeks prospective and injunctive relief, not individualized damages.  *E.g.*, *Consumer Data Indus. Ass'n v. Texas*, No. 21–51038, 2023 WL 4744918, at *4 n.7 (5th Cir. 2023).

393.    With respect to a racial gerrymandering claim arising under the Fourteenth Amendment, "a plaintiff who resides in a district which is the subject of a racial-gerrymander claim has standing to challenge the legislation which created that district."  *Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 904 (1996); *accord United States v. Hays*, 515 U.S. 737, 744–45 (1995)

("Where a plaintiff resides in a racially gerrymandered district, . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action."); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) ("[A] plaintiff who alleges that he is the object of a racial gerrymander . . . has standing to assert . . . that his own district has been so gerrymandered.").

394.    Plaintiffs have standing with respect to their racial gerrymandering claims.  At least one individual voter plaintiff resides in each of the challenged districts (Enacted SDs 2 and 48, and Enacted HDs 22, 34, and 64, respectively).  And MS NAACP also has associational standing to challenge these districts because it has members who reside in each of those districts.  *See, e.g.*, Stip. 2.

## II.    Right of Action to Enforce Section 2

395.    Under this Court's rules, legal defenses must be raised by motion.  *See* L. Uniform Civ. R. 7(b).  Neither Defendants nor Intervenors raised any defense relating to a purported lack of a private right of action to enforce Section 2 of the Voting Rights Act by motion.  Nor do either of them argue that the issue goes to the Court's jurisdiction, which it does not.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction.").  Because the private-right-of-action issue does not implicate the Court's subject matter jurisdiction, it is waivable.  Here, it has been waived.

396.    In any event, the Fifth Circuit has already resolved the issue, holding that there is an implied private right of action to enforce Section 2.  The Voting Rights Act contemplates enforcement actions both by the U.S. Department of Justice and by "aggrieved person[s]." *Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023) (quoting 52 U.S.C. § 10302).  Individual

voters whose votes have been diluted by a challenged districting scheme "are aggrieved persons," and accordingly they have "a right … to bring these claims." *Id.*; *see also, e.g.*, *Morse v. Republican Party of Virginia*, 517 U.S. 186, 232 (1996) ("Although § 2, like § 5, provides no right to sue on its face, 'the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'" (citing S. Rep. No. 97-417, at 30)).

397.    And even if the law with respect to an implied right of action to enforce Section 2 was not so clear, Plaintiffs here could still enforce their rights under 42 U.S.C. § 1983, which provides an enforceable remedy for the deprivation of any right "secured by the Constitution and laws."

398.    While the implied-right-of-action question is governed by the standard set forth in *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), the question whether a statutory violation may be enforced *via Section 1983* "is a different inquiry." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–284 (2002).  Under that inquiry, once a plaintiff demonstrates that Congress "intended to create a federal right," "the right is presumptively enforceable by § 1983."  *Gonzaga Univ.*, 536 U.S. at 283-284 (emphasis omitted); *accord Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183–184 (2023).

399.    This presumption is rarely overcome.  *See Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994).  To do so, a defendant must show that Congress implicitly foreclosed Section 1983 relief by creating an incompatible private remedy scheme.  *E.g.*, *Gonzaga*, 536 U.S. at 284–285 n.4.  The presence of a parallel *public* remedy (*i.e.*, government enforcement) is insufficient.  Rather, "a more restrictive *private* remedy" is required because restrictions on *private* remedies (such as special filing or exhaustion requirements, or limits on damages) are inconsistent with the relief available under Section 1983. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254, 256 (2009)

(emphasis added).

400.     Section 2 makes crystal clear that it protects individual federal rights.   The statute bars voting standards or practices that "result in a denial or abridgement of *the right of any citizen of the United States to vote* on account of race or color" under the law's "totality-of-the-circumstances" test.   52 U.S.C. § 10301 (emphasis added).   That is the type of rights-creating language that is presumptively enforceable in a Section 1983 action.  *E.g.*, *Gonzaga*, 536 U.S. at 284 n.4.

401.     Here, Plaintiffs invoked Section 1983 as a basis for enforcing their Section 2 rights. Accordingly, even if the right to enforce Section 2 via an implied right of action were not a matter of settled law in the Fifth Circuit, and even if the issue had been properly preserved, Plaintiffs would in all events be able to enforce their rights by proceeding under Section 1983.

## III.    Admission of Certain Expert Reports

402.     While most of the expert reports in this case were admitted by stipulation of the parties, Intervenor Defendants objected to the admission of the reports of Dr. Luckett and Dr. King. Those objections were overruled and the reports admitted for the reasons stated below.

### A.   Waiver of the Objections to the Expert Reports of Drs. Luckett and King

403.     No Defendant, including Intervenors, made any timely objection to, or motion to exclude, any expert report served in this matter.

404.     Under the Local Civil Rules and the operative Scheduling Orders in this matter (ECF Nos. 35 and 44), any *Daubert* motions or motions *in limine* challenging another party's expert were due no later than December 26, 2023 (i.e., 14 days after the close of discovery).  *See* L.Rs. 7(b)(2)(D) & 26(a)(3).

405.     In the Order setting the Final Pretrial Conference, this Court admonished the parties

that "[n]o motions will be considered which are filed out of time as set forth in the scheduling order of the particular case." Dkt. No. 167.  In the leadup to the January 25, 2024 Final Pretrial Conference, the parties agreed to stipulate to the admission of all of the parties' expert reports, and delivered a draft Joint Pretrial Order to the Court containing such a stipulation by the deadline set forth in the Court's Pretrial Notice.  *See* Transcript of January 25, 2024 Pretrial Conference ("PTC Tr.") at 15:4–15; Pretrial Notice, Dkt. No. 167.

406.    At 9:18 A.M. on the morning of the Final Pretrial Conference which was scheduled to begin at 10:00 A.M., Intervenor sent an email to the Court and to the other parties raising, for the first time, an objection on unspecified grounds to the admission of the reports of Dr. King (both his initial and supplemental report) and Dr. Luckett.  At the pretrial conference, Intervenor reiterated its unspecified "objection."  PTC Tr. at 14:4–19.

407.    Intervenor has waived its right to object to the King and Luckett reports because it failed to timely file the required written pretrial motions challenging the reports.

408.    Trial courts are afforded "broad discretion to preserve the integrity and purpose of the pretrial order."  *E.g.*, *Buchanan v. Gulfport Police Dep't*, No. 1:08CV1299-LG-RHW, 2011 WL 6326241, at *1 (S.D. Miss. Dec. 16, 2011); *see also Alpha Kappa Alpha Sorority Inc. v. Converse Inc.*, 175 F. App'x 672, 682 (5th Cir. 2006); *Time Ins. Co. v. White*, No. 1:08CV16-HSO-JMR, 2008 WL 11440690, at *2 (S.D. Miss. Nov. 12, 2008).

409.    Consistent with that authority, courts in this district routinely reject untimely challenges to expert reports.  *See Koch Foods, Inc. v. Pate Dawson Co., Inc.*, No. 3:16-CV-355-DCB-MTP, 2018 WL 651371, at *3 (S.D. Miss. Jan. 31, 2018) ("The Court need not consider untimely-filed *Daubert* challenges.  Particularly so where, as here, the movant neither acknowledges nor explains the motion's untimeliness." (citations omitted)); *Robinson v. Colucci*,

No. 3:16CV687TSL-RHW, 2018 WL 2025861, at *9 (S.D. Miss. May 1, 2018) (denying motion

to exclude expert testimony for untimeliness); *see also Goode v. City of Southaven*, No. 3:17-CV-

60-MPM-RP, 2019 WL 1089510, at *2–5 (N.D. Miss. Mar. 7, 2019) (same); *Caldwell v. Wal-*

*Mart Stores E., LP*, No. 3:10-CV-651-DPJ-FKB, 2012 WL 1712377, at *1 (S.D. Miss. May 14,

2012) (same); *Penthouse Owners Assoc., Inc. v. Certain Underwriters at Lloyd's, London*, No.

1:07CV568-HSO-RHW, 2011 WL 13073684, at *2 (S.D. Miss. Feb. 9, 2011) (same).[1]  Here too,

the Court need not consider Intervenor's belated challenge to the Luckett and King Reports.

### B. Admissibility of the Luckett and King Reports

410.    An expert's opinions and testimony are admissible if they meet a two-part test.

First, the expert must be qualified to offer the opinions for which they are designated.  *Palmer v.*

*Sun Coast Contracting Servs., Inc*., No. 1:15CV34-HSO-JCG, 2017 WL 3081668, at *4 (S.D.

Miss. July 19, 2017); *accord Carlson v. Bioremedi Therapeutic Sys., Inc*., 822 F.3d 194, 199 (5th

Cir. 2016).  Second, the proposed testimony must, under Rule 702 of the Federal Rules of

---

[1]    Because it is undisputed that both Dr. King and Dr. Luckett were timely designated as experts according to Federal Rule of Civil Procedure 26(a)(2)(B), *Hamburger v. State Farm Mut. Auto. Ins. Co*., 361 F.3d 875 (5th Cir. 2004), which sets forth the test for evaluating late expert disclosures, does not apply to Intervenor's failure to make a timely written motion challenging the Luckett and King reports.  *Cf. Robinson v. Colucci*, No. 3:16CV687TSL-RHW, 2018 WL 2025861, at *8-9 (S.D. Miss. May 1, 2018) (applying the four-factor test in *Hamburger* to decide whether plaintiff offered a valid reason for not timely disclosing expert opinions, but not applying *Hamburger* to decide whether a motion to strike expert testimony was untimely filed when filed after the court-ordered deadline for such a motion and holding that said motion was untimely).  Nor to the extent that the *Hamburger* factors could be applied by analogy would they support consideration of Intervenor's untimely arguments.  Intervenor offers no explanation for its failure to challenge these reports by the applicable deadline; the belated challenge would waste the resources of the parties and the Court, causing prejudice, by injecting uncertainty into and prolonging the trial presentation; and Intervenor's arguments were first offered on the eve of trial, where no continuance was possible.  *Hamburger*, 361 F.3d at 882–83.

Evidence, "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702).

411.    Both Dr. Luckett and Dr. King are qualified to offer their opinions on Mississippi history and politics.  Dr. Luckett is a Professor of History and an expert in African American political history and the modern civil rights movement with a focus on the State of Mississippi. *See supra*, Findings of Fact ¶¶ 140–141.  Dr. King is a Professor of Political Science and an expert in political science, voting behavior, racially polarized voting issues, related discrimination and suppression, as well as the role of race in politics in the American South in general and Mississippi in particular.  *See supra*, Findings of Fact ¶¶ 139, 141.

412.     Their reports and testimony explain and analyze facts and data grounded in history and political science and are relevant to nearly all of the "Senate Factors" that courts consider in Section 2 vote dilution cases as part of the "totality of the circumstances."  *See Gingles,* 478 U.S. 30, 36–37 (1986) (enumerating "Senate Factors"); *see infra* Conclusions of Law § VII.

413.    Dr. King was recently qualified as an expert in *Nairne v. Ardoin*, a Voting Rights Act case in the Middle District of Louisiana.   2024 WL 492688, at *12 ("Plaintiffs further rebutted Dr. Alford's theories of partisan polarization with the expert testimony of Dr. Marvin P. King, Jr., who was accepted as an expert in political science, voting behavior and racially polarized voting.").

414.    Dr. King offers similar testimony in this case as he did in *Nairne*, where he also was presented to rebut certain opinions by Defendants' expert, Dr. John R. Alford.  2024 WL 492688, at *12.

415.    The court not only accepted Dr. King as an expert in political science, voting behavior and racially polarized voting, the same expertise he is being offered for in this case, but also called him a credible witness.  *Nairne,* 2024 WL 492688, at *12. ("Defendants did not rebut

Dr. King's EI analysis or testimony.  The Court credits Dr. King's findings over the conclusions of Dr. Alford and finds Dr. King's testimony more credible.").

416.    Both experts' reports and opinions would assist the Court in considering the totality of the circumstances analysis because they explain and analyze facts and information from history and political science that are relevant to several of the "Senate Factors" that courts consider in Section 2 vote dilution cases.  *See Gingles*, 478 U.S. 30, 36–37(1986) (enumerating "Senate Factors").

417.    Defendants suggest that expert opinion regarding history and historical events is unnecessary.  However, courts routinely qualify historians as expert witnesses precisely for their expert interpretation of historical events.  Historians situate sources in their "historical context," "provide a meta-understanding of the historical record itself," and offer a "synthesis of various source materials that enables the [factfinder] to perceive patterns and trends," all of which are "'helpful' within the meaning of Rule 702."  *Burton v. Am. Cyanamid*, No. 07-CV-0303, 2018 WL 3954858, at *4 (E.D. Wis. Aug. 16, 2018); *accord vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 450 (D.S.C. 2019) (rejecting defendant's argument that expert witness offering historical testimony must be excluded and concluding that "this type of evidence, synthesizing voluminous historical texts, is precisely the type of expertise that courts acknowledge historians possess").  *See also Langbord v. U. S. Dep't of Treasury*, 832 F.3d 170, 195 (3d Cir. 2016) (no error in admitting expert historian); *Waterhouse v. R.J. Reynolds Tobacco Co*., 368 F. Supp. 2d 432, 436 (D. Md. 2005), *aff'd*, 162 F. App'x 231 (4th Cir. 2006) (similar).

418.    Courts routinely rely on historians as expert witnesses in Voting Rights Acts cases alleging Section 2 violations because the Senate Factors expressly call for consideration of historical practices.  *See Houston v. Lafayette Cnty*., 20 F. Supp. 2d 996, 1003 n.5 (N.D. Miss.

1998) ("As to the racial-appeals and history-of-discrimination factors, the court primarily bases its findings on the relevant testimony of David Sansing, Ph.D., the Defendants' political history expert who testified during the 1993 bench trial." (citation omitted)); *Ewing v. Monroe Cnty., Miss.*, 740 F. Supp. 417, 423 (N.D. Miss. 1990) (utilizing the testimony of Dr. James Cobb, a historian who specializes in history of the South to show that "[d]isparities in housing, income, employment and education do exist between whites and blacks in Monroe County[, Mississippi.]"); *Citizens for a Better Gretna v. City of Gretna, La.*, 636 F. Supp. 1113, 1119 n.12 (E.D. La. 1986), *aff'd*, 834 F.2d 496 (5th Cir. 1987) ("Plaintiff's expert historian, Dr. Cassimere, offered one of several possible answers for lower black turnout in aldermanic elections."); *Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1067 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) ("As Dr. Gordon testified, historical policies, including not only educational segregation and the racially-motivated use of incorporation but also the way houses, streets, and public infrastructure were physically built, were 'intended and designed to create starkly segregated and separate [school] districts.'") (citations omitted); *Singleton*, 582 F. Supp. 3d at 974–76, 1021–22 (accepting as a credible expert witness and relying on report and testimony from Dr. Joseph Bagley, a history professor, concerning the Senate factors, including the history of discrimination in Alabama).

419.    Courts also routinely rely on political scientists to give similar testimony. *See Perez v. Texas*, No. 11–CA–360–OLG–JES–XR, 2014 WL 12480146, *1–3 (W.D. Tex. July 9, 2014) (denying state defendants' motion to exclude two political scientist expert witnesses who would testify to discriminatory purpose and the persistence of voting discrimination in Texas since the adoption of the Voting Rights Act in a Voting Rights Act case); *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020) ("In sum, Dr. Barreto is

extremely well credentialed and at the leading edge of political science and statistical analysis with respect to racially polarized voting and voting estimates. I found him to be entirely credible."); *Baltimore Cnty. Branch of Nat'l Ass'n for the Advancement of Colored People v. Baltimore Cnty., Maryland*, No. 21-CV-03232-LKG, 2022 WL 657562, at *12–13 (D. Md. Feb. 22, 2022), *modified*, No. 21-CV-03232-LKG, 2022 WL 888419 (D. Md. Mar. 25, 2022) (referring to the testimony of a community research scientist on the disputed County's history of racial discrimination, continuing racial disparities, and related lawsuits).

420.     Here, Dr. Luckett examines facts and data relevant to Senate Factors One, Three, and Five.  Dr. Luckett examines Mississippi's history of discrimination against Black voters, how this history has shaped modern voting restrictions, and how racial discrimination rooted in government policy impacts the participation of Black Mississippians in civic life.  Dr. King examines facts and data relevant to Senate Factors One, Two, Three, Six, Seven, and Nine, and addresses the use of racial appeals in Mississippi political campaigns, the obstacles that minority election candidates face outside of majority-minority districts, and the tenuous reasons for the adoption of Mississippi's current voter maps to support these conclusions.  Dr. King also offers opinions on the relationship between partisan polarization and racial polarization based on his expert analysis of Mississippi history and politics.

421.     These experts rely on sources commonly used by historians and political scientists to conduct their analyses, including academic literature and scholarship, contemporaneous newspaper articles, primary sources, and government data.  Both Dr. King and Dr. Luckett surveyed historical sources, gathered multiple sources of information, including original and secondary sources, evaluated their reliability, and used them as the basis for a reliable narrative. *See United States v. Paracha*, No. 03 CR. 1197 (SHS), 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3,

2006) (historical methodology "consists of gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information to determine whether his conclusions remain consonant with the most reliable sources."), *aff'd*, 313 F. App'x 347 (2d Cir. 2008) (admitting expert testimony as based on reliable methodology); *accord United States v. Kantengwa*, 781 F.3d 545, 562 (1st Cir. 2015); *vonRosenberg*, 413 F. Supp. 3d at 450; *see also Perez*, 2014 WL 12480146, *2 (denying motion to exclude political scientist expert witnesses and finding analysis was reliable).  Both experts supported their conclusions with historical facts and data.  They also synthesized dense or voluminous historical texts and offered context that illuminates or places in perspective past events.  Their reports are thoroughly sourced and cited, with Dr. King's Report capturing 153 footnotes and Dr. Luckett's report capturing 91 endnotes.

422.    The Court's conclusion is unaffected by the recent revisions to Federal Rule of Evidence 702.  The advisory committee notes make clear that recent changes to FRE 702 are simply meant to further remind courts of the already existing rule that the court is the gatekeeper of expert testimony, but they do not otherwise change the test under FRE 702.  *See* FRE 702 advisory committee's note to December 1, 2023 amendment ("Nothing in the amendment imposes any new, specific procedures.  Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702.  Similarly, nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support.").

423.    Moreover, admitting Dr. Luckett's and Dr. King's reports into evidence is a proper way to conserve resources.  For this reason, the parties agreed to admit the reports of every expert offered in this case.  Intervenor objected to Dr. King's and Dr. Luckett's reports but did not object

to the admission of the other reports from all other experts for both Plaintiffs and Defendants.

424.    Courts routinely admit the signed reports of testifying experts into evidence in bench trials to conserve judicial resources and streamline the presentation of evidence. *See United States v. Philip Morris USA Inc.*, No. CV 99-2496, 2021 WL 4318113, at *2 (D.D.C. Sept. 23, 2021); *see also Pearlstein v. Blackberry*, No. 13 CIV. 7060 (KHP), 2022 WL 704010, at *1 (S.D.N.Y. Mar. 9, 2022); *Kerek v. Crawford Elec. Supply Co., Inc.*, No. CV 18-76-RLB, 2019 WL 6311365, at *3 (MD. La. Nov. 25, 2019); *Schmucker v. Johnson Controls, Inc.*, No. 3:14-CV-1593, 2019 WL 5579470, at *6 (N.D. Ind. Oct. 28, 2019); Fed. R. Evid. 807.

425.    Additionally, in Voting Rights Act cases, courts have admitted expert reports into evidence for both Plaintiffs and Defendants. *See Perez v. Abbott*, 253 F. Supp. 3d 864, 888 (W.D. Tex. 2017) ("Dr. Andres Tijerina's expert report was admitted without objection. Joint Expert Ex. E–10. He opined on the history of the violation of civil rights of Latinos in Texas and the use of devices related to voting to limit the Mexican–American vote."); *Alabama State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama,* No. 2:16-CV-731-WKW, 2020 WL 579385, at *3 n.1 (M.D. Ala. Feb. 5, 2020) ("At trial, Dr. Gaylord's expert reports were admitted as Defendants' Exhibits 25 and 27.").

426.    Accordingly, and in light of the Court's broad discretion over evidentiary matters in a bench trial, the Court's admission of the King and Luckett reports was proper.

## IV.    Vote Dilution: The *Gingles* Framework

427.    Section 2 of the VRA renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a); *see also Gingles*, 478 U.S. at 36.

428.    Dilution of a minority community's voting strength violates Section 2 if, under the

totality of the circumstances, the "political processes leading to nomination or election in the State . . . are not equally open to participation by members of [a racial minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 36.

429.     The *Thornburg v. Gingles* framework governs vote dilution claims under Section 2 of the VRA, as it has for nearly 40 years.  *See Milligan*, 599 U.S. at 19.  Under *Gingles*, "[d]ilution of racial minority group voting strength" in violation of Section 2 "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Gingles*, 478 U.S. at 46 n.11.  It is well established that single-member district lines can violate Section 2 by diluting minority voting strength.  *E.g.*, *Milligan*, 599 U.S. at 17–23, 38; *Robinson*, 86 F.4th at 597; *see Growe v. Emison*, 507 U.S. 25, 40 (1993).

430.     A violation of Section 2 does not require proof of discriminatory intent and can "be proved by showing discriminatory effect alone." *Gingles*, 478 U.S. at 35.  The essence of such a Section 2 "results" claim is that an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Id.* at 47, 63; *see also, e.g.*, *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 159 (W.D. Tex. 2022) (three-judge court) ("The Supreme Court interpreted that new language in *Thornburg v. Gingles*, to mean that Section 2, unlike the Constitution, could be violated even if a state did not act with a racial motive… The Court also took a broad view of discriminatory effect….") (citations omitted).

431.     To prevail on a Section 2 claim, Plaintiffs must initially satisfy the three

preconditions established in *Gingles*: "'First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district.' A district is reasonably configured when it complies 'with traditional districting criteria, such as being contiguous and reasonably compact.'  Second, the minority group must be politically cohesive. Third, the white majority must be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate."  *Robinson*, 86 F.4th at 589 (quoting *Milligan*, 599 U.S. at 18); *accord Gingles*, 478 U.S. at 50–51.

432.    The three preconditions together result in what the *Gingles* Court referred to as "vote dilution by submergence," where, because of the combination of district lines and persistent patterns of racially polarized voting, minority voters are rendered unable to elect candidates of choice, even though they vote cohesively and are numerous enough to comprise a majority in a compact, reasonably-configured legislative district.  478 U.S. at 46–51, 59 n.28.  In such circumstances, the combination of district lines and persistent patterns of racially polarized voting operate to submerge or fragment minority voters within White-majority districts, shutting them out of power.  *E.g.*, *Growe*, 507 U.S. at 40.

433.    After establishing the three *Gingles* preconditions, a plaintiff must "'show, under the totality of the circumstances, that the political process is not equally open to minority votes,' causing a Section 2 violation."  *Robinson*, 86 F.4th at 589 (quoting *Milligan*, 599 U.S. at 18). "Courts must determine whether plaintiffs have an equal opportunity in the voting process to elect their preferred candidate under the challenged districting map."  *Id.* (citing *Gingles*, 478 U.S. at 44); *see also* 52 U.S.C. § 10301(b).

434.    Once the *Gingles* preconditions have been established, and the core elements of the dilution-by-submergence dynamic identified, a liability determination typically follows:  "[I]t will

be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles*
[preconditions] but still have failed to establish a violation of § 2 under the totality of
circumstances." *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 293 (5th Cir. 1996) (quoting *Clark v.
Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994); *see also Ga. State Conf. of NAACP v. Fayette Cnty.
Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (same).

435.    In examining the totality of the circumstances, courts consider the so-called Senate
Factors (also called the *Zimmer* factors).  *E.g.*, *Robinson*, 86 F.4th at 589; *accord Gingles*, 478
U.S. at 36–37, 44–45.

436.    The Senate Factors include: "(1) the extent of any history of official discrimination
in the state or political subdivision that touched the rights of the members of the minority group to
register, to vote, or otherwise participate in the democratic process; (2) the extent to which voting
in the elections of the state or political subdivision is racially polarized; (3) the extent to which the
state or political subdivision has used unusually large election districts, majority vote
requirements, anti-single shot provisions, or other voting practices or procedures that may enhance
the opportunity for discrimination against the minority group;" (4) whether minority candidates
have been denied access to any candidate-slating process; (5) the extent to which minorities in the
state or political subdivision bear the effects of discrimination in education, employment, and
health, which hinder their ability to participate effectively in the political process; "(6) whether
political campaigns have been characterized by overt or subtle racial appeals;" and (7) the extent
to which minority group members have been elected to public office (internal quotations omitted).
*See Gingles*, 478 U.S. at 36–37 (quoting S. Rep. No. 97-417, at 28–29 (1982), *as reprinted in* 1982
U.S.C.C.A.N. 177, 206–07).

437.    Additional factors recognized by the Senate Committee include whether there is a

significant lack of responsiveness on the part of elected officials to the particular needs of members

of the minority group, and whether the policy underlying the state or political subdivision's use of

such voting qualification, prerequisite to voting, or standard practice of procedure is tenuous. *See*

*Gingles*, 478 U.S. at 36–37.

438.    In describing the "comprehensive" totality-of-circumstances analysis, the Supreme

Court has also explained that while "proportionality is not dispositive in a challenge to single-

member districting, it is a relevant fact in the totality of circumstances to be analyzed when

determining whether members of a minority group have less opportunity than other members of

the electorate to participate in the political process and to elect representatives of their choice."

*Johnson v. De Grandy*, 512 U.S. 997, 1000, 1011 (1994) (internal quotation marks omitted); *see*

*also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 (2006) [hereinafter *LULAC*]

("[W]hether the number of districts in which the minority group forms an effective majority is

roughly proportional to its share of the population in the relevant area" is a "relevant

consideration".) (citing *De Grandy*, 512 U.S. at 1000).

## V.    *Gingles* I

439.    The first *Gingles* precondition is "focused on geographical compactness and

numerosity, [and] is 'needed to establish that the minority has the potential to elect a representative

of its own choice in some single-member district.'" *Milligan*, 599 U.S. at 18 (quoting *Growe*, 507

U.S. at 40); *see also Robinson*, 86 F.4th at 589.  To satisfy the first precondition, a plaintiff must

show that "the minority group [is] sufficiently large and [geographically] compact to constitute a

majority in a reasonably configured district." *Milligan*, 599 U.S. at 18 (cleaned up).

440.    The *Gingles* I showing is typically made through the proffer of an illustrative

legislative plan containing additional, reasonably-configured majority-minority districts, such as

the Illustrative Senate and House Plans offered in this case by Mr. Cooper. *Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1406–07 (5th Cir. 1996) [hereinafter *Clark II*]; *see also Gonzalez v. Harris Cnty.*, 601 F. App'x 255, 258 (5th Cir. 2015) ("Satisfying the first *Gingles* precondition—compactness—normally requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans."); *accord Nairne*, 2024 WL 492688, at *11-18, 20-30; *Alpha Phi Alpha Fraternity*, 2023 WL 7037537, at *16–17, 26-31; *Robinson*, 605 F. Supp. 3d at 778-784, 820-838; *Singleton*, 582 F. Supp. 3d at 977, 1004–1016.

441.   Although "[p]laintiffs typically attempt to satisfy [the first *Gingles* precondition] by drawing hypothetical majority-minority districts," *Clark II*, 88 F.3d at 1406, such illustrative plans are "not cast in stone" and are offered only "to demonstrate that a majority-[B]lack district is feasible," *Clark v. Calhoun Cnty.*, 21 F.3d 92, 95 (5th Cir. 1994) [hereinafter *Clark I*]; *see also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (same).

442.   The "ultimate end of the first *Gingles* precondition is to prove that a solution is possible, not necessarily to present the ultimate solution to the problem." *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 746 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez,* 601 F. App'x 255 (citing *Gingles*, 478 U.S. at 50 n.17); *accord Clark I*, 21 F.3d at 95.

443.   Because the ultimate question in the *Gingles* I analysis is whether the minority population in a particular area is sufficiently numerous and geographically compact to form a majority in a single-member district, courts appropriately analyze whether Gingles has been satisfied, and liability established, on a district-by-district basis. *See, e.g.*, *Perez v. Abbott*, 250 F. Supp. 3d 123, 143 (W.D. Tex. 2017) (conducting district-by-district analysis of Texas state legislative districts).

### A.  Numerosity

444.   With respect to the numerosity of the minority population, a bright-line 50% plus one rule applies in assessing whether the minority population is "sufficiently large" for purposes of *Gingles* I.  *Bartlett*, 556 U.S. at 12, 18–20.  That is, Plaintiffs "asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent."  *Id.* at 19–20; *see also Robinson v. Ardoin*, 86 F.4th 574, 590 (5th Cir. 2023) (citing *Bartlett*, 556 U.S. at 19–20).

445.   In voting rights cases when Black voters are the only minority group whose effective exercise of the franchise is at issue, "it is proper to look at *all* individuals who identify themselves as [B]lack" to calculate a district's BVAP and assess the numerosity of the Black population in that district.  *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003) (emphasis in original); *see also, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1343 n.8 (N.D. Ga. 2015); *Singleton*, 582 F. Supp. 3d at 1004.  Accordingly, the "any-part" or AP BVAP metric is appropriate when establishing the first *Gingles* precondition in a Section 2 case*.  See, e.g.*, *Robinson*, 605 F. Supp. 3d at 819–20; *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 419–20 (M.D. La. 2017), *rev'd on other grounds sub nom.*, *Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020); *Alpha Phi Alpha Fraternity*, 2023 WL 7037537, at *9; *Singleton*, 582 F. Supp. 3d at 1002–04; *Ga. State Conf. of NAACP*, 118 F. Supp. 3d at 1343; *Covington v. North Carolina*, 316 F.R.D. 117, 125 n.2 (M.D.N.C. 2016) (three-judge court), *aff'd*, 581 U.S. 1015 (2017); *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1033 (E.D. Mo. 2016).

446.   Based on the foregoing findings of fact, the Court concludes that Plaintiffs have established by a preponderance of the evidence that the BVAP in each newly-added majority-Black district in the Illustrative Senate and House Plans—specifically, Illustrative SD 2, SD 9, SD

135

17, SD 35, and Illustrative HD 22, HD 56, and HD 84—is greater than 50 percent. *See, e.g.*, *supra*, Findings of Fact ¶¶ 65, 66. Consistent with that, the Illustrative Senate Plan increases the number of Black-majority State Senate districts from 15 to 19, and the Illustrative House Plan increases the number of Black-majority State House districts from 42 to 45.

### B.  Compactness and Other Traditional Redistricting Principles

447.   "Compactness under Section 2 is an imprecise concept, but traditional districting principles like maintaining communities of interest and traditional boundaries should be considered." *Robinson*, 86 F.4th at 590 (citing *LULAC*, 548 U.S. at 433)); *see also Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 494 (5th Cir. 2020).  The bottom-line question is whether the proferred illustrative districts are "reasonably configured," and "[a] district will be reasonably configured … if it comports with traditional districting criteria, such as being contiguous and reasonably compact" and "respect[ing] existing political subdivisions, such as counties, cities, and towns." *Milligan*, 599 U.S. at 18, 20 (citing *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015)); *see also LULAC*, 548 U.S. at 433 (*Gingles* I "should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries'") (citation omitted); *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) (plaintiffs satisfy the first *Gingles* precondition when their proposed majority-minority district is "consistent with traditional districting principles").

448.   In addition to compliance with Section 2, the traditional districting principles include population equality, contiguity, geographic compactness, respect for political boundaries, and respect for communities of interest. *See Milligan*, 599 U.S. at 18, 20; *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (identifying contiguity as a traditional districting principle); *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 651–52 (1993) (identifying population equality as a traditional

districting principle); *see also, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1307 (N.D. Ga. 2013) (traditional districting principles include "maintaining communities of interest and traditional boundaries," "geographical compactness, contiguity, and protection of incumbents") (citation omitted).

449.    There is no requirement that the new Black-majority districts in a *Gingles* I illustrative plan comport with traditional redistricting principles *better* than the districts in the challenged plan. Compliance with the compactness criterion requires only that an illustrative district is "*reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries," not that the illustrative districts are equally or more compact than the enacted districts. *Bush v. Vera*, 517 U.S. 952, 977 (1996) (emphasis in original); *accord Milligan*, 599 U.S. at 18.

450.    "The first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district." *Houston v. Lafayette Cnty.*, 56 F.3d 606, 611 (5th Cir. 1995) (quoting *Clark I*, 21 F.3d at 95). And "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles, even if not to the same extent or degree as some other hypothetical district." *Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000). Accordingly, an illustrative plan can be "far from perfect" in terms of compactness yet satisfy the first *Gingles* precondition. *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

451.    Nor for purposes of the *Gingles* I analysis is there any material distinction between the compactness of the minority *population* and the compactness of the illustrative majority-minority district in the area where that population lives. *See Robinson*, 86 F.4th at 590–591.

Demonstrating reasonably-configured minority-majority districts is necessarily sufficient to satisfy the requirement that the "minority group … be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Id.* (quoting *Milligan*, 599. U.S. at 18).

452. In this case, and in light of the foregoing findings of fact, Mr. Cooper's Illustrative Plans and the additional Black-majority districts contained in them easily satisfy the first *Gingles* precondition. Notably, Defendant's *Gingles I* expert, Dr. Brunell, does not contend that those districts are insufficiently compact or that the Illustrative Plans otherwise violate traditional redistricting principles.

### 1. Population Equality

453. Population equality is a traditional redistricting principle. *E.g.*, *Reynolds v. Sims*, 377 U.S. 533, 562–63 (1964); *Gaffney v. Cummings*, 412 U.S. 735, 741–746 (1973); *Shaw I*, 509 U.S. at 651–52.

454. The Court concludes based upon the foregoing findings of fact that all the districts in the Illustrative Senate and House Plans are within the +/- 5% population deviation guidelines adopted by the Joint Committee, that the Illustrative Plans are consistent with the principle of population equality. *See supra*, Findings of Fact § III.D.

### 2. Contiguity

455. Contiguity is a traditional redistricting principle that requires districts to be contiguous, meaning that all parts of a district are connected to one another. *E.g.*, *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 258 (2016) (citation omitted) (recognizing contiguity as a traditional redistricting principle).

456.    Based upon the foregoing findings of fact, the Court concludes that all the districts in the Illustrative Senate and House Plans comport with the traditional redistricting principle of contiguity.  *See supra*, Findings of Fact § III.D.

### 3.  Compactness

457.    Geographical compactness is assessed based on the shape of the districts. "For example, a district would not be sufficiently compact if it was so spread out that there was no sense of community, that is, if its members and its representative could not effectively and efficiently stay in touch with each other; or if it was so convoluted that there was no sense of community." *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-CV-0087-D, 2014 WL 4055366, at *9 (N.D. Tex. Aug. 15, 2014) (quoting *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1466 (M.D. Ala. 1988)).

458.    The Court concludes that Plaintiffs' illustrative plans—and in particular the additional Black-majority districts, SDs 2, 9, 17, and 35, and HDs 22, 56, and 84—comport with the compactness criterion.  Based on a visual analysis, they are regularly shaped, do not contain "land bridges" between disparate areas, and are not "convoluted."  They are not at all comparable, for example, to those at issue in *LULAC*, where the Supreme Court found one district noncompact because of "the enormous [300 mile] geographical distance separating the Austin and Mexican-border communities, *coupled with* the disparate needs and interests of these populations." 548 U.S. at 435 (emphasis added).  Indeed, Mr. Cooper's configuration of the district lines is in many instances visually more compact than the Enacted Plans.

459.    In addition, and as discussed already, there is no dispute that Mr. Cooper's Illustrative Plans are comparable to if not more compact than the Enacted Plans when considering

various mathematical metrics for assessing compactness, such as the Reock and Polsby-Popper metrics. *See, e.g.*, PTX-001 at 45–46, 68–70, 399-417, 822-855. Indeed, Defendants' expert does not contend that the Illustrative Plans are insufficiently compact.

460. Based upon the foregoing findings of fact, the Court concludes that the the Illustrative Senate and House Plans comport with the traditional redistricting principle of compactness. *See supra*, Findings of Fact § III.D.

### 4. *Traditional boundaries*

461. The Illustrative Plans also maintain "traditional boundaries." *LULAC*, 548 U.S. at 433 (citation omitted).

462. To be sure, Plaintiffs in proffering an illustrative plan are not required to adopt the same line-drawing priorities as the State. *See Gonzalez*, 601 F. App'x at 260–61 (citation omitted) (stating it would be "unfair to require Plaintiffs to draw maps in strict accordance with [a jurisdiction's] priorities"); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1113 (E.D. Cal. 2018) (holding that plaintiffs need not prioritize redistricting principles in the same manner as a jurisdiction did when creating a challenged map). Nor can the maintenance of county or other political lines trump compliance with Section 2 of the Voting Rights Act where splitting of counties is necessary to create a reasonably compact majority-minority district and provide Black voters the opportunity to elect their candidate of choice despite racially-polarized voting patterns. *See Bartlett*, 556 U.S. at 7 (noting that a state's election law requirements may be superseded by federal law); *see also Perez v. Abbott*, 250 F. Supp. 3d 123, 142 (W.D. Tex. 2017) (holding that states cannot "claim that a single traditional districting principle . . . allows them to avoid drawing districts required by § 2 under the totality of circumstances").

463.     That being said, and as set forth already, the Illustrative Senate and House Plans are in fact comparable the Enacted Plans with respect to county and voting district (also known as precinct) splits.  *See supra*, Findings of Fact § III.D.  In some cases, the Illustrative Plans are noticeably *better* than the Enacted Plans on this score—for example, the Illustrative Senate Plan splits 34 counties, whereas the Enacted Senate Plan splits 43.  Mr. Cooper testified that he largely used county and precinct lines to draw the plans, and both of the Illustrative Plans split fewer precincts than the Enacted Plans.  Moreover, where Mr. Cooper split precincts, he followed other political boundaries such as municipal lines.

464.     Based upon the foregoing findings of fact, the Court concludes that the Illustrative Senate and House Plans comport with the traditional redistricting principle of respecting traditional political boundaries.  *See supra*, Findings of Fact § III.D.

*5.  Communities of Interest*

465.     Courts have recognized that "maintaining communities of interest" is a traditional redistricting principle. *LULAC*, 548 U.S. at 433. "A State is free to recognize communities that have a particular racial makeup" so long as there is "some common thread of relevant interests." *Miller*, 515 U.S. at 920. "The Court recognizes the distinct need to afford communities of interest the respect they deserve." *Kumar*, 476 F. Supp. 3d at 502.

466.     "[M]embers of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." *LULAC*, 548 U.S. at 435.  In accordance with this principle, the Court affirmed in *Milligan* that an illustrative district that joined an urban city (Mobile) to a rural community (the Black Belt) was reasonably configured. *Milligan*, 599 U.S. at 1503–05.  The

inquiry thus is whether communities share relevant and sufficient characteristics, not whether they fall into the category of rural or urban.

467.    Such shared characteristics may include social and economic needs of the communities.   For example, in *Theriot v. Parish of Jefferson*, the Fifth Circuit found that a majority-Black district for the Jefferson Parish Council included "low-income residents who are less-educated, more often unemployed, and more poorly-housed" and thus shared "common social and economic needs." 185 F.3d 477, 486 (5th Cir. 1999).  The Court held that, "[g]iven the common thread which binds the [B]lack voters within [that district], they are entitled to an effective voice in the electoral process and to an influence over the outcome of elections."  *Id.* at 487 (internal quotation marks and citation omitted)*.  See also Lawyer v. Dep't of Just.*, 521 U.S. 567, 581 (1997) (affirming that a community of interest existed where people shared socioeconomic interests).

468.    Furthermore, illustrative plans need not perfectly encompass every community of interest*. See Kern*, 291 F. Supp. 3d at 1110 ("Plaintiffs are . . . not required to accommodate every conceivable community of interest . . . in order to draw a sufficient illustrative map that satisfies the first *Gingles* precondition"); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1399 (E.D. Wash. 2014) (holding that *Gingles I* does not require a "perfectly harmonized districting plan," as such a requirement "would put the cart before the horse").  Plaintiffs' burden under *Gingles* is not one "that requires plaintiffs to establish there are no identifiable differences between the communities joined in their illustrative map.   It is simply too easy to identify at least some differences between any two communities." *Kern,* 291 F. Supp. 3d at 1116.  Rather, "it is sufficient that a plaintiff show that a workable plan for another minority-controlled voting district is possible." *Fairley v. Hattiesburg*, 584 F.3d 660, 671 n.14 (5th Cir. 2009) (citing *Gingles*, 478 U.S. at 50 n.17; *Houston v. Lafayette County*, 56 F.3d 606, 611 (5th Cir. 1995)).  "Illustrative plans that focus[] on other,

different, overlapping communities of interest are valid; there is no need to conduct a "beauty contest" between the maps. *Robinson*, 86 F.4th at 592 (citing *Milligan*, 599 U.S. at 21).

469.    To reiterate its prior findings, the Court credits Mr. Cooper's testimony that he respected communities of interest when drawing the Illustrative Senate and House Plans.  Mr. Cooper's analysis demonstrated that he considered communities of interest such as planning and development districts, municipalities, and school districts, which are plainly common identities with distinct interests capable of representation.  *See, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 758 (1983) (noting "residents of political units such as townships, cities, and counties often develop a community of interest").   He also considered other connections between communities, such as economic, regional, and transport-related ties.

470.    The configuration of the Illustrative Senate and House Plans, and in particular the extent to which the newly-added Black-majority districts in those plans respect and take into account communities of interest, was further supported by fact witness testimony.  As stated already, Plaintiffs adduced credible testimony regarding each of the areas where they alleged vote dilution regarding the shared connections in the areas united by the new Black-majority districts in Mr. Cooper's the Illustrative Senate and House Plans (namely, SDs 2, 9, 17, and 35, and HDs 22, 56, and 64).  There are "common threads" that bind Black voters who reside in the respective areas in those Illustrative Plan districts.

471.    Based upon the foregoing findings of fact, the Court concludes that the Illustrative Senate and House Plans comport with the traditional redistricting principle of respecting traditional political boundaries.  *See supra*, Findings of Fact § III.D.

**C.  Racial Predominance**

472.    "Awareness of race is permissible" in the redistricting context; indeed, "Section 2

143

demands such consideration." *Robinson*, 86 F.4th at 593.  In *Milligan*, the Supreme Court expressly confirmed that it is appropriate—indeed, necessary—for race to be a consideration in drawing an illustrative plan for *Gingles* I purposes: Section 2 "demands consideration of race" because "[t]he question whether additional majority-<u>minority</u> districts can be drawn . . . involves a quintessentially race-conscious calculus." 599 U.S. at 31 (citation and internal quotation marks omitted) (Op. of Roberts, C.J.); *id.* at 42 (Kavanaugh, J., concurring) ("[T]he effects test, as applied by *Gingles* to redistricting, requires in certain circumstances that courts account for the race of voters so as to prevent the cracking or packing—whether intentional or not—of large and geographically compact minority populations." (collecting cases)); *see also Clark II*, 88 F.3d at 1407.  And federal courts enforcing the Voting Rights Act have long "authorized race-based redistricting as a remedy for state districting maps that violate § 2." *Milligan*, 599 U.S. at 40–41.

473.    Accordingly, it is not a defense in a Section 2 case to claim merely that the plaintiffs' proffered *Gingles* I illustrative plans sought (consistent with *Gingles* and *Bartlett*) to meet a racial goal.  "[A]n express racial target is just one consideration in a traditional redistricting analysis under *Gingles*." *Robinson*, 86 F.4th at 594–595 (5th Cir. 2023) (citing *Milligan*, 599 U.S. at 32).

474.    Nor are such *Gingles* I illustrative plans, which are offered by private parties in litigation and lack the force of law, subjected to the same type of "racial predominance" analysis that applies to state-enacted plan when it is challenged on constitutional grounds. *See Clark II*, 88 F.3d at 1406–07; *see also Robinson v. Ardoin*, 37 F.4th 208, 223 (5th Cir. 2022) (citing *Clark II* and explaining that the Fifth Circuit has "rejected the proposition that a plaintiff's attempt to satisfy the first *Gingles* precondition is invalid if the plaintiff acts with a racial purpose."); *accord Bone Shirt*, 461 F.3d at 1019; *Davis*, 139 F.3d at 1417–18; *Sanchez v. State of Colorado*, 97 F.3d 1303,

1327 (10th Cir. 1996); *Cane v. Worcester Cty.*, 35 F.3d 921, 926 n.6 (4th Cir. 1994).

475.    Moreover, even if a showing of racial predominance could theoretically defeat a plaintiff's attempt to satisfy *Gingles* I, the foregoing findings of fact preclude such a showing here. Mr. Cooper considered race appropriately for the purposes of satisfying *Gingles* I, balancing it with the other traditional redistricting principles he considered.  *See Robinson*, 86 F. 4th at 595 (rejecting suggestion of racial predominance where mapping experts, including Mr. Cooper, considered race "alongside … the other race-neutral traditional redistricting criteria *Gingles* requires").   Even Defendants' expert, Dr. Brunell, does not conclude (or does not credibly conclude) that race in fact predominated in Mr. Cooper's illustrative plans, nor does he conclude that the illustrative plans violate traditional redistricting principles.

476.    Based on all of the evidence presented, including Mr. Cooper's credible explication of his Illustrative Plans and his process in both his report and his testimony, the fact that Mr. Cooper's plans perform at least as well as the enacted plans on compactness and other objective traditional redistricting metrics, and the testimony from fact witnesses in support of Mr. Cooper's plans, the Court reiterates its finding that race did not predominate in Mr. Cooper's illustrative plans or in the process he used to develop them.

477.    Based upon the foregoing findings of fact and conclusions of law, the Court holds that Plaintiffs have established the first *Gingles* precondition.  *See supra*, Findings of Fact § III.

## VI.    *Gingles* II and III

478.    The second and third *Gingles* preconditions involve racially-polarized voting. Racially polarized voting exists where there is a "consistent relationship between [the] race of the voter and the way in which the voter votes." *Gingles*, 478 U.S. at 53 n.21 (alteration in original).

479.    The second *Gingles* precondition requires a showing that "the minority group … is

politically cohesive." *Gingles*, 478 U.S. at 51.  This showing of minority political cohesiveness is typically made by demonstrating "that a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56 (cleaned up).   The *Gingles* II precondition, by establishing "the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected" in a majority-minority district.  *Milligan*, 599 U.S. at 18–19.

480.    The third *Gingles* precondition requires a showing that "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate" under the challenged districting scheme. *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51).  *Gingles* III "'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race."  *Id.* at 19 (quoting *Growe*, 507 U.S. at 40).   The relevant consideration under the third *Gingles* precondition is the *challenged* plan."  *Robinson*, 86 F.4th at 596 (emphasis in original).  The question is whether, in the area of focus where an additional, reasonably-configured Black-majority district can be drawn, White bloc voting generally operates to "minimize or cancel black voters' ability to elect" their preferred candidate.  *Id.* at 595.

481.    Plaintiffs in redistricting cases in Mississippi have repeatedly demonstrated racially polarized voting for purposes of the second and third *Gingles* preconditions*. See, e.g., Thomas v. Bryant*, 366 F. Supp. 3d 786, 807 (S.D. Miss.) (Mississippi Delta State Senate district), *aff'd*, 931 F.3d 455 (5th Cir. 2019), *on reh'g en banc sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020), and *on reh'g en banc sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020); *Fairley v. City of Hattiesburg*, 122 F. Supp. 3d 553, 580 (S.D. Miss. 2015), *aff'd*, 662 F. App'x 291 (5th Cir. 2016);, *aff'd*, 561 F.3d 420 (5th Cir. 2009); *Jamison v. Tupelo*, Miss., 471 F. Supp. 2d 706, 713 (N.D. Miss. 2007); *Teague v. Attala Cnty.*, 92 F.3d 283, 285 (5th Cir. 1996); *Clark II*, 88 F.3d at 1395; *Houston v. Lafayette Cnty.*, 20 F. Supp. 2d 996, 1003 (N.D. Miss. 1998); *Ewing v. Monroe*

*Cnty.*, 740 F. Supp. 417, 425 (N.D. Miss. 1990); *Gunn v. Chickasaw Cnty.*, 705 F. Supp. 315, 319 (N.D. Miss. 1989); *Jordan v. City of Greenwood*, 599 F. Supp. 397, 402 (N.D. Miss. 1984).

482.    Applying the *Gingles* principles to the foregoing findings of fact, the Court concludes that Plaintiffs have established *Gingles II* and *III*.  *See supra*, Findings of Fact § IV.  As described already, and summarized below, there is abundant record evidence showing that Black voters in Mississippi are "politically cohesive," and also that "the white majority typically votes in a bloc to defeat the minority candidate" both statewide and in the particular areas of focus.  *See Lopez*, 339 F. Supp. 3d at 610.

483.    Courts generally rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate.  *See, e.g.*, *Gingles*, 478 U.S. at 52–54; *Nipper v. Smith*, 39 F.3d 1494, 1505 n.20 (11th Cir. 1994); *Gretna*, 834 F.2d at 500–03 (5th Cir. 1987); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 743 (5th Cir. 1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993).  And courts have recognized ecological inference ("EI"), a statistical method for estimating racial vote shares using election return and demographic data, as an appropriate analysis for determining whether a plaintiff has satisfied the second and third *Gingles* preconditions.  *See, e.g.*, *Nairne*, 2024 WL 492688, at *31-34;  *Alpha Phi Alpha Fraternity*, No. 1:21-CV-5337-SCJ, 2022 WL 633312, at *56–64; *Caster v. Merrill*, No. 2:21-cv-1536-AMM, 2022 WL 264819, at *27, *38, *68–70 (N.D. Ala. Jan. 24, 2022), *aff'd sub nom. Milligan*, 599 U.S. 1; *Rose v. Raffensperger*, No. 1:20-CV-02921-SDG, 2022 WL 205674, at *11 (N.D. Ga. Jan. 24, 2022); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 691 (S.D. Tex. 2017); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 723–24 (N.D. Tex. 2009); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004), *aff'd*, 461 F.3d 1011 (8th Cir. 2006).

484.    Dr. Handley conducted a statistical analysis of Mississippi elections using EI.  As

noted already, this Court finds Dr. Handley credible, her analysis methodologically sound, and her conclusions reliable, and credits Dr. Handley's testimony and conclusions. *See supra*, Findings of Fact § IV.A.

485. Dr. Handley properly focused on biracial elections (that is, elections featuring at least one Black candidate and at least one White candidate), which courts, including the Fifth Circuit, have repeatedly held are more probative than the elections only involving white candidates in assessing racial polarization. See Gingles, 478 U.S. at 80–82 (relying exclusively on interracial contests to determine whether the Black vote was diluted); Nairne, 2024 WL 492688, at *31; Magnolia Bar Ass'n, Inc. v. Lee, 994 F.2d 1143, 1149 (5th Cir. 1993); E. Jefferson Coal. For Leadership & Dev. V. Par. Of Jefferson, 926 F.2d 487, 493 (5th Cir. 1991); Campos v. City of Baytown, 840 F.2d 1240, 1248–49 (5th Cir. 1988); Gretna, 834 F.2d at 503–04; see also Wright, 979 F.3d at 1301; Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1128 (3d Cir. 1993).

486. Dr. Handley's analysis is "district-specific." *Gingles*, 478 U.S. at 103 (O'Connor, J., concurring). She did not rely on *statewide* voting statistics to establish legally significant racially polarized voting in the areas of focus. *See, e.g., Magnolia Bar Ass'n*, 994 F.2d at 1151. Rather, the RPV analysis Dr. Handley conducted was specific to the particular areas of the state where Plaintiffs have asserted vote dilution claims. Dr. Handley identified the seven areas of focus based on the location of the new Black-majority districts in Mr. Cooper's Illustrative Senate and House Plans. *See, e.g.*, PTX-004 at 6. In her EI analysis of statewide elections, she focused on the voting patterns in those elections for voters living in each of the seven areas of interest, which were defined by specific clusters of counties in the particular areas at issue in this case. *Id.* at 7–9, 11.

487.    Moreover, Dr. Handley also conducted EI analysis on 19 state legislative elections in the same seven areas of focus, all of which were also racially polarized.  *E.g.*, PTX-004 at 9–10, 12.  Courts have consistently held that such endogenous elections, *i.e.*, elections for the same office within the same area, are especially probative. *Magnolia Bar Ass'n,* 994 F.2d at 1149; *see also Nairne*, 2024 WL 492688, at *32 (crediting Dr. Handley's analysis of state legislative elections from elections using prior legislative maps).  The analysis conducted by Dr. Handley of endogenous state legislative elections is highly probative and strongly supports the conclusion that state legislative elections in the seven areas of interest are racially polarized, including in state legislative contests in particular.

488.    In focusing her racially-polarized-voting analysis on the specific areas of the State where Plaintiffs claim vote dilution is occurring, and where the additional majority-Black illustrative legislative districts are drawn (indicating the presence of large and compact Black populations), Dr. Handley performed precisely the type of local analysis of the challenged districts that the *Gingles* analysis requires.  *See Nairne*, 2024 WL 492688, at *31–32.

489.    It does not matter that Dr. Handley did not look at election results from elections held under the challenged plans.  Dr. Handley could not have done so, because at the time she conducted her analysis and wrote her report, no state legislative elections had taken place using the Enacted Plans.  The Section 2 vote-dilution standard is sufficiently flexible to accommodate such circumstances.  *Cf. Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1209 n.11 (5th Cir. 1989) (citing *Gretna*, 834 F.2d at 502–03).  Indeed, Courts have relied on this exact type of analysis from Dr. Handley in recent Section 2 cases.  *See, e.g., Nairne*, 2024 WL 492688, at *31–32; *Robinson*, 605 F. Supp. 3d. at 803; *Alpha Phi Alpha*, 2023 WL 7037537, at *40.

149

490.     Based on the foregoing findings of fact, the Court concludes that the second *Gingles* precondition is satisfied here, because Black voters in Mississippi in the areas of interest are politically cohesive. *See* 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Id.* at 68. Dr. Handley's unchallenged analysis clearly demonstrates extremely high levels of cohesiveness among Black Mississippians in supporting their preferred candidates in the specific areas where Mr. Cooper has proposed to draw additional majority-Black districts. For example, across the elections that Dr. Handley analyzed, Black candidates preferred by Black voters received an average of 94.3% of the Black vote in statewide elections in these areas and only an average of 6.9% of the white vote. *E.g.*, PTX-004 at 11.

491.     Based on the foregoing findings of fact, the Court also concludes that the third *Gingles* precondition is satisfied here, because the White majority consistently votes in the seven areas of interest vote as a bloc to defeat the minority candidate.

492.     While there is no specific threshold percentage required to demonstrate bloc voting, as "[t]he amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice . . . will vary from district to district." *Gingles*, 478 U.S. at 56 (internal citations omitted). In the areas of focus, average white voter support for the Black-preferred Black candidate was only 6.9% across 11 elections (and was still under 10% with respect to Black-preferred White candidates). Consistent with that very high degree of White bloc voting against Black-preferred candidates, Dr. Handley's unchallenged recompiled-precinct analysis showed that the only state legislative districts that were effective for Black voters in the areas of focus were ones that had a BVAP majority, while in other districts, Black-preferred candidates

were uniformly defeated by White bloc voting, *see, e.g.*, PTX-004 at 16–36.  *See Nairne*, 2024 WL 492688, at *32 (finding *Gingles* III satisfied with white crossover voting of 15.6%); *Alpha Phi Alpha*, 2023 WL 7037537, at *57 (finding *Gingles* III satisfied where "only 12.4% of white voters support Black-preferred candidates"); *Milligan*, 599 U.S. at 22 (upholding district court's finding of white bloc voting for *Gingles* III inquiry where "white voters supported Black-preferred candidates with 15.4% of the vote").  That showing—that White bloc voting against Black-preferred candidates prevents Black voters in the areas of focus from electing state legislative candidates of choice despite their own cohesive voting patterns—is the essence of *Gingles* III.

493.    Dr. Handley's analysis, which the Court credits, demonstrates that starkly racially polarized voting in the areas of interest substantially impedes the ability of Black voters to elect candidates of their choice to the Mississippi State Legislature in the areas of interest unless Black-majority districts are drawn to provide Black voters with this opportunity.

**VII.    Totality of Circumstances**

494.    After a plaintiff establishes the *Gingles* preconditions, the "totality of circumstances" must be considered to make a final determination whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also Milligan*, 599 U.S. at 26; *LULAC*, 548 U.S. at 425–26; *Robinson*, 86 F.4th at 597.  The Court applies this analysis "specifically to the facts of each case and the state electoral mechanism while also considering the [Senate] factors as a guide."  *Id.*  The totality of the circumstances inquiry "is peculiarly dependent upon the facts of each case," "requires an intensely local appraisal of the design and impact of the contested electoral mechanisms," and "depends upon a searching practical evaluation of the past and present reality and on a functional view of the political process." *Gingles*, 478 U.S. at 45, 79

(citations and internal quotation marks omitted); *see also, e.g.*, *Westwego Citizens for Better Gov't, v. City of Westwego*, 946 F.2d 1109, 1115 (5th Cir. 1991) (discussing how the lingering effects of racial discrimination continued to impact voting in Westwego).

495.    The Senate factors "are 'neither comprehensive nor exclusive.'" *Ga. State Conf. of NAACP*, 775 F.3d at 1342 (quoting *Gingles*, 478 U.S. at 45). Nor is there any "requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29, 1982 U.S.C.C.A.N, 207); *see also Westwego Citizens for Better Gov't*, 946 F.2d at 1120; *see also McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1042–47 (5th Cir. 1984) (finding a Section 2 violation based on Senate Factors 1, 2, 3, 5, 7, and 9); *Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1262–68 (N.D. Miss. 1987) (finding a Section 2 violation after determining that five Senate Factors weighed in plaintiffs' favor), *aff'd*, 932 F.2d 400 (5th Cir. 1991).

496.    Senate Factor 2, the extent to which voting in the jurisdiction is racially polarized, and Senate Factor 7, the extent to which members of the minority group have been elected to office in the jurisdiction, are the most important Senate Factors. *E.g.*, *Fairley*, 662 F. App'x at 296 (citing *Clark II*, 88 F.3d at 1397) ("The existence of racially polarized voting and the extent to which minorities are elected to public office remain the two most important factors considered in the totality-of-circumstances inquiry."); *Clark II*, 88 F.3d at 1398 (finding the "presence of racially polarized voting and the virtually complete absence of black elected officials in county offices" provided strong evidence of vote dilution). The presence or absence alone of these factors is not, however, dispositive. *See, e.g.*, *Major v. Treen*, 574 F. Supp. 325, 351 (E.D. La. 1983) (three-judge court).

497.    As noted already, "it will be only the very unusual case in which the plaintiffs can

establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 293 (5th Cir. 1996) (quoting *Clark v. Calhoun County*, 21 F.3d 92, 97 (5th Cir. 1994); *see also Ga. State Conf. of NAACP*, 775 F.3d at 1342 (same).

### A. Senate Factor 1: Mississippi's History of Voting-Related Discrimination Against Black Voters

498.    Senate Factor 1, accounting "the history of official voting-related discrimination in the state or political subdivision," weighs heavily in Plaintiffs' favor. *Gingles*, 478 U.S. at 37.

499.    "Mississippi plainly has a long history of official discrimination against African-Americans seeking to vote." *Thomas*, 366 F. Supp. 3d at 807; *see also Teague*, 92 F.3d at 293–94 ("That Mississippi has a long and dubious history of discriminating against blacks is indisputable."); *Clark II*, 88 F.3d at 1399 ("The long and unhappy history of discrimination in Mississippi requires no protracted discussion."); *Jamison*, 471 F. Supp. 2d at 714 ("[T]he court acknowledges that official discrimination historically has hindered potential minority voters in Mississippi…").

500.    In fact, the history of discrimination is so undisputed that courts have taken judicial notice of it. *See e.g.*, *Fairley v. Hattiesburg, Miss.*, 122 F. Supp. 3d 553, 567 (S.D. Miss. 2015), *aff'd sub nom. Fairley v. Hattiesburg Mississippi*, 662 F. App'x 291 (5th Cir. 2016).   And as discussed in the foregoing findings of fact, *supra* Findings of Fact §§ V.A, C, D, Plaintiffs have paired their evidence regarding Mississippi's official history of discrimination with a showing that Black Mississippians "do not in fact participate to the same extent as other citizens."   *Cf. N.A.A.C.P. v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001).   Plaintiffs have also presented evidence that such discrimination is not merely something from the history books, but a matter of lived

experience and living memory for many Mississippians today.

501.    Based upon the foregoing findings of fact, the Court concludes that the extensive history of discrimination against Black voters in Mississippi supports a determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House.

## B. Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi

502.    The second Senate Factor is "the extent to which voting … is racially polarized." *Clements*, 999 F.2d at 850 (quoting S. Rep. No. 97-417, at 29, 1982 U.S.C.C.A.N., 206). Proof of racially polarized voting under *Gingles* creates an inference of racial bias in the electoral system. *See Teague*, 92 F.3d at 290 ("Plaintiffs are to present evidence of racial bias operating in the electoral system by proving up the *Gingles* factors."). Here, the undisputed facts show extremely stark and persistent levels of racially polarized voting in all of the areas of Mississippi at issue, and in both statewide and local state legislative contests. The extent of this racial polarization is sweeping and weighs heavily in favor of a finding of liability.

503.    Defendants argue that the observed differences in voting behavior between Black and White Mississippians are driven by partisan affiliation rather than race. This question is properly considered as part of the totality of the circumstances. *Teague*, 92 F.3d at 292; *see also Gingles*, 478 U.S. at 74. The burden to show non-racial causes for evident racial polarization is on the Defendants: Only where "the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens" could a vote dilution claim turn on this factor. *Clements*, 999 F.2d at 850; *accord Teague*, 92 F.3d at 290 (showing "is for the defendants to make"). To meet their burden, Defendants must "try to rebut plaintiffs' claim of vote dilution via evidence of 'objective, nonracial factors'" like partisanship.

*See id.* at 292 (quoting *Nipper*, 39 F.3d at 1513).  Like the rest of the totality of circumstances factors, courts balance the relative strength of evidence the parties direct to each factor—including racial polarization—to determine whether Black Mississippians' votes are being diluted.  *See, e.g.*, *Lopez*, 339 F. Supp. 3d at 604 ("[P]laintiffs do not bear the burden in the first instance to eliminate factors other than race as influencing voters.") (citation omitted); *accord Teague,* 92 F.3d at 295.

504.    Defendants have not made the necessary showing here.  Defendants' expert, Dr. Alford, merely notes the existence of a partisan divide along racial lines.  Dr. Alford does not explain *why* Black and White voters cohesively support candidates from different parties.  He does not conduct any analysis attempting to assess the roles race and party have in Mississippi voters' vote choices.  The Court concludes that Defendants have failed to rebut the inference of "racial bias . . . in the electoral system" that follows from Plaintiffs' showing of persistent patterns of racially polarized voting in the areas of focus. *Teague*, 92 F.3d at 290; *see also Nairne*, 2024 WL 492688, at *38.

505.    This conclusion is strengthened by the evidence adduced by Plaintiffs that race and not party is a consistent factor in the voting patterns in the areas of interest.  For example, Dr. Handley found evidence of extreme racial polarization in nonpartisan contests for the state supreme court.  PTX-004 at 13.  In other words, Dr. Handley's analysis shows evidence of racial polarization even controlling for party.

506.    Moreover, Plaintiffs adduced expert analysis and other testimony explaining and demonstrating how racial divisions precede and inform voters' partisan alignment.  For example, the historical realignment of Black voters, in Mississippi from voting Republican to voting Democratic, undercuts the argument that polarization is due to partisanship and not race.  *See Nairne*, 2024 WL 492688, at *38 ("The historical realignment of Black voters from voting

155

Republican to voting Democrat undercuts the argument that the vote is polarized along party lines and not racial lines."); *Robinson*, 605 F. Supp. 3d at 845 ("The realignment of Black voters from Democrat to Republican is strong evidence that, party affiliation notwithstanding, Black voters cohesively [vote] for candidates who are aligned on issues connected to race."). The evidence adduced by Plaintiffs demonstrates that voters have consistently responded to the attitudes and positions of parties and candidates on issues connected to race, including by switching candidates or parties in response to shifts in those positions. At present, issues of race and racial justice play a critical role in shaping the partisan preferences of Black and White voters. This reality further supports the Court's conclusion that Defendants have failed to show that non-racial causes explain the persistence of racially polarized voting in the areas of focus.

507.    This Court rejects the notion that "true cause for racially polarized voting actually has less to do with racial bias and more to do with partisanship" because "the reasons that black and white voters vote differently have no relevance to the central inquiry of [Section 2]." *Jamison*, 471 F. Supp. 2d at 714. A Section 2 plaintiff does not have "the burden of negating all nonracial reasons possibly explaining" racially polarized voting. *Teague*, 92 F.3d 283, at 295.

508.    This court's conclusions are consistent with numerous courts that have similarly found racially polarized voting in Mississippi without conducting an inquiry into partisanship as a cause of racially polarized voting. *See, e.g., Thomas*, 366 F. Supp. 3d at 807, aff'd, 931 F.3d 455 (5th Cir. 2019); *Fairley v. City of Hattiesburg*, 122 F. Supp. 3d 553, 580 (S.D. Miss. 2015), aff'd, 662 F. App'x 291 (5th Cir. 2016); *Jamison.*, 471 F. Supp. 2d at 713; *Clark II*, 88 F.3d at 1395–97; *Houston v. Lafayette Cnty.*, 20 F. Supp. 2d 996, 1003 (N.D. Miss. 1998); *Ewing v. Monroe Cnty.*, 740 F. Supp. 417, 425 (N.D. Miss. 1990); *Gunn v. Chickasaw Cnty.*, 705 F. Supp. 315, 319 (N.D. Miss. 1989); *Jordan v. City of Greenwood*, 599 F. Supp. 397, 402 (N.D. Miss. 1984).

509.    Based upon the foregoing findings of fact, the Court concludes that elections in Mississippi in the areas of interest are characterized by patterns of starkly racially polarized voting, which strongly supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House in those areas.

### C. Senate Factor 3: Mississippi's Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters

510.    Senate Factor 3, assessing "the extent to which the state of political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group," weighs in Plaintiffs' favor.  *Gingles*, 478 U.S. at 45.

511.    The existence and use of restrictive voting practices may exacerbate the dilution caused by racial polarization and the submergence of Black voters in White-majority districts.  *See, e.g.*, *id.* at 47 (affirming that at-large voting may "operate to minimize or cancel out the voting strength of racial minorities in the voting population") (citation omitted).  That includes practices used in Mississippi, such as majority vote requirements, absentee ballot restrictions, odd year elections, and a history of racial gerrymandering and use of at-large elections.  *See Harvell v. Blytheville Sch. Dist. No. 5*, 71 F. 3d 1382, 1390–91 (8th Cir. 1995) (finding that "majority vote requirement" and "staggered terms" "tend to suppress minority voters' influence"); *see also Nairne*, 2024 WL 492688, at *39 (weighing Senate Factor 3 in favor of Plaintiffs because state "has a majority vote requirement for its primaries and general elections" and "holds off-year elections" which "breed[] voter fatigue and confusion, which is amplified in poor and under educated communities"); *Alpha Phi Alpha*, 2023 WL 7037537, at *64 n. 54 (law restricting absentee ballot usage weighed for plaintiffs under Senate Factor 3 because of its "actual or

perceived negative impact on Black voters" who had used absentee voting in greater numbers before passage of the law); *Singleton*, 582 F. Supp. 3d at 1021 (weighing history of court invalidations of racial gerrymanders and at-large voting systems on grounds of racially discriminatory purpose or effect in favor of Plaintiffs under Senate Factor 3).

512.    Based on the foregoing findings of fact, this Court concludes that voting practices in Mississippi's legislative elections further enhance the opportunity for discrimination, which supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House.

### D.  Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation

513.    Senate Factor 5, measuring "the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process," weighs in Plaintiffs' favor as well. *Gingles*, 478 U.S. at 37. Courts have recognized that, as a result of past discrimination, Black voters in Mississippi suffer from socio-economic disadvantages that diminish their ability to participate in the political process. *See, e.g.*, *Teague*, 92 F.3d at 294; *Thomas*, 366 F. Supp. 3d at 807; *Magnolia Bar Ass'n*, 793 F. Supp. at 1409 (noting that due to the fact that Black Mississippians "continue to bear the effects of discrimination in critical areas of socioeconomic attainment" like education and automobile ownership, Senate Factor 5 "will be a factor on which the plaintiffs in voting rights cases will always win in the foreseeable future").

514.    "To establish this factor, a plaintiff must prove two elements—(1) socioeconomic disparities in areas such as education, income level, and living conditions which arise from past discrimination, and (2) 'proof that participation in the political process is in fact depressed among

minority citizens,' which can be shown by evidence of reduced levels of registration or lower turnout among minority voters." *Terrebonne Par. Branch NAACP*, 274 F. Supp. 3d at 442 (quoting *LULAC*, 999 F.2d at 867). "Where the minority group presents evidence that its members are socioeconomically disadvantaged and that their level of participation in politics is depressed, the group need not prove any further causal nexus between its members' disparate socioeconomic status and the depressed level of political participation." *LULAC*, 986 F.2d at 750 (cleaned up); *see also Teague*, 92 F.3d at 294 ("Plaintiffs are not required to prove a causal connection between [socioeconomic disparities] and a depressed level of political participation."); *Thomas v. Bryant*, 366 F. Supp. 3d at 807 (same).

515.     Depressed levels of income, education and employment are a consequence of severe historical disadvantage.  "Political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes." *Thomas*, 366 F. Supp. 3d at 808 (citing *Gingles*, 478 U.S. at 69); *see also Citizens for a Better Gretna*, 636 F. Supp. at 1120 ("Depressed levels of participation in voting and candidacy are inextricably involved in the perception of futility and impotence such a history engenders"); *St. Bernard Citizens for Better Gov't*, 2002 WL 2022589, at *9 ("Both Congress and the Courts have recognized the effect lower socio-economic status has on minority participation in the political process."); *Major*, 574 F. Supp. at 340–41 (similar).

516.     Courts have recognized that "[t]here are vast differences between [Black and White Mississippians] on education, employment, income, housing, and health indices, among others, that ultimately reflect the effects of slavery and segregation." *Thomas*, 366 F. Supp. 3d at 807. Here, Plaintiffs have offered extensive, unrebutted evidence that Black Mississippians suffer socioeconomic hardships stemming from centuries of racial discrimination.  As discussed above

and throughout Dr. Orey's expert report, Mississippi's Black residents experience stark socioeconomic disadvantages across all areas of life: employment, education, poverty, health, housing, and exposure to the criminal justice system.  *See supra* Findings of Fact § V.D.  These disparities, arising from a long history of discrimination, burden Black Mississippians' participation in the political process as compared to Whites.  Dr. Orey's analyses not only demonstrated disparities in voter participation between Black and White Mississippians, but showed empirically that Black voter participation is linked to educational attainment and income, both areas where there are significant racial gaps between Blacks and Whites.  *See supra* Findings of Fact ¶¶ 224–225

517.    Based upon the foregoing findings of fact, the Court concludes that Black Mississippians suffer from disparities in income, education, health, and other areas, which hinder their ability to participate equally in politics as compared to Whites.  This too supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House.

### E.  Senate Factor 6: Racial Appeals in Mississippi Politics

518.    Senate Factor 6, "the use of overt or subtle racial appeals in political campaigns," weighs in Plaintiffs' favor.  *Gingles*, 478 U.S. at 37.  Here, Plaintiffs have provided specific examples of both "blatant" as well as "subtle and furtive" racial appeals during campaigns over the past few decades.  *Id.* at 40.

519.    This Court has previously recognized the use of racial appeals in Mississippi's political campaigns.  *See, e.g.*,  *Martin v. Allain*, 658 F. Supp. 1183, 1195 (S.D. Miss. 1987) (finding continued existence of both "overt" and "subtle" racial appeals in Mississippi).  Even today, racial appeals remain a regrettable aspect of Mississippi politics.

520.    Based upon the foregoing findings of fact, the Court concludes that the use of racial appeals in political campaigns in Mississippi supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House.

### F.    Senate Factor 7: Lack of Success for Black Candidates in Mississippi

521.    Senate Factor 7, "the extent to which members of the minority group have been elected to public office in the jurisdiction," weighs heavily for Plaintiffs.  *Gingles*, 478 U.S. at 37. "The extent to which minority candidates are elected to public office also contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process." *Veasey*, 830 F.3d at 261.

522.    "[E]lections involving the particular office at issue will be more relevant than elections involving other offices." *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993); *see also Rangel v. Morales*, 8 F.3d 242, 245–46 (5th Cir.1993); *Clark*, 21 F.3d at 97; *see also Thomas*, 366 F. Supp. 3d at 806 ("It is not credible to draw a conclusion about white bloc voting in District 22 based exclusively on the fact that there are some black elected officials in parts of the District.").

523.    Plaintiffs' evidence, including Dr. King's expert report, witness testimony, and stipulated facts, demonstrate that Black Mississippians are unrepresented in statewide elected offices and rarely succeed in local and district-based elections outside of majority-Black districts, including in state legislative elections in the particular areas of focus.  Defendants do not meaningfully dispute that Black Mississippians are almost never elected to state legislative office in the areas of focus other than from Black-majority districts.

524.    Based upon the foregoing findings of fact, the Court concludes Black

161

Mississippians are underrepresented in public office in Mississippi and almost never win election to state legislative office except in Black-majority districts.  This supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House.

### G.  Senate Factor 8: Lack of Responsiveness to the Needs of Black Mississippians

525.     Senate Factor 8, whether there is a "lack of responsiveness on the part of elected officials to the particularized needs of minority group members," also weighs for Plaintiffs. *Gingles*, 478 U.S. at 37.

526.     Based upon the foregoing findings of fact, which are supported by the reports and testimony of Dr. Orey, Dr. Luckett, and Dr. King, as well as other witness testimony, the Court concludes that elected officials in Mississippi have not been consistently responsive to the particularized needs of Black Mississippians on basic and important issues like education and health.  This supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House.

### H.  Senate Factor 9: Tenuous Justifications for the Challenged Plans

527.     Senate Factor 9, determining that the policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is "tenuous," favors Plaintiffs. *Gingles*, 478 U.S. at 37.

528.     As set forth in the above findings of fact, legislators have not offered justifications for their proposed map in the record of this case.  Statements made during the abbreviated legislative process offer little to no explanation of the justifications for the map, either.  Legislators noted they kept the same number of Black-majority districts despite changes in the State's

demographics.  To the extent the Legislature sought to create a partisan advantage, that does not justify district lines that violate the Voting Rights Act.

529.    Based upon the foregoing findings of fact, the Court concludes that Defendants' justifications for the challenged plans are tenuous, which supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House.

**I.  Proportionality**

530.    In addition to analyzing the Senate Factors, the Court may also consider the extent to which there is a mismatch between the proportion of Mississippi's voting-age population that is Black and the proportion of legislative districts in which they have an opportunity to elect their candidates of choice.  *See De Grandy*, 512 U.S. at 1000; *see also Milligan*, 599 U.S. at 1504; *see also, e.g.*, *Mo. State Conf. of NAACP*, 894 F.3d at 940 n.12; *Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 312 (D. Mass. 2004) (three-judge court).  "[W]hether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area is a relevant consideration for courts to make." *Robinson*, 86 F.4th at 597–98 (5th Cir. 2023) (citing *LULAC*, 548 U.S. at 426).

531.    While the Voting Rights Act does not mandate proportionality, an inquiry into proportionality "provides some evidence of whether the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by a minority group.  *LULAC*, 548 U.S. at 438 (cleaned up).

532.    Thus, though not dispositive, disproportionality may be relevant to the totality-of-circumstances analysis.  *See, e.g.*, *Bone Shirt*, 336 F. Supp. 2d at 1049; *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 281 F. Supp. 2d 436, 455–56 (N.D.N.Y. 2003).

533.     Mississippi's statewide BVAP exceeds 36 percent.  *See supra*, Findings of Fact ¶ 42.  As a matter of total population, the State is just under 38% Black.  Under the enacted state legislative plans, the number of Senate and House where Black voters constitute an effective voting majority of the population under the Enacted Plans is disproportionately low relative to the proportion of Mississippi's population that is Black.  That is particularly true with respect to the State Senate, where less than 29% of the 52 districts in the Enacted Plan are majority-Black.

534.     Based on the foregoing findings of fact, the Court concludes that the disproportionality of the Enacted Plans weighs in favor of a finding of vote dilution.  *See Singleton*, 2022 WL 265001, at *73–74 (assessing comparable proportionality figures, "consider[ing] the proportionality arguments of the plaintiffs as part and parcel of the totality of the circumstances, and [] draw[ing] the limited and obvious conclusion that this consideration weighs decidedly in favor of the plaintiffs"); *see also Robinson*, 605 F. Supp. 3d at 844–51.  This is especially true given that Black Mississippians grew in their share of the population over the past 10 years.  *See Bone Shirt*, 336 F. Supp. 2d at 1049 (accepting evidence from Mr. Cooper showing that minority group's population "rapidly increas[ed in] both their absolute numbers and share of the population" and finding that plaintiffs "presented evidence of disproportionality").

*           *           *

535.     Under the totality of the circumstances, Black voters in the areas of focus have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House.

536.     Having considered the facts of this case, as well as "an intensely local appraisal of the design and impact of the contested electoral mechanisms," *Gingles*, 478 U.S. at 79 (citations omitted), the Court concludes that Mississippi's Enacted Senate Plan deprives Black voters of the

equal opportunity to elect candidates of their choice in the areas in and around Illustrative SDs 2, 9, 17, and 35, and that Mississippi's Enacted House Plan deprives Black voters of the equal opportunity to elect candidates of their choice in the areas in and around Illustrative HDs 22, 56, and 84, in violation of Section 2 of the Voting Rights Act of 1965.  52 U.S.C. § 10301.

## VIII.   Racial Gerrymandering

### A.  Legal Standard

537.    A party proves a racial gerrymandering claim regarding an electoral district under *Shaw I*, 509 U.S. at 630, and its progeny, using a two-step inquiry.

538.    "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'"  *Cooper v. Harris*, 581 U.S. 285, 291 (2017); *see also Alabama Legislative Black Caucus v. Alabama ("ALBC")*, 575 U.S. 254, 260–61 (2015) (first quoting *Miller v. Johnson*, 515 U.S. 900, 913, 916 (1995), and then quoting *Shaw II*, 517 U.S. at 902).

539.    "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny."  *Cooper*, 581 U.S. at 292.  That is, "[t]he burden . . . shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end."  *Id.* (quoting *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 193 (2017)).

540.    To prove racial predominance, plaintiffs may rely on "direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both."  *Cooper*, 581 U.S. at 291 (internal quotation marks omitted).   There is no "special evidentiary prerequisite" that plaintiffs must satisfy.  *Id.*

541.    Proving racial predominance may involve relying on evidence that "the enacted

plan conflicts with traditional redistricting criteria," such as "compactness, contiguity of territory, and respect for communities of interest." *Bethune-Hill*, 580 U.S. at 183, 190.  While "a conflict or inconsistency may be persuasive circumstantial evidence tending to show racial predomination," "there is no rule requiring challengers to present this kind of evidence in every case." *Id.* at 190.

542.    Similarly, there is no requirement that a racial gerrymander be bizarre in its shape, though non-compactness may be relevant evidence.  "Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race . . . was the legislature's dominant and controlling rationale." *Bethune-Hill*, 580 U.S. at 188.

543.    "[S]tark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target" may also demonstrate racial predominance. *Bethune-Hill*, 580 U.S. at 192.

544.    Courts also consider racial disparities in the splitting of precincts, municipalities, counties, or other areas as evidence of racial predominance.  Such disparities may occur when most of the "portions allocated to challenged districts had a higher [or lower] BVAP percentage than the portions allocated to non-challenged districts." *E.g.*, *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 147 (E.D. Va. 2018).  In *Covington*, for instance, the panel found that splits in one district "seem to trace areas that have a high proportion of African-Americans." 316 F.R.D. at 142–43.  In another district, the *Covington* court found that predominantly white neighborhoods were "notably excluded" from the district, while "neighborhoods with substantial African-American populations, such as West End, Old Farm, and the area surrounding North Carolina Central University, were captured by the bizarre district lines." *Id.* at 145.

545.    Other evidence of racial predominance may include excessive changes that are unnecessary to achieve equal population, and an over-representation of a racial group in the population being moved.  In *Page v. Virginia State Bd. of Elections*, the court found it notable that the state moved three times as many people as needed to balance population, and the population being moved out was "predominantly white, while the populations moved into the District were predominantly African-American." No. 3:13-CV-678, 2015 WL 3604029, at *12 (E.D. Va. June 5, 2015).

546.    Where the state has offered "political goals" as a justification for a district's design, plaintiffs may submit "an alternative map" that shows "how the legislature could have accomplished its political goals other than through the map it chose."  *Cooper*, 581 U.S. at 320. But such an alternative map is not necessary, when the state has not "raised a partisanship defense," *id.* at 308, or when there is other evidence disentangling the effect of race from the effect of party, *id.* at 320–22.   Ultimately, "in no area of our equal protection law," including in the racial gerrymandering context, has the Supreme Court "forced plaintiffs to submit one particular form of proof to prevail."  *Id.* at 319.

547.    For each challenged district, courts must "consider all of the lines of the district at issue," analyzing the district as a whole and "tak[ing] account of the districtwide context." *Bethune-Hill*, 580 U.S. at 192.  Statewide evidence may also be considered, but "[a] showing that race-based criteria did not significantly affect the drawing of some . . . districts, however, [does] little to defeat a claim that race-based criteria predominantly affected the drawing of other . . . districts." *ALBC*, 575 U.S. at 262–64.

**B.  Racial Predominance**

548.    Racial predominance is a question of fact. *Cooper*, 581 U.S. at 293 ("[T]he court's

findings of fact—most notably, as to whether racial considerations predominated in drawing district lines—are subject to review only for clear error."); *see id.* at 327 (Thomas, J., concurring) (agreeing that predominance is question of fact).

549.    Based on the foregoing findings of fact, Plaintiffs have proven that race predominated in the construction of SD 2, SD 48, HD 22, HD 34, and HD 64.

550.    Based on Dr. Ragusa's and Mr. Cooper's analysis, the testimony of fact witnesses who are familiar with these areas, and visual examinations of the areas included and excluded from these five districts, the Court finds that race was the predominant factor in the placement of "a significant number of voters within or without" those districts.  *Cooper*, 581 U.S. at 291.

551.    In each of those five districts, the State made line-drawing decisions that were inconsistent with traditional redistricting principles, such as compactness, communities of interest, and core preservation.  In SD 2 and SD 48, for example, they needlessly divided growing municipalities (Horn Lake and Gulfport, respectively) and needlessly split neighboring counties (Tate and Hancock, respectively) in order to construct districts that were less visually compact. Line drawers shifted thousands and in some instances tens of thousands of voters in and out of the five districts even where there was no population imbalance that required such movement.  They moved areas with higher concentrations of Black voters out of the districts and areas with higher concentrations of White voters in, diminishing the BVAP of the district well below 40%, ensuring that the districts would not be competitive for voters in those districts.

552.    That consistent pattern of decreasing the challenged districts' BVAP significantly below 40% is akin to a racial target and constitutes additional circumstantial evidence of racial predominance.  *See Cooper*, 581 U.S. at 300–01.

553.    This evidence of racial sorting and inconsistency with traditional redistricting

principles cannot be explained by any attempt to sort voters by their partisan affiliation or voting history.  First, Plaintiffs have sufficiently disentangled race-based sorting from partisanship-based sorting, with Dr. Ragusa showing that race is a significant predictor of how voters were sorted even after controlling for the partisan composition of the Census blocks being assigned.

554.    Second, Dr. Ragusa found statistically significant racial disparities in how precincts were split in the challenged districts, such that the parts of the precincts included in the districts at issue contained far fewer Black residents than those parts of the split precincts that were assigned to a neighboring district.  This pattern of racialized precinct splits for each of the challenged districts, is notable for two reasons.

555.    For one, it is another indication of an overriding effort to lower the Black population in the challenged districts by excluding areas with high numbers of Black voters.

556.    For another, the pattern of racialized precinct splits strongly indicates that Defendants sorted voters by race, rather than party or voting history, in designing SD 2, HD 22, HD 34, and HD 64 (SD 48 does not split precincts).  To be able to consistently split a precinct along racial or partisan lines, one must have data below the precinct level, *i.e.*, at the level of Census blocks, to know, for instance, where Black or White voters (or Biden or Trump voters) are located within the precinct being split.  The State had racial data at the block level from the Census.  But it had electoral data—number of votes for Republican and Democratic candidates—only at the precinct level.  While the electoral data supplied via the Secretary of State's office could show approximately how many voters cast a ballot for a Republican candidate in a precinct overall, that electoral data necessarily is not sufficiently granular for differentiating the parts of the precinct that lean Republican from the parts that lean Democratic.  Therefore, the racial disparities that Dr. Ragusa observed, whereby precincts were consistently split into portions that had higher Black

populations and portions that had lower Black populations, with the higher BVAP areas excluded from the challenged districts, could not have been an accidental byproduct of dividing the precinct into Democratic areas and Republican areas.

557.    Because of the evidence in the record disentangling race and partisanship, no alternative map is required.  *Cooper*, 581 U.S. at 322 (holding that "there was no need for an alternative map to do the same job" because other evidence existed to debunk partisan rationales offered by the state).

558.    In any event, the Court further finds that there is no evidence of specific political objectives that the state had, in either the trial or legislative records, pertaining to the five challenged districts.  Where the State proffers evidence of such specific objectives, an alternative map may be used to show that the State's "legitimate political objectives" can be met in a different manner, thus demonstrating that the political objectives cannot explain the enacted plan's design. *Cooper*, 581 U.S. at 320.  Here, no such objectives have been identified, and Plaintiffs need not offer an alternative map to satisfy undisclosed objectives.

559.    In consideration of all available evidence and in recognition of the "demanding" standard that racial gerrymandering plaintiffs must meet and the presumption of good faith of the legislature, the Court finds race predominated in the design of Enacted SD 2, SD 48, HD 22, HD 34, and HD 64.  *See Cooper*, 581 U.S. at 309 & n.8, 319.  Based on the foregoing findings of fact, each of those five districts subordinated traditional redistricting principles in order to sort voters on the basis of their race, and those district lines cannot be explained by any attempt to sort voters based on their voting history or partisanship.

### C.  Strict Scrutiny

560.    Because Plaintiffs have shown that race predominated in the design of SD 2, SD

48, HD 22, HD 34, and HD 64, the burden shifts to the State to show that its race-based sorting of voters survives strict scrutiny. That is, the district lines for each district must serve a "compelling interest" and be "narrowly tailored" to that end. *Cooper*, 581 U.S. at 292.

561. The Supreme Court "has long assumed that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965." *Cooper*, 581 U.S. at 292. The Supreme Court has not recognized other lawful bases to classify voters on the basis of race.

562. Notably, the possibility that the State may have drawn these districts in order to achieve a political advantage (or some other objective) does not save them from strict scrutiny. Any effort to sort "voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 581 U.S. at 308 n.7 (citing *Bush v. Vera*, 517 U.S. 952, 968–70 (1996) (plurality opinion)); *Miller*, 515 U.S. at 914. Thus, "[a] plaintiff succeeds . . . even if the evidence reveals that a legislature elevated race to the predominant criterion in order to advance other goals, including political ones." *Cooper*, 581 U.S. at 291 & n.1.

563. In this case, the State does not claim that any of the five challenged districts were drawn in a manner to comply with the VRA or to meet any other compelling interest. Accordingly, the Court concludes that the use of race in constructing the challenged districts was not narrowly tailored. Accordingly, the strict scrutiny standard is not satisfied for Enacted SD 2, SD 48, HD 22, HD 34, and HD 64.

564. Therefore, the Court concludes that the impermissible use of race in the construction of Enacted SD 2, SD 48, HD 22, HD 34, and HD 64 violates the Fourteenth Amendment.

## IX.   Remedy

565.   Because the Court has determined that the Enacted Plans violate Section 2 of the Voting Rights Act and the Fourteenth Amendment, further use of the Enacted Plans is enjoined. In addition to success on the merits, the other permanent injunction considerations warrant such relief.

566.   The harm suffered by Plaintiffs and Mississippi voters from unlawful electoral maps is undoubtedly irreparable.   Voting is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).   "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).   "Though the states retain considerable power to regulate elections, their power has limits: in the course of their regulation, they may not unduly burden the citizens' right to vote – the fundamental political right, because preservative of all rights.   Indeed, voting is of the most fundamental significance under our constitutional structure." *Harding v. Edwards*, 487 F. Supp. 3d 498, 503 (M.D. La. 2020) (internal quotation marks omitted).

567.   Given the fundamental importance of the right to vote, Courts frequently hold that that violations of rights in voting and redistricting cases constitute irreparable harm.   *See, e.g.*, *Robinson*, 605 F. Supp. 3d at 851 (M.D. La.), *aff'd in relevant part* 86 F.4th at 599 (preliminary injunction based on irreparable harm in Section 2 case was "valid when it was issued");   *see also* *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). "Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law." *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D.

Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015).

### A. Remedial Plans

568.    Drawing state legislative districts is the responsibility of the Legislature in the first instance.  Accordingly, where Plaintiffs prevail in a redistricting case, it falls to the Legislature in the first instance to draw a lawful plan.  *See Wise v. Lipscomb*, 437 U.S. 535, 539–40 (1978) (opinion of White, J.) (collecting cases); *Robinson v. Ardoin*, 86 F.4th 574, 601 (5th Cir. 2023); *see also Caster*, 2022 WL 264819, at \*82.  If the state legislature cannot or will not adopt a remedial map that complies with federal law in time for the 2024 election, then the job of drawing an interim map may fall to this Court. *Wise*, 437 U.S. at 540 (when "those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the unwelcome obligation of the federal court to devise and impose a reapportionment plan.") (internal citations and quotation marks omitted).

569.    In order to hold elections under lawful State Senate and State House plans in 2024 as discussed, *infra*, the Legislature should produce plans within three weeks of the date of this Order.  Lawful State Senate and State House Plans are plans that:

   a.   Add an additional majority-Black State Senate district in which Black voters have an opportunity to elect candidates of their choice in the areas in and around Illustrative SDs 2, 9, 17, and 35;

   b.   Reconfigure SD 48 such that race does not predominate in the construction of that district without a compelling interest;

   c.   Add an additional majority-Black State House district in which Black voters have an opportunity to elect candidates of their choice in the areas in and around Illustrative HDs 22, 56, and 84;

173

d.  Reconfigure HD 34 and HD 64 such that race does not predominate in the construction of those districts without a compelling interest.

570.    This timeline balances the relevant equities and serves the public interest by providing the Legislature with its rightful opportunity to craft a remedy in the first instance, while also ensuring that, if an acceptable remedy is not produced, there will be time for the Court to fashion one in advance of the 2024.  Doing so is necessary because, as explained below, the equities and the public interest also support a special election to fill the remained of the four-year legislative term for those districts that must be redrawn to remedy unlawful vote dilution and/or racial gerrymandering.

**B.  Special Elections**

571.    Mississippi held a general election for State Senate and State House in November 2023, and the next election is not until 2027.  In these circumstances, a special election to three-year terms in any districts altered in order to remedy unlawful vote dilution and/or racial gerrymandering is a proper remedy.  *See Watkins v. Fordice*, 791 F. Supp. 646, 648 (S.D. Miss. 1992) (ordering special elections for three-year terms in a state legislative redistricting case following adoption of remedial districts).

572.    The Supreme Court has laid out three "obvious considerations" for courts to weigh when assessing whether ordering a special election is the appropriate remedy for similar violations: (1) "the severity and nature of the particular constitutional violation"; (2) "the need to act with proper judicial restraint when intruding on state sovereignty"; and (3) "the extent of the likely disruption to the ordinary processes of governance if early elections are imposed." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017).  All of these factors weigh in favor of granting a special election here.

573.   *First*, the harm—Plaintiffs' loss of a meaningful right to vote—is unquestionably severe and requires immediate redress.  *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 361 F. Supp. 3d 1296, 1302 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *see also Robinson*, 605 F. Supp. 3d at 851 ("Voting is a 'fundamental political right, because it is preservative of all rights.'") (internal citations omitted); *see Tucker v. Burford*, 603 F. Supp. 276, 279 (N.D. Miss. 1985).

574.   The number of individuals and districts impacted by the violation, which between the Voting Rights Act and constitutional violations covers five Senate districts and five House districts in different areas of the State, enhances the severity of the harm and the concordant need for immediate redress.  *Covington v. North Carolina*, 270 F. Supp. 3d 881, 892 (M.D.N.C. 2017) (on remand from the Supreme Court, concluding that the "substantial number of legislative districts that must be redrawn . . . weighs in favor of ordering a special election").  The Court concludes the first *Covington* factor weighs in favor of ordering special elections.

575.   *Second*, ordering a special election is consistent with principles of judicial restraint, particularly in light of the severity of the harm and the particular circumstances of this case.  *Wright*, 361 F. Supp. 3d at 1305; *see also Covington v. North Carolina*, 270 F. Supp. 3d 881, 895– 97 (M.D.N.C. 2017) (finding factor to weigh in favor of granting special elections in light of severity of harm).

576.   Plaintiffs filed this action in 2022, while nearly all litigation under Section 2 of the Voting Rights Act was stayed awaiting the Supreme Court's decision in *Allen v Milligan*.  *See* Dkt. 40, 41, 44; *see also, e.g.*, *Nairne v. Ardoin*, No. CV 22-178-SDD-SDJ, 2022 WL 3756195, at *1 (M.D. La. Aug. 30, 2022) (staying proceedings until June 2023).  Plaintiffs therefore could not have obtained relief for the 2023 election.  Courts under analogous circumstances have found

special elections to be appropriate. *See, e.g., Clark v. Roemer*, 777 F. Supp. 471, 485 (M.D. La. 1991) (special election relief proper where pendency of litigation in the Supreme Court prevented plaintiffs from obtaining the relief sought in time for the regularly scheduled elections).

577.    Here, special elections to a shortened term in those districts that are altered in a remedial map (but not in those that remain unchanged) would comport with judicial restraint while ensuring that tens of thousands of Mississippians need not wait until 2028 to obtain represent pursuant to lawful legislative districting plan.    This Court has taken that same approach before. *See Watkins*, 791 F. Supp. at 648 (special elections for three-year terms); *Tucker*, 603 F. Supp. at 279 (ordered special elections to shortened terms).    Indeed, "[f]ederal courts have ordered special elections to remedy violations of voting rights on many different occasions." *Clark,* 777 F. Supp. at 484; *see also, e.g.*, *Keller v. Gilliam*, 454 F.2d 55, 57 (5th Cir. 1972); *Large v. Fremont Cty.*, No. 05-CV-0270, 2010 WL 11508507, at *15 (D. Wyo. Aug. 10, 2010); *United States v. Osceola Cty.*, 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006); *Smith v. Beasley*, 946 F. Supp. 1174, 1212–13 (D.S.C. 1996); *Williams v. City of Dallas*, 734 F. Supp. 1317, 1318, 1415 (N.D. Tex. 1990); *Ketchum*, 630 F. Supp. at 565–68; *Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981); *Coal. for Educ. in Dist. One v. Bd. of Elections of City of New York*, 370 F. Supp. 42, 58 (S.D.N.Y. 1974).

578.    Further, because sovereignty is evaluated from the perspective of the people of Louisiana, any alleged inconvenience to legislators elected under the unlawful maps "does not constitute a significant intrusion on state sovereignty" and does not outweigh the importance of the voting rights at stake in this case. *League of Women Voters of Michigan v. Benson*, 373 F. Supp. 3d 867, 959 (E.D. Mich. 2019) (citing *U.S. Term Limits Inc. v. Thornton*, 514 U.S. 779, 793-94 (1995))

579.    *Third*, there will be little disruption to governance if special elections are imposed as there is sufficient time to implement a remedial map *and* to hold a special election in 2024 without disrupting existing schedules or causing voter confusion.  The ability to hold a special election concurrently with already scheduled elections in 2024, minimizing added cost and administrative burden, weighs in favor of imposing a special election as a remedy.  *See Clark*, 777 F. Supp. at 484; *Wright*, 361 F. Supp. 3d at 1306; *Nation v. San Juan Cnty.,* 2017 WL 6547635, *18 (D. Utah Dec. 21, 2017), *aff'd sub nom. Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270 (10th Cir. 2019).  Mississippi already has elections scheduled for 2024, and the cost of adding legislative elections to these already scheduled federal elections "is negligible in comparison to the cost to holding special elections at some future date," *Clark*, 777 F. Supp. at 484.

580.    Moreover, special elections could be held in 2024 in a manner that would not unduly burden the administration of elections.

581.    Based on the foregoing findings of fact, once a remedial map has been put in place by either the Legislature or the Court, it would take several weeks for the counties where the lines have changed to update the state's election-management system, and for the Secretary of State to prepare ballots.  Ballots must be ready 45 days before an election.  Accordingly, a plan would need to be in place approximately 70 days prior to the first election for which the new lines would be used.

582.    Therefore, if a remedial map is in place by the end of May, there will accordingly be sufficient time to use the general election calendar dates, including August primaries, for a 2024 special election in any changed districts.  Notably, this schedule is consistent both with the evidence in the record and with the schedule adopted for the 1992 special elections in *Watkins*.

583.    If a remedial map is in place by June, a modified version of the above schedule

could be used, with September rather than August primaries.  *Cf. Taylor v. Monroe County Board of Supervisors*, 421 F.2d 1038, 1041 (5th Cir. 1970) ("[W]here it is necessary to override specific provisions of state law to afford adequate relief, the state statutes must yield.").

584.    If a remedial map is put into place later than that, then the procedures for filling vacancies can be used.  Under those procedures, there would be no party primary.  Any altered districts would be filled by a non-partisan special election concurrent with the 2024 federal general election (although no election would need to be held in those districts where only one candidate qualified).  Any of these processes would use the existing procedures set forth in state law while ensuring that irreparable harm is mitigated.

585.    Because the *Covington* factors weigh in favor of ordering special elections, this court will order a special election for all districts in the remedial plans with changed boundaries from the Enacted Plans to coincide with the Fall 2024 federal elections in Mississippi, on a schedule to be determined by further order of the Court in light of the above findings of fact and conclusions of law.

*       *       *

Plaintiffs reserve the right to submit post-trial Proposed Findings of Fact and Conclusions of Law with citations to the trial record, as well as post-trial briefing on any questions of law or matters relating to remedy, should the Court allow or request any such submissions.

Respectfully submitted,

This the 12th day of February, 2024.

/s/ *Joshua Tom*                                      Ari J. Savitzky
Joshua Tom, MSB 105392                  asavitzky@aclu.org
jtom@aclu-ms.org                               Ming Cheung
ACLU OF MISSISSIPPI                       mcheung@aclu.org
101 South Congress Street                 Casey Smith

178

Jackson, MS 39201
(601) 354-3408

Robert B. McDuff, MSB 2532
*rbm@mcdufflaw.com*
MISSISSIPPI CENTER FOR JUSTICE
767 North Congress Street
Jackson, MS 39202
(601) 969-0802

Carroll Rhodes, MSB 5314
Law Offices of Carroll Rhodes
*crhodes6@bellsouth.net*
PO Box 588
Hazlehurst, MS 39083
(601) 894-1464

John P. Lavelle, Jr.
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-3007
Telephone:       +1.215.963.5000
Facsimile:       +1.215.963.5001
*john.lavelle@morganlewis.com*

Drew Cleary Jordan
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Telephone:       +1.202.739.3000
Facsimile:       +1.202.739.3001
*drew.jordan@morganlewis.com*

*csmith@aclu.org*
Garrett Muscatel
*gmuscatel@aclu,org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500

Ezra D. Rosenberg
*erosenberg@lawyerscommittee.org*
Jennifer Nwachukwu
*jnwachukwu@lawyerscommittee.org*
David Rollins-Boyd
*drollins-boyd@lawyerscommittee.org*
Javon Davis
*jdavis@lawyerscommittee.org*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
(202) 662-8600

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua Tom, do certify that on this day I caused to be filed a true and correct copy of

the foregoing on the Court's ECF System which sent notice to all counsel of record.

This the 12th day of February, 2024.

/s/ <i>Joshua Tom</i>
Joshua Tom
