**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

MISSISSIPPI STATE CONFERENCE OF THE
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE; DR.
ANDREA WESLEY; DR. JOSEPH WESLEY;
ROBERT EVANS; GARY FREDERICKS; PAMELA
HAMNER; BARBARA FINN; OTHO BARNES;
SHIRLINDA ROBERTSON; SANDRA SMITH;
DEBORAH HULITT; RODESTA TUMBLIN; DR.
KIA JONES; MARCELEAN ARRINGTON;
VICTORIA ROBERTSON,

    *Plaintiffs*,

      vs.

STATE BOARD OF ELECTION COMMISSIONERS;
TATE REEVES, *in his official capacity as Governor of*
*Mississippi*; LYNN FITCH, *in her official capacity as*
*Attorney General of Mississippi*; MICHAEL WATSON,
*in his official capacity as Secretary of State of*
*Mississippi*,

    *Defendants,*
AND

MISSISSIPPI REPUBLICAN EXECUTIVE
COMMITTEE,

    *Intervenor-Defendant.*

**CIVIL ACTION NO.**
**3:22-cv-734-DPJ-HSO-LHS**

## DEFENDANTS' POST-TRIAL BRIEF

## INTRODUCTION

Defendants State Board of Election Commissioners, Governor Tate Reeves, Attorney

General Lynn Fitch, and Secretary of State Michael Watson and Intervenor Defendant,

Mississippi Republican Executive Committee (collectively, "Defendants"), submit this Post-Trial

Brief pursuant to the instructions of the Court set out on March 6, 2024, and March 15, 2024, in addition to Defendants' Post-Trial Findings of Fact and Conclusions of Law submitted contemporaneously.[1]

Plaintiffs bear a demanding burden to prove both their Equal Protection and Section 2 claims. *See Easley v. Cromartie*, 532 U.S. 234, 241 (2001) ("*Cromartie II*") (quoting *Miller v. Johnson*, 515 U.S. 900, 928 (1995) (O'Connor, J., concurring)); *Cooper v. Harris*, 581 U.S. 285, 291 (2017); *Allen v. Milligan*, 599 U.S. 1, 18 (2023); *Abbott v. Perez*, 585 U.S. 579, 603 (2018). After eight days of trial, Plaintiffs failed to carry their "demanding burden" in their Section 2 claims and did not disentangle race from politics or provide sufficient evidence that black Mississippians are inhibited from participating in the electoral process. On their Fourteenth Amendment claims, Plaintiffs failed to allege or provide any direct evidence as to racially discriminatory intent. Furthermore, the weak circumstantial evidence presented was insufficient to prove the Legislature subordinated traditional redistricting principles for race.

## <u>ARGUMENT</u>

### I.   PLAINTIFFS BEAR THE BURDEN OF PROOF

"Vote dilution suits are 'peculiarly dependent upon the facts of each case, and require[ ] an intensely local appraisal of the design and impact of the contested electoral mechanisms.'" *Anne Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 306 (5th Cir. 2020) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)). The burden of proof in redistricting cases is solely on the Plaintiffs. *See Cooper*, 581 U.S. at 291; *Allen*, 599 U.S. at 18 ("To succeed in proving a § 2 violation under *Gingles*, plaintiffs must satisfy three 'preconditions.'. . . [A] plaintiff who

---

[1] The Court posed seven questions for the parties to brief. While the arguments set forth in this brief address those questions, Defendants address each one specifically in the attached Exhibit "A," including references to the relevant parts of the brief in each response.

demonstrates the three preconditions must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters.").

"Redistricting 'is primarily the duty and responsibility of the State,' and '[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions.'" *Abbott*, 585 U.S. at 603 (quoting *Miller*, 515 U.S. at 915). "The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Id.* So courts must "exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916 (emphasis added). Here, like in *Cromartie II*, "the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." *Cromartie II*, 532 U.S. at 242.

"Redistricting based on Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, is complex, historically evolving, and sometimes undertaken with looming electoral deadlines." *In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023) (vacating district court-ordered map). "[L]egislative reapportionment is primarily a matter for legislative consideration and determination." *Reynolds v. Sims*, 377 U.S. 533, 586 (1964). Accordingly, "[S]tate legislatures have primary jurisdiction over legislative reapportionment[.]" *North Carolina v. Covington*, 585 U.S. 969, 979 (2018) (quoting *White v. Weiser*, 412 U.S. 783, 795 (1973)).  The drawing of district maps is "primarily the duty and responsibility of the State[s], not the federal courts." *Allen*, 599 U.S. at 29 (quoting *Abbott*, 585 U.S. at 588).

## II.   PLAINTIFFS FAILED TO PROVE ANY VIOLATION OF THE EQUAL PROTECTION CLAUSE

### A.  Burden of Proof of an Equal Protection Clause Claim

"The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans. It prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper*, 581 U.S. at 291 (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178 (2017)). "When a voter sues state officials for drawing . . . race-based lines . . . the ***plaintiff*** must prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 291 (emphasis added).[2] "The racial predominance inquiry concerns the *actual considerations* that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 580 U.S. at 189-90 (emphasis added).

"[U]ntil a ***claimant*** makes a showing sufficient to support th[e] allegation" of "race-based decision-making," the "good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 915 (emphasis added). "[T]he burden of proof lies with the ***challenger***, not the State." *Abbott*, 585 U.S. at 603 (emphasis added). "This rule takes on special significance in districting cases." *Abbott*, 585 U.S. at 603.

---

[2] "[I]f racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper*, 581 U.S. at 292. The Supreme Court has held that "complying with the VRA is a compelling interest." *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 401 (2022). To this point, the Legislature adopted redistricting criteria at the outset of the redistricting process, including compliance with Section 2 of the Voting Rights Act. [JTX-008].

"'[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.'" *Abbott*, 585 U.S. at 603 (quoting *Mobile v. Bolden*, 446 U.S. 55, 74 (1980)) (internal quotation marks omitted). The "ultimate question remains whether a discriminatory intent has been proved in a given case." *Id.* "The 'historical background' of a legislative enactment is 'one evidentiary source' relevant to the question of intent." *Id.* (quoting *Vil. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). "But we have never suggested that past discrimination flips the evidentiary burden on its head." *Abbott*, 585 U.S. at 604.

## B.  Plaintiffs' Constitutional Racial Gerrymandering Claims Fail

Plaintiffs' Fourteenth Amendment Equal Protection Claims fail from the start. Plaintiffs explicitly affirmed that they were not alleging racially discriminatory intent, and in fact stipulated it away. *See* [Dkt. #199], at p. 16, ¶ 9). Notwithstanding Plaintiffs' pleading away of the intent requirement, the weak circumstantial evidence Plaintiffs offer is insufficient to establish a racial gerrymandering claim. Moreover, if the Court were to accept Plaintiffs' circumstantial evidence, it actually confirms the significance that party politics played in the composition of the challenged districts—which is a valid basis for districting under *Rucho v. Common Cause*. 588 U.S. ----, 139 S.Ct. 2484 (2019).

### 1.  Plaintiffs failed to allege intent in the Complaint, and the Pre-Trial Order specifically disclaims it.

The Supreme Court in *Cooper*, in its support of *Miller v. Johnson*, is clear:

the plaintiff *must prove* that 'race was the predominant factor *motivating* the legislature's decision to place a significant number of voters within or without a particular district.' That entails demonstrating that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.' The plaintiff may make the required showing through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both.

5

*Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916) (emphasis added). The showing required by *Miller v. Johnson* is that race was the predominant factor motivating the legislature. That motivation or intent can be explained by direct evidence, circumstantial evidence, or a mixture of both, but intent still must be proven. *Cooper*, 581 U.S. at 308 ("a trial court has a formidable task: It must make a 'sensitive inquiry' into all 'circumstantial and direct evidence of intent' to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines.").

Here, Plaintiffs do not allege intent in the Complaint [Dkt. #27], at ¶ 55, and the Pre-Trial Order specifically disclaims that Plaintiffs have any evidence of discriminatory intent. [Dkt. #199], at p.16, ¶ 9. Plaintiffs simply failed to plead or prove the required showing of intent that is the fundamental basis for a Fourteenth Amendment Equal Protection Claim.

## 2. There is no evidence that the Legislature redistricted with racially discriminatory intent.

Notwithstanding the Plaintiffs' failure to plead intent, the circumstantial evidence presented at trial also fails to establish racially discriminatory intent. As set forth in the Defendants' Proposed Findings of Fact and Conclusions of Law submitted contemporaneously herewith, the Plaintiffs' expert on racial gerrymandering, Dr. Jordan Ragusa, utilized a novel, unproven and flawed methodology in his efforts to support the Plaintiffs' racial gerrymander claims. However, Dr. Ragusa's own analysis demonstrated that the best he could conclude was that race was a significant factor in the redistricting, but not that it was the predominant factor. That is because Dr. Ragusa did not know what variables the Legislature considered in the redistricting process, and his own analysis (as discussed in the next section) showed that partisan politics played a significant—if not the predominant—role in the redistricting.

What is most telling is that Dr. Ragusa admitted that his analysis "can't disentangle intentional from unintentional racial discrimination." Tr. 1120:15-23. Further, none of the Plaintiffs' lay witnesses offered any proof of the Legislature's motivation or intent for drawing the five challenged districts. There is simply no proof in this record of racially discriminatory intent. And, because it is the Plaintiffs' burden to prove intent, which they have not done, all of their Equal Protection claims necessarily fail.

### 3. Plaintiffs' own evidence supports that districts were drawn for partisan purposes, and the Plaintiffs have failed to disentangle race from party.

Dr. Ragusa's own analysis demonstrates the significant impact that party politics played in the composition of the challenged districts. Despite claiming he controlled for partisanship, in 18 of 20 models, Dr. Ragusa could not tell the Court whether race or party was the driving or motivating factor behind the challenged districts' boundaries. *See* Findings of Fact and Conclusions of Law, ¶¶ 395, 397, 413, 417. And, in the remaining two models, Dr. Ragusa could only say that race was a significant factor—but, again, not the predominating factor. *Id.* at ¶¶ 384-385. Further, the record shows that partisanship or political performance was an important factor considered by the Legislature. [JTX-010], 14:25-15:6 (Chairman Beckett explaining that political performance was an "important consideration developing this proposed plan"); 25:1-27:17(Chairman Beckett explaining that political performance does not guarantee election of candidates of a specific race but considers the party of the candidate); [JTX-011], 12:6-11 (Vice Chairman Kirby describing political performance as an "important consideration in developing the proposed plan"); Tr. 1121:25-1122:25 (Dr. Ragusa reviewed the floor debate transcripts and confirmed political performance was a consideration of the Legislature).

"If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify."

*Cromartie II*, 532 U.S. at 243 (quoting *Bush v. Vera*, 517 U.S. at 968) (O'Connor, J., principal opinion). Put simply: "where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Cromartie II*, 532 U.S. at 258. Plaintiffs "must also show that those districting alternatives would have brought about significantly greater racial balance[]"…*i.e.*, alternative maps. *Id.*

Under *Cooper*, alternative maps are not necessary when there is direct evidence supporting a legislature's intent of racial predominance. However, under *Cromartie II*, alternative maps are required when the direct evidence is weak (or, in this case, nonexistent). Where the plaintiffs had "meager direct evidence of a racial gerrymander and needed to rely on evidence of forgone alternatives—only maps of that kind could carry the day." *Cromartie II*, 532 U.S. at 258; *Cooper*, 581 U.S. at 322. "In a case such as this one where majority-minority districts ... are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Cromartie II*, 532 U.S. at 258.

As the *Cooper* Court noted: "One, often highly persuasive way to disprove a State's contention that politics drove a district's lines is to show that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district." *Cooper*, 581 U.S. at 317. "If you were really sorting by political behavior instead of skin color (so the argument goes) you would have done—or, at least, could just as well have done—this. Such would-have, could-have, and (to round out the set) should-have arguments are

a familiar means of undermining a claim that an action was based on a permissible, rather than a prohibited, ground." *Id.* at 317-18

Here, there is no direct evidence and only weak circumstantial evidence of intent. *Cromartie II* and *Cooper* both support, if not require, alternative maps by the Plaintiffs to show that the Legislature could have achieved its partisan objectives in a more racially balanced way.[3] However, the Plaintiffs did not produce a single map to that effect. And citing to maps prepared by Mr. Cooper in his *Gingles* 1 analyses are not the types of alternative maps contemplated by *Cromartie II* and *Cooper*. Mr. Cooper was hired as a Section 2 mapdrawer for *Gingles* 1 —and his *Gingles* 1 maps create black majority-minority districts which certainly do not achieve the Legislature's partisan objectives under *Cromartie II's* alternative map requirement. Despite Plaintiffs' misguided and last-ditch effort to point the Court to Mr. Cooper's maps, the record is devoid of any such alternatives to show that the Legislature could have achieved its partisan objectives in a more racially balanced way. As in *Cromartie II*, the evidence before the Court indicates party, not race. *See* 532 U.S. at 245.

Finally, the United States Supreme Court has foreclosed partisan gerrymandering claims because there is no appropriate standard to assess partisan gerrymandering. *Rucho*, 139 S.Ct.. at 2495-96. Courts cannot review political gerrymanders. *Id.* "[D]etermining that lines were drawn on the basis of partisanship does not indicate that the districting was improper. A permissible intent, securing partisan advantage, does not become constitutionally impermissible, like racial

---

[3] Although Plaintiffs' Section 2 and Fourteenth Amendment claims are distinct, the evidence from Dr. Ragusa supports that partisanship played a role in the Legislature's redistricting decisions. While Defendants were not required to affirmatively demonstrate that partisan politics played a significant role in the composition of the statewide redistricting plans (that is the Plaintiffs' burden to disentangle), the trial record supports such evidence about the importance of political performance, and the Defendants specifically raised the defense of partisanship as a nonjusticiable political question in their Answer. [Dkt. #28], at p. 31.

discrimination, when that permissible intent 'predominates.'" *Id.* at 2502. The burden is on the Plaintiffs to prove that the State subordinated traditional redistricting principles so that race predominated in the drawing of the five alleged racial gerrymander districts. It is the Plaintiffs' burden to disentangle race from partisanship in the mapdrawing process—and they have not done that. The record contains sufficient evidence showing that partisan politics was an important factor in the mapdrawing process. And, Plaintiffs' own expert, Dr. Ragusa, produced statistical analysis that clearly demonstrates partisanship was a significant factor in the composition of the five challenged districts. But, because Dr. Ragusa did not perform a substantive analysis for the party variable (the 2020 Trump Vote), the Court is left with no guidance as to whether race or party had a greater impact, or which one predominated in the drawing of the districts. *Rucho v. Common Cause* approves of districting on the basis of partisanship. Plaintiffs have failed to provide any evidence, whether that be through Dr. Ragusa's analysis, lay witnesses, alternative maps or otherwise, to disentangle the two. Accordingly, Plaintiffs have not met their burden, so their Equal Protection Claims must fail.

## III.   PLAINTIFFS' VOTING RIGHTS ACT CLAIMS FAIL

### A.  Plaintiffs' Section 2 Claims

From the moment Plaintiffs filed their original Complaint, they have consistently denied pursuing any claim for intentional discrimination under Section 2 of the Voting Rights Act. ("Section 2"). [Dkt. # 1], at ¶ 29-31; [Dkt. # 27], at ¶ 55. In the Joint Pre-Trial Order, Plaintiffs specifically disavowed making any claims for intentional invidious discrimination. [Dkt. #199],

at p. 16, ¶ 9. Throughout trial, Plaintiffs maintained this position.[4] Tr. 1569:4-13. Accordingly, this is not a case where Plaintiffs claim that the Legislature acted with intentional discrimination under Section 2 or the Fifteenth Amendment. Rather, Plaintiffs assert that the Legislature's actions in adopting redistricting plans resulted in discriminatory effect. [Dkt. #27], at ¶ 55; [Dkt. #199], at ¶ 9; Tr. 1569:4-13. Consequently, the analytical framework to be applied is set forth in *Gingles*. *See Abbott*, 585 U.S. at 614.

### B.  Burden of Proof of a Section 2 Violation Claim

Section 2 prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgment of the right of any citizen of the United States to vote on *account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). "To succeed in proving a § 2 violation under *Gingles*, ***plaintiffs*** must satisfy three 'preconditions.' First, the 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.'" *Allen*, 599 U.S. at 18 (emphasis added) (internal citations omitted). "Second, the minority group must be able to show that it is politically cohesive. And third, 'the minority must be able to demonstrate that the white majority votes sufficiently as a block to enable it . . . to defeat the minority's preferred candidate." *Id.*

After establishing the three *Gingles* preconditions, ***Plaintiffs*** "must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Id.* Precedent is clear that ***Plaintiffs*** bear the burden of establishing the *Gingles* preconditions *and* the totality of the circumstances. *See Allen*, 599 U.S. at 18; *Abbott*, 585 U.S. at 614 (2018); *Anne*

---

[4] "[Plaintiffs] have reiterated that Section 2 turns on the presence of discriminatory effects, not discriminatory intent." Tr. 1569:5-7. "The *Gingles* vote dilution framework carries out Congress' command to prohibit voting schemes that have discriminatory results regardless of intent." Tr. 1568:21-23.

*Harding*, 948 F.3d at 308; *League of United Latin American Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993).

## C. Analytical Framework

When analyzing whether a legislative redistricting plan results in a discriminatory effect, the proper analytical framework to apply is that set forth in *Gingles*, 478 U.S. at 50-51;[5] *see Allen*, 599 U.S. at 18. In *Clements*, the Fifth Circuit explained the proper application of the *Gingles* analytical framework. 999 F.2d at 849. To prove a vote dilution claim under Section 2, Plaintiffs:

> must demonstrate that (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district;[6] (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate . . . Satisfaction of these three "preconditions," is necessary, but not sufficient to establish liability under § 2 . . . Plaintiffs must also show that, under the "totality of circumstances," they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters. Courts are guided in this second inquiry by the so-called *Zimmer* factors listed in the Senate Report.

*Clements*, 999 F.2d at 849 (internal citations omitted).

At issue in *Clements* was the same analytical question presented in this case: what is the proper inquiry with regard to the third precondition of *Gingles*, *i.e.*, determining whether racial bloc voting is operating to usually defeat the minority's preferred candidate? In *Clements*, the

---

[5] Applying the *Gingles* analytical framework in an "effects" claim under Section 2 contrasts with the analysis employed if Plaintiffs were asserting an intentional discrimination claim. In that event, the Court would consider the factors set forth in *Vill. of Arlington Heights*, 429 U.S. at 267-68. This distinction is borne out between voter suppression claims, which usually involve an intentional discrimination claim under Section 2, as opposed to voter dilution claims, such as this case, which usually involve an "effects" or "results" claim under Section 2. As Plaintiffs have alleged, this is "a Section 2 results case." Tr. 1587:25-1588:1.

[6] Defendants address the first *Gingles* precondition in Defendants' Findings of Fact and Conclusions of Law ¶¶ 85-148.

district court applied the analysis advanced by Plaintiffs in this case. There, as Plaintiffs assert here, "the district court held that plaintiffs need only demonstrate that whites and blacks generally support different candidates to establish legally significant white bloc voting." *Id.* at 850. This question arises out of the Supreme Court's split decision interpreting the *Gingles* preconditions. As the Fifth Circuit noted in *Clements*, "a majority of the Justices [in *Gingles*] rejected the very test employed by the district court as a standard crafted to shield political minorities from the vicissitudes of 'interest-group politics rather than a rule hedging against racial discrimination.'" *Id.* at 851 (quoting *Gingles*, 478 U.S. at 83).  In review of the district court decision, the Fifth Circuit held that it is necessary to inquire as to the cause of any lack of success at the polls in order to determine whether the third precondition of *Gingles* is met. *Id.* at 853-54.

The Supreme Court has held that Congress "used the words 'on account of race or color' [ ] to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination." *Allen*, 599 U.S. at 25 (quoting *Gingles*, 478 U.S. at 71, n.34).  Accordingly, bloc voting along racial lines must arise "against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter." *Id.* So, the "rigorous protections" of Section 2 should "extend only to defeats experienced by voters 'on account of race or color.'" *Clements*, 999 F.2d at 850 (quoting 52 U.S.C. § 10301(a)).

The Senate Report "accorded this inquiry into 'racial bloc voting,' that is, whether 'race is the predominant determinant of political preference,' dispositive significance: Absent a showing of 'racial bloc voting,' the Senate Report asserted, 'it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test.'" *Clements*, 999 F.2d at 855 (quoting *Whitcomb v. Chavis*, 403 U.S. 124

(1971)). Therefore, Plaintiffs bear the burden to "supply affirmative proof of 'racial bloc voting.'" *Id.*

Furthermore, "[e]lectoral losses that are attributable to partisan politics do not implicate the protections of § 2." *Clements*, 999 F.2d at 863. "[I]t is *Whitcomb* and *White* that we should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2." *Gingles*, 478 U.S. at 97 (O'Connor, J., concurring). Noting that blacks enjoyed full access to the political process, the *Clements* Court reasoned that Section 2 "is implicated only when Democrats lose because they are black, not where blacks lose because they are Democrats." *Clements*, 999 F.2d at 854.

"Certainly, the allocation of proof in § 2 cases must reflect the central purpose of the Voting Rights Act and its intended liberality as well as the practical difficulties of proof in the real world of trial." *Id.* at 860. It only makes sense that if there is a claimed effect, there must be an inquiry into the cause of that effect. This is particularly true under Section 2 because the plain language of the statute provides that it is actionable only when vote dilution is "on the account of race or color." 52 U.S.C. § 10301(a). If the cause of the vote dilution is not due to race, there is no Section 2 claim.

*Clements* does not stand alone in its approach. Several other Circuits have followed the same rationale. *See Uno v. City of Holyoke,* 72 F.3d 973 (1st Cir. 1995); *Goosby v. Town Bd. of Hempstead,* 180 F.3d 476, 496 (2d Cir. 1999) (favorably citing *Clements*); *Clarke v. City of Cincinnati,* 40 F.3d 807, 812 (6th Cir. 1994); *see also, Nipper v. Smith,* 39 F.3d 1494, 1523-24 (11th Cir. 1994) (en banc) (opinion of Tjoflat, J.) (explaining that Section 2 requires patterns of voting attributable to race, not partisanship). To be sure, the dissent in *Clements* criticized the majority's approach while acknowledging that the *Gingles* framework was proper, but it should

be applied differently. The dissent argued that the question of causation of polarization was not relevant to the third *Gingles* precondition, but it would be proper for the totality of circumstances analysis. *See, Clements,* 999 F.2d 910-911 (King, dissenting). Several lower courts have taken this view as well. *See Alpha Phi Alpha Fraternity Inc. v. Raffensperger,* 587 F. Supp. 3d 122 (N. D. Ga. 2022); *Lopez v. Abbott,* 339 F. Supp. 3d 589 (S.D. Tex. 2018).  However, notably, those Courts which have taken a different view regarding relevancy as to the third precondition all agree that the causation inquiry is appropriate as to Senate Factor 2 under the totality of circumstances analysis. *See Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1293 (M.D. Ala. 2020) (finding "[t]here is a strong case that party, not race, is driving election results in Alabama appellate judicial races).

Regardless of whether the Court treats evidence of party polarization as relevant to the third *Gingles* precondition or Senate Factor 2 in the totality of circumstances analysis, the critical fact is the existence of evidence of *party* –rather than *race*—driving voter behavior.  Where the evidence demonstrates these circumstances, there is no actionable Section 2 claim because Plaintiffs have failed to prove that any vote dilution is occurring "on account of race or color." *See* 52 U.S.C. Section 10301(a). In this regard, we now turn to the evidence presented in this case.

      a.    <u>Evidence</u>

          *i.*    *Dr. Handley*

Plaintiffs presented the testimony of Dr. Lisa Handley in an effort to satisfy the second and third *Gingles* preconditions.  Dr. Handley's view of racially polarized voting is simply whether blacks and whites are voting for different candidates. Tr. 265:21-266:2; Tr. 314:5-8. She employs the EI RxC methodology along with several others to determine whether racially

polarized voting exists. Tr. 316:10-317:2.   Although employing several methodologies, she

acknowledges that the EI RxC method is the most sophisticated and reliable. Tr. 317:3-6.

Without considering any evidence beyond what Dr. Handley offered in terms of the elections she

chose to analyze, her own testimony of her analysis fails to support the existence of racially

polarized voting.  Specifically, Dr. Handley chose to analyze nineteen (19) elections that she

considered "endogenous," and most probative for purposes of determining racially polarized

voting. Tr. 285:2-4. She claims that all of these elections demonstrate racially polarized voting in

spite of the fact that when the Credible Intervals are applied appropriately to all elections, only

twelve (12) actually demonstrate racially polarized voting. [PTX-004, pp. 58-60].[7] Here, it is

important to consider Dr. Handley's testimony regarding the applicability of Credible Intervals.

She testified that Credible Intervals are important because they indicate the measure of reliability

of the Point Estimate arrived at in the EI RxC analysis. Tr. 320:25-321:11. Although she

described Credible Intervals in this way, she refused to apply them accordingly to her Point

Estimates in seven (7) of the elections she analyzed. She went so far as to admit that those Point

Estimates were her "best guess estimates." Tr. 331:8-15. "Best guesses" are insufficient for

Plaintiffs to carry their heavy burden of proof when analyzing voter behavior in a § 2 case.

While this represents a majority of the elections Dr. Handley considered as sufficient to

demonstrate racially polarized voting in response to the second *Gingles* precondition, this Court

must go one step further to determine whether there is sufficient evidence in her analysis to

satisfy the third precondition, *viz.,* racial bloc voting.  The Court must take this extra step

because it is only where all three preconditions of *Gingles* are met that the Court ever moves on

---

[7] Dr. Handley's specific findings can be found in Appendix B of her report. [PTX-004, pp. 58-60]. Of the districts analyzed, the following did not demonstrate racially polarized voting: SD 12, SD 42, SD 45, HD 17, HD 36, HD 39, and HD 70.

to a totality of circumstances analysis.  The important factor to consider in Dr. Handley's analysis in determining whether the third precondition is met is whether the black candidate of choice wins in the elections she analyzed.  Of the twelve (12) elections which credibly support racially polarized voting, the black candidate of choice wins in five (5).  [PTX-006, pp. 58-60].[8] That leaves only seven (7) elections out of the nineteen (19) she analyzed where both the second and third preconditions are met.  Seven (7) out of nineteen (19), or approximately thirty-seven percent (37%) of the elections she chose to analyze for purposes of the *Gingles* preconditions is hardly sufficient evidence to satisfy *Gingles* prongs 2 and 3. As such, based on Dr. Handley's testimony standing alone, there is no need to go further and analyze totality of circumstances because the Section 2 inquiry stops there. *See Growe v. Emison*, 507 U.S. 25, 40-41 (1993) ("Unless these points are established, there neither has been a wrong nor can be a remedy); *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 673 (5th Cir. 2009) (affirming Plaintiffs failed to establish the first *Gingles* precondition and that the Court "need not reach the totality analysis at all.").

      ii.    *Dr. Alford*

      The Defendants offered the testimony of Dr. John Alford to rebut Dr. Handley.  Dr. Alford employed the same methodology that Dr. Handley used which he also considered to be the most reliable, *i.e.,* EI RxC.  [DX-001, p. 3]; Tr. 1417:19-1418:13. He analyzed the same data that Dr. Handley selected for her analysis.  When one considers Dr. Alford's analysis of the same data chosen by Dr. Handley and applying her most sophisticated and reliable methodology, it becomes even more evident that Plaintiffs' Section 2 claims must fail.

---

[8] Those districts include SD 32, SD 34, SD 38, HD 16, and HD 68. Also, the black candidate of choice wins districts SD 12, HD 36, and HD 70.

Dr. Alford explained the purpose of Credible Intervals and how they are to be applied to Point Estimates in the EI RxC analysis. Tr. 1426:20-21.  Dr. Alford testified that when the Credible Intervals that Dr. Handley cited for her Point Estimates are properly applied, there are seven (7) of her "endogenous" elections where we cannot determine if there is racially polarized voting. Tr. 1462:24-1465:11. Also, because Dr. Handley does not identify a standard for cohesion, it is impossible to determine whether there is sufficient political cohesion to satisfy the second and third preconditions.  Tr. 1454:8-14.

Dr. Alford analyzed the data pertaining to the three presidential elections Dr. Handley chose. He concluded that virtually the same percentage of whites and blacks were voting for the Democratic candidates regardless of race, and that the same was true for white and black voters for the Republican candidates. [DX-001, pp. 6-7].  Likewise, when that set of elections was expanded to include statewide candidate elections, the results were essentially the same. Tr. 1437:11-1439:4. As Dr. Alford found, whether a candidate is a Democrat or Republican makes a huge difference to black and white voters in those elections, but whether a candidate is black or white makes hardly any difference. *Id.*  Dr. Alford also examined elections in the Democratic primaries that Dr. Handley chose to analyze.  While Dr. Handley opined that those election were not probative, Tr. 298:6-9, Dr. Alford noted that the results in the primary contests were entirely consistent with the general election contests. Tr. 1469:22-1470:2. That is, the race of the candidates appears to have little, if any, systemic influence on the voting behavior of either black or white voters. *Id.*

Finally, Dr. Handley chose three (3) judicial elections to review in anticipation that Defendants would claim that party was influencing voter behavior more than race.  She testified that she chose these elections because they were non-partisan. Tr. 298:17-25. While Dr. Handley

testified that the only indicator to her that these races were non-partisan was the absence of party affiliation on the ballot, Dr. Alford pointed to a number of circumstances demonstrating that these elections are, in reality, partisan in nature. Tr. 1473:11-1474:24. As Dr. Alford noted, in one of the judicial elections there was no polarization, with black and white voters favoring the same candidate. Tr. 1477:7-12.  In the other two, the voting patterns match those found in the statewide general elections, with black voters favoring the Democrats and white voters favoring Republicans. Tr. 1477:6-7.

The evidence in this record is replete with analyses from both the Plaintiffs' own expert, Dr. Handley, and Defendants' expert, Dr. Alford, that party—not race—is driving voter behavior in Mississippi in the elections analyzed. This Court's analysis of the evidence should be the same as *Clements*:

> We repeat. The race of the candidate did not affect the pattern. White voters' support for black Republican candidates was equal to or greater than their support for white Republicans. Likewise, black and white Democratic candidates received equal percentages of the white vote. Given these facts, we cannot see how minority-preferred judicial candidates were defeated "on account of race or color." Rather, the minority-preferred candidates were consistently defeated because they ran as members of the weaker of two partisan organizations. We are not persuaded that this is racial bloc voting as required by *Gingles*.

*Clements*, 999 F.2d at 879.  As in *Clements*, the race of the candidate did not affect the pattern of voter behavior and after applying the credible evidence to the *Gingles* framework in consideration of all three *Gingles* preconditions and totality of circumstances, there is insufficient proof to establish any Section 2 claims.

## **CONCLUSION**

For all these reasons, Plaintiffs have failed to carry their burden by a preponderance of the credible evidence. Plaintiffs failed to prove that the relevant minority group "is politically cohesive" and that, in absence of a § 2 remedy, a white voting bloc will usually "defeat the

minority's preferred candidate." *Allen*, 599 U.S. at 18. Even if the Court were to consider that

Plaintiffs established the *Gingles* preconditions, the Plaintiffs failed to meet their burden to

demonstrate that under the totality of circumstances "members of a racial group have less

opportunity than other members of the electorate." *LULAC*, 548 U.S. at 425-26. Accordingly,

Plaintiffs failed to carry their burden on their § 2 claims. Furthermore, Plaintiffs did not allege

nor prove discriminatory intent, and the weak circumstantial evidence precludes success on their

Fourteenth Amendment claims. This matter now having been fully adjudicated by a trial on the

merits, the Court should enter judgment for Defendants on all of Plaintiffs' claims.

This the 29th day of March, 2024.

Respectfully submitted,

STATE BOARD OF ELECTION
COMMISSIONERS; TATE REEVES, IN HIS
OFFICIAL CAPACITY AS GOVERNOR OF
MISSISSIPPI; LYNN FITCH, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
MISSISSIPPI; MICHAEL WATSON, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
STATE, DEFENDANTS

By: */s/ Tommie S. Cardin*
Tommie S. Cardin (MB #5863)
ONE OF THEIR COUNSEL

OF COUNSEL:

Tommie S. Cardin (MB #5863)
P. Ryan Beckett (MB #99524)
B. Parker Berry (MB #104251)
J. Dillon Pitts (MB #106399)
**BUTLER SNOW LLP**
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
P.O. Box 6010, Ridgeland, MS 39158-6010
Phone: 601.948.5711
Fax:    601.985.4500
tommie.cardin@butlersnow.com
ryan.beckett@butlersnow.com
parker.berry@butlersnow.com
dillon.pitts@butlersnow.com
Rex M. Shannon III (MB #102974)
**STATE OF MISSISSIPPI**
**OFFICE OF THE ATTORNEY GENERAL**
**CIVIL LITIGATION DIVISION**
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-4184
Fax: (601) 359-2003
rex.shannon@ago.ms.gov


MISSISSIPPI REPUBLICAN EXECUTIVE
COMMITTEE, INTERVENOR-DEFENDANT

By: */s/ Michael B. Wallace*
    MICHAEL B. WALLACE (MB #6904)


OF COUNSEL:

Michael B. Wallace (MB #6904)
Charles E. Cowan (MB #104478)
**WISE CARTER CHILD & CARAWAY, P.A.**
401 East Capitol Street, Suite 600
P.O. Box 651, Jackson, MS 39201
Ph: (601) 968-5500
Fax: (601) 968-5519
mbw@wisecarter.com
cec@wisecarter.com

## <u>CERTIFICATE OF SERVICE</u>

I, Tommie S. Cardin, one of the attorneys for the Defendants, do hereby certify that I have this day filed the above and foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 29th day of March, 2024.

*/s/ Tommie S. Cardin*

Tommie S. Cardin

86534046.v2