# Exhibit A

# EXHIBIT A

## DEFENDANTS' RESPONSES TO QUESTIONS POSED BY THE COURT ON MARCH 15, 2024

**1.** **Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of" voting rights. Is motive nonetheless a highly relevant and even controlling factor for when the State argues that partisan reasons explain the redistricting decisions?**

Defendants' trial brief addresses this question in Section III.A and B, pp. 10-11. Motive would be relevant if Plaintiffs were making an intentional discrimination claim under Section 2 and the 15th Amendment. *See Vil. of Arlington Heights v. Metro. House. Dev. Corp.*, 429 U.S. 252 (1977) (explaining analytical framework for intentional discrimination claims); *Veasey v. Abbott*, 830 F.3d 216, 230, 243 (5th Cir. 2016) (applying the *Village of Arlington Heights* framework to "discriminatory *purpose* claims" and applying *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986), to "discriminatory *effect*" claims). No such claim is made in this lawsuit, however, and *Arlington Heights* and its progeny thus have no application.

When, as here, plaintiffs limit their allegations to an "effects" claim under Section 2, the relevant inquiry focuses on voter behavior, political access, and political participation rather than the motive of the legislature. *See Gingles*, 478 U.S. at 35. This is so because Section 2 only affords relief when there is vote dilution "on account of race or color." 52 U.S.C. § 10301(a). In order to make this determination, the Court must analyze voter behavior in the subject jurisdiction and determine whether that behavior is being driven by race or something else. *See League of United Latin American Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 855-61 (5th Cir. 1993). Here, the evidence shows that voter behavior is being driven by party, not race. *See Clements*, 999 F.2d at 883. Accordingly, Plaintiffs' Section 2 claims fail.

**2.   If the State seeks to justify a redistricting map on the basis of partisan considerations, what if any evidence must the State introduce on that motivation?**

Defendants' trial brief addresses this question in Section II.A and B, pp. 4-10. When considering the factors employed by the legislature in drawing its maps, the Court must keep in mind that the burden of proof is on the Plaintiffs to prove that the legislature has violated Section 2 or the Equal Protection Clause of the Fourteenth Amendment. *See Easley v. Cromartie*, 532 U.S. 234, 241 (2001) ("*Cromartie II*") (quoting *Miller v. Johnson*, 515 U.S. 900, 928 (1995) (O'Connor, J., concurring)); *Cooper v. Harris*, 581 U.S. 285, 291 (2017); *Allen v. Milligan*, 599 U.S. 1, 18 (2023); *Abbott v. Perez*, 585 U.S. 579, 603 (2018). The legislature is presumed to have acted in good faith. *See Abbott*, 585 U.S. at 603 (quoting *Miller*, 515 U.S. at 915). Plaintiffs bear a demanding burden to prove otherwise. *See Miller*, 515 U.S. at 915-917 ("'[D]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences, it implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects"). The State can offer evidence of partisan and other considerations to rebut Plaintiffs' proof, but the burden of proof remains that of the Plaintiffs to fulfill. *See Clements*, 999 F.2d at 859.

**3.   What evidence is in the record to support the role of partisanship in the relevant redistricting decisions?**

Defendants' trial brief addresses this question in Section II.B.2 and 3, pp. 5-10. As set forth in more detail in Defendants' Findings of Fact and Conclusions of Law ¶¶ 14-31, the Mississippi Legislature adopted the redistricting plans for the Mississippi House and Senate on March 29, 2022. [JTX-010]; [JTX-011]. Both floor debates were admitted into evidence at trial. Tr. 73:2; [JTX-010]; [JTX-011]. Also, the redistricting criteria adopted by the Standing Joint Committee was admitted at trial. [JTX-008]. Tr. 73:2.

During discussion of the plans on the Mississippi House Floor, Chairman Beckett described the Standing Joint Committee's process for redistricting which included nine public hearings. [JTX-010], 8:4-9. In addition to the criteria adopted by the Committee, "political performance" was an "important consideration developing this proposed plan." [JTX-010], 14:25-15:2. Chairman Beckett explained that the "proposed plan maintains consistent Republican and Democratic political performance throughout the . . . state." [JTX-010], 15:3-6. Upon further questioning, Chairman Beckett expanded on political performance. *Id.* at 20:9-24. For example, years of service and incumbency were considered, but these were not deciding factors. *Id.* In the Senate, Vice Chairman Kirby included that "[a]n important consideration in developing the proposed plan was maintaining political performance in each district." [JTX-011], 12:6-8. He explained that "[t]he proposed plan maintains consistent Republican and Democratic performance throughout the State." *Id.* at 12:9-11.

Although Plaintiffs' Section 2 and Fourteenth Amendment claims are distinct, the evidence from Dr. Ragusa supports that partisanship played a role in the Legislature's redistricting decisions. [Defs.' Trial Brief], pp. 7-8. While Defendants were not required to affirmatively demonstrate that partisan politics played a significant role in the composition of the statewide redistricting plans (that is the Plaintiffs' burden to disentangle), the trial record supports such evidence about the importance of political performance, and Defendants specifically raised the defense of partisanship as a nonjusticiable political question in their Answer. [Dkt. #28], at p. 31.

4.   **Once there is a substantial correlation between race and party in the politics of that State, what role does Section 2 of the Voting Rights Act have in redistricting?**

Defendants' trial brief addresses this question in Section III.C, pp. 12-15. Section 2 provides relief where vote dilution occurs "on account of race or color", thus requiring the Court

3

to determine whether voter behavior is being driven by race or something else. *See* 52 U.S.C. § 10301(a); *Clements*, 999 F.2d at 855-61.  This requires an intensely local analysis of voter behavior in the subject jurisdiction to determine whether race is the motivating factor. *See Clements*, 999 F.2d at 857. If it is not, then Section 2 has no role. *Id.* at 860-61.

5. **If the court is to consider whether the State could have achieved its legitimate political objectives in alternative ways that "would have brought about significantly greater racial balance," Cooper v. Harris, 137 S. Ct. at 1480, what is in the record on that possibility?**

Defendants' trial brief addresses this question in Section II.B.3, pp. 7-10. The record contains no evidence bearing on the question of whether the State could have achieved its legitimate political objectives in alternative ways. The Plaintiffs did not produce alternative maps to show that those districting alternatives would have brought about significantly greater racial balance while achieving the legislature's political objectives.  "One, often highly persuasive way to disprove a State's contention that politics drove a district's lines is to show that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district." *Cooper*, 581 U.S. at 317. Under *Cooper*, alternative maps are not necessary when there is direct evidence supporting the legislature's intent of racial predominance. *Id.* at 322. However, under *Cromartie II*, alternative maps are required when the direct evidence is weak (or, in this case, nonexistent): where the plaintiffs had "meager direct evidence of a racial gerrymander and needed to rely on evidence of forgone alternatives—only maps of that kind could carry the day." *Cromartie II*, 532 U.S. at 258; *Cooper*, 581 U.S. at 322. "In a case such as this one where majority-minority districts . . .  are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate

4

political objectives in alternative ways that are comparably consistent with traditional districting principles." *Cromartie II*, 532 U.S. at 258.

Here, there is no direct evidence and only weak circumstantial evidence. *Cromartie II* and *Cooper* both support, if not require, alternative maps by the Plaintiffs to show that the legislature could have achieved its partisan objectives in a more racially balanced way. Plaintiffs did not produce a single map to that effect.

6. **If the predominant motive for the redistricting decisions was partisanship, is the State arguing that the plaintiffs' claims are not justiciable under Rucho v. Common Cause, 139 S. Ct. 2484 (2019)?   The Plaintiffs' response to the question should be to brief its position on the applicability of Rucho.**

Defendants' trial brief addresses this question in Section II.B.3, pp. 7-10. For the Fourteenth Amendment Equal Protection Clause Claim, the burden is on the Plaintiffs to prove that the State subordinated traditional redistricting principles so that race predominated in the drawing of the five challenged racial gerrymander districts. *See Cooper*, 581 U.S. at 291. It is the Plaintiffs' burden to disentangle race for partisanship in the mapdrawing process—and they have not done that. *Id.* at 308. The record contains sufficient evidence showing that partisan politics was an important factor in the mapdrawing process. *See supra Response to Question 2*, pp. 1-2; Defs.' Findings of Fact and Conclusions of Law ¶¶ 17-25, 82-83, 96, 99, 335, 393. And, Plaintiffs' own expert, Dr. Ragusa, produced statistical analysis that clearly demonstrates that partisanship was significant factor in the composition of the five challenged districts. *See* Defs. Findings of Fact and Conclusions of Law ¶¶ 395, 397, 413, 417. But, because Dr. Ragusa did not do a substantive analysis for the party variable in his analysis, the Court is left with no guidance as to whether race or party had a greater impact, or which one predominated in the drawing of the districts. And, because *Rucho v. Common Cause* approves of districting on the basis of

partisanship, Plaintiffs have failed to carry their burden of proving a racial gerrymandering claim.

7. **Are claims for violation of equal protection and for violation of Section 2 analyzed the same when considering the possible partisan motivations of the State in redistricting?**

Defendants' trial brief addresses this question in Section I.A, pp. 2-3. Claims for violation of the Equal Protection Clause of the Fourteenth Amendment and Section 2 of the Voting Rights Act are not analyzed under the same framework. Claims for violation of the Equal Protection Clause of the Fourteenth Amendment focus on the intent of the legislature whereas claims for violation of Section 2 focus on voter behavior, political access, and political participation in the jurisdiction. *See Cooper*, 581 U.S. at 291; *Veasey*, 830 F.3d at 229, 243 (applying the purpose and effects analyses).

When analyzing the Equal Protection claims, the focus is on the motivation of the legislature in drawing the plan. *See Cooper*, 581 U.S. at 291. The legislature is presumed to have acted in good faith. *Miller*, 515 U.S. at 915. The burden of proof rests with the Plaintiffs to prove race, not politics, drove a district's line by "circumstantial and direct evidence of intent." *Cooper*, 581 U.S. at 308. In this regard, Plaintiffs must prove that the legislature subordinated traditional redistricting principles to race in drawing the districts. *Id.* at 291. In this case, Plaintiffs presented no direct evidence of racial predominance. The only circumstantial evidence presented was Dr. Ragusa's testimony, which was predicated exclusively on his flawed and discredited methodology. This evidence is insufficient to meet the Plaintiffs' burden of proof as to their Equal Protection claims.

Plaintiffs make no claim of intentional discrimination under Section 2 and rely only on allegations that the effect of the legislature's actions resulted in discrimination. It is important

6

here to draw a distinction between intent and causation. [Dkt. #27], at ¶ 55; [Dkt. #199], at p. 16, ¶ 9.  If Plaintiffs were making a claim for intentional discrimination, then the motive of the legislature would be relevant. *See Veasey*, 830 F.3d at 229. However, where—as here—the claim is solely an "effects" claim, then the relevant question is "what is the cause of that effect." *See Gingles*, 478 U.S. at 30. Intent and causation are distinctly different concepts. *See Intent*, Black's Law Dictionary (11th ed. 2019) ("The state of mind accompanying an act"); *Causation*, Black's Law Dictionary (11th ed. 2019) ("The causing or producing of an effect").  Intent involves a mental state whereas causation is about whether A led to B. *Id.*

      This is where the inquiry regarding polarization becomes critical because the language of Section 2 provides that there is only a claim when vote dilution occurs "on account of race or color." 52 U.S.C. § 10301(a).  If the evidence shows that polarization is occurring for any reason(s) other than race, then there is no Section 2 claim because there is no vote dilution caused by "race or color." *Clements*, 999 F.2d at 855-61. In this case, the evidence offered by both Drs. Handley and Alford establishes that voter behavior is being driven by party and not race, thereby undermining any Section 2 claim.