**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

|  |  |
|---|---|
| MISSISSIPPI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; DR. ANDREA WESLEY; DR. JOSEPH WESLEY; ROBERT EVANS; GARY FREDERICKS; PAMELA HAMNER; BARBARA FINN; OTHO BARNES; SHIRLINDA ROBERTSON; SANDRA SMITH; DEBORAH HULITT; RODESTA TUMBLIN; DR. KIA JONES; MARCELEAN ARRINGTON; VICTORIA ROBERTSON, | |
| *Plaintiffs*, | **CIVIL ACTION NO.** **3:22-cv-734-DPJ-HSO-LHS** |
| vs. | |
| STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, *in his official capacity as Governor of Mississippi*; LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON, *in his official capacity as Secretary of State of Mississippi*, | |
| *Defendants*, | |
| AND | |
| MISSISSIPPI REPUBLICAN EXECUTIVE COMMITTEE, | |
| *Intervenor-Defendant.* | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants State Board of Election Commissioners, Governor Tate Reeves, Attorney

General Lynn Fitch, and Secretary of State Michael Watson and Intervenor Defendant, Mississippi

Republican Executive Committee (collectively, "Defendants"), submit this Proposed Findings of

Fact and Conclusions of Law.

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | | Overview of Mississippi Legislative Reapportionment | 3 |
| II. | | 2022 Mississippi Legislative Reapportionment Process | 4 |
| | 1. | Entity Plaintiff | 10 |
| | 2. | Individual Plaintiffs | 10 |
| | 3. | Defendants | 12 |
| IV. | | 2022 Lawsuit | 12 |
| | 1. | Challenged Senate Districts | 13 |
| | 2. | Challenged House Districts | 15 |
| V. | | Voting Rights Act Claims | 17 |
| | 1. | Private Right of Action | 17 |
| | 2. | General Law | 17 |
| | 3. | *Gingles* Prong 1 | 21 |
| | | a.    Findings of Fact | 21 |
| | | b.    Conclusions of Law | 28 |
| | 4. | Gingles 2 & 3 | 43 |
| | | a.    Findings of Fact | 43 |
| | | b.    Conclusions of Law | 52 |
| | 5. | Totality of the Circumstances | 54 |
| | | a.    General Law | 54 |
| | | b.    Drs. Luckett and King | 57 |
| | | c.    Senate Factor 1 | 59 |
| | | d.    Senate Factor 2 | 61 |
| | | e.    Senate Factor 3 | 66 |
| | | f.    Senate Factor 4 | 70 |
| | | g.    Senate Factor 5 | 70 |
| | | h.    Senate Factor 6 | 87 |
| | | i.    Senate Factor 7 | 87 |
| | | j.    Senate Factor 8 | 89 |
| | | k.    Senate Factor 9 | 91 |
| | | l.    Proportionality | 94 |
| VI. | | Racial Predominance Claim | 95 |
| | 1. | General Law | 95 |
| | | a.    Findings of Fact | 98 |
| | | b.    Conclusions of Law | 106 |
| VII. | | Remedy | 109 |

## SUMMARY

Before the Court is a civil action brought by the Mississippi State Conference of the National Association for the Advancement of Colored People ("NAACP") and individual voters—black Mississippians—("Plaintiffs") against the Mississippi State Board of Election Commissioners. Plaintiffs challenge Mississippi's 2022 redistricting plans for the State Senate and the State House. Plaintiffs claim that the configuration of State Senate and State House districts in the 2022 plan dilute the voting strength of black Mississippians in certain areas of the State in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. Plaintiffs also allege that certain State Senate and State House districts in the 2022 plans constitute racial gerrymanders in violation of the Fourteenth Amendment to the United State Constitution.

## FINDINGS OF FACT

### I.   Overview of Mississippi Legislative Reapportionment

1.      The Mississippi Constitution directs that every ten years the Mississippi Legislature must "apportion the state in accordance with the Constitution of the state and of the United States into consecutive numbered senatorial and representative districts of contiguous territory." MISS. CONST. art. XIII, § 254. [1]

2.      Mississippi has a bi-cameral legislature, consisting of the House of Representatives, with 122 representatives, and the State Senate, with 52 senators. Representatives and senators are each elected to four-year terms from their respective

---

[1] Specifically, Section 254 provides: "The Legislature shall at its regular session in the second year following the 1980 decennial census and every ten (10) years thereafter, and may, at any other time, by join resolution, by majority vote of all members of each house, apportion the state ...." MISS. CONST. art. XIII, § 254. The decennial census is conducted by the United States Census Bureau during the first year of each decade and the results are released the following year.

geographical districts existing at the time of the elections. [Dkt. # 199], at ¶¶ 66, 78.

3.      The practical application of legislative reapportionment is marshaled by the

Standing Joint Legislative Committee on Reapportionment and Redistricting (the "Standing Joint

Committee"), as established by Sections 5-3-91 through 5-3-103 of the Mississippi Code.[2] [Dkt.

# 199], at ¶ 56. The Standing Joint Committee drafts reapportionment plans for each chamber

and, in addition to such constitutional standards that may apply at the time of reapportionment,

the Standing Joint Committee is also guided by the following statutory principles:

> (a) Every district shall be compact and composed of contiguous territory and the
> boundary shall cross governmental or political boundaries the least number of
> times possible; and
>
> (b) Districts shall be structured, as far as possible and within constitutional
> standards, along county lines; if county lines are fractured, then election district
> lines shall be followed as nearly as possible.

MISS. CODE ANN. § 5-3-101; [Dkt. # 199], at ¶¶ 55.

## II.      2022 Mississippi Legislative Reapportionment Process

4.      In accordance with Section 254 of the Mississippi Constitution, during the 2021

Regular Session of the Mississippi Legislature, the Standing Joint Committee was formed to

reapportion both chambers based upon the 2020 census data that was released on August 12,

2021.[3]

5.      The Legislature created the Standing Joint Committee, and the Lieutenant

Governor and Speaker of the House called an organizational meeting on June 30, 2021, to elect a

---

[2] The Standing Joint Committee is established by the Speaker of the House and the Lieutenant
Governor and consists of the chairs and vice chairs of the elections committee of both chambers along
with ten (10) members from each chamber. MISS. CODE ANN. § 5-3-91.

[3] The statutory deadline to provide redistricting data was March 31, 2021, but the Census Bureau
delayed release until August 12, 2021.

Chairman and Vice Chairman. The Standing Joint Committee elected former Representative Charles Jim Beckett as Chairman and Senator Dean Kirby as Vice Chairman. At that meeting the Standing Joint Committee adopted a public records policy, hired and retained counsel, and announced the schedule for public hearings.

6.      The Standing Joint Committee conducted nine public hearings and held four public meetings during the redistricting process. [Dkt. # 199], at ¶¶ 58, 59.

7.      The Standing Joint Committee adopted neutral redistricting criteria at the November 21, 2021, meeting. The Standing Joint Committee adopted the following criteria for all State Legislative Districts:

   a.   Each district's population should be less than 5% above or below the ideal population of the district.

   b.   Districts should be composed of contiguous territory.

   c.   The redistricting plan should comply with all applicable state and federal laws including Section 2 of the Voting Rights Act of 1965, as amended, and the Mississippi and United States Constitutions. [Dkt. # 199], at ¶ 60.

8.      For a State Senate district, the ideal district size is 56,948. For a State House district, the ideal size is 24,273. [Dkt. # 199], at ¶ 57.

9.      Following the 2020 Census, Mississippi had a total population of 2,961,279. [Dkt. # 199], at ¶ 53. That was a decrease of 6,018 people or -0.2% from the prior decade. *Id.* The non-Hispanic white population decreased by 83,210 persons. *Id.* The Any-Part black population increased by 7,812 persons. *Id.* Plaintiffs compare the change in population in Mississippi, not with persons who consider themselves any part white, which Dr. King did not know, but with non-Hispanic whites, necessarily a smaller number. Tr. 815:13-816:14.

10.     Based on the 2020 Census, the black population (Any-Part black) in Mississippi constitutes 37.94% of the State's total population and 36.14% of the voting age population. [Dkt. # 199], at ¶ 54.

11.     The 2022 Benchmark Plan consists of the 2012 Plan geography with the 2020 Census results. Although the 2012 Senate Plan was amended in 2019, the Joint Resolution provided that it would be repealed "and the districts as originally configured [in the 2012 Plan] shall take effect." J.R. 202, Regular Session 2019. Following the vacatur by the Fifth Circuit in *Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020), the geography of the Benchmark reverted to that of the 2012 Plan. J.R. 202, Regular Session 2019.

12.     The 2012 Senate Plan contained fourteen (14) majority-minority districts and the 2012 House Plan contained 42 majority-minority districts. [Dkt. # 199], at ¶¶ 67, 79. These plans were submitted to the United States Department of Justice (the "DOJ") for preclearance under Section 5 of the Voting Rights Act of 1965. The DOJ interposed no objection to the 2012 Plans thereby preclearing them both.[4] [DX-006, DX-007].

13.     On March 27, 2022, the Standing Joint Committee held an open meeting and adopted the redistricting plans for the Mississippi House and Senate. *See* [JTX-014]. Thereafter, on March 29, 2022, the Mississippi House of Representatives adopted a House Redistricting Plan ("JR 1"). *See* [JTX-010].

14.     Two amendments to JR 1 were proposed. The first amendment—made in agreement with two black Democrat Representatives Earle Banks of HD 67 and Zakiya Summers of HD 68 to unpair these incumbents into separate districts—was adopted by voice

---

[4] Preclearance pursuant to Section 5 of the Voting Rights Act of 1965 is no longer applicable. *See Shelby County v. Holder*, 570 U.S. 529 (2013).

vote. [JTX-010, 31:20-24].

15.     The second amendment—introduced by House Minority Leader Robert Johnson—supplied an alternative map that was an admitted racial gerrymander; that amendment failed. *Id.* at 32:25-46:20.

16.     During discussion of the plans on the Mississippi House Floor, Chairman Beckett described the statewide population decrease and the "ideal size" for districts. *Id.* at 6:10-7:2. Chairman Beckett explained that "significant shifts in our population" including "a loss of approximately 65,000 people in the Delta area. Southwest Mississippi had a loss of population, as did the Jackson/Hinds County area." *Id.* at 7:4-11. Whereas "DeSoto County, Rankin and Madison Counties and the coastal counties saw the most gains in population." *Id.* at 7:11-14. Furthermore, "other counties [ ] had large percentage increases, as large as these, but they've started from a smaller base. Like Lafayette County, for example, went from 40-something thousand to 50-something thousand." *Id.* at 7:15-20.

17.     Chairman Beckett described the Standing Joint Committee's process for redistricting including nine public hearings over the course of nine months. *Id.* at 8:4-9. In addition to the criteria adopted by the Committee, "political performance" was an "important consideration developing this proposed plan." *Id.* at 14:25-15:2. Chairman Beckett explained that the "proposed plan maintains consistent Republican and Democratic political performance throughout the . . . state." *Id.* at 15:3-6.

18.     When questioned about the number of majority-minority districts, Chairman Beckett explained the challenge with creating majority-minority districts due to the population not being "evenly spread across the state." *Id.* at 19:5-20. Chairman Beckett described the goal was to not lose any majority-minority districts. *Id.*

19.     Upon further questioning, Chairman Beckett expanded on political performance. *Id.* at 20:9-24. For example, years of service and incumbency were considered, but were not the deciding factors. *Id.*

20.     Chairman Beckett explained that the Committee did not consider the amount of time a district existed. "We look more at communities of interest, and you know, political subdivision[s]." *Id.* at 22:4-7. "[T]here was no reason for that to be a criteria or necessarily considered then . . . because it would have just been repeating a same mistake that had been made." *Id.* at 22:10-17.

21.     Chairman Beckett also expanded on communities of interest in that "[w]hen possible, . . . you would like to keep a county together or city together or as much of it as possible." *Id.* at 23:21-23. "[P]eople who historically have been together." But communities of interest was "not the overriding consideration." *Id.* 23:24-24:2. "Population is the overriding consideration and what you have to do to make that work." 24:2-4.

22.     Vice Chairman Kirby described the significant changes across the State and the challenges the Committee faced such as moving a district from one part of the State that lost population to another area of the State. [JTX-011], 4:12-5:6; 8:25-9:17. One reason for collapsing a district and pairing two incumbents was to maintain two majority-minority districts "to ensure compliance with [ ] Section 2 of the Voting Rights Act." *Id.* at 9:11-17

23.     Vice Chairman Kirby explained that the Census results were delayed due to COVID, so the first few public meetings were held using estimates. *Id.* at 5:18-6:1.

24.     Vice Chairman Kirby described the process for redistricting including adopting criteria such as "stay within the plus or minus 5 percent deviation from the ideal size in each district to comply with one person, one vote requirement of the Constitution. And the other

things, districts had to be contiguous, and we had to comply with all the state and federal laws including Section 2 of the Voting Rights Act." *Id.* at 7:15-8:3.

25.     "An important consideration in developing the proposed plan was maintaining political performance in each district." *Id.* at 12:6-8. "The proposed plan maintains consistent Republican and Democratic performance throughout the State." *Id.* at 12:9-11.

26.     On March 29, 2022, the Mississippi State Senate adopted a Senate Redistricting Plan ("JR 202").[5] [Dkt. # 199], at ¶ 64.

27.     On March 31, the House adopted JR 202 and the Senate adopted JR 1 and upon their signing and enrolling, those maps (the "Enacted Plans") became law. [Dkt. # 199], at ¶ 65.

28.     The 2012 Senate Plan contained 15 majority-black Senate Districts. In the Benchmark Senate Plan there were 14 majority-black State Senate Districts. In the 2019 General Election, the 2019 Senate Plan contained 15 majority-black Senate Districts. The 2022 Enacted Plan contains 15 majority-black Senate Districts. [Dkt. # 199], at ¶¶ 67-69.

29.     In the Benchmark House Plan, there were 42 majority-black State House Districts.   [Dkt. #199], at ¶ 79; [JTX-46]. In the 2022 Enacted House Plan there were 42 majority- black House Districts. [Dkt. # 199], at ¶ 80.

30.     As of January 15, 2024, there are 16 Democrats and 36 Republicans in the Mississippi State Senate. There are 41 Democrats, 79 Republicans, and 2 Independents in the Mississippi State House of Representatives. [Dkt. # 199], at ¶ 91.

31.     Once the Enacted Plans became law, the Legislature and the Standing Joint Committee had no remaining role in redistricting and elections. Enforcement and implementation of the law and administration of elections is the work of various state and local executive

---

[5] Two amendments to JR 202 were proposed, but both amendments failed.

officials and state political parties. *See* Miss. Code Ann. § 23-15-211.1 *et seq.*; *Joint Resolution 202, Mississippi Legislature, 2022 Regular Session*, Miss. Legislative Info. Sys., Bill Status Sys., https://billstatus.ls.state.ms.us/2022/pdf/history/JR/JR0202.xml.; *Joint Resolution 1, Mississippi Legislature, 2022 Regular Session,* Miss. Legislative Info. Sys., Bill Status Sys., https://billstatus.ls.state.ms.us/2022/pdf/history/JR/JR0001.xml.

### III.    Parties

### 1. Entity Plaintiff

32.     The operative complaint lists one Entity Plaintiff, the Mississippi State Conference of the National Association for the Advancement of Colored People ("MS NAACP"). [Dkt. #27], at ¶ 15. The Entity Plaintiff is a non-profit corporation. *See Id.*

33.     The MS NAACP has members who are registered voters who reside in Senate Districts 2 and 48 and House Districts 22, 34, and 64. *Id.* [Dkt. # 199], at ¶ 2.

### 2. Individual Plaintiffs

34.     The operative complaint lists fifteen individuals as Plaintiffs: Dr. Andrea Wesley, Dr. Joseph Wesley, Robert Evans, Gary Fredericks, Pamela Hamner, Barbara Finn, Otho Barnes, Shirlinda Robertson, Sandra Smith, Deborah Hulitt, Rodesta Tumblin, Dr. Kia Jones, Angela Grayson, Marcelean Arrington, and Victoria Robertson ("Individual Plaintiffs"). *Id.* at ¶¶ 23 – 48.

35.     Plaintiff Angela Grayson has since voluntarily dismissed her claims. *See* [Dkt. #83].

36.     Drs. Andrea and Joseph Wesley are black Mississippians who currently reside in enacted SD 45. [Dkt. #27], at ¶¶ 23, 24.  Drs. Andrea and Joseph Wesley are registered members of the Democratic Party.  [Dkt. #199], at ¶¶ 5, 6.

37.     Robert Evans is a black Mississippian who currently resides in enacted SD 45. [Dkt. #27], at ¶ 25.  Mr. Evans is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 7.

38.     Gary Fredericks is a black Mississippian who currently resides in enacted SD 48. *Id.* at ¶ 27.  Mr. Fredericks is a registered member of the Democratic Party.  [Dkt. # 199], at ¶ 8.

39.     Pamela Hamner is a black Mississippian who currently resides in enacted SD 2. *Id.* at ¶ 29.  Ms. Hamner is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 9.

40.     Barbara Finn is a black Mississippian who currently resides in enacted SD 1. *Id.* at ¶ 31.  Ms. Finn is a member of the Democratic Party. [Dkt. # 199], at ¶ 10.

41.     Otho Barnes is a black Mississippian who currently resides in enacted SD 35. *Id.* at ¶ 33.  Mr. Barnes is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 11.

42.     Shirlinda Robertson is a black Mississippian who currently resides in enacted SD 35. *Id.* at ¶ 34.  Ms. Robertson is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 12.

43.     Marcelean Arrington is a black Mississippian who currently resides in enacted HD 84. *Id.* at ¶ 36. Ms. Arrington is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 13.

44.     Sandra Smith is a black Mississippian who currently resides in enacted HD 34. *Id.* at ¶ 38. Ms. Smith is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 14.

45.     Deborah Hulitt is a black Mississippian who currently resides in enacted HD 56. *Id.* at ¶ 40. Ms. Hulitt is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 15.

46.     Dr. Kia Jones is a black Mississippian who currently resides in enacted HD 64. *Id.* at ¶ 42. Dr. Jones is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 16.

47.     Victoria Robertson is a black Mississippian who currently resides in enacted SD 17. *Id.* at ¶ 45. Ms. Robertson is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 17.

48.     Rodesta Tumblin is a black Mississippian who currently resides in enacted HD 22. *Id.* at ¶ 47.  Ms. Tumblin is a registered member of the Democratic Party. [Dkt. # 199], at ¶ 18.

### 3.  Defendants

49.     Defendant State Board of Election Commissioners ("SBEC") is composed of the Governor, the Attorney General, and the Secretary of State. Its respective duties are set forth in Mississippi Code Annotated § 23-15-211 (Rev. 2018). [Dkt. # 199], at ¶ 19.

50.     Defendant Tate Reeves is the Governor of the State of Mississippi and is a member of the SBEC pursuant to MISS. CODE ANN. § 23-15-211 (Rev. 2018). [Dkt. # 199], at ¶ 20.

51.     Defendant Lynn Fitch is the Attorney General of the State of Mississippi and is a member of the SBEC pursuant to MISS. CODE ANN. § 23-15-211 (Rev. 2018). [Dkt. # 199], at ¶ 21.

52.     Defendant Michael Watson is the Secretary of State of the State of Mississippi and is a member of the SBEC pursuant to MISS. CODE ANN. § 23-15-211 (Rev. 2018). [Dkt. # 199], at ¶ 22.

53.     Intervenor Defendant the Mississippi Republican Executive Committee moved to intervene in this matter on May 16, 2023. [Dkt. #32]. The motion was granted on May 19, 2023. [Text-Only Order May 19, 2023].

### IV.   2022 Lawsuit

54.     Plaintiffs filed this civil action on December 20, 2022, challenging the Enacted

Plans under the Voting Rights Act and the Fourteenth Amendment to the United States

Constitution. *See* Complaint [Dkt. #1]. Plaintiffs subsequently confessed a Motion to Dismiss

[Dkt. ## 17, 18, 24] brought by two prior Defendants, State Senator Dean Kirby and State

Representative Dan Eubanks, and amended their Complaint [Dkt. #27].

55.     Plaintiffs advocate for the creation of four new majority-minority Senate districts

and allege that two Senate districts are racial gerrymanders. [Dkt. #27]. Plaintiffs also advocate

for the creation of three new majority-minority House districts and allege that three other House

districts are racial gerrymanders. [Dkt. #27]. Plaintiffs' Illustrative Plans will impact more than

70 districts. [PTX-001, p. 28, ¶ 53 and p. 60, ¶ 122].

### 1.   Challenged Senate Districts

56.     Plaintiffs allege that the "Black population in and around DeSoto County and the

Memphis suburbs, specifically in and around the area where enacted Senate District ("SD") 2

was drawn, is sufficiently numerous and compact to support an additional Black-majority Senate

district." [Dkt. #27], at ¶ 80. Plaintiffs also assert that the Legislature "approved a map that

carves up the large, cohesive Black communities in this region, diluting Black voting strength

and deploying irregular district lines that are inconsistent with traditional redistricting

principles." *Id.* SD 2 has a black voting-age population ("BVAP") of 39.6% in the Benchmark

Senate Plan and a BVAP of 32.88% in the Enacted Senate Plan. *See* [Dkt. # 199], at ¶ 72.

Additionally, Plaintiffs allege that "[r]ace was the predominant factor in the creation of SD[ ] 2."

[Dkt. #27], at ¶ 190.

57.     Plaintiffs allege that the "Black population in and around the Golden Triangle

area, specifically in and around the area where enacted Senate District 17 was drawn, is

sufficiently numerous and compact to support an additional Black-majority Senate district."
[Dkt. #27], at

¶ 88. Plaintiffs also assert "the 2022 maps carve up the large, cohesive Black communities in this

region, diluting Black voting strength and deploying irregular district lines that are inconsistent

with traditional redistricting principles." *Id.* SD 17 has a BVAP of 29.48% in the Enacted Senate

Plan. [2022 Full Report Senate Plan JR202].

58.      Plaintiffs allege that the "Black population in Central Mississippi, in and around

Jefferson Davis, Simpson, and Copiah counties and surrounding areas, specifically in and around

enacted Senate District 35, is sufficiently numerous and compact to support an additional Black-

majority Senate district." [Dkt. #27], at ¶ 94. Plaintiffs also assert "the 2022 maps carve up the

large, cohesive Black communities in this region, diluting Black voting strength." *Id.* SD 35 has

a BVAP of 39.38% in the Enacted Senate Plan. *Id.*

59.      Plaintiffs also allege that an "additional Black-majority Senate district also could

have been drawn in Hattiesburg within Forrest County, in and around the area of SDs 34, 44, and

45 under the 2022 maps, avoiding the dilution of Black voting strength while adhering to

traditional districting principles." [Dkt. #27], at ¶ 100. Plaintiffs assert the "Black population in

and around Hattiesburg is sufficiently numerous and compact to support an additional Black-

majority Senate district." *Id.* Additionally, Plaintiffs allege that "the 2022 maps carve up the

large, cohesive Black communities in this area, diluting Black voting strength." *Id.*

60.      Finally, Plaintiffs allege that "[r]ace was the predominant factor in the drawing of

State Senate District 48 ("SD 48")." [Dkt. #27], at ¶ 107. Plaintiffs also assert that "the State

cracked the City of Gulfport and its diverse population between SD 48 and neighboring Senate

District 49 ("SD 49")." *Id.* at ¶ 109. Plaintiffs allege that the "configuration of SDs 48 and 49

indicates that race improperly predominated the drawing of district lines in this area, with map drawers packing and cracking Black voters and/or voters from other racial minority groups to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles such as compactness." *Id.* at ¶ 112. SD 48 had a BVAP of 36.3% in the Benchmark Senate Plan and has a BVAP of 29.4% in the Enacted Senate Plan. *See* [Dkt. # 199], at ¶ 75.

### 2. Challenged House Districts

61.      Plaintiffs allege that the "Black population in and around Western Hinds and Madison counties near Clinton specifically in and around enacted House District 56, is sufficiently numerous and compact to support an additional Black-majority House district." [Dkt. # 27], at

¶ 114. Plaintiffs also assert that the Legislature "approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength." *Id.* HD 56 has a BVAP of 22.97% in the Enacted House Plan. [JTX-051].

62.      Plaintiffs allege that the "Black population in and around the area north of the Golden Triangle, specifically in and around enacted HD 22 and in, around, and between the Cities of West Point and Tupelo, is sufficiently numerous and compact to support an additional Black-majority House district." [Dkt. # 27], at ¶ 121. Plaintiffs also assert that the Legislature "approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength and deploying irregular district lines that are inconsistent with traditional redistricting principles." *Id.* Plaintiffs claim the "current configuration of HD 22 also indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters to advance particular electoral outcomes, in derogation of the U.S. Constitution." *Id.* at ¶ 132. HD 22 had a BVAP of 37.1% in the Benchmark House Plan and

now has a BVAP of 29.9% in the Enacted House Plan. *See* [Dkt. # 199], at ¶ 83.

63.     Plaintiffs allege that the "Black population in, around, and between the Cities of Meridian and Laurel, specifically in and around enacted House District 84 ("HD 84"), in and around Jasper and Clarke Counties, is sufficiently numerous and compact to support an additional Black-majority Senate district." [Dkt. # 27], at ¶ 133. Plaintiffs also assert that the Legislature "approved a map that carves up the large, cohesive Black communities in this region, diluting Black voting strength." *Id.* HD 84 has a BVAP of 37.28%.

64.     Plaintiffs allege that "[r]ace was also the predominant factor in the drawing of State House District 34 ("HD 34") in and around Grenada County." [Dkt. # 27], at ¶ 140. Plaintiffs also assert that the "current configuration of HD 34 indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles such as compactness." *Id.* at ¶ 146. HD 34 had a BVAP of 60.5% in the Benchmark House Plan and now has a BVAP of 31.6% in the Enacted House Plan. *See* [Dkt. # 199], at ¶ 85.

65.     Finally, Plaintiffs allege that "[r]ace was also the predominant factor in the drawing of State House District 64 ("HD 64") in and around Hinds and Madison counties." [Dkt. #27], at

¶ 147. Plaintiffs assert that the "current configuration of HD 64 indicates that race improperly predominated in the drawing of district lines in this area, with map drawers packing and cracking Black voters to advance electoral outcomes, in derogation of the U.S. Constitution and traditional districting principles such as compactness." *Id.* at ¶ 153. HD 64 had a BVAP of 37.9% in the Benchmark House Plan and now has a BVAP of 31% in the Enacted House Plan. *See* [Dkt. #

199], at ¶ 87.

### V.   Voting Rights Act Claims

#### 1.   Private Right of Action

66.     Congress did not create a private right of action to enforce § 2 of the Voting Rights Act. *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023), *reh'g den.*, --- F.4th ---- (8th Cir. Jan. 30, 2024); *contra Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023) (citing *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017)).  Indeed, the plain text of the Voting Rights Act shows that Congress grants the exclusive enforcement authority over the Act to the Attorney General of the United States.  52 U.S.C. § 10308(d).

67.     In 1982 Congress amended § 2 of the Voting Rights Act to reach by statute circumstances which did not violate the Fifteenth Amendment. Congress did not create a new remedy, leaving unchanged that exclusive authority to enforce § 2 granted to the Attorney General in § 12(d) of the Act. Because of the ambiguity of the non-constitutional reach of § 2, and because Congress has provided a comprehensive remedy, § 2 may not be enforced under 42 U.S.C. § 1983. *See generally Suter v. Artist M.*, 503 U.S. 347 (1992).

#### 2.   General Law

68.     Redistricting "'is primarily the duty and responsibility of the State[s],' not the federal courts." *Allen v. Milligan*, 599 U.S. 1, 29 (2023) (quoting *Abbott v. Perez*, 138 S.Ct. 2305, 2324 (2018)).

69.     "'Electoral districting is a most difficult subject for legislatures,' requiring a delicate balancing of competing considerations." *Bethune-Hill v. Virginia State Bd. of Elections*,

137 S.Ct. 788, 797 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995)).

70.    "Section 2 of the Voting Rights Act prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" *Anne Harding v. Cnty. Of Dallas, Texas*, 948 F.3d 302, 308 (5th Cir. 2020) (quoting 52 U.S.C. § 10301(a)).

71.    Thus, this case calls on the Court to determine whether the alleged vote dilution is "on account of race or color," 52 U.S.C. § 10301(a), or caused by some other factor.

72.    Plaintiffs seek to have this Court use Section 2 of the Voting Rights Act to order "more success in place of some." *Johnson v. De Grandy*, 512 U.S. 997, 1012-13 (1994). But if dilution is not happening or if it is not happening on account of race, then there can be no findings for Plaintiffs.

73.    "Unless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." *Cooper v. Harris*, 581 U.S. 285, 335, 137 S.Ct. 1455, 1490 (2017) (Alito, J., concurring in the judgment in part and dissenting in part) (quoting *Miller*, 515 U.S. at 916).

74.    This is because "partisan motives are not the same as racial motives." *Brnovich v. Democratic Nat'l Comm.*, 141 S.Ct. 2321, 2349 (2021). And federal courts are "not responsible for vindicating generalized partisan preferences." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2501 (2019).

75.    Such caution is "especially appropriate . . . where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in

which race and political affiliation are highly correlated." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (*Cromartie II*).

76.     Accordingly, Plaintiffs bear a "demanding" burden of proof on their challenge to the redistricting plan enacted in 2022. *See Cooper*, 581 U.S. at 319; *Cromartie II*, 532 U.S. at 241.

77.     For a Section 2 claim, (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) "the minority group must be able to show that it is politically cohesive," and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 51-52 (1986). "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines" violate § 2. *Abbott*, 138 S.Ct. at 2331.

78.     "The question which the court must answer in a section 2 case is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991) (citation omitted). The inquiry "depends upon a searching practical evaluation of the past and present reality" and on a "functional view of the political process." *Westwego*, 946 F.2d at 1120.

79.     "To establish a § 2 vote dilution claim, a plaintiff must show, 'based on the totality of circumstances, . . . that the political processes leading to nomination or election' are 'not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" 52 U.S.C. § 10301(b). "Section 2 does not however,

'establish[ ] a right to have members of a protected class elected in numbers equal to their proportion in the population.'" *Anne Harding*, 948 F.3d at 308 (quoting 52 U.S.C. § 10301(b)); *Milligan*, 599 U.S. at 14.

80.     Here, the challenged Mississippi State House and Senate plans contain 57 majority-black districts. [Dkt. # 199], at ¶¶ 69, 80. The Mississippi State House contains 42 majority-black districts and the Senate contains 15 majority-black districts.  [Dkt. # 199], at ¶¶ 69, 80.  Plaintiffs are therefore asserting, "not the chance for some electoral success in place of none, but the chance for more success in place of some." *Johnson*, 512 U.S. at 1012-13. Consequently, this case presents "closer calls" than many Section 2 cases. *Id.* at 1013.

81.     In addition to compliance with constitutional requirements, the redistricting standards applicable to the Mississippi Legislature as a matter of law are set forth in MISS. CODE ANN. § 5-3-01:

>     (a)     Every district shall be compact and composed of contiguous territory and the boundaries shall cross governmental or political boundaries the least number of times possible; and

>     (b)     Districts shall be structured, as far as possible and within constitutional standards, along county lines; if county lines are fractured, then election district lines shall be followed as nearly as possible.

82.     The separation of incumbents into separate districts is a redistricting standard which the Mississippi Legislature could and obviously did legally employ.  *Bush v. Vera*, 517 U.S. 952, 964 (1996).  The Enacted Plan contained only one Senate District in which two incumbents resided and only three such House Districts.  On the House floor, the House plan was amended to separate a pair of incumbents into separate districts.  As a matter of fact, then, a redistricting standard employed by the Legislature was the minimization of conflicts between incumbents.

83.     The Legislature also considered political performance in drawing the maps. [JTX-010, pp.14:25-15:6, 20:9-21:7]; [JTX-011, p. 12:6-11].

84.     In a case involving multimember districts, the Supreme Court held that, as one of three prerequisites to bringing a claim under § 2 of the Voting Rights Act, a "minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50 (footnote omitted).  The same prerequisite was established for single-member districts in *Growe v. Emison*, 507 U.S. 25 (1993). Neither case even suggested that expert evidence is required to establish this prerequisite, and experience has shown that no such specialized expertise is necessary to the drafting of a plan. This Court adopted its own plan for Congressional Districts in *Smith v. Clark*, 189 F. Supp. 2d 529 (S.D. Miss. 2002), *aff'd sub nom. Branch v. Smith*, 538 U.S. 254 (2003).  Ten years later, in the same case, this Court ordered the parties to provide it with redistricting software, so that it could devise its own plan.  No. 3:01-CV-855-HTW-DCB, (S.D. Miss. Dec. 6, 2011).

### 3.  *Gingles* Prong 1

85.     Plaintiffs must demonstrate that a "'minority group' [is] 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district[.]" *Cooper*, 581 U.S. at 301 (quoting *Gingles*, 478 U.S. at 50).

#### a.  Findings of Fact

86.     Plaintiff's expert, Mr. William Cooper, drew an "Illustrative Plan" creating four (4) new majority black Senate districts and three (3) new majority black House districts. [PTX-001].

87.     In developing his Illustrative Plans, Mr. Cooper started with the enacted maps. Tr. 102:23. Then, Mr. Cooper utilized Planning & Development District boundaries because they

"are a useful reference point for constructing electoral districts in the state." [PTX-001, p. 15, ¶ 27]; Tr. 104:6-22.

88.     Mr. Cooper "focused on planning districts with substantial Black populations that have experienced double-digit Black population growth since 2000 …, or, conversely, areas with stable Black populations where there has been a double-digit decline in the White population since 2000." [PTX-001, p. 19, ¶ 33]. These were areas that Mr. Cooper "felt it was likely . . . [to] develop additional majority Black districts." Tr. 160:4-8.

89.     Mr. Cooper focused on "planning and development districts as regional communities of interest…" [PTX-001, p. 21, ¶ 37]; Tr. 117:8-10.

90.     Planning & Development Districts ("PDDs") in Mississippi are private, non-profit Mississippi corporations and are not public civil divisions recognized by the U.S. Census Bureau when conducting the Census. [DX-016].

91.     PDDs contain disparate geographical areas, many of which lack common interests with other areas within the same PDD boundaries.

92.      Mississippi's Planning & Development Districts have never been utilized by the Mississippi Legislature nor any federal Court to carry out legislative redistricting.

93.     MISS. CODE ANN. § 5-3-101, which sets forth the guidelines and standards that the legislature must follow when developing redistricting plans, makes no mention of using PDD boundaries.

94.     Mr. Cooper did not consider political performance in developing his Illustrative Plans. Tr. 225:21-226:2.

95.     In fact, Mr. Cooper acknowledged that he did not have to consider, much less balance, the many competing interests the Legislature must consider in drawing his proposed new districts.  163:20-164:7.

96.     At trial, Mr. Cooper reviewed the legislative process for redistricting in the House. Tr. 168:20. On March 29, Chairman Beckett explained the process the Standing Joint Committee utilized in adopting the redistricting plans. The Chairman explained the factors the Committee considered when drafting the plans included One Person, One Vote, contiguity of the districts, political performance, and compliance with all state and federal laws—such as Section 2 of the Voting Rights Act, compactness, and minimalization of county and precinct splits. [JTX-010, pp. 8-14].

97.     The Chairman indicated that significant shifts in population throughout the state—a loss of approximately 65,000 people in the Delta, as well as losses in Southwest Mississippi and the Jackson/Hinds County areas—necessitated the collapse of two districts to be moved to the areas with the largest increases in population. [JTX-010, pp. 11-14].

98.     Likewise, the Court and Mr. Cooper reviewed the legislative process for redistricting in the Senate. Tr. 208:14. Similar to the House, on March 29, Vice Chairman Kirby explained the process the Standing Joint Committee utilized in adopting the redistricting plans to the Mississippi Senate. The Vice Chairman identified significant population shifts throughout the state, *viz.*, over 65,000 people in the Delta area either moved to another part of the state or left the state, Southwest Mississippi experienced population loss, and the city of Jackson and Hinds County area also experienced population loss. [JTX-011, pp. 3-4].

99.     Vice Chairman Kirby explained that the factors the Committee considered when drafting the plans included One Person, One Vote; contiguity of the districts; compliance with all

state and federal laws, such as Section 2 of the Voting Rights Act; compactness; minimalization of county and precinct splits; and political performance. [JTX-011, pp. 6-11].

100.    In developing his Illustrative Plans, Mr. Cooper built districts based on precincts. In doing so, he identified precincts that were over 30% BVAP in his software program, Maptitude, and used that data to draw his Illustrative Plans. [PTX-001, p. 7, ¶ 12]; Tr.109:6-22. Precincts that were "racially diverse" were denoted by "little dots" in the software. Tr. 109:10-22.  Notably, there was no ceiling for BVAP that was utilized. Accordingly, the dots did not distinguish between precincts at 30% and those with a BVAP of nearly 100%.

101.    Mr. Cooper claims that his Illustrative Senate Plan is "superior or equal to the 2022 Legislative Plans across almost every conceivable race-neutral quantitative measure of community of interest (as defined by splits) – including counties, municipalities, school districts, planning districts, and federally defined regional areas known as core-based statistical areas, which include metropolitan statistical areas ("MSAs") and micropolitan statistical areas ("MPSAs")." [PTX-001, p. 21, ¶ 37. He makes a similar claim as to the Illustrative House Plan. *Id.* at 71-74, ¶ 143-151.

102.    Under Mr. Cooper's Illustrative Plans, 19 of the 52 Senate districts (36.54%) are majority-black and 45 of the 122 House districts (36.89%) are majority-black. [PTX-001, p. 8]. These both exceed the percentage of BVAP in Mississippi (36.14%).  [PTX-001, p.10].

103.    The only geographical boundaries required by Mississippi law to be followed "as nearly as possible" are county, municipal and precinct lines. MISS. CODE ANN. § 5-3-101.

104.    Defendants offered the testimony of Dr. Thomas Brunell to address certain aspects of Mr. Cooper's testimony. Dr. Brunell analyzed how Mr. Cooper's Illustrative Plans fared when compared to the Enacted Maps in terms of applying traditional redistricting

principles. With regard to the traditional redistricting principle of compactness, Dr. Brunell opined that the differences between the compactness scores between and among the plans are small, and in five of the six instances there is no statistically significant difference between Mr. Coopers' plans and the Enacted Maps. [DX-003, pp. 12-14]. Based on this analysis, Dr. Brunell concluded that the difference between Mr. Cooper's maps and the Enacted Maps was marginal. *Id.*

105.    Even Mr. Cooper stated that his Illustrative Senate Plan performed only a "little better. Not a lot but a little." Tr. 112:10-11. As to the Illustrative House Plan "[t]here's very little difference. They're almost the same." Tr. 112:22-23.

106.    The following Table depicts a comparison of the splits of counties, VTDs and municipalities between the Illustrative and Enacted Maps. *See* [DX-003, p. 15].

| | Split Counties | Total County Splits | 2020 VTD Splits | Municipalities not Split | Total Municipal Splits |
|---|---|---|---|---|---|
| 2022 House | 67 | 179 | 255 | 216 | 225 |
| Cooper House | 67 | 167 | 228 | 218 | 221 |
| 2022 Senate | 43 | 58 | 41 | 244 | 128 |
| Cooper Senate | 34 | 52 | 38 | 253 | 110 |

107.    Considering relevant political subdivision splits, Dr. Brunell notes only modest differences between Mr. Cooper's plans and the Enacted Plans. Dr. Brunell noted that Mr. Cooper's Illustrative Plan for the House has the same number of split counties as the Enacted Plans and then modestly fewer split municipalities and precincts. [DX-003, p. 15]. Mr. Cooper's Illustrative Plan for the Senate splits fewer counties, but almost has the same number of total county splits. *Id.*

108.    As to incumbent pairings, Dr. Brunell noted that the Enacted Maps only have one (1) pairing in the Senate and three (3) in the House. [DX-003, p. 14].  Mr. Cooper's plans have more pairings, but Mr. Cooper claims he did not have complete address information for all incumbents when he drew them.  *Id.* Regardless, incumbency protection was obviously an important factor to the Legislature when drawing its plans as the House floor amendment demonstrates, and the Enacted Plans fare favorably when compared to Mr. Cooper's plans. [JTX-010, pp. 12:3-15, 20:19-24]; [JTX-011, p. 8:5-10].

109.    Mr. Cooper moved incumbents between districts into entirely new geography. Tr. 192:19-193:18; 197:15-198:10. *See* [JTX-009]; [PTX-001, pp. 28, 60].

110.    Although Mr. Cooper claims the Illustrative Plans are "superior or equal to" the Enacted Plans, a comparison of the relevant boundary splits reveals no material differences in the Illustrative Plans and the legislative plans. [PTX-001, p. 21, ¶ 37]; Tr. 114:8-24.

111.    Mr. Cooper draws a new Senate District 2 in DeSoto County with an any part black voting-age population ("APBVAP") of 50.91%. [PTX-001, p. 324]. He admits that the surrounding Senate districts to the south located in the Mississippi Delta region all lost population from 2010-2020 and were underpopulated in the Benchmark Plan. Tr. 173:13-18; Tr. 175:15-177:11. Accordingly, if these districts were to be maintained as black-majority districts, they had to migrate northward towards DeSoto County since DeSoto County had some of the highest population gains from 2010.  Tr. 177:12-22.

112.    Mr. Cooper draws an additional majority black Senate district in the Hattiesburg area, which he designates as SD 9.  He splits the Sheeplo and Sunrise precincts between SD 9 and 42 with a resulting BVAP in SD 9 of 50.95%. [PTX-001, p. 324].

113.    In drawing a new Senate District 17 in the Golden Triangle area, Mr. Cooper dismantles the existing Senate District 7. Mr. Cooper makes significant changes to the existing Senate District 7, reducing its BVAP from 40.08% to 17.83% and reducing adjacent existing SD 16 from 63.06% to 53.54%. [PTX-001, p. 324]; [JTX-049, p. 3].  In the 2023 statewide election, voters in SD 7 elected a white Democrat with 54.9% of the vote.  [DX-005, p. 8].  The newly redrawn SD 17 increases to 54.18% BVAP from 29.48% BVAP. [PTX-001, p. 324]; [JTX-049, p. 4].  In redrawing SD17, Mr. Cooper crosses PDD boundaries and he introduces yet another metric to consider – public school district athletic divisions.  Mr. Cooper is very knowledgeable with the geography of the Tupelo area. Tr. 203:23-204:2.

114.    Mr. Cooper redraws SD 35 to be a majority black Senate district in the Copiah, Simpson, Lincoln, Lawrence and Jefferson Davis County areas. Mr. Cooper splits precincts in redrawing SD 35 and splits Lincoln County, crossing the county boundary to go into the City of Brookhaven which he states has a "significant Black population." Mr. Cooper also crosses multiple PDD boundaries in redrawing SD 35.  SD 35 moves from a BVAP under the existing plan of 39.38% to a BVAP of 52.12% in the redrawn district. [PTX-001, p. 324]; [JTX-049, p. 4].

115.    Mr. Cooper redraws House District 22 in the Chickasaw and Monroe County areas, changing its BVAP from 29.86% to 55.41%.  [PTX-001, p. 716]; [JTX-051, p. 4]. Mr. Cooper also splits Aberdeen, and Houston in HD 22. [PTX-001, p. 897].

116.    Mr. Cooper redraws House District 84 in the Newton, Jasper and Clarke County areas, splitting the City of Quitman, which was whole in the 2022 House Plan.  HD 84 has a BVAP of 53.05% vs. 37.28% in the 2022 House Plan.   [PTX-001, p. 716]; [JTX-051, p. 6].

117.    Mr. Cooper redraws House District 56 in the Hinds, Madison County areas, splitting the City of Clinton. HD 56, at the time of redistricting in 2022, was the Speaker of the House's district.  Tr. 214:17-24.  As redrawn, HD 56 has a BVAP of 58.99% vs. 22.97% in the 2022 House Plan.  [PTX-001, p. 716]; [JTX-051, p. 6].

### b.   Conclusions of Law

118.    To meet the first *Gingles* precondition, Plaintiffs must show that the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Allen*, 599 U.S.at 18 (quoting *Wisc. Legis. v. Wisc. Elections Comm'n*, 595 U.S. 398, 402 (2022) (*per curiam*)).

119.    "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 433 (2006) ("*LULAC*") (quoting *Vera*, 517 U.S. at 997).

120.    The first precondition also asks whether the proposed district is geographically compact, meaning whether it is reasonably configured. *See Allen*, 599 U.S. at 18. "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Id.* (citing *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015)).

121.    The Supreme Court and Fifth Circuit both prohibit the separation of the first prong of liability under *Gingles* and the potential remedy. *See Abbott*, 138 S.Ct. at 2333; *Anne Harding*, 948 F.3d at 309-10.

122.    The fact that districts can be drawn with more than 50% BVAP is not dispositive of the first *Gingles* precondition. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality op.).

Plaintiffs must present evidence that the proposed districts comply with traditional redistricting principles in addition to having a BVAP of more than 50%. *Allen*, 599 U.S. at 30.

123.   "The Supreme Court held that '[c]ourts cannot find § 2 violations on the basis of *uncertainty*.'" *Anne Harding*, 948 F.3d at 310 (quoting *Abbott*, 138 S.Ct. at 2333) (emphasis in original).  "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *LULAC*, 548 U.S. at 433-34.

124.   Thus, Plaintiffs must prove that their proposed majority-minority district "is consistent with 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Robinson v. Ardoin*, 37 F.4th 208, 219 (5th Cir. 2022) (quoting *LULAC*, 548 U.S. at 433).

125.   And "[r]ace may predominate even when a reapportionment plan respects traditional principles, the Court explained, if '[r]ace was the criterion that, in the [mapdrawer's] view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill*, 580 U.S. at 189 (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)).

126.   Racial predominance occurs when (1) a mapdrawer "purposefully established a racial target," such as that "African-Americans should make up no less than a majority of the voting-age population," and (2) the racial target "had a direct and significant impact" on the district's "configuration." *Cooper*, 581 U.S. at 300.

127.   Further, a mapdrawer "may not 'assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *LULAC*, 548 U.S. at 433 (quoting *Miller*, 515 U.S. at 912).

128.     "To the extent possible, consistent with the constitutional and statutory requirements, federal redistricting courts attempt to preserve local political boundaries—city and county lines." *Smith v. Clark*, 189 F. Supp. 2d 529, (S.D. Miss. 2002), *aff'd sub nom. Branch v. Smith*, 538 U.S. 254 (2003) (citing *Balderas v. Texas*, No. 6:01-CV-158, at 7 (E.D. Tex. 2001) (unpublished)).

129.     *Allen* adheres to the precedent established in *Gingles*, but a majority of the Supreme Court did not agree on what that precedent requires. 599 U.S. at 8, 42.  In *Allen*, as in this case, there was no doubt that the illustrative plans devised by Mr. Cooper were designed to include a black majority.  Four Justices saw no problem with that.

130.     "For all those maps were created with an express target in mind -- they were created to show, as our cases require, that an additional majority-minority district could be drawn."  *Allen*, 599 U.S. at 33 (opinion of Roberts. C.J.).  Because Justice Kavanaugh did not join that portion of the opinion, it does not constitute part of the holding of the Court.

131.     In his separate opinion, Justice Kavanaugh explained the nature of the statutory violation which would justify the use of the majority-black districts drawn by Mr. Cooper. "*Gingles* requires the creation of a majority-minority district only when, among other things, (i) a State's redistricting map cracks or packs a large and 'geographically compact' minority population and (ii) a plaintiff's proposed alternative map and proposed majority-minority district are 'reasonably configured' ...." *Id.*, at 43, (Kavanaugh, J., concurring) (citing *Voinovich v. Quilter*, 507 U.S. 146, 153-54 (1993)).[6]  The two preconditions identified by Justice Kavanaugh go together:  A "proposed majority-minority district" that is "reasonably configured" may be put

_____

[6]*Voinovich* warned against "the manipulation of district lines" by "[d]ividing the minority group among various districts so that it is a majority in none." *Id.*, at 153.

into effect when "a large and 'geographically compact' minority population" has been cracked or packed.  Nor is this connection accidental.

132.    Later in the opinion, Justice Kavanaugh described "the effects test" as "requir[ing] in certain circumstances that courts account for the race of voters so as to prevent the cracking or packing -- whether intentional or not -- of large and geographically compact minority populations." 599 U.S. at 44.[7]  Courts may take race into account in crafting a remedy where a racial violation has been proven.[8]

133.    Justice Kavanaugh's refusal to approve a race-conscious remedy without a racial statutory violation is consistent with the Court's prior applications of § 2.  In *Miller v. Johnson*, the Court made clear that the ability to draw a majority-black district does not compel its adoption.  The Supreme Court expressly rejected the Justice Department's "policy of maximizing majority-black districts."  515 U.S. at 925.  The Court found that the Attorney General had told States "that wherever possible, you must draw majority black districts, wherever possible."  *Id.*, at 925 n.*.  In departing from the opinion of Chief Justice Roberts, Justice Kavanaugh carefully guarded against a potential understanding that § 2 would require the imposition of black-majority districts wherever Mr. Cooper could draw them.

134.    Considering the concurrence of Justice Kavanaugh as controlling authority, this Court would follow the same path trod by the Fifth Circuit after *Gingles* in *Clements*, 999 F.2d

---

[7]The Alabama Legislature had, in fact, cracked just such a geographically compact black area. Justice Kavanaugh joined the Court opinion in acknowledging the Black Belt, split by the Legislature, as a community of interest.  *Allen,* 599 U.S. at 21.

[8] In *Growe v. Emison*, the first Supreme Court case to apply *Gingles* to single-member districts, the Court said that the point of the "three *Gingles* prerequisites" is "to establish that the minority has the potential to elect a representative of its own choice in some single-member district."  507 U.S. at 40. Absent a reasonably configured black-majority district, "there neither has been a wrong nor can be a remedy."  *Id.*, at 41.

831.  Justice Brennan's opinion in *Gingles* did not command a majority of the Court in all respects.  The fifth vote was provided by Justice White, who disagreed with Justice Brennan and his colleagues on the nature of the voting behavior that would support a violation of § 2.  The Court read Justice White's concurrence together with the concurrence of four other Justices as preserving the prior distinction "between actionable vote dilution and 'political defeat at the polls.'"  999 F.2d at 850 (quoting *Whitcomb v. Chavis*, 403 U.S. 124 (1971)).

135.  Just as the Fifth Circuit relied on Justice White to conclude that "§ 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats," *Clements*, 999 F.2d at 854, this Court should rely on Justice Kavanaugh to conclude that no black-majority district can be imposed unless cracking or packing has been established.

136.  Plaintiffs do not attempt to argue that the Legislature packed too many blacks into a district.  Instead, they assert with no detail that black communities have been cracked, but they do not identify any "large and geographically compact minority populations," *Allen*, 599 U.S. at 44 (Kavanaugh, J., concurring), that have been cracked.  In *Kirksey v. Bd. of Sup'rs of Hinds Cnty., Miss.*, 554 F.2d 139 (5th Cir. 1977) (*en banc*), plaintiffs alleged and proved that the vast majority of blacks in Hinds County "reside in the central city area of Jackson in 48 contiguous census enumeration districts," which were divided among five districts so that none had a black voting age majority.  *Id.*, at 41.[9]  Here, plaintiffs have made no effort to describe a geographically concentrated black community with sufficient precision for the Court to conclude that cracking has taken place.

---

[9] Similarly, in *Robinson v. Commissioners Court*, 505 F.2d 674 (5th Cir. 1974), plaintiffs identified three enumeration districts, collectively having an 83% black population, which had been "diced into three parts, each in a different new precinct."  *Id.*, at 677-78.

137.   In redrawing Senate District 2 (SD 2), Mr. Cooper used a feature on his Maptitude software whereby dots indicated precincts that were 30% and over in BVAP.  Tr. 109:6-22. He used this feature in developing all of the districts in his Illustrative Plans. *Id.* Although he claims to have followed natural boundaries when redrawing SD 2, an examination of his redraw reveals otherwise.  [DX-003, Appx. 2]. Specifically, Highway 51 is a natural boundary going through DeSoto County and while he follows it for a portion of the eastern boundary of the district, he abruptly abandons it and draws the boundary around the Colonial Hills precinct, which happens to be a majority white populated precinct. Tr.187:6-191:10. SD 2 as redrawn is underpopulated at -4.27%, and the adjacent district, SD 1, is overpopulated by only .55%.  Including the Colonial Hills precinct in SD 1 would be an easy transfer and would improve the overall population deviation for both districts while adhering to natural boundaries.  *Id.*  However, since Colonial Hills contains a total voting-age population ("VAP") of 1,822 persons, 452 (24.8%) of whom are black, that would defeat Mr. Cooper's racial objective by reducing the BVAP in his redrawn SD 2 below 50%.  [JTX-049, p. 5].  Also, an examination of precincts on either side of the boundaries of the redrawn SD 2 in DeSoto County shows that most precincts with majority black population are included in SD 2 and those with majority white population are excluded. Dr. Brunell offered screenshots of the districts at issue redrawn by Mr. Cooper using the Maptitude software, which is the same software used by Mr. Cooper in redrawing the districts.  [DX-003, Appx. 2]. These screenshots show the actual precincts comprising the redrawn districts, which Mr. Cooper never provided in a map in any of his voluminous exhibits. *Id.* The precincts are color coded to reflect the degree of black and white voting age population for each precinct. The following Figure depicts the location of black and white citizens of voting age in SD 2. *See* [DX-

003, p. 48]. Areas shaded green or yellow have a BVAP of more than 50%. Anything dark blue

or purples is 30% BVAP or less.



138.    In redrawing Senate District 17 (SD 17), Mr. Cooper clearly includes

predominantly black populated precincts in and around the Tupelo area and south.  He splits the

City of Amory.  Tr.197:10-14. He also violates his own self-imposed recognition of geographic

regions by crossing the boundary between two PDDs (Three Rivers and Golden Triangle) to

achieve his racial objective. Tr.197:1-6.  He introduces yet another criterion—public school

athletic divisions—in an effort to provide a race neutral explanation for crossing PDD

boundaries. However, when asked why he did not consider private schools as well, he revealed

his motivation: he didn't think black children would be attending private schools, so he did not

look at them.  200:15-202:17. Further, Mr. Cooper dismantles the existing SD 7 that most

recently elected a white Democrat in 2023 for the sake of creating another majority-minority district for no other reason rather than race. Under the Enacted Plan, SD 7 complies with Section 2 of the Voting Rights Act because it elects the minority preferred candidate, a Democrat. Section 2 does not require the Court to dismantle an existing minority performing district solely to create another majority-minority district based on race alone.  The configuration of the redrawn SD 17 demonstrates that race was the predominant reason in dismantling the existing SD 7 to achieve a racial objective. The following Figure depicts the location of black and white citizens of voting age in SD 17. *See* [DX-003, p. 42].



139.    In the redrawn Senate District 9 (SD 9), the boundary lines of the district follow remarkably along racial lines with all of the precincts in the City of Hattiesburg and the

surrounding area consisting of larger concentrations of black population included within the district and excluding those with larger white population.  Precinct splits are also telling.  The Sheeplo and Sunrise precincts are split between SD 9 and SD 42 with no race-neutral explanation. Tr. 205:7-15.  The Sheeplo precinct is split with 925 VAP in SD 9 and 966 VAP in SD 42.  The Sunrise split consists of 703 VAP in SD 9 and 3,902 VAP in SD 42.  Given that the BVAP of redrawn SD 9 is 50.95%, making either of these precincts whole would likely alter the delicate BVAP percentage, precluding the racial objective utilized by Mr. Cooper. The following Figure depicts the location of black and white citizens of voting age in SD 9. *See* [DX-003, p. 46].



140.     In redrawing Senate District 35 (SD 35), Mr. Cooper once again transgresses his own self-imposed criteria and crosses multiple PDD boundaries to achieve his racial objective. In addition, he splits Lincoln County, which was whole in the Adopted Plan, and runs a finger down into Brookhaven which has, according to him, "significant Black population." Tr. 206:13-22.  This finger can hardly be considered reasonably compact and includes precincts with predominantly black population.  In running the finger into the City of Brookhaven, he splits the city between SD 35 and SD 39. Mr. Cooper's efforts in redrawing SD 35 belie traditional redistricting principles and indicate a predominant racial objective. Moreover, the legislative presentation by Vice-Chairman Kirby indicated that SD 36 was collapsed in Southwest Mississippi due to population loss, resulting in a redraw of Senate Districts 35 and 37 to accommodate this population loss.  [JTX-011, pp. 7-8].  The following Figure depicts the location of black and white citizens of voting age in SD 35, specifically related to the area within the finger drawn into the City of Brookhaven. *See* [DX-003, p. 44].



141.    There were legitimate, race-neutral explanations for the legislature's drawing HD

22 as it did.  As indicated in the floor presentation of the House Plan, there was population loss

in the area in and around HD 22, indicating a need to add population to comply with the one

person, one vote requirement. [JTX-010, p. 6].  Also, the incumbent, Rep. Jon Lancaster,

switched parties from Democrat to Republican.  [Dkt. # 199], at ¶ 90. Redrawing HD 22 to

achieve compliance with the constitutional requirement of one person, one vote and the political

objective of protecting an incumbent who had switched to the majority party are plausible race-

neutral reasons for drawing a district.  Moreover, when Mr. Cooper's Illustrative HD 22 is

examined, once again its boundaries are drawn predominantly along racial lines. Most majority-

black population precincts are included within the boundaries of the new HD 22 and

predominantly white population precincts are excluded. The following Figure depicts the

location of black and white citizens of voting age in HD 22. *See* [DX-003, p. 50].



142.     In redrawing HD 84, Mr. Cooper splits the City of Quitman, which was whole in

the 2022 House Plan.  Plaintiffs' witness, Terry Rogers, testified about the similarities of the

surrounding counties, yet Plaintiffs split his own hometown of Quitman and subordinated

traditional redistricting principles for racial reasons. Tr. 938:23-939:25. The following Figure

depicts the location of black and white citizens of voting age in HD 84. *See* [DX-003, p. 52].



143.    HD 56 was represented by then Speaker Philip Gunn.  Tr. 214:17-24.  Preserving the Speaker's district is certainly a legitimate political reason for redrawing HD 56 as it was drawn in the Enacted Plan.  When redrawn, Mr. Cooper splits the City of Clinton to achieve a racial objective.

144.    Mr. Cooper's Illustrative Plans fail to satisfy the first *Gingles* precondition for several reasons. First, Mr. Cooper set out to determine if he could draw additional majority-black districts in various geographic regions of the state.  He chose arbitrary boundaries of areas that are not public civil divisions for which Census data is reported and determined that those areas should be the focus of his inquiry.  He focused on regions with "substantial Black populations" and he identified precincts with 30% or more BVAP when redrawing districts. He considered high school athletic divisions, a redistricting criterion never considered by the Legislature nor

40

any Court in redistricting, to the exclusion of private school athletic divisions, on the assumption that black students would not be attending private schools. This approach demonstrates that race was the predominant factor that Mr. Cooper considered in redrawing the additional districts. This approach demonstrates that he targeted race in seeking to draw new districts, indicating that race had a direct and significant impact in redrawing the additional districts. *See Cooper*, 581 U.S. at 296-303.

145.    Second, in most of the districts that Mr. Cooper redraws for both the Senate and House, there is no plausible explanation other than race for the configuration of the districts. Despite creating regions for purposes of demographic analysis where he believed additional majority-black districts could be drawn, Mr. Cooper does not consistently use those regions in drawing districts in his Illustrative Plans.  For example, in redrawing both SD 17 and SD 35, Mr. Cooper crosses multiple PDD boundaries in an effort to achieve a racial objective.  This is in addition to unnecessarily splitting county, municipal and precinct boundaries in order to achieve a racial objective. Further, an examination of the precincts inside and outside the boundaries of each of the redrawn districts reveals the inclusion of predominantly black populated districts within the district boundaries and the exclusion of predominantly white populated precincts, indicative of packing of black voters.  The configuration of the precincts in the redrawn districts indicates race was the predominant factor in redrawing the districts.

146.    Third, with regard to applying traditional redistricting principles of compactness, incumbency and political subdivision splits, Mr. Cooper's Illustrative Plans fare no better than the Enacted Plans.  As Dr. Brunell concluded, the differences in compactness scores among the plans are marginal and there are only modest differences in political subdivision splits.  Given the variety of interests that legislative bodies must consider when adopting plans, these

differences in traditional redistricting principles are not significant enough to demonstrate that the Illustrative Plans are in any way "superior", as Mr. Cooper claims, to the Enacted Plans. This is especially true when we consider that Mr. Cooper had an advantage in developing his plans since he knew the compactness scores and number of political subdivision splits that he had to beat before he started drawing his plans.  All in all, the Court concludes that the Illustrative Plans fare no better than the Enacted Plans in applying traditional redistricting principles, providing further evidence that Mr. Cooper subordinated traditional redistricting principles to race.

147.    Fourth, Mr. Cooper applies the incorrect standard for determining the compactness requirement of the first precondition.  Tr. 183:9-185:25. Mr. Cooper is adamant that the compactness requirement refers to the compactness of the district as a whole and not the minority community within the district.  *Id.*  The U.S. Supreme Court has made this standard clear: compactness refers to compactness of the minority community within the district.  *See LULAC*, 548 U.S. at 402 ("Under § 2, . . ., the injury is vote dilution, so the compactness inquiry considers 'the compactness of the minority population, not . . . the compactness of the contested district.'") (quoting *Vera*, 517 U.S. at 997).  Mr. Cooper only computes compactness scores for his redrawn districts and not the minority communities within those districts, thus applying the wrong standard to determine whether the first precondition has been met.

148.    The first *Gingles* precondition is satisfied only "[w]here an election district could be drawn in which minority voters form a majority, but such a district is not drawn." *Strickland*, 556 U.S. at 18. As demonstrated, Mr. Cooper utilized race in drawing the Illustrative districts then found non-racial reasons for the lines and offers them as *post hoc* justifications. *See Cooper*, 581 U.S. 285; *Bethune-Hill*, 580 U.S. 178; *Shaw*, 517 U.S. at 910. We therefore conclude that

Plaintiffs have failed to satisfy the first *Gingles* precondition.

**4. Gingles 2 & 3**

149.    "Second, the minority group must be 'politically cohesive[ ]' . . . [a]nd third, a district's white majority must 'vote [ ] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper*, 581 U.S. at 301-02 (quoting *Gingles*, 478 U.S. at 50-51).

**a. Findings of Fact**

150.    Plaintiffs' counsel retained Dr. Lisa Handley to analyze "voting patterns by race" to lay "the foundation of two of the three elements of the 'results test' as outlines in *Thornburg v. Gingles*: a racial bloc voting analysis . . . to determine whether the minority group is politically cohesive; and . . . to determine if White voters are voting sufficiently as a bloc to usually defeat the candidates preferred by minority voters." [PTX-004, pp. 2-3].

151.    Plaintiffs offered Dr. Handley as their sole expert to address the second and third preconditions of *Gingles.* In conducting her analyses, Dr. Handley used several statistical methodologies.  Of the four employed, she considers the EI RxC methodology the most sophisticated and likely to be the most accurate in most instances. [PTX-004, pp. 3-4]; Tr.317:3-6.

152.    One of the advantages of EI RxC is that it allows one to report Confidence Intervals, or as Dr. Handley indicated, she has recently adopted the terminology of "Credible Intervals" to describe these.   Credible Intervals tell us that 95% of the simulations drawn in the EI RxC analysis produce means within the specified range. Credible Intervals give us an indication of the uncertainty of the Point Estimate. Tr. 320:21-321:11.

153.    Dr. Handley conducted the EI RxC analysis to assess whether there was racially polarized voting in the selected areas of interest. [PTX-004, p. 2].

154.    Dr. Handley analyzed a set of nineteen (19) state legislative contests in legislative

districts under the 2012 district boundaries that were located within the selected areas of interest.

[PTX-004, p. 12]. Dr. Handley did not run an EI analysis for each of the Adopted districts at

issue. *Id.*  Rather, she performed what she calls an "Effectiveness Analysis." *Id*; Tr. 322:19-22.

155.    Dr. Handley categorizes these state legislative contests as endogenous elections.

[PTX-004, p. 9].  Endogenous elections are those for the specific offices at issue as opposed to

exogenous elections, or those for offices not at issue.  *Id.*  Endogenous elections are considered

more probative than exogenous elections. *Id.* However, Dr. Alford described these elections as

"semi-endogenous." Tr. 1447:17-21. These are the correct office but not the districts Plaintiffs

challenged. Tr. 1448:11-13.

156.    Election returns for all precincts were available from the Secretary of State as of

November 20, 2023. Tr. 1203:1-4. Neither Dr. Handley, whose supplemental report was filed on

December 22, 2023, nor any of Plaintiffs' other experts ever examined those returns. Tr. 284:13-

18; Tr. 579:3-5; 1065:8-10.

157.    Dr. Handley defines racially polarized voting as follows: "voting is polarized if

Black and white voters are voting differently" such that "if you consider[] them separately" "they

elect[] different candidates.  Tr. 265: 19-266:2. She defines political cohesion as "a substantial

number of minority voters consistently vote for the same candidates, but she resists adopting a

numerical threshold instead preferring to determine whether voters are less cohesive or more

cohesive.  Tr. 267:8-19.  With regard to determining cohesion, Dr. Handley only examines

cohesion among black voters and not white voters. Tr. 315:20-23.

158.    Dr. Handley testified that she found racially polarized voting in all nineteen (19)

of the "endogenous" elections she analyzed.  [PTX-004, p. 12]. This was in spite of seven (7) of

those elections showing results within Credible Intervals which call into question the reliability of the Point Estimate which she asserts indicates the existence of racially polarized voting. She testified that her Point Estimates in these seven (7) elections were her "best guess estimate".  Tr. 329:10-12; Tr. 331:13-15.

159.    Dr. Handley admitted that in the nineteen (19) "endogenous" elections she analyzed, the black Candidate of Choice won in eight (8) of those, or 42% of the time. Tr. 336:7-13.

160.    Dr. Handley analyzed eight (8) Democratic primary elections using statewide election results, but she did not believe they were particularly probative in her *Gingles* analysis. *Id.* at 10.

161.    Dr. Handley analyzed three (3) judicial elections involving candidates for the Mississippi Supreme Court "specifically with the idea that this is a way to rebut the argument that party is the driver." *Id.* at 13. She found racially polarized voting in two of these elections.  She believed these races were non-partisan because her "definition of whether a contest is partisan [is] whether the contest includes the party of the candidates next to the name."

162.    Dr. Handley examined eleven (11) statewide races conducted from 2011 to 2020 to predict voter behavior in the redrawn legislative districts in the Illustrative Plans prepared by Mr. Cooper. The minority-preferred candidate of choice in each of those eleven (11) contests was always the Democrat. *Id.* at 1.  In her experience as a political scientist, black voters usually support the Democrat and it was certainly true for the eleven (11) contests she analyzed.  Based on this analysis, Dr. Handley computed an "Effectiveness Score" for each of the redrawn districts to predict whether the minority-preferred candidate of choice could be elected in those districts.

163.    A black Republican has been elected to the House from a majority- white district. Tr. 776:10-11.  The other black members of the House and Senate have been elected from majority-black districts. Tr. 776:11-17.  A white Democrat preferred by black voters has been regularly elected in SD 7 since 1984.   [Dkt. # 199], at ¶ 109.  A white Democrat preferred by black voters has been regularly elected in SD 29.  [Dkt. #199], at ¶ 105; [DX-024, p. 1]. A white Democrat preferred by black voters was elected in HD 64 in 2019. [Dkt. # 199], at ¶ 118.[10]

164.    Neither Dr. Handley nor any other witness attempted to establish any correlation between voter behavior in statewide elections and voter behavior in legislative elections. In SD 2, which has a 33% BVAP and, according to Dr. Handley, a 33% effectiveness score, Pamela Hamner, a black Democrat (and a plaintiff in this suit), obtained 43% of the vote. [PTX-004, p. 16]; Tr. 708:5.  Furthermore, in SD 7, which has a 40.08% BVAP and, according to Dr. Handley, a 43.9% effectiveness score, Hob Bryan, a white Democrat, obtained more than 54.89% of the vote.  Tr. 347:23-348:25. Dr. Handley's models simply are not reliable in predicting the results of actual Mississippi local elections.  Moreover, Dr. King testified that historically Southern whites would vote Republican at the top of the ticket but Democrat down ballot. Tr. 855:11-15. Given these substantial differences, Plaintiffs have not carried the burden of establishing that voter behavior in statewide elections can be used to predict the usual voter behavior in legislative elections.

165.    Defendants offered Dr. John R. Alford as an expert to address the second and third preconditions of *Gingles,* as well as Senate Factor 2.  Dr. Alford is a tenured full professor

---

[10] Representative Shanda Yates switched from the Democratic Party to Independent on January 13, 2022. [Dkt. # 199], at ¶ 118.

of Political Science at Rice University who has testified in many redistricting cases in numerous states across the country. [DX-001, p. 2]; Tr. 1413:12-19.

166.    Dr. Alford used the same data and methodology to analyze the data that Dr. Handley employed.   The methodology is known as an EI RxC analysis. [DX-001, p. 3]; Tr. 1417:19-1418:13.

167.    Dr. Alford described an EI RxC analysis as useful for the following reasons: first, the estimates are "bounded by reality, that none of the estimates can be something that couldn't physically be true in terms of the actual election results at the precinct level and at the aggregate level." Tr. 1425:12-16. Second, an EI RxC analysis is "a nonlinear estimate, it's not throwing away information . . . or assuming something that we know probably isn't true." Tr. 1425:17-19. Dr. Alford gave the example that a linearity assumption would show the likelihood of a black person voting for a black candidate would be the same if they lived in a 99% white precinct as it would if they lived in a 99% black precinct. But that is "simply politically not a very realistic assumption to make." Tr. 1425:19-1426:1. So the EI RxC analysis relaxes that assumption. Tr. 1426:1. Next, Dr. Alford explained that the EI RxC analysis considers turnout at the precinct level. Tr. 1426:2-7. Finally, the EI RxC analysis "produces credible intervals that are sort of the rough equivalence of confidence intervals that are methodologically defensible and probably closer to being accurate than any of the other methodologies." Tr. 1426:8-12.

168.    Dr. Alford described credible intervals as the "philosophical equivalent of confidence interval." Tr. 1426:20-21. A confidence interval tells the reader "the range in which something is most likely to occur." Tr. 1428:20-21. Dr. Alford qualified the use of the term "confidence intervals" in Dr. Handley's analysis. Tr. 1449:25-1450:5. In reality, the "confidence intervals" are "95% credible intervals. That means that the pattern of results in the simulations

that drive EI RxC estimation, the mean share of the vote for a candidate is 45.5, but the 95% credible interval ranges from 38.9 to 54.5.[11]

169.    Dr. Alford examined the EI RxC results that Dr. Handley performed for seventeen (17) statewide contests analyzed within her geographically defined areas of interest.  Included in these contests were three (3) presidential elections, 2012, 2016 and 2020.  In analyzing the estimated voting behavior of blacks and whites in those contests, Dr. Alford concludes that black and white voters appear to offer very different levels of support to Democratic and Republican candidates, but there is virtually no difference in the levels of support when we focus on the mix between black and white candidates in those contests. What differences do exist do not fall in the order we would expect if race of the candidate was driving the voter behavior. [DX-001, p. 7].

170.    First, Dr. Alford explained his analysis of Dr. Handley's general election analysis. Tr. 1429:1-11. The following table was utilized to demonstrate the "impact on black cohesion for candidates and white opposition to candidates for the race of the candidates" in the areas analyzed by Dr. Handley. Tr. 1430:3-8.

**Table 2:  Presidential Election Results Report –
Averages of EI RxC Estimates across Handley's Seven Areas of Interest**

| Date | Contest | Candidate Name | Party | Race | % Black Support | % White Support |
|------|---------|----------------|-------|------|-----------------|-----------------|
| Nov. 2012 | President | Obama/Biden | D | B/W | 97.0 | 6.7 |
|  |  | Romney/Ryan | R | W/W | 2.4 | 92.8 |
| Nov. 2016 | President | Clinton/Kaine | D | W/W | 96.8 | 5.5 |
|  |  | Trump/Pence | R | W/W | 2.3 | 93.6 |
| Nov. 2020 | President | Biden/Harris | D | W/B | 96.6 | 7.4 |
|  |  | Trump/Pence | R | W/W | 2.6 | 92.0 |

_____

[11] Drs. Brunell, Orey and Ragusa confirmed the 95% confidence level is the lowest level of statistical significance utilized to determine the reliability of estimates. *See* Tr. 1261:5-14; Tr. 606:20-609:3 Tr. 1000:11-20.

171.    Dr. Alford prepared this table from Dr. Handley's report. Tr. 1429:4-10. As to the 2012 election, this table demonstrates the overlapping of race and party in the challenged areas. Dr. Alford described it as "perfectly correlated." Tr. 1431:6-9. Dr. Alford testified that the 2016 election portrays "completely stable" voting patterns between black and white voters. Tr. 1432:9-11. Once more, the 2020 election results present "basically the same" as the prior two elections. Tr. 1432:20.

172.    Accordingly, this table demonstrates that "black voters in every one of those cases are voting very cohesively at nearly identical levels for the Democrat candidate. [And] white voters very cohesively and identical levels for the white candidate." Tr. 1432:24-1433:3. When asked if race was the focus of the black vote, Dr. Alford testified that "we would expect to see black support being more cohesive for Obama than for Clinton or Biden." Tr. 1433:7-8. Accordingly, "we would expect to see that the white opposition to Obama would produce more cohesive vote among white voters than a situation where both of the presidential candidates are white." Tr. 1433:10-14. So, "it is not the case that blacks vote overwhelmingly or cohesive simply for a black candidate rather than a white candidate. And it's not the case that whites support either for the candidate or opposition to a candidate is conditioned here by race. So [ ] the party explanation is supported by the entire table, and the race explanation simply isn't." Tr. 1433:25-1434:6. Dr. Alford makes this conclusion based on the variation of the race of the candidate. Tr. 1434:15-16.

173.    After examining all of the seventeen (17) statewide general election contests used by Dr. Handley, Dr. Alford opines that the data demonstrate that black voters tend to provide cohesive support to Democratic candidates, almost always in the 90% range, and white voters support Republican candidates typically in the 80-90% range.  Dr. Alford opines that this indeed

represents partisan polarized voting with black voters providing highly cohesive support to every Democratic candidate and white voters providing clearly cohesive support to every Republican candidate. [DX-001, pp. 7-8]; Tr. 1438:23-1439:4.

174.    Another way of summarizing polarization according to Dr. Alford is to compute the difference between black and white voter preferences.  In Dr. Handley's analysis, this gap is very large at 87.6 in the eleven (11) contests with black Democratic candidates but is equally large at 86.3 in the five (5) contests with white Democratic candidates. Tr. 1440:16-1441:2. The difference in voting support among black and white voters in a contest between two white candidates is highly polarized at a mean difference of 86.5% based solely on the party affiliation of the candidates.  When an election is racially contested the difference in voting support among black and white voters in a contest between the white Republican and the black Democrat candidate is a nearly identical 86.3%.  Removing the racial cue only reduces the mean difference by one percentage point.  Whether a candidate is a Democrat, or a Republican makes a huge, almost 90 percentage point difference to black and white voters in these elections.  Whether a candidate is black or white barely registers at only slightly above a single percentage point, and even that small difference depends, as Dr. Handley notes, on a single contest. [DX-001, p. 10]; Tr. 1442:5-11.

175.    Dr. Alford examined Dr. Handley's analysis of the nineteen (19) endogenous elections, consisting of state legislative contests from 2015 and 2019.  In these contests, she only used racially contested elections, thus preventing the comparison of white and black candidate support that was analyzed in the statewide general elections. Tr. 1445:15-18. While Dr. Handley concludes that all 19 of those elections demonstrated racially polarized voting, her unwillingness to define what she believes constitutes political cohesion casts doubts on her conclusions. Tr.

294:12-16. She seems to define political cohesion on a sliding scale if there is either more cohesion or less cohesion. Tr. 1455:1-16.  This presents a challenge when trying to determine with any degree of scientific certainty whether an approximate 50% division in either the white vote or black vote in a particular election represents racially polarized voting.  Given these divisions in several of her cited contests, Dr. Alford opines that we cannot conclude that the third precondition of *Gingles* is met, i.e., whether white voters are voting as a block to usually defeat the minority preferred candidate. [DX-001, p. 11].

176.     While Dr. Handley admits that her analysis of the statewide Democratic primary contests is not probative, Dr. Alford analyzes her results and concludes that they also show the same pattern as the general election contests, *viz.*, while they show a high degree of partisan polarization, they do not indicate that the race of the candidates makes much difference at all. [DX-001, pp. 14-15].

177.     Dr. Alford considered Dr. Handley's analysis of the three judicial contests, all of which were racially contested.  Tr. 1477:6. In one of the three contests, there was no polarization as black and white voters favored the same candidate.  As to the other two, Dr. Alford points out that while they purport to be non-partisan, they are anything but that in reality. Tr. 1477:6-7. Dr. Alford points to several facts pertaining to the candidates as demonstrating the partisan nature of those races.  Dr. Alford concludes that the voting patterns in those two elections match those seen in statewide general elections with black voters favoring the Democrat and white voters favoring the Republican. [DX-001, p. 15]; Tr.1477:3-5.

178.     Dr. Alford opines that based on his analysis of Dr. Handley's results, the high cohesion demonstrated by black voters in the elections analyzed is not a function of black voters coalescing around black candidates but rather is a function of cohesive black voter preferences

for Democratic Party candidates.  Similarly, the tendency of white voters to vote cohesively against Democratic candidates is not reserved for opposition to black Democratic candidates but is instead cohesive support for Republican Party candidates whether the candidate for either party is white or black.  [DX-001, p. 17]; Tr. 1443:23-1444:12.

### b.  Conclusions of Law

179.    Plaintiffs do not establish the second and third preconditions, which require proof that the relevant minority group "is politically cohesive" and that, in the absence of a § 2 remedy, a white voting bloc will usually "defeat the minority's preferred candidate." *Allen*, 599 U.S. at 18. "The second and third *Gingles* preconditions are often analyzed together." *Christian Ministerial All. v. Sanders*, No. 4:19-CV-0042-JM, 2023 WL 4745352, at *16 (E.D. Ark. July 25, 2023); *see also Alpha Phi Alpha Fraternity Inc. v. Raffensperger,* 587 F. Supp. 3d 122 (N. D. Ga. 2022); *Lopez v. Abbott,* 339 F. Supp. 3d 589 (S.D. Tex. 2018); *Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1293 (M.D. Ala. 2020). Plaintiffs fail to prove both for several reasons.

180.    Dr. Handley's own analysis of the endogenous elections, which she considers to be the most probative regarding assessment of racially polarized voting, is insufficient to satisfy the second and third preconditions of *Gingles.* With regard to the second precondition, racially polarized voting, of the nineteen (19) endogenous elections she analyzed, when the Credible Intervals are applied to the Point Estimates of the EI RxC analysis, only 12 of the 19 indicate racially polarized voting.  [PTX-004, pp. 58-60].  And, of those 12, the black candidate of choice loses 7 times, meaning that in the 19 races she analyzed, the black candidate of choice is defeated approximately 37% of the time.  [PTX-004, pp. 58-60].

181.    Given these results, Dr. Handley's EI RxC analysis is statistically insignificant to support the existence of racially polarized voting in the selected areas of interest. The Court cannot conclude that prongs 2 and 3 of *Gingles* are met based on Dr. Handley's "best guess". The Court requires proof of statistically significant racially polarized voting, and that is missing in this Record.

182.    Further, to satisfy the third *Gingles* precondition, Plaintiffs must show that white voters are voting as a block to usually defeat the minority preferred candidate in the selected contests.  The winning percentages of the black candidates of choice in the nineteen (19) endogenous elections analyzed are insufficient to support the third precondition and therefore Plaintiffs have failed to satisfy that precondition as well.

183.    If "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens, then there is no "legally significant" racially polarized voting under the third *Gingles* precondition. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). This is so because "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.'" *Clements*, 999 F.2d at 854 (quoting *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992)). Section 2 "is implicated only when Democrats lose because they are black, not where blacks lose because they are Democrats." *Id.* As the Fifth Circuit explained in *Clements*, a majority of Justices in *Gingles* held § 2 liability does not lie where different candidate preferences reflect "interest-group politics." *See id.* at 855-59. In this case, as in *Clements*, the evidence "shows that divergent voting patterns among white and minority voters are best explained by partisan affiliation." *Id.* at 861.

184.    Plaintiffs have not carried the burden of proving that white voters will usually defeat black-preferred candidates in the seven challenged districts.

185.    Because § 2(b) guarantees an equal "opportunity . . . to elect representatives of their choice," the relevant consideration in an action brought by black voters is not the race of the candidate, but the choice of black voters. Plaintiffs have not demonstrated the choice of black voters in any of the legislative elections conducted in 2023.

186.    We conclude that Dr. Alford's testimony regarding his analysis of Dr. Handley's data and results is persuasive to explain that voter behavior in those elections is driven by party and not race.  Dr. Alford reaches his conclusions based on analyzing the same empirical data and methodology used by Dr. Handley. Dr. Alford's conclusions persuade the Court that there is no "legally significant" racially polarized voting under the *Gingles* preconditions. *See Clements*, 999 F.2d at 850.[12]  Accordingly, Plaintiffs have not established the second and third prongs of *Gingles*.

### 5.  Totality of the Circumstances

#### a.  General Law

187.    "[T]he totality of the circumstances inquiry recognizes that application of the *Gingles* factors is 'peculiarly dependent upon the facts of each case." *Allen*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79).

188.    "[T]he Court may not view the totality of the circumstances 'less critically'

---

[12] Some district courts within and outside of the Fifth Circuit have held that the party polarization inquiry is not relevant to prong 3 of *Gingles*, but definitely is relevant to the analysis of Senate Factor 2, which considers the extent of racially polarized voting in the jurisdiction. The Fifth Circuit has considered the party polarization inquiry as relevant to prong 3, i.e., is there "*legally sufficient*" racial bloc voting, as well as for Senate Factor 2. Accordingly, we analyze the evidence of party polarization with regard to both prong 3 and Senate Factor 2, *infra*.

because the *Gingles* precondition have been met." *Fairley v. Hattiesburg, Miss.*, 122 F. Supp. 3d 553, 567 (S.D. Miss. 2015), *aff'd sub nom* 662 F. App'x 291 (5th Cir. 2016) (quoting *NAACP v. Fordice*, 252 F.3d 361, 373-74 (5th Cir. 2001)).

189.   If the *Gingles* preconditions are met, the totality of the circumstances must be considered "to determine whether members of a racial group have less opportunity than do other members of the electorate." *LULAC*, 548 U.S. at 425-26. As recited by the Senate Report on the 1982 amendments to the Voting Rights Act, the following so-called "Senate Factors," among others, may be used in assessed the totality of the circumstances:

1)   the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2)   the extent to which voting in the elections of the state or political subdivision is racially polarized;

3)   the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4)   if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5)   the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6)   whether political campaigns have been characterized by overt or subtle racial appeals;

7)   the extent to which members of the minority group have been elected to public office in the jurisdiction.

8)   whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

9)   whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

190.   Finally, in reviewing the totality of the circumstances, not every factor is relevant in every case and not all of the factors must be proved, nor is the Court required to find that a majority of the factors point one way or the other. *See Gingles*, 478 U.S. at 45. However, "the existence of racially polarized voting and the extent to which minorities are elected to public office remain the two most important factors considered in the totality-of-circumstances inquiry." *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996) (citing *Gingles*, 478 U.S. at 48 n.15).

191.   Section 2 violations require "an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality." *Allen*, 599 U.S. at 19. There is "no requirement that any particular number of factors be proved, or that a majority of them point one way or another." S. Rep. at 29. As already demonstrated, Justice Kavanaugh's controlling opinion in *Allen* requires Plaintiffs to prove cracking. Whether that is considered as a prerequisite to the use of black-majority maps under the first prong of *Gingles* or as part of the totality of circumstances analysis, Plaintiffs have failed to carry the burden of proving cracking.

### b. Drs. Luckett and King

192.    Plaintiffs have failed to prove by a preponderance of the evidence that the level of black participation in politics in any challenged district is depressed.  Therefore, evidence of disproportionate educational, employment, income level, and living conditions between blacks and whites intended to prove the reason for that depressed participation is inadmissible for lack of foundation.

193.    Plaintiffs have failed to demonstrate by a preponderance of the evidence that their proffered expert Marvin King has specialized knowledge of history or political science that will help this Court to understand the evidence or to determine a fact in issue.

194.    Plaintiffs' proffered expert Marvin King declares that "the conclusions within this report" are drawn from his "years of teaching, writing, and research."  He testified that he did no original research but relied on his footnoted sources. Tr. 803:2-6. He did no quantitative analysis, but said, "you explore something that's happened, and then you apply theories to it." Tr. 801:9-10. Plaintiffs failed to establish by a preponderance of the evidence that it is more likely than not that his opinions are the product of reliable principles and methods or that he has reliably applied any principles and methods to the facts of this case.

195.    Plaintiffs have failed to demonstrate by a preponderance of the evidence that their proffered expert Robert Luckett has specialized knowledge of history that will help this Court to understand the evidence or to determine a fact in issue.

196.    The report of Plaintiffs' proffered expert Robert Luckett contains no explanation of any principles and methods upon which his opinions are based. He testified that he did no original research, but merely relied on the sources cited in his report. Tr. 433:11-16, his experience of reviewing the work of other historians to identify a consensus among historians

and other scholars. Plaintiffs have failed to establish by a preponderance of the evidence that it is more likely than not that his opinions are the product of reliable principles and methods or that he has reliably applied any principles and methods to the facts of this case.

197.   One Court of Appeals has admitted testimony of an expert historian, notwithstanding the fact that "[t]he appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events." *United States v. Kantengwa*, 781 F.3d 545, 561 (1st Cir. 2015) (approving expert testimony) (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (excluding expert testimony). The Court approved "expert testimony assessing a particular historical detail (not others' states of mind) in light of the consistency of that detail in testimonial accounts and other corroborative sources about an otherwise contentious historical event, and in light of the narrative consistency of that particular historical detail with other political events in the historical record." *Kantengwa*, 781 F.3d at 562-64. The Court noted that such evidence "may be especially helpful 'in cases involving complicated or unfamiliar historical issues.'" *Id.* at 562. Applying those principles, the Court admitted an expert opinion "about the existence and timing of the Hotel Ihuriro roadblock" during the Rwandan genocide, "largely based on conversations with people he knew in Butare, twenty to twenty-five formal interviews (not all relevant), and the work of collaborators." *Id.* at 561. Here, by contrast, neither Dr. Luckett nor Dr. King conducted any interviews of black Mississippians nor considered any original research, relying entirely on hearsay sources in academic journals. Moreover, this Court is entirely familiar with the historical issues, many of which have been litigated frequently in this Court.

198.   Neither Dr. King nor Dr. Luckett has established that it is more likely than not that their testimony is the product of reliable principles and methods or that they have reliably

applied any principles and methods to the facts of this case. According to the advisory committee note to the 2023 amendments to Fed. R. Evid. 702, that failure precludes admissibility and does not simply affect the weight to be given to the reliance.

199.    The Supreme Court in *Shelby County v. Holder*, 570 U.S. 529 (2013), held that factual circumstances prevailing in 1965 were constitutionally insufficient to support the continued application of § 4 of the Voting Rights Act to formerly covered States and political subdivisions. The Court of Appeals for the Fifth Circuit in *Harness v. Watson*, 47 F.4th 296 (5th Cir. 2022) (*en banc*), *cert. denied*, 143 S.Ct. 2426 (2023), held that the circumstances surrounding the adoption of Mississippi's Constitution of 1890 did not necessarily invalidate voting qualifications currently applied. With that guidance in mind, this Court finds that no historical, political, or socioeconomic evidence older than 1965 is relevant to the central issue: whether the challenged legislative district lines result in rendering the political processes leading to nomination or election to the Legislature not equally open to participation by members of a class of citizens protected by § 2(a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

### c.   Senate Factor 1

#### (a) Findings of Fact

200.    Senate Factor 1 concerns the "extent of any history of official discrimination in state . . . that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

201.    Following adoption of redistricting plans for both the Senate and House after both

the 2000 and the 2010 cycles, the United States Department of Justice precleared all plans with no objections. *See* [DX-006]; [DX-007].

202.    Plaintiffs' expert, Dr. Orey, championed Mississippi as a success story of the Voting Rights Act. Tr. 623:19-20.

203.    Further, Mr. Kyle Kirkpatrick, Assistant Secretary of State for Elections, testified that Mississippi's voting laws are in accordance with the Constitution. Tr. 1199:25-1200:23; Tr. 1198:11-22.

## **(b) Conclusions of Law**

204.    The most relevant question is whether there is "recent evidence of discrimination." *Lopez v. Abbott*, 339 F. Supp. 3d 589, 611 (S.D. Tex. 2018). Plaintiffs failed to present any meaningful *recent* evidence of official discrimination.

205.    "That Mississippi has a long and dubious history of discriminating against blacks is indisputable." *Teague v. Attala Cnty.*, 92 F.3d 283, 293-94 (5th Cir. 1996). However, "these discriminatory practices ceased long ago. . . ." *Fairley*, 122 F. Supp. 3d at 567 (quoting *Fairley v. Hattiesburg, Miss.*, No.2:06-CV-167-KS, 2008 WL 3287200, *9 (S.D. Miss. Aug. 7, 2008), *aff'd* 584 F.3d 660 (5th Cir. 2009)).

206.    "Absent an indication that these facts 'actually hamper the ability of minorities to participate,' they are, however, insufficient to support a finding that minorities suffer from unequal access to Mississippi's political process." *Fordice*, 252 F.3d at 368 (quoting *Clements*, 999 F.2d at 866).  Plaintiffs did not identify a single black voter whose opportunity to participate in the political process was hampered in any way by any of the historical practices Plaintiffs' witnesses identified. Instead, the Plaintiffs and their other fact witnesses all testified that they are registered to vote and vote regularly.  Tr. 648:20-649:4; Tr. 666:2-9; Tr. 685:19-686:9; Tr.

707:8-18; Tr. 877:3-18; Tr. 894:2-5; Tr. 921:14-22; Tr. 930:24-931:11; Tr. 934:22-935:2.

207.    As previously discussed, the Senate and House Plans from 2002 and 2012, which form the basis of the 2022 Enacted Plans, were all precleared by the Department of Justice. [DX-006]; [DX-007].[13]

208.    The Fifth Circuit has held that "contemporary examples of discrimination are more probative than historical examples" and that "long-ago evidence of discrimination has less force than more contemporary evidence." *Veasey*, 830 F.3d at 257-258.

209.    The Fifth Circuit has held that, to be relevant, evidence must "properly link the effects of past and current discrimination with the racially disparate effects of the challenged law." *Veasey*, 830 F.3d at 246. Plaintiffs have neither proven the racially disparate effects of the lines of the seven challenged districts, nor have they linked the effects of those lines to the historical evidence they offer.

210.    Furthermore, "'our country has changed' in its treatment of minorities." *Fusilier*, 963 F.3d at 459 n.9 (quoting *Shelby County*, 570 U.S. at 557).

211.    The Plaintiffs have the burden of proof. We are not convinced that they have met that burden for Senate Factor 1. Accordingly, Senate Factor 1 weighs in favor of the Defendants.

### d.  Senate Factor 2

### (a) Findings of Fact

212.    Senate Factor 2 concerns the extent to which voting in the elections of the state or

---

[13] Dr. King acknowledged that, in redistricting, "each map is drawn based off of the previous map that came before it." Tr. 819:19-20.  He asserted that, by doing so, "you're simply embedding the problems from – or the issues from prior districts into the next districts." Tr. 819:23-25.  However, he identified no such problems or issues. In fact, the maps drawn after the 2000 and 2010 Censuses were approved by the Department of Justice. [DX-006]; [DX-007].

political subdivision is racially polarized. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07). The Findings of Fact pertaining to prongs two and three of *Gingles* set forth in ¶¶ 127-156, *supra*, are relevant to an analysis of the extent of racially polarized voting and are considered by the Court in connection with an assessment of Senate Factor 2.

213.    Defendants' expert, Dr. John Alford, testified in response to Plaintiffs' expert, Dr. Lisa Handley, and utilized the same data and methodology—specifically EI RxC analysis—to analyze the data. [DX-001, p. 3]; Tr. 1417:19-1418:13.

214.    Both Dr. Alford and Dr. Handley concluded that black and white voters offer different levels of support to Democratic and Republican candidates. Tr. 296:2-18; Tr. 1441:3-12.

215.    Dr. Handley testified that she did not analyze Republican primaries because "the vast majority of black voters who participate in the primaries choose the Democrat primaries, so you wouldn't find a black-preferred candidate in the Republican primary." Tr. 296: 9-14. Also, Dr. Handley testified that "so few black voters actually participate in the Republican primary, you cannot produce estimates, reliable estimates, of black voting behavior in the Republican primaries." Tr. 296:15-18. Yet, Dr. Handley produced a statewide estimate based off this data. Tr. 297:2-3.

216.    Dr. Alford testified that it is not the race of the candidate but the party of the candidate that is "basically all the difference in the world." Tr. 1441:5. "A Democratic candidate is going to get . . . the support of almost the entire black community and a . . . Republican candidate will get almost the entire support of the white voters." Tr. 1441:6-10. "[T]his is not representative of the state of Mississippi, it's just representative of these areas of interest." Tr. 1441:10-12.

217.    Dr. Alford cautioned not to minimize the importance of the race of the candidate. Tr. 1441:16-22. But Dr. Alford testified that even when varying the race of candidates "it simply doesn't make a difference." Tr. 1442:10-1. Ultimately, Dr. Alford concluded based on the results of Dr. Handley's analysis of statewide elections in the seven areas of interest that "the polarization is related to the party label of the candidates. It is not related the race of the candidates or to the preference of the voters for black or white candidates. It's related to the preference of the voters for Democrat and Republican candidates." Tr. 1444:4-12.

218.    Dr. Alford testified that there was no way to disentangle race from party with Dr. Handley's analysis of racially contested statewide legislative elections. This is because there is "no variation in the race of a Democratic candidate. The Democratic candidate is always black" in this analysis. Tr. 1445:16-18.  Accordingly, neither Dr. Alford nor Dr. Handley were able "to disentangle the effects of a candidate's race from the candidate's party." Tr. 1445: 4-6; Tr. 1445:10-12.

219.    Dr. Handley determined that Democratic primaries in Mississippi are not the barrier to election. Tr. 296:2-3; Tr. 297:3-4. Dr. Handley was unable to demonstrate in the areas of interest an estimate of voting patterns of race based on Democratic primaries. Tr. 296:23-297:4; Tr. 298:1-9.

220.    Dr. Alford testified that although he agrees with Dr. Handley that Democratic primaries are not a barrier to election for black Mississippians, he notes that the Democratic primary analyses are relevant "in the sense that they provide an additional way of thinking about how we might separate the impact of party and race, and what we see here . . . is very clear, as Dr. Handley concludes, when you eliminated the cue of party, you just don't have polarization." 1469:23-2.

221.     Dr. Alford reviewed the Republican primary in DeSoto County. Tr. 1470:6-10.

Dr. Alford testified that the results of that election indicate that "a black individual running as a

Republican is able to get a majority of Republican votes." Tr. 1471:16-17.

222.     As to Dr. Handley's analysis of judicial elections, she would not testify that her

analysis was "sufficient" to rebut that statewide voter behavior is based on party, not race. Tr.

341:14-16.

223.     Further, Dr. Alford testified that "there's plenty of information to suggest that both

the candidates and the campaigns are heavily influenced by partisanship." Tr. 1476:21-23. "The

actual results are completely compatible with those." Tr. 1476:23-24.  "Black voters are favoring

the candidates that are openly known to be Democrats, white voters favor [ ] the candidates

openly known to be Republicans." Tr. 1477:3-5; [DX-001, p. 15].

224.     Additionally, Dr. Alford pointed out that Dr. Handley only analyzed three judicial

elections. Tr. 1477:6; [PTX-004, p.63]. "And two of them show that sort of partisan pattern." Tr.

1477:6-7.

225.     Dr. Alford testified that the analyses Dr. Handley conducted only analyzing

racially contested elections are inappropriate to distinguish race from party. Tr. 1489:7-9.

226.     Dr. Alford testified that "given how dominated it is by party polarization, this

evidence is not evidence of racial polarization in Mississippi. There may be racial polarization in

Mississippi, but it's not in this data. It's not in the Democratic primary. It's not in the comparison

between racially and nonracially contested elections. If it is present, it's not present in the way it

was in 1960." Tr. 1490:5-12.  "[T]here's nothing in Dr. Handley's report and, again, I agree with

the data, the analysis, the techniques. There's nothing in her report that demonstrates that there's

racially polarized voting in the Mississippi elections." Tr. 1490:24-1491:1. "When voting is

racially polarized, it's not going to somehow magically not show up in election results when you have candidates of different races running in those elections. So there's an opportunity for that to be apparent in this data and I don't see it in the data." Tr. 1491:14-19.

### (b) Conclusions of Law

227.    "[T]he existence of racially polarized voting" is one of the "most important factors considered in the totality-of-circumstances inquiry." *Clark*, 88 F.3d at 1397 (quoting *Gingles*, 478 U.S. at 48 n.15); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 747 (5th Cir.), *on reh'g* 999 F.2d 831 (5th Cir. 1993) ("This factor is one of the two most important in the inquiry into the past and present reality of the challenged electoral structure.").

228.    "The scope of the Voting Rights Act is indeed quite broad, but its rigorous protections, as the text of § 2 suggests, extend only to defeats experienced by voters 'on account of race or color.'" *Clements*, 999 F.2d at 850.

229.    "The focus now, at the totality-of-circumstances stage, is on evidence of causation, which looks to 'why' voters cast their ballots for certain candidates. That is to say, 'what appears to be bloc voting on account of race [which is the inevitable result of satisfying the three *Gingles* preconditions], may, instead, be the result of political or personal affiliation of different racial groups with different candidates.'" *Alabama.*, 612 F. Supp. 3d at 1291 (quoting *Solomon v. Liberty Cnty. Com'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000)).

230.    "The suggestion that Republican voters are galvanized by a 'white' or 'anti-minority' agenda is plausible only to the extent that the Democratic Party can be viewed as a vehicle for advancing distinctively minority interests, which clearly is not the case." *Clements*, 999 F.2d at 861. Plaintiffs have not carried the burden of proving that Republican voters in

Mississippi "are galvanized by a 'white' or 'anti-minority' agenda." *Id.*

231.    If "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens," then there is no "legally significant" racially polarized voting under the third *Gingles* precondition. *Clements*, 999 F.2d at 850. This is so because "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.'" *Id.* at 854 (quoting *Baird*, 976 F.2d at 361). Section 2 "is implicated only when Democrats lose because they are black, not where blacks lose because they are Democrats." *Id.* Here, the evidence "shows that divergent voting patterns among white and minority voters are best explained by partisan affiliation." *Id.* at 861.

232.    Dr. Alford concluded that the evidence presented does not show the existence of racial polarization in the voting patterns observed by Dr. Handley. Tr. 1435:22-1436:6; Tr. 1469:8-15; Tr. 1469:23-1470:2; Tr. 1471:11-17; Tr. 1476:16-1477:23; Tr. 1478:6-1479:1.

233.    Dr. Alford's analysis of the same empirical data set forth by Dr. Handley concluding that it actually shows voter behavior being driven by partisan polarization rather than racial polarization is persuasive. His analysis persuades this Court that voter behavior is now marked by party affiliation more so than race. This Court concludes that based on this intensely local analysis of voter behavior in the areas of interest chosen by the Plaintiffs, Senate Factor 2 weighs in favor of the Defendants.

### e.   Senate Factor 3

### (a) Findings of Fact

234.    Senate Factor 3 concerns the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions or other voting practices or procedures that may enhance the opportunity for discrimination against

the minority group. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

235.     The State Board of Election Commissioners (the "SBEC") includes the Governor, the Attorney General and the Secretary of State.  *See* MISS. CODE ANN. § 23-15-211; Tr.1195:1-3. The SBEC meets to review the qualification of candidates to certify them to stand for election and approves the ballot for statewide elections. *Id*; Tr.1195:8-19.  Beyond that, the SBEC has no other statutory role in or responsibility for conducting elections under Mississippi law. *See* MISS. CODE ANN. § 23-15-211.

236.     The Secretary of State is responsible for maintaining the Statewide Election Management System ("SEMS").  SEMS is an electronic database that houses election-related information, including the list of registered voters, their addresses, and their district assignments. [Dkt. # 199], at ¶¶ 92; Tr. 1188:8-17

237.     The Secretary of State trains the various local County Circuit Clerks and County Elections Commissioners on election-related laws and the functionality of SEMS.  Tr. 1181:12-13.  The Circuit Clerks and Election Commissioners are elected officials.  Tr. 1181:14-15.  Each county has one Circuit Clerk and five Election Commissioners.

238.     The Secretary of State's training for these county election officials includes instructions on how to update address libraries in SEMS when redistricting is done.  This includes presentations and materials throughout the year and at the annual Election Commissioners Association Meeting ("ECAM").  Tr. 1181:24-1182:1.

239.     Importantly, SEMS is a dynamic database that it is constantly being updated and changed.  It does not preserve snapshots of the past, but instead updates and overrides old information.  Tr. 1196:12-23.

240.    Mississippi's voter file is constantly updated and replicates itself to the current date. In other words, one cannot access the file to review its records from a prior date in time. The file is only current and shows those registered voters as of the date it is accessed. Tr. 1196:12-23.

241.    The Secretary of State maintains a dynamic and interactive website that offers assistance to county election officials, including: (1) My Election Day guides for voters; (2) step-by-step absentee voting requirements; (3) Frequently Asked Questions regarding absentee voting; (4) a voter registration toolkit; and (5) a voter registration "lookup."  Tr. 1183:17-1184:6.

242.    The Secretary of State's official role in voter registration is limited to the maintenance of SEMS for use by the local county election commissioners.  But, the Secretary of State performs other services meant to encourage voter registration, including: (1) providing voter registration toolkits to be used in voter registration drives; (2) publishing an elections calendar with all relevant deadlines; (3) using social media to encourage voter registration; (4) conducting voter registration drives on college campuses, including the State's three Historically Black Colleges and Universities; (5) providing funding to counties from grants under the Help America Vote Act; and (6) providing funding to counties from grants under the Mississippi Voting Modernization Act.  Tr. 1184:10-15; Tr. 1192:23-1193:5; Tr. 1192:4-20; Tr. 1193:6-1194:3.

243.    In Mississippi, elections are conducted at the county level rather than the state level.  This has been described as a "bottom up" election system by the parties and experts. Tr. 1186:3-10.

244.    The phrase "bottom up" refers to a decentralized election process in which the local county election officials are responsible for conducting, implementing and certifying

elections.  Tr. 1186:3-10.

245.    Each county is responsible for maintaining and updating voter records, including where voters should vote based on their address.  Tr. 1211:19-24.

246.    After redistricting occurs at the state, county or municipal level, each county is responsible for updating those voter records.  Tr. 1205:25-1206:10.

247.    Neither the Secretary of State nor the SBEC has regulatory authority or responsibility over county officials in the performance of these responsibilities.  Tr. 1235:1-10.

248.    After the Secretary of State creates an election in SEMS, it is the responsibility of these county officials to conduct the elections.  The County Election Commissioners are responsible for acquiring voting machines, printing ballots and operating polling precincts.  Tr. 1186:1-10.

### (b) Conclusions of Law

249.    "The effects of multi-member districts are a moot question because the electoral districts for [the Legislature] are single member districts." *See Fordice*, 252 F.3d at 371. Also, "a majority vote requirement is not inherently discriminatory." *Id.* (quoting *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1409 (S.D. Miss. 1992), *aff'd* 994 F.2d 1143 (5th Cir. 1993)). Additionally, "Mississippi does not have anti-single shot voting provisions." *Magnolia Bar*, 793 F. Supp. at 1409.

250.    The statute requiring runoffs in party primaries for election to the Legislature where no candidate receives a majority, presently codified as MISS. CODE ANN. § 23-15-191, was originally adopted as 1914 Miss. Gen. Laws ch. 149. Dr. King's testimony that this provision was originally adopted in 1972 because of fear of the Voting Rights Act and modeled on an earlier statute in Georgia is so factually inaccurate that it bears on his overall credibility. Tr. 756:8-

757:6.

251.    Mississippi does not have a majority vote requirement for legislative elections. There is no reason to believe Mississippi has voting practices or procedures that may enhance the opportunity for discrimination against minority groups. Senate Factor 3 weighs in favor of the Defendants.

**f.   Senate Factor 4**

252.    The fourth Senate Factor concerns "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

253.    "There is no candidate slating process in Mississippi." *Magnolia Bar*, 793 F. Supp. at 1409. Therefore, this factor favors the Defendants.

**g.   Senate Factor 5**

**(a) Findings of Fact**

254.    Senate Factor 5 concerns the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

255.    Plaintiffs' counsel retained Dr. Byron D'Andra Orey to provide a report regarding Senate Factor 5 under the totality of the circumstances analysis for determining whether a Section 2 violation has occurred. [PTX-008, p. 1].

256.     To first determine whether black Mississippians, as the minority group at issue, bear the effects of discrimination, Dr. Orey examined socioeconomic data in Mississippi comparing blacks and whites utilizing survey information from a single year—the 2021 American Community Survey (ACS). [PTX-008, p. 4].

257.     The ACS is a self-reported survey conducted annually by the United States Census Bureau that provides information about our nation and its people. *Available at*, www.census.gov/programs-surveys/acs/about.html, last visited Feb. 7, 2024. Information from the survey generates data that help inform how federal funds are distributed each year. *Id.*

258.     In analyzing the socioeconomic data from the ACS, Dr. Orey prepared twelve (12) tables in an effort to demonstrate the socioeconomic disparities between blacks and whites in Mississippi. [PTX-008, pp. 4-17]. However, in ten (10) of the twelve (12) tables (Tables 1-5 and 8-12),[14] Dr. Orey relied exclusively on data collected by the ACS for only one year (2021) despite the ACS being conducted and available annually. *Id.*

259.     While Dr. Orey's socioeconomic tables appear to show disparities between blacks and whites in Mississippi in 2021, Dr. Orey relied exclusively upon self-reported survey data to reach his conclusions. Dr. Orey admitted to performing none of his own socioeconomic analysis, but instead relied heavily on other academic literature to support his conclusions. Tr. 569:16-25. Furthermore, the significance of some of the data is questionable. For example, Table 9, entitled "No Vehicle", attempts to demonstrate that blacks in Mississippi are twice as likely to not own a car versus their white counterparts. [PTX-008, pp. 13-14]. However, a review of the data demonstrates that 90% of blacks in Mississippi do, in fact, own a car compared to 95.2% of

---

[14] While Tables 6 and 7 do not rely on ACS data, they do rely on information from the Mississippi Department of Education from a single year—2023. [PTX-008, pp. 9-10].

whites. *Id.* And, at trial, Dr. Orey admitted to making an "overstatement" about voter suppression tied to vehicle access in the narrative portion of his report discussing that topic. Tr. 565:10.

260.    Additionally, Dr. Orey also analyzes felony disenfranchisement and political participation in Mississippi. [PTX-008, pp. 18-20]. However, blacks and whites in Mississippi are both subject to the same felony disenfranchisement laws. *See Harness*, 47 F.4th at 309-10 (holding the felony disenfranchisement law was not motivated by discriminatory intent but was an attempt "to eliminate several objections contained in the then-recent findings of the Civil Rights Commission."). Dr. Orey also acknowledged that his felony disenfranchisement section contains inaccurate information from the Sentencing Project. Tr. 508:5-10; 571:16-17. Further, Dr. Orey's Table 13, entitled "Suffrage Bills Introduced and Passed on Both Houses" is not broken down by race and provides no information as to whether blacks or whites are more successful in having their voting rights restored following a felony conviction. [PTX-008, p. 20].

261.    Merely producing data from a single year of self-reported surveys in an effort to show socioeconomic disparities is not enough to satisfy the requirements of Senate Factor 5. The disparities must also hinder black Mississippians from participating effectively in the political process.

262.    Dr. Orey attempts to establish this consequence utilizing three separate methods to examine black voting turnout: (1) ecological inference (EI); (2) Bayesian Improved Surname Geocoding (BISG); and (3) Cooperative Election Survey (CES). [PTX-008, pp. 21-25]. However, despite idiosyncrasies like weather, candidates, and policy issues that can affect turnout in elections differently, Dr. Orey only analyzed one election—the federal 2020 General Election—to prepare his voter turnout analysis. Tr. 581:6-582:11. In contrast, for similar idiosyncrasies between elections, Dr. Brunell testified that one election was insufficient to

conduct a turnout analysis. Tr. 1258:17-18. Dr. Brunell explained that the appropriate inquiry would be to look at the trends over time in turnout between the two groups. Tr. 1258:20-1259:5.

263.    Dr. Orey's EI analysis attempts to draw conclusions about individual voter turnout based on characteristics of the entire group that the individuals belong to. [PTX-008, p. 22].  The purpose of EI is to estimate individual behavior when it is difficult or impractical to collect information from each personal individually. *Id.* While Dr. Orey's EI analysis shows a gap between black and white turnout in Mississippi it, again, is based solely on one federal election in 2020 for offices that are not the subjection of this litigation.

264.    Next, Dr. Orey conducted a BISG analysis of the 2020 election. BISG is a method used to predict a person's race or ethnicity by looking at their last name and where they live on a map. [PTX-008, p. 23]. The BISG dataset was constructed utilizing a snapshot of the Mississippi voter file from June of 2022 to infer individuals' turnout in the 2020 general election—some 20 months prior. *Id.* And, each individual was assigned the race that the BISG procedure predicted to be most likely. [PTX-008, p.24]. Dr. Orey admitted to having never performed a BISG analysis before. Tr. 582:18.

265.    Mississippi's voter file is constantly updated and replicates itself to the current date. Tr. 1196:12-18. The file is only current and shows those registered voters as of the date it is accessed. Tr. 1196:22-23. Consequently, there were many voters that were on the voter file as registered voters and turned out to vote in the 2020 election, but subsequently died, moved out of state, or were convicted of a felony and removed from Mississippi's voter file. By the time Dr. Orey accessed the file in June of 2022, those individuals were not listed on the file despite having previously been on the voter file and voted in the 2020 election. Tr. 583:7-584:1. Accordingly, as demonstrated by Defendants' expert Dr. Brunell, when compared to the official

turnout numbers from the Mississippi Secretary of State for the 2020 election of 1,334,155, Dr. Orey was first missing over half of the eligible voters in his dataset. Tr. 1293:5-6. Upon criticism by Dr. Brunell, Dr. Orey updated his BISG analysis but was still missing 70,765 voters in his BISG data set rendering it incomplete.  [DX-002, p. 5]; Tr. 1293:6-7. Additionally, Dr. Orey's BISG method contains no measures of uncertainty to ascertain whether the asserted turnout gap is statistically significant and meaningful. Tr. 1119:7-17.

266.    During the trial, to counter Dr. Orey's analysis, Defendants presented a recently released March 2024 BISG study from the Brennan Center for Justice at NYU Law School, entitled "Growing Racial Disparities in Voter Turnout, 2008-2022." [DX-081 (Marked for ID)]; Tr. 1283:12-15. The Brennan Center "is a nonpartisan law and policy institute that works to reform and revitalize—and when necessary defend—our country's system of democracy and justice." [DX-081, p. 2.] The Brennan Center focuses "on voting rights, campaign finance reform, ending mass incarceration, and preserving our liberties while also maintaining our national security." *Id.*

267.    Dr. Brunell testified that he had reviewed the Brennan Center study. Tr. 1283:21-22. Dr. Brunell explained that the premise of the study was to show that the voter turnout gap had widened post-*Shelby County v. Holder*, particularly in previously Section 5-covered states. Tr. 1285:1-9. However, a review of the turnout gap actually demonstrates Mississippi was the outlier with blacks turning out greater than whites in 2020 and on parity in 2022:



**FIGURE 7**

**Weighted Turnout Gap by Largest Nonwhite Racial or Ethnic Group, 2020**



**FIGURE 8**

**Weighted Turnout Gap by Largest Nonwhite Racial or Ethnic Group, 2022**

[DX-081, p.15]; Tr. 1285:10-1287:6.

268.     In explaining his review of the Brennan Center study, Dr. Brunell set forth two plausible reasons as to why it differs from the BISG study prepared by Dr. Orey. First, snapshots of the state voter files used by the Brennan Center were obtained on March 23, 2021 (following the 2020 election) and April 20, 2023 (following the 2022 election). Tr. 1289:15-25. This compares to Dr. Orey obtaining the state voter file in June of 2022 (following the 2020 election)—indicating a less accurate voter file as further removed from the pertinent election. Tr. 1290:1-15. Secondly, Dr. Orey assigned all voters in his BISG analysis a discrete race based on the highest probability of that person's race predicted by BISG. Tr. 1290:16-1291:15; [PTX-008, p. 24]. In contrast, the Brennan Center retains the probability information and assigns races proportionally. Tr. 1291:10-25; [DX-081, p. 22, fn. 18]. For example, if there are ten people in Mississippi assigned by BISG with a likelihood that these people are 60 percent black and 40 percent white, Dr. Orey would assign all ten people as black while the Brennan Center would assign 6 people as black and 4 as white. *Id.*

269.    And, though it was not peer reviewed, the Brennan Center study had a number of reviewers and academic personnel involved in its preparation. Tr. 1284:7-25. Accordingly, Dr. Brunell had no reason to doubt the study's credibility or reliability. Tr. 1292:2-5.[15]

270.    Finally, Dr. Orey examined turnout by race estimates using the CES. [PTX-008, p. 23]. The CES is a national survey administered by YouGov. *Id.* Dr. Orey, in explaining why he prefers the CES to other surveys, stated that it "includes verification of respondents' registration and voting behavior." [PTX-009, p. 2, ¶ 4].  As explained by the CES Guidebook, Catalist obtained the state voter files for all states around May of 2021 following the 2020 election and performed the vote validation matching from the survey to the state voter files in June of 2021. [DX-012, p. 19]. As a result, and as discussed in Dr. Orey's BISG analysis, there could be Mississippi CES survey respondents who voted in the November 2020 election, but by the time Catalist vote validated the Mississippi CES sample, those respondents may have been removed from the state voter file in the intervening six months due to death, moving out of state, or felony conviction. Tr. 596:1-597:3. Accordingly, the Mississippi CES sample may contain respondents that Catalist identified as not vote validated when, in fact, they were indeed registered and did turn out to vote. This calls into question the CES turnout analysis and Plaintiffs presented no evidence to refute this possibility.

_____

[15] Interestingly, Plaintiffs' expert Mr. Cooper cites to the Brennan Center for reliable guidance regarding communities of interest. [PTX-001, p. 20 fn. 15]. *See also Nairne v. Ardoin*, No. CV 22-178-SDD, --- F. Supp. 3d ----, 2024 WL 492688 (M.D. La. Feb. 8, 2024). Furthermore, federal courts across the counrty have cited to analyses performed by the Brennan Center. *See Jones v. Governor of Florida*, 975 F.3d 1016 (11th Cir. 2020); *McConchie v. Scholz*, 577 F. Supp. 3d 842 (N.D. Il. 2021); *McConnell v. Federal Election Commission*, 251 F. Supp. 2d 176 (D.D.C. 2003). Finally, the Brennan Center has been an active participant in many redistricting cases. *See Arizona State Legislature v. Arizon Independent Redistricting Com'n*, 576 U.S. 787 (2015); *Singleton v. Allen*, 2023 WL 6567895 (N.D. Ala. Oct. 5, 2023); *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014); *Benisek v. Lamone*, 241 F. Supp. 3d 566 (D. Md. 2017); *Democratic Nat. Committee v. Republican Nat. Committee*, 671 F. Supp. 2d 575 (D. N.J. 2009); *Daunt v. Benson*, 956 F.3d 396 (6th Cir. 2020).

271.    For Mississippi, the CES survey included 462 respondents, two of whom were non-citizens and should be excluded. Tr. 611:11-12. However, upon questioning in cross-examination of the CES data set, Dr. Orey fundamentally failed to comprehend the very purpose of the CES and the dataset he was utilizing by claiming that all 462 respondents in the Mississippi sample were validated as having turned out to vote. Tr. 595:2-16.  This raises credibility questions and whether Dr. Orey did, in fact, perform his own CES analysis.

272.    The CES also supplies weights that should be utilized to address issues with sampling that accompany surveys. Weights are often used to address where certain subpopulations may be under or over-sampled in the data. [DX-002, p. 3]; Tr. 1259:11-1260:4.

273.    Dr. Brunell also testified that survey data or estimates like the CES, as previously stated, should also be accompanied by tests of statistical significance.  [DX-002, p. 4]; Tr. 1260:5-16. Dr. Brunell testified that .05% (or 95% confidence level) is typically the lowest level of statistical significance that is used to determine the reliability of the estimates. Tr. 1261:5-14. [16] In fact, Dr. Orey admitted that a p-value of <0.05 means that one can be 95% confident in the estimates and this is the "more stringently and more commonly" used threshold for tests of statistical significance. [PTX-009, p.7, n.4]. Furthermore, Dr. Orey even utilized the 95% threshold in his Table 14 EI analysis. [PTX-008, p. 25].

274.    For the CES, Dr. Orey estimated turnout for all of Mississippi by counting black and white individuals (from the 460 respondents) whom YouGov validated as 2020 general election voters according to Mississippi's voter file, which yielded 441 observations and an

---

[16] Both Drs. Alford and Ragusa confirmed the 95% confidence level is the lowest level of statistical significance utilized to determine the reliability of estimates. *See* Tr. 1487:12-24; Tr. 1000:11-20.

approximate 14 point turnout gap between whites and blacks, as reflected in his Table 16. [PTX-008, p. 25].

**Table 16. Percent Turnout by Race 2020**[59]

|  | Turnout | Observations |
|---|---|---|
| Blacks | 72.5% | 158 |
| Whites | 86.8% | 283 |

275.    However, while Dr. Orey finally utilized the proper weighting variable of "vv_weight" under the CES Guidebook in his Second Amended Report to characterize the behavior of voters or registered voters for his analysis in Table 16, Dr. Orey failed to provide any measures of uncertainty or confidence intervals around his turnout analysis. *Id.*; *see also* [PTX-009, p. 2, n.4]. In fact, as shown below, once tests of statistical significance were performed to Dr. Orey's Table 16 analysis by Dr. Brunell in his Second Supplemental Expert Report of December 6, 2023, Dr. Orey's turnout analysis actually shows there is no significant relationship between race and turnout at the 95% confident level (i.e., p-val<0.05). [DX-002, p. 3 (Table 3)] (emphasis added).

Table 3. Linear Regression: Turnout Without Non-Citizens Using "vvweight" for weighting

-----------------------------------------------------------------------------

         Coef. std. err.  T-stat  p-val  95% conf. interval

-----------------------------------------------------------------------------

| | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|---|---|---|---|---|---|---|
| Black | -.143 | .075 | -1.92 | 0.055 | -.290 | .003 |
| Constant | .868 | .032 | 26.79 | 0.000 | .804 | .932 |

N=278, ***p<.001, **p<.01, *p<.05

276.    Further, in his Responsive Report of November 22, 2023, Dr. Orey attempted to rectify his failure to produce measures of uncertainty for his CES analysis by running a statistical

significance test on the two groups of voters: (1) turnout with non-citizens (Table 1), and (2) turnout without non-citizens (Table 2) utilizing a commonweight weighting variable, which was different than his Table 16 analysis. [PTX-009, pp. 3-5].

277.    Again, Dr. Orey's CES analysis fails. First, Dr. Orey's Table 1 in his Responsive Report should carry no weight as he includes in his turnout analysis non-citizens, who cannot vote. *Id.* at 4. Second, once you exclude the non-citizens, who cannot vote, as Dr. Orey does in his Table 2 of his Responsive Report, turnout and race are again not statistically significant at, in Dr. Orey's own words, the "more stringent and commonly" accepted 95% confidence level. *Id*. at 5 (Table 2); p. 4, n.7.

278.    And, for clarity, regardless of whether you apply the proper weight of "vvweight" or "vvweight_post" to the turnout with non-citizens or to the turnout without non-citizens, Dr. Brunell demonstrates that there is no statistically significant relationship between turnout and race at the 95% confidence level:

Table 1. Linear Regression: Turnout With Non-Citizens Using "vvweight" for weighting

| | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|---|---|---|---|---|---|---|
| Black | -.143 | .075 | -1.92 | 0.055 | -.290 | .003 |
| Constant | .868 | .032 | 26.79 | 0.000 | .804 | .931 |

N=278, ***p<.001, **p<.01, *p<.05

Table 2. Linear Regression: Turnout With Non-Citizens Using "vvweight_post" for weighting

| | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|---|---|---|---|---|---|---|
| Black | -.060 | .094 | -0.64 | 0.526 | -.245 | .126 |
| Constant | .820 | .052 | 15.69 | 0.000 | .717 | .923 |

N=227, ***p<.001, **p<.01, *p<.05

Table 3. Linear Regression: Turnout Without Non-Citizens Using "vvweight" for weighting

| | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|---|---|---|---|---|---|---|
| Black | -.143 | .075 | -1.92 | 0.055 | -.290 | .003 |
| Constant | .868 | .032 | 26.79 | 0.000 | .804 | .932 |

N=278, ***p<.001, **p<.01, *p<.05

Table 4. Linear Regression: Turnout Without Non-Citizens Using "vvweight_post" for weighting

| | Coef. | std. err. | T-stat | p-val | 95% conf. interval | |
|---|---|---|---|---|---|---|
| Black | -.060 | .094 | -0.64 | 0.526 | -.245 | .126 |
| Constant | .820 | .052 | 15.69 | 0.000 | .717 | .923 |

N=227, ***p<.001, **p<.01, *p<.05

[DX-002, p. 3 (Tables 1, 2, 3 and 4)] (emphasis added); Tr. 1266:2-18.

279.    Finally, Dr. Orey's CES turnout analysis included at least two out-of-state residents—from Kentucky and South Carolina—who should not have been included. Tr. 618:17-622:5. As demonstrated in Dr. Orey's Tables 1 and 2 in his responsive report, the difference of two individuals (including and then excluding the two non-citizens) can have a significant impact on statistical significance. Accordingly, this error further skews his analysis.

280.    In his summary conclusion regarding Dr. Orey's turnout analysis, Dr. Brunell was highly skeptical of its reliability due to Dr. Orey's basing his analysis on a singular federal election, the lack of statistical significance in the CES analysis, and Dr. Orey's missing BISG data coupled with the Brennan Center's competing analysis. Tr. 1292:6-1293:11.

281.    In response to Dr. Orey's efforts to demonstrate disparity in voter turnout in Mississippi based on one election year, the Defendants submitted evidence from the U.S. Census Bureau and the U.S. Department of Labor's Current Population Survey ("CPS"), which the Supreme Court specifically relied upon in *Shelby County v. Holder*, that provides close to 40 years of registration and turnout rates between blacks and whites in Mississippi. [DX-026]. According to the U.S. Census Bureau, the CPS is "one of the oldest, largest, and most well-recognized surveys in the United States. It is immensely important, providing information on many of the things that define us as individuals and as a society—our work, our earnings, and our education." Available at, https://www.census.gov/programs-surveys/cps/about.html (last accessed, Feb. 12, 2024) (referenced quotation appears at this link).

282.    The following summary table clearly shows an objective change in voter participation between black and white voters in Mississippi beginning in or around 2004. Tr. 560:19-562:19. In every year since 2004, black voter registration and turnout in Mississippi have exceeded or been at parity with white voter registration and turnout.

| Political Participation by Race, Mississippi Since 1986 | | | | | | | |
| Voter Registration (Persons 18+) | | | | Voter Turnout (Persons 18+) | | | |
| Year | % White (NH) | % Black (AP) | Black minus White | Year | % White (NH) | % Black (AP) | Black minus White |
|---|---|---|---|---|---|---|---|
| 1986 | 77.3% | 75.9% | -1.4% | 1986 | 45.8% | 40.2% | -5.6% |
| 1988 | 80.5% | 74.2% | -6.3% | 1988 | 64.2% | 60.3% | -3.9% |
| 1990 | 70.8% | 71.4% | 0.6% | 1990 | 35.8% | 32.5% | -3.3% |
| 1992 | 80.2% | 78.5% | -1.7% | 1992 | 69.4% | 61.9% | -7.5% |
| 1994 | 74.6% | 69.9% | -4.7% | 1994 | 46.2% | 41.7% | -4.5% |
| 1996 | 75.0% | 67.4% | -7.6% | 1996 | 59.3% | 48.8% | -10.5% |
| Voter Registration (Citizens 18+) | | | | Voter Turnout (Citizens 18+) | | | |
| 1998 | 75.8% | 71.3% | -4.5% | 1998 | 41.1% | 40.4% | -0.7% |
| 2000 | 72.6% | 73.7% | 1.1% | 2000 | 61.9% | 58.5% | -3.4% |
| 2002 | 72.1% | 67.9% | -4.2% | 2002 | 44.6% | 40.2% | -4.4% |
| 2004 | 73.6% | 76.2% | 2.6% | 2004 | 60.0% | 66.6% | 6.6% |
| 2006 | 71.0% | 72.2% | 1.2% | 2006 | 39.9% | 50.5% | 10.6% |
| 2008 | 75.0% | 81.9% | 6.9% | 2008 | 68.4% | 73.1% | 4.7% |
| 2010 | 74.2% | 73.6% | -0.6% | 2010 | 47.7% | 48.1% | 0.4% |
| 2012 | 82.4% | 90.8% | 8.4% | 2012 | 71.8% | 82.7% | 10.9% |
| 2014 | 72.8% | 83.2% | 10.4% | 2014 | 40.3% | 46.6% | 6.3% |
| 2016 | 78.8% | 81.3% | 2.5% | 2016 | 67.7% | 69.2% | 1.5% |
| 2018 | 71.8% | 77.9% | 6.1% | 2018 | 51.7% | 59.8% | 8.1% |
| 2020 | 79.2% | 83.4% | 4.2% | 2020 | 69.8% | 72.9% | 3.1% |
| 2022 | 74.3% | 72.2% | -2.1% | 2022 | 47.6% | 47.0% | -0.6% |

*See* [DX-026].

283.    Plaintiffs presented no evidence contesting levels of voter registration determined by the CPS.

284.    Plaintiffs offered evidence of turnout in 2020 general elections, but Dr. King asserted that "black turnout was highest when Obama ran" in 2008 and 2012. Tr. 849:21-850:2. When asked if anything happened after the elections of President Obama to inhibit the opportunity of blacks in Mississippi to vote in Presidential elections, Dr. King speculated that some polling places might have been closed, but he did not demonstrate that any closures had any effect on black voter turnout. Tr. 850:23-25.

285.    Dr. King testified that the level of turnout is affected by the viability of candidates and the competitiveness of the elections, further agreeing that Mississippi has very few competitive elections. Tr. 824:22-825:11. Thus, turnout may be lowered, not by lack of opportunity, but by reasonable conviction that one's vote is unlikely to make any difference.

286.     As described by the Supreme Court in *Miller v. Johnson*, it was the policy of the United States Department of Justice in the 1990s to require the creation of the maximum number of black-majority districts before approval could be obtained under § 5 of the Voting Rights Act. Dr. King agreed that the creation of more black-majority districts caused white moderates to "disappear." Tr. 861:4-6. Indeed, he said that "moderate white Democrats get squeezed out," and that "the long-term effect of the Voting Rights Act is it did reduce the number of white Democrats." Tr. 859:9-15. It follows that the mandated creation of more black-majority districts reduced competitiveness and turnout, making it effectively impossible to determine the extent to which whites would usually vote against black candidates in competitive elections.

287.     Plaintiffs' lay witnesses, all of whom were black, were asked if they were familiar with the United States Census, that they completed the Census survey in 2020, and that they answered the Census questions truthfully. All witnesses who were asked this question indicated no reason to lie to the United States Census Bureau. Tr. 728:23-729:9; Tr. 908:18-24; Tr. 931:12-24.

288.     Furthermore, Plaintiffs' lay witnesses testified that they vote regularly and plan to continue voting. Tr. 648:20-649:4; Tr. 666:2-9; Tr. 685:19-686:9; Tr. 707:8-18; Tr. 877:3-18; Tr. 894:2-5; Tr. 921:14-22; Tr. 930:24-931:11; Tr. 934:22-935:2.

289.     Additionally, many of Plaintiffs' witnesses—*viz.*, Sharon Moman, Kenneth Harris, Ashley Wilson, Gary Fredericks, Dr. Kia Jones, and Terry Rogers—ran for public office. Tr. 649:7-8; Tr. 707:19-22; Tr. 895:11-12; Tr. 921:23-24; Tr. 937:12-13. The ability of these individuals to run for political office undermines Plaintiffs' allegations that their identification as minorities inhibits their ability to participate effectively in the political process. Furthermore, the witnesses who testified that they ran for public office all ran as Democrats, which as discussed

previously is the minority-preferred party in Mississippi. Tr. 661:8-10; Tr. 896:1-16; Tr. 922:5; Tr. 955:17-19.

### (b) Conclusions of Law

290.    Senate Factor 5 concerns the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process. To the extent the Senate Report is to be considered, it provides that socioeconomic factors are to be considered only "where the level of black participation in politics is depressed." Senate Report at 29 n.114.

291.    Notwithstanding past discrimination and socioeconomic disparities, Plaintiffs must prove "that minority voters *in this case* failed to participate equally in the political process." *Clements*, 999 F.2d at 867 (emphasis in original). Plaintiffs failed to identify a single voter who was deprived of an opportunity to participate in the political process by any socioeconomic conditions.

292.    "Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote." *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992).

293.    In 2015, this Court found that black citizens in the City of Hattiesburg "participate in the political process at the same or higher levels [as the City's other citizens]." *Fairley*, 122 F. Supp. 3d at 569.

294.    Plaintiffs offered the expert opinion of Dr. Orey regarding socioeconomic disparities between whites and blacks in Mississippi in an effort to establish a correlation between black Mississippians bearing the effects of discrimination and their corresponding

inability to participate effectively in the political process. Plaintiffs have proven neither half of the correlation.

295.    We have serious concerns about Dr. Orey's credibility and reliability to perform the required turnout analysis. First, Dr. Orey's socioeconomic data is based only on the 2021 ACS—one year of self-reported surveys without any original analysis to confirm the data. Second, and perhaps most fatal, Dr. Orey's voter turnout analysis suffers from the same limited sample size—one federal election in 2020. Third, Dr. Orey's BISG analysis is missing over 70,000 voters, fails to include measures of uncertainty, and the Brennan Center's recent study shows a completely contrasting turnout analysis over two elections in Mississippi. Finally, Dr. Orey's CES analysis is riddled with infirmities in his apparent failure to understand the underlying dataset, the delay in which Catalist vote validated the Mississippi survey, the inclusion of at least two out-of-state voters in his turnout analysis, and the clear lack of race and turnout showing statistical significance at the commonly accepted 95% confidence level.

296.    Furthermore, the above must be weighed in the balance against almost 40 years of CPS data from the United States Census Bureau and Department of Labor that shows a continual trend in the past 20 years of black registration and turnout in Mississippi exceeding that of white or, at worst, on parity. *See Shelby County*, 570 U.S. at 535 (holding "Census Bureau data indicate that African-American voter turnout has come to exceed white voter turnout."). And, in fact, the CPS is corroborated by the Brennan Center study showing black turnout exceeding white turnout in 2020 and white turnout narrowly exceeding black turnout in 2022.

297.    "'[P]roof of socioeconomic disparities and a history of discrimination without more' does not demonstrate that a group of citizens has less opportunity to participate in the political process." *Fairley*, 662 F. App'x at 298 (quoting *Clark*, 88 F.3d at 1399).

298.    "Testimony regarding depressed political participation relevant to a local election must be grounded in a *local* appraisal of the facts." *Fairley*, 662 F. App'x. at 298 (citing *Fordice*, 252 F.3d at 368). "[T]o support a favorable finding on [whether socioeconomic disparity hampers the ability of minorities to participate], [the plaintiff bears] the burden to demonstrate that the African-American citizens of Mississippi 'do not in fact participate to the same extent as other citizens.'" *Fordice*, 252 F.3d at 368 (quoting *Clements*, 999 F.2d at 866).

299.    Accordingly, the Court is not required to accept the testimony of Dr. Orey. *See Clements*, 999 F.2d at 867-68. Plaintiffs' evidence on the "effects of past discrimination" was not "proof that minority voters *in this case* failed to participate equally in the political processes." *Fairley*, 662 Fed. App'x. at 298.  In fact, in Dr. Orey's own words, Mississippi is a success story of the Voting Rights Act. Tr. 623:13-20.

300.    Plaintiffs seek to have it both ways in asserting reliability or lack thereof with Census data relevant to Senate Factor 5.  On the one hand, they assert that one year of self-reported, non-validated Census data in the American Community Survey is reliable and sufficient to establish socioeconomic disparity between black and white voters. On the other hand, they assert that almost forty (40) years of self-reported, non-validated Census data in the CPS is unreliable to assess voter registration and turnout.  Plaintiffs cannot have it both ways.  This Court concludes, as the United States Supreme Court concluded in *Shelby County v. Holder*, that the CPS data is reliable and sufficient to establish the current state of voter registration and turnout by race in Mississippi.

301.    Plaintiffs have failed to produce sufficient evidence establishing that any socioeconomic disparities which exist between blacks and whites have actually hindered the ability of black citizens to participate effectively in the political process. The evidence supports

that Mississippi has now reached a point in its history where black voter registration and turnout is essentially at parity with that of whites. Accordingly, Senate Factor 5 weighs in favor of the Defendants.

### h.   Senate Factor 6

#### (a) Findings of Fact and Conclusions of Law

302.    Senate Factor 6 concerns "the use of overt or subtle racial appeals in political campaigns." *Gingles*, 478 U.S. at 37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

303.    There is evidence of appeals based on race on the part of both black and white candidates, although Plaintiffs offered no testimony of its use in legislative elections. Tr. 787:1-5. The white candidates whom Dr. King believed to have indulged in racial appeals, with the exception of Senator Cindy Hyde-Smith, were defeated, and Dr. King did not ask Senator Hyde-Smith whether she believed she was engaging in such an appeal. Tr. 834:15-836:6. By contrast, racial appeals like those detailed in *United States v. Brown*, 494 F. Supp. 2d 440 (S.D. Miss. 2007), interact with what Dr. King called "the Black utility heuristic" to produce "higher levels of black voting cohesion." Tr. 849:6. Accordingly, Senate Factor 6 weighs in favor of the Defendants.

### i.   Senate Factor 7

#### (a) Findings of Fact

304.    Senate Factor 7 concerns the extent to which members of the minority group have been elected to public office in the jurisdiction. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

305.     Plaintiffs' expert Dr. King claims black candidates in Mississippi face substantial barriers to political office outside of majority-black districts. But "Mississippi has the largest number of blacks serving in the legislature and currently leads the nation in the number of black elected officials." "Evolution and Devolution of the Voting Rights Act? Black Descriptive and Substantive Representation" In <u>Minority Voting in the United States.</u> August 2015. Editors: Kyle Kreider and Thomas Balidino (Praeger). Byron D'Andra Orey, Gloria Billingsly and Athena King. "Over the years, Mississippi has consistently possessed the largest percentage of black state legislators in the country." *Id.* Plaintiffs' own expert, Dr. Orey, made these findings and lists this professional publication on his Curriculum Vitae. [PTX-008, Appx. 1, p. 6].

306.     Dr. Brunell testified that Mississippi is among the states with the highest number of black elected officials. Tr. 1346:22-19. As of 2015, Mississippi elected more black officials at all levels of government than any other state. Furthermore, Dr. Alford testified that Mississippi "has a large number of black elected officials." Tr. 1441:21-22.

307.     Dr. Orey also testified that Mississippi is among the states with the highest number of black elected officials. Tr. 623:4-12.

308.     Under Mr. Cooper's Illustrative Plans, 19 of the 52 Senate districts (36.54%) are majority-black and 45 of the 122 House districts (36.89%) are majority-black. These both exceed the percentage of BVAP in Mississippi (36.14%).

### (b) Conclusions of Law

309.     "[T]here have been 'significant increases in the number of African-Americans serving in elected offices'; more specifically there has been approximately a 1,000 percent increase since 1965 in the number of African-American elected officials in the six States

originally covered by the Voting Rights Act." *Shelby County*, 570 U.S. at 547 (quoting H.R. Rep. 109-478, at 18 (2006), 2006 U.S.C.C.A.N. 618, 527).

310. "Section 2 does not however, 'establish[ ] a right to have members of a protected class elected in numbers equal to their proportion in the population.'" *Anne Harding*, 948 F.3d at 308 (quoting 52 U.S.C. § 10301(b)).

311. This Court concludes that Mississippi elects if not the highest, among the highest, number of black public officials of any state. Accordingly, Senate Factor 7 weighs in favor of Defendants.

### j.  Senate Factor 8

### (a) Findings of Fact

312. Senate Factor 8 concerns whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

313. Although both chambers of the Mississippi Legislature are controlled by Republicans, there are numerous Democrat committee chairs in both chambers that have been appointed by Republican leadership.

314. Democrat Senator Juan Barnett of SD 34, who is black, is Chairman of the Corrections Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 100.

315. Democrat Senator Simmons of SD 12, who is black, is Chairman of the County Affairs Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 101.

316. Democrat Senator Angela Turner-Ford of SD 16, who is black, is Chairman of the Drug Policy Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 102.

317.     Democrat Senator David Jordan of SD 24, who is black, is Chairman of the Enrolled Bills Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 103.

318.     Democrat Senator Sollie B. Norwood of SD 28, who is black, is Chairman of the Executive Contingent Fund Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 104.

319.     Democrat Senator David Blount of SD 29, who is white, is Chairman of the Gaming Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 105.

320.     Democrat Senator John Horhn of SD 26, who is black, is Chairman of the Housing Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 106.

321.     Democrat Senator Hillman Frazier of SD 27, who is black, is Chairman of the Interstate and Federal Cooperation Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 107.

322.     Democrat Senator Albert Butler of SD 37, who is black, is Chairman of the Investigate State Offices Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 108.

323.     Democrat Senator Hob Bryan of SD 7, who is white, is Chairman of the Public Health and Welfare Committee of the Mississippi State Senate. [Dkt. # 199], at ¶ 109.

324.     Democrat Representative Carl Mickens of HD 42, who is black, is Chairman of the Housing Committee of the Mississippi House of Representatives. [Dkt. # 199], at ¶ 110.

325.     Democrat Representative Cedric Burnett of HD 9, who is black, is Chairman of the Interstate Cooperation Committee of the Mississippi House of Representatives. [Dkt. # 199], at ¶ 111.

326.     Democrat Representative Karl Gibbs of HD 36, who is black, is Chairman of the State Library Committee of the Mississippi House of Representatives. [Dkt. # 199], at ¶ 112.

327.     Democrat Representative Otis Anthony of HD 31, who is black, is Chairman of

the Youth and Family Affairs Committee of the Mississippi House of Representatives. [Dkt. # 199], at ¶ 113.

328.    As stated, *supra*, an amendment to JR 1 was proposed to unpair two incumbents. This amendment was made in agreement with two black Democrat Representatives—Earle Banks of HD 67 and Zakiya Summers of HD 68—to unpair these incumbents into separate districts and was adopted by voice vote. [JTX-010, p. 31, ¶¶ 20-24].

### (b) Conclusions of Law

329.    In applying this factor, the Fifth Circuit has cautioned that "responsiveness cannot be weighed in the abstract" and that "[r]esponsiveness, like many things, is a question of both kind and degree." *Clark*, 88 F.3d at 1401.

330.    Plaintiffs did not introduce any evidence regarding the responsiveness of elected officials to the particularized needs to prove Senate Factor 8. There is no reason to believe that elected officials are unresponsive to the needs of members of the minority group.

331.    The evidence is insufficient to establish that there is a significant lack of representation on the part of elected officials to the particularized needs of the members of the minority group. Accordingly, Senate Factor 8 weighs in favor of Defendants.

### k.  Senate Factor 9

### (a) Findings of Fact

332.    Senate Factor 9 concerns "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

333.    In drafting the redistricting plan, the Standing Joint Committee avoided

presumptively unconstitutional race-based redistricting, and it retained the cores of existing districts. These policies are not tenuous. [JTX-010]; [JTX-011].

334.    Compliance with the United States Constitution—and therefore, federal law— cannot be a "tenuous" policy interest. *See Terrazas v. Clements*, 581 F. Supp. 1329, 1357 (N.D. Tex. 1984) ("We cannot conclude that compliance with federal constitutional and statutory standards are only tenuously related to the district lines as drawn.").

335.    On March 29, Chairman Beckett explained the process the Standing Joint Committee utilized in adopting the redistricting plans. The Chairman explained the factors the Committee considered when drafting the plans included One Person, One Vote, contiguity of the districts, political performance, and compliance with all state and federal laws—such as Section 2 of the Voting Rights Act, compactness, minimalization of county and precinct splits. [JTX-010, pp. 8-14].

336.    The Chairman signaled significant shifts in population throughout the state necessitated the collapse of two districts to be moved to the areas with the largest increases in population. [JTX-010 pp. 11-14].

337.    Accordingly, HD 20 was moved to DeSoto County and District 33 was redrawn on the Coast to accommodate the significant population growth in those areas. *Id.* at pp. 11-12.

338.    Minority Leader Robert Johnson introduced an amendment to the House Redistricting Plan. *Id.* at pp. 18, 32.

339.    Minority Leader Johnson's proposed amendment added five more majority-minority districts and in 10 districts increased the African American "participation." *Id.* at 34.

340.    Minority Leader Johnson admitted that the amended map was not shared with anyone until the amendment was introduced on the floor. *Id.* at 36.

341.     Speaker Pro Tem Jason White—now Speaker White—questioned Minority Leader Johnson as to the mapdrawers' processes. *Id.* at 42-46.

342.     Specifically, Speaker White asked "did you have a goal when you sat down to draw the plan?" To which Representative Johnson responded: "Yeah, to get as many African American districts as we could get. . . . We can make your district an African American [district]. You can get black folks to vote for you." *Id.* at p. 44, ¶¶ 5-16.

343.     Speaker White also asked "Was a heat map used?" *Id.* at p. 43, ¶ 15. Minority Leader Johnson replied: "Absolutely." *Id.* at ¶ 19.

344.     Ultimately, Minority Leader Johnson's amendment failed. *Id.* at ¶¶ 20-21.

345.     Defendants presented extensive evidence regarding the drawing process of the Enacted Plans that supports a finding that the process used and justifications for the creation of the districts was not tenuous.

346.     A review of the Enacted Plans demonstrates an effort to comply with Section 2, a lack of any evidence of packing voters in districts, and a partisan focus on the mapdrawing process, which is permissible.

347.     Assistant Secretary of State Kyle Kirkpatrick testified that the Secretary of State's office tries to "increase voter turnout across the board for all Mississippians." Tr. 1225:3-4.

**(b) Conclusions of Law**

348.     "Under our cases, the States retain a flexibility that federal courts enforcing § 2 lack, both insofar as they may avoid strict scrutiny altogether by respecting their own traditional districting principles, and insofar as deference is due to their reasonable fears of, and to their reasonable efforts to avoid, § 2 liability." *Vera*, 517 U.S. at 978.

349.     Thus, considering the entirety of the evidence regarding the justifications of the

plan, the Court finds this factor weighs heavily in favor of the Defendants because the justifications are not tenuous. The Standing Joint Committee engaged in an extensive process to comply with Section 2 in an area where it has extensive authority to do so and had partisan motives unlike the racial motives presented by the Democrats in Minority Leader Johnson's proposed amended plan. In light of the requirement of presumption of legislative good faith, *Abbott*, 138 S.Ct. at 2324, and the evidence presented, the Court concludes that the justifications of the Enacted Plans are not tenuous.

### l.   Proportionality

#### (a) Findings of Fact

350.   Mississippi's statewide BVAP is 36.14%. [Dkt. #199], at ¶ 54.

351.   Under Mr. Cooper's Illustrative Plans, 19 of the 52 Senate districts (36.54%) are majority-black and 45 of the 122 House districts (36.89%) are majority-black. [PTX-001, p. 8]. These both exceed the percentage of BVAP in Mississippi (36.14%).  [Dkt. #199], at ¶ 54; [PTX-001 p.10].

352.   Chairman Beckett described Mississippi's black population as "not evenly spread across the state." [JTX-010], at 19:5-9.

#### (b) Conclusions of Law

353.   Section 2 of the Voting Rights Act "is not concerned with maximizing minority voting strength." *Strickland*, 556 U.S. at 23(citing *Johnson*, 512 U.S. at 1022).

354.   Cooper's Illustrative Plans were predominantly motivated by race and achieving more than proportionality of majority-minority districts. *Fairley*, 662 F. App'x at 300 (quoting *Miller*, 515 U.S. at 915-16).

355.   "One may suspect vote dilution from political famine, but one is not entitled to

suspect (much less infer) dilution from mere failure to guarantee a political feast." *Johnson*, 512 U.S. at 1017.

356.    Minority groups are "not constitutionally entitled to an apportionment structure designed to maximize its political advantage" and have "no federal right to be represented in legislative bodies in proportion to their numbers in the general population." *Panior v. Iberville Par. Sch. Bd.*, 536 F.2d 101, 104 (5th Cir. 1976).

357.    "Forcing proportional representation is unlawful and inconsistent with [the Supreme] Court's approach to implementing § 2." *Allen*, 599 U.S. at 28.

358.    Therefore, Plaintiffs are not entitled to a "political feast" and this factor weighs in favor of the Defendants.

359.    Accordingly, the Court finds that under the totality of the circumstances, Plaintiffs failed to meet their burden to demonstrate that "members of a racial group have less opportunity than do other members of the electorate." *LULAC*, 548 U.S. at 425-26. Plaintiffs have failed to prove by a preponderance of evidence that the lines of any legislative district result in rendering the political processes leading to nomination or election to the Legislature not equally open to participation by members of a class citizens protected by Section(a) in that its members have less opportunity than other members of the electorate to participate in the electoral process and to elect representatives of their choice.

## VI.    <u>**Racial Predominance Claim**</u>

### 1.  **General Law**

360.    "The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans. It prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'"

*Cooper*, 581 U.S. at 291 (quoting *Bethune-Hill*, 580 U.S. at 187). "When a voter sues state officials for drawing . . . race-based lines, … the plaintiff must prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 291. "The racial predominance inquiry concerns the *actual considerations* that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 580 U.S. at 189-90 (emphasis added).

361.   The requirement that Plaintiffs clearly establish racial motivation, as in other applications of the Equal Protection Clause was established in *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (quoting *Personnel Administrator v. Feeney*, 442 U.S. 256, 279 (1979) ("'[D]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of' its adverse effects.") (footnote and citations omitted). A court is required to distinguish "between being aware of racial considerations and being motivated by them." *Miller*, 515 U.S. at 916. Plaintiffs' suggestion that the requirement of discriminatory intent was eliminated by *Cooper* is wrong. *Cooper* implements *Miller*, it does not alter it in any way. *Cooper*, 581 U.S. at 291-92.

362.   Plaintiffs amended their pleading before trial to make clear that they "do not assert any claims premised on invidious discriminatory intent on the basis of race." [Dkt. #199], at p. 16, ¶ 9. Because Plaintiffs did not plead invidious discriminatory intent, their circumstantial evidence cannot be construed to establish invidious discriminatory intent. Moreover, as seen hereafter, their evidence fails to support any such inference.

363.    "[U]ntil a claimant makes a showing sufficient to support th[e] allegation" of "race-based decision-making," "the good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 915. "[T]he burden of proof lies with the challenger, not the State." *Abbott*, 138 S.Ct. at 2324. "This rule takes on special significance in districting cases." *Id.*

364.    "The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. '[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.'" *Abbott*, 138 S.Ct. at 2324 (quoting *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980)). The "ultimate question remains whether a discriminatory intent has been proved in a given case." *Id.* "The 'historical background' of a legislative enactment is 'one evidentiary source' relevant to the question of intent." *Id.* (quoting *Vil. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). "But we have never suggested that past discrimination flips the evidentiary burden on its head." *Abbott*, 138 S.Ct. at 2325.

365.    The Supreme Court has affirmed findings that the lines of a district violate the Equal Protection Clause only where the record contains direct evidence of racially discriminatory intent.  *Abbott*, 138 S.Ct. at 2334; *Cooper*, 581 U.S. at 309-14; *Shaw*, 517 U.S. at 905-06; *Vera*, 517 U.S. at 960-61 (Opinion of O'Connor, J.); *Miller*, 515 U.S. at 917-18.

366.    Federal law imposes no restrictions on "cracking" a city in the process of redistricting. Under certain circumstances, federal law may address the situation when "a State's redistricting map cracks or packs a large and 'geographically compact' minority population." *Allen*, 599 U.S. at 43 (Kavanaugh, J., concurring). The 2022 plan did not "crack" a black population when it separated one neighborhood in downtown Gulfport from another in the Turkey Creek area at the far north end of Gulfport. Not only are these distinct neighborhoods

separated by many miles, but Mr. Fredericks testified that there was "friction" between the people in Turkey Creek and those in the original Gulfport. Tr. 911:3.

367.    In *Rucho v. Common Cause*, 588 U.S. ----, 139 S.Ct. 2484, 2508 (2019), the Supreme Court held that partisan gerrymandering claims are not justiciable in federal court because no judicially manageable standard exists to determine the reallocating of power and influence between political parties. Accordingly, Federal courts are not responsible for vindicating generalized partisan preferences. *See Rucho*, 139 S.Ct. at 2494.

### a.  Findings of Fact

368.    Plaintiffs' counsel retained Dr. Jordan Ragusa to opine on whether and to what extent race was a factor in the design of House Districts (HD) 22, 34 and 64 and Senate Districts (SD) 2 and 48. [PTX-005, p. 4].

369.    In the prior election cycle leading up to the redistricting in 2022, the incumbent for HD 34 switched from the Democrat Party to the Republican Party. [Dkt. # 199], at ¶ 117.

370.    In the prior election cycle leading up to the redistricting in 2022, the incumbent for HD 22 switched from the Democrat Party to the Republican Party. [Dkt. # 199], at ¶ 90.

371.    In the prior election cycle leading up to the redistricting in 2022, the incumbent for HD 64 switched from the Democrat Party to Independent. [Dkt. # 199], at ¶ 118.

372.    The districts challenged by the Plaintiffs as racial gerrymanders have the following benchmark and enacted APBVAP:

|        | Benchmark APBVAP | Enacted APBVAP | Difference |
|--------|------------------|----------------|------------|
| SD2    | 39.64%           | 32.88%         | 6.76%      |
| SD48   | 36.33%           | 29.40%         | 6.93%      |
| HD22   | 37.04%           | 29.86%         | 7.18%      |

|        |        |        |        |
|--------|--------|--------|--------|
| HD34   | 60.49% | 31.55% | 28.94% |
| HD64   | 37.93% | 30.99% | 6.94%  |

[DX-003, pp. 4-5]

373.    Dr. Ragusa has never authored a peer-reviewed article on redistricting. [PTX-005, pp. 32-36].

374.    Dr. Ragusa has never authored a peer-reviewed article on racial gerrymandering. [PTX-005, pp. 32-36].

375.    Dr. Ragusa has never presented at conferences or seminars on the topics of redistricting or racial gerrymandering. [PTX-005, pp. 37-38].

376.    Dr. Ragusa has not taught a class specifically on redistricting or racial gerrymandering. [PTX-005, pp. 32-40].

377.    Dr. Ragusa has never worked as a consultant or represented a governmental body to draw redistricting maps or plans. [PTX-005, pp. 32-40].

378.    Prior to this case, Dr. Ragusa has only employed his county envelope theory as an expert in one other case.[17]

379.    To support this county envelope methodology approach, Dr. Ragusa cited to expert reports by Dr. Ansolabehere in *Cooper v. Harris*, 581 U.S. 285 (2017), and Dr. Max Palmer in *Bethune Hill v. Virginia State Board of Elections*, 326 F. Supp. 3d 128 (E.D. Va. 2018). [PTX-006, p. 7]. However, a review of these cases and pertinent expert reports do not support Dr. Ragusa's assertion. In *Cooper*, there was direct evidence of a racial gerrymander and Dr. Ansolabehere's analysis was simply circumstantial evidence cited in one paragraph in the opinion. 581 U.S. at 322. In *Bethune Hill*, Dr. Ragusa admitted to having not even reviewed Dr. Palmer's expert report. Tr. 1090:18-22. Instead, Dr. Palmer's report categorically demonstrates the following different analysis than the county envelope methodology employed by Dr. Ragusa: (1) no county envelope, instead Dr. Palmer's models used VTDs for the entire state; (2) a vote index was utilized instead of a singular election; (3) Dr. Palmer used a distance measure where Dr. Ragusa only used his border block variable; and (4), Dr. Palmer's models were weighted based on VTD population, whereas Dr. Ragusa used no weighting. Tr. 1091:18-1092:24.

380.    Dr. Ragusa also cited to an article entitled "Old Voters, New Voters, and the Personal Vote" by Dr. Ansolabehere, Snyder, and Stewart III in the American Journal of Political Science (2000, Vo. 44). [PTX-006], p. 7. However, this article is not about racial gerrymandering, it does not analyze race or ethnicity or data at the block level, it uses multiple

---

[17]Dr. Ragusa was hired by plaintiffs in *South Carolina State Conf. of NAACP v. Alexander*, 649 F. Supp. 3d 177 (D.S.C. 2023), in a racial gerrymandering suit. This was the first time Dr. Ragusa has been qualified as an expert and the first time he utilized his "county envelope" methodology that is also used in this case. Of note, *South Carolina State Conf. of NAACP v. Alexander* is on appeal to the United States Supreme Court whereby Dr. Ragusa's methodology is being questioned.

elections for its analysis and, ultimately, Dr. Ragusa uses only "broad" elements from the models in the articles. Tr. 1061:16-1066:12.[18]

381.    In performing his analysis, Dr. Ragusa conducted a multivariate analysis that attempted to examine the movements of voters between districts by the Enacted Plan. [PTX-005, p. 5]. In this analysis, Dr. Ragusa considered only four variables by census block that he presumed were the most likely considered by the mapdrawers in efforts to determine whether race was a significant factor in the composition of the challenged districts: (1) BVAP; (2) Trump 2020 vote to measure partisan politics for partisan gerrymandering (Trump Vote); (3) Total VAP; and (4) Border Block—which is those blocks on the border of the benchmark district. *Id.* at 8-9.

382.    Dr. Ragusa admitted that he does not and cannot know all the variables considered by the mapdrawers in drawing the challenged districts. Tr. 1076:16-22.

383.    Further, Dr. Ragusa did not review the criteria adopted by the State of Mississippi, which included a requirement that each district should be within +/- 5% deviation of the ideal district size—a variable that could have been included in the models as certainly considered by the mapdrawers when drawing the challenged districts. Tr. 1123:22-1124:5. The criteria also included a requirement that the maps be in compliance with the Voting Rights Act. Tr. 1124:13-1125:5; [JTX-008].

384.    In fact, nowhere did Dr. Ragusa conclude that race was the predominant factor in drawing the districts; instead, he testified that he "[didn't] know what [was] needed to arrive at a conclusion of racial predominance." Tr. 1094:20-195:12. And, he did not use the word

---

[18] Dr. Ragusa, for the first time during trial, also cited to an article entitled "The Interest of Redistricting, Race and Participation" by Hayes and McKee. Tr. 996:11-18; Tr. 1068:19-24. However, this article is also not about racial gerrymandering and contains no mention of the county envelope. Tr. 1067:3-21; Tr. 1301:8-1302:14.

"predominance" in any of his reports. Tr. 1075:1-3. Instead, Dr. Ragusa used the word

"significant," which he admitted did not have the same meaning as "predominance." Tr. 1094:3-

5.

385.    Dr. Ragusa admitted that his analysis "can't disentangle intentional from

unintentional racial discrimination" but that he understood race could be a factor considered in

redistricting. Tr. 1120:15-23. Because Plaintiffs have the burden of proof, their ambiguous

circumstantial evidence cannot support an inference of invidious discriminatory intent.

386.    Dr. Ragusa admitted that his analysis was only "one piece of the potential

evidence" and that it was not the only evidence that was relevant. Tr. 1075:5-7; Tr. 1094:11-19.

387.    Dr. Ragusa's analysis includes three models for each district based around the

inclusion or exclusion of a block in the Enacted Plan. [PTX-005, pp. 6-7]. Two of these models

include a concept called the "county envelope" whereby all blocks outside the benchmark district

but within the same county or counties of the benchmark district are considered as equally likely

to be included or excluded within the newly enacted district. *Id.* at 6; *see also* [DX-003, p. 6].

388.    Defendants' expert, Dr. Brunell, criticized Dr. Ragusa's "county envelope"

methodology as pure speculation regarding what the mapdrawers may or may not have

considered. [DX-003, p. 6].  Dr. Brunell asserts that Dr. Ragusa's "county envelope" method is

over-inclusive by including blocks at the far end of a populous county as just as likely to be

included in the enacted district even though doing so could make the district non-contiguous. *Id.*

at 6-7. Likewise, Dr. Brunell asserts that the "county envelope" model is under-inclusive by not

considering counties adjacent to the benchmark districts that very well may have been

considered by the mapdrawers when drawing the new districts. *Id.* This is evident by the fact that

over 30 districts changed county composition in the redistricting of Mississippi. *Id.* at 6. Further,

it is unknown for how many other districts the mapdrawers considered changing the county composition. *Id.* at 6-7.  Dr. Brunell demonstrated his under and over-inclusiveness criticism by examining the benchmark map of DeSoto County, a county that included all or parts of seven House districts. [DX-003, p. 19]; Tr. 1304:5-1309:19.

389.    Dr. Brunell also criticized Dr. Ragusa's analysis for not taking into account compactness, contiguity or equal population. Tr. 1309:24-1313:21.

390.    Dr. Ragusa failed to account for incumbency. Tr. 1072:7-20.

391.    Dr. Ragusa claimed that no adjustments were needed for two districts because they were within deviation under the benchmark, but Dr. Ragusa did not examine the neighboring districts around any of the challenged districts to know the population or demographic needs of the neighboring districts, which could indicate why people were moved in or out of the challenged districts. Tr. 1126:4-25.

392.    To explain how he determined that race was considered a significant factor in the drawing of each challenged district, Dr. Ragusa states: "[i]n the analysis, the BVAP variable will be statistically insignificant if race does not reliably predict how the district lines were reconfigured. In other words, an insignificant BVAP variable would be an inclusive result on the question of racial gerrymandering. Alternatively, a significant BVAP variable would indicate that the racial composition of a block was a reliable predictor of its district assignment under the Enacted Plan. A statistically significant BVAP would therefore constitute evidence of racial gerrymandering." [PTX-005, p. 8].

393.    Political performance was a stated goal of the Legislature in drawing the districts. Tr. 1121:25-1123:6.

394.    To account for the role that partisanship plays in redistricting, Dr. Ragusa relied on a single federal election for his models—the 2020 Trump election. Tr. 1078:5-16. However, in its review of partisanship, the State of Mississippi considered statewide races—the 2019 Attorney General's race and the 2019 Governor's race. Tr. 1080:14-1081:1.

395.    Dr. Ragusa prepared 15 models (3 for each district at issue) in an effort to determine whether race was a significant factor in the five challenged districts. Tr. 1314:3-7. While Dr. Ragusa concluded that race was a significant factor for each of the districts, his own models also demonstrated that partisan politics—the Trump Vote variable—was statistically significant more often than race. [DX-008].

396.    In the 15 models:

a.    BVAP and the Trump Vote were significant in 7;

b.    BVAP was not significant, but the Trump Vote was significant in 5;

c.    BVAP was significant, but the Trump Vote was not significant in 2; and

d.    Neither BVAP nor the Trump Vote was significant in 1. *See* [DX-008].

397.    A variable may be statistically significant, but substantively insignificant. Or, in other words, the statistically significant variable may have very little impact on the analysis. Tr. 1314:15-1315:14. Without a substantive analysis, a researcher cannot tell which variable had a bigger impact or bigger effect. *Id.* While Dr. Ragusa performed a substantive significance test for BVAP, he inexplicably failed to do so for the Trump Vote thereby leaving devoid any determination of which variable had a greater effect or was more important on the drawing of the districts. Tr. 1113:19-1116:6; Tr. 1314:12-14.

398.     As a result, HD 22, HD34 and SD 2 have no models that demonstrate that the BVAP variable (i.e., race) had a bigger impact or was more important that the Trump Vote (i.e., party). [DX-008].

399.     The remaining two districts, HD 64 and SD 48, each had only one model where BVAP was significant and the Trump Vote was not. *Id*; Tr. 1116:7-11. But, again, Dr. Ragusa could not say race predominated in the drawing of these two districts.

400.     Accordingly, Dr. Ragusa's substantive significance test for HD 64 revealed that a block with a 0% BVAP had an approximate 7% chance of being moved in or kept in HD 64 compared to a block with a 100% BVAP with an approximate 3% chance of being moved in or kept in the district—a total change of a mere 4%. [PTX-005, p. 18]; Tr. 1118:3-1119:17.

401.     Notwithstanding Dr. Ragusa's models' statistical infirmities, his models also do not consider traditional redistricting criteria for the districts as a whole, nor do they compare the districts to other unchallenged districts in the plan to determine any telling deviations. Tr. 1134:7-19; Tr. 1136:15-22.

402.     Furthermore, Dr. Ragusa's robustness checks, undertaken in response to Dr. Brunell's claims of over or under-inclusiveness for the "county envelope" method, continue to reinforce the flaws in that method by artificially limiting the ability of the mapdrawers by restricting the manner in which the districts can be drawn. Tr. 1315:15-1316:21. HD 22 is the example, but the same over or under-inclusiveness criticism applies to all of the districts. In the Enacted Plan, the mapdrawers moved HD 22 east into Monroe County and removed some blocks in Pontotoc and Chickasaw Counties, while keeping others from the Benchmark. [PTX-006, p. 10]; Tr. 1142:12-1144:2. Dr. Ragusa's robustness checks include these counties in the "county envelope" from which were possible areas that the mapdrawers considered. *Id.* However, Dr.

Ragusa failed to include Calhoun County, directly to the west of HD 22, in any of his robustness checks as a county of possible consideration by the mapdrawers despite it being directly adjacent to HD 22. *Id.*

403.    Dr. Ragusa performed 5 new statistical tests for Model 1 in his robustness checks. [PTX-006, pp. 11-16]. Yet, again, for all 5 new tests, the Trump Vote variable—partisanship—shows up as statistically significant. Tr. 1317:10-12. And, again, Dr. Ragusa failed to perform a substantive significance test on the Trump Vote to determine whether race or partisanship played a greater role in the drawing of the districts. Tr. 1317:13-19.

404.    In discussing precinct splits, Dr. Ragusa admitted that he did not know if the State had access to partisanship data at the precinct level, the block level or both. Tr. 1139:18-1140:4. Dr. Ragusa acknowledged that precinct splits at the block level could be based on incumbent requests and knowledge of his or her constituents to get re-elected. 1140:11-1141:6.

405.    Finally, Dr. Ragusa presented no alternative maps to disentangle race from party to demonstrate that the challenged districts are not merely a product of partisan politics. Tr. 1138:25-1139:3.

**b. Conclusions of Law**

406.    "The courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." *Miller*, 515 U.S. at 915–16 (citing *Shaw v. Reno*, 509 U.S. 630, 646 (1993)).

407.    One of the Legislature's adopted criteria was compliance with Section 2 of the Voting Rights Act, demonstrating that race was considered in the composition of the districts.

[JTX-008]; Tr. 1124:13-1125:5.

408.    Plaintiffs bear a "demanding" burden to prove their racial gerrymandering claim. *Cooper*, 581 U.S. at 318-19 (quoting *e.g., Cromartie II*, 532 U.S. at 241).

409.    To carry this burden, Plaintiffs "must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916).

410.    This requires Plaintiffs to prove that race was the Legislature's "dominant and controlling consideration," *Shaw*, 517 U.S. at 905, such that the Legislature "subordinated" race-neutral districting principles to "racial considerations." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916).

411.    In *Rucho*, "the Court held that claims of excessive partisanship in districting are not justiciable." *Mi Familia Vota v. Abbott*, 977 F.3d 461, 466 (5th Cir. 2020) (citing *Rucho*, 139 S.Ct. at 2491).  "[D]etermining that lines were drawn on the basis of partisanship does not indicate that the districting was improper. A permissible intent—securing partisan advantage—does not become constitutionally impermissible, like racial discrimination, when that permissible intent 'predominates.'" *Id.* at 2502. Accordingly, claims of partisan gerrymanders are political questions that "lack 'judicially discoverable and manageable standards for resolving [them].'" *Rucho*, 139 S.Ct. at 2494 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

412.    Here, the only proof offered by Plaintiffs of a racial gerrymander is, at best, weak circumstantial evidence, consisting of a report and opinion by a single academic expert, Dr. Jordan Ragusa, applying his unproven and questionable "county envelope" method. Dr. Ragusa cannot conclude that race predominated in the drawing of any of the challenged districts because he simply does not know what was considered by the mapdrawers. Further, Dr. Ragusa's models

do not take into account traditional redistricting principles at the district level, nor does he make any comparisons of the challenged districts to the other unchallenged districts in the plans, as one would expect under *Miller* and its progeny in analyzing whether traditional redistricting criteria were subordinated. *See Miller*, 515 U.S. at 916-17. Dr. Ragusa also failed to analyze the deviation and demographic requirements of the neighboring districts to the challenged districts, which could explain why populations were moved in or out of the challenged districts. Dr. Ragusa's methodology is flawed and unreliable to establish the necessary elements for racial predominance.

413.    It is the Plaintiffs' burden to prove their racial gerrymander claims and to disentangle race from political affiliation. *See Cooper*, 581 U.S. at 307-08. In 12 of Dr. Ragusa's 15 models[19] in his principal report, the Trump Vote—or the variable measuring partisan politics that could explain the districts' composition—shows up as statistically significant either by itself (5 models) or in conjunction with the BVAP variable (7 models). Further, in Dr. Ragusa's robustness checks in his responsive report, the Trump Vote shows up as significant in all five new tests. Thus, for the 12 models where BVAP and the Trump Vote are statistically significant (principal report and robustness checks), a substantive significance test should also have been performed to determine which variable—BVAP or the Trump Vote—was more important or had a greater effect. Or, in this case, which one predominated. However, while Dr. Ragusa performed a substantive significance test for BVAP, he inexplicably failed to do one for the Trump Vote. If nothing else, in no less than 18 of the 20 models, Dr. Ragusa's own methodology tells us that the challenged districts could just as much be the result of partisan politics than anything else.

414.    "[W]here racial identification correlates highly with political affiliation, the party

---

[19] In one model, neither BVAP nor the Trump Vote showed up as statistically significant.

attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles. That party must also show that those districting alternatives would have brought about significantly greater racial balance." *Cromartie II*, 532 U.S. at 258.

415.    So, Plaintiffs must "disentangle race from politics and prove that the former drove a district's lines." *Cooper*, 581 U.S. at 307-08.

416.    Accordingly, Plaintiffs "need an alternative map" where, as here, they "rely on evidence of forgone alternatives—only maps of that kind could carry the day." *Cooper*, 581 U.S. at 322 (citing *Cromartie II*, 532 U.S. at 258). Plaintiffs produced no such maps.

417.    Plaintiffs presented no evidence—either through lay or expert witnesses—of any intentional discrimination. Dr. Ragusa's circumstantial evidence is flawed and unreliable.  If nothing else, it demonstrates how much partisan politics played a role in the composition of the five challenged districts—but whether party or race predominated—the Plaintiffs have left us in the dark.  And, under *Cromartie* and *Cooper*, Plaintiffs failed to present alternative maps to demonstrate that it was race, not party, that drove the creation of the challenged districts. The Plaintiffs have failed to meet their burden to carry their racial gerrymandering claims in any of the five challenged districts.

**VII.    Remedy**

418.    There is no need for any remedy.  The Enacted 2022 House Plan and the Enacted 2022 Senate Plan are constitutional and enforceable, and the Court should enter judgment for Defendants on all counts.

419.    In the event the Court determines that one or more House or Senate districts constitutes a violation of Section 2 of the Voting Rights Act or of the Fourteenth Amendment,

this Court should afford the State Legislature a reasonable opportunity to cure by drawing new district maps.  *See, e.g., Smith v. Clark*, 189 F. Supp. 2d 503, 507 (S.D. Miss. 2002), *aff'd sub nom. Branch*, 538 U.S. 254; *Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022), *cert. granted before judgment*, 142 S.Ct. 2892 (2022), and *cert. dismissed as improvidently granted*, 143 S.Ct. 2654 (2023), and *vacated and remanded*, 86 F.4th 574 (5th Cir. 2023) (citing *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978)).

420.    This Court is not required to order a special election.  Instead, ordering a special election involves an "equitable weighing process" taking into account "what is necessary, what is fair, and what is workable."  *North Carolina v. Covington*, 581 U.S. 486, 488 (2017). The Enacted Plans were adopted on March 31, 2022. Plaintiffs did not file this suit until December 20, 2022. [Dkt. #1]. *See Lopez v. Hale Cty., Tex.*, 797 F. Supp. 547, 550 (N.D. Tex. 1992), *aff'd* 506 U.S. 1042 (1993) (barring untimely Voting Rights Act challenges).

421.    In deciding whether to truncate existing legislator's terms and order a special election, "obvious considerations include the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and the need to act with proper judicial restraint when intruding on state sovereignty." *Covington*, 581 U.S. at 488 (citing *Swann v. Charlotte–Mecklenburg Bd. of Ed.,* 402 U.S. 1, 16 (1971)).  "These factors … are among the matters a court would generally be expected to consider in its 'balancing of the individual and collective interests' at stake."  *Id.*

422.    Here, Plaintiffs cannot demonstrate the severity of any particular constitutional violations.  They have not proved any violation of any nature or severity.

This the 29th day of March, 2024.

Respectfully submitted,

STATE BOARD OF ELECTION
COMMISSIONERS; TATE REEVES, IN HIS
OFFICIAL CAPACITY AS GOVERNOR OF
MISSISSIPPI; LYNN FITCH, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
MISSISSIPPI; MICHAEL WATSON, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
STATE, DEFENDANTS

By: */s/ Tommie S. Cardin*

    Tommie S. Cardin (MB #5863)
    ONE OF THEIR COUNSEL

OF COUNSEL:

Tommie S. Cardin (MB #5863)
P. Ryan Beckett (MB #99524)
B. Parker Berry (MB #104251)
J. Dillon Pitts (MB #106399)
**BUTLER SNOW LLP**
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
P.O. Box 6010, Ridgeland, MS 39158-6010
Phone: 601.948.5711
Fax:     601.985.4500
tommie.cardin@butlersnow.com
ryan.beckett@butlersnow.com
parker.berry@butlersnow.com
dillon.pitts@butlersnow.com

Rex M. Shannon III (MB #102974)
**STATE OF MISSISSIPPI**
**OFFICE OF THE ATTORNEY**
**GENERAL**
**CIVIL LITIGATION DIVISION**
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-4184
Fax: (601) 359-2003
rex.shannon@ago.ms.gov

MISSISSIPPI REPUBLICAN EXECUTIVE
COMMITTEE, INTERVENOR-DEFENDANT
By: */s/ Michael B. Wallace*
MICHAEL B. WALLACE (MB #6904)

OF COUNSEL:

Michael B. Wallace (MB #6904)
Charles E. Cowan (MB #104478)
**WISE CARTER CHILD & CARAWAY, P.A.**
401 East Capitol Street, Suite 600
P.O. Box 651, Jackson, MS 39201
Ph: (601) 968-5500
Fax: (601) 968-5519
mbw@wisecarter.com
cec@wisecarter.com

## CERTIFICATE OF SERVICE

I, Tommie S. Cardin, one of the attorneys for the Defendants, do hereby certify that I have this day filed the above and foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 29th day of March, 2024.

*/s/ Tommie S. Cardin*
Tommie S. Cardin