**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| MISSISSIPPI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; DR. ANDREA WESLEY; DR. JOSEPH WESLEY; ROBERT EVANS; GARY FREDERICKS; PAMELA HAMNER; BARBARA FINN; OTHO BARNES; SHIRLINDA ROBERTSON; SANDRA SMITH; DEBORAH HULITT; RODESTA TUMBLIN; DR. KIA JONES; MARCELEAN ARRINGTON; VICTORIA ROBERTSON, | |
| *Plaintiffs*, | **CIVIL ACTION NO.** **3:22-cv-734-DPJ-HSO-LHS** |
| vs. | |
| STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, *in his official capacity as Governor of Mississippi*; LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON, *in his official capacity as Secretary of State of Mississippi,* | |
| *Defendants,* AND | |
| MISSISSIPPI REPUBLICAN EXECUTIVE COMMITTEE, | |
| *Intervenor-Defendant.* | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ........................................................................................1

I.      The Redistricting Process ....................................................................................1

II.     Parties..................................................................................................................5

    A.   Plaintiffs and MS NAACP Members....................................................................5

    B.   Defendants .........................................................................................................12

    C.   Intervenor ..........................................................................................................13

III.    Vote Dilution:  *Gingles* 1 ..................................................................................13

    A.   The Black Population in Mississippi ..................................................................16

    B.   The Benchmark and Enacted Plans.....................................................................19

    C.   Plaintiffs' Illustrative Plans................................................................................22

    D.   The Numerosity and Compactness of the Black Population as Demonstrated by the
Illustrative Plans ...............................................................................................................29

IV.     Vote Dilution:  *Gingles* 2 and 3 ........................................................................50

    A.   Dr. Handley's RPV Analysis .............................................................................52

    B.   Dr. Handley's Effectiveness Analysis ...............................................................65

V.      Vote Dilution:  Totality of the Circumstances...................................................72

    A.   Senate Factor 1:  Mississippi's History of Voting-Related Discrimination Against Black
Voters ...............................................................................................................................72

    B.   Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi........................85

    C.   Senate Factor 3: Mississippi's Voting Practices and Procedures That Tend to Enhance the
Opportunity for Discrimination Against Minority Voters ......................................................97

    D.   Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political
Participation ....................................................................................................................102

    E.   Senate Factor 6:  Racial Appeals in Mississippi Politics....................................125

    F.   Senate Factor 7:  Lack of Success for Black Candidates in Mississippi ........................129

    G.   Senate Factor 8:  Lack of Responsiveness to the Needs of Black Mississippians............134

    H.   Senate Factor 9:  Tenuous Justifications for the Challenged Plans ..................139

VI.     Racial Gerrymandering.....................................................................................144

    A.   Consideration of Racial Data During the Redistricting Process .......................144

B.   Dr. Jordan Ragusa's Analysis ...............................................................147

C.   Dr. Thomas Brunell's Response to Dr. Ragusa .....................................162

D.   Racial Predominance in the Five Challenged Districts...........................173

VII.   Remedy .........................................................................................................210

PROPOSED CONCLUSIONS OF LAW .......................................................................214

I.   Jurisdiction, Parties, and Standing ..............................................................214

II.   Right of Action to Enforce Section 2 ...........................................................218

III.   Vote Dilution: The *Gingles* Framework .....................................................220

IV.   *Gingles* 1 ......................................................................................................224

A.   Numerosity ............................................................................................225

B.   Compactness and Other Traditional Redistricting Principles.................227

C.   Racial Predominance ............................................................................235

V.   *Gingles* 2 and 3 ............................................................................................237

VI.   Totality of Circumstances .............................................................................244

A.   Senate Factor 1: Mississippi's History of Voting-Related Discrimination Against Black Voters ...............................................................................................................246

B.   Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi.....................248

C.   Senate Factor 3: Mississippi's Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters ...........................................255

D.   Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation ...............................................................................................................257

E.   Senate Factor 6: Racial Appeals in Mississippi Politics..................................261

F.   Senate Factor 7: Lack of Success for Black Candidates in Mississippi .........................262

G.   Senate Factor 8: Lack of Responsiveness to the Needs of Black Mississippians.............264

H.   Senate Factor 9: Tenuous Justifications for the Challenged Plans .................................265

I.   Proportionality ......................................................................................267

VII.   Racial Gerrymandering .................................................................................269

A.   Legal Standard ......................................................................................269

B.   Racial Predominance in the Five Challenged Districts...........................274

C.   Strict Scrutiny ......................................................................................282

VIII.   Remedy .........................................................................................................283

A.   Remedial Plans.............................................................................................284

B.   Special Elections..........................................................................................285

## PROPOSED FINDINGS OF FACT

### I.    The Redistricting Process

1.    The Mississippi State Legislature is responsible for establishing new plans for Mississippi's state legislative districts following each decennial Census.  *See* Miss. Const. Art. XIII, Sec. 254.

2.    The number of state legislative districts is set by the Mississippi State Constitution. There are 52 State Senate districts and 122 State House districts.  Miss. Const., Art. 13, Sec. 254.

3.    The maps must be approved by the Standing Joint Legislative Committee on Reapportionment ("SJLCR"), and ultimately by the full House and Senate by majority vote on a joint resolution.  Miss. Const. Art. 13, Sec. 254; Miss. Code Ann. § 5-3-91; Miss. Code Ann. § 5-3-93.  The boundaries for the state legislative districts are drawn by the Legislature and not subject to gubernatorial veto.  *See* Miss. Const. Art. 13, Sec. 254.

4.    In November 2021, the SJLCR adopted redistricting criteria for the map-drawing process.  Joint Ex. 13, Notice, Agenda, Minutes from November 19, 2021 Meeting of Joint Committee [hereinafter "JTX-013"] at 8.  That meeting lasted about fifteen minutes.  *Id.* at 8–9.

5.    For state legislative districts, the criteria adopted by the SJLCR specified that district population deviations should be less than 5% above or below the ideal population of the district, districts should be contiguous, and the redistricting plan should comply with all applicable state and federal laws, including Section 2 of the VRA and the Mississippi Constitution and U.S. Constitution.  *E.g.*, Joint Pre-Trial Order, Dkt. 199, Appx. A: Stipulated Facts [hereinafter "Stip."] at ¶¶ 57, 60 (also marked as Joint Ex. 55); Joint Ex. 8, Redistricting Criteria of the Joint Committee [hereinafter "JTX-008"].  The criteria adopted by the SJLCR do not include partisan gain, political performance, or incumbent protection.  *Id.*

6.      The Mississippi Code further specifies that "[e]very district shall be compact and composed of contiguous territory and the boundary shall cross governmental or political boundaries the least number of times possible," and that "[d]istricts shall be structured, as far as possible and within constitutional standards, along county lines; if county lines are fractured, then election district lines[1] shall be followed as nearly as possible."  Mississippi Code Annotated [hereinafter "Miss. Code Ann."] § 5-3-101.

7.      Although the SJLCR held nine public hearings between August 5, 2021 and August 23, 2021, no proposed maps were revealed at any of these hearings.  Stip. ¶ 58; *see also* Joint Exhibits 22 through 30, SJLCR Hearing Transcripts.  The public was never given an opportunity to comment on the maps being considered in secret by the SJLCR:  On Sunday, March 27, 2022, just nine days before the end of the legislative session, the SJLCR revealed to the public, for the first time, proposed maps for both the Mississippi State Senate and State House.  Stip. ¶ 63.

8.      The same day at 5:00 p.m., the SJLCR voted to adopt a proposed State House map, with Representative Bo Brown, Senator Angela Turner-Ford, and Senator Derrick Simmons voting against the map.  The SJLCR also voted to adopt a proposed State Senate map, without a recorded vote of the yays and nays.  *See* Stip. ¶ 63; Joint Ex. 14, Minutes from December 7, 2021 Meeting of Joint Committee at 1–3 [hereafter "JTX-014"].

9.      Both Enacted Plans kept the number of Black-majority districts the same as the plans that had been last used for state legislative elections prior to the 2020 Census.  *E.g.*, Stip. ¶¶ 68, 69, 79, 80.

---

[1] In Mississippi, election districts refer to voting precincts used for elections.  Consistent with the trial record, the terms "precincts" or "VTDs" are used interchangeably throughout to refer to such geography.

10.     Two days later, on March 29, the full State House voted to adopt the House districting plan with one minor amendment, and the full State Senate voted to adopt the Senate districting plan unaltered.  *See* Stip. ¶ 64.

11.     Most of the Legislature's Black representatives and senators voted against adoption of these plans and some criticized them in the brief floor debate that was allowed on the issue. *See, e.g.*, Joint Ex. 10, Transcript of Video Proceedings, Mississippi House of Representatives, March 29, 2022, at 16:7–18:21, 32:11–35:24 [hereinafter "JTX-010"]; Joint Ex. 11, Transcript of Video Proceedings, Mississippi Senate, March 29, 2022, at 98:9–100:5 [hereinafter "JTX-011"]. For example, during the House debate, Representative Robert Johnson introduced an amendment with a proposed map that showed it was possible to have an additional five majority-Black districts in the State House.  JTX-010 at 33:7–10, 34:22–25.  Representative Johnson stated that the SJLCR's plan packed the Black population into fewer Black-majority districts and diluted Black Mississippians' voting strength and explained that his amendment demonstrated an alternative that would avoid those results.  Representative Johnson also noted that he had consulted other Black representatives who "constantly feel locked out of the process."  JTX-010 at 43:1–12.  The House did not take the time to review Representative Johnson's amendment.  Instead, after a brief discussion, the House rejected the amendment by a vote of seventy-seven to thirty-nine.  JTX-010 at 47:20–21.  Shortly thereafter, the House approved the SJLCR's initial proposed map by a vote of eighty-one to thirty-seven.  JTX-010 at 48:5–6.

12.     During the March 29 Senate debate, Senator Derrick Simmons introduced an amendment with a proposed map that included an additional four majority-Black districts in the State Senate, noting that a "map that maintains the status quo simply dilutes [B]lack voting strength in Mississippi."  JTX-011 at 99:9–100:12.  In response, Senator Dean Kirby, the vice-chair of the

SJLCR, told the Senate, "this is not a map that this state needs." *Id.* at 99:9–100:20. Without any further questions, comments, or debate, and after a very brief discussion, the Senate voted down the amendment. The Senate eventually approved the SJLCR's initial proposed map by a vote of forty-five to seven. JTX-011 at 194:13–14.

13.     The floor debates contained generalized statements from Senator Kirby and Representative Beckett that "maintaining the political performance" of the electoral districts was "[a]n important consideration," but those statements were not in relation to the specific districts at issue in this case, nor was there any mention of the types of data (i.e., racial or political) that were used to achieve that general goal. *See* JTX-010 at 15:1–3; JTX-011 at 12:6–11. Senator Kirby also stated his expectation that the districting plan "will end up in court." JTX-011 at 12:22–24.

14.     On March 31, 2022, four days after the proposed maps were first revealed to the public, the House approved the Senate plan, and the Senate approved the House plan. Stip. ¶ 65.

15.     The plans [hereinafter and throughout, the "Enacted Senate Plan" and the "Enacted House Plan"] became law on March 31, 2022.

16.     Plaintiffs challenge the Enacted Plans as violating both Section 2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. Under Section 2, Plaintiffs claim that four additional State Senate districts and three additional State House districts are required to be drawn. Separately, Plaintiffs contend that two Senate districts and three House districts were drawn via unconstitutional racial gerrymandering. Where Plaintiffs raise both claims in the same geographic area, the Court need not decide the constitutional claim if Plaintiffs prevail on the statutory claim. The following chart is a summary of the areas and districts where Plaintiffs have raised a claim (areas comprising the same or overlapping parts of Mississippi appear on the same row):

| Section 2 Vote Dilution Areas<br>*(Areas Where an Additional Majority-Black District Could Be Drawn)* | Racially Gerrymandered Districts<br>*(Districts Where Voters Were Unlawfully Sorted on the Basis of Race)* |
|---|---|
| Illustrative Senate District 2 (in and around DeSoto and Tunica Counties) | Enacted Senate District 2 (DeSoto County) |
| Illustrative Senate District 17 (in and around Chickasaw, Clay, Lee, and Monroe Counties) | -- |
| Illustrative Senate District 35 (in and around Copiah, Lincoln, Simpson, and Jefferson Davis Counties) | -- |
| Illustrative Senate District 9 (in and around the City of Hattiesburg) | -- |
| -- | Enacted Senate District 48 (Harrison and Hancock Counties) |
| | |
| Illustrative House District 22 (in and around Chickasaw and Monroe Counties) | Enacted House District 22 (Chickasaw, Monroe, and Pontotoc Counties) |
| -- | Enacted House District 34 (Carroll, Grenada, Lafayette, and Yalobusha Counties) |
| Illustrative House District 56 (in and around the City of Clinton in Hinds County) | -- |
| | Enacted House District 64 (Hinds and Madison Counties) |
| Illustrative House District 84 (in and around Clarke, Jasper, and Newton Counties) | |

## II.      Parties

### A.      Plaintiffs and MS NAACP Members

17.     Plaintiff Mississippi State Conference of the National Association for the Advancement of Colored People, Inc. ("MS NAACP") is a subsidiary organization of the National Association for the Advancement of Colored People, Inc., a national non-profit organization founded in 1909.  Stip. ¶ 1.  The mission of the MS NAACP is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination in Mississippi; the MS NAACP is in turn composed of county and local branches, including in the various areas at issue in this case, such as Gulfport, Forrest County (Hattiesburg),

Newton County, DeSoto County, and Monroe County. *E.g.*, M. Cunningham Testimony, 2/27/2024 Trial Tr. 245:14–18; G. Fredericks Testimony, 2/29/2024 Trial Tr. 891:12–15; 893:5–10; J. Wesley Testimony, 2/28/2024 Trial Tr. 670:9–671:25; P. Hamner Testimony, 2/28/2024 Trial Tr. 706:5–20; K. Harris Testimony, 2/28/2024 Trial Tr. 688:22–689:4.

18.   Protecting the right to vote and securing an equal vote and fair representation for Black Mississippians is and has long been a central mission of the MS NAACP. *E.g.*, G. Fredericks Testimony, 2/29/2024 Trial Tr. 891:4–24. The Mississippi NAACP accordingly considers redistricting very important to its work. *Id*. at 893:2–4.

19.   The MS NAACP has members who are registered voters who reside in each of the Senate Districts 2 and 48 and House Districts 22, 34, and 64, i.e., the districts that Plaintiffs challenge as unconstitutional racial gerrymanders. *See* Stip. ¶ 2.

20.   Plaintiffs Dr. Andrea Wesley, Dr. Joseph Wesley, Robert Evans, Gary Fredericks, Otho Barnes, Marcelean Arrington, Deborah Hulitt, Kia Jones, Pamela Hamner, and Rodesta Tumblin, among others, are members of the MS NAACP. Stip. ¶¶ 5–8, 11, 13, 15, 16, 18; P. Hamner Testimony, 2/28/2024 Trial Tr. 706:20–25. Mamie Cunningham and Sharon Moman, who testified at trial, are also members of the MS NAACP. Stip. ¶¶ 3–4.

21.   Plaintiff Dr. Andrea Wesley is a citizen of the United States and the State of Mississippi, residing in Forrest County. Stip. ¶ 5. She is over the age of 18. *Id.* She is a member of the MS NAACP. *Id.* She identifies as Black. *Id.* She is a registered voter in Senate District 45 under the Enacted Senate Plan and intends to vote in that district in future elections. *Id.* Dr. Andrea Wesley also resided in Senate District 45 under the prior previous decade's maps. *Id.* Enacted Senate District 45 is not majority-Black. *Id.* In the Illustrative Senate Plan, Ms. Wesley would reside in majority-Black Senate District 9. *Id.*

22.     Plaintiff Dr. Joseph Wesley is a citizen of the United States and the State of Mississippi, residing in Forrest County.  Stip. ¶ 6.  He is over the age of 18.  *Id.*  He identifies as Black.  J. Wesley Testimony, 2/28/2024 Trial Tr. 664:9–10.  He has lived in Hattiesburg, Mississippi for over 40 years and is a retired career technical counselor.  J. Wesley Testimony, 2/28/2024 Trial Tr. 664:18–666:12.  Dr. Wesley is involved with numerous community organizations in Hattiesburg.  *Id.* at 667:3–675:1.  He is a member of MS NAACP and is the chair of the Forrest County Branch's political action committee.  *Id*. at 667:24–669:9; Stip. ¶ 6.  He is a registered voter in Senate District 45 under the Enacted Senate Plan and intends to vote in that district in future elections.  J. Wesley Testimony, 2/28/2024 Trial Tr. 666:2–9; Stip. ¶ 6.  Dr. Joseph Wesley also resided in Senate District 45 under the previous decade's maps.  Stip. ¶ 6.  Enacted Senate District 45 is not majority-Black.  *Id.*  In the Illustrative Senate Plan, Mr. Wesley would reside in majority-Black Senate District 9.  *Id.*

23.     Plaintiff Robert Evans is a citizen of the United States and the State of Mississippi, residing in Forrest County.  Stip. ¶ 7.  He is over the age of 18.  *Id.*  He is a member of MS NAACP.  *Id*.  He identifies as Black.  *Id*.  He is a registered voter in Senate District 45 under the Enacted Senate Plan and intends to vote in that district in future elections.  *Id.*  Mr. Evans also resided in Senate District 45 under the previous decade's maps*.  Id.*  Enacted Senate District 45 is not majority-Black.  *Id.*  In the Illustrative Senate Plan, Mr. Evans would reside in majority-Black Senate District 9.  *Id.*

24.     Plaintiff Gary Fredericks is a citizen of the United States and the State of Mississippi, residing in Harrison County.  Stip. ¶ 8.  He is over the age of 18.  *Id.*  Mr. Fredericks is a lifelong resident of Gulfport, Mississippi (except for when he went to graduate school).  G. Fredericks Testimony, 2/29/2024 Trial Tr. 890:7–19.  Mr. Fredericks is involved with numerous

community organizations in Gulfport. *Id.* at 891:13–15. He is a member of MS NAACP and serves as President of the organization's Gulfport chapter. *Id.* at 893:8–24. Mr. Fredericks is a registered voter in Senate District 48 under the Enacted Senate Plan and intends to vote in this district in future elections. Stip. ¶ 8. Under the previous decade's maps, Mr. Fredericks was also in Senate District 48. *Id.* Mr. Fredericks identifies as Black. *Id.*

25.     Plaintiff Pamela Hamner is a citizen of the United States and the State of Mississippi, residing in DeSoto County. Stip. ¶ 9. She is over the age of 18. *Id.* She is a registered voter in the newly enacted Senate District 2. *Id.* She intends to vote in this district in future elections. *Id.* Under the previous decade's maps, Ms. Hamner was in Senate District 1. *Id.* Ms. Hamner identifies as Black. *Id.* Ms. Hamner, a former broadcast journalist, has lived in the city of Southaven in DeSoto County since 1998. P. Hamner Testimony, 2/28/2024 Trial Tr. 704:15–24. She ran for office in Senate District 2 in 2023 under the 2022 Enacted Senate plan, and she lost after winning 43% of the vote. *Id.* at 707:19–708:8. Ms. Hamner is a member of the DeSoto County NAACP. *Id.* at 706:20–25.

26.     Plaintiff Barbara Finn is a citizen of the United States and the State of Mississippi, residing in DeSoto County. Stip. ¶ 10. She is over the age of 18. *Id.* She identifies as Black. *Id.* She is a registered voter in Senate District 1 under the Enacted Senate Plan and intends to vote in that district in future elections. *Id.* Under the previous decade's maps, Ms. Finn was in Senate District 2. *Id.* Ms. Finn identifies as Black. Enacted Senate District 1 is not majority-Black. *Id.* In the Illustrative Senate Plan, Ms. Finn would reside in majority-Black Senate District 2. *Id.*

27.     Plaintiff Otho Barnes is a citizen of the United States and the State of Mississippi, residing in Jefferson Davis County. Stip. ¶ 11. He is over the age of 18. *Id.* He is a member of MS NAACP. *Id.* He identifies as Black. *Id.* He is a registered voter in Senate District 35 under

8

the Enacted Senate Plan and intends to vote in that district in future elections.  *Id.*  Under the previous decade's maps, Mr. Barnes was in Senate District 41.  *Id.* Enacted Senate District 35 is not majority-Black.  *Id.*  In the Illustrative Senate Plan, Mr. Barnes would reside in majority-Black Senate District 35.  *Id.*

28.     Plaintiff Shirlinda Robertson is a citizen of the United States and the State of Mississippi, residing in Jefferson Davis County.  Stip. ¶ 12.  She is over the age of 18.  *Id.*  She identifies as Black.  *Id.*  She is a registered voter in Senate District 35 under the Enacted Senate Plan and intends to vote in that district in future elections.  *Id.*  Under the previous decade's maps, Ms. Robertson was also in Senate District 35.  *Id.*  Ms. Robertson identifies as Black.  *Id.*  Enacted Senate District 35 is not majority-Black.  *Id.*  In the Illustrative Senate Plan, Ms. Robertson would reside in majority-Black Senate District 35.  *Id.*

29.     Plaintiff Marcelean Arrington is a citizen of the United States and the State of Mississippi, residing in Jasper County.  Stip. ¶ 13.  She is over the age of 18.  *Id.*  She identifies as Black.  *Id.*  She is a member of MS NAACP.  *Id.*  She is a registered voter in House District 84 under the Enacted House Plan and intends to vote in that district in future elections.  *Id.*  Ms. Arrington was assigned to House District 79 under the previous decade's maps.  *Id.*  Enacted House District 84 is not majority-Black.  *Id.*  In the Illustrative House Plan, Ms. Arrington would reside in majority-Black House District 84.  *Id.*

30.     Plaintiff Sandra Smith is a citizen of the United States and the State of Mississippi, residing in Grenada County.  Stip. ¶ 14.  She is over the age of 18.  *Id.*  She is a registered voter in the newly enacted House District 34.  *Id.*  She intends to vote in this district in the future.  *Id.*  Under the previous decade's maps, Ms. Smith was also in House District 34.  *Id.*  Ms. Smith identifies as Black.  *Id.*

31.     Plaintiff Deborah Hulitt is a citizen of the United States and the State of Mississippi, residing in Hinds County.  Stip. ¶ 15.  She is over the age of 18.  *Id.*  She is a member of MS NAACP.  *Id.*  She identifies as Black.  *Id.*  She is a registered voter in House District 56 under the Enacted House Plan and intends to vote in that district in the future.  *Id.*  Under the previous decade's maps, Ms. Hulitt was also in House District 56.  *Id.*  In the Illustrative House Plan, Ms. Hulitt would reside in majority-Black House District 56.  *Id.*

32.     Plaintiff Dr. Kia Jones is a citizen of the United States and the State of Mississippi, residing in Hinds County.  Stip. ¶ 16.  She is over the age of 18.  *Id.*  Dr. Jones is a lifelong resident of the Jackson and Jackson Metro areas.  K. Jones Testimony, 3/1/2024 Trial Tr. 918:2–21.  She is a member of MS NAACP, as well as the Junior League of Jackson and the Delta Sigma Theta Sorority.  *Id.* at 919:25–921:5; Stip. ¶ 16.  Dr. Jones identifies as Black.  Stip. ¶ 16.  Dr. Jones is a registered voter in House District 64 under the Enacted House Plan and intends to vote in that district in the future.  Stip. ¶ 16; K. Jones Testimony, 3/1/2024 Trial Tr.  918:24–919:4–5, 921:14–22.

33.     Plaintiff Victoria Robertson is a citizen of the United States and the State of Mississippi, residing in Lowndes County.  Stip. ¶ 17.  She is over the age of 18.  *Id.*  She identifies as Black.  *Id.*  She is a registered voter in Senate District 17 under the Enacted Senate Plan and intends to vote in that district in the future.  *Id.*  Under the previous decade's maps, Ms. Robertson was also in Senate District 17.  *Id.*  In the Illustrative Senate Plan, Ms. Robertson would reside in majority-Black Senate District 16.  *Id.*

34.     Plaintiff Rodesta Tumblin is a citizen of the United States and the State of Mississippi, residing in Chickasaw County.  Stip. ¶ 18.  She is over the age of 18.  *Id.*  She identifies as Black.  *Id.*  She is a member of MS NAACP.  *Id.*  She is a registered voter in House District 22

under the Enacted House Plan and intends to vote in that district in the future. *Id.* Under the previous decade's maps, Ms. Tumblin was also in House District 22. *Id.* Enacted House District 22 is not majority-Black. *Id.* In the Illustrative House Plan, Ms. Tumblin would reside in majority-Black House District 22. *Id.*

35.     Mamie Cunningham is a citizen of the United States and the State of Mississippi, residing in Chickasaw County. Stip. ¶ 3. She is over the age of 18. *Id.* She is a member of MS NAACP. *Id.* She identifies as Black. *Id.* She is a registered voter in Senate District 8 under the Enacted Senate Plan and intends to vote in that district in future elections. *Id.* Ms. Cunningham also resided in Senate District 8 under the prior previous decade's maps. *Id.* Enacted Senate District 8 is not majority-Black. *Id.* In the Illustrative Senate Plan, Ms. Cunningham would reside in majority-Black Senate District 17. *Id.* Ms. Cunningham, who is 83 years old, lives on her family farm that was passed down from her grandfather, a former slave. M. Cunningham Testimony, 2/27/2024 Trial Tr. 233:2–234:2. She has been an advocate for civil rights and voting rights since she was a college student in 1964, when she traveled to the Democratic National Convention with Fannie Lou Hamer and other movement leaders to oppose the Mississippi Democratic Party's exclusion of Black voters. *Id.* at 236:3–24, 238:2–239:17.

36.     Deacon Kenneth Harris is a citizen of the United States and the State of Mississippi, residing in Newton County. K. Harris Testimony, 2/28/2024 Trial Tr. 685:12. He is over the age of 18. *Id.* at 685:15–16. He is a member of MS NAACP. *Id.* at 688:22–689:4. He identifies as Black. *Id.* at 685:9–10. He is a registered voter in House District 81 under the Enacted Senate Plan and intends to vote in that district in future elections. *Id.* at 685:19–20, 685:25–686:2, 695:20–21. Deacon Harris resided in House District 84 under the prior previous decade's maps. *Id.* at 695:22–24. Enacted House District 81 is not majority-Black. *Id.* at 695:25–696:2. In the

Illustrative House Plan, Deacon Harris would reside in majority-Black House District 84. *Id.* at 685:11–14; JTX-007.

37.     Ashley Wilson is a citizen of the United States and the State of Mississippi, residing in Copiah County.  A. Wilson Testimony, 2/29/2024 Trial Tr. 874:6–9.  She is over the age of 18. *Id.* at 877:3–6.  She identifies as Black.  *Id.* at 873:23–24.  Ms. Wilson is a member of MS NAACP. *Id.* at 877:21–25; 879:12–14.  She is a registered voter.  *Id.* at 877:3–4.  In the Illustrative Senate Plan, Ms. Wilson would reside in majority-Black Senate District 35.  *Id.* at 877:7–11; 881:1–13.

38.     Sharon Moman is a citizen of the United States and the State of Mississippi, residing in Hinds County.  S. Moman Testimony, 2/28/2024 Trial Tr. 644:4–7.  She is over the age of 18.  *Id.* at 644:11–12.  She identifies as African-American.  *Id.* at 644:2–3.  She is a registered voter in House District 56 under the Enacted House Plan and intends to vote in that district in future elections.  *Id.* at 648:20–649:6.

### B.     Defendants

39.     Defendant the State Board of Elections Commissioners ("SBEC") is composed of the Governor, the Attorney General, and the Secretary of State.  Its respective duties are set forth in Miss. Code Ann. § 23-15-211.

40.     Defendant Tate Reeves is the Governor of the State of Mississippi and is a member of the State Board of Election Commissioners ("SBEC") pursuant to Miss. Code Ann. § 23-15-211.

41.     Defendant Lynn Fitch is the Attorney General of the State of Mississippi and is a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211.

42.     Defendant Michael Watson is the Secretary of State of the State of Mississippi and a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211.

### C.    Intervenor

43.    Intervenor is the Republican Party of Mississippi.

44.    The State Democratic Party has stipulated to be bound by any judgment in this case. *See* Stipulation, Dkt. 184.

### III.    Vote Dilution:  *Gingles* 1

45.    The first *Gingles* precondition is whether "the minority group [is] sufficiently large and geographically compact to constitute a majority in a reasonably configured district."  *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (alteration and citation omitted); *see Thornburg v. Gingles*, 478 U.S. 30, 46–51 (1986).

46.    On the first precondition, plaintiffs presented expert testimony by William Cooper, who was tendered as an expert in redistricting, demographics, and census data.  W. Cooper Testimony, 2/26/2024 Trial Tr. 84:11–14, 85:23–86:1.

47.    The Court found Mr. Cooper qualified by his extensive experience to testify as an expert witness in redistricting and demographics, including the drawing of electoral maps using Census data and map-drawing software.  *See generally, e.g.*, Pl.'s Ex. 1, Aug. 28, 2023 Report of William Cooper, at 2–5, 80–91 [hereinafter "PTX-001"]; W. Cooper Testimony, 2/26/2024 Trial Tr. 77:13–80:22.  Mr. Cooper's extensive experience dates back to the days of "working off of paper maps and then running the calculations through a macro-driven Lotus 1–2–3 spreadsheet," although he uses Maptitude software now.  W. Cooper Testimony, 2/26/2024 Trial Tr. 78:15–20, 79:4–9.

48.    Since 1987, Mr. Cooper has prepared redistricting maps in approximately 750 jurisdictions in 45 states.  *See* PTX-001 at 2–5, 80–91; W. Cooper Testimony, 2/26/2024 Trial Tr. 78:21–79:5, 81:24–82:5.  Mr. Cooper has been qualified as an expert witness on redistricting and

demographics in federal courts in well over 50 voting rights cases in 20 states. W. Cooper Testimony, 2/26/2024 Trial Tr. 80:10–13. At least six of these lawsuits resulted in changes to statewide legislative boundaries, including one in Mississippi. *See* PTX-001 at 2, 80–91. Notably, illustrative plans drawn by Mr. Cooper in a Section 2 case were recently reviewed and affirmed by the United States Supreme Court. *See Milligan*, 599 U.S. at 20, 31; W. Cooper Testimony, 2/26/2024 Trial Tr. 80:19–22.

49. Mr. Cooper has over thirty years of experience in voting cases in Mississippi. *See* PTX-001 at 4–5; W. Cooper Testimony, 2/26/2024 Trial Tr. 82:15–18, 83:10–84:10; *see also* PTX-001 at 80–91. He has served as an expert witness in redistricting and demographics in multiple statewide cases in Mississippi, including *Thomas v. Reeves*, No. 18-cv-441 (S.D. Miss. 2019), a Voting Rights Act case which resulted in the revision of Mississippi State Senate lines in the Mississippi Delta. *Id*. at 83:10–15. In addition to the *Thomas* case, he has testified at trial in two other state-level voting lawsuits in Mississippi: *NAACP v. Fordice*, No. 92-CV-250 (S.D. Miss. 1999), which involved the districts used for the Public Service Commission and Transportation Commission, and *Smith v. Clark*, No. 01-CV-855 (S.D. Miss. 2002), which involved congressional redistricting in Mississippi. PTX-001 at 4.

50. Mr. Cooper has testified at trial as an expert witness in seven local redistricting cases in Mississippi since 1990. *See, e.g., Addy v. Newton County*, No. 95-cv-39 (S.D. Miss. 1997); *Gunn v. Chickasaw County*, No. 87-cv-165 (N.D. Miss. 1989); *Nichols v. Okolona*, No. 97-cv-00030 (N.D. Miss. 1995); *Fairley v. Hattiesburg*, No. 06-cv-167 (S.D. Miss. 2008); *Boddie v. Cleveland School District*, No. 07-cv-63 (N.D. Miss. 2010); *Jamison v. City of Tupelo*, No. 07-cv-366 (N.D. Miss. 2007); *Fairley v. City of Hattiesburg*, No. 13-cv-18 (S.D. Miss. 2015); PTX-001 at 5; W. Cooper Testimony, 2/26/2024 Trial Tr. 83:18–84:10.

14

51.    He developed election plans that were adopted by local governing bodies in Webster County in the 1990s; in Bolivar County and Webster County in the 2000s; in Bolivar County, Claiborne County, and the City of Grenada in the 2010s; and in Bolivar County and Washington County in 2022.  PTX-001 at 5.  He is currently developing redistricting plans for the City of Grenada.  *Id*.

52.    For this current redistricting cycle, Mr. Cooper has testified at trial as an expert witness in redistricting and demographics in at least nine cases challenging district boundaries under Section 2 of the Voting Rights Act: *Caster v. Merrill*, No. 21-1356-AMM (N.D. Ala. 2022), *Pendergrass v. Raffensperger*, No. 21-05337-SCJ (N.D. Ga. 2022), *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 21-05339-SCJ (N.D. Ga. 2022), *NAACP v. Baltimore County*, No.21-cv-03232-LKG (D. Md. 2022), *Christian Ministerial Alliance v. Hutchinson*, No. 19-cv-402-JM (E.D. Ar. 2022), *Robinson v. Ardoin*, No. 22-cv-00211-SDD-SDJ (M.D. La. 2022), *Caroline County Branch of the NAACP v. Town of Federalsburg*, No. 23-00484-SAG (D. Md. 2023), *Dickinson Bay Area NAACP Branch v. Galveston County*, No. 22-cv-117-JVB (S.D. Tex. 2023), and *Nairne v. Ardoin*, No. 22-cv-178-SDD (M.D. La. 2023).   PTX-001 at 3–4; W. Cooper Testimony, 2/26/2024 Trial Tr. 79:12-80:9.  Those courts and numerous others have found him credible.  *See, e.g., Nairne v. Ardoin*, No. CV 22-178-SDD-SDJ, 2024 WL 492688, at *12 (M.D. La. Feb. 8, 2024); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, --- F. Supp. 3d ----, No. 1:21-CV-05337-SCJ, 2023 WL 7037537, at *16–17 (N.D. Ga. Oct. 26, 2023); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 977, 1004–1007 (N.D. Ala. 2022), *aff'd sub nom. Milligan*, 599 U.S. 1; *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 778 (M.D. La. 2022).

53.    This Court also finds Mr. Cooper's testimony reliable and highly credible, especially given his decades of experience drawing statewide plans and applying traditional

districting principles, and his extensive experience drawing plans in Mississippi in particular.

54.    Defendants offered Dr. Thomas Brunell as an expert to rebut Mr. Cooper on the first *Gingles* precondition (as well as in response to other Plaintiffs' experts on Senate Factor 5 and racial gerrymandering).    The Court gives Dr. Brunell's testimony on the first *Gingles* precondition little weight, because he has no experience drawing redistricting plans, has never balanced traditional redistricting principles, does not know how to use map-drawing software, and has not used any mapping software to analyze Mr. Cooper's plans.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1325:1–11, 1325:22–24, 1326:15–17.    Moreover, and as explained below, Dr. Brunell's testimony was generally not credible.  *Infra* ¶¶ 409–419.  Nor would the weight assigned to Dr. Brunell's testimony on *Gingles* 1 matter, because Dr. Brunell simply did not offer any testimony disputing the bottom-line conclusion that Mr. Cooper's Illustrative Plans contain reasonably configured districts that are consistent with traditional districting principles.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1332:8–13.  In fact, Dr. Brunell concluded that Mr. Cooper's Illustrative Plans perform as well or better than the Enacted Plans on traditional redistricting principles.  *Id.* at 1332:19–1333:6, 1334:3–7, 1334:11–1335:2, 1335:15–18.

A.    **The Black Population in Mississippi**

55.    According to the 2020 Census, non-Hispanic Whites comprise 55.35% of the population in Mississippi.  *See* PTX-001 at 9.  African Americans are the next largest racial/ethnic category, representing 37.94% of the population in 2020—the highest proportion of any state in the nation.  *Id.*  The 2020 Census shows that Mississippi's Black population has increased since 2000 (up from 36.62%), while its non-Hispanic White population has decreased since 2000 (down from 60.74%).  *Id.*

56.    In absolute terms, Mississippi has grown by 116,621 persons between 2000 and

16

2020.  Growth in the African-American population, which increased by 81,905, is the single largest driver of overall population growth, along with the growth of other racial minority groups. Mississippi's non-Hispanic White population fell by 88,831 during that same period.  PTX-001 at 10; W. Cooper Testimony, 2/26/2024 Trial Tr. 87:5–13.

57.    The statewide Black voting age population ("BVAP") has steadily increased over the past two decades—from 33.29% in 2000 to 36.14% in 2020, according to the Census category "Any Part Black" or "AP Black."  PTX-001 at 6, 10–11.  During that same period, the non-Hispanic ("NH") White VAP has dropped by nearly seven percentage points, from 64.16% in 2000 to 57.76% in 2020.  *E.g.*, PTX-001 at 10–11.

58.    Mr. Cooper looked at demographic change since 2000 because the number of majority-Black House and Senate districts is almost unchanged since 2002, with only one additional majority-Black district in the House and one additional majority-Black district in the Senate over that period.  W. Cooper Testimony, 2/26/2024 Trial Tr. 89:12–90:1. The additional majority-Black Senate district only came into existence through litigation, in which Mr. Cooper was a testifying expert.  W. Cooper Testimony, 2/26/2024 Trial Tr. 90:2–8.

59.    Mr. Cooper also evaluated population change on a regional level, using Mississippi's Planning and Development District ("planning district" or "PDD") boundaries as "a way to organize the state in[to] regions" "that actually matter today."  W. Cooper Testimony, 2/26/2024 Trial Tr. 90:23–24.  Mr. Cooper testified that PDDs are a useful reference point for considering regional demographics for redistricting purposes because they are quasi-governmental bodies that "represent a distinctly different region of the state" and deal with and share "local needs and priorities."  PTX-001 at 15; W. Cooper Testimony, 2/26/2024 Trial Tr. 90:20–91:16.  The relevance of PDDs as regional bodies and communities of interest is also supported by the

17

testimony of Deacon Harris, who testified based on his decades of experience as a County Supervisor and member of the Advisory Board for the East Central Planning and Development District, as to the county and municipal funding structure of the PDDs.  K. Harris Testimony, 2/28/2024 Trial Tr. 687:4–688:11.

60.      Between 2000 and 2020, Black population growth at the regional level has been concentrated in four planning districts: Central Mississippi, North Delta, Southern Mississippi, and Three Rivers.  PTX-001 at 17; W. Cooper Testimony, 2/26/2024 Trial Tr. 92:1–11.  Taken together, these four regions account for a net Black population gain of 120,399 persons since 2000. The 2000 to 2020 White population loss in these same planning districts is -7,636.  *Id*.  In addition, East Central PDD has seen a double-digit percentage decline in the White population since 2000, while the Black population has remained relatively constant, resulting in an increased concentration of the Black population in that region.  *Id*. at 18; W. Cooper Testimony, 2/26/2024 Trial Tr. 93:12–20.

61.      The 2000 to 2020 Black population growth in Central PDD, North Delta PDD, Southern PDD, and Three Rivers PDD (120,399) equals about two 100% Black Senate districts (ideal Senate district size of 56,948) and about five 100% Black House districts (ideal House district size of 24,273).  PTX-001 at 18; W. Cooper Testimony, 2/26/2024 Trial Tr. 94:14–24. This suggests "it would be very easy to draw additional majority-Black districts in the state of Mississippi in these specific areas."  W. Cooper Testimony, 2/26/2024 Trial Tr. 95:3–8.

62.      The Court credits Mr. Cooper's unrebutted demographic analysis of population change in Mississippi, which is relevant to whether the Black population in particular areas of Mississippi is sufficiently numerous and concentrated to comprise majorities in additional legislative districts.

**B.      The Benchmark and Enacted Plans**



PTX-001 at 156

63.     The 2019 Senate Plan, which was used prior to the adoption of the 2022 Enacted Senate Plan, contained 15 majority-Black districts, as depicted above and set forth in Mr. Cooper's report.  PTX-001 at 22–23, 177–179; Stip. ¶ 68; JTX-002; W. Cooper Testimony, 2/26/2024 Trial Tr. 96:10–16.

19



PTX-001 at 224

64.     Despite significant Black population growth and White population decline throughout the state, the 2022 Enacted Senate Plan also contained 15 majority-Black districts, located in essentially the same places, as depicted above and set forth in Mr. Cooper's Report. PTX-001 at 24–25, 244–246; Stip. ¶ 69; JTX-004; W. Cooper Testimony, 2/26/2024 Trial Tr. 96:17–22.  In Mr. Cooper's opinion, maintaining the same number of majority-Black Senate districts does not reflect the population change patterns seen in the 2020 Census.  W. Cooper Testimony, 2/26/2024 Trial Tr. 96:23–97:1.



65.     The 2012 House Plan which was used prior to the adoption of the 2022 Enacted House Plan contained 42 majority-Black districts, as depicted above and set forth in Mr. Cooper's Report.  PTX-001 at 54–55, 45–46, 68–70, 498–501; W. Cooper Testimony, 2/26/2024 Trial Tr. 98:13–16; Stip. ¶ 79; JTX-003.



PTX-001 at 569

66.     Despite significant Black population growth and White population decline throughout the state, the 2022 Enacted House Plan also contains 42 majority-Black districts, located almost entirely in essentially the same places, as depicted above and set forth in Mr. Cooper's Report.   PTX-001 at 56–57, 590–593; Stip. ¶ 80; JTX-005; W. Cooper Testimony, 2/26/2024 Trial Tr. 98:17–23.  In Mr. Cooper's opinion, maintaining the same number of majority-Black House districts does not reflect the population change patterns seen in the 2020 Census.  W. Cooper Testimony, 2/26/2024 Trial Tr. 98:24–99:10.  In fact, only "one [majority-Black] House District has been added since the 2001 redistricting."  *Id*. at 99:9–10.

### C.     Plaintiffs' Illustrative Plans

67.     Plaintiffs' map-drawing expert, Mr. Cooper, developed illustrative state legislative plans [hereinafter and throughout, the "Illustrative Senate Plan" and the "Illustrative House Plan"]

to assess whether the Black population in Mississippi is sufficiently large and geographically compact to allow for the creation of additional majority-Black Senate and House districts.  W. Cooper Testimony, 2/26/2024 Trial Tr. 86:5–17.

68.     To develop the Illustrative Plans, Mr. Cooper used (1) population and geographic data from the 1990 to 2020 Censuses, (2) the 1 and 5-year American Community Survey ("ACS") estimates conducted by the U.S. Census Bureau, (3) geographic boundary files created from the U.S. Census and 1990, 2000, 2010, and 2020 Topologically Integrated Geographic Encoding and Referencing (TIGER) files, (4) the Mississippi precinct boundaries produced by the Mississippi Automated Resource Information System (MARIS), and (5) incumbent address information posted on the Mississippi legislature's website and provided by Defendants to counsel.  PTX-001 at 92–94.  He used *Maptitude for Redistricting*, a geographic information system ("GIS") software that many local and state bodies employ for redistricting.  *See id*.  The Maptitude program contains several data points, including political boundaries, roads, and geographic features.

69.     Mr. Cooper used population data from the U.S. Census 1990, 2000, 2010, and 2020 PL 94-171 data files.  The PL 94-171 dataset is the complete count population file designed by the Census Bureau for use in legislative redistricting.  *E.g.*, PTX-001 at 92–94; W. Cooper Testimony, 2/26/2024 Trial Tr. 77:25–78:12.  The file contains basic race and ethnicity data on the total population and voting-age population found in various units of Census geography.  PTX-001 at 92–94.  It is published in electronic format.  *Id*.; *see* Joint Ex. 1, "PL 94-171 File" [hereinafter "JTX-001"].

70.     Mr. Cooper also reviewed current and historical demographics of Mississippi, including the socio-economic, employment, education, and health characteristics of the Black, Latino, and non-Hispanic White populations at the state, PDD, county, metropolitan, and

municipal levels, as published by the Census Bureau in the ACS.  *E.g.*, PTX-001 at 11–13, 21–22 & n.19; W. Cooper Testimony, 2/26/2024 Trial Tr. 87:24–88:7; *see also* PTX-001 at 977.

71.    Mr. Cooper developed the Illustrative Plans in this case in accordance with traditional redistricting principles, including population equality, compactness; contiguity; communities of interest; traditional political boundaries; and non-dilution of minority voting strength.  PTX-001 at 19–20; W. Cooper Testimony, 2/26/2024 Trial Tr. 105:4–106:20.  Mr. Cooper also considered incumbent pairings in constructing the Illustrative Plans.  PTX-001 at 7; W. Cooper Testimony, 2/26/2024 Trial Tr. 106:21–107:12.

72.    Mr. Cooper testified that, in constructing the Illustrative Plans, he balanced the various traditional districting principles such that none predominated over any other.  W. Cooper Testimony, 2/26/2024 Trial Tr. 107:13–22; 109:2–6.  Mr. Cooper testified that "the name of the game is balancing all of these factors as you're drawing a plan."  *Id*. at 123:13–14.

73.    The Court credits Mr. Cooper's testimony regarding his consideration of all the various traditional districting principles in constructing his plans, his balancing approach, and his overarching goal to draw electoral plans with compact, reasonably configured districts.  W. Cooper Testimony, 2/26/2024 Trial Tr. 107:13–22; 124:6–10.

74.    Mr. Cooper credibly testified that he did not seek to maximize the number of Black-majority districts in the Illustrative Plans, and Defendants do not claim otherwise.  W. Cooper Testimony, 2/26/2024 Trial Tr. 124:18–21; T. Brunell Testimony, 3/5/2024 Trial Tr. 1336:1–9 (Dr. Brunell agreeing that Mr. Cooper was "not maximizing" the number of Black-majority districts).  Mr. Cooper also explained the limited manner in which he considered racial demographic information, namely, by using a feature in his mapping software that indicated precincts with a BVAP of greater than 30%.  W. Cooper Testimony, 2/26/2024 Trial Tr. 109:2–

17. Mr. Cooper credibly testified that he did not use racial shading or heat maps to construct the plans, and that he followed county and precinct lines where possible. *Id*. at 109:23–111:7.

75. Mr. Cooper began his inquiry by studying demographic data. *See* PTX-001 at 9–22. To determine whether additional majority-Black legislative districts could be drawn based on the 2020 Census, Mr. Cooper focused primarily on PDD regions with substantial Black populations that have experienced Black population growth since 2000, either in raw numbers or as a share of the population in that PDD. *See id.* at 18–21; W. Cooper Testimony, 2/26/2024 Trial Tr. 156:11–157:9, 159:18–160:3.

76. As depicted below and as set forth in his report, Mr. Cooper's Illustrative Senate Plan includes four additional majority-Black districts: Illustrative Senate District ("SD") 2 in Tunica and DeSoto Counties; Illustrative SD 9 in Forest and Lamar Counties (Hattiesburg); Illustrative SD 17 in Clay, Chickasaw, Lee, and Monroe Counties; and Illustrative SD 35 in Copiah, Lincoln, Simpson, and Jefferson Davis Counties. PTX-001 at 26–27, 323–25; Stip. ¶¶ 70, 71; JTX-006; W. Cooper Testimony, 2/26/2024 Trial Tr. 151:21–152:7.



77.     As depicted below and as set forth in his report, Mr. Cooper's Illustrative House Plan includes three additional majority-Black districts.  Illustrative House District ("HD") 22 in Chickasaw and Monroe Counties; Illustrative HD 56 in Hinds County (Clinton); and Illustrative HD 84 in Newton, Jasper, and Clarke Counties.  *Id.* at 58–59, 715–718; Stip. ¶¶ 81, 82; JTX-007; W. Cooper Testimony, 2/26/2024 Trial Tr. 151:21–152:7.

26



PTX-001 at 694

78.    As compared to the 2022 Enacted Plan, Mr. Cooper's Illustrative House Plan modifies 33 of the 122 Enacted House districts.  The Illustrative Senate Plan modifies 41 of the 52 Enacted Senate Districts.  PTX-001 at 28, 68; W. Cooper Testimony, 2/26/2024 Trial Tr. 102:24–103:4.

79.    Mr. Cooper compared the share of Black voters in majority-Black districts to the share of White voters in majority-White districts under both sets of plans.  In the Enacted Senate Plan, 50.36% of Black voters live in majority-Black districts, compared to 84.33% of Whites living in majority-White districts.  In Mr. Cooper's view, this "suggest[s] that perhaps districts could be drawn in addition to the 15 in the [Enacted] State Senate Plan."  W. Cooper Testimony, 2/26/2024 Trial Tr. 97:23–25.  In the Illustrative Senate Plan, 58.39% of Black voters live in majority-Black districts, compared to 75.24% of Whites living in majority-White districts.  W. Cooper Testimony,

27

2/26/2024 Trial Tr. 98:1–12; PTX-001 at 50.  The Illustrative Senate Plan thus reduces the overall representation gap by 17.13 percentage points.  PTX-001 at 50; W. Cooper Testimony, 2/26/2024 Trial Tr. 98:1–12.  These improvements are consistent across each of the areas of interest.  PTX-001 at 51.

80.     In the Enacted House plan, 62.38% of Black voters live in majority-Black districts, compared to 82.92% of Whites living in majority-White districts.  W. Cooper Testimony, 2/26/2024 Trial Tr. 99:17–25; PTX-001 at 74.  In the Illustrative House Plan, 64.78% of Black voters live in majority-Black districts, compared to 80.12% of Whites living in majority-White districts.  PTX-001 at 74.  The Illustrative House plan thus reduces the overall representation gap by 5.19 percentage points.  *Id.*  These improvements are consistent across each of the areas of interest.  *Id*. at 75.

81.     The Court credits Mr. Cooper's testimony and finds the above disparity to be "probative evidence of cracking and packing BVAP in enacted districts." *Nairne*, 2024 WL 492688, at *16 (relying on the same representation gap analysis provided by Mr. Cooper).

82.     As explained in further detail below, the Court finds that each of the additional majority-Black districts in the Illustrative Senate and House Plans is over 50% BVAP, and each is reasonably configured.  Moreover, it is undisputed that Mr. Cooper's Illustrative Plans are comparable to or better than the Enacted Plan with respect to various objective metrics associated with the traditional districting principles, such as mathematical compactness scores, county splits, precinct splits, and splits of communities of interest such as PDDs and municipalities.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1332:19–1333:6 (compactness), 1334:3–7 (compactness), 1334:11–1335:2 (county, precinct, and municipality splits), 1335:15–18 (communities of interest).

83.     The Court finds that the Illustrative Plans' inclusion of four additional, reasonably

configured majority-Black districts in the Mississippi Senate and three additional, reasonably configured majority-Black districts in the Mississippi House, indicates that the Black population in Mississippi is sufficiently numerous and geographically compact to allow for additional majority-Black Senate and House districts in those identified areas of the state.  PTX-001 at 7–8.

84.     "Cracking" describes election plans with one or more districts "fragmenting" or dividing the minority population, resulting in an overall dilution of minority voting strength in the voting plan.  PTX-001 at 30; W. Cooper Testimony, 2/26/2024 Trial Tr. 97:2–25.  "Packing" describes "overconcentration" of minority voters in a single district, reducing their ability to influence elections in other districts in a voting plan.  W. Cooper Testimony, 2/26/2024 Trial Tr. 108:18–23.

85.     Based on Mr. Cooper's testimony and analysis, which the Court credits, and as discussed further in detail below, the Court finds that Black voters in Mississippi are packed or cracked across various House and Senate districts and that reassignment of BVAP resulted in four additional reasonably configured majority BVAP Senate Districts (Illustrative SDs 2, 9, 17, and 35) and three additional majority BVAP House districts (Illustrative HDs 22, 56, and 84).

**D.     The Numerosity and Compactness of the Black Population as Demonstrated by the Illustrative Plans**

86.     The Court finds that the Illustrative Plans, and in particular the additional majority-Black districts included in them, are reasonably configured in light of the various traditional districting principles.  The Court reaches that conclusion based on its own consideration of the Illustrative Plans and its crediting of Mr. Cooper's analysis, as well as supporting witness testimony from voters who reside in the areas of focus.  It is also notable that Defendants offered no expert opinion testimony contesting the bottom-line issue that the Illustrative Plans comport

with traditional districting principles.

87.     The Court finds that the Illustrative Plans adhere to the principle of one-person, one-vote.  Consistent with the requirements adopted by the SJLCR, none of the populations of the districts in the Illustrative Plans deviate more than five percent in either direction from the ideal district population.  *E.g.*, W. Cooper Testimony, 2/26/2024 Trial Tr. 105:13–19; PTX-001 at 323–325, 715–718.

88.     The Court credits Mr. Cooper's testimony and finds that the districts in the Illustrative Plans are all contiguous.  W. Cooper Testimony, 2/26/2024 Trial Tr. 113:4–8.

89.     The Court credits Mr. Cooper's testimony and finds that the districts in the Illustrative Plans are compact.  W. Cooper Testimony, 2/26/2024 Trial Tr. 112:5–24.  Mr. Cooper considered mathematical compactness scores generated by the Maptitude software program.  *E.g.*, PTX-001 at 45–46, 68–70.  Mr. Cooper reported three compactness scores: Reock, Polsby-Popper, and Convex Area/Hull.  *Id.*; W. Cooper Testimony, 2/26/2024 Trial Tr. 106:3–13.  These measures, particularly Reock and Polsby-Popper, are typically used by *Gingles* 1 experts in analyzing the mathematical compactness of districts.  *E.g.*, PTX-001 at 69.  These measures are calculated by the Maptitude software and can be compared across districts.  *Id.*  Using these metrics, the Illustrative Senate and House Plans are each similarly compact or more compact than the Enacted Senate and House plans.  *E.g.*, *id.* at 45–46, 68–70.  On average, the Illustrative Senate Plan districts are slightly more compact than the Enacted Senate plan, and the compactness of the Illustrative House and Enacted House Plans are comparable.  W. Cooper Testimony, 2/26/2024 Trial Tr. 111:7–112:24; PTX-001 at 45–46, 68–70, 399–417, 822–855.  The minimum compactness scores in the Illustrative Plans (*i.e.*, the compactness score of the least compact district in the plans) are also comparable to the minimum scores in the Enacted Plans.  PTX-001

at 45–46, 68–70.

90.     A visual assessment and comparison to the Enacted Plans confirms that the majority-Black districts in the Illustrative Plans are geographically compact.  *See, e.g.*, PTX-001 at 27–28, 59–60, 385, 388, 394, 398, 813, 817, 821.  The Illustrative Plan districts largely follow traditional boundaries, corresponding to existing county, precinct, and municipal borders.

91.     The Court finds that the Illustrative Plans are not only compact but meet the other traditional redistricting criteria.  PTX-001 at 7–8, 18–20.  Mr. Cooper reduced political subdivision splits in both the Illustrative Senate and House plans.  W. Cooper Testimony, 2/26/2024 Trial Tr. 113:9–116:15.  The Illustrative Senate plan scores better than the Enacted Senate Plan on county, precinct (also called "VTD"), municipal, school district, PDD, and MSA splits.  *Id.*  The Illustrative House plan scores better than the Enacted Senate Plan on county, VTD, municipal, school district, and PDD splits, with the same number of MSA splits.  *Id.*; *see also* PTX-001 at 46–50, 70–74, 418–65, 856–951.

92.     The Court finds that the Illustrative Plans respect communities of interest.  *E.g.*, PTX-001 at 29–45, 61–68.  The Court credits Mr. Cooper's testimony that community of interest is a somewhat "fuzzy term" that is not expressly defined in Mississippi law.  W. Cooper Testimony, 2/26/2024 Trial Tr. 91:12–14, 159:7–17.  The Court credits Mr. Cooper's definition that it involves communities that share a "common interest," "who are likely to have similar legislative concerns, and who might therefore benefit from cohesive representation in the legislature."  PTX-001 at 20.

93.     The Court credits Mr. Cooper's testimony that he considered communities of interest in assessing and seeking to minimize splits of counties, municipalities, PDDs, and school districts, all of which are existing political communities with specific shared interests capable of

legislative representation, and therefore constitute communities of interest as that term is typically understood.   W. Cooper Testimony, 2/26/2024 Trial Tr. 121:1–122:25; *see also* K. Harris Testimony, 2/28/2024 Trial Tr. 687:4–688:11.   Notably, Defendant's expert Dr. Brunell agreed that municipalities (more of which are kept whole in the Illustrative Senate and House Plans) may generally be considered communities of interest.   *See* T. Brunell Testimony, 3/5/2024 Trial Tr. 1335:19–21.   The Court also credits Mr. Cooper's testimony that he considered his prior knowledge and experience in Mississippi, socioeconomic data, geographic information, and other research in seeking to account for communities of interest when drawing the Illustrative Plans.  W. Cooper Testimony, 2/26/2024 Trial Tr. 121:23–122:12.

94.     The Court further notes that, in light of the Illustrative Plans meeting or beating the Enacted Plans on virtually every other metric, nothing in particular turns on whether or not PDD regions are considered communities of interest or for that matter considered at all.   The Court credits Mr. Cooper's testimony that PDDs were used as "a framework for taking into account the different regions of the state" and that "you can eliminate the concept of planning districts and still come up with something similar" using some other statewide regional breakdown, like the regions depicted on Senator Hyde-Smith's website.   W. Cooper Testimony, 2/26/2024 Trial Tr. 156:25–157:9, 158:2–5, 160:2–3.

95.     The Court credits the testimony of individual voters regarding the commonalities and shared interests that connect the communities included in each of the additional majority-Black districts under the Illustrative Senate and House Plans.

96.     The Court also credits Mr. Cooper's testimony that he considered incumbent information in drafting the Illustrative Plans and sought to avoid pairing incumbents where possible.  W. Cooper Testimony, 2/26/2024 Trial Tr. 123:1–9.  The Court finds that the Illustrative

Plans pair a comparable number of incumbents as compared to the Enacted Plans.

97.     The Court specifically finds, based on Mr. Cooper's testimony and the testimony of individual voters from the areas at issue, that the additional majority-Black districts in the Illustrative Senate and House Plans are reasonably configured.

98.     Illustrative SD 2 is an additional majority-Black district that can be drawn in Tunica and DeSoto Counties.  *E.g.*, PTX-001 at 29–34.  Mr. Cooper testified that De Soto County contains "the fastest growing Black population in the state."  W. Cooper Testimony, 2/26/2024 Trial Tr. 130:2–3.  Illustrative SD 2 can be drawn by combining some of the population of Enacted SD 11 (62.38% BVAP) with neighboring portions of Enacted SDs 1 and 2 that also contain substantial Black population.  PTX-001 at 29–34.  Illustrative SD 2 has a Black Voting Age Population ("BVAP") of 50.91%.  *Id*. at 323–25.

99.     Mr. Cooper credibly testified that Illustrative SD 2 respects traditional redistricting principles.  While the City of Horn Lake and its substantial Black population are divided across three different Senate districts under the Enacted Senate Plan, Illustrative SD 2 splits it only once and very slightly, keeping virtually all of Horn Lake in a single district.  PTX-001 at 29–34; W. Cooper Testimony, 2/26/2024 Trial Tr. 131:23–132:1.  The Court credits Mr. Cooper's testimony that in the Enacted Senate Plan, the Black population of Horn Lake is "cracked" or "submerged into majority-White [Enacted Senate] Districts 1 and 2 as a result of [the] three-way split."  PTX-001 at 30; W. Cooper Testimony, 2/26/2024 132:21–25.  In addition to improving the treatment of Horn Lake, the Illustrative Senate Plan also eliminates splits of Tate and Panola Counties as compared to the Enacted Senate Plan.  PTX-001 at 29–34; W. Cooper Testimony, 2/26/2024 Trial Tr. 132:2–8.  Illustrative SD 2 is compact visually and metrically.  W. Cooper Testimony, 2/26/2024 Trial Tr. 131:12–14; PTX-001 at 29–34.  The district also tracks the highway 61

transportation and economic corridor.  W. Cooper Testimony, 2/26/2024 Trial Tr. 131:14–20.

100.    Mr. Cooper also testified that race did not predominate in the construction of Illustrative SD 2.  On cross examination, Mr. Cooper highlighted numerous non-racial traditional redistricting principles, such as county splits, municipal boundaries, and population equality that justified the boundaries of the district.  W. Cooper Testimony, 2/26/2024 Trial Tr. 188:24–189:7, 190:15–191:5, 193:19–194:1, 223:1–7.

101.    For example, Defendants suggested that Mr. Cooper could have included the Colonial Hills precinct in Southaven in SD 2 and stayed the 5% population deviation.  However, Mr. Cooper explained that, due to the rapid growth in the area of Illustrative SD 2, he intentionally kept the population deviation on the lower end of the legislature's 5% guideline.  W. Cooper Testimony, 2/26/2024 Trial Tr. 188:24–189:7.  He also testified that Illustrative SD 2 tracks the Horn Lake municipal boundary in that area, such that adding the Colonial Hills precinct would have required deviating from that boundary line.  *Id.* at 223:1–7.  Mr. Cooper also pointed to instances in which he included precincts with low BVAP percentages and excluded precincts with high BVAP percentages.  *Id.* at 190:15–191:5.

102.    The Court credits Mr. Cooper's testimony and finds that race did not predominate in the construction of SD 2.



PTX-001 at 385

103.   The Court also credits the testimony of Pamela Hamner that Illustrative SD 2 respects communities of interest by bringing together areas with shared interests and connections. Ms. Hamner has deep experience based on her 25 years of living in DeSoto County, her career as a reporter covering the northern Mississippi area, and her recent campaigns for political office, which brought her in contact with thousands of voters.  P. Hamner Testimony, 2/28/2024 Trial Tr. 704:10–14, 705:15–706:4, 710:1–4, 720:5–11.  Ms. Hamner credibly testified that residents in Tunica and the parts of DeSoto County that are included in Illustrative Senate 2 frequently travel back and forth for church, healthcare, entertainment, shopping, and family.  *Id.* at 723:13–20.  The same is true of the municipalities within DeSoto County that are part of the district, including Walls.  *Id.* at 725:21–726:9.  The areas are linked by Highway 61, a major transportation corridor that she has frequently traveled.  *Id.* at 723:18–20, 724:13–22.

35

104.     Ms. Hamner also testified that the areas in the illustrative district are economically alike and that the residents are concerned about similar issues, including improving public schools and expanding access to healthcare.  P. Hamner Testimony, 2/28/2024 Trial Tr. 723:7–12, 714:14–715:6, 727:16–22.

105.     The Court finds Ms. Hamner's testimony to be highly credible, based on the specificity of her answers, including the fact that her husband is OB/GYN who treats patients from Tunica County, the manner in which she identified the issues central to her campaign platform, and her lived experience in both DeSoto and Tunica Counties.  *See* P. Hamner Testimony, 2/28/2024 Trial Tr. 706:5–19, 710:5–25, 714:14–715:6, 725:1–18.

106.     Consistent with Ms. Hamner's testimony, Mr. Cooper's Illustrative SD 2 does a better job of respecting communities of interest than the State's Enacted Plan, which cracks the heavily Black community of Horn Lake across three districts, while also splitting Horn Lake and excluding the historically African-American town of Jago, which used to be in Senate District 2 prior to the 2022 redistricting.  P. Hamner Testimony, 2/28/2024 Trial Tr. 713:15–714:6, 716:5–25, 718:7–20.  The effect of splitting those communities is, as Ms. Hamner testified, to "take[] away the power" of these communities to collectively seek representation.  *Id.* at 714:7–13, 715:10–17.

107.     Accordingly, the Court finds that Illustrative Senate District 2 is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a Senate district.  The Court finds that the Illustrative SD 2 is reasonably configured.  The Court finds that Illustrative SD 2 reflects a balanced approach in which race did not predominate over other traditional districting principles.

108.     Illustrative SD 9 is an additional district that can be drawn in the metropolitan

36

Hattiesburg area in Forrest and Lamar Counties.  PTX-001 at 38–41.  Illustrative SD 9 has a BVAP of 50.95%.  *Id*. at 323–325.

109.    Mr. Cooper credibly testified that Illustrative SD 9 respects traditional redistricting principles.  Unlike the contorted and packed Enacted SD 34 (56.48% BVAP), which picks up parts of central Hattiesburg and then extends 65 miles north through Jones County into Jasper County, Illustrative SD 9 is anchored firmly in Hattiesburg and encompasses only two counties.  W. Cooper Testimony, 2/26/2024 Trial Tr. 134:1–14; PTX-001 at 38–41, 247.[2]  In contrast to the Enacted Plan's split of Hattiesburg across four districts, the Illustrative SD 9 keeps Hattiesburg almost entirely whole, with 84% of the Illustrative SD 9's population coming from the city.  W. Cooper Testimony, 2/26/2024 Trial Tr. 134:19–20; PTX-001 at 38–41.  Where the district leaves Hattiesburg, it follows municipal boundaries in West Hattiesburg and Arnold Line.  W. Cooper Testimony, 2/26/2024 Trial Tr. 134:23–135:10. Mr. Cooper also split two precincts east of Hattiesburg in order to avoid pairing an incumbent. *Id.* at 205:7–15.  On cross examination, Mr. Cooper highlighted that the district both includes multiple low BVAP precincts and excludes high BVAP precincts. *Id.* at 204:17–25.

---

[2] In addition to a compact majority-Black Illustrative SD 9 anchored in Hattiesburg, the Illustrative Plan retains a more compact version of majority-Black Senate District 34 (53.1% BVAP) that includes Laurel as well as outlying rural areas in Jasper and Wayne counties. *See* PTX-001 at 302.



PTX-001 at 394

110.    The Court also credits the testimony of Dr. Joseph Wesley that Illustrative SD 9 respects communities of interest.  Dr. Wesley has resided in Hattiesburg since 1977.  J. Wesley Testimony, 2/28/2024 Trial Tr. 665:7–9.  Dr. Wesley explained that Hattiesburg is a "Hub City" and that people from the surrounding area in the proposed district drive to Hattiesburg for the restaurants, shopping, different festivals, and the city's three major educational institutions.  *See* J. Wesley Testimony, 2/28/2024 Trial Tr. 676:2–12.  He specifically testified that the proposed district reflects roads and highways of import to the Black community and contains shopping and economic hubs of import, as well as churches and communities that serve the broader Black community.  *See* J. Wesley Testimony, 2/28/2024 Trial Tr. 679:4–681:3.

111.    He further testified that the areas reflected in Illustrative SD 9 share common histories and traditions, including celebrations based in Hattiesburg, such as the Mobile Street Festival, which is held in a historical Black neighborhood of Hattiesburg.  *See* J. Wesley

38

Testimony, 2/28/2024 Trial Tr. 676:13–677:3; 677:5–8.  He also testified that the Forrest County

Branch of the NAACP meets in Hattiesburg and that members from surrounding areas and counties

without a branch will come into Hattiesburg.  *See* J. Wesley Testimony, 2/28/2024 Trial Tr. 678:3–

5.  Dr. Wesley testified that education and healthcare access are two particularly important issues

facing the Black community in the area and that the proposed illustrative district would give Black

residents of the Hattiesburg area "hope for the future" and optimism that their voices would be

heard.  *See* J. Wesley Testimony, 2/28/2024 Trial Tr. 681:4–684:9.

112.    The Court finds that Illustrative SD 9 is visually compact, does not contain

excessive county or precinct splits, and respects communities of interest, uniting areas with

common interests in a majority-Black Senate district.  The Court finds that the Illustrative SD 9 is

reasonably configured.  The Court finds that Illustrative SD 9 reflects a balanced approach in which

race did not predominate over other traditional districting principles.

113.    Illustrative SD 17 is an additional majority-Black district that can be drawn,

anchored in the Three Rivers PDD—specifically, in Clay, Chickasaw, Lee, and Monroe Counties.

Illustrative SD 17 has a BVAP of 54.18%.  PTX-001 at 323–25.  The Three Rivers PDD region

has never contained any part of a majority-Black Senate district.  W. Cooper Testimony, 2/26/2024

Trial Tr. 136:7–10.  Illustrative SD 17 can be created by unpacking the neighboring Enacted SD

16 (63.1% BVAP) and uncracking the Black population in this area that is currently split across

Enacted SDs 6, 7, and 8. PTX-001 at 249–50; *see* PTX-001 at 386.

114.    Mr. Cooper credibly testified that Illustrative SD 17 respects traditional

redistricting principles.   Illustrative SD 17 brings together nearby, predominantly Black

communities along the Highway 45 corridor between West Point and Tupelo, which share various

common socioeconomic interests and are part of what is historically known as the "Mississippi

Black Belt Prairie."  PTX-001 at 34–38; W. Cooper Testimony, 2/26/2024 Trial Tr. 136:18–21, 199:24–200:14.  The eastern boundary tracks the Tennessee-Tombigbee waterway and precinct lines up to Southern Tupelo.  *Id.* at 136:7–17.  In Tupelo, the district follows whole precincts and tracks the same lines as Enacted SD 7 with the exception of one precinct.  *Id.* at 223:25–224:3.

115.    On cross-examination, Mr. Cooper discussed splitting the city of West Point to protect an incumbent, splitting the city of Amory to preserve precinct lines, and avoiding pairing incumbents in SD 7 and SD 17.  W. Cooper Testimony, 2/26/2024 Trial Tr. 196:25–198:3.



116.    The Court also credits the testimony of Ms. Mamie Cunningham, a lifelong resident of Chickasaw County who continues to live on a family farm passed down from her grandfather, a former slave.  M. Cunningham Testimony, 2/27/2024 Trial Tr. 233:2–234:2.  Although residing in Chickasaw County, Ms. Cunningham is a retired schoolteacher who taught in Aberdeen, which is in neighboring Monroe County.  *Id.* at 244:17–245:1.  She has also worked in neighboring Clay

County, and her family's land extends partially into Clay County as well.  *Id.* at 244:13–16, 245:10–13.

117.    Ms. Cunningham's testimony confirms that the Illustrative SD 17 brings together areas with shared interests and connections in Clay, Chickasaw, Monroe, and Lee Counties.  The residents in this area, including Ms. Cunningham herself, intermingle for work, sports, civic organizations, and church, and they often have family members who live across county lines.  M. Cunningham Testimony, 2/27/2024 Trial Tr. 245:2–246:13.  Residents typically travel to Tupelo in Lee County for stores and services.  *Id.* at 247:16–248:2.  Ms. Cunningham also testified that the municipalities that are part of Illustrative SD 17, including Tupelo, Amory, Okolona, Aberdeen, and West Point, are connected by either Highway 45 or Alternate Highway 45.  *Id.* at 246:14–247:15.

118.    The Court finds that Illustrative SD 17 is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black Senate district.  The Court finds that the Illustrative SD 17 is reasonably configured.  The Court finds that Illustrative SD 17 reflects a balanced approach in which race did not predominate over other traditional districting principles.

119.    Illustrative SD 35 is an additional majority-Black district that can be drawn in Copiah, Lincoln, Simpson, and Jefferson Davis Counties.  PTX-001 at 42–44.  Illustrative SD 35 has a BVAP of 52.12%.  *Id.* at 323–325.  Illustrative SD 35 can be created by unpacking existing SDs 37 and 38, both over 61% BVAP in the Enacted plan, and uncracking the Black populations in Crystal Springs, Hazelhurst, and Brookhaven, all of which are currently split across Enacted SDs 35, 37, and 39. PTX-001 at 249–250; *see* PTX-001 at 396.

120.    Mr. Cooper credibly testified that Illustrative SD 35 respects traditional

redistricting principles. Illustrative SD 35 keeps Copiah and Jefferson Davis counties whole. PTX-001 at 341. The district splits only one precinct to keep the city of D'Lo whole in Simpson County. PTX-001 at 367.

121. Mr. Cooper credibly testified that the communities included in Illustrative SD 35 are united by geography, regional, transportation, and educational connections. The extension of Illustrative SD 35 south into Lincoln County follows U.S. Highway 51, unifying the traditionally linked cities of Crystal Springs, Hazelhurst and Brookhaven. W. Cooper Testimony, 2/26/2024 Trial Tr. 139:1–7. Mr. Cooper also testified that the Census Bureau includes Brookhaven in the same combined statistical area as Copiah and Simpson counties due to similar commuting patterns to Jackson. *Id.* at 139:8–14. In addition, Copiah, Lincoln, and Jefferson Davis counties all belong to the same high school sports leagues. *Id.* at 224:9–225:10. Illustrative SD 35 scores similarly on compactness as compared to the average district in the 2022 Enacted Senate Plan. *Id.* at 139:15–20.

122. Mr. Cooper credibly testified that race did not predominate in the construction of Illustrative SD 35. While race was, of course, a consideration, Mr. Cooper demonstrated that he could have included additional precincts with high BVAPs surrounding Illustrative SD 35 but drew his district using whole precincts to keep a historical transportation corridor together along Highway 51. W. Cooper Testimony, 2/26/2024 Trial Tr. 206:19–207:12, 224:9–225:10. The socioeconomic and historical links between these communities (which as noted below were confirmed by the testimony of a local resident) provide a non-racial, and in Court's view, persuasive, justification for bringing these communities together in one district. Further, that the district performs well on compactness metrics, county splits, and uses almost entirely whole precincts, reflecting a balanced.

42



PTX-001 at 398

123.     The Court also credits the testimony of Ashley Wilson that Illustrative SD 35 respects communities of interest.  Ms. Wilson, a lifelong resident of Crystal Springs who has been heavily involved in civic and community groups in the area, credibly testified to the similarities and strong social and economic connections between the cities of Crystal Springs, Hazlehurst, Copiah County at large, and the City of Brookhaven.  A. Wilson Testimony, 2/29/2024 Trial Tr. 875:1–8; *see also id.* at 875:9–876:24, 877:19–879:16, 884:2-885:3, 887:25–888:18.  For instance, Ms. Wilson credibly testified regarding the demographic and socioeconomic similarities between Crystal Springs, Hazlehurst, and Brookhaven (*id.* at 879:24–880:3; 884:2–14), how these areas share common centers of shopping, retail, and grocery stores (*id.* at 882:21–883:7), and are connected by major roadways, including Interstate-55 and Highway 51.  *Id.* at 882:15–20.  Ms. Wilson testified about how these areas share resources, such as a hospital, King's Daughters Medical Center in Brookhaven, where Ms. Wilson was born.  *Id.* at 874:10–12; 883:8–884:1.  She

43

testified about how her church in Crystal Springs is part of a larger church district headquartered in Brookhaven and includes churches from the Cities of Crystal Springs, Hazlehurst, Wesson, and Brookhaven and how these communities routinely come together. *Id.* at 878:4–879:6. Ms. Wilson also testified about how people from these areas share common centers of employment, including working in factories located along the economic corridor in Crystal Springs (ABB/Hitachi factory), Gallman (DG Foods), Hazlehurst (Sanderson Farms), and Brookhaven (Walmart distribution center). *Id.* at Tr. 880:4–15. Ms. Wilson credibly explained how these communities share common interests and concerns, including schooling, infrastructure, public safety, and economic development, testifying that it made sense to keep them "united" in a district. *Id.* at 880:16–21, 884:12–885:11.

124.    The Court finds that Illustrative SD 35 is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black Senate district. The Court finds that the Illustrative SD 35 is reasonably configured. The Court finds that Illustrative SD 35 reflects a balanced approach in which race did not predominate over other traditional districting principles.

125.    Illustrative HD 22 is an additional majority-Black district that can be drawn in Chickasaw and Monroe Counties. PTX-001 at 61–64. Illustrative HD 22 has a BVAP of 55.41%. *Id*. at 715–18.

126.    Mr. Cooper credibly testified that Illustrative HD 22 respects traditional redistricting principles. Illustrative HD 22 can be drawn by unpacking Enacted HD 36 (61.2% BVAP) and HD 16 (62.3% BVAP) and reducing the geographic extent of Enacted HD 22, yielding a more compact district that contains parts of only two counties. PTX-001 at 61–64; W. Cooper Testimony, 2/26/2024 Trial Tr. 142:8–15. Like Illustrative SD 17, Illustrative HD 22 follows the

Highway 45 corridor and unifies predominantly Black communities such as Houston, Okolona, and Aberdeen—closely-linked communities that are split across three districts in the Enacted Plan. PTX-001 at 61–64; W. Cooper Testimony, 2/26/2024 Trial Tr. 142:16–143:8. Illustrative HD 22 uses whole precincts and follows natural boundaries like the Tennessee-Tombigbee waterway as well as county lines in the North and South. *Id.* at 144:2–6. In contrast to Mr. Cooper's configuration, the Enacted House Plan splits both Chickasaw and Monroe Counties three ways each, connecting them via a narrow land bridge. The Court credits the testimony of Mr. Cooper, who described the Enacted House Plan as "cracking Black population in the midsection of Chickasaw and Monroe Counties." *See* W. Cooper Testimony, 2/26/2024 Trial Tr. 142:21–143:8. *See also infra* ¶ 489.



127.     As with Illustrative SD 17, the Court credits the testimony of Ms. Cunningham, a longtime resident of Chickasaw County, regarding the communities of interest in this area. HD

22 consists entirely of Chickasaw and Monroe Counties and municipalities therein, which, as discussed above, include residents who share employment, sports, and family connections.  M. Cunningham Testimony, 2/27/2024 Trial Tr. 245:14–247:11.  Ms. Cunningham herself worked as a teacher in Aberdeen, Monroe County and belongs to the Monroe County NAACP, even though she resides in Chickasaw County.  *Id.* at 244:17–245:1, 245:14–18.  Illustrative HD 22 also includes municipalities along the Highway 45 and Alternative Highway 45 corridor.  *Id.* at 246:14–247:4.

128.    The Court finds that Illustrative HD 22 is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black House district.  The Court finds that the Illustrative HD 22 is reasonably configured.  The Court finds that Illustrative HD 22 reflects a balanced approach in which race did not predominate over other traditional districting principles.

129.    Illustrative HD 56 is an additional majority-Black district that can be drawn in Hinds County.  PTX-001 at 66–68.  Illustrative HD 56 has a BVAP of 58.99%.  *Id.* at 715–718.

130.    Mr. Cooper credibly testified that Illustrative HD 56 respects traditional redistricting principles.  Illustrative HD 56 is firmly anchored in Clinton, which has a large and growing Black population.  Illustrative HD 56 unpacks Black populations in Enacted HD 69 (90.36% BVAP) and Enacted HD 70 (83.18% BVAP) to yield an additional majority-Black district. PTX-001 at 592.  Rather than stretching far to the north and crossing into Madison County, Illustrative HD 56 is an "extremely compact district" at no more than 15 miles across.  W. Cooper Testimony, 2/26/2024 Trial Tr. 144:11–24.  The southern border tracks I-20, while the rest of the district uses whole precincts and removes an unnecessary county split.  *Id.* at 145:14–23.

131.    The Court also credits the testimony of Sharon Moman that Illustrative HD 56

respects communities of interest.  Illustrative HD 56 encompasses portions of the City of Clinton and adjacent portions of western Jackson and is situated entirely within Hinds County.  S. Moman Testimony, 2/28/2024 Trial Tr. 649:17–651:2.  Ms. Moman, a lifelong resident of Clinton and Jackson and a real estate broker serving clients in both areas, offered testimony describing the similarities and strong social connections between Clinton and western Jackson.  *Id.* at 644:4–10, 645:3–21.  She testified, for example, that Hinds County provides common governmental services to the entirety of the area falling within Illustrative HD 56, that residents in Illustrative HD 56 frequent the same shops, restaurants, religious spaces, and entertainment venues, and that both areas share similar socioeconomic characteristics.  *Id.* at 651:3–9, 652:3–653:15, 655:21–656:17, 657:5–16.  Ms. Moman also testified about the differences between Clinton and Flora, a town located approximately 20 miles north of Clinton that is currently included in the Enacted HD 56.  *Id.* at 658:1–2.  She contrasted Flora's rural nature with the size and character of Clinton and western Jackson, noted the lack of shared governmental resources between Clinton and Flora (which sits in a separate county), and testified to an absence of significant economic connections between the two areas.  *Id.* at 651:10–22, 658:1–659:20.  She testified that Illustrative HD 56 appropriately represents a community of interest shared between Clinton and western Jackson without including outlying areas that are not part of that distinct community.  *Id.* at 657:17–22; 659:21–660:1.



PTX-001 at 821

132.     The Court finds that Illustrative HD 56 is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black House district.  The Court finds that the Illustrative HD 56 is reasonably configured.  The Court finds that Illustrative HD 56 reflects a balanced approach in which race did not predominate over other traditional districting principles.

133.     Illustrative HD 84 is an additional majority-Black district that could be drawn in Newton, Jasper, and Clarke Counties.  PTX-001 at 64–66.  Illustrative HD 84 has a BVAP of 53.05%.  *Id*. at 715–718.  Illustrative HD 84 can be created by unpacking Enacted HD 80 (68.3% BVAP) and uncracking the Black population currently spread across Enacted HDs 79, 81, and 84.  PTX-001 at 592, 815.

134.     The Enacted House Plan splits both Jasper and Clarke Counties three ways, and

48

Newton County five ways.  PTX-001 at 857–862.  The Court finds these excessive splits in the Enacted Plan are indicative of cracking.

135.    Mr. Cooper credibly testified that Illustrative HD 84 respects traditional redistricting principles.  By reducing the splits in each county, an additional majority-Black district can be drawn.  Using whole precincts, Illustrative HD 84 also keeps the City of Newton mostly whole and avoids splitting Newton's only majority-Black precinct, which the Enacted plan divides along with several other precincts in Newton County.  K. Harris Testimony, 2/28/2024 Trial Tr. 697:1–16; PTX-001 at 870, 881–91.



136.    The Court also credits the testimony of Deacon Kenneth Harris and Terry Rogers that Illustrative HD 84 respects communities of interest.  Both witnesses testified about the common, rural, low-income nature of Newton, Jasper, and Clarke counties.  K. Harris Testimony, 2/28/2024 Trial Tr. 691:5–11; T. Rogers Testimony, 3/01/2024 Trial Tr. 938:23–940:16.  With

shared traditions and festivals like the Bay Fest in Jasper County and Loose Caboose in Newton, common centers for employment and shopping, sports rivalries between Newton, Bay Springs, and Quitman, and church and family across these three counties, there are distinct communities of interests in Illustrative HD 84 that are kept together by Mr. Cooper's plan.  K. Harris Testimony, 2/28/2024 Trial Tr. 691:3–693:21; T. Rogers Testimony, 3/01/2024 Trial Tr. 938:23–940:16.  In other words, Illustrative HD 84 "binds" this area, with its many shared interests, "together instead of splitting it like it is now."  K. Harris Testimony, 2/28/2024 Trial Tr. 693:20–21.

137.   The Court finds that Illustrative HD 84 is visually compact, does not contain excessive county or precinct splits, and respects communities of interest, uniting areas with common interests in a majority-Black House district.  The Court finds that the Illustrative HD 84 is reasonably configured.  The Court finds that Illustrative HD 84 reflects a balanced approach in which race did not predominate over other traditional districting principles.

138.   In sum, and crediting the testimony and analysis of Mr. Cooper as well as individual Mississippi voters, the Court finds that the Black population in the areas in and around Illustrative SDs 2, 9, 17, and 35 and HDs 22, 56, and 84 is sufficiently numerous and compact to support an additional, reasonably configured Black-majority Senate or House district in each of those areas.

## IV.   Vote Dilution: *Gingles* 2 and 3

139.   The other two *Gingles* preconditions are that minority voters are "politically cohesive" and that "the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate."  *Milligan*, 599 U.S. at 18 (quoting *Thornburg*, 478 U.S. at 51).

140.   On the second and third preconditions, plaintiffs presented the expert testimony and analysis of Dr. Lisa Handley, whom the Court accepted as an expert in racially polarized voting and the statistical analysis of minority vote dilution and redistricting.  L. Handley Testimony,

2/27/2024 Trial Tr. 262:15–22.

141.     The Court found Dr. Handley qualified by her extensive experience conducting quantitative analysis on *Gingles* 2 and 3.  Pl.'s Ex. 4, December 22, 2023 Amended Report of Dr. Lisa Handley, at 2–3 [hereinafter "PTX-004"]; L. Handley Testimony, 2/27/2024 Trial Tr. 262:15–22.

142.     Dr. Handley has over 35 years of experience as a voting rights and redistricting expert.  *See* PTX-004 at 2; L. Handley Testimony, 2/27/2024 Trial Tr. 261:16–19.  She holds a Ph.D. in political science from George Washington University.  PTX-004 at 64–70.  She has taught political science courses at both the graduate and undergraduate level at several universities.  *Id.*  Dr. Handley has provided election assistance to numerous countries through the United Nations.  *Id.*

143.     Dr. Handley has been accepted as an expert witness in litigation involving voting rights and redistricting scores of times, and courts have routinely credited and relied on her expert testimony, particularly on the analysis of racially polarized voting ("RPV").  PTX-004 at 2–3, 70; *Nairne*, 2024 WL 492688, at *36 (finding Dr. Handley "credible and her conclusions reliable and well supported"); *Alpha Phi Alpha*, 2023 WL 7037537, at *21 (accepting Dr. Handley as an expert and noting she has routinely been qualified as an expert in cases where she used the same methodology she employed here); *Robinson*, 605 F. Supp. 3d at 840; *Lopez v. Abbott*, 339 F. Supp. 3d 589, 610 (S.D. Tex. 2018) (crediting Dr. Handley's testimony); *United States v. Vill. Of Port Chester*, 704 F. Supp. 2d 411, 427, 441 (S.D.N.Y. 2010) (relying on Dr. Handley as an expert and noting that "[t]he methods employed by Dr. Handley," including ecological inference analysis, "have been accepted by numerous courts in voting rights cases"); *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 257:23–260:16; 261:20–25.

A.      **Dr. Handley's RPV Analysis**

144.    To assess RPV in this case, Dr. Handley analyzed voting patterns by race in seven areas of Mississippi where the Illustrative Plans create additional majority-Black Senate and House districts.  *E.g.*, PTX-004 at 6–8; L. Handley Testimony, 2/27/2024 Trial Tr. 262:24–263:7.

145.    Dr. Handley's seven areas are:

a.  Area 1: North West and North Central Mississippi (Coahoma, De Soto, Lafayette, Marshall, Panola, Quitman, Tate, Tunica, and Union counties), corresponding to the area in and around Illustrative SD 2.

b.  Area 2: The Greater Golden Triangle Area of Mississippi (Chickasaw, Choctaw, Clay, Itawamba, Lee, Lowndes, Monroe, Montgomery, Noxubee, Oktibbeha, Webster, and Winston counties), corresponding to the area in and around Illustrative SD 17.

c.  Area 3: South Central Mississippi (Adams, Amite, Clairborne, Copiah, Franklin, Hinds, Jefferson, Jefferson Davis, Lawrence, Lincoln, Pike, Simpson, and Walthall counties), corresponding to the area in and around Illustrative SD 35.

d.  Area 4: South East Mississippi (Clarke, Forrest, Greene, Jasper, Jones, Lamar, Perry and Wayne counties), corresponding to the area in and around Illustrative SD 9.

e.  Area 5: The Western Jackson Area (Hinds and Madison counties), corresponding to the area in and around Illustrative HD 56.

f.  Area 6: The Golden Triangle Area (Chickasaw, Clay, Lee, Lowndes, Monroe, Oktibbeha, and Pontotoc counties), corresponding to the area in and around Illustrative HD 22.

> g.  Area 7: East Central Mississippi (Clarke, Jasper, Jones, Lauderdale, and Newton
>
> counties), corresponding to the area in and around Illustrative HD 84.

*E.g.*, PTX-004 at 7–8; L. Handley Testimony, 2/27/2024 Trial Tr. 263:8–265:18.

146.   The Court credits Dr. Handley's testimony that she selected these clusters of counties in order to evaluate the extent of racially polarized voting in areas that contain overlapping sets of districts in the Illustrative and Enacted Plans. *See, e.g.*, PTX-004 at 6 n. 10.  For example, Area 1 includes the counties that contain Illustrative Senate Districts 1, 2, 11, 15, and 19 and Enacted Senate Districts 1, 2, 10, 11, and 19. *See* PTX-004 at 7; L. Handley Testimony, 2/27/2024 Trial Tr. 264:10–20.  This method, which Dr. Handley has used in other Section 2 cases, allows for an assessment of the level of racial group cohesion in each specific geographic area and the ability of Black voters to elect candidates of choice in such areas. *See, e.g.*, PTX-004 at 6 n. 11.

147.   Dr. Handley credibly testified that within each area, she employed three commonly used, well-accepted statistical methods to conduct her racially polarized voting analysis: homogeneous precinct analysis, ecological regression, and ecological inference ("EI").  PTX-004 at 3–5; L. Handley Testimony, 2/27/2024 Trial Tr. 270:6–12; *see also* PTX-004 at 37–63.  The Court credits Dr. Handley's testimony and finds that with these three statistical methods, she calculated for each of the seven geographic areas estimates of the percentage of Black and White voters who voted for candidates in recent statewide general elections and state legislative general elections, as well as certain statewide democratic primaries and nonpartisan judicial contests. PTX-004 at 8–11; *see also* PTX-004 at 37–63; L. Handley Testimony, 2/27/2024 Trial Tr. 273:25–274:7.

148.   Dr. Handley focused primarily on contests that were "biracial," *i.e.*, where there was both a Black candidate and a White candidate.  Dr. Handley primarily focused on biracial

elections because these are the most probative for measuring racial polarization.  PTX-004 at 8 n. 12; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 274:22–275:6.  As Dr. Handley explained, "courts have been quite clear that the contests that include Black candidates are more probative than those in which only white candidates compete [because] you want to make sure that Black voters can elect their preferred candidates, not just if they're [W]hite but if they're Black as well." L. Handley Testimony, 2/27/2024 Trial Tr. 274:22–275:6.  Defendants' expert Dr. John Alford also agreed that biracial contests were the most probative contests for analyzing rationally polarized voting.  *See* J. Alford Testimony, 3/6/2024 Trial Tr. 1507:22–1509:22.

149.    The Court credits Dr. Handley's testimony on the importance of biracial contests in evaluating racially polarized voting and finds that those contests are the most probative for analyzing RPV, consistent with other courts.  *See Nairne*, 2024 WL 492688, at *31 ("This Court finds—and both Defendants' expert [Dr. Alford] and additional courts agree—that biracial statewide elections are the 'most probative' for determining racial polarization."); *Robinson*, 605 F. Supp. 3d at 801 (crediting Dr. Handley's opinion that "courts consider election contests that include minority candidates to be more probative than contests with only White candidates, because this approach recognizes that it is not sufficient for minority voters to be able to elect their preferred candidate only when that candidate is White"); *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 610–11 (E.D. Mich. 2019) ("These [white-only] elections are . . .  less probative because the fact that black voters also support white candidates acceptable to the majority does not negate instances in which a white voting majority operates to defeat the candidate preferred by black voters when that candidate is a minority."); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 598 (N.D. Ohio 2008) ("These contests are probative of racial bloc voting because they . . . featured African-American candidates.").

54

150.    The Court also credits Dr. Handley's testimony that, while homogeneous precinct analysis and ecological regression have been used for approximately 40 years, *see, e.g.*, PTX-004 at 3–4; *see also Gingles*, 478 U.S. at 52–53, 80, EI is a more recently developed technique that experts agree produces the most accurate estimates.  PTX-004 at 4–5; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 270:13–273:11.  Again, Dr. Alford agreed.  J. Alford Testimony, 3/5/2024 Trial Tr. 1425:2–1426:18.  EI has been accepted in numerous district court proceedings and the Court finds, consistent with those decisions, that the EI method is scientifically accepted and reliable.  *See, e.g.*, *Nairne*, 2024 WL 492688, at *31 (noting that "[e]xperts agree and courts recognize that EI produces the most reliable estimates"); *id.* at *33 ("[T]he scientifically accepted method for analyzing whether there is racially polarized voting ('RPV') is the ecological inference analysis ('EI')."); *Alpha Phi Alpha*, 2023 WL 7037537, at *40 and n.35 (noting that Dr. Handley and defendant's expert Dr. John Alford agreed that EI RxC is "the best of the statistical methods for estimating voting behaviors"); *Petteway v. Galveston Cnty.*, No. 3:22-CV-57, 2023 WL 6786025, at *47 (S.D. Tex. Oct. 13, 2023) (noting that all experts in the case agreed that "RxC ecological inference is an appropriate method for analyzing the voting patterns of different demographic groups"), *amended*, No. 3:22-CV-57, 2023 WL 6812289 (S.D. Tex. Oct. 15, 2023); *see also Singleton*, 582 F. Supp. 3d at 967, 981, 991.

151.    Dr. Handley primarily used "EI RxC" for her analysis.  *E.g.*, PTX-004 at 4–5; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 272:10–273:2.  Dr. Handley also uses a form of EI called "King's EI or EI 2X2", homogeneous precinct analysis, and ecological regression to check the estimates produced by her EI RxC.  L. Handley Testimony, 2/27/2024 Trial Tr. 273:3–11; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 290:15–24.  As Dr. Handley explained, these other statistical analyses are easier to describe, explain, and understand.  *See* L. Handley

Testimony, 2/27/2024 Trial Tr. 273:3–11.   Further, she testified that they can be represented visually and are good checks on the EI RxC estimates that she produced.   *See id.* at 273:3–11.   Dr. Handley credibly demonstrated in her testimony how, in some instances, the EI 2x2 and ER estimates helped corroborate or confirm her finding of racially polarized voting, especially in certain state legislative contests where the EI RxC analysis produced wider confidence intervals, or point estimates for White voters was close to 50%.   *See, e.g.*, *id.* at 287:2–290:24.

152.   The various RPV analyses conducted by Dr. Handley utilized a database that combined precinct-level racial demographic information from the Census with precinct-level election return data.   *See* L. Handley Testimony, 2/27/2024 Trial Tr. 273:12–18.   Dr. Handley used election return data from 11 recent (2011–2020) biracial statewide general election and general election runoff contests that included Black candidates, including elections for U.S. Senator, Governor, Attorney General, Secretary of State, Treasurer, and Commissioner of Insurance.   PTX-004 at 8–9; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 274:8–275:23.   Additionally, Dr. Handley analyzed data from the 2020 Presidential election contest which included Kamala Harris, a Black candidate.   *Id.*   Dr. Handley also analyzed 5 recent statewide general elections (2016–2020) that did not include Black candidates.   PTX-004 at 9; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 274:8–275:23.   There were no statewide general elections in 2021 or 2022, and at the time of Dr. Handley's report, data from the 2023 statewide general elections was unavailable*.   See* PTX-004 at 8–9 & n.13.   In total, Dr. Handley analyzed data from 17 statewide general election and general election runoff contests in each of the seven areas of focus.   *See* PTX-004 at 8–9; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 274:8–275:23.

153.   Dr. Handley also analyzed data from 19 recent (2015 and 2019) biracial state legislative election contests that included Black candidates in the areas of interest.   PTX-004 at 9–

10; L. Handley Testimony, 2/27/2024 Trial Tr. 284:4–285:4. A biracial state legislative election contest was analyzed if the House or Senate district was wholly contained within any areas of interest or if the district overlapped with any of the Illustrative or Enacted districts being compared within the area of interest. PTX-004 at 9–10. The Court credits Dr. Handley's testimony that she did not review 2023 state legislative election contests because at the time of Dr. Handley's report, data from the 2023 state legislative election contests was unavailable. *See* L. Handley Testimony, 2/27/2024 Trial Tr. 285:13–20 (further testifying that in addition, she thinks that only 17 or 18 percent of the districts she compared in her comparison tables actually had contested elections in 2023); *see also* J. Alford Testimony, 3/6/2024 Trial Tr. 1446:8–15 (acknowledging that data for 2023 election would not have been available at the time of Dr. Handley's report).

154.    Additionally, because there is typically a two-stage election process in the United States, with a primary election required to produce the party nominee for the general election, Dr. Handley analyzed data from 8 recent (2011–2020) statewide Democratic primaries (including a Democratic primary runoff) that included Black candidates. PTX-004 at 10–11; L. Handley Testimony, 2/27/2024 Trial Tr. 295:5–296:8. The Court credits Dr. Handley's testimony that she did not analyze Republican primaries for two reasons: (1) "the vast majority of Black voters who participate in primaries choose the Democrat primaries, so you wouldn't find a Black-preferred candidate in the Republican primary," and (2) "so few Black voters actually participate in the Republican primary, you cannot produce . . . reliable estimates[] of Black voting behavior in the Republican primaries." *See* L. Handley Testimony, 2/27/2024 Trial Tr. 296:9–18.

155.    Lastly, in order to rebut potential claims that clear patterns of polarization in Mississippi are a consequence of partisanship rather than racial polarization, Dr. Handley analyzed three recent (2012–2020) nonpartisan judicial elections that included both Black and White

candidates. *See* PTX-004 at 11; L. Handley Testimony, 2/27/2024 Trial Tr. 298:10–299:10.

156.     The Court credits Dr. Handley's testimony and finds Dr. Handley's methods to be sound and therefore also credits her analysis.

157.     The Court credits Dr. Handley's analysis, as described in further detail below, which demonstrated consistently high levels of racially polarized voting in each of the seven areas of interest, with Black voters cohesively supporting their preferred candidates and white voters cohesively bloc voting against Black-preferred candidates. *See, e.g.*, PTX-004 at 11–12 and 36 (statewide contests); PTX-004 at 12 and 36 (state legislative contests); *see also* PTX-004 at 37–60; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 266:3–8; 283:15–18; 293:22–294:16.

158.     For the 11 biracial statewide general and runoff elections, Black-preferred Black candidates received an average of 94.3% of the Black vote in the seven areas of interest and only an average of 6.9% of the White vote. PTX-004 at 11; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 266:3–8; 283:15–18; 293:22–294:16. The percentage of White support for the candidates preferred by Black voters varied only slightly across the seven areas of interest, exceeding 10% in only one area, Western Jackson (14.0%). PTX-004 at 11.

159.     For the statewide general and runoff elections that did not include a Black candidate, the average percentage of White support for the Black-preferred White candidates was slightly higher than that for the Black-preferred Black candidates:  9.1% of the White voters crossed over to vote for White candidates of choice of Black voters (compared to 6.9% for the Black candidates preferred by Black voters). PTX-004 at 11–12. This was driven in large measure by support for Jim Hood, a White candidate, in the 2019 gubernatorial general election contest (17.7% White support across the seven areas). *Id.* at 12; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 280:17–20.

58

160.    Considering all 17 of the statewide contests in the dataset, the level of racial polarization was stark in each of the seven areas:

a.    In Area 1, the percentage of Black voter support for the Black-preferred candidate ranged from 96.6% to 73.9% (average 92.29%).  *See* PTX-004 at 37–39; L. Handley Testimony, 2/27/2024 Trial Tr. 281:22–282:11.  The percentage of White voter support for the Black-preferred candidate in Area 1 ranged from 20.5% to 6.3% (average 9.67%).  *See* PTX-004 at 37–39; L. Handley Testimony, 2/27/2024 Trial Tr. 282:12–20] *id*.

b.    In Area 2, the percentage of Black voter support for the Black-preferred candidate ranged from 97.4% to 85.3% (average 95.23%).  *See* PTX-004 at 40–42; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 281:22–283:5.  The percentage of White voter support for the Black-preferred candidate in Area 2 ranged from 14.7% to 2.9% (average 5.84%).  *See id*.

c.    In Area 3, the percentage of Black voter support for the Black-preferred candidate ranged from 98.4% to 89.3% (average 96.61%).  *See* PTX-004 at 43–45; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 281:22–283:5.  The percentage of White voter support for the Black-preferred candidate in Area 3 ranged from 17.5 % to 4.2% (average 7.49%).  *See id*.

d.    In Area 4, the percentage of Black voter support for the Black-preferred candidate ranged from 96.2% to 83.2% (average 93.73%).  *See* PTX-004 at 46–48; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 281:22–283:5.  The percentage of White voter support for the Black-preferred candidate in Area 4 ranged from 13.1% to 2.8% (average 5.02%).  *See id*.

e.  In Area 5, the percentage of Black voter support for the Black-preferred candidate ranged from 98.3% to 89.0% (average 96.31%).  *See* PTX-004 at 49–51; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 281:22–283:5.  The percentage of White voter support for the Black-preferred candidate in Area 5 ranged from 32% to 5.3% (average 15.68%).  *See id*.

f.  In Area 6, the percentage of Black voter support for the Black-preferred candidate ranged from 96.9% to 85.2% (average 94.98%).  *See* PTX-004 at 52–54; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 281:22–283:5.  The percentage of White voter support for the Black-preferred candidate in Area 6 ranged from 14.8% to 3.1% (average 5.35%).  *See id*.

g.  In Area 7, the percentage of Black voter support for the Black-preferred candidate ranged from 96.6% to 82.9% (average 94.26%).  *See* PTX-004 at 55–57; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 281:22–283:5.  The percentage of White voter support for the Black-preferred candidate in Area 7 ranged from 11.2% to 2.2% (average 3.86%).  *See id*.

161.  The Court finds that this 90%+ level of racial polarization for both Black and White voters in each of the seven areas of focus is extremely stark.  *See* PTX-004 at 37–57; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 283:15–18] (Dr. Handley testifying that voting is very polarized in those seven areas).  Notably, Dr. Handley testified that "I've not been in a jurisdiction in which polarization is higher."  L. Handley Testimony, 2/27/2024 Trial Tr. 267:4–5.

162.  Dr. Handley also found racial polarization in all of the 19 recent, biracial state legislative contests in the areas of focus.  *E.g.*, PTX-004 at 12 and 36; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 293:22–294:16.  Dr. Handley found that (1) Black voters were

cohesive in supporting Black candidates in these state legislative contests (average 83.3%); (2) White voters cohesively opposed Black-preferred Black candidates (average 18.3%); and (3) the Black-preferred Black candidates won the legislative seats for which they competed only in majority-Black districts.  PTX-004 at 12 and 36.

163.    The Court credits Dr. Handley's analysis of these state legislative contests and her conclusion that they were uniformly racially polarized, albeit to varying degrees of polarization and cohesion among Black voters.  *See* L. Handley Testimony, 2/27/2024 Trial Tr. 293:22–294:16; 355:5–13.  The majority of the nineteen were starkly polarized.  *See* L. Handley Testimony, 2/27/2024 Trial Tr. 293:22–294:16; 355:5–13.  And notably, during her testimony, Dr. Handley walked through the seven least polarized contests out of the 19 total (SD 12, HD 36, SD 42, SD 45, HD 17, HD 39, and HD 70) where the point estimates for the EI RxC analysis were closer to 50%, or where the model produced wider confidence intervals, and explained how the non-EI RxC analyses that she included as a "check" helped confirm that those contests were polarized. *See generally* L. Handley Testimony, 2/27/2024 Trial Tr. 286:21–294:3; 354:10–355:13.  Dr. Alford testified that he did not replicate this aspect of Dr. Handley's analysis and therefore could offer no opinion on it.  J. Alford Testimony, 3/6/2024 Trial Tr. 1502:19–1503:1.

164.    Dr. Handley also testified that she found that in these 19 legislative election contests, Black-preferred candidates were successful only in the majority-Black districts and were not successful in districts that were not majority Black.  L. Handley Testimony, 2/27/2024 Trial Tr. 294:17–21.

165.    Dr. Handley also identified racially polarized voting in two recent nonpartisan judicial contests that included both Black and White candidates.  *E.g.*, PTX-004 at 13–14; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 299:24–300:3.  Dr. Handley reviewed two contests for

Position 1 in the Central District of the Supreme Court and one contest for Position 2 in the Southern District of the Supreme Court.  PTX-004 at 13; *see also* PTX-004 at 63; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 299:24–300:3.  Dr. Handley's analysis showed that the two contests for Position 1 in the Central District of the Supreme Court were sharply racially polarized, with over 90% of the Black voters supporting the Black candidate and over 90% of the White voters supporting the White candidate in both instances.  PTX-004 at 13.  The third contest analyzed, Position 2 in the Southern District, was not polarized: White voters strongly favored the White candidate, Dawn Beam, as did a slight majority of Black voters.  *Id.*

166.    Defendants' expert Dr. Alford replicated the analysis and did not dispute it, agreeing that in the two contests where Dr. Handley found polarization, that Black and White voters were in fact voting for different candidates, with Black voters voting for the Black candidate, and White voters voting for the White candidate.  *See generally* J. Alford Testimony, 3/6/2024 Trial Tr. 1534:24–1535:8; 1536:17–1537:2.  Dr. Handley found that racial polarization in these judicial contests cannot fully be explained by party because the election contests were nonpartisan.  PTX- 004 at 13–14*; see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 300:16–22.  The Court credits Dr. Handley's testimony that her review of these nonpartisan judicial contests was merely done to rebut the contention that it could be party not race that is driving polarization in Mississippi and was not done to determine if voting in the seven areas of interests was racially polarized.  *See* L. Handley Testimony, 2/27/2024 Trial Tr. 300:4–15.  The Court finds that voting behavior in these non-partisan contests cannot fully be explained by party given that party designations were not on the ballot.  The Court finds unpersuasive and does not credit Dr. Alford's suggestion that voters must know the party affiliation or endorsement status of judicial candidates; Dr. Alford offered little if any basis of knowledge for making that assertion.

*See* J. Alford Testimony, 3/6/2024 Trial Tr. 1503:5–1505:6 (Dr. Alford did not cite academic literature, review party platforms, or review surveys or polling to substantiate views about partisanship driving judicial elections).

167.    Dr. Handley also evaluated the voting patterns of 8 statewide Democratic primaries, including a primary runoff.  PTX-004 at 12–13; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 295:5–12.  Dr. Handley found that generating reliable statistical estimates in the seven areas proved impossible and therefore reported only statewide estimates.  PTX-004 at 12; 61–62; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 296:19–297:4.

168.    In these elections, Dr. Handley found that some of the Democratic primary contests were polarized by race.  PTX-004 at 12–13; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 297:16–25.  However, because most White voters who cast ballots in primaries voted in Republican primaries, candidates supported by Black voters usually managed to win the Democratic primary; accordingly, the barrier to elected office for candidates preferred by Black voters is usually the general election, not the Democratic primary.  PTX-004 at 12–13; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 296:19–297:4; 298:1–9.  Notably, however, Dr. Handley's analysis of Democratic primary contests showed that the lack of polarization tended to be due to Black voters voting for White candidates; in contrast, in seven of eight of the Democratic primary contests, White voters supported White candidates (and opposed Black candidates) with a high degree of cohesion.  *See* PTX-004 at 61–62; Defs. Ex. 1, October 16, 2023, Expert Report of John Alford, Ph.D., at 13 [hereinafter "DX-001"] (containing table reflecting RxC EI estimates from the Statewide Democratic Primaries including in Appendix C of Dr. Handley's report).

169.    The Court credits Dr. Handley's conclusions, based on her analysis, regarding the

existence of high levels of racially polarized voting in Mississippi general elections and general election runoffs, across all various types of elections (including statewide elections and state legislative elections) and across all seven areas of focus.  The Court finds based on that analysis that, in general elections and general election runoffs in each of the seven areas, Black voters are highly cohesive in supporting preferred candidates, and White voters are highly cohesive in opposing Black-preferred candidates.

170.    Due to this high degree of racially polarized voting, Dr. Handley further found that, within the seven areas of interest, candidates preferred by Black voters are consistently unable to win elections due to White bloc voting against Black-preferred candidates, unless running in a Black-majority district.  *E.g.*, PTX-004 at 36; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 268:1–9.  Dr. Handley concluded that the starkly racially polarized voting patterns in the areas that she analyzed "substantially impedes" the ability of Black voters to elect candidates of their choice to the state legislature unless districts are drawn to provide Black voters with this opportunity. PTX-004 at 2 and 36; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 266:3–267:7; 268:1–9. For the reasons stated already, as well as those discussed below with respect to Dr. Handley's effectiveness analysis, the Court credits this conclusion as well and finds that, outside of Black-majority districts, White bloc-voting against Black-preferred candidates typically (indeed, nearly always) results in the defeat of Black-preferred candidates in each of the seven areas of interest.

171.    The Court also credits fact testimony that Black and White Mississippians consistently support different candidates, and that Black candidates tend to be unsuccessful outside of Black-majority districts because they cannot garner White support, which is consistent with Dr. Handley's analysis.  For instance, Ms. Pamela Hamner, who ran for election in SD 2 in 2023, testified that, "in Mississippi people vote based on race," and that she had no chance of winning

based on the number of overwhelmingly White precincts in her district.  P. Hamner Testimony, 2/28/2024 Trial Tr. 708:9–709:19 ("And I wish it were that we all believed in the principles that we say we believe in when we did that, but, realistically, people tend to align in Mississippi based on race and I knew that I was going to have a hard time."); *see also*  K. Harris Testimony, 2/28/2024 Trial Tr. 694:21–695:7 (testifying that no Black county supervisors have been elected outside of majority-Black districts in Newton, Jasper, and Clarke counties).

172.     Defendants' expert, Dr. John Alford replicated Dr. Handley's analysis.  DX-001 at 5; J. Alford Testimony, 3/6/2024 Trial Tr. 1500:19–24.  He confirmed that all of Dr. Handley's estimates were accurate.  *E.g.*, *id.* at 1501:24–1502:14.  Notwithstanding his speculation about the underlying causes of racially polarized voting, Dr. Alford did not dispute that Black voters in Mississippi and White voters in Mississippi vote for different candidates, and that this dynamic typically leads to the defeat of Black-preferred candidates except in Black-majority districts.  *Id.* at 1511:11–22; 1512:2–1514:5, 1515:3–,1516:3; *see Nairne*, 2024 WL 492688, at *36 ("[B]oth Dr. Handley and Dr. Alford agree that Louisiana's Black and White voters 'are voting differently,' with Dr. Alford further testifying, '[i]f that's what you want to call racially polarized voting, then it's racially polarized voting.'").

### B.      Dr. Handley's Effectiveness Analysis

173.     Dr. Handley also evaluated whether, given evident racially polarized voting patterns, Black voters had the opportunity to elect candidates of their choice in the areas of interest under the Illustrative Senate and House Plans as compared to the Enacted Plans.  *See, e.g.*, PTX-004 at 14–15; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 300:23–303:23.  She did this by looking individually at the performance of comparable, geographically overlapping sets of districts from each plan in each of the seven areas of focus.  *E.g.,* PTX-004 at 14–35.  The Court

credits this aspect of Dr. Handley's analysis as well.

174.    At the time Dr. Handley performed her analysis in the seven areas of interest there had been no general election results using the Enacted Plans.  PTX-004 at 14; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 302:25–303:4.  Further, because the Illustrative Plans are only for demonstrative purposes, they have not been used in any elections either.  PTX-004 at 14. Accordingly, Dr. Handley employed an alternative method, called, "recompiled elections analysis," to assess whether Black voters have an opportunity to elect their candidates of choice under both the Enacted and Illustrative Plans.  PTX-004 at 14–15; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 300:23–302:16.

175.    For her recompiled elections analysis, Dr. Handley considered the district's demographic composition (*i.e.*, its BVAP) and used recompiled election results with official data from the 11 biracial statewide election contests in her dataset to determine whether Black voters have an opportunity to elect Black candidates of choice in the newly proposed districts in the Illustrative Plans as compared to the Enacted Plans.  PTX-004 at 14–15; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 300:23–302:16.  Recompiled elections analysis has been accepted by courts for the purpose of evaluating Black voters' opportunity to elect their chosen candidates under a districting plan.  *See, e.g.*, *Nairne*, 2024 WL 492688, at *31–32; *Robinson*, 605 F. Supp. 3d at 803–04; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 302:17–24.

176.    To perform this recompiled elections analysis, precinct-level election returns from the 11 biracial general election contests in Dr. Handley's dataset were disaggregated down to the level of the census block and then the block-level election data was reaggregated up, or recompiled, to conform to the boundaries of each of the Enacted and Illustrative Senate and House Districts in the seven areas of interest.  *E.g.,* PTX-004 at 14–15.  The recompiled election results were analyzed

in light of each district's demographic composition (*i.e.,* its BVAP)*. See, e.g.*, *id.*

177.    Based on this analysis, Dr. Handley calculated an "Effectiveness Score," which is simply the average vote share received by the 11 Black-preferred Black candidates across the 11 contests in each of the individual districts.  PTX-004 at 15; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 303:16–304:7.  A score of less than 0.5 means that the average vote share received by the 11 Black-preferred Black candidates is less than 50% and the district is not likely to provide Black voters with an opportunity to elect their candidates of choice.  *Id.*

178.    The Court credits Dr. Handley's testimony that based on her analysis she concluded that in each of the seven areas of interest, the only districts that provided Black voters with an opportunity to elect their chosen candidates despite White bloc voting against Black-preferred candidates were districts that were at least 50 percent BVAP.  *E.g.*, PTX-004 at 16–35; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 268:1–17; 303:16–304:7.

179.    The Court further credits Dr. Handley's testimony that she found that, in each of the seven areas, Black voters would have a greater opportunity to elect their candidates of choice under the Illustrative Plans as opposed to the Enacted Plans, with the Illustrative Plans containing at least one additional opportunity district for Black voters in each of the seven areas.  PTX-004 at 16–35; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 268:1–17; 303:16–304:7.

a.    Area of Interest 1 has five Senate districts.  PTX-004 at 16; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 305:1–21.  Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SDs 2 and 11—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect

their candidates of choice.  PTX-004 at 16; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 306:9–15.  But in the Enacted Senate Plan, only Enacted SD 11 had an Effectiveness Score above 50%, while in the other four districts, White bloc voting typically would result in the defeat of Black-preferred candidates. PTX-004 at 16; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 306:16–22.

b.  Area of Interest 2 has four Senate districts.  PTX-004 at 18.  Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SDs 16 and 17—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice.  PTX-004 at 18; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 307:3–11.  But in the Enacted Senate Plan, only Enacted SD 16 had an Effectiveness Score above 50%, while in the other three districts White bloc voting typically would result in the defeat of the Black-preferred candidates.   PTX-004 at 18; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 307:3–11.

c.  Area of Interest 3 has three Senate districts.  PTX-004 at 21.  Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SDs 35 and 37—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice.  PTX-004 at 21; *see also* L.

68

Handley Testimony, 2/27/2024 Trial Tr. 307:15–21.  But in the Enacted Plan, only Enacted SD 37 had an Effectiveness Score above 50%, while in the other two districts White bloc voting typically would result in the defeat of the Black-preferred candidates.  PTX-004 at 21; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 307:15–21.

d. Area of Interest 4 has four Senate districts.  PTX-004 at 24.  Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SDs 9 and 34—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. PTX-004 at 24; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 307:22–308:9.  But in the Enacted Plan, only Enacted SD 34 had an Effectiveness Score above 50%, while in the other three districts White bloc voting typically would result in the defeat of the Black-preferred candidates.  PTX-004 at 24; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 307:22–308:9.

e. Area of Interest 5 has three House districts.  PTX-004 at 27.  Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the three Black-majority districts in the Illustrative House Plan in this area—Illustrative HDs 56, 63, and 70—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice.  PTX-004 at 27; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 308:9–18]  But in the Enacted Plan,

69

only Enacted HDs 63 and 70 had Effectiveness Score above 50%, while in the Enacted HD 56 White bloc voting typically would result in the defeat of the Black-preferred candidates.   PTX-004 at 27; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 308:9–18.

f.   Area of Interest 6 has four House districts.  PTX-004 at 30.  Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the three Black-majority districts in the Illustrative House Plan in this area—Illustrative HDs 16, 22, and 36—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. PTX-004 at 30; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 308:19–309:2.  But in the Enacted Plan, only Enacted HDs 16 and 36 had Effectiveness Scores above 50% while in the other two districts, White bloc voting typically would result in the defeat of the Black-preferred candidates.   PTX-004 at 30 *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 308:19–309:2.

g.   Area of Interest 7 has five House districts.  PTX-004 at 33.  Taking into account the recompiled election results, the effectiveness scores, and the districts' BVAP, Dr. Handley concluded that the three Black-majority districts in the Illustrative House Plan in this area—Illustrative HDs 80, 82, and 84—had Effectiveness Scores above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice.  PTX-004 at 33; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 309:3–16.  But in the Enacted Plans, only Enacted SD 80 and 82 had Effectiveness Scores above 50% while in the

other three districts, White bloc voting typically would result in the defeat of the Black-preferred candidates.   PTX-004 at 33; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 309:3–16.

180.   Dr. Handley's recompiled elections analysis demonstrated that, across all seven areas of interest, and considering a number of recent, contested, biracial elections, zero of the districts with less than 50% BVAP provided an effective opportunity for Black voters to elect their candidate of choice and overcome White bloc voting against Black-preferred Black candidates. *See* PTX-004 at 16–35; *see generally* L. Handley Testimony, 2/27/2024 Trial Tr. 305:1–309:16. Dr. Alford did not attempt to replicate this analysis and offered no basis to dispute it.   J. Alford Testimony, 3/6/2024 Trial Tr. 1503:2–4.   The Court credits this analysis.

181.   The Court's finding regarding the reliability of Dr. Handley's effectiveness analysis is unaffected by Defendants' references to the re-election of Hob Bryan, a White Democrat who has been in office since the 1980s, in Enacted SD 7 (which Dr. Handley assigned an effectiveness score of 0.439).   PTX-004 at 18.   While Defendants referred to Mr. Bryan's election in their cross-examination questions to Dr. Handley, and Intervenors' counsel mentioned Mr. Bryan in his closing statement, neither introduced any evidence into the trial record regarding any election involving Mr. Bryan or the level of support for him among Black or White voters.   *See* L. Handley Testimony, 2/27/2024 Trial Tr. 347:23–348:14; M. Wallace Closing 3/6/2024 Trial Tr. 1668:20–1671:3.   Meanwhile, Dr. Handley testified that her effectiveness analysis was based on whether the Black voters could elect a *Black* candidate of choice.   L. Handley Testimony, 2/27/2024 Trial Tr. 347:23–348:18.   The Court credits Dr. Handley's conclusion that Enacted SD 7 had an effectiveness score below .5, such that it is not an effective opportunity district for Black voters.

182.   The Court finds, consistent with both of Dr. Handley's analyses (her RPV analyses

and her effectiveness analysis in all seven areas) and her bottom-line conclusions, that White bloc voting typically results in the defeat of Black-preferred candidates in each of the areas of interest except where a Black-majority district is drawn.

### V.       Vote Dilution:  Totality of the Circumstances

#### A.       Senate Factor 1:       Mississippi's History of Voting-Related Discrimination Against Black Voters

183.    The first Senate Factor is the "extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process."  *Gingles*, 478 U.S. at 36–37.  It accounts for "the history of voting-related discrimination in the State or political subdivision."  *Gingles*, 478 U.S. at 44.

184.    As demonstrated by the analyses of political scientist Dr. Marvin P. King, Jr. and historian Dr. Robert Luckett, among other evidence, the Court finds that Mississippi has an extensive history of voting-related discrimination, from 1890 to the present, including in the areas of focus in this case.  *See* M. King Testimony, 2/29/2024 Trial Tr. 760:19–25; R. Luckett Testimony, 2/27/2024 Trial Tr. 369:12–13.

185.    As the Court ruled at trial, Dr. King is qualified to serve as an expert political scientist and historian, with a focus on Political Science and African American Studies.  M. King Testimony, 2/29/2024 Trial Tr. 812:6–17; *see* Pl.'s Ex. 128, Marvin King CV [hereafter "PTX-128"].  Dr. King is a tenured professor at the University of Mississippi with a joint position in both Political Science and African American studies.  M. King Testimony, 2/29/2024 Trial Tr. 738:22–739:4; PTX-128.  He has a Ph.D. in political science from the University of North Texas and has written and lectured extensively on southern political history with a particular emphasis on African

American politics, including the different political orientations for Black citizens from the Civil War to present day.  M. King Testimony, 2/29/2024 Trial Tr. 738:8–21; 739:9–740:13; 741:2–743:8; PTX-128.

186.    The Court also ruled that Dr. Luckett is qualified to serve as an expert historian. M. King Testimony, 2/29/2024 Trial Tr. 812:6–17 (Court overruling Rule 702 objections as to Dr. Luckett and Dr. King because their testimony is based on specialized knowledge).  Dr. Luckett is a tenured professor at Jackson State University and Director of the Margaret Walker Center and COFO Center.  Luckett Testimony, 2/27/2024 Tr. 357:23–367:10 (discussing qualifications); *see also* Pl.'s Ex. 129, Robert E. Luckett CV [hereafter "PTX-129"].  He has a Ph.D. in history from the University of Georgia, with a focus on 20th Century American History, African American History, and the Modern Civil Rights Movement.  *Id.*  Dr. Luckett has written, taught, and lectured extensively on Black history, with a particular emphasis on Southern Black advancement and the Civil Rights Movement, including Mississippi in particular.  *Id.*

187.    The Court finds that Dr. King and Dr. Luckett's analyses of Mississippi's history of voting-related discrimination were extensive, consistent with one another, and credible.

188.    Both Dr. King and Dr. Luckett testified that Mississippi has a long history of racial discrimination, with respect to the right of Black voters to register, vote, and otherwise participate in the political process, continuing in some forms to the recent past and even the present day.  *See* R. Luckett Testimony, 2/27/2024 Trial Tr. 369:4–13; M. King Testimony, 2/29/2024 Trial Tr. 760:19–25.  Mississippi's history of voting-related discrimination against African Americans has taken the forms of violent, legal, and extra-legal measures and means.  *See, e.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 372:21–385:19.

189.    The Court credits the expert testimony of Dr. Luckett (as an expert historian) and

Dr. King (as an expert political scientist) regarding the connection between the past and the present, particularly where their testimony situates present events in a historical context.  Courts in the Section 2 context routinely admit testimony linking historical events of discrimination and voter disenfranchisement to present day policies and tactics, ruling that it is helpful and relevant. *See, e.g.*, *Alpha Phi Alpha*, 587 F. Supp. 3d at 1315–19 (finding expert's historical analysis, which spanned Reconstruction to the "present day" was "thorough and methodologically sound" and that his conclusions were reliable); *Singleton*, 582 F. Supp. 3d at 974–76 (accepting expert historian's testimony and conclusion that based on Senate Factors, current plan would deny Black voters the right to elect candidates of choice, where the analysis spanned 1901 to present, including then recent COVID-19 pandemic); *Brown v. Bd. of Sch. Comm'rs of Mobile Cnty., Ala.*, 542 F. Supp. 1078, 1090–91 (S.D. Ala. 1982) (relying on expert historian's testimony that past discrimination had a present effect on discrimination), *aff'd*, 706 F.2d 1103 (11th Cir. 1983), *aff'd sub nom. Bd. of Sch. Commissioners of Mobile Cnty., Alabama v. Brown*, 464 U.S. 1005 (1983); *Bolden v. City of Mobile, Ala.*, 542 F. Supp. 1050 (S.D. Ala. 1982) (holding that evidence, including expert testimony of historian that spanned 1867 to present, established that one of the principal motivating factors for at-large electoral system in Mobile, Alabama was the purpose to discriminate against blacks and deny them access to political process and political office, and the effects of that discriminatory intent continued to the present).

190.    After the Civil War, the 1868 Mississippi Constitution, written by Black and White delegates, abolished slavery and gave voting rights to Black men.  *E.g.*, M. King Testimony, 2/29/2024 Tr. 752:5–753:2; R. Luckett Testimony, 2/27/2024 Trial Tr. 371:24–372:15.  Numerous Black Mississippians held political office and positions of leadership during this period of Reconstruction.  *See* M. King Testimony, 2/29/2024 Trial Tr. 752:5–753:2.

191.    However, in response to the enactment of the 1868 Constitution, White Democrats created the so-called "Mississippi Plan," which was an effort to obtain political power through violence, intimidation, and voter suppression of Black voters.  *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 372:16–374:16; M. King Testimony, 2/29/2024 Trial Tr. 753:3–20.  Sadly, those efforts were successful.  *See generally* R. Luckett Testimony, 2/27/2024 Trial Tr. 374:17–375:3.

192.    During the 1875 Clinton Massacre, in Clinton, Mississippi, White Democrats and hostile onlookers created a melee at a political rally hosted by Black Republicans, and an estimated 35 to 50 Black people were killed and others were wounded by White vigilantes.  *E.g.*, M. King Testimony, 2/29/2024 Tr. 753:10–20; R. Luckett Testimony, 2/27/2024 Trial Tr. 372:23–373:21.  White residents identified and targeted Black leaders in the community in particular.  R. Luckett Testimony, 2/27/2024 Trial Tr. 372:21–373:21.  The Court credits Dr. Luckett's analysis that the Clinton massacre fomented an era of racial violence and foreshadowed its continued use as a political tool, including well into the 20th Century.  *Id.* at 373:22–25.

193.    Federal troops had occupied the South since the end of the Civil War to protect Black freedpeople, but were removed starting in 1877, after which former Confederate leaders in Mississippi stepped up efforts to consolidate political power through vigilante violence and lynching.  R. Luckett Testimony, 2/27/2024 Trial Tr. 374:6–16.  White vigilantes used lynchings as a form of racial terror in Mississippi, including for the purpose of suppressing Black efforts for equality or political rights.  *Id.* at 374:1–16.  Mississippi led the nation in raw numbers of total known lynchings.  *See id.* at 374:1–5.  And lynchings in Mississippi were connected to efforts to deter Black voters.  *Id.* at 374:6–16.

194.    White leaders convened a new constitutional convention in 1890 to reinvent its

legal system. The President of the constitutional convention declared its purpose was to disenfranchise Black Mississippians. *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 374:17–375:3; M. King Testimony, 2/29/2024 Trial Tr. 754:4–12.

195. The 1890 Mississippi Constitution eliminated the voting power of Black Mississippians through various mechanisms, including the implementation of poll taxes, literacy exams, residency requirements, and felony disenfranchisement. *E.g.*, R. Luckett Testimony, 2/27/2024 Tr. 375:10–378:4; M. King Testimony, 2/29/2024 Trial Tr. 754:4–19.

196. When registering to vote for the first time, Mississippians were required to pay a $2 poll tax for each preceding year, making the poll tax for first time registration $6, an insurmountable amount for Black Mississippians who were disproportionately impoverished due to the sharecropping system. R. Luckett Testimony, 2/27/2024 Trial Tr. 376:5–20.

197. Literacy exams were administered by White registrars who often used their discretion to fail Black potential voters. *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 376:21–377:12. Literacy exams had an "understanding clause" included as a mechanism to enable illiterate White people to vote. *E.g.*, *id.* at 377:1–12.

198. The 1890 Constitution mandated a two-year residency requirement in the election district to register to vote. R. Luckett Testimony, 2/27/2024 Trial Tr. 375:10–15. Black Mississippians were a particularly transient population, frequently moving throughout the South for economic reasons or to search for lost family members who had been separated due to slavery, making it difficult to meet the residency requirement to vote. *E.g.*, *id.* at 375:21–376:4.

199. The Mississippi Constitution also reduced the number of Black Mississippians eligible to vote by barring persons with felony convictions from voting and selecting crimes for disenfranchisement that they believed Black people were most likely to commit. *See* M. King

Testimony, 2/29/2024 Trial Tr. 754:22–756:4; R. Luckett Testimony, 2/27/2024 Trial Tr. 377:13–22.   The Mississippi Supreme Court declared in 1896 that the offenses that led to disenfranchisement were those associated with Black people, further underscoring the intent surrounding the felony disenfranchisement provisions.  R. Luckett Testimony, 2/27/2024 Trial Tr. 377:21–378:4; *see also* M. King Testimony, 2/29/2024 Trial Tr. 754:22–755:11.

200.    As a result of these mechanisms, voter registration rates among Black men fell from 90% during Reconstruction (prior to the passage of the 1890 Constitution) to less than 6% by 1892. *See* R. Luckett Testimony, 2/27/2024 Trial Tr. 378:17–22 (testifying that over 100,000 Black voters were disenfranchised in this period).

201.    In addition to these various legal barriers to political participation, Mississippi also adopted a pervasive system of racial segregation after 1890.  R. Luckett Testimony, 2/27/2024 Trial Tr. 379:2–5.

202.    Another method of voting discrimination that developed over the course of the 20th Century was the White Primary.  For decades, the Democratic Party, which was the party of the White South until the parties began realigning around 1968, restricted its membership based on race and established all-White primaries.  *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 379:6–21.  Those Black people who were able to register to vote were denied the opportunity to participate in Democratic primaries until the Supreme Court ended the practice of all-White primaries in 1944. *Id.*  Even after its formal abolition, state-sanctioned discrimination and violence continued to enable exclusion of Black people from Democratic primaries.  *E.g.*, *id.* at 379:18–380:2.  This led to efforts such as the Mississippi Freedom Democratic Party, which sought to hold parallel party proceedings from the precinct level up to the Democratic National Convention in order to oppose the continued racial exclusion from the party.  *E.g.*, M. Cunningham Testimony, 2/27/24 Trial Tr.

239:2–17 (discussing those efforts, including her personal participation in the Mississippi Freedom Democratic Party and related protests). Because the Democratic Party held an overwhelming political advantage in Mississippi well into the 20th Century, this exclusion from the primaries effectively constituted exclusion from seeking office. *See generally* R. Luckett Testimony 2/27/2024 Trial Tr. 379:2–380:2; *see also Jordan v. Winter*, 604 F. Supp. 807, 812 (N.D. Miss. 1984) (finding all-White primaries as evidence of official discrimination in Senate Factors analysis); *Mississippi State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1250 (N.D. Miss. 1987) (taking judicial notice of existence of all-White primaries).

203.    Into the 20th Century and the lifetimes of current Mississippi voters, powerful politicians in the State supported formally excluding Black Mississippians from political and civic life through legal and extra-legal means:

  a.  U.S. Senate candidate Theodore Bilbo publicly called for violence against Black people to intimidate them from voting that year. R. Luckett Testimony 2/27/2024 Trial Tr. 374:6–16. Mississippi State court judge (and Brookhaven, Mississippi native) Tom Brady authored Black Monday, which used the language of racism and White superiority to explain why schools should not be integrated. M. King Testimony, 2/29/2024 Trial Tr. 760:5–11. Brady was later appointed to the State Supreme Court and served into the 1970s. *Id*. at 760:12–16.

  b.  During the 1950s and 1960s, the White Citizens' Council, the Mississippi State Sovereignty Commission, and other White groups used violence and intimidation tactics against Black voters seeking political advances. *E.g*., M. King Testimony, 2/29/2024 Trial Tr. 757:12–758:11; 759:4–25; R. Luckett

Testimony, 2/27/2024 Trial Tr. 383:25–385:19.   Created in 1956, the State Sovereignty Commission was a department of the state tasked with intimidating civil rights activists and discouraging Black people from registering to vote.  M. King Testimony, 2/29/2024 Trial Tr. 758:5–759:1.  The White Citizens' Council also resisted the *Brown v. Board of Education of Topeka*, 349 U.S. 294 (1955), decision and conducted essay writing and competitions on topics such as "Why I believe in social separation of the races of mankind" and "Why the preservation of States rights is important to every American."  M. King Testimony, 2/29/2024 Trial Tr. 757:12–23; 759:4–25.

204.   Into the 1960s, when Black Mississippians attempted to register to vote or when activists tried to register and turn out voters, they continued to face lethal violence and intimidation tactics by White vigilantes.  *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 380:3–383:24.

a.   Medgar Evers, an activist who previously confronted an angry White mob after attempting to register Black veterans in the 1940s, was assassinated in his driveway in Hinds County by a known Citizens' Council and Ku Klux Klan member in 1963 for his activism and involvement in promoting voting rights. R. Luckett Testimony, 2/27/2024 Trial Tr. 380:3–25.

b.   When civil rights activists attempted to register Black voters as part of the "Freedom Summer" in 1964, three were murdered by a White lynch mob aided by the Klan and the local sheriff's office in Neshoba County, Mississippi.  R. Luckett Testimony, 2/27/2024 Trial Tr. 382:10–383:16; M. King Testimony, 2/29/2024 Trial Tr. 758:12–759:1.   White law enforcement officials were implicated in these murders, and the State Sovereignty Commission supported

their defense.  M. King Testimony, 2/29/2024 Trial Tr. 758:12–759:1.

    c.  Another NAACP leader, Vernon Dahmer, was assassinated by Klansmen in his home outside Hattiesburg, Mississippi in 1966, after he led efforts to register potential Black voters and offered to pay poll taxes on their behalf, even after the Supreme Court had ruled poll taxes unconstitutional.  R. Luckett Testimony, 2/27/2024 Trial Tr. 381:17–382:9.

    d.  Also in 1966, James Meredith, a Black civil rights activist, was shot by a White gunman in DeSoto County after he organized a march to register Black people in the state to vote.  R. Luckett Testimony, 2/27/2024 Trial Tr. 381:1–16.

205.    Following the passage of the Voting Rights Act ("VRA"), the Mississippi legislature and local governments also used redistricting in Mississippi to dilute the impact of the Black vote, leading to multiple federal court orders directing the legislature to redraw districting plans and repeated intervention from the United States Department of Justice.  *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 394:2–11, 396:16–397:2, 397:9–400:6, 400:17–401:4.

206.    White leaders sought to minimize the VRA's impact by creating at-large elections and enacting racial gerrymandering through redistricting.  *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 386:10–20.  For example, the all-White Mississippi legislature divided the Mississippi Delta (a majority-Black area that had previously been in one congressional district) into three congressional districts after the VRA passed, only one of which was majority-Black by a slim margin.  *Id.* at 386:24–387:23, 388:10–389:2.  Despite having the highest percentage of Black population of any state in the nation, Mississippi did not elect a Black congressman after Reconstruction until 1986, when a federal court ordered a redrawn map bringing the Delta back into one Congressional district.  *Id.*

207.    From 1985 to 2012, the Civil Rights Division of the U.S. Department of Justice issued 81 letters to Mississippi and counties and local districts within Mississippi, alleging violations of the Voting Rights Act.  *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 394:6–11, 396:16–20; *see also* Pl.'s Ex. 63, Voting Determination Letters for Mississippi [hereinafter "PTX-063"] (listing all 81 instances);  Pl.'s Ex. 64, Letter, Acting Assistant U.S. Attorney General, Civil Rights Division, James P. Turner to John P. Fox, Esq., February 27, 1990 [hereinafter "PTX-064"]; Pl.'s Ex. 65, Letter, Assistant U.S. Attorney General, Civil Rights Division, Deval Patrick to Jeffery M. Navarro, December 4, 1995 [hereinafter "PTX-065"]; Pl.'s Ex. 66, Letter, Assistant U.S. Attorney General, Civil Rights Division, Thomas E. Perez to Kenneth Dreher, Esq., and David Wade, Senior Planner, December 3, 2012 [hereinafter "PTX-066"].  The Department of Justice objected to numerous local redistricting plans, including in Chickasaw County, Monroe County, and the City Clinton in Hinds County as late as 2012.  R. Luckett Testimony, 2/27/2024 Trial Tr. 396:21–397:2, 397:9–399:2, 399:21–400:6; PTX-064 (U.S. Department of Justice Letter regarding proposed redistricting of board of supervisor districts for Chickasaw County); PTX-065 (U.S. Department of Justice Letter regarding redistricting plan for the City of Aberdeen in Monroe County); PTX-066 (U.S. Department of Justice Letter regarding redistricting plan for City of Clinton in Hinds County).  Federal courts also found local redistricting plans in Tupelo and Chickasaw County, and quite recently a state legislative plan in the Delta region, to violate Section 2 of the Voting Rights Act because they diluted the power of Black voters.  R. Luckett Testimony, 2/27/2024 Trial Tr. 399:3–20; *see also Thomas v. Bryant*, 366 F. Supp. 3d 786, 810 (S.D. Miss.) (Mississippi Delta State Senate district), *aff'd*, 931 F.3d 455 (5th Cir. 2019), *on reh'g en banc sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020), and *on reh'g en banc sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020); *Jamison v. Tupelo*, 471 F. Supp. 2d 706, 716 (N.D. Miss.

2007); *Gunn v. Chickasaw Cnty*, 705 F. Supp. 315, 324 (N.D. Miss. 1989).  Following the 2000

and 2010 Census, federal courts also drew new congressional districts when Mississippi failed to

produce a plan that complied with Section 5 of the Voting Rights Act.  R. Luckett Testimony,

2/27/2024 Trial Tr. 400:17–401:4; *see also Smith v. Clark*, 189 F. Supp. 2d 503, 512 (S.D. Miss.

2002).

208.    Mississippi maintained a requirement that voters register separately for municipal

and federal elections (otherwise known as "dual registration") from 1892 until it was struck down

in 1987, with a court finding that the law had discriminatory intent and discriminatory impact on

Black voters.  R. Luckett Testimony, 2/27/2024 Trial Tr. 391:13–392:25; *see also Operation Push*,

674 F. Supp. at 1245.  Mississippi continued to try to revive the practice in a variety of ways up

until 1997, but its efforts continued to face objections from the Justice Department under Section

5 of the Voting Rights Act.  R. Luckett Testimony, 2/27/2024 Trial Tr. 391:13–392:25; *see also*

Pl.'s Ex. 67, Letter of Isabelle Katz Pinzler, Acting Assistant Attorney General, to Sandra M.

Shelson, Special Assistant Attorney General, State of Mississippi, September 22, 1997 [hereinafter

"PTX-067"] (objecting to attempt to revive dual registration scheme).

209.    In 2011, Mississippi passed a law requiring an approved form of identification to

vote, but the U.S. Department of Justice denied preclearance of the law under Section 5 of the

Voting Rights Act, preventing it from going into effect.  R. Luckett Testimony, 2/27/2024 Trial

Tr. 401:10–403:17.  Black Mississippians were shown to be much less likely to have the required

identification.  *Id.*  After the Supreme Court's *Shelby County v. Holder* decision, Mississippi

implemented this voter identification requirement, which has a disproportionate impact on Black

voters.  *Id.*  Moreover, local election officials determine whether someone has satisfied the voter

identification requirement, and the State of Mississippi provides no oversight into how local

election officials determine whether the requirement has been satisfied.  K. Kirkpatrick Testimony, 3/04/24 Trial Tr. 1232:19–1233:5.

210.    In more recent years, Mississippi has imposed new or additional restrictions on voting that enhance opportunities for discrimination, in effect if not intent.  R. Luckett Testimony, 2/27/2024 Trial Tr. 402:24–403:17, 404:9–413:4.

211.    Today, some methods of state-sanctioned voting-related discrimination persist. Lifetime felony disenfranchisement has disenfranchised Black Mississippians by a greater amount than White Mississippians over time, and even as other states trended toward reinstating the right to vote after a felony conviction, Mississippi expanded the list of crimes for which a citizen to lose the right to vote.  *See* M. King Testimony, 2/29/2024 Trial Tr. 755:12–756:4.  The present-day effect of the 1890 Constitution's practice of felony disenfranchisement is that an estimated 58% of Mississippians who are disenfranchised due to a felony conviction are Black, even though only 37% of voting age citizens in Mississippi are Black.  *See* R. Luckett Testimony, 2/27/2024 Trial Tr. 416:6–13; *see also* M. King Testimony, 2/29/2024 Trial Tr. 755:18–756:4.

212.    There is no question that Mississippi in 2024 is different from Mississippi in 1894 or 1964.  However, the Court credits the historical analysis offered by Dr. King and Dr. Luckett and finds that Mississippi has a long and particularly extensive history of official discrimination in voting, extending in some ways into the very recent past and the present.  R. Luckett Testimony, 2/27/2024 Trial Tr. 369:10–13; 371:12–23; 393:1–19; 400:7–12; 403:6–17; 407:15–22; 409:12–18; 412:22–413:4; 414:8–16; 416:25–418:13; M. King Testimony, 2/27/2024 Trial Tr. 750:6–17, 751:9–752:4, 754:22–757:9, 760:19–25.

213.    This finding is consistent with and supported by the trial testimony of Black Mississippians demonstrating that Mississippi's sad history of pervasive and often violent racial

discrimination and political exclusion is not some distant memory or mere vestige of the past, but a reality that continues to impact Black voters today.

214.    The Court credits the testimony of Ms. Mamie Cunningham, who demonstrated that many of the historical systems of discrimination, including segregation, all-White primaries, and violence against Black voters and activists remains within the living memory of Mississippians even today.  Ms. Cunningham, who has been advocating for voting and civil rights in Mississippi since she was a college student in the 1960s, recalls needing to be escorted by a federal agent when she first registered to vote, to ensure that she would not be intimidated and harassed.   M. Cunningham Testimony, 2/27/2024 Trial Tr. 236:3–19.   She testified that Black people in Chickasaw County, even in predominantly Black areas, were too afraid to register and vote.  *Id.* at 237:4–23.  Ms. Cunningham also testified that, in response to being excluded by the Mississippi Democratic Party, which was all-White, she and other prominent civil rights icons, including Fannie Lou Hamer, Aaron Henry, Ed King, and Bob Moses, organized a parallel political party known as the Mississippi Freedom Democratic Party.  *Id.* at 238:2–239:17.  She traveled with the Black delegation to protest the all-White Democratic delegation from Mississippi at the National Democratic Convention in 1964.  *Id.*  Ms. Cunningham further testified that she continues to experience restrictions on voting rights today, particularly Mississippi's recently enacted restriction on ballot assistance, S.B. 2358, which she had to challenge in court as a plaintiff.  *Id.* at 241:6–242:23.  Ms. Cunningham obtained a preliminary injunction, which ruled that S.B. 2358 likely violates Section 208 of the Voting Rights Act.  *See Disability Rts. Mississippi v. Fitch*, No. 3:23-CV-350-HTW-LGI, 2023 WL 4748788 (S.D. Miss. July 25, 2023).

215.    The Court also credits the testimony of Deacon Harris regarding the recency of violent efforts to stop Black Mississippians from voting.  As Deacon Harris described, "Medgar

Evers grew up in the town that I live in.  My dad went to school with Medgar Evers and Charles."
After returning from service in World War II, "[Medgar] came back to that same courthouse that
I've been serving in for 24 years [as a county supervisor], tried to register to vote after serving his
country.  He was ran away. He wasn't allowed to vote."  K. Harris Testimony, 2/28/2024 Trial Tr.
689:9–20.

216.    The Court credits the testimony of Terry Rogers about the continued resonance of
the history of discrimination in Clarke County.  In particular, Mr. Rogers testified about "the
Hanging Bridge in Shubuta, basically what I know as a place in which there was instances in which
African-Americans were hung up on the bridge.  It's a bridge in which my parents told me the
story to try to, like, advise me on how to go about day to day, how to keep a head on my shoulders
. . . to try to advise me about life in the South."  T. Rogers Testimony, 3/01/2024 Trial Tr. 941:2–
9 (cleaned up).

217.    The Court credits the testimony of Dr. Joseph Wesley regarding the continued
resonance of violent efforts to stop Black Mississippians from voting.  Dr. Wesley shared the story
of Vernon Dahmer, a local hero who was killed in a firebombing incident because of his work to
register Black Mississippians to vote in the Hattiesburg area.  Dr. Wesley testified that the local
community continues to reflect and speak about the impact of that incident, with community
leaders referring to it to emphasize the importance of voting to the community.  J. Wesley
Testimony, 2/28/2024 Trial Tr. 671:16–672:11.

**B.      Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi**

218.    The second Senate Factor is "the extent to which voting in the elections of the state
or political subdivision is racially polarized."  *Gingles*, 478 U.S. at 37.

219.     As demonstrated by the analyses of Dr. Handley and Dr. King, among other evidence, the Court finds that voting in Mississippi and in the specific areas of focus remains extremely polarized along racial lines.

220.     As set forth above, Mississippi elections are characterized by stark patterns of RPV. *See, e.g.*, *supra* ¶¶ 157–70.  Without repeating the discussion of Dr. Handley's extensive and highly credible analysis, the Court credits Dr. Handley's characterization that the observed levels of racially polarized voting by Black and White voters are extremely high and extremely consistent— as much as anywhere she has observed in her decades of work conducting such analyses.  *See, e.g.*, L. Handley Testimony, 2/27/2024 Trial Tr. 267:4–7.  And as noted previously, Dr. Alford does not dispute the accuracy of Dr. Handley's calculations or the resulting estimates of bloc voting that she produced.  *See supra* ¶ 172.

221.     The dramatic extent to which politics in Mississippi is divided along racial lines is further illustrated by the analysis and conclusion of Dr. Handley, with which Dr. Orey and Dr. King agreed, that Black candidates nearly always lose elections outside of Black-majority districts in Mississippi.  *See, e.g.*, *supra* ¶¶ 162–64, 170, 178–82; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 268:1–9; 294:17–295:4; 309:17–310:9; 310:17–311:3 (testifying that majority-Black districts are necessary to provide Black voters with an opportunity to elect their candidates of choice); B. Orey Testimony, 2/28/2024 Trial Tr. 623:13–624:4 (testifying that it is "overwhelmingly" the case that "the Blacks in Mississippi who are elected officials have been elected from majority-Black districts."); M. King Testimony, 2/29/2024 Trial Tr. 789:4–13 ("Outside of Black-majority districts, majority-minority districts, Black-opportunity districts, we just don't see evidence that Blacks can win.").

222.     Defendants' expert witness, Dr. Brunell, agreed with all of this as well.  He testified

that racial polarization continues to persist in the South, including in Mississippi, according to a study he published in 2019.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1341:11–1342:3, 1343:7–10, 1344:1–13, 1344:22–1345:14.   According to Dr. Brunell's peer-reviewed scholarship, the "consensus" among academics who have studied racial polarization since at least as far back as 1980 is that "it's been very difficult for African-Americans to be elected from state legislative or congressional districts that are less than a majority African-American in voting-age population," "except for when there are other minorities in the district." *Id.* at 1345:2–7.  Moreover, Dr. Brunell and his co-authors concluded that "there's no evidence to support" the claim "that racially polarized voting has substantially diminished." *Id.* at 1344:1–5.  In fact, "especially in the South," it is "very likely" that there has been "an increase in racial polarization in general elections." *Id.* at 1344:14–19, 1345:12–14.   Thus, as Dr. Brunell acknowledged, "despite more Black people being elected in recent years, Black legislators continue to be . . . overwhelmingly elected from districts that are majority Black." *Id.* at 1341:11–16.

223.    The Court finds, consistent with the evidence in the trial record, that this polarization is genuinely racial in nature, and not merely partisan polarization that happens to coincide with racial lines.   There are several evidentiary bases for this conclusion—and importantly, none beyond mere overlap that might support the alternative conclusion that the apparent and stark division of the electorate along racial lines is actually just a matter of party affiliation.

224.    First, the data demonstrates that White voters in Mississippi virtually never vote to elect Black candidates in biracial election contests, across a range of different types of contests, including non-partisan and party primary contests where party affiliation is not a factor.

a.   In statewide elections, White crossover voting for Black candidates in the eleven

biracial elections from the past decade that Dr. Handley analyzed was exceedingly low across the board, with Black candidates earning only 6.9% of the White vote on average against White opponents.  PTX-004 at 8–9, 11; *see also* L. Handley Testimony, 2/27/2024 Trial Tr. 283:11–14.  In six of the seven areas of interest the level of White crossover voting for Black candidates was less than 10%; in the Jackson area it was 14%.  PTX-004 at 11.  By contrast, in the five statewide contests where the candidates preferred by Black voters were White, those White candidates received a higher share (9.1%) of the White vote on average, with 17.7% of White voters across the seven areas crossing over to vote for White Democrat Jim Hood in the 2019 gubernatorial general election contest.  PTX-004 at 11–12.

b.  A similar pattern existed in the 19 state legislative elections that involved Black and White opponents in 2015 and 2019.  PTX-004 at 12.  On average, more than 80% of White voters voted against the Black candidate.  *Id.*  And in majority-White districts in the dataset (Senate Districts 2, 8, 10, 14, 17, 19, 39. 42 and 45, and House Districts 17 and 39), which are the districts where White crossover voting was needed for Black candidates to prevail, over 80% of White voters voted against the Black candidate *in every single election*.  *See* PTX-004 at 58–60.

c.  In *all three* non-partisan judicial elections that Dr. Handley examined, White voters voted against the Black candidate with over 70% cohesion (over 85% on average).  PTX-004 at 63.

d.  And in *seven out of the eight* Democratic primary elections that Dr. Handley

examined, most White voters voted against Black candidates.  PTX-004 at 61–

62.  That included not only contests where Black voters also supported White

candidates (which is consistent with Dr. King's testimony that Black voters pay

close attention to candidate viability, which is rational in a racially polarized

environment, *infra* ¶¶ 165–68, 224, 239), but also in the 2011 gubernatorial

primary and primary runoff elections, where then-sitting mayor of Hattiesburg,

Johnny DuPree, ran for the nomination, which he achieved with high levels of

Black support but was cohesively opposed by White voters, PTX-004 at 61–62.[3]

225.    Second, the data and evidence demonstrate that White Democrats do sometimes

win sufficient White "crossover" support to prevail in White-majority jurisdictions in Mississippi,

but that Black Democrats do not.  As Dr. Alford acknowledged, Jim Hood, a White Democrat,

served as the State's elected Attorney General until 2020.  *See* J. Alford Testimony, 3/6/2024 Trial

Tr. 1513:1–3, 11–14.  Other Democratic candidates have won statewide elections in Mississippi

in the recent past as well, including Eric Clark, who was Secretary of State from 2004 to 2008, and

George Dale, who was insurance commissioner from 2004 to 2008.  *Id.* at 1513:4–6, 11–14.[4]  But

no Black candidate of any political party has prevailed in a statewide election in Mississippi since

---

[3] The Court takes judicial notice of the fact that Johnny Dupree was mayor of Hattiesburg in 2011 as that fact is not subject to reasonable dispute and is generally known within the jurisdiction.  *See* Fed. R. Evid. 201(b); *see, e.g.*, City of Hattiesburg, MS, *Two City Buildings Named for Hattiesburg Mayors* (July 6, 2023), https://www.hattiesburgms.com/news-updates/two-city-buildings-named-for-hattiesburg-mayors/.

[4] The Court may also take judicial notice of these facts, which are not subject to dispute and can be readily determined from government sources.  MS Secretary of State, *2020–2024 Mississippi Blue Book, Historical and Statistical Information* 550, 552, (2021), https://www.sos.ms.gov/content/documents/ed_pubs/pubs/BlueBook20-24/14%20Historical%20and%20Statistical%20Info.pdf.

Reconstruction.  Stip. ¶ 46.  *Accord* M. King Testimony, 2/29/2024 Trial Tr. 788:11–18 ("[A]s we can see, Blacks just have not been elected to statewide office.  The last one finished serving in 1878, so that's 145 years or so.").  The same is true with respect to state legislative offices, where, as noted, the "Black candidates supported by Black voters won the legislative seats . . . only in majority Black districts."  PTX-004 at 12.

226.    Third, the evidence shows that the Republican Party—the party typically favored by White voters in Mississippi—almost never nominates Black candidates.  In the dataset examined by Dr. Handley, which includes all biracial elections in the past decade, there were no statewide election contests with Black Republican nominees, or Republican primaries for statewide office featuring Black candidates, and the only state legislative contest out of 19 that included a Black Republican was in a Black-majority district where the Democratic candidate was also Black.  *See* PTX-004 at 37–63.[5]

227.    The Court finds that the data in the record, demonstrating that White voters almost never vote to elect Black candidates from either party to office, indicates that the racial division of the electorate is best explained by race and not by party labels.

228.    This finding is further supported by unrebutted expert analysis, which this Court credits, that, in Mississippi, contemporary partisan lines formed in response to racial politics, not independently of them.

229.    The Court credits Dr. King's analysis explaining how the racial divide between voters predates the current alignment of the political parties, and how attitudes towards civil rights

---

[5] In that contest, the 2015 election in majority-Black SD 38, a White third-party candidate garnered nearly 40% of the White vote.  PTX-004 at 59.

and racial equality significantly contributed to and continue to drive that alignment.  *See* M. King Testimony, 2/29/2024 Trial Tr. 772:24–773:4 ("To understand today's political party system, you have to understand that race was the root cause of our current party system, that that was the -- that was the critical issue that defined the parties. So race comes first and then party second. Race is the core polarization here.").

230.    As Dr. King explained, following the Civil War, Black Americans were typically Republican partisans due to President Lincoln and the Republican Congress's measures that attempted to address the needs of the Freedman.  *E.g.*, M. King Testimony, 2/29/2024 Trial Tr. 766:3–17.  The Black vote remained mostly Republican through the 1930s, because the Republican party was deemed to be the political party that would elevate Black interests.  *See e.g.*, *id*. at 766:25–769:7.

231.    During Franklin Delano Roosevelt's presidency, Black voters began to vote for Democratic policies because Northern Blacks, in particular, benefited from New Deal policies, even though the Democratic party generally, and especially in the South was associated with Jim Crow policies which served to disenfranchise African Americans.  *See* M. King Testimony, 2/29/2024 Trial Tr. 766:25–767:22.

232.    In 1948, the Democratic party made an affirmative decision to be the party of civil rights, which alienated a coalition of anti-civil rights Democrats, causing them to stage a walk-out of 1948 Democratic Convention and resulting in the formation of the States' Rights Independent Party, which was based on a segregationist platform.  *See* M. King Testimony, 2/29/2024 Trial Tr. 767:25–768:17.  This momentum was furthered by President Harry Truman taking actions during his presidency to further civil rights, including forming the President's Commission on Civil Rights, integrating the U.S. Army, and desegregating the federal workforce.  *See id.* at 768:18–

769:7.

233.    The Court credits the testimony of Dr. King that this partisan realignment around civil rights issues solidified as a result of the 1964 Civil Rights Act.  *See e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 769:10–24.  During and after the 1964 election, Black voters (including Black voters in the South who began to gain the franchise in the years following the passage of the 1965 Voting Rights Act) gravitated to the Democratic Party, because Democratic candidates began to advocate for advancing civil rights, while Republican candidates appealed to White voters dissatisfied with the Democratic Party's promotion of civil rights.  *See id.* at 769:16–770:7.

234.    The Court credits the testimony of Dr. King that the so-called "Southern Strategy" resulted in the movement of voters who were dissatisfied with the Democratic Party's stance on civil rights to the Republican Party, which had articulated opposition to the types of relief afforded to African Americans in the Civil Rights Act as part of a "states' rights" platform advocated by candidates like Barry Goldwater.  *See, e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 769:25–770:21 (explaining that Goldwater was "one of five Republican Senators who voted against the Civil Rights Act" and whose nomination was part of "the Southern Strategy" to woo "racially conservative voters over to the Republican Party").

235.    The Court further credits Dr. King's testimony that these conclusions about the partisan realignment also apply to Mississippi in particular.  *See, e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 770:24–772:2.  Dr. King credibly testified that, as a result of party realignment around these of civil rights issues, racially conservative Mississippians gravitated towards the Republican party as well as candidates who expressed racially conservative views, *see id.* at 770:24–771:21, which Dr. King credibly describes as a conservative attitude and belief about the proper size and scope of the Government's role in addressing racial issues, such as racial

integration and issues relating to racial inequality and injustice, in society. *See id*. at 841:5–21, 838:13–839:5. Dr. King credibly explained that the history of partisan realignment demonstrates that race was the root cause of the current party system which helps to drive Black and White voting behavior in Mississippi. *See id*. at 764:16–765:3, 772:24–773:4, 776:18–777:3. In Mississippi, a race-based partisan realignment occurred because of decades of action and inaction relating to racial issues by both political parties. *Id.*

236.    Defendants offered no expert historian or political scientist to rebut or disagree with any of this analysis. To the contrary, Defendant's expert Dr. Brunell testified that there is "[n]o question" that the split between the political parties today "rests on a racial division." T. Brunell Testimony, 3/5/2024 Trial Tr. 1319:19–22, 1320:5–8. He further opined that that the racial division that exists today "definitely" traces, in significant part, back to Democrats becoming "associated with civil rights and other issues of importance to the African-American community, including racial equality," while the Republican Party nominated candidates opposed to civil rights, such as Barry Goldwater. *Id.* at 1319:23–1320:8; *see also* M. King Testimony, 2/29/2024 Trial Tr. 769:25–770:21.

237.    The Court further credits Dr. King's analysis based on the political science scholarship that the polarized voting behavior observed in Black and White Mississippians is driven primarily by racial considerations and that party affiliations are driven by such considerations as well. *See* M. King Testimony, 2/29/2024 Trial Tr. 773:7–774:4; *see also id.* at 772:24–773:4, 776:18–777:3. Notably, Defendants' expert Dr. Alford agreed that political affiliations may be driven by race. J. Alford Testimony, 3/6/2024 Trial Tr. 1537:3–6.

238.    The Court credits Dr. King's analysis, based on political science scholarship, that one way that race informs political affiliation is that Black voters tend to vote for political

candidates who are perceived as more likely to advance the common good of Black people.  Dr. King explained that this conclusion is supported by the "Linked Fate" and "Black Utility Heuristic" concepts.  M. King Testimony, 2/29/2024 Trial Tr. 763:7–764:15.  Linked Fate describes the idea that certain communities, including the Black community in particular, feel that their individual lives are tied to the fortunes of the group.  *Id*. at 763:7–14.  And the Black Utility Heuristic describes African-American voting patterns of voting for the candidates and/or issues that are best for Black people on a whole.  *Id*. at 763:15–764:1.  The Court credits Dr. King's testimony that these concepts demonstrate that in order to understand individual voting patterns, in particular the voting patterns of Black Mississippians, it is necessary to understand the Black community as a whole.  *Id*. at 764:2–15.  Dr. King credibly testified that because Blacks have historically been treated as a group, they act as a group in turn—so Black voters vote for who they perceive is best for the group, and not always who is best for the individual.  *Id*.  The Court also credits Dr. King's analysis that racial considerations also inform the political behavior and affiliation of many White voters.  *See, e.g.*, *supra* ¶¶ 235–37 and *infra* ¶¶ 240–41, 310–12, 327.

239.    The Court also credits Dr. King's testimony that voters' revealed preferences indicate that the race of candidates is important to voters notwithstanding political party.  For example, Dr. King explained that, while Democratic presidential slates (Obama/Biden, Clinton/Kaine, and Biden/Harris) earned similarly high shares of the Black votes in Mississippi and similarly low shares of the White vote among those who cast a ballot during those elections, Black *turnout* was higher when a Black candidate was on the ballot.  *See* M. King Testimony, 2/29/2024 Trial Tr. 774:7–21.  The Court also credits Dr. King's testimony that, with respect to state-level contests, candidate viability, that is, voters' assessment of a candidate's strategic chances of winning an election based on the strength of their campaign apparatus, including, for

example, how much money they have earned and their electoral history relevant to the candidate's chance of winning (*id.* at 774:22–775:20; *see id.* at 823:8–21) is especially important to Black voters, who are less likely to turn out when there is not a viable preferred candidate. *Id.* at 824:22–825:1.

240.   The Court also credits Dr. King's testimony that the current makeup of the Mississippi state legislature is consistent with his opinion that racial considerations drive voting behavior in Mississippi. *See* M. King Testimony, 2/29/2024 Trial Tr. 775:21–777:3.   In particular, virtually all White-majority districts are represented by White legislators, and almost all Black-majority districts are represented by Black legislators. *See id.* at 776:1–9; 789:14–25.   Dr. King credibly testified that the small handful of counterexamples does not undermine the longstanding and credible pattern of Black Mississippians voting for Black candidates in Black-majority districts (and White Mississippians voting for White candidates in White-majority districts). *Id.* at 776:1–9; s*ee id.* at 775:7–20.   That includes the recent election of Republican Rep. Rodney Hall, who is Black, in an uncontested general election in a majority-White House district in DeSoto County. *See id.* at 776:10–17; *see also id.* at 775:7–20.   In fact, as Dr. King testified, this singular counterexample out of approximately 140 years of election history is better categorized as evidence of this longstanding pattern than it is evidence against the reality that Black Mississippians cannot win elections outside of majority-minority districts. *Id.* at 789:1–13.   As Dr. King testified, "the outlier of a case almost just proves the rule." *Id.* at 776:11–12.

241.   The use of racial appeals is further evidence of the salience of race and racial division in Mississippi politics.   As detailed further below, *infra* ¶¶ 310–12, political campaigns in Mississippi continue to feature racial appeals designed to appeal to specific racial groups, which have the effect of reinforcing the racial divide between the political parties and ensuring that

partisan politics remains racialized.  *See, e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 779:13–20 (explaining that racial appeals are "designed to send a signal to certain voters that the candidate shares their sympathy and empathizes perhaps with them on views on race"), 782:12–783:2 (explaining that appeals to Confederate symbols, including by Senator Cindy Hyde-Smith, will only appeal to a subset of voters), 784:21–785:17 (explaining that candidates, including Governor Tate Reeves, who prominently deny the existence of systemic racism are generally "going to push away Black voters" by showing them "that he is not empathetic to their world view").

242.    The Court's finding that the consistently high levels of racially polarized voting in Mississippi are not merely a byproduct of party affiliation but rather are best explained by race is further supported by the testimony of individual Mississippians, which confirms that voters respond to the positions taken by parties and candidates, particularly their positions on issues that relate to racial justice and equality.  In other words, and consistent with Dr. King's discussion of the importance of group or community interests in driving Black voting behavior, *supra* ¶ 238, the fact that polarization continues to persist is not because Black voters are inherently aligned with Democrats but because of the positions and actions taken by parties and candidates in responding to the particular needs and preferences of Black voters and predominantly Black communities.

243.    For example, numerous Black voters testified that they would be willing to support Republican candidates and that they decide who to support based on the candidates' positions on important issues.  *See, e.g.*, G. Fredericks Testimony, 2/29/2024 Trial Tr. 894:6–17; T. Rogers Testimony, 3/1/2024 Trial Tr. 943:12–14; S. Moman Testimony, 2/28/2024 Trial Tr. 661:23–662:7; A. Wilson Testimony, 2/29/2024 Trial Tr. 877:12–18.

244.    The Court credits the testimony of Deacon Harris, who indicated that his support for candidates depends on their support of policy to address the unique needs of Black community.

Deacon Harris supported Delbert Hosemann, a White Republican, who reached out to the Black community and supported important issues to that community, like Medicaid expansion.  K. Harris Testimony, 2/28/2024 Trial Tr. 700:19–701:20. "He listened and he wanted all the facts before he made a decision.  And he just was a down-to-earth person, and I think he was concerned about people.  And that's why I supported Delbert this last go-round and probably would—and will support him again."  K. Harris Testimony, 2/28/2024 Trial Tr. 701:4–8.  The Court finds this testimony provides a pertinent example of candidate policies driving Black support for particular candidates, as opposed to pure partisan politics.

245.   The Court credits the testimony of Gary Fredericks, who testified that he votes based on issues that are important to his community, such as economic opportunities and health care.  G. Fredericks Testimony, 2/29/2024 Trial Tr. 894:6–17.  He has voted for Republicans in the past.  *Id*. at 894:21–22.  For example, he "championed" Senator Thad Cochran's campaign because Thad Cochran "worked with us to make sure that all Mississippians were taken care of" after Hurricane Katrina, including in areas such as "mental health, housing, education, [and] employment."  *Id*. at 894:23–895:10.  The Court finds this testimony provides another example of Black support for candidates being driven by the candidates and campaigns' inclusivity and responsiveness to the needs of Black voters, as opposed to pure partisan politics.

### C.   Senate Factor 3: Mississippi's Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters

246.   The third Senate Factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."  *Gingles*, 478 U.S. at 37.

247.     The Court finds that Mississippi has used, and in some cases continues to use, voting practices or procedures that increase the opportunity for discrimination against Black voters, including in the areas at issue in this case, as demonstrated by the analyses of Dr. King and Dr. Luckett, which the Court credits.   Many of those practices and procedures were detailed already.  *See supra* ¶¶ 195–211.  Past mechanisms include poll-taxes, all-White primaries, literacy tests, and grandfather clauses.  Past and continuing mechanisms which enhance opportunities for discrimination, including by burdening the right to vote, include at-large voting, majority-vote requirements, felony disenfranchisement, burdens on registration and voting such as strict voter ID laws, and restrictions on early voting and absentee voting, as discussed already and in further detail below.

248.     After the passage of the Voting Rights Act, Mississippi authorized at-large elections districts for all manner of elected offices.  By having at-large elections across a city or region, local communities and neighborhoods within those areas that were majority-Black saw their voting power diluted and suppressed, resulting in little to no representation for Black Mississippians.  *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. 389:3–21.  As some examples, in 1977, the city of Jackson, despite having a 47% Black population, selected White commissioners and a White mayor through city-wide, at-large elections.  *Id.* at 389:22–390:25.  More recently, in 2004, Black voters in Tupelo (including in one of the areas of interest in this case) successfully challenged an at-large system for electing city council members that diluted the voting strength of Black voters.  *Id.* at 399:3–20; *see also Jamison*, 471 F. Supp. at 716.

249.     Mississippi also continues to use a majority-vote requirement, holding primary election runoffs for many state offices, as well as primary runoffs in state legislative races.  *See* Miss. Code Ann. § 23-15-833; *see also, e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 756:16–

757:9.  These runoffs reduce the ability of Black voters to elect preferred candidates because they allow White voters to coalesce around a preferred candidate and oppose the Black preferred candidate and prevent multiple White preferred candidates from splitting the vote such that a Black preferred candidate can prevail in a majority-White jurisdiction.  M. King Testimony, 2/29/2024 Trial Tr. 756:16–757:9.  Notably, Mississippi also uses runoff elections for general elections for statewide office.  *See* Miss. Code Ann. § 23-15-193.

250.  Mississippi holds elections for the state legislature (as well as other state offices) in odd years, in contrast to federal elections, which are held in even years.  Miss. Code Ann. 23-15-193.  Assistant Secretary of State Kyle Kirkpatrick testified that turnout is "typically higher for presidential elections" and "typically lower for . . . the state legislative and statewide office elections" that occur during these odd-year elections.  K. Kirkpatrick Testimony, 3/4/2024 Trial Tr. 1226:12–1227:13.  Defendants' expert, Dr. Brunell, also confirmed that "frequent elections suppress turnout" by "contributing to voter fatigue," and that voters with lower educational attainment are less likely to vote in off-year elections.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1375:16–1376:2.  It is undisputed (and in any case, the trial record established) that Black Mississippians have lower levels of educational attainment.  *See infra* ¶ 270.

251.  As discussed already, Mississippi also adopted lifetime felony disenfranchisement for certain crimes as part of its 1890 Constitution.  R. Luckett Testimony, 2/27/2024 Trial Tr. 377:13–20.  As noted already, this provision, which was expressly adopted to help exclude Black Mississippians from politics, continues to disproportionately disenfranchise Black citizens.  *Id.* at 377:21–378:4; 415:22–416:13. *See also supra* ¶¶ 199, 211.

252.  Mississippi's absentee voting rules are among the most stringent in the Nation.  Mississippi restricts absentee voting to voters with one of eight acceptable excuses to vote absentee

and requires certain absentee voters to obtain notarization on the paperwork for both their application and their ballot. Miss. Code Ann. § 23-15-631(1)(c); R. Luckett Testimony, 2/27/2024 Trial Tr. 403:20–404:8; *see also* K. Kirkpatrick Testimony, 3/04/2024 Trial Tr. 1229:18–1232:3. In 2023, Mississippi sought to restrict most eligible assistors for people with disabilities from collecting or transmitting an absentee ballot. *E.g.*, R. Luckett Testimony, 2/27/2024 Trial Tr. at 405:21–406:9; 407:1–407:9–408:9. Kyle Kirkpatrick, Mississippi Assistant Secretary of State, confirmed that this law was passed but subsequently enjoined by a federal court. K. Kirkpatrick Testimony, 3/4/2024 Trial Tr. 1231:25–1232:12. The Court credits Dr. Luckett's conclusion that these restrictions on absentee voting disproportionately impact Black voters who rely on absentee voting in greater proportions than White voters due to financial hardships, work requirements, health disparities, and high incarceration rates. R. Luckett Testimony, 2/27/2024 Trial Tr. at 404:9–405:20; 406:10–406:20; 407:10–22.

253.    In 2023, Mississippi passed a law that removes registered voters from the voting rolls if they do not participate in a federal election over a four-year period and do not return an address confirmation card. R. Luckett Testimony, 2/27/2024 Trial Tr. at 408:10–20. The removal of these more infrequent voters is not required by federal law, as Assistant Secretary Kirkpatrick acknowledged. K. Kirkpatrick Testimony, 3/4/2024 Trial Tr. 1216:19–1218:19. The Court credits Dr. Luckett's testimony that this law is likely to disproportionately affect Black citizens, including because Black Mississippians are more likely to live in poverty and to lack a long-term permanent address or reliable access to mail. R. Luckett Testimony, 2/27/2024 Trial Tr. 408:21–409:18.

254.    The Court finds that, in addition to these barriers and burdens, Mississippi lacks many of the legal provisions used by other states to make voting easier and more accessible, such as early voting at the polls, no-excuse mail-ballot voting, same-day registration, and online

registration. *See, e.g.*, K. Kirkpatrick Testimony, 3/4/2024 Trial Tr. 1228:20–1234:25.

255.     The Court's findings regarding Mississippi's voting practices that enhance opportunities for discrimination is consistent with and supported by the trial testimony of Black Mississippians regarding the burdens on Black voters in particular due to the voting practices and procedures employed in Mississippi.

256.     The Court credits the testimony of Ms. Cunningham as to the lack of early voting options in Mississippi, and the State's recent attempt, via S.B. 2358, to criminalize her efforts to assist voters in her community who are elderly or who have physical disabilities, including amputations, with returning their absentee ballots.  M. Cunningham Testimony, 2/27/2024 Trial Tr. 241:6–242:23.

257.     The Court credits the testimony of Dr. Wesley, who detailed how after the 2021 adoption of the New Magnolia flag, which had replaced the prior state flag that had featured the battle flag of the Confederacy, a voting precinct in the Hattiesburg area had insisted on continuing to fly the old flag, prompting complaints and concern from Black voters and forcing community leaders to advocate for a new voting precinct.  *See* J. Wesley Testimony, 2/28/2024 Trial Tr. 672:12–673:20.

258.     The Court credits the testimony of Deacon Harris regarding the voter confusion and election administration difficulty caused by the numerous precinct splits in Newton, including a three-way split of the city.  K. Harris Testimony, 2/28/24 Trial Tr. 696:23–698:1.  Deacon Harris testified that "it was so confusing that people didn't know where to vote, they didn't know who they were voting for." *Id*. at 697:22–24.

259.     The Court also credits the testimony of Deacon Harris regarding the difficulty of voting in Mississippi, and the impact that the burdens and costs of voting have on those with fewer

means.  As Deacon Harris testified, "I see a lot of situations where . . . it's being made harder . . . for people to vote.  And when you put obstacles out there, that's to deter something.  And most people are not like I am.  I'm not going to let those stumbling blocks stop me from voting.  If I have to stand in a line long, I'm going to stand in the line long.  If I got to go back every election to check to see this and that, I'll do that.  But most people not going to do that."
 K. Harris Testimony, 2/28/2024 Trial Tr. 700:7–18.

### D.     Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation

260.    The fifth Senate Factor considers "the extent to which members of the minority group…  bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process[,]" and weighs in Plaintiffs' favor as well.  *Gingles*, 478 U.S. at 37.

261.    The Court finds that there are persistent disparities between Black and White Mississippians in such areas as income, poverty, employment, educational attainment, and health, which bear on and hinder Black Mississippians' ability to participate equally in politics, as demonstrated by the analysis of Dr. Byron D'Andra Orey, among other evidence.  *See, e.g.*, Pl.'s Ex. 8, November 14, 2023 2nd Amended Report of Dr. Byron D'Andra Orey [hereinafter "PTX-008"].  For the reasons explained below, the Court also credits Dr. Orey's conclusion that the "disparities related to social and economic indicators" that he identified, which Defendants did not dispute, "negatively impacted turnout amongst African-Americans."  B. Orey Testimony, 2/28/2024 Trial Tr. 506:21–24.

262.    Dr. Orey is a full professor with tenure in the Department of Political Science at Jackson State University and a former chair of the Department of Political Science.  B. Orey

Testimony, 2/28/2024 Trial Tr. 492:13–493:7.  He received his Ph.D. in political science from the University of New Orleans and also holds a master's degree in public administration from the University of Mississippi.  PTX-008 at 29-30; B. Orey Testimony, 2/28/2024 Trial Tr. 493:25– 494:4; 494:18–495:5; 496:17–22.  He has taught, published, and conducted significant research in the area of race and political behavior.  PTX-008 at 2, 31–52.  He teaches statistical analysis research methods including quantitative survey analysis.  B. Orey Testimony, 2/28/2024 Trial Tr. 497:23–498:13.  His research has been presented at professional conferences and published in several peer reviewed scholarly journals.  PTX-008 at 2, 31–52.  He has also served on the executive committees for the American Political Science Association, the Southern Political Science Association, and the National Conference of Black Political Scientists.  *Id*.  He serves currently as President-Elect of the Southern Political Science Association, a position for which he was nominated by his peers in his field.  B. Orey Testimony, 2/28/2024 Trial Tr. 499:17–500:4. He holds university leadership positions including on tenure and promotion committees.  *Id*. at 499:9–16.  He has received grants from the National Science Foundation and others supporting his research projects on political participation.  *Id*. at 500:5–16.  He has presented at over 100 conferences including on political participation and race.  *Id*. at 500:20–501:8.  He has authored over 30 peer-reviewed publications including on political participation and behavior in Mississippi. *Id*. at 501:9–19.  His peer reviewed publications have quantitatively analyzed political participation by race.  *Id*. at 502:6–18.

263.    This Court received Dr. Orey as an expert in political science, political participation and behavior, and race and politics at trial.  B. Orey Testimony, 2/28/2024 Trial Tr. 506:14–15.

264.    In preparing his reports, Dr. Orey relied on sources and methodologies that are consistent with his work as a political scientist, including the use of statistical methods for

analyzing populations and political behavior.  Dr. Orey focuses on race, politics, and political behavior, and uses surveys, election data and results, statistical analysis, and descriptive analysis in his work as a political scientist, B. Orey Testimony, 2/28/2024 Trial Tr. 495:6–496:6, including in his dissertation work, *id*. at 497:12–22.  He has prior experience conducting voter turnout analysis and other forms of quantitative analysis using ecological inference analysis, survey data, census data, state-issued statistics, and electoral data.  *Id*. at 503:4–504:1.  Dr. Orey investigated Senate Factor 5 using these same methods.  *Id*. at 505:1–5.  The Court finds that the methodologies and data sources Dr. Orey used in his analysis are reliable and are commonly used and relied upon among experts in political science.  *Id*. at 505:5–24.

265.     The Court finds that Dr. Orey is highly credible and qualified to give expert opinion testimony regarding racial disparities in Mississippi and their effects on voter participation.

266.     The Court credits Dr. Orey's analysis, based on the political science literature, that voting and political participation has an economic "cost," and accordingly whether an individual voter participates is influenced by their own access to the resources necessary to pay the "costs" of voting, such as financial resources, leisure time, and education.  *See, e.g.*, PTX-008 at 4.  As Dr. Orey testified, drawing on the literature in his field, "individuals vote when the benefits outweigh the cost[.]"  B. Orey Testimony, 2/28/2024 Trial Tr. 509:11–18.  "[T]ime, money, and knowledge" are among the resources required to vote, and Black people face disparities in areas such as education and income, affecting the relative likelihood that they have the resources that are needed to vote.  *Id*. at 509:21–510:9.

267.     The Court credits Dr. Orey's uncontested analysis that, as a result of Mississippi's long history of discriminating against Black residents in nearly every aspect of daily life, Black Mississippians experience socioeconomic disparities that impair their ability to participate in the

political process.  *E.g.*, PTX-008 at 2–19.  The Court credits Dr. Orey's analysis, based on data from the U.S. Census' American Community Survey and Mississippi state sources, that Black Mississippians are significantly worse off in terms of income, poverty, unemployment, educational attainment, internet access, vehicle ownership, and health insurance coverage.  *E.g.*, *id.* at 5–19; B. Orey Testimony, 2/28/2024 Trial Tr. 510:24–511:8 ("Whites were better off" on poverty disparities "when compared to Blacks"), 511:14–20, 512:8–9 (noting Dr. Orey used ACS 2021 one-year data), 514:15–17 (noting Dr. Orey used Mississippi Department of Education data).

268.    Economically, Mississippi continues to be one of the poorest states in the nation. According to the 2021 American Community Survey (ACS), roughly 14.4 percent of Mississippians lived in poverty.  As Dr. Orey testified, his analysis showed that "Blacks were about three times more likely to be in poverty[.]"  B. Orey Testimony, 2/28/2024 Trial Tr. 510:24–511:8.  More specifically, 31% of Black Mississippians live below the poverty line compared to only 11.5% of White Mississippians.  *E.g.*, PTX-008 at 5.  This racial disparity is evident across a number of other economic indicators as well:

    a.  Median income: "Whites had about two times the amount of money when compared" to Black Mississippians.  B. Orey Testimony, 2/28/2024 Trial Tr. 510:24–511:8.  Black households earned approximately $33,541, compared to $61,340 for Whites.  PTX-008 at 6.

    b.  Percentage receiving food stamps: With regard to food stamps "there was a large disparity where African-Americans were more inclined to have food stamps or to receive food stamps."  B. Orey Testimony, 2/28/2024 Trial Tr. 511:25–512:7.  Almost 25% of Blacks receive them compared to only 7% of Whites.  PTX-008 at 6.

> c. Unemployment: 10.5% of Black Mississippians are unemployed, compared to 3.9% of Whites.  PTX-008 at 7.  Black Mississippians are "more than twice [as] likely to be unemployed when compared to Whites."   B. Orey Testimony, 2/28/2024 Trial Tr. 511:25–512:7.

269.    The Court credits Dr. Orey's analysis, based on well-developed political science literature, that there is a strong correlation between financial status and voter turnout.  As Dr. Orey demonstrated, based on the literature as well as his own regression analysis, income and poverty are significant factors influencing voter participation, generally and specifically in Mississippi.  B. Orey Testimony, 2/28/2024 Trial Tr. 511:21–23, 512:10–15 (socioeconomic variables representing income and poverty "have been found in the literature to affect voting").  The Court finds that the significant economic disparities between Black and White Mississippians hinder Black political participation as compared to White Mississippians.  PTX-008 at 4–7, 27–28.

270.    The Court also credits Dr. Orey's uncontested analysis demonstrating significant racial disparities in Mississippi with respect to educational attainment.  *E.g.*, PTX-008 at 8–12; B. Orey Testimony, 2/28/2024 Trial Tr. 512:19–513:3 (Dr. Orey finding that Black Mississippians "were less educated when compared to [their] White counterparts"), 513:4–19 (the disparities between Black and White Mississippians with respect to educational attainment were "large"); *see also* T. Brunell Testimony, 3/5/2024 Trial Tr. 1371:14–1372:5 (not contesting Dr. Orey's analysis of the socioeconomic disparities between Black and Mississippians, including the fact that Black Mississippians have lower levels of educational attainment on average).  According to ACS data, 10.3% of White Mississippians did not complete high school, compared to 17.9% of Black Mississippians.  *E.g.*, PTX-008 at 8.  On the other end of the spectrum, 28.5% of White Mississippians have a bachelor's degree or higher, compared to 18.2% of Black Mississippians.

*Id.* The Court also credits Dr. Orey's analysis that racial disparities are observable in student test scores. *E.g.*, *id.* at 10–11.

271.   The Court credits Dr. Orey's analysis that these educational disparities can be traced to the long history of both de jure and de facto racial segregation in Mississippi.  *E.g.*, B. Orey Testimony, 2/28/2024 Trial Tr. 513:10–19 ("segregation" causes educational disparities). While de jure segregation has been unlawful for decades, residential patterns among other things have resulted in many school systems being as segregated today as they were decades ago.  *E.g.*, PTX-008 at 9.  As recently as 2023, dozens of school districts in Mississippi remained under federal desegregation orders.  *Id.* at 8.

272.   The Court credits Dr. Orey's analysis, which also was uncontested, regarding the numerous negative effects of segregation in housing and education.   Because of the racial economic disparities and resulting variations in local tax bases, residential segregation results in underfunded Black schools compared to predominantly White schools.  PTX-008 at 8–9.  In short, poorer, Blacker areas can afford fewer educational services.  This resource disparity is exacerbated by the underfunding of Mississippi public schools, which Dr. Orey estimates have been underfunded by $2.3 billion since 2008.  PTX-008 at 12.  Dr. Orey's analysis also indicated that the state has spent tens of billions of dollars less on educating Black students than White students since 1890. *Id.*

273.   Dr. Orey also explained the significant body of research on the psychological effects of segregation on Black students.  The experience of attending an under-resourced school with limited diversity can lead to feelings of marginalization, low self-esteem, and diminished confidence in academic abilities.  This can create a cycle of underperformance and reduced motivation to excel in academics.  *E.g.*, PTX-008 at 12.

274.    The Court also credits Dr. Orey's original analysis demonstrating a correlation between school segregation and test scores, which demonstrates the negative effects of continued de facto segregation.  *E.g.*, PTX-008 at 11–12; B. Orey Testimony, 2/28/2024 Trial Tr. 514:8–14 (as "White enrollment increases, then test scores increase" and "as the percentage of Blacks increase[s], there's a negative relationship that's extremely high with respect to test scores going down").  The analysis Dr. Orey conducted shows "[t]hat the quality of education for Blacks tends to be less when compared to Whites" in Mississippi.  *Id*. at 514:19–24.

275.    The Court credits Dr. Orey's analysis, also uncontested and based on an extremely well-developed body of political science literature, that there is a very strong correlation between educational attainment and voter turnout.  B. Orey Testimony, 2/28/2024 Trial Tr. 515:20–516:1 (the relationship between education and participation in politics is "well-established" in political science literature "to the point that virtually anyone that's doing an analysis of voting behavior will include education in a model").   Simply put: Educational disparities affect political participation, with the highest voter turnout occurring among people with the most education.  PTX-008 at 7.   Education is "one of the resources that individuals need to vote" in order to "understand[] the issues" and "navigate the registration process[,]" for instance.   B. Orey Testimony, 2/28/2024 Trial Tr. 515:7–19.  The Court also credits Dr. Luckett's analysis, based on well-developed historical and political science literature, showing that Mississippi's history of discrimination with respect to public education impacts voting turnout and life outcomes, resulting in a hindrance of political participation among Black Mississippians.  R. Luckett Testimony, 2/27/2024 Trial Tr. 419:5–430:18.  The Court finds that racial disparities in educational attainment hinder Black political participation as compared to White Mississippians.

276.    Dr. Orey identified (and Defendants offered nothing to dispute) additional racial

disparities based on objective socioeconomic data, and the Court credits his conclusion that these disparities further contribute to the ability of Black Mississippians to participate equally in politics. For example:

    a.  Dr. Orey also identified a gap in the percentage of Black and White Mississippians with access to broadband internet. B. Orey Testimony, 2/28/2024 Trial Tr. 516:2–8 (concluding "[t]here were disparities" in internet access between Black and White Mississippians such that "[a]bout 23 percent of African-Americans [] did not have access to the internet"). The Court credits Dr. Orey's conclusion that lack of access to broadband can limit economic opportunity and opportunities for political engagement. PTX-008 at 12–13. Dr. Orey testified that internet access affects political participation because "having access to the internet gives one information," for instance "it can tell you whether or not you're registered to vote" and "educate you on the issues" and candidates. B. Orey Testimony, 2/28/2024 Trial Tr. 516:9–19.

    b.  Dr. Orey also identified a gap in the percentage of Black and White Mississippians with access to a vehicle. B. Orey Testimony, 2/28/2024 Trial Tr. 516:20–517:4 (in Mississippi, "[a]bout 10 percent of African-Americans do not own vehicles. Whereas about 4 percent of Whites do not own vehicles."). The Court credits Dr. Orey's conclusion that lack of access to a vehicle increases the cost of voting and political participation and limits economic opportunities. PTX-008 at 14; B. Orey Testimony, 2/28/2024 Trial Tr. 517:1–4 (vehicle ownership disparity is "extremely important, because one may need a vehicle to vote, particularly in rural areas where the poll oftentimes is not as close in

proximity to one's dwelling").

277.    The Court also credits Dr. Orey's uncontested analysis identifying racial disparities in health between Black and White Mississippians.  Mississippi ranks last, or near the bottom in the country, in almost every leading health indicator.  And Black Mississippians exhibited the highest mortality rates for numerous health conditions, including hypertension, stroke, diabetes, renal disease, HIV/AIDS, cancer, and homicide; the highest rates of infant mortality rate, and higher rates of prevalence of coronary heart disease, hypertension, obesity, diabetes, current childhood asthma, HIV, and permanent teeth extractions.  *E.g.*, PTX-008 at 15–16; B. Orey Testimony, 2/28/2024 Trial Tr. 517:5–16; 517:25–518:3.

278.    Dr. Orey also identified significant racial disparities in health insurance coverage, with more Black Mississippians lacking coverage, and more Black Mississippians reliant on public health insurance programs such as Medicaid.  B. Orey Testimony, 2/28/2024 Trial Tr. 518:10–14 ("Whites typically will have private insurance more so when compared to Blacks.  Blacks are more likely to have public insurance, when you look at the disparity that exists between Blacks and Whites.  And Blacks will more likely depend on Medicaid relative to Whites.").  The Court credits Dr. Orey's conclusion that racial disparities in health insurance coverage are reflective of historical and ongoing economic inequality.  *E.g.*, PTX-008 at 16–18.

279.    The Court credits Dr. Orey's analysis that health conditions significantly influence an individual's level of political participation, with both direct and indirect effects on their engagement in the political process.  *E.g.*, B. Orey Testimony, 2/28/2024 Trial Tr. 518:20–519:3 (political science literature shows that "physical and mental health can impact whether or not one participates in politics").  Lack of access to affordable health care, or dependence on public insurance, can lead to limited choices and potentially restricted access to certain healthcare

providers and services, which both exacerbates economic disadvantages for Black Mississippians and makes political participation much more difficult.  *E.g.*, PTX-008 at 17.

280.     The Court also acknowledges Dr. Orey's analysis that state policy decisions have exacerbated health inequality.  For example, Mississippi is one of the few states not to expand Medicaid after passage of the Affordable Care Act.  PTX-008 at 18; B. Orey Testimony, 2/28/2024 Trial Tr. 519:4–15 (Medicaid expansion could address health disparity between Black and White Mississippians because it could "fund[] rural hospitals where there are a sizable number of African-Americans" and "increase the number of African-Americans who can acquire insurance").

281.     The Court also credits Dr. Orey's analysis that disproportionate involvement with the criminal justice system hinders Black Mississippians' ability to participate equally in politics relative to Whites.  B. Orey Testimony, 2/28/2024 Trial Tr. 519:19–520:9 (noting that political science literature "suggests that formerly incarcerated individuals are less likely to participate in politics" and that "African-Americans are disproportionately incarcerated" in Mississippi). In particular, and as noted already, Mississippi's continuing imposition of permanent disenfranchisement for certain felony offenses disproportionately impedes voting for Black Mississippians due to historical and systemic factors that have led to higher rates of incarceration within the Black community, and higher rates of permanent disenfranchisement.  PTX-008 at 19–20; B. Orey Testimony, 2/28/2024 Trial Tr. 520:10–20 (disparities in criminal justice involvement "go back to the legacy of slavery" in Mississippi).

282.     Dr. Orey also conducted three separate analyses measuring levels of voter turnout levels among Black and White Mississippians.  The Court finds Dr. Orey's methods reliable and credits Dr. Orey's conclusion, based on multiple analyses, that Black Mississippians not only face more substantial impediments to political participation due to these persistent disparities, but

actually turn out at lower rates.

283.     Dr. Orey examined Black and White voter turnout in the 2020 general election using three different, widely accepted methods: (1) ecological inference analysis based on precinct-level election results and U.S. Census racial demographic data; (2) Bayesian Improved Surname Geocoding (BISG) of the Mississippi Secretary of State's full voter database (which includes voter history); and (3) reviewing estimates from the Cooperative Election Study ("CES"), a survey where voters' turnout behavior is independently validated to eliminate the known problem of overreporting voting behavior in polls and surveys.  PTX-008 at 22–24; B. Orey Testimony, 2/28/2024 Trial Tr. 521:12–522:18 (overview of methods), 523:17–524:9 (EI analysis), 525:15–526:7 (BISG analysis), 531:25–534:25 (CES analysis).   Each of these methods showed a significant gap in turnout between Black and White Mississippians.

284.     Defendants' expert, Dr. Brunell, agreed that Dr. Orey's use of multiple statistical methods improves the robustness of Dr. Orey's results.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1374:3–11.

285.     The Court finds that Dr. Orey's use of multiple methods to evaluate turnout renders his analysis and conclusions extremely reliable.  B. Orey Testimony, 2/28/2024 Trial Tr. 523:9–16 (purpose of using three different methods was to see if each method yields "the same results"). The Court finds that 2020 is a recent and salient presidential election to examine, and credits Dr. Orey's analysis that nothing about the racial composition of the electorate has been indicated to be atypical or anomalous in 2020.  *Id*. at 522:23–523:8.  Dr. Orey's examination of the 2020 election is consistent with Dr. Ragusa's testimony that 2020 had high turnout and therefore allows for analysis of a wider swath of the electorate, rendering it more accurate than using another election. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1065:11–24 ("One of the reasons" for using a recent

presidential election over state legislative election data is that legislative races are "highly variable" in terms of turnout such that "the 2020 presidential election data was the most reliable and accurate at the time the districts were being redrawn"), 1078:21–1079:9 ("Given that there was high turnout in the 2020 presidential election in Mississippi, 60 percent, which was a record, that makes the data the most accurate"), 1080:2–11 (2020 turnout levels were "not anomalous in historic standards").

286.    Dr. Orey's EI estimate indicated that White turnout in 2020 was 65.84%, while Black turnout was only 56.03%.  The Court credits Dr. Orey's conclusion, based on the confidence intervals he calculated for his EI analysis, that this estimated 10-point gap reflects a real, significant disparity in turnout levels.  PTX-008 at 25; B. Orey Testimony, 2/28/2024 Trial Tr. 524:17–525:14 (confidence interval range for EI estimate was "extremely close" which indicates high confidence "that [the] estimate is the correct estimate").

287.    Dr. Orey used BISG to estimate the racial composition of the Mississippi voter file. BISG is an algorithmic method used to predict a person's race or ethnicity based on their last name and where they live on a map.  B. Orey Testimony, 2/28/2024 Trial Tr. 522:2–10; 525:15–526:7. This approach has been accepted by Courts in redistricting cases nationwide.  *See Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 227 (2d Cir. 2021); *Petteway v. Galveston Cnty.*, No. 3:22-CV-57, 2023 WL 6786025, at *16 (S.D. Tex. Oct. 13, 2023), *aff'd sub nom. Petteway v. Galveston Cnty., Texas*, 86 F.4th 214 (5th Cir. 2023), *reh'g en banc granted, opinion vacated on other grounds*, 86 F.4th 1146 (5th Cir. 2023).  Applying BISG to a copy of the Mississippi voter file, which contains voter names, addresses, and voting history from 2020 and prior elections, Dr. Orey estimated a 69.7% turnout rate for White Mississippi registered voters, compared to 57.3% for Blacks—a 12.4-point gap.  PTX-008 at 25.

288.    The Court credits this analysis.  While the voter file used by Dr. Orey was obtained in 2022, the Court finds that Dr. Orey's analysis was run with voters who registered after October 2020 removed from consideration, and that the voter file he used otherwise accounted for about 95% of the over 1.3 million total votes cast in the 2020 election, making it an extremely robust form of analysis.  *See, e.g.*, Pl.'s Ex. 9, November 22, 2023 Responsive Expert Report of Dr. Byron D'Andra Orey, at 6 [hereinafter "PTX-009"]; B. Orey Testimony, 2/28/2024 Trial Tr. 526:19–527:24.[6]  The fact that a small number of the voter records from 2020 were not included does not alter the power of the analysis, especially because, as Dr. Orey testified, there were so few missing that they could not change the bottom-line result of the analysis.  B. Orey Testimony, 2/28/2024 Trial Tr. 527:25–528:20 (Dr. Orey testified he is "very confident" in the BISG results because "with the law of large numbers, the mean or the averages typically will converge on the actual percentage that's in . . . the voter file").

289.    Defendants' expert, Dr. Brunell, criticizes Dr. Orey's BISG analysis for not including that small number of voters who cast a ballot in 2020 but were no longer part of the State's voter file when Dr. Orey later retrieved that data (likely because those voters moved or passed away since the 2020 election).  T. Brunell Testimony, 3/5/2024 Trial Tr. 1377:2–5, 1378:8–12.  But Dr. Brunell also testified that the maximum impact that set of missing voters could have on Dr. Orey's estimate, *i.e.*, if every missing voter happened to be a Black voter who cast a ballot

---

[6] Depending on which denominator for the total number of votes cast is used, the percentage of 2020 voters accounted for by Dr. Orey's BISG analysis is either 98 percent or 94.6 percent.  B. Orey Testimony, 2/28/2024 Trial Tr. 583:16–584:5, 628:19–24; *see also* T. Brunell Testimony, 3/5/2024 Trial Tr. 1378:3–7.  The Court credits Dr. Orey's testimony that, whether the analysis includes 94.6 or 98 percent of the records of voters who voted in 2020 does not affect his overall conclusion because the number of missing voters is very small relative to the size of the data set.  B. Orey Testimony, 2/28/2024 Trial Tr. 628:25–629:8.

in 2020, *id.* at 1378:18–22, which Dr. Brunell agreed is improbable, *id.* at 1379:4–7, would be to reduce the estimated turnout gap from 12.4% to 8.9%, *id.* at 1379:8–15. Because 8.9% is still a significant turnout disparity, the Court gives little weight to Dr. Brunell's critique of Dr. Orey's BISG analysis.

290.    Notably, because the BISG analysis was based on the voter file, it also allowed for county-level estimates of turnout by race, which show that these racial gaps in actual turnout exist in the specific areas of focus in this case. *E.g.*, PTX-008 at 26, 58–60. More specifically, according to Dr. Orey's BISG analysis, the turnout gap was about 10% in Chickasaw County; 13% in Copiah County; 9% in DeSoto County; 18% in Forrest County; 13% in Lamar County; 13% in Lincoln County; 11% in Monroe County; and 14% in Newton County. B. Orey Testimony, 2/28/2024 Trial Tr. 529:10–530:7.

291.    Moreover, because the Mississippi voter file contains voting history from years before 2020, it also allowed for confirmation of racial turnout gaps in prior elections as well. *E.g.*, PTX-009 at 6. Dr. Orey "looked at 2019, 2018, 2016, and 2015 and found that there were disparities between Blacks and Whites where Whites were more likely to turn out" in those years as well. B. Orey Testimony, 2/28/2024 Trial Tr. 530:14–22.

292.    Lastly, Dr. Orey examined turnout by race estimates using the Cooperative Election Survey or CES, a 50,000+ person national stratified sample survey administered by the polling firm YouGov. PTX-008 at 26; B. Orey Testimony, 2/28/2024 Trial Tr. 531:24–532:11. The CES dataset includes "validated vote" information, representing an independent validation of whether a survey respondent voted, which Dr. Orey used for his analysis. B. Orey Testimony, 2/28/2024 Trial Tr. 532:24–533:15 (CES incorporates data from government records "used to validate whether or not an individual voted" as a separate variable); 534:12–20 (Dr. Orey used the

validation variable for his analysis, not respondents' self-reported voting history). Among registered voters, the CES's validated-vote turnout estimate was 72.5% for Black Mississippians in 2020, compared to 86.8% turnout for White Mississippians, a 14.3 point gap. PTX-008 at 26. Among all adults, the validated-vote turnout rates estimated by the CES were 46.1% for Black Mississippians in 2020, compared to 59.6% turnout for Whites, a similar, 13.5% gap. *Id*. at 25. Dr. Orey used the weighting variables corresponding to turnout among registered voters and among all adults and observed a racial gap in turnout across both measures. B. Orey Testimony, 2/28/2024 Trial Tr. 536:8–24. Dr. Orey testified that this disparity was "great in terms of the magnitude." *Id*. at 535:6–8.

293. The Court credits Dr. Orey's analysis that the racial turnout gaps demonstrated by the CES among all adults and registered voters are statistically significant, and corroborative of the gaps he observed with the EI and BISG methods. Dr. Orey tested the statistical significance of the CES data using a regression analysis, B. Orey Testimony, 2/28/2024 Trial Tr. 539:7–11, which allowed him to establish confidence in the reliability of the estimate, *id*. at 538:23–539:6. The statistical significance level of the racial turnout gap among all adults in Mississippi (excluding noncitizens) was .058, meaning that one can be "94 percent sure that this is the correct estimate," which is a high level of confidence. *Id*. at 540:2–9. The confidence level looking at the racial turnout gap among registered voters was similar (.055). *Id*. at 543:8–15.

294. The Court acknowledges that a p-value of .055 or .058 falls just outside of the .05 p-value level of statistical significance, if that is the threshold chosen by an academic, but finds that this is of little import: the practical difference between these values is whether the estimated result has a 5% or 5.5% or 5.8% probability of being the product of random chance, and the difference is marginal. As Plaintiffs' experts testified, researchers can (and do) use the .10 p-value

as a threshold for indicating a statistically significant difference.  B. Orey Testimony, 2/28/2024 Trial Tr. 605:7–18 (Dr. Orey testifying that "there's nothing definitive about .05"); 606:1–5 (Dr. Orey testifying that researchers and reviewers can, and do, accept the .10 standard); 626:5–8; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1097:15–1098:12 (Dr. Ragusa testifying that for statistical significance, "a p-value of less than .1, but not less than .05, is one of [the] options" and "more people, in my judgment, are using a p-value of less than .1 as a minimally significant result"). Defendants' own expert Dr. Brunell agreed that choosing any particular threshold as a cutoff was "arbitrary" or "artificial" and that social scientists may choose different thresholds.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1385:21–1386:2, 1386:23–1387:14.  The Court credits Dr. Orey's conclusion that, in the end, it is up to the researcher (or in this case, the fact-finder) to make the assessment.  Here, the high, 94%+ confidence in the turnout gap shown by the CES's validated vote data, both among registered voters and among all adults, is corroborated by and consistent with the results of the BISG and EI analyses for the same election.  Dr. Orey credibly testified that using three different methods-EI analysis, BISG analysis, and CES analysis-allowed him to be "very confident" in his results.  B. Orey Testimony, 2/28/2024 Trial Tr. 543:23–544:3.

295.    The only expert Defendants relied on regarding this issue, Dr. Brunell, did not actually dispute that Black turnout was lower in 2020 relative to White turnout.  He did not dispute the results of Dr. Orey's first method of estimating turnout, ecological inference, which showed that Black turnout was about 10 percentage points lower than White turnout in 2020.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1376:13–17.  As noted, he acknowledged that, under Dr. Orey's BISG analysis, Black turnout in 2020 was between 8.9 and 12.4 percentage points lower than White turnout.  *Id.* at 1378:13–1379:21.  And finally, as to Dr. Orey's third method, using the CES survey results, Dr. Brunell agreed that, among registered voters, Black turnout in 2020 was 14.3

117

percentage points lower than White turnout, and that there is only a 5.5% possibility that the disparity occurred due to random chance. *Id.* at 1385:6–25.

296.     The Court does not credit Dr. Brunell's speculation that the turnout disparity in 2020 "could have been" an outlier.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1374:12–1375:13. Notably, Dr. Brunell had access to turnout information for other election cycles, and he did not provide any analysis to show that the racial disparity in turnout was smaller in other years.  *Id.* Indeed, Dr. Brunell acknowledged that 2020 was a presidential election year and agreed that "voters who turn out in nonpresidential elections tend to be more highly educated[.]"  *Id.* at 1375:14–18.  He also agreed that in Mississippi, White voters tend to be more highly educated. *Id.* at 1371:14–1372:5.  Accordingly, based on his own admissions, the turnout disparity between White and Black voters may be even *larger* in non-presidential years.

297.     Based on the consistent racial turnout gap across the three measures of turnout conducted by Dr. Orey using validated or government-reported data, the Court credits Dr. Orey's conclusion and finds that there was a substantial, roughly 10-point gap in voter turnout between Blacks and Whites in the 2020 election, with Black voters turning out at lower rates.  PTX-008 at 26; B. Orey Testimony, 2/28/2024 Trial Tr. 544:4–9 ("There was at least approximately a 10-point gap when comparing Blacks and Whites on turnout" across three analyses of the 2020 election).

298.     In contrast, the Court does not credit survey data from the Current Population Survey (CPS) Voting and Registration Supplement offered by Defendants as an alternative measure of voter turnout in Mississippi.

299.     The CPS is not population data from the decennial U.S. Census; it is an unverified, self-reported survey of voting behavior from a random sample of persons.  *E.g.*, J. Ragusa Testimony, 3/4/2024 Trial Tr. 986:21–987:9 (Dr. Ragusa testifying that "the CPS, the Current

Population Survey, is a monthly survey that is done with a large sample" and "[e]very two years, they commission a special survey that asks voters questions about the election" which is different from the Decennial Census in that "the [Decennial] census is not a survey . . . it's an enumeration of everyone, not just a sample of people").[7]

300.    The Court finds that because the CPS is a self-reported voluntary survey, its measurement of voter turnout and voter turnout by race in particular are subject to serious problems that are widely understood by social scientists, and that were indeed acknowledged by both parties' experts.  As Dr. Orey testified, "voters lie" on surveys of voting behavior because of the tendency

---

[7] In addition to Dr. Ragusa's testimony, the Court can also take judicial notice under Federal Rule of Evidence 201 of the fact that the Decennial Census is a count of every resident of the United States, conducted every 10 years, whereas the CPS is a voluntary survey administered to a sample of the population.  *See, e.g.*, U.S. Census Bureau, *Decennial Census of Population and Housing*, https://www.census.gov/programs-surveys/decennial-census.html (last updated Aug. 18, 2022) ("The U.S. census counts each resident of the country, where they live on April 1, every ten years ending in zero."); U.S. Census Bureau, *Methodology*, https://www.census.gov/programs-surveys/cps/technical-documentation/methodology.html (last updated Nov. 19, 2021) ("The CPS is administered by the Census Bureau using a probability selected sample of about 60,000 occupied households.  The fieldwork is conducted during the calendar week that includes the 19th of the month."); U.S. Census Bureau, *Frequently Asked Questions*, https://www.census.gov/programs-surveys/cps/about/faqs.html (last updated Oct. 2, 2023) ("About 59,000 households are selected for the CPS each month, and it is a voluntary survey.")).  The above facts are drawn directly and verbatim from U.S. government websites maintained by the U.S. Census Bureau and the Bureau of Labor Statistics.  The accuracy of the information cannot be reasonably questioned.  *See* Fed. R. Evid. 201(b)(2).  Consistent with that, courts can and do take judicial notice of undisputed facts or descriptions from government websites.  *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of approval by the National Mediation Board published on the agency's website); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of Texas agency's website).

to give "social[ly] desirable responses" where "they may give the response that they believe the interviewer wants to hear or because of pressures that impact them."   B. Orey Testimony, 2/28/2024 Trial Tr. 530:23–531:7.  This phenomenon is not universal to all survey questions—it is an issue with survey questions about *voter turnout* in particular.  *Id.* at 555:19–556:6; 557:11–15; 630:5–631:1.  Moreover, "the literature shows that African-Americans are more likely to overreport" voting "because of racial identity" and a sense that "what happens to other Blacks impacts one's individual life" or "linked [fate]," which leads to increased pressure to over-report.  B. Orey Testimony, 2/28/2024 Trial Tr. 531:13–23; *see id.* at 631:2–13.  This differential overreporting means that using an unverified survey to examine turnout *by race* is particularly likely to lead to an inaccurate result.  *Id.*  Notably, the Census Bureau acknowledges that "respondent misreporting" causes "error in the CPS estimates" and that the CPS estimates differ from official vote counts.  Pl.'s Ex. 25, U.S. Census Bureau, *Frequently Asked Questions (FAQs) About Voting and Registration*, [hereinafter PTX-025] at 3; B. Orey Testimony, 2/28/2024 Trial Tr. 631:15–22.[8]

---

[8] For this reason, courts have repeatedly refused to take judicial notice of the voter turnout statistics reported in the CPS Voting and Registration Supplement, as this Court did at trial, 2/26/24 Trial Transcript 101:9–20 ("[T]he Court cannot take judicial notice of the actual data because the accuracy of the data is disputed.  The census itself indicates as much as well as the other sources listed in the plaintiffs' response.").  *See also Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-CV-5337-SCJ, 2023 WL 5675032, at *2–3 (N.D. Ga. Aug. 23, 2023) (declining to take judicial notice of CPS data because "the Census Bureau expressly states that its voter turnout and registration data has errors").  Courts in the Fifth Circuit have similarly found that the CPS is not reliable as an estimate for voter turnout because of known issues with self-reported voting surveys,

301.    The Court credits Dr. Orey's conclusion, based on empirical analysis that has been published in reputable journals, that the racial differential in over-reporting of voting behavior renders the CPS in particular an inaccurate measure of voter turnout by race.  *E.g.* B. Orey Trial Testimony, 2/28/2024 Trial Tr. 531:2–23; 553:14–21 ("There's a problem with the CPS.  The CPS does not verify voters.  And so I did not use that because . . . when people take surveys, they may not be truthful and they will give socially desirable responses.  And that has been found to be the case in literature, particularly Ansolabehere's analysis where he finds that Blacks and Hispanics overreport and then [] other analyses that describe why Blacks might overreport"); *see also id.* at 630:23–632:20; 634:11–641:5; PTX-009 at 2.  At trial, Dr. Orey read at length from a reputable, recent, peer-reviewed article entitled "*The Current Population Survey Voting and Registration Supplement Overstates Minority Turnout*" by Professors Ansolabehere, Fraga, and Schaffner, in the Journal of Politics, describing "growing concerns among researchers that the CPS may not accurately measure turnout, particularly for minority citizens" and demonstrating that in fact there is a "serious bias" in the CPS such that it "consistently overstates the participation rate among Blacks and Hispanics while it sometimes underestimates participation among Whites."  B. Orey Testimony, 2/28/2024 Trial Tr. 635:18–19, 640:11–13; *see id.* at 634:11–641:5; *see also* Pl.'s Ex. 12, Stephen Ansolabehere et al., *The Current Population Survey Voting and Registration*

---

namely the known tendency of survey respondents to say they voted even when they did not.  *Thomas v. Bryant*, 938 F.3d 134, 162–63 (5th Cir. 2019) (upholding district court decision to discredit CPS as measure of voter turnout because CPS data has "known issues" as a "self-reported voting survey[]" and finding ecological inference and official voter records more credible); *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 412 (5th Cir. 1991) (affirming district court decision to favor expert analysis of voter registration based on official state records, over Census Bureau survey data due to unreliability of "uncorroborated self-reporting" and to "evidence demonstrating that black respondents to the [census] questionnaire overreported voter registration at a higher rate than white respondents.")

*Supplement Overstates Minority Turnout*, 84 The Journal of Politics 1850 (2022) [hereinafter "PTX-012"] (marked for identification); 2/28/2024 Trial Tr. 633:23–634:6 (ruling Ansolabehere article was a learned treatise and may be read into the record).

302.   Defendants offered no contrary analysis.  Defendants' expert Dr. Brunell *agreed* that academic studies have shown that "the Current Population Survey . . . actually understates the magnitude of the turnout gap[,]" T. Brunell Testimony, 3/5/2024 Trial Tr. 1391:25–1392:5, and testified that understating the racial turnout gap was a "problem with the CPS" and that he "[doesn't] use the CPS," *id.* at 1392:9–12 (testifying that such inaccuracy is found in every survey that does not validate turnout).   Other than that, Defendants asked some individual witnesses whether they lied on the Decennial Census, *e.g.*, P. Hamner Testimony, 2/28/2024 Trial Tr. 728:20–729:9; G. Fredericks Testimony, 2/29/2024 Trial Tr. 908:18–24; K. Jones Testimony, 3/1/2024 Trial Tr. 931:12–24, but the Court gives this questioning no weight because, as already noted and among other reasons, the CPS is a voluntary survey, not the official Census count, *see supra* ¶¶ 299–300 & n.8.[9]

---

[9] Similarly, the Court would not credit the suggestion, which no expert advanced, that according to the CPS the racial turnout gap in Mississippi narrowed around 2004.  Setting aside the general unreliability of the CPS for purposes of examining voter turnout by race, *supra* ¶¶ 298–302, comparing the CPS specifically states that its pre-2004 numbers should not be compared to post-2004 numbers: "Because of changes in the Current Population Survey race categories beginning in 2003, 2004–2022 data on race are not directly comparable with data from earlier years."  Current Population Survey, *Historical Reported Voting Rates*, Table A-4.   Reported Voting and Registration for Total and Citizen Voting-Age Population for Congressional Elections: 1978 to 2022,   https://www2.census.gov/programs-surveys/cps/tables/time-series/voting-historical-time-series/hst_vote04.xlsx; Mary Bowler, Randy E. Ilg, Stephen Miller, Ed Robison, and Anne Polivka, *Revisions to the Current Population Survey Effective in January 2003*, U.S. Bureau of Labor Statistics, https://www.bls.gov/cps/rvcps03.pdf.  That the CPS changed its race categories in 2004 is also judicially noticeable under Rule 201 as it is indisputable information from a government website.  *See Kitty Hawk Aircargo, Inc.*, 418 F.3d at 457; *Coleman*, 409 F.3d at 667.

303.    The Court also does not credit Dr. Brunell's eleventh-hour reliance on a report about voter turnout by race that was published on the internet by the Brennan Center mere days before he took the stand.  T. Brunell Trial Testimony, 3/5/2024 Trial Tr. 1387:14–19.  Dr. Brunell testified that he spent about two or three hours reviewing the report.  *Id*. at 1387:20–22.  He testified that this report was not peer reviewed, *id.* at 1387:23–1388:10, that he had never heard of the authors previously and did not know if they were reputable in the field and that to his knowledge had not reviewed any other publications of theirs, *id.* at 1388:11–20, that neither the model nor the paper was specific to Mississippi, 1389:8–10, that (unlike with the data and code for Dr. Orey's multiple analyses) the data and code used for the report's turnout model were not public or otherwise available to the parties so he had not reviewed them, *id.* at 1388:24–1389:4, and that (unlike with Dr. Orey's turnout analyses, which used population data from the Decennial Census) the report's turnout model relied on survey-based population estimates that the Census Bureau has itself characterized as failing to meet quality standards because of a massive drop in response rates in 2020 due to the onset of the pandemic, *id.* at 1389:21–1391:14.[10]  *See also* W. Cooper Trial Testimony, 2/26/2024 Trial Tr. 122:10–12 (testifying that he avoided the particular dataset used); PTX-001 at 22 n. 18 ("The 2015–2019 ACS is the last 5-year time period in which the socioeconomic data was unaffected by the pandemic.").  Dr. Brunell's attempt to rely on this source was not credible—and also casts doubt on the overall rigor of Dr. Brunell's work in this case.

---

[10] *See* Pl.'s Ex. 155, U.S. Census Bureau, *Increased Margins of Error in the 5-Year Estimates Containing Data Collected in 2020* (March 2022), https://www.census.gov/programs-surveys/acs/technical-documentation/user-notes/2022-04.html [hereinafter "PTX-155"] (marked for identification).

304.    In addition to his analysis of voter turnout by race, Dr. Orey also conducted a regression analysis (a common method among political scientists) to examine, empirically, the extent to which Black turnout in Mississippi was in fact driven by the socioeconomic markers discussed already.  *E.g.*, PTX-008 at 26–28; B. Orey Testimony, 2/28/2024 Trial Tr. 544:17–23 ("I did a regression analysis to see if there was a correlation between those indicators that we examined based on disparities and to see whether or not those indicators had an impact on voter turnout amongst Blacks"); 545:16–19 (regression analysis is "common" in analyzing voting behavior in political science).  Dr. Orey used "data from the voter file" and "aggregated the data" along with "census data at the [block] level" and in doing so, he was "able to examine whether or not the turnout amongst Blacks was a function of some of these indicators."  B. Orey Testimony, 2/28/2024 Trial Tr. 545:4–11.

305.    The Court credits this original analysis, which indicated a statistically significant relationship between Black turnout and a number of independent variables, specifically Black educational attainment, food stamp use, and rates of uninsured.  *E.g.*, PTX-008 at 26–28.  More specifically, Dr. Orey testified that "in those areas where there was a high concentration of individuals on food stamps, turnout was low[,]" "in those areas where there was a high density of people who do not have health insurance, voter turnout was low," and "in those areas where there was a high level of education among the individuals, they were more likely to turn out."  B. Orey Testimony, 2/28/2024 Trial Tr. 546:3–11.  This analysis strongly corroborates the finding that the undisputed racial gaps with respect to education, financial status (and poverty in particular), and health between Black and White voters hinders Black Mississippians' ability to participate equally in politics as compared to Whites.  The Court credits Dr. Orey's testimony that based on his analysis, "these disparities have an impact on turnout amongst African-Americans" such that "as

these disparities increase, then the disparities in voting or turnout amongst Blacks increased." *Id*. at 546:12–19.  Dr. Orey credibly concluded that "Blacks were less likely to participate in the area of voting when compared to Whites, and it was also a direct function of some of the social indicators that I examined."  B. Orey Testimony, 2/28/2024 Trial Tr. 546:24–547:6.

### E.     Senate Factor 6:  Racial Appeals in Mississippi Politics

306.     The sixth Senate Factor assesses "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37.  Both overt racial appeals and subtle, racialized references can be employed to influence voters. *Id.*

307.     The Court credits the testimony of Dr. King that elections in Mississippi have long been marked by both overt and subtle racial appeals, and that the unfortunate use of such appeals by some campaigns has continued into the present. *See* M. King Testimony, 2/29/2024 Trial Tr. 787:6–12.

308.     The Court credits Dr. King's conclusion that candidates use racial appeals to increase their chances of successfully getting elected or reelected.  M. King Testimony, 2/29/2024 Trial Tr. 779:7–12.

309.     Overt racial appeals include the use of explicitly racist language.   M. King Testimony, 2/29/2024 Trial Tr. 778:14–19.  This language was more commonly used through the mid-1960s. *Id*.  By 1968, candidates who engaged in racial appeals began using implicitly coded language. *Id*. at 778:20–779:3.

310.     The Court credits Dr. King's testimony that candidates have used subtle racial appeals, also known as "dog whistles," when they could not make overt racial appeals.  M. King Testimony, 2/29/2024 Trial Tr. 778:20–779:3.  The Court credit Dr. King's testimony that "a dog whistle would be a subtle coded appeal designed to send a signal to certain voters that the candidate

shares their sympathy and empathizes perhaps with them on views on race." *Id.* at 779:13–20.
"Dog whistles" allow candidates to use racial appeals to achieve support from racially conservative
voters. *Id.* at 778:20–779:3. As Dr. King testified, "how [campaigns] portray themselves to the
public is not done coincidentally or by chance." *Id.* at 835:18-836:1. Rather, when a candidate
"wear[s] Confederate garb during campaign season," for example, "they know that this is going to
be -- you know, it's for the television cameras." *Id.*

311. Dr. King pointed to numerous examples of such "dog whistles," some more explicit
than others, from the last four decades in Mississippi politics:

      a. In 1986, a White candidate deployed racial appeals in his campaign against the
first Black justice appointed to the Mississippi Supreme Court, Justice Reuben
Anderson. M. King Testimony, 2/29/2024 Trial Tr. 780:1–24. During the
campaign, the White candidate stated he was "running against quota makers"
and that he was "running against reserving a seat on the Mississippi Supreme
Court for the NAACP." *Id.*

      b. In 1991, Justice Fred Banks, Jr.'s White opponent ran newspaper advertisements
that pictured the two candidates to emphasize their races, with Judge Banks
having been made to appear darker, and captioning the incumbent Judge Banks
as "Fred Banks," versus "Judge W.O. 'Chet' Dillard." M. King Testimony,
2/29/2024 Trial Tr. 781:22–782:9.

      c. In 2004, when White Rankin County Circuit Judge Samac Richardson ran for
the Supreme Court against Black incumbent Justice James Graves, Richardson
ran on the campaign slogan "One of Us"—the same slogan that a federal district
court had previously recognized as a racial appeal in a 1982 congressional

Mississippi campaign.  M. King Testimony, 2/29/2024 Trial Tr. 780:25–781:7; *see Jordan*, 604 F. Supp. at 813.

d.  In 2014, then-U.S. Senate candidate Chris McDaniel ran a television ad that included a clip of him speaking in front of a Confederate flag as a signal to people with positive nostalgia for the Confederacy."  M. King Testimony, 2/29/2024 Trial Tr. 781:8–13.

e.  In 2015, a sitting state representative, Lester "Bubba" Carpenter, urged voters to vote down a ballot initiative because, if it passed, a "Black judge" would decide what to do with public schools.  M. King Testimony, 2/29/2024 Trial Tr. 781:14–19.

f.  In 2018, while campaigning against Mike Espy, a Black former Congressman, Cindy Hyde-Smith, a White U.S. Senator, used mailer ads depicting Espy as a criminal, showing his face framed by flashing lights and prison bars.  M. King Testimony, 2/29/2024 Trial Tr. 783:5–17.

g.  Senator Hyde-Smith has also appealed to people with nostalgia for the Confederacy by dressing in Confederate garb while campaigning.  M. King Testimony, 2/29/2024 Trial Tr. 782:14–22.

h.  In 2023, Governor Tate Reeves sent voters a political mailer attacking his opponent Brandon Presley by depicting Stacey Abrams, a prominent Black politician from Georgia, flanked by White children wearing face masks, implying Abrams, a Black woman, would indoctrinate White children; the ad depicted her alongside crime scene tape, criminal imagery meant to evoke a stereotypical association between African Americans and criminals.  M. King

127

Testimony, 2/29/2024 Trial Tr. 783:19–784:7.

312.    In addition to such instances of racial appeals on the campaign trail, the Court credits Dr. King's analysis that Mississippi lawmakers sometimes advance symbolic political issues as a form of racial appeal.  Prominent examples of this include:

 a. Governor Reeves' statement that there is no such thing as systematic racism, M. King Testimony, 2/29/2024 Trial Tr. 784:10–785:5;

 b. Official statements of opposition to the so-called "woke" agenda ("woke" being a word that emerges from Black vernacular), M. King Testimony, 2/29/2024 Trial Tr. 785:6–17;

 c. Continued official celebration of Robert E. Lee Day on the same day as the Martin Luther King Day federal holiday, M. King Testimony, 2/29/2024 Trial Tr. 785:18–23; and

 d. Continued official endorsement of Confederate symbols and figures, such as the continued celebration of Confederate Heritage Day, despite the association of the Confederacy with the enslavement of Black people.  M. King Testimony, 2/29/2024 Trial Tr. 786:9–18.

317.    The Court credits Dr. King's testimony that these racial appeals also have effects on Black voters and their voting behavior, even if not used in political campaigns.  M. King Testimony, 2/29/2024 Trial Tr. 786:2–8.

318.    To be sure, there are reasons to be hopeful, such as the successful effort to change the Mississippi flag in 2020.  Nevertheless, the Court finds that political campaigns have been, and in some instances continue to be, characterized by racial appeals.

F.        **Senate Factor 7:  Lack of Success for Black Candidates in Mississippi**

319.    The seventh Senate Factor is "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.  Consistent with the unrebutted expert analysis in the trial record and the stipulated facts, since the end of Reconstruction and the adoption of the Constitution of 1890, Black Mississippians have almost never been elected to public office outside of Black-majority districts.  *See e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 788:11–789:13

320.    As noted already, no Black Mississippian has ever been elected to any statewide office in the 132 years since the current Mississippi Constitution was adopted in 1890.  Stip. ¶ 46; *see also* M. King Testimony, 2/29/2024 Trial Tr. 788:11–18; M. Cunningham Testimony, 2/27/2024 Trial Tr. 252:22–253 (83-year-old Ms. Cunningham testifying that, in her lifetime, she has never seen a Black candidate win a statewide election).  No Black Mississippian has served in Congress since Reconstruction except in majority-Black District 2, which was first drawn pursuant to a Court order in the 1980s.  R. Luckett Testimony, 2/27/2024 Trial Tr. 388:10–389:2.  No Black Mississippian has ever served as Speaker of the House or President Pro Tempore of the Senate in the 132 years since the current Mississippi Constitution was adopted in 1890.  Stip. ¶¶ 45, 47.

321.    The Court credits Dr. King's analysis and finds that Black candidates almost never prevail in legislative district elections outside of Black-majority districts, including in the areas of focus in this case.  M. King Testimony, 2/29/2024 Trial Tr. 789:1–13.  Not only was Dr. King's testimony on this point unrebutted, it was echoed by Plaintiffs' expert Dr. Orey and by Defendants' own expert Dr. Brunell.  B. Orey Testimony, 2/28/2024 Trial Tr. 623:13–624:4 ("[T]he Blacks in Mississippi who are elected officials have been elected from majority-Black districts" and this is "overwhelmingly" the case).  T. Brunell Testimony, 3/5/2024 Trial Tr. 1341:11–1342:3, 1343:7–

10, 1344:1–13, 1344:22–1345:14 (testifying as to Dr. Brunell's recent scholarship, which shows that Black legislators continue to be "overwhelmingly elected" from majority-Black districts).

322.     In the Mississippi legislature, nearly every Black legislator is and has been elected from a majority-Black district, including in the areas of focus in this case. *See, e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 789:1–13.  Black majority districts are almost uniformly represented by Black legislators, with a total of three out of 57 Black majority districts being represented by non-African Americans. *See id*. at 747:3–24, 789:14–25.  But with respect to White-majority districts, there are no Black legislators representing White-majority districts in the Senate, and there is only one in the House (out of 110):  Rep. Rodney Hall, who won an unopposed election in November 2023, making him the first and only Black Republican elected to the Mississippi state legislature since 1894. *Id.* at 789:1–13, 829:1–13.

323.     No Black Mississippian has ever represented DeSoto County, Simpson County, Newton County, Chickasaw County, or Monroe County in the State Senate.  Stip. ¶ 49; *see also* K. Harris Testimony, 2/28/24 Trial Tr. 702:9–14; P. Hamner Testimony, 2/28/2024 Trial Tr. 726:10–13.  And no Black Mississippian has ever represented Newton County, Chickasaw County, or Monroe County in the State House.  Stip. ¶ 50; K. Harris Testimony, 2/28/24 Trial Tr. 702:9–14.

324.     In the areas in the Enacted Plans where Plaintiffs claim new Black-majority districts should be drawn to remedy vote dilution, the comparator White-majority districts under the plans in place prior to 2022 all elected White representatives for at least the last three election cycles. *See* Stip. ¶¶ 71, 82, 89.  They did so again in 2023.

325.     Consistent with this, Dr. Handley's analysis of biracial state legislative election contests in the areas of focus demonstrated that Black-preferred Black candidates only prevailed

in Black-majority districts.  *See supra* ¶¶ 162–64, 170.  And Dr. Handley's effectiveness analysis, which was based on the aggregated results of biracial statewide contests in the specific areas of focus, similarly showed that only Black-majority districts provided Black voters with effective opportunities to elect Black candidates notwithstanding prevailing levels of racial polarization and White bloc voting against such candidates.  *See supra* ¶¶ 178–82.  Dr. Handley's analyses further support the Court's finding that Black candidates are almost never elected to state legislative office in the areas at issue in this case outside of Black-majority districts.

326.    Also consistent with this finding, Defendants' expert Dr. Brunell agreed that Black Mississippians are underrepresented relative to their population, especially in the State Senate and State House.  In particular, Dr. Brunell identified 2019 as the year with the highest number of Black representatives and senators, and agreed that, even then, Black voters were under-represented by five to six legislators in each chamber relative to their share of the population.  T. Brunell Testimony, 3/5/24 Trial Tr. 1341:1–10.  Dr. Brunell does not dispute that Mississippi's population is either 37% or 38% Black, depending on the Census category being used, and that, within the period he examined (2007 to 2019), at no point did the number of Black legislators exceed 26.9% in the Senate or 32.7% in the House.  *Id.* at 1339:16–1340:1, 1340:16–25; DTX-3 at 11.

327.    The Court also credits Dr. King's analysis that racially polarized voting and "racial resentment" in Mississippi "weigh heavily on the chances of success for Black candidates across the state."  M. King Testimony, 2/29/2024 Trial Tr. 790:1–792:23.  The Court credits Dr. King's testimony that "racial resentment" has been measured by political scientists through survey methods for over 40 years and describes levels of racial conservatism, that is, conservative attitudes and beliefs regarding the role of government in addressing racial issues in society.  *Id.* at

790:1–971:6; *see also id.* at 841:5–21, 838:13–839:5.  The Court credits Dr. King's testimony that Mississippi ranked sixth among the United States (*i.e.*, near the top) in the extent of racial resentment.  *Id.* at 791:12–792:4.  As Dr. King explained, it is more difficult for Black candidates to get elected to office than White candidates in Mississippi because of Mississippi's high level of racial resentment, which makes it much more difficult for Black candidates to win support from White voters and form winning cross-racial coalition.  *Id*. at 791:17–792:4.

328.    The Court also credits testimony from fact witnesses that is consistent with the above analysis.  For example, Deacon Harris, who represented a majority-Black County Supervisor district in Newton County, testified that no Black county supervisors have been elected outside of majority-Black districts in Newton, Jasper, and Clarke counties.  K. Harris Testimony, 2/28/2024 Trial Tr. 694:21–695:4; *see also* P. Hamner Testimony, 2/28/2024 Trial Tr. 726:10–13.

329.    The Court also credits the testimony of Black Mississippians who have recently campaigned for political office, and who described obstacles faced by Black candidates in particular:

330.    The Court credits the testimony of Terry Rogers, who experienced racism while speaking at Mississippi's premier political event, the Neshoba County Fair, as a candidate for commissioner of agriculture in 2023.  T. Rogers Testimony, 3/1/2024 Trial Tr. 937:14–18; 947:7–948:25.  When Mr. Rogers was delivering his speech as a 19-year-old candidate running for statewide office, a person in the audience held up a phone with an image that "looked like a

pickaninny doll with a noose around its neck."[11]  *Id.* at 948:12–14.  In addition, Mr. Rogers could see Confederate flags being displayed at the fair during his speech.  *Id.* at 949:1–3.  Mr. Rogers testified that seeing the image and the flags understandably "didn't make [him] feel too welcome." *Id.* at 949:1–950:4.

331.    The Court credits the testimony of Pamela Hamner, whose 2023 state senatorial campaign encountered hostility in Hernando, a predominantly White part of her district in DeSoto County.  P. Hamner Testimony, 2/28/2024 Trial Tr. 718:15–24.  Her canvassers had the police called on them while campaigning in Hernando, and she personally had a similar encounter while campaigning for Alderman in 2021.  *Id.*  Due to the hostility that she and her campaign have experienced, including warnings from her team not to travel to Hernando by herself, Ms. Hamner was unable to hold campaign events in the Hernando area.  *Id.*

332.    The Court's finding regarding the lack of success for Black candidates is not altered by the claim by Defendants' expert Dr. Brunell that Mississippi elects a large number of Black officials compared to other states.  Dr. Brunell admittedly used two sources that he did not know to be reliable to make this claim, and the Court accordingly gives it little weight.  T. Brunell Testimony,  3/5/2024  Trial  Tr.  1347:23–1348:4,  1348:21–23.    Moreover,  Dr.  Brunell acknowledged that Mississippi has the highest Black population percentage in the country, and admitted that he did not know if Black Mississippians are under-represented or over-represented in public office.  *Id.* at 1340:2–4, 1347:12–15.  Indeed, and as already noted, with respect to the

---

[11] A pickaninny (or piccaninny) is a doll that contains a "racial caricature of black children," typically featuring "bulging eyes, unkempt hair, red lips, and wide mouths."  David Pilgrim, *The Picaninny  Caricature*,  Jim  Crow  Museum,  Ferris  State  University  (Oct.  2000)*,* https://jimcrowmuseum.ferris.edu/antiblack/picaninny/homepage.htm (last visited Mar. 21, 2024).

Mississippi state legislature Dr. Brunell conceded that Black Mississippians were underrepresented in the State Senate and State House relative to their population. *See supra* ¶ 326.

333.    Perhaps most importantly, and as noted already, Dr. Brunell agreed, consistent with his own scholarship published in 2019, that the "vast majority" of Black officials in the South, including in Mississippi, are elected from Black-majority districts.   T. Brunell Testimony, 3/5/2024 Trial Tr. 1343:7–10, 1344:1–13, 1344:22–1345:14.   According to Dr. Brunell's scholarship, academics have studied the relationship between "minority concentration" in legislative districts and the election of minority legislators for every decade "since at least as far back as 1980." *Id.* at 1344:1–1345:2.  "The consensus of this [academic] literature has been that, except for when there are other minorities in the district, it's been very difficult for African-Americans to be elected from state legislative or congressional districts that are less than a majority African-American in voting-age population." *Id.* at 1345:2–7.  And Dr. Brunell agreed that is because there is no evidence that "White voters [are] increasingly willing to vote for minority candidates"—there has not been "an increase in the number of overwhelmingly White districts electing minorities." *Id.* at 1344:9–13.  In fact, "especially in the South," including Mississippi, it is "very likely" that there has been "an increase in racial polarization in general elections." *Id.* at 1344:14–19, 1345:12–14.  The evidently undisputed fact that racial demographics of a district are essentially a *sine qua non* for the election of Black candidates strongly supports the Court's findings regarding the lack of success of Black candidates in Mississippi and in the particular areas at issue.

### G.    Senate Factor 8:   Lack of Responsiveness to the Needs of Black Mississippians

334.    The eighth Senate Factor concerns "whether there is a significant lack of

responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37.

335.    The Court finds that Mississippi's public officials are unresponsive to the particularized needs of Black Mississippians on certain issues, especially with respect to the longstanding and persistent racial gaps in education and health. *See supra* ¶¶ 270–275, 276–280. This Court credits the testimony of individual Black Mississippians as to their personal experiences with these disparities, as well as the analyses of Dr. Orey, Dr. Luckett, and Dr. King.

336.    One important example is Mississippi's decision not to expand Medicaid. According to Dr. Orey, estimates show that Medicaid expansion would be an economic boon for the state, easily paying for itself through the large federal government subsidies made available under the terms of the federal Affordable Care Act as well as increases in tax revenue from a healthier population.    PTX-008 at 17–18.    By contrast, rejecting Medicaid expansion disproportionately harms Black communities, particularly those in the Mississippi Delta where regional hospitals are on the brink of closure. *Id.*   The Court credits Dr. Orey's testimony that Black Mississippians "will more likely depend on Medicaid relative to Whites" and face "vast differences" in health coverage, B. Orey Testimony, 2/28/2024 Trial Tr. 518:10–19, but that Mississippi has declined to expand Medicaid even though it would ameliorate these disparities, *id.* at 519:4–15.    The Court also credits the testimony of fact witnesses like Dr. Wesley and Mr. Fredericks who spoke about the importance of access to healthcare in their communities.    G. Fredericks Testimony, 2/29/2024 Trial Tr. 893:13–24 (describing the Gulfport NAACP's interest in health advocacy work because "there's so many challenges in Mississippi: obesity, heart disease, catastrophic illnesses"); *id.* at 894:14–17; J. Wesley Testimony, 2/28/2024 Trial Tr. 671:10–15 (explaining that the Mississippi NAACP has a committee that addresses health needs,

including Medicaid expansion, which is of major concern); *id.* at 678:19–679:3 (Dr. Wesley testifying that in areas outside Hattiesburg area, "a lot of the local hospitals are struggling"); *id.* at 682:5–16 (Dr. Wesley testifying that "there are certain diseases in the Black community" that are "more prevalent than the White community" such as diabetes).

337.    Another example is education.  The Court credits Dr. Orey's and Dr. Luckett's analysis that Mississippi's successes with respect to education have been unevenly distributed, with predominantly Black schools underfunded and underperforming as compared to predominantly White schools.  PTX-008 at 9; R. Luckett Testimony, 2/27/2024 Trial Tr. 419:5–430:18.  The Court credits Dr. Orey's testimony that the State of Mississippi "has not funded education adequately" and that this lack of education funding "has disproportionally impacted African-Americans."  B. Orey Trial Testimony, 2/28/2024 Trial. Tr. 514:25–515:6.

338.    The legislative process that led to the passage of the Enacted Plans also demonstrates a lack of responsiveness to Black Mississippians.  Prior to the public release of the Enacted Plans in late March 2022, numerous Black Mississippians attended the nine public sessions held by the SJLCR, repeatedly asking for district lines that did not dilute Black voting strength and instead added minority representation.  *See, e.g.*, Joint Ex. 23, Tr. of Public Hearing of the SJLCR, August 6, 2021, Tupelo, Mississippi [hereinafter "JTX-023"], at 16:17–19:23, 29:8–31:6 (Charles Moore, representing inter alia the NAACP Lee County Branch, highlighting need for fair district boundaries), 20:1–22:7 (Charles Pittson, highlighting need for greater minority representation in Lee County), 24:11–25:22 (Councilwoman Jones, highlighting need for fair political boundaries representing Black communities in Lee County); Joint Ex. 24, Tr. of Public Hearing of the SJLCR, August 8, 2021, Gulfport, Mississippi [hereinafter "JTX-024"] at 14:22–17:23 (James Crowell, representing Biloxi Branch of the NAACP, asking for development of maps

that do not discriminate on the basis of race and Reverend Dr. Robert James, representing Mississippi NAACP, asking for maps that do not prevent Black voters from electing candidates of their choice), 22:16–23:20 (Stephanie Piper, registered voter of color, asking for maps that represent the growth of Black population in the state); Joint Ex. 26, Tr. of Public Hearing of the SJLCR, August 11, 2021, Itta Bene, Mississippi [hereinafter "JTX-026"] at 19:1–21:12 (representative of Mississippi NAACP coalition group, asking for fair maps keeping Black communities together); Joint Ex. 29, Tr. of Public Hearing of the SJLCR, August 19, 2021, Hattiesburg, Mississippi [hereinafter "JTX-029"] at 19:2–20:23 (former Mississippi NAACP board member, requesting equity for minority voters in electing candidates), 24:24–26:5 (Toni Johnson, representing Mississippi Black Women's Roundtable, asking for fair redistricting for Black women), 28:11–29:5 (Donald Bentley, representing Black Lives Matter Mississippi, requesting a fair process and concern over larger cities being broken up unfairly), 29:10–31:22 (Robin Wolf, district 4 supervisor for Forrest County, requesting a majority-minority Senate district in Hattiesburg); Joint Ex. 30, Tr. of Public Hearing of the SJLCR, August 23, 2021, Jackson, Mississippi [hereinafter "JTX-030"] at 15:18–22:20 (Representative Hester Jackson McCray requesting majority-minority districts be drawn in areas including DeSoto and Chickasaw Counties).

339. However, the Enacted Plans did not increase the number of Black-majority districts or otherwise create new political opportunities for Black voters.  PTX-001 at 24-25, 56-57, 244-246, 590-593; Stip. ¶¶ 69, 80; JTX-004; JTX-005; W. Cooper Testimony, 2/26/2024 Trial Tr. 96:17–22, 98:17–23.  When Representative Robert Johnson, a Black Democrat, offered a proposed map with five additional Black-majority districts, the House rejected it after less than fifteen minutes of debate.  *See* JTX-010 at 32:11–47:12.  Similarly, Senator Derrick Simmons, a Black

Democrat, offered a proposed map with four additional Black-majority districts, but after two minutes of discussion, the Senate rejected that proposal as well.  JTX-011 at 98:9–100:5.

341.    Dr. Wesley, Deacon Harris, and Terry Rogers all testified that White legislators do not campaign in Black communities or attend events hosted by Black civic organizations.  K. Harris Testimony, 2/28/2024 Trial Tr. 698:15–25; J. Wesley Testimony, 2/28/2024 Trial Tr. 668:21–670:8; T. Rogers Testimony, 3/01/2024 Trial Tr. 943:22–944:3.  As Deacon Harris told the Court: "Most of the time Blacks [are] the ones on the low-income level, they're below poverty level, so their needs are-their needs are different from the average.  And I just think if a person is going to represent you, you need to know-you need to communicate with those people to-to know what their needs are … I mean, you don't know a need unless you involved in it."  K. Harris Testimony, 2/28/2024 Trial Tr. 699:6–16.

340.    The Court's finding with respect to the lack of official responsiveness to the needs of Black voters is also supported by the testimony of individual fact witnesses, which the Court credits.

342.    The Court also credits the testimony of Dr. Joseph Wesley that in his role as Political Action Chair for the Forrest County Branch of the NAACP, the Branch has held numerous community forums, including for statewide candidates, open to all candidates, and yet his elected senator has not ever come to one of the forums to speak with or engage with the Black community in the district.  *See* J. Wesley Testimony, 2/28/2024 Trial Tr. 668:21–670:8.

343.    The Court also credits the testimony of Ms. Pamela Hamner that her current senator is not responsive to needs and concerns of Black voters in her area.  P. Hamner Testimony, 2/28/2024 Trial Tr. 726:14–727:2 ("And I don't believe [our values are] important to him.").  For instance, as Ms. Hamner explained, vouchers for private schools are of little use for voters in the

predominantly Black and economically depressed Horn Lake area, as those voters would not be able to afford the remaining balance, which would still be thousands of dollars more in tuition. *Id.* at 720:25–721:16 ("[I]f you [can't] pay $6,500 for a semester at private school, a $2,500 voucher does you nothing if you can't have the money to pay the whole fee.").

### H.    Senate Factor 9:  Tenuous Justifications for the Challenged Plans

344.    The ninth Senate Factor concerns "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 37.  Based on the evidence presented, the Court finds that the enacted plans are supported by tenuous justifications.

345.    The Court finds that the legislative process surrounding the passage of the plans was very truncated and minimized the time to offer and deliberate on alternative plans, including dismissing alternatives with little to no substantive discussion.  *See, e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 793:20–794:6, 797:4–21.

346.    While the SJLCR held public hearings for Mississippians to comment on their redistricting priorities, no proposed maps were displayed or presented at any of these hearings, which all took place before the committee revealed proposed House and Senate maps.  Stip. ¶ 58.  Nor is there any evidence in the record regarding how if at all the feedback received from voters at those hearings was taken into account, because none of the legislators or staffers serving on or working for the SJLCR testified at trial or produced any documentary evidence on that point.  The record moreover demonstrates that Black voters consistently asked the SJLCR to draw districts that would provide fairer representation to Black voters, but that the plans eventually produced did not add any Black-majority districts.  *Supra* ¶¶ 338–339.

347.    The Enacted Plans were enacted in a highly abbreviated process:  The 2022

legislative session was scheduled to end on April 5, 2022; however, the SJLCR did not hold its final meeting until March 27, 2022. *See* Joint Ex. 17, Agenda, Minutes from March 27, 2022 for the Standing Joint Legislative Committee on Reapportionment and Standing Joint Congressional Redistricting Committee [hereinafter "JTX-017"].  At that meeting, the SJLCR revealed to the public for the first time the proposed maps for both chambers of the Mississippi legislature, approving them that same day. *See id*.; Joint Ex. 15, Agenda, Minutes from March 27, 2022 for the Standing Joint Legislative Committee on Reapportionment and Standing Joint 4 Congressional Redistricting Committee (House Subcommittee) [hereinafter "JTX-015"]; Joint Ex. 16, Agenda, Minutes from March 27, 2022 for the Standing Joint Legislative Committee on Reapportionment and Standing Joint Congressional Redistricting Committee (Senate Subcommittee) [hereinafter "JTX-016"].  Legislators acknowledged the hurried nature of the process.  During the floor debate immediately prior to passage, State Senator Chris McDaniel stated, "[w]e had no chance to do anything other than what we've done because of the secrecy in this chamber.  Let me be real clear. We asked to see the whole map, begged to see the whole map.  We weren't allowed to see the whole map." JTX-011 at 106:12–17.

348.   On March 29, 2022, the State House adopted the House redistricting plan, and the State Senate adopted the State redistricting plan, two days after the plans were first revealed to the public. *See* JTX-010 at 47:24–48:13; JTX-011 at 194:11–15.

349.   During the House floor debate, Representative Robert Johnson, a Black Democrat, proposed a map with five additional majority-Black districts, noting that the SJLCR's maps diluted the Black vote.  JTX-010 at 34:10–23.  The House allowed less than fifteen minutes of debate on Representative Johnson's amendment. *See* JTX-010.  And the SJLCR's Chairman stated during the floor debate when asked if there was an attempt to increase the number of majority-minority

districts that the intention was to maintain the amount of those districts, saying "we went in with 42 and we came out with 42" (*see id*. at 18:22–18:3) and "our goal was to make sure that we did not go down in districts" (*see id*. at 18:10–20).  *See also* M. King Testimony, 2/29/2024 Trial Tr. 871:14–873:2.

350.     During the State Senate floor debate, Senator Derrick Simmons, a Black Democrat, proposed a map with four additional majority-Black districts.  JTX-011 at 99:9–25; *see, e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 794:15–795:7.  Senator Dean Kirby, the vice-chair of the SJLCR, stated that Senator Simmons' map "is not a map that this State needs."  JTX-011 at 100:19–20.  The Senate voted down the amendment.  *Id*. at 100:17–101:5.  Two days later, on March 31, both of the Enacted Plans were enacted into law.  The only change in the plans compared to the versions that had been recent to the public by the SJLCR a few days prior was a small tweak to the House plan to unpair two incumbents in the Jackson area.  Stip. ¶ 64.

351.     The Court credits and agrees with Dr. King's characterization that the opportunity for public discussion and debate regarding the plans prior to their passage provided by the SJLCR was "the bare minimum, if that."  M. King Testimony, 2/29/24, Trial Tr. 794:21–22

352.     The Court also credits Dr. King's testimony that, although his approval of the maps was not legally required, Governor Reeves made statements in connection with the enacted maps that signaled a hope and expectation that the maps would be adopted quickly without changes.  *See* M. King Testimony, 2/29/2024 Trial Tr. 795:24–797:9.  Dr. King testified that Governor Reeves' tweets on March 27, 2022, signaled to the legislature a desire to approve the enacted maps as quickly as possible, and an implicit opposition to the creation of any additional Black-majority districts (because such districts might elect Democrats).  *Id*. at 795:24–797:6 (discussing tweets from Governor Reeves that read: "When Legislative districts are drawn for fair competition,

Republicans WIN because Mississippians believe in our ideals and principles" (Pl.'s Ex. 13, Expert Report of Professor Marvin King [hereinafter "PTX-013"] (marked for identification) at 46), and "Any plan that reduces the number of districts where Republicans can compete in favor of more easy Democrat wins should not be proposed – much less approved – by either chamber of the Legislature.  Mississippians put Republicans in charge in 2019 for a reason."  (PTX-013 at 48)).

353.    The Court finds that compliance with the Voting Rights Act was not offered as a non-tenuous justification for the Enacted Plans.  The State did not call any witnesses affiliated with the SJLCR or involved in the map-drawing process to speak to any of the specific line-drawing decisions in those areas or offer testimony that the configuration of district lines in the areas of interest (*i.e.*, where additional, reasonably configured Black-majority districts could have been drawn, but were not) was due to efforts to comply with the VRA.  Any such argument would be implausible given that, despite the growth of the Black population, there was no change in the number of Black-majority districts.  JTX-010 at 19:2–20; *see* M. King Testimony, 2/29/2024 Trial Tr. 795:10–21, 797:4–21.  Moreover, the Court finds that the statements in the House and Senate hearing transcripts do not indicate that compliance with the VRA was a justification for the particular line-drawing in the areas of focus.  Rather, those transcript statements indicate only that the House Chairman of the SJLCR, Rep. Beckett, generally believed it was permissible under the VRA to level-set the number of Black-majority districts (*i.e.*, "[w]e went in with 42  and we came out with 42," JTX-010 at 19:2–3) and that several state senators believed the goal of the redistricting process was to *minimize* the number of districts where Black voters could elect Black-preferred candidates in order to maximize Republican partisan advantage, *see* JTX-011 at 188:25–190:22.

354.    The Court also finds that the State has not offered or pointed to any specific non-tenuous justification (for example, the inclusion of a particular town in a particular district) for the configuration of any of the district lines in the areas of focus because again, the State did not call any witnesses affiliated with the SJLCR or involved in the map-drawing process to speak to any of the specific line-drawing decisions in those areas.  Moreover, the Court finds that Mr. Cooper's Illustrative Plans demonstrate that any generalized justification that the Enacted Plans were required to comply with traditional districting principles, such as compactness or minimizing county splits or accounting for population changes, was not inconsistent with the creation of additional, reasonably configured Black-majority districts in the areas of focus.  *See supra* ¶¶ 86–138.

355.    The Court further finds that Defendants offered no evidence from which it could be concluded that partisan advantage or performance is a *state* or *public* interest, as opposed to an interest that inures only to the political advantage of one political party.  Defendants offered no expert analysis explicating how configuring districts to serve the interests of one party and its members benefits the public or supports election integrity, public confidence in the democratic process, or any similar value.  The Court accordingly credits Dr. King's analysis that, on this record, seeking to obtain a partisan advantage is not a legitimate policy justification—especially when done by unlawfully diluting Black voting strength.  *See, e.g.*, M. King Testimony, 2/29/2024 Trial Tr. 795:10–21, 797:4–21.   The Court also credits Dr. King's analysis that reducing competitiveness of elections contributes to why "Mississippi has typically the lowest voter turnout in the country" because Black Mississippians are less likely to vote in a noncompetitive election. M. King Testimony, 2/29/2024 Trial Tr. 825:2-11.

356.    The Court further finds that, while the floor debate transcripts do contain

generalized statements from Senator Kirby and Representative Beckett that "maintaining the political performance" of the electoral districts was "[a]n important consideration," those statements were not in relation to any of the specific districts or areas at issue in this case. *See supra* ¶ 13.

*   *   *

357.    Consistent with all the foregoing findings of fact, the Court finds that the political process is not equally open to Black Mississippians with respect to the Enacted State Senate and State House lines inasmuch as Black Mississippians have less opportunity than White Mississippians to participate in the political process and to elect representatives of their choice to state legislative offices in the particular areas at issue in this case.

## VI.    Racial Gerrymandering

358.    Plaintiffs claim that two Senate districts (SDs 2 and 48) and three House districts (HDs 22, 34, and 64) are racial gerrymanders, violating the Equal Protection Clause of the Fourteenth Amendment.

### A.    Consideration of Racial Data During the Redistricting Process

359.    During the redistricting process, the state legislature utilized the PL 94-171 dataset created by the U.S. Census Bureau.  Stip. ¶¶ 24, 25.

360.    The PL 94-171 dataset contains demographic data, including race, at the level of census blocks.  JTX-001; *see also* Pl.'s Ex. 5, August 28, 2023 Report of Dr. Jordan Ragusa [hereinafter "PTX-005"] at 4 (describing contents of the PL 94-171 dataset); J. Ragusa Testimony, 3/4/2024 Trial Tr. 985:14–25 (similar).  A census block is a unit of geography that is smaller than precincts and therefore enables a mapmaker to be more precise when identifying voters, including when splitting precincts between districts.  *E.g.*, Pl.'s Ex. 6, November 27, 2023 Amended Rebuttal

Report of Dr. Jordan Ragusa [hereinafter "PTX-006"] at 5 ("[P]recinct splits are relatively common both enacted plans, making census blocks a more precise and necessary unit of analysis.").

361.    Between 2010 and 2020, Mississippi experienced significant growth in the Black population in the areas containing Benchmark SDs 2 and 48 and Benchmark HDs 22 and 64.  PTX-001 at 178–179, 499–501.  All of these Benchmark districts had saw their BVAP shares increase, and they were approaching 40% BVAP prior to the 2022 redistricting (SD 2: 39.64%; SD 48: 36.33%; HD 22: 37.04%; 37.93%).  *Id.*; *see also* Defs. Ex. 3, November 17, 2023, Amended Expert Report of Dr. Thomas L. Brunell [hereinafter "DX-003"] at 4–5.  The Court credits expert witness testimony that districts with BVAPs in this range can become more competitive for Black candidates in the South.  *See infra* ¶¶ 404–407.

362.    During the 2022 redistricting, Mississippi had access to the aforementioned Census data, which contains race information at the level of census blocks.  Stip. ¶ 25; Joint Ex. 31, Email with Booth and Lennep (Jan. 15, 2019) [hereinafter "JTX-31"] (counsel for SJLCR acknowledging that committee is examining race data from Census file PL 94-171 for 2022 redistricting); *see* JTX-1 (PL 94-171 file).

363.    The Census data also enables the State to infer demographic trends, such as growth in Black populations over time.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1356:11–21.

364.    The SJLCR—the legislative committee responsible for the 2022 process—and its staff also obtained electoral data, *i.e.*, vote totals for various candidates, and voter registration data, at the precinct level, from the Secretary of State's office through Madalen Lennep, a contractor who is responsible for operating and extracting data from SEMS, the state's elections database. Court Ex. 1, Deposition Transcript of Madalen Lennep (Dec. 28, 2023) (also marked as Pl.'s Ex.

127) [hereinafter "Lennep Dep. Tr."] at 82:22–83:2, 102:15–106:7, 106:10–107:6, 115:7–118:7, 122:15–123:25, 124:7–127:12, 127:17–130:25, 133:17–136:7, 137:16–139:10, 141:11–144:19; *see also* Pl.'s Exs. 99 through 109; Joint Exs. 31–42.  The Standing Committee made various requests for precinct-level registration and turnout data, organized by county, for key election contests in Mississippi, including for the 2020 U.S. Senate contest as well as recent elections for governor and attorney general.  *See* Pl.'s Exs. 105 through 109; Joint Exs. 31–42.

365.    Ted Booth, who is counsel to the SJLCR, requested and received the voter registration and electoral data from Ms. Lennep.  JTX-31 (email from Booth); Lennep Dep. Tr. 102:15–106:7, 106:10–107:6, 115:7–118:7; *see also* Pl.'s Ex. 99; Joint Exs. 31–33.

366.    Ben Collins, who is the Standing Committee's staff person responsible for Geographic Information Systems (GIS) and mapdrawing, also requested and received registration and electoral data at the precinct level from Ms. Lennep.  Lennep Dep. Tr. 115:7–118:7, 122:15–123:25, 124:7–127:12, 127:17–130:25, 133:17–136:7, 137:16–139:10, 141:11–144:19; *see also* Pl.'s Exs. 101 through 109; Joint Exs. 34–42.  Mr. Collins indicated that the precinct-level data provided by Ms. Lennep are of "great utility," and that the SJLCR needed "the full 82 county record."  Lennep Dep. Tr. 134:4–135:14.

367.    Mr. Booth and Mr. Collins obtained that data for purposes of "design[ing] districts for the House and Senate," to use in conjunction with the PL 94-171 dataset containing Mississippi voters' racial identification at the block level.  Stip. ¶ 62; Pl.'s Ex. 97.  In response to Ms. Lennep's inquiry into the purpose of their information requests, Booth acknowledged that the Standing Committee was "looking at . . . minority voting age population" and that "it would be beneficial to have an understanding of how many persons are actually registered in a precinct" while examining that racial data.  Stip. ¶ 62; Pl.'s Ex. 97; JTX-31 (Booth email).

146

368.    Based on this record, the Court finds that, for purposes of the 2022 redistricting process, electoral data, reflecting Republican and Democratic turnout, was available only at the precinct level, whereas more granular racial data was available for each census block in the State. The electoral datasets that Ms. Lennep provided to the redistricting committee uniformly consisted of data at the precinct-level.  *See also* K. Kirkpatrick Testimony, 3/4/2024 Trial Tr. 1210:7–24 (confirming electoral data provided by Ms. Lennep was precinct-level); Joint Exs. 31–42.

369.    The Court credits Dr. Jordan Ragusa's unrebutted testimony that precinct-level electoral data cannot be used to divide a precinct along partisan lines, and that splitting precincts requires the use of Census-block-level data.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:5–10, 1139:23–1140:14.

### B.    Dr. Jordan Ragusa's Analysis

370.    With respect to their racial gerrymandering claims, Plaintiffs presented the expert testimony and analysis of political scientist Dr. Ragusa, who was qualified as an expert witness in quantitative methods and analysis, the modeling of electoral districting, and American politics.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 980:17–25.  The Court credits Dr. Ragusa's testimony that he analyzed the effect of race on the design of the five challenged districts, controlling for the effect of traditional redistricting principles and the possibility that the districts were achieved by sorting voters based on their voting history.

371.    For the reasons detailed below, the Court finds that Dr. Ragusa's conclusion that "Black voters were systematically excluded from the redrawn district[s]" in a "consequential" fashion is well supported by the evidence.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1056:16–1057:7.  The Court further finds that the critiques by Defendants' expert, Dr. Brunell, are far less helpful and probative, in addition to being lacking in credibility for the reasons discussed below.

147

*See infra* ¶¶ 409–419.

372.    Dr. Ragusa has a Ph.D. in political science from the University of Florida and is an associate professor of political science at the College of Charleston.  PTX-005 at 3; J. Ragusa Testimony, 3/4/2024 Trial Tr. 980:17–25.  He has held various leadership roles in academia, and he teaches both graduate and undergraduate courses on research methodology and statistical computing, including specifically in the context of elections, voting, and redistricting.  PTX-005 at 3; J. Ragusa Testimony, 3/4/2024 Trial Tr. 971:11–972:3, 972:20–974:4.  Dr. Ragusa has published over a dozen peer-reviewed articles, including two co-authored books, on elections and other subjects in political science.  PTX-005 at 3; J. Ragusa Testimony, 3/4/2024 Trial Tr. 978:7–14.

373.    Dr. Ragusa previously testified in a racial gerrymandering case in South Carolina: The three-judge panel relied heavily on his analysis disentangling racial sorting from partisan sorting, and found Dr. Ragusa's results "particularly probative" in showing that a congressional district was a racial gerrymander.  *S.C. State Conf. of NAACP v. Alexander*, 649 F. Supp. 3d 177, 192 (D.S.C. 2023).

374.    Dr. Ragusa conducted multiple analyses of the challenged districts, and the Court finds that these analyses and the opinions based on them reflect a reliable application of statistical methods to the facts of this case.

375.    For one of his analyses, Dr. Ragusa designed a series of multivariate regressions to determine if the racial composition of a particular census block predicted the block's inclusion or exclusion from a challenged district.  Each of Dr. Ragusa's three regression models controlled for the census block's partisan composition (the number of Trump voters), the block's population size (which also accounts for the possibility that the inclusion/exclusion of certain blocks was caused

by a need to balance population), and the block's location on the benchmark district's border (which may affect the likelihood of inclusion, because including relatively more proximate blocks is more likely to be consistent with compactness, communities of interest, contiguity, retaining cores of district, or other redistricting principles). *E.g.*, PTX-005 at 8–10; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 989:21–991:10.  The Court credits Dr. Ragusa's testimony that this multivariate logistic regression method enabled him to "control for the effect of partisanship, such that any effect of race that is left over is above and beyond any partisan gerrymandering." *Id.* at 991:11–992:4 (explaining that his regression models are "a way of canceling out the effect of partisanship to see whether or not race has any additional effect").  The use of a multivariate regression model is "one of the most common techniques in all of the social sciences," and one that Dr. Ragusa has used in peer-reviewed publications. *Id.* at 993:6–12.

376.    The Court finds that Dr. Ragusa's use of the Trump vote as a proxy for partisanship in his regression model is reasonable.  Specifically, Dr. Ragusa relied on the number of votes cast for Donald Trump in 2020, "which was the most recent [data] at the time that the districts were being reconfigured." J. Ragusa Testimony, 3/4/2024 Trial Tr. 1017:8–13; *see also* PTX-5 at 9 ("[T]he 2020 contest was the most recent general election (with high voter turnout) at the time the maps were being redrawn.  Simply put, if mapmakers relied on partisan information when drafting the enacted plan, the 2020 data were the most accurate and reliable at the time.").

377.    The Court further credits Dr. Ragusa's explanation for why he chose the 2020 presidential election, as opposed to other elections.  He testified that "the Trump 2020 vote is . . . less prone to . . . idiosyncratic fluctuations," whereas "state legislative data . . . are highly variable," such as due to the absence of incumbents or challengers. J. Ragusa Testimony, 3/4/2024 Trial Tr. 1065:11– 24, 1078:25–1079:24 ("[T]he 2020 presidential election data was the most reliable and

accurate at the time the districts were being redrawn."). Dr. Ragusa also explained that, to the extent that the State relied on electoral data from statewide offices, such as for Governor or Attorney General, "the 2020 Trump vote would correlate very highly with those races," because in contemporary American politics, it is known that "very few voters split their ticket." *Id.* at 1080:19–1081:10.

378. Defendants' expert, Dr. Brunell, did not opine that the 2020 Trump vote is an inaccurate approximation of partisanship. He instead repeatedly attempted to rely on the statistical significance of the Trump vote variable to argue that partisanship had an effect on redistricting. *See* T. Brunell Testimony, 3/5/2024 Trial Tr. 1314:3–11; 1361:11–16. While the Trump vote is an approximation for Republican partisanship, "every statistical model is a simplification of the real world," as Dr. Brunell acknowledged, and the Court finds that the use of the 2020 election results in Dr. Ragusa's models is a reasonable control for partisanship. *See id.* at 1363:22–24.

379. The Court credits Dr. Ragusa's testimony that he improved upon this methodology from his prior work in South Carolina by adding the border block variable to further control for the effect of a census block's proximity to the district border, as well as compactness and contiguity. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 989:21–991:10, 1011:24–1012:2, 1149:16–1150:24 ("[I]n the South Carolina case, one of the critiques was that I wasn't sufficiently controlling for geographic factors, like proximity to the district, compactness, and contiguity. I maintain that my analysis did get at those factors with the county envelope, but to further address that issue, I included the border block variable, which . . . I think that's a substantial improvement."). The Court credits Dr. Ragusa's analysis and conclusions based on his methodical and considered approach.

380. The Court also credits Dr. Ragusa's testimony that his models control for

considerations of equal population, by including a variable representing the total voting age population of each census block.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1125:6–21.  Defendants argue that the equal population requirement is determined based on total population, rather than total adult population, but the Court credits Dr. Ragusa's explanation that the two are near-perfect proxies for one another, and that there is no impact on his results.  *Id.* at 1129:11–1132:9 ("If I were to swap out the total population instead, I have no doubt the results would be exactly the same.").

381.    Dr. Ragusa applied those three regression models to each of the five challenged districts.  The first ("Model 1") focused on census blocks that could be moved into the challenged district from a nearby district, to determine whether a block's racial composition affected the probability of the block being *added* to the district.  The second ("Model 2") looked at census blocks already within the benchmark version of the challenged district, to determine whether a block's racial composition affected the probability of the block being *removed* from the district, *i.e.*, moved to another district.  The third ("Model 3") combined both approaches by examining which census blocks were moved into or kept within the relevant district in the Enacted Plans.  *See* PTX-005 at 6–7; J. Ragusa Testimony, 3/4/2024 Trial Tr. 994:22–995:12, 998:18–24, 999:12–15. The Court acknowledges and credits Dr. Ragusa's explanation that the race variable need not be statistically significant in every model in order to demonstrate racial sorting—the BVAP of a district can be altered by disproportionately moving a certain racial group in *or* out of a district (*or* maybe, but not necessarily, both).  *E.g.*, PTX-006 at 17; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1097:1–4.  Defendants' expert, Dr. Brunell, agreed that a racial gerrymander can be achieved by moving one racial group disproportionately in only one direction.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1369:20–1370:2.  The Court finds that Dr. Ragusa's three models

account for each possible mode of racial sorting.

382.    Models 1 and 3 rely on a well-established method developed by Dr. Stephen Ansolabehere, known as the "county envelope," which was described and cited favorably by the U.S. Supreme Court to find racial predominance in *Cooper v. Harris*, 581 U.S. 285, 315 (2017). *E.g.*, PTX-006 at 7–8; PTX-005 at 6–7; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 996:19–997:3, 1144:21–1145:6 ("It is a well-established methodology that I have adapted given the circumstances of this case."). For a given district, Dr. Ragusa's county envelope consists of the counties that overlapped with the benchmark district, as well as new areas drawn into the district during the 2022 redistricting. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 995:13–996:8, 997:4–14, 998:18–999:15. The envelope is designed to approximate "essentially the region from which mapmakers could have drawn the district's population," *Cooper*, 581 U.S. at 315. The regression analysis performed by Dr. Ragusa with respect to Models 1 and 3 takes all of the census blocks within the county envelope as the universe of possible district building blocks that could reasonably be selected and then analyzes whether the various independent variables like partisanship and race had a significant effect in predicting whether a block was included in the district. J. Ragusa Testimony, 3/4/2024 Trial Tr. 991:11–993:5, 995:4–996:8, 997:4–14, 998:18–24. The Court finds that, by design, the county envelope takes into account the traditional redistricting principles of compactness, contiguity, and communities of interest—that is, the county envelope ensures that the potential districts that could be drawn under Models 1 and 3 are not significantly reconfigured relative to the enacted district, thereby keeping modeled districts about as compact as the enacted ones. J. Ragusa Testimony, 3/4/2024 Trial Tr. 995:13–996:8; 998:18–999:7, 999:12–15; 1002:7–14, 1082:16-1083:3.

383.    Model 2, which only examined the assignment of census blocks that were already

within the benchmark district, is limited to the geography of the prior district and does not utilize a county envelope.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 997:15–998:7 ("There is no envelope in Model 2.  It simply is the district as it was drawn under the Benchmark plan.").  The Court also finds that, by design, Model 2 takes into account the traditional redistricting principle of core preservation—this model evaluates the assignment of census blocks out of the benchmark districts to assess to what extent mapmakers kept the prior district intact or reconfigured it in the Enacted Plans.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 998:8–17, 1002:15–17.

384.    For each of the five districts challenged as racial gerrymanders, Dr. Ragusa found based on his three regression models that the racial composition of a census block significantly predicted the block's inclusion or exclusion from the challenged district.  Blocks with higher Black populations were significantly less likely to be added to the challenged district, more likely to be moved out of the challenged district, or both, depending on the particular district.  PTX-005 at 10–26, 30–31; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1020:15–23, 1031:16–1032:10, 1038:5–21, 1043:21–1045:2, 1050:11–1051:9.  "The effect of the Black voting-age population variable is statistically significant in at least one model in all five of those districts."  J. Ragusa Testimony, 3/4/2024 Trial Tr. 982:19–24.

385.    The Court credits Dr. Ragusa's findings that, where the effect of race was statistically significant in his regression models, the effect of race fit "a clear and consistent pattern"—Black voters were less likely to be assigned to the challenged districts.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1018:21–1019:5, 1056:16–1057:4 (explaining that race variable pointed in the expected direction in every statistically significant result).  Defendants' expert, Dr. Brunell, also agreed that the regression results consistently pointed in the direction of "reducing the BVAP in the challenged district[s]."  T. Brunell Testimony, 3/5/2024 Trial Tr. 1370:3–15.

386.    The Court also credits Dr. Ragusa's testimony that the partisanship (i.e., Trump vote) variable, although statistically significant in various of his models, does not indicate that Defendants were engaged in partisan gerrymandering, because the effect of partisanship, unlike the race variable, was not consistent.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1056:24–1057:1 ("The Trump vote, by comparison, is very inconsistent in terms of its direction, even though it is often statistically significant."), 1099:13-21, 1109:5-19.  In three of the five challenged districts— HD 22, HD 64, and SD 48—the partisanship variable is statistically significant in at least one model showing that Trump voters were *less* likely to be included in the enacted district.  *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1015:9–21, 1037:10–21, 1049:23–1050:8.  In other words, Trump voters were being assigned in a manner contrary to what one would expect if the State had been trying to increase the number of Republican voters in the challenged districts.  *Id.* at 1116:18– 23, 1148:3–10 ("[T]he Trump vote is in a direction contrary to what one would expect from a purposeful partisan gerrymander.  In contrast, the BVAP variable, when it is significant, is always in a consistent direction.  I think that is a telling piece of evidence.").

387.    Thus, the directions in which voters were being moved in and out of the challenged districts are indicative of racial sorting, not partisan sorting.  Defendants and Dr. Brunell attempt to count the number of times that the Trump vote variable was statistically significant in Dr. Ragusa's models, but that oversimplification, as Dr. Ragusa repeatedly explained at trial, fails to account for the direction of the Trump vote variable, which points in contradictory directions, and the Court does not credit that approach.  *See, e.g.*, J. Ragusa Testimony, 3/4/2024 Trial Tr. 1099:13–21, 1109:5–23, 1123:10–18; Defs. Ex. 8, Summary of Dr. Ragusa's Model Findings of Statistical Significance [hereinafter "DX-8"]; T. Brunell Testimony, 3/5/2024 Trial Tr. 1314:3– 11.

388.     In response to Dr. Brunell's criticism that Dr. Ragusa's county envelopes used in Models 1 and 3 were potentially over-inclusive or under-inclusive, Dr. Ragusa conducted a series of so-called "robustness checks" by expanding or narrowing the county envelopes to see if the change affected the results.  Dr. Ragusa explained that these robustness checks confirmed that, even after major changes to the county envelopes, the results were the same—"Black voters were excluded from the five challenged districts in a statistically significant fashion."  *E.g.*, PTX-006 at 8–15, 19–30; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 969:23–970:7.  Dr. Brunell agreed that Dr. Ragusa's results remained statistically significant after the reconfiguration of the county envelopes.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1361:6–14.

389.     The Court also credits Dr. Ragusa's opinion that the robustness checks also validate his use of the border block variable to control for compactness and contiguity and to approximate the area around the enacted districts where changes were most likely to occur during redistricting. Even when Dr. Ragusa "shrink[s] the envelope substantially" for purposes of a robustness check, including by "discarding 80 percent of" the original envelope, he obtains "the exact same results." J. Ragusa Testimony, 3/4/2024 Trial Tr. 1132:24–1133:7 ("The only reason that can occur is if the border block variable is satisfactorily controlling for that factor.").

390.     Especially in light of Dr. Ragusa's robustness checks, the Court credits his analysis and conclusions regarding the significance of race in determining the likelihood that a given census block was moved in or out of the districts at issue, even when controlling for partisanship.

391.     After finding that race was statistically significant, Dr. Ragusa analyzed the magnitude of the effect of race on a census block's district assignment.  Dr. Ragusa found that the relationship between racial composition and exclusion from a challenged district was not merely statistically significant but also substantively impactful, even when controlling for partisanship.  J.

Ragusa Testimony, 3/4/2024 Trial Tr. 982:19–983:5 ("Additionally, the effect of race is substantively significant as well, because the analysis controls for partisanship and traditional redistricting principles."); PTX-005 at 10–26.  As detailed below for each of the five challenged districts, by examining the effect size of the race variable (representing the number of Black adults in the census block), Dr. Ragusa found that as the number of Black adults in a block increased, the likelihood of the block being included in a challenged district dropped markedly in response.  *E.g.*, PTX-005 at 10–26 & figs. 1–9; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1020:15–23, 1031:16–1032:10, 1038:5–21, 1043:21–1045:2, 1050:11–1051:9. The Court credits Dr. Ragusa's analysis that these differences in percentage likelihood of inclusion or exclusion have large effects when multiplied by the many blocks within each district.  *See, e.g.*, J. Ragusa Testimony, 3/4/2024 Trial Tr. 1118:3–1119:1 ("In the analysis for HD64 Model 3, there are 5,400 blocks, so though these probabilities may be individually small, collectively they're quite large.").

392.    In addition to his regression analyses, Dr. Ragusa also examined the racial compositions of the populations moved in and out of each of the challenged districts to determine whether Black voters were over-represented in the populations included or excluded from the challenged districts.  He found that Black voters were disproportionately excluded from the challenged districts relative to their share of the population, whether within the county envelope or within the areas bordering the challenged district.  *E.g.*, PTX-005 at 11–25, tbls. 2, 4, 6, 8, 10; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1021:1–1022:8, 1032:13–1033:2, 1038:24–1039:14, 1045:5–1046:17, 1051:12–25.  On this basis, he concluded that the racial disparities in the assignment of Black voters cannot be explained by Black voters' proximity to district boundaries.  The Court credits his analysis and conclusions.

393.    Separately from his regression analyses, Dr. Ragusa also conducted a split-precinct

analysis, which is another improvement on his prior redistricting work related to South Carolina redistricting.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1150:15–24.  Specifically, Dr. Ragusa examined the precincts split by each of the challenged districts, to see if the splits tracked racial lines.  A precinct split occurs when a precinct is divided between two or more districts.  *See generally* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1023:23–1024:9.  Precinct splits are relatively common under the Enacted House and Senate Plans: The Enacted House Plan splits 255 precincts, while the Enacted Senate Plan splits 41 precincts.  PTX-006 at 5.  All but eight House districts (93%) contain at least one split precinct, and over half of the Senate districts (58%) split at least one precinct.  *Id.*

394.    Dr. Ragusa found "a statistically significant pattern whereby precinct splits systematically excluded Black voters from the challenged districts."  PTX-006 at 6; PTX-005 at 26–28; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1053:6–21; *see also* PTX-005 at 26 ("A consistent feature of the challenged districts is the existence of split precincts, where the portions drawn into the challenged district have a far lower BVAP % than the portions added to a neighboring district.").  Overall, the Enacted Plans assign "twice as many Black residents of voting age to neighboring districts" as it does to the challenged districts.  PTX-005 at 26.

395.    The Court credits Dr. Ragusa's analysis and conclusion that, when the challenged districts split a precinct, the part of the precinct with a higher Black population was significantly more likely to be placed outside of the challenged district, while the part with a higher White population was more likely to be placed inside the challenged district.  As shown in the below table, the challenged districts consistently follow this pattern, with the exception of SD 48, which does not split any precincts.  *Id.*

396.    Overall, Dr. Ragusa found that "there is only a 3% chance" that the pattern of racial

disparities in the precinct splits is "due to random variation," a highly statistically significant result. PTX-005 at 27; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1053:12–1054:4.

| Table 11: VTD Splits in the Challenged Districts (Enacted Plan) | Challenged Split | Neighboring Split |
|---|---|---|
| HD 22 | | |
| BVAP | 763 | 1,258 |
| All Voters | 3,433 | 3,641 |
| BVAP % | 22% | 35% |
| HD 34 | | |
| BVAP | 708 | 3,131 |
| All Voters | 2,950 | 6,230 |
| BVAP % | 24% | 50% |
| HD 64 | | |
| BVAP | 684 | 938 |
| All Voters | 3,841 | 1,591 |
| BVAP % | 18% | 59% |
| SD 2 | | |
| BVAP | 1,336 | 1,828 |
| All Voters | 5,679 | 4,801 |
| BVAP % | 24% | 38% |
| T-Test | | |
| Average BVAP % | 23% | 41% |
| Standard Deviation | 18 | 26 |
| Observations | 16 | 16 |
| T-Value | 2.28 | |
| P-Value | 0.03 | |

397.    Dr. Ragusa also determined as part of his split precinct analysis that the disparities in BVAP—between the portions of precincts assigned to the challenged districts and those portions assigned to neighboring districts—"are not a legacy of the benchmark plan." PTX-005 at 28–29. He concluded that the disparate treatment of Black and White voters within the same precinct is instead a "direct consequence of mapmakers' decisions during the most recent round of redistricting." *See id*. The Court credits his analysis and conclusions.

398.    The Court finds that the consistent splitting of precincts into a part with more Black voters and a part with fewer Black voters cannot be explained by splitting the precinct along partisan lines, even in a racially polarized environment.  That is because, as discussed above, the SJCLR's electoral or partisan data consisted only of precinct-level vote totals—those vote totals do not contain any information as to how Republican or Democratic voters are distributed *within a precinct.  See supra* ¶¶ 359–369.

399.    Accordingly, the Court finds that the pattern of racialized precinct splits cannot be explained "as anything other than [by] the use of race."  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:5–10, 1139:23–1140:14.  The only plausible explanation for the racialized pattern of precinct splits is reliance on sub-precinct level racial demographic data from the Census.  As discussed above, such data was available as part of the PL 94-171 file down to each census block, which allowed the state's mapmaker to identify the blocks where greater numbers of Black voters lived and then to exclude those blocks from the challenged districts.

400.    The Court finds that the overall effect of the racial disparities in the assignment of voters in and out of the five challenged districts, including the racialized precinct splits, was to lower the Black population within those districts.  It is undisputed that four of the five challenged districts saw their BVAP drop by about seven percentage points, while the fifth, HD 34, saw a decrease of 29 percentage points.  Defs. Ex. 3, Am. Expert Report of Dr. Thomas L. Brunell [hereinafter "DX-3"] at 4–5.  All five districts experienced among the steepest declines in BVAP when compared to the remaining 167 Senate and House districts and are clear outliers (all five challenged districts are to the left of the red reference line on the graph below).  *E.g.*, PTX-006 at 2–3; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:24–1055:17.

401.    As can be seen in Dr. Ragusa's chart below, the vast majority of the districts

experienced a change in BVAP % of less than 5% points.  *See* PTX-006 at 3–4 ("54.0% of districts

in the state had a 2% or less BVAP change in either direction, while 81.0% saw a 5% or less BVAP

change in either direction.").



402.    Prior to the 2022 redistricting, HD 34 had a BVAP of more than 60%, while SD 2,

SD 48, HD 22, and HD 64 had BVAPs between 36–40%.  PTX-005 at 12, 15, 19, 22, 25; DX-3 at

4–5.

403.    After the 2022 redistricting, the BVAP of all five districts dropped significantly, all

landing between 29–33% BVAP.  PTX-005 at 12, 15, 19, 22, 25; DX-3 at 4–5.

404.    The Court credits Dr. Ragusa's analysis, based on academic scholarship, that

districts in the South may be capable of electing a Black candidate when the BVAP is below 50%,

specifically in the range of 40–50% BVAP.  PTX-006 at 5 ("From 2013–2015, the most recent

period they examine . . . the probability of electing a Black lawmaker reaches 50/50 in the Deep

South when the BVAP is in the 48–49% range."); *see also* J. Ragusa Testimony, 3/4/2024 Trial

Tr. 1087:22–1088:4.  According to the academic literature that Dr. Ragusa relied on, districts with

BVAP "between 35–55%" may be sufficiently competitive (or close enough to being competitive) for Black candidates, such that changes in BVAP are likely to have an impact on electoral outcomes, whereas BVAP changes outside of that range have "little effect on the probability of electing a Black lawmaker."  PTX-006 at 5; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1088:2–4 ("[T]he BVAP reduction precisely in districts like the challenge[d] ones are uniquely consequential for making those districts less competitive for a Black candidate.").  Therefore, as Dr. Ragusa concluded, districts below 50% BVAP may be "prime targets for racial gerrymandering."  PTX-006 at 4.

405.    Defendants' expert Dr. Brunell's testimony corroborated Dr. Ragusa's opinion that districts with BVAP close to 40% would be prime targets for racial gerrymandering.  Dr. Brunell agreed that state legislative districts in some parts of the South have become competitive for Black voters when the BVAP is in the 40–50% range.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1355:2–6.  And Dr. Brunell further testified that districts with a BVAP close to 40% could exceed that threshold over the course of a census cycle if the Black population in those districts was growing.  *Id.* at 1355:7–10, 1356:1–5; 1356:11–17.

406.    The changes made to the five challenged districts in 2022 are therefore consistent with a deliberate pattern of lowering the BVAPs significantly below 35–40%, so that those districts do not potentially become competitive over the next decade.  Prior to the 2022 redistricting, four of the five challenged districts had a BVAP between 36.33 to 39.64%, i.e., very close to the 40% threshold that could produce some electoral opportunity for Black voters or candidates.  *See* DX-3 at 4–5.  The fifth district, HD 34, was a majority-Black district (BVAP of 60.49%), which Dr. Brunell agreed was likely to elect a Black candidate before its BVAP was dramatically reduced during redistricting—a scenario that Dr. Brunell conceded is "consistent with a racial

gerrymander." T. Brunell Testimony, 3/5/2024 Trial Tr. 1356:22–1357:9.  In all five districts, the State reduced the BVAP under 35%, i.e., below the threshold of potential competitiveness for legislative districts in the South.  *See* DX-3 at 4–5; PTX-006 at 5.

407.    The Court therefore credits Dr. Ragusa's finding that "the BVAP was reduced in all five of the challenge[d] districts in a way that is likely to be very consequential over the coming decade." J. Ragusa Testimony, 3/4/2024 Trial Tr. 1057:4–7.

408.    Overall, the Court finds Dr. Ragusa's methodology and testimony to be highly reliable and credible.  He relied on established statistical methods that other courts have recognized, utilized academic research, designed, and performed his own statistical analyses, and, furthermore, engaged with critiques of his methods in good faith by stress-testing his results using robustness checks and confirming that his conclusions withstand scrutiny.  The Court credits Dr. Ragusa's conclusion that his findings as to racial sorting "cannot be dismissed as a simple byproduct of partisan gerrymandering or adherence to those common redistricting principles."  J. Ragusa Testimony, 3/4/2024 Trial Tr. 983:3–5.

### C.    Dr. Thomas Brunell's Response to Dr. Ragusa

409.    Defendants' only critique of Dr. Ragusa's methodology comes from Dr. Brunell. For the reasons noted below, those critiques are both flawed and inherently limited to only some of Dr. Ragusa's analyses.  Moreover, those critiques will be accorded much less weight because the Court finds, for a multitude of reasons as set forth below, that Dr. Brunell's reports and conclusions were generally not credible.

410.    First, Dr. Brunell exhibited a concerning pattern of parroting information provided to him by his attorneys without verifying that information in any way:

    a.  Dr. Brunell admitted that he obtained the compactness scores in his report from

his attorney, and that he did not check the accuracy of the scores he received.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1330:20–1331:4.  Dr. Brunell failed to disclose the source of the compactness scores in his report.  *Id.* at 1330:13–19.

b.  Dr. Brunell testified that he did not calculate the BVAP figures used in his report, and he "assume[s] that counsel provided these data to" him, because his report did not disclose a source.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1331:12–20. When pressed on his assumption, Dr. Brunell testified he could not recall where those figures came from.  *Id.* at 1331:21–25.

c.  Dr. Brunell's report contains a series of map images, which purportedly show the racial demographics of Mr. Cooper's illustrative Senate and House plans. DX-3 at 16 n.1.  But Dr. Brunell received those maps from an individual named Ken Holland, who was retained by defense counsel, *id.*, and Dr. Brunell relied on those maps in his report without verifying their accuracy or assessing Mr. Holland's qualifications.   T. Brunell Testimony, 3/5/2024 Trial Tr. 1327:3–1328:1.

d.  Dr. Brunell's report cited the Secretary of State's Official and Statistical Register, which contains photographs of legislators, as his source for determining the racial composition of the state legislature.  DX-3 at 11.  But Dr. Brunell admitted that he did not personally utilize the source he cited, and that he instead relied on his attorneys to tally up the number of legislators who appeared to be Black based on their photographs, and that he did not personally check his attorney's work.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1327:3–1328:1.  Dr. Brunell's report did not disclose that the figures came from counsel.

*See* DX-3 at 11.

411.     Second, Dr. Brunell repeatedly relied on sources whose reliability is admittedly unknown, and he did not support his conclusions using peer-reviewed, academic articles.

    a.   Dr. Brunell relied on two sources from a website (governing.com) without knowing if the website "is a reliable source."  T. Brunell Testimony, 3/5/2024 Trial Tr. 1347:23–1348:4.   In fact, Dr. Brunell "had no idea where governing.com got its data from."  *Id.* at 1348:21–23.

    b.   In his response to Dr. Ragusa's racial gerrymandering analysis, Dr. Brunell failed to cite any peer-reviewed scholarship, and his only source—of any kind—was a generic quote from a statistician in 1987; nor did Dr. Brunell perform any statistical analysis of his own.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1349:10–1350:16.

    c.   During his trial testimony in response to Dr. Orey's turnout estimates, Dr. Brunell claimed to rely upon a non-peer reviewed report posted on the internet three days prior, even though he had not reviewed the underlying data or code, knew nothing of the authors or their qualifications or their academic reputation, and acknowledged that the report relied on data that the Census Bureau concluded failed to meet quality control standards.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1388:11–1389:7, 1391:8–13.

412.     Third, Dr. Brunell repeatedly contradicted his own statements on the stand and was impeached.

    a.   In his report, Dr. Brunell represented that Mr. Holland—the person he relied on to create maps for his report—"is proficient" in Maptitude.   DX-3 at 16.

However, Dr. Brunell admitted at trial that, at the time he prepared his report, he "actually did not know anything" about Mr. Holland's work and expertise.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1327:10–19.

b. Dr. Brunell testified at trial that he reviewed the legislative hearings about the 2022 redistricting—directly contradicting his deposition testimony that he had not participated in or reviewed any of those hearings.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1351:15–1352:8.

c. Dr. Brunell testified at trial that he knew "for a fact" that Dr. Ragusa's county envelopes are underinclusive of the areas that the legislature considered—again squarely contrary to his deposition testimony.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1359:21–1360:7.

d. Dr. Brunell also abandoned the conclusion in his report that Mr. Cooper "maximized" the number of Black-majority districts in his illustrative plans, acknowledging that his conclusion was "too forceful."  T. Brunell Testimony, 3/5/2024 Trial Tr. 1335:22–1336:9.

413.    Fourth, Dr. Brunell offered opinions in this case that are contrary to his own academic writings.

a. Dr. Brunell testified that there is no political "utility" to reducing the BVAP in four of the five districts challenged as racial gerrymanders, because they were below 50% BVAP prior to redistricting.  T. Brunell Testimony, 3/5/2024  Trial Tr. 1353:15–1355:1.   But Dr. Brunell's found in his published academic scholarship that districts in the 40–50% BVAP range, including in the South, have become competitive for Black candidates, and the four non-majority Black

districts here were on the verge of crossing the 40% BVAP threshold for competitiveness, including a BVAP that was as high as 39.64%.  DX-3 at 4–5.

b. Dr. Brunell's report claimed that "all [of Dr. Ragusa's] results are invalid," because Dr. Ragusa does not know "with certainty" what the legislature actually considered during redistricting.  DX-3 at 6 (emphasis in original).  But Dr. Brunell acknowledged at trial that he has personally published peer-reviewed scholarship analyzing legislative decision-making and drawing conclusions about whether race motivated the legislature's behavior, even when his models do not capture all of the possible considerations.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1362:3–1363:21.

414.    Fifth, Dr. Brunell repeatedly attempted to offer new opinions that were not disclosed in his reports, without any justification.

a. Dr. Brunell attempted to offer an undisclosed opinion at trial on the importance of party-switching on redistricting, even though that was beyond the scope of his reports.  T. Brunell Testimony, 3/5/2024  Trial Tr. 1294:7–25.

b. Dr. Brunell also offered an undisclosed opinion about one of Dr. Ragusa's models, acknowledging that the opinion is not contained in his reports.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1369:6–8.

415.    Sixth, Dr. Brunell is the proponent of a radical theory of redistricting that he concedes no one has accepted, premised on the idea that "competitive elections are bad for America," which is the title of Dr. Brunell's book.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1320:14–17, 1321:1–3, 1322:11–13.  In a state like Mississippi, Dr. Brunell's theory would have the effect of segregating Black and White voters into separate districts, including by packing Black

voters into districts with BVAP as high as 100%, even if doing so would require drawing "wildly noncompact districts" that split county and city boundaries. *Id.* at 1320:22–25, 1323:4–10, 1323:21–23.

416.    Other courts have declined to credit Dr. Brunell's testimony and conclusions for those same or similar reasons, in cases where he has offered similar testimony.

417.    In a case challenging Oregon's congressional districts, the special master (whose findings were adopted by a special five-judge panel) found Dr. Brunell's conclusions not creditable or reliable. *See* T. Brunell Testimony, 3/5/2024 Trial Tr. 1400:1–1403:4; *Clarno v. Fagan*, No. 21-CV-40180, 2021 WL 8972043, at *50 (Or. Cir. Nov. 5, 2021).

> a.    The court relied in part on the fact that "Dr. Brunell testified that he merely copied and pasted these figures from counsel—he did not otherwise know where the figures came from—and he never examined or verified the calculations that he reported." *Id.*
>
> b.    The court also criticized Dr. Brunell for including a map in his report, which he "knew little about." *Id.*
>
> c.    The court further found that Dr. Brunell "failed to cite any academic or peer-reviewed sources." *Id.* at 51.
>
> d.    Overall, the court concluded that "Dr. Brunell's conclusions lack even a minimum of academic or methodological rigor." *Id.* at 50. The court ultimately found that his methodology and conclusions "lack credibility" and are "unreliable." *Id.* at 51.

418.    In a case challenging Ohio's congressional districts as partisan gerrymanders, a three-judge panel found Dr. Brunell's testimony "unhelpful" and gave it little weight. T. Brunell

Testimony, 3/5/2024 Trial Tr. 1393:20–1398:1; *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978, 1058 n.621 (S.D. Ohio 2019).[12]   In that case, Dr. Brunell responded to the work of five experts, including Mr. Cooper and Dr. Handley, who are Plaintiffs' experts in this case.  *Id.* at 1058.

    a.   The panel characterized Dr. Brunell's various assessments of other experts as "quibbles," "entirely unhelpful," and failing to "contain any helpful critiques." *Id.* at 1060–62.

    b.   In response to Mr. Cooper's map in particular, Dr. Brunell opined that it was not clear why Mr. Cooper's proposal is "better" than the state's.  *Id.* at 1062.  The panel found that Dr. Brunell missed the point, because Mr. Cooper, as in this case, need not show that his maps are "better."  *Id.*

    c.   Similar to his criticism of Dr. Ragusa, Dr. Brunell in *Householder* opined that a plaintiff's expert failed to account for certain redistricting principles, such as equal population and incumbency, and therefore that expert's models "cannot serve as a good comparison" to the enacted plan. *Id.* at 1058–59.  The panel did "not find this critique persuasive."  *Id.*

    d.   The panel also faulted Dr. Brunell for offering "new and previously undisclosed expert opinions at trial," and excluded those opinions as "neither substantially justified nor harmless."  *Id.* at 1058 n.621.

    e.   The panel did not "give much weight to Dr. Brunell's report and testimony," in

---

[12] The *Householder* case was later vacated and remanded in light of *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), which held that partisan gerrymandering claims are non-justiciable. *Chabot v. Ohio A. Philip Randolph Inst.*, 140 S. Ct. 102 (2019).

part because "much of his report suffers from a scarcity of explanation." *Id.*

419.    In a case challenging North Carolina's legislative districts as partisan gerrymanders, a three-judge panel found that "Dr. Brunell's opinions were unpersuasive, sometimes inconsistent with prior testimony he has given, and [gave] them little weight."  T. Brunell Testimony, 3/5/2024 Trial Tr. 1398:4–1399:20; *Common Cause v. Lewis*, No. 18-CV-14001, 2019 WL 4569584, at *88 (N.C. Super. Sep. 03, 2019).[13]

  a.  The panel found that "Dr. Brunell's report and testimony contained numerous statements that were erroneous and reflect a failure to understand the work of Plaintiffs' experts." *Id.* at 90.

  b.  Similar to his critique of Dr. Ragusa in this case, Dr. Brunell opined that a plaintiff's expert's algorithm was "'different from the legislative criteria' in unspecified ways," and "he did no work to determine whether a different [methodology] would have affected" the expert's conclusions. *Id.*

  c.  Similar to his critique of Mr. Cooper in this case, Dr. Brunell erroneously testified that a plaintiff's expert "maximize[d]" a redistricting criterion.  *Id.*

  d.  The panel also "reject[ed] Dr. Brunell's testimony that the simulated maps are not proper comparisons to the enacted map to the extent they do not preserve the 'core' of an incumbent's district," because "Dr. Brunell acknowledged that he had "no idea if and to what extent core preservation was used" in the enacted map."  *Id.* (noting also that "no other witness testified that the 2017 Plans

---

[13] The *Lewis* decision was abrogated when the North Carolina Supreme Court ruled that partisan gerrymanders are non-justiciable.  *Harper v. Hall*, 886 S.E.2d 393, 448 (N.C. 2023).

preserved district cores").  Nor did Dr. Brunell perform any analysis to determine how incorporating core preservation would affect the results of the other expert's analysis.  *Id.*

e. Because of the numerous deficiencies in Dr. Brunell's methodology, the unhelpfulness of his critiques of Plaintiffs' experts, and the multiple instances of Dr. Brunell contradicting himself on the stand—all of which have been documented as a pattern of Dr. Brunell's behavior as an expert witness in other cases—the Court finds his testimony and analysis generally unreliable and assigns it little to no weight.

420.   In addition to his general lack of credibility, Dr. Brunell's critiques of Dr. Ragusa are not persuasive.  He admits that he does not rely on any academic sources, nor did he perform any statistical analysis of his own.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1350:7–16.  As a result, Dr. Brunell is unable to explain how any of his critiques might impact Dr. Ragusa's results, whether by causing the estimated effect of race to be an underestimate or an overestimate.  *Id.* at 1360:8–1361:5. Instead, Dr. Brunell engages in speculation about whether or not such flaws actually exist, such as whether Dr. Ragusa's county envelope approximations are in fact underinclusive or overinclusive; he contradicted his deposition testimony on this subject and was impeached.  *Id.* at 1359:11–1360:7.

421.   While Dr. Brunell criticizes Dr. Ragusa for not knowing "with certainty" every possible consideration that legislators may have had during redistricting, DX-3 at 6, he conceded he was not aware of any actual considerations that Dr. Ragusa's models failed to incorporate, let alone how any such considerations might impact Dr. Ragusa's results.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1351:15–1352:24.  Indeed, Dr. Brunell admitted that he did not "know what the

Legislature or mapmaker actually considered during redistricting." *Id.* at 1366:24–1367:2. Dr. Brunell's contention that Dr. Ragusa's work is "invalid" also runs counter to political science research that Dr. Brunell has personally published, in which he has performed regressions and drawn conclusions about legislative decision-making without needing to capture every possible consideration of every legislator. *Id.* at 1362:3–1363:24. The Court also credits Dr. Ragusa's testimony that various idiosyncratic considerations, such as the residence of an incumbent's relative, are unlikely to be driving the results of his regression analyses, which can only be explained by "a systemic pattern in how the blocks were selected" for each district. J. Ragusa Testimony, 3/4/2024 Trial Tr. 1074:5–22, 1128:20–1129:4. Similarly, incumbent protection, in the sense of ensuring that incumbents remain within their existing districts, also cannot explain the "total reconfiguration of the district like we [see] in the five challenged ones." *Id.* at 1072:21–1073:1.

422.    Dr. Brunell also notes that Dr. Ragusa's reports do not compare the effects of the race and party variables in the three regression models to determine which variable had a larger effect. For the reasons discussed below, *infra* ¶¶ 769–770, such a comparison is not required for proving racial predominance. In any event, the Court gives Dr. Brunell's opinion on this point minimal weight, because, as he admitted at trial, he could have determined the relative effect of the party variable himself, yet he presented no such results in his report to rebut Dr. Ragusa's conclusions. T. Brunell Testimony, 3/5/2024 Trial Tr. 1370:25–1371:13. The Court also credits Dr. Ragusa's testimony that the relative effects of the BVAP and Trump vote variables cannot be directly compared using the size of the coefficients in his logistic regression results and that such a comparison requires a separate analysis—a fact that Dr. Brunell does not appear to contest. *E.g.*, J. Ragusa Testimony, 3/4/2024 Trial Tr. 1012:17–1013:2, 1019:6–14 ("[T]he variables and the

coefficients are dependent on the mean of the variable, its standard deviation, and the units that they're measured in. That means that we can't simply eyeball the numbers and make comparisons across the factors."); *see* T. Brunell Testimony, 3/5/2024 Trial Tr. 1370:25–1371:7 (agreeing that he did not undertake separate analysis of the variables' relative effects).  Accordingly, there would be no basis in the record for the Court to conclude that the party variable had a larger effect than the race variable, even if that comparison were legally relevant.

423.    Dr. Brunell's critiques are almost entirely aimed at Dr. Ragusa's county envelope method, and are therefore not applicable to Dr. Ragusa's analysis of voters moved out of the challenged districts (Model 2), which does not use a county envelope.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1367:17–22.  Nor does Dr. Brunell offer any criticism of Dr. Ragusa's split-precinct analysis, which also does not rely on the county envelope method.  *Id.* at 1349:5–9.

424.    Ultimately, Dr. Brunell's limited critiques consist of generic and surface-level observations that can be made of almost any expert analyzing how a redistricting map is drawn, unsupported by any statistical analysis of his own to validate his criticisms.  *Id.* at 1353:3–14.  Dr. Brunell also attempts to hold Plaintiffs' experts to a standard that he acknowledges is "virtually impossible" to meet.  *Id.* at 1361:19–24; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1077:19–1078:4 ("No statistical analysis is a certainty."), 1095:15–1096:1 ("[I]t's impossible to take into consideration every conceivable single factor . . . . [I]t's undeniable that my analysis is capturing the main factors.").  As discussed above, Dr. Brunell has made similar critiques in other redistricting cases as well, and courts have declined to credit his conclusions.  T. Brunell Testimony, 3/5/2024 Trial Tr. 1399:2–20.

425.    The Court gives Dr. Ragusa's opinions far greater weight than Dr. Brunell's.

### D.    Racial Predominance in the Five Challenged Districts

#### 1.    Senate District 2

426.    Viewing all of the evidence in its totality, the Court finds that race predominated in the design of Senate District 2 under the Enacted Plan.

##### a.    Inconsistency with Traditional Redistricting Principles

427.    Enacted SD 2 consists of portions of DeSoto County.

428.    Based on a visual inspection, the Court finds that the Enacted Senate Plan significantly reconfigured the prior version of SD 2, which was a more compact, rectangular shape. In the Enacted Senate Plan, SD 2 is shaped like a question mark and is much more irregular in shape.

429.    As shown in the map image below, the Enacted Senate Plan removed high-BVAP precincts in Horn Lake to the west and Southaven in the center, avoided other high-BVAP areas in Southaven and around Northwest Community College, and added lower-BVAP precincts to the east and south, including Hernando and Pleasant Hill.  PTX-006 at 28.  (For this map and the ones that follow, which are included in Dr. Ragusa's report, blue areas reflect census blocks removed from the benchmark district to create the enacted district; purple areas were unchanged and remain in the enacted district; red areas were added to the benchmark district to create the enacted district; and darker shading reflects higher BVAP in the census block.)



430.    After the 2020 Census, the Benchmark SD 2 was overpopulated by 4,144 persons.

Stip. ¶ 73.  However, the Enacted Senate Plan removed 24,574 people from SD 2, retaining just

60% of its core population.  PTX-005 at 22.  In making those changes, which were largely not

needed to balance population, mapmakers assigned 35% of the residents drawn out of SD 2 to SD

11, which increased in BVAP from 61.57% in the Benchmark Plan to 62.88% in the Enacted

Senate Plan.  PTX-001 at 177–179, 244–246.

431.    The size of the reduction in SD 2's BVAP was a statistical outlier compared to the

other 2022 districts and therefore cannot be explained as a typical fluctuation in BVAP as a result

of ordinary redistricting changes.  PTX-006 at 3.  In total, 8,258 Black voting-age residents were

moved out of SD 2.  PTX-005 at 22.  SD 2 had a BVAP of 39.6% in the Benchmark Senate Plan

and has a BVAP of 32.88% in the Enacted Senate Plan, a reduction of 6.8%.  SD 2 had the

thirteenth largest reduction in BVAP out of all 174 Senate and House districts.  PTX-006 at 3; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:22–1055:17.

432.    The reduction in BVAP was achieved by cracking areas with large Black populations in DeSoto County.  *See also supra* ¶ 99.  The Court credits the analysis of Mr. Cooper, who explained that the enacted SD 2 "splits the densely populated areas of Horn Lake and Southaven across three different districts," and that Horn Lake is a majority-Black municipality.  PTX-001 at 31.  Indeed, Mr. Cooper demonstrated that the Black population in the area of Horn Lake is sufficiently numerous and concentrated to support a compact Black-majority County Supervisor district.  *See* PTX-1 at 30–31.

433.    The Court also finds based on its own visual analysis that the Enacted Senate Plan conspicuously splits Horn Lake across three different Senate Districts, as depicted below.  PTX-001 at 383.



PTX-001 at 383

434.    Mr. Cooper has also demonstrated that SD 2 could be configured differently, reducing county and municipality splits in the area.  PTX-001 at 32.

435.    The Court also credits the testimony of Plaintiff Pamela Hamner, who resides in enacted SD 2 and campaigned for the SD 2 seat in the November 2023 election, that the enacted SD 2 fails to respect communities of interest in the area and splits the municipalities of Horn Lake and Southaven in a manner that excludes Black voters from the district and reduces the electoral competitiveness of the district.  *See* P. Hamner Testimony, 2/28/2024 Trial Tr. 708:24–709:19, 712:17–22, 714:7–13, 715:10–17.

436.    The Court credits Ms. Hamner's testimony that Horn Lake likely has the "[h]ighest concentration of Black people" in all of DeSoto County.  *Id.* at 712:17–24.  Horn Lake, however, is split across three senate districts, even though, as Ms. Hamner testified, there are no notable differences in the various parts of Horn Lake that could justify such a division.  *Id.* at 713:22–714:6.

437.    The Court credits Ms. Hamner's testimony that Southaven also has a significant Black population, including a historical African American area known as Jago.  *Id.* at 716:5–717:13.  Jago has "a special meaning for Black voters" in the area, because many of them have a shared history tracing back generations as descendants of slaves and sharecroppers, and they, over generations, advanced civil rights and became lawyers and doctors who returned to the area to serve their community.  *Id.* at 717:1–13.

438.    Jago's historical significance to Black residents was known to the redistricting committee, who heard public testimony advocating for the preservation of Jago as an important community of interest.  JTX-025 at 5.

439.    Despite the redistricting committee's being made aware of Jago as a community,

176

the enacted SD 2, after splitting Horn Lake, hooks around and stretches to avoid Jago, so that it can continue further and capture areas with lower Black populations in areas such as Hernando, which is predominantly White. *See* P. Hamner Testimony, 2/28/2024 Trial Tr. 718:2–16, 718:23–719:19.

440.    The Court credits Ms. Hamner's testimony that, as a result of its non-compact shape, the enacted SD 2 consists of communities with dissimilar interests. Apart from differences in racial demographics, Hernando is wealthier, and unlike residents from Horn Lake and other parts of the district, are less concerned about expanding access to healthcare (because they are more likely to have insurance coverage) and improving public schools (because children in Hernando are more likely to attend private school and benefit from school vouchers). *Id.* at 720:25–721:19. The Court finds persuasive Ms. Hamner's testimony that Hernando had so little in common with the rest of the district that Ms. Hamner, who ran in SD 2 in 2023, could not hold campaign events in Hernando due to hostility to her campaign, with law enforcement being called on her canvassers. *Id.* at 722:15–24. Ms. Hamner had a similar experience campaigning in Hernando in 2021, when she ran for alderman. *Id.* at 710:1–4, 722:15–24.

441.    The Court finds that the net effect of those efforts to exclude Black voters from SD 2 was a district that consisted of 19 precincts in total, 11 of which were 70% or more White, with no precinct that was 70% Black. *Id.* at 709:24–710:11. Nine of the precincts were organized around churches with predominantly White congregations; none of the precinct locations was a Black church. *Id.* at 721:20–722:12.

442.    Ms. Hamner, who is Black, ultimately lost her race in SD 2 by 7%—mirroring the 7% reduction in SD 2's BVAP that occurred during the 2022 redistricting. *Id.* at 708:3–8.

443.    In light of the foregoing evidence, the Court finds that the design of enacted SD 2

is inconsistent with traditional redistricting principles, including compactness, respect for communities of interest, minimization of political subdivision splits, and core preservation. The Court further finds that the design of enacted SD 2 demonstrates the cracking of Black population in the area in order to lower the BVAP of the resulting district.

### b.   Significant Effect of Race

444.    Relying in part on his regression models, Dr. Ragusa concluded that "Black voters were excluded from the redrawn district in a statistically significant and substantively consequential fashion" even when controlling for the possibility of partisan gerrymandering. PTX-005 at 23.  The Court credits this analysis.

445.    First, Dr. Ragusa's Model 1 showed that BVAP was statistically significant in predicting the movement of precincts into SD 2 under the Enacted Senate Plan—census blocks with a larger BVAP were less likely to be moved into SD 2.  PTX-005 at 20; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1043:7–13.

446.    Race had a large effect on the movement of census blocks into SD 2.  Dr. Ragusa examined the effect size of the BVAP variable to determine the impact that the racial composition of a census block had on its inclusion in SD 2.  His analysis concluded that "blocks with no Black residents of voting age had an 18% chance of being drawn into SD #2.  By comparison, blocks with a BVAP of 50 had a 16% chance of being added to the district, blocks with a BVAP of 100 had a 15% chance of being added to the district, and blocks with 150 Black residents of voting age had less than a 12% chance of being added to SD #2."  PTX-005 at 20; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1044:7–17.

447.    Second, Model 2 reflected a statistically significant finding that census blocks with a larger BVAP were more likely to be moved out of SD 2.  *Id.*; *see also* J. Ragusa Testimony,

3/4/2024 Trial Tr. 1043:7–8, 14–18.

448.   Race had a large effect on the movement of census blocks out of SD 2.   Dr. Ragusa's analysis concluded that "blocks with no Black residents of voting age had a 32% chance of being drawn out of SD #2.   By comparison, blocks with a BVAP of 50 had a 43% chance of being removed from the district, blocks with a BVAP of 100 had a[n] 54% of being removed from the district, and blocks with 150 Black residents of voting age had a 64% chance of being drawn out of SD#2."   PTX-005 at 20; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1044:18–1045:2.

449.   Although Black voters were only 29% of the voting-age population moved into SD 2 in the Enacted Senate Plan, they were 44% of the voting age population moved out of the district. PTX-005 at 21–22; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1045:5–1046:6.

450.   Dr. Ragusa also conducted a robustness check of his multivariate analysis to determine whether altering the county envelope surrounding the challenged district—in response to Defense Expert Dr. Brunell's criticism that the envelope included parts of DeSoto County far from the boundaries of SD 2—would affect his conclusions.   His robustness check of SD 2 found that "even when restricting the analysis to the border of the benchmark district, we again find that race was a significant factor in the blocks added to the redrawn district…the robustness check based on Dr. Brunell's critique provides the same evidence of racial gerrymandering."   PTX-006 at 13–14; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1047:15–1048:9.

451.   Consistent with Dr. Ragusa's analysis, the Court finds that the population moved into SD 2 under the Enacted Senate Plan had fewer Black people than expected based on the demographics of the area around the district, while the population moved out of SD 2 had more Black people than expected based on the demographics of the district near the border.   PTX-005 at 22; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1045:5–1046:6.

452. The Court also credits Dr. Ragusa's analysis showing that Enacted SD 2 splits precincts in a racially disparate manner. Dr. Ragusa analyzed the BVAP of the three split precincts in SD 2, finding that "the splits assigned to SD #2 had an average BVAP of 24%, comprising 1,336 Black residents of voting age, compared to 38% for the splits added to a neighboring district, comprising 1,828 Black residents of voting age." PTX-005 at 23; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1047:1–6 ("[R]ace was used to disproportionately remove Black voters from the district."). Dr. Ragusa also determined that the mapmakers' decision to do so contributed to the reduction in BVAP % and validated his multivariate results showing that race was a significant factor in the composition of SD 2 in the Enacted Senate Plan. *Id.*

453. The Court credits Dr. Ragusa's analysis and conclusion that the patterns of sorting by race in the split precincts in SD 2 cannot be explained by partisan gerrymandering. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:5–10, 1139:23–1140:14.

454. The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience of race in the construction of SD 2 and finds that race, not traditional redistricting principles or sorting on the basis of partisanship, better explains the design of SD 2. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1048:14–23 ("I conclude that there is significant evidence of racial gerrymandering in SD2. The multivariate statistical analyses that control for partisanship and traditional redistricting principles indicate that Black voters were systematically excluded from the redrawn district. That conclusion is confirmed by the raw data. It is also confirmed by the precinct splits.").

455. The Court finds that the net effect of the changes to SD 2 was the exclusion of a significant number of Black voters from the district, resulting in a reduction of the district's BVAP % by approximately 7 points. J. Ragusa Testimony, 3/4/2024 Trial Tr. 1046:5–12; DX-3 at 4.

That significant reduction in BVAP % caused SD 2 to lose any realistic possibility of being competitive for Black voters or Black candidates in the coming decade.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1046:5–17 ("I would characterize that as a significant removal of Black voters from the district.  I believe that's likely to be consequential in the coming decade as far as the election of Black candidates."); *see also* T. Brunell Testimony, 3/5/2024 Trial Tr. 1355:2–6, 1357:6–9.

456.    Based upon all the evidence provided by expert and fact witnesses and a visual inspection of the enacted SD 2 (as compared to the prior 2019 district and the alternative illustrative district drawn by Mr. Cooper), the Court finds that race predominated in the design of SD 2; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of county and municipality splits, were subordinated to race; that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of census blocks had a significant effect on the block's assignment under the Enacted Senate Plan, even after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted SD 2; and that the resulting reduction in BVAP in SD 2 was substantively meaningful and impactful in reducing the likelihood that a Black candidate (or any candidate preferred by Black voters) would be able to be elected.  The Court further finds that the design of enacted SD 2 demonstrates the cracking of Black population in the area in order to lower the BVAP of the resulting district.

### 2.    *Senate District 48*

457.    Viewing all of the evidence in its totality, the Court finds that race predominated

in the design of SD 48 under the Enacted Senate Plan.

*a. Inconsistency with Traditional Redistricting Principles*

458.    Enacted SD 48 consists of portions of Hancock and Harrison Counties.

459.    Based on a visual inspection, the Court finds the Enacted Senate Plan significantly reconfigures the prior version of SD 48 that was in place in 2019, which was entirely within Harrison County, creating a much less compact district by reaching into Hancock County and excising a central part of Gulfport.

460.    As shown below, the Enacted Senate Plan removes high-BVAP census blocks in the northeast portion of benchmark SD 48 (the Bel-Aire area precincts) and in the center of Gulfport, while adding low-BVAP census blocks to the southeast, reaching across a large waterway and into Hancock County to do so.  PTX-006 at 27 (blue blocks were removed; red blocks were added; purple blocks were kept; darker shading reflects higher BVAP).



461.    As a result, SD 48 splits two counties, whereas the benchmark SD 48 was contained entirely within Harrison County.  PTX-006 at 29.

462.    After the 2020 Census, SD 48 in the Benchmark Plan was overpopulated by 5,707 persons.  Stip. ¶ 76.  However, under the Enacted Senate Plan, mapmakers *added* 12,208 residents to the already over-populated district, ultimately resulting in the unnecessary removal of thousands of additional residents and retaining just 75% of the district's core population.  PTX-005 at 25.

463.    The size of the reduction in SD 48's BVAP was a statistical outlier compared to other enacted districts and therefore cannot be explained as a typical fluctuation in BVAP as a

result of ordinary redistricting changes.  In total, 5,607 Black voting-age residents were moved out of SD 48.  PTX-005 at 25.  SD 48 had a BVAP of 36.3% in the Benchmark Senate Plan and has a BVAP of 29.4% in the Enacted Senate Plan, a reduction of 6.9%.  Stip. ¶ 75.  SD 48 had the twelfth largest reduction in BVAP out of all 174 Senate and House districts.  PTX-006 at 3; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:22–1055:17.

464.    The Court finds that this reduction in BVAP was achieved by cracking Black communities in Gulfport and reaching into Hancock County to pick up precincts with lower BVAP.

465.    The Court credits the testimony of Mr. Cooper, who produced an alternative map for SD 48 that better complies with traditional redistricting principles, including by reducing the number of county, municipality, and VTD splits.  W. Cooper Testimony, 2/26/2024 Trial Tr. 141:10–142:1.  Mr. Cooper explained that, under the Enacted Senate Plan, "there's no district in or around Gulfport at the Senate level that has more than 30 percent or so Black population," even though an opportunity district for Black voters, with BVAP in the low 40% range and a minority VAP around 50%, could be readily created largely by combining the area comprising two existing Gulfport-area House districts.  *Id.* at 139:21–140:14.

466.    The Court also credits the testimony of Plaintiff Gary Fredericks, who resides in enacted SD 48 and who ran for office there in 2019, that the enacted SD 48 fails to respect communities of interest in the area and splits Gulfport and surrounding majority-Black communities in a manner that excludes Black voters there from the district and reduces the electoral competitiveness of the district.

467.    As described *supra*, Gary Fredericks is a lifelong resident of Gulfport, Mississippi (except for when he went to graduate school), and he leads the local Gulfport NAACP chapter.  G.

Fredericks Testimony, 2/29/2024 Trial Tr. 890:7–19; 891:13–15; 893:8–24.  Mr. Fredericks ran

for SD 48 in 2018–2019.  *Id.* at 895:11–17.  He defeated Senator Debbie Dawkins, a White

Democrat, in a primary; Sen. Dawkins was an incumbent who held the seat for over 20 years.  *Id.*

at 896:1–10.  He then lost the general election to Mike Thompson, a White Republican, by about

400 votes.  *Id.* at 896:11–19.  After Mr. Fredericks lost SD 48 in a close election, the legislature

changed the districts in the 2022 redistricting process.  *Id.* at 896:20–25.  The makeup of the

population changed "drastically," *id.* at 899:3–5, in the following three ways:

      a.  A "historic African-American" area around 19th Street and 33rd Avenue in

          central Gulfport was removed from the district.  *Id.* at 902:12–20.  Mr. Fredericks

          testified that in his extensive familiarity with the district from his community

          service, work, and campaigning in the area, *id.* at 900:23–901:21, there was no

          reason that the area removed might be considered a separate community from

          the rest of Gulfport, *id.* at 902:23–903:1.

      b.  An area in northeastern Gulfport with a "mostly African-American population,"

          developed after Hurricane Katrina, in the north of the district around Dedeaux

          Road was also removed, *id.* at 903:17–904:3, which Mr. Fredericks testified

          about based on his family and business ties to the area, *id.* at 903:10–16.

      c.  A "majority white" area stretching from West Pass Christian to Bay St. Louis

          across the bridge from Hancock into Harrison County was also added, *id.* at

          904:11–905:2, which Mr. Fredericks testified to based upon his time

          volunteering and working in that area, *id.* at 905:3–4.

    468.    As a lifelong resident of Gulfport, Mr. Fredericks testified that the redraw of SD 48

was "confusing, especially after the minority growth after the 2020 census" and that it "diluted the

Black vote," *id.* at 906:9–15, impacting the Black community in the area "largely," *id.* at 906:16–18, including because there is "no engagement" with his current representatives, *id.* at 907:9–18.

469.    Mr. Fredericks' testimony aligns with Mr. Cooper's finding that a hypothetical majority-minority Senate district could be drawn in Gulfport while avoiding the unnecessary split of Gulfport and extension into Hancock County.  PTX-001 at 51–52.

470.    In light of the foregoing evidence, the Court finds that the design of enacted SD 48 is inconsistent with traditional redistricting principles, including compactness, respect for communities of interest, respect for political subdivisions, and core preservation.  The Court further finds that the design of enacted SD 48 demonstrates the cracking of Black population in the area in order to lower the BVAP of the resulting district.

### b.   *Significant Effect of Race*

471.    Relying in part on his regression models, Dr. Ragusa concluded that "Black voters were excluded from the redrawn district in a statistically significant and substantively consequential fashion" even when controlling for the possibility of partisan gerrymandering.  PTX-005 at 26.

472.    First, Dr. Ragusa's Model 1 showed that BVAP was statistically significant in predicting the movement of census blocks into SD 48 under the Enacted Senate Plan.  census blocks with a larger BVAP were significantly less likely to be moved into SD 48.  *Id.*; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1049:8–17.

473.    Race had a large effect on the movement of census blocks into SD 48.  Dr. Ragusa found that "blocks with no Black residents of voting age had [a] 17% chance of being drawn into SD #48.  By comparison, blocks with a BVAP of 50 had a 9% chance of being added to the district, [b]locks with a BVAP of 100 had a 3% chance of being added to the district, and [b]locks with

186

150 Black residents of voting age had only a 1% chance of being added to SD#48." PTX-005 at 23; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1050:11–1051:1.

474.     Second, Model 2 showed that census blocks with a larger BVAP were significantly more likely to be moved out of SD 48. PTX-005 at 23; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1049:8–12, 18–22.

475.     Race also had a large effect on the movement of census blocks out of SD 48. Dr. Ragusa found that "blocks with no Black residents of voting age had a 15% chance of being drawn out of SD #48. By comparison, blocks with a BVAP of 50 had a 23% chance of being removed from the district, blocks with a BVAP of 100 had a[n] 33% of being removed from the district, and blocks with 150 Black residents of voting age had a 45% chance of being drawn out of SD #48." PTX-005 at 24. J. Ragusa Testimony, 3/4/2024 Trial Tr. 1051:2–9.

476.     The Court also credits Dr. Ragusa's testimony that Models 1 and 3 point in opposite and therefore inconsistent directions with respect to partisan gerrymandering in SD 48. Specifically, the results of Model 3 indicate that Trump voters were significantly less likely to be moved in or kept in enacted SD 48, which is inconsistent with an effort to increase the number of Republican voters in the district. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1049:23–1050:8; PTX-005 at 30. By contrast, in the models where race is significant, the direction is "always" consistent: Black voters were less likely to be added in, and more likely to be removed. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1018:21–1019:5, 1049:11–22, 1056:16–1057:4; *see also* T. Brunell Testimony, 3/5/2024 Trial Tr. 1370:3–15 (agreeing that the race variable consistently points in "the direction that we would expect for reducing the BVAP in the challenged district").

477.     While Black voters were 17% of the voting-age population moved into SD 48 in the Enacted Senate Plan, they were a far higher 48% of the voting age population moved out of

the district.  PTX-005 at 25; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1051:12–25.

478.    Consistent with Dr. Ragusa's analysis, the Court finds that the population moved into SD 48 under the Enacted Senate Plan had fewer Black people than expected, based on the demographics of the area around the district, while the population moved out of SD 48 had more Black people than expected based on the demographics of the district near the border.  PTX-005 at 25.

479.    Dr. Ragusa also conducted a robustness check of his multivariate analysis to determine whether altering the county envelope surrounding the challenged district—in response to Defense Expert Dr. Brunell's criticism that the envelope may be under-inclusive—would affect his results.  His robustness check of SD 48 found that even when expanding the county envelope to include additional portions of Hancock County, race was a significant factor in the blocks added to the redrawn district, and Dr. Ragusa's models provide the same evidence of racial gerrymandering.  PTX-006 at 14–15; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1052:22–1053:3.

480.    The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience of race in the construction of SD 48 and finds that race, not traditional redistricting principles or sorting on the basis of partisanship, better explains the design of SD 48.  PTX-005 at 26 ("Black voters were excluded from the redrawn district in a statistically significant and substantively consequential fashion . . . . even when controlling for a host of closely related explanations for the district's configuration, most notably partisan gerrymandering."); J. Ragusa Testimony, 3/4/2024 Trial Tr. 1049:19–22 ("Black voters were more likely to be moved out of the [enacted SD 48]. Once again, that's controlling for partisanship and traditional redistricting principles.").

481.    The Court also credits the testimony of Plaintiff Gary Fredericks that the enacted SD 48 fails to respect communities of interest in the area and splits Gulfport and surrounding

majority-Black communities in a manner that excludes Black voters there from the district and reduces the electoral competitiveness of the district. Mr. Fredericks' testimony aligns with Mr. Cooper's finding that a hypothetical majority-minority Senate district could be drawn in Gulfport while avoiding the unnecessary split of Gulfport and extension into Hancock County. PTX-001 at 51–52.

482. The Court finds that the net effect of the changes to SD 48 was the exclusion of a significant number of Black voters from the district, resulting in a reduction of the district's BVAP % by approximately 7 points. J. Ragusa Testimony, 3/4/2024 Trial Tr. 1052:1–13; DX-3 at 4. That significant reduction in BVAP caused SD 48 to lose any realistic possibility of being competitive for Black voters or Black candidates in the coming decade. J. Ragusa Testimony, 3/4/2024 Trial Tr. 1052:1–13 ("I would characterize this as a consequential reduction in the district's BVAP, one that is likely to render it less competitive or even noncompetitive for Black candidates in the coming decade."); *see also* T. Brunell Testimony, 3/5/2024 Trial Tr. 1355:2–6, 1357:6–9.

483. Based upon all relevant evidence and a visual inspection of the enacted SD 48, as compared to the prior 2019 district and the alternative illustrative district drawn by Mr. Cooper, the Court finds that race predominated in the design of SD 48; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of county and municipality splits, were subordinated to race; and that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of census blocks has a significant effect on the block's assignment under the Enacted Senate Plan, even after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted SD 48. The Court

further finds that the design of enacted SD 48 demonstrates the cracking of Black population in the area in order to lower the BVAP of the resulting district.

### 3.   House District 22

484.   Viewing all of the evidence in its totality, the Court finds that race predominated in the design of HD 22 under the Enacted House Plan.

#### a.   Inconsistency with Traditional Redistricting Principles

485.   Enacted HD 22 consists of portions of Chickasaw, Monroe, and Pontotoc counties.

486.   Based on a visual assessment, the Court finds that the Enacted House Plan significantly reconfigured the prior HD 22, which had included the entirety of Chickasaw County and part of Pontotoc County, creating a much more oddly shaped district. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1008:15–20 (describing new HD 22's new "appendage" that makes the district significantly less compact post-redistricting).

487.   As shown below, the Enacted House Plan removes high-BVAP census blocks in Okolona (a municipality in eastern Chickasaw County) and other such blocks in eastern Pontotoc County, before reaching into a part of Monroe County to grab multiple low-BVAP precincts. PTX-006 at 22 (blue blocks were removed from the benchmark; red blocks were added; purple blocks were kept; darker shading reflects higher BVAP).



488.    As a result of those changes, the enacted HD 22 splits three counties, whereas the benchmark HD 22 split only Pontotoc County.  PTX-006 at 21; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1008:21–1009:3.  Not only are Chickasaw and Monroe Counties split, they are split into thirds, including parts that are completely severed from the rest of the county (blue parts of Chickasaw and the gray parts of Monroe County shown in the above map).  PTX-006 at 22.

489.    As noted, the Court credits the testimony of Mr. Cooper, who described the enacted plan as "cracking Black population in the midsection of Chickasaw and Monroe Counties," as well as the testimony of Dr. Ragusa, who similarly explained how the enacted HD 22 splits Chickasaw

County along racial lines to grab low-BVAP precincts in Monroe County. *See* W. Cooper Testimony, 2/26/2024 Trial Tr. 142:21–143:8; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1009:4–21. As Dr. Ragusa pointed out at trial, enacted HD 22 splits the Egypt precinct in Chickasaw County, using the White area of the precinct as a land bridge to avoid predominantly Black areas to the north and south, including the city of Okolona, in order to reach Monroe County. *Id.* ("[T]hat corridor that extends between Chickasaw and Monroe County has some significant racial implications in my analysis."); *id.* at 1010:17–23 ("To the north of Egypt and to the south of Egypt are particularly notable, given that the corridor seems to have very few Black voters, where those two areas have large concentrations of Black voters."). Once inside Monroe County, the enacted HD 22 curves upward to avoid municipalities with Black populations, like Aberdeen. *See* PTX-006 at 22.

490. After the 2020 Census, HD 22 was underpopulated by 513 residents, with a total population of 23,760. Stip. ¶ 84; PTX-005 at 12 n.20. Based on the State's redistricting criteria, it was not necessary to redraw HD 22 at all—its 513-person population deviation from the ideal district size is within the +/-5% deviation range. *See* Stip. ¶ 57; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1022:9–19. However, under the Enacted House Plan, the district removed 8,321 of these residents, equivalent to 35% of the district's core population. PTX-005 at 12.

491. The size of the reduction in HD 22's BVAP was a statistical outlier when compared to other enacted districts and therefore cannot be explained as a typical fluctuation in BVAP as a result of ordinary redistricting changes. In total, 3,186 Black voting-age residents were moved out of HD 22. PTX-005 at 12. HD 22 had a BVAP of 37.1% in the Benchmark House Plan and now has a BVAP of 29.9% in the Enacted House Plan, a reduction of 7.2%. Stip. ¶ 83. HD 22 had the ninth largest reduction in BVAP out of all 174 Senate and House districts. PTX-006 at 3; J. Ragusa

192

Testimony, 3/4/2024 Trial Tr. 1054:22–1055:17.

492.    Black voters represent 49% of the voters moved out of HD 22 in the Enacted House Plan.  PTX-005 at 11.  Of the Black voters drawn out of HD 22, most were moved into HD 16, which was already a majority-Black district.  *Id.*

493.    The Court further credits the analysis of Mr. Cooper, who demonstrated that HD 22 could be configured differently, to become a more compact district while reducing county and municipality splits in the area.  PTX-1 at 63; W. Cooper Testimony, 2/26/2024 Trial Tr. 142:21– 144:6.  Mr. Cooper's Illustrative HD 22 contains only two counties, and links together the communities of Houston, Okolona, and Aberdeen along the Highway 45 transportation corridor, instead of splitting them across three districts as the Enacted House Plan does.  PTX-1 at 63; *see also supra* ¶ 126.

494.    The Court also credits the testimony of Ms. Mamie Cunningham that the enacted HD 22 fails to respect communities of interest in the area.  M. Cunningham Testimony, 2/27/2024 Trial Tr. 233:2–23, 234:1–2.  Consistent with Dr. Ragusa's analysis, Ms. Cunningham testified that the enacted HD 22 carves predominantly Black areas in Chickasaw County out of the district, including the southeast part of the county where she resides, and the city of Okolona to the north. *Id.* at 249:3–22.  Ms. Cunningham also testified that Aberdeen, the portion of Monroe County that is excluded from the area added to HD 22, is majority Black.  *Id.* at 250:16–19.

495.    In light of the foregoing evidence, the Court finds that the design of enacted HD 22 is inconsistent with traditional redistricting principles, including compactness, respect for communities of interest, respect for political subdivisions, and core preservation.

### b.  Significant Effect of Race

496.    Relying in part on his regression models, Dr. Ragusa concluded that "Black voters

were drawn out of the district in a statistically significant and substantively consequential fashion" even when controlling for the possibility of partisan gerrymandering. PTX-005 at 13.

497.   The results of Dr. Ragusa's Model 2 showed that BVAP was statistically significant in predicting the movement of census blocks out of HD 22—blocks with a larger BVAP were more likely to be moved out to another district. PTX-005 at 10. This finding is statistically significant at a 95% level of confidence. *Id.* at 30; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1013:25–1014:15.

498.   Race had a large effect on the movement of census blocks out of HD 22. Dr. Ragusa found that "blocks with no Black residents of voting age had a 29% chance of being drawn out of HD #22. By comparison, blocks with a BVAP of 50 had a 59% chance of being removed from the district and blocks with a BVAP of 100 had an 84% of being drawn out of HD #22." PTX-005 at 11.

499.   Consistent with Dr. Ragusa's analysis, the Court finds that the population moved out of HD 22 under the Enacted House Plan had more Black people than expected based on the demographics of the district, particularly in the areas near the border. PTX-005 at 11; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1021:23–1022:8. Although "Black voters comprised 37% of the benchmark district and 32% of voters on the border of the district," they "represent 49% of those who were drawn out of HD #22 by the enacted plan." PTX-005 at 11. The majority of the Black population moved out of HD 22 was packed into the neighboring HD 16, a Black-majority district which saw its BVAP increase to 62%. *Id.*

500.   Although Dr. Ragusa's initial analysis of HD 22 yielded statistically significant results for race under Model 2, which does not rely on the county envelope method, Dr. Ragusa nonetheless conducted a robustness check for Model 1, in response to Dr. Brunell's critique that the county envelope may be under-inclusive. PTX-006 at 10. The results of the expanded county

envelope analysis, which includes all of Monroe County instead of only the portion actually added to HD 22, shows that "Black voters were significantly less likely to be moved into the redrawn district." PTX-006 at 10; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1028:2–16. In other words, when the State was adding voters from Monroe County into HD 22, it disproportionately added White voters, even after controlling for partisanship. PTX-006 at 10 ("[T]he additions to HD #22 from Monroe County have a lower BVAP compared to the blocks that were not chosen.").

501.   The Court also credits Dr. Ragusa's testimony that Models 1 and 2 point in conflicting directions with respect to the effect of partisanship in the construction of HD 22. Specifically, the results of Model 1 show that "that blocks with a large Trump population were less likely to be moved into the district," which is inconsistent with an effort to increase the number of Republican voters in the district. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1015:9–21; PTX-005 at 30. By contrast, in the models where race is significant, the direction is "always" consistent: Black voters were less likely to be added in, and more likely to be removed. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1018:21–1019:5, 1049:11–22, 1056:16–1057:4; *see also* T. Brunell Testimony, 3/4/2024 Trial Tr. 1370:3–15 (agreeing that the race variable consistently points in "the direction that we would expect for reducing the BVAP in the challenged district").

502.   The enacted HD 22 splits five precincts, and it does so in a racially disparate manner. Dr. Ragusa analyzed the BVAP of these split precincts, finding that "[i]n all five instances, the portions assigned to HD 22 had a lower BVAP % than the portions assigned to neighboring districts." PTX-005 at 12; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1024:23–1025:12. The effect of race on the movement of voters out of HD 22 was extremely large according to Dr. Ragusa's analysis: blocks with no Black residents of voting age had a 29% chance of being drawn out of HD 22, but blocks with 100 Black residents had an 84% of being drawn out of HD

22.  PTX-005 at 11.

503.     The Court credits Dr. Ragusa's analysis and conclusion that the patterns of sorting

by race in the split precincts in HD 22 cannot be explained by partisan gerrymandering.  *See* J.

Ragusa Testimony, 3/4/2024 Trial Tr. 1054:5–10, 1139:23–1140:14.

504.     The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience

of race in the construction of HD 22 and finds that race, not traditional redistricting principles or

sorting on the basis of partisanship, better explains the design of HD 22.  PTX-005 at 13 ("Black

voters were drawn out of the district in a statistically significant and substantively consequential

fashion . . . even when controlling for a host of closely related explanations for the district's

configuration, most notably partisan gerrymandering."); J. Ragusa Testimony, 3/4/2024 Trial Tr.

1028:17–1029:5 (finding "significant evidence of racial gerrymandering in HD22," even after

"control[ling] for partisanship and traditional redistricting principles").

505.     The Court finds that the net effect of the changes to HD 22 was the exclusion of a

significant number of Black voters from the district, resulting in a reduction of the district's BVAP

% by approximately 7 points.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1022:20–1023:10; DX-3

at 4.  That significant reduction in BVAP % caused HD 22 to lose any realistic possibility of being

competitive for Black voters or Black candidates in the coming decade.  J. Ragusa Testimony,

3/4/2024 Trial Tr. 1022:20–1023:10 ("I would characterize that [7% drop in BVAP %] as a

particularly significant change given the BVAP prior to redistricting.  Research indicates that that

would be a modestly competitive district for a Black candidate, but by moving it down by a

seemingly small 7 percent, mapmakers likely moved it out of competitive territory for a Black

candidate."); T. Brunell Testimony, 3/5/2024 Trial Tr. 1355:2–6, 1357:6–9.

506.     Based upon all relevant evidence provided by expert and fact witnesses and a visual

inspection of the enacted HD 22 (as compared to the benchmark district and the alternative illustrative district drawn by Mr. Cooper), the Court finds that race predominated in the design of HD 22; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of county and municipality splits, were subordinated to race; that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of census blocks has a significant effect on the block's assignment under the Enacted House Plan, even after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted HD 22; and that the resulting reduction in BVAP in HD 22 was substantively meaningful and impactful in reducing the likelihood that a Black candidate (or any candidate preferred by Black voters) would be able to be elected. The Court further finds that the design of enacted HD 22 demonstrates the cracking of Black population in the area in order to lower the BVAP of the resulting district and the packing of Black population in the majority-Black HD 16.

### 4.   House District 34

507.    Viewing all of the evidence in its totality, the Court finds that race predominated in the design of HD 34 under the Enacted House Plan.

#### a.   Inconsistency with Traditional Redistricting Principles

508.    Based on a visual assessment, the Court finds that the Enacted House Plan dramatically reconfigured HD 34, creating a much less compact and more irregularly shaped district that bears little resemblance to the original.

509.    As shown in the map image below, PTX-006 at 23, the prior version of HD 34 included portions of Grenada, Leflore County, Holmes, and Carroll Counties. The enacted version

of HD 34 drops virtually all of the high-BVAP areas in the prior district, withdrawing entirely

from Holmes, Leflore, and Tallahatchie Counties, while also eliminating parts of Grenada and

Carroll Counties.  The enacted HD 34 instead reaches up to Yalobusha and Lafayette Counties to

primarily add areas with low BVAP.  PTX-006 at 23.  HD 34 now consists of Yalobusha County

and—due to splitting—portions of Lafayette, Grenada, and Carroll Counties.



510.    As a result of those changes, the enacted HD 34 bears virtually no resemblance to

the prior district.  As Dr. Ragusa observed in his report, HD 34 retains "just 27% of the benchmark population" and is "among the most heavily redrawn districts" during this redistricting cycle. PTX-006 at 11; PTX-005 at 15.

511.    Removing voters from the benchmark HD 34 was not necessary to balance population.  After the 2020 Census, the benchmark HD 34 was underpopulated by 3,253 persons. Stip. ¶ 86.  The Enacted House Plan *removed* an additional 15,286 people from HD 34 and then *added* 19,502 people.  PTX-005 at 15.  Overall, the State removed 3,442 Black voters from the benchmark HD 34, cutting the district's BVAP nearly in half.  *Id.*

512.    In the Enacted House Plan, mapmakers moved HD 33 to the southeastern part of the state and, in doing so, assigned the district's population to both HD 30 and HD 34.  The portion assigned to HD 34 had a BVAP of only 35%, while the portion assigned to HD 30, which was already majority-Black, had a BVAP of 53%.  PTX-005 at 15.  The Enacted House Plan also adds portions of Carroll and Lafayette Counties, which had a BVAP of 12% and 24% respectively, to HD 34.  *Id.* at 16.

513.    The size of the reduction in HD 34's BVAP was an extreme statistical outlier and therefore cannot be explained as a typical fluctuation in BVAP as a result of ordinary redistricting changes.  Due to the assignment of the low-BVAP areas to HD 34, the district's BVAP "declined by roughly 30%."  PTX-005 at 15.  HD 34 had a BVAP of 60.5% in the Benchmark House Plan and now has a BVAP of 31.6% in the Enacted House Plan, a reduction of 28.9%.  Stip. ¶ 85.  HD 34 had the second largest reduction in BVAP under the Enacted House Plan out of all 174 Senate and House districts.  PTX-006 at 3; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:22–1055:17.

514.    The Court further credits the analysis of Mr. Cooper, who demonstrated that HD 34 could be configured differently, to become a more compact district while reducing county splits

in the area.  PTX-001 at 77.

515.    In light of the foregoing evidence, the Court finds that the design of enacted HD 34 is inconsistent with traditional redistricting principles, including compactness, respect for communities of interest, respect for political subdivisions, and core preservation.

### b.  Significant Effect of Race

516.    Relying in part on his regression models, Dr. Ragusa concluded that "Black voters were excluded from the redrawn district in a statistically significant and substantively consequential fashion" even when controlling for the possibility of partisan gerrymandering.  PTX-005 at 16.

517.    The results of Dr. Ragusa's Model 1 showed that BVAP was a statistically significant predictor of the movement of census blocks into HD 34—blocks with a larger BVAP were significantly less likely to be moved into HD 34.  This finding is statistically significant at a 99% level of confidence.  Similarly, Model 3 showed a statistically significant finding that census blocks with a larger BVAP were less likely to be moved into or kept in HD 34.  This finding is also statistically significant at a 99% level of confidence.  PTX-005 at 13, 30; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1030:15–1031:6.

518.    Race had a large effect on the inclusion of census blocks in HD 34.  Dr. Ragusa found that under Model 1, "blocks with no Black residents of voting age had a 33% chance of being drawn into HD #34.  By comparison, blocks with a BVAP of 50 had a 6% chance of being added to the district and blocks with 100 Black residents of voting age had less than a 1% chance of being added to HD #34."  PTX-005 at 13.  Model 3 yielded similar results.  *Id*.; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1031:9–1032:10.

519.    Although Black voters were 32% of the voting-age population moved into HD 34

in the Enacted House Plan, they were also 72% of the voting-age population moved out of the district.  PTX-005 at 15; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1032:13–1033:2.

520.    Consistent with Dr. Ragusa's analysis, the Court finds that the population moved into HD 34 under the Enacted House Plan had fewer Black people (32%) than expected based on the demographics of the area around the district (51% BVAP), while the population moved out of HD 34 had more Black people (72% BVAP) than expected based on the demographics of the district near the border (60% BVAP).  PTX-005 at 15.  In other words, the population that was moved into HD 34 was disproportionately White, while the population that was moved out was disproportionately Black.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1032:13–1033:2.

521.    Dr. Ragusa also conducted a robustness check of his multivariate analysis to determine whether altering the county envelope surrounding the challenged district—in response to criticism from Defendants' expert, Dr. Brunell, that the envelope may be overbroad—would affect his results.  The robustness check showed that, even when restricting the envelope to Grenada and Yalobusha Counties, which hold 93% of the district's population in the Enacted House Plan, "race was [again] a significant factor" and indicated that "Black voters were significantly less likely to be moved into" HD 34.  PTX-006 at 11; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1033:14–1034:14, 1034:16–1035:11.

522.    The enacted HD 34 splits four precincts along racial lines, such that "Black voters were disproportionately moved into the neighboring district."  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1033:5–13; PTX-005 at 16.  "In total, the splits assigned to HD #34 had an average BVAP of 24%, comprising of 708 Black residents of voting age, compared to 50% for the splits added to a neighboring district, comprising 3,131 Black residents of voting age."  PTX-005 at 16. Specifically, Black voters comprise 24 percent of the portion that was kept in the challenged

district, that compares to 50 percent that were moved into a neighboring district.).  He also determined that the mapmakers' decision to do so contributed to the reduction in BVAP % and validated his multivariate statistical analysis findings that race was a significant factor in the composition of HD 34 in the Enacted House Plan.  *Id.*; J. Ragusa Trial Tr. 1033:5–13.

523.    The Court credits Dr. Ragusa's analysis and conclusion that the patterns of sorting by race in the split precincts in HD 34 cannot be explained by partisan gerrymandering.  *See generally* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:5–10, 1139:23–1140:14.

524.    The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience of race in the construction of HD 34 and finds that race, not traditional redistricting principles or sorting on the basis of partisanship, better explains the design of HD 34.  PTX-005 at 16; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1035:12–1036:8 ("Black voters were systematically excluded from the [enacted HD 34] . . . . That effect cannot be dismissed as a byproduct of partisan gerrymandering or adherence to traditional redistricting principles.").

525.    The Court finds that the net effect of the changes to HD 34 was the exclusion of a significant number of Black voters from the district, resulting in a reduction of the district's BVAP % by approximately 28 points.  PTX 005 at 15, tbl. 4; DX-3 at 5.  That significant reduction in BVAP % caused HD 34 to lose its status as a Black-majority district and any realistic possibility of being competitive for Black voters or Black candidates in the coming decade.  *See generally* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1087:22–1088:4; T. Brunell Testimony, 3/5/2024 Trial Tr. 1355:2–6, 1357:6–9 (agreeing that the BVAP drop in HD 34 is "consistent with a racial gerrymander").

526.    Based upon all relevant evidence and a visual inspection of the enacted HD 34 (as compared to the benchmark district and the alternative illustrative district drawn by Mr. Cooper),

the Court finds that race predominated in the design of HD 34; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of county splits, and core preservation, were subordinated to race; that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of census blocks has a significant effect on the block's assignment under the Enacted House Plan, even after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted HD 34; and that the resulting reduction in BVAP in HD 34 was substantively meaningful and impactful in reducing the likelihood that a Black candidate (or any candidate preferred by Black voters) would be able to be elected.  The Court further finds that the design of enacted HD 34 demonstrates the packing of Black population in the area into the nearby, majority-Black HD 30.

### 5.    House District 64

527.    Viewing all of the evidence in its totality, the Court finds that race predominated in the design of House District 64 under the Enacted House Plan.

#### a.   Inconsistency with Traditional Redistricting Principles

528.    Based on a visual inspection, the Court finds that the changes made to HD 64 make the district less compact.

529.    As shown in the map image below, the Enacted House Plan removes areas in blue, including the predominantly Black Northpointe neighborhood, and adds areas in red with lower Black population on the northern and southern ends of the district.  PTX-006 at 26.  This makes the district more elongated and less compact compared to the benchmark district.



530.    Enacted HD 64 consists of portions of Hinds County along its northeastern border

and a portion of the Ridgeland Recreation Center precinct in Madison County.

531.    The changes made to HD 64 under the Enacted House Plan were not necessary to

balance population.  After the 2020 Census, HD 64 was overpopulated by 320 persons, Stip. ¶ 88,

with a total population of 24,593.  PTX-005 at 18 & n. 30; *see also* J. Ragusa Testimony, 3/4/2024

Trial Tr. 1039:15–25.  Based on the State's redistricting criteria, it was not necessary to redraw

HD 64—its 320-person population deviation from the ideal district size is within the +/–5% deviation range. *See* Stip. ¶ 57; 1126:9–12. However, under the Enacted House Plan, the State removed 18% of the district's previous population, or 4,457 residents. PTX-005 at 18. The Enacted House Plan then added 3,822 new residents to the district. *Id.*; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1039:15–25 ("As a result of these changes, the district is now overpopulated by 900 persons, which is three times more overpopulated than it was prior to redistricting.").

532.    The size of the reduction in HD 64's BVAP was a statistical outlier when compared to other enacted districts and therefore cannot be explained as a typical fluctuation in BVAP as a result of ordinary redistricting changes. In total, 2,123 Black voting-age residents were moved out of HD 64. PTX-005 at 18. HD 64 had a BVAP of 37.9% in the Benchmark House Plan and now has a BVAP of 31% in the Enacted House Plan, a reduction of 6.9%. Stip. ¶ 87. HD 64 had the eleventh largest reduction in BVAP out of all 174 Senate and House districts. PTX-006 at 3; *see generally* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:22–1055:17.

533.    Black voters represent 59% of the voters moved out of HD 64 under the Enacted House Plan; those voters were moved to HD 65. PTX-005 at 18, 19; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1039:18–25. HD 65 is a majority-Black district that increased from 76.51% BVAP in the Benchmark Plan to 78.83% BVAP in the Enacted House Plan, which is evidence of packing an already-majority-Black district. *See* PTX-001 at 498–501, 590–593.

534.    The Court further credits the analysis of Mr. Cooper, who demonstrated that HD 64 could be configured differently, to become a more compact district while reducing county, municipality, precinct splits in the area. PTX-001 at 78–79.

535.    The Court also credits the testimony of Kia Jones, a lifelong resident of the Jackson

metro area who currently lives in House District 64 on Northtown Road.  K. Jones Testimony, 2/30/2024 Trial Tr. 918:2–919:1.  She attempted to run for HD 64 in 2023 but was determined to be ineligible because her former address in Northpointe Village was redistricted out of HD 64 in 2022.  *Id*. at 921:23–922:11. Ms. Jones credibly testified that the 2022 state legislative maps were redrawn to take out predominantly African-American areas and add predominantly White areas. *Id*. at 930:5–12.  More specifically, an area around Northpointe Village (where Ms. Jones used to live), where "most of the people" were Black, *id.*  at 925:8–24, was removed from HD 65 and added to HD 65, which already 70%+ Black, *id.*  at 925:25–926:14.  A "predominantly Caucasian neighborhood" was added to the northern end of HD 64 in Madison County.  *Id*. at 927:16–927:23. Ms. Jones testified that, overall, the redraw of the new HD 64 was "adding more of a particular population, such as Caucasian population," to the district.  *Id*. at 930:10–12.  And she testified that a "predominantly African-American population" was "moved out of the district to suppress the Black voters."  *Id*. at 929:22–930:1.

536.    In light of the foregoing evidence, the Court finds that the design of enacted HD 64 is inconsistent with traditional redistricting principles, including compactness, respect for communities of interest, respect for political subdivisions, and core preservation.

### b.  *Significant Effect of Race*

537.    Relying in part on his regression models, Dr. Ragusa found that Black voters were excluded from the redrawn district in a statistically significant and substantively consequential fashion even when controlling for the possibility of partisan gerrymandering.  PTX-005 at 19.  The results of Dr. Ragusa's Model 1 showed that BVAP was a statistically significant predictor of the movement of census blocks into HD 64—blocks with a larger BVAP were less likely to be moved into HD 64.  This finding is statistically significant at a 99% level of confidence.  Similarly, Model

3 showed a statistically significant finding that census blocks with a larger BVAP were less likely to be moved into and kept in HD 64.  This finding is statistically significant at a 99% level of confidence.  *Id.* at 16, 30; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1036:19–1037:9.

538.   Race had a large effect on the inclusion of census blocks in HD 64.  Dr. Ragusa found that under Model 1, "blocks with no Black residents of voting age had a 2.0% chance of being drawn into HD #64.  By comparison, blocks with a BVAP of 30 had a 1.0% chance of being added to the district and any block with 70 or more Black residents of voting age had less than a 0.5% chance of being added to HD #64."  Model 3 had similar results.  PTX-005 at 17; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1037:24–1038:21.

539.   The Court also credits Dr. Ragusa's testimony that Models 1 and 2 point in conflicting directions with respect to partisan gerrymandering in HD 64.  Specifically, the results of Model 1 "indicate that blocks with a large Trump population were less likely to be moved into the redrawn district,"  which is inconsistent with an effort to increase the number of Republican voters in the district. J. Ragusa Testimony, 3/4/2024 Trial Tr. 1037:10–21; PTX-005 at 30.  By contrast, in the models where race is significant, the direction is "always" consistent:  Black voters were less likely to be added in, and more likely to be removed.  *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1018:21–1019:5, 1036:22–1037:9, 1056:16–1057:4; *see also* T. Brunell Testimony, 3/4/2024 Trial Tr. 1370:3–15 (agreeing that the race variable consistently points in "the direction that we would expect for reducing the BVAP in the challenged district").

540.   Black voters were only 19% of the voting age population moved into HD 64 in the Enacted House Plan, but they were 59% of the voting age population moved out of the district. PTX-005 at 19; J. Ragusa Testimony, 3/4/2024 Trial Tr. 1038:24–1039:14.

541.   Consistent with Dr. Ragusa's analysis, the Court finds the population moved into

HD 64 under the Enacted House Plan had fewer Black people (19%) than expected based on the demographics of the area around the district (44% BVAP), while the population moved out of HD 64 had more Black people (59% BVAP) than expected based on the demographics of the district near the border (38% BVAP).  PTX-005 at 15.  In other words, the population that was moved into HD 64 was disproportionately White, while the population that was moved out was disproportionately Black.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1038:24–1039:14.

542.    Dr. Ragusa also conducted a robustness check of his multivariate analysis to determine whether altering the county envelope surrounding the challenged district—in response to Defense Expert Dr. Brunell's criticism that the envelope is over-inclusive—would affect his results.  Even after dramatically shrinking the county envelope by 86% (going from all of Hinds County to only the area bordering the benchmark district), the results remained the same—"race was a significant factor in the blocks added to" HD 64, such that "Black voters were significantly less likely to be moved into the redrawn district."  PTX-006 at 12; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1041:22–1042:11 ("[E]ven when we shrink down the envelope substantially, the evidence still indicates that Black voters were systematically excluded from the redrawn district.").

543.    The enacted HD 64 splits two precincts, which is one more than the prior district, and does so in a racially disparate manner.  Dr. Ragusa analyzed the BVAP of these split precincts, finding that "in both instances, the portions assigned to HD #64 had a lower BVAP % than the portions assigned to neighboring districts."  PTX-005 at 19.  Specifically, "Black voters comprise 18 percent of the population" that was kept in the district, "compare[d] to [the] 59 percent" BVAP of the portions assigned to a neighboring district.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1041:4–13.  Dr. Ragusa also determined that the mapmakers' decision to split the precincts in this manner

contributed to the reduction in BVAP, validating his multivariate regression results showing that race was a significant factor in the composition of HD 64 in the Enacted House Plan.  PTX-005 at 19.

544.     The Court credits Dr. Ragusa's analysis and conclusion that the patterns of sorting by race in the split precincts in HD 64 cannot be explained by partisan gerrymandering.  *See generally* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1054:5–10, 1139:23–1140:14.

545.     The Court credits Dr. Ragusa's analysis and his conclusion regarding the salience of race in the construction of HD 64 and finds that race, not traditional redistricting principles or sorting on the basis of partisanship, better explains the design of HD 64. *See* J. Ragusa Testimony, 3/4/2024 Trial Tr. 1042:12–18.

546.     The Court finds that the net effect of the changes to HD 64 was the exclusion of a significant number of Black voters from the district, resulting in a reduction of the district's BVAP % by approximately 7 points. J. Ragusa Testimony, 3/4/2024 Trial Tr. 1040:1–9; DX-3 at 5.  That significant reduction in BVAP % caused HD 64 to any realistic possibility of being competitive for Black voters or Black candidates in the coming decade.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1040:1–9; *see also* T. Brunell Testimony, 3/5/2024 Trial Tr. 1355:2–6, 1357:6–9.

547.     Based on all relevant evidence and a visual inspection of the enacted HD 64 (as compared to the prior district and the alternative illustrative district drawn by Mr. Cooper), the Court finds that race predominated in the design of HD 64; that traditional redistricting principles, including compactness, respect for communities of interest, minimization of political subdivision splits, and core preservation, were subordinated to race; that Plaintiffs, through Dr. Ragusa's analysis, have sufficiently disentangled racial sorting from partisan sorting, showing that racial composition of census blocks has a significant effect on the block's assignment under the Enacted

House Plan, even after controlling for, among other things, the partisan makeup of the block, such that Black voters in the area were significantly less likely to be drawn into the enacted HD 64; and that the resulting reduction in BVAP in HD 64 was substantively meaningful and impactful in reducing the likelihood that a Black candidate (or any candidate preferred by Black voters) would be able to be elected.  The Court further finds that the design of enacted HD 64 demonstrates the cracking of Black population in the area in order to lower the BVAP of the resulting district and packing the population of nearby, majority-Black HD 65.

*      *      *

548.    Based on the expert analyses of Dr. Ragusa and Mr. Cooper, among other evidence, including testimony from fact witnesses, as well as its own visual assessment, the Court finds that the Enacted Plans moved voters in and/or out of SD 2, SD 48, HD 22, HD 34, and HD 64 predominantly based on their race, subordinating traditional redistricting principles, "cracking" areas with large Black populations and significantly diminishing the Black population percentage in those districts.  The Court finds that the significance of race in the assignment of voters is demonstrated even when controlling for the possibility that voters were sorted based on their partisan vote history and accounting for traditional redistricting principles and other factors.

## VII.    Remedy

549.    The 2024 general election is scheduled to take place on November 5, 2024.  Stip. ¶ 99.

550.    After new legislative district lines are adopted, counties input any changes in district assignments from the new district lines into the Statewide Election Management System ("SEMS").  Lennep Dep. Tr. 62:24–63:19; Court Ex. 1, Deposition Transcript of Kyle Kirkpatrick (also marked as Pl.'s Ex. 116) [hereinafter "Kirkpatrick Dep. Tr."] at 45:23–46:7.

551. SEMS is an electronic database that houses election-related information, including the list of registered voters, their addresses, and their district assignments. Lennep Dep. Tr. 54:17–55:8.

552. The process of implementing new districts in SEMS involves modifying the precinct split and addressing range boundaries where necessary to reflect any changes to the districting lines. Lennep Dep. Tr. 62:24–63:19

553. A "precinct split" exists when district lines run through a particular voting precinct, such that changing district lines may change whether a precinct is split or not. Lennep Dep. Tr. 77:9–78:13.

554. The time it takes to implement new legislative districts in SEMS varies based on several factors, including the extent of the changes to the preexisting district lines, as well as the size and number of counties impacted. Lennep Dep. Tr. 66:16–67:23; Kirkpatrick Dep. Tr. 46:18–47:18.

555. Depending on those factors, the process of implementing new legislative districts can take anywhere from several days to several weeks. Lennep Dep. Tr. 66:16–67:23. SEMS enables county officials to efficiently and electronically implement new district lines by updating the precinct assignments for given address ranges (e.g., 100 to 500 Main Street). Lennep Dep. Tr. 77:9–78:3; Kirkpatrick Dep. Tr. 109:21–110:9.

556. The process of implementing new legislative districts is generally completed in SEMS at least 60 days in advance of a given election day for ballots to be generated, prepared, and shipped by the 45-day deadline provided by the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and to make absentee ballots available 45 days prior to an election. Kirkpatrick Dep. Tr. 47:25–49:3, 55:17–56:8.

557.     In the 2023 election cycle, it took the Secretary of State's office a few days' worth of work to get the election updated and created in the SEMS database, and to review the names for all of the offices to ensure accuracy.  Kirkpatrick Dep. Tr. 69:15–70:2.

558.     Based on the foregoing, the Court finds that changes to the legislative district lines could be enacted as late as August 27, 2024, and there would be sufficient time to implement the changes in SEMS in advance of the November general election.

559.     The Court finds that it would not unduly burden election administrators to implement new plans so long as the plans are available at least 70 days before the election.

560.     For state legislative elections, the primary election is typically held on the first Tuesday in August.  For 2024, the state primary election, if it were a state general election year, would occur on August 6, 2024.

561.     The Court finds that, if changes to the legislative district lines were enacted by May 28, 2024, the primary for a November 5, 2024 election could be held on August 6, 2024 without any undue burden.

562.     The Court further finds that, if changes to the legislative district lines were enacted after May 28, 2024, then the primary date for a November 5, 2024 special election could be moved later to relieve any potential for undue burden on election administrators.

563.     In the alternative, a special election could be held without a primary.  If no primary were held for the special election, a plan would need to be put into place by August 27, 2024.

564.     The Court takes notice of the fact that Mississippi does not have primaries for special elections to the Mississippi House and Senate.  Instead, all candidates participate in a non-partisan general election with a runoff for the top two candidates, should no candidate earn 50% of the vote.  Miss. Code Ann. § 23-15-851; Miss. Code Ann. § 23-15-833.

565.   Special elections to the Legislature can be held with as little as 60 days' notice, with the candidate qualifying deadline required to be at least 50 days before the general election. Miss. Code Ann. § 23-15-851; *see also, e.g.*, K. Kirkpatrick Testimony, 3/4/2024 Trial Tr. 1205:20–1207:14 (if the Court were to order a remedial election, election administration must take place before UOCAVA deadline of sending ballots 45 days before the election); 1237:14–1238:13 (implementing special election by "building the election" with district information takes time of "a few days").  The SBEC has the discretion to cancel any scheduled special election should only one candidate qualify.  Miss. Code Ann. § 23-15-837.

566.   The Court grants Plaintiffs' Motion for Judicial Notice, Dkt. 196, and takes notice of the following facts regarding the timelines for and conduct of recent special elections for State Senate and State House.   In 2021, three special elections were called to fill vacancies in the Mississippi House and Senate.[14]  All three elections were scheduled to coincide with the November 2, 2021 local elections already occurring throughout the state.  Pl.'s Mot. Ex. C (Dkt. 196-3) at 1; Ex. H (Dkt. 196-8) at 1; Ex. I (Dkt. 196-9) at 1.  For the House election, the vacancy was not created until August 31, 2021, just 63 days before the special election.  *See* Pl.'s Mot. Ex. G (Dkt. 196-7) at 1; *see also* Sarah Ulmer, *Rep. Abe Hudson Resigns from Mississippi House of*

---

[14] *See* Plaintiffs' Memorandum in Support of Motion for Judicial Notice, Dkt. 197, at 4-5; Ex. C to Plaintiffs' Motion for Judicial Notice, The Associated Press, *Governor sets special elections in November to fill 2 empty seats in Mississippi Senate* (July 14, 2021) (reporting that the Governor scheduled special elections for November 2, 2021 due to vacancies in Senate Districts 32 and 38), Dkt. 196-3, at 1; Ex. H to Plaintiffs' Motion for Judicial Notice, State of Mississippi Office of the Governor, *Writ of Election* (July 14, 2021) (scheduling special election in Senate District 32 for November 2, 2021), Dkt. 196-8, at 1; Ex. G to Plaintiffs' Motion for Judicial Notice, The Associated Press, *Democrat Abe Hudson Resigning from Mississippi House* (Aug. 28, 2021), Dkt. 196-7, at 1 (reporting vacancy in House District 29); Ex. I to Plaintiffs' Motion for Judicial Notice, State Board of Election Commissioners, *Order*, Dkt. 196-9, at 1 (reporting that House District 29 special election had been set for November 2, 2021).

*Representatives*, Magnolia Tribune (Aug. 27, 2021), https://magnoliatribune.com/2021/08/27/rep-abe-hudson-resigns-from-mississippi-house-of-representatives/ (noting Rep. Hudson's resignation was effective August 30, 2021).   Candidate qualifying ended 16 days later on September 13, 2021—exactly 50 days before the general election.  *See* Pl.'s Mot. Ex. I (Dkt. 196-9) at 1; Miss. Code Ann. § 23-15-851.  The SBEC dispensed with the House election because only one candidate qualified.  Pl.'s Mot. Ex. I (Dkt. 196-9) at 1.  The two Senate elections proceeded to the November 2 general elections, with one election going to a runoff.  Pl.'s Mot. Ex. H (Dkt. 196-8) at 1; Ex. K (Dkt. 196-11) at 11 (Secretary of State, *2021 Election Calendar*, *available at* https://www.sos.ms.gov/content/documents/elections/2021%20Website%20Calendar.pdf).

567.   The next regularly scheduled general election for state legislative districts is in November 2027, with candidates elected in those elections not taking office until January 2028.

## PROPOSED CONCLUSIONS OF LAW

### I.   Jurisdiction, Parties, and Standing

568.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1357; 42 U.S.C. §§ 1983 and 1988; and 52 U.S.C. §§ 10301, 10302, 10308(f), and 10310(e).

569.   This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

570.   A three-judge district court was properly convened in this case pursuant to 28 U.S.C. § 2284(a) because Plaintiffs "challeng[e] the constitutionality of … the apportionment of [a] statewide legislative body."  No argument challenging the application of Section 2284 here has been preserved.

571.   The Voting Rights Act, under which Plaintiffs bring suit, validly abrogates state sovereign immunity.  *Robinson*, 86 F.4th at 588; *see OCA-Greater Houston v. Texas*, 867 F.3d

604, 614 (5th Cir. 2017).  No sovereign immunity defense has been preserved by the Defendants here.

572.    The State Board of Election Commissioners, as the body that holds final, statewide authority over the placement of candidates on the ballot and the certification of state legislative elections in Mississippi, is a proper defendant against whom relief may be sought in a legislative redistricting case.  *See, e.g.*, *Connor v. Winter*, 519 F. Supp. 1337, 1343 (S.D. Miss. 1981).  No proper party defenses have been preserved by Defendants here.

573.    All potentially necessary parties are joined or otherwise accounted for.  To the extent that any remedy will require the Court to fashion relief that affects the conduct or timing of primary elections in Mississippi, the Mississippi Republican Party is an Intervenor in the case, and the Mississippi Democratic Party has signed a stipulation agreeing to abide by any judgment and order in the case.  *See* Stipulation, Dkt. 184.  No failure-to-join-a-necessary-party defenses have been preserved here.

574.    Plaintiffs have Article III standing because as to each challenged district or area, at least one plaintiff has suffered a cognizable injury that is "fairly traceable to the challenged action" and "redressable by a favorable ruling."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *see also, e.g.*, *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit.").

575.    An organization has associational standing on behalf of its members if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Students for Fair*

215

*Admissions, Inc. v. President and Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

576.    With respect to vote dilution claims under Section 2 of the Voting Rights Act, a minority voter is injured when they reside in a White-majority district that is alleged to result in the dilution of the minority group's voting strength. *See, e.g.*, *Anne Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 307 (5th Cir. 2020); *see also, e.g.*, *Gingles*, 478 U.S. at 46–57 & n.11 (describing the dilution-by-submergence dynamic).  Some courts have also suggested that Section 2 plaintiffs must demonstrate that they could be included in a reasonably configured majority-minority district if their claims were to succeed.  *Compare League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 486 (W.D. Tex. 2022) (three-judge panel) (suggesting *Gingles* plaintiffs must show they "would have resided where that Section 2 district should have existed") *with Anne Harding*, 948 F.3d at 307 (suggesting that this approach would "collapse[] standing and merit resolution").

577.    Plaintiffs have standing for their Section 2 vote dilution claims as to each of the challenged districts.  As to each of the areas around Illustrative SD 2, SD 9, SD 35 and Illustrative HD 22, HD 56, and HD 84, at least one of the individual plaintiffs is a Black voter who (1) resides in majority-White district in the Enacted Plans in an area where vote dilution is alleged to be occurring, and (2) can be drawn into a reasonably-configured Black-majority districts as demonstrated by the Cooper Illustrative SDs 2, 9, and 35, and HDs 22, 56, and 84.  As to the area around Illustrative SD 17, at least one MS NAACP member is a Black voter who (1) resides in majority-White district in the Enacted Plans in an area where vote dilution is alleged to be occurring, and (2) can be drawn into a reasonably-configured Black-majority district as demonstrated by the Cooper Illustrative SD 17.

216

578.    MS NAACP satisfies the other two elements of the associational standing test.  As the Fifth Circuit has previously held, "protecting the strength of votes . . . [is] surely germane to the NAACP's expansive mission." *Hancock Cnty.  Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 197 (5th Cir. 2012).  The record, which includes live testimony from numerous NAACP members and local leaders about the NAACP's work, as well as the transcripts from the SJCLR's roadshow hearings at which numerous NAACP members testified, supports that conclusion here as well. Moreover, participation of individual members is not required because in this action MS NAACP seeks prospective and injunctive relief, not individualized damages.  *E.g.*, *Consumer Data Indus. Ass'n v. Texas*, No. 21–51038, 2023 WL 4744918, at *4 n.7 (5th Cir. 2023).

579.    With respect to a racial gerrymandering claim arising under the Fourteenth Amendment, "a plaintiff who resides in a district which is the subject of a racial-gerrymander claim has standing to challenge the legislation which created that district."  *Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 904 (1996); *accord United States v. Hays*, 515 U.S. 737, 744–45 (1995) ("Where a plaintiff resides in a racially gerrymandered district, . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action."); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) ("[A] plaintiff who alleges that he is the object of a racial gerrymander . . . has standing to assert . . . that his own district has been so gerrymandered.").

580.    Plaintiffs have standing with respect to their racial gerrymandering claims.  At least one individual voter plaintiff resides in each of the challenged districts (Enacted SDs 2 and 48, and Enacted HDs 22, 34, and 64, respectively).  And MS NAACP also has associational standing to challenge these districts because it has members who reside in each of those districts.  *See, e.g.*, Stip. ¶ 2.

## II.     Right of Action to Enforce Section 2

581.     Under this Court's rules, legal defenses must be raised by motion.  *See* L. Uniform

Civ. R. 7(b).  Neither Defendants nor Intervenors raised any defense relating to a purported lack

of a private right of action to enforce Section 2 of the Voting Rights Act by motion.  Nor do either

of them argue that the issue goes to the Court's jurisdiction, which it does not.  *See Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the

absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter

jurisdiction.").  Because the private-right-of-action issue does not implicate the Court's subject

matter jurisdiction, it is waivable.  Here, it has been waived.

582.     In any event, the Fifth Circuit has already resolved the issue, holding that there is

an implied private right of action to enforce Section 2.  The Voting Rights Act contemplates

enforcement actions both by the U.S. Department of Justice and by "aggrieved person[s]."

*Robinson*, 86 F.4th at 588 (quoting 52 U.S.C. § 10302).  Individual voters whose votes have been

diluted by a challenged districting scheme "are aggrieved persons," and accordingly they have "a

right … to bring these claims."  *Id.*; *see also, e.g.*, *Morse v. Republican Party of Virginia*, 517 U.S.

186, 232 (1996) ("Although § 2, like § 5, provides no right to sue on its face, 'the existence of the

private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'"

(citing S. Rep. No. 97-417, at 30)).

583.     And even if the law with respect to an implied right of action to enforce Section 2

was not so clear, Plaintiffs here could still enforce their rights under 42 U.S.C. § 1983, which

provides an enforceable remedy for the deprivation of any right "secured by the Constitution and

laws."

584.     While the implied-right-of-action question is governed by the standard set forth in

218

*Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), the question whether a statutory violation may be enforced *via Section 1983* "is a different inquiry." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). Under that inquiry, once a plaintiff demonstrates that Congress "intended to create a federal right," "the right is presumptively enforceable by § 1983." *Gonzaga Univ.*, 536 U.S. at 283 (emphasis omitted); *accord Health and Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183–184 (2023).

585.    This presumption is rarely overcome. *See Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994). To do so, a defendant must show that Congress implicitly foreclosed Section 1983 relief by creating an incompatible private remedy scheme. *E.g.*, *Gonzaga*, 536 U.S. at 284–285 n.4. The presence of a parallel *public* remedy (*i.e.*, government enforcement) is insufficient. Rather, "a more restrictive *private* remedy" is required because restrictions on *private* remedies (such as special filing or exhaustion requirements, or limits on damages) are inconsistent with the relief available under Section 1983. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254, 256 (2009) (emphasis added).

586.    Section 2 makes crystal clear that it protects individual federal rights. The statute bars voting standards or practices that "result in a denial or abridgement of *the right of any citizen of the United States to vote* on account of race or color" under the law's "totality-of-the-circumstances" test. 52 U.S.C. § 10301 (emphasis added). That is the type of rights-creating language that is presumptively enforceable in a Section 1983 action. *E.g.*, *Gonzaga*, 536 U.S. at 284 n.4.

587.    Here, Plaintiffs invoked Section 1983 as a basis for enforcing their Section 2 rights. Accordingly, even if the right to enforce Section 2 via an implied right of action were not a matter of settled law in the Fifth Circuit, and even if the issue had been properly preserved, Plaintiffs

would in all events be able to enforce their rights by proceeding under Section 1983.

### III.   Vote Dilution: The *Gingles* Framework

588.    Section 2 of the VRA renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a); *see also Gingles*, 478 U.S. at 36.

589.    Dilution of a minority community's voting strength in violation of Section 2 is "established" if, under the totality of the circumstances, the "political processes leading to nomination or election in the State . . . are not equally open to participation by members of [a racial minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 36.

590.    The *Gingles* framework governs vote dilution claims under Section 2 of the VRA, as it has for nearly 40 years.  *See Milligan*, 599 U.S. at 19.  Under *Gingles*, "[d]ilution of racial minority group voting strength" in violation of Section 2 "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority."  *Gingles*, 478 U.S. at 46 n.11. It is well established that single-member district lines can violate Section 2 by diluting minority voting strength.  *E.g.*, *Milligan*, 599 U.S. at 17–23, 38; *Robinson*, 86 F.4th at 597; *see Growe v. Emison*, 507 U.S. 25, 40 (1993).

591.    A violation of Section 2 does not require proof of discriminatory intent and can "be proved by showing discriminatory effect alone."  *Gingles*, 478 U.S. at 35.  In other words, Section 2 vote-dilution liability "turns on the presence of discriminatory effects, not discriminatory intent."  *Milligan*, 599 U.S. at 25.  "Congress has used the words 'on account of race or color' in the Act to

220

mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination." *Id.* (cleaned up)). The essence of such a Section 2 "results" claim is that an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47, 63. The Section 2 analysis thus *does not turn on the State's motives*, including partisan advantage. If the *result* of the challenged scheme is unequal opportunities for Black voters, liability follows. *E.g.*, *Gingles*, 478 U.S. at 35, 47, 63; *accord Robinson*, 86 F.4th at 589.

592.   To prevail on a Section 2 claim, Plaintiffs must initially satisfy three preconditions: "'First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district.' A district is reasonably configured when it complies 'with traditional districting criteria, such as being contiguous and reasonably compact.' Second, the minority group must be politically cohesive. Third, the white majority must be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate." *Robinson*, 86 F.4th at 589 (quoting *Milligan*, 599 U.S. at 18); *accord Gingles*, 478 U.S. at 50–51.

593.   The three preconditions together result in what the *Gingles* Court referred to as "vote dilution by submergence," whereby, because of the combination of district lines and persistent patterns of racially polarized voting, minority voters in one area of the state are rendered unable to elect candidates of choice, despite voting cohesively and being numerous enough to comprise a majority in a compact, reasonably-configured district. *E.g.*, 478 U.S. at 46–51, 59 n.28. In such circumstances, the combination of district lines and persistent patterns of racially polarized voting operate to submerge or "fragment[]" minority voters within White-majority districts, shutting them out of power. *E.g.*, *Growe*, 507 U.S. at 40.

594.     After establishing the three *Gingles* preconditions, a plaintiff must "'show, under the totality of the circumstances, that the political process is not equally open to minority votes,' causing a Section 2 violation," with respect to the challenged districting scheme. *Robinson*, 86 F.4th at 589 (quoting *Milligan*, 599 U.S. at 18). "Courts must determine whether plaintiffs have an equal opportunity in the voting process to elect their preferred candidate under the challenged districting map." *Id.* (citing *Gingles*, 478 U.S. at 44); *see also* 52 U.S.C. § 10301(b). Courts determine liability based on "'an intensely local appraisal'" of the mechanism at issue, as well as a "'searching practical evaluation of the "past and present reality."'" *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79).

595.     Once the *Gingles* preconditions have been established, and the core elements of the dilution-by-submergence dynamic identified, a liability determination typically follows: "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Teague v. Attala Cnty.*, 92 F.3d 283, 293 (5th Cir. 1996) (quoting *Clark v. Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994) [hereinafter *Clark I*]); *see also Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (same).

596.     In examining the totality of the circumstances, courts consider the so-called Senate Factors. *E.g.*, *Robinson*, 86 F.4th at 589; *accord Gingles*, 478 U.S. at 36–37, 44–45. These are also referred to as the "*Zimmer* factors" because the Senate Report that accompanied the 1982 Voting Rights Act reauthorization drew for this non-exclusive set of guides on the Fifth Circuit's decision in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973). *See Robinson*, 86 F.4th at 589; *accord Gingles*, 478 U.S. at 36–37 & n.4.

597.     The Senate Factors include: "(1) the extent of any history of official discrimination

222

in the state or political subdivision that touched the rights of the members of the minority group to register, to vote, or otherwise participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;" (4) whether minority candidates have been denied access to any candidate-slating process; (5) the extent to which minorities in the state or political subdivision bear the effects of discrimination in education, employment, and health, which hinder their ability to participate effectively in the political process; "(6) whether political campaigns have been characterized by overt or subtle racial appeals;" and (7) the extent to which minority group members have been elected to public office (internal quotations omitted). *See Gingles*, 478 U.S. at 36–37 (quoting S. Rep. No. 97-417, at 28–29 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 206–07).

598.    Additional factors recognized by the Senate Committee include whether there is a significant lack of responsiveness on the part of elected officials to the particular needs of members of the minority group, and whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard practice of procedure is tenuous. *See Gingles*, 478 U.S. at 36–37.

599.    Proportionality, while "not dispositive in a challenge to single-member districting," is another "relevant fact in the totality of circumstances to be analyzed when determining whether members of a minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Johnson v. De Grandy*, 512 U.S. 997, 1000, 1011 (1994) (internal quotation marks omitted); *see also League of*

*United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 (2006) [hereinafter *LULAC*] ("[W]hether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area" is a "relevant consideration".) (citing *De Grandy*, 512 U.S. at 1000).

IV.     ***Gingles* 1**

600.    The first *Gingles* precondition is "focused on geographical compactness and numerosity, [and] is 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Milligan*, 599 U.S. at 18 (quoting *Growe*, 507 U.S. at 40); *see also Robinson*, 86 F.4th at 589.  To satisfy the first precondition, a plaintiff must show that "the minority group [is] sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Milligan*, 599 U.S. at 18 (cleaned up).  "A district is reasonably configured when it complies 'with traditional districting criteria, such as being contiguous and reasonably compact.'" *Robinson*, 86 F.4th at 589 (quoting *Milligan*, 599 U.S. at 18).

601.    The *Gingles* 1 showing is typically made through the proffer of an illustrative legislative plan containing additional, reasonably configured majority-minority districts, such as the Illustrative Senate and House Plans offered in this case by Mr. Cooper.  *Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1406–07 (5th Cir. 1996) [hereinafter *Clark II*]; *see also Gonzalez v. Harris Cnty.*, 601 F. App'x 255, 258 (5th Cir. 2015) ("Satisfying the first *Gingles* precondition—compactness—normally requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans."); *accord Nairne*, 2024 WL 492688, at *11–18, 20–30; *Alpha Phi Alpha*, 2023 WL 7037537, at *16–17, 26–31; *Robinson*, 605 F. Supp. 3d at 778–784, 820–838; *Singleton*, 582 F. Supp. 3d at 977, 1004–1016.

602.   Although "[p]laintiffs typically attempt to satisfy [the first *Gingles* precondition] by drawing hypothetical majority-minority districts," *Clark II*, 88 F.3d at 1406, such illustrative plans are "not cast in stone" and are offered only "to demonstrate that a majority-[B]lack district is feasible," *Clark I*, 21 F.3d at 95; *see also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (same).   The "ultimate end of the first *Gingles* precondition is to prove that a solution is possible, not necessarily to present the ultimate solution to the problem."   *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 746 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez,* 601 F. App'x 255 (citing *Gingles*, 478 U.S. at 50 n.17); *accord Clark I*, 21 F.3d at 95.

603.   Because the ultimate question in the *Gingles* 1 analysis is whether the minority population in a particular area is sufficiently numerous and geographically compact to form a majority in a single-member district, courts appropriately analyze the proposed additional majority-Black districts on a district-by-district basis.  *See, e.g.*, *Nairne*, 2024 WL 492688, at *13-17; *Perez v. Abbott*, 250 F. Supp. 3d 123, 143 (W.D. Tex. 2017) (conducting district-by-district analysis of Texas state legislative districts).   Importantly, the focus for purposes of *Gingles* 1 is on the *illustrative plans*, not on the plans enacted by the State.   *E.g.*, *Milligan*, 599 U.S. at 19-22; *Robinson*, 86 F.4th at 590.

### A.   Numerosity

604.   With respect to the numerosity of the minority population, a bright-line 50% plus one rule applies in assessing whether the minority population is "sufficiently large" for purposes of *Gingles* 1.  *Bartlett v. Strickland*, 556 U.S. 1, 12, 18–20 (2009).   That is, Plaintiffs "asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent."   *Id.* at 19–20; *see also Robinson*, 86 F.4th at 590 (citing *Bartlett*, 556 U.S. at 19–20).

605.   In voting rights cases when Black voters are the only minority group whose effective exercise of the franchise is at issue, "it is proper to look at *all* individuals who identify themselves as [B]lack" to calculate a district's BVAP and assess the numerosity of the Black population in that district.  *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003) (emphasis in original); *see also, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1343 n.8 (N.D. Ga. 2015); *Singleton*, 582 F. Supp. 3d at 1004.  Accordingly, the "any-part" or AP BVAP metric is appropriate when establishing the first *Gingles* precondition in a Section 2 case.  *See, e.g.*, *Robinson*, 605 F. Supp. 3d at 819–20; *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 419–20 (M.D. La. 2017), *rev'd on other grounds sub nom.*, *Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020); *Alpha Phi Alpha*, 2023 WL 7037537, at *9; *Singleton*, 582 F. Supp. 3d at 1002–04; *Ga. State Conf. of NAACP*, 118 F. Supp. 3d at 1343; *Covington v. North Carolina*, 316 F.R.D. 117, 125 n.2 (M.D.N.C. 2016) (three-judge court), *aff'd*, 581 U.S. 1015 (2017); *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1033 (E.D. Mo. 2016).

606.   Based on the foregoing findings of fact, the Court concludes that Plaintiffs have established by a preponderance of the evidence that the BVAP in each newly-added majority-Black district in the Illustrative Senate and House Plans—specifically, Illustrative SD 2, SD 9, SD 17, SD 35, and Illustrative HD 22, HD 56, and HD 84—is greater than 50 percent.  *See, e.g.*, *supra* ¶¶ 82, 98, 108, 113, 119, 125, 129, 133.  Consistent with that, the Illustrative Senate Plan increases the number of Black-majority State Senate districts from 15 to 19, and the Illustrative House Plan increases the number of Black-majority State House districts from 42 to 45.  PTX-001 at 302, 477, 569, 694.

**B.     Compactness and Other Traditional Redistricting Principles**

607.    "Compactness under Section 2 is an imprecise concept, but traditional districting principles like maintaining communities of interest and traditional boundaries should be considered." *Robinson*, 86 F.4th at 590 (citing *LULAC*, 548 U.S. at 433)); *see also Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 494 (5th Cir. 2020).  The bottom-line question is whether the proffered illustrative districts are "reasonably configured," and "[a] district will be reasonably configured … if it comports with traditional districting criteria, such as being contiguous and reasonably compact" and "respect[ing] existing political subdivisions, such as counties, cities, and towns." *Milligan*, 599 U.S. at 18, 20; *see also LULAC*, 548 U.S. at 433 (*Gingles* 1 "should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries'") (citation omitted); *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) (plaintiffs satisfy the first *Gingles* precondition when their proposed majority-minority district is "consistent with traditional districting principles").

608.    In addition to compliance with Section 2, the traditional districting principles include population equality, contiguity, geographic compactness, respect for political boundaries, and respect for communities of interest.  *See Milligan*, 599 U.S. at 18, 20; *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (identifying contiguity as a traditional districting principle); *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 651–52 (1993) (identifying population equality as a traditional districting  principle); *see also, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1307 (N.D. Ga. 2013) (traditional districting principles include "maintaining communities of interest and traditional boundaries," "geographical compactness, contiguity, and protection of incumbents") (citation omitted).

609.    There is no requirement that the new Black-majority districts in a *Gingles* 1

227

illustrative plan comport with traditional redistricting principles *better* than the districts in the challenged plan.  Compliance with the compactness criterion requires only that an illustrative district is "*reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries," not that the illustrative districts are equally or more compact than the enacted districts.  *Bush v. Vera*, 517 U.S. 952, 977 (1996) (emphasis in original); *accord Milligan*, 599 U.S. at 18.  "The first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district."  *Houston v. Lafayette Cnty.*, 56 F.3d 606, 611 (5th Cir. 1995) (quoting *Clark I*, 21 F.3d at 95).  And "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles, even if not to the same extent or degree as some other hypothetical district."  *Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000).  Accordingly, an illustrative plan can be "far from perfect" in terms of compactness yet satisfy the first *Gingles* precondition.  *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections and Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

610.    Nor for purposes of the *Gingles* 1 analysis is there any material distinction between the compactness of the minority *population* and the compactness of the illustrative majority-minority district in the area where that population lives.  *See Robinson*, 86 F.4th at 590–591.  Demonstrating reasonably configured minority-majority districts is necessarily sufficient to satisfy the requirement that the "minority group … be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district."  *Id.* (quoting *Milligan*, 599. U.S. at 18).

611.    In this case, and in light of the foregoing findings of fact, Mr. Cooper's Illustrative Plans and the additional Black-majority districts contained in them easily satisfy the first *Gingles*

precondition.  Notably, Defendant's *Gingles* 1 expert, Dr. Brunell, does not contend that those districts are insufficiently compact or that the Illustrative Plans otherwise violate traditional redistricting principles.  *E.g.*, *supra* ¶¶ 54, 74, 93.  Mr. Cooper testified credibly and in detail about his balanced map-drawing process, and about his decisions in configuring the additional Black-majority districts.  *E.g.*, *supra* ¶¶ 71-75; *see also id.* ¶¶ 98–138.  And his plans perform as well or better than the Enacted Plans with respect to all the objective metrics, such as mathematical measures of compactness and county, precinct, and municipal splits, which is highly probative of a plan containing reasonably configured districts.  *See, e.g.*, *Milligan*, 599 U.S. at 20, 30-31; *Robinson*, 86 F.4th at 590-592; *Nairne*, 2024 WL 492688, at *21-25.  Indeed, Mr. Cooper complied with the criteria set forth in the State's guidelines (population equality, compactness, and county and precinct lines) at least as well and in many cases better than the State did.  *Supra* ¶¶ 71–72, 82, 86–96.

### 1.  Population Equality

612.   Population equality is a traditional redistricting principle.  *E.g.*, *Reynolds v. Sims*, 377 U.S. 533, 562–63 (1964); *Gaffney v. Cummings*, 412 U.S. 735, 741–746 (1973); *Shaw I*, 509 U.S. at 651–52.

613.   Based upon the foregoing findings of fact, all the districts in the Illustrative Senate and House Plans are within the +/–5% population deviation guidelines adopted by the SJLCR, that the Illustrative Plans are consistent with the principle of population equality.

### 2.  Contiguity

614.   Contiguity is a traditional redistricting principle that requires districts to be contiguous, meaning that all parts of a district are connected to one another.  *E.g.*, *Harris v. Ariz.*

*Indep. Redistricting Comm'n*, 578 U.S. 253, 258 (2016) (citation omitted) (recognizing contiguity as a traditional redistricting principle).

615.    Based upon the foregoing findings of fact, all the districts in the Illustrative Senate and House Plans comport with the traditional redistricting principle of contiguity.

### 3.   Compactness

616.    Geographical compactness is assessed based on the shape of the districts.  "For example, a district would not be sufficiently compact if it was so spread out that there was no sense of community, that is, if its members and its representative could not effectively and efficiently stay in touch with each other; or if it was so convoluted that there was no sense of community." *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-CV-0087-D, 2014 WL 4055366, at *9 (N.D. Tex. Aug. 15, 2014) (quoting *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1466 (M.D. Ala. 1988)).

617.    The Illustrative Plans—and in particular the additional Black-majority districts, SDs 2, 9, 17, and 35, and HDs 22, 56, and 84—are sufficiently compact.  Based on a visual analysis, they are regularly shaped, do not contain "land bridges" between disparate areas, and are not "convoluted."  They are not at all comparable, for example, to those at issue in *LULAC*, where the Supreme Court found one district noncompact because of "the enormous [300 mile] geographical distance separating the Austin and Mexican-border communities, *coupled with* the disparate needs and interests of these populations."  548 U.S. at 435 (emphasis added).  Indeed, Mr. Cooper's configuration of the district lines is in many instances visually more compact than the Enacted Plans.

618.    In addition, and as discussed already, there is no dispute that Mr. Cooper's

Illustrative Plans are comparable to if not more compact than the Enacted Plans when considering various mathematical metrics for assessing compactness, such as the Reock and Polsby-Popper metrics.  *See, e.g.*, PTX-001 at 45–46, 68–70, 399-417, 822-855.  Indeed, Defendants' expert does not contend that the Illustrative Plans are insufficiently compact.

619.   Based upon the foregoing findings of fact, the Illustrative Senate and House Plans comport with the traditional redistricting principle of compactness.

### 4.   *Traditional boundaries*

620.   The Illustrative Plans also maintain "traditional boundaries."  *LULAC*, 548 U.S. at 433 (citation omitted).

621.   To be sure, plaintiffs in proffering an illustrative plan are not required to adopt the same line-drawing priorities as the State.  *See Gonzalez*, 601 F. App'x at 260–61 (citation omitted) (stating it would be "unfair to require Plaintiffs to draw maps in strict accordance with [a jurisdiction's] priorities"); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1113 (E.D. Cal. 2018) (holding that plaintiffs need not prioritize redistricting principles in the same manner as a jurisdiction did when creating a challenged map).  Nor can the maintenance of county or other political lines trump compliance with Section 2 of the Voting Rights Act where splitting of counties is necessary to create a compact, reasonably-configured majority-Black district and provide Black voters the opportunity to elect their candidate of choice despite racially-polarized voting patterns.  *See Bartlett*, 556 U.S. at 7 (noting that a state's election law requirements may be superseded by federal law); *see also Perez*, 250 F. Supp. 3d at 142 (holding that states cannot "claim that a single traditional districting principle . . . allows them to avoid drawing districts required by § 2 under the totality of circumstances").

622.   That said, and as set forth already, the Illustrative Senate and House Plans are in fact comparable and in fact on most metrics, including county and precinct splits, noticeably better than the Enacted Plans with respect to county and precinct splits.  *See supra* ¶¶ 91–94.

623.   Based upon the foregoing findings of fact, the Illustrative Senate and House Plans comport with the traditional redistricting principle of respecting traditional political boundaries.

### 5.  *Communities of Interest*

624.   Courts have recognized that "maintaining communities of interest" is a traditional redistricting principle.  *LULAC*, 548 U.S. at 433.  "A State is free to recognize communities that have a particular racial makeup" so long as there is "some common thread of relevant interests."  *Miller*, 515 U.S. at 920.  "The Court recognizes the distinct need to afford communities of interest the respect they deserve."  *Kumar*, 476 F. Supp. 3d at 502.

625.   "[M]embers of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity."  *LULAC*, 548 U.S. at 435.  Consistent with this principle, the Court affirmed in *Milligan* that an illustrative district that joined an urban city (Mobile) to a rural community (the Black Belt) was reasonably configured.  *Milligan*, 599 U.S. at 1503–05.  The inquiry thus is whether communities in the illustrative district share relevant and sufficient characteristics, not whether they fall into a single category (like "rural" or "urban").

626.   Such shared characteristics may include social and economic needs of the communities.  For example, in *Theriot v. Parish of Jefferson*, the Fifth Circuit found that a majority-Black district for the Jefferson Parish Council included "low-income residents who are less-educated, more often unemployed, and more poorly-housed" and thus shared "common social

and economic needs." 185 F.3d 477, 486 (5th Cir. 1999).  The Court held that, "[g]iven the common thread which binds the [B]lack voters within [that district], they are entitled to an effective voice in the electoral process and to an influence over the outcome of elections."  *Id.* at 487 (internal quotation marks and citation omitted)*.  See also Lawyer v. Dep't of Just.*, 521 U.S. 567, 581 (1997) (affirming that a community of interest existed where people shared socioeconomic interests).

627.    More generally, it is relevant whether voters and communities in the areas at issue share "similar needs and interests beyond race."  *Robinson*, 86 F.4th at 590.

628.    Of course, illustrative plans need not perfectly encompass every community of interest*.  See Kern*, 291 F. Supp. 3d at 1110 ("Plaintiffs are . . . not required to accommodate every conceivable community of interest . . . in order to draw a sufficient illustrative map that satisfies the first *Gingles* precondition"); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1399 (E.D. Wash. 2014) (holding that *Gingles* 1 does not require a "perfectly harmonized districting plan," as such a requirement "would put the cart before the horse").  Plaintiffs' burden is not one "that requires plaintiffs to establish there are no identifiable differences between the communities joined in their illustrative map.   It is simply too easy to identify at least some differences between any two communities." *Kern,* 291 F. Supp. 3d at 1116.  Rather, "it is sufficient that a plaintiff show that a workable plan for another minority-controlled voting district is possible." *Fairley v. Hattiesburg*, 584 F.3d 660, 671 n.14 (5th Cir. 2009) (citing *Gingles*, 478 U.S. at 50 n.17; *Houston*, 56 F.3d at 611.  "Illustrative plans that focus[] on other, different, overlapping communities of interest are valid; there is no need to conduct a "beauty contest" between the maps. *Robinson*, 86 F.4th at 592 (citing *Milligan*, 599 U.S. at 21).

629.    To reiterate its prior findings, the Court credits Mr. Cooper's testimony that he respected communities of interest when drawing the Illustrative Senate and House Plans.  Mr.

Cooper's analysis demonstrated that he considered communities of interest such as planning and development districts, municipalities, and school districts, which are plainly common identities with distinct interests capable of representation. *See, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 758 (1983) (noting "residents of political units such as townships, cities, and counties often develop a community of interest"). He also considered other connections between communities, such as economic, regional, and transport-related ties.

630. Notably, the Illustrative Plans keep more municipalities whole, *supra* ¶¶ 82, 93, and Defendants' expert agreed that municipalities are a classic community of interest, *supra* ¶ 93. The Illustrative Plans also split fewer Planning and Development District areas and fewer school districts, among other potential communities of interest. *Supra* ¶¶ 82, 91–93.

631. The configuration of the Illustrative Senate and House Plans, and in particular the extent to which the newly-added Black-majority districts in those plans respect and take into account communities of interest, was further supported by fact witness testimony. As stated already, Plaintiffs adduced credible testimony from individual voters who live in the specific areas at issue regarding each of the areas where they alleged vote dilution regarding the shared connections in the areas united by the new Black-majority districts in Mr. Cooper's the Illustrative Senate and House Plans (namely, SDs 2, 9, 17, and 35, and HDs 22, 56, and 64). Voters described the "similar needs and interests beyond race" shared by the communities included in the new majority-Black Senate and House districts, *Robinson*, 86 F.4th at 590, including shared resources like hospitals, shopping centers, and transportation corridors; school systems and sports; and cultural connections like church memberships and local festivals. *See supra* ¶¶ 103–06, 110–11, 116–17, 123, 127, 131, 136. There are "common threads" that bind Black voters who reside in the respective areas in those Illustrative Plan districts.

632.    Based upon the foregoing findings of fact, the Illustrative Senate and House Plans comport with the traditional redistricting principle of respecting communities of interest.

### C.    Racial Predominance

633.    "Awareness of race is permissible" in the redistricting context; indeed, "Section 2 demands such consideration." *Robinson*, 86 F.4th at 593; *see also id.* at 595 (race properly "considered alongside" other traditional principles).  In *Milligan*, the Supreme Court expressly confirmed that it is appropriate—indeed, necessary—for race to be a consideration in drawing an illustrative plan for *Gingles* 1 purposes: Section 2 "demands consideration of race" because "[t]he question whether additional majority-minority districts can be drawn . . . involves a quintessentially race-conscious calculus."  599 U.S. at 31 (citation and internal quotation marks omitted) (Op. of Roberts, C.J.); *id.* at 42 (Kavanaugh, J., concurring) ("[T]he effects test, as applied by *Gingles* to redistricting, requires in certain circumstances that courts account for the race of voters so as to prevent the cracking or packing—whether intentional or not—of large and geographically compact minority populations." (collecting cases)); *see also Clark II*, 88 F.3d at 1407.  And federal courts enforcing the Voting Rights Act have long "authorized race-based redistricting as a remedy for state districting maps that violate § 2." *Milligan*, 599 U.S. at 40–41.

634.    Accordingly, it is not a defense in a Section 2 case to claim merely that the plaintiffs' proffered *Gingles* 1 illustrative plans sought (consistent with *Gingles* and *Bartlett*) to meet a racial goal.  "[A]n express racial target is just one consideration in a traditional redistricting analysis under *Gingles*." *Robinson*, 86 F.4th at 594–595 (5th Cir. 2023) (citing *Milligan*, 599 U.S. at 32).

635.    Nor are such *Gingles* 1 illustrative plans, which are offered by private parties in litigation and lack the force of law, subjected to the same type of "racial predominance" analysis

that applies to state-enacted plan when it is challenged on constitutional grounds. *See Clark II*, 88 F.3d at 1406–07; *see also Robinson v. Ardoin*, 37 F.4th 208, 223 (5th Cir. 2022) (citing *Clark II* and explaining that the Fifth Circuit has "rejected the proposition that a plaintiff's attempt to satisfy the first *Gingles* precondition is invalid if the plaintiff acts with a racial purpose."); *accord Bone Shirt*, 461 F.3d at 1019; *Davis*, 139 F.3d at 1417–18; *Sanchez v. State of Colorado*, 97 F.3d 1303, 1327 (10th Cir. 1996); *Cane v. Worcester Cnty.*, 35 F.3d 921, 926 n.6 (4th Cir. 1994).

636.     Moreover, even if a showing of racial predominance could theoretically defeat a plaintiff's attempt to satisfy *Gingles* 1, the foregoing findings of fact preclude such a showing here. Mr. Cooper considered race appropriately for the purposes of satisfying *Gingles* 1, balancing it with the other traditional redistricting principles he considered. *See Robinson*, 86 F. 4th at 595 (rejecting suggestion of racial predominance where mapping experts, including Mr. Cooper, considered race "alongside … the other race-neutral traditional redistricting criteria *Gingles* requires"). Even Defendants' expert, Dr. Brunell, does not conclude (or does not credibly conclude) that race in fact predominated in Mr. Cooper's illustrative plans, nor does he conclude that the illustrative plans violate traditional redistricting principles.

637.     Based on all of the evidence presented, including Mr. Cooper's credible explication of his Illustrative Plans and his process in both his report and his testimony, the fact that Mr. Cooper's plans perform at least as well as the Enacted Plans on compactness and other objective traditional redistricting metrics, and the testimony from fact witnesses in support of Mr. Cooper's plans, the Court reiterates its finding that the proposed additional majority-Black districts are reasonably configured and that race did not predominate in Mr. Cooper's Illustrative Plans or in the process he used to develop them.

638.     Based upon the foregoing findings of fact and conclusions of law, the Court holds

that Plaintiffs have established the first *Gingles* precondition.

### V.    *Gingles* 2 and 3

639.    The second and third *Gingles* preconditions involve racially-polarized voting. Racially polarized voting exists where there is a "consistent relationship between [the] race of the voter and the way in which the voter votes." *Gingles*, 478 U.S. at 53 n.21 (alteration in original).

640.    The second and third *Gingles* preconditions concern the behavior of voters and the electoral outcomes that result from racially polarized voting behavior.  They identify those instances where the risk of dilution-by-submergence is at its highest, namely "'where minority and majority *voters* consistently prefer different candidates' and where minority *voters* are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Milligan*, 599 U.S. at 17–18 (emphasis added).

641.    As *Milligan*'s emphasis on voter behavior and electoral outcomes makes clear, any inquiry into *why* voters are polarized, and the role played by partisanship, is part of the totality of the circumstances inquiry, not the *Gingles* 2 and 3 analysis.  *E.g., Teague*, 92 F.3d at 292.  To the extent *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc) can be read to suggest that this inquiry regarding the role of partisanship takes place in connection with the third *Gingles* precondition rather than the totality of the circumstances, *Milligan* strongly suggests that this is incorrect:   "The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." 599 U.S. at 19; *accord Nairne*, 2024 WL 492688, at *36, *38 and *Alpha Phi Alpha*, 2023 WL 7037537, at *56 n.45 (both applying *Milligan*  to hold that the partisanship issue is more properly analyzed in the context of the totality of the circumstances); *Lopez*, 339 F. Supp. 3d at 612–13 (considering issue at the

totality-of-the-circumstances phase).  Either way, Defendants have failed to meet their burden on this issue as stated in the discussion of Senate Factor 2, *infra*.

642.   The second *Gingles* precondition requires a showing that "the minority group . . . is politically cohesive." *Gingles*, 478 U.S. at 51.  It asks whether Black voters are voting cohesively for preferred candidates, such that Black voters would in fact elect representatives of choice if drawn into a majority-Black single member district.  *Milligan*, 599 U.S. at 18-19.  This showing of minority political cohesiveness is typically made by demonstrating "that a significant number of minority group members usually vote for the same candidates."  *Gingles*, 478 U.S. at 56.  The *Gingles* 2 precondition, by establishing "the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected" in a majority-minority district. *Milligan*, 599 U.S. at 18–19.

643.   The third *Gingles* precondition requires a showing that "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate" under the challenged districting scheme.  *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51).  *Gingles* 3 "'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race."  *Id.* at 19 (quoting *Growe*, 507 U.S. at 40).  "The relevant consideration under the third *Gingles* precondition is the *challenged* plan."  *Robinson*, 86 F.4th at 596 (emphasis in original).  The question is whether, in the area of focus where an additional, reasonably configured Black-majority district can be drawn, White bloc voting generally operates to "minimize or cancel black voters' ability to elect" their preferred candidate.  *Id.* at 595. Together, *Gingles* 2 and 3 provide a complete picture of how racial polarization operates in the area of focus.

644.   Plaintiffs in redistricting cases in Mississippi have repeatedly demonstrated racially

polarized voting for purposes of the second and third *Gingles* preconditions. *See, e.g., Teague*, 92 F.3d at 285; *Clark II*, 88 F.3d at 1395; *Thomas*, 366 F. Supp. 3d at 807; *Fairley v. City of Hattiesburg*, 122 F. Supp. 3d 553, 580 (S.D. Miss. 2015), *aff'd*, 662 F. App'x 291 (5th Cir. 2016); *Jamison*, 471 F. Supp. 2d at 713; *Houston v. Lafayette Cnty.*, 20 F. Supp. 2d 996, 1003 (N.D. Miss. 1998); *Ewing v. Monroe Cnty.*, 740 F. Supp. 417, 425 (N.D. Miss. 1990); *Gunn*, 705 F. Supp. at 319; *Jordan v. City of Greenwood*, 599 F. Supp. 397, 402 (N.D. Miss. 1984).

645.    Applying the *Gingles* principles to the foregoing findings of fact, the Court concludes that Plaintiffs have established *Gingles* 2 and 3.  As described already, and summarized below, there is abundant record evidence showing that Black voters in Mississippi are politically cohesive, and also that White bloc voting typically results in the defeat of Black-preferred candidates, both statewide and in the particular areas of focus. *Id.*  Indeed, Dr. Lisa Handley, who also served as an expert in *Nairne*, testified that "I've not been in a jurisdiction in which polarization is higher." *Supra* ¶ 161.

646.    Courts generally rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate. *See, e.g., Gingles*, 478 U.S. at 52–54; *Nipper v. Smith*, 39 F.3d 1494, 1505 n.20 (11th Cir. 1994); *Citizens for a Better Gretna v. City of Gretna, La.,* 834 F.2d 496, 500–03 (5th Cir. 1987); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 743 (5th Cir. 1993), *on reh'g en banc*, 999 F.2d 831 (5th Cir. 1993). And courts have recognized ecological inference ("EI"), a statistical method for estimating racial vote shares using election return and demographic data, as an appropriate analysis for determining whether a plaintiff has satisfied the second and third *Gingles* preconditions. *See, e.g., Nairne*, 2024 WL 492688, at *31–34; *Alpha Phi Alpha Fraternity*, No. 1:21-CV-5337-SCJ, 2022 WL 633312, at *56–64; *Caster v. Merrill*, No. 2:21-cv-1536-AMM, 2022 WL 264819, at *27, *38,

*68–70 (N.D. Ala. Jan. 24, 2022), *aff'd sub nom. Milligan*, 599 U.S. 1; *Rose v. Raffensperger*, No. 1:20-CV-02921-SDG, 2022 WL 205674, at *11 (N.D. Ga. Jan. 24, 2022); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 691 (S.D. Tex. 2017); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 723–24 (N.D. Tex. 2009); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004), *aff'd*, 461 F.3d 1011 (8th Cir. 2006).

647.    Dr. Handley conducted a statistical analysis of Mississippi elections using EI.  As noted already, this Court found Dr. Handley credible, her analysis methodologically sound, and her conclusions reliable, and credits Dr. Handley's testimony and conclusions.

648.    Dr. Handley properly focused on biracial elections (that is, elections featuring at least one Black candidate and at least one White candidate), which courts, including the Fifth Circuit, have repeatedly held are more probative than the elections only involving White candidates in assessing racial polarization.  *See Gingles*, 478 U.S. at 80–82 (relying exclusively on interracial contests to determine whether the Black vote was diluted); *Nairne*, 2024 WL 492688, at *31; *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993); *E. Jefferson Coal. For Leadership and Dev. V. Par. Of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991); *Campos v. City of Baytown*, 840 F.2d 1240, 1248–49 (5th Cir. 1988); *Gretna*, 834 F.2d at 503–04; *see also Wright*, 979 F.3d at 1301; *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1128 (3d Cir. 1993).

649.    Dr. Handley's analysis is "district-specific."  *Gingles*, 478 U.S. at 103 (O'Connor, J., concurring).  She did not rely on *statewide* voting statistics to establish legally significant racially polarized voting in the areas of focus.  *See, e.g., Magnolia Bar Ass'n*, 994 F.2d at 1151. Rather, the RPV analysis Dr. Handley conducted was specific to the particular areas of the state where Plaintiffs have asserted vote dilution claims.  Dr. Handley identified the seven areas of focus

based on the location of the new Black-majority districts in Mr. Cooper's Illustrative Senate and House Plans. *See, e.g.*, PTX-004 at 6.  In her EI analysis of statewide elections, she focused on the voting patterns in those elections for voters living in each of the seven areas of interest, which were defined by specific clusters of counties in the particular areas at issue in this case. *Id.* at 7–9, 11.

650.    Moreover, Dr. Handley also conducted EI analysis on 19 state legislative elections in the same seven areas of focus, all of which were also racially polarized. *E.g.*, PTX-004 at 9–10, 12.  Courts have consistently held that such endogenous elections, *i.e.*, elections for the same office within the same area, are especially probative. *Magnolia Bar Ass'n,* 994 F.2d at 1149; *see also Nairne*, 2024 WL 492688, at *32 (crediting Dr. Handley's analysis of state legislative elections from elections using prior legislative maps).  The analysis conducted by Dr. Handley of endogenous state legislative elections is highly probative and strongly supports the conclusion that state legislative elections in the seven areas of interest are racially polarized, including in state legislative contests in particular.

651.    In focusing her racially-polarized-voting analysis on the specific areas of the State where Plaintiffs claim vote dilution is occurring, and where the additional majority-Black illustrative legislative districts are drawn (indicating the presence of large and compact Black populations), Dr. Handley performed precisely the type of local analysis of the challenged districts that the *Gingles* analysis requires. *See Nairne*, 2024 WL 492688, at *31–32.

652.    It does not matter that Dr. Handley did not look at election results from elections held under the challenged plans.  Dr. Handley could not have done so, because at the time she conducted her analysis and wrote her report, no state legislative elections had taken place using the Enacted Plans.  The Section 2 vote-dilution standard is sufficiently flexible to accommodate

such circumstances.  *Cf. Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1209 n.11 (5th Cir. 1989) (citing *Gretna,* 834 F.2d at 502–03).  Indeed, Courts have relied on this exact type of analysis from Dr. Handley in recent Section 2 cases.  *See, e.g., Nairne*, 2024 WL 492688, at *31–32; *Robinson*, 605 F. Supp. 3d. at 803; *Alpha Phi Alpha*, 2023 WL 7037537, at *40.

653.    Based on the foregoing findings of fact, the second *Gingles* precondition is satisfied here, because Black voters in Mississippi in the areas of interest are politically cohesive.  *See* 478 U.S. at 49.  "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district."  *Id.* at 68.  Dr. Handley's unchallenged analysis clearly demonstrates extremely high levels of cohesiveness among Black Mississippians in supporting their preferred candidates in the specific areas where Mr. Cooper has proposed to draw additional majority-Black districts.  For example, across the elections that Dr. Handley analyzed, Black candidates preferred by Black voters received an average of 94.3% of the Black vote in statewide elections in these areas and only an average of 6.9% of the White vote.  *E.g.*, PTX-004 at 11; *supra* ¶ 158.  In all 17 of the statewide contests that Dr. Handley examined, including contests from 2019 and 2015, the level of cohesion among Black voters was over 75% in each of the areas of interest.  *Supra* ¶¶ 160–161.  In the vast majority of state legislative contests she examined (14 out of 19), the level of cohesion was greater than 75%.  *Supra* ¶¶ 162–163.  Defendants' expert did not dispute that Black voters are cohesively supporting preferred candidates in those areas.  *Supra* ¶ 172

654.    Based on the foregoing findings of fact, the third *Gingles* precondition is satisfied here, because the White majority consistently votes in the seven areas of interest vote as a bloc to defeat the minority candidate.

655.    There is no specific threshold percentage required to demonstrate bloc voting, as "[t]he amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice . . . will vary from district to district." *Gingles*, 478 U.S. at 56 (internal citations omitted).  In the areas of focus, average White voter support for the Black-preferred Black candidate was only 6.9% across 11 elections (and was still under 10% with respect to Black-preferred White candidates).  *Supra* ¶ 158.  In biracial state legislative contests in 2019 and 2015, Black-preferred candidates only prevailed in Black-majority districts.  *Supra* ¶¶ 162–164.  And consistent with the very high degree of White bloc-voting against Black-preferred candidates and minimal White crossover voting that she observed, Dr. Handley's unchallenged recompiled-precinct analysis showed that the only state legislative districts that were effective for Black voters in the areas of focus were ones that had a BVAP majority, while in other districts, Black-preferred candidates were uniformly defeated by White bloc voting, *see, e.g.*, *supra* ¶¶ 178–180; *see also id.* ¶ 172; PTX-004 at 16–36.

656.    All of this is the same type of analysis and evidence that demonstrated legally significant racially polarized voting for purposes of the *Gingles* preconditions in *Milligan*, *Robinson*, and *Nairne*.  In *Milligan*, for example, the evidence was that, "on average, Black voters supported their candidates of choice with 92.3% of the vote" while "white voters supported Black-preferred candidates with 15.4% of the vote" and "that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters."  599 U.S. at 22.  In *Robinson*, the evidence similarly showed that Black voter cohesion was 83.8% on average, and that White crossover voting was between 11.7 percent and 20.8 percent—and the Court concluded this was sufficient to show legally significant polarization.  86 F.4th at 597; *see also* *Robinson*, 605 F. Supp. 3d at 801.  In *Nairne* the numbers were similar, and Dr. Handley similarly

used recompiled precinct analysis, as she did here, to show that the illustrative plans offered additional Black-majority districts where Black voters would have the opportunity to elect candidates of choice.  2024 WL 492688, at *31; *see also Alpha Phi Alpha*, 2023 WL 7037537, at *57 (finding *Gingles* 3 satisfied where "only 12.4% of white voters support Black-preferred candidates").  That showing—that White bloc voting against Black-preferred candidates prevents Black voters in the areas of focus from electing state legislative candidates of choice despite their own cohesive voting patterns except in Black-majority districts—is the essence of *Gingles* 3.

## VI.    Totality of Circumstances

657.    After a plaintiff establishes the *Gingles* preconditions, the "totality of circumstances" must be considered to make a final determination whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also Milligan*, 599 U.S. at 26; *LULAC*, 548 U.S. at 425–26; *Robinson*, 86 F.4th at 597.   The Court applies this analysis "specifically to the facts of each case and the state electoral mechanism while also considering the [Senate] factors as a guide." *Id.*  The totality of the circumstances inquiry "is peculiarly dependent upon the facts of each case," "requires an intensely local appraisal of the design and impact of the contested electoral mechanisms," and "depends upon a searching practical evaluation of the past and present reality and on a functional view of the political process." *Gingles*, 478 U.S. at 45, 79 (citations and internal quotation marks omitted); *see, e.g.*, *Westwego Citizens for Better Gov't, v. City of Westwego*, 946 F.2d 1109, 1115 (5th Cir. 1991) (discussing how the lingering effects of racial discrimination continued to impact voting in Westwego).

658.    The Senate factors "are 'neither comprehensive nor exclusive.'" *Ga. State Conf. of NAACP*, 775 F.3d at 1342 (quoting *Gingles*, 478 U.S. at 45).  Nor is there any "requirement that

any particular number of factors be proved, or that a majority of them point one way or the other."
*Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29, 1982 U.S.C.C.A.N, 207); *see also
Westwego Citizens for Better Gov't*, 946 F.2d at 1120; *see also McMillan v. Escambia Cnty.*, 748
F.2d 1037, 1042–47 (5th Cir. 1984) (finding a Section 2 violation based on Senate Factors 1, 2, 3,
5, 7, and 9); *Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1262–68 (N.D.
Miss. 1987) (finding a Section 2 violation after determining that five Senate Factors weighed in
plaintiffs' favor), *aff'd*, 932 F.2d 400 (5th Cir. 1991).

659.    Senate Factor 2, the extent to which voting in the jurisdiction is racially polarized,
and Senate Factor 7, the extent to which members of the minority group have been elected to office
in the jurisdiction, are the most important Senate Factors. *E.g.*, *Fairley*, 662 F. App'x at 296 (citing
*Clark II*, 88 F.3d at 1397) ("The existence of racially polarized voting and the extent to which
minorities are elected to public office remain the two most important factors considered in the
totality-of-circumstances inquiry."); *Clark II*, 88 F.3d at 1398 (finding the "presence of racially
polarized voting and the virtually complete absence of black elected officials in county offices"
provided strong evidence of vote dilution).  The presence or absence alone of these factors is not,
however, dispositive. *See, e.g.*, *Major v. Treen*, 574 F. Supp. 325, 351 (E.D. La. 1983) (three-
judge court).

660.    As noted already, "it will be only the very unusual case in which the plaintiffs can
establish the existence of the three *Gingles* [preconditions] but still have failed to establish a
violation of § 2 under the totality of circumstances." *Teague*, 92 F.3d at 293 (quoting *Clark I*, 21
F.3d at 97; *see also Ga. State Conf. of NAACP*, 775 F.3d at 1342 (same).

661.    Because Plaintiffs have proven the three *Gingles* preconditions, they have shown
that, in the specific areas of focus, the combination of the district lines and persistent White bloc

voting against Black-preferred candidates will operate to lock substantial numbers of Black voters out of power. That is the fundamental dilution dynamic that *Gingles* and its progeny recognize. *E.g.*¸ 478 U.S. at 46–57 & n.11. And looking to the totality of the circumstances, including the Senate Factors, this is not the "'very unusual case'" where liability does not follow, *Teague*, 92 F.3d at 293 (quoting *Clark I*, 21 F.3d at 97). Rather, the evidence is fundamentally similar to the evidence that supported liability in recent cases like *Milligan*, *Robinson*, and *Nairne*

### A. Senate Factor 1: Mississippi's History of Voting-Related Discrimination Against Black Voters

662. Senate Factor 1, accounting "the history of official voting-related discrimination in the state or political subdivision," weighs heavily in Plaintiffs' favor. *Gingles*, 478 U.S. at 37.

663. "Mississippi plainly has a long history of official discrimination against African-Americans seeking to vote." *Thomas*, 366 F. Supp. 3d at 807; *see also Teague*, 92 F.3d at 293–94 ("That Mississippi has a long and dubious history of discriminating against blacks is indisputable."); *Clark II*, 88 F.3d at 1399 ("The long and unhappy history of discrimination in Mississippi requires no protracted discussion."); *Jamison*, 471 F. Supp. 2d at 714 ("[T]he court acknowledges that official discrimination historically has hindered potential minority voters in Mississippi…").

664. In fact, the history of discrimination is so undisputed that courts have taken judicial notice of it. *See e.g.*, *Fairley*, 122 F. Supp. 3d at 567. And as discussed in the foregoing findings of fact, Plaintiffs have paired their evidence regarding Mississippi's official history of discrimination with a showing that Black Mississippians "do not in fact participate to the same extent as other citizens." *Cf. N.A.A.C.P. v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001).

665. Plaintiffs have also presented evidence that Mississippi's past history of

discrimination continues to impact Black voters today.  *Supra* ¶¶ 188–209; *see also* R. Luckett Testimony, 2/27/2024 Trial Tr. 371:9–23; 400:7–12 (testifying Department of Justice voting determination letters from 1985–2012 are connected to where we are today in 2024 because they indicate a continued history of voting determination and discriminatory practices); 401:5–413:4 (testifying about current voting laws and their connection to the long history of discrimination against Black Mississippians and the attempts to disenfranchise Black voters and dilute Black votes); 413:24–415:5 (same for divestment in the City of Jackson); 415:6–416:20 (same for felony disenfranchisement); 416:25–418:13 (concluding that Mississippi has a long history of voter-related discrimination against African-Americans that continues to this day); 450:4–24 ("that history, from the past to the present, all the way to now, is increasingly more and more less about the openly racially discriminatory language and intent, and instead intent that is masked by what we call color-blind language but in fact does have racial impact . . . this history of racial discrimination particularly [is relevant] in relation to Senate factors 1, 3, 5"); 456:2–16 ("[k]ind of like the rest of this history, those factors don't exist in a vacuum.  They interact with each other over time"); 461:25–462:24 (testifying the lingering impact of dual registration laws have a discriminatory impact on Black voters today).

666.    We reject Defendants' contention that this past history of discrimination is irrelevant and does not continue to negatively impact Black voters and their ability to elect candidates of choice today.  Individual voters' testimony showed that the history of exclusion still influences the lives of Black Mississippians, and for some represents their lived experience.  FOF ¶¶ 213–17.  That the very worst discriminatory voting rules were eradicated after 1965 is not a defense to vote dilution, as recent Section 2 merits determinations in Alabama (*Milligan*), Georgia (*Alpha Phi Alpha*), Louisiana (*Robinson* and *Nairne*), and Mississippi (*Thomas*) demonstrate.

667.    Based upon the foregoing findings of fact, the extensive history of discrimination against Black voters in Mississippi supports a determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House in the areas of focus.

### B.    Senate Factor 2:    High Levels of Racially Polarized Voting in Mississippi

668.    The second Senate Factor is "the extent to which voting … is racially polarized." *Nairne*, 2024 WL 492688, at *38 (quoting *Gingles*, 478 U.S. at 37).

669.    Here, the undisputed facts show extremely stark and persistent levels of racially polarized voting in all of the areas of Mississippi at issue, and in both statewide and local state legislative contests.  The extent of this racial polarization is sweeping and weighs heavily in favor of a finding of liability.  Proof of such racially polarized voting *itself* creates an inference of racial bias in the electoral system.  *See Teague*, 92 F.3d at 290 ("Plaintiffs are to present evidence of racial bias operating in the electoral system by proving up the *Gingles* factors.") *accord United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566–67 (11th Cir. 1984) (Wisdom, J.) (racially-polarized voting is "the surest indication of race-conscious politics").

670.    Defendants argue that the observed differences in voting behavior between Black and White Mississippians are driven by partisan affiliation rather than race.  This question is properly considered as part of the totality of the circumstances.  *Teague*, 92 F.3d at 292; *see also Gingles*, 478 U.S. at 74.

671.    The burden to rebut the inference of race-conscious politics, and to demonstrate that stark patterns of racial polarization in the electorate are due to something other than race, lies in the first instance with the defendant.  A Section 2 plaintiff does not have "the burden of negating

all nonracial reasons possibly explaining" those voting patterns. *Teague*, 92 F.3d at 295; *accord id.* at 290; *Nairne*, 2024 WL 492688 at *38. Rather, it is for the defendant to "try to rebut plaintiffs' claim of vote dilution via evidence of 'objective, nonracial factors.'" *See Teague*, 92 F.3d at 292 (quoting *Nipper*, 39 F.3d at 1513). Viewing the burden this way makes sense because, in a Section 2 results case, Plaintiffs are not required to affirmatively prove the ultimate or underlying *cause* of unequal opportunity for Black voters, only the unequal *result* of the imposition of the challenged districting plan. *See Milligan,* 599 U.S. at 18.

672.    Like the rest of the totality of circumstances factors, courts balance the relative strength of evidence the parties direct to each factor—including racial polarization—to determine whether Black Mississippians' votes are being diluted. *See, e.g.*, *Lopez*, 339 F. Supp. 3d at 604 ("[P]laintiffs do not bear the burden in the first instance to eliminate factors other than race as influencing voters.") (citation omitted); *accord Teague,* 92 F.3d at 295. Defendants have not made and cannot make the necessary showing here.

673.    In the few instances where defendants have succeeded with this "party defense," there has been record evidence that "indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens." *Clements*, 999 F.2d at 850. Thus, in *Clements*, the evidence showed very high levels of White crossover voting in Texas judicial elections for minority-preferred candidates, between 30 and 40 percent. *Id.* at 861. In addition, both political parties "aggressively recruited" minority candidates, successfully nominated them, and elected them with White support, such that there was a track record of minority candidates winning elections repeatedly and "without fail" with support primarily from White voters, including in contests against White candidates. *Id.* at 861.

674.    Similarly, in *Lopez*, another Texas judicial districting case, both parties were

running minority candidates, and White voters were consistently voting to elect minority candidates nominated by their preferred party.  339 F. Supp. 3d at 612–13.

675.    Likewise in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), on which Defendants also rely, poor Black and poor White voters in one section of the County were voting for one party, and wealthier voters elsewhere were voting for the other party—but both parties were nominating and electing Black candidates, and doing so with White support.  403 U.S. at 149–53 & nn. 29–30. Justice White described a similar scenario in his *Gingles* concurrence, in which both parties were nominating racially mixed slates of candidates, such that White voters were supporting and electing Black candidates and vice versa.  478 U.S. at 83 (White, J., concurring).

676.    The common thread among these cases—and the reason why the facts in each could support the conclusion that the polarization of the electorate might be partisan rather than racial in nature—is that White voters were consistently *voting for and electing to office* minority candidates, both by "crossover" voting for minority voters' preferred candidates in significant numbers, and by voting for minority nominees from their own preferred party.  These cases show that, when the facts demonstrate that there are two genuinely multi-racial coalitions operating in politics, with both parties nominating and electing minority candidates with White support, the mere fact that the racial composition of the two coalitions varies somewhat may not be sufficient to sustain a Section 2 claim.  In that situation, it might be said that partisan affiliation "best explains" polarization.  *Clements*, 999 F.2d at 850.

677.    But, the trial record in this case could not be more different than the facts and circumstances of those cases.  The trial record here does not show that the stark polarization of the electorate along racial lines is primarily a function of partisanship.  Rather, it shows that race best explains the polarization of the electorate along racial lines.  *Accord Nairne,* 2024 WL 492688 at

*38.

678.    Defendants' expert, Dr. Alford, merely notes the existence of a partisan divide along racial lines, such that Black voters tend to support Democrats and White voters tend to support Republicans.  Dr. Alford did not testify as to *why* Black and White voters cohesively support candidates from different parties.  He did not conduct any analysis attempting to assess the roles race and party have in Mississippi voters' vote choices.  Courts have repeatedly rejected Dr. Alford's assertion that mere correlation between race and partisanship, without more, can negate or diminish evidence of stark racial polarization among voters. *Robinson*, 605 F. Supp. 3d at 840-41 ("Dr. Alford's opinions border on *ipse dixit*. His opinions are unsupported by meaningful substantive analysis and are not the result of commonly accepted methodology in the field."); *see also Nairne*, 2024 WL 492688 at *38; *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, Nos. 1:21-CV-5339-SCJ, 1:22-CV-122-SCJ, 587 F.Supp.3d 1222, 1305–06 (N.D. Ga. Feb. 28, 2022); *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020); *cf. Clements*, 999 F.2d at 860–61 (holding it "entirely correct … that courts should not summarily dismiss vote dilution claims in cases where racially divergent voting patterns correspond with partisan affiliation").  His analysis followed the same pattern here, and the Court rejects it for the same reasons.  *See also Jamison*, 471 F. Supp. 2d at 713–14 ("The reasons that black and white voters vote differently have no relevance to the central inquiry of § 2….").  Having offered only Dr. Alford's unsupported opinion, Defendants have failed to rebut the inference of "racial bias . . . in the electoral system" that follows from Plaintiffs' showing of persistent patterns of racially polarized voting in the areas of focus.  *Teague*, 92 F.3d at 290; *see also Nairne*, 2024 WL 492688, at *38.

679.    In contrast, Plaintiffs *did* adduce extensive evidence bearing on the racial nature

and causes of racially polarized voting in Mississippi, affirmatively demonstrating that race best explains the electorate's clear polarization along racial lines.

680.    For one, the data itself shows that the race of the candidate matters in Mississippi elections:  Unlike in *Clements*, White voters vote against Black candidates almost uniformly, in election after election, such that Black candidates only win in Black-majority districts.  In *Clements* and similar cases, there were consistently high levels of White crossover voting.  But in the undisputed data in the trial record, White crossover voting is low, almost always under 10% in statewide contests in the areas of focus, and only ticking up for a top-of-the ticket White candidate, Jim Hood.  *E.g.*, FOF ¶¶ 159, 224.  In *Clements*, both parties were consistently nominating minority candidates.  But in the undisputed data in the trial record, which contains every biracial statewide contest and every biracial state legislative contest from the areas of focus from the last decade, there was not a single instance in which the Republican Party (*i.e.*, the party typically favored by White voters) nominated a Black candidate for statewide office—and only one out of nineteen where a Black Republican was nominated for state legislative office (in a Black-majority district against an incumbent Black Democrat).  FOF ¶¶ 225–26, 322.  And perhaps most importantly, in *Clements*, White voters were voting for *and electing* minority candidates to office.  Here, by contrast there has not been a Black candidate elected statewide since Reconstruction, even while White candidates from both parties (such as Jim Hood) have won statewide office in the recent past, *see supra* ¶¶ 225, 320.  Similarly, in state legislative contests in White-majority districts (*i.e.*, where White support was required to win), White voters voted against Black candidates at 80%+ levels of cohesion in *every single election*.  FOF ¶ 224(b).

681.    The data from Democratic primary contests and non-partisan contests, where there was no partisan "cue" about the candidates on the ballot, also consistently show that White voters

almost never vote to elect Black candidates.  Dr. Handley concluded that a number of these primary and non-partisan contests were not polarized, but the reason for this is almost uniformly because Black voters sometimes voted for White candidates, which is consistent with Dr. Marvin King's testimony about Black voters' keen attention to candidate viability.  *Supra* ¶¶ 165–68, 224, 239.  On the other hand, White voters in these contests consistently voted against Black candidates.  In seven out of eight Democratic primaries, the bulk of White voters voted against the Black candidate.  FOF ¶ 224(d).  And in *all three* of those non-partisan State Supreme Court contests, White voters voted against the Black candidate, with 70%+ cohesion.  FOF ¶ 224(c).

682.   The data thus supports the conclusion that race "best explains" the stark patterns of racial polarization in Mississippi in the areas of focus, and reaffirms that Senate Factor 2 (and Senate Factor 7) weigh strongly in favor of liability.  And Dr. Marvin King's wholly unrebutted analysis of *why* the electorate is racially polarized and *how* it got that way confirms that conclusion.

683.   First, Dr. King explained that while Black voters do vote for White candidates, Black voters also respond to the race of the candidate by turning out in higher numbers when a Black candidate is on the ballot.  FOF ¶ 239.  Voters' preferences with respect to the race of the candidate are also revealed by reference to the candidates who prevail in Black and White majority districts:  Black-majority districts are almost all represented by Black legislators, and White-majority districts by White legislators.   FOF ¶ 239–40.

684.   More broadly, Dr. King explained that race and racial issues played a critical role in shaping the partisan alignment of Black and White voters that we see today—and Defendants' own expert Dr. Brunell agreed.  FOF ¶¶ 218–22, 229–38, 333.  As Dr. King explained, after passage of the VRA in 1965, as Black voters in Mississippi and across the South were newly empowered to exercise their voting rights, they began voting Democratic—and in the election

cycles after that, White voters responded by moving to the Republican Party.  FOF ¶¶ 229–35.  As Dr. King explained, with absolutely no contrary analysis from any defense expert, Mississippi voters realigned over time based on the parties' and candidates' positions with respect to racial equality and civil rights.  FOF ¶¶ 237–39.  The historical realignment of Black voters in Mississippi from voting Republican to voting Democratic "undercuts the argument that the vote is polarized along party lines and not racial lines."  *Nairne*, 2024 WL 492688, at *38; *Robinson*, 605 F. Supp. 3d at 845 ("The realignment of Black voters from Democrat to Republican is strong evidence that, party affiliation notwithstanding, Black voters cohesively [vote] for candidates who are aligned on issues connected to race.").  And this descriptive analysis is consistent with empirical and survey-based analyses of the ways race drives voters' political decision-making.  FOF ¶¶ 237–39.[15] Indeed, Dr. Alford agreed that race can motivate political affiliation.  FOF ¶¶ 237.

685.    Dr. King's unrebutted analysis on the salience of race in Mississippi politics was clear:  "Race has always been the preeminent political issue in Mississippi and so that defines the dividing lines for the parties. So race comes first. That's the foundation for polarization."  FOF ¶¶ 229.

686.    This court's conclusions are also consistent with numerous courts that have similarly found racially polarized voting in Mississippi without conducting an inquiry into partisanship as a cause of racially polarized voting.  *See, e.g., Clark II*, 88 F.3d at 1395–97;

---

[15] Consistent with that, the trial record also confirms that voters vote their perceived values and interests—but that those perceived interests can change in response to the positions taken by the candidates and the parties.  Thus, Deacon Kenneth Harris and Gary Fredericks testified about supporting Republicans like Lt. Gov. Delbert Hosemann and former Senator Thad Cochran when those officials demonstrated responsiveness to issues of concern their communities.  FOF ¶¶ 243–45.

*Thomas*, 366 F. Supp. 3d at 807; *Fairley*, 122 F. Supp. 3d at 580; *Jamison.*, 471 F. Supp. 2d at

713; *Houston*, 20 F. Supp. 2d at 1003; *Ewing v. Monroe Cnty.*, 740 F. Supp. 417, 425 (N.D. Miss.

1990); *Gunn*, 705 F. Supp. at 319; *Jordan*, 599 F. Supp. at 402.

687.     Based upon the foregoing findings of fact, elections in Mississippi in the areas of

interest are characterized by patterns of starkly racially polarized voting, and race best explains

those racially polarized voting patterns.   Racial polarization remains stark and persistent; it is

historically prior (and in no small part has helped to shape) the present partisan alignment of Black

and White voters; and it operates in all types of elections, even absent partisan cues, especially

with respect to White voters' persistent opposition to Black candidates. As a result, Black

candidates nearly always lose outside of Black-majority districts.   All of this strongly supports the

determination that Black voters have less opportunity than Whites to participate in the political

process and to elect representatives of their choice to the State Senate and State House in the areas

of focus.   Senate Factor 2 (and, as discussed further below, its counterpart Senate Factor 7) thus

weigh extremely strongly in favor of Plaintiffs.

### C.     Senate Factor 3:  Mississippi's Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters

688.     Senate Factor 3, assessing "the extent to which the state of political subdivision has

used voting practices or procedures that tend to enhance the opportunity for discrimination against

the minority group," weighs in Plaintiffs' favor.   *Gingles*, 478 U.S. at 45.

689.     The existence and use of restrictive voting practices may exacerbate the dilution

caused by racial polarization and the submergence of Black voters in White-majority districts.   *See,*

*e.g.*, *Gingles*, 478 U.S. at 47 (affirming that at-large voting may "operate to minimize or cancel

out the voting strength of racial minorities in the voting population") (citation omitted).   That

includes practices used in Mississippi, such as majority vote requirements, absentee ballot restrictions, odd year elections, and a history of racial gerrymandering and use of at-large elections. *See Harvell v. Blytheville Sch. Dist. No. 5*, 71 F. 3d 1382, 1390–91 (8th Cir. 1995) (finding that "majority vote requirement" and "staggered terms" "tend to suppress minority voters' influence"); *see also Nairne*, 2024 WL 492688, at *39 (weighing Senate Factor 3 in favor of Plaintiffs because state "has a majority vote requirement for its primaries and general elections" and "holds off-year elections" which "breed[] voter fatigue and confusion, which is amplified in poor and under educated communities"); *Alpha Phi Alpha*, 2023 WL 7037537, at *64 n. 54 (law restricting absentee ballot usage weighed for plaintiffs under Senate Factor 3 because of its "actual or perceived negative impact on Black voters" who had used absentee voting in greater numbers before passage of the law); *Singleton*, 582 F. Supp. 3d at 1021 (weighing history of court invalidations of racial gerrymanders and at-large voting systems on grounds of racially discriminatory purpose or effect in favor of Plaintiffs under Senate Factor 3).

690.    Plaintiffs have presented evidence that Mississippi historically employed and continues to employ voting practices that enhance the opportunity for discrimination against Black voters.  R. Luckett Testimony, 2/27/2024 Trial Tr. 369:18–21, 371:9–23, 393:1–20, 400:7–12, 401:5–413:4, 413:24–415:5, 415:6–416:20, 416:25–418:13, 450:4–24, 456:2–16, 461:25–462:24.

691.    The trial record shows that voting rules and procedures that enhance opportunities for discrimination in voting and burden the right to vote disproportionately for Black Mississippians remain in place, and in some cases have been expanded.  These include lifetime felony disenfranchisement; restrictions on absentee voting, including new restrictions imposed in the last year; a strict voter ID law; a  new voter purge law that extends beyond what federal law requires and that will lead to less frequent voters being taken off the active list and subjected to

additional barriers to voting in the future; odd-year state legislative elections that lead to lower turnout and greater voter fatigue, especially among less educated voters; and a lack of early voting, mail-in voting, or same-day registration, or other practices that might make it easier to vote and ameliorate the effects of past discrimination and socioeconomic disparities. *Supra* ¶¶ 247–55. Such restrictive policies are relevant regardless of their legality. *See, e.g.*, *Nairne*, 2024 WL 492688, at *36–39; *Jamison*, 471 F. Supp. 2d at 714. That is especially so where both the expert and fact witness testimony showed that the burdens imposed by restrictive voting rules fall disproportionately on Black voters, *e.g.*, *supra* ¶¶ 255–59. *See Nairne*, 2024 WL 492688, at *39; *Alpha Phi Alpha*, 2023 WL 7037537, at *64 n. 54; *see also Singleton*, 582 F. Supp. 3d at 1021.

692.     Based on the foregoing findings of fact, voting practices in Mississippi's legislative elections further enhance the opportunity for discrimination, which supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House.

### D.     Senate Factor 5:  Disparities in Education, Employment, and Health That Hinder Political Participation

693.     Senate Factor 5, measuring "the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process," weighs in Plaintiffs' favor as well. *Gingles*, 478 U.S. at 37.  Courts have recognized that, as a result of past discrimination, Black voters in Mississippi suffer from socio-economic disadvantages that diminish their ability to participate in the political process. *See, e.g.*, *Teague*, 92 F.3d at 294; *Thomas*, 366 F. Supp. 3d at 807; *Magnolia Bar Ass'n*, 793 F. Supp. at 1409 (noting that due to the fact that Black Mississippians "continue to bear the effects of discrimination in critical areas of socioeconomic

attainment" like education and automobile ownership, Senate Factor 5 "will be a factor on which the plaintiffs in voting rights cases will always win in the foreseeable future").

694.     "To establish this factor, a plaintiff must prove two elements—(1) socioeconomic disparities in areas such as education, income level, and living conditions which arise from past discrimination, and (2) 'proof that participation in the political process is in fact depressed among minority citizens,' which can be shown by evidence of reduced levels of registration or lower turnout among minority voters." *Terrebonne Par. Branch NAACP*, 274 F. Supp. 3d at 442 (quoting *Clements*, 999 F.2d at 867). "Where the minority group presents evidence that its members are socioeconomically disadvantaged and that their level of participation in politics is depressed, the group need not prove any further causal nexus between its members' disparate socioeconomic status and the depressed level of political participation." *Clements*, 986 F.2d at 750 (cleaned up); *see also Teague*, 92 F.3d at 294 ("Plaintiffs are not required to prove a causal connection between [socioeconomic disparities] and a depressed level of political participation."); *Thomas*, 366 F. Supp. 3d at 807 (same).

695.     Depressed levels of income, education and employment are a consequence of severe historical disadvantage. "Political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes." *Thomas*, 366 F. Supp. 3d at 808 (citing *Gingles*, 478 U.S. at 69); *see also Citizens for a Better Gretna*, 636 F. Supp. at 1120 ("Depressed levels of participation in voting and candidacy are inextricably involved in the perception of futility and impotence such a history engenders"); *St. Bernard Citizens for Better Gov't*, 2002 WL 2022589, at *9 ("Both Congress and the Courts have recognized the effect lower socio-economic status has on minority participation in the political process."); *Major*, 574 F. Supp. at 340–41 (similar).

696.     Courts have recognized that "[t]here are vast differences between [Black and White Mississippians] on education, employment, income, housing, and health indices, among others, that ultimately reflect the effects of slavery and segregation." *Thomas*, 366 F. Supp. 3d at 807.

697.     Here, Plaintiffs have offered extensive, unrebutted evidence that Black Mississippians suffer socioeconomic hardships stemming from centuries of racial discrimination. As discussed above and throughout Dr. Orey's expert report and testimony, and the testimony of Dr. Luckett, Mississippi's Black residents experience stark socioeconomic disadvantages across all areas of life:  Poverty rates among Black Mississippians are three times that of Whites; educational attainment, especially with respect to higher education, is significantly lower; rates of disease and lack of access to private medical coverage are significantly higher. *Supra* ¶¶ 267–81.

698.     These disparities, arising from a long history of discrimination, burden Black Mississippians' participation in the political process as compared to Whites.  Dr. Orey testified, again without any dispute from Defendants, regarding the established empirical link in the political science literature between political participation and socioeconomic categories like income, poverty, educational attainment, and health. *Supra* ¶ 266; *see also, e.g.*, *Gingles*, 478 U.S. at 69 ("[P]olitical participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes.").  Dr. Orey's regression analysis, which Defendants did not challenge, showed empirically that Black voter participation is linked to educational attainment, poverty, and rates of public insurance, all areas where there are significant racial gaps between Blacks and Whites. *Supra* ¶¶ 304–05; *see also* R. Luckett Testimony, 2/27/2024 Trial Tr. 370:2–5; 429:15–25.  That uncontested analysis in itself demonstrates that lower levels of education, income, and health depress Black turnout. *See, e.g.*, *Nairne*, 2024 WL 492688, at *39-41 (crediting analysis that

disparities in these factors depress turnout); *see also, e.g.*, *Terrebonne Par. Branch NAACP*, 274 F. Supp. 3d 395 at 442 (Senate Factor 5 includes "proof that participation in the political process is in fact depressed among minority citizens").

699.     Plaintiffs also demonstrated, via Dr. Orey's use of three different analytical methods, that Black turnout was in fact around ten points lower than White turnout in 2020 election, both statewide and in the areas of focus, like Chickasaw, Copiah, DeSoto, Forrest, Lamar, Lincoln, Monroe, and Newton Counties.  *Supra* ¶¶ 282–303.  The substance of Dr. Orey's three analyses, each of which used a different form of validated data, and which produced consistent results, was largely uncontested.  *Supra* ¶¶ 284, 295–96.  And Dr. Orey and Dr. Jordan Ragusa also both explained why 2020, as a higher turnout election, is a good benchmark for assessing electoral behavior and turnout by race.  *Supra* ¶ 285.

700.     In contrast to Dr. Orey's multiple methodologies, Defendants argue there was no turnout gap by pointing to sources whose validity no expert credibly vouched for.  First, they relied on the Current Population Survey ("CPS") voting supplement, an unvalidated survey that relies solely on voters' self-reported behavior.  *Supra* ¶¶ 299–300.  As Dr. Orey credibly testified (and as Defendants' own expert Dr. Brunell agreed), the CPS data on turnout by race is not considered reliable by political scientists.  *Supra* ¶¶ 301–02; *accord Thomas*, 366 F. Supp. 3d at 808 (noting "known issues with self-reported voting surveys").  Defendants also attempted to rely on a new report about voter turnout by race that was published on the internet in the middle of trial.  But Dr. Brunell testified that this source, which he reviewed for all of a few hours before testifying on it, was not peer reviewed, that it was not specific to Mississippi, that its data and code were not public, that its authors (and their reputation and qualifications) were unknown to him, and that the Census Bureau had characterized some of the population data used in the report's model as failing to meet

quality standards.  FOF ¶ 303; *see also* FOF ¶ 303 (Cooper testimony regarding data quality).

701.    Based upon the foregoing findings of fact, Black Mississippians suffer from disparities in income, education, health, and other areas, which impede their ability to participate equally in politics as compared to Whites.  This too supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House in the areas of focus.

### E.    Senate Factor 6:  Racial Appeals in Mississippi Politics

702.    Senate Factor 6, "the use of overt or subtle racial appeals in political campaigns," weighs in Plaintiffs' favor.  *Gingles*, 478 U.S. at 37.  Here, Plaintiffs have provided specific examples of both "blatant" as well as "subtle and furtive" racial appeals during campaigns over the past few decades.  *Id.* at 40.

703.    This Court has previously recognized the use of racial appeals in Mississippi's political campaigns.  *See, e.g.*, *Martin v. Allain*, 658 F. Supp. 1183, 1195 (S.D. Miss. 1987) (finding continued existence of both "overt" and "subtle" racial appeals in Mississippi).

704.    Even today, racial appeals remain a regrettable aspect of Mississippi politics.  These include, as Dr. King described, advertisements and political messages that invoke discriminatory tropes to make Black candidates seem less electable in the minds of some voters, or that portray Black people using those tropes in order to gain political advantage.  *Supra* ¶¶ 306–18.  Dr. King cited numerous examples, including examples from the last few election cycles, of campaign messaging signaling nostalgia for the Confederacy, or portraying Black politicians and political leaders as criminals or otherwise not "one of us."  FOF ¶¶ 311; *cf. Jordan*, 604 F. Supp. at 813 n.8 (use of "one of us" as a slogan and images of confederate monuments in advertisements signaled racial appeals), *aff'd sub nom. Mississippi Republican Exec. Comm. v. Brooks*, 469 U.S. 1002

261

(1984).  Dr. King testified, unrebutted, that campaigns do not invoke such rhetoric "coincidentally or by chance."  FOF ¶ 310.

705.    That such messages were issued by private political campaigns does not diminish their relevance.  The very existence of these racial appeals reflects an environment where race is highly salient in politics, and where campaigns believe that racial appeals will be effective in further polarizing voters.  *See, e.g., Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,* 201 F. Supp. 3d 1006, 1078 (E.D. Mo. 2016), *aff'd,* 894 F.3d 924 (8th Cir. 2018).

706.    Based upon the foregoing findings of fact, the history and continued use of racial appeals in political campaigns in Mississippi supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House in the areas of focus.

### F.    Senate Factor 7:  Lack of Success for Black Candidates in Mississippi

707.    Senate Factor 7, "the extent to which members of the minority group have been elected to public office in the jurisdiction," weighs heavily in favor of Plaintiffs.  *Gingles,* 478 U.S. at 37.  "The extent to which minority candidates are elected to public office also contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process."  *Veasey v. Abbott,* 830 F.3d 216, 261 (5th Cir. 2016) (en banc).

708.    "[E]lections involving the particular office at issue will be more relevant than elections involving other offices."  *Magnolia Bar Ass'n,* 994 F.2d at 1149; *see also Rangel v. Morales,* 8 F.3d 242, 245–46 (5th Cir.1993); *Clark,* 21 F.3d at 97; *see also Thomas,* 366 F. Supp. 3d at 806 ("It is not credible to draw a conclusion about white bloc voting in District 22 based exclusively on the fact that there are some black elected officials in parts of the District.").

709.     Plaintiffs' evidence, including stipulated facts, Dr. King's testimony, as well as the testimony of other experts, demonstrate that Black Mississippians are completely unrepresented in statewide elected offices, and they rarely succeed in local and district-based elections outside of majority-Black districts, including in state legislative elections in the particular areas of focus. Defendants do not meaningfully dispute that Black Mississippians are almost never elected to state legislative office in the areas of focus other than from Black-majority districts—indeed, *their own experts agreed* with this conclusion.  *Supra* ¶¶ 221–22.

710.     Consistent with that, both Dr. King and Defendants' expert Dr. Brunell agreed that Black legislators are underrepresented relative to the State's Black population, especially in the State Senate, where Black legislators make up approximately 27% of that body.  *Supra* ¶ 326.  This underrepresentation is especially pronounced in the particular areas of focus in this case.  The White-majority districts in the areas of focus are all represented by White legislators and have been for at least the last decade.  *See* Stip. ¶¶ 71, 82, 89.  No part of DeSoto County has been represented by a Black State Senator since the 1800s.  Stip. ¶ 49.  The same is true for Chickasaw and Monroe Counties in the State House.  Stip. ¶ 50.  All of this is also consistent with Mr. Cooper's regional representation gap analysis which showed especially low numbers of Black-majority districts in those areas.  *Supra* ¶¶ 79–80.

711.     And as Dr. King explained, Black candidates in Mississippi face difficulty winning outside of Black-majority districts in no small part because racial resentment among some White voters impedes them from forming winning coalitions with White voters.  *Supra* ¶ 327.

712.     The Court's findings and conclusions are not altered by the fact that a single Black Republican recently won a primary election and an uncontested general election in a White-majority House district.  As Dr. King testified, "the outlier of a case almost just proves the rule."

FOF ¶ 240.  Courts have repeatedly found that Senate Factor 7 weighs in plaintiffs' favor in similar circumstances notwithstanding one or two outlier cases.  *See, e.g.*, *Alpha Phi Alpha*, 2023 WL 7037537, at *72 (holding Senate Factor 7 weighed heavily in favor of Plaintiffs despite election of Black U.S. Senator and noting that "[t]he Supreme Court in *Gingles*, when discussing the success of a select few Black candidates, cautioned courts in conflating the success of few as dispositive"); *see also, e.g.*, *Gunn v. Chickasaw Cnty., Mississippi*, 166 F.3d 341, 1998 WL 912195 at *3 (5th Cir. 1998) (unpublished) (minority candidates winning some elections unpersuasive where they did "not necessarily indicate significant crossover-voting by whites").

713.    Based upon the foregoing findings of fact, Black Mississippians are underrepresented in public office in Mississippi and almost never win election to state legislative office except in Black-majority districts.  This supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House in the areas of focus.

### G.    Senate Factor 8:  Lack of Responsiveness to the Needs of Black Mississippians

714.    Senate Factor 8, whether there is a "lack of responsiveness on the part of elected officials to the particularized needs of . . . minority group members," also weighs in favor of Plaintiffs.  *Gingles*, 478 U.S. at 37.

715.    As to Senate Factor 8, the trial record demonstrates such a lack of responsiveness, especially with regard to significant racial disparities in the educational funding and quality and pervasive health disparities, both of which are substantial concerns for Black Mississippians that have not been addressed by State leaders.  *Supra* ¶¶ 335–37.  In a number of the areas of focus in this case, legislators had not campaigned in Black communities or attended non-partisan campaign

forums held by Black-led organizations. *Supra* ¶¶ 341–43. Black voters repeatedly asked legislative map-drawers at public hearings to provide increased representation for Black communities, but that no additional Black majority districts were drawn. *Supra* ¶ 338; *see Nairne*, 2024 WL 492688, at *42–43. All of this is consistent with the evidence that, outside of Black-majority districts, elected officials have little political incentive to appeal to Black voters' particularized needs.

716.     Based upon the foregoing findings of fact, the Court concludes that elected officials in Mississippi have not been consistently responsive to the particularized needs of Black Mississippians on basic and important issues like education and health. This supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House in the areas of focus.

### H.     Senate Factor 9:  Tenuous Justifications for the Challenged Plans

717.     Senate Factor 9, determining that the policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is "tenuous," favors Plaintiffs. *Gingles*, 478 U.S. at 37.

718.     The conspicuous lack of public discussion and debate over Enacted Plans prior to their passage is consistent with a tenuous justification for those plans. The level of public disclosure and debate was "the bare minimum, if that." *Supra* ¶ 351. With the exception of a precinct swap to unpair two incumbents, there were no changes to the plans between their first public unveiling towards the tail-end of the legislative session and their final passage mere days later. *Supra* ¶ 350. And despite the increase in the Black population and the decrease in the White population and calls for greater representation for Black voters, the number of Black-majority

districts did not change at all.  *Supra* ¶¶ 338, 346.

719.     Nor does raw partisan advantage constitute a non-tenuous justification for the Enacted Plans.  Advancing the private interests of politicians and their parties is not a "legitimate state interest[]."  *Veasey*, 830 F.3d at 262.   Legitimate interests may include election integrity and "promoting public confidence in the voting process," *id.* at 231.  But drawing districts to secure partisan gain runs contrary to the legitimate governmental or public interests that courts have recognized.  As Dr. King explained, reducing the competitiveness of districts *undermines* public confidence and voter turnout—and is one of the reasons why Mississippi typically has "the lowest voter turnout in the country."  *Supra* ¶ 355.  Nor can the absence of discrimination be inferred from the presence of partisan motives.  To the contrary: "Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive" and thus "acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory."  *Veasey*, 830 F.3d at 241 n.30.[16]

720.     Even if partisan motives could be considered a legitimate rationale for a challenged districting scheme, the trial record would not support such an argument here.  *See, e.g.*, *infra* ¶¶ 766–68.  No legislators or mapdrawers testified at trial about the creation of the 2022 Senate and House Plans.  Defendants adduced no evidence demonstrating that particular district lines in the areas of focus were drawn in service of some specific consideration (partisan or otherwise), such as the protection of a particular incumbent or the inclusion of a particular business or institution or address in a particular district.  The official criteria adopted by the legislative map

---

[16] In *Veasey*, the Court relied on historical evidence that, regardless of the political party in power—"whether [it is the] Republicans, Democrats[,] or Martians" —the White majority had consistently acted to deny or dilute the Black vote.  830 F.3d at 241 n.30.  The record shows the same is true here.  *See, e.g*, *supra* ¶¶ 190-213, 353.

drawers, which are in evidence, do not include partisan gain or incumbent protection.  *See supra* ¶ 5.

721.    Nor would more specific evidence lead to this factor weighing in Defendants' favor in any event.  In a recent redistricting case in Georgia where (unlike here) the state's mapdrawer took the stand and offered specific testimony about partisan motivations for certain line-drawing decisions, the court concluded that, in the vote dilution context, Senate Factor 9 generally should receive "less weight" because, under the *Gingles* results test, "a legislature's intent in drawing [the] map is irrelevant."  *Alpha Phi Alpha*, 2023 WL 7037537, at *73 & n.69.

722.    Based upon the foregoing findings of fact, Defendants' justifications for the challenged plans are tenuous, which supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House in the areas of focus.

## I.    Proportionality

723.    In addition to analyzing the Senate Factors, the Court may also consider the extent to which there is a mismatch between the proportion of Mississippi's voting-age population that is Black and the proportion of legislative districts in which they have an opportunity to elect their candidates of choice.  *See De Grandy*, 512 U.S. at 1000; *see also Milligan*, 599 U.S. at 1504; *see also, e.g.*, *Mo. State Conf. of NAACP*, 894 F.3d at 940 n.12; *Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 312 (D. Mass. 2004) (three-judge court).  "[W]hether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area is a relevant consideration for courts to make."  *Robinson*, 86 F.4th at 597–98 (5th Cir. 2023) (citing *LULAC*, 548 U.S. at 426).

724.    While the Voting Rights Act does not mandate proportionality, an inquiry into

proportionality "provides some evidence of whether the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by a minority group. *LULAC*, 548 U.S. at 438 (cleaned up).

725.     Thus, though not dispositive, disproportionality may be relevant to the totality-of-circumstances analysis. *See, e.g.*, *Bone Shirt*, 336 F. Supp. 2d at 1049; *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 281 F. Supp. 2d 436, 455–56 (N.D.N.Y. 2003).

726.     Mississippi's statewide BVAP exceeds 36 percent. *E.g.*, PTX-001 at 11.  As a matter of total population, the State is just under 38% Black. *Id.* at 9.  Under the Enacted Plans, the number of Senate and House where Black voters constitute an effective voting majority of the population under the Enacted Plans is disproportionately low relative to the proportion of Mississippi's population that is Black.  That is particularly true with respect to the State Senate, where less than 29% of the 52 districts in the Enacted Plan are majority-Black.

727.     Based on the foregoing findings of fact, the Court concludes that the disproportionality of the Enacted Plans weighs in favor of a finding of vote dilution. *See Singleton*, 2022 WL 265001, at *73–74 (assessing comparable proportionality figures, "consider[ing] the proportionality arguments of the plaintiffs as part and parcel of the totality of the circumstances, and [] draw[ing] the limited and obvious conclusion that this consideration weighs decidedly in favor of the plaintiffs"); *see also Robinson*, 605 F. Supp. 3d at 844–51.  This is especially true given that Black Mississippians grew in their share of the population over the past 10 years. *See Bone Shirt*, 336 F. Supp. 2d at 1049 (accepting evidence from Mr. Cooper showing that minority group's population "rapidly increas[ed in] both their absolute numbers and share of the population" and finding that plaintiffs "presented evidence of disproportionality").

\*     \*     \*

728.    Under the totality of the circumstances, Black voters in the areas of focus have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Senate and State House in the areas of focus.

729.    Having considered the facts of this case, as well as "an intensely local appraisal of the design and impact of the contested electoral mechanisms," *Gingles*, 478 U.S. at 79 (citations omitted), the Court concludes that Mississippi's Enacted Senate Plan deprives Black voters of the equal opportunity to elect candidates of their choice in the areas in and around Illustrative SDs 2, 9, 17, and 35, and that Mississippi's Enacted House Plan deprives Black voters of the equal opportunity to elect candidates of their choice in the areas in and around Illustrative HDs 22, 56, and 84, in violation of Section 2 of the Voting Rights Act of 1965.  52 U.S.C. § 10301.

## VII.    Racial Gerrymandering

### A.    Legal Standard

730.    A racial gerrymandering claim asserts "that race was improperly used in the drawing of the boundaries" of an electoral district.  *Alabama Legislative Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 262–63 (2015).

731.    Sorting voters predominantly on the basis of their race is a "racial classification" that inflicts individualized harm on voters living within those districts.  *Id.* at 263; *Shaw I*, 509 U.S. at 643–44.  Such classifications are suspect "regardless of purported motivation." *Id.*

732.    When the Supreme Court recognized a racial gerrymandering claim for the first time in *Shaw I*, the Court created a claim that is "analytically distinct" from the type of "purposeful" discrimination at issue in *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980).  *Miller*, 515 U.S. at 911.  In contrast to claims involving racial animus or invidious discrimination, "the essence of the equal protection claim recognized in *Shaw I* is that the State has used race as a basis

269

for separating voters into districts." *Id.* Racial gerrymandering claims are thus cognizable regardless of the state's motivation, including when the state engages in the racial sorting with a "benign" motivation. *Shaw I*, 509 U.S. at 653; *see also Bush*, 517 U.S. at 984.

733. A party proves a racial gerrymandering claim under *Shaw I*, 509 U.S. at 630, and its progeny, using a two-step inquiry.

734. "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper*, 581 U.S. at 291; *see also ALBC*, 575 U.S. at 260–61 (first quoting *Miller*, 515 U.S. at 913, and then quoting *Shaw II*, 517 U.S. at 902). Race is the predominant factor if the legislature has "subordinated" other redistricting factors in favor of racial sorting. *Cooper*, 581 U.S. at 291.

735. "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny." *Cooper*, 581 U.S. at 292. That is, "[t]he burden . . . shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* (quoting *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 193 (2017)).

736. The racial predominance inquiry concerns *how* redistricting was conducted, rather than *why* the legislature did what it did. *Cooper*, 581 U.S. at 308 n.7. The standard is "satisfied when legislators have 'place[d] a significant number of voters within or without' a district predominantly because of their race, *regardless of their ultimate objective in taking that step*." *Id.* (emphasis added); *accord Shaw*, 509 U.S. at 645 ("[D]istrict lines obviously drawn for the purpose of separating voters by race require careful scrutiny under the Equal Protection Clause regardless of the motivations underlying their adoption.").

737.    The fact that legislators may have separated voters along racial lines "with the end goal of advancing their partisan interests" is no defense to racial gerrymandering.  *Cooper*, 581 U.S. at 308 n.7.  "[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Id.*; *see also Bush*, 517 U.S. at 968–70 ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation.") (finding racial predominance because Black population was "spread[]" between districts in order to protect incumbents); *Miller,* 515 U.S. at 914 (stating that the "use of race as a proxy" for "political interest[s]" is "prohibit[ed]").

738.    To prove racial predominance, plaintiffs may rely on "direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both." *Cooper*, 581 U.S. at 291 (internal quotation marks omitted).  There is no "special evidentiary prerequisite" that plaintiffs must satisfy. *Id.*

739.    Circumstantial evidence is not categorically inferior to direct evidence.  In a given case, "[c]ircumstantial evidence is not only sufficient, [it] may also be more certain, satisfying, and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation omitted); *see also Hunt v. Cromartie*, 526 U.S. 541, 548–49 (1999) ("[A]ppellees' evidence tends to support an inference that the State drew its district lines with an impermissible racial motive—even though they presented no direct evidence of intent.").

740.    Proving racial predominance may involve relying on evidence that "the enacted plan conflicts with traditional redistricting criteria," such as "compactness, contiguity of territory, and respect for communities of interest." *Bethune-Hill*, 580 U.S. at 183, 190.  While "a conflict or inconsistency may be persuasive circumstantial evidence tending to show racial predomination," "there is no rule requiring challengers to present this kind of evidence in every

case." *Id.* at 190.

741.    Similarly, there is no requirement that a racial gerrymander be bizarre in its shape, though non-compactness may be relevant evidence.  "Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race . . . was the legislature's dominant and controlling rationale."  *Bethune-Hill*, 580 U.S. at 188.

742.    "[S]tark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target" may also demonstrate racial predominance.  *Bethune-Hill*, 580 U.S. at 192.

743.    Courts also consider racial disparities in the splitting of precincts, municipalities, counties, or other areas as evidence of racial predominance.  Such disparities may occur when most of the "portions allocated to challenged districts had a higher [or lower] BVAP percentage than the portions allocated to non-challenged districts."  *E.g.*, *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 147 (E.D. Va. 2018).  In *Covington*, for instance, the panel found that splits in one district "seem to trace areas that have a high proportion of African-Americans." 316 F.R.D. at 142–43.  In another district, the *Covington* court found that predominantly white neighborhoods were "notably excluded" from the district, while "neighborhoods with substantial African-American populations, such as West End, Old Farm, and the area surrounding North Carolina Central University, were captured by the bizarre district lines."  *Id.* at 145.

744.    Courts may also consider whether the state set a "racial target" when designing a district, *i.e.*, requiring that a particular racial group exceeds or falls below a particular percentage in a district, such that the target "had a direct and significant impact" on the district's configuration. *Cooper*, 581 U.S. at 299–300.

745.   Other evidence of racial predominance includes excessive changes that are unnecessary to achieve equal population, and an over-representation of a racial group in the population being moved.  In *Page v. Virginia State Bd. of Elections*, the court found it notable that the state moved three times as many people as needed to balance population, and the population being moved out was "predominantly white, while the populations moved into the District were predominantly African-American."  No. 3:13-CV-678, 2015 WL 3604029, at *12 (E.D. Va. June 5, 2015).

746.   Where the state has offered "political goals" as a justification for a district's design, plaintiffs may submit "an alternative map" that shows "how the legislature could have accomplished its political goals other than through the map it chose."  *Cooper*, 581 U.S. at 320. That is because, if "racial identification is highly correlated with political affiliation," both race-based and partisan-based lines may be "capable of yielding similar oddities in a district's boundaries."  *Id.* at 308; *see also* J. Ragusa Testimony, 3/4/2024 Trial Tr. 990:5–15 (Dr. Ragusa explaining that he designed his analysis "to control and account for the effect of partisanship to see if, above and beyond that, there is any evidence of . . . racial gerrymandering," because of the possibility that a BVAP change is "due to partisan gerrymandering").

747.   But such an alternative map is not necessary when the state has not "raised a partisanship defense," *see Cooper*, 581 U.S. at 308, or when there is other evidence disentangling the effect of race from the effect of party, *id.* at 320–22 (holding that, because other evidence sufficiently "debunk[ed] North Carolina's 'it was really politics' defense," "there was no need for an alternative map to do the same job").  "An alternative map is merely an evidentiary tool," among others, that may be used "to show that such a substantive violation has occurred; neither its presence nor its absence can itself resolve a racial gerrymandering claim."  *Id.* at 319.

748.    Ultimately, "in no area of our equal protection law," including in the racial gerrymandering context, has the Supreme Court "forced plaintiffs to submit one particular form of proof to prevail." *Cooper*, 581 U.S. at 319.

749.    For each challenged district, courts must "consider all of the lines of the district at issue," analyzing the district as a whole and "tak[ing] account of the districtwide context." *Bethune-Hill*, 580 U.S. at 192.  Statewide evidence may be considered, but "[a] showing that race-based criteria did not significantly affect the drawing of some . . . districts, however, [does] little to defeat a claim that race-based criteria predominantly affected the drawing of other . . . districts." *ALBC*, 575 U.S. at 262–64.

750.    Establishing that race predominated in the drawing of district lines overcomes "the presumption of good faith" to which the legislature is entitled.  *Miller*, 515 U.S. at 915–16 (holding that "the good faith of a state legislature must be presumed" "until a claimant makes a showing" of "race-based decisionmaking"); *Harris v. McCrory*, 159 F. Supp. 3d 600, 611 (M.D.N.C. 2016) (good-faith "presumption must yield, however, when the evidence shows that citizens have been assigned to legislative districts primarily based on their race"), *aff'd sub nom. Cooper*, 581 U.S. at 291.

**B.    Racial Predominance in the Five Challenged Districts**

751.    Racial predominance is a question of fact.  *Cooper*, 581 U.S. at 293 ("[T]he court's findings of fact—most notably, as to whether racial considerations predominated in drawing district lines—are subject to review only for clear error."); *see id.* at 327 (Thomas, J., concurring) (agreeing that predominance is question of fact).

752.    Based on the foregoing findings of fact, Plaintiffs have proven that race predominated in the construction of SD 2, SD 48, HD 22, HD 34, and HD 64.

753.    Based on Dr. Ragusa's and Mr. Cooper's analysis, the testimony of fact witnesses who are familiar with these areas, and visual examinations of the areas included and excluded from these five districts, the Court finds that race was the predominant factor in the placement of "a significant number of voters within or without" those districts.  *Cooper*, 581 U.S. at 291.

754.    In each of those five districts, the State made line-drawing decisions that were inconsistent with traditional redistricting principles, such as compactness, respect for communities of interest, minimization of county and municipality splits, and core preservation.  In all five districts, the State made excessive changes that were not needed to balance population.  J. Ragusa Testimony, 3/4/2024 Trial Tr. 1125:17–21 ("[A]ll the [challenged] districts have far more changes than were necessary to reach equal population."); *see, e.g.*, *Cooper*, 581 U.S. at 310 (relying on fact that challenge district "was approximately the right size as it was" prior to redistricting); *Page*, 2015 WL 3604029, at *12 ("Far from attempting to retain most of the Benchmark Plan's residents . . . the 2012 Plan moved over 180,000 people in and out of the districts surrounding the Third Congressional District to achieve an overall population increase of only 63,976 people.").

755.    The State shifted thousands and in some instances tens of thousands of voters in and out of the five districts even where there was no population imbalance that required such movement.  All five districts became significantly less compact compared to the prior districts, often splitting additional counties unnecessarily, contrary to the State's own redistricting criteria. *See* Miss. Code Ann. § 5-3-101 (requiring that district "boundar[ies] shall cross governmental or political boundaries the least number of times possible").  The challenged districts also repeatedly crack growing municipalities and other communities with significant Black populations, including Gulfport, Horn Lake Southaven, Northpointe, and Okolona, while packing nearby districts that were already majority-Black.   The Enacted Plans consistently moved areas with higher

concentrations of Black voters out of the districts and areas with higher concentrations of White voters in, diminishing the BVAP of the district below 35%, ensuring that the districts would not be competitive for voters in those districts.

756.   That consistent pattern of decreasing the challenged districts' BVAP significantly below 35% is akin to a racial target and constitutes additional circumstantial evidence of racial predominance. *See Cooper*, 581 U.S. at 300–01.

757.   As the Supreme Court found in *Cooper*, this Court concludes that the disproportionate movement of voters by race in each of the challenged districts involved a "significant number of voters." *Id.* at 291, 314.  Based on the analysis of Dr. Ragusa—and even the academic research published by Defendants' own expert, Dr. Brunell—there is no serious dispute that the reduction in BVAP, which ranged from about seven to 30 percentage points in the five challenged districts, reduced the districts' electoral competitiveness in a significant manner, virtually eliminating all opportunity for Black voters and candidates to prevail.  As Dr. Ragusa testified, the racially disproportionate movements here, such as with the racial disparities in split precincts, affected thousands of voters.

758.   For multiple reasons, this evidence of racial sorting and inconsistency with traditional redistricting principles cannot be explained by any attempt to sort voters by their partisan affiliation or voting history.

759.   First, Plaintiffs have sufficiently disentangled race-based sorting from partisanship-based sorting, with Dr. Ragusa showing that race is a significant predictor of how voters were sorted even after controlling for the partisan composition of the census blocks being assigned.  *See supra* ¶¶ 375–85, 444–55, 471–82, 496–505, 516–25, 537–46.

760.   Second, unlike the direction of the race variable in Dr. Ragusa's regression models,

which consistently pointed to a suppression of the challenged districts' BVAP, the direction of the partisanship variable (i.e., the Trump vote) was inconsistent and often contrary to what one would expect if the State were trying to increase the number of Republican voters in the challenged districts.  *See supra* ¶¶ 384–87.  If the State had sorted voters based predominantly on their partisan voting history, then the direction of the partisan variable should not point to a statistically significant reduction of Republican voters in the challenged districts—as was the case in HD 22, HD 64, and SD 48 with at least one model.  *See supra* ¶¶ 476, 501, 539.

761.    Third, Dr. Ragusa found statistically significant racial disparities in how precincts were split in the challenged districts, such that the parts of the precincts included in the districts at issue contained far fewer Black residents than those parts of the split precincts that were assigned to a neighboring district.  *See supra* ¶¶ 393–99.  This pattern of racialized precinct splits for each of the challenged districts, is notable for two reasons.

762.    For one, it is another indication of an overriding effort to lower the Black population in the challenged districts by excluding areas with high numbers of Black voters.

763.    For another, the pattern of racialized precinct splits strongly indicates that Defendants sorted voters by race, rather than party or voting history, in designing SD 2, HD 22, HD 34, and HD 64 (SD 48 does not split precincts).  *See supra* ¶¶ 398–99.  To be able to consistently split a precinct along racial or partisan lines, one must have data below the precinct level, *i.e.*, at the level of census blocks, to know, for instance, where Black or White voters (or Biden or Trump voters) are located within the precinct being split.  *See supra* ¶¶ 369.  The State had racial data at the block level from the Census.  *See supra* ¶¶ 359–63.  But it had electoral data—number of votes for Republican and Democratic candidates—only at the precinct level.  *See supra* ¶¶ 364–68.  While the electoral data supplied via the Secretary of State's office could show

approximately how many voters cast a ballot for a Republican candidate in a precinct overall, that electoral data necessarily is not sufficiently granular for differentiating the parts of the precinct that lean Republican from the parts that lean Democratic, as Dr. Ragusa testified.  Therefore, the racial disparities that Dr. Ragusa observed, whereby precincts were consistently split into portions that had higher Black populations and portions that had lower Black populations, with the higher BVAP areas excluded from the challenged districts, could not have been an accidental byproduct of dividing the precinct into Democratic areas and Republican areas.  That pattern of racialized precinct splits is a hallmark of racial gerrymandering.  *See Bush*, 517 U.S. at 970–71 ("Given that the districting software used by the State provided only racial data at the block-by-block level, the fact that District 30 . . . splits voter tabulation districts and even individual streets in many places . . . suggests that racial criteria predominated over other districting criteria in determining the district's boundaries.").

764.    Defendants' expert, Dr. Brunell, who responded to Dr. Ragusa's analysis, is not credible, for the reasons articulated already.  *Supra* ¶¶ 409–19.  In general, Dr. Brunell offered limited and unsupported critiques of a subset of Dr. Ragusa's work, and he was unable to explain the effects of the purported methodological flaws he identified.  Accordingly, the Court does not credit Dr. Brunell's criticisms of Dr. Ragusa, whose methodology relies and improves upon an approach credited by the Supreme Court in *Cooper* and by a unanimous three-judge panel in South Carolina.  *See* 581 U.S. at 315; *Alexander*, 649 F. Supp. 3d at 192.

765.    Because of the foregoing evidence disentangling race and partisanship, no alternative map is required.  *Cooper*, 581 U.S. at 322 (holding that "there was no need for an alternative map to do the same job" because other evidence existed to debunk partisan rationales offered by the state).  Plaintiffs have sufficiently demonstrated that the challenged districts are

"unexplainable on grounds other than race." *Miller*, 515 U.S. at 905.

766.    In any event, the Court further finds that there is no evidence of specific political objectives that the State had, in either the trial or legislative records, pertaining to the five challenged districts, that would be sufficient to raise a partisanship defense to racial gerrymandering in the first place.  Where the State proffers evidence of such specific objectives, an alternative map may be used to show that the State's "legitimate political objectives" can be met in a different manner, thus demonstrating that the political objectives cannot explain the enacted plan's design. *Cooper*, 581 U.S. at 320.  Here, unlike in cases where the state has claimed that particular district lines can be explained by the exclusive or predominant use of partisan or electoral data (as opposed to racial data), the record here contains no affidavit or testimony from any legislator, mapmaker, or staffer indicating that they used partisan or electoral data to draw or evaluate the lines at issue. *See, e.g.*, *Cooper*, 581 U.S. at 289, 313–14 (testimony from state mapmaker that he had drawn district lines based on Obama-McCain votes); *Bush*, 517 U.S. at 967, 970 (testimony from state officials that political and incumbency considerations predominated as to challenged districts); *Cromartie*, 526 U.S. at 549 (affidavit testimony from two legislators responsible for developing the challenged plan).  Defendants' lone expert who testified on the racial gerrymandering claims, Dr. Brunell, has no knowledge of "what the Legislature or mapmaker actually considered during redistricting." *E.g.*, T. Brunell Testimony, 3/5/2024 Trial Tr. 1366:24–1367:2.  Accordingly, no particular political objectives have been identified as to the challenged districts, and Plaintiffs need not offer an alternative map to satisfy undisclosed objectives.

767.    While Defendants played parts of the Senate and House floor debates during trial, floor statements are not a meaningful substitute for sworn testimony, and the statements in this

case do not adequately raise a partisan explanation for the challenged districts. *See* W. Cooper Testimony, 2/26/2024, Tr. 169:24–170:3, 209:21–23 (cross-examination of Plaintiffs' expert after playing video segments of Senate and House proceedings). The statements played by Defendants at trial include the generalized claim that "maintaining the political performance" of legislative districts was "[a]n important consideration," but neither those snippets nor the underlying transcripts, contain any claims about relying on partisan *data* instead of racial data to achieve the desired "political performance." *See id.*; JTX-10 at 13:25–14:6 (House transcript); JTX-11 at 11:6–11 (Senate transcript); *Cooper*, 581 U.S. at 308 n.7 (predominant reliance on race data to achieve partisan ends impermissible). Nor is the evidence, which shows a significant *decrease* in the BVAP of the challenged districts, consistent with merely "maintaining" political performance. Nor in any case do the video snippets or transcripts contain any specific discussion of any of the challenged districts or the reasons why the specific lines for those districts were drawn. *See ALBC*, 575 U.S. at 262–63 ("A racial gerrymandering claim . . . applies to the boundaries of individual districts. It applies district-by-district.").

768.    The Court also notes that floor statements by legislators are not sworn testimony, and in general, there is reason to doubt the accuracy of legislators' own statements about their non-racial motivations. *See Hunt*, 526 U.S. at 553 ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence."). As Dr. Ragusa explained, lawmakers have reason to "obfuscate" their actions when there's a potential accusation of racial gerrymandering. J. Ragusa Testimony, 3/4/2024 Trial Tr. 1081:11–18 ("[T]he motivations that [lawmakers] give for one decision or another, particularly in a very partisan and racialized context like this, I would rather analyze the data on my own and see what the data show, not what they say."). Indeed, Senator Kirby, whose statements on the Senate floor are relied upon

by Defendants, made his remarks in anticipation of litigation.  JTX-011 at 12 ("I'm sure [the 2022 redistricting plan] will end up in court.  They always do.").

769.    Defendants criticize Dr. Ragusa for not comparing the magnitude of the race variable against the size of the partisanship variable, but that argument misunderstands the governing law.  A plaintiff must show that race was the predominant factor driving the movement of "a significant number of voters" in or out of a district.  *E.g.*, *Cooper*, 581 U.S. at 291.  But they need not show that race was the predominant motivation behind the movement of *all* voters or a *majority* of the voters in a district, or that *more* voters were moved on the basis of race than on the basis of their electoral preferences.  Indeed, in *Cooper*, the Supreme Court found that the net movement of 25,000 Black voters was significant, even though the population of the congressional district at issue was over 730,000.  *See* 581 U.S. at 295, 314.

770.    In this case, as to the effect of race, Dr. Ragusa found that, once partisanship and other factors were accounted for, race continued to exert "a substantively significant" effect on the design of the challenged districts, which were markedly less likely to include a census block as its BVAP increased.  Furthermore, the precinct splits and the raw data confirm Dr. Ragusa's analysis, indicating that thousands of Black voters were disproportionately moved out or kept out of the challenged districts.  Given that Dr. Ragusa's analysis controls for the possibility of partisan sorting and other redistricting factors, his results "cannot be dismissed as a simple byproduct of partisan gerrymandering or adherence to . . . common redistricting principles."  J. Ragusa Testimony, 3/4/2024 Trial Tr. 982:19–983:5.

771.    In consideration of all available evidence and in recognition of the "demanding" standard that racial gerrymandering plaintiffs must meet and the presumption of good faith of the legislature, the Court finds race predominated in the design of Enacted SD 2, SD 48, HD 22, HD

34, and HD 64.  *See Cooper*, 581 U.S. at 309 & n.8, 319.  Based on the foregoing findings of fact, each of those five districts subordinated traditional redistricting principles in order to sort voters on the basis of their race, and those district lines cannot be explained by any attempt to sort voters based on their voting history or partisanship.

**C.    Strict Scrutiny**

772.    Because Plaintiffs have shown that race predominated in the design of SD 2, SD 48, HD 22, HD 34, and HD 64, the burden shifts to the State to show that its race-based sorting of voters survives strict scrutiny.  That is, the district lines for each district must serve a "compelling interest" and be "narrowly tailored" to that end.  *Cooper*, 581 U.S. at 292.

773.    The Supreme Court "has long assumed that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965."  *Cooper*, 581 U.S. at 292.  The Supreme Court has not recognized other lawful bases to classify voters on the basis of race.

774.    Notably, the possibility that the State may have drawn these districts in order to achieve a political advantage (or some other objective) does not save them from strict scrutiny.  Any effort to sort "voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics."  *Cooper*, 581 U.S. at 308 n.7 (citing *Bush*, 517 U.S. at 968–70); *Miller*, 515 U.S. at 914.  Thus, "[a] plaintiff succeeds . . . even if the evidence reveals that a legislature elevated race to the predominant criterion in order to advance other goals, including political ones."  *Cooper*, 581 U.S. at 291 & n.1.

775.    In this case, the State does not claim that any of the five challenged districts were drawn in a manner to comply with the VRA or to meet any other compelling interest.  Accordingly, the Court concludes that the use of race in constructing the challenged districts was not narrowly tailored.  Accordingly, the strict scrutiny standard is not satisfied for Enacted SD 2, SD 48, HD

282

22, HD 34, and HD 64.

776.    Therefore, the Court concludes that the impermissible use of race in the construction of Enacted SD 2, SD 48, HD 22, HD 34, and HD 64 violates the Fourteenth Amendment.

**VIII.   Remedy**

777.    Because the Court has determined that the Enacted Plans violate Section 2 of the Voting Rights Act and the Fourteenth Amendment, further use of the Enacted Plans is enjoined. In addition to success on the merits, the other permanent injunction considerations warrant such relief.

778.    The harm suffered by Plaintiffs and Mississippi voters from unlawful electoral maps is undoubtedly irreparable.   Voting is "a fundamental political right, because [it is] preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."  *Reynolds*, 377 U.S. at 555. "Though the states retain considerable power to regulate elections, their power has limits: in the course of their regulation, they may not unduly burden the citizens' right to vote-the fundamental political right, because preservative of all rights.   Indeed, voting is of the most fundamental significance under our constitutional structure."  *Harding v. Edwards*, 487 F. Supp. 3d 498, 503 (M.D. La. 2020) (internal quotation marks omitted)*.*

779.    Given the fundamental importance of the right to vote, Courts frequently hold that violations of rights in voting and redistricting cases constitute irreparable harm.  *See, e.g.*, *Robinson*, 605 F. Supp. 3d at 851 (M.D. La.), *aff'd in relevant part* 86 F.4th at 599 (preliminary injunction based on irreparable harm in Section 2 case was "valid when it was issued"); *see also*

*Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). "Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law." *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015).

### A.    Remedial Plans

780.    Drawing state legislative districts is the responsibility of the Legislature in the first instance.  Accordingly, where Plaintiffs prevail in a redistricting case, it falls to the Legislature in the first instance to draw a lawful plan.  *See Wise v. Lipscomb*, 437 U.S. 535, 539–40 (1978) (opinion of White, J.) (collecting cases); *Robinson*, 86 F.4th at 601; *see also Caster*, 2022 WL 264819, at *82.  If the state legislature cannot or will not adopt a remedial map that complies with federal law in time for the 2024 election, then the job of drawing an interim map may fall to this Court.  *Wise*, 437 U.S. at 540 (when "those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the unwelcome obligation of the federal court to devise and impose a reapportionment plan.") (internal citations and quotation marks omitted).

781.    In order to hold elections under lawful State Senate and State House plans in 2024 as discussed, *infra*, the Legislature should produce plans within three weeks of the date of this Order.  Lawful State Senate and State House Plans are plans that:

      a.  Add an additional majority-Black State Senate district in which Black voters have an opportunity to elect candidates of their choice in the areas in and around Illustrative SDs 2, 9, 17, and 35;

      b.  Reconfigure SD 48 such that race does not predominate in the construction of

that district without a compelling interest;

  c. Add an additional majority-Black State House district in which Black voters have an opportunity to elect candidates of their choice in the areas in and around Illustrative HDs 22, 56, and 84;

  d. Reconfigure HD 34 and HD 64 such that race does not predominate in the construction of those districts without a compelling interest.

782. This timeline balances the relevant equities and serves the public interest by providing the Legislature with its rightful opportunity to craft a remedy in the first instance, while also ensuring that, if an acceptable remedy is not produced, there will be time for the Court to fashion one in advance of the 2024 election. Doing so is necessary because, as explained below, the equities and the public interest also support a special election to fill the remained of the four-year legislative term for those districts that must be redrawn to remedy unlawful vote dilution and/or racial gerrymandering.

## B. Special Elections

783. Mississippi held a general election for State Senate and State House in November 2023, and the next election is not until 2027. In these circumstances, a special election to three-year terms in any districts altered in order to remedy unlawful vote dilution and/or racial gerrymandering is a proper remedy. *See Watkins v. Fordice*, 791 F. Supp. 646, 648 (S.D. Miss. 1992) (ordering special elections for three-year terms in a state legislative redistricting case following adoption of remedial districts).

784. The Supreme Court has laid out three "obvious considerations" for courts to weigh when assessing whether ordering a special election is the appropriate remedy for similar violations: (1) "the severity and nature of the particular constitutional violation"; (2) "the need to act with

proper judicial restraint when intruding on state sovereignty"; and (3) "the extent of the likely disruption to the ordinary processes of governance if early elections are imposed." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017).  All of these factors weigh in favor of granting a special election here.

785.    First, the harm—Plaintiffs' loss of a meaningful right to vote—is unquestionably severe and requires immediate redress.  *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 361 F. Supp. 3d 1296, 1302 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *see also Robinson*, 605 F. Supp. 3d at 851 ("Voting is a 'fundamental political right, because it is preservative of all rights.'") (internal citations omitted); *see Tucker v. Burford*, 603 F. Supp. 276, 279 (N.D. Miss. 1985).

786.    The number of individuals and districts impacted by the violation, which between the Voting Rights Act and constitutional violations covers five Senate districts and five House districts in different areas of the State, enhances the severity of the harm and the concordant need for immediate redress.  *Covington v. North Carolina*, 270 F. Supp. 3d 881, 892 (M.D.N.C. 2017) (on remand from the Supreme Court, concluding that the "substantial number of legislative districts that must be redrawn . . . weighs in favor of ordering a special election").  The Court concludes the first *Covington* factor weighs in favor of ordering special elections.

787.    Second, ordering a special election is consistent with principles of judicial restraint, particularly in light of the severity of the harm and the particular circumstances of this case. *Wright*, 361 F. Supp. 3d at 1305; *see also Covington*, 270 F. Supp. 3d at 895–97 (finding factor to weigh in favor of granting special elections in light of severity of harm).

788.    Plaintiffs filed this action in 2022, while nearly all litigation under Section 2 of the Voting Rights Act was stayed awaiting the Supreme Court's decision in *Allen v Milligan*.  *See* Dkt.

40, 41, 44; *see also, e.g.*, *Nairne v. Ardoin*, No. CV 22-178-SDD-SDJ, 2022 WL 3756195, at *1 (M.D. La. Aug. 30, 2022) (staying proceedings until June 2023).  Plaintiffs therefore could not have obtained relief for the 2023 election.  Courts under analogous circumstances have found special elections to be appropriate.  *See, e.g., Clark v. Roemer*, 777 F. Supp. 471, 485 (M.D. La. 1991) (special election relief proper where pendency of litigation in the Supreme Court prevented plaintiffs from obtaining the relief sought in time for the regularly scheduled elections).

789.    Here, special elections to a shortened term in those districts that are altered in a remedial map (but not in those that remain unchanged) would comport with judicial restraint while ensuring that tens or hundreds of thousands of Mississippians need not wait until 2028 to obtain representation pursuant to lawful legislative districting plan.  This Court has taken that same approach before.  *See Watkins*, 791 F. Supp. at 648 (special elections for three-year terms); *Tucker*, 603 F. Supp. at 279 (ordered special elections to shortened terms).  Indeed, "[f]ederal courts have ordered special elections to remedy violations of voting rights on many different occasions." *Clark,* 777 F. Supp. at 484; *see also, e.g.*, *Keller v. Gilliam*, 454 F.2d 55, 57 (5th Cir. 1972); *Large v. Fremont Cty.*, No. 05-CV-0270, 2010 WL 11508507, at *15 (D. Wyo. Aug. 10, 2010); *United States v. Osceola Cty.*, 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006); *Smith v. Beasley*, 946 F. Supp. 1174, 1212–13 (D.S.C. 1996); *Williams v. City of Dallas*, 734 F. Supp. 1317, 1318, 1415 (N.D. Tex. 1990); *Ketchum*, 630 F. Supp. at 565–68; *Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981); *Coal. for Educ. in Dist. One v. Bd. of Elections of City of New York*, 370 F. Supp. 42, 58 (S.D.N.Y. 1974).

790.    *Third*, there will be little disruption to governance if special elections are imposed as there is sufficient time to implement a remedial map *and* to hold a special election in 2024 without disrupting existing schedules or causing voter confusion.  The ability to hold a special

election concurrently with already scheduled elections in 2024, minimizing added cost and administrative burden, weighs in favor of imposing a special election as a remedy. *See Clark*, 777 F. Supp. at 484; *Wright*, 361 F. Supp. 3d at 1306; *Nation v. San Juan Cnty.,* 2017 WL 6547635, *18 (D. Utah Dec. 21, 2017), *aff'd sub nom. Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270 (10th Cir. 2019). Mississippi already has elections scheduled for 2024, and the cost of adding legislative elections to these already scheduled federal elections "is negligible in comparison to the cost to holding special elections at some future date," *Clark*, 777 F. Supp. at 484.

791. Moreover, special elections could be held in 2024 in a manner that would not unduly burden the administration of elections.

792. Based on the foregoing findings of fact, once a remedial map has been put in place by either the Legislature or the Court, it would take several weeks for the counties where the lines have changed to update the state's election-management system, and for the Secretary of State to prepare ballots. Ballots must be ready 45 days before an election. Accordingly, a plan would need to be in place approximately 70 days prior to the first election for which the new lines would be used.

793. Therefore, if a remedial map is in place by the end of May, there will be sufficient time to use the general election calendar dates, including August primaries, for a 2024 special election in any changed districts. Notably, this schedule is consistent both with the evidence in the record and with the schedule adopted for the 1992 special elections in *Watkins*.

794. If a remedial map is in place by June, a modified version of the above schedule could be used, with September rather than August primaries. *Cf. Taylor v. Monroe County Board of Supervisors*, 421 F.2d 1038, 1041 (5th Cir. 1970) ("[W]here it is necessary to override specific provisions of state law to afford adequate relief, the state statutes must yield.").

795.   If a remedial map is put into place later than that, then the special election procedures for filling vacancies can be used.  *See supra* ¶¶ 563–566.  As noted, under those procedures, there would be no party primary.  Any altered districts would be filled by a non-partisan special election concurrent with the 2024 federal general election (although no election would need to be held in those districts where only one candidate qualified).  Any of these processes would use the existing procedures set forth in state law while ensuring that irreparable harm is mitigated.

796.   Because the *Covington* factors weigh in favor of ordering special elections, this Court will order a special election for all districts in the remedial plans with changed boundaries from the Enacted Plans to coincide with the Fall 2024 federal elections in Mississippi, on a schedule to be determined by further order of the Court in light of the above findings of fact and conclusions of law.

*      *      *

Respectfully submitted,


This the 29th day of March 2024.

<table>
<tr><td>

/s/ *Joshua Tom*<br>
Joshua Tom, MSB 105392<br>
*jtom@aclu-ms.org*<br>
ACLU OF MISSISSIPPI<br>
101 South Congress Street<br>
Jackson, MS 39201<br>
(601) 354-3408<br>
<br>
Robert B. McDuff, MSB 2532<br>
*rbm@mcdufflaw.com*<br>
Paloma Wu, MSB 105464<br>
*pwu@mscenterforjustice.org*<br>
MISSISSIPPI CENTER FOR JUSTICE<br>
767 North Congress Street

</td><td>

Ari J. Savitzky<br>
*asavitzky@aclu.org*<br>
Ming Cheung<br>
*mcheung@aclu.org*<br>
Casey Smith<br>
*csmith@aclu.org*<br>
Garrett Muscatel<br>
*gmuscatel@aclu.org*<br>
ACLU FOUNDATION<br>
125 Broad Street, 18th Floor<br>
New York, New York 10004<br>
(212) 549-2500<br>
<br>
Ezra D. Rosenberg

</td></tr>
</table>

Jackson, MS 39202
(601) 969-0802

Carroll Rhodes, MSB 5314
Law Offices of Carroll Rhodes
*crhodes6@bellsouth.net*
PO Box 588
Hazlehurst, MS 39083
(601) 894-1464

John P. Lavelle, Jr.
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-3007
Telephone:     +1.215.963.5000
Facsimile:      +1.215.963.5001
*john.lavelle@morganlewis.com*

Drew Cleary Jordan
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Telephone:     +1.202.739.3000
Facsimile:      +1.202.739.3001
*drew.jordan@morganlewis.com*

*erosenberg@lawyerscommittee.org*
Jennifer Nwachukwu
*jnwachukwu@lawyerscommittee.org*
David Rollins-Boyd
*drollins-boyd@lawyerscommittee.org*
Javon Davis
*jdavis@lawyerscommittee.org*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
(202) 662-8600

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua Tom, do certify that on this day I caused to be served a true and correct copy of the foregoing by electronic mail to all counsel of record.

This the 29th day of March, 2024.

/s/ *Joshua Tom*
Joshua Tom