**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

MISSISSIPPI STATE CONFERENCE OF THE
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE; DR.
ANDREA WESLEY; DR. JOSEPH WESLEY;
ROBERT EVANS; GARY FREDERICKS;
PAMELA HAMNER; BARBARA FINN; OTHO
BARNES; SHIRLINDA ROBERTSON; SANDRA
SMITH; DEBORAH HULITT; RODESTA
TUMBLIN; DR. KIA JONES; MARCELEAN
ARRINGTON; VICTORIA ROBERTSON,

*Plaintiffs*,

vs.

STATE BOARD OF ELECTION
COMMISSIONERS; TATE REEVES, *in his
official capacity as Governor of Mississippi*; LYNN
FITCH, *in her official capacity as Attorney General
of Mississippi*; MICHAEL WATSON, *in his official
capacity as Secretary of State of Mississippi*,

*Defendants*,
AND

MISSISSIPPI REPUBLICAN EXECUTIVE
COMMITTEE,

*Intervenor-Defendant*.

**CIVIL ACTION NO.
3:22-cv-734-DPJ-HSO-LHS**

**PLAINTIFFS' POST-TRIAL BRIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................. 1

I.   PLAINTIFFS HAVE PROVEN THEIR SECTION 2 CLAIMS ............................... 2

   A.   Plaintiffs Have Proven the *Gingles* Preconditions ........................................... 4

      1.   Plaintiffs have proven the first Gingles precondition ................................... 4

      2.   Plaintiffs have proven the Second and Third Gingles preconditions ............ 7

   B.   Plaintiffs Have Proven Section 2 Violations Based on Totality of the Circumstances .... 10

      1.   Defendants' "Party Not Race" Argument Fails, and Senate Factor 2 Weighs Strongly
         in Favor of Liability ..................................................................................... 11

      2.   The Remaining Senate Factors Also Weigh in Favor of Liability ................ 17

II.   PLAINTIFFS HAVE PROVEN RACIAL GERRYMANDERING IN THE FIVE
CHALLENGED DISTRICTS ............................................................................................ 24

   A.   Plaintiffs Have Proven Racial Predominance in the Five Challenged Districts ............... 27

   B.   No Partisanship Defense Is Viable on This Trial Record .................................. 32

   C.   The Use of Race in Constructing the Challenged Districts Fails Strict Scrutiny ............. 35

CONCLUSION .................................................................................................................. 35

## TABLE OF AUTHORITIES

### Cases

*Alabama Legislative Black Caucus v. Alabama*,
  575 U.S. 254 (2015) ................................................................... 24, 27, 34

*Allen v. Milligan*,
  599 U.S. 1 (2023) ............................................................................. *passim*

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,
  --- F. Supp. 3d ----, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023) .................... *passim*

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,
  587 F. Supp. 3d 1222 (N.D. Ga. Feb. 28, 2022) ..................................... 13

*Bartlett v. Strickland*,
  556 U.S. 1 (2009) ....................................................................................... 5

*Bethune-Hill v. Virginia State Bd. of Elections*,
  580 U.S. 178 (2017) ................................................................................ 26

*Bush v. Vera*,
  517 U.S. 952 (1996) ........................................................................ *passim*

*Clark v. Calhoun Cnty.*,
  21 F.3d 92 (5th Cir. 1994) ..................................................................... 21

*Clark v. Calhoun Cnty.*,
  88 F.3d 1393 (5th Cir. 1996) .............................................................. 5, 17

*Cooper v. Harris*,
  581 U.S. 285 (2017) ........................................................................ *passim*

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003) .................................................................................. 26

*Fairley v. City of Hattiesburg*,
  662 F. App'x 291 (5th Cir. 2016) .......................................................... 11

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
  775 F.3d 1336 (11th Cir. 2015) .......................................................... 4, 17

*Growe v. Emison*,
  507 U.S. 25 (1993) ..................................................................................... 4

*Gunn v. Chickasaw Cnty.*,
  166 F.3d 341, 1998 WL 912195 (5th Cir. 1998) ................................... 22

*Harris v. McCrory*,
  159 F. Supp. 3d 600 (M.D.N.C. 2016) ................................................. 25

*Hunt v. Cromartie,*
  526 U.S. 541 (1999) ............................................................................ 26, 33

*Jamison v. Tupelo,*
  471 F. Supp. 2d 706 (N.D. Miss. 2007) ............................................ 14, 18

*Jordan v. Winter,*
  604 F. Supp. 807 (N.D. Miss.) ................................................................ 20

*Lopez v. Abbott,*
  339 F. Supp. 3d 589 (S.D. Tex. 2018) ................................................... 8, 12

*LULAC v. Clements,*
  999 F.2d 831 (5th Cir. 1993) ........................................................... *passim*

*Magnolia Bar Ass'n v. Lee,*
  994 F.2d 1143 (5th Cir. 1993) .................................................................. 20

*Miller v. Johnson,*
  515 U.S. 900 (1995) ............................................................. 25, 26, 27, 34

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,*
  201 F. Supp. 3d 1006 (E.D. Mo. 2016) .................................................... 20

*N.A.A.C.P. v. Fordice,*
  252 F.3d 361 (5th Cir. 2001) ................................................................... 18

*NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.,*
  462 F. Supp. 3d 368 (S.D.N.Y. 2020) ...................................................... 13

*Nairne v. Ardoin,*
  --- F. Supp. 3d ----, 2024 WL 492688 (M.D. La. Feb. 8, 2024) ...................... *passim*

*Page v. Virginia State Bd. of Elections,*
  No. 3:13-CV-678, 2015 WL 3604029 (E.D. Va. June 5, 2015) ...................... 30–31

*Robinson v. Ardoin,*
  605 F. Supp. 3d 759 (M.D. La. 2023) ...................................... 5, 6, 10, 13

*Robinson v. Ardoin,*
  86 F.4th 574 (5th Cir. 2023) ............................................................ *passim*

*Rucho v. Common Cause,*
  139 S. Ct. 2484 (2019) ............................................................................ 26

*Shaw v. Reno,*
  509 U.S. 630 (1993) .................................................... 24, 25, 26, 30

*Singleton v. Merrill,*
  582 F. Supp. 3d 924 (N.D. Ala. 2022) ............................................. 5, 6, 18

*Teague v. Attala Cnty.*,
 92 F.3d 283 (5th Cir. 1996) .................................................................................. *passim*

*Thomas v. Bryant*,
 366 F. Supp. 3d 786  (S.D. Miss. 2009) ................................................. 17, 18, 19, 21

*Thornburg v. Gingles*,
 478 U.S. 30 (1986) ................................................................................................. *passim*

*United States v. Marengo Cnty. Comm'n*,
 731 F.2d 1546 (11th Cir. 1984) ..................................................................................... 11

*United States v. Rylander*,
 460 U.S. 752 (1983 ......................................................................................................... 35

*Veasey v. Abbott*,
 830 F.3d 216 (5th Cir. 2016) ................................................................................... 21, 23

*Whitcomb v. Chavis*,
 403 U.S. 124 (1971) ......................................................................................................... 12

*Zimmer v. McKeithen*,
 485 F.2d 1297 (5th Cir. 1973) ...................................................................................... 10

**Statutes**

52 U.S.C. § 10301(a) .......................................................................................................... 2

52 U.S.C. § 10301(b) .......................................................................................................... 3

**INTRODUCTION**

Plaintiffs have proven their statutory and constitutional claims over the course of an eight-day trial in which the Court heard from eighteen witnesses, including six of Plaintiffs' experts and nine voters from across the State.  Defendants, by contrast, did not put on a single witness who was remotely involved in drawing the challenged Senate and House maps.

On the vote dilution claims, Plaintiffs proved up the *Gingles* preconditions and offered extensive evidence as to the totality of the circumstances, consistent with recent cases like *Allen v. Milligan*, 599 U.S. 1 (2023), *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023), and *Nairne v. Ardoin*, --- F. Supp. 3d ----, No. CV 22-178-SDD-SDJ, 2024 WL 492688 (M.D. La. Feb. 8, 2024).  The trial record amply demonstrates the vote dilution dynamic in four areas of the Senate map and three areas of the House map:  the fragmentation of a large and cohesive Black population into White-majority districts where Black voters will be shut out of power due to persistent racial polarization and White bloc voting.  *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 46–57 & n.11 (1986).  The evidence shows that the challenged district lines result in unequal opportunities for Black voters in those areas.  And contrary to Defendants' main argument, the record shows that stark racially polarized voting patterns in those areas are best explained by race, and not party affiliation.  Beyond the mere overlap of race and party, Defendants point to nothing like the sort of large-scale White crossover voting for Black candidates and the election of Black candidates in non-minority-majority districts that would demonstrate partisan rather than racial polarization.  *See LULAC v. Clements*, 999 F.2d 831, 860–861 (5th Cir. 1993) (en banc).  Rather, the evidence demonstrates that White voters almost never vote to elect Black candidates, that Black candidates virtually always lose outside of Black-majority districts, and that the deep racial division in Mississippi politics precedes the current partisan alignment.  Nor is raw partisan advantage ever a

justification for diluting the voting strength of Black citizens in violation of Section 2.

Plaintiffs have also proven unconstitutional racial gerrymandering as to five districts, two of which (in DeSoto County and in Chickasaw and Monroe Counties) overlap with the vote dilution areas of focus. Plaintiffs have proven that race was the predominant factor in moving a significant number of voters in and out of those districts, all of which saw substantial drops in Black voting age percentage (BVAP) that cannot be explained by adherence to traditional districting principles. *See Cooper v. Harris*, 581 U.S. 285, 291 (2017). Against the weight of expert statistical analysis showing the significance of race even accounting for the use of partisan electoral data, as well as witness testimony from community members, Defendants offered no testimony from any map-drawer or legislator to describe the line-drawing process or the line-drawers' motivations. And as for any "partisanship" defense, the Supreme Court has squarely held that voters may not be sorted by race to advance a partisan goal. *E.g.*, *id.* at 308 n.7.

The overwhelming evidence in the trial record—reasonably configured illustrative maps, unrebutted statistical analyses as to racially polarized voting and the predominance of race in the map-drawing, and detailed testimony as to communities of interest and past and present reality—all points one way: Plaintiffs have proven their claims by a preponderance of the evidence.

## I.    PLAINTIFFS HAVE PROVEN THEIR SECTION 2 CLAIMS

Section 2 of the VRA prohibits districting plans that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a); *see also Gingles*, 478 U.S. at 36. A violation of the statute is "established" where a plaintiff demonstrates, based on "the totality of the circumstances," that the "political processes" with respect to elections under the challenged plan in a particular area or areas "are not equally open to participation by members of [a racial minority group] . . . in that its members have less

2

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).

Section 2 vote-dilution liability "turns on the presence of discriminatory effects, not discriminatory intent."  *Milligan*, 599 U.S. at 25 ("Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination." (cleaned up)).  The Section 2 analysis *does not turn on the State's motives*, including partisan advantage.  If the *result* of the challenged scheme is unequal opportunities for Black voters, liability follows.  *E.g.*, *Gingles*, 478 U.S. at 35, 47, 63; *accord Robinson*, 86 F.4th at 589.

To prevail on a Section 2 vote dilution claim, Plaintiffs must initially satisfy three preconditions: "'First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district.' A district is reasonably configured when it complies 'with traditional districting criteria, such as being contiguous and reasonably compact.'  Second, the minority group must be politically cohesive.  Third, the white majority must be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate." *Robinson*, 86 F.4th at 589 (quoting *Milligan*, 599 U.S. at 18); *accord Gingles*, 478 U.S. at 50–51.

The three preconditions result in what the *Gingles* Court termed "vote dilution by submergence," whereby the combination of district lines and persistent patterns of racially polarized voting render minority voters in one area of the state unable to elect candidates of choice, despite voting cohesively and being numerous enough to comprise a majority in a compact, reasonably-configured district.  478 U.S. at 46–51, 59 n.28; *accord Milligan*, 599 U.S. at 18.  In such circumstances, the enacted lines submerge or "fragment[]" minority voters within White-majority districts, such that White bloc voting against the minority group's preferred

3

candidates will shut them out of power.  *E.g.*, *Growe v. Emison*, 507 U.S. 25, 40 (1993).[1]

Once the *Gingles* preconditions are established, and the core elements of the dilution-by-submergence dynamic shown, a liability determination based on the totality of the circumstances will follow in all but "the very unusual case." *Teague v. Attala Cnty.*, 92 F.3d 283, 293 (5th Cir. 1996) (quoting *Clark v. Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994); *Nairne*, 2024 WL 492688, at \*36; *see also, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (same).  Courts determine liability based on "'an intensely local appraisal'" of the mechanism at issue, as well as a "'searching practical evaluation of the "past and present reality."'" *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79).

Here, Plaintiffs alleged vote dilution in four areas of the 2022 Enacted Senate Plan: the DeSoto County area, the Hattiesburg area, the area north of the Golden Triangle including Chickasaw and Monroe Counties, and central Mississippi including portions of Lincoln, Copiah, Simpson, and Jefferson Davis Counties.  Plaintiffs also alleged vote dilution in three areas of the 2022 Enacted House Plan: the area around Chickasaw and Monroe Counties, the Clinton area in Hinds County, and East Central Mississippi around Clarke, Jasper, and Newton Counties.  On this trial record, Plaintiffs have proven vote dilution in each of the seven challenged areas.

## A.  Plaintiffs Have Proven the *Gingles* Preconditions

### 1.  *Plaintiffs have proven the first* Gingles *precondition*

Proof of the first *Gingles* precondition is typically made through the offer of an

---

[1] Such fragmentation, in the single-member-district context, can also be referred to as "packing and cracking," *i.e.*, the "[d]ilution of racial minority group voting strength" via "the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *E.g.*, *Gingles*, 478 U.S. at 46 n.11; *Nairne*, 2024 WL 492688, at \*15 nn. 158 & 159; *see also* FOF ¶¶ 79–81, 84–85, 98–99, 106, 109, 113, 119, 126, 133–134, 432, 443, 456, 489, 506.

illustrative districting plan containing additional majority-minority districts, which must be greater than 50% minority voting age population and reasonably configured, consistent with traditional districting principles.  *See, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 12, 18–20 (2009) (numerosity); *Clark v. Calhoun Cnty. ("Clark II")*, 88 F.3d 1393, 1406–07 (5th Cir. 1996); *Gonzalez v. Harris Cnty.* 601 F. App'x 255, 258 (5th Cir. 2015); *accord Nairne*, 2024 WL 492688, at \*11-17, 20-30; *see also Robinson v. Ardoin*, 605 F. Supp. 3d 759, 778-784, 820-838 (M.D. La.), *vacated and remanded on other grounds*, 86 F.4th 574 (5th Cir. 2023); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 977, 1004–1016 (N.D. Ala. 2022), *aff'd sub nom*. *Milligan*, 599 U.S. 1.  The analysis proceeds on a district-by-district basis.  *E.g.*, *Nairne*, 2024 WL 492688, at \*13-17.  The focus for purposes of *Gingles* 1 is on the *illustrative plans*, not on the plans enacted by the State.  *E.g.*, *Milligan*, 599 U.S. at 19-22; *Robinson*, 86 F.4th at 590.

It is undisputed that the additional majority-Black districts in the Illustrative Plans submitted by Plaintiffs' expert William Cooper—Illustrative Senate Districts 2, 9, 17, and 35 and Illustrative House Districts 22, 56, and 84—are each greater than 50% BVAP.  *See* FOF ¶¶ 82, 606.  And Mr. Cooper's demographic analysis demonstrated that Mississippi's Black population is growing more numerous and concentrated relative to the White population, both statewide and particularly in the areas of focus.  FOF ¶¶ 55-62.

Plaintiffs also established that the additional majority-Black Senate and House districts in Mr. Cooper's Illustrative Plans are sufficiently compact, *i.e.*, that they are "reasonably configured" such that they "comport[] with traditional districting criteria."  *Milligan*, 599 U.S. at 18, 20.  Such traditional criteria include "being contiguous and reasonably compact," "respect[ing] existing political subdivisions, such as counties, cities, and towns," and "maintaining communities of interest and traditional boundaries."  *Id.*; *Robinson*, 86 F.4th at 590

(citing *LULAC v. Perry*, 548 U.S. 399, 433 (2006)).  There is no material distinction between the compactness of the minority *population* and the compactness of the illustrative majority-minority *district* in the area where that population lives.  *See Robinson*, 86 F.4th at 590–591.  Reasonably-configured majority-minority districts are necessarily sufficient.  *Id.*

Here, all of the relevant considerations support the conclusion that *Gingles* 1 is met.

The trial record demonstrates, and Defendants' own expert confirmed, that the Illustrative Senate and House Plans performed as well or better than the Enacted Plans with respect to all relevant objective metrics, such as mathematical compactness scores, and tallies of split counties, precincts, and municipalities.  FOF ¶¶ 71–72, 82, 86–96.  Mr. Cooper thus complied with the criteria set forth in the State's guidelines (population equality, compactness, and county and precinct lines) at least as well as the State did.  *Id.*  Comparable performance with respect to such metrics is highly probative of a plan with reasonably-configured districts.  *See, e.g.*, *Milligan*, 599 U.S. at 20, 30–31; *Robinson*, 86 F.4th at 590-592; *Nairne*, 2024 WL 492688, at *21–25.

Mr. Cooper also offered extensive and credible testimony about his balanced mapdrawing approach, both generally and specifically with respect to the new majority-Black districts in the areas of focus, based on decades of experience drawing plans that Courts have found consistent with traditional districting principles, FOF ¶¶ 71–75; *see also* FOF ¶¶ 98–138.  *See, e.g.*, *Nairne*, 2024 WL 492688, at *12; *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, --- F. Supp. 3d ----, No. 1:21-CV-05337-SCJ, 2023 WL 7037537, at *16–17 (N.D. Ga. Oct. 26, 2023); *Singleton*, 582 F. Supp. 3d at 1004–1006; *Robinson*, 605 F. Supp. 3d at 778.  As in *Milligan*, Mr. Cooper testified about his limited use of race in his mapmaking process, FOF ¶¶ 74.  *See, e.g.*, *Robinson*, 86 F.4th at 595 (race properly "considered alongside" other traditional principles).  Meanwhile, Defendants' expert never opined that the Illustrative Plans were inconsistent with traditional

principles or that race predominated in their construction. *E.g.*, FOF ¶¶ 54, 74, 93.

With respect to communities of interest, the Illustrative Plans keep more municipalities whole, FOF ¶¶ 82, 93, and Defendants' expert agreed that municipalities are a classic community of interest, FOF ¶¶ 93. The Illustrative Plans also split fewer Planning and Development District ("PDD") areas and fewer school districts, among other potential communities of interest.[2] FOF ¶¶ 82, 91–93. The trial record also includes testimony from individual voters who live in the specific areas at issue, describing the "similar needs and interests beyond race" that are shared by the communities included in the new majority-Black Senate and House districts. *Robinson*, 86 F.4th at 590. These include shared resources like hospitals, shopping centers, and transportation corridors; school systems and sports; and cultural connections like church memberships and local festivals. *See* FOF ¶¶ 103–106, 110–111, 116–17, 123, 127, 131, 136.

The metrics, Mr. Cooper's extensive testimony, and the testimony of individual voters all demonstrate that the additional majority-Black districts in the Illustrative Plans are reasonably configured and consistent with traditional districting principles. *Gingles* 1 is satisfied.

### 2. *Plaintiffs have proven the Second and Third* **Gingles** *preconditions*

The second and third *Gingles* preconditions concern the behavior of voters and the electoral outcomes that result from racially polarized voting behavior. They identify those instances where the risk of dilution-by-submergence is at its highest, namely "'where minority

---

[2] That the legislature itself may not have utilized PDDs and school districts in constructing its plans does not mean those could not be considered to be communities of interest. *See* FOF ¶ 91–94. In any case, the ultimate question for purposes of *Gingles* 1 is whether the additional majority-Black districts in the Illustrative Plans are reasonably configured in light of traditional districting principles. *E.g.*, *Milligan*, 599 U.S. at 18, 20. As Mr. Cooper testified, his Illustrative Plans meet that standard whether or not PDDs and the like are considered. *See* FOF ¶ 94.

and majority *voters* consistently prefer different candidates' and where minority *voters* are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Milligan*, 599 U.S. at 17–18 (emphasis added).  As *Milligan*'s emphasis on voter behavior and electoral outcomes makes clear, any inquiry into *why* voters are polarized, and the role of partisanship, is part of the totality-of-the-circumstances inquiry, not the *Gingles* 2 and 3 analysis.[3]

Each prong addresses a different aspect of voter behavior.  The second *Gingles* prong asks whether Black voters are voting cohesively for preferred candidates, such that Black voters would in fact elect representatives of choice if drawn into a majority-Black single member district.  *Milligan*, 599 U.S. at 18-19.  The third prong considers the interaction between Black and White bloc voting, and, when proven, demonstrates that "'the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race."  *Id.* at 19 (quoting *Growe*, 507 U.S. at 40); *see also Robinson*, 86 F.4th at 596.  Together, *Gingles* 2 and 3 provide a complete picture of how racial polarization operates in the area of focus.  Both are met here.  Indeed, Dr. Lisa Handley, who also served as an expert in *Nairne*, testified that "I've not been in a jurisdiction in which polarization is higher."  FOF ¶ 161.

On *Gingles* 2, Dr. Handley's analysis of Black voter cohesion in each of the seven areas of focus was confirmed by Defendants' own expert.  In all 17 of the statewide contests that Dr.

---

[3] To the extent *LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc) can be read to suggest that this inquiry regarding the role of partisanship takes place in connection with *Gingles* 3, *Milligan* strongly suggests that this is incorrect:  "The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race."  599 U.S. at 19; *accord Nairne*, 2024 WL 492688, at *36, *38 and *Alpha Phi Alpha*, 2023 WL 7037537, at *56 n.45 (both applying *Milligan* to hold that the partisanship issue is properly analyzed in the context of totality of the circumstances); *Lopez v. Abbott*, 339 F. Supp. 3d 589, 612-613 (S.D. Tex. 2018) (considering issue at the totality-of-the-circumstances phase).  Either way, Defendants have failed to meet their burden on this issue as stated in the discussion of Senate Factor 2, *infra*.

Handley examined, including contests from 2019 and 2015, the level of cohesion among Black voters was over 75% in each of the areas of interest. FOF ¶¶ 160–161. And in the vast majority of state legislative contests she examined (14 out of 19), the level of cohesion was greater than 75%. FOF ¶¶ 162–163. The average level of Black support for preferred candidates across the seven areas was *94.3%* in biracial contests. FOF ¶ 158. Defendants' expert did not dispute that Black voters are cohesively supporting preferred candidates in those areas. FOF ¶ 172.

On *Gingles* 3, undisputed evidence in the trial record unambiguously showed that White support for Black-preferred candidates (sometimes called "crossover" voting) is minimal, and that Black-preferred candidates will typically be defeated by White bloc voting outside of Black majority districts. The average level of White crossover voting for Black-preferred candidates across the seven areas was only 6.9%. FOF ¶ 158. In biracial state legislative contests in 2019 and 2015, Black-preferred candidates only prevailed in Black-majority districts. FOF ¶¶ 162–164. And Dr. Handley's recompiled precinct analysis, which looked at the performance of Black-preferred Black candidates across 12 contests using the specific district boundaries in the 2022 Enacted Plans in the areas of focus, showed that those candidates would be consistently defeated except in Black-majority districts. FOF ¶¶ 178–180; *see also* FOF ¶ 172.[4]

All of this is the same type of analysis and evidence that demonstrated legally significant racially polarized voting for purposes of the *Gingles* preconditions in *Milligan*, *Robinson*, and

---

[4] Defendants point to one district, SD 7, in which a long-serving White Democratic incumbent, Hob Bryan prevailed in 2022. But Defendants did not adduce any evidence about Mr. Bryan, or conduct their own analysis of his election, and thus there is no evidence in the record regarding the extent of Black or White support for him. And in any case, Dr. Handley's recompiled analysis showed that, whether or not an established White incumbent may be able to win in Senate District 7, Black-preferred Black candidates will typically be defeated. FOF ¶ 178-182.

*Nairne*.  In *Milligan*, for example, the evidence was that, "on average, Black voters supported their candidates of choice with 92.3% of the vote" while "white voters supported Black-preferred candidates with 15.4% of the vote" and "that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters." 599 U.S. at 22. In *Robinson*, the evidence similarly showed that Black voter cohesion was 83.8% on average, and that White crossover voting was between 11.7 percent and 20.8 percent—and the Court concluded this was sufficient to show legally significant polarization.  86 F.4th at 597; *see also Robinson*, 605 F. Supp. 3d at 801.  In *Nairne* the numbers were similar, and Dr. Handley similarly used recompiled precinct analysis, as she did here, to show that the illustrative plans offered additional Black-majority districts where Black voters would have the opportunity to elect candidates of choice.  2024 WL 492688, at *31.  On evidence that is, if anything, stronger than the evidence in those cases, Plaintiffs have proven *Gingles* 2 and 3.

## B.  Plaintiffs Have Proven Section 2 Violations Based on the Totality of the Circumstances

Because Plaintiffs have proven the three *Gingles* preconditions, they have shown that, in the specific areas of focus, the combination of the district lines and persistent White bloc voting against Black-preferred candidates will operate to lock substantial numbers of Black voters out of power.  That is the fundamental dilution dynamic that *Gingles* and its progeny recognize. *E.g.*, 478 U.S. at 46–57 & n.11.  And looking to the totality of the circumstances, including the Senate Factors,[5] this is not the "'very unusual case'" where liability does not follow, *Teague*, 92

---

[5] The Senate Report that accompanied the 1982 Voting Rights Act reauthorization drew for this non-exclusive set of guides on the Fifth Circuit's decision in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973).  *See Robinson*, 86 F.4th at 589; *accord Gingles*, 478 U.S. at 36–37 & n.4.

F.3d at 293 (quoting *Clark*, 21 F.3d at 97).  Rather, the evidence is fundamentally similar to the evidence that supported liability in recent cases like *Milligan*, *Robinson*, and *Nairne*.

### 1. Defendants' "Party Not Race" Argument Fails, and Senate Factor 2 Weighs Strongly in Favor of Liability

The second Senate Factor is "'the extent to which voting … is racially polarized.'"  *Nairne*, 2024 WL 492688, at *38 (quoting *Gingles*, 478 U.S. at 37).  Along with the seventh (the extent to which members of the minority group have been elected to office), it is often considered especially important.  *E.g.*, *Fairley v. City of Hattiesburg*, 662 F. App'x 291, 296 (5th Cir. 2016) (quoting *Clark II*, 88 F.3d at 1397-98).

Dr. Handley's uncontested analysis showed that the degree of racial polarization in Mississippi is very stark.  Such proof *in itself* creates an inference of racial bias in the electoral system.  *See Teague*, 92 F.3d at 290 ("Plaintiffs are to present evidence of racial bias operating in the electoral system by proving up the *Gingles* factors."); *accord United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566-67 (11th Cir. 1984) (Wisdom, J.) (racially polarized voting is "the surest indication of race-conscious politics").

The burden to rebut this inference and demonstrate that stark patterns of racial polarization in the electorate are due to something other than race lies with the defendant.  A Section 2 plaintiff does not have "the burden of negating all nonracial reasons possibly explaining" those voting patterns.  *Teague*, 92 F.3d at 295; *accord Nairne*, 2024 WL 492688 at *38.  Rather, it is for the defendant to "try to rebut plaintiffs' claim of vote dilution via evidence of 'objective, nonracial factors.'"  *See Teague*, 92 F.3d at 292 (quoting *Nipper v. Smith*, 39 F.3d 1494, 1513 (11th Cir. 1994) (en banc)).  Viewing the burden this way makes sense because, in a Section 2 results case, Plaintiffs are not required to affirmatively prove the ultimate or underlying *cause* of unequal opportunity for Black voters, only the unequal *result* of the

11

imposition of the challenged districting plan.  *See Milligan,* 599 U.S. at 18.

In the few instances where defendants have succeeded with this defense, there has been record evidence that "indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens." *Clements*, 999 F.2d at 850.  Thus in *Clements*, the evidence showed very high levels of White crossover voting in Texas judicial elections for minority-preferred candidates, between 30 and 40 percent.  *Id.* at 861.  In addition, both political parties "aggressively recruited" minority candidates, successfully nominated them, and elected them with White support, such that there was a track record of minority candidates winning elections repeatedly and "without fail" with support primarily from White voters, including in contests against White candidates.  *Id.* at 861.

Similarly, in *Lopez v. Abbott*, another Texas judicial districting case, both parties were running minority candidates, and White voters were consistently voting to elect minority candidates nominated by their preferred party.  339 F. Supp. 3d 589, 612-613 (S.D. Tex. 2018).

Likewise in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), on which Defendants also rely, poor Black and poor White voters in one section of the County were voting for one party, and wealthier voters elsewhere were voting for the other party—but both parties were nominating and electing Black candidates, and doing so with White support.  403 U.S. at 149–153 & nn. 29–30.  Justice White described a similar scenario in his *Gingles* concurrence, in which both parties were nominating racially mixed slates of candidates, such that White voters were supporting and electing Black candidates and vice versa.  478 U.S. 30, 83 (White, J., concurring).

The common thread among these cases—and the reason why the facts in each could support the conclusion that the polarization of the electorate might be partisan rather than racial in nature—is that White voters were consistently *voting for and electing to office* minority

12

candidates, both by "crossover" voting for minority voters' preferred candidates in significant

numbers, and by consistently voting for minority nominees from their own preferred party.

These cases teach that, when the facts demonstrate that there are two genuinely multi-racial

coalitions operating in politics, with both parties nominating and electing minority candidates

with White support, the mere fact that the racial composition of the two coalitions varies

somewhat may not be sufficient to sustain a Section 2 claim.  In that situation, it might be said

that partisan affiliation "best explains" polarization.  *Clements*, 999 F.2d at 850.

The trial record in this case could not be more different.  The trial record here does not

show that the stark polarization of the electorate along racial lines is primarily a function of

partisanship.  Rather, it shows that race best explains the polarization of the electorate along

racial lines.  *Accord Nairne,* 2024 WL 492688 at *38.

Defendants' argument is premised on their expert Dr. John Alford's claim that Black

voters tend to support Democrats and White voters tend to support Republicans, regardless of the

race of the candidate.  Courts have repeatedly rejected Dr. Alford's assertion that such mere

correlation, without more, can negate or diminish evidence of stark racial polarization among

voters. *Robinson*, 605 F. Supp. 3d at 840–41 ("Dr. Alford's opinions border on *ipse dixit*. His

opinions are unsupported by meaningful substantive analysis and are not the result of commonly

accepted methodology in the field."); *see also Nairne*, 2024 WL 492688 at *38; *Alpha Phi Alpha

Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1305–06 (N.D. Ga. Feb. 28, 2022);

*NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381

(S.D.N.Y. 2020).  *Cf. Clements*, 999 F.2d at 860–861 (holding it "entirely correct … that courts

should not summarily dismiss vote dilution claims in cases where racially divergent voting

patterns correspond with partisan affiliation").  His analysis followed the same pattern here, and

the Court can reject it without going further.  *See also Jamison v. Tupelo*, 471 F. Supp. 2d 706,

713–14 (N.D. Miss. 2007) ("The reasons that black and white voters vote differently have no

relevance to the central inquiry of § 2…."). But if the argument merited further consideration,

the record shows that *race best explains the electorate's clear polarization along racial lines*.

For one, the data shows that the race of the candidate matters in Mississippi elections:

Completely unlike in *Clements*, White voters vote against Black candidates almost uniformly, in

election after election, such that Black candidates only win in Black-majority districts.  In

*Clements* and similar cases, there were consistently high levels of White crossover voting.  But

in the undisputed data in the trial record, White crossover voting is low, almost always under

10% in statewide contests in the areas of focus, and only ticking up for a top-of-the ticket White

candidate, Jim Hood.  *E.g.*, FOF ¶¶ 159, 224.  In *Clements*, both parties were consistently

nominating minority candidates.  But in the undisputed data in the trial record, which contains

every biracial statewide contest and every biracial state legislative contest from the areas of focus

from the last decade, there was not a single instance in which the Republican Party (*i.e.*, the party

typically favored by White voters) nominated a Black candidate for statewide office—and only

one out of nineteen where a Black Republican was nominated for state legislative office (in a

Black-majority district against an incumbent Black Democrat).  FOF ¶¶ 225–226, 322.  And

perhaps most importantly, in *Clements*, White voters were voting for *and electing* minority

candidates to office.  Here, by contrast there has not been a Black candidate elected statewide

since Reconstruction, even while White candidates from both parties (such as Jim Hood) have

won statewide office in the recent past, *see* FOF ¶¶ 225, 320.  Similarly, in state legislative

contests in White-majority districts (*i.e.*, where White support is needed to win), White voters

voted against Black candidates at 80%+ levels of cohesion *every single time*.  FOF ¶ 224(b).

14

The data from Democratic primary contests and non-partisan contests, where there was no partisan "cue" about the candidates on the ballot, is similarly consistent in showing that White voters almost never vote to elect Black candidates.  Dr. Handley concluded that a number of these primary and non-partisan contests were not polarized, but the reason for this was almost uniformly because Black voters sometimes voted for White candidates, which is consistent with Dr. Marvin King's testimony about Black voters' keen attention to candidate viability.  FOF ¶¶ 165–68, 224, 239.  But White voters in these contests consistently voted against Black candidates.  In seven out of eight Democratic primaries, the bulk of White voters voted against the Black candidate.  FOF ¶ 224(d).  And in *all three* of the non-partisan State Supreme Court contests, White voters voted against the Black candidate, with 70%+ cohesion.  FOF ¶ 224(c).

The data thus supports the conclusion that race "best explains" the stark patterns of racial polarization in Mississippi in the areas of focus, and reaffirms that Senate Factor 2 (and Senate Factor 7) weigh strongly in favor of liability.  And Dr. King's wholly unrebutted analysis of *why* the electorate is racially polarized and *how* it got that way confirms that conclusion.

First, Dr. King explained that while Black voters do vote for White candidates, Black voters also respond to the race of the candidate by turning out in higher numbers when a Black candidate is on the ballot.  FOF ¶ 239.  Voters preferences with respect to the race of the candidate are also revealed by reference to the candidates who prevail in Black and White majority districts:  Black-majority districts are almost all represented by Black legislators, and White-majority districts by White legislators.  FOF ¶ 239–40.

More broadly, Dr. King explained that race and racial issues played a critical role in shaping the partisan alignment of Black and White voters that we see today—and Defendants' own expert Dr. Thomas Brunell agreed.  FOF ¶¶ 218–22, 229–38, 333.  As Dr. King explained,

as Black voters in Mississippi and across the South gained the franchise after the passage of the VRA in 1965, they began voting Democratic—and in the election cycles after that, White voters responded by moving to the Republican Party.  FOF ¶¶ 229–235.  As Dr. King explained, with absolutely no contrary analysis from any defense expert, Mississippi voters realigned over time based on the parties' and candidates' positions with respect to racial equality and civil rights. FOF ¶ 237–239.  This realignment "undercuts the argument that the vote is polarized along party lines and not racial lines."  *Nairne*, 2024 WL 492688, at *38.  And Dr. King's descriptive historical analysis is consistent with empirical and survey-based analyses of the ways race drives voters' political decision-making.  FOF ¶¶ 237–239.[6]  Indeed, Dr. Alford agreed that race can motivate political affiliation.  FOF ¶¶ 237.  Dr. King's unrebutted analysis on the salience of race in Mississippi politics could not be clearer:  "Race has always been the preeminent political issue in Mississippi and so that defines the dividing lines for the parties. So race comes first. That's the foundation for polarization."  FOF ¶¶ 229.

Race best explains racially polarized voting patterns in Mississippi elections.  Racial polarization remains stark and persistent; it is historically prior (and has helped to shape) the present partisan alignment of Black and White voters; and it operates in all types of elections, even absent partisan cues, especially with respect to White voters' persistent opposition to Black candidates.  As a result, Black candidates nearly always lose outside of Black-majority districts. Senate Factor 2 weighs extremely strongly in favor of the Plaintiffs.

---

[6] The trial record confirms that voters vote their perceived values and interests—but that those perceived interests can change in response to the positions taken by the candidates and the parties.  Thus, Deacon Kenneth Harris and Gary Fredericks testified about supporting Republicans like Lt. Gov. Delbert Hosemann and former Senator Thad Cochran when those officials demonstrated responsiveness to issues of concern their communities.  FOF ¶¶ 243–245.

### 2.   The Remaining Senate Factors Also Weigh in Favor of Liability

The ultimate question for purposes of a liability determination is whether Black voters "have an equal opportunity in the voting process to elect their preferred candidate under the challenged districting map." *Robinson*, 86 F.4th at 589.  The Senate Factors are a non-exclusive guide to that inquiry.  *E.g.*, *Ga. State Conf. of NAACP*, 775 F.3d at 1342.  Those factors, and especially Senate Factors 2 and 7, confirm that, in the areas of focus, Black voters do not have an equal opportunity to elect candidates of their choice under the Enacted Senate and House Plans.

**Senate Factors 1 and 3:**  On Senate Factors 1 and 3, there is no dispute that Mississippi has a long history of voting-related discrimination, including the use of numerous mechanisms that enhance the opportunity for voting discrimination, as courts have repeatedly acknowledged. *See, e.g.*, *Thomas v. Bryant*, 366 F. Supp. 3d 786, 807 (S.D. Miss.), *aff'd*, 931 F.3d 455 (5th Cir. 2019), *vacated as moot on other grounds, Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020); *see also, e.g.*, *Teague*, 92 F.3d at 293–94; *Clark II*, 88 F.3d at 1399.  The expert testimony of Dr. Robert Luckett and Dr. King both detailed that history, and their testimony as well as the 81 U.S. Department of Justice voting determination letters issued prior to 2013 demonstrate the extent to which discriminatory voting practices continued into the modern era.  FOF ¶¶ 188–209. Individual voters' testimony showed that the history of exclusion still influences the lives of Black Mississippians, and for some represents their lived experience.  FOF ¶¶ 213–217.  That the very worst discriminatory voting rules were eradicated after 1965 is not a defense to vote dilution, as recent Section 2 merits determinations in Alabama (*Milligan*), Georgia (*Alpha Phi Alpha*), Louisiana (*Robinson* and *Nairne*), and Mississippi (*Thomas*) demonstrate.

Moreover, the trial record shows that voting rules and procedures that enhance opportunities for discrimination in voting and burden the right to vote disproportionately for

17

Black Mississippians remain in place, and in some cases have been expanded.  These include lifetime felony disenfranchisement; restrictions on absentee voting, including new restrictions imposed in the last year; a strict voter ID law; a  new voter purge law, beyond what federal law requires, that will lead to less frequent voters being taken off the active list and subjected to additional barriers; odd-year state legislative elections that lead to lower turnout and more voter fatigue, especially among less educated voters; and a lack of early voting, mail-in voting, or same-day registration, or other practices that might make it easier to vote and ameliorate the effects of past discrimination and socioeconomic disparities.  FOF ¶¶ 247–255.  Such restrictive policies are relevant whether or not they are lawful.  *See, e.g.*, *Nairne*, 2024 WL 492688, at *36-39; *Jamison*, 471 F. Supp. 2d at 714.  That is especially so where both the expert and fact witness testimony showed that the burdens imposed by restrictive voting rules fall disproportionately on Black voters, *e.g.*, FOF ¶¶ , 255–259.  *See Nairne*, 2024 WL 492688, at *39; *Alpha Phi Alpha*, 2023 WL 7037537, at *64 n.54; *see also Singleton*, 582 F. Supp. 3d at 1021.[7]

**Senate Factor 5:**  Courts have repeatedly recognized that, as a result of past discrimination, Black voters in Mississippi suffer from significant socio-economic disadvantages in areas such as education, income, and health that impede their ability to participate in the political process*.  See, e.g.*, *Teague*, 92 F.3d at 294; *Thomas*, 366 F. Supp. 3d at 807.

On this trial record, those substantial disparities are undisputed:  Poverty rates among Black Mississippians are three times that of Whites; educational attainment, especially with respect to higher education, is significantly lower; rates of disease and lack of access to private

---

[7] Moreover, to whatever extent required, Plaintiffs have paired their evidence regarding Mississippi's official history of discrimination with a showing that Black Mississippians "do not in fact participate to the same extent as other citizens." *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001) (quoting *Clements,* 999 F.2d at 866).  *See* FOF ¶¶ 282–305.

medical coverage are significantly higher.  FOF ¶¶ 267–281.  And Dr. D'Andra Orey also

testified, again without any dispute from Defendants, regarding the established empirical link in

the political science literature between political participation and socioeconomic categories like

income, poverty, educational attainment, and health.  FOF ¶ 266; *see also, e.g.*, *Gingles*, 478

U.S. at 69 ("[P]olitical participation by minorities tends to be depressed where minority group

members suffer effects of prior discrimination such as inferior education, poor employment

opportunities, and low incomes.").  Nor did Defendants dispute Dr. Orey's analysis

demonstrating a statistically significant link between Black voter turnout and socioeconomic

characteristics where Black voters lag behind Whites, such as poverty, educational attainment,

and rates of public insurance.  FOF ¶¶ 304–305.  That uncontested analysis demonstrates that

lower levels of education, income, and health depress Black turnout.  *See, e.g.*, *Nairne*, 2024 WL

492688, at *39-41 (crediting analysis that disparities in these factors depress turnout).

Plaintiffs also demonstrated via Dr. Orey's use of three different analytical methods that

Black turnout was in fact around ten points lower than White turnout in 2020 election, both

statewide and in the areas of focus, like Chickasaw, Copiah, DeSoto, Forrest, Lamar, Lincoln,

Monroe, and Newton Counties.  FOF ¶¶ 282–303.  The substance of Dr. Orey's three analyses,

each of which used a different form of validated data, and which produced consistent results, was

largely uncontested.  FOF ¶¶ 284, 295–296.[8]  And Dr. Orey and Dr. Jordan Ragusa also both

---

[8] In contrast to Dr. Orey's multiple methodologies, Defendants argue there was no turnout gap
by pointing to sources whose validity no expert credibly vouched for.  First, they relied on the
Current Population Survey ("CPS") voting supplement, an unvalidated survey that relies solely
on voters' self-reported behavior.  FOF ¶¶ 299–300.  As Dr. Orey credibly testified (and as
Defendants' own expert Dr. Brunell agreed), the CPS data on turnout by race is not considered
reliable by political scientists.  FOF ¶¶ 301–302; *accord Thomas*, 366 F. Supp. 3d at 808 (noting

explained why 2020, as a higher turnout election, is a particularly good benchmark for assessing electoral behavior and turnout by race.  FOF ¶ 285.

**Senate Factor 6:**  Plaintiffs have also established the continued use of "overt or subtle racial appeals" in political campaigns in Mississippi.  *Gingles*, 478 U.S. at 37.  These include, as Dr. King described, advertisements and political messages that invoke discriminatory tropes that make Black candidates less electable in the minds of some voters, or that portray Black people negatively in order to gain political advantage.  FOF ¶¶ 306–318.  Dr. King cited numerous examples, including from the last few election cycles, of campaign messaging signaling nostalgia for the Confederacy, or portraying Black politicians and political leaders as criminals or otherwise not "one of us."  FOF ¶¶ 311.  *Cf. Jordan v. Winter*, 604 F. Supp. 807, 813 n.8 (N.D. Miss.) (slogan "one of us" and images of confederate monuments in advertisements signaled racial appeals), *aff'd sub nom. Mississippi Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984).  Dr. King testified, unrebutted, that campaigns do not invoke such rhetoric "coincidentally or by chance."  FOF ¶ 310.  That these messages were issued by private political campaigns does not diminish their relevance.  Their very existence reflects an environment where race is highly salient in politics, and where campaigns believe that racial appeals will be effective in polarizing voters. *See, e.g., Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,* 201 F. Supp. 3d 1006, 1078 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018).

--------

"known issues with self-reported voting surveys").  Defendants also attempted to rely on a report about voter turnout by race that was published on the internet over the weekend in the middle of trial.  But Dr. Brunell testified that this source, which he reviewed only briefly before testifying on it, was not peer reviewed, that it was not specific to Mississippi, that its data and code were not public, that its authors were unknown, and that the Census Bureau had characterized some of the population data used in the report's model as failing to meet quality standards.  FOF ¶ 303.

**Senate Factor 7:**  Black Mississippians are underrepresented in high public office in Mississippi, despite being nearly 40% of the State's population.  *See Gingles*, 478 U.S. at 37. Mississippi has not elected a Black candidate of any party to statewide office since Reconstruction.  FOF ¶ 320.  And the story is similarly stark with respect to state legislative offices, which are especially relevant here.  *E.g.*, *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993); *see also Clark*, 21 F.3d at 97; *Thomas*, 366 F. Supp. 3d at 806.  The testifying experts, *including Defendants' experts*, all agreed that Black candidates in Mississippi are almost exclusively elected only from Black-majority districts.  FOF ¶¶ 221–222.  As Dr. King testified, "[o]utside of Black-majority districts, majority-minority districts, … we just don't see evidence that Blacks can win."  FOF ¶ 221.  That reality contextualizes the high level of racially polarized voting in Mississippi and "the degree to which vestiges of discrimination continue to reduce minority participation in the political process." *Veasey v. Abbott*, 830 F.3d 216, 261 (5th Cir. 2016) (en banc) (citing *Gingles*, 478 U.S. at 45).

Consistent with that, both Dr. King and Defendants' expert Dr. Brunell agreed that Black legislators are underrepresented relative to the State's Black population, especially in the State Senate, where Black legislators make up approximately 27% of that body.  FOF ¶¶ 326.  This underrepresentation is especially pronounced in the particular areas of focus in this case.  The White-majority districts in the areas of focus are all represented by White legislators and have been for at least the last decade.   *See* Stip. ¶¶ 71, 82, 89.  No part of DeSoto County has been represented by a Black State Senator since the 1800s.  Stip.  ¶ 49.  The same is true for Chickasaw, Newton, and Monroe Counties in the State House.  Stip.  ¶ 50.  All of this is consistent with Mr. Cooper's regional representation gap analysis which showed especially low numbers of Black-majority districts in those areas.  FOF ¶¶ 79–80.

21

As Dr. King explained, Black candidates in Mississippi face difficulty winning outside of Black-majority districts in no small part because racial resentment among some White voters impedes them from forming winning coalitions with White voters.  FOF ¶ 327.

None of this is altered by a single Black Republican winning a primary election and an uncontested general election in a White-majority House district in 2023.  As Dr. King testified, "the outlier of a case almost just proves the rule," FOF ¶ 240.  *See, e.g.*, *Alpha Phi Alpha*, 2023 WL 7037537, at *72 (holding Senate Factor 7 weighed heavily in favor of Plaintiffs despite election of Black U.S. Senator and noting that "[t]he Supreme Court in *Gingles*, when discussing the success of a select few Black candidates, cautioned courts in conflating the success of few as dispositive"); *see also, e.g.*, *Gunn v. Chickasaw Cnty.*, 166 F.3d 341, 1998 WL 912195 at *3 (5th Cir. 1998) (unpublished) (minority candidates winning some elections unpersuasive where they did "not necessarily indicate significant crossover-voting by whites").

**Senate Factor 8:**  This factor and Senate Factor 9 are additional factors that also have probative value.  As to Senate Factor 8, the trial record demonstrates a "lack of responsiveness on the part of elected officials to the particularized needs" of Black Mississippians, *Gingles*, 478 U.S. at 37, specifically, significant racial disparities in the educational funding and quality and pervasive health disparities, both of which are substantial concerns for Black Mississippians that have not been addressed by State leaders.  FOF ¶¶ 335–337.  In a number of the areas of focus, legislators had not campaigned in Black communities or attended non-partisan campaign forums held by Black-led organizations.  FOF ¶¶ 341–343.  Black voters repeatedly asked legislative map-drawers at public hearings to provide increased representation for Black communities, but no additional Black majority districts were drawn.  FOF ¶¶ 338; *see Nairne*, 2024 WL 492688, at *42–43.  All this is consistent with the evidence that, outside of Black-majority districts, elected

officials have little political incentive to appeal to Black voters' needs.

**Senate Factor 9:**  The trial record also supports the conclusion that the rationale for the district lines in the 2022 Senate and House Plans is "tenuous."  *Gingles*, 478 U.S. at 37.  Public discussion and debate over the plans prior to their passage was "the bare minimum, if that."  FOF ¶ 351.   Other than a precinct swap to unpair two incumbents, there were no changes to the plans between their unveiling and their passage mere days later.  FOF ¶ 350.  And despite Black population growth and persistent calls for greater representation for Black voters, the number of Black-majority districts did not change.  FOF ¶¶ 338, 346.

Raw partisanship is no defense.  It begs credulity to claim that that advancing the private interests of politicians and their parties constitutes a "legitimate state interest[]."  *Veasey*, 830 F.3d at 262.   Indeed, the record shows that drawing districts to secure partisan gain runs contrary to the legitimate interests that courts have identified, such as "promoting public confidence in the voting process," *id.* at 231.  As Dr. King explained, reducing the competitiveness of districts *undermines* public confidence—and is one of the reasons why Mississippi typically has "the lowest voter turnout in the country."  FOF ¶ 355.  "Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive" and thus "acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory."  *Veasey*, 830 F.3d at 241 n.30.[9]

Even if partisan motives could be considered a legitimate rationale for a challenged districting scheme, the trial record would not support such an argument here.  *See, e.g.*, FOF ¶¶ 766–768.  No legislators or mapdrawers testified at trial about the creation of the 2022 Senate

---

[9] In *Veasey*, the Court relied on historical evidence that, regardless of the political party in power—"whether [it is the] Republicans, Democrats[,] or Martians" —the White majority had consistently acted to deny or dilute the Black vote.  830 F.3d at 241 n.30.  The record shows that such dilution occurred here.  *See, e.g*, FOF ¶¶ 190-213, 353.

and House Plans.  Defendants adduced no evidence demonstrating that particular district lines in the areas of focus were drawn in service of some specific consideration (partisan or otherwise), such as the protection of a particular incumbent or the inclusion of a particular business or institution or address in a particular district.  The official criteria adopted by the legislative map drawers, which are in evidence, do not include partisan gain or incumbent protection.  FOF ¶ 5.

In any event, more specific evidence would not lead to this factor weighing in Defendants' favor.  In a recent redistricting case in Georgia where (unlike here) the state's mapdrawer took the stand and offered specific testimony about partisan motivations for certain line-drawing decisions, the court concluded that, in the vote dilution context, Senate Factor 9 generally should receive "less weight" because, under the *Gingles* results test, "a legislature's intent in drawing [the] map is irrelevant."  *Alpha Phi Alpha*, 2023 WL 7037537, at *73 & n.69.

*       *       *

In the four areas of the Enacted Senate Plan and three areas of the Enacted House Plan at issue, the trial record shows that large numbers of Black voters are submerged in White-majority districts, shut out of power due to persistent racially polarized voting, and will not "have an equal opportunity … to elect their preferred candidate under the challenged districting map." *Robinson*, 86 F.4th at 589.  Plaintiffs have proven vote dilution in each of the areas of focus.

## II.   PLAINTIFFS HAVE PROVEN RACIAL GERRYMANDERING IN THE FIVE CHALLENGED DISTRICTS

A racial gerrymandering claim asserts "that race was improperly used in the drawing of the boundaries" of an electoral district.  *Alabama Legislative Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 262–63 (2015).  Sorting voters predominantly on the basis of their race is a "racial classification" that inflicts individualized harm on voters living within those districts. *Id.* at 263; *Shaw v. Reno*, 509 U.S. 630, 643–44 (1993).  Such classifications are suspect

24

"regardless of purported motivation." *Id.*

To determine whether a district is an unconstitutional racial gerrymander, courts conduct "a two-step analysis." *Cooper*, 581 U.S. at 291.  "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).  Race is the predominant factor if the legislature has "subordinated" other redistricting factors in favor of racial sorting.  *Id.*  Establishing that race predominated in the drawing of district lines overcomes "the presumption of good faith" to which the legislature is entitled. *Miller*, 515 U.S. at 915–16 (presumption overcome by a showing of "race-based decisionmaking"); *Harris v. McCrory*, 159 F. Supp. 3d 600, 611 (M.D.N.C. 2016) (good-faith "presumption must yield, however, when the evidence shows that citizens have been assigned to legislative districts primarily based on their race"), *aff'd sub nom. Cooper*, 581 U.S. at 291.[10]

The racial predominance inquiry concerns *how* redistricting was conducted, rather than *why* the legislature did what it did. *Cooper*, 581 U.S. at 308 n.7.  The standard is "satisfied when legislators have 'place[d] a significant number of voters within or without' a district

_____

[10] When the Supreme Court recognized a racial gerrymandering claim for the first time in *Shaw*, the Court created a claim that is "analytically distinct" from the type of "purposeful" discrimination at issue in *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980).  *Miller*, 515 U.S. at 911.  In contrast to claims involving racial animus or invidious discrimination, "the essence of the Equal Protection claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts." *Id.*  Racial gerrymandering claims are thus cognizable even when the State undertakes the racial sorting with a "benign" motivation.  *Shaw*, 509 U.S. at 653; *see also Bush*, 517 U.S. at 984.  Consistent with that distinction, racial gerrymandering claims require that racial sorting be the "predominant" consideration affecting a "significant" number of voters, whereas claims of invidious discrimination are actionable even if discriminatory purpose is merely "a motivating factor" affecting any racial group, regardless of the number of individuals affected.  *Compare Cooper*, 581 U.S. at 291–92 *with Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

predominantly because of their race, *regardless of their ultimate objective in taking that step*." *Id.* (emphasis added); *accord Shaw*, 509 U.S. at 645 ("[D]istrict lines obviously drawn for the purpose of separating voters by race require careful scrutiny under the Equal Protection Clause regardless of the motivations underlying their adoption.").  That legislators may have separated voters along racial lines "with the end goal of advancing their partisan interests" is no defense: "[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 581 U.S. at 308 n.7; *accord Bush v. Vera*, 517 U.S. 952, 968–70 (1996) (plurality opinion) (race predominated where Black population was "spread[]" between districts in order to protect incumbents); *Miller,* 515 U.S. at 914 ("use of race as a proxy" for "political interest[s]" is "prohibit[ed]"). [11]

Plaintiffs may carry their burden by relying on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916).  Circumstantial evidence is not inferior to direct evidence.  Indeed, "[c]ircumstantial evidence is not only sufficient, [it] may also be more certain, satisfying, and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation omitted); *see also Hunt v. Cromartie*, 526 U.S. 541, 548–49 (1999) ("[A]ppellees' evidence tends to support an inference that the State drew its district lines with an impermissible racial motive—even though they presented no direct evidence of intent.").

---

[11] The Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), holding that *partisan* gerrymandering claims are not justiciable, has no application in the racial gerrymandering context—and Defendants have never argued otherwise.  Partisan gerrymandering claims involve sorting voters based on partisan data or information, and thus do not involve an impermissible racial classification. *Id.* at 2502–2503.  Of course, there might be instances where a contested question of fact arises as to what type of data or information mapdrawers used, and to what extent they used it.  But this is not such a case. *See* FOF ¶¶ 359–369, 398–399.

Evidence of racial predominance that courts have recognized includes, among other things: (i) a district's bizarre shape, *Miller*, 515 U.S. at 912; (ii) inconsistency with traditional redistricting principles, *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 190 (2017); (iii) "stark splits in the racial composition of populations moved into and out" of a district, *id.* at 192; (iv) the use of a racial target, *Cooper*, 581 U.S. at 300; and (v) precinct splits that can only be explained by block-level racial data, not precinct-level electoral data, *Bush*, 517 U.S. at 970.

Once a plaintiff has shown that "racial considerations predominated over others, the design of the district must withstand strict scrutiny." *Cooper*, 581 U.S. at 292. In other words, "[t]he burden . . . shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* (quoting *Bethune-Hill*, 580 U.S. at 193). "[O]ne compelling interest is complying with" the Voting Rights Act of 1965—but no other compelling interest has been recognized in the context of racial gerrymandering. *See id.*

### A. Plaintiffs Have Proven Racial Predominance in the Five Challenged Districts

The trial record here demonstrates that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without" each of the five challenged districts. *See ALBC*, 575 U.S. at 266–67.

First, Dr. Ragusa's analyses showed that "Black voters were systematically excluded" from the five challenged districts. FOF ¶¶ 371, 384–408, 426–549. His three regression models analyzed whether, controlling for partisanship and other redistricting principles, Black voters were less likely to be moved into a challenged district, more likely to be moved out of a challenged district, or both. FOF ¶¶ 375–383. At least one model showed that race had a statistically significant effect for each challenged district, and those results consistently showed that Black

voters were far more likely to be excluded from those districts.  FOF ¶¶ 381, 384–385.[12]  Such evidence is highly probative of racial predominance.  *See Cooper*, 581 U.S. at 315.

Defendants criticize Dr. Ragusa for not comparing the magnitude of the race variable against the magnitude of the partisanship variable, but that argument misunderstands the law.  A plaintiff must show that race was the predominant factor driving the movement of "a significant number of voters" in or out of a district.  *E.g.*, *Cooper*, 581 U.S. at 291.  They need not show that race was the predominant motivation behind the movement of *all* voters or a *majority* of the voters in a district, or that *more* voters were moved on the basis of race than on the basis of their electoral preferences.  Indeed, in *Cooper*, the Court found that the net movement of 25,000 Black voters was significant, even though the population of the district was 730,000.  *See* 581 U.S. at 295, 314.

Here, Dr. Ragusa found that, once partisanship and other factors were accounted for, race continued to exert "a substantively significant" effect on the design of the challenged districts, which were markedly less likely to include a census block as its BVAP increased.  FOF ¶¶ 391.  Furthermore, the raw data confirm Dr. Ragusa's analysis, indicating that thousands of Black voters were disproportionately and unnecessarily moved out or kept out of the challenged districts.  FOF ¶¶ 430–31, 462–63, 490–91, 511, 531–532.  These results affecting significant numbers of voters thus "cannot be dismissed as a simple byproduct of partisan gerrymandering or adherence to . . . common redistricting principles."  FOF ¶ 408.

---

[12] As Dr. Ragusa explained, a racial gerrymander can be enacted by disproportionately moving a particularly racial group into a district, or out of a district, or both.  FOF ¶ 381.  Again, Dr. Brunell agreed that one can manipulate the BVAP of a district by focusing on racial movements in a single direction.  FOF ¶ 381.  Accordingly, it does not matter that some of Dr. Ragusa's models did not show statistical significance; the important thing is that at least one of them did for every one of the challenged districts.

Second, Dr. Ragusa conducted a separate analysis to show that HD 22, HD 34, HD 64, and SD 2 all split precincts along racial lines—a pattern that cannot be explained by the use of partisan data, which the record shows was provided to map-drawers only at the precinct-level. FOF ¶¶ 393–400. Dr. Ragusa's unrebutted analysis showed that the portions of the split precincts that were added to those four challenged districts have a "far lower BVAP % than the portions added to a neighboring district," with twice as many Black residents of voting age moved out of those districts via the splitting of precincts as kept in. FOF ¶ 394. That racial disparity, which Defendants' expert did not dispute, is highly statistically significant. FOF ¶ 396. This racial disparity in precinct splits, which could only have been accomplished by using racial data at the census-block level, is the exact type of evidence that the Supreme Court relied on in *Bush*. 517 U.S. at 970.

Third, academic studies—including one published by Defendants' own expert Dr. Brunell—show that there is a political incentive to reduce the BVAP of a district that is in the 35–40% BVAP range. FOF ¶¶ 402–407. Similarly, according to a study cited by Dr. Ragusa, changes in BVAP had the greatest effect on electoral outcomes when a district's BVAP was between 35–55%, making such districts "prime targets for racial gerrymandering." FOF ¶ 404. Here, SD 2, SD 48, HD 22, and HD 64 had BVAPs ranging from 36.33–39.64%. FOF ¶ 406. As Dr. Brunell acknowledged, with continuing Black population growth, those districts could have come to exceed 40% BVAP over the course of the Census cycle. FOF ¶ 405.

Fourth, under the Enacted Plans, "the BVAP was reduced in all five of the challenge[d] districts in a way that is likely to be very consequential." FOF ¶ 407. One of the five challenged districts, HD 34, saw a dramatic decrease in its BVAP, from 60.49% to 31.55%, which Dr. Brunell acknowledged was "consistent with a racial gerrymander." FOF ¶ 406. Each of the remaining

29

districts saw a reduction of approximately seven percentage points, dropping to a range of 29.40–32.88% BVAP, ensuring they would not be competitive for Black voters or Black candidates.  *See* FOF ¶¶ 404–407.  A similar 7% change was held legally significant in *Cooper*.  *See* 581 U.S. at 296, 310 (packing of a 43.8% BVAP district to 50.7% BVAP when the original district was already effective for Black voters was a racial gerrymander).  Indeed, the State's systematic effort to drop the challenged districts' BVAP below 35% is the functional equivalent of imposing a racial target. *See id.* at 300.

Finally, the district-specific testimony demonstrates that Defendants achieved those significant reductions in BVAP by violating traditional redistricting principles.

In **SD 2**, a visual assessment shows that the State drew a "bizarre" district reminiscent of a question mark, reconfiguring the compact, rectangular shape of the benchmark district.  *Cf. Shaw*, 509 U.S. at 644.  The tip of the question-mark splits a heavily Black municipality, Horn Lake, which Mr. Cooper described as being "cracked" across three Senate districts.  FOF ¶¶ 99, 428–440.  As Ms. Pamela Hamner testified, the district then hooks around and avoids a historically African-American town known as Jago, which holds a special meaning for Black residents of DeSoto County, while splitting Southaven, another municipality with a significant Black population.  FOF ¶¶ 435, 437–439.  SD 2's unusual shape enables it to capture predominantly White voters living in Hernando—an area with disparate interests compared to Horn Lake and Southaven.  FOF ¶ 440.  The changes to SD 2 were largely unnecessary for purposes of balancing population, as the former district was overpopulated by 4,000 people, while the state removed nearly 25,000, leaving just 60% of the benchmark population, FOF ¶ 430.  *See Cooper*, 581 U.S. at 295 (noting that state "decided to reconfigure" a district that needed no population adjustments); *Page v. Virginia State Bd. of Elections*, No. 3:13-CV-678,

2015 WL 3604029, at *12 (E.D. Va. June 5, 2015) (movement of three times as many people as needed to balance population, with racial disparities in the populations moved, was evidence of racial gerrymandering).

**SD 48** is similar.  SD 48, which was anchored in Gulfport, was overpopulated by over 5,700 people, yet mapdrawers *added* 12,200 people in lowering the BVAP of the district.  FOF ¶ 462–463.  Mr. Gary Fredericks, a Black Gulfport resident who nearly won election in SD 48 under the prior configuration, testified that the enacted SD 48 removes two predominantly Black areas of Gulfport from the district, excising a notch out of the very center of Gulfport and a large area around Dedeaux Road.  FOF ¶¶ 466–469.  In place of those areas, SD 48 reaches across the county line and over a waterway to add a predominantly White area from the other side of Bay Saint Louis into the reconfigured district.  FOF ¶ 467(c).  As Mr. Cooper's hypothetical map showed, a substantially more compact SD 48 could have been drawn.  FOF ¶ 469.

In **HD 22**, the Enacted House Plan unnecessarily splits Chickasaw County three ways, while extending into Monroe County, which it also splits into thirds.  FOF ¶¶ 485–88.  Mr. Cooper described this as a clear instance of "cracking."  FOF ¶ 489.  Chickasaw and Monroe Counties are split along racial lines, with Enacted HD 22 using a White area of the Egypt precinct in Chickasaw as a land bridge to avoid predominantly Black areas to the north and south, and then curving upward once in Monroe County to avoid municipalities with Black populations, like Aberdeen. *Id*.  Ms. Mamie Cunningham, who lives in one of the parts of Chickasaw County that was excised from HD 22, confirmed this racialized split.  FOF ¶ 494.  Dr. Ragusa's analyses confirmed that the effect of race on the movement of voters was extremely large in HD 22.  FOF ¶¶ 496–505.  And Mr. Cooper's Illustrative Plan also shows that HD 22 could have been drawn in a manner that better complies with redistricting principles.  FOF ¶ 493.

**HD 34**, which was formerly a majority-minority district, underwent dramatic changes. Virtually all of the high-BVAP precincts in the benchmark district were cut out, as the enacted district pivots about 180 degrees to pick up almost exclusively new areas with low BVAP.   FOF ¶¶ 508–510.  As a result of those changes, the enacted HD 34 retains just 27% of the benchmark district's population.  FOF ¶ 510.  Those changes were largely unnecessary:  Although the district was underpopulated by 3,253, map-drawers *subtracted* a further 15,000 voters, then added nearly 20,000 voters from elsewhere.  FOF ¶ 511.  HD 34 also could have been drawn more compactly but instead splits four precincts along racial lines and packs many removed Black voters into majority-Black HD 30.  FOF ¶¶ 512–514, 522, 526.

Finally, **HD 64** also underwent unnecessary changes in order to reduce the district's BVAP. The state added nearly 4,000 people, only to remove another 4,400.  FOF ¶ 531.  As Dr. Ragusa found, the population swap was racially disproportionate:  Black voters were 38% of the benchmark district, yet 59% of the people who were moved out of the district were Black.  FOF ¶¶ 532–533.  HD 64 splits precincts along racial lines.  FOF ¶¶ 543–544.  Dr. Kia Jones, a lifelong Jacksonian, testified that the new HD 64 removes Northpointe, a predominantly Black community, while adding predominantly White areas to the district, elongating the district on both ends.  FOF ¶ 535.  And Mr. Cooper demonstrated that a substantially more compact district easily could have been constructed without needing to reach into and split Madison County.  FOF ¶ 534.

### B.  No Partisanship Defense Is Viable on This Trial Record

"[W]hen the State asserts partisanship as a defense" to a racial gerrymandering claim, the trial court "must make 'a sensitive inquiry' into all 'circumstantial and direct evidence of intent,' to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines."  *Cooper*, 581 U.S. at 308.  That is because, if "racial identification

is highly correlated with political affiliation," both race-based and partisan-based lines may be "capable of yielding similar oddities in a district's boundaries." *Id.*

However, Defendants have not offered a viable partisanship justification for the district lines in SD 2, SD 48, HD 22, HD 34, and HD 64. No legislators or legislative staff testified at trial. Thus, unlike in cases where the state has claimed that particular district lines can be explained by the exclusive or predominant use of partisan or electoral data (as opposed to racial data), the record here contains no submission or testimony from any legislator, map-maker, or staffer indicating that they used partisan or electoral data to draw or evaluate the lines at issue. *See, e.g.*, *Cooper*, 581 U.S. at 289, 313–14 (testimony from state mapmaker that he had drawn district lines based on Obama-McCain votes); *Bush*, 517 U.S. at 967, 970 (testimony from state officials that political and incumbency considerations predominated as to challenged districts); *Cromartie*, 526 U.S. at 549 (affidavit testimony from two legislators responsible for developing the challenged plan). Here, Defendants' lone expert who testified on the racial gerrymandering claims had no knowledge of the legislature's redistricting considerations. FOF ¶ 421.

Nor can recordings of legislators' floor statements serve as a meaningful substitute. *See* FOF ¶ 13. While snippets from those statements played by Defendants at trial include a generalized claim about "maintaining the political performance," neither those snippets nor the underlying transcripts contain any claims about relying on partisan *data* instead of racial data to achieve the desired "political performance." *Id.*; *see, e.g.*, *Cooper*, 581 U.S. at 308 n.7 (predominant reliance on race data to achieve partisan ends impermissible); *see also* FOF ¶¶ 359–369 (evidence that redistricting committee considered race). Nor is the evidence, which shows a significant *decrease* in the BVAP of the challenged districts, consistent with merely "maintaining" political performance. Nor does the record contain any specific discussion of the

33

reasons why the specific lines for the challenged districts were drawn.  *See ALBC*, 575 U.S. at

262–63 ("A racial gerrymandering claim . . . applies to the boundaries of individual districts.").

And in any case, Plaintiffs have sufficiently demonstrated that the challenged districts are

"unexplainable on grounds other than race."  *Miller*, 515 U.S. at 905.  First, Dr. Ragusa's

regression models showed that race had a statistically significant and substantively large effect on

the design of the five challenged districts, even after controlling for the effect of partisanship.  FOF

¶¶ 375–387, 444–455, 471–482, 496–505, 516–525, 537–546.  Second, while the effect of

partisanship was inconsistent in the models, the effect of race consistently pointed to diminution

of the challenged districts' BVAP—indicating that, regardless of map-drawers' ultimate goal, the

State was engaged in racial, not partisan, sorting to achieve it.  FOF ¶¶ 384–387.  Third, Dr. Ragusa

found a pattern of precincts being split along racial lines, which cannot be explained by the use of

the precinct-level electoral data that the State had available.  FOF ¶¶ 359–369, 393–399.

Defendants' expert, Dr. Brunell, generally lacked credibility, FOF ¶¶ 409–419, and

otherwise offered only a limited critique of Dr. Ragusa's methods, FOF ¶¶ 420–424.  His primary

criticism was of the "county envelope" methodology, but the same methodology was used in

*Cooper* to disentangle the effect of race from party, FOF ¶¶ 381–84, 420–424.  581 U.S. at 315.

Moreover, in response to Dr. Brunell's criticism as to the design of the county envelopes, Dr.

Ragusa conducted robustness checks, which confirmed that his statistically significant results

remain unchanged.  FOF ¶¶ 388–389.

Moreover, Dr. Brunell's criticism of the county envelope method is categorically

inapplicable to Dr. Ragusa's findings that Black voters were more likely to be *removed* from HD

22, SD 2, and SD 48, and to his separate split precinct analysis.  FOF ¶ 423.  That pattern of

racialized splits is a hallmark of racial gerrymandering.  *See Bush*, 517 U.S. at 970–71.

Nor was any alternative map required to be submitted here.  Where a state defendant has offered "political goals" as a justification for a district's design, plaintiffs *may* submit "an alternative map" that shows "how the legislature could have accomplished its political goals other than through the map it chose." *Cooper*, 581 U.S. at 320 (emphasis added).  But such an alternative map is not necessary where (as here) the state has not viably "raised a partisanship defense," *id.* at 308, or where (as here) there is other evidence disentangling the effect of race from the effect of party, *id.* at 320–22.  Rather, "[a] plaintiff's task … is simply to persuade the trial court—*without any special evidentiary prerequisite*—that race (not politics) was the predominant consideration in deciding to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 318 (citation omitted) (emphasis added).[13]  Plaintiffs have done that here.

### C.  The Use of Race in Constructing the Challenged Districts Fails Strict Scrutiny

Defendants have never argued that the race-based sorting of voters with respect to the challenged district lines here could survive strict scrutiny.  Nor could reducing the BVAP of the challenged districts, making them less competitive for Black votes and candidates, have been necessary to comply with the Voting Rights Act.

**CONCLUSION**

The Court should issue an order determining that Defendants are liable for the Section 2 and Equal Protection violations proven at trial and order a remedy into place.

---

[13] Requiring an "alternative map" that would satisfy legislators' objectives would be especially inappropriate here because legislators consistently asserted total immunity from discovery into their decision-making process which would have revealed those objectives.  *Cf. United States v. Rylander*, 460 U.S. 752, 758 (1983) (assertion of privilege does not free the holder from carrying their burden).

This the 29th day of March, 2024.

*s/ Joshua Tom*
Joshua Tom, MSB 105392
*jtom@aclu-ms.org*
ACLU OF MISSISSIPPI
101 South Congress Street
Jackson, MS 39201
(601) 354-3408

Robert B. McDuff, MSB 2532
*rbm@mcdufflaw.com*
MISSISSIPPI CENTER FOR JUSTICE
767 North Congress Street
Jackson, MS 39202
(601) 969-0802

Carroll Rhodes, MSB 5314
Law Offices of Carroll Rhodes
*crhodes6@bellsouth.net*
PO Box 588
Hazlehurst, MS 39083
(601) 894-1464

John P. Lavelle, Jr.
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-2921
Telephone:       +1.215.963.4824
Facsimile:       +1.215.963.5001
*john.lavelle@morganlewis.com*

Drew C. Jordan
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Telephone:       +1.202.739.5962
Facsimile:       +1.202.739.3001
*drew.jordan@morganlewis.com*

Ari J. Savitzky
*asavitzky@aclu.org*
Ming Cheung
*mcheung@aclu.org*
Casey Smith
*csmith@aclu.org*
Garrett Muscatel
*gmuscatel@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500

Ezra D. Rosenberg
*erosenberg@lawyerscommittee.org*
Jennifer Nwachukwu
*jnwachukwu@lawyerscommittee.org*
David Rollins-Boyd
*drollins-boyd@lawyerscommittee.org*
Javon Davis
*jdavis@lawyerscommittee.org*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
(202) 662-8600

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua Tom, do certify that on this day I caused to be served a true and correct copy of the foregoing by electronic mail to all counsel of record.

This the 29th day of March, 2024.

s/_Joshua Tom_____
Joshua Tom