UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MISSISSIPPI STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, ET AL.                                      PLAINTIFFS

V.                        CIVIL ACTION NO. 3:22-CV-734-DPJ-HSO-LHS

STATE BOARD OF ELECTION
COMMISSIONERS, ET AL.                              DEFENDANTS

1   Before SOUTHWICK, *Circuit Judge,* JORDAN, *Chief District Judge*, and
2   OZERDEN, *District Judge*.

3   PER CURIAM.

4       The Mississippi State Conference of the National Association for the
5   Advancement of Colored People and numerous individual black Mississippi
6   voters brought this suit against the Mississippi State Board of Election
7   Commissioners and other Mississippi officials.  They challenged the State's
8   2022 redistricting maps for electing members of the state legislature.  The
9   Plaintiffs allege the 2022 maps dilute black Mississippian votes in violation
10  of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and contain
11  unconstitutional racial gerrymanders in violation of the Fourteenth
12  Amendment of the United States Constitution.

13      We find the Plaintiffs have satisfied their burden under *Thornburg v.*
14  *Gingles*, 478 U.S. 30 (1986), by presenting three illustrative districts that
15  satisfy the requirements of Section 2.  *See* 52 U.S.C. § 10301.  We conclude,
16  however, that the Plaintiffs did not establish the redistricting maps are
17  unconstitutional racial gerrymanders.  We will provide the Mississippi
18  Legislature an opportunity to enact revised maps.

Mississippi NAACP v. State Board of Election Commissioners

Before explaining our ruling, we wish to state the court's appreciation to all counsel for their professionalism. Voting-rights litigation can be contentious. In this lawsuit, though, lawyers and witnesses were respectful and measured in the expression of the disagreements about the law and the evidence. Some very wise and experienced Mississippi voting-rights lawyers appeared on both sides of this dispute. New and quite able lawyers from within and beyond the state's borders appeared as well. All are to be commended.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Parties

The Mississippi State Conference of the National Association for the Advancement of Colored People ("Mississippi NAACP") is the only organizational plaintiff in this suit. It is a subsidiary organization of the National Association for the Advancement of Colored People, Inc., a non-profit organization founded in 1909. Stipulations [199] App. A at 1. Some Mississippi NAACP members are registered voters who reside in the five legislative districts that the Plaintiffs challenge as unconstitutional racial gerrymanders. *Id.*; Doc [220], 6.

Fourteen individual Mississippians joined the Mississippi NAACP as Plaintiffs in this case.[1] Doc [199], 2–5. These individuals are all registered voters who live in one of the challenged legislative districts and consider themselves to be Democrats. *Id.* Several individual Plaintiffs are also

---

[1] The Individual Plaintiffs named in the complaint are Dr. Andrea Wesley, Dr. Joseph Wesley, Robert Evans, Gary Fredericks, Pamela Hamner, Barbara Finn, Otho Barnes, Shirlinda Robertson, Sandra Smith, Deborah Hulitt, Rodesta Tumblin, Dr. Kia Jones, Angela Grayson, Marcelean Arrington, and Victoria Robertson. Doc [199], 2–5. Angela Grayson withdrew as a Plaintiff in September 2023. Doc [84] (Order Granting Withdrawal).

41    members of the Mississippi NAACP.  *Id.*  We refer to these parties
42    collectively as the Plaintiffs.

43    The Mississippi State Board of Election Commissioners is composed
44    of the Attorney General, the Mississippi Governor, and the Secretary of
45    State.  MISS. CODE ANN. § 23-15-211.  That board, Mississippi Attorney
46    General Lynn Fitch, Mississippi Governor Tate Reeves, and Mississippi
47    Secretary of State Michael Watson were all named as Defendants in this suit.
48    *Id.* at 5–6.  The Mississippi Republican Executive Committee moved to
49    intervene as a Defendant, and the motion was granted in May 2023.  Doc [32]
50    (Motion); Text-Only Order May 19, 2023 (Granting Motion).  We refer to
51    these parties collectively as the Defendants.

52    **B.    *The Mississippi Legislature's Actions***

53    The United States Census Bureau conducts a census during the first
54    year of each decade and releases the results the following year to every state.
55    *See* 13 U.S.C. § 141.  Every ten years following the release of the census data,
56    the Mississippi Legislature is to "apportion the state in accordance with the
57    Constitution of the state and of the United States into consecutive numbered
58    Senatorial and Representative districts of contiguous territory."  MISS.
59    CONST. art. XIII, § 254.  The Mississippi Legislature's Standing Joint
60    Legislative Committee on Reapportionment and Redistricting ("Standing
61    Joint Committee") is the legislative body responsible for drafting each
62    Mississippi reapportionment plan for state senate and state house
63    membership once the decennial census data is delivered.  *See* MISS. CODE
64    ANN. §§ 5-3-91 to 5-3-103.  The Standing Joint Committee must draw plans
65    "according to constitutional standards" and state guidelines.  §§ 5-3-93, 5-3-
66    101.  The state guidelines are:

67        (a) Every district shall be compact and composed of contiguous
68            territory and the boundary shall cross governmental or
69            political boundaries the least number of times possible; and

3

Mississippi NAACP v. State Board of Election Commissioners

> (b) Districts shall be structured, as far as possible and within constitutional standards, along county lines; if county lines are fractured, then election district lines shall be followed as nearly as possible.

§ 5-3-101. Once the redistricting maps are drafted and approved by the Standing Joint Committee, each house must approve a joint resolution that sets out the maps. MISS. CONST. art. XIII, § 254. The Mississippi Governor has no official role in the approval of the maps.

In response to COVID-19, the Census Bureau was required to adapt and delay some of its 2020 Census operations. *See* U.S. CENSUS BUREAU, U.S. DEP'T OF COM. AND LABOR, 2020 CENSUS OPERATIONAL ADJUSTMENTS: CHANGES DUE TO COVID-19 (2020), https://www.census.gov/content/dam/Census/library/factsheets/2023/dec/operational-adjustments-covid-19.pdf. The release of redistricting data had an original statutory deadline of March 31, 2021, but it was not released to states until August 12, 2021. *Id.*; Stipulations [199] App. A at 10. The 2020 Census data showed that over the last ten years, Mississippi's overall population declined from 2,967,297 to 2,961,279 — a 6,018-person decrease from the 2010 Census. Stipulations [199] App. A at 11. The non-Hispanic White population decreased by 83,210 persons, and the Any-Part Black population increased by 7,812 persons. *Id.* The Any-Part Black population constitutes 37.94 percent of the state's total population and 36.14 percent of the voting-age population, making it the largest minority population in Mississippi. *Id.* Based on this population data, the ideal district size for a state senate district is 56,948, and the ideal size for a state house district is 24,273. *Id.* at ¶ 57.

Following the release of the 2020 Census data, the Mississippi Legislature convened the Standing Joint Committee, which conducted nine public hearings and held four public meetings over the course of nine months.

Mississippi NAACP v. State Board of Election Commissioners

99    Doc [199], 10–11; Stipulations [199] App. A at 12.  Members of the public
100   were invited to participate in the public hearings held between August 5,
101   2021, and August 23, 2021, and to provide input on the redistricting process.
102   Stipulations [199] App. A at 12.  No proposed redistricting maps were
103   revealed to the public at these hearings, nor was the public given the
104   opportunity to comment on the maps.  *Id.*

105        In a 15-minute November 2021 open meeting, the Standing Joint
106   Committee adopted the following criteria for drawing the state legislative
107   districts:

108        (1) Each district's population should be less than 5 [percent]
109            above or below the ideal population of the district.
110        (2) Districts should be composed of contiguous territory.
111        (3) The redistricting plan should comply with all applicable
112            state and federal laws including Section 2 of the Voting
113            Rights Act of 1965, as amended, and the Mississippi and
114            United States Constitutions.

115   Doc [199], 10; Stipulations [199] App. A at 12; JTX-013.  Thus, the
116   population must be within 5 percent of 56,948 for a state senate district and
117   within 5 percent of 24,273 for a state house district.  Stipulations [199] App.
118   A at 11–12.  In addition to these three criteria, separation of incumbents into
119   different districts is a legally available redistricting standard.  *Bush v. Vera*,
120   517 U.S. 952, 964–65 (1996) (plurality opinion).   The Standing Joint
121   Committee also considered precinct-level voting-age and voting-age racial-
122   demographic information as required by the Voting Rights Act when devising
123   districts.  Stipulations [199] App. A at 12–13; *see* 52 U.S.C. § 10301.

124        The Standing Joint Committee held its final meeting on March 27,
125   2022, and it publicly revealed the proposed maps for the state legislative
126   districts.  Stipulations [199] App. A at 13.  At five o'clock that same day, the
127   Standing Joint Committee voted to adopt both proposed maps, with

Mississippi NAACP v. State Board of Election Commissioners

128    Representative Bo Brown, Senator Angela Turner-Ford, and Senator
129    Derrick Simmons voting against the proposed state house map. *See id.* at
130    ¶ 63; JTX-014.

131        On March 29, both the full state house and state senate voted to adopt
132    their respective districting plans. Stipulations [199] App. A at 13. Two
133    amendments were proposed to the state house districting plan, JR 1. JTX-
134    010, 31:20–24, 23:25–46:20. The first amendment was adopted by voice vote
135    to separate the districts for two black Democratic representative incumbents,
136    and the second amendment supplying an alternative map portraying an
137    additional five black-majority districts failed by a vote of 77 to 39 as an
138    admitted racial gerrymander. *Id.* at 47:20–21. The two amendments
139    proposed to the state senate districting plan, JR 202, also failed. Those
140    amendments would have added four black-majority districts. Democratic
141    Senator Simmons, who advocated for adding four majority-black senate
142    seats, emphasized that the black population in Mississippi had grown and the
143    white population had shrunk. Therefore, he argued, a "map that maintains
144    the status quo simply dilutes black voting strength in Mississippi." JTX-011,
145    98:09–99:12; *see also* Stipulations [199] App. A at 13; Doc [219], 9 n.5.
146    Republican Senator Dean Kirby responded by contending that Senator
147    Simmons's proposed map "is not a map this state needs." JTX-011, 99:19–
148    20. The senate approved the map released by the Standing Joint Committee.
149    JTX-011, 194:13–14; *see also* Doc [219], 9 n.5; Doc [220], 4.

150        On March 31, the state house approved JR 202, the state senate
151    approved JR 1, and the maps (the "Enacted Plans") became law.
152    Stipulations [199] App. A at 13. The Enacted Plans were determined to be in
153    compliance with the Mississippi Code, containing only one senate district
154    and three house districts where two incumbents were paired together. *See*
155    MISS. CODE ANN. § 5-3-101; *see also Bush*, 517 U.S. at 964–65.

Mississippi NAACP v. State Board of Election Commissioners

156    The Mississippi Legislature consists of 52 state senate districts and
157  122 state house districts. Stipulations [199] App. A at 13, 15. Of the 52 senate
158  districts, the Enacted Senate Plan renders 15 black-majority districts, and of
159  the 122 house districts, the Enacted House Plan renders 42 black-majority
160  districts based on the 2020 Census data. *Id.* at 14–15. Both Enacted Plans
161  retained the same number of black-majority districts used for the last state
162  legislative elections prior to the 2020 Census.[2] Doc [220], 2. In doing so,
163  the floor debates of both houses contained generalized statements from
164  Senator Kirby and Representative Beckett that "maintaining the political
165  performance" of Republicans and Democrats throughout the state was an
166  "important consideration in developing th[e] proposed plan[s]," yet those
167  statements were not made in relation to the specific districts in this case, nor
168  was there any data mentioned that was used to achieve that general goal.
169  JTX-010, 14:25–15:06; *see* JTX-011, 12:06–11. The only specifics provided
170  were that years of service and incumbency were considered factors of
171  "political performance." JTX-010, 20:09–24. The Defendants use that
172  phrase without specifically defining it. We take from the record, though, that
173  years of service and incumbency are aspects of political performance. If
174  political performance is distinguishable from incumbent protection, the
175  differences would seem to be minor.

---

[2] The legislature enacted plans for both houses in 2012 following the release of the 2010 Census data; in 2019, the legislature adopted a revised plan for the senate as a result of a court order. *See Thomas v. Bryant*, 938 F.3d 134, 140, 143 (5th Cir. 2019). The 2012 State Senate Plan contained 15 black-majority districts, and the 2012 State House Plan contained 42 black-majority districts. Stipulations [199] App. A at 14–15 ¶¶ 67, 79. The United States Department of Justice precleared the plans as was then required under Section 5 of the Voting Rights Act. *See Shelby County v. Holder*, 570 U.S. 529, 556–57 (2013). The 2019 Senate Plan that created one more black-majority district was used in the 2019 elections, but the senate districts reverted to the 2012 geographical boundaries following the Fifth Circuit's vacating the 2019 Senate Plan because the litigation that caused its creation was moot. *Thomas v. Reeves*, 961 F.3d 800, 801 (5th Cir. 2020).

Mississippi NAACP v. State Board of Election Commissioners

176    The Standing Joint Committee played no further role in the
177 redistricting process once the Enacted Plans became state law.  It is the
178 responsibility of various other state and local officials to enforce and
179 implement the law and to administer elections.  *See* MISS. CODE ANN. § 23-
180 15-211, *et seq.*  The Enacted Plans established the current makeup of the
181 Mississippi Legislature as of January 15, 2024: 16 Democrats and 36
182 Republicans in the state senate; 41 Democrats, 79 Republicans, and 2
183 Independents in the state house; 14 black senators and 38 white senators; and
184 roughly 40 black representatives and 82 white representatives.  Stipulations
185 [199] App. A at 16.

186    *C.   The Litigation*

187    The Plaintiffs filed this civil action in December 2022, challenging the
188 Enacted Plans as violations of both the Equal Protection Clause of the
189 Fourteenth Amendment and Section 2 of the Voting Rights Act and seeking
190 declaratory and injunctive relief.  Doc [219], 13; Doc [220], 4; Doc [1]
191 (Complaint).  Two former defendants, State Senator Dean Kirby and State
192 Representative Dan Eubanks, filed a motion to dismiss for lack of jurisdiction
193 over them, after which the Plaintiffs amended their complaint and named
194 only the above-mentioned Defendants.  Docs. [17], [18], [24], [27].  The
195 Mississippi Republican Executive Committee later intervened as a
196 Defendant.  Doc [32] (Motion); Text-Only Order May 19, 2023 (Granting
197 Motion).

198    As part of their Section 2 claim, the Plaintiffs assert Mississippi's
199 black population requires at least four additional black-majority senate
200 districts and at least three additional black-majority house districts be drawn.
201 Doc. [27], 3.  In some of the same areas where these alleged districts can be
202 drawn, the Plaintiffs contend two enacted senate districts and three enacted
203 house districts are unconstitutional racial gerrymanders that were drawn

Mississippi NAACP v. State Board of Election Commissioners

204  with race as the predominant factor.  *Id.* at 4; Doc [220], 4–5 (*see* chart on pg.
205  5).  To support their contention, the Plaintiffs proposed two Illustrative Plans
206  — one Illustrative Senate Plan and one Illustrative House Plan — that
207  contained seven illustrative majority-minority districts to be added to the
208  current number of majority-minority districts.  PTX-001, 26–79, Ex. M &
209  AH.  According to the Defendants, were the Mississippi Legislature to accept
210  the Plaintiffs' seven illustrative districts, it would cause ripple effects in more
211  than 70 current electoral districts.  PTX-001, 28 ¶ 53, 60 ¶ 122.

212        An order for a trial was entered in June 2023, but the trial did not begin
213  until February 26, 2024, before a three-judge panel as required by statute.
214  *See* 28 U.S.C. § 2284(a); Doc [3], 40, 44; *see* Text-Only Order June 23, 2023
215  (Setting Trial Deadlines).  The trial lasted eight days, during which fourteen
216  Plaintiff witnesses and three Defense witnesses testified.  *See generally* Docs
217  [212], [215].  Thereafter, the Plaintiffs and Defendants, along with the
218  Intervenor Defendant, filed post-trial briefs and proposed findings and
219  conclusions of law.  Docs. [218]–[221].

220                    II.  GENERAL LEGAL PRINCIPLES

221        Legislative reapportionment "is primarily the duty and responsibility
222  of the States, not the federal courts."  *Allen v. Milligan*, 599 U.S. 1, 29 (2023)
223  (quotation marks and citation omitted).   However, a State's actions
224  throughout its redistricting process can be challenged under both the
225  Fourteenth Amendment and the Voting Rights Act.  The Equal Protection
226  Clause of the Fourteenth Amendment prohibits states from denying "any
227  person within [their] jurisdiction the equal protection of the laws."  U.S.
228  CONST. amend. XIV, § 1.  "Its central purpose is to prevent the States from
229  purposefully discriminating between individuals on the basis of race."  *Shaw*
230  *v. Reno*, 509 U.S. 630, 642 (1993).  Improper racial gerrymanders used in
231  legislative redistricting — like those alleged here — fall within the

Mississippi NAACP v. State Board of Election Commissioners

232   Fourteenth Amendment's prohibition.  *Cooper v. Harris*, 581 U.S. 285, 291
233   (2017).

234          "'Electoral districting is a most difficult subject for legislatures,'
235   requiring a delicate balancing of competing considerations."  *Bethune-Hill v.*
236   *Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*,
237   515 U.S. 900, 915 (1995)).  Section 2 of the Voting Rights Act prohibits any
238   "standard, practice, or procedure" imposed by a State throughout its
239   electoral districting process that "results in a denial or abridgement of the
240   right of any citizen of the United States to vote on account of race or color."
241   52 U.S.C. § 10301(a).  "The essence of a [Section] 2 claim is that a certain
242   electoral law, practice, or structure interacts with social and historical
243   conditions to cause an inequality in the opportunities enjoyed by black and
244   white voters to elect their preferred representatives."  *Gingles*, 478 U.S. at
245   47.  "Such a risk is greatest 'where minority and majority voters consistently
246   prefer different candidates' and where minority voters are submerged in a
247   majority voting population that 'regularly defeats' their choices."  *Milligan*,
248   599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 48).  The Supreme Court thus
249   requires Section 2 vote-dilution claims be analyzed using the *Gingles* three-
250   part framework.  *Id.* at 17.  If a court concludes that plaintiffs do not have an
251   equal opportunity to elect their preferred candidate under a challenged
252   districting map, there likely is a Section 2 violation.  *See Gingles*, 478 U.S. at
253   44; *Robinson v. Ardoin*, 86 F.4th 574, 589 (5th Cir. 2023).

254          The Plaintiffs presented evidence at trial under both the Equal
255   Protection Clause and Section 2.  We will discuss each theory separately.

256                    III.    EQUAL PROTECTION CLAIM

257          Racial gerrymandering occurs when race improperly motivated the
258   drawing of electoral districts such that it "rationally cannot be understood as
259   anything other than an effort to separate voters" based on race.  *Shaw*, 509

*Mississippi NAACP v. State Board of Election Commissioners*

260  U.S. at 649; s*ee Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262–
261  63 (2015).  Courts conduct "a two-step analysis" to determine whether a
262  legislative district is an unconstitutional racial gerrymander.  *Harris*, 581 U.S.
263  at 291.  "First, the plaintiff must prove that 'race was the predominant factor
264  motivating the legislature's decision to place a significant number of voters
265  within or without a particular district.'"  *Id.* (quoting *Miller*, 515 U.S. at 916).
266  If "the legislature subordinated other factors — compactness, respect for
267  political subdivision, partisan advantage, [etc.] — to racial considerations,"
268  race is the predominant factor.  *Id.* (quotation marks and citation omitted).

269      The plaintiff has the burden of proof when asserting a challenged
270  district was enacted with discriminatory intent.  *Abbott v. Perez*, 585 U.S. 579,
271  603 (2018).  Because of the "serious intrusion" courts make into "the most
272  vital of local functions" when analyzing redistricting cases, the "good faith
273  of the state legislature must be presumed."  *Id.* (quoting *Miller*, 515 U.S. at
274  915).  This presumption, however, can be overcome if the plaintiff makes a
275  sufficient showing that the legislature subordinated traditional race-neutral
276  districting principles to race.  *See Miller*, 515 U.S. at 915–16.  Plaintiffs can
277  use "direct evidence of legislative intent, circumstantial evidence of a
278  district's shape and demographics," or both to meet this burden and to
279  establish race as the predominant factor.  *Harris*, 581 U.S. at 291 (quotation
280  marks and citation omitted).

281      The second step in the analysis shifts the burden to the State to
282  withstand strict scrutiny.  *Id.* at 292.  If race was the predominant factor, the
283  State must prove that "its race-based sorting of voters" and the district's
284  design serve a "compelling interest" and are "narrowly tailored to that end."
285  *Id.* (quotation marks and citation omitted).  The Supreme Court recognizes
286  compliance with the Voting Rights Act — including Section 2 — as a
287  compelling interest.  *Id.*  Using Section 2 to justify race-based districting,
288  however, requires a State show "it had 'a strong basis in evidence' for

Mississippi NAACP v. State Board of Election Commissioners

289   concluding that the statute required its action." *Id.* (quoting *Alabama Legis.*
290   *Black Caucus*, 575 U.S. at 278).  In other words, the legislature must have had
291   "good reasons" to believe such district drawing was necessary for statutory
292   compliance.  *Alabama Legis. Black Caucus*, 575 U.S. at 278.

293          The racial-predominance inquiry "concerns the actual considerations
294   that provided the essential basis for the lines drawn, not *post hoc* justifications
295   the legislature in theory could have used but in reality did not." *Bethune-Hill*,
296   580 U.S. at 189–90.   It concerns *how* the legislature conducted the
297   redistricting, not *why* the legislature conducted it that way.  *See Harris*, 581
298   U.S. at 308 n.7.  The Plaintiffs thus bear the burden under this inquiry "to
299   show, either through circumstantial evidence of a district's shape and
300   demographics or more direct evidence going to legislative purpose, that race
301   was the predominant factor motivating the legislature's [redistricting]
302   decision," *Bethune-Hill*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916),
303   "regardless of [the legislature's] ultimate objective," *Harris*, 581 U.S. at 308
304   n.7.

305          Unlike a Section 2 claim that may be established by discriminatory
306   results, the Plaintiffs were required to provide sufficient evidence of "race-
307   based decisionmaking" to prove their Equal Protection claim.  *See Miller*, 515
308   U.S. at 915.  In other words, the Plaintiffs' task "is simply to persuade the
309   trial court — without any special evidentiary prerequisite — that race (not
310   politics) was the predominant consideration" of the Mississippi Legislature
311   during the redistricting process when drawing the Enacted Plans. *Harris*, 581
312   U.S. at 318 (quotation marks and citation omitted).  This is a demanding
313   burden, and "[p]roving racial predominance with circumstantial evidence
314   alone is much more difficult" when partisanship is raised as a defense.
315   *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1234–35 (2024).

Mississippi NAACP v. State Board of Election Commissioners

"[P]artisan and racial gerrymanders 'are capable of yielding similar oddities in a district's boundaries' when there is a high correlation between race and partisan preference." *Id.* at 1235 (quoting *Harris*, 581 U.S. at 308). "When partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map." *Id.* To prevail on their racial gerrymandering claim, the Plaintiffs "must disentangle race from politics by proving that the former *drove* a district's lines." *Id.* (emphasis in original) (quotation marks and citation omitted).

The Intervenor Defendant insisted throughout trial the Plaintiffs stipulated this constitutional claim away with one of their interrogatory responses:

> 9. Does the identification of invidiously discriminatory intent on the basis of race constitute technical knowledge which may be the subject of expert testimony under Rule 702?

> Plaintiffs' Response: Plaintiffs do not assert any claims premised on invidious discriminatory intent on the basis of race.

Doc [199], 16 (Pretrial Order). The Plaintiffs, however, attempt to distinguish "invidious" behavior and the necessary predominance under Equal Protection. Footnote 10 of the Plaintiffs' post-trial brief argues it this way:

> In contrast to claims involving racial animus or invidious discrimination, "the essence of the [E]qual [P]rotection claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts." [*Miller*, 515 U.S. at 911.] Racial gerrymandering claims are thus cognizable even when the State undertakes the racial sorting with a "benign" motivation. *Shaw*, 509 U.S. at 653; *see also Bush*, 517 U.S. at 984. Consistent with that distinction, racial gerrymandering claims require that racial sorting be the "predominant"

13

Mississippi NAACP v. State Board of Election Commissioners

347    consideration affecting a "significant" number of voters,
348    whereas claims of invidious discrimination are actionable even
349    if discriminatory purpose is merely "a motivating factor"
350    affecting any racial group, regardless of the number of
351    individuals affected. *Compare* [*Harris*], 581 U.S. at 291–92 *with*
352    *Vill*[*age*] *of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429
353    U.S. 252, 265 (1977).

354 Doc [221], 25 n.10.

355    One of the cited precedents discusses whether a statute's explicit
356 racial classification was "benign" and subject to the less-searching review
357 Justice Souter argued for in dissent or was "motivated by illegitimate notions
358 of racial inferiority or simple racial politics." *Shaw*, 509 U.S. at 642–43, 653
359 (quotation marks and citation omitted). The Supreme Court held that either
360 motive, if focused on race, was subject to strict scrutiny under the Equal
361 Protection Clause "because without it, a court cannot determine whether or
362 not the discrimination truly is 'benign.'" *Id.* at 653.

363    Other caselaw indicates racial reasons might be able to survive strict
364 scrutiny if the State believes a racial gerrymander enactment is needed to
365 satisfy the Voting Rights Act. As recently as 2022, the Supreme Court stated
366 that a consciously gerrymandered district could be upheld for that reason:

367    Under the Equal Protection Clause, districting maps that sort
368    voters on the basis of race "'are by their very nature odious.'"
369    *Shaw*[,] 509 U.S. [at] 643[.] Such laws "cannot be upheld
370    unless they are narrowly tailored to achieving a compelling
371    state interest." *Miller*[,] 515 U.S. [at] 904[.] We have assumed
372    that complying with the VRA is a compelling interest. [] *Harris*,
373    581 U.S. [at 292]. And we have held that if race is the
374    predominant factor motivating the placement of voters in or
375    out of a particular district, the State bears the burden of
376    showing that the design of that district withstands strict
377    scrutiny. *Ibid.* Thus, our precedents hold that a State can

Mississippi NAACP v. State Board of Election Commissioners

378    satisfy strict scrutiny if it proves that its race-based sorting of
379    voters is narrowly tailored to comply with the VRA. *Ibid.*

380    *Wisconsin Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 401 (2022).  The
381    word "invidious" was not used in either the 2022 *Wisconsin Legislature*
382    opinion or the 2017 *Harris* opinion that it cites.  The Supreme Court did use
383    "invidious" in its 1995 *Miller* opinion, which also dealt with a motive of
384    advantaging minorities.  There, the State argued that the Department of
385    Justice made it utilize race-based redistricting:

386         Our presumptive skepticism of all racial classifications
387         prohibits us as well from accepting on its face the Justice
388         Department's conclusion that racial districting is necessary
389         under the Act.  Where a State relies on the Department's
390         determination that race-based districting is necessary to
391         comply with the Act, the judiciary retains an independent
392         obligation in adjudicating consequent equal protection
393         challenges to ensure that the State's actions are narrowly
394         tailored to achieve a compelling interest.

395    *Miller*, 515 U.S. at 922 (citation omitted).

396         The *Miller* Court noted it was uncontested that the parties
397    "practically stipulated" that a particular district was a racial gerrymander
398    and explicitly discussed the "maximizing majority-black" policy that drove
399    the enactment of the "max-black plan." *Id.* at 910, 924.  The majority never
400    tried to distinguish the advantaging-minorities motive from harming them,
401    simply referring to "invidious discrimination" in its concluding paragraph as
402    the label for what the legislature had done even though it was trying to help
403    the minority population have an equal opportunity to gain public office. *Id.*
404    at 927.  The Court reprimanded any form of "automatic invocation of race
405    stereotypes" as they "retard[] that progress and cause[] continued hurt and
406    injury" to the minority population in election law. *Id.*

Mississippi NAACP v. State Board of Election Commissioners

407    There is little caselaw discussing whether favorable motives are
408    "invidious" even when they fail under strict scrutiny as they did in *Miller*.
409    We thus give the Plaintiffs some leeway as to the relevance of the label
410    "invidious" considering the Supreme Court recognized racial motives that
411    might be upheld in *Shaw*, *Harris*, and *Wisconsin Legislature*.    Still, no
412    precedent has made the point the Plaintiffs urge here — that the word
413    "invidious" does not apply to some unacceptable motives.    The only racial
414    motives so far discussed by the Court that might be upheld are used to
415    comply with the Voting Rights Act. *Wisconsin Legis.*, 595 U.S. at 401; *Miller*,
416    515 U.S. at 922.

417    The allegations here are not that.    The Plaintiffs allege that the
418    Enacted Plans contain unconstitutional racial gerrymanders; they do not
419    challenge them as failed efforts possibly intended to comply with federal law.
420    Thus, it would take *invidious* discrimination to make an Equal Protection case
421    here.    The Plaintiffs clarified they "are not alleging invidious" discrimination
422    or "animus" as part of their Equal Protection claim.    Trial Tr. 1672:6–8.
423    Without that intent, however, the Plaintiffs cannot meet their required
424    burden. *See Abbott*, 585 U.S. at 603.

425    Even if we assume the Plaintiffs preserved a benign-motive case, there
426    was insufficient evidence of racial predominance under the Equal Protection
427    Clause.    The Plaintiffs rely on the testimony of Dr. Jordan Ragusa, a tenured
428    professor of political science at the College of Charleston, to prove race
429    predominated in the design of the five challenged districts.    Trial Tr. 968:16–
430    971:10.    We accepted Dr. Ragusa as an expert in quantitative methods and
431    analysis, the modeling of electoral districting, and American politics, Trial
432    Tr. 980:17–25, and allowed his explanation as to whether he disentangled the
433    effects of race, partisanship, and traditional redistricting principles on the
434    Enacted Plans,    Trial Tr. 981:9–18.

Mississippi NAACP v. State Board of Election Commissioners

435      Dr. Ragusa conducted a statistical analysis comparing Census data to
436 the Enacted Plans and created multivariate logistic-regression models of the
437 information.  Trial Tr. 981:19–982:5. In doing so, the Plaintiffs contend Dr.
438 Ragusa was able to evaluate the Mississippi Legislature's decisions made
439 during the redistricting process and determine what factor predominantly
440 influenced its decisions.  Trial Tr. 982:6–15. Dr. Ragusa's regression models
441 showed the effect of the black voting-age population ("BVAP") was
442 statistically significant in at least one model for all five districts, which Dr.
443 Ragusa testified allowed him to "conclude that race was a significant factor
444 in all five of the challenge[d] districts."  Trial Tr. 982:21–24.  The Plaintiffs
445 assert Dr. Ragusa's regression models sufficiently control for partisanship
446 and other factors and show race was the motivating factor in moving voters
447 in and out of districts.  Doc [221], 27–28.  Thus, according to the Plaintiffs,
448 their Equal Protection claim was clearly established.  *Id.*

449      The Defendants, however, persuasively discredited those models and
450 articulated how they establish partisanship was just as much a factor in the
451 drawing of district lines as race.  Doc [218], 6–7. One problem with Dr.
452 Ragusa's analysis is that he used what he called the "county envelope"
453 method to determine whether geographical units called census blocks, *see*
454 Trial Tr. 983:23–986:9 (discussing census blocks), were more likely to be
455 moved into a district based on their racial composition,  Trial Tr. 995:4–
456 996:8.  The Supreme Court recently concluded that the county-envelope
457 model is flawed because it inadequately accounts for contiguity and
458 compactness. *See Alexander*, 144 S. Ct. at 1246.  Further, even though Dr.
459 Ragusa initially attempted to conclude his findings could not "be dismissed
460 as a simple byproduct of partisan gerrymandering or adherence to th[e]
461 common redistricting principles," Trial Tr. 983:3–5, he later stated he was
462 "unable to offer definitive proof" of racial gerrymandering because "[t]he
463 analysis can't disentangle intentional from unintentional racial

464  discrimination.  Both are reasonable explanations for the results . . . but [he]
465  can't say one way or the other what caused the effect of race.  What [he] can
466  say is that race was a factor."  Trial Tr. 1120:12–20.

467          Thus, at most, the Plaintiffs' expert's opinion was that race was one
468  factor in the Mississippi Legislature's redistricting that merged with partisan
469  protection.    That is not enough.    The Enacted Plans must have
470  predominantly utilized race such that the only rational way to view the
471  districts is "an effort to separate voters" based solely on their race.  *Shaw*,
472  509 U.S. at 649.  Because Plaintiffs failed to prove that race was the
473  predominant factor, we do not consider the evidence and specific arguments
474  that two enacted senate districts and three enacted house districts were racial
475  gerrymanders.  Without invidious intent, the Plaintiffs cannot establish an
476  Equal Protection violation.

477          IV.    SECTION 2 OF THE VOTING RIGHTS ACT
478      *A.  Private Right of Action Under Section 2*

479          We start with the Defendants' argument that Section 2 of the Voting
480  Rights Act cannot be enforced by private parties.  They acknowledge
481  foreclosure of the issue in the Fifth Circuit because of a recent opinion
482  recognizing such a right.  *See Robinson*, 86 F.4th at 588.  The Defendants
483  present their no-private-right-of-action arguments to preserve the issue for
484  later review.

485          Though the *Robinson* holding is binding on this court, that opinion's
486  explanation was brief, responding in kind to the limited argument made by
487  Louisiana in that appeal.  Further review of the private-right-of-action issue
488  in the present case may occur, and we include additional analysis now.

489          The *Robinson* court concluded the issue was essentially foreclosed by
490  a Fifth Circuit precedent holding that Section 2 of the Voting Rights Act
491  abrogated state sovereign immunity.  *Id.* (citing *OCA-Greater Hous. v. Texas*,

Mississippi NAACP v. State Board of Election Commissioners

492    867 F.3d 604, 614 (5th Cir. 2017)).  The court determined that the abrogation
493    was not without purpose and that private individuals had been granted a right
494    to sue under Section 2.  *Id.*

495        The *Robinson* court did not discuss the revamped analysis used by the
496    Supreme Court since 2001 for determining whether a congressional
497    enactment may be enforced by private individuals.  *See Gonzaga Univ. v. Doe*,
498    536 U.S. 273, 284 (2002); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).
499    That analysis first examines the relevant statute for an explicit grant of a right
500    to sue.  *See, e.g.*, *Gonzaga Univ.*, 536 U.S. at 283–84.  Absent such welcomed
501    textual clarity, a private cause of action may be implied when a statute
502    (1) contains rights-creating language and (2) displays "an intent 'to create
503    . . . a private remedy.'"  *Id.* at 284 (quoting *Sandoval*, 532 U.S. at 286).

504        An overlapping though separate inquiry is "whether a statutory
505    violation may be enforced through [42 U.S.C.] § 1983."  *Id.* at 283.
506    "Plaintiffs suing under § 1983 do not have the burden of showing an intent
507    to create a private remedy because § 1983 generally supplies a remedy for the
508    vindication of rights secured by federal statutes."  *Id.* at 284.  Therefore, if
509    "a plaintiff demonstrates that a statute confers an individual right, the right
510    is presumptively enforceable by § 1983."  *Id.*

511        In looking for congressionally created private rights that can be
512    protected under Section 1983, the *Gonzaga* and *Sandoval* opinions rejected
513    earlier, less-demanding approaches for deciding when Congress has created
514    a private right in a statute.  *See id.* at 282–83; *see also Sandoval*, 532 U.S. at
515    287 (stating the Supreme Court had "sworn off the habit of venturing beyond
516    Congress's intent" on whether a statute created private rights).

517        We start with the text of Section 2 of the Voting Rights Act:

518        (a)    No voting qualification or prerequisite to voting or
519        standard, practice, or procedure shall be imposed or applied by

Mississippi NAACP v. State Board of Election Commissioners

520    any State or political subdivision in a manner which results in a
521    denial or abridgement of the right of any citizen of the United
522    States to vote on account of race or color, or in contravention
523    of the guarantees set forth in section 10303(f)(2) of this title, as
524    provided in subsection (b).

525    (b)    A violation of subsection (a) is established if, based on
526    the totality of circumstances, it is shown that the political
527    processes leading to nomination or election in the State or
528    political subdivision are not equally open to participation by
529    members of a class of citizens protected by subsection (a) in
530    that its members have less opportunity than other members of
531    the electorate to participate in the political process and to elect
532    representatives of their choice.  The extent to which members
533    of a protected class have been elected to office in the State or
534    political subdivision is one circumstance which may be
535    considered: *Provided*, That nothing in this section establishes a
536    right to have members of a protected class elected in numbers
537    equal to their proportion in the population.

538    52 U.S.C. § 10301.

539        There certainly is an emphasis on rights in subsection (a) when it
540    prohibits states taking actions that "result[] in a denial or abridgement of the
541    right . . . to vote."  § 10301(a).  Less obvious is textual language revealing a
542    congressional intent to provide for a private remedy.  In considering how to
543    evaluate what Section 2 does and does not state, we find it useful to review
544    an Eighth Circuit opinion issued after the Fifth Circuit's *Robinson* opinion.
545    *See Arkansas State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204
546    (8th Cir. 2023).  There, the majority held Section 2 provided no private right
547    of action.  *Id.* at 1206–07.  It also determined that the plaintiffs had neither
548    included in their complaint nor made a meaningful argument that their rights
549    could be enforced using Section 1983.  *Id.* at 1218.  The Plaintiffs in the case
550    before us included Section 1983 in their complaint as one of the bases for the
551    suit, thus there is no waiver of the argument.  Amended Comp. ¶ 11.

552     With respect for the Eighth Circuit majority, we find Chief Judge
553 Smith's dissent in that case to express the more persuasive analysis.  *See*
554 *Arkansas State Conf. NAACP*, 86 F.4th at 1218–24 (Smith, C.J., dissenting).
555 Of course, we are bound by *Robinson* regardless of which opinion persuades.
556 Still, we explain what we find persuasive about the dissent.

557     The Eighth Circuit majority and dissent each discuss a 1996 Supreme
558 Court opinion in which a plurality stated that "the existence of the private
559 right of action under Section 2 . . . has been clearly intended by Congress
560 since 1965."  *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996)
561 (plurality opinion) (quoting Voting Rights Extension, S. Rep. No. 97-417
562 (1982), 30, *as reprinted in* 1982 U.S.C.C.A.N. 177)).  Though we find that a
563 majority of the *Morse* Court agreed with that part of the plurality opinion, it
564 may have been *dicta*.  *See Arkansas State Conf. NAACP*, 86 F.4th at 1215.

565     It was not until a little more than 35 years after the Voting Rights Act
566 was enacted that the Supreme Court articulated a test for determining
567 whether Congress has created a private right of action to enforce a particular
568 enactment.  *See Sandoval*, 532 U.S. at 286.

569     Even if the *Morse* statement is *dicta*, the Fifth Circuit has held that it
570 is generally bound by Supreme Court *dicta*, especially when it is "recent and
571 detailed."  *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013).
572 The *Morse* opinion is neither particularly recent nor detailed, but the Fifth
573 Circuit seemingly would tread cautiously before taking a different path.  As
574 to the second issue — that the decision might be questionable because it
575 predates *Sandoval* — we find that the Supreme Court has told inferior courts
576 to remain faithful to its on-point precedent: "[I]f a precedent of this Court
577 has direct application in a case, yet appears to rest on reasons rejected in some
578 other line of decisions, the Court of Appeals should follow the case which
579 directly controls, leaving to [the Supreme Court] the prerogative of

Mississippi NAACP v. State Board of Election Commissioners

580    overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997)
581    (citation omitted).

582        Also weighing against any court's marking its own path is that, before
583    *Sandoval* and continuing with quite recent opinions, there has been
584    substantial caselaw in which "the Federal Government and individuals have
585    sued to enforce [Section] 2, and injunctive relief [was held to be] available in
586    appropriate cases to block voting laws from going into effect." *Shelby County*,
587    570 U.S. at 537 (citations omitted).  The existence of a private right of action
588    in opinions such as *Shelby County* has simply been assumed by courts.
589    Indeed, for decades, Supreme Court and circuit court opinions have resolved
590    Section 2 cases brought by private parties without addressing whether there
591    was even a right for those parties to sue.

592        Eighth Circuit Chief Judge Smith reviewed this same history and
593    expressed prudent caution:

594        Furthermore, since the Court decided *Morse*, "scores if not
595        hundreds of cases have proceeded under the assumption that
596        Section 2 provides a private right of action.  All the while,
597        Congress has consistently reenacted the VRA without making
598        substantive changes, impliedly affirming the previously
599        unanimous interpretation of Section 2 as creating a private
600        right of action." *Coca* [*v. City of Dodge City*, 669] F. Supp. 3d
601        [1131, 1140 (D. Kan. 2023)]. . . . Until the Supreme Court
602        instructs otherwise, I would hold that [Section] 2 contains an
603        implied private right of action.

604    *Arkansas State Conf. NAACP*, 86 F.4th at 1223–24 (Smith, C.J., dissenting).

605        Finally, few congressional enactments have had a more profound
606    effect on the country than the Voting Rights Act of 1965, and a large
607    percentage of the enforcement actions under the Voting Rights Act have been
608    brought by private individuals.  Though the following does not come from
609    statutory text, it is noteworthy that on the page of the Senate Report

Mississippi NAACP v. State Board of Election Commissioners

610   immediately following the discussion of what we now call the Senate Factors
611   appears this assertion: "the Committee reiterates the existence of the private
612   right of action under Section 2, as has been clearly intended by Congress
613   since 1965.  *See Allen v. Board of Elections*, 393 U.S. 544 (1969)."  S. REP.
614   NO. 97-417, at 30.

615        If a court now holds, after almost 60 years, that cases filed by private
616   individuals were never properly brought, it should be the Supreme Court,
617   which has the controlling word on so momentous a change.  Regardless, we
618   are bound by the Fifth Circuit *Robinson* opinion that the Plaintiffs may
619   properly bring this suit to enforce their rights under the Voting Rights Act.

620   *B.    The* Gingles *Framework*

621        To succeed in proving a Section 2 vote-dilution claim, plaintiffs must
622   first satisfy the three *Gingles* preconditions. *Milligan*, 599 U.S. at 18.  "First,
623   the minority group must be sufficiently large and [geographically] compact
624   to constitute a majority in a reasonably configured district."  *Id.* (alteration
625   in original) (quotation marks and citation omitted).  A district is reasonably
626   configured when it complies "with traditional districting criteria, such as
627   being contiguous and reasonably compact."  *Id.*  Second, the minority group
628   must be politically cohesive.  *Id.*  Third, the white majority must be shown to
629   vote sufficiently as a bloc to usually defeat the minority-preferred candidate.
630   *Id.*  "The  third  precondition,  focused  on  racially  polarized  voting,
631   'establish[es] that the challenged districting thwarts a distinctive minority
632   vote' at least plausibly on account of race."  *Id.* at 19 (alteration in original)
633   (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

634        If a plaintiff fails to establish any one of these three preconditions, a
635   court need not consider the others nor continue the analysis.  *See League of
636   United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) [hereinafter
637   *LULAC v. Perry*].

Mississippi NAACP v. State Board of Election Commissioners

The first and second *Gingles* preconditions "are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Emison*, 507 U.S. at 40.  The second and third *Gingles* preconditions "are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." *Id.*  "Unless these points are established, there neither has been a wrong nor can be a remedy." *Id.* at 40–41.

Although "the *Gingles* requirements cannot be applied mechanically and without regard to the nature of the claim[,] . . . [i]t remains the rule . . . that a party asserting [Section] 2 liability must show by a preponderance of the evidence" that all three preconditions are met. *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009).  The Plaintiffs must meet this burden, and "[a]ny lack of evidence in the record regarding a violation of the Voting Rights Act . . . must be attributed to" the Plaintiffs.  *League of United Latin Am. Citizens #4552 v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 846 (5th Cir. 1997).

Once a plaintiff sufficiently establishes the three threshold preconditions, he must then "show, under the totality of the circumstances, that the political process is not equally open to minority voters," which, in turn, establishes a Section 2 violation.  *Milligan*, 509 U.S. at 18 (quotation marks and citation omitted).  Courts are guided by factors identified by the Supreme Court in their totality-of-the-circumstances analyses.  *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993) (en banc) [hereinafter *LULAC v. Clements*]; *Robinson*, 86 F.4th at 589 n.2.  We will identify and analyze these factors after reviewing the three preconditions.

*1.*  Gingles *Precondition One*

"The first *Gingles* precondition focuses on [the] geographical compactness and numerosity" of the minority population.  *Robinson*, 86

Mississippi NAACP v. State Board of Election Commissioners

666 F.4th at 589 (citing *Milligan*, 599 U.S. at 18). Under this precondition, a
667 plaintiff is required to establish that the minority population forms a
668 sufficient majority in a district to have the potential to elect a minority-
669 preferred candidate if there is political cohesion. *Emison*, 507 U.S. at 40. To
670 do so, the plaintiff "must show by a preponderance of the evidence that the
671 minority population in the potential election district is greater than 50
672 percent." *Strickland*, 556 U.S. at 19–20. "This percentage is analyzed in
673 terms of the [BVAP] because only eligible voters can affect the *Gingles*
674 analysis." *Robinson*, 86 F.4th at 590. If the BVAP is greater than 50 percent,
675 it must also be sufficiently compact such that a reasonably configured
676 majority-minority district can be drawn. *See LULAC v. Perry*, 548 U.S. at
677 433.

678     This first precondition is satisfied as follows:
679     Where an election district could be drawn in which minority
680     voters form a majority but such a district is not drawn, or where
681     a majority-minority district is cracked by assigning some voters
682     elsewhere, then — assuming the other *Gingles* factors are also
683     satisfied — denial of the opportunity to elect a candidate of
684     choice is a present and discernible wrong that is not subject to
685     the high degree of speculation and prediction attendant upon
686     the analysis of crossover claims.

687 *Strickland*, 556 U.S. at 18–19. It also "requires the possibility of creating
688 more than the existing number of reasonably compact districts with a
689 sufficiently large minority population to elect candidates of its choice."
690 *LULAC v. Perry*, 548 U.S. at 430 (quoting *Johnson v. De Grandy*, 512 U.S.
691 997, 1008 (1994)). Thus, it must be shown that a large, geographically
692 compact minority population exists that could be part of an additional,
693 reasonably configured majority-minority district that the State did not draw.
694 *See Milligan*, 599 U.S. at 20.

Mississippi NAACP v. State Board of Election Commissioners

695    The Defendants argue that after the Supreme Court's recent *Milligan*
696 decision, there is another requirement — a precondition to the precondition
697 as it were.  They rely on Justice Kavanaugh's concurrence in that opinion to
698 assert that a court must first find that the districts as legislatively drawn
699 combined or divided the black population.  Before quoting the part of the
700 concurring opinion on which the Defendants rely, we address a part of the
701 majority opinion they ignore.   The majority opinion described the first
702 precondition this way:

703        First, the "minority group must be sufficiently large and
704        [geographically] compact to constitute a majority in a
705        reasonably configured district." *Wisconsin Leg*[.,] 595 U. S. [at
706        400] (*per curiam*) (citing *Gingles*, 478 U.S. at 46–51, 106 S. Ct.
707        2752).  A district will be reasonably configured, our cases
708        explain, if it comports with traditional districting criteria, such
709        as being contiguous and reasonably compact.

710 *Milligan*, 599 U.S. at 18 (first alteration in original) (citing *Alabama Legis.*
711 *Black Caucus*, 575 U.S. at 272).  Justice Kavanaugh joined the majority's
712 analysis of the *Gingles* preconditions.  *Id.* at 42 (Kavanaugh, J., concurring in
713 part and concurring in the judgment).  It is difficult to interpret anything else
714 Justice Kavanaugh wrote as being an alteration of what he accepted as the
715 majority's understanding of precondition one.

716    Instead of revising precondition one, his concurring opinion was
717 responding to the State's argument that *Gingles* needed to be abandoned
718 because it "inevitably requires a proportional number of majority-minority
719 districts."   *Id.* at 42–43.   That is not what *Gingles* demands, Justice
720 Kavanaugh wrote, as that would require the combining of "geographically
721 dispersed minority voters into unusually shaped districts, without concern
722 for traditional districting criteria such as county, city, and town lines." *Id.* at
723 43.  "*Gingles* requires the creation of a majority-minority district only when,
724 among other things, (i) a State's redistricting map cracks or packs a large and

Mississippi NAACP v. State Board of Election Commissioners

725  geographically compact minority population and (ii) a plaintiff's proposed
726  alternative map and proposed majority-minority district are reasonably
727  configured." *Id.* (quotation marks and citations omitted).

728      We view this portion of Justice Kavanaugh's opinion as simply
729  explaining the natural effect of satisfying precondition one. The effect is that
730  if a reasonably configured majority-minority district can be formed that
731  satisfies traditional redistricting principles and does not join "geographically
732  dispersed minority voters into unusually shaped districts," then minority
733  voters have been cracked from that minority district to form majority
734  districts. *Id.* Justice Kavanaugh also agreed that analyzing the preconditions
735  "requires in certain circumstances that courts account for the race of voters
736  so as to prevent the cracking or packing . . . of large and geographically
737  compact minority populations." *Id.* at 44.

738      We conclude, then, that Justice Kavanaugh's concurring opinion
739  cannot be read as his abandonment of almost 40 years of jurisprudence
740  applying *Gingles*. We still, however, need to understand what compactness
741  of a district means. We see it as an imprecise concept, but we know we are
742  to consider traditional districting principles like communities of interest and
743  maintaining traditional boundaries. *LULAC v. Perry*, 548 U.S. at 433.
744  "Communities of interest vary between states, generally defined by the given
745  state's districting guidelines." *Robinson*, 86 F.4th at 590; *see Milligan*, 599
746  U.S. at 20–21. The districting guidelines applicable here require
747  communities that share a common interest, are likely to have similar
748  legislative concerns, and might benefit from cohesive representation in the
749  state legislature. PTX-001, 20.

750      In *Milligan*, the Supreme Court concluded that "proposed maps
751  [which] split the same number of county lines as (or even *fewer* county lines
752  than) the State's map" and contained no "tentacles, appendages, bizarre

Mississippi NAACP v. State Board of Election Commissioners

753   shapes, or any other obvious irregularities" can strongly support the first
754   *Gingles* precondition.  599 U.S. at 20 (emphasis in original) (quoting *Singleton*
755   *v. Merrill*, 582 F. Supp. 3d 924, 1011 (N. D. Ala. 2022)).  We will look for that
756   in the Plaintiffs' Illustrative Plans.

757       The Court further identified that equal populations, contiguity, and
758   respect for existing political subdivisions like counties, cities, and towns
759   would allow illustrative maps to satisfy traditional districting criteria and
760   strongly suggest black voters could constitute a majority in a reasonably
761   configured district.  *Id.*  In analyzing communities of interest, the Court
762   concluded that even urban and rural communities can be configured into
763   reasonably compact districts if they share cultural, economic, social, and
764   educational ties despite the geographical distance.  *See id.* at 19–21; *LULAC*
765   *v. Perry*, 548 U.S. at 434–35.

766       Race can also be considered in drawing illustrative districts to satisfy
767   the first *Gingles* precondition.  *See Milligan*, 599 U.S. at 31.  Certainly, to
768   demonstrate that reasonably configured, majority-minority districts could be
769   drawn, race must be considered, but race cannot be "the predominant factor
770   in drawing district lines."  *Id.*  Here, William S. Cooper testified as an expert
771   for the Plaintiffs in redistricting relevant to the first *Gingles* precondition, and
772   he drew the Illustrative Plans the Plaintiffs presented as part of his overall
773   analysis.  Cooper testified that he was aware of and considered race as
774   required by *Gingles* when drawing his maps, but it did not predominate in his
775   analysis.  Trial Tr. 109:2–5; 152:20–21.  We will explore the specifics of
776   Cooper's testimony when we examine each of the illustrative districts.  For
777   now, it suffices to say that we have found as to some of the districts, but not
778   all, race predominated and traditional factors were not followed.

779       Besides arguing that race predominated, the Defendants argue that
780   Cooper did not take in account the traditional redistricting principle of

781    "political performance."  As we mentioned earlier, the best explanation of
782    that phrase offered by the Defendants is that it refers to length of service and
783    incumbency.  To the extent this can be seen as, among other interests,
784    protecting incumbent-constituent relationships and maintaining hard-earned
785    legislative expertise, that is a valid state interest but should not be deferred to
786    at the cost of "constitutional norms."  *League of United Latin Am. Citizens,*
787    *Council No. 4434 v. Clements*, 986 F.2d 728, 763 (5th Cir.), *rev'd en banc*, 999
788    F.2d 831 (5th Cir. 1993) (quoting *White v. Weiser*, 412 U.S. 783, 791 (1973)).

789          Much of the law on incumbent protection is in the context of equal
790    protection claims.  For example, the Supreme Court has held that "avoiding
791    contests between incumbent[s]" is a legitimate state goal.  *Karcher v. Daggett*,
792    462 U.S. 725, 740 (1983).  Similarly, we conclude that political performance,
793    a concept that gives weight to the length of service of incumbents and their
794    relationships with constituents, is a valid consideration under the first *Gingles*
795    precondition.

796          Courts must consider each illustrative district independently to
797    "determine if the illustrative districts have similar needs and interests
798    beyond race."  *Robinson*, 86 F.4th at 590; *see LULAC v. Clements*, 999 F.2d
799    at 877–94 (analyzing each district in detail).  An illustrative map proposing
800    overall compactness improvements does not necessarily meet *Gingles* one as
801    to each illustrative district within the map.  *See LULAC v. Clements*, 999 F.2d
802    at 877–94.  Thus, the key consideration here is that if one of the Illustrative
803    Plans presented by the Plaintiffs identifies a reasonably configured, compact
804    majority-minority district that respects traditional redistricting principles,
805    the first *Gingles* precondition is met.  *See Milligan*, 599 U.S. at 20.  We discuss
806    each of the Plaintiffs' Illustrative Plans and their respective districts to
807    determine whether each satisfies the first *Gingles* precondition.

Mississippi NAACP v. State Board of Election Commissioners

808          *a.   An Overview of the Plaintiffs' Illustrative Plans*

809          As noted, the Plaintiffs presented the expert testimony of William
810    Cooper, who was tendered and accepted as an expert in redistricting,
811    demographics, and census data, to prove the first *Gingles* precondition.  Trial
812    Tr. 84:11–14, 85:23–86:1.  Cooper works with different organizations and
813    states as a private consultant in redistricting work.   He has prepared
814    redistricting maps in approximately 750 jurisdictions in 45 states and has
815    been qualified as a redistricting and demographics expert in over 50 voting-
816    rights cases in 20 states since 1987.  Trial Tr. 78:21–79:5, 80:10–13, 81:24–
817    82:5; *See* PTX-001, 81–91.  In Mississippi, Cooper has over 30 years of
818    experience in voting cases and has served as a redistricting and demographics
819    expert in multiple statewide cases.  Trial Tr. 82:15–18, 83:10–84:10.

820          In preparation for this trial, Cooper developed two Illustrative
821    Legislative Plans — the Illustrative Senate Plan and the Illustrative House
822    Plan — to assess whether Mississippi's black population is sufficiently
823    geographically compact to create additional majority-minority districts.  Trial
824    Tr. 86:5–17.  We found Cooper's extensive experience, particularly in
825    Mississippi cases, qualified him to testify as an expert in redistricting and
826    demographics relevant to this case.

827          We first offer the two statewide Illustrative Plans.  Each shows the
828    location of the Plaintiffs' illustrative additional majority-minority districts:
829    four senate districts and three house districts.

Mississippi NAACP v. State Board of Election Commissioners

830    This is the map showing all the illustrative senate districts:



831

832    The Enacted Senate Plan has 50.36 percent of black voters living in
833    black-majority districts and 84.33 percent of white voters living in white-
834    majority districts. PTX-001, 50.  In Cooper's Illustrative Senate Plan, 58.39
835    percent of black voters live in black-majority districts and 75.24 percent of
836    white voters live in white-majority districts.  *Id.*  By modifying 41 of the 52
837    enacted senate districts, the Illustrative Senate Plan reduces the alleged

Mississippi NAACP v. State Board of Election Commissioners

838    representation gap found in the Enacted Senate Plan by 17.13 percent.  Trial
839    Tr. 98:1–12; PTX-001, 28, 67–68.

840            This is the map showing all the illustrative house districts.



841

842            The Enacted House Plan has 62.38 percent of black voters living in
843    black-majority districts and 82.92 percent of white voters living in white-

Mississippi NAACP v. State Board of Election Commissioners

844    majority districts.  PTX-001, 74.  In Cooper's Illustrative House Plan, 64.78
845    percent of black voters live in black-majority districts and 80.12 percent of
846    white voters live in white-majority districts.  *Id.*  The Illustrative House Plan
847    modifies 33 of the 122 enacted house districts and improves the alleged
848    representation disparity found in the Enacted House Plan by 5.19 percent.  *Id.*

849          We next consider the testimony explaining the drawing of these maps.

850          To develop his Illustrative Plans, Cooper's initial analysis began with
851    black-population statistics in Mississippi.  Cooper used several data points,
852    including population and geographic data from the 1990 to 2020 Censuses,
853    socioeconomic data published by the Census Bureau, Mississippi precinct
854    boundaries, and incumbent-address information.  PTX-001, 93–94.  The
855    specific Census population data set Cooper used is the complete population
856    file designed by the Census Bureau for use by states in legislative
857    redistricting.  *Id.*  Cooper then used the well-known redistricting software
858    "Maptitude for Redistricting" to compile the data and draw his Illustrative
859    Plans.[3]  *Id.*  Maptitude displays various kinds of voter data and precinct lines
860    and permits the map-drawer to see precincts shaded in different colors based
861    on their BVAP.  Doc [201], 78, 109–110.

862          According to the 2020 Census data, the non-Hispanic White
863    population comprises 55.35 percent of the total population in Mississippi.  *See*
864    PTX-001, 9.  African Americans are the next largest racial/ethnic category,
865    representing 37.94 percent of the total population in 2020, which is the
866    highest proportion of any state.  *Id.*  Mississippi's overall population grew by
867    116,621 persons from 2000 to 2020.  Doc [220], 16–17.  The African
868    American population alone grew by 81,905 persons, making it the largest

───────────────────────

[3] "This software is deployed by many local and state governing bodies across the country for redistricting and other types of demographic analysis."  PTX-1, 92.

Mississippi NAACP v. State Board of Election Commissioners

869  element of Mississippi's population growth.  PTX-001, 10; Trial Tr. 87:5–13.
870  Mississippi's BVAP also increased from 33.29 percent to 36.14 percent
871  during that same period.  PTX-001, 6, 10–11.  In contrast, Mississippi's non-
872  Hispanic White population fell by 88,831, and the non-Hispanic White VAP
873  dropped from 64.16 percent to 57.76 percent from 2000 to 2020.  PTX-001,
874  6, 10–11; Trial Tr. 87:5–13.

875          Cooper used Mississippi's Planning and Development Districts
876  ("PDDs") to evaluate the state's population change at the regional level.
877  Trial Tr. 90:23–24.  These PDDs were designed to "provide a consistent
878  geographic base for the coordination of Federal, State, and local development
879  programs."  PTX-020, 1 (Exec. Order).  They were also "organized with
880  boundaries which represent natural, social, and economic relationships." *Id.*
881  at 2.  Cooper used these PDDs as "a way to organize [Mississippi] in[to]
882  regions . . . that actually matter today."  Trial Tr. 90:23–24.  However, the
883  PDD boundaries have remained unchanged since at least 1971.  *See* PTX-020.
884  That by itself suggests they are poorly designed tools for the purposes of
885  evaluating legislative districts.[4]

---

[4] The Plaintiffs filed a pretrial motion seeking judicial notice of facts related to
PDDs, and we deferred ruling.  *See* Pls.' Mot. [196].  Under Federal Rule of Evidence
201(b), a "court may judicially notice a fact that is not subject to reasonable dispute because
it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be
accurately and readily determined from sources whose accuracy cannot reasonably be
questioned."  Some facts the Plaintiffs mentioned in their motion were introduced into
evidence, thus mooting those issues.  For example, former Mississippi Governor John Bell
Williams's 1971 executive order was introduced as PTX-020.  *See* Mem. [197] at 6.  Cooper
then testified about the general purpose of PDDs.  *See, e.g.*, Trial Tr. at 90–91.

         Beyond what was admitted into evidence, the Plaintiffs have not established that
other potentially relevant facts satisfy Rule 201.  For example, they have not shown that we
should take judicial notice of facts found on a trade association's website.  *See* Pls.' Mem.
[197] at 6.  Even if we were to take judicial notice of the remaining facts, it would not change
the conclusion that PDDs are ill-suited for legislative districting.

Mississippi NAACP v. State Board of Election Commissioners

886        Cooper combined the 2020 Census data and population information
887    provided by the PDDs to determine whether additional majority-minority
888    districts could be drawn in his Illustrative Plans.  PTX-001, 16–18.  Cooper
889    focused primarily on PDD regions with substantial black populations that
890    experienced double-digit black-population growth or double-digit white-
891    population decline between 2000 and 2020.  PTX-001, 18–21; Trial Tr.
892    156:11–157:9, 159:18–160:3.  These were the areas in which Cooper "felt it
893    was likely . . . [to] develop additional majority [b]lack districts."  Trial Tr.
894    160:4–8.

895        Cooper's analysis of Mississippi's PDDs showed the black population
896    growth at the regional level was concentrated in four PDD regions: Central
897    Mississippi, North Delta, Southern Mississippi, and Three Rivers.  Trial Tr.
898    92:1–11; PTX-001, 17.  The net black-population growth in these four regions
899    was 120,399 persons between 2000 and 2020, and the white population loss
900    was 7,636 persons.  Trial Tr. 92:1–11; PTX-001, 17.  Cooper testified the net
901    black-population growth in these four regions equates to the drawing of two
902    100 percent black senate districts and about five 100 percent house districts,
903    thus suggesting "it would be very easy to draw additional majority-[b]lack
904    districts in the state of Mississippi in these specific areas."  Trial Tr. 95:3–8.
905    By focusing on these areas, Cooper further asserted his Illustrative Plans
906    "prove superior or equal to the 2022 Legislative Plans across almost every
907    conceivable race-neutral quantitative measure of community of interest."
908    PTX-001, 21.

909        While we credit Cooper's overall analysis and drawing of the
910    Illustrative Plans as viable methods for us to consider when determining
911    compactness, we find the evidence does not support his use of PDDs as
912    communities of interest.  The PDDs were created about 60 years ago, PTX-
913    0020, and they are "voluntary nonprofit corporations," Trial Tr. 156:5–7,
914    that have differing priorities and common interests,  DTX-016.  Further,

Mississippi NAACP v. State Board of Election Commissioners

915    there was testimony that PDDs are not public civil divisions for which the
916    Census Bureau reports. Trial Tr. 154:5–15. The Plaintiffs even concede
917    PDDs do not help further analysis of the first *Gingles* precondition, stating
918    the court "can eliminate the concept of [PDDs] and still come up with . . .
919    similar" districts. *See* Trial Tr. 156:25–157:9, 158:2–5, 160:2–3. There is also
920    no evidence the Mississippi Legislature considered PDDs in drawing the
921    Enacted Plans. *See* MISS. CODE ANN. § 5-3-101. We find the use of PDDs in
922    Cooper's analysis to be unhelpful.

923      Of importance, though, is that the 2022 Enacted Plans contained the
924    same number of majority-minority districts as the previously enacted plans
925    despite the admitted black-population growth and white-population decline.
926    PTX-001, 22–25, 45–46, 54–57, 68–70, 177–79, 244–46, 498–501, 590–93;
927    JTX-002; JTX-004; JTX-005. Indeed, both the state senate and state house
928    have only added one additional majority-minority district in their respective
929    legislative plans since 2002. Trial Tr. 89:12–90:1. The additional majority-
930    minority senate district resulted from a court order four years ago. *See*
931    *Thomas*, 961 F.3d at 800–01. Trial Tr. 90:2–8.

932      Cooper testified that he developed the Illustrative Plans here by using
933    traditional redistricting principles, including population equality,
934    compactness, contiguity, communities of interest, traditional political
935    boundaries, non-dilution of minority voting strength, and incumbent
936    pairings. Trial Tr. 105:4–107:12. He further testified that he balanced the
937    traditional redistricting principles such that none predominated over the
938    other when drawing the Illustrative Plans. Trial Tr. 107:13–22, 109:2–6,
939    123:13–14. We credit this statement as to some of his illustrative districts,
940    but not every illustrative district.

941      The Defendants challenged whether Cooper properly used these
942    traditional redistricting principles. At trial, Cooper was asked to review the

Mississippi NAACP v. State Board of Election Commissioners

943    legislative redistricting process and the factors the Standing Joint Committee
944    was required to consider — one person, one vote; contiguity of the districts;
945    political performance; compliance with all state and federal laws such as
946    Section 2 of the Voting Rights Act; compactness; and minimalization of
947    county and precinct splits. JTX-010, at 8-14; Trial Tr. 168:20. The Standing
948    Joint Committee examined the significant population shifts throughout
949    Mississippi where major areas experienced population loss and indicated this
950    necessitated the collapse of two districts to be moved to the areas with the
951    largest increase in population. JTX–010, 11–14.

952        Cooper acknowledged that he neither examined the many competing
953    interests the Mississippi Legislature examines when drawing maps nor
954    considered political performance while drawing the Illustrative Plans. Trial
955    Tr. 225:21–226:2. On the other hand, the Defendants failed to provide any
956    detail as to how the failure to consider those interests impacted any of
957    Cooper's illustrative districts. The Defendants' evidence was fairly brief
958    videos of each committee chair explaining to his chamber what that
959    committee had tried to do. General statements about political performance
960    were made. Nothing in that evidence addresses how Cooper's failure or
961    inability to consider political performance invalidated any of the illustrative
962    districts. Even if "political performance" is a trump card, which it is not, the
963    Defendants must at least place it face up on the table.

964        The Defendants offered the testimony of Dr. Thomas Brunell to
965    prove that the Plaintiffs did not meet their burden under *Gingles* precondition
966    one. *See generally* Trial Tr. 1242–1495. Dr. Brunell is a professor with a
967    doctorate in political science at the University of Texas at Dallas, where he
968    has been employed since 2005. DX-003, 22. He is an appointed member of
969    the Census Scientific Advisory Committee for the Census Bureau where he
970    provided guidance and assistance related to redistricting development
971    procedures. Trial Tr. 1250:18–1251:13. Dr. Brunell was accepted at trial as

Mississippi NAACP v. State Board of Election Commissioners

972    an expert in redistricting, elections, the Voting Rights Act, and
973    representation and statistics.    Trial Tr. 1253:24–1254:2.    Although the
974    Defendants offered Dr. Brunell's testimony specifically to challenge
975    Cooper's methods, Dr. Brunell agreed Cooper was not maximizing the
976    number of majority-minority districts.    Trial Tr. 1336:1–9.

977           Regarding compactness and split precincts, Dr. Brunell opined that
978    there were only marginal differences between the compactness scores of the
979    Enacted Plans and Cooper's Illustrative Plans.    DX-003, 12–14.    Cooper
980    considered three mathematical compactness scores generated by the
981    accepted Maptitude software and asserted that, on average, the Illustrative
982    Senate Plan is slightly more compact than the Enacted Senate Plan and the
983    compactness of the Illustrative and Enacted House Plans are comparable.
984    Trial Tr. 106:3–13, 111:7–112:24.    That is generally true.

985           The only geographical boundaries Mississippi law requires be
986    followed "as nearly as possible" are county, municipal, and precinct lines.
987    MISS. CODE ANN. § 5-3-101.    Both the Enacted Plans and Illustrative Plans
988    satisfied this requirement.    The Illustrative House Plan has the same number
989    of split counties and modestly fewer split municipalities and precincts
990    compared to the Enacted House Plan.    DX-003, 15.    The Illustrative Senate
991    Plan splits fewer counties but has almost the same number of total county
992    splits as the Enacted Senate Plan.    Dr. Brunell created a chart to show the
993    comparisons.

Mississippi NAACP v. State Board of Election Commissioners

|            | Split Counties | Total County Splits | 2020 VTD Splits | Municipalities not Split | Total Municipal Splits |
|------------|------|------|------|------|------|
| 2022 House | 67 | 179 | 255 | 216 | 225 |
| Cooper House | 67 | 167 | 228 | 218 | 221 |
| 2022 Senate | 43 | 58 | 41 | 244 | 128 |
| Cooper Senate | 34 | 52 | 38 | 253 | 110 |

994

995    Dr. Brunell's chart supports Cooper's statement that "[t]here's very little
996    difference" between the Enacted Plans and the Illustrative Plans.  Trial Tr.
997    112:22–23.  The Illustrative Plans perform only a "little better[, n]ot a lot but
998    a little," better than the Enacted Plans, such that "[t]hey're almost the
999    same."  Trial Tr. 112:10–11, 22–23.

1000    As to incumbent pairings, Dr. Brunell noted the Enacted Plans have
1001    only one incumbent pairing in the senate and three pairings in the house. DX-
1002    003, 14.  Separating incumbents into different districts was an important
1003    factor the Mississippi Legislature considered when drawing its plans.  JTX-
1004    10, 12:3–15, 20:19–24; JTX-011, 8:5–10.  That is a valid consideration for the
1005    legislature. *See Vera*, 517 U.S. at 963–64; *League of United Latin Am. Citizens,*
1006    *Council No. 4434*, 986 F.2d at 763.  The Illustrative Plans, however, have
1007    more incumbent pairings than the Enacted Plans, despite incumbency
1008    protection being an important consideration.  DX-003, 14. Cooper testified
1009    he was unable "to obtain complete information about all of the incumbents,"
1010    and it was sometimes impossible "to keep all incumbents in separate
1011    districts." Trial Tr. 106:23–107:12. Nonetheless, the Enacted Plans are more
1012    favorable as to incumbency protection.

1013    We found at trial that Dr. Brunell is qualified to testify as an expert in
1014    redistricting and demographics, but the following discussion of the individual
1015    illustrative districts will reveal some of his testimony that we do not credit.

Mississippi NAACP v. State Board of Election Commissioners

1016            *b.   Illustrative Senate District 2*



1017

1018         Illustrative SD 2 is an additional majority-minority district with a
1019 BVAP of 50.91 percent that Cooper asserts can be drawn in Tunica and
1020 DeSoto Counties.  PTX-001, 29–34, 324.  We reproduce the western-most
1021 part of the map.   DeSoto County contains the fastest growing black
1022 population in Mississippi.  Trial Tr. 130:2–3.  Cooper combined some of the
1023 population from three enacted senate districts throughout DeSoto County,
1024 to create Illustrative SD 2 in addition to maintaining a current majority-black
1025 district.  PTX-001, 29–34.  Cooper divided the City of Horn Lake and its
1026 substantial black population once, keeping most of it in a single district, and
1027 eliminated the splitting of Tate and Panola Counties under the Enacted
1028 Senate Plan.  PTX-001, 29–34; Trial Tr. 131:23–132:8.  Cooper testified that
1029 he followed natural boundaries by tracking the Highway 61 transportation
1030 and economic corridor, allowed for population growth by including precincts

Mississippi NAACP v. State Board of Election Commissioners

1031    with low BVAP, and kept the population deviation on the lower end of the
1032    required 5-percent deviation.  Trial Tr. 131:14–20, 190:15–191:5.

1033         Pamela Hamner also testified for the Plaintiffs to explain how
1034    Illustrative SD 2 respects communities of interests.  Hamner has lived in
1035    DeSoto County for 25 years as a reporter covering northern Mississippi.  She
1036    recently ran for political office, which caused her to contact voters and
1037    residents in the areas contained in Illustrative SD 2.  Trial Tr. 704:10–14,
1038    705:15–706:4, 710:1–4, 720:5–11.  Hamner testified that she received some
1039    threats while campaigning in white communities, though few details were
1040    given.  She testified that Highway 61 connects the communities and allows
1041    the residents to travel between towns in DeSoto County for church,
1042    healthcare, entertainment, and other activities.    Trial Tr. 723:13–20.
1043    Hamner also explained in detail the economic, education, healthcare, and
1044    numerous other issues the residents are similarly concerned with.  Trial Tr.
1045    723:7–12, 714:14–715:6, 727:16–22.

1046         In creating Enacted SD 2, the Mississippi Legislature effectively
1047    cracked the majority-black community in Horn Lake across three districts
1048    and split Horn Lake and the historically black town of Jago rather than
1049    keeping them together like in Illustrative SD 2.  Trial Tr. 713:15–714:6, 716:5–
1050    25, 718:7–20.  Hamner testified this effectively took away the power of the
1051    black communities to seek representation when the Enacted Plans became
1052    law.  Trial Tr. 714:7–13, 715:10–17.  We credit that testimony.

1053         The Defendants disputed that Cooper's methods followed traditional
1054    redistricting principles for this illustrative district.  Defendants' expert Dr.
1055    Brunell opined that Cooper specifically targeted the majority-black precincts
1056    to include in Illustrative SD 2 while excluding the majority-white precincts
1057    to increase the number of black-majority districts.  DX-003, 11; Trial Tr.
1058    1336:1–9.  On that point, we know that in preparing illustrative districts, the
1059    Supreme Court recognizes their purpose is to show what can be done, *i.e.*,

Mississippi NAACP v. State Board of Election Commissioners

1060 that a reasonably compact majority-minority district can be created that
1061 respects traditional districting principles. *Milligan*, 599 U.S. at 30. There "is
1062 a difference 'between being aware of racial considerations and being
1063 motivated by them'" in preparing the maps. *Id.* (quoting *Miller*, 515 U.S. at
1064 916). Cooper's identifying those majority-minority areas was a necessary
1065 part of the exercise.

1066     This district is reasonably compact and satisfies traditional
1067 redistricting factors. Cooper testified that he was not maximizing the number
1068 of majority-minority districts, and Defendants' expert Dr. Brunell opined the
1069 same. We credit both witnesses' testimony as it applies to this illustrative
1070 district. Further, there was no evidence offered about how considerations of
1071 political performance affected the districting here. We thus find that
1072 Illustrative SD 2 satisfies the first *Gingles* precondition.

1073          *c.   Illustrative Senate District 9*



1074

Mississippi NAACP v. State Board of Election Commissioners

1075    Illustrative SD 9 is an additional majority-minority district with a
1076    BVAP of 50.95 percent that Cooper asserts can be drawn in Forrest and
1077    Lamar Counties and adjacent to the City of Hattiesburg.  PTX-001, 38–41,
1078    324.  It includes Rawls Springs, Glendale, and substantial portions of Arnold
1079    Line and West Hattiesburg, and it is drawn primarily around Hattiesburg's
1080    municipal borders.  *See* PTX-001, 394.  Cooper testified this illustrative
1081    district better respects traditional redistricting principles than the Enacted
1082    Senate Plan.  Trial Tr. 134:1–14; PTX-001 at 38–41, 247.  The Enacted Senate
1083    Plan split Hattiesburg across four districts and went far north "to pick up
1084    pieces of Jones County and Laurel and then on into Jasper County."  PTX-
1085    001, 302.  Illustrative SD 9 instead keeps the city almost entirely whole,
1086    follows municipal boundaries extending from Hattiesburg, avoids pairing an
1087    incumbent, and evenly includes and excludes various BVAP precincts.  Trial
1088    Tr. 134:19–20, 134:23–135:10, 204:17–25, 205:7–15.

1089    Lay testimony supports the reasonableness of keeping Hattiesburg
1090    together.  Dr. Joseph Wesley, a Hattiesburg resident since 1977, explained
1091    that Hattiesburg is the "Hub City" for people from the surrounding areas
1092    near Illustrative SD 9 to come for education, culinary, and economic needs.
1093    Trial Tr. 665:7–9, 676:2–12.  He testified Illustrative SD 9 better respects the
1094    geographic boundaries of highways that serve the surrounding areas and
1095    allows easier access to education and healthcare for the communities.  Trial
1096    Tr. 679:4–684:9.   The common histories and traditions for the black
1097    communities are also centered in Hattiesburg, where the communities are
1098    kept whole through Illustrative SD 9.  Trial Tr. 676:13–677:8, 678:3–5.  We
1099    credit his unrebutted testimony.

1100    The Defendants presented evidence that the boundary lines of
1101    Illustrative SD 9 followed along the racial lines of larger concentrations of
1102    black populations and split two precincts between Enacted SD 9 and SD 42.
1103    PTX-001, 38–41, 324; Trial Tr. 205:7–15.  The Defendants asserted there

Mississippi NAACP v. State Board of Election Commissioners

1104 was no race-neutral explanation for Cooper's redrawing of Illustrative SD 9
1105 in this way because altering either of the split precincts to make them whole
1106 would undermine the 50.95 percent BVAP of Illustrative SD 9 and preclude
1107 Cooper's racial objective. DX-003, 46; Doc [219], 36. However, the
1108 Defendants' overlay of Illustrative SD 9's borders on a racially shaded
1109 precinct map does not demonstrate such clear-cut cherry-picking between
1110 majority-black and majority-white precincts, as several majority-white
1111 precincts just outside Hattiesburg are also within Illustrative SD 9's borders.
1112 *See* DX-003, 046.

1113   Here, too, we find that Cooper has created a reasonably compact
1114 district that follows traditional redistricting principles. His purpose, as
1115 *Gingles* precondition one requires, was to identify whether a reasonably
1116 compact majority-minority district could be formed that respected traditional
1117 redistricting factors. We find that the City of Hattiesburg itself is less split in
1118 the illustrative district. Although Illustrative SD 9 does exclude what we
1119 accept are some majority-white areas, we find the design still leaves the
1120 district reasonably compact. We find this district satisfies *Gingles*
1121 precondition one.

Mississippi NAACP v. State Board of Election Commissioners

1122                    *d.    Illustrative Senate District 17*



1124        Illustrative SD 17 is an additional majority-minority district with a
1125    BVAP of 53.54 percent that Cooper asserts can be drawn in the Golden
1126    Triangle and Three Rivers areas.  PTX-001, 323–25.  SD 17 had an original
1127    BVAP of 29.48 percent in the Enacted Senate Plan.  *Id.*; JTX-049, 4.  To
1128    create Illustrative SD 17, Cooper took portions of the black populations from
1129    Enacted SD 6, 7, 8, and 16.  PTX-001, 249–50, 386; Trial Tr. 136:7–10.
1130    Cooper testified this better respected black communities along Highway 45
1131    that share socioeconomic and historical interests, followed whole precincts,
1132    and tracked natural boundaries.  Trial Tr. 136:7–21, 199:24–200:14, 223:25–
1133    224:3.

1134        Mamie Cunningham, a retired schoolteacher and lifelong resident of
1135    Chickasaw County, testified as to the common interests that Illustrative SD
1136    17 brings together.  Trial Tr. 233:2–234:2, 244:17–245:1.  Residents in the
1137    area share socioeconomic, civic, economic, educational, and other interests

Mississippi NAACP v. State Board of Election Commissioners

1138    across county lines, and the municipalities are connected by natural
1139    boundaries Highway 45 and Alternate Highway 45, which are frequently
1140    traveled by residents to access retail outlets and services.  Trial Tr. 245:2–
1141    246:13, 247:14–248:2.    Although she resides in Chickasaw County,
1142    Cunningham herself worked in neighboring Monroe and Clay Counties, all
1143    of which are within Illustrative SD 17.  Trial Tr. 244:13–245:13.  We credit
1144    her testimony in general, but we do not credit her reliance on the fact that a
1145    particular highway goes through the entire district to say a community of
1146    interest exists.

1147        According to the Defendants, however, Cooper "dismantles"
1148    Enacted SD 7 and SD 16 by reducing their BVAPs from 40.08 percent and
1149    63.06 percent to 17.83 percent and 53.54 percent, respectively, to draw
1150    Illustrative SD 17.  Doc [219], 27; PTX-001, 324; JTX-049, 3–4.  They assert
1151    Cooper crossed PDD boundaries, violating his own redistricting criteria, and
1152    used only public-school-district athletics in his consideration for Illustrative
1153    SD 17 because he did not think black children would be attending private
1154    schools.  Trial Tr. 197:1–6, 200:15–204:2.  We have already found that the
1155    PDDs are not useful in the analysis, and Cooper's deviation from them helps
1156    support our earlier finding.  On cross, Cooper explained the precinct splits
1157    he created protected incumbents and better preserved other precinct lines,
1158    resulting in fewer splits than the Enacted Plans.  Trial Tr. 196:25–198:3.

1159        The Defendants maintain that it is clear Illustrative SD 17 was created
1160    for no reason other than race.  They assert Cooper had to dissolve Enacted
1161    SD 7, which elected a minority-preferred white Democratic candidate in
1162    2023, and the dismantling of an existing minority-performing district is not
1163    required under Section 2.  Doc [219], 34–35.

1164        This illustrative district splits three major municipalities in the area,
1165    crossing multiple relevant boundaries.  It splits Tupelo and captures only
1166    black-majority precincts but excludes white-majority precincts.  DX-003, 42.

Mississippi NAACP v. State Board of Election Commissioners

1167 It further splits West Point and Amory by crossing PDD and geographic
1168 boundaries that split communities of interest. *See* PTX-001 at 338; Trial Tr.
1169 136, 197–198. These facts support that Cooper had a racial objective and that
1170 race predominated in his drawing of this district to achieve said objective.
1171 Although he gave his opinion that there was a community of interest because
1172 Illustrative SD 17 follows Highway 45 and the Tennessee-Tombigbee
1173 Waterway from north to south, we do not accept that following those two
1174 transportation corridors supports that the communities they encounter share
1175 interests. Rather, the evidence indicates Cooper combined parts of distinct
1176 communities in an attempt to force one community of interest to exist.

1177　　　　We find that Cooper's claimed considerations of communities of
1178 interest and lack of a racial objective are not credible. Illustrative SD 17 does
1179 not satisfy the first *Gingles* precondition.

1180　　　　　*e.　Illustrative Senate District 35*



1181

Mississippi NAACP v. State Board of Election Commissioners

1182       Illustrative SD 35 is an additional majority-minority district with a
1183  BVAP of 52.12 percent that Cooper asserts can be drawn in Copiah, Simpson,
1184  Lincoln, Lawrence, and Jefferson Davis Counties.  PTX-001, 324.  Enacted
1185  SD 35 had an original BVAP of 39.38 percent in the Enacted Senate Plan.  *Id.*;
1186  JTX-049, 4.   To achieve his illustrative district, Cooper splits Lincoln
1187  County, crossing the county boundary to cut out a portion of the City of
1188  Brookhaven and to incorporate the area between it and the City of Wesson,
1189  which has a "significant Black population."  Trial Tr. 206:15–18, 139:4–7.
1190  Cooper testified Illustrative SD 35 also keeps Copiah and Jefferson Davis
1191  Counties whole; splits only one precinct to keep the City of D'Lo whole;
1192  respects the geographical, transportation, and educational connections along
1193  Highway 51; and respects high-school-sports leagues in the counties.  Trial
1194  Tr. 139:1–14, 224:9–225:10; PTX-001, 341, 367.

1195       In redrawing Illustrative SD 35, Cooper split counties and
1196  municipalities to achieve his apparent racially predominant objective.  *See*
1197  Trial Tr. 206:24–207:22; DX-003, 44; PTX-001, 398.  By running a narrow
1198  extension south into a portion of Brookhaven, Cooper splits the city between
1199  two districts and includes only predominantly black precincts within
1200  Illustrative SD 35 to reach the desired BVAP.  *See* Trial Tr. 206:24–207:22;
1201  DX-003, 44; PTX-001, 398.  This extension into the black precincts of
1202  Brookhaven, not into the whole city, certainly falls into the category of a
1203  "tentacle" that shows the illustrative district does not have a reasonably
1204  compact majority-minority voting-age population.

1205       In defending Illustrative SD 35, Cooper testified that Highway 51 and
1206  Interstate Highway 55 run north from Brookhaven through Hazelhurst and
1207  to Crystal Springs as common boundaries and that a significant number of
1208  Mississippians commute to work via these highways.  *See* Trial Tr. 138-39,
1209  224–25; PTX-001, 398.  Nonetheless, the tentacle into Brookhaven excludes

Mississippi NAACP v. State Board of Election Commissioners

1210    Interstate 55 and hugs only the east side of Highway 51 to capture the higher
1211    BVAP population of the area.  *See* DX-003, 44; PTX-001, 398.

1212    Plaintiffs' witness Ashley Wilson, a lifelong resident of the City of
1213    Crystal Springs, testified there were significant community ties between
1214    Brookhaven and Copiah County.  *See* Trial Tr. 873–85.  Specifically, many
1215    people in Copiah County and Brookhaven share economic, shopping, work,
1216    hospital, and travel interests that are all connected along Highway 51 and
1217    Interstate 55.  *Id.*  These ties, however, are not enough to overcome the
1218    significant county and municipality splits in Illustrative SD 35, nor do they
1219    explain how one tentacle of Brookhaven that is majority black would have any
1220    more in common with Copiah County municipalities than other precincts.

1221    Illustrative SD 35 does not satisfy the first *Gingles* precondition.

1222        *f.    Illustrative House District 22*



1223

1224    Illustrative HD 22 is an additional majority-minority district with a
1225    BVAP of 55.41 percent that Cooper asserts can be drawn in Chickasaw and

Mississippi NAACP v. State Board of Election Commissioners

1226   Monroe Counties by splitting small areas from the Cities of Aberdeen and
1227   Houston. PTX-001, 716, 897. HD 22 had an initial BVAP of 29.86 percent
1228   in the Enacted House Plan. PTX-001, 716; JTX-051, 4. Cooper testified
1229   Illustrative HD 22 is more compact than the Enacted House Plan by
1230   containing only two counties and following Highway 45 rather than splitting
1231   predominantly black communities across three districts like in the Enacted
1232   House Plan. Trial Tr. 142:5–143:8; PTX-001, 61–64. He explained
1233   Illustrative HD 22 encompasses whole precincts and follows natural
1234   boundaries such as waterways and county borders. Trial Tr. 144:2–6. The
1235   Enacted House Plan instead "crack[s the b]lack population in the midsection
1236   of Chickasaw and Monroe Counties" three ways and connects them via a
1237   narrow land bridge. Trial Tr. 142:21–143:8.

1238       Mamie Cunningham again testified about the communities of interest
1239   for Illustrative HD 22, and like for Illustrative SD 17, residents in the
1240   Illustrative HD 22 area share socioeconomic, civic, economic, educational,
1241   and other similar interests across county lines, and the municipalities are
1242   connected by the frequently traveled natural boundaries Highway 45 and
1243   Alternate Highway 45. Trial Tr. 245:2–246:13, 247:14–248:2. We credit her
1244   testimony.

1245       The Defendants do not so much challenge the illustrative district as
1246   they explain why a different district was drawn. They rely on the state house
1247   committee chairman's summary statement explaining the plan and how there
1248   was population loss in the state. JTX-010, 6. The Defendants interpret the
1249   statement as indicating that there was a population loss in this specific
1250   district, but that is not what the chairman said. Regardless, all such a
1251   statement means is that a district that lost population must add population to
1252   comply with the required population-deviation standards, nothing more.

1253       The Defendants also assert that Enacted HD 22 was designed to
1254   protect an incumbent. That fact does not affect the legitimacy of the

Mississippi NAACP v. State Board of Election Commissioners

1255    illustrative district.   Further, the Defendants argue Illustrative HD 22 is
1256    drawn along racial lines such that majority-black population precincts are
1257    included and majority-white precincts are excluded solely to achieve a racial
1258    objective.  DX-003, 50.  We explained before that so long as race is not the
1259    predominant factor, the Supreme Court has approved the consideration of
1260    race to show that a reasonably compact majority-minority district could be
1261    drawn.  *Milligan*, 599 U.S. at 30–31.  We distinguish our earlier discussion of
1262    Illustrative SD 17, where we found that Cooper allowed race to predominate
1263    when he split the black populations from three different cities, and the
1264    Plaintiffs offered little credible evidence that the resulting illustrative district
1265    joined communities of interest.  There is no significant splitting of cities in
1266    Illustrative HD 22, and we find the evidence credible that the resulting
1267    district shares relevant interests.
1268            Illustrative HD 22 was not drawn with race as the predominant factor,
1269    and it satisfies traditional redistricting criteria.  We find this district satisfies
1270    the first *Gingles* precondition.

Mississippi NAACP v. State Board of Election Commissioners

1271                   g.   *Illustrative House District 56*



1273        Illustrative HD 56 is an additional majority-minority district with a
1274   BVAP of 58.99 percent that Cooper asserts can be drawn in Hinds and
1275   Madison Counties by splitting the City of Clinton.  PTX-001, 717; Trial Tr.
1276   143:724, 215 13–16.  Enacted HD 56 had an original BVAP of 22.97 percent
1277   in the Enacted House Plan.  PTX-001, 716; JTX-051, 6.  Cooper testified
1278   Illustrative HD 56 is "an extremely compact district" anchored in Clinton
1279   that does not stretch into Madison County like the Enacted House Plan and
1280   is only 15 miles long.  Trial Tr. 144:11–24, 217:2–4.  Illustrative HD 56 instead
1281   tracks the Interstate 20 border and contains whole precincts, while removing
1282   allegedly unnecessary county splits.  Trial Tr. 145:14–23.
1283        While this illustrative district is entirely contained in Hinds County
1284   and the Jackson municipal area, it does not appear Cooper gave the needed
1285   consideration as to whether there is an actual community of interest between
1286   Clinton and west Jackson.  *See* PTX-001, 821.  Cooper identified that because

1287 "[t]hey're right next door to one another," "it's an urban area [where] there
1288 could be all sorts of common side relating roads and highways," and "they're
1289 so close to one another," Illustrative HD 56 could contain a potential
1290 community of interest. Trial Tr. 216:8–18. He could not identify any of the
1291 "other factors that [he] considered in determining whether or not there's a
1292 community of interest." *See* Trial Tr. 216:21–217:4. Cooper only discussed
1293 Clinton's proximity to west Jackson and its "significant increase in the Black
1294 population." Trial Tr. 217:14–15; *see id.* This does not explain why the parts
1295 of Clinton included in Illustrative HD 56 have more in common with west
1296 Jackson than the rest of the city other than race.

1297        Sharon Moman, a real-estate broker in and lifelong resident of Clinton
1298 and Jackson, testified about the strong connections between the two areas
1299 that make Illustrative HD 56 a community of interest.  Trial Tr. 644:4–10,
1300 649:17–651:2.  Though Moman identified various connections, she did not
1301 testify that the specific portion of west Jackson that was included in the
1302 illustrative district shared such interests with Clinton.  Instead, most of her
1303 testimony centered on Jackson amenities that were not in the part of Jackson
1304 included in the illustrative district.  While Moman credibly answered the
1305 questions she was asked, her testimony does not establish a community of
1306 interest across Illustrative HD 56.

1307        In addition, the Defendants argue that political performance justified
1308 Enacted HD 56 and undermined the illustrative district.  We would describe
1309 the argument as being that the illustrative district did not follow traditional
1310 redistricting criteria because it did not take political performance into
1311 account.   Here, the criterion is better understood as being incumbent
1312 protection.   Though counsel's argument to the court mentioned the
1313 connection, no evidence was introduced that Speaker of the House Philip
1314 Gunn represented the enacted district.  Trial Tr. 214:17–24.  Nonetheless,
1315 we can take judicial notice that Speaker Gunn represented that district, but

Mississippi NAACP v. State Board of Election Commissioners

1316   we must also take notice that he did not run for re-election.  Nothing in the
1317   record, or that we can take judicial notice of, indicates whether it was already
1318   known by the Mississippi Legislature that he would not run again when the
1319   redistricting maps were adopted.  In light of that uncertainty, we give only
1320   slight weight to the argument that the illustrative district did not follow the
1321   traditional redistricting criteria of political performance.

1322          Considering all the evidence, we find that the Plaintiffs did not prove
1323   that Illustrative HD 56 was reasonably configured using traditional
1324   redistricting factors, particularly as to a community of interest.  Thus, we find
1325   Illustrative HD 56 does not satisfy the first *Gingles* precondition.

1326          *h.   Illustrative House District 84*



1328          Illustrative HD 84 is an additional majority-minority district with a
1329   BVAP of 53.05 percent that Cooper asserts can be drawn in Newton, Jasper,
1330   and Clark Counties by splitting the City of Quitman.  PTX-001, 717.  The
1331   Enacted House Plan left Quitman whole and had a BVAP of 37.28 percent.

Mississippi NAACP v. State Board of Election Commissioners

1332    *Id.*; JTX-051, 6. Cooper's Illustrative HD 84 is underpopulated by 2.76
1333    percent while Illustrative HD 81, located east of Illustrative HD 84, is
1334    overpopulated by 4.67 percent. *See* DX-003, 50. Cooper nonetheless
1335    testified that Illustrative HD 84 reduces the number of county splits from
1336    eight to two, keeps the City of Newton mostly whole, and avoids splitting
1337    Newton's only majority-black precinct, all while the Enacted House Plan
1338    splits multiple counties and multiple precincts. PTX-001, 857–62, 870, 881–
1339    91; *see* Trial Tr. 697:1–16.

1340        Deacon Kenneth Harris and Terry Rogers both testified as to the
1341    community of interest found within Illustrative HD 84. Deacon Harris is a
1342    lifelong Newton County resident who previously served as a Newton County
1343    Supervisor and was a member of the East Central Planning and Development
1344    Board that worked on the redistricting of the district. Trial Tr. 685:17–
1345    687:16. Rogers is a nineteen-year-old lifelong City of Quitman resident and
1346    current college student who ran for Mississippi Commissioner of Agriculture
1347    and Commerce. Trial Tr. 933:11–19, 936:17–937:18. Both Harris and Rogers
1348    credibly testified as to the common, rural, low-income nature of the
1349    communities combined in the illustrative district and how these communities
1350    share traditions, festivals, retail and church venues, and sports rivalries. Trial
1351    Tr. 691:3–693:21, 938:23–940:16. They also explained the employment and
1352    healthcare opportunities shared among Newton, Jasper, and Clark County
1353    residents. *Id.* According to Harris and Rogers, Illustrative HD 84 does a
1354    better job maintaining communities than the Enacted House Plan and
1355    "binds" the area "together instead of splitting it like it is now." *Id.*; Trial
1356    Tr. 693:20–21.

1357        However, this testimony does not provide enough to overcome the
1358    significance of splitting three counties and the City of Quitman.
1359    Neighboring-county residents attending major festivals in the area;
1360    preferring to attend church, shop, and work in Newton County; and being

Mississippi NAACP v. State Board of Election Commissioners

1361    served by Newton County's one hospital speaks to their geographic
1362    proximity but is not enough to support that this illustrative district comprises
1363    a distinct community of interest. *See* Trial Tr. 690:16–693:20; 938:20–
1364    942:24. That the one hospital does not appear to be within Illustrative HD
1365    84 and an identified community of interest — Quitman — is split undermines
1366    the assertion that this illustrative district contains a community of interest.
1367    *See* Trial Tr. 693:9–10; PTX-001, 694. Illustrative HD 84 is thus not
1368    reasonably drawn and does not satisfy *Gingles* one.

1369                        *   *   *

1370          Under the first *Gingles* precondition, the Plaintiffs were required to
1371    prove the geographical compactness and numerosity of Mississippi's
1372    minority population. *Robinson*, 86 F.4th at 589. The evidence presented
1373    must prove Mississippi's minority population in a potential election district
1374    is greater than 50 percent and is compact enough to create another black-
1375    majority district that the State did not draw, and the potential district must
1376    respect traditional districting criteria. *See Strickland*, 556 U.S. at 19–20;
1377    *Milligan*, 599 U.S. at 20.

1378          We find that three of the illustrative senate and house districts reflect
1379    minority groups that are sufficiently large and geographically compact
1380    enough to constitute a majority in a reasonably configured district. *Milligan*,
1381    599 U.S. at 18. These districts are Illustrative SD 2, SD 9, and HD 22.

1382          The remaining four illustrative districts — Illustrative SD 17, SD 35,
1383    HD 56, and HD 84 — do not satisfy this *Gingles* precondition.

1384       *2.*   Gingles *Preconditions Two and Three*

1385          The Supreme Court requires that the evidence allow a court to make
1386    findings as to all three preconditions as they specifically relate to an
1387    illustrative district. "Those three showings, [the Court] explained, are
1388    needed to establish that 'the minority [group] has the potential to elect a

Mississippi NAACP v. State Board of Election Commissioners

1389    representative of its own choice' in a possible district, but that racially
1390    polarized voting prevents it from doing so in the district as actually drawn
1391    because it is 'submerg[ed] in a larger white voting population.'" *Harris*, 581
1392    U.S. at 302 (second and third alteration in original) (quoting *Emison*, 507 U.S.
1393    at 40).   Thus, once an acceptable illustrative district for purposes of
1394    precondition one has been identified, the Plaintiffs must establish that the
1395    second and third preconditions are satisfied as to the enacted districts in the
1396    geographical area of the illustrative district.  In addition, evidence covering
1397    other geographical areas, if it can be shown those areas share relevant
1398    characteristics, could be shown to be relevant.

1399        The second *Gingles* precondition concerns the voting behavior of
1400    black voters.  *See Gingles*, 478 U.S. at 51, 56.  It asks whether a significant
1401    number of black voters "usually vote for the same candidates," *id.* at 56, such
1402    that they would elect their representative of choice in a majority-minority
1403    district,  s*ee Milligan*, 599 U.S. at 18–19.

1404        The third *Gingles* precondition focuses on the electoral outcomes
1405    resulting from racially polarized behavior.  *See Gingles*, 478 U.S. at 51, 56.
1406    Concentrating on racially polarized voting, "the plausibility that the
1407    challenged legislative districting thwarts minority voting on account of race"
1408    must be established.  *Robinson*, 86 F.4th at 595.  In other words, a plaintiff
1409    must provide proof that "whites vote sufficiently as a bloc usually to defeat
1410    the minority's preferred candidates."  *Gingles*, 478 U.S. at 56.  "Thus, the
1411    question whether a given district experiences legally significant racially
1412    polarized voting requires discrete inquiries into minority and white voting
1413    practices."  *Id.*

1414        The second and third *Gingles* preconditions are often analyzed
1415    together.  *Emison*, 507 U.S. at 40; *see Milligan*, 599 U.S. at 22.  Courts
1416    determine first if the black voters are politically cohesive.  *Milligan*, 599 U.S.

Mississippi NAACP v. State Board of Election Commissioners

1417   at 18–19.  Then, "[t]he question is not whether white bloc voting is present,
1418   but whether such bloc voting in a given district amounts to legally significant
1419   racially polarized voting."   *Robinson*, 86 F.4th at 595;  *see also LULAC v.*
1420   *Clements*, 999 F.2d at 850.   The Supreme Court recognizes a difference
1421   between legally significant and statistically significant racially polarized
1422   voting.  *See Gingles*, 478 U.S. at 53, 55.  Statistics may be used to determine
1423   the voting percentages and support for candidates in a given election, but
1424   what amounts to statistical importance may not rise to legal significance given
1425   the relevant facts.  *See id.* at 79 (clarifying the determination of "whether the
1426   political process is equally open to minority voters" is "peculiarly dependent
1427   upon the facts of each case" (quoting *Rogers v. Lodge*, 458 U.S. 613, 621)); *see*
1428   *also LULAC v. Clements*, 999 F.2d at 850–51.

1429          Thus, "[t]he proper question to ask is this: If the [S]tate's districting
1430   plan takes effect, will the voting behavior of the white majority cause the
1431   relevant minority group's preferred candidate usually to be defeated?"
1432   *Robinson*, 86 F.4th at 597 (quotation marks and citation omitted).  In other
1433   words, do cohesion among the minority group and bloc voting among the
1434   majority population both exist.  We now examine the evidence regarding the
1435   second and third preconditions as they relate to the enacted districts in the
1436   areas where we found the three illustrative districts satisfied precondition
1437   one.

1438          The Plaintiffs presented the expert testimony of Dr. Lisa Handley as
1439   their evidence of the second and third *Gingles* preconditions.  Dr. Handley
1440   received her PhD in political science.  She then started her own company
1441   where she provides redistricting expertise to various districts throughout the
1442   United States.   Trial Tr. 260:20–25.   She has aided state and local
1443   jurisdictions, the Department of Justice, and independent-redistricting and
1444   civil-rights organizations by providing racial bloc-voting analysis and
1445   expertise.  Trial Tr. 255:18–21, 261:1–7.  With over 35 years of quantitative-

Mississippi NAACP v. State Board of Election Commissioners

1446   voting-analysis experience, she has testified as an expert in numerous
1447   redistricting cases, including in Louisiana, Georgia, and Texas, where she
1448   conducted analyses of voting patterns by race and redistricting plans to
1449   determine whether the black population is politically cohesive and the voting
1450   is polarized. PTX-004, 2–3, 70; Trial Tr. 255:18–21, 257:23–260:16. At trial,
1451   we accepted Dr. Handley as an expert in racially polarized voting and the
1452   statistical analysis of minority vote dilution and redistricting.   Trial Tr.
1453   262:15–22.

1454       To challenge Dr. Handley's analyses, the Defendants presented
1455   expert testimony from Rice University professor Dr. John Alford. DX-001,
1456   2. Dr. Alford has been teaching political science at Rice for over 35 years and
1457   is well-versed in redistricting, elections, voting behavior, and statistical
1458   methods. *Id.*   Dr. Alford has served as an expert witness in numerous
1459   redistricting cases, including in Louisiana, Georgia, and Texas, where he
1460   presented statistical methodology and analyses related to racially polarized
1461   voting pursuant to the *Gingles* second and third preconditions.   Trial Tr.
1462   1410:22–1411:23; DX-001, 30–31.   At trial, we accepted Dr. Alford as an
1463   expert on assessing the second and third *Gingles* preconditions and Senate
1464   Factor 2. Trial Tr. 1413:12–19.

1465       Dr. Handley analyzed racial voting patterns in the county clusters
1466   where the seven illustrative districts were drawn to evaluate the extent of
1467   racially polarized voting.  She focused on areas where the Illustrative and
1468   Enacted Plans overlapped.  PTX-004, 6–8; Trial Tr. 262:24–263:7.  She
1469   classified the senate districts as Area One — North West and North Central;
1470   Area Two — Greater Golden Triangle; Area Three — South Central; and
1471   Area Four — South East.  The house districts were classified as Area Five
1472   — Western Jackson; Area Six — Golden Triangle; and Area Seven — East
1473   Central. PTX-004, 7–8 (Table One).  The two illustrative senate districts we
1474   concluded satisfy the first *Gingles* precondition, Illustrative SD 2 and SD 9,

Mississippi NAACP v. State Board of Election Commissioners

1475    are in Areas One and Four, and the valid illustrative house district,
1476    Illustrative HD 22, is in Area Two, with some overlap in Area Six. *See id.*

1477    Dr. Handley utilized homogeneous precinct analysis, ecological
1478    regression, and ecological inference, three well-accepted statistical methods
1479    employed in *Gingles* analyses. PTX-004, 3–5; Trial Tr. 270:6–12. These
1480    three methods calculate the percentage of black voters and white voters who
1481    voted for specific candidates in certain elections. Trial Tr. 273:25–274:7. Dr.
1482    Handley and Dr. Alford agreed that, of the three methods used, the ecological
1483    inference ("EI RxC") method is the most accurate and reliable for
1484    determining credible intervals of racial bloc voting. Trial Tr. 270:13–273:11,
1485    1425:2–9, 1426:8–12. We accept this characterization. Further, EI RxC was
1486    the principal method Dr. Handley employed when analyzing the recent
1487    statewide general elections, state legislative general elections, statewide
1488    Democratic primaries, and nonpartisan judicial contests in the seven areas of
1489    interest. PTX-004, 8–11; Trial Tr. 270:13–273:11.

1490    Dr. Handley primarily focused on contests that included both black
1491    and white candidates because courts have found these biracial elections to be
1492    more probative than contests with only white candidates for a *Gingles*
1493    polarized-voting analysis. Trial Tr. 274:22–275:6. For a comparison, she
1494    also analyzed several elections that did not include black candidates. *See*
1495    PTX-004, 9. Dr. Handley found that all seven areas she examined
1496    demonstrated consistently high levels of racially polarized voting, with black
1497    voters cohesively supporting their preferred candidates and white voters
1498    cohesively bloc-voting against black-preferred candidates. Though we must
1499    be alert to how the evidence and Dr. Handley's findings relate to the areas

Mississippi NAACP v. State Board of Election Commissioners

1500   encompassing the three illustrative districts that satisfy the first *Gingles*
1501   precondition, we need not disentangle all of Dr. Handley's analyses.[5]

1502        *a.   State Legislative Elections*

1503        Dr. Handley analyzed 19 biracial state legislative elections in each of
1504   the seven illustrative district areas under the 2012 enacted district
1505   boundaries. PTX-004, 9–10, 12. Dr. Handley classified these state legislative
1506   contests as endogenous elections, meaning the elections are for the same
1507   offices as the ones involved in the litigation. Trial Tr. 1447:2–16. She
1508   testified that endogenous elections are the most probative when analyzing the
1509   second and third preconditions. The Fifth Circuit once stated that when
1510   considering whether there is racial bloc voting under *Gingles*, "elections
1511   involving the particular office at issue will be more relevant than elections
1512   involving other offices." *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149
1513   (5th Cir. 1993). We agree that legislative elections are the most probative
1514   here, but we also acknowledge that evidence as to other elections is
1515   potentially relevant.

1516        The Defendants' expert Dr. Alford testified that the legislative
1517   elections Dr. Handley considered are better classified as semi-endogenous.
1518   Trial Tr. 1447:17–1448:13. His clarification was because the 19 elections
1519   concern the right office but not the right districts since Dr. Handley used the
1520   2012 district lines rather than the 2022 enacted district lines. Trial Tr.
1521   1448:11–13; PTX-004, 9. We do not resolve the definitional dispute but

--------

[5] We examine significant parts of Dr. Handley's evidence in what follows, but our findings as to the second and third preconditions rely on evidence relevant to the enacted districts that are in the geographical areas where the illustrative districts that we already found satisfied precondition one are located. As the Fifth Circuit stated, "plaintiffs must show that such bloc voting would be present in the *challenged* districting plan. And that conclusion must be true for voters in a particular location." *Robinson v. Ardoin*, 37 F.4th 208, 224 (5th Cir. 2022) (emphasis in original) (citations omitted).

61

Mississippi NAACP v. State Board of Election Commissioners

1522    simply accept that the 19 legislative elections selected by Dr. Handley are the
1523    most analogous ones.

1524        The 2022 district lines and the 2023 state legislative election returns
1525    for all county precincts became available as of November 2023, just a few
1526    months before trial, but neither Dr. Handley nor any other expert analyzed
1527    those returns.  Trial Tr. 1202:21–1203:4; Doc [219], 44.  Instead, under the
1528    previously enacted plans, Dr. Handley considered any election within a
1529    district if the district was either wholly contained in any of her seven areas or
1530    overlapped with either the illustrative or enacted districts.  Trial Tr. 1202:21–
1531    1203:4; Doc [219], 44.  She then performed an effectiveness analysis.  PTX-
1532    004, 58–60; Trial Tr. 322:19–22.  Whatever arguments could be made that
1533    later and better data existed, we find that at most they affect, slightly, the
1534    weight to be given to Dr. Handley's findings.

1535        Dr. Handley used these results to find that black citizens voted
1536    cohesively for their candidates while white voters cohesively opposed the
1537    black-preferred candidates in all state legislative elections.  PTX-004, 12.
1538    None of the following findings were limited to just the three geographical
1539    areas of the relevant illustrative districts, but there also is no suggestion of
1540    significant regional polarization variations in Mississippi.  Here, too, we find
1541    that the absence of evidence focused just on the three areas is a matter of the
1542    weight of the evidence.

1543        Dr. Handley found that on average, 83.3 percent of black voters
1544    supported black-preferred candidates compared to 18.3 percent of white
1545    voters.  *Id.*  Additionally, black candidates were successful in the state
1546    legislative elections only in majority-minority districts.  Trial Tr. 294:17–21.
1547    The black-preferred candidate is sometimes a white Democrat, ones like
1548    Senator Hob Bryan, Senator David Blount, and Representative Shandra
1549    Yates (first elected as a Democrat, then re-elected as an Independent).

Mississippi NAACP v. State Board of Election Commissioners

1550 Stipulations [199] App. A at 17–19.  The Defendants showed that in Enacted
1551 SD 2, which contains only a 33 percent BVAP, black Democrat (and Plaintiff)
1552 Pamela Hamner obtained 43 percent of the vote.  PTX-004, 16.  Enacted SD
1553 7 has a 40.08 percent BVAP and 43.9 percent effectiveness score from Dr.
1554 Handley, but white Democrat Hob Bryan obtained 54.89 percent of the vote.
1555 Trial Tr. 347:23–348:25.

1556   Dr. Handley's effectiveness analysis is not altered by these references.
1557 Under Senate Factor 2, "proof that some minority candidates have been
1558 elected does not foreclose a § 2 claim."  *Gingles*, 478 U.S. at 75.  "'[T]he
1559 election of a few minority candidates does not necessarily foreclose the
1560 possibility of dilution of the black vote.'"  *Clark v. Calhoun County*, 88 F.3d
1561 1393, 1397 (5th Cir. 1996) (citation omitted).  At most these examples show
1562 an occasional breakdown of racial polarization for reasons not explained in
1563 the record.  Quality of candidates and of opposition cannot always be
1564 irrelevant. One of the Plaintiffs' experts, Dr. Marvin King of the University
1565 of Mississippi, testified as to those considerations:

1566   Q. Dr. King, you also refer to candidate viability.  What do
1567   you mean by that?

1568   A. Sure.  So — so Black voters are strategic, right?  So, you
1569   know, there are instances when Blacks may not support the
1570   Black Democrat candidate if they are not viable.  And what we
1571   mean by that is they haven't raised money, they might be a
1572   perennial candidate that puts their name on the ballot election
1573   after election.

1574 Trial Tr. 774:22–775:4.

1575   Further, racial polarization in voting is not disproved by evidence that
1576 black voters supported a white candidate.  We are concerned with racial
1577 polarization of voters, *i.e.*, are white voters consistently preventing the

Mississippi NAACP v. State Board of Election Commissioners

1578    election of the candidates that black voters would choose?  It is the race of
1579    the voters, not of the candidates, that matter.

1580        Dr. Handley testified to the presence of racially polarized voting in all
1581    19 elections, but to the extent possible we focus on her testimony related to
1582    the areas of Illustrative SD 2, SD 9, and HD 22.  Of course, none of the
1583    elections occurred in the precise districts at issue.  Trial Tr. 284:8–18.  We
1584    find that, nonetheless, the relevant areas comprise Enacted SD 2, 10, 19, 34,
1585    42, and 45 and Enacted HD 36 and 39.  *See* PTX-004, 58–60 (App. B).

1586        Of these districts, Dr. Handley specifically testified as to Enacted HD
1587    36 and 39 and Enacted SD 42 and 45.  Trial Tr. 289–93.  Enacted HD 36 was
1588    a black-majority district in which the black-preferred candidate won 77.7
1589    percent of the votes and the white-preferred candidate received essentially
1590    no black support.  Trial Tr. 290; PTX-004, 59 (App. B).  Enacted HD 39 was
1591    not a black-majority district, and the white candidate received 75 percent of
1592    the vote to the black-preferred candidate's 25 percent.  Trial Tr. 293:2–9;
1593    PTX-004, 60 (App. B).  Dr. Handley concluded that, in Enacted SD 42, had
1594    there been more black voters in the district, the black-preferred candidate
1595    would have carried the election.  Trial Tr. 291:22–292:2.  Instead, the
1596    majority-white district gave 85.8 percent of the votes to the white-preferred
1597    candidate.  PTX-004, 59 (App. B).  In Enacted SD 45, the white-preferred
1598    candidate received 86.8 percent of the vote, while the black-preferred
1599    candidate received 13.2 percent.  PTX-004, 59 (App. B).  The white
1600    candidate received over 95 percent of the white vote, while the majority of
1601    black voters supported the black-preferred candidate.  Trial Tr. 292:3–19.
1602    From this, Dr. Handley concluded there was clear racial polarization in each
1603    applicable district.  Trial Tr. 289–93.

1604        Although Dr. Handley testified all 19 elections were racially polarized,
1605    the Defendants argue the black-preferred candidate won in eight of the 19

Mississippi NAACP v. State Board of Election Commissioners

1606   elections and seven elections were only able to be "best guess estimate[s]"
1607   of the racially polarized voting, indicating reliability issues in Dr. Handley's
1608   analysis. Doc [219], 45. In most of the state legislative contests (14 out of
1609   19), Dr. Handley found that cohesion among black voters was at least 75
1610   percent. Pls. FOF ¶¶ 162–163. The average level of black support for
1611   preferred candidates across the seven areas was 94.3 percent in biracial
1612   contests. Trial Tr. 283:6–10. The Defendants' expert did not dispute that
1613   black voters are cohesively supporting preferred candidates in those areas.

1614        In Dr. Alford's opinion, Dr. Handley's definition of cohesion is
1615   flawed. Dr. Handley defines cohesive voting as when "a substantial number
1616   of minority voters consistently vote for the same candidates," but she does
1617   not identify a specific numerical threshold to determine cohesion. Trial Tr.
1618   267:8–19. Dr. Handley testified that courts do not set a bright-line rule on
1619   cohesive voting and instead provide a range. Trial Tr. 267:14–19. Dr. Alford
1620   generally agreed with that but then criticized Dr. Handley's analysis that
1621   found "every preferred candidate gets cohesive support [b]ecause they
1622   couldn't be the preferred candidate" without cohesive support. Trial Tr.
1623   1455:1–10. Dr. Alford explained the candidates would not be considered
1624   preferred "unless they [had gotten] more votes than the other candidate" in
1625   the election. *Id.* In his opinion, no finding can be made that the second and
1626   third *Gingles* preconditions are met to any degree of scientific certainty
1627   because Dr. Handley's cohesion standard lacks any indication of the needed
1628   level of black support to meet that standard. *Id.*; DX-001, 11.

1629        We credit Dr. Handley's testimony that, even absent a precise
1630   definition for cohesiveness, black and white voters are voting for separate
1631   candidates at a sufficiently high percentage to satisfy the *Gingles*
1632   requirements for racial polarization. In majority-black districts, the evidence
1633   shows that white voters do not prevent the election of candidates that black
1634   voters prefer, but that fact supports and does not undermine that

Mississippi NAACP v. State Board of Election Commissioners

1635    preconditions two and three are satisfied.  We thus reject Dr. Alford's
1636    criticisms of Dr. Handley's methodology or her findings.

1637        *b.* *Statewide General Elections*

1638      Dr. Handley testified that legislative elections were the most
1639    probative, but she also found useful data from other elections.  She analyzed
1640    17 statewide general elections in each of the seven illustrative district areas.
1641    PTX-004, 8–9.  Eleven elections had a black Democrat running against a
1642    white Republican, and the remaining five had no black candidates.[6]  *Id.*  Dr.
1643    Handley concluded that voting was consistently and starkly racially polarized
1644    in all 17 elections.  PTX-004, 11–12.  An average of 94.3 percent of black
1645    voters cohesively supported their preferred candidate, while an average of 6.9
1646    percent of white voters voted for the black-preferred candidate in the 11
1647    biracial elections.  *Id.* at 11.  In the five elections with no black candidates, the
1648    average white support for black-preferred candidates increased to 9.1 percent
1649    for white candidates.  *Id.* at 11–12.  Specifically in these statewide general
1650    elections, Dr. Handley calculated what she qualified as "quite stark" voting
1651    behavior.  Trial Tr. 266:7.  We provide Dr. Handley's calculations, then
1652    address Dr. Alford's responses.

1653      First, the areas encompassing the three illustrative districts that
1654    satisfy *Gingles* precondition one.  For Illustrative SD 2 and 9, those are Areas
1655    One and Four.  In Area One, black-voter support for black-preferred
1656    candidates ranged from 96.6 percent to 73.9 percent, with an average of 92.29
1657    percent.  PTX-004, 37–39; Trial Tr. 281:22–282:11.  White-voter support for

---

[6] Dr. Handley analyzed the 2020 presidential race in which a white man, Joseph Biden, headed the Democratic ticket and a black woman, Kamala Harris, was his running mate.  PTX-004, 8.  Neither Dr. Handley nor the Plaintiffs presented further statistics or analysis on the 2020 Presidential election other than to state it "was also starkly polarized in all seven areas of interest."  PTX-004, 11 n.16.  Thus, we discuss only the 16 statewide elections where meaningful data was presented to the court.

Mississippi NAACP v. State Board of Election Commissioners

1658 the black-preferred candidate ranged from 20.5 percent to 6.3 percent, with
1659 an average of 9.67 percent. PTX-004, 37–39; Trial Tr. 282:12–20. In Area
1660 Four, black-voter support for the black-preferred candidate ranged from 96.2
1661 percent to 83.2 percent, with an average of 93.73 percent. PTX-004, 46–48;
1662 *see generally* Trial Tr. 281:22–283:5. White-voter support for the black-
1663 preferred candidate ranged from 13.1 percent to 2.8 percent, with an average
1664 of 5.02. *Id.*

1665       For Illustrative HD 22, we consider Dr. Handley's Areas Two and
1666 Six. In Area Two, black-voter support for the black-preferred candidate
1667 ranged from 97.4 percent to 85.3 percent, with an average of 95.23 percent.
1668 PTX-004, 40–42; *see generally* Trial Tr. 281:22–283:5. White-voter support
1669 for the black-preferred candidate ranged from 14.7 percent to 2.9 percent,
1670 with an average of 5.84 percent. *Id.* In Area Six, black-voter support for the
1671 black-preferred candidate ranged from 96.9 percent to 85.2 percent, with an
1672 average of 94.98 percent. PTX-004 at 52–54; *see generally* Trial Tr. 281:22–
1673 283:5. White-voter support for the black-preferred candidate ranged from
1674 14.8 percent to 3.1 percent, with an average of 5.35 percent. *Id.*

1675       Now, the statistics for the remaining three areas. In Area Three, black
1676 voter support for the black-preferred candidate ranged from 98.4 percent to
1677 89.3 percent, with an average of 96.61 percent. PTX-004, 43–45; *see generally*
1678 Trial Tr. 281:22–283:5. White-voter support for the black-preferred
1679 candidate ranged from 17.5 percent to 4.2 percent, with an average of 7.49
1680 percent. *Id.* In Area Five, black-voter support for the black-preferred
1681 candidate ranged from 98.3 percent to 89.0 percent, with an average of 96.31
1682 percent. PTX-004, 49–51; *see generally* Trial Tr. 281:22–283:5. White-voter
1683 support for the black-preferred candidate ranged from 32 percent to 5.3
1684 percent, with an average of 15.68 percent. *Id.* In Area Seven, black-voter
1685 support for the black-preferred candidate ranged from 96.6 percent to 82.9
1686 percent, with an average 94.26 percent. PTX-004, 55–57; *see generally* Trial

Mississippi NAACP v. State Board of Election Commissioners

1687   Tr. 281:22–283:5.   White-voter support for the black-preferred candidate
1688   ranged from 11.2 percent to 2.2 percent, with an average of 3.86 percent.   *Id.*

1689        Dr. Handley explained only the elections results in Area One at trial.
1690   *See* Trial Tr. 276–283.   She discussed her determinations with respect to two
1691   of the elections in this area of interest, finding clear black-voter cohesion and
1692   racial polarization.   *See* Trial Tr. 278–281.   Using her specific results from
1693   Area One and the above voter-support ranges for the remaining six areas, Dr.
1694   Handley opined that the 17 statewide general elections portrayed black voters
1695   as being "very cohesive" and that "[y]ou couldn't get much more cohesive
1696   than this."   Trial Tr. 279:21–22; *see generally* Trial Tr. 276–283.   She further
1697   articulated that "[v]oting is quite polarized in th[e] seven areas" of interest.
1698   Trial Tr. 283:18.

1699        Dr. Alford used Dr. Handley's data to formulate his own opinions
1700   about the 17 statewide elections.   He insisted that the data does not
1701   demonstrate racially polarized voting but, instead, voting that is polarized
1702   around party.   Trial Tr. 1443:1–:13.   Dr. Alford explained that the data
1703   showed a gap in voter preference in these statewide general elections among
1704   black and white voters in a contest between two white candidates with a mean
1705   difference of 86.5 percent based solely on party.   DX-001, 10.   In an election
1706   between a white Republican and a black Democrat, however, the mean
1707   difference in voting support among black and white voters was 87.6 percent.
1708   *Id.*   Removing the racial cue, the mean difference between the white
1709   Republican and black Democrat is 86.3 percent.   *Id.*   Democratic candidates
1710   had a 90 percent range of cohesive support by black voters, and Republican
1711   candidates had an 80–90 percent range of cohesive support by white voters.
1712   *Id.* at 7–8.   In Dr. Alford's opinion, whether a candidate is a Democrat or a
1713   Republican makes an almost 90 percent difference to black and white voters
1714   in these elections, but whether a candidate is black or white barely registers.
1715   *Id.* at 10.

Mississippi NAACP v. State Board of Election Commissioners

1716       Dr. Alford asserted this indeed shows partisan polarized voting
1717  because "when we vary the race of candidates, it simply doesn't [] make a
1718  difference." Trial Tr. 1442:10–11. Dr. Alford conceded, however, that it is
1719  "not empirically untrue of" Dr. Handley's data that "Black voters
1720  overwhelmingly prefer Black candidates[, and] White voters overwhelmingly
1721  prefer White candidates." Trial Tr. 1443:1–6. He clarified this "is not
1722  actually something the [data] could disconfirm" and opined the better
1723  conclusion is that partisanship is what is polarizing the voters because "the
1724  data [in its entirety] doesn't support" race as the polarizing factor. Trial Tr.
1725  1443:5–12.

1726       We find Dr. Alford's concession — that race versus party as the
1727  motivating factor is quite difficult to distinguish from the data — may be true
1728  but does not prevent us from making findings here. We see in the 16
1729  statewide contests almost always a range of no less than 95 percent support
1730  by black voters for the Democratic candidate, and, in those same elections,
1731  less than 10 percent support from white voters. There are aberrant elections,
1732  as both experts testified. The most significant is when the last of the
1733  Democratic statewide officials, Attorney General Jim Hood, ran for
1734  Governor in 2019. He received almost 18 percent of the white vote and 96
1735  percent of the black vote. We contrast that with the evidence in Dr.
1736  Handley's report that when black Hattiesburg mayor Johnny DuPree was the
1737  Democratic nominee for Governor in 2011, his white crossovers were only
1738  8.4 percent, less than half of what Attorney General Hood received. Race
1739  matters.

1740       We do not find that, if an occasional candidate supported
1741  overwhelmingly by black voters can break the color barrier just a bit among
1742  white voters, this proves anything other than that there will be outliers in
1743  statistical analysis.

Mississippi NAACP v. State Board of Election Commissioners

1744         Similarly, at times the black Democratic candidate did not have a
1745    significant campaign.  One of these was the 2015 Governor's race, where the
1746    black Democratic nominee Robert Gray received only 84 percent of the black
1747    vote.  No evidence was introduced about him, but we accept that election as
1748    an example of a Democratic candidate who may not have appeared credible
1749    to many black voters.  We find that this data demonstrates racial bloc voting
1750    exists in the areas of the three illustrative districts that satisfied the first
1751    precondition.

1752              c.    *Statewide Democratic Primaries and Judicial-District Elections*

1753         Dr. Handley next analyzed eight statewide biracial Democratic
1754    primary elections.  PTX-004, 10–11.  She found reliable statistical estimates
1755    impossible to generate solely in the seven areas and thus reported statewide
1756    estimates.    Trial Tr. 296:21–297:4.    Dr. Handley focused solely on
1757    Democratic primaries because black voters generally prefer Democrats over
1758    Republicans, meaning there would be no black-preferred candidates in the
1759    Republican primaries.    Moreover, so few black voters participate in
1760    Republican primaries such that reliable voting behavior estimates cannot be
1761    produced.  Trial Tr. 296:9–18.  Just these preliminary observations reveal
1762    that these elections are not useful.  Accordingly, we do not discuss the
1763    evidence with the exception of the following.

1764         Dr. Handley examined three recent Mississippi non-partisan elections
1765    for the state supreme court in which there was at least one black and one
1766    white candidate.  She found sharp racial polarization in the two contests in
1767    which the black candidate won in a district with a voting-age population fairly
1768    evenly divided between black citizens and white citizens.  She found no racial
1769    polarization in the third election, won by the white candidate in a district with
1770    a substantial white-majority electorate.  PTX-004, 13.  The two polarized
1771    elections had over 90 percent black-voter support for black candidates and

Mississippi NAACP v. State Board of Election Commissioners

white-voter support for white candidates. *Id.* Dr. Handley conducted this analysis solely "to rebut the contention that it could be party not race" causing these results, and she concluded polarization was present "regardless of the fact that party was not on the ballot." Trial Tr. 300:7–8, 21–22.

Dr. Alford's rebuttal was to acknowledge that while Mississippi judicial elections are nominally nonpartisan, it is a widely acknowledged fact that the candidates and their campaigns are anything but nonpartisan. DX-001, 15. Partisan advertisements, appeals, candidate endorsements, and donations are common in Mississippi, even resulting in court battles over party alignment for candidates. *See generally James v. Westbrooks*, 275 So. 3d 62 (Miss. 2019). We agree with the Plaintiffs that not all voters would be aware of the partisan alliances behind individual supreme court candidates. Nonetheless, a high-enough percentage of voters know which party supports which judicial candidate for us to reject Dr. Handley's factual claims as to these elections.

*   *   *

We find racial polarization among voters in Mississippi is quite high. Trial Tr. 267:4–6. Black-preferred candidates are consistently unable to win elections unless running in a majority-minority district. Trial Tr. 268:1–9. White voters are also cohesive in voting for candidates that usually defeat the black-preferred candidates. Though there is no standard set by courts on the level of cohesion needed to support the analysis under *Gingles*, we find that Dr. Handley is correct that the level of cohesion here is sufficient, particularly for the areas encompassing the three valid illustrative districts.

Having met their burden under the second and third *Gingles* preconditions, the Plaintiffs have no duty "to disprove that factors other than race affected voting patterns" in the areas of interest. *Teague v. Attala*

Mississippi NAACP v. State Board of Election Commissioners

1800    *County*, 92 F.3d 283, 290 (5th Cir. 1996).  The Defendants, however, could
1801    "rebut the plaintiffs' evidence by showing that no such [racial] bias exists in
1802    the relevant voting community."  *Id.*

1803        We have already mentioned that the Defendants attempt to rebut by
1804    saying this is all partisanship, not race.  Whether that argument should be
1805    addressed here or under the totality-of-the-circumstances analysis is unclear.
1806    The Defendants at least acknowledged that it could fall under Senate Factor
1807    2, *see* Doc [218], 15, but precedent sometimes blurs that line.[7]

1808        Just where the discussion best fits will not matter in this case, as
1809    ultimately the evidence does not support that racial polarization has become
1810    partisan divisions.  For detailed reasons we set out in our analysis of Senate
1811    Factor 2, we find that, although there certainly was evidence and argument
1812    presented on that possibility, the Defendants have not rebutted the Plaintiffs'
1813    showing under *Gingles* preconditions two and three.

1814        The Plaintiffs have thus satisfied the three *Gingles* preconditions for
1815    Illustrative SD 2, SD 9, and HD 22.

1816        3.    *Totality of the Circumstances*

1817        Having found that the Plaintiffs satisfied all three preconditions for a
1818    vote-dilution claim, we must now engage in a "searching practical evaluation
1819    of the past and present reality" of the political process in Mississippi.
1820    *Gingles*, 478 U.S. at 79 (quotation marks and citation omitted).    That

---

[7] For example, the *en banc* court in *LULAC v. Clements* held that the evidence failed to show race, not partisanship, best explained voting in Dallas County.  999 F.2d at 877.  As such, there was no "threshold showing required by *Gingles*."  *Id.*  That implicates the preconditions.  That same opinion, however, also noted when discussing partisanship that the question is "whether the political processes are equally open," which rests "upon a searching practical evaluation of the past and present reality."  *Id.* at 860 (quotation marks and citations omitted).  That is a totality inquiry.  *See Milligan*, 599 U.S. at 19.

Mississippi NAACP v. State Board of Election Commissioners

1821 evaluation considers the totality of the circumstances, described as "an
1822 intensely local appraisal of the design and impact of the contested electoral
1823 mechanisms." *Id.* (quotation marks and citation omitted).

1824     In 1986, the Supreme Court adopted "typical factors" to be
1825 considered in this portion of the Section 2 vote-dilution analysis. *Id.* at 36 &
1826 n.4. The United States Senate referred to these same factors in its report on
1827 the 1982 amendments to the Voting Rights Act. *See* S. REP. NO. 97-417, at
1828 23, 28–29. Most courts refer to them as the Senate Factors, and so will we.

1829     The following is the usual enumeration:

1830     1. the extent of any history of official discrimination in the
1831        state or political subdivision that touched the right of the
1832        members of the minority group to register, to vote, or
1833        otherwise to participate in the democratic process;
1834     2. the extent to which voting in the elections of the state or
1835        political subdivision is racially polarized;
1836     3. the extent to which the state or political subdivision has
1837        used unusually large election districts, majority vote
1838        requirements, anti-single shot provisions, or other voting
1839        practices or procedures that may enhance the opportunity
1840        for discrimination against the minority group;
1841     4. if there is a candidate slating process, whether the members
1842        of the minority group have been denied access to that
1843        process;
1844     5. the extent to which members of the minority group in the
1845        state or political subdivision bear the effects of
1846        discrimination in such areas as education, employment, and
1847        health, which hinder their ability to participate effectively
1848        in the political process;
1849     6. whether political campaigns have been characterized by
1850        overt or subtle racial appeals; [and]
1851     7. the extent to which members of the minority group have
1852        been elected to public office in the jurisdiction. . . .

Mississippi NAACP v. State Board of Election Commissioners

8.  whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; [and]

9.  whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Teague*, 92 F.3d at 292–93 (alterations in original) (quoting *Gingles*, 478 U.S. at 36–37).

      *Gingles* invited consideration of other factors: "While the enumerated factors will often be pertinent to certain types of [Section] 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." *Gingles*, 478 U.S. at 45 (footnote omitted). Rarely do courts consider others, though. We do not consider Factor 4, as no evidence was offered relevant to the slating of candidates.

      Importantly, the totality-of-the-circumstances inquiry recognizes that a court's application of these factors "is peculiarly dependent upon the facts of each case." *Id.* at 79. Defendants may attempt "to rebut plaintiffs' claim[s] of vote dilution via evidence of objective, nonracial factors" like partisan politics; as we stated before, it is not the Plaintiffs' burden to negate "all nonracial reasons possibly explaining" voting patterns. *Teague,* 92 F.3d at 292, 295 (quotation marks and citation omitted).

      Indeed, "[i]t will be only the very unusual case in which" the *Gingles* preconditions are established and liability does not follow, and, in such a case, the court "must explain with particularity why it has concluded" there is no Section 2 violation. *Id.* at 293 (quoting *Clark v. Calhoun County*, 21 F.3d 92, 97 (5th Cir. 1994)).

      We now review the factors.

Mississippi NAACP v. State Board of Election Commissioners

1880            *a.    Senate Factors 1 and 3*

1881            The first factor in examining the totality of the circumstances is "the
1882    extent of any history of official discrimination in the state" that diluted or
1883    denied "the right of the members of the minority group to register, to vote,
1884    or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at
1885    36–37.  The third is "the extent to which the state . . . has used . . . voting
1886    practices or procedures that may enhance the opportunity for discrimination
1887    against the minority group." *Id.* at 37.  We consider the two factors together
1888    because both look at the history of discrimination.  The evidence as to each
1889    is at times the evidence as to both.

1890            How much history to consider is one question.  To answer it, we
1891    distinguish between judicial precedents that examined history relevant to an
1892    Equal Protection analysis, which requires showing discriminatory or
1893    invidious intent, and those that examined history relevant to Section 2 of the
1894    Voting Rights Act.

1895            The Defendants argue that distant history of discrimination in
1896    Mississippi is all but irrelevant.  Among their authorities is *Shelby County*, 570
1897    U.S. 529.  There, the Supreme Court concluded the factual circumstances in
1898    1965 that allowed Congress to impose preclearance obligations on changes to
1899    election and voting rules in those states with a history of racial discrimination
1900    were constitutionally insufficient to support the continued application of the
1901    preclearance obligations.  *Id.* at 556–57.  As the Court phrased it, the
1902    "extraordinary measure[]" of requiring certain "States to obtain federal
1903    permission before enacting any law related to voting" was "a drastic
1904    departure from basic principles of federalism." *Id.* at 534–35.  Making that
1905    requirement applicable only to some states was "an equally dramatic
1906    departure from the principle that all States enjoy equal sovereignty." *Id.* at
1907    535.  The Court held that current conditions must justify so wrenching a

Mississippi NAACP v. State Board of Election Commissioners

1908   change to constitutional norms as to require states to preclear their laws. *Id.*
1909   at 536.

1910          Obviously, *Shelby County* was not a Section 2 case and did not concern
1911   Senate Factor 1.  Moreover, we are involved in a less revolutionary task than
1912   distorting the constitutional norms of equal sovereignty.  We are considering
1913   a range of circumstances, including history, that the Supreme Court has
1914   identified to help us evaluate a State's recent redistricting decision.  The
1915   *Shelby County* decision thus does not provide us with relevant guidance.

1916          Further, the Defendants rely on a recent Fifth Circuit opinion which
1917   held that the circumstances surrounding the adoption of Mississippi's 1890
1918   Constitution did not invalidate voting qualifications as currently applied in
1919   the state. *Harness v. Watson*, 47 F.4th 296, 306–307, 311 (5th Cir. 2022) (en
1920   banc), *cert. denied*, 143 S. Ct. 2426 (2023).  That was an Equal Protection
1921   claim for which the Fifth Circuit had to decide whether the invidious intent
1922   behind the initial measure was relevant after later amendments. *Id.* at 299,
1923   303.  There was no analysis of Senate Factor 1. *See generally id.*

1924          The Defendants urge us to interpret a 2001 Fifth Circuit opinion
1925   applying the Voting Rights Act as closing the door to any review of older
1926   history.  Doc [219], 60 ¶ 206.  The opinion concerned Mississippi's being
1927   divided into three districts for election of state supreme court justices and
1928   members of two state commissions. *NAACP v. Fordice*, 252 F.3d 361, 364
1929   (5th Cir. 2001).   The court remarked that "the abysmal reality of
1930   Mississippi's history of official discrimination regarding the right of African–
1931   Americans to register and to vote is evident in the record," and "that
1932   African–Americans in Mississippi are less educated, suffer from higher
1933   unemployment, earn lower incomes, and live in disparate conditions as
1934   compared to Mississippi's white citizens." *Id.* at 367.  The court then stated
1935   that unless plaintiffs show "these facts 'actually hamper the ability of

Mississippi NAACP v. State Board of Election Commissioners

1936    minorities to participate,'" the evidence does not "support a finding that
1937    minorities suffer from unequal access to Mississippi's political process." *Id.*
1938    (quoting *LULAC v. Clements*, 999 F.2d at 866).   We consider the Fifth
1939    Circuit's holding to focus on what is not enough by itself, not to limit what
1940    we are to consider as to the totality.

1941        We find no bar in *Shelby County*, *Fordice*, or *Harness* as to when older
1942    history becomes too attenuated or diluted by later events to be relevant in a
1943    Voting Rights Act claim.   There is, however, a clear statement in a Fifth
1944    Circuit Voting Rights Act opinion: "[T]he most relevant historical evidence
1945    is relatively recent history, not long-past history," but "even long-ago acts of
1946    official discrimination give context to the [*Gingles*] analysis."   *Veasey v.*
1947    *Abbott*, 830 F.3d 216, 232, 257 (5th Cir. 2016) (quotation marks and citation
1948    omitted).   At least for context, then, early history of discrimination has
1949    relevance.

1950        For all that, there is no reason to summarize the evidence concerning
1951    the earlier history and determine its precise relevance. The Defendants have
1952    accepted the accuracy of the statement in one precedent "[t]hat Mississippi
1953    has a long and dubious history of discriminating against blacks is
1954    indisputable."   *Teague*, 92 F.3d at 293–94.   We find, based on the evidence
1955    introduced in this case, that the long and dubious history, with significant
1956    acts of violence still occurring, lasted at least through the 1960s.   We examine
1957    what has occurred since then.

1958        Though we just disclaimed full consideration of early history, we will
1959    start with the Plaintiffs' arguments concerning how certain provisions in the
1960    1890 Mississippi Constitution continue to have discriminatory effects.   Two
1961    of the Plaintiffs' expert witnesses, the previously mentioned Dr. Marvin King
1962    and Jackson State University Professor Robert Luckett, elaborated on the
1963    effects of the 1890 constitution.   The constitution contained both a poll tax

Mississippi NAACP v. State Board of Election Commissioners

and literacy test, allowed for the creation of all-white primaries and segregated education, and created a means to disenfranchise black Mississippians, though it also could have operated to prevent poor and poorly educated whites from voting.   Trial Tr. 375:4–377:22, 379:2–17, 421:10–422:16.   Of these provisions, the only identified provisions still in effect in Mississippi are a lifetime disenfranchisement of those convicted of certain crimes and a residency requirement.  Trial Tr. 451:13–452:2, 454:15–456:16. There was evidence that only the disenfranchisement provision continues to disproportionately disenfranchise black citizens.   The Fifth Circuit concluded that this current, somewhat-amended list of disenfranchising crimes has been shorn of its original discriminatory *purpose.   Harness*, 47 F.4th at 306–307, 311.

Under Section 2 of the Voting Rights Act, though, we are concerned with whether there are discriminatory *effects*.  Plaintiffs' expert Dr. Byron D'Andra Orey testified that "formerly incarcerated individuals are less likely to participate in politics" in Mississippi and that "African-Americans are disproportionately incarcerated."  Trial Tr. 519:22–25.  Dr. Orey opined that Mississippi's disenfranchising laws cause a huge racial disparity in whether black Mississippians are able to participate in voting.   *Id.*; *see* Trial Tr. 569:19–571:13.  Dr. Orey further identified that Mississippi's severe lifetime-disenfranchisement law and black Mississippians' overrepresentation in the criminal-justice system lead to black Mississippians being 12 percent less likely to vote while white Mississippians are one percent less likely to do so. PTX-008, 19–20; *see* Trial Tr. 569:19–571:13.  Dr. Luckett, another Plaintiffs' expert, presented further evidence that black Mississippians are incarcerated at disproportionately higher rates than whites.   Trial Tr. 416:6–13.  We are not concerned here with policy justifications, only whether the disenfranchisement provision is disproportionate in its effects.   We accept

Mississippi NAACP v. State Board of Election Commissioners

1992    the testimony as credible that it does leave a higher percentage of black than
1993    white Mississippians ineligible to vote.

1994          The two Plaintiffs' experts also found racial discrimination in the
1995    State's rules for nominating candidates.  Dr. King found that in 1972, the
1996    legislature first adopted the requirement that party primaries include a runoff
1997    if no candidate receives a majority, and that the adoption was "an effort to
1998    minimize nascent Black voting strength."  PTX-013, 16–17.  That is factually
1999    incorrect.  The statute Dr. King cites as creating the requirement of runoff
2000    primaries was the recodification of a prior statute into a new Mississippi Code
2001    adopted in 1972.  *See* MISS. CODE ANN. § 23–3–69 (1972) (recodifying MISS.
2002    CODE § 3194 (1942)).  A still earlier statute was the first to mandate runoff
2003    primaries.  *See* MISS. CODE § 3701 (1906).

2004          The Plaintiffs do not argue that party primaries are discriminatory.
2005    Their arguments solely apply to the runoff requirement.  Because the only
2006    testimony to support a discriminatory purpose to runoff primaries was
2007    inaccurate, we find no racial motive behind adoption of the requirement.

2008          Regardless of motive, though, runoff primaries qualify as potential
2009    evidence relevant to Senate Factor 3 as a majority-vote requirement that
2010    could provide an opportunity for discrimination.  Any discriminatory effect
2011    of the runoffs applies only to party nominations, not to general elections.  In
2012    fact, the report by Plaintiffs' expert Dr. Lisa Handley stated that "candidates
2013    supported by black voters usually managed to win the Democratic
2014    nomination."  PTX-004, 13.  Her trial testimony was arguably even stronger:
2015    "[E]ven if voting is [racially] polarized in the Democratic primary, it's
2016    relatively easy, because so few whites participate in the Democratic primary
2017    for the candidate of choice of Black voters to succeed in the Democratic
2018    primary."  Trial Tr. 296:4-8.  We find that the Plaintiffs did not present

Mississippi NAACP v. State Board of Election Commissioners

2019    evidence to support that runoff primaries enhance the opportunities to
2020    discriminate against black voters in Mississippi.

2021            The Plaintiffs also criticize a 2023 statute governing the removal of
2022    names, or purging, from the voting rolls.  *See* H.B. 1310, 2023 Leg., Reg.
2023    Sess., 2023 Miss. Laws, ch. 534 (codified as MISS. CODE ANN. § 23-15-153).
2024    It provides that, along with other reasons, names of registered voters may be
2025    removed from the voter rolls if they have "failed to comply with the
2026    provisions of Section 23-15-152."  MISS. CODE ANN. § 23-15-153(1).  Both
2027    the referenced Section 23-15-152 and a federal statute allow removal of
2028    voters' names when they have not voted for two consecutive federal
2029    elections.  *Compare* MISS. CODE ANN. § 23-15-152(4), *with* 52 U.S.C.
2030    § 20507(d)(1)(B)(ii).   Federal law also requires that state policies be
2031    nondiscriminatory and not result in the removal of a registered voter who has
2032    voted or appeared to vote in one of the past two general federal elections.  52
2033    U.S.C. § 20507(b)(1)–(2).  We have not been shown how the Mississippi
2034    statutes on removing names of those who have not voted violate any federal
2035    law.

2036            Another of the Plaintiffs' claims concerns Mississippi's absentee-
2037    voting rules.  Mississippi restricts absentee voting to voters with one of eight
2038    acceptable excuses.  MISS. CODE ANN. § 23–15–713(a)–(h).  Requesting an
2039    absentee ballot by mail may also require notarization.  *See* § 23–15–627.  The
2040    Plaintiffs do not claim, and we do not hold, that the State is violating the legal
2041    rights of voters in having more restrictive absentee-voting practices and not
2042    allowing early voting.  Those are policy decisions on the proper procedures
2043    for conducting elections.  A more traditional state might not embrace all the
2044    current options for voting other than in person on election day.  The factual
2045    issue under Senate Factor 3, however, is whether identified voting
2046    procedures tend to enhance the opportunity for discrimination against the
2047    minority group.  Dr. Luckett testified that Mississippi's restrictions on

Mississippi NAACP v. State Board of Election Commissioners

2048   absentee voting disproportionately impact black voters who rely on absentee
2049   voting in greater proportions than white voters due to financial hardships,
2050   work requirements, and health disparities.   Trial Tr. 403:18–408:9.   We
2051   credit that testimony.   The main factor allegedly driving the disproportionate
2052   impact is the nature of black poverty.   *See* Trial Tr. 404:19–406:20.

2053          The Plaintiffs also claim a recent statutorily implemented voting
2054   practice disproportionately affects black voters.   In 2023, the legislature
2055   enacted House Bill 1020, which expanded the already existing Capitol
2056   Complex Improvement District of Jackson ("CCID").   *See* H.B. 1020, 138th
2057   Leg., Reg. Sess., 2023 Miss. Laws, ch. 546.   Dr. Luckett asserted the
2058   expansion of the police force and court system in the CCID now
2059   encompassed "what constitutes 100 percent of the measurable white
2060   population in the city of Jackson."   Trial Tr. 411:4–6.   Dr. Luckett claimed
2061   this enactment was "part of a long history and a continuum of attempts to
2062   diminish and disfranchise African-Americans in the state of Mississippi from
2063   1868 to the present."   Trial Tr. 413:2–4.

2064          Dr. Luckett's testimony was based on a provision of the enactment
2065   that created four temporary judgeships to be appointed by the State's chief
2066   justice.   *See* H.B. 1020, *supra*, at sec. 1.   Because black residents compose 83
2067   percent of the Jackson population, Dr. Luckett asserted those unelected
2068   judges would disproportionately impact black voters.   *See* Trial Tr. 412.

2069          Events have overtaken the issue.   In September 2023, the Mississippi
2070   Supreme Court held that creating four temporary appointed judgeships with
2071   terms just short of four years violated the state constitution.   *Saunders v.*
2072   *State*, 371 So. 3d 604, 608 (Miss. 2023).   On the other hand, the court
2073   recognized the chief justice's long-existing and frequently utilized statutory
2074   authority to appoint special judges to assist a "judicial district in Mississippi
2075   facing *exigent circumstances*."   *Id.* (emphasis in original); *see also* MISS. CODE

Mississippi NAACP v. State Board of Election Commissioners

2076    ANN. § 9–1–105(2).  Such judgeships would end when the exigencies ended.
2077    *See Saunders*, 371 So. 3d at 608.  We thus find that the allegedly
2078    disenfranchising aspects of H.B. 1020 are gone.  Moreover, the state court's
2079    analysis revealed that the same power to appoint temporary judges had
2080    already been granted to the chief justice.  The part of H.B. 1020 that was
2081    invalidated was essentially a duplication of existing authority, though the
2082    prior statute did not mandate its immediate use in a specific locale as did H.B.
2083    1020.  The differences between the chief justice's authority under the two
2084    statutes is an insufficient basis to find a dilution of black voting rights.

2085        The Defendants urge that under Senate Factor 1 we consider the
2086    history of legislative redistricting.  The Defendants suggest we start with
2087    redistricting after the 2000 census.  We instead will begin one decade earlier,
2088    when a three-judge district court rejected the Mississippi Legislature's plan
2089    adopted after the 1990 census and which had been used in the 1991 election;
2090    the court ordered a new election in 1992 under a court-ordered plan.  *Watkins
2091    v. Mabus*, 771 F. Supp. 789, 797–98, 807 (S.D. Miss. 1991), *aff'd in part,
2092    vacated in part*, 502 U.S. 954 (1991).  The Defendants are correct, though,
2093    that the next two redistricting plans for the legislature, adopted after the 2000
2094    and 2010 censuses, were precleared by the Department of Justice under the
2095    then-operative requirements of the Voting Rights Act.

2096        Less favorable evidence concerns congressional redistricting.  The
2097    Plaintiffs' only argument regarding congressional redistricting was in one
2098    sentence detailing Mississippi's need to draw new Section 5-compliant
2099    congressional districts in 2002.  *See generally Smith v. Clark*, 189 F. Supp. 2d
2100    503 (S.D. Miss. 2002).  The additional court opinions that have often found
2101    those districts to violate either the Constitution or the Voting Rights Act are
2102    available to us for consideration as well.  We consider them.

Mississippi NAACP v. State Board of Election Commissioners

2103    The legislature drew new congressional districts in 1981, but the
2104 United States Attorney General objected to the districts under the
2105 preclearance requirement of Section 5 of the Voting Rights Act. *See Jordan*
2106 *v. Winter*, 541 F. Supp. 1135, 1138 (N.D. Miss. 1982). The 1982 primaries
2107 and general elections were held under an interim redistricting plan designed
2108 by a three-judge district court. *Id.* at 1144–45. That court's 1982 decision
2109 was later vacated and the case remanded by the Supreme Court "for further
2110 consideration in light of Section 2 of the Voting Rights Act of 1965, 42 U.S.C.
2111 [§] 1973, as amended in 1982." *Brooks v. Winter*, 461 U.S. 921, 921 (1983).
2112 That amendment allowed a finding of a Section 2 violation if the results of a
2113 measure relating to voting, regardless of intent, denied or abridged voting
2114 rights. *See* Voting Rights Act Amendments of 1982, Pub. L. No. 97–205, § 3,
2115 96 Stat. 131, 134 (codified as amended 52 U.S.C. § 10301). On remand, the
2116 district court imposed a new map that increased the black voting-age
2117 population in the Second District. *Jordan v. Winter*, 604 F. Supp. 807, 810,
2118 814 (N.D. Miss.), *aff'd sub nom. Mississippi Republican Exec. Comm. v. Brooks*,
2119 469 U.S. 1002 (1984).

2120    There was no litigation over the Mississippi Legislature's plan for
2121 congressional districts after the 1990 Census. That is the most recent
2122 congressional redistricting that has not been challenged.

2123    After the 2000 Census, which led to Mississippi's loss of one
2124 congressional seat, the legislature failed to adopt a redistricting plan in time
2125 for the 2002 election filing deadlines. *See Smith*, 189 F. Supp. 2d at 504–05.
2126 Therefore, a three-judge district court devised a redistricting plan and
2127 ordered that it be used for the 2002 elections and every succeeding election
2128 until the State produced an acceptable plan. *Smith v. Clark*, 189 F. Supp. 2d
2129 548, 559 (S.D. Miss. 2002). The Supreme Court affirmed. *Branch v. Smith*,
2130 538 U.S. 254, 265 (2003).

Mississippi NAACP v. State Board of Election Commissioners

After the 2010 Census, the same three-judge district court found the new census rendered the court's 2002 plan malapportioned, but the legislature had yet to produce a viable new plan for use in the 2012 elections. *Smith v. Hosemann*, 852 F. Supp. 2d 757, 760–61 (S.D. Miss. 2011). The court developed a plan to which no party objected, and the court in 2011 ordered its use until the State produced an acceptable plan. *Id*. at 765–67.

After the 2020 Census, the legislature adopted its own congressional-redistricting plan. *Smith v. Hosemann*, No. 3:01-cv-855, 2022 WL 2168960, *1 (S.D. Miss. May 23, 2022). The defendants moved to vacate the 2011 order, while the plaintiffs insisted the legislature's plan was invalid. *Id.* at *1–2. The district court vacated the 2011 injunction, allowing the legislature's plan to go into effect, but it also held that the plaintiffs were not barred from seeking relief under the Voting Rights Act. *Id*. at *8. The United States Supreme Court dismissed for lack of jurisdiction. *Buck v. Watson*, 143 S. Ct. 770 (2023). There have been no further proceedings in that case.

Thus, unlike for legislative redistricting after the 2000 and 2010 censuses when there were no challenges to those plans, the legislature has been held to violate the Voting Rights Act in drawing new congressional districts in 1980, then in not drawing any in 2000 and 2010. This is some evidence of a continuation of official discrimination.

To summarize, this factor is about history. When the United States Supreme Court upheld a district court's finding in *Milligan* that the evidence supported Senate Factor 1, the Court quoted the district court finding that "Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented." *Milligan*, 599 U.S. at 22 (quoting *Singleton*, 582 F. Supp. 3d at 1020). We examine the Alabama district court's opinion to determine what the Supreme Court found sufficient. The district court included these events:

Mississippi NAACP v. State Board of Election Commissioners

2159    (1)    A successful constitutional challenge to legislative redistricting
2160 after the 2010 census. *Singleton*, 582 F. Supp. 3d at 1020. The Alabama suit
2161 concerned congressional redistricting yet considered constitutional defects
2162 in prior legislative redistricting. Our facts are a mix, such that in this
2163 challenge to the legislature's redistricting we have considered challenges in
2164 Mississippi both for Congress and for the legislature. We find that record to
2165 be of at least comparable weight as the record in Alabama.

2166    (2)    A successful challenge to "local at-large voting systems with
2167 numbered post created by the State Legislature." *Id.* at 1021. This is another
2168 example of a successful challenge to a legislative measure, and we have
2169 identified relatively recent and successful litigation in Mississippi both for
2170 congressional and legislative redistricting.

2171    (3)    "[T]he Justice Department has sent election observers to
2172 Alabama nearly 200 different times, and . . . between 1965 and 2013, more
2173 than 100 voting changes proposed by the State or its local jurisdictions were
2174 blocked or altered under Section 5 of the Voting Rights Act." *Id.* Here, the
2175 Justice Department issued 81 voting-determination letters to Mississippi
2176 counties between 1985 and 2012, ordering districts be redrawn and voting
2177 practices be amended (PTX-063; Trial Tr. 396:16–400:12); Mississippians
2178 have successfully challenged at-large election procedures (PTX-007, 29–30;
2179 Trial Tr. 389:3–390:25); and more restrictive voting changes proposed by
2180 Mississippi were enjoined by federal courts (PTX-007, 38; Trial Tr. 405:24–
2181 406:9; 407:1–408:9; 1231:25–1232:12).

2182    We consider the evidence here to be comparable to what the *Milligan*
2183 Court found satisfied the first and third Senate Factors for Alabama. To be
2184 sure, Mississippi is a much different state today than during the period of its
2185 "long and dubious history of discriminating against blacks." *Teague*, 92 F.3d
2186 at 293–94. Nonetheless, we find more recent events still cause the first and
2187 third Senate Factors to weigh in favor of the Plaintiffs.

Mississippi NAACP v. State Board of Election Commissioners

2188            *b.    Senate Factor 2*

2189            Senate Factor 2 measures "the extent to which voting in the elections
2190    of the state or political subdivision is racially polarized."  S. REP. NO. 97-417,
2191    at 29.  Said differently, the factor considers "racial bloc voting."  *Gingles*, 478
2192    U.S. at 52 n.18; *see also* S. REP. NO. 97-417, at 55.

2193            As explained before, Senate Factor 2 overlaps with *Gingles*
2194    precondition three, which is also routinely described as concentrating on
2195    racial polarization.  *See, e.g.*, *Milligan*, 599 U.S. at 19 (identifying *Gingles*
2196    precondition three as "focused on racially polarized voting").  We have
2197    concluded under *Gingles* precondition three that the Plaintiffs met their
2198    burden and the Defendants failed to rebut it.  We now consider the issue
2199    under the totality of the circumstances.

2200            When viewed under the totality of the circumstances, racial bloc
2201    voting is one of the two most important factors, the other being minority
2202    candidates' success or failure in elections. *Gingles*, 478 U.S. at 48 n.15 (citing
2203    S. REP. NO. 97-417, at 28–29).  If both factors are "present, the other factors
2204    . . . are supportive of, but not essential to, a minority voter's claim." *Id.*
2205    (emphasis omitted).

2206            To begin, the scope of relevant evidence is broader at this stage.  While
2207    we focused our review of the *Gingles* preconditions on the districts at issue,
2208    we may consider more under the totality analysis.  *See LULAC v. Perry*, 548
2209    U.S. at 438 (citing *Gingles*, 478 U.S. at 44–45) (noting that statewide
2210    evidence has been used under other Senate Factors and finding it
2211    "[p]articularly" appropriate under the proportionality factor "given the
2212    presence of racially polarized voting . . . throughout Texas"); *see also*
2213    *Milligan*, 599 U.S. at 22 (relying on statewide evidence under totality of
2214    circumstances); *Fordice*, 252 F.3d at 370 (noting that exogenous elections
2215    are probative under Senate Factor 2).

86

Mississippi NAACP v. State Board of Election Commissioners

2216        Turning to the facts, the parties agree that Mississippians vote along
2217    racial lines.    But under the totality-of-the-circumstances analysis, "[a]
2218    defendant may try to rebut plaintiffs' claim of vote dilution via evidence of
2219    'objective, nonracial factors.'"    *Teague*, 92 F.3d at 292 (quoting *Nipper v.
2220    Smith*, 39 F.3d 1494, 1513 (11th Cir. 1994)).    The Defendants take that
2221    approach, arguing that the existing polarization is not "on account of race"
2222    because Mississippi voters are "driven by partisan polarization rather than
2223    racial polarization." Doc [219] ¶ 233.[8]

2224        The parties say the Court must determine whether partisan affiliation
2225    or race "best explains the divergent voting patterns among minority and
2226    white citizens." Doc [219] ¶ 183 (citation omitted); *see* Doc [220] ¶ 677; *see
2227    also Lopez v. Abbott*, 339 F. Supp. 3d 589, 602–03 (S.D. Tex. 2018) (applying
2228    similar standard).    That test comes from *LULAC v. Clements*, a Section 2 case
2229    filed by black and Hispanic residents challenging the way Texas elected its
2230    trial judges.  999 F.2d at 838.

2231        The *LULAC v. Clements* district court held that "plaintiffs need only
2232    demonstrate that whites and blacks generally support different candidates to
2233    establish legally significant white bloc voting." *Id.* at 850.  The Fifth Circuit
2234    reversed, agreeing with the defendants that "the record indisputably
2235    prove[d] that partisan affiliation, not race, *best explain*[ed] the divergent
2236    voting patterns among minority and white citizens in the contested

---

[8] The Supreme Court recently considered a race-versus-partisanship issue in
*Alexander*, 144 S. Ct. 1221.  The plaintiffs' claim, though, was of racial gerrymandering
violative of the Equal Protection Clause, and the question before the court was whether
"race predominated in the drawing of a district." *Id.* at 1252.  The *Alexander* plaintiffs did
"not rely on the Voting Rights Act of 1965," nor did the defendants. *Id.* (Thomas, J.,
concurring in part).  Though the *Alexander* Court considered a similar issue to the one
before us, its decision is inapplicable to effects-based review under Section 2 of the Voting
Rights Act. *See Milligan*, 599 U.S. at 13 (discussing the effects standard).

Mississippi NAACP v. State Board of Election Commissioners

2237  counties." *Id.* (emphasis added).  The appellate court also observed that
2238  "[a]bsent evidence that minorities have been excluded from the political
2239  process, a 'lack of success at the polls' is not sufficient to trigger judicial
2240  intervention." *Id.* at 853 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 109
2241  (1980) (Marshall, J., dissenting)).[9]

2242      The *LULAC v. Clements* court found no evidence that minorities had
2243  been excluded from the political process on account of race.  *Id.* at 861.
2244  Instead, it found facts "unmistakably" proving "partisan affiliation," not
2245  race, defeated the minority-backed judicial candidates in Texas.  *Id.*  "First,
2246  white voters constitute[d] the majority of not only the Republican Party, but
2247  also the Democratic Party, even in several of the counties in which the former
2248  dominate[d]."  *Id.*  Second, both parties, "especially the Republicans,
2249  aggressively" nominated minority candidates who were then supported
2250  "without fail" by white voters just as much as those voters supported white
2251  candidates.  *Id.*  Finally, the court found no evidence that white elected
2252  officials were unresponsive to minority constituents, something the court
2253  considered a hallmark of racial bloc voting.  *Id.* at 858–59.

2254      This case is different.  While we recognize that our review requires a
2255  "'functional' and 'practical'" examination rather than a mechanical
2256  checklist of the facts that buttressed the *LULAC v. Clements* opinion, *id.* at
2257  861, none of those facts exist here.  There is no proof that whites constitute a
2258  majority of the Democratic Party, that Republicans aggressively recruit and
2259  unfailingly support black Republican candidates, or that elected white
2260  officials respond to black constituents as they did in Texas.

---

[9] The Supreme Court has never applied a best-explains test, but it has not overruled that binding precedent.

Mississippi NAACP v. State Board of Election Commissioners

On the responsiveness question, the parties addressed various public issues and whether the Republican-dominated legislature has been receptive to the stated desires of black voters. We are more persuaded, though, by witnesses Joseph Wesley, Kenneth Harris, Pamela Hamner, Gary Fredericks, and Terry Rogers who all testified — without contradiction — that their elected officials ignore the black community. Trial Tr. 669:3–670:8 (Wesley); 698:15–699:16, 702:9–14 (Harris); 726:10–727:2 (Hamner); 906:20–907:18 (Fredericks); 943:22–944:3 (Rogers). According to *LULAC v. Clements*, these facts indicate racial bloc voting and not partisan bloc voting. 999 F.2d at 859; *see also Rogers v. Lodge*, 458 U.S. 613, 623 (1982) (noting that racial bloc voting "allows those elected to ignore [minority] interests without fear of political consequences").

Not only are the salient *LULAC v. Clements* facts missing here, but we also find no analogous facts exist in this record. Instead, the Plaintiffs presented credible evidence that the "political process is not 'equally open' to minority voters." *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 45–46) (summarizing a plaintiff's burden under the totality-of-the-circumstances test). As noted above, the Enacted Plans split black communities like Horn Lake and Jago. *See* Section IV(B)(1)(b), *supra*. As a result, there is no dispute that black voters are disproportionally located in districts in which they are the minority. Under the Enacted Senate Plan, 84.33 percent of white voters live in white-majority districts while only 50.36 percent of black voters live in black districts. PTX-001, 50. A similar disparity exists under the Enacted House Plan — 82.92 percent of whites live in majority districts compared to just 62.38 percent of black voters. PTX-001, 74.

Once in those minority districts, it is almost impossible for a black-preferred candidate to prevail because crossover voting is nearly non-existent. We credit Dr. Handley's testimony regarding "stark" polarization

Mississippi NAACP v. State Board of Election Commissioners

2290   across varied local and statewide elections.  Trial Tr. 266:7; *see also* Section
2291   IV(B)(2)(a)–(c), *supra*.  When Dr. Handley considered votes in the areas of
2292   interest during statewide elections, black voters supported black Democrats
2293   94.3 percent of the time while white voters crossed over at only a 6.9 percent
2294   rate.  That crossover number rose to 9.1 percent when the Democrat was
2295   white.  PTX-004, 11–12.

2296        Other courts have found that crossover percentages like these support
2297   a finding of racial bloc voting.  Most notably in *Milligan*, the district court
2298   found racial bloc voting under *Gingles* two and three where "on average,
2299   Black voters supported their candidates of choice with 92.3 [percent] of the
2300   vote" while "white voters supported Black-preferred candidates with 15.4
2301   [percent] of the vote."  599 U.S. at 22 (quoting *Singleton*, 582 F. Supp. 3d at
2302   1017).  The Supreme Court affirmed.  *Id.* at 23, 42.

2303        A similar result followed in *Robinson v. Ardoin*, when white crossover
2304   voting was around 11.7 percent in statewide elections (per Dr. Handley) and
2305   about 20.8 percent in "a different set of elections" (per another expert
2306   witness).  605 F. Supp. 3d 759, 842 (M.D. La. 2022), *vacated and remanded*,
2307   86 F.4th 574 (5th Cir. 2023) (affirming finding of Section 2 violation but
2308   vacating injunction as legislature prepared new map).  Black voters' support
2309   for their chosen candidates averaged 83.8 percent and rose to 93.5 percent in
2310   two-person races.  *Id.* at 801.  The Fifth Circuit addressed "racial
2311   polarization" under the third *Gingles* precondition and affirmed the finding
2312   that the plaintiffs proved its existence.  *Robinson*, 86 F.4th at 597.  The
2313   averages for Mississippi resemble — if not surpass — those in *Milligan* and
2314   *Robinson*.

2315        The extent of that polarization further distinguishes *LULAC v.*
2316   *Clements*, which found no legal significance to "blacks generally support[ing]
2317   different candidates" than whites.  999 F.2d at 850.  That case did not

Mississippi NAACP v. State Board of Election Commissioners

2318  consider polarization of this magnitude or the effect it has on open
2319  participation when coupled with cracking and packing.  We find as a factual
2320  matter the extent of the polarization between races across Mississippi
2321  provides at least circumstantial evidence that the divide is based on race.

2322        This is not, however, the only evidence; other facts make this case
2323  much like *Milligan*.  There, the Supreme Court explained that the plaintiffs
2324  had carried their burden at the totality-of-the-circumstances stage because
2325  "elections in Alabama were racially polarized; . . . 'Black Alabamians
2326  enjoy[ed] virtually zero success in statewide elections'; . . . political
2327  campaigns in Alabama had been 'characterized by overt or subtle racial
2328  appeals'; and . . . 'Alabama's extensive history of repugnant racial and
2329  voting-related discrimination [was] undeniable and well documented.'"  599
2330  U.S. at 22 (quoting *Singleton*, 582 F. Supp. 3d at 1018–24).  Though Alabama
2331  did not appeal the totality holding, the Supreme Court still found no reason
2332  to dispute the district court's "careful factual findings," *id.* at 23, including
2333  the finding that Senate Factor 2 "weigh[ed] heavily in favor of the"
2334  plaintiffs' Section 2 claim because the "pattern of racially polarized voting
2335  [was] clear, stark, and intense," *Singleton*, 582 F. Supp. 3d at 1018.

2336        These facts are equally true here in Mississippi.  The two states share
2337  a similar history, and neither has elected a black candidate in a statewide
2338  election since Reconstruction.  Trial Tr. 752:19–25, 788:14–18.  Also, black
2339  legislative candidates in Mississippi have had virtually no success in federal
2340  or state elections outside majority-black districts.  Trial Tr. 310:6–9, 388:10–
2341  389:2, 789:1–7.  We find that the Plaintiffs have shown racially polarized
2342  voting under the totality of the circumstances.

2343        The Defendants attempt to rebut all this, however, and argue
2344  Mississippians vote based on party, not race.  To begin, they say we should
2345  consider two Equal Protection cases that addressed the politics-versus-race

Mississippi NAACP v. State Board of Election Commissioners

2346   issue: *White v. Regester*, 412 U.S. 755 (1973), and *Whitcomb v. Chavis*, 403
2347   U.S. 124 (1971).  "Congress codified the 'results' test [the Supreme Court]
2348   had employed, as an interpretation of the Fourteenth Amendment, in *White*
2349   and *Whitcomb*."  *LULAC v. Clements*, 999 F.2d at 851 (quoting *Gingles*, 478
2350   U.S. at 97 (O'Connor, J., concurring in the judgment)).  To the extent they
2351   are relevant, our case is like *White*, not *Whitcomb*.

2352        In *White*, the Court found Equal Protection violations in some Texas
2353   districts based on evidence of lack of minority political success since
2354   Reconstruction, a history of discrimination, voting requirements that
2355   depressed minority votes, racial campaign tactics, and a lack of
2356   responsiveness from elected officials in minority communities.  412 U.S. at
2357   765–69; *see also* S. REP. NO. 97-417, at 21–22.  Our facts and record are similar.

2358        By contrast, the Court found in *Whitcomb* that politics, not race,
2359   motivated the disputed election practices because there were no
2360   impediments to black participation and black-preferred and minority
2361   candidates enjoyed some success at the polls with support of white voters.
2362   403 U.S. at 149–50.  According to *LULAC v. Clements*, *Whitcomb*

2363        established a clean divide between actionable vote dilution and
2364        "political defeat at the polls"; the 1982 amendments [were]
2365        enacted to restore a remedy in cases "where a combination of
2366        public activity and private discrimination have joined to make
2367        it virtually impossible for minorities to play a meaningful role
2368        in the electoral process."

2369   999 F.2d at 850–51 (emphasis omitted) (quoting *Hearings on the Voting Rights
2370   Act Before the Subcomm. on the Constitution of the S. Comm. of the Judiciary*,
2371   97th Cong., 2d Sess. 1367–68 (1982) (statement of Professor Drew Days)).
2372   Again, the Plaintiffs have shown that impediments do exist in Mississippi —
2373   for example being disproportionately placed in minority districts — and that

Mississippi NAACP v. State Board of Election Commissioners

2374   they have had almost no success electing their candidates of choice outside
2375   majority-minority districts.

2376        The Defendants also rely on Dr. Alford's expert opinion that
2377   partisanship explains the polarization Dr. Handley's data reveals.  Although
2378   we have considered all opinions Dr. Alford offered, none convince us that the
2379   Defendants have overcome the Plaintiffs' showing of racially polarized
2380   voting.  We will, however, address a few examples.

2381        Dr. Alford identifies select races in predominantly white house
2382   districts where Dr. Handley's statistics have massive confidence intervals,
2383   indicating uncertainty.  *See* DX-001, 11 (Alford Report).  It may be true
2384   uncertainty exists, but Dr. Handley explained that districts with small
2385   minority populations are harder to evaluate.  Trial Tr. 278:5–11, 288:2–18.
2386   That statistical reality does not outweigh the breadth of Dr. Handley's
2387   opinions and supporting evidence about stark racial bloc voting, nor does it
2388   offer rebuttal evidence to meet the Defendants' burden.

2389        Another fact Dr. Alford relies on is the recent success of a lone black
2390   Republican candidate in a legislative election.  Trial Tr. 1470:18–23.  The
2391   same thing happened in *Milligan*, but the district court held under Senate
2392   Factor 2 that "[o]ne election of one Black Republican is hardly a sufficient
2393   basis . . . to ignore . . . the veritable mountain of undisputed evidence that in
2394   all the districts at issue in this case, and in all statewide elections, voting in
2395   Alabama is polarized along racial lines."  *Singleton*, 582 F. Supp. 3d at 1019.
2396   The Supreme Court took no issue with these Senate Factor 2 findings.  599
2397   U.S. at 23.  In any event, "proof that some minority candidates have been
2398   elected does not foreclose a [Section] 2 claim."  *Gingles*, 478 U.S. at 75; *see*
2399   *Clark*, 88 F.3d at 1397 ("'[T]he election of a few minority candidates does
2400   not necessarily foreclose the possibility of dilution of the black vote.'"
2401   (citation omitted)).

Mississippi NAACP v. State Board of Election Commissioners

2402        Dr. Alford generally says black voters support white Democrats in
2403    equal measure with black Democrats, thus demonstrating that partisanship is
2404    the answer. Trial Tr. 1521:4–15. That statement is superficially true but fails
2405    to consider the record evidence explaining why black voters might choose
2406    white Democrats — like support for issues important to black citizens. And
2407    even Dr. Alford acknowledges that "it's possible for political affiliation to be
2408    motivated by race." Trial Tr. 1537:3–6. Yet he never examined the political
2409    positions of the two state parties — or any candidates — to determine
2410    whether race factored into partisan voting. Trial Tr. 1504:9–25. Another
2411    defense expert, Dr. Brunell, has written that "the split between the political
2412    parties rests on a racial division." Trial Tr. 1319:19:19–22. He also testified
2413    that there is "[n]o question" "that racial division . . . is still part of what's
2414    going on in politics today." Trial Tr. 1320:5–8.

2415        Dr. Alford also cites the 2012, 2016, and 2020 presidential elections,
2416    when voting percentages remained roughly the same for candidates Barack
2417    Obama, Hillary Clinton, and Joe Biden despite their differing races. DX-001
2418    at 6–7. We mention that, though the 2016 Democratic Presidential ticket had
2419    no black nominee, Joe Biden's 2020 running mate was Kamala Harris, who
2420    was a black candidate. Additionally, Dr. Alford's analysis does not consider
2421    how race may factor into partisan voting. As we have explained in our
2422    discussion of *Gingles* preconditions two and three, the baseline white
2423    opposition to black-preferred candidates is so high — between 92 percent
2424    and 93.6 percent in these three elections, DX-1 at 6–7 — there is little room
2425    for additional white opposition to a black Democratic candidate.

2426        *LULAC v. Clements* anticipated a similar issue, remaining "sensitive
2427    to the reality that political positions can be proxies for racial prejudice." 999
2428    F.2d at 879. While acknowledging this possibility, the Fifth Circuit saw no
2429    such concern "where white voters support black candidates of a particular
2430    party in larger percentage than they support white candidates of the same

Mississippi NAACP v. State Board of Election Commissioners

2431    party."  *Id.*  In addition, as noted, Senate Factor 2 is part of a "searching
2432    practical evaluation of the 'past and present reality.'"  *Milligan*, 599 U.S. at
2433    19 (quoting *Gingles*, 478 U.S. at 79).  Given the undisputed history of
2434    polarized voting in Mississippi — including recent history — Dr. Alford has
2435    not convincingly separated race from politics.

2436          Context also matters.  The opinions from the Plaintiffs' expert
2437    historian Dr. King need not be taken as correct in every detail, but in recent
2438    decades the Democratic Party has certainly been the one more closely
2439    associated with civil rights.  The Defendants' expert Dr. Brunell agrees.  He
2440    testified that racial division and the Democratic Party's association with civil
2441    rights "definitely played a role" in party realignment.  Trial Tr. 1320:4.

2442          That Mississippi voters have been separated by race even when most
2443    black voters were Republicans and white voters were Democrats adds weight
2444    to our finding that racially polarized voting best explains the divide — at least
2445    on this record.  Dr. King testified "that the racial polarization throughout
2446    Mississippi political history precedes the partisan polarization.  So the
2447    foundation of any polarization people see is the racial polarization that comes
2448    first, right.  Race has always been the preeminent political issue in Mississippi
2449    and so that defines the dividing lines for the parties.  So race comes first.
2450    That's the foundation for polarization."  Trial Tr. 764:21-765:3.[10]

2451          To conclude on Dr. Alford, he offered similar testimony in *Robinson*,
2452    where the court found his "opinions are unsupported by meaningful
2453    substantive analysis" and "border on *ipse dixit*."  605 F. Supp. 3d at 840.  We
2454    share those concerns.  While we accepted Dr. Alford as an expert and find

---

[10] We do not hold — nor need we — that realignment was solely race-based or that every Republican is motivated by it.  But the evidence is undisputed that race plays a role.

Mississippi NAACP v. State Board of Election Commissioners

2455   that some of his opinions are plausible, he has not overcome Dr. Handley's
2456   testimony.

2457         In short, we find that the Plaintiffs established racially polarized voting
2458   "on account of race or color" as those words are interpreted by the Senate
2459   Report and the Supreme Court. *See Milligan*, 599 U.S. at 25 (explaining that
2460   "it is patently clear that Congress has used the words 'on account of race or
2461   color' in the Act to mean 'with respect to' race or color, and not to connote
2462   any required purpose of racial discrimination" (quoting *Gingles*, 478 U.S. at
2463   71 n.34).  The Defendants' evidence fails to show that "partisan affiliation,
2464   not race, best explains the divergent voting patterns among minority and
2465   white citizens." *LULAC v. Clements*, 999 F.2d at 850.

2466         As in *Singleton*, when "we look deeper" into the race-versus-politics
2467   issue "we are looking at very little evidence."  582 F. Supp. 3d at 1018–19.
2468   Although we acknowledge that partisanship plays a role, we agree with Dr.
2469   Brunell that there is "[n]o question" "that racial division . . . is still part of
2470   what's going on in politics today."  Trial Tr. 1320:5–8.  The Defendants'
2471   proof does not outweigh the Plaintiffs' evidence on this factor, and it
2472   certainly would not make this one of those "very unusual case[s]" where no
2473   violation is found despite establishing the *Gingles* preconditions. *Clark*, 21
2474   F.3d at 97 (citation omitted).  Senate Factor 2 weighs in favor of the Plaintiffs.

2475         *c.*   *Senate Factor 5*

2476         This factor considers the extent to which members of the minority
2477   group still bear the effects of discrimination in areas such as education,
2478   employment, and health, and whether as a result they are hindered in their
2479   ability to participate effectively in the political process.

2480         Much of the relevant evidence was offered by Dr. Orey, a professor in
2481   the Department of Political Science at Jackson State University.  Trial Tr.
2482   492:13–19.  Dr. Orey has both teaching and publication experience in areas

Mississippi NAACP v. State Board of Election Commissioners

2483    directly linked with race and its effect on political behavior.  Trial Tr. 495:6–
2484    16.  He teaches multiple undergraduate- and graduate-level classes regarding
2485    minority politics, black voters in the political system, and applicable research
2486    methods.  Trial Tr. 498:1–16.  Dr. Orey also has experience conducting voter-
2487    turnout analyses using the EI RxC methodology, conducting descriptive
2488    statistical analyses for Senate Factor 5, and testifying as an expert in
2489    numerous court cases.  Trial Tr. 495:25–496:3, 503:4–17, 504:2–16.  Based
2490    on these qualifications, we accepted Dr. Orey as an expert in political science,
2491    political participation and behavior, and race and politics.  Trial Tr. 506:8–
2492    15.

2493          The Plaintiffs offered Dr. Orey's testimony specifically to explain the
2494    "social and economic indicators [that] had an impact on voting amongst
2495    African-Americans" and how those "indicators negatively impacted turnout
2496    amongst African-Americans."  Trial Tr. 506:21–24.  To conduct this Senate
2497    Factor 5 analysis, Dr. Orey used descriptive statistics like poverty, education
2498    access, turnout data, and EI RxC data to determine whether black citizens
2499    had the ability to effectively participate in Mississippi politics.  Trial Tr.
2500    504:23–505:13.  These methodologies and data sources Dr. Orey used in his
2501    analysis are ones commonly relied upon among experts in political science.
2502    Trial Tr. 505:14–24.

2503          Dr. Orey started his analysis with a theoretical framework regarding
2504    the resources required for Mississippians to participate in the political
2505    process.  PTX-008, 4.  We find persuasive his determination that voting and
2506    political participation has economic costs such that whether individual voters
2507    participate is influenced by financial resources, leisure time, and education.
2508    Dr. Orey further concluded black voters face larger disparities than white
2509    voters in areas such as education and income, affecting both the relative
2510    likelihood that they have the resources that are needed to vote and the ability
2511    to participate in the voting process.  PTX-008, 3–11.

Mississippi NAACP v. State Board of Election Commissioners

2512    We find Dr. Orey is correct that black Mississippians suffer
2513 socioeconomic disparities that impair their ability to participate in the
2514 political process.  Black Mississippians are significantly worse off in terms of
2515 income, poverty, unemployment, educational attainment, internet access,
2516 vehicle ownership, and health-insurance coverage.  We accept as accurate the
2517 evidence that about 31 percent of black Mississippians live below the poverty
2518 line as compared to about 11.5 percent of white Mississippians.  PTX-008, 5.
2519 Dr. Orey testified, based on political-science literature and his own
2520 regression analysis, that there is a strong correlation between financial status
2521 and voter turnout.  Trial Tr. 512:10–15, 544:17–546:23.  The analysis he
2522 conducted supports that income and poverty have been significant factors
2523 influencing voter participation, generally and specifically in Mississippi.
2524 PTX-008, 27–28.

2525    Dr. Orey quantified racial disparities in Mississippi regarding the level
2526 of education as establishing black citizens have long been segregated from
2527 attaining the needed education for coherent political participation.  PTX-
2528 008, 9–12.  About 10.3 percent of white Mississippians did not complete high
2529 school, compared to 17.9 percent of black Mississippians.  PTX-008, 8.  As
2530 to college degrees, 28.5 percent of white Mississippians have a bachelor's
2531 degree or higher, compared to 18.2 percent of black Mississippians.  PTX-
2532 008, 8.

2533    Dr. Orey testified that these educational disparities can be traced to
2534 the long history of both *de jure* and *de facto* racial segregation in Mississippi.
2535 Residential patterns and the quality of education located in certain
2536 Mississippi locales, among other things, have resulted in many school
2537 systems being as segregated today as they were decades ago.  PTX-008, 9; *see*
2538 Trial Tr. 512–514.  Numerous negative effects of segregation in housing and
2539 education were also identified by Dr. Orey.  For example, because of the
2540 racial economic disparities and resulting variations in local tax bases,

Mississippi NAACP v. State Board of Election Commissioners

2541   residential segregation results in lower-funded black schools compared to
2542   predominantly white ones.  PTX-008, 9.

2543        Dr. Orey described a very strong, "well-established" correlation
2544   between educational attainment and voter turnout such that political-science
2545   literature renders education as a requirement in "virtually" any "analysis of
2546   voting behavior . . . model."  Trial Tr. 515:20–516:1.  Education is "one of
2547   the resources that individuals need to vote" in order to "understand[] the
2548   issues" and "navigate the registration process[,]" for instance.  Trial Tr.
2549   515:7–19.  We accept as fact that there has been a historical pattern, based on
2550   all these factors and perhaps others, that black citizens of Mississippi have
2551   participated in the political process in lower percentages than white citizens.

2552        The factual issue for us is the current effect of these conditions on
2553   black-voter turnout.   The disparities continue to exist, but are black
2554   Mississippians currently voting in lower percentages than whites because of
2555   the effects of discrimination?  If not, then any past hindrance caused by those
2556   conditions to black citizens' ability to participate effectively in the political
2557   process has been overcome.  Dr. Orey addressed this factual question by
2558   examining voter turnout only in the 2020 general election.  Trial Tr. 579:3–
2559   5.  The Defendants' expert Dr. Brunell said it was important to examine
2560   trends over time and one election was inadequate.  Trial Tr. 1258:15–1259:5.
2561   We find that examining multiple elections would give a clearer picture, but
2562   we acknowledge that Dr. Orey's analysis is only weakened, not discredited,
2563   by its consideration of solely 2020.

2564        In his 2020 election analysis, Dr. Orey used three different, generally
2565   accepted methods: (1) ecological-inference analysis based on precinct-level
2566   election results and United States Census racial demographic data; (2)
2567   Bayesian Improved Surname Geocoding ("BISG") of the Mississippi
2568   Secretary of State's full voter database (which includes voter history); and

2569   (3) reviewing estimates from the Cooperative Election Study ("CES"), a
2570   survey where voter turnout behavior is independently validated to eliminate
2571   the known problem of overreporting voting behavior in polls and surveys.
2572   PTX-008, 22–25.  Dr. Orey testified that each of these methods showed a
2573   significant gap in turnout between black and white Mississippians.  Trial Tr.
2574   642:4–17.

2575   Dr. Orey's EI RxC estimate was that white turnout in 2020 was 65.84
2576   percent, while black turnout was 56.03 percent.  PTX-008, 25.  The
2577   Defendants' response does not significantly challenge the validity of the EI
2578   RxC analysis itself but argues this estimate is unreliable because it is based on
2579   data from one federal election for offices that are not the subject of this suit.
2580   Doc [219], 73.  The Defendants' arguments are legitimate, but we find the
2581   estimates are still sufficiently reliable for our consideration.

2582   Dr. Orey then used BISG to estimate the racial composition of the
2583   Mississippi voter file.  BISG is an algorithmic method used to predict a
2584   person's race or ethnicity based on their last name and where they live on a
2585   map.  PTX-008, 24.  Applying BISG to a copy of the Mississippi voter file,
2586   which contains voter names, addresses, and voting history from 2020 and
2587   prior elections, Dr. Orey estimated a 69.7 percent turnout rate for white
2588   Mississippi voters, compared to 57.3 percent for black voters.  PTX-008, 25.

2589   The Defendants argue Dr. Orey's BISG analysis uses an incomplete
2590   data set, in part because the contents of the state voter file are so far removed
2591   from the 2020 election.  Doc [219], 73–74.  Dr. Orey used information from
2592   the file as it existed in June 2022 to infer individuals' turnout in the
2593   November 2020 general election.  The file is continuously updated, and as
2594   voters move and new information is recorded, the file reflects each change.
2595   Dr. Orey acknowledged he had not previously performed a BISG analysis but

Mississippi NAACP v. State Board of Election Commissioners

2596   stood behind the results despite there being a 5 percent loss in data.  Trial Tr.
2597   583:23–585:10.

2598        Here, too, we do not refuse to consider the analysis.  We find the
2599   questions about the accuracy of the data Dr. Orey used for his analysis to be
2600   legitimate but not dispositive.

2601        Finally, Dr. Orey examined turnout by race estimates using the CES,
2602   a 50,000-plus person national stratified sample survey administered by the
2603   polling firm YouGov.  PTX-008, 24–25.  The CES dataset includes
2604   "validated vote" information, representing an independent authentication of
2605   whether a survey respondent voted, which Dr. Orey used for his analysis.
2606   Trial Tr. 532:24–533:15.  Among registered voters, the CES's validated vote-
2607   turnout estimate was 72.5 percent for black Mississippians in 2020,
2608   compared to 86.8 percent turnout for white Mississippians.  PTX-008, 26.
2609   Among all adults, the validated vote-turnout rates estimated by the CES for
2610   2020 were 46.1 percent for black Mississippians and 59.6 percent turnout for
2611   white Mississippians.  PTX-008, 26 n.59.  Dr. Orey used the weighting
2612   variables corresponding to turnout among registered voters and among all
2613   adults to confirm his observation that a racial gap in turnout existed across
2614   both measures.  Trial Tr. 535:22–536:24.

2615        The Defendants identified some errors in the computations, including
2616   voters that should not have been included.  The central criticism of these last
2617   calculations by the Defendants' expert Dr. Brunell is in evaluating the
2618   statistical significance of the figures.  Dr. Brunell testified that 0.05 p-value
2619   (probability value) — or a 95 percent confidence level — is typically the
2620   lowest level of statistical significance that is used to determine the reliability
2621   of the estimates.  Dr. Orey admitted that a p-value of less than 0.05 means
2622   that one can be 95 percent confident in the estimates.  He testified that this
2623   level is the "more stringently and more commonly" used threshold for tests

Mississippi NAACP v. State Board of Election Commissioners

2624    of statistical significance. Dr. Orey himself utilized the 95 percent threshold
2625    in some of his analysis.

2626        Dr. Orey acknowledged, however, that his analysis did not quite reach
2627    a p-value of less than 0.05. By his calculations, the statistical significance
2628    level of the racial-turnout gap among all adults in Mississippi (excluding
2629    noncitizens) was 0.058, meaning that one can be "94 percent sure that this is
2630    the correct estimate," which is a high level of confidence. Trial Tr. 540:2–9.
2631    The confidence level looking at the racial-turnout gap among registered
2632    voters was similar at 0.055. Trial Tr. 543:8–15.

2633        Dr. Orey explained "there's nothing definitive about [0].05," yet Dr.
2634    Brunell said there is. Dr. Brunell nonetheless agreed that choosing any
2635    particular threshold as a cutoff was "arbitrary" or "artificial," and that social
2636    scientists may choose different thresholds. Another of the Plaintiffs' experts,
2637    Dr. Ragusa, supported this statement and explained that for statistical
2638    significance, "a p-value of less than .1, but not less than .05, is one of [the]
2639    options" and "more people, in my judgment, are using a p-value of less than
2640    [0].1 as a minimally significant result."

2641        Disputes among the experts about statistical significance have arisen
2642    in other cases. We accept the view of a Ninth Circuit opinion that insofar as
2643    admissibility is concerned, "[a]s a general matter, so long as the evidence is
2644    relevant and the methods employed are sound, neither the usefulness nor the
2645    strength of statistical proof determines admissibility under Rule 702." *Obrey*
2646    *v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005). This evidence was properly
2647    admitted. Once admitted, how we as factfinders consider the evidence is the
2648    issue. The Seventh Circuit was particularly dismissive of the 95 percent
2649    standard:

2650        Litigation generally is not fussy about evidence; much
2651        eyewitness and other nonquantitative evidence is subject to

Mississippi NAACP v. State Board of Election Commissioners

2652   significant possibility of error, yet no effort is made to exclude
2653   it if it doesn't satisfy some counterpart to the 5 percent
2654   significance test.

2655   *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362 (7th Cir. 2001).

2656   We need not be nearly so loose in our standards as that quote, but we
2657   should consider evidence that the expert acknowledges fall short of the 95
2658   percent confidence level, but not too far, and that the expert explains as
2659   statistically significant. We find questions about the accuracy of the data Dr.
2660   Orey used for his analysis to be legitimate but not dispositive.

2661   To respond to Dr. Orey's analysis, the Defendants presented a
2662   recently released March 2024 BISG study from the Brennan Center for
2663   Justice at NYU Law School, entitled "Growing Racial Disparities in Voter
2664   Turnout, 2008–2022." Trial Tr. 1272:10–15. No party had been aware of
2665   the study when the eight-day trial began, and it was introduced only for
2666   identification. Trial Tr. 1282:16–17, 1283:12–15. In fact, the study states it
2667   was published on March 2, 2024, the Saturday at the end of the first week of
2668   trial.

2669   The study showed a narrow gap in voter turnout between black and
2670   white Mississippians. Most importantly, the study found that in 2020 there
2671   was a slightly higher-percentage turnout among blacks than among whites.
2672   Trial Tr. 1286:13–19. Dr. Brunell explained that the premise of the study was
2673   to show that the voter-turnout gap had widened post-*Shelby County*,
2674   particularly in states previously covered by Section 5. Trial Tr. 1285:1–9.
2675   The study found that the voter-turnout gap reversed only in Mississippi, with
2676   blacks turning out in a higher percentage than whites in 2020 and slightly
2677   higher in 2022. Trial Tr. 1286:21–1287:6.

2678   The Plaintiffs objected to the survey, claiming that it was not disclosed
2679   by the expert-designation deadline and was not sufficiently reliable under

Mississippi NAACP v. State Board of Election Commissioners

2680   Federal Rule of Evidence 702.  We took those objections under advisement
2681   and now overrule them.  Starting with the disclosure, we consider the missed
2682   deadline under the standard set forth in *Hamburger v. State Farm Mutual*
2683   *Automobile Insurance*, 361 F.3d 875, 883 (5th Cir. 2004).  Under that standard,
2684   good cause existed for the late disclosure because the survey was first
2685   published after the expert-disclosure deadline and just four days before the
2686   Defendants offered it.  The Defendants also provided a copy to the Plaintiffs
2687   once they discovered the survey and before mentioning it in court.  Any
2688   prejudice caused by the late disclosure was addressed when the court
2689   recessed the case to allow the Plaintiffs to depose Dr. Brunell about the
2690   report.  That approach also eliminated the need for a longer continuance.
2691   Although the importance of the testimony is minimal, this factor does not
2692   outweigh the others, which favor admission.

2693        As for Rule 702, Dr. Brunell testified that the Brennan Center is a
2694   respected institution and that surveys like this are the kind he would rely on
2695   in his normal work.  Trial Tr. 1277:11–25.  "As a general rule, questions
2696   relating to the bases and sources of an expert's opinion affect the weight to
2697   be assigned that opinion rather than its admissibility and should be left for the
2698   jury's consideration."  *United States v. 14.38 Acres of Land, More or Less*
2699   *Situated in Leflore County*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo*
2700   *v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).  We find that Dr.
2701   Brunell's testimony regarding the Brennan Center survey was admissible,
2702   and the reliability of the survey is a question of weight.

2703        We accept that survey into evidence.  Nonetheless, the parties had
2704   almost no time to explore the details of the survey nor to consider through
2705   their own experts its possible flaws.  As we understand the survey report, it
2706   was not peer reviewed.  Trial Tr. 1387:23–1388:7.  Dr. Brunell stated he had
2707   not previously heard of its authors, though we do not know the significance
2708   of such lack of fame.  Trial Tr. 1388:11–20.  We accept that the Brennan

Mississippi NAACP v. State Board of Election Commissioners

2709   Center is a respected institution and that its reports are not amateurish.
2710   Nonetheless, we know too little about this particular report to have it
2711   outweigh other evidence in the case.

2712       The Defendants submitted evidence from the U.S. Census Bureau
2713   and the U.S. Department of Labor's Current Population Survey ("CPS").
2714   The Defendants emphasize the Supreme Court's explicit reliance on CPS
2715   data in *Shelby County* as evidence of its trustworthiness.  The Court held that
2716   conditions that once supported requiring only some states but not others to
2717   preclear all changes to voting practices with the Department of Justice no
2718   longer existed.  *See Shelby County*, 570 U.S. at 554.  Starting with the adoption
2719   of the Voting Rights Act in 1965, "Census Bureau data indicate that African–
2720   American voter turnout has come to exceed white voter turnout in five of the
2721   six States originally covered by [Section] 5."  *Id.* at 535.  As the Court
2722   mentioned, a chart using the CPS data was placed in both the Senate and
2723   House reports on the bill that reauthorized the Voting Rights Act in 2006 and
2724   was also reproduced in the opinion.  *Id.* at 548 (citing S. REP. NO. 109–295,
2725   at 11 (2006); H.R. REP. NO. 109–478, at 12 (2006)).

2726       The relevant part of the CPS survey is conducted every two years.
2727   Voters are asked questions about the election, specifically whether they
2728   voted.  The CPS shows insignificant differences between black and white
2729   turnout either among registered voters or among the voting-age population
2730   in Mississippi.  Trial Tr. 560:19–562:11. Dr. Orey disagreed, testifying that
2731   black turnout remains lower than white turnout.  Dr. Orey's criticism of the
2732   CPS survey focuses on how the data is collected.  He testified that "the
2733   literature shows that African-Americans are more likely to overreport"
2734   voting "because of racial identity" and a sense that "what happens to other
2735   Blacks impacts one's individual life," which leads to increased pressure to
2736   over-report. Trial Tr. 531:15–23.

Mississippi NAACP v. State Board of Election Commissioners

2737    While Dr. Orey raises facially plausible problems with CPS data, we
2738 are not necessarily persuaded by this testimony.   We acknowledge the
2739 Supreme Court's *Shelby County* opinions contain no discussion of arguments
2740 that the CPS data is unreliable.  If the argument was not raised, there was no
2741 need for the Court to consider possible inaccuracies.  The Supreme Court
2742 found the data sufficient to discuss, but it is unnecessary to resolve any
2743 potential statistical issue to decide this case.   Dr. Orey's arguments are
2744 reasonable, but we find the evidence supports, at the very least, that whatever
2745 gap existed in the turnout in Mississippi in 1965 is greatly reduced today.

2746    In addition to his analysis of voter turnout by race, Dr. Orey also
2747 conducted a regression analysis to examine the extent to which black turnout
2748 in Mississippi was in fact driven by the socioeconomic markers discussed
2749 previously.  PTX-008, 26–27.  Dr. Orey used "data from the voter file" and
2750 "aggregated the data" along with "census data at the [bloc] level" and, in
2751 doing so, he was "able to examine whether or not the turnout amongst Blacks
2752 was a function of some of these indicators."   Trial Tr. 544:12–546:23.

2753    This factor required us to consider the extent past discrimination
2754 affected black voters' ability to participate in Mississippi's political process
2755 today.  *Teague*, 92 F.3d at 292.  We credit Dr. Orey's conclusion that voting
2756 and political participation is influenced by financial resources, education,
2757 income, and unemployment.  We find that black Mississippians are worse off
2758 than white voters in terms of these factors.  The percentage of black voters
2759 who live below the poverty line is more than twice that of white voters, and
2760 they are less likely to graduate high school and college where they would have
2761 access to the required education needed to navigate the political process.

2762    Irrespective of the size or even existence of turnout discrepancies, we
2763 find that the record establishes black Mississippians' ability to participate
2764 effectively in Mississippi politics is hindered by racial gaps in education

Mississippi NAACP v. State Board of Election Commissioners

2765  access, financial status, and health.  Senate Factor 5 thus weighs in favor of
2766  the Plaintiffs.

2767          *d.  Senate Factor 6*

2768          This factor considers the use of "overt or subtle racial appeals" in
2769  political campaigns.  *Gingles*, 478 U.S. at 37.  The Plaintiffs' evidence
2770  identified other elections, but we will discuss only those elections the
2771  Plaintiffs identified in their proposed findings of fact regarding this factor.

2772          In a Republican primary contest, one candidate's 30-second video
2773  advertisement briefly showed the candidate speaking on a stage next to a
2774  furled Confederate flag.  That was an isolated incident, but we accept it was
2775  seeking white-voter support.

2776          In a general election between a white Republican senator and a black
2777  challenger, the state Republican Party issued a campaign flyer focusing on the
2778  fact that the Democratic candidate "was forced to resign after being indicted
2779  in Washington, D.C. as U.S. Agriculture Secretary."  The flyer did not
2780  acknowledge that he had been acquitted following a trial.  Though perhaps
2781  unfair, a political party's highlighting that the other party's candidate was
2782  indicted for a crime, regardless of the candidate's race and even if there had
2783  been an acquittal or no trial as of yet, is neither surprising nor a racial appeal.

2784          Two other examples in evidence are of a white congressional
2785  candidate in 1982 and a white supreme court candidate in 2004 who each
2786  identified himself as "one of us" when running against a black man.  Another
2787  three-judge district court categorized the congressional candidate's slogan as
2788  a racial appeal.  *See Jordan*, 604 F. Supp. at 813 & n.8.  Similarly appealing to
2789  white voters, a sitting state representative in 2015 urged "voters to vote
2790  against a ballot initiative because, if it passed, it would allow a Black judge to
2791  decide what happens with public schools."  Trial Tr. 781:14–19.

Mississippi NAACP v. State Board of Election Commissioners

2792         The Plaintiffs also introduced evidence of how some black candidates
2793 were exposed to the racial animosities of some voters.  That evidence did not
2794 reveal official discrimination under Senate Factor 1, nor racial appeals by
2795 opposing candidates under Senate Factor 6.  Nonetheless, if white voters are
2796 insulting or even threatening black candidates, that is relevant to
2797 understanding the totality of the circumstances.  Because a consideration of
2798 this evidence is supported by the Supreme Court's observation in *Gingles*
2799 that the "list of typical factors is neither comprehensive nor exclusive," *see*
2800 *Gingles*, 478 U.S. at 45 (citing S. REP. NO. 97-417, at 29–30), we conclude
2801 that, if there have been threats to black candidates because of their race, it is
2802 a relevant consideration.

2803         One relevant witness on this additional consideration was Pamela
2804 Hamner.  She was questioned about her campaign in DeSoto County, having
2805 been a candidate both in 2021 for the Board of Aldermen and in 2023 for the
2806 state senate.

2807         Q.     I know you mentioned earlier that you campaigned in
2808                Horn Lake, did you campaign in Hernando?
2809         A.     No -- very little. Hernando, I -- so when I ran in '21 I had
2810                the police called on me, and people in my party, some of the
2811                men, they told me don't go out by myself, which I'm glad I
2812                didn't, so I didn't spend a lot of time in Hernando, I -- and my
2813                canvassers had the police called on them this time too.

2814 Trial Tr. 720:15–22.

2815         Hamner described Hernando as "the county seat [that is] an older
2816 historic area, too, but it's . . . more rural and it's more White. . . . Hernando
2817 is predominantly White."  Trial Tr. 719:10–19.  Hamner's trial testimony
2818 implies she and her party members were treated this way because she was a
2819 black candidate campaigning in a predominantly white area.

Mississippi NAACP v. State Board of Election Commissioners

2820        Another witness was Terry Rogers.  At age 18, he ran for the statewide
2821    office of Agriculture Commissioner in 2023.  He testified that while
2822    campaigning at a county fair that is the state's largest political forum, he saw
2823    Confederate flags.  While he was giving a speech there, someone in the
2824    audience held up a cell phone so that Rogers could see a picture of a dog with
2825    a noose around its neck.

2826        The evidence supports that some candidates continue to make racial
2827    appeals.  We find that Senate Factor 6 weighs in favor of the Plaintiffs.  Other
2828    candidates occasionally encounter offensive or threatening actions by voters
2829    due to their race.  We also find that the limited evidence of such conduct to
2830    add slight weight in favor of the Plaintiffs.

2831        *e.*   *Senate Factor 7*

2832        This factor considers "the extent to which members of the minority
2833    group have been elected to public office in the jurisdiction."  *Gingles*, 478
2834    U.S. at 37.  Senate Factor 7 is a particularly important factor in the totality-
2835    of-the-circumstances analysis.  The success of black candidates is far from
2836    negligible.  As stated by Plaintiffs' expert Dr. Orey, Mississippi is among the
2837    states with the highest number of black elected officials.

2838        The evidence shows, though, that in order for black-preferred
2839    candidates to be elected for the legislature or for Congress, they almost
2840    always have to be running in majority-black districts.  The evidence further
2841    showed there has not been a black candidate elected to statewide office since
2842    the end of Reconstruction 150 years ago.  In recent elections, the Democratic
2843    Party has had some black nominees for statewide office, including for the
2844    United States Senate and Governor, but all have been defeated.

2845        Because a black-majority district is a virtual prerequisite for black
2846    candidates' success in Mississippi politics, it is relevant that the Mississippi
2847    Legislature left the number of majority-black districts unchanged following

Mississippi NAACP v. State Board of Election Commissioners

2848   the recent Census, despite substantial increases in the black population and
2849   corresponding losses in the white population.  There was testimony that the
2850   number of black legislators today is disproportionate to their percentage of
2851   the state's population.  We do not overlook that the Voting Rights Act states
2852   "[t]hat nothing in this section establishes a right to have members of a
2853   protected class elected in numbers equal to their proportion in the
2854   population."  52 U.S.C. § 10301(b).  Indeed, the Supreme Court concluded
2855   in its recent decision regarding Alabama congressional districts that
2856   proportional representation can rarely be achieved because of diffusion of the
2857   relevant population.  *Milligan*, 599 U.S. at 28–29.   Nonetheless,
2858   proportionality "is a relevant fact in the totality of the circumstances to be
2859   analyzed when determining whether members of a minority group have 'less
2860   opportunity . . . to participate in the political process.'" *De Grandy*, 512 U.S.
2861   at 1000 (citation omitted).  The Court later restated that relevance in relation
2862   to majority-minority districts: "Another relevant consideration is whether
2863   the number of [black-majority] districts . . . is roughly proportional to [the
2864   black] population in the relevant area." *LULAC v. Perry*, 548 U.S. at 426.

2865        Balancing the substantial success for black-preferred candidates with
2866   its currently unbreachable limits, we conclude this factor, if not neutral,
2867   slightly favors the Plaintiffs.

2868        *f.   Senate Factor 8*

2869        This factor considers whether "elected officials are unresponsive to
2870   the [minority's] particularized needs."  *Gingles*, 478 U.S. at 45.   The
2871   Plaintiffs seek to show a lack of responsiveness on the part of the white
2872   Republican Mississippi Legislature with evidence of such matters as a failure
2873   to expand Medicaid, not adequately funding education, and the decision to
2874   enact the legislative-redistricting plan being challenged in this case.

Mississippi NAACP v. State Board of Election Commissioners

2875    We find, based on testimony, that Medicaid expansion is important to
2876    the black community.  Trial Tr. 701:12–24, 726:14–727:2.  The unrebutted
2877    testimony is that the failure to expand Medicaid disproportionately harms
2878    black communities, particularly those in the Mississippi Delta where regional
2879    hospitals are in financial struggles.  Trial Tr. 519:4–15.  Dr. Orey testified that
2880    black Mississippians "will more likely depend on Medicaid relative to
2881    whites" and face "vast differences" in health coverage.  Trial Tr. 518:4–19.

2882    Regarding education funding, the Plaintiffs provided two expert
2883    opinions, and we find both credible.  Dr. Orey and Dr. Luckett concluded
2884    that Mississippi's successes with respect to education have been unevenly
2885    distributed, with predominantly black schools being underfunded and
2886    underperforming as compared to predominantly white schools.  PTX-008,
2887    8–12; PTX-007, 48–50.

2888    Other witnesses, such as Dr. Joseph Wesley, Deacon Kenneth Harris,
2889    and Terry Rogers, testified that white legislators do not campaign in black
2890    communities or attend events hosted by black civic organizations.   Dr.
2891    Wesley testified that, during his role as Political Action Chair for the Forrest
2892    County Branch of the NAACP, the Branch has held numerous community
2893    forums — including for statewide candidates — open to all candidates, and
2894    yet his elected senator has never attended or otherwise engaged with the
2895    black community in the district.  Finally, Pamela Hamner testified that her
2896    senator was not responsive to the needs and concerns of black voters in her
2897    area.  The testimony of these witnesses was unrebutted, and we credit it.

2898    We mention that funding is a component of the decision that the
2899    Plaintiffs say should be made.  Funding based on a set budget is a zero-sum
2900    calculation.  Whether there is money for full funding of education and to
2901    expand Medicaid, even though Medicaid expansion has significant federal
2902    contribution, and also pay for the other significant work authorized by the

Mississippi NAACP v. State Board of Election Commissioners

2903    Mississippi Legislature is not for this court to decide.  We mention as well
2904    that the Defendants did not offer any testimony that could have added
2905    context for the decisions.

2906            Under this factor, we analyze whether there are circumstances in
2907    which Mississippi has failed to respond to the needs of black voters.  *Teague,*
2908    92 F.3d at 292.  The Defendants are quite correct that the state government
2909    is not running roughshod over the interests of those in the minority.
2910    Although both chambers of the Mississippi Legislature are controlled by
2911    Republicans, a significant number of Democrats chair committees in both
2912    chambers, having been appointed by Republican leadership.  Doc [199], 17–
2913    18.  Even its redistricting decision served the minority's interests when the
2914    majority agreed to unpair two incumbent Democrats such that the new plan
2915    would not require them to run against each other.

2916            In sum, the Plaintiffs' examples of a lack of responsiveness include
2917    shortfalls in funding for education and the failure to expand Medicaid, the
2918    redistricting plan itself, and the failure of some white legislators to participate
2919    in black-community events.  We find Senate Factor 8 favors the Plaintiffs.

2920            *g.    Senate Factor 9*
2921            This factor considers "whether the policy underlying the state or
2922    political subdivision's use of such voting qualification, prerequisite to voting,
2923    or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 37.  This
2924    factor requires a consideration of the policies used by Mississippi to justify
2925    its districting decisions in this case.  *Teague,* 92 F.3d at 292.  The Plaintiffs
2926    do not contest that the legislature followed its policy of creating districts that
2927    were sufficiently equal in population for each chamber and consisted of
2928    contiguous tracts.  The legislature's policies also require that the districts
2929    comply with all state and federal laws relating to redistricting, that the

112

2930    districts be compact and minimize county and precinct splits, and that the
2931    design of the districts consider "political performance."

2932          The Defendants described the basic criteria the Standing Joint
2933    Committee was required to follow to avoid unconstitutional race-based
2934    redistricting and to retain the cores of the existing districts: One Person, One
2935    Vote; contiguity of the districts; and compliance with all state and federal
2936    laws. JTX-010, 8–14. Those are legitimate, non-tenuous policies, but how
2937    they were applied needs to be explained. We accept that some *limited* packing
2938    or cracking of minority populations in order to protect a white incumbent is
2939    a non-tenuous reason. All we have in that regard are quite general
2940    pronouncements made by the chair of the committee in each chamber when
2941    explaining the relevant plan that assisting incumbents was a factor. There is
2942    no evidence of when such considerations led to the creation of a particular
2943    district and resulted in the failure to create a black-majority district in that
2944    same area. We needed more than generalized statements for this defense in
2945    light of the Plaintiffs' evidence of a Section 2 violation.

2946          We find the legislature did not enact an egregiously flawed plan, the
2947    equivalent of a political gerrymander of squeezing the minority into as few
2948    districts as possible. Yet, we do not find any specific, non-tenuous
2949    justifications for why black-majority districts were not created in the three
2950    identified areas. We find, therefore, that this factor weighs in favor of the
2951    Plaintiffs.

2952          *h.   Summary of the Senate Factors*

2953          We have detailed the law, evidence and our findings on all the Senate
2954    Factors except for the inapplicable Senate Factor 4. We found all clearly to
2955    favor the Plaintiffs with two exceptions. One exception was Senate Factor 6,
2956    concerning overt or subtle racial appeals election campaigns. We found it
2957    only slightly favors the Plaintiffs. We also found that Senate Factor 7, which

Mississippi NAACP v. State Board of Election Commissioners

2958   considers the success of minority candidates in elections, either is neutral or
2959   only slightly favors the Plaintiffs.

2960        Senate Factors 2 (racially polarized voting) and 7 are considered "the
2961   most important" factors in a totality-of-the-circumstances analysis. *Gingles*,
2962   478 U.S. at 48 n.15. One of these most important factors clearly favors the
2963   Plaintiffs, while the other is perhaps almost neutral. As indicated, though, all
2964   other factors in the totality of circumstances clearly favor the Plaintiffs.

2965        After engaging in the required "intense[] local appraisal" and
2966   "searching practical evaluation of the past and present reality" of
2967   Mississippi's political process, *see Gingles*, 478 U.S. at 79 (quotation marks
2968   and citation omitted), we conclude this is not one of the "only very unusual
2969   case[s]" where the *Gingles* preconditions are established, but there is no
2970   liability. *Teague*, 92 F.3d at 293 (quoting *Clark*, 21 F.3d at 97). The Plaintiffs
2971   instead met their burden under both the *Gingles* preconditions and the
2972   totality of the circumstances. We therefore find Mississippi's 2022 Enacted
2973   Plans violate Section 2 of the Voting Rights Act.

2974                    V.    REMEDY

2975        We have concluded that the Plaintiffs met their burden under the
2976   *Gingles* framework to establish that Mississippi's 2022 Enacted Plans violate
2977   Section 2 of the Voting Rights Act. The task now is to establish a remedy.

2978        Once a Section 2 violation is found, the court faces "the difficult
2979   question of the proper remedial devices which federal courts should utilize in
2980   state legislative apportionment cases." *Reynolds v. Sims*, 377 U.S. 533, 585
2981   (1964) (Fourteenth Amendment case). One thing is clear though: the court's
2982   "first and foremost obligation" must be "to correct the Section 2 violation."
2983   *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009) (citation omitted).
2984   "In doing so, the district court 'should exercise its traditional equitable

Mississippi NAACP v. State Board of Election Commissioners

2985    powers to fashion the relief so that it completely remedies the prior dilution
2986    of minority voting strength.'" *Id.* (quoting S. REP. NO. 97-417, at 31).

2987    Addressing similar equities in the equal-protection context, the
2988    Supreme Court has noted that courts must "tak[e] account of what is
2989    necessary, what is fair, and what is workable." *North Carolina v. Covington*,
2990    581 U.S. 486, 488 (2017) (per curiam) (quoting *Reynolds*, 377 U.S. at 585).
2991    Though neither *Covington* nor *Reynolds* are Section 2 cases, the Fifth Circuit
2992    has relied on *Reynolds* and other equal-protection cases when discussing
2993    Voting Rights Act remedies. *See Veasey v. Abbott*, 830 F.3d 216, 270 (5th Cir.
2994    2016). The Fifth Circuit also holds that "any remedy 'should be sufficiently
2995    tailored to the circumstances giving rise to the Section 2 violation,' . . . and
2996    to the extent possible, courts should respect a legislature's policy objectives
2997    when crafting a remedy." *Id.* at 269 (quoting *Brown*, 561 F.3d at 435) (other
2998    citations omitted).

2999    While the proper remedy depends on the specific circumstances of
3000    each case, "it would be the unusual case in which a court would be justified
3001    in not taking appropriate action to [e]nsure that no further elections are
3002    conducted under the invalid plan." *Reynolds*, 377 U.S. at 585; *see also Veasey*,
3003    830 F.3d at 270 (applying *Reynolds* under Section 2). That is particularly true
3004    when elections are imminent, but here the next legislative election would not
3005    happen until 2027. Therefore, the question is whether to order a special
3006    election to remedy the Section 2 violation found.

3007    The Defendants urge us not to order any special elections, relying on
3008    the equitable considerations found in *Covington*: "[1] the severity and nature
3009    of the particular . . . violation, [2] the extent of the likely disruption to the
3010    ordinary processes of governance if early elections are imposed, and [3] the
3011    need to act with proper judicial restraint when intruding on state
3012    sovereignty." Def. Findings ¶ 421 (quoting *Covington*, 581 U.S. at 488). We

Mississippi NAACP v. State Board of Election Commissioners

3013   accept the Defendants' invitation to use this test and find that these same
3014   equities are relevant under Section 2.

3015          Starting with the first consideration, the Defendants argue the
3016   violations are not severe because the Plaintiffs "have not proved any
3017   violation." Def. Findings ¶ 422. We disagree with the premise of this
3018   argument — that there are *no* violations — and the Defendants give us
3019   nothing further in deciding how to determine severity. Even so, the severity
3020   here is greater than in *Covington*. There, the Supreme Court unanimously
3021   vacated a district-court decision that ordered special elections in 28 North
3022   Carolina legislative districts in 2017 that would allow the winners to serve
3023   only one year until the next regular legislative elections. *Covington*, 581 U.S.
3024   at 487. The Supreme Court concluded that the district court had given only
3025   cursory consideration to the balance of equities before ordering the elections.
3026   *Id.* at 488–89.

3027          The violations in *Covington* were more numerous than those proved
3028   here, but the length of the remaining Mississippi terms is three times as long.
3029   The legislators elected under the Enacted Plans have served, at this point, a
3030   little more than six months of their four-year terms. Thus, if left as is, black
3031   voters in each affected district will be served for a full term by a legislator
3032   chosen in an election that diluted black votes. The harm is localized, but it is
3033   severe to the affected voters. This is the exact kind of injury that warrants a
3034   remedy.

3035          The extent of any likely disruption to the ordinary governmental
3036   processes is the next factor to consider. In Section 2 litigation, requiring a
3037   special session of a legislature to redraw district lines is a common remedy.
3038   *See, e.g.*, *Robinson*, 86 F.4th at 600–01. Nonetheless, such special sessions
3039   are a disruption of the ordinary legislative process and should be ordered only
3040   if it is equitable to do so.

Mississippi NAACP v. State Board of Election Commissioners

3041       One equitable consideration in deciding the proper timing of a remedy
3042  is whether the Plaintiffs acted quickly to assert their rights.  By the end of
3043  March 2022, Mississippi approved redistricting plans for both houses of the
3044  legislature.  The Plaintiffs did not sue until December 20, 2022.  As they
3045  state, however, other Section 2 cases were stayed during this period while the
3046  Supreme Court considered *Milligan*.  *See Nairne v. Ardoin*, No. CV 22-178-
3047  SDD-SDJ, 2022 WL 3756195, at *1 (M.D. La. Aug. 30, 2022) (staying
3048  proceedings until June 2023).  Further, despite some initial delay in
3049  challenging the Enacted Plans, the Plaintiffs sought an expedited pretrial
3050  schedule — which the Defendants opposed — and required no extensions
3051  under that schedule.  We find that any initial delays are insufficient to make
3052  a special election inequitable, nor would they justify not having a special
3053  session, which would be unfortunate but likely limited in time.

3054       The final factor is that the court must exercise restraint before
3055  intruding onto state sovereignty. In addition to our finding violations, we also
3056  find that allowing the violations to go unaddressed for the entire four-year
3057  term of affected legislators, when only a little more than six months have been
3058  served at this date, is not an equitable result.  We therefore need to order
3059  some redistricting to rectify the Section 2 violations.

3060       In doing so, we know that "reapportionment is primarily the duty and
3061  responsibility of the State through its legislature or other body, rather than of
3062  a federal court."  *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) (citations
3063  omitted).  Thus, "in redistricting cases, district courts must offer governing
3064  bodies the first pass at devising a remedy."  *Brown*, 561 F.3d at 435 (citation
3065  omitted).

3066       We will do that here with this guidance.  Three of the illustrative
3067  districts satisfy all three *Gingles* preconditions: Illustrative Senate Districts 2
3068  and 9 and Illustrative House District 22.  Our determination that these

Mississippi NAACP v. State Board of Election Commissioners

3069    specific illustrative districts support a Section 2 violation does not require the
3070    State to draw districts as proposed in the Plaintiffs' remedial plans. *See Vera*,
3071    517 U.S. at 978.  The State has discretion in determining how best to remove
3072    the violation, subject to further judicial review.  *See id.*  The Plaintiffs'
3073    proposed remedy is to require districts be drawn "in which Black voters have
3074    an opportunity to elect candidates of their choice in the areas in and around"
3075    the relevant illustrative districts.  Pls.' Proposed Findings ¶ 781.  We agree
3076    that would satisfy the State's obligations, but the State has discretion on how
3077    to proceed with the remedy.

3078         Because we have concluded that only three of the illustrative districts
3079    identified by the Plaintiffs satisfy the three *Gingles* preconditions, there is no
3080    obligation to redraw districts in the areas of the other four illustrative
3081    districts.  If the Mississippi Legislature creates three new majority-minority
3082    districts, however, there will likely be a need to revise other districts to make
3083    that possible.  We find that the equitable factors identified in *Covington* allow
3084    the State to limit the ripple effect of creating new majority-minority districts
3085    as much as reasonably possible.  Special elections will need to be called for all
3086    revised districts, and minimizing the number of legislative seats subject to
3087    election for a briefer-than-usual term is a significant State interest.

3088         So, how much time is needed for a special election?  As mentioned
3089    before, we are to "afford a reasonable opportunity for the legislature" to
3090    create and adopt its own constitutional plan.  *Wise v. Lipscomb*, 437 U.S. 535,
3091    540 (1978).  Because we will require elections for any districts the Mississippi
3092    Legislature alters in response to this court's ruling, relevant dates are these:
3093    (1) for the Mississippi Legislature to adopt new maps; (2) for this court to be
3094    presented either with objections to new maps drawn by the Mississippi
3095    Legislature or with maps proposed by the parties if the Mississippi
3096    Legislature does not act; and (3) for elections to be held.

Mississippi NAACP v. State Board of Election Commissioners

3097       After trial, we asked the parties to submit their arguments about the
3098  necessary timing of new elections for some legislative districts if we found a
3099  need to order elections. We have found the need, but the parties'
3100  submissions are now outdated. It is the desire of this court to have new
3101  legislators elected before the 2025 legislative session convenes, but the
3102  parties can make whatever arguments about timing they conclude are valid.
3103  We state now that the parties should be prepared to present their own
3104  respective maps five days after the deadline for the Mississippi Legislature to
3105  adopt its own plan, thereby being able to present alternatives almost
3106  immediately should the Mississippi Legislature not act.

3107       In order for the court to receive the arguments of counsel on the issue
3108  of timing for the steps that must be taken, we will conduct a video
3109  conferencing hearing on Monday, July 8, at 2:00 p.m.; Tuesday, July 9, at
3110  2:00 p.m.; or Thursday, July 11, at 1:00 p.m. Counsel will be contacted by
3111  the court to determine the most appropriate date.

3112       It is SO ORDERED.