IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MISSISSIPPI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; DR. ANDREA WESLEY; DR. JOSEPH WESLEY; ROBERT EVANS; GARY FREDERICKS; PAMELA HAMNER; BARBARA FINN; OTHO BARNES; SHIRLINDA ROBERTSON; SANDRA SMITH; DEBORAH HULITT; RODESTA TUMBLIN; DR. KIA JONES; MARCELEAN ARRINGTON; VICTORIA ROBERTSON,

    *Plaintiffs*,

vs.

STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, *in his official capacity as Governor of Mississippi*; LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON, *in his official capacity as Secretary of State of Mississippi*,

    *Defendants,*

AND

MISSISSIPPI REPUBLICAN EXECUTIVE COMMITTEE,

*Intervenor-Defendant.*

**CIVIL ACTION NO.
3:22-cv-734-DPJ-HSO-LHS**

**PLAINTIFFS' RESPONSIVE BRIEF REGARDING REMEDY**

**INTRODUCTION**

Following trial, this Court concluded that, in particular areas, "Mississippi's 2022 Enacted Plans violate Section 2 of the Voting Rights Act." July 2 *Per Curiam* Op., ECF No. 224 at 114. Having found those violations, the Court emphasized that its "first and foremost obligation" must be "to correct [them]." *Id.* (citing *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009) (citation omitted)).

The parties briefed the facts and law regarding remedy extensively in their post-trial Findings of Fact and Conclusions of Law. *See* Pls.'s FOFs & COLs, ECF No. 220 at ¶¶ 549-567, 777-796; State Defs.' FOFs & COLs, ECF No. 219 at ¶¶ 418-422. In its opinion, the Court applied *North Carolina v. Covington*, 581 U.S. 486 (2017), to determine whether a special elections remedy is warranted. ECF No. 224 at 115-118. Weighing the *Covington* factors, the Court concluded that such a remedy is just and proper here. *See id.* at 116. The Court concluded that additional districts where Black voters have an opportunity to elect candidates of choice must be added in the geographic areas where a Section 2 violation was proven, *id.* at 117-118, and that "[s]pecial elections will need to be called for all revised districts" as a result of the addition of these new districts. *Id.* at 118. Weighing the equities, the Court stated its "desire … to have new legislators elected before the 2025 legislative session convenes[.]" *Id.* at 119. And then, earlier this week, the Court convened a conference for the parties to address the "timing for the steps that must be taken" for special elections. *Id.*

At the July 8 conference, the Court directed the parties to confer and, if possible, to arrive at an agreed-on schedule for such special elections, including the date by which the Legislature must enact new maps in time to hold elections in 2024, the date for the parties to submit objections

1

to maps enacted by the Legislature (if any) and/or to submit their own proposed maps, and the relevant dates for the election itself. *See* ECF No. 224 at 118. As explained below, Plaintiffs and State Defendants did confer, and Plaintiffs agree more or less entirely with the schedule set forth in State Defendants' brief. *See* State Defs.' Br., ECF No. 227 at 3. The bottom line: Plaintiffs and State Defendants agree that holding special elections in November 2024, using Mississippi's special elections procedure, is feasible.

Beyond this point of agreement that 2024 special elections are feasible, both State Defendants and Intervenor-Defendant Mississippi Republican Executive Committee seek to continue litigating the question of whether special elections for 2024 should be ordered at all. Their arguments on that score lack merit.

State Defendants argue that special elections should not occur until sometime in 2025, ECF No. 227 at 4-5, but they offer no new argument for why that result would be equitable. Waiting until 2025 in fact would not be equitable: A standalone special election in 2025 would burden election administrators and voters and would likely lead to low turnout if not outright confusion; by contrast, a special election concurrent with the November 2024 general election, which State Defendants concede is feasible, would minimize the burden on elections officials, and maximize voter awareness and participation. It would also ensure that voters need not live any longer than necessary under a scheme of representation that has been determined to violate the Voting Rights Act. Meanwhile, Intervenor-Defendant argues that this Court lacks the power to order a special election unless it includes a party primary, ECF No. 227, but they cite no authority supporting any such limitation, which would be inconsistent with *Covington* and with basic equitable principles. Mississippi law provides for a special election process that may be used for state legislators, and this Court may work with that procedure, even though it does not include party primary elections,

2

to fashion a just and equitable remedy.

I.  **PLAINTIFFS AND THE STATE DEFENDANTS AGREE ON A FEASIBLE SPECIAL ELECTIONS SCHEDULE FOR 2024**

As noted, Plaintiffs and State Defendants agree more or less entirely on a feasible schedule for special elections to occur in 2024 and to enable new legislators to be elected before the 2025 legislative session convenes. Plaintiffs' proposed schedule, which is almost identical to State Defendants' proposal, is as follows:

- **August 2, 2024**: Date for the Legislature to adopt remedial maps. Defendants would submit those maps to the Court by that same date, along with any supporting data, documents, or reports. This is the same date proposed by State Defendants.

- **August 7, 2024**: Date for the parties to submit any objections and/or any proposed remedial plans, including any supporting data, documents, or reports. This is two days earlier than the date proposed by State Defendants.

- **August 14, 2024**: Date for local election officials to receive information to implement new district lines. This is the same date proposed by State Defendants. (although it is one week earlier than the date indicated by State Defendants at the July 8 conference).

- **September 6, 2024**: Candidate qualifying deadline. This is the same date proposed by State Defendants.

- **September 21, 2024**: 45-day Deadline for ballots to be sent in compliance with the federal Uniformed and Overseas Citizens Absentee Voting Act.

- **November 5, 2024**: Election Day. This is same the date proposed by State Defendants.

- **November 26, 2024**: Runoff Election if necessary. This is the same date proposed by State Defendants.

Plaintiffs' and State Defendants' proposals are essentially identical with one exception: Plaintiffs propose that the date for the parties to submit any objections and any proposed maps, supporting data, documents, or reports be set for August 7, 2024, rather than August 9. This will give the Court more time to consider any objections and make any necessary decisions before the

3

August 14 date by which State Defendants say that final maps need to be in place.[1]  It is also consistent with the Court's suggestion that the parties be prepared to present their respective maps five days after the deadline for the Mississippi Legislature to adopt its own maps.  *See* ECF No. 224 at 119.  Either way, though, Plaintiffs and State Defendants fundamentally agree that the special elections may feasibly be held in 2024 consistent with either the above schedule or the schedule set forth in State Defendants' brief.

Either proposed schedule comports with the statutory requirements for special elections, Miss. Code Ann. § 23-15-851, as well as the trial testimony and relevant examples and precedents, ECF No. 220 at ¶¶ 549-566.  Indeed, special elections have been judicially ordered to take place in less time than this.  In *Tucker v. Burford,* after finding a Section Five violation, the district court held that "[f]ollowing the implementation of the redistricting as ordered by the court, a special election shall be held *within thirty days* to fill the unexpired portion of the terms of those officials elected on November 6, 1984."  603 F. Supp. 276, 279 (N.D. Miss. 1985) (emphasis added).  Here, the agreed-upon schedule provides more than 70 days before the November 5 election, which is consistent with recent special elections to fill vacant seats in the Legislature.  ECF No. 220 at ¶ 566 (setting forth recent examples of special elections).

---

[1] Plaintiffs accept State Defendants' revised statement that final plans need to be in place by August 14, rather than the August 21 date that was stated at the July 8 conference.  However, the evidence in the record indicates that, if plans were in place by August 21, there would still be sufficient time to update the SEMS system and otherwise prepare ballots for the November election.  The process of counties implementing new legislative districts in SEMS after a redistricting of the entire Legislature can take up to several weeks.  Lennep Dep. Tr. (PTX-127) 66:16–67:23 (designated); *see also* ECF No. 220 at ¶¶ 551-556.  After that, the work done by the Secretary of State's Office in building elections and reviewing candidate qualifications takes a few days.  Kirkpatrick Dep. Tr. (PTX-115) 69:15–70:2 (designated); *see also* ECF No. 220 at ¶ 557.  Accordingly, for redistricting that will affect less than a third of Senate districts, and a small fraction of House districts, three weeks is more than sufficient.

## II. SPECIAL ELECTIONS IN 2024 ARE A JUST AND EQUITABLE REMEDY FOR THE VIOLATIONS OF LAW FOUND AFTER TRIAL

State Defendants and Intervenor-Defendant ask to delay the introduction of new maps that remedy the Section 2 violation proven at trial until at least 2025. State Defendants assert that, "if the Legislature is unable to produce redrawn maps on the timetable above, along with the necessary information to properly implement those maps, the proper course would be to allow the Legislature to produce new maps in the 2025 legislative session." ECF No 227 at 3-4. And Intervenor-Defendant argues that special elections cannot be held, as a matter of equity, without also holding a primary election. ECF No. 225.

Both positions are incorrect. The Court can and should order a special election in 2024 in order to ensure that new legislators are "elected before the 2025 legislative session convenes," as the Court already expressed its desire to do so after weighing the applicable *Covington* factors.

### A. This Court May Order 2024 Special Elections as a Remedy

Intervenor-Defendant is wrong in asserting that the Court's equitable power to fashion a complete remedy does not extend far enough to order special elections without separate party primaries even though state law itself provides for such special elections. To the contrary, the "suggestion" that federal courts are "powerless to grant affirmative relief requiring … a special election" has long been rejected. *Bell v. Southwell*, 376 F.2d 659, 665 (5th Cir. 1967) (remanding with instructions to order special election). "If affirmative relief is essential, the Court has the power and should employ it." *Id.* (citations omitted). That is no less true in the Section 2 context, where, upon a finding of liability, "the district court's first and foremost obligation ... is to correct the Section 2 violation, by "exercis[ing] its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength." *U.S. v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009). *See, e.g.*, *Arbor Hill Concerned Citizens v. County of Albany*, 357 F.3d

5

260, 262 (2d Cir. 2004) ("It is within the scope of [a federal court's] equity powers to order a governmental body to hold special elections to redress violations of the VRA.") (collecting cases).[2]

Indeed, special elections are a common remedy in redistricting cases. "Federal courts have often ordered special elections to remedy violations of voting rights." *Ketchum v. City Council of City of Chi., Ill.*, 630 F. Supp. 551, 565 (N.D. Ill. 1985) (citing examples including *Tucker v. Burford*, 603 F. Supp. at 279, which involved special elections in Mississippi); *see also, e.g.*, *Nation v. San Juan Cnty.*, No. 2:12-cv-00039, 2017 WL 6547635, at *18 (D. Utah Dec. 21, 2017) (applying *Covington* and ordering special election in Section 2 case), *aff'd* 929 F.3d 1270 (10th Cir. 2019); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 361 F. Supp. 3d 1296, 1305 (M.D. Ga. 2018) (ordering special elections and recognizing "that 'citizens are entitled to have their rights vindicated as soon as possible so that they can vote for their representatives under a [lawful] plan.'" (citation omitted)), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *Clark,* 777 F. Supp. at 484 ("Federal courts have ordered special elections to remedy violations of voting rights on many different occasions.") (citation omitted); *Williams v. City of Dallas*, 734 F. Supp. 1317, 1415 (N.D. Tex. 1990) (finding special election warranted for Section 2 violation).

Intervenor-Defendant does not appear to contest that it is fully within the power of a federal court to order special elections as a remedy for violations of Section 2. Intervenor-Defendant argues instead that there is a bespoke limitation on the Court's equitable power that requires any such elections to include a party primary. This is incorrect. Mississippi's Election Code specifically provides for special elections where "vacancies occur in either house of the

---

[2] *See also Clark v. Roemer*, 777 F. Supp. 471, 484 (M.D. La. 1991) ("That the vote dilution of minority voters has occurred in violation of a federal statute rather than in violation of the Constitution makes prompt new elections no less imperative.").

Legislature." *See* Miss. Code Ann. § 23-15-851; Miss. Code Ann. § 23-15-833. Such elections are held without a party primary. *See* Miss. Code Ann. § 23-15-851. State law thus specifically provides a process for electing state legislators to fill vacant districts that does *not* include a party primary. And here, the new districts, once ordered into effect, will be vacant. Holding special elections in those circumstances is proper. Where the "will of the voters is in doubt," Mississippi courts have "the authority to order a special election if the situation requires it." *Folson v. Fulco*, 305 So. 3d 406, 413 (Miss. 2020) (affirming trial court's ordering of special election).

Moreover, even if state law did otherwise require party primaries in the situation presented here, the formalities of state law would still yield in order to remedy a violation of federal law. When a violation of federal law necessitates a remedy otherwise barred by state law, state law gives way. *See Large v. Fremont Cnty., Wyo.*, 670 F.3d 1133, 1145 (10th Cir. 2012) ("In remedial situations under Section 2 where state laws are necessarily abrogated, the Supremacy Clause appropriately works to suspend those laws because they are an unavoidable obstacle to the vindication of the federal right.") (emphasis and citations omitted); *Cleveland Cnty. Ass'n for Gov't by People v. Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468, 477 (D.C. Cir. 1998) ("In other words, if a violation of federal law necessitates a remedy barred by state law, the state law must give way;" where a plan is "intended to remedy an admitted or adjudged violation of the Voting Rights Act" conflict with state law "would not stand in the way of the plan's implementation.") (citations omitted); *Perkins v. City of Chi. Heights*, 47 F.3d 212, 216 (7th Cir. 1995) ("Once a court has found a federal constitutional or statutory violation, however, a state law cannot prevent a necessary remedy. Under the Supremacy Clause, the federal remedy prevails. To hold otherwise would fail to take account of the obligations of local governments, under the Supremacy Clause, to fulfill the requirements that the Constitution imposes on them.") (citations omitted); *Montes v.*

*City of Yakima*, No. 12-CV-3108-TOR, 2015 WL 11120964, at *5 (E.D. Wash. Feb. 17, 2015) ("[S]tate law must sometimes yield to afford an effective remedy under the Voting Rights Act. The Supremacy Clause requires that state law be abrogated where doing so is necessary to remedy a violation of the Voting Rights Act.") (citations omitted); *see also Taylor v. Monroe Cnty. Bd. of Supervisors*, 421 F.2d 1038, 1041 (5th Cir. 1970) ("[W]here it is necessary to override specific provisions of state law to afford adequate relief, the state statutes must yield.") (ordering special elections) (citations omitted). Here, using the special election procedure set forth in state law is necessary in order to put new, lawful districts into place before the next legislative session, and to do so in a manner that minimizes the burdens on election administrators and voters by holding such elections in conjunction with the high-turnout statewide election occurring in November 2024.

The cases Intervenor-Defendant cites do not say otherwise. Intervenor-Defendant relies primarily on *Watkins v. Fordice*, 791 F. Supp. 646 (S.D. Miss. 1992) and *Martin v. Mabus*, 700 F. Supp. 327 (S.D. Miss. 1988), but both are readily distinguishable, and most importantly, neither one stands for any categorical barrier against the use of non-partisan special election procedures as a remedy in a redistricting case.

*Watkins* involved the implementation of a complete redistricting plan for the entire Legislature, following interim 1-year elections that had been held in 1991 pursuant to an old, outdated plan after the Legislature initially failed to pass a lawful plan following the 1990 Census. 791 F. Supp. at 646-647. The court in *Watkins* issued its order on May 21, 1992, and there was therefore more than enough time to hold August primary elections prior to the November 1992 general election. 791 F. Supp. at 648-649. In those circumstances—where the entire Legislature was being elected under a newly adopted plan, and where there was sufficient time to hold primary

8

elections in advance of a November general election—it was reasonable to follow the State's general policy of holding party primaries in such circumstances. Here, elections will be held only in certain districts rendered vacant by the adoption of superseding remedial plans, and most importantly, there is not sufficient time to hold primary elections in advance of the November general election.

*Martin* similarly presented different and distinguishable facts. There, a decision did not issue until mid-September 1988. The court, having ordered new judicial subdistricts to remedy Section 2 violations, ruled that it was too late to hold non-partisan special elections in conjunction with the November general election because the "severe time restrictions on the candidates' ability to raise money or conduct a full campaign" (and educate voters on the changed format for judicial elections) less than two months from Election Day would be unfair, both to voters and to attorney-candidates who, "if elected, will have to give up their law practices[.]" 700 F. Supp. at 344. Again, that is not the case here: State Defendants agree that there is sufficient time to hold a special election, and the record shows that the amount of time available is consistent with other special elections for vacant legislative seats. Moreover, most candidates in the changed districts will be incumbents who are likely to run unopposed, and there is no reason to think any will need to give up their law practice or make an equivalent sacrifice.

Intervenor-Defendant's invocation of *Upham v. Seamon*, 456 U.S. 37 (1982) is likewise unavailing. That case stands for the uncontroversial principle that a district court, in remedying a violation of law in the redistricting context, should allow the legislature an opportunity to produce an appropriate map. *Id.* at 43. That is what the Court meant when it said that a "district court's modifications of a state plan" should be "limited to those necessary to cure any constitutional or statutory defect." *Id.* In *Upham*, the district court's remedial plan was not so limited—instead, the court improperly adopted its own maps over remedial maps enacted by the legislature, without

9

considering whether the legislature's revised maps were sufficient to cure the violation. *Id.* Nothing like that has happened here.

Neither *Upham* nor any other case cited by Intervenor-Defendant supports the proposition that federal courts cannot modify or otherwise make use of state election rules to the extent necessary to swiftly and completely remedy a violation of the Voting Rights Act.[3] The cases already discussed refute that proposition. And in the end, the proper articulation for how federal courts evaluate the necessity of a special election remedy in a redistricting case is dictated, not by *Upham*, but by *Covington*. This Court appropriately applied *Covington* already and found that a remedy is warranted. ECF No. 224. at 116.

Finally, Intervenor-Defendant suggests that if the Court orders special elections for 2024, it should allow some indicia of party affiliation or endorsement on the ballot. This would be an unnecessary and potentially cumbersome deviation from the special election procedure as set forth in state law, which does not normally provide for this information on the ballot. Nothing prevents any political party from endorsing candidates even in a nominally non-partisan race. But if the Court considers including some indicia of party affiliation or endorsement on the ballot to be an equitable course of action as part of its ordering special elections without a separate party primary, that would be a preferable result to not holding any special election in November 2024.

### B. 2024 Special Elections Are a Just and Equitable Remedy

This Court has concluded that "[s]pecial elections will need to be called for all revised

---

[3] Intervenor-Defendants reliance on Justice Thomas's concurrence in *Whole Woman's Health v. Jackson*, 595 U.S. 30, 53 (2021), and the cases cited therein (none of which are voting or elections cases), is misplaced. Those cases, which largely come out of the preliminary injunction context, concern the availability of a "negative injunction remedy" against the government, which is not at issue here. Most importantly, those cases say nothing at all to suggest that special election relief here is somehow inconsistent with the traditional role of a court sitting in equity.

10

districts," and "we will require elections for any districts the Mississippi Legislature alters in response to this court's ruling[.]" ECF No. 224 at 118.  State Defendants agree that holding special elections in 2024 based on the agreed-upon schedule set forth above and in their brief would be feasible as a matter of election administration.  *See supra* Sec. I.  But they appear to seek to relitigate the special elections issue anyway.  They make no new arguments that might change the calculus that led this Court to conclude, under *Covington*, that special elections in 2024 are a proper and equitable remedy for the violations of the Voting Rights Act proven at trial.  *See* ECF No. 224 at 115-118.

State Defendants suggest that no harm would result from pushing any special election until 2025.  But they concede (ECF No. 227 at 4) that under their preferred course, office holders elected using districts that violate Voting Rights Act would participate in the 2025 legislative session beginning in January.  That is not an equitable result where 2024 special elections are admittedly feasible.

In addition to minimizing the amount of time voters must live in unlawful districts, special elections in November 2024 would minimize the burden on election administrators and voters, as statewide election is already being held and voters across the State will already be going to the polls.[4]  By contrast, the suggestion to wait and hold special elections some time in 2025[5] would require that a new, off-year election be conducted by local election officials at a time when no

---

[4] Moreover, the burden is further minimized because, when the special election procedure is used, the SBEC has the discretion to cancel any scheduled special election should only one candidate qualify. Miss. Code Ann. § 23-15-837.

[5] State Defendants have not offered an alternative date for a 2025 special election.  To the extent they seek to schedule elections in conjunction with any scheduled primary and general elections in 2025 (notwithstanding that there are no statewide or federal elections on the ballot), this would prolong the use of the unlawful districts here by over a year.  To the extent they seek to schedule elections in the middle of the year, the risk of low turnout and voter confusion is further magnified.

11

other significant state or federal elections are being held, and would likely lead to significantly lower turnout and potential voter confusion. Again, that is not an equitable result where 2024 special elections are admittedly feasible.

Beyond their suggestion to conduct special elections in 2025, State Defendants also suggest that it may be "impossible" for the Governor to call a special session, or for the Legislature to adopt a plan, under the schedule that they have agreed to. ECF No. 227 at 4. They do not suggest any other timeline that might work better for those actors.

Calling a special session is not impossible. State law allows the Governor to do so at his discretion, "whenever, in his judgment, the public interest requires it." Miss. Const. art 5, § 121. In the 2020 Census cycle, where Section 2 violations were found in Georgia, Alabama, and Louisiana, the Governors of those states rapidly called special sessions into order, and the Legislatures of those States acted within weeks of the operative judicial decision. *See* Governor of Georgia, Proclamation (Nov. 27, 2023), https://gov.georgia.gov/document/2023-proclamation/covening-general-assembly-georgia-special-session-102623/download; *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-CV-05337-SCJ, 2023 WL 9424682, at *1 (N.D. Ga. Dec. 28, 2023) (noting remedial state legislative plans enacted in under two weeks); Governor of Alabama, Proclamation (June 27, 2023), https://governor.alabama.gov/assets/2023/06/2023-2nd-Special-Session-Proclamation.pdf. *Singleton v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 5691156, at *2 (N.D. Ala. Sept. 5, 2023) (noting congressional plan drawn in one-week special session); *see also* Governor of Louisiana, Proclamation (Jan. 16. 2024), https://legis.la.gov/LegisDocs/241ES/call.pdf (calling eight-day special session).

Nor would drawing plans that comport with the Court's order be impossible. Mr. Cooper's plans have been in the State's possession since his report was served in October 2023. The

detailed, block-level data for those plans was provided to Defendants at the time and admitted into evidence at trial back in February. *See* PTX-6, PTX-7. As described at the July 8 conference, Plaintiffs were able to devise a "least-change" version of the Senate and House maps incorporating additional Black-majority districts SD 2, SD 9, and HD22 within mere days of the Court's July 2 opinion, have further refined them since then, and will be able to submit them to the Legislature immediately if a special session is called. Understanding the Legislature may not entirely agree with or adopt those plans, their availability nevertheless lessens the burden on the Legislature even further. And, of course, the Legislature has a professional map-drawer on its staff.[6]

The Governor and the Legislature have the opportunity to exercise discretion to craft a plan that complies with the law as set forth in the Court's order. ECF No. 224 at 118. But the cases *do not* require or suggest that this Court withhold a remedy for violations of law proven at trial because those actors do not exercise that discretion for whatever reason. To the contrary, this Court's "first and foremost obligation" in such circumstances is affirmatively to fashion a remedy. ECF No. 224 at 114. Ordering special elections for November 2024 is the most just and equitable way to accomplish that important and necessary remedy.

State Defendants' reliance on Justice Kavanaugh's concurrence in the non-precedential stay decision in *Merrill v. Milligan*, 142 S. Ct. 879 (2022)—the one authority they cite—is misplaced.[7] The Supreme Court's stay in *Milligan* was issued in response to a preliminary

---

[6] *See, e.g.*, Lennep Dep. Tr. (PTX-127) 112:7–113:19, 115:7–118:7, 122:15–123:25, 124:7–127:12, 127:17–130:25, 133:17–136:7, 137:16–139:10, 141:11–144:19 (testimony regarding communications with legislative map-drawer); *see also* PTX-101–109 (emails with legislative map-drawer); JTX-34–42 (same).

[7] State Defendants also claim (at 5) that *Milligan* involved a ruling that the challenged districts were unconstitutional, but the order at issue in the stay decision involved only Section 2. 142 S. Ct. at 879.

13

injunction that altered the lines for an upcoming congressional election, not a decision following trial finding violations of law and requiring special elections to cure them. In that preliminary injunction context, Justice Kavanaugh suggested that temporary injunctive relief in a redistricting case might be improper if ordered in the period immediately before an upcoming election unless "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.* at 881 (citations omitted). Even setting aside the inapposite context and non-precedential nature of the *Milligan* stay decision, *Milligan* could not support delaying relief in this case because here, 2024 special elections *are* feasible.

State Defendants, including the Secretary of State, agree that the special election process may feasibly be used in concert with the November 2024 general election—that if remedial plans are in place by August 14, counties and the Secretary of State will be able to administer special elections in the changed districts adopted as part of a remedial plan. *See supra* Sec. I. Consistent with its July 2 opinion, the Court should proceed to order into place a schedule that provides for 2024 special elections, which are not only feasible, but a just, equitable, and complete remedy for voters.

## CONCLUSION

Plaintiffs respectfully submit that the Court should adopt their proposed schedule for the remedy process and order special elections for any changed districts to take place on November 5, 2024.

This the 12th day of July, 2024.

| | |
|---|---|
| *s/ Joshua Tom* <br> Joshua Tom, MSB 105392 <br> jtom@aclu-ms.org <br> ACLU OF MISSISSIPPI <br> 101 South Congress Street <br> Jackson, MS 39201 <br> (601) 354-3408 | Ari J. Savitzky <br> asavitzky@aclu.org <br> Ming Cheung <br> mcheung@aclu.org <br> Casey Smith <br> csmith@aclu.org |

14

<div style="columns:2">

Robert B. McDuff, MSB 2532
*rbm@mcdufflaw.com*
MISSISSIPPI CENTER FOR JUSTICE
767 North Congress Street
Jackson, MS 39202
(601) 969-0802

Carroll Rhodes, MSB 5314
Law Offices of Carroll Rhodes
*crhodes6@bellsouth.net*
PO Box 588
Hazlehurst, MS 39083
(601) 894-1464

John P. Lavelle, Jr.
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-2921
Telephone:      +1.215.963.4824
Facsimile:       +1.215.963.5001
*john.lavelle@morganlewis.com*

Drew C. Jordan
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Telephone:      +1.202.739.5962
Facsimile:       +1.202.739.3001
*drew.jordan@morganlewis.com*

Garrett Muscatel
*gmuscatel@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500

Ezra D. Rosenberg
*erosenberg@lawyerscommittee.org*
Jennifer Nwachukwu
*jnwachukwu@lawyerscommittee.org*
David Rollins-Boyd
*drollins-boyd@lawyerscommittee.org*
Javon Davis
*jdavis@lawyerscommittee.org*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
(202) 662-8600

</div>

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Joshua Tom, do certify that on this day I caused to be served a true and correct copy of the foregoing by electronic mail to all counsel of record.

This the 12th day of July, 2024.

<div style="text-align: right;">

s/ Joshua Tom_____
Joshua Tom

</div>