**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| MISSISSIPPI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; DR. ANDREA WESLEY; DR. JOSEPH WESLEY; ROBERT EVANS; GARY FREDERICKS; PAMELA HAMNER; BARBARA FINN; OTHO BARNES; SHIRLINDA ROBERTSON; SANDRA SMITH; DEBORAH HULITT; RODESTA TUMBLIN; DR. KIA JONES; MARCELEAN ARRINGTON; VICTORIA ROBERTSON, <br><br> *Plaintiffs*, <br><br> vs. <br><br> STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, *in his official capacity as Governor of Mississippi*; LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON, *in his official capacity as Secretary of State of Mississippi,* <br><br> *Defendants,* <br> AND <br><br> MISSISSIPPI REPUBLICAN EXECUTIVE COMMITTEE, <br><br> *Intervenor-Defendant.* | **CIVIL ACTION NO.** <br> **3:22-cv-734-DPJ-HSO-LHS** |

**PLAINTIFFS' PARTIAL OBJECTIONS TO THE**
**LEGISLATIVE SENATE AND HOUSE PLANS**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ..........................................................**Error! Bookmark not defined.**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

    A.   Plaintiffs Prove Vote Dilution at Trial and This Court Orders a Remedy ......................... 3

    B.   The Legislature Adopts Plans That Only Partially Remedy Vote Dilution ....................... 6

        1.   The Legislative Senate Plan ................................................................................. 7

        2.   The Legislative House Plan ................................................................................ 10

        3.   The 2025 Special Elections Schedule ................................................................ 12

GOVERNING LAW ...................................................................................................... 12

ARGUMENT ................................................................................................................. 17

I.     PLAINTIFFS' OBJECTION TO THE LEGISLATIVE SENATE PLAN SHOULD BE SUSTAINED ................................................................................................................. 17

    A.   The Legislative Senate Plan Does Not Add a New Opportunity District in the DeSoto County Area and Therefore Does Not Remedy Vote Dilution ................................................ 17

    B.   Plaintiffs' Alternative Plans Remedy Vote Dilution in the DeSoto County Area ........... 24

        1.   Plaintiffs' Senate Plan A ................................................................................... 25

        2.   Plaintiffs' Senate Plan B ................................................................................... 26

II.    PLAINTIFFS' OBJECTION TO THE LEGISLATIVE HOUSE PLAN SHOULD BE SUSTAINED ................................................................................................................. 27

    A.   The Legislative House Plan Does Not Add a New Opportunity District in the Chickasaw/Monroe County Area and Therefore Do Not Remedy Vote Dilution ................... 27

    B.   Plaintiffs' Alternative Plans Remedy Vote Dilution in the Chickasaw/Monroe County Area 32

        1.   Plaintiffs' House Plan A ..................................................................................... 33

        2.   Plaintiffs' House Plan B ..................................................................................... 33

III.   SPECIAL ELECTIONS SHOULD BE HELD IN 2025 ...................................... 34

CONCLUSION .............................................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abbott v. Perez,*
    585 U.S. 579 (2018) ....................................................................................................15, 17

*Allen v. Milligan,*
    599 U.S. 1 (2023) ...............................................................................................................17

*Baldus v. Members of Wisconsin Gov't Accountability Bd.,*
    862 F. Supp. 2d 860 (E.D. Wis. 2012) ..................................................................15, 16, 30

*Bartlett v. Strickland,*
    556 U.S. 1 (2009) ..............................................................................................................24

*Bone Shirt v. Hazeltine,*
    387 F. Supp. 2d 1035 (D.S.D. 2005), *aff'd,* 461 F.3d 1011 (8th Cir. 2006) ..........15, 16, 29, 30

*Ketchum v. Byrne,*
    740 F.2d 1398 (7th Cir. 1984) ...............................................................................15, 16, 30

*Kingman Park Civic Ass'n v. Williams,*
    348 F.3d 1033 (D.C. Cir. 2003) .......................................................................................15

*Kirksey v. Bd. of Sup'rs of Hinds Cnty.,*
    554 F.2d 139 (5th Cir. 1977) ...............................................................................13, 14, 29

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006) ....................................................................................................14, 17

*Magnolia Bar Ass'n, Inc. v. Lee,*
    793 F. Supp. 1386 (S.D. Miss. 1992), *aff'd,* 994 F.2d 1143 (5th Cir. 1993) .........................17

*Mallory v. Ohio,*
    38 F. Supp. 2d 525 (S.D. Ohio 1997), *aff'd,* 173 F.3d 377 (6th Cir. 1999) .........................30

*Miss. State Conf. of NAACP v. State Bd. of Election Commissioners,*
    739 F. Supp. 3d 383, 466 (S.D. Miss. 2024) .................................................................. passim

*Miss. State Conf. of NAACP v. State Bd. of Election Commissioners,*
    741 F. Supp. 3d 509 (S.D. Miss. 2024) .............................................................................3, 6

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v.*
   *Ferguson-Florissant Sch. Dist.,*
   894 F.3d 924 (8th Cir. 2018) ...............................................................14

*Monroe v. City of Woodville,*
   881 F.2d 1327 (5th Cir. 1989) ............................................................14

*Monroe v. City of Woodville, Miss.,*
   819 F.2d 507 (5th Cir. 1987) ..............................................................18

*Moore v. Leflore Cnty. Bd. of Election Comm'rs,*
   502 F.2d 621 (5th Cir. 1974) ..............................................................14

*Nipper v. Smith,*
   39 F.3d 1494 (11th Cir. 1994) ............................................................30

*Perez v. Abbott,*
   253 F. Supp. 3d 864, 889–90 (W.D. Tex. 2017)...........................16, 23

*Perry v. Perez,*
   565 U.S. 388 (2012)............................................................................16

*Pope v. Cty. of Albany,*
   687 F.3d 565 (2d Cir. 2012)................................................................14

*Robinson v. Ardoin,*
   86 F.4th 574 (5th Cir. 2023) .........................................................20, 24

*Singleton v. Allen,*
   690 F. Supp. 3d 1226, 1295 (N.D. Ala. 2023) ...................................15

*Singleton v. Allen,*
   691 F. Supp. 3d 1343 (N.D. Ala. 2023) .............................................17

*Singleton v. Allen,*
   No. 2:21-CV-1291, 2023 WL 6567895 (N.D. Ala. Oct. 5, 2023) ...........1, 16, 20, 28

*Soto Palmer v. Hobbs,*
   686 F. Supp. 3d 1213 (W.D. Wash. 2023), *cert. before judgment denied sub*
   *nom. Trevino v. Palmer,* 144 S. Ct. 873 (2024)...............................16, 32

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Thomas v. Bryant*,
  366 F. Supp. 3d 786 (S.D. Miss.), *aff'd*, 931 F.3d 455 (5th Cir. 2019), *vacated as moot*, 961 F.3d 800, 801 (5th Cir. 2020)................................................................14, 18, 24

*United States v. Bd. of Sup'rs of Forrest Cnty.*,
  571 F.2d 951 (5th Cir. 1978) ............................................................................13, 17

*United States v. Brown*,
  561 F.3d 420 (5th Cir. 2009) ...............................................................13, 18, 24, 33

*United States v. Dallas Cnty. Comm'n*,
  850 F.2d 1433 (11th Cir. 1988) ................................................................... passim

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
  979 F.3d 1282 (11th Cir. 2020) ...............................................................................14

### STATUTES

52 U.S.C. 10301...................................................................................... *passim*

### OTHER AUTHORITIES

Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg.
  5525, 5529.....................................................................................................31

## INTRODUCTION

This Court ordered a remedy for Section 2 vote dilution in three areas of the State where violations were proven at trial: The DeSoto County and Hattiesburg areas in the Senate, and the Chickasaw and Monroe County area in the House.  As the Court explained, while the State "has discretion" in fashioning a remedy, it must add districts "in which Black voters have an opportunity to elect candidates of their choice."  *Miss. State Conf. of NAACP v. State Bd. of Election Commissioners*, 739 F. Supp. 3d 383, 466 (S.D. Miss. 2024) (docketed at ECF No. 224) (hereinafter "July 2 Order").  Indeed, at the remedy phase of a Section 2 case, the question whether a remedial plan functionally provides new electoral opportunities for Black voters despite racially polarized voting is frequently the central issue.  As one three-judge federal court recently explained, for a remedial district to pass muster, "a performance analysis 'should demonstrate that the Black-preferred candidate often would win an election in the subject district.'"  *Singleton v. Allen*, No. 2:21-CV-1291, 2023 WL 6567895, at *8 (N.D. Ala. Oct. 5, 2023) (citation omitted).

Last week, the Legislature enacted remedial plans (the "Legislative Senate and House Plans").  In two of the three areas where a remedy is required, the Legislature added districts that are numerically just above 50% Black voting age, but that do not "perform"—that is, in Section 2 terms, they do not provide a realistic opportunity for Black voters to elect chosen candidates despite extreme levels of racial polarization.  Dr. Lisa Handley's analysis of the Legislative Plans, using the same "effectiveness score" analysis she offered at trial to help assess the third *Gingles* prong, shows that Black-preferred candidates will often be defeated in some of the numerically Black-majority districts in the DeSoto and Chickasaw/Monroe County areas.  Her analysis is consistent with extensive additional evidence of the barriers Black voters face in those areas.

Because the Legislative Plans do not create new districts where Black voters have a realistic opportunity to elect candidates of their choice despite racially polarized voting, there is

no functional change from the unlawful 2022 Plans.  There is no *addition*.  There was previously one effective opportunity Senate District for Black voters in the DeSoto County area, and there is *at most* one under the Legislative Senate Plan.  There were previously two Black opportunity House Districts in the area around Chickasaw and Monroe Counties, and there are two under the Legislative House Plan.

That is not a permissible remedy.  It is the continuation of vote dilution.

Plaintiffs do not reflexively object to the Legislature's efforts.  Indeed, Plaintiffs are not objecting to the Legislative Senate Plan's configuration of the Hattiesburg area, which adds an additional Black majority district and remedies vote dilution there, even though it does so differently than Plaintiffs might have liked.  But sometimes, the realm of what is politically possible and the realm of what is legally permissible may not align.  That is the case with the Legislative Plans' treatment of the Senate map in the DeSoto County area, and the House map in the area around Chickasaw and Monroe.

On the other hand, William Cooper's analysis shows it is entirely possible to draw plans with additional Black-majority districts that *do* provide additional opportunities for Black voters despite extreme racial polarization—plans that Dr. Handley analyzed for effectiveness to show that they actually remedy vote dilution.  Mr. Cooper's plans add new, effective Black-majority districts in both of the areas at issue while matching or beating the Legislative Plans on metrics like splits and compactness, respecting communities of interest, and adhering to the Legislature's stated goals, including minimizing the number of incumbents who must run in special elections.

While the Legislature came up short in the DeSoto and Chickasaw/Monroe areas on the crucial, dispositive question of electoral performance for Black voters, the modest further changes by Mr. Cooper bring the remedy across the goal line.

This Court should accordingly accept the Legislative Senate Plan in the Hattiesburg area, to which no party has objected, and then sustain Plaintiffs' objections as to the other two areas and order one of Plaintiffs' alternative plans into place.

## FACTUAL BACKGROUND

This Court is familiar with the underlying facts of this case and the trial record, which Plaintiffs incorporate here by reference. *See generally* July 2 Order; *Miss. State Conf. of NAACP v. State Bd. of Election Commissioners*, 741 F. Supp. 3d 509 (S.D. Miss. 2024) (docketed at ECF No. 229) (hereinafter "July 18 Remedial Order"); *see also* Pls.' Proposed Findings of Fact and Conclusions of Law ("PFOFCOL"), ECF No. 220.[1]  Plaintiffs recite here only those facts necessary to provide context for the present partial objections.

### A.    Plaintiffs Prove Vote Dilution at Trial and This Court Orders a Remedy

After a two-week trial, this Court identified Section 2 violations in three parts of the state: (i) the area in and around DeSoto and Tunica Counties (Illustrative SD 2), (ii) the area in and around Hattiesburg and Forrest and Lamar Counties (Illustrative SD 9), and (iii) the area in and around Chickasaw and Monroe Counties (Illustrative HD 22).  July 2 Order at 40-42, 42-44, 49-51.  In doing so, the Court concluded that high levels of racially polarized voting in those areas have consistently resulted in White voters bloc-voting to defeat the candidates preferred by Black voters.  *E.g.*, July 2 Order at 56-57, 63-64, 71.

Specifically, this Court concluded that "racial polarization among voters in Mississippi is quite high."  July 2 Order at 71.  As a result of that polarization, "Black-preferred candidates are consistently unable to win elections unless running in a majority-minority district."  *Id.*  The Court

---

[1] For ease of reference, Plaintiffs cite to the docketed slip opinions rather than the federal reporter for both the July 2 Order (ECF No. 224) and the July 18 Remedial Order (ECF No. 229).

credited the racial polarization and effectiveness analyses performed by Dr. Handley.  *Id.* at 62, 69.  Dr. Handley's methods and results undisputedly were "accurate and reliable."  *Id.* at 60.  For purposes of the second and third *Gingles* preconditions, the Court ultimately credited Dr. Handley's conclusions regarding racial polarization, "particularly for the areas encompassing the three valid illustrative districts."  *Id.* at 65-66, 71.  The Court also credited Dr. Handley's analysis as to Senate Factor 2, finding that "it is almost impossible for a black-preferred candidate to prevail [in non-Black-majority districts] because crossover voting is nearly non-existent" given the "stark" levels of racial polarization.  *Id.* at 89-90.

The Court noted that the trial record did not contain analyses of election results from November 2023, which only became available shortly before trial.  July 2 Order at 62.  Those analyses, as well as analysis for the November 2024 elections, are contained in Dr. Handley's new remedy-phase report, which shows that high levels of racial polarization continue to persist in the relevant areas.  *See* Ex. J, Expert Report of Dr. Lisa Handley on the 2025 Mississippi Senate and House Remedial Plans ("Handley Remedial Report") at 3-4, 8 & Appxs. A & B.  In the DeSoto County area, an average of 93% of Black voters supported the same candidates in the ten elections examined from 2023 and 2024; those Black-preferred candidates received on average only 8.6% support from White voters.  *Id.* at 2-3.  In the area around Chickasaw and Monroe Counties, Black voter cohesion was over 95% on average, and the Black-preferred candidates received on average 5.4% support among White voters.  *Id.* at 7.  In both areas, by far the highest level of White crossover support went to a White candidate, Brandon Presley.  *Id.* at 3, 7; *see* July 2 Order at 69.

Dr. Handley's trial-stage analysis of political performance also included calculating "effectiveness scores" for the districts in both the 2022 Enacted Plans and Mr. Cooper's trial-stage Illustrative Plans for each of the relevant areas using the results of past statewide elections.  *See*

Handley Amended Expert Report dated December 22, 2023, PTX-004 ("Handley Trial Report") at 14-16, 30. This performance analysis showed that Mr. Cooper's plans created additional districts that not only contained numerical Black voting-age majorities, but that were actually effective in providing Black voters with opportunities to elect candidates of their choice despite racially polarized voting patterns. *Id.*; *see also, e.g.*, PFOFCOL ¶¶ 179.

With respect to the totality of the circumstances, the Court examined the political and socioeconomic realities in Mississippi that hinder Black political participation. For instance, in analyzing Senate Factor 5, the Court found that Plaintiffs' expert, "Dr. Orey[,] is correct that black Mississippians suffer socioeconomic disparities that impair their ability to participate in the political process." July 2 Order at 98. The Court found that "Black Mississippians are significantly worse off in terms of income, poverty, unemployment, educational attainment, internet access, vehicle ownership, and health-insurance coverage," disparities that can be traced back to residential and school segregation *Id.* at 98-99, 106-07. The Court ultimately "credit[ed] Dr. Orey's conclusion that voting and political participation is influenced by financial resources, education, income, and unemployment" in the present day, based on Dr. Orey's regression analysis of the latest Census and voter file data, and found "that black Mississippians are worse off than white voters in terms of these factors." *Id.* at 106-07.[2]

The Court also credited expert testimony that Black Mississippians are "disproportionately incarcerated," and that "formerly incarcerated individuals are less likely to participate in politics."

---

[2] Dr. Orey was also able to quantify a turnout gap between Black and White Mississippians using "three different, generally accepted methods," all of showed an actual racial turnout gap. July 2 Order at 99-101; *see also* Orey Trial Report at 22-26. Dr. Handley's remedy-stage report corroborates this racial turnout gap finding based on additional analysis, especially in DeSoto County. *See* Handley Remedial Report at 5 & Appx. C.

July 2 Order at 78.  Mississippi's lifetime ban on voting for certain criminal convictions, combined with Black Mississippians' "overrepresentation in the criminal-justice system," means that "a higher percentage of black than white Mississippians [are] ineligible to vote." *Id.*

Taking the entire record into account, this Court found Section 2 violations in three areas of the state where Black voters have less opportunity to elect their preferred candidates as a result of Black voting strength being submerged in White-majority districts, stark racial polarization with minimal crossover voting, and present-day barriers to equal political participation and turnout. July 2 Order at 1, 10, 114, 118.  The Court held that new lines would need to be drawn in those areas to remedy the "severe" harm of unlawful vote dilution.  July 2 Order at 116.  The Court ordered that special elections would be held in 2025, giving the Legislature the opportunity to enact remedial plans during the 2025 legislative session.  *See* July 18 Remedial Order at 4-5.

**B.    The Legislature Adopts Plans That Only Partially Remedy Vote Dilution**

On March 5, 2025, the Legislature adopted Joint Resolutions 202 and 1, which embody proposed remedial districting plans for the State Senate and the State House, respectively.  Unlike with the 2022 Enacted Plans, there were no public meetings to solicit input from affected communities.  Nor did the Legislature hold any public hearings or otherwise publicly solicit input from community leaders or experts.[3]  Rather, each of the Legislative Plans was drafted behind closed doors and then brought to the floor and voted on by the originating chamber the day after

---

[3] At the start of the session, and before any of the Legislature's plans had been announced, Plaintiffs provided the leaders of the Legislature with proposed remedial plans.  *See* Ex. H, Pl.s' Letter to Legislative Leaders dated Jan. 10, 2025.  Plaintiffs explained that it was possible to draw additional Black opportunity districts "while maintaining all existing Black-majority districts as opportunity districts where Black voters can elect candidates of choice despite racially polarized voting patterns," *id.* at 3, 5, and expressed that they were "ready and eager to work with the Legislature to ensure passage of a complete remedy along the lines of this proposal," *id.* at 6.

being introduced. *See, e.g.*, Ex. A, Bill Histories for Joint Res. 202 and Joint. Res. 1; *see also generally, e.g.*, Ex. B, Mississippi House Webcast Recording for February 6, 2025 ("Feb. 6 House Floor Video") at 19:00-37:03; Ex. C, Mississippi Senate Webcast Recording for February 26, 2025 ("Feb. 26 Senate Floor Video") at 4:19:00-6:33:00.

### 1.    *The Legislative Senate Plan*

The Legislative Senate Plan modifies five districts in the DeSoto County area—Districts 1, 2, 10, 11, and 19. Under the 2022 Enacted Plan, Senate District 11 was a Black-majority district, which stretched from Quitman and Coahoma Counties in the Delta north through Tunica County into western DeSoto County. *E.g.*, PFOFCOL ¶¶ 63, 430; Declaration of William S. Cooper, PTX-001 at 23, 31. Under the Legislative Senate Plan, a new Black-majority district, renumbered as Senate District 11, is created in the area where Plaintiffs' trial-stage Illustrative Senate District 2 had been drawn, based in the City of Horn Lake as well as western DeSoto County and northern Tunica County. *See* Ex. F, MARIS Data on Legislative Senate Plan ("MARIS Senate Data") at 1, 42; *see also* Ex. I, Declaration of William S. Cooper Regarding Remedial Plans ("Cooper Remedial Report") at 7-9; Feb. 26 Senate Floor Video at 4:26:00-4:28:05 (Sen. Kirby identifying District 11 as the "newly created minority district in the area" under the Legislative Senate Plan).[4] Dr. Handley's subsequent effectiveness analysis shows that Legislative Senate Plan District 11 as

---

[4] The Legislative Senate Plan also modifies five districts in the Hattiesburg area (Senate Districts 34, 41, 42, 44 and 45). Senate District 34, which was already a Black-majority district, had stretched from Jasper County south into downtown Hattiesburg under the 2022 Enacted Plan. *See* PFOFCOL ¶¶ 109; Declaration of William S. Cooper, PTX-001 at 25, 40. Under the 2025 Legislative Senate Plan, SD 34 is modified and now includes Jasper County and parts of Covington and Jones counties, with its BVAP reduced from 56.48% to 53.30%. *See* MARIS Senate Data at 1, 42. A new SD 45 is added in the Hattiesburg area in Forrest and Lamar Counties, with a BVAP of 51.24%. *See id.* Plaintiffs do not object to the Legislative Senate Plan's configuration of the Hattiesburg area.

configured is *extremely* competitive as an open seat, with an "effectiveness score" of .502, barely over the threshold that she has identified for a Black opportunity district. *See* Handley Remedial Report at 5-6; *see also infra* pp. 18-20.

The Legislative Senate Plan meanwhile reconfigures the old majority-minority North Delta district and renumbers it as Senate District 1. Legislative Senate Plan District 1 combines the Delta-based, majority-Black portions of former Senate District 11—*i.e.*, the rest of Tunica County, all of Quitman County, and part of Coahoma County including Clarksdale—with portions of the predominantly White City of Hernando in DeSoto County. *See* MARIS Senate Data at 1, 41; *see also* Cooper Remedial Report at 7-9. As Senate Majority Leader Dean Kirby, who led the redistricting process in the Senate, explained, under the Legislative Senate Plan, "[t]he old District 11 from '22, which is an existing minority district, becomes District Number 1." Feb. 26 Senate Floor Video at 4:26:00-4:28:05. The Legislative Senate Plan's reconfiguration of Senate District 1 paired two incumbents—Sen. Michael McLendon of Hernando, a White Republican, and Sen. Reginald Jackson of Quitman County, a Black Democrat. *See* Cooper Remedial Report at 7-9; *see also* Feb. 26 Senate Floor Video at 4:28:00-4:28:05. The Black voting age percentage ("BVAP") of this North-Delta-based Black-majority district, which had previously been over 62% under the 2022 Enacted Plan, was reduced by nearly 10 points, to 52.5%. Dr. Handley's functional analysis of electoral performance for this district shows that Black voters will usually be unable to elect preferred candidates, with an effectiveness score of less than .5 (.491). Handley Remedial Report at 5-6. Black-preferred candidates were unable to carry the district in 11 out of 19 biracial elections over the last decade. *See id.*; *see also infra* p. 18-20.

The Legislative Senate Plan was released on February 25 and brought to the Senate floor for a vote the next day, February 26. *See, e.g.*, Ex. A, Bill Histories for Joint Res. 202 and Joint.

Res. 1 at 1.  On the Senate floor, the plan was opposed by nearly every Black Senator, including Senate Minority Leader Derrick Simmons.   Senator Simmons raised concerns about the performance of Senate District 1 under the Legislative Senate Plan, noting that, "even though a district may be right above fifty percent, vote dilution still may exist if minorities in that particular district cannot select the candidates of choice." *See* Feb. 26 Senate Floor Video at 5:38:00-5:38:50; *see also* Ex. L, Declaration of Senator Derrick T. Simmons ("Simmons Declaration") at ¶¶ 3-4. He proposed an amendment that accepted the Legislative Plan's configuration of the Hattiesburg area but modified the DeSoto County area to unpair Senators McLendon and Jackson and increase the BVAP of the new Senate District 1.  *See* Feb. 26 Senate Floor Video at 5:25:10-5:45:20. The proposed amendment was defeated, although every Black Senator in the chamber supported it.[5]

Senator McLendon also opposed the Legislative Senate Plan, arguing that, given that the Legislative Senate Plan was not released until the day before the floor vote, and the fact that legislative leaders could not identify the company that had conducted a purported performance analysis of the plan or any details of that purported analysis, "we're at a point that we aren't transparent." *See* Feb. 26 Senate Floor Video at 5:02:00-5:09:45. Senator McLendon also objected to the Legislative Senate Plan's treatment of the City of Hernando, arguing that including voters from the predominantly White precincts around Hernando in new Senate District 11 was "penaliz[ing]" those voters "for voting too high."  Feb. 26 Senate Floor Video at 4:53:00-4:56:00. Senator McLendon argued it was improper to pair portions of Hernando with majority-Black areas in the Delta, stating that the Legislative Senate Plan, in doing so, was "taking two cultures and pairing them together." *E.g.*, Feb. 26 Senate Floor Video at 6:04:20-6:04:28.  Notably, however,

---

[5] *See* Yeas and Nays on Amendment No. 1 to J. R. No. 202, https://billstatus.ls.state.ms.us/2025/pdf/votes/senate/0510018.pdf

while Senator McLendon opposed combining Hernando with majority-Black areas in the North Delta, he did not express any concern about his ability to win the new 52.5% BVAP Senate District 1. Nor did Senator Kirby. In a colloquy with Senator McLendon, Senator Kirby appeared to state that voters in the predominantly White Hernando area would still be "getting the person of their choice, I would think," under the Legislative Senate Plan. *See* Feb. 26 Senate Floor Video at 4:55:55 - 4:55:58. Senator McLendon offered an amendment that was defeated on a voice vote. *See* Feb. 26 Senate Floor Video at 6:21:00-6:22:05.

The Senate voted the same day to adopt the Legislative Senate Plan, largely along partisan and racial lines.[6]

On March 5, the House took up and passed the Senate Plan by a 67-51 vote. *See* Ex. E, Mississippi House Webcast Recording for March 5, 2025 ("March 5 House Floor Video") at 42:56-54:10. Several White Republicans from the DeSoto County area criticized the Senate Plan for combining portions of DeSoto County around Hernando with the Mississippi Delta. *Id.* at 46:00-54:10. A number of them voted against the plan, as did nearly every Black House member. *Id.*[7]

## 2.    *The Legislative House Plan*

The 2025 Legislative House Plan modifies five districts in the area of Chickasaw and Monroe Counties (House Districts 16, 22, 36, 39, and 41). House District 16, which was already

---

[6] Three Black Democrats voted for the Legislative Senate Plan on final passage (Senator Barnett, the incumbent in Black-majority Senate District 34 north of Hattiesburg, Senator Sarita Simmons, and Senator Turner-Ford); four White Republicans voted against (Senators McLendon, Chism, Hill, and Tate). *See* Yeas and Nays on J. R. No. 202, https://billstatus.ls.state.ms.us/2025/pdf/votes/senate/0510019.pdf.

[7]    *See* Yeas and Nays on J. R. No. 202, https://billstatus.ls.state.ms.us/2025/pdf/votes/house/0580025.pdf.

a Black-majority district with its population base in Tupelo, was reconfigured, with its BVAP reduced from 62.29% to 53.21%. *See* Ex. G, MARIS Data on Legislative House Plan ("MARIS House Data") at 2-3; *see also* Cooper Remedial Report at 18-19. The effectiveness score for that district drops from .582 under the 2022 Plan to .503 under the new Legislative House Plan—sharply more competitive, and just a hair over a 50% average vote-share. *See* Handley Remedial Report at 9; Handley Trial Report at 30.[8]

Adjacent House District 22, the "new" Black-majority district, had its BVAP increased to just over 50% (51.2%). *See* MARIS House Data at 2-3. The effectiveness score of the new HD 22 is .530. *See* Handley Remedial Report at 9. The Legislative House Plan divides Monroe County in particular among six different House districts, including HDs 16, 22, and 36, and splits both of the County's Black population centers (Amory and Aberdeen). *See* Cooper Remedial Report at 18 & Ex. K-2 at Ex.I-098-102.

The Legislative House Plan does not pair any incumbents. *See* Feb. 6 House Floor Video at 23:00-23:35. Representative Jon Lancaster, a White Republican, will be able to run for re-election in the new majority-Black House District 22 as an incumbent under the Legislative House Plan. *See, e.g.*, Ex. K, Expert Report of Dr. Marvin King ("King Remedial Report") at 1-2.

The Legislative House Plan was released on February 5 and brought to the House floor for

---

[8] Other existing Black-majority districts in the area were changed but not significantly affected. House District 36, which was already a Black-majority district with its population base in Clay County, was reconfigured, with its BVAP reduced from 61.2% to 54.6%. *E.g.*, MARIS House Data at 2-3; *see also* Cooper Remedial Report at 18-19. The effectiveness score for that district remains strong at .580. *See* Handley Remedial Report at 9; *see also* Handley Trial Report at 30. House District 41, which was also a Black-majority district with its population base in Columbus (Lowndes County) was modified very slightly under the Legislative House Plan, with its BVAP reduced to 64.56%. *See* MARIS House Data at 2-3; *see also* Cooper Remedial Report at 18-19. It remains effective in terms of performance under the Legislative House Plan. *See* Handley Remedial Report at 10 n.7.

a vote the next day, February 6.  *See, e.g.*, Ex. A, Bill Histories for Joint Res. 202 and Joint Res. 2.  The House adopted the 2025 Legislative House Plan that day largely along partisan and racial lines:  Representative Lancaster voted against the plan, Representative Rickey Thompson, a Black Democrat who is the incumbent representative in HD 16, voted "present," and in all, 31 out of 41 Black representatives voted against the plan.  *See* Feb. 6 House Floor Video at 36:38-37:05.[9]

On March 5, the Senate took up and passed the House Plan by a 33-15 vote.  *See* Ex. D, Mississippi Senate Webcast Recording for March 5, 2025 ("March 5 House Floor Video") at 1:06:39-1:06:50.[10]  Nearly every Black Senator voted against the plan.  *See id*.

### 3.      *The 2025 Special Elections Schedule*

Both resolutions include identical special election schedules, culminating in a November 2025 special election for the districts that have been altered.  *See* Feb. 26 Senate Floor Video at 4:30:49-4:32:02 (noting that the two schedules are the same).

The candidate qualifying period begins May 19, 2025, and ends May 30, 2025.  The 45-day absentee voting period pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") begins on June 21, 2025, for the primary election.  The primary election then takes place on August 5, 2025, with runoffs on September 2, 2025.[11]  For the November 4, 2025 special general election, UOCAVA voting begins on September 20, 2025.

### GOVERNING LAW

At the remedial stage, "the court's first and foremost obligation must be to correct the

---

[9]      *See    also*    Yeas    and    Nays    on    J.R.    1, https://billstatus.ls.state.ms.us/2025/pdf/votes/house/0310002.pdf.
[10]      *See    also*    Yeas    and    Nays    on    J.    R.    No.    1, https://billstatus.ls.state.ms.us/2025/pdf/votes/senate/0580013.pdf.
[11]      *See,    e.g.*,    Text    of    J.    R.    No.    1, https://billstatus.ls.state.ms.us/documents/2025/pdf/JR/JR0001PS.pdf.

Section 2 violation."  July 2 Order at 114 (quoting *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009)) (internal quotation marks omitted).  "The goal of any [Section 2] remedy is to assure effective black minority participation in democracy."  *United States v. Bd. of Sup'rs of Forrest Cnty.*, 571 F.2d 951, 955 (5th Cir. 1978) (quoting *Kirksey v. Bd. of Sup'rs of Hinds Cnty.*, 554 F.2d 139, 151 (5th Cir. 1977) (en banc)).  Therefore, any remedial plan must "completely remed[y] the prior dilution of minority voting strength," July 2 Order at 114-15 (citing *Brown*, 561 F.3d at 435), and "fully provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice."  *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437-38 (11th Cir. 1988) (quoting S. Rep. No. 97-417, at 31 (1982)).  In doing so, the remedy must be "tailored to the circumstances giving rise to the Section 2 violation," which here involve high levels of racial polarization and barriers to Black political participation in three areas of the state.  July 2 Order at 115 (quoting *Brown*, 561 F.3d at 435).

A remedial plan that "perpetuates" the dilution of Black voting strength, on the other hand, must be rejected.  *E.g.*, *Dallas Cnty. Comm'n*, 850 F.2d at 1437-38.

The creation of an additional district with a numerical majority Black population does not automatically cure a Section 2 violation.  That is because, as the Supreme Court has recognized, it is "possible for a citizen voting-age majority to lack real electoral opportunity."  *Cf. League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 428 (2006).  Indeed, "bare population majorities" in some circumstances "may actually enhance the possibility of continued minority political impotence."  *Kirksey*, 554 F.2d at 150 (citing *Moore v. Leflore Cnty. Bd. of Election Comm'rs*, 502 F.2d 621, 624 (5th Cir. 1974)); *see also, e.g.*, *Monroe v. City of Woodville*, 881 F.2d 1327, 1333 (5th Cir. 1989) ("Unimpeachable authority from our circuit has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote

13

dilution.").  Courts have thus repeatedly held that numerically minority-majority districts that do not provide sufficient electoral opportunity dilute minority voting strength, including, just a few years ago, in a case in this District involving a just-over-50%-BVAP district in the Mississippi Delta.  *See Thomas v. Bryant*, 366 F. Supp. 3d 786, 805, 809-10 & n.80 (S.D. Miss.), *aff'd*, 931 F.3d 455 (5th Cir. 2019), *vacated as moot*, 961 F.3d 800, 801 (5th Cir. 2020).[12]

Rather than mere numerical majority-minority districts, a proper remedial plan must add districts in which compact minority communities can form "effective majorities," providing them a realistic chance of electing candidates of choice in spite of racially polarized voting.  *E.g.*, *Abbott v. Perez*, 585 U.S. 579, 587 (2018).  And to determine whether a district is effective, courts must conduct a functional analysis of local political realities—akin to the analysis that originally identified the Section 2 violation.  *See, e.g.*, *Dallas Cnty. Comm'n*, 850 F.2d at 1437 ("It is clear that any proposal to remedy a Section 2 violation must itself conform with Section 2.").

At the remedial stage, courts thus often rely on an effectiveness (or "performance") analysis—of the kind that Plaintiffs submitted in support of the third *Gingles* precondition, *see*

---

[12] *See also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1308 (11th Cir. 2020) (agreeing Section 2 claims may prevail even "when members of a protected class form a majority of a challenged district's voting age population"); *Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934 (8th Cir. 2018) ("[Plaintiffs] do not lose VRA protection simply because they represent a bare numerical majority within the district."); *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012) (racial minorities who constitute a majority within a challenged district can prevail on a Section 2 claim when the district does "not present the 'real electoral opportunity' protected by Section 2); *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003) ("demographic and political contexts" may support finding that "minority voters might have less opportunity to elect representatives of their choice even where they remain an absolute majority in a contested voting district"); *Ketchum v. Byrne*, 740 F.2d 1398, 1413 (7th Cir. 1984) (discussing "the widely accepted understanding . . . that minorities must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice" and rejecting remedies "which will not in fact provide [minority voters] with a realistic opportunity to elect a representative of their choice").

Handley Trial Report at 14-35—to statistically assess the likelihood of Black-preferred candidates prevailing under the remedial plan.  *See Singleton v. Allen*, 690 F. Supp. 3d 1226, 1295 (N.D. Ala. 2023) (three-judge panel) (collecting appellate and remedial cases relying on performance analyses); *see also Baldus v. Members of Wisconsin Gov't Accountability Bd.*, 862 F. Supp. 2d 860, 862 (E.D. Wis. 2012) (determining effectiveness based on turnout rates and population data); *Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035, 1041 (D.S.D. 2005) (determining effectiveness of remedial district based on likely vote-shares, calculated using voting age population and turnout estimates), *aff'd*, 461 F.3d 1011 (8th Cir. 2006).

As one three-judge court recently affirmed in assessing a Section 2 remedy: "[F]or a proposed remedial district to perform as an opportunity district, a performance analysis 'should demonstrate that the Black-preferred candidate often would win an election in the subject district.'"  *Allen*, 2023 WL 6567895, at *8 (quoting report of special master).

Numerous additional considerations may also inform the court's evaluation of the effectiveness of a remedial district in addition to quantitative analysis of election results.  Those include registration and turnout rates, including racial turnout gaps, *e.g.*, *Bone Shirt*, 461 F.3d at 1023; *Ketchum*, 740 F.2d at 1414; *Baldus*, 862 F. Supp. 2d at 862; the effects of incumbency, including whether any incumbents reside in the proposed remedial districts, *Bone Shirt*, 461 F.3d at 1019, 1023; and whether "past discrimination, current social/economic conditions, and a sense of hopelessness" disproportionately reduce minority turnout. *Soto Palmer v. Hobbs*, 686 F. Supp. 3d 1213, 1234 (W.D. Wash. 2023), *cert. before judgment denied sub nom. Trevino v. Palmer*, 144 S. Ct. 873 (2024); *see also Dallas Cnty. Comm'n*, 850 F.2d at 1440 (rejecting district court's remedial district as ineffective because of "the fact that black citizens share a vastly lower socio-economic status than do whites . . . , and that black citizens have been the victims of past

15

discrimination," which cause lower levels of voter registration and turnout and political participation). Gaps in turnout may be especially relevant because when lower-turnout minority voters are combined with higher-turnout White voters into one district, minority voters will likely have "have less practical opportunity to elect." *Perez v. Abbott*, 253 F. Supp. 3d 864, 889–90 (W.D. Tex. 2017) (three-judge panel).

In determining a proper remedy and assessing proposed alternative remedies, the court should also consider legislative policies underlying the remedial plan, but only "to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." *Perry v. Perez*, 565 U.S. 388, 393 (2012) (citation omitted). Thus, a Section 2 remedial plan may disregard policies like partisanship or "incumbency protection," *LULAC*, 548 U.S. at 440-41, or "core retention," *Allen v. Milligan*, 599 U.S. 1, 21-22 (2023), when they have the effect of perpetuating vote dilution.

Finally, where an additional majority-minority district is required in order to remedy vote dilution, it is not permissible to offset the creation of a new minority-opportunity district by eliminating another one next door. The "goal" of a Section 2 vote dilution remedy is to *increase* Black political opportunity. *See Bd. of Sup'rs of Forrest Cnty.*, 571 F.2d at 955. "[P]laintiffs could not establish a violation of [Section] 2 of the VRA without showing that there is a 'possibility of creating more than the existing number of reasonably compact' opportunity districts." *Abbott*, 585 U.S. at 615. Accordingly, and certainly in the context of this case and the areas of the state at issue, a "complete" remedy must actually increase the number of districts where Black voters have an equal opportunity to elect their preferred candidates. *See* July 2 Order at 114-15; *see also, e.g.*, *Singleton v. Allen*, 691 F. Supp. 3d 1343, 1351 (N.D. Ala. 2023) (three-judge panel) (rejecting remedial plan that "provide[d] no greater opportunity for Black Alabamians to elect a candidate of their choice than the 2021 Plan provided").

**ARGUMENT**

I.    **PLAINTIFFS' OBJECTION TO THE LEGISLATIVE SENATE PLAN SHOULD BE SUSTAINED**

A.    **The Legislative Senate Plan Does Not Add a New Opportunity District in the DeSoto County Area and Therefore Does Not Remedy Vote Dilution**

Courts in Mississippi previously used a "65% rule" to ensure Black opportunity remedial districts in the Mississippi Delta. *See, e.g.*, *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1396 (S.D. Miss. 1992) (discussing use of 65% Black population or 60% Black voting age population as threshold for remedial districts to ensure electoral opportunity for Black voters), *aff'd*, 994 F.2d 1143 (5th Cir. 1993).  Today, such bright-line rules regarding district BVAP no longer apply, and remedial districts may surely be drawn such that they are somewhat competitive. On the other hand, there are also no bright lines on the other end of the spectrum:  A district is not a valid remedy for vote dilution merely because it is numerically above 50% BVAP.  A functional analysis is required:  "[T]he question of the size of the majority necessary to ensure the likelihood of minority success at the polls cannot be determined by a set formula, but must be evaluated on a case-by-case basis according to the political and other characteristics of the relevant population." *E.g.*, *Monroe v. City of Woodville, Miss.*, 819 F.2d 507, 511 n.1 (5th Cir. 1987) (per curiam); *see also, e.g.*, *Thomas*, 366 F. Supp. 3d at 799, 810 (51% BVAP district diluted Black voting strength); *see also* Pl.'s Notice, *Thomas v. Reeves*, No. 18 Civ. 441, ECF No. 99 (April 4, 2019) (agreeing to 58% BVP remedial district).  Indeed, the functional analysis is critical at the remedy stage to determine whether a plan has in fact added a minority opportunity district and thereby "completely remed[ied]" vote dilution.  *E.g.*, *Brown*, 561 F.3d at 435; *see also* July 2 Order at 114-15.

Here, the required functional analysis is supplied by Dr. Handley.  Dr. Handley's effectiveness analysis—the same type of quantitative analysis she employed at trial to help determine whether White bloc-voting typically results in the defeat of Black-preferred candidates

in the areas at issue and whether Plaintiffs' trial-stage Illustrative Plans in fact added new opportunity districts, Handley Trial Report at 14-35—accounts for nineteen biracial elections from 2015 through 2024 to determine whether Black-preferred candidates are on average able to carry any particular district. *See* Handley Remedial Report at 4-5. She analyzed effectiveness in two ways: First, by generating an "effectiveness score," representing the average vote-share for Black-preferred candidates each district, and second, calculating a "percent won score" by looking at the raw number of contests where Black-preferred candidates carried each district. *Id.* As with her trial-stage analysis, a district is "performing" based on its effectiveness score if the score is greater than .5—and it is *per se* not performing if the score is less than .5. *See* Handley Remedial Report at 4-5; *see also* Handley Trial Report at 14. With respect to the "percent won score" metric, districts where Black-preferred candidates are defeated in more than 40% of contests can be considered non-performing. Handley Remedial Report at 4-5.

Dr. Handley's effectiveness analysis shows that shows that in the DeSoto County area, there has been no increase in the number of Black opportunity districts as compared to the 2022 Senate Plan that violated the Voting Rights Act. If anything there has been a diminution.

Under the 2022 Senate Plan, there was one Black-majority district in the area that was highly effective—former District 11, which extended from the Delta into Western DeSoto County, had a BVAP of 62.4%, and, according to Dr. Handley's trial analysis, an effectiveness score of .582. *See* Handley Trial Report at 16-17; *see also* PFOFCOL ¶ 179. And, under the Legislative Plan, there is *at most* one Black-majority district in the area that is effective—District 11, now located in DeSoto County and northern Tunica County. *See* Handley Remedial Report at 6.

To be clear: As configured in the Legislative Senate Plan as a 50.9% BVAP open-seat district, Senate District 11 is *extremely* competitive. Handley Remedial Report at 6. Dr. Handley

18

calculates Legislative Senate Plan District 11's effectiveness score at .502, meaning that the average vote-share for Black-preferred candidates in that district is almost exactly 50%. *See id.* at 5-6. Looking at the "percent won score" metric, out of 19 biracial elections, Black-preferred candidates carried the district in 12 of them (63 percent). *Id.* Senate District 11 is just barely over the threshold for performance on both metrics. *See* Handley Remedial Report at 3-4.

But even granting that Legislative Senate Plan District 11 is a performing district for remedial purposes, *there are not any other effective districts in the area*. There was one before, and there is *at most* one now.

Legislative Senate Plan District 1, the other Black-majority district in the area, simply is not a performing district. While it has a BVAP of slightly more than 50% (52.46%), District 1, which combines parts of DeSoto County around Hernando with parts of the North Delta, has an effectiveness score of .491 (meaning that the average vote-share for Black-preferred candidates in that district is just 49.1%). *See* Handley Remedial Report at 5-6. According to the effectiveness score metric, Legislative Senate Plan District 1 is not an opportunity district for Black voters. *Id.* at 4; *see also* Handley Trial Report at 15 (applying consistent .5 effectiveness score threshold). The "percent won score" confirms this conclusion: Out of 19 biracial elections, Black-preferred candidates carried Legislative Senate Plan District 1 in just 8 of them—42 percent, well below the 60%-of-contests level that can indicate an ineffective district for this metric. *See* Handley Remedial Report at 4-6. As Dr. Handley explains, Legislative Senate Plan District 1 "fall[s] below the applicable threshold on both metrics" for assessing performance and is simply "not a functional opportunity district for Black voters." *Id.* at 6. Or, in the parlance of the third *Gingles* factor, Black-preferred candidates "will usually fail" in Legislative Senate Plan District 1. *E.g.*, *Robinson v. Ardoin*, 86 F.4th 574, 596 (5th Cir. 2023).

This conclusive functional analysis demonstrates that no new opportunity district has been added in the DeSoto County area. *See, e.g.*, *Allen*, 2023 WL 6567895, at *8. No remedy has been put in place for the vote dilution proven at trial (let alone a complete remedy).

Instead, vote dilution continues in the DeSoto County area under the Legislative Senate Plan. Applying the *Gingles* preconditions illustrates the point. As the Court already found at trial, and as Plaintiffs' alternative remedial plans further demonstrate, it is possible to draw an additional reasonably-configured Black-majority district in the DeSoto County area (*Gingles* 1). *See* July 2 Order at 40-42, 114; *see also infra* pp. 24-27. As the Court already found at trial, and as Dr. Handley's additional racial bloc voting analysis of the 2023 and 2024 elections confirms, Black voters vote highly cohesively for chosen candidates, and White voters vote highly cohesively against Black-preferred candidates, in the DeSoto County area (*Gingles* 2). *See* July 2 Order at 60-61; *see also* Handley Remedial Report at 3-4 and Appxs. A & B. And as just discussed, in this extremely racially polarized context, Black-preferred candidates will typically be defeated in Legislative Senate Plan District 1. *See supra*. The Legislative Senate Plan merely shifts the locus of vote dilution slightly southward within the same geographic area, so that now it is Black voters in the North Delta that will bear the brunt of the damage.

Other evidence, all consistent with the extensive findings this Court made already in evaluating the totality of the circumstances at the trial stage, strongly corroborates this dispositive analysis. The level of racial polarization in the area remains extremely high. *See* Handley Remedial Report at 3-4 and Appxs. A & B; *see also* July 2 Order at 60-61, 65-66, 71. Consistent with the trial evidence, the most recent elections continue to show that it is Black-preferred candidates who are White can attain higher White crossover support, Handley Remedial Report at 3-4, which is further evidence that "race matters" in politics. *See* July 2 Order at 69. And this

polarization goes hand in hand with localized evidence of racial division in politics—division encapsulated by, among other things, Senator McLendon's statement on the floor of the Mississippi Senate that the Delta and Hernando were "two cultures" that could not be properly grouped together. *E.g.*, Feb. 26 Senate Floor Video at 6:04:20-6:04:28.[13]

The geographic and socioeconomic circumstances of the district also strongly confirm the analysis. Mr. Cooper's Report and Appendices include an array of socioeconomic data for the relevant counties and communities in Legislative Senate Plan District 1, including Hernando and the Delta. *See* Cooper Remedial Report at 10 and Appxs. A-1 & A-2. These data illustrate extensive residential segregation between these areas and socioeconomic chasms between Black and White Mississippians between and within them, especially with respect to education, income, poverty, and employment. *Id.* Hernando, which makes up a large portion of Legislative Senate Plan District 1, is predominantly White (approximately 80% for the portion included in Legislative Plan District 1, and nearly 80% overall) and generally affluent—for example, median annual income for White residents is high at around $100,000 (versus $29,000 for Black residents) and unemployment is low at around 2% for White residents (versus 7.9% for Black residents). *See id.* at 9; *see* Cooper Remedial Report Appx. A-2 at Ex.I-1009-1010 (racial demographics of Clarksdale), Ex.I-1026-1054 (education, income, and employment statistics by race for Hernando). The Delta communities in Tunica, Quitman, and Coahoma Counties, including the population center of Clarksdale, are predominantly Black (approximately 78% Black for the

---

[13] As another example, Plaintiff Pam McKelvy Hamner previously campaigned in Hernando and testified that law enforcement was called on her and her canvassers. *See* P. Hamner Testimony, 2/28/24, Trial Tr. 720:15-24; *see also* July 2 Order at 108. In response, Senator McLendon inveighed that Ms. McKelvy's recounting of this incident was "perjury." *See* Feb. 26 Senate Floor Video at 5:53:09-5:56:18.

portions included in Legislative Plan District 1) and substantially poorer— median annual income for White residents is around $60,000 versus $29,000 for Black residents and unemployment is around 1.4% for White residents but 13.2% for Black residents.  *See* Cooper Remedial Report at 9; *see* Cooper Remedial Report Appx. A-2 at Ex.I-890-891 (racial demographics of Clarksdale), Ex.I-908-936 (education, income, and employment statistics by race for Clarksdale); *see also* Cooper Remedial Report Appx. A-1 at Ex.I-122-150, Ex.I-241-268, Ex.I-359-386 (same statistics for Coahoma, Quitman, and Tunica Counties).

This data is confirmed by Senator Simmons, who represents Coahoma County and other Delta communities and has extensive experience in politics in the area:  "[T]he predominantly Black portions of the district are largely rural areas in the North Delta where there are significant barriers to organizing and turnout, including economic and educational inequality, lack of access to a vehicle, and proximity to polling locations.  By contrast, the predominantly White portion of the district, around Hernando, is a more densely populated, relatively affluent, high-turnout area." Simmons Declaration at ¶ 4.

As this Court has already found based on extensive trial-stage evidence, and consistent with Dr. Orey's trial analysis of voter behavior, such racial gaps have a profound effect on political participation and voter turnout.  *See* July 2 Order at 98-99, 106-107; *see also supra* p. 5.  And indeed, Dr. Handley directly confirmed a racial turnout gap in the DeSoto County area in her remedial analysis by conducting an ecological inference analysis on multiple sets of election return data.  *See* Handley Remedy Report at 5 & Appx. C.  In short, it is no wonder at all that combining these two areas in a district that is barely over 50% BVAP yields a district that is not effective for Black voters.  *See Perez*, 253 F. Supp. 3d at 889–90 ("Including lower-turnout Hispanics and excluding higher-turnout Hispanics (and fracturing politically cohesive and active Hispanic

communities), while simultaneously including higher-turnout Anglos in the district ensures that Hispanics have less practical opportunity to elect.").

It is no response to say, as Defendants may, that Legislative Senate Plan District 1 is over 50% Black.  Showing that it is *possible* to draw a 50%+ BVAP district is necessary to prove vote dilution *at the liability phase*, specifically in order to establish the first *Gingles* prong and show the existence of a geographically compact minority population.  *See Bartlett v. Strickland,* 556 U.S. 1, 12, 18-20 (2009)*; see also Robinson*, 86 F.4th at 590; July 2 Order at 56.  No one disputes that it is possible to draw an additional majority-Black Senate district in the DeSoto County area.  But to remedy vote dilution, a new district must provide new *opportunities* for Black voters to elect candidates of choice notwithstanding high levels of racially polarized voting.  *E.g.*, *Dallas Cnty. Comm'n*, 850 F.2d at 1438-40.  A district being 50%+ BVAP may not be sufficient for that purpose, because sometimes district lines still dilute Black voting strength even where the BVAP of a district exceeds 50%—especially where (as in the Delta, the area where Legislative Senate District 1 is drawn)  racial polarization is extremely high and racial inequality in education and access to resources is extremely pervasive.  *E.g.*, *Thomas*, 366 F. Supp. at 805, 809-10 & n.80; *see supra* pp. 13-14 & n.12 (collecting cases where 50%+ BVAP district resulted in vote dilution).  The validity of the Legislative Senate Plan turns not on district BVAP, but district *performance*, based on the type of functional analysis conducted by Dr. Handley as well as consideration of other relevant factors.  *See supra* pp. 14-16.  Only the addition of a performing district—one that offers Black voters a real opportunity to elect candidates of choice—can remedy vote dilution.

The Legislative Senate Plan does not do that.  It does not "correct the Section 2 violation." July 2 Order at 114 (citing *Brown*, 561 F.3d at 435).   It fails to add an additional district where Black voters will have a fair or equal opportunity to elect candidates of their choice despite

persistent inequality and racially polarized voting. Because the vote dilution in the DeSoto County area that was proven at trial is not remedied by the Legislative Senate Plan, Plaintiffs' objection to the plan's configuration of the DeSoto County area should be sustained.

**B.    Plaintiffs' Alternative Plans Remedy Vote Dilution in the DeSoto County Area**

In contrast, the two alternative remedial Senate Plans set forth in Mr. Cooper's report would create an additional opportunity district for Black voters in the DeSoto County area while adhering to the priorities expressed by the Legislature.

According to Senator Kirby, the Senate prioritized minimizing the number of changed districts, so that fewer incumbents would be required to run for special elections. *See* Feb. 26 Senate Floor Video at 4:31:12-4:32:35. Both of Plaintiffs' Senate Plans maintain that goal. Both of Plaintiffs' plans change only six districts—the same five that are changed in the Legislative Senate Plan, plus District 12 in the Delta. *See* Cooper Remedial Report at 4-6. Senator Simmons, the incumbent in District 12, has indicated that he would support the adoption of Plaintiffs' alternative plans even if it means running again in 2025. *See* Simmons Declaration at ¶ 6.

The Senate also prioritized creating a new Black-majority district with no incumbent, which it believed it was required to do. *See* Feb. 26 Senate Floor Video at 4:24:58 - 4:26:03 (Sen. Kirby) ("[W]e did exactly what the court asked us to do: To create a new, in the North and South, with a newly minority-majority minority district with no incumbent."). Both of Plaintiffs' plans maintain that goal as well. Plaintiffs' Senate Plan A leaves Black-majority District 11 open, and pairs Senator McLendon with Senator Blackwell, also of DeSoto County, in District 2. *See* Cooper Remedial Report at 11-12. And Plaintiffs' Senate Plan B also leaves SD 11 open, while pairing Senator McLendon with Senator Jackson (*i.e.*, the same two Senators paired under the 2025 Legislative Senate Plan). *See* Cooper Remedial Report at 14-15.

Both plans demonstrate that it is possible to add an additional opportunity district in the

DeSoto County area without changing numerous additional districts, while adhering to the Legislature's overall priorities, and while performing comparably on standard districting metrics.

### 1.    *Plaintiffs' Senate Plan A*

Plaintiffs' Senate Plan A includes a new Black-majority District 11 based in Horn Lake and Southaven (50.15% BVAP) while maintaining the existing North Delta-based Black-majority district anchored in Tunica, Quitman, and Coahoma Counties as District 1 (57.23% BVAP) and respecting traditional districting principles like communities of interest.  *See* Cooper Remedial Report at 10-14.   Indeed, from the perspective of DeSoto County and the Delta as communities of interest, Plaintiffs' Senate Plan A could be considered significantly better.  Plaintiffs' Senate Plan A includes three Senate districts that are firmly anchored in DeSoto County:  Two entirely within DeSoto County that are majority-White (SDs 2 and 19) and one that is almost entirely within DeSoto County (92.24% of total population) that is majority-Black (SD 11).  *Id.* at 11-12. Meanwhile, Plaintiffs' Senate Plan A also maintains the North-Delta-based character of the existing Black-majority district, renumbered as in the Legislative Senate Plan as Senate District 1. *Id.* at 11-12.  Plaintiffs' Senate Plan A also matches or exceeds the Legislative Senate Plan on every metric relating to population deviations, splits, and compactness, with municipal and precinct splits being significantly lower.  *Id.* at 13-14.

Most importantly, though, Plaintiffs' Senate Plan A plainly contains the additional opportunity district in the DeSoto County area that is required to remedy the vote dilution proven at trial.  Black-majority Senate District 11 in DeSoto County is still highly competitive, but even with a marginally lower BVAP, its effectiveness score increases, from .502 in the Legislative Senate Plan to .509.  *See* Handley Remedial Report at 6.  And SD 11's "percent won" score increases even more dramatically, to 78.9%.  *Id.*  Meanwhile, Black-majority SD 1, which had

been non-performing under the Legislative Senate Plan, becomes an opportunity district for Black voters under Plaintiffs' Senate Plan A with an effectiveness score of .536 and a "percent won" score of 89.5—still not as strong as the prior Senate District 11 under the 2022 Enacted Plan, but clearly above the threshold. *Id.* Plaintiffs' Senate Plan A thus "create[s] two state senate districts that provide Black voters with a realistic opportunity to elect their candidates of choice" in the DeSoto County area, *id.* at 7, which is exactly what is required to remedy vote dilution there.

### 2. *Plaintiffs' Senate Plan B*

Plaintiffs' Senate Plan B includes the same Black-majority Senate District 11 anchored in DeSoto County, identically configured to the version in Senate Plan A (50.15% BVAP). *See* Cooper Remedial Report at 14-17. The main difference with Senate Plan A is that, to include the same Jackson/McLendon incumbent pairing as the Legislative Senate Plan, District 1 must run from the Delta counties like Coahoma and Quitman and Tunica into DeSoto County and the City of Hernando. *Id.* Yet even while incorporating this particular pairing into the plan, Plaintiffs' Senate Plan B significantly increases the BVAP of Senate District 1, to 57.06%, while meeting or exceeding the plan metrics of the Legislative Senate Plan on county splits (same), precinct splits (much better), municipal splits (better), and compactness (better). *See id.* at 17.

On the all-important question of performance, Plaintiffs' Senate Plan B also contains the additional opportunity district in the DeSoto County area that is required to remedy the vote dilution. As with Plaintiffs' Senate Plan A, Black-majority Senate District 11 in DeSoto County is highly competitive, but with higher effectiveness and "percent won" scores as compared to the Legislative Senate Plan. *See* Handley Remedial Report at 6. And Black-majority Senate District 1, meanwhile, becomes an opportunity district for Black voters. Under Plaintiffs' Senate Plan B, Senate District 1's effectiveness score is .522 and its percent won score is 73.7—certainly not as

strong as the prior Senate District 11 under the 2022 Enacted Plan, and not as strong as Senate Plan A, but above the threshold for creating a "a realistic opportunity to elect … candidates of choice" in the DeSoto County area, *id.* at 7, thereby remedying vote dilution.

## II. PLAINTIFFS' OBJECTION TO THE LEGISLATIVE HOUSE PLAN SHOULD BE SUSTAINED

### A. The Legislative House Plan Does Not Add a New Opportunity District in the Chickasaw/Monroe County Area and Therefore Do Not Remedy Vote Dilution

A functional analysis shows that the Legislative House Plan also fails to meaningfully increase Black electoral opportunities in the Chickasaw/Monroe area and therefore fails to remedy the Section 2 violation proven at trial.

Dr. Handley's quantitative approach pinpoints one aspect of the problem. Under the Legislative House Plan, new majority-Black House District 22 in Chickasaw and Monroe Counties (51.2% BVAP) initially appears to be sufficiently effective, with a .530 effectiveness score, and an 84.2 "percent won" score. On the other hand, House District 16, an adjacent, existing majority-Black district (53.2% BVAP under the Legislative House Plan), has been decimated.

Under the 2022 Enacted Plan, House District 16, which is based in Tupelo, was 62.3% Black with a .582 effectiveness score. *See* Handley Trial Report at 30. Under the Legislative House Plan, the district's effectiveness plummets to 0.503, "just a hair over .5." Handley Remedial Report at 8. And the district's percent won score is 57.9 percent (11 out of 19 contests) which is below the 60% threshold Dr. Handley indicated can indicate a non-performing district. *Id.*; *accord Allen*, 2023 WL 6567895, at *8. While the case may be less extreme than with Senate District 1, Dr. Handley's performance analysis nevertheless supports the conclusion that Legislative House Plan District 16 "does not provide Black voters with a realistic opportunity to elect their preferred candidates." *Id.* Of course, offsetting an apparent increase in electoral opportunity in House District 22 with a decrease in House District 16 impermissible and contrary to a Section 2 remedy's

27

purpose of *increasing* Black political opportunity.  *See, e.g.*, *Allen*, 691 F. Supp. 3d at 1351.

Moreover, contextual evidence beyond Dr. Handley's quantitative analysis casts serious doubt on whether Legislative House Plan District 22 actually provides Black voters a "realistic opportunity" to elect candidates of choice.  *See, e.g.*, *Kirksey*, 554 F.2d at 150.

*First*, and most importantly, unlike the Legislative Senate Plan, the Legislative House Plan fails to create any open seats, with a dramatic effect on electoral opportunity for Black voters. Representative Lancaster, an established White incumbent who switched political parties in 2021, continues to reside in Legislative House Plan District 22, and can thus run for reelection in that district.  *See* Feb. 6 House Floor Video at 23:14-24:27; King Remedial Report at 2.

Incumbency is a powerful advantage.  King Remedial Report at 2.  At trial, both sides' experts agreed that incumbency is a significant factor impacting elections and turnout.  *See* B. Orey Testimony, 02/28/2024 Trial Tr. 581:3-12; J. Alford Testimony, 03/05/2024 Trial Tr. 1480:14-1481:3.  Dr. Alford further explained that "long-term" incumbents are more common in state legislative elections, which, as a result of factors like constituent services and relationships, may operate differently than statewide political dynamics.  J. Alford Testimony, 03/05/2024 Trial Tr. 1480:14-1481:3.  Consistent with that, as Dr. King explains, incumbency is particularly powerful in low-information elections such as state legislative contests (or for that matter special elections), and that this advantage "grows over time."  King Remedial Report at 2.

Thus, although Legislative House Plan District 22 is nominally majority Black—and even though Black-preferred *statewide* candidates have had success in carrying the district—the presence of a two-term incumbent in the supposed remedial district will make it much harder for Black-supported challengers to prevail.  King Remedial Report at 2, 4; *see Bone Shirt*, 461 F.3d at 1019, 1023 (taking into account the presence of incumbents in fashioning remedy).

*Second*, and as discussed with respect to the Senate Plan, socioeconomic disparities between Black and White Mississippians persist in the Chickasaw and Monroe County areas, across numerous categories, including education and income. *See* Cooper Remedial Report at 19-20 and Appxs. B-1 & B-2 (county and municipal statistics by race for the area at issue). These disparities, which this Court has already found affect voter participation and turnout, are shown not only in the data, but in the testimony of trial witness Mamie Cunningham that the House District 22 area is very rural and under-developed, that most of the Black voters in the area "do not have a college education," and that "most do not have access to the internet." Ex. M., Declaration of Mamie Cunningham ("Cunningham Decl.") at ¶ 17. Such racial disparities, combined with Mississippi's frequent and off-year elections, mean that more Black voters are unlikely to know that a special legislative election will even be taking place. Cunningham Decl. at ¶ 17; *see also* King Remedial Report at 2-3 (documenting "abysmally low" rates of turnout in special elections).[14] Despite her efforts to engage voters in her community, spreading the word about a local election in a sprawling, rural area covering parts of three counties is resource-intensive and challenging. Cunningham Decl. ¶¶ 15, 17-18.[15]

Courts routinely consider racial disparities relevant to turnout at the remedial stage, and this Court should do so as well. *See, e.g.*, *Bone Shirt*, 461 F.3d at 1023; *Ketchum*, 740 F.2d at 1414; *Baldus*, 862 F. Supp. 2d at 862; *see also, e.g.*, *Dallas Cnty. Comm'n*, 850 F.2d at 1440

---

[14] *See also* Orey Trial Report at 7-14 (discussing these racial disparities).

[15] All of these burdens may also be exacerbated during regular election years by "ballot rolloff"—that is, where voters vote for higher profile races but leave their ballot blank for lower-level elections. J. Alford Testimony, 03/05/2024 Trial Tr. 1480:14-1481:3; *accord Mallory v. Ohio*, 38 F. Supp. 2d 525, 536 (S.D. Ohio 1997), *aff'd*, 173 F.3d 377 (6th Cir. 1999). Roll-off is a form of voter turnout, and is influenced by the factors that affect turnout generally, like education and income. *See Nipper v. Smith*, 39 F.3d 1494, 1507-08 (11th Cir. 1994) (en banc) (plurality op.).

(rejecting remedial district as ineffective because of "the fact that black citizens share a vastly lower socio-economic status than do whites . . . , and that black citizens have been the victims of past discrimination," which impeded Black political participation).

*Third*, Mississippi's disproportionate incarceration of Black Mississippians and lifetime disenfranchisement of residents for certain convictions has a particularly severe impact in House District 22.  As this Court has found, those policies continue to disproportionately impact Black Mississippians' ability to participate politically.  July 2 Order at 78; *see also* Report of Dr. Byron D'Andra Orey, PTX-008 ("Orey Trial Report") at 19-21.  That phenomenon is especially significant here because House District 22 encompasses a state prison whose population is unlikely to be voting but nonetheless counts towards the district's BVAP under the decennial census.  *See* Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525, 5529 (defining a prisoner's residence as their prison facility, for purposes of the 2020 Census).  Thus, while District 22 technically has a BVAP of 51.2%, the district's voting-*eligible* population—once the population of the prison and the racial disparities of the state's disenfranchisement policy more generally are accounted for—may well be lower than 50%.[16]

*Fourth*, Black voters in House District 22 are likely to be disproportionately affected by split precincts, which can cause confusion about where (and in this case, whether) to vote.  *See* Cunningham Decl. ¶ 12.  Legislative House Plan District 22 splits five precincts—three in Aberdeen, one in Okolona, and one in Wren.  MARIS House Data at 15-16.   The splits are concentrated in predominantly Black municipalities, Aberdeen and Okolona.  *See* Cunningham

---

[16] Legislative House Plan District 22's total Black voting age population is just over 10,000 persons.  *See* Cooper Remedial Report at 19.  The 300 beds at the Chickasaw prison facility are numerically equal to 3% of the district's Black adult population.  Cunningham Decl. at ¶ 14.

Decl. ¶ 12; *see also* M. Cunningham Testimony, 02/27/2024 Trial Tr. 249:18-22, 250:16-19; W. Cooper Testimony, 02/26/2024 Trial Tr. 142:21-143:8.  Again, education and internet access in turn influence whether voters can overcome the informational challenges posed by split precincts.

*Fifth*, voter purges, which involve the removal of voters from the rolls, may also affect Black electoral opportunity.  *See also* K. Kirkpatrick Testimony, 03/04/2024 Trial Tr. 1198:9-23 (describing state's purge process).  Official records obtained by Ms. Cunningham show that such purges are happening in House District 22, with 459 voters recently purged from the rolls in two majority-Black precincts in Chickasaw County.  Cunningham Decl. ¶ 15.  Once a voter is purged, the voter must re-register, on pain of all the "costs" of participation in terms of time and resources, which are harder to pay for those who lack education, economic resources, internet access, and transportation.  *See* Cunningham Decl. ¶ 15; *see also, e.g.*, Orey Trial Report at 3-19.

*Sixth*, the sense of hopelessness experienced by voters who historically have been denied legislative representation may impede turnout in special elections for the Legislature.  *See Hobbs*, 686 F. Supp. 3d at 1234 ("A majority Latino CVAP of slightly more than 50% is insufficient to provide equal electoral opportunity where past discrimination, current social/economic conditions, and a sense of hopelessness keep Latino voters from the polls in numbers significantly greater than white voters.").  The fact that Ms. Cunningham—who is 84 years old—has never been able to elect a House member who she believes will represent her interests explains the apathy she encounters when registering and assisting voters.  *See* Cunningham Decl. ¶¶ 6, 16.  Chronic inability to win elections, combined with a long history of legislators being nonresponsive to Black voters' policy interests, creates a vicious cycle in which residents are discouraged from registering and participating.  *See id.*; July 2 Order at 110-12 (discussing examples of non-responsiveness).

Such concerns may be particularly acute in House District 22 because the incumbent

legislator recently switched parties, a common phenomenon in Mississippi especially among White officials that scholars have suggested undermines votes' trust in the political process. *See* King Remedial Report at 3-4. Indeed, as Ms. Cunningham observed after convening a community forum to discuss the new district lines, while many voters attended, few voters believed that the state's latest plan would actually provide sufficient opportunity to elect their preferred candidate—pessimism that feeds apathy and lower turnout. Cunningham Decl. ¶¶ 12, 16.

While the effectiveness analysis shows that the Legislative House Plan is a closer call than the Senate Plan, there remains, on balance, no additional opportunity district for Black voters in the Chickasaw/Monroe area. Majority-Black House District 16's effectiveness declines so significantly under the state's new plan so as to render it non-performing for Black voters. And majority-Black House District 22, while it scores higher on paper, is still unlikely to perform for Black voters due to the presence of a White incumbent and other district-specific factors. In the end, the Legislative House Plan creates no overall increase in political opportunity for Black voters in this area and thus does not "completely remed[y] the prior dilution of minority voting strength," as required. July 2 Order at 114-15 (citing *Brown*, 561 F.3d at 435).

## B. Plaintiffs' Alternative Plans Remedy Vote Dilution in the Chickasaw/Monroe County Area

In contrast, the two alternative remedial House Plans set forth in Mr. Cooper's report would create an additional opportunity district and thus supply a remedy. Plaintiffs' Plans add an additional Black-majority House District 22 that performs for Black voters, while adhering to traditional districting principles as well as the Legislature's priorities, especially changing as few districts as possible. *See* Feb. 6 House Floor Video at 22:21-23:12. Plaintiffs' House Plan A changes seven districts total, and Plaintiffs' House Plan B changes just five—the same five as in the Legislative House Plan. *See* Cooper Remedial Report at 17-24.

### 1.    *Plaintiffs' House Plan A*

Plaintiffs' House Plan A includes a majority-Black House District 22 (54.31% BVAP) in Chickasaw and Monroe Counties that includes the municipalities of Okolona and Houston in Chickasaw County and all of Aberdeen in Monroe County.  While the plan makes minor changes to two districts that are unchanged in the Legislative Plan (HDs 15 and 23), these changes will entail very little extra work for election administrators.  *See* Cooper Remedial Report at 21.  It also keeps House District 41 identical as compared to the Legislative Plan.  In terms of metrics, Plaintiffs' House Plan A is highly comparable to the Legislative House Plan, except that Plaintiffs' House Plan A does not split *any* municipalities—clearly a benefit from a communities-of-interest perspective and for campaigns and civic volunteers seeking to boost turnout in a special election. *Id.* at 22.  Moreover, majority-Black House District 16, which falls to non-performing effectiveness levels under the Legislative House Plan, sees its BVAP increase to 56%.  *Id.*

These changes have a clear impact on district performance, with both House District 16 and House District 22 improving on both the effectiveness score and "percent won" score metrics under Plaintiffs' House Plan A.  Simply put:  Under Plaintiffs' House Plan A, *both* House Districts 16 and 22 clearly perform.  The effectiveness and "percent won" scores for District 16 in Plaintiffs' House Plan A are .531 and 89.5; the effectiveness and "percent won" scores for District 22 in Plaintiffs' House Plan A are .554 and 94.7.  *See* Handley Remedial Report at 8-9.

### 2.    *Plaintiffs' House Plan B*

Plaintiffs' House Plan B also creates additional opportunity districts while changing only the same five districts that are altered under the Legislative House Plan—and while continuing to match the Legislative House Plan almost exactly on the various plan metrics such as splits and compactness.  *See* Cooper Remedial Report at 24-25.  Under Plaintiffs' House Plan B, the BVAP

of House District 22 is slightly lower than under Plan A (52.95%) but the BVAP of neighboring House District 16 is somewhat higher (57.4%). *Id.*

Plaintiffs' House Plan B also clearly adds an additional Black opportunity district, thereby remedying vote dilution. As with Plaintiffs' House Plan A, both House District 16 and House District 22 are effective according to both metrics utilized by Dr. Handley. *See* Handley Remedial Report at 8-9. The effectiveness and percent won scores for District 16 under Plaintiffs' House Plan B are .541 and 89.5—similar to House Plan A and materially better than under the Legislative House Plan. And the effectiveness and percent won scores for District 22 under Plaintiffs' House Plan B are .557 and 94.7—nearly identical to Plan A. *Id.*

### III.    SPECIAL ELECTIONS SHOULD BE HELD IN 2025

As this Court previously held, Black voters in the three areas where vote dilution was proven will suffer "severe" harm until new legislators are elected to represent them under lawful lines. July 2 Order at 116. "[A]llowing the violations to go unaddressed for the entire four-year term of affected legislators . . . is not an equitable result." *Id.* at 117. None of the considerations that led to that conclusion have changed, and now, the Legislature has affirmatively adopted a workable schedule to hold special elections this year.

The Court should resist as unwarranted any argument that those elections cannot go forward because Plaintiffs lodged these objections. As long as the district lines are determined by the beginning of the qualifying period—May 19, 2025 under the Legislature's schedule—then the Legislature's election calendar can and should be used without any modification. And if for any reason Plaintiffs' objections have not been resolved by that date, the Court should in the interest of justice move back or truncate the schedule to ensure that the 2025 special elections proceed.

### CONCLUSION

The Court should sustain Plaintiffs' objections to the Legislative Senate Plan's

configuration of the DeSoto County area and to the Legislative House Plan's configuration of the Chickasaw/Monroe County area. It should approve the Legislative Senate Plan's configuration of the Hattiesburg area.

For those areas where Plaintiffs' objections are sustained, the Court could order the parties to meet and confer on an expedited basis to determine whether they can come to agreement on an alternative plan that remedies the vote dilution proven at trial. Either way, if the parties have not come to any agreement, the Court should order one of Plaintiffs' proposed alternative plans into place for each of those areas where Plaintiffs' objections have been sustained.

The Court should order that special elections in November 2025 will proceed on the schedule set forth by the Legislature, subject to any modifications made in the interest of justice.

Respectfully submitted,

This the 14th day of March 2025.

/s/ Joshua Tom
Joshua Tom, MSB 105392
jtom@aclu-ms.org
ACLU OF MISSISSIPPI
101 South Congress Street
Jackson, MS 39201
(601) 354-3408

Robert B. McDuff, MSB 2532
rbm@mcdufflaw.com
MISSISSIPPI CENTER FOR JUSTICE
767 North Congress Street
Jackson, MS 39202
(601) 969-0802

Carroll Rhodes, MSB 5314
Law Offices of Carroll Rhodes
crhodes6@bellsouth.net
PO Box 588
Hazlehurst, MS 39083
(601) 894-1464

Ari J. Savitzky
asavitzky@aclu.org
Ming Cheung
mcheung@aclu.org
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500

Jennifer Nwachukwu
jnwachukwu@lawyerscommittee.org
David Rollins-Boyd
drollins-boyd@lawyerscommittee.org
Javon Davis
jdavis@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
(202) 662-8600

35

John P. Lavelle, Jr.
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-3007
Telephone:       +1.215.963.5000
Facsimile:       +1.215.963.5001
*john.lavelle@morganlewis.com*

Drew Cleary Jordan
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Telephone:       +1.202.739.3000
Facsimile:       +1.202.739.3001
*drew.jordan@morganlewis.com*

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua Tom, do certify that on this day I caused to be served a true and correct copy of the foregoing by electronic mail to all counsel of record.

This the 14th day of March, 2025.

/s/ *Joshua Tom*
Joshua Tom