## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

MISSISSIPPI STATE CONFERENCE OF THE
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE; DR.
ANDREA WESLEY; DR. JOSEPH WESLEY;
ROBERT EVANS; GARY FREDERICKS; PAMELA
HAMNER; BARBARA FINN; OTHO BARNES;
SHIRLINDA ROBERTSON; SANDRA SMITH;
DEBORAH HULITT; RODESTA TUMBLIN; DR.
KIA JONES; MARCELEAN ARRINGTON;
VICTORIA ROBERTSON,

     *Plaintiffs*,

     vs.

STATE BOARD OF ELECTION COMMISSIONERS;
TATE REEVES, *in his official capacity as Governor of
Mississippi*; LYNN FITCH, *in her official capacity as
Attorney General of Mississippi*; MICHAEL WATSON,
*in his official capacity as Secretary of State of
Mississippi*,

     *Defendants,*
AND

MISSISSIPPI REPUBLICAN EXECUTIVE
COMMITTEE,

*Intervenor-Defendant.*

**CIVIL ACTION NO.
3:22-cv-734-DPJ-HSO-LHS**

## DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS
## TO LEGISLATIVE SENATE AND HOUSE PLANS

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 1

     A.    2025 Mississippi House Plan ................................................................... 2

     B.    2025 Mississippi Senate Plan.................................................................. 5

III.  STANDARD AND LEGAL AUTHORITY .......................................................... 9

IV.   ARGUMENT ..................................................................................................... 10

     A.    The State's Plans Provide Majority-Minority Districts And Thus Comply
         With Section 2................................................................................... 11

     B.    The State's Election Performance Analysis Shows That The Plans Comply
         With Section 2................................................................................... 12

          1.    House Remedial Plan ................................................................. 17

          2.    Senate Remedial Plan ................................................................ 22

     C.    Plaintiffs' Proposed Remedial Maps Are Flawed..................................... 25

     D.    If This Court Does Not Approve The Legislature's Plans, The State
         Should Have An Opportunity To Remedy The Section 2 Violations.................. 25

V.    CONCLUSION .................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

*Cases*

*Bartlett v. Strickland*,
   556 U.S. 1 (2009) ................................................................................ 11

*Bush v. Vera*,
   517 U.S. 952 (1996) ...................................................................... 2, 9, 24

*Clark v. Calhoun Cnty., Miss.*,
   88 F.3d 1393 (5th Cir. 1996) ................................................ 9, 11, 24, 25

*Guile v. United States*,
   422 F.3d 221 (5th Cir. 2005) .............................................................. 16

*Jeffers v. Beebe*,
   895 F. Supp. 2d 920 (E.D. Ark. 2012) .............................................. 11

*League of United Latin American Citizens v. Perry*,
   548 U.S. 399 (2006) ................................................................ 1, 10, 11, 20

*Magnolia Bar Ass'n, Inc. v. Lee*,
   994 F.2d 1143 (5th Cir. 1993) ............................................................ 13

*Miller v. Johnson*,
   515 U.S. 900 (1995) ................................................................ 10, 11, 25

*Missouri State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*,
   201 F. Supp. 3d 1006 (E.D. Mo. 2016) .............................................. 13

*Nairne v. Ardoin*,
   715 F. Supp. 3d 808 (M.D. La. 2024) .......................................... 14, 16

*North Carolina v. Covington*,
   581 U.S. 486 (2017) .............................................................................. 2

*Perez v. Abbott*,
   253 F. Supp. 3d 864 (W.D. Tex. 2017) .............................................. 12

*Petteway v. Galveston County*,
   698 F. Supp. 3d 952 (S.D. Tex. 2023) ................................................ 13

*Rodriguez v. Harris Cnty., Tex.*,
   964 F. Supp. 2d 686 (S.D. Tex. 2013) ................................................ 13

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ........................................................................................ 9

*United States v. Brown*,
   561 F.3d 420 (5th Cir. 2009) ...................................................................... 2

*Upham v. Seamon*,
   456 U.S. 37 (1982) ........................................................................................ 9

*Voinovich v. Quilter*,
   507 U.S. 146 (1993) ...................................................................................... 2

*Wise v. Lipscomb*,
   437 U.S. 535 (1978) ...................................................................................... 9

**Statutes**

   52 U.S.C. § 10301 ...................................................................................... 10

## I.  **INTRODUCTION**

This Court should approve the Legislature's remedial redistricting plans. The Plans draw the majority-minority districts that this Court ordered, they provide the "opportunity" that Section 2 of the Voting Rights Act demands, and they have solid record and expert support. Plaintiffs ask this Court to provide them more and to violate the law—by giving them a guarantee (rather than an opportunity) to elect preferred candidates and by endorsing an overwhelmingly race-driven approach to redistricting. Those arguments defy federal law and Supreme Court precedent. The Supreme Court has been clear: the "ultimate right of Section 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *League of United Latin American Citizens v. Perry,* 548 U.S. 399, 428 (2006) (quotation marks omitted). And adopting Plaintiffs' race-dominating approach would violate the Equal Protection Clause. The Legislature's remedial plans afford minority citizens in the respective districts an equal opportunity to elect candidates of their choice without transgressing constitutional demands. This Court should approve the State's plans and bring this case to a close.

## II.  **BACKGROUND**

On July 2, 2024, this Court issued an opinion rejecting most of Plaintiffs' challenges to the Mississippi Legislature's 2022 state reapportionment plans. Dkt. 224. The Court rejected all five of Plaintiffs' racial-gerrymandering claims and four of Plaintiffs' claims under Section 2 of the Voting Rights Act. *Id.* at 114. The Court ruled that Plaintiffs had shown only three violations of Section 2. *Id.* at 117-118. Specifically, the Court concluded that three districts—House District 22 (Chickasaw County area), Senate District 2 (DeSoto County area), and Senate District 9 (Hattiesburg area)—"reflect minority groups that are sufficiently large and geographically compact enough to constitute a majority in a reasonably configured district." *Id.* at 56.

1

On remedy, the Court recognized that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court," and that the Court "must offer governing bodies the first pass at devising a remedy." *Id.* at 117 (quoting *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993), and *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009)). The Court also recognized that, although it found that Plaintiffs' illustrative districts in three areas support a Section 2 violation, the State is not required to adopt Plaintiffs' preferred plans. Dkt. 224 at 118 (citing *Bush v. Vera*, 517 U.S. 952, 978 (1996)). Rather, the State has discretion over how to remedy these violations by adopting districts where minority voters "'have an *opportunity* to elect candidates of their choice in the areas and around' the relevant districts." *Id.* (emphasis added). Further, the Court observed that "the equitable factors identified in *Covington* allow the State to limit the ripple effect of creating new majority-minority districts as much as reasonably possible." *Id.* (citing *North Carolina v. Covington*, 581 U.S. 486, 488 (2017)). In line with these points, the Court ordered that the Mississippi Legislature would have until the close of its regular 2025 session to remedy the three Section 2 violations. Dkt. 229 at 5.

Consistent with this Court's ruling and guidance, the Legislature adopted Senate and House remedial redistricting plans that affect fewer districts than any of the plans submitted by Plaintiffs while providing an equal opportunity for minority citizens to elect candidates of their choice. The Legislature also included a recommended election schedule in the Joint Resolutions providing a General Election date of November 4, following primaries on August 5, and a qualifying period beginning May 19.

### A.    2025 Mississippi House Plan

On February 6, 2025, the Mississippi House of Representatives adopted a remedial redistricting plan to create a new majority-minority district in the area of House District 22 (House

Plan or Joint Resolution 1). *See* Joint Resolution 1 which may be found at https://www.legislature.ms.gov/. The House Plan affects only five districts: HD 16, HD 22, HD 36, HD 39, and HD 41. HD 22 is the newly created majority-minority district, while HD 16, 36, and 41 were all existing majority-minority districts and remain as such under the House Plan.

The House Plan increases the Any-Part Black Voting Age Population (APBVAP) in House District 22 from 29.86% to 51.18% to create the new additional majority-minority district. *See* 2025 House Plan Short Report, which also includes a map depicting the new boundaries of the affected districts. 2025 House Plan Short Report, available at https://maris.mississippi.edu/MARISdata/Redistricting/Redevelopment2025/House/HRP_ShortReport_02.04.2025.pdf. Accordingly, to create HD 22, the House Plan reflects the following APBVAP in the affected districts:

| **House District** | 2022 House Plan APBVAP | 2025 House Plan APBVAP |
|---|---|---|
| 16 | 62.29% | 53.21% |
| 22 | 29.86% | 51.18% |
| 36 | 61.18% | 54.61% |
| 39 | 22.22% | 18.54% |
| 41 | 67.46% | 64.56% |

*See* Mississippi Redistricting Data, available at https://maris.mississippi.edu/HTML/Redistricting/Redistricting.html#gsc.tab=0.

Joint Resolution 1 was introduced through the normal legislative process through the House of Representatives Apportionment and Elections Committee, where it was adopted by unanimous vote. The House Plan was based on several criteria. *See* House Floor Debate, February 6, 2025, at 22:26, available at https://www.youtube.com/watch?v=SPptg5D1nVo&t=1563s.They are:

    a. Each district's population should be less than 5% above or below the ideal

population of the district.

    b.  Districts should be composed of contiguous territory.

    c.  The redistricting plan should comply with all applicable state and federal laws including Section 2 of the Voting Rights Act of 1965, as amended, and the Mississippi and United States Constitutions.

The House also respected incumbency by pairing no incumbents, considered political performance, and sought to affect as few districts as possible, in line with the Court's order. Dkt. 224 at 118.

On the House floor, Apportionment and Elections Committee Chairman Noah Sanford explained that the State conducted functional performance analyses to ensure that the majority-minority districts affected in the House Plan provide minority citizens an opportunity to elect a candidate of their choice. *See* House Floor Debate, February 6, 2025, at 26:00 (discussing redrawn majority-minority districts would afford minority citizens to elect their candidate of choice). The performance analysis indicates that all affected majority-minority House districts provide a clear opportunity to elect the candidate of choice of minority voters. *See* Report of Expert Dr. John R. Alford attached as Exhibit A. No amendments of any kind, including from Legislative Black Caucus members, were offered.

Joint Resolution 1 was adopted by a vote of 81 to 33.[1] The House Plan was approved by the Senate on March 5, 2025, by a vote of 30 to 12 with three pairs. *See* Senate Floor Debate, March 5, 2025, available at https://www.youtube.com/live/9Ip4MjihKcw?si=gdN3YiSrK2pi0PR1 at 50:50 (discussing redrawn majority-minority districts would afford minority citizens to elect

---

[1] Republican Representative McLean of HD 39 was the only Republican member in opposition to Joint Resolution 1. Contrary to Plaintiffs' claims, Dkt. 243 at 12, Republican Representative Lancaster of HD 22 and Democrat Representative Gibbs of HD 36 each voted yea, while the other affected majority-minority Democratic members (Representatives Thompson of HD 16 and Karriem of HD 41) did not vote in opposition by voting present.

their candidate of choice).

As explained in detail below, the House functional performance analysis conducted for the Legislature during the remedial redraw and the Plaintiffs' own data demonstrate that the House Plan provides minority citizens a clear opportunity to elect their candidate of choice in newly created HD 22 along with the continuation of such elections in HDs 16, 36, and 41. *See* Dkt. 224 at 118; *see* Exhibit A, Report of Dr. John R. Alford.

Before Joint Resolution 1 was adopted, Plaintiffs submitted a proposed plan—different from those they used at trial—to Speaker Jason White, Chairman Sanford, and House Black Caucus Chair Johnson. That plan affected 8 House districts. No House member submitted that plan as an amendment to Joint Resolution 1. In their objections, Plaintiffs now submit their third and fourth sets of House plans (Plan A and Plan B). Plaintiffs make no showing that even a single member would have supported these new plans.

**B.     2025 Mississippi Senate Plan**

On February 26, 2025, the Mississippi Senate adopted a remedial redistricting plan to create two new majority-minority districts in the areas of Senate District 2 (DeSoto County area) and Senate District 9 (Hattiesburg area)[2] (Senate Plan or Joint Resolution 202, and, together with the House Plan, the Plans). *See* Joint Resolution 202, which may be found at https://www.legislature.ms.gov/. The Senate Plan affects 10 districts: SD 1, SD 2, SD 10, SD 11, SD 19, SD 34, SD 41, SD 42, SD 44, and SD 45. SD 11 (DeSoto County area) and SD 45

---

[2] Illustrative SD 9 is an additional majority-minority district identified in Plaintiffs' Illustrative Plan at trial, which is drawn in Forrest and Lamar Counties in the Hattiesburg area. *See* Dkt. 224 at 43. In the existing 2022 plan and in the Senate Plan, SD 9 is in North Mississippi; therefore, SD 45, in the Hattiesburg area, was chosen as the new majority-minority district.

(Hattiesburg area) are the newly created majority-minority districts, while SD 1[3] and SD 34 were all existing performing majority-minority districts and remain as such under the Senate Plan.[4]

The Senate Plan increases the APBVAP in Senate District 11 from 25.40% to 50.92% to create a new majority-minority district in the DeSoto County area with no incumbent. *See* 2025 Senate Plan Short Report, available at https://maris.mississippi.edu/MARISdata/Redistricting/Redevelopment2025/Senate/SenateRemedyShortReport_02252025.pdf. As a result, Senators McLendon (R) and Jackson (D) are paired in SD 1, an existing majority-minority district. The Senate Plan also increases the APBVAP in Senate District 45 from 25.42% to 51.24% to create a new majority-minority district in the Hattiesburg area. As a result, Senators Polk (R) and Johnson (R) are paired in SD 44. *See* 2025 Senate Plan Short Report. Accordingly, to create the two new majority-minority districts, the Senate Plan reflects the following APBVAP in the affected districts:

| **Senate District** | 2022 Senate Plan APBVAP | 2025 Senate Plan APBVAP |
|---|---|---|
| 1 | 25.40% | 52.46% |
| 2 | 32.88% | 25.03% |
| 10 | 33.47% | 29.28% |
| 11 | 62.38% | 50.92% |
| 19 | 25.44% | 23.95% |
| 34 | 56.48% | 53.30% |
| 41 | 29.96% | 23.51% |
| 42 | 16.60% | 8.37% |
| 44 | 23.61% | 14.90% |
| 45 | 25.42% | 51.24% |

---

[3] At a Senator's request, the numbering of the SD 1 and 11 were switched from the 2022 Enacted Plan. The old SD 11 from 2022 (which was an existing majority-minority district) is now SD 1. The new SD 11 is the newly created majority-minority district with no incumbent.

[4] Plaintiffs do not object to the Hattiesburg area draw in the Senate Plan. Dkt. 243. Defendants discuss the Hattiesburg area draw (SD 45 and SD 34) in this Background section but will not address the area in the remainder of the response as it is uncontested.

*See* Mississippi Redistricting Data, available at https://maris.mississippi.edu/HTML/Redistricting/Redistricting.html#gsc.tab=0.

Joint Resolution 202 was introduced through the normal legislative process through the Senate Rules Committee where it was adopted by unanimous vote. The Senate Plan was based on several criteria *See* Senate Floor Debate, February 26, 2025, at 4:23:44, available at https://www.youtube.com/live/A-MhE7SZQqM?si=sJoHT5gxHkF5ARcs. They are:

    a.  Each district's population should be less than 5% above or below the ideal population of the district.
    b.  Districts should be composed of contiguous territory.
    c.  The redistricting plan should comply with all applicable state and federal laws including Section 2 of the Voting Rights Act of 1965, as amended, and the Mississippi and United States Constitutions.

Additionally, the Senate considered political performance and endeavored to affect as few districts as possible pursuant to the Court's Order. *See* Dkt. 224 at 118.

On the Senate floor, Rules Committee Chairman Kirby explained that the State conducted functional performance analyses to ensure that the affected majority-minority districts provide minority citizens an opportunity to elect a candidate of their choice. Senate Floor Debate, February 26, 2025, at 4:29:43 (discussing redrawn majority-minority districts would afford minority citizens to elect their candidate of choice). All affected majority-minority districts provide at least an equal opportunity to elect the candidate of choice of minority voters. *See* Exhibit A, Report of Dr. John R. Alford.

Two amendments were proposed on the floor: one by Senator McLendon (R) of SD 1 and another by Senator Simmons (D) of SD 12. Senator McLendon's amendment proposed to unpair himself in SD 1 while placing Senator Parker (R) in the newly created majority-minority district of SD 11. This amendment failed by a voice vote. Senator Simmons' amendment affected 14

districts (but not his own, SD 12) in comparison to the 10 districts in the Senate Plan (which also does not affect SD 12).[5] Senator Simmons' amendment also placed a Republican incumbent, Senator McLendon, within the newly drawn majority-minority district in DeSoto County. This amendment failed by a vote of 36 to 15.

Thereafter, Joint Resolution 202 was adopted by a vote of 33 to 16. The Senate Plan was approved by the Mississippi House of Representatives on March 5, 2025, by a vote of 67 to 51. *See* House Floor Debate, March 5, 2025, at 44:06 available at https://www.youtube.com/live/Uvj4dhSq3Sc?si=j0kWGinMnVfHm26r (discussing redrawn majority-minority districts would afford minority citizens to elect their candidate of choice).

Similar to the House and as discussed below, the Senate functional performance analysis conducted for the Legislature during the remedial redraw and the Plaintiffs' own data also demonstrates that the Senate Plan provides minority citizens an equal opportunity to elect their candidate of choice in newly created SD 11 along with the continuation of such elections in SD 1. *See* Dkt. 224 at 18; *see* Alford at 9.

Before Joint Resolution 202 was adopted, Plaintiffs submitted a proposed plan—different from those they used at trial—to Lt. Governor Hosemann, Chairman Kirby, and Senate Black Caucus Chair Simmons. That plan affected 17 Senate districts. No Senator introduced this plan as an amendment to Joint Resolution 202. In their objections, Plaintiffs now submit their third and fourth sets of Senate plans (Plan A and Plan B). Plaintiffs make no showing that even a single member would have supported these new plans during the legislative remedial process.

---

[5] Tellingly, Senator Simmons did not introduce any of the plans devised by the Plaintiffs. Yet, despite having the opportunity in his own floor amendment, Senator Simmons is only now more than willing to have SD 12 affected and run in a special election. He said as much by waiving his legislative privilege in introducing a declaration in this matter. Dkt. 243-12 at ¶ 6.

### III.    STANDARD AND LEGAL AUTHORITY

Following a determination that the State's redistricting plans violated Section 2 of the Voting Rights Act, this Court must evaluate the Plans to ensure that they remedy the identified violation and comply with the Voting Rights Act. To do so, the Court exercises its equitable authority to assess whether the Plans remedy the Section 2 violation and provide minority voters with an equal opportunity to participate in the political process and elect candidates of their choice. *See Thornburg v. Gingles*, 478 U.S. 30, 44 (1986); *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ("[A] state's freedom of choice to devise substitutes for an apportionment plan found unconstitutional . . . should not be restricted beyond the clear commands of the Equal Protection Clause."). Remedial plans must be "fair, reasonable, and effective" in curing the Section 2 violation while adhering to constitutional and statutory requirements, but the Court should not "intrude upon state policy any more than necessary." *Upham v. Seamon*, 456 U.S. 37, 42-43 (1982).

As the Court recognized, although Plaintiffs' illustrative districts support a Section 2 violation, the State is not required to adopt Plaintiffs' preferred plans. Dkt. 224 at 118 (citing *Vera*, 517 U.S. at 978). The State has discretion to determine how best to remedy these violations. *Id.* A majority-minority district passes constitutional muster "if the State has a 'strong basis in evidence' for concluding that the three *Gingles* preconditions are present and if the district drawn in order to satisfy § 2 does not 'subordinate traditional districting principles to race substantially more than is reasonably necessary to avoid § 2 liability.'" *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1407 (5th Cir. 1996) (quoting *Vera*, 517 U.S. at 979). "To be narrowly tailored, the remedial district must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the found wrong." *Id.* The plan must also comply with the Equal Protection Clause, avoiding racial gerrymandering that subordinates traditional districting criteria to race without a

compelling justification. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995).[6]

Section 2 of the Voting Rights Act states:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision *are not equally open to participation* by members of a class of citizens protected by subsection (a) in that *its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.* The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301 (emphases added). The "ultimate right of § 2 is equality of opportunity, not a

guarantee of electoral success for minority-preferred candidates of whatever race." *Perry*, 548 U.S.

at 428 (quotation marks omitted).

## IV.    <u>ARGUMENT</u>

The Plans provide the "opportunity" that Section 2 of the Voting Rights Act requires. Each

affected majority-minority district in the Plans exceeds 50% APBVAP and each functionally

performs to elect the minority-preferred candidate of choice (Democrat) more times than not—

and in two of the three districts (HD 16 and HD 22), far more times than not. That comports with

---

[6] How the Legislature is to draw a remedial district that "does not subordinate traditional districting principles to race" "substantially more than is reasonably necessary" while "avoiding racial gerrymandering" in creating a new majority-minority district where none exists is a most difficult task. So far, no Court has laid out a workable objective standard to guide Legislatures in this task. Regardless, Plaintiffs do not contend that the Legislature gave unconstitutional priority to race in the drawing of the Plans.

the law. This Court should approve the Plans.

This Court should reject Plaintiffs' objections. Plaintiffs want a guarantee that black Mississippians will elect a Democrat in HD 16, HD 22, and SD 1. Despite all affected majority-minority districts in the Plans performing over 50% for the Democrat in the relevant elections, Plaintiffs now demand that a Democrat must win over 60% of the time in the elections analyzed in each district. This is not the law. Nor can such a view comport with the Constitution, as shown by the fact that Plaintiffs' objections and plans predominantly elevate race over all other considerations. *See Perry,* 548 U.S. at 428; *Clark,* 88 F.3d at 1407; *see also Miller,* 515 U.S. at 916. While the State respectfully disagrees with the Court's finding of Section 2 liability in the subject districts, it has complied with the Court's order and drawn remedial districts that give minority-preferred candidates of choice strong opportunities to get elected in HD 16, HD 22, and SD 1. As analyzed in each challenged district below, the State's data, Plaintiffs' own data, and the law of the land support this conclusion. Plaintiffs' objections should be overruled.

A.    **The State's Plans Provide Majority-Minority Districts And Thus Comply With Section 2.**

The Plans—including the contested districts—provide equal opportunity as a matter of law. Equal opportunity means having "no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength." *Bartlett v. Strickland*, 556 U.S. 1, 14 (2009). Where a minority "make[s] up more than 50% of the voting age population," a group having "the same relative voting strength" cannot exist. *Id.* at 18, 14. The group having a majority cannot have "less opportunity" than smaller groups, as Section 2(b) requires. *See Jeffers v. Beebe*, 895 F. Supp. 2d 920, 932 (E.D. Ark. 2012) (finding § 2 cannot require more black residents in a 52.88% BVAP district because it was "*already* a majority-minority district under *Bartlett*'s

definition.").

"Section 2 does not require those who draw election districts to draw majority-minority districts with the most potential or to maximize minority voting strength, nor does it always require mapdrawers to account for low voter turnout." *Perez v. Abbott*, 253 F. Supp. 3d 864, 889 (W.D. Tex. 2017). Since the districts in question all exceed the 50% threshold, as a matter of law, the majority in these districts cannot have "less opportunity" than a minority. The Plaintiffs' objections should be overruled.

**B.    The State's Election Performance Analysis Shows That The Plans Comply With Section 2.**

Even if the points set out in Section IV.A were not conclusive, the State's election performance analysis—performed on all affected majority-minority districts—demonstrates that the Plans comport with Section 2.

Plaintiffs cite several cases, most of which are not even in this Circuit, regarding the need to conduct a functional performance analysis to determine whether the districts at issue actually provide "an opportunity" to minority citizens of electing their candidate. All the Court needs to know about these cases is that none orders what Plaintiffs are asking this Court to do—namely, (i) guarantee that Democrats get elected and (ii) draw majority-minority districts that exceed a 60% Democratic-win threshold. However, before looking at the individual performance metrics of each of the districts challenged by the Plaintiffs (HD 16, HD 22, and SD 1), it is paramount to understand what the State of Mississippi analyzed in contrast to the Plaintiffs.

Defendants' expert, Dr. John Alford, performed the State's functional election analyses during the legislative redistricting process to determine whether the district at issue performs for the candidate of choice. *See* Alford at 2. Much like that by Plaintiffs' expert Dr. Lisa Handley,

these analyses looked at prior elections reconstituted into the proposed new district boundaries. *See Petteway v. Galveston County*, 698 F. Supp. 3d 952, 978 (S.D. Tex. 2023) ("An electoral-performance/reconstituted-election analysis is a technique used to examine how candidates would have fared under different maps or precinct boundaries."). Here, that means whether the majority-minority districts at issue perform for the Democrat. While biracial races are generally probative, this Court also recognized that "evidence as to other elections is potentially relevant." Dkt. 224 at 61; *see Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993) (discussion of probativeness of biracial races). Further, the most probative elections are generally the most recent. *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013) ("Temporally, recent elections are more probative than elections in the distant past.").

Consistent with those parameters, Dr. Alford examined 15 statewide contests between 2019 and 2023; 4 out of 7 of the 2019 elections and 5 out of 8 of the 2023 elections included biracial contests.[7] The statewide races, particularly those held in 2023, are the most probative of performance of legislative races, as those races are held on the same ballot as the statewide races. Dr. Alford's analysis provides the percentage of Democratic vote in the district across the selected elections, while also looking at whether the Democrat was elected in such elections. If the percentage of the Democratic vote exceeds 50%, then the district performs by providing no less than an opportunity to black voters to elect their candidate of choice. The number is further

---

[7] The 2024 U.S. Senate and Presidential races included biracial contests, but these elections are less probative of state legislative district performance because they are "not representative of the typical way in which the electoral process functions." *Missouri State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1040 (E.D. Mo. 2016). For instance, these federal elections are not on the same ballot as the odd-year state-level contests and include either a long-term incumbent candidate (Senator Roger Wicker in 2024) or a political anomaly in President Donald Trump (2020 and 2024).

strengthened by demonstrating that the actual Democratic wins in the district also exceeds 50%. Put simply: greater than 50% provides an "opportunity."

Plaintiffs' efforts to attack this approach, through their expert, fail. Plaintiffs' expert, Dr. Handley, used two metrics to determine, in her opinion, whether the challenged districts perform. Dkt. 243-10. First, Dr. Handley also performed a reconstituted election analysis that she calls the Effectiveness Score (ES). *Id.* Dr. Handley's ES is functionally equivalent to Dr. Alford's Democratic percentage for each district—*i.e.*, if the average vote share for the Democrat is over 50% in a district, then it performs or is effective. The distinguishing feature between those results is not the underlying election returns or data: it is the elections that Dr. Handley chose to analyze. Instead of reviewing the probative 15 statewide races from 2019-2023 like Dr. Alford, Dr. Handley looked only at the 9 biracial races in those election years—an approach that disregards the clear minority candidate of choice (the white Democrat) in the 6 other elections. Dkt. 243-10. That is an abrupt departure from the elections that Dr. Handley presented in her report and testimony at trial—which this Court accepted—where she included contests where both the Democratic and the Republican candidates were White, and the black-preferred candidate was the white Democrat. Alford at 2, n.2; PTX-004 at 9.[8]

The departure was not just abrupt but deeply flawed and transparently result-oriented. Excluding the non-biracial races where the black-preferred candidate was the white Democrat improves her numbers. But, Dr. Handley did not stop there. If she had included only the biracial

---

[8] Dr. Handley previously stated in her expert report submitted in *Nairne v. Ardoin*, 715 F. Supp. 3d 808 (M.D. La. 2024), that "it is important to recognize that not all minority candidates are the preferred candidates of minority voters." Exhibit B, Expert Report on the Enacted Louisiana State House and Senate Plans, Dr. Lisa Handley (Dkt. 198-83 at 6, n.9). Yet she excludes those types of races here.

statewide races from 2019-2023 in her election analysis, her analysis would have shown a trend of improvement, overall performance, and opportunity from 2019 to 2023 for a Democrat (minority-preferred candidate) in all affected districts. To avoid that, Dr. Handley included 6 federal races and stale elections from 2011, 2012 (federal), 2015 and 2018 (federal)—all which have the effect that Plaintiffs are looking for: to drag down the most probative statewide election results from 2019-2023.[9]

Dr. Handley's second measure of performance used in her report is what she calls a "percent won" score. Dkt. 243-10 at 4. This is the number of contests the black-preferred black candidates won divided by the total number of election contests (19) that Dr. Handley included in the recompiled election returns. *Id.* That would be fine if she was just giving the Court the facts of how many times the Democrat won in the races she analyzed like Dr. Alford does in his analysis. But she goes much further because Plaintiffs want a guarantee of election performance. Even though her ES for a district exceeds .5 or 50% for the Democrat, she now asserts that same district must also exceed 60% won for the Democrat in the 19 elections she analyzed for it to be performing in a manner that gives black voters an opportunity to elect black-preferred candidates. As Dr. Alford states: "The usual standard of 'an equal opportunity to elect candidates of choice' seems consistent with Dr. Handley's use of a 50% threshold for her 'effectiveness score', but not consistent with her 60% threshold for her 'percent won' measure." Alford at 3.

Dr. Handley's approach here is remarkable, flawed, and (again) entirely result-oriented. Dr. Handley's 60% won metric is nowhere to be found in her trial expert report, deposition testimony, or trial testimony. It has materialized only now, because it is needed to attack the State's plans.

---

[9] Federal elections are less indicative of potential state legislative district performance than State level elections. Alford at 5, n.4.

This statement from Dr. Handley's current report is fitting: "*While the line is not precise*, in my opinion a percent won score of less than 60% can indicate that the district is not likely to provide Black voters with a realistic opportunity to elect their candidate of choice." Dkt. 243-10 at 4 (emphasis added). That is it: no authority, sources, or studies of any kind are cited for such an opinion because there are not any, as a 60% win metric strains the notion of credibility. The Court should reject this opinion outright as unsupported. *See Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness.") (internal quotation marks omitted).

But there is more. Dr. Handley does cite her use of the "percent won" metric in *Nairne v. Ardoin*, 715 F. Supp. 3d 808 (M.D. La. 2024). But in *Nairne* Dr. Handley used only the "percent won" measure: she never mentioned her newfound 60% threshold. *See* Expert Report on the Enacted Louisiana State House and Senate Plans, attached as Exhibit B. Fortunately, the Court is not left to wonder what Dr. Handley believed was the appropriate win threshold in Louisiana, a case that went to trial just a few months before this one, as she provided the following definitive statement in her expert report admitted as the chief exhibit at trial:

> The Illustrative Plan offers two majority Black BVAP districts: District 38, which has effectiveness scores equal to those of Enacted District 39, and a second majority BVAP district, **District 39, which also offers Black voters an opportunity to elect their candidates of choice as the Black-preferred Black candidate wins more than 50% of the contests examined and is therefore what I define as an effective district.**

Exhibit B at 16 (emphasis added).[10]

---

[10] Dr. Handley's opinion in her principal report in *Nairne* is consistent with her preliminary report before a stay was entered where she also opined that Senate District 39 and House District 1, each with a 55% win rate, were effective districts.

In sum: This is not a dispute over the data, but a dispute over which elections are most relevant to review in the performance analysis and whether 50%+ or 60%+ win rate is more consistent with the meaning of "opportunity" under the Voting Rights Act. With this context, we now address the challenged districts in more detail. The facts show that the State's Plans comply with Section 2 and that Plaintiffs' objections lack merit.

### 1.  House Remedial Plan

As the data reflects in Dr. Alford's report, the 2019 and 2023 two-party contested statewide elections for statewide offices show that all affected majority-minority House districts (HD 16, 22, and 36)[11] provide a clear opportunity to elect the candidate of choice (Democrat) of minority voters. Below is a chart summarizing Dr. Alford's findings that he performed for the House districts during the legislative redistricting process.

---

[11] Due to the negligible change in APBVAP for HD 41 (67.46% to 64.56%), this district was not analyzed for performance.

| Office | Democratic Candidate Race | Year | House District 16 | | House District 22 | | House District 36 | |
|---|---|---|---|---|---|---|---|---|
| | | | Dem. % | Dem. Win | Dem. % | Dem. Win | Dem. % | Dem. Win |
| Governor | White | 2019 | 57.1% | 1 | 64.9% | 1 | 62.4% | 1 |
| Lt. Governor | White | 2019 | 49.4% | 0 | 53.0% | 1 | 56.5% | 1 |
| Attorney General | Black | 2019 | 52.2% | 1 | 54.9% | 1 | 59.7% | 1 |
| Treasurer | Black | 2019 | 49.5% | 0 | 52.2% | 1 | 57.1% | 1 |
| Agriculture | White | 2019 | 51.8% | 1 | 55.8% | 1 | 59.6% | 1 |
| Insurance Commissioner | Black | 2019 | 48.6% | 0 | 52.1% | 1 | 57.3% | 1 |
| Secretary of State | Black | 2019 | 51.1% | 1 | 54.2% | 1 | 58.5% | 1 |
| Governor | White | 2023 | 61.3% | 1 | 62.8% | 1 | 65.4% | 1 |
| Lt. Governor | White | 2023 | 49.3% | 0 | 52.0% | 1 | 56.3% | 1 |
| Secretary of State | Black | 2023 | 51.5% | 1 | 53.8% | 1 | 58.5% | 1 |
| Attorney General | White | 2023 | 51.3% | 1 | 53.0% | 1 | 57.8% | 1 |
| Auditor | Black | 2023 | 52.4% | 1 | 55.4% | 1 | 60.2% | 1 |
| Treasurer | Black | 2023 | 53.1% | 1 | 55.3% | 1 | 60.0% | 1 |
| Agriculture | Black | 2023 | 53.8% | 1 | 56.3% | 1 | 61.3% | 1 |
| Insurance Commissioner | Black | 2023 | 50.7% | 1 | 53.4% | 1 | 58.9% | 1 |
| 2019-2023 Average | | | 52.2% | | 55.3% | | 59.3% | |
| 2023 Average | | | 52.9% | | 55.2% | | 59.8% | |
| Number of Democratic Wins | | | | 11 | | 15 | | 15 |

**House District 16.** For HD 16, start with the State's own performance analysis above. HD 16 in the House Plan has an APBVAP of 53.21%.[12] In HD 16, the candidate of choice wins 11 out of 15 of the reconstituted elections and, in the most probative recent statewide elections in

---

[12] To make HD 22 a majority-minority district and to minimize the impact to surrounding districts pursuant to the Court's order, it was necessary take black population from HD 16, which had an APBVAP under the 2022 plans of 62.29%. Plaintiffs complain that HD 16 is "decimated" by the newly-drawn HD 22, which shifted some black voters from HD 16 to HD 22 to create the new majority-minority district. Such shifting is a known, predictable dilemma inherent in the creation of neighboring new majority-minority districts. Such voters have to come *from somewhere*, and the principles of contiguity and compactness requires that they come from adjacent districts. There is no way to create a new majority-minority district without impacting the APBVAP of neighboring districts. Plaintiffs should not be heard to complain of diluted black voting power in neighboring districting resulting from remedial plans *drawn at their request*.

2023, wins 7 out of 8 elections.[13] This includes wins all biracial contests in 2023 and 2 out of 4 in 2019. Further, the average Democratic vote % across 2019-2023 was 52.2%, which improved to 52.9% in the most recent and probative 2023 statewide elections. HD 16 affords the "opportunity" that Section 2 requires.

Even if this Court were to consider the 19 elections used by Dr. Handley, her own ES for HD 16 demonstrates it performs at 50.3% with a 57.9% Democratic win percentage.[14] Dkt. 243-10 at 8. Even with these numbers, Plaintiffs object to HD 16 in the House Plan as not providing the required opportunity to black voters. It is not Dr. Handley's ES of 50.3% that forms the basis for Plaintiffs' objections (because how can they say greater than 50% on performance does not perform)—it is that the Democrat "win percentage" does not exceed Dr. Handley's novel, unsupported 60% threshold. And it is not just unsupported: all signs suggest that Dr. Handley has proposed unconstitutional race-based redistricting through packing to guarantee black-preferred candidates win in HD 16. That is unconstitutional.

To further illustrate the performance of HD 16 in the House Plan, the chart below summarizes Dr. Handley's analysis side by side with the 8 most recent statewide elections from 2023, and also includes the less probative 2024 federal races for president and senator to demonstrate HD 16's strong Democratic performance (and refute Plaintiffs' objections to it):

---

[13] The only 2023 loss for the black-preferred Democratic candidate was in the Lt. Governor's contest where that candidate lost narrowly with an estimated 49.3 % of the two-party vote.

[14] Dr. Alford shows in his report how the stale elections used prior to 2018 by Dr. Handley clearly drag down the overall performance metrics for HD 16. Alford at 7. Regardless, even including these stale and non-probative elections, HD 16 strongly performs under the Plaintiffs' own metrics.

| | Handley (2011-2024) | | All Statewide (2023) | | | All Statewide (2023-2024) | | |
|---|---|---|---|---|---|---|---|---|
| District | % Dem. | % Black Won | % Dem. | % Won | % Black Won | % Dem. | % Won | % Black Won |
| HD 16 | .503 | 58% | .529 | 88% | 100% | .519 | 70.0% | 60% |

Alford at 9.

HD 16 in the House Plan provides a clear opportunity to elect a Democrat, thus no less than an equal opportunity to elect the candidate of choice for black voters. Plaintiffs' objections to HD 16 should be overruled.

**House District 22.** In HD 22, which is the newly draw majority minority district with an APBVAP of 51.18%, the black-preferred candidate of choice wins all 15 out of 15 elections in Dr. Alford's chart above. The numbers speak for themselves: HD 22 provides the "opportunity" that Section 2 requires. Dr. Handley even opined in her report using her ES and the much maligned "percent won" metrics, that HD 22 in the House Plan will "provide Black voters with a realistic opportunity to elect their candidates of choice to the state house." Dkt. 243-10 at 8.

Plaintiffs contend that HD 22 does not guarantee a win by a Democrat as drawn. Their first complaint about HD 22 is that Representative Lancaster, a second-term former Democrat who changed parties in 2021, remains in their district, failing to create an open seat for them. Dkt. 243 at 28. But the Voting Rights Act does not guarantee electoral success by a racial group to elect a member of their group. Perry, 548 U.S. at 428. Plaintiffs would require that all remaining white Democrats be replaced by black Democrats. The Illustrative Plans they submitted to this Court at trial, in fact, asked the Court to do just that—to collapse SD 7 represented by Hob Bryan, a white Democrat (and the minority candidate of choice in that area), into a new majority-minority Senate

District more likely to elect a new black Democrat. PTX-001 at 35-38. This is a flawed reading of the Voting Rights Act, which neither requires Representative Lancaster to move, retire, or resign nor gives the Plaintiffs a guarantee of a victory by a black Democrat.

Plaintiffs' second argument asks this Court to assume "more black voters are unlikely to know that a special election will even be taking place," based on speculation by Ms. Cunningham, unsupported by data, statistics, expert reports or any other acceptable form of evidence. Dkt. 243 at 29. The Court should reject such speculation. To the extent that Plaintiffs are complaining that turnout in a special election is typically lower than turnout in a typical general election year, that is a problem of their making. Plaintiffs delayed bringing this challenge for over nine months following adoption of the 2022 plans. If they had brought their challenge in a timely manner in March of 2022, it is much more likely that the special elections ordered by this Court would have occurred during the state regular election cycle in 2023 or the Presidential election cycle in 2024.

Plaintiffs' next argument is that HD 22 does not perform because there is a state prison in the district. Dkt. 243 at 30. Plaintiffs offer no support for this statement by way of data, statistics, expert reports, or other evidence. Instead, Plaintiffs float the argument through a local witness who "approximate[s]" that the prison has 300 beds, hoping that this Court will accept as fact this "approximation" and presume further that there are 300 more black disenfranchised black voters that should be excluded. If that is the case, and if there is a corresponding impact on APBVAP in this district correlated to those facts, that would be helpful for the Court to know. But they have not given the Court any evidence to support that view. In their own words, "while HD 22 technically has a APBVAP of 51.2%, the district's voting-eligible population … ***may well be lower*** than 50%." Under this theory, if all 300 beds in the Chickasaw County prison facility are occupied

by white disenfranchised Mississippians, the BVAP **might be** substantially higher than 51.2%. This Court should not entertain such unserious, rank speculation by Plaintiffs.

Finally, Plaintiffs emphasize Ms. Cunningham's claim that as a HD 22 voter she "has never been able to elect a House member who she believes will represent her interests." Dkt. 243 at 31. Ms. Cunningham is a lifelong Democrat and active in the party. Dkt. 243-13 ¶ 6; *see* Dkt. 202, Day 2 of Trial Transcript at pp. 253-54. But Ms. Cunningham fails to mention that HD 22's current representative was a member of her party until recently, nor does she explain how he no longer "represent[s] her interests." Dkt. 243 at 31.

### 2.    Senate Remedial Plan

Dr. Alford also considered the same 15 statewide contests in 2019 and 2023 for the Senate Plan election performance analysis as the House Plan. Below is a chart summarizing Dr. Alford's findings as they relate to the functional analyses, he performed for the affected majority-minority Senate districts during the legislative redistricting process:

| Office | Democratic Candidate Race | Year | Senate District 1 Dem. % | Dem. Win | Senate District 11 Dem. % | Dem. Win | Senate District 34 Dem. % | Dem. Win | Senate District 45 Dem. % | Dem. Win |
|---|---|---|---|---|---|---|---|---|---|---|
| Governor | White | 2019 | 55.4% | 1 | 53.4% | 1 | 58.0% | 1 | 68.8% | 1 |
| Lt. Governor | White | 2019 | 48.0% | 0 | 48.8% | 0 | 50.0% | 0 | 57.7% | 1 |
| Attorney General | Black | 2019 | 49.4% | 0 | 50.7% | 1 | 51.7% | 1 | 62.8% | 1 |
| Treasurer | Black | 2019 | 47.1% | 0 | 48.3% | 0 | 49.5% | 0 | 60.0% | 1 |
| Agriculture | White | 2019 | 48.9% | 0 | 49.4% | 0 | 52.6% | 1 | 62.5% | 1 |
| Insurance Commissioner | Black | 2019 | 46.8% | 0 | 48.4% | 0 | 49.5% | 0 | 59.5% | 1 |
| Secretary of State | Black | 2019 | 48.9% | 0 | 49.8% | 0 | 53.7% | 1 | 60.4% | 1 |
| Governor | White | 2023 | 58.0% | 1 | 60.1% | 1 | 58.0% | 1 | 70.9% | 1 |
| Lt. Governor | White | 2023 | 50.4% | 1 | 56.5% | 1 | 50.9% | 1 | 58.7% | 1 |
| Secretary of State | Black | 2023 | 49.4% | 0 | 55.5% | 1 | 50.6% | 1 | 62.2% | 1 |
| Attorney General | White | 2023 | 49.5% | 0 | 55.4% | 1 | 51.0% | 1 | 63.7% | 1 |
| Auditor | Black | 2023 | 50.1% | 1 | 55.8% | 1 | 50.5% | 1 | 60.8% | 1 |
| Treasurer | Black | 2023 | 51.7% | 1 | 56.3% | 1 | 51.8% | 1 | 64.0% | 1 |
| Agriculture | Black | 2023 | 52.8% | 1 | 57.2% | 1 | 52.7% | 1 | 64.9% | 1 |
| Insurance Commissioner | Black | 2023 | 50.2% | 1 | 55.9% | 1 | 51.4% | 1 | 62.8% | 1 |
| 2019-2023 Average | | | 50.4% | | 53.4% | | 52.1% | | 62.6% | |
| 2023 Average | | | 51.5% | | 56.6% | | 52.1% | | 63.5% | |
| Number of Democratic Wins | | | | 7 | | 10 | | 12 | | 15 |

Alford at 8.

**Senate District 1.** In SD 1, the black-preferred candidate of choice (Democrat) wins 7 out of 15 statewide elections (47%) compared to 42.1% in Dr. Handley's elections. Dkt. 243-10 at 5; Alford at 8. The average Democratic share of the two-party vote across the 15 statewide elections (2019-2023) is 50.4% (compared to 49.1% in Dr. Handley's elections). More importantly, in the most recent and probative statewide elections from 2023, the Democrat wins 6 out of 8 elections (75%) including 4 of the 5 (80%) biracial elections (Secretary of State, Auditor, Treasurer, Agriculture Commissioner, and Insurance Commissioner) and the average Democratic share of the two-party vote across these 8 reconstituted elections is 51.5%. This analysis shows a better opportunity to elect the candidate of choice for black voters in SD 1 as compared to the analysis provided by Dr. Handley. This is no surprise as the district performed much weaker in the stale elections predating 2018. To quote Dr. Alford:

> In those contests [prior to 2018,] Dr. Handley's data shows the Black-preferred Black candidates losing 4 out of 5 contests (a win percentage of just 20%) compared to Black-preferred Black candidates winning 7 out of 14 contests from 2018 forward (a win percentage of 50.0%) in Dr. Handley's data. Similarly, Dr. Handley's data indicate that the average vote share for Black-preferred Black candidates in the elections from 2018 forward is 50.3%, an improvement over her reported 49.1% for the entire period from 2011 forward and a modest improvement on the 48.5% average for the period prior to 2018 based on her election data.

Alford at 9. SD 1's statewide performance metrics and Dr. Handley's own ES (excluding those elections pre-2018) for SD 1 demonstrate that the district performs in giving black voters an opportunity to elect candidates of their choice in SD 1. Further, as provided for HD 16 above, the following chart demonstrates SD 1's recent performance (statewide and federal) in juxtaposition to Dr. Handley's analysis, which includes many stale elections pushing 15 years old:

| District | Handley (2011-2024) | | All Statewide (2023) | | | All Statewide (2023-2024) | | |
|---|---|---|---|---|---|---|---|---|
| | % Dem. | % Black Won | % Dem. | % Won | % Black Won | % Dem. | % Won | % Black Won |
| SD 1 | .491 | 42% | .515 | 75% | 80% | .502 | 60% | 67% |

Alford at 9.

Plaintiffs attack the composition of SD 1 on socio-economic grounds, complain about turnout, and restate much of what was litigated at trial at the liability phase. Dkt. 243 at 21-23. At trial, this Court found a Section 2 violation in the DeSoto County area based, in part, on this information. Defendants are not here to re-litigate those points. What matters for present purposes is that the Legislature has narrowly tailored a remedy to comply with Section 2 of the Voting Rights Act under this Court's order, and SD 1 remains a performing majority-minority district supported by election analyses. *See Clark*, 88 F.3d at 1407 (quoting *Vera*, 517 U.S. at 977). "To be narrowly tailored, the remedial district must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the found wrong." *Clark*, 88 F.3d at 1407.[15]

SD 1 in the Senate Plan affords black voters the opportunity to elect their candidates of

---

[15] DeSoto County filed leave to submit an amicus brief in this case opposing the Senate Plan for SD 1. The County's objections center only on traditional redistricting principles and offer no analysis addressing Section 2 compliance and no alternative plans. The State was ordered to draw a compliant Section 2 district and it has done so via a narrowly tailored remedy affecting only 5 Senate districts by the creation of new majority-minority SD 11, while preserving the majority-minority and performance status of SD 1. How they accomplished such a difficult task is within the Legislature's discretion barring evidence of overt racial gerrymandering—which there is none and Desoto County does not allege. It is this Court's order mandating a new majority-minority district in the DeSoto County area that essentially required a Republican senator in DeSoto County either to be paired with another senator, end up in a majority-minority district or both. The Legislature complied with that directive. DeSoto County's arguments are simply irrelevant to any issue now before the Court. This Court should reject those arguments.

choice. Plaintiffs' objection to SD 1 should be overruled.

### C.    Plaintiffs' Proposed Remedial Maps Are Flawed.

As explained at several points above, Plaintiffs seek unconstitutional guaranteed safe minority districts in violation of *Clark* and *Miller*. 88 F.3d at 1407; 515 U.S. 916. Below is from Table 4 in Dr. Alford's report:

| District | Adopted Remedial Percent Won | Plaintiffs Plan A Percent Won | Plaintiffs Plan B Percent Won |
|---|---|---|---|
| House District 16 | 57.9 | 89.5 | 89.5 |
| House District 22 | 84.2 | 94.7 | 94.7 |
| Senate District 1 | 42.1 | 89.5 | 73.7 |
| Senate District 11 | 63.2 | 78.9 | 78.9 |

Alford at 10. Table 4 uses the "percent won" score for the districts at issue. (District 11 is included only to illustrate the point.) Plaintiffs' Plans A and B increase performance well beyond the 50% equal opportunity effectiveness threshold, and in many instances pushing performance near or above 90%. Again, a guarantee—not an opportunity—is what Plaintiffs seek. That is not what Section 2 requires. And Plaintiffs' heavy fixation on race—which they make the overwhelming driver of their proposed plans—would violate the Equal Protection Clause. For these reasons and the others set out above, this Court should reject Plaintiffs' plans.

### D.    If This Court Does Not Approve The Legislature's Plans, The State Should Have An Opportunity To Remedy The Section 2 Violations

As noted, the Court afforded the Mississippi Legislature the first opportunity to remedy the Section 2 violations the Court found. Joint Resolution 1 and Joint Resolution 202 represent the Legislature's attempt at a remedy. Defendants believe that those Resolutions fully remedy the adjudicated Section 2 violations. If, however, the Court determines such Plans (or any portion of them) do not remedy the Section 2 violations, Defendants respectfully request an opportunity to

25

submit a proposed alternative plan (or plans) for consideration before this Court orders a remedy. Such an alternative plan can be submitted to the Court upon seven days' notice to Defendants.

## V.  CONCLUSION

The Legislature has drawn remedial districts that provide minority citizens an *opportunity* to elect candidates of choice. Section 2 caselaw directs that this is what Courts require of legislative bodies when called upon to craft remedial districts. The evidence shows strong political performance for minority-preferred candidates in **all** the remedial districts drawn by the Legislature. The time has come for approval of the Legislature's Plans to allow the voters in each of these districts to determine whether they want to take advantage of the *opportunities* afforded by the new districts.

This the 21st day of March, 2025.

Respectfully submitted,

STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF MISSISSIPPI; LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI; MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE, DEFENDANTS

By: */s/ Tommie S. Cardin*
   Tommie S. Cardin (MB #5863)
   ONE OF THEIR COUNSEL

OF COUNSEL:

Tommie S. Cardin (MB #5863)
P. Ryan Beckett (MB #99524)
B. Parker Berry (MB #104251)
J. Dillon Pitts (MB #106399)
**BUTLER SNOW LLP**
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
P.O. Box 6010, Ridgeland, MS 39158-6010
Phone: 601.948.5711
Fax:    601.985.4500
tommie.cardin@butlersnow.com
ryan.beckett@butlersnow.com
parker.berry@butlersnow.com
dillon.pitts@butlersnow.com

Rex M. Shannon III (MB #102974)
**STATE OF MISSISSIPPI**
**OFFICE OF THE ATTORNEY GENERAL**
**CIVIL LITIGATION DIVISION**
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-4184
Fax: (601) 359-2003
rex.shannon@ago.ms.gov

**<u>CERTIFICATE OF SERVICE</u>**

I, Tommie S. Cardin, one of the attorneys for the Defendants, do hereby certify that I have this day filed the above and foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 21st day of March, 2025.

<div style="margin-left: 45%;">

_/s/ Tommie S. Cardin_____
Tommie S. Cardin

</div>

28