# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

MISSISSIPPI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; DR. ANDREA WESLEY; DR. JOSEPH WESLEY; ROBERT EVANS; GARY FREDERICKS; PAMELA HAMNER; BARBARA FINN; OTHO BARNES; SHIRLINDA ROBERTSON; SANDRA SMITH; DEBORAH HULITT; RODESTA TUMBLIN; DR. KIA JONES; MARCELEAN ARRINGTON; VICTORIA ROBERTSON,

  *Plaintiffs*,

  vs.

STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, *in his official capacity as Governor of Mississippi*; LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON, *in his official capacity as Secretary of State of Mississippi*,

  *Defendants,*

AND

MISSISSIPPI REPUBLICAN EXECUTIVE COMMITTEE,

*Intervenor-Defendant.*

**CIVIL ACTION NO.
3:22-cv-734-DPJ-HSO-LHS**

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR PARTIAL OBJECTIONS TO THE LEGISLATIVE SENATE AND HOUSE PLANS**

**INTRODUCTION**

The Legislative Plans do not create true, equal opportunities for Black voters in the areas at issue despite extreme racially polarized voting. Plaintiffs' objections should be sustained.

In the DeSoto County area, the Legislative Senate Plan includes at least one bare majority-minority district in which Black voters will still usually be defeated. Any principled analysis of the electoral data as to Senate District 1 shows this. *See* Ex. A, Responsive Report of Dr. Lisa Handley ("Handley Resp. Report"). The numbers—plus the yawning disparities between Hernando and the North Delta—demonstrate the Legislative Plan does not remedy vote dilution.

In the Chickasaw and Monroe County area, the Legislative House Plan hobbled an existing Black-majority District 16, and then added a bare-majority-Black House District 22 that includes an existing incumbent, who will undisputedly have major advantages in retaining his seat. The Legislative House Plan also portends no real change in the opportunities for Black voters.

Defendants suggest (at 11-12) that simply drawing numerically majority-minority districts is enough to remedy vote dilution, regardless of Black voters' political opportunities. Precedent and common sense foreclose this argument. To be sure, a majority-minority district will *often* be a minority opportunity district. But not always—especially not in the Mississippi Delta.

They assert (*e.g.*, at 1) a Section 2 remedy requires only "equality of opportunity," but that just begs the question of what equality of opportunity means. Here, racially polarized voting remains intense, and Black voters will often be defeated in the Legislative Plans' Black-majority districts, especially in Senate District 1. That is dilution, not equal opportunity.

And Defendants insist (at 1, 25) that Plaintiffs' alternative plans somehow violate the Equal Protection Clause, even as they concede that Plaintiffs' plans comport with traditional districting principles, *reducing* splits and *increasing* compactness while following the Legislative Plans' parameters in every key respect. The difference is Plaintiffs' plans *also* remedy vote dilution.

## ARGUMENT

I. **A BARE MAJORITY-MINORITY DISTRICT IS NOT AUTOMATICALLY A SUFFICIENT REMEDY FOR VOTE DILUTION**

Defendants claim that Black voters necessarily "cannot have 'less opportunity'" if they are placed in a district that is numerically majority-Black. Defs.' Br. (ECF No. 249) at 11. That contention is contrary to binding precedent, as Plaintiffs explained already, *see* Pls.' Objections (ECF No. 243) at 13-14 & n.12 (collecting cases). *See, e.g., League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 428 (2006); *Moore v. Leflore Cnty. Bd.*, 502 F.2d 621, 624 (5th Cir. 1974) ("The mere existence of a black population majority does not preclude a finding of dilution." (internal citation omitted)). Especially where barriers to participation are high, or racial disparities deep and entrenched, a district that is just over 50% BVAP can still result in vote dilution, with Black voters unable to overcome White bloc voting—and the Mississippi Delta is a quintessential example of such a place. *See* Pls.' Objections at 23-24.

Defendants' cases do not say otherwise. They quote *Bartlett v. Strickland* for the proposition that "[e]qual opportunity means having 'no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength.'" Defs.' Br. at 11 (quoting 556 U.S. 1, 14 (2009)). But the Court in *Bartlett* was referring to scenarios where Black voters *could not* form a majority and thus necessarily had the same *lack* of opportunity as other groups. 556 U.S. at 14. *Bartlett* addressed the first *Gingles* precondition; it did not announce any ceiling past which minority opportunity may be presumed (there is none) or discuss what constitutes a valid remedial district. It certainly "did not hold … that if the district being challenged already contains a majority-minority population, then a § 2 claim is precluded." *Thomas v. Bryant*, 938 F.3d 134, 157 (5th Cir. 2019), *vacated as moot*, 961 F.3d 800 (5th Cir. 2020).

Defendants also cite two district court cases, neither of which supports them. In *Jeffers v.*

2

*Beebe*, 895 F. Supp. 2d 920, 932 (E.D. Ark. 2012), the district court concluded the first *Gingles* precondition could not be met where the challenged district was already over 50% Black. But the Eighth Circuit subsequently rejected this holding, concluding that such a "*per se* rule would mean that any section 2 claim would be defeated the moment black voters made up a bare numerical majority of the district, regardless of whether minority voters in that district still face actual impediments and disadvantages," which would "not comport with the VRA's substantive requirement[s]." *Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934 (8th Cir. 2018); *see also Thomas*, 938 F.3d at 157 n.111 (noting *Jeffers* "was overruled").

And the three-judge decision in *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) strongly supports Plaintiffs. The *Perez* court *rejected* the claim "that § 2 challenges may not be raised to a majority-minority district," because minority voters "may still lack 'real electoral opportunity'" in a minority-majority district. *Id.* at 879 (quoting *LULAC*, 548 U.S. at 428). It affirmatively held that a numerical Hispanic-majority congressional district diluted Hispanic voting strength. *Id.* at 879-889. Indeed, the passage from *Perez* that Defendants selectively quote loudly echoes the circumstances in the DeSoto County area under the Legislative Senate Plan:

> Section 2 does not require those who draw election districts to draw majority-minority districts with the most potential or to maximize minority voting strength …. However, it does require equality of opportunity, and that equality is lacking where the mapdrawers take steps to intentionally disadvantage Hispanic voters in the district, even if done to further political goals. *Including lower-turnout Hispanics and excluding higher-turnout Hispanics (and fracturing politically cohesive and active Hispanic communities), while simultaneously including higher-turnout Anglos in the district ensures that Hispanics have less practical opportunity to elect*.

253 F. Supp. 3d at 889 (emphasis added); *see* Pls.' Objections at 22-23 (describing how Legislative Senate Plan District 1 combines, affluent, high-turnout, predominantly White areas of DeSoto

3

County with lower-turnout, poorer, more rural, predominantly Black areas of the Delta).

## II. THE LEGISLATIVE PLANS DO NOT REMEDY VOTE DILUTION

The main issue before the Court is factual: Do the Legislative Plans "*completely remed[y]* the prior dilution of minority voting strength" in the areas at issue. *E.g.*, July 2 Order at 114-115 (citing *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009)) (emphasis added). The question is whether additional Black *opportunity* districts were drawn—not just numerically majority-Black districts, but districts with "effective majorities," *e.g.*, *Abbott v. Perez*, 585 U.S. 579, 587 (2018), where Black voters have "a realistic opportunity" to elect preferred candidates, *e.g.*, *Kirksey v. Bd. of Sup'rs*, 554 F.2d 139, 150 (5th Cir. 1977) (en banc), such that "'the Black-preferred candidate often would win an election in the subject district,'" *Singleton v. Allen*, No. 2:21-CV-1291, 2023 WL 6567895, at *8 (N.D. Ala. Oct. 5, 2023) (three-judge panel) (citation omitted).

That question necessarily requires analysis of the electoral data, as well as the "circumstances giving rise to the Section 2 violation." July 2 Order at 115 (citation omitted); *see* Pls.' Objections at 13. Plaintiffs accordingly ground their arguments on the data and the totality of the circumstances, not on any request to "guarantee that Democrats get elected" or demand for "districts that exceed a 60% Democratic-win threshold," as Defendants wrongly claim (at 12, 17).[1]

---

[1] Plaintiffs do not "demand that a Democrat must win over 60% of the time in the elections analyzed in each district." Defs. Br. at 11. Defendants make this assertion based on Dr. Handley's discussion of the "percent won score," an effectiveness measurement which represents the number of contests where the Black-preferred candidate actually prevailed. As to this metric, Dr. Handley explained that, while there is not a precise line, a percent won score under 60% "can indicate that the district is not likely to provide Black voters with a realistic opportunity to elect their candidates of choice." Handley Remedial Report (ECF No. 243-10) at 5. Defendants wrongly suggest (at 16) that this was inconsistent with her analysis in the *Nairne* case based on a line in her report indicating that a percent won score of over 50% was defined as "effective." *See* Defs.' Resp. Ex. B (ECF No. 249-2) at 16. But Dr. Handley *never* identified any district with a score of under 60% as an *opportunity* district—and as she explains, whether a plan offers Black voters a realistic

As to the data, Defendants are correct that a "distinguishing feature" between Dr. Handley's "effectiveness score" analysis and Dr. Alford's Democratic vote share analysis is which elections each expert analyzed. Defs.' Br. at 14. The differences between the two are telling.

Dr. Handley's approach is straightforward: She simply took the dataset that she used at trial to analyze effectiveness, which included all biracial statewide elections from 2011 through 2020, and then added biracial contests from the newly available 2023 and 2024 elections. *See* Handley Resp. Report at 2-3; Handley Remedial Report (ECF No. 243-10) at 4. Her use of more rather than less data was reasonable. So was her focus on biracial contests, which "ensures that the analysis properly identifies districts where Black voters are able to elect preferred candidates despite high levels of racially polarized voting even when those preferred candidates are Black." Handley Resp. Report at 2-3; *see, e.g.*, *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503-504 (5th Cir. 1987) ("[I]implicit in the *Gingles* holding is the notion that black preference is determined from elections which offer the choice of a black candidate."). Defendants appear confused in claiming (at 14) that Dr. Handley's use of only biracial contests was some "abrupt departure" from her prior approach. Dr. Handley examined both biracial and White-versus-White elections *only in analyzing whether voting was racially polarized*. *See* Handley Trial Report (PTX-004) at 8-9; Handley Remedial Report at 3-4. But in her effectiveness analysis, she consistently used only biracial contests. *See id.* at 4; Handley Trial Report at 14-15. There is no departure.

While Dr. Handley simply extended her trial-stage analysis, Dr. Alford engages in clear cherry picking. Dr. Alford derived his Democratic vote share numbers by looking at only the 2019 and 2023 elections *and* including White-versus-White contests in examining those years. *See*

---

opportunity to elect candidates of choice is a different issue than whether an individual district is effective based on any single metric. *See* Handley Resp. Report at 1-2.

Alford Remedial Report (ECF No. 249-1) at 2. He never justifies this divergent approach. Dr. Alford never addresses the skewing effect of adding White-versus-White contests, particularly due to the inclusion of Jim Hood (2019) and Brandon Presley (2023)—top-ticket White Democrats who received far more White crossover support (and thus far higher vote shares) than any Black candidate. *See* Handley Resp. Report at 2-3; Handley Remedial Report at 4, 8; *see also* July 2 Order at 69. Dr. Alford offers no principled reason to exclude the 2015 statewide elections, which are less than a decade old and are just as "representative of the typical way in which the electoral process functions" as the 2019 and 2023 statewide elections. Defs.' Br. 13 n.7 (quoting *Missouri State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1040 (E.D. Mo. 2016)); *see* Handley Resp. Report at 7. And Dr. Alford gives no principled reason to exclude the recent (and thus probative) 2024 presidential and U.S. Senate elections, either. Defendants say Senator Wicker is a "long-term incumbent candidate" and President Trump is a "political anomaly," Defs.' Br. 13 n.7, but don't say why these generalizations justify ignoring relevant data.

In the end, though, as shown below, the numbers simply cannot be forced into submission.

**A.    The Legislative Senate Plan Does Not Completely Remedy Vote Dilution**

This Court ultimately does not need to choose between Dr. Handley's and Dr. Alford's approaches, because Dr. Handley calculated effectiveness scores for the districts at issue using numerous permutations of the data: all contests from 2015 on, all contests from 2018 on, all statewide contests from 2015, 2019, and 2023, and all statewide contests from 2019 and 2023 only. Handley Resp. Report at 6-7 & Appx. She looked at these data for biracial elections only (*i.e.*, the correct way to conduct the analysis) and including White-versus-White elections as well. *Id.*

The result is crystal clear: Legislative Senate Plan District 1 is not even marginally effective for Black voters (by either effectiveness score *or* "percent won" score) on *any version of*

6

*the analysis* except Dr. Alford's cherry-picked approach. It is not effective looking at *any* subset of biracial elections.[2] Handley Resp. Report at 6-7. It is not effective looking at all but one subset of biracial and White-versus-White elections. *Id.* The chart below tells the story.

**Effectiveness Scores for Remedial Senate District 1 Using Different Election Combinations**

| Election Years | Candidates | Effectiveness Score | Percent Won |
|---|---|---|---|
| 2015-2024 | Biracial only (*Handley approach*) | 0.488 | 41.2% |
| 2015-2024 | Biracial and White-versus-White | 0.494 | 41.4% |
| 2015, 2019, 2023 | Biracial only | 0.485 | 33.3% |
| 2015, 2019, 2023 | Biracial and White-versus-White | 0.495 | 38.1% |
| 2018-2024 | Biracial only | 0.496 | 50.0% |
| 2018-2024 | Biracial and White-versus-White | 0.499 | 45.5% |
| 2019, 2023 | Biracial only | 0.496 | 44.4% |
| 2019, 2023 | Biracial and White-versus-White (*Alford Approach*) | 0.503 | 46.7% |

Handley Resp. Report at 6-7. Indeed, looking at the last three statewide election years (2015, 2019, and 2023), *both* Legislative Senate Plan Districts 1 *and* 11 are non-performing, even including White-versus-White elections in the analysis. *Id.*, Appx. at EX.A-021-022.

Plaintiffs do not agree that mere numerical equality, as expressed by a 50% vote share or a 50% "percent won" score, is necessarily sufficient to prove or disprove equal opportunity for Black voters. *Compare* Defs.' Br. at 7, 15 *with* Handley Resp. Report at 1-2 & n.1, 8. But even if that were the standard, Plaintiffs would clearly prevail here. The numbers conclusively show that Legislative Senate Plan District 1 simply is not effective and thus cannot support a remedy for vote

---

[2] Dr. Alford claims at one point in his report (ECF No. 249-1 at 9) that "Dr. Handley's data indicate that the average vote share for Black-preferred Black candidates in the elections from 2018 forward is 50.3%." *See* Defs.' Br. at 23. *That is false*. *See* Handley Resp. Report at 7 (showing result as .496). In order to obtain that result, Dr. Alford appears to be (1) excluding the federal elections from 2020 and 2024 while (2) including the federal elections from 2018 featuring former Congressman Mike Espy. Suffice it to say, this is not a principled approach to the data. *Id.* at 7-8.

7

dilution. And that is before considering the deep disparities between Black and White voters in the area around District 1—outlined in Plaintiffs' objections and *totally uncontested by Defendants in their response*, Defs.' Br. at 24—which will make it even harder for Black voters there to overcome White bloc voting under the Legislative Plan. *E.g.*, Pls.' Objections at 22-23. On this record, Plaintiffs' objections as to the Legislative Senate Plan must be sustained.

> **B.     The Legislative House Plan Does Not Completely Remedy Vote Dilution**

As for the Legislative House Plan, the data confirms that District 16's performance is marginal. In all permutations of the data that do not exclude 2015, the district's effectiveness score is either just below or just above .5, and its percent won score is consistently below 60%. Handley Resp. Report, Appx. at Ex.A-015. Defendants take issue (at 15-16, 19) with Dr. Handley's view that a percent won score under 60% can indicate insufficient opportunity for Black voters, *see supra* n.1, but the fact is that, consistent with an average vote share of almost exactly 50%, Black-preferred candidates "often" lose in District 16. *Cf. Singleton*, 2023 WL 6567895, at *8.

Having rendered House District 16 a marginal-opportunity-at-best district, the Legislative House Plan then creates another "skin-of-the-teeth" Black-majority district, House District 22, that is unlikely to elect a Black-preferred candidate in practice. *See Kirksey*, 554 F.2d at 150. Defendants concede virtually every point about the disadvantages Black voters face in District 22.

Defendants do not deny that Rep. Lancaster will benefit from a powerful incumbency advantage in District 22. *See* Pls.' Objections at 28; Defs.' Br. at 20-21. That incumbency advantage has real effects for Black voters. *Cf. Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035, 1040-1041 (D.S.D. 2005) ("A 58 percent minority VAP district with no white incumbent is the equivalent in practical political terms to a 60.55 percent minority VAP district with a white incumbent." (citation omitted)), *aff'd*, 461 F.3d 1011 (8th Cir. 2006). Defendants miss the point

8

with their accusations about "replac[ing]" White Democrats with Black Democrats, Defs.' Br. at 20. The issue is only whether *Black voters* in House District 22 can elect a candidate of choice, even if their preferred candidate is pitted against incumbent Rep. Lancaster. They likely cannot.

And Defendants offer zero response to Plaintiffs' other points. They don't contest that District 22 splits precincts in predominantly Black municipalities, *see* Pls.' Objections at 30-31. They don't dispute that state legislative elections—and special elections in particular—are low-information, low-turnout contests, which pose greater burdens on Black voters, especially in rural areas. *See* King Remedial Report (ECF No. 243-11) at 2-3; Cunningham Decl. (ECF No. 243-13) ¶ 17[3]; Pls.' Objections at 29; *see also* Remedial Order at 3. They also don't deny that hundreds of voters in predominantly Black precincts have been purged from the rolls, Pls.' Objections at 31.

In sum, there is no net increase in opportunities for Black voters in the Chickasaw/Monroe area under the Legislative House Plan. Plaintiffs' objections should be sustained.

### III.   PLAINTIFFS' ALTERNATIVE PLANS CAN BE PUT INTO PLACE NOW

Defendants claim (at 25) that Plaintiffs' alternative plans are "[f]lawed" but never articulate why. It is not a "flaw" that Black voters in the Black-majority districts in those plans will frequently be able to elect preferred candidates, any more than it is a flaw that White voters *virtually always* elect *their* preferred candidates in White-majority districts. *See* Handley Resp. Report at 1 n.1 (drawing "coin flip" Black-majority districts while guaranteeing White voters win in White-majority districts is not "equal opportunity under the Voting Rights Act" (citation omitted)); *see also id.*, Appx. (showing 90-100% success for White voters in White-majority districts across all

---

[3] Defendants argue that Ms. Cunningham is not an expert witness, but she does not need to be an expert to testify about her personal experiences, Cunningham Decl. ¶¶ 6-11. *See, e.g.*, *United States v. Williams*, 83 F.4th 994, 996 (5th Cir. 2023).

9

plans and election combinations). In any case, the Black-majority districts in the alternative plans are competitive, with average vote-shares right near 50%. *E.g.*, *id.*

Defendants' suggestion that the alternative plans "would violate the Equal Protection Clause" is meritless. Such violations may be shown where the map-drawer "subordinated traditional race-neutral districting principles," such as "compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). But here, Defendants concede that Plaintiffs' plans meet and often beat the Legislative Plans on all those traditional metrics (while also fully remedying vote dilution). *See* Pls.' Objections at 24-27, 33-34. If anything, the Legislative Plans keep the BVAP of Black-majority districts artificially low at expense of traditional districting principles. *See* Pls.' Objections at 24-27; *see also* DeSoto Cnty. Br. (ECF No. 251) at 4-5.

Plaintiffs' alternative plans undisputedly (1) follow all the same parameters as the Legislative Plans, such as which districts are changed and even which incumbents are paired, (2) follow the same overall configuration as the Legislative Plans, (3) meet or beat the Legislative Plans on traditional metrics, *and* (4) actually remedy vote dilution. Accordingly, they can be ordered into place now, paving the way for November special elections with time to spare. Plaintiffs are open to an expedited meet-and-confer process, but the Court should not grant Defendants' request (at 25-26) to submit *alternatives* to the alternative plans, not authorized by the Legislature, weeks after Plaintiffs did so—an unnecessary "second bite at the apple" that could delay a badly-needed remedy. *Cf. North Carolina v. Covington*, 585 U.S. 969, 977 (2018).

## CONCLUSION

The Court should sustain the objections and order into place districting plans that completely remedy the violations of Section 2 proven at trial.

Respectfully submitted,

This the 26th day of March 2025.

| | |
|---|---|
| Joshua Tom, MSB 105392<br>*jtom@aclu-ms.org*<br>ACLU OF MISSISSIPPI<br>101 South Congress Street<br>Jackson, MS 39201<br>(601) 354-3408 | /s/ *Ari J. Savitzky*<br>Ari J. Savitzky<br>*asavitzky@aclu.org*<br>Ming Cheung<br>*mcheung@aclu.org*<br>125 Broad Street, 18th Floor<br>New York, New York 10004<br>(212) 549-2500 |
| Robert B. McDuff, MSB 2532<br>*rbm@mcdufflaw.com*<br>MISSISSIPPI CENTER FOR JUSTICE<br>767 North Congress Street<br>Jackson, MS 39202<br>(601) 969-0802 | Jennifer Nwachukwu<br>*jnwachukwu@lawyerscommittee.org*<br>David Rollins-Boyd<br>*drollins-boyd@lawyerscommittee.org*<br>Javon Davis<br>*jdavis@lawyerscommittee.org* |
| Carroll Rhodes, MSB 5314<br>LAW OFFICES OF CARROLL RHODES<br>*crhodes6@bellsouth.net*<br>PO Box 588<br>Hazlehurst, MS 39083<br>(601) 894-1464 | LAWYERS' COMMITTEE FOR CIVIL RIGHTS<br>UNDER LAW<br>1500 K Street NW Suite 900<br>Washington, DC 20005<br>(202) 662-8600 |
| John P. Lavelle, Jr.<br>MORGAN, LEWIS & BOCKIUS LLP<br>2222 Market Street<br>Philadelphia, PA 19103-3007<br>Telephone: +1.215.963.5000<br>Facsimile: +1.215.963.5001<br>*john.lavelle@morganlewis.com* | Drew Cleary Jordan<br>MORGAN, LEWIS & BOCKIUS LLP<br>1111 Pennsylvania Ave. NW<br>Washington, DC 20004-2541<br>Telephone: +1.202.739.3000<br>Facsimile: +1.202.739.3001<br>*drew.jordan@morganlewis.com* |

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

      I, Ari Savitzky, do certify that on this day I caused to be served a true and correct copy of the foregoing by electronic mail to all counsel of record.

      This the 26th day of March 2025.

                                                /s/ *Ari J. Savitzky*
                                                Ari J. Savitzky