UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MISSISSIPPI STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, et al.                                                                                    PLAINTIFFS

V.                                                          CIVIL NO. 3:22-CV-734-DPJ-HSO-LHS

STATE BOARD OF ELECTION
COMMISSIONERS, et al.                                                                      DEFENDANTS

Before Southwick, *Circuit Judge*, Ozerden, *Chief District Judge*, and Jordan, *District Judge*

Per Curiam:

Following an eight-day bench trial, this Court held that "Mississippi's 2022 Enacted [Senate and House] Plans violate Section 2 of the Voting Rights Act." *Miss. N.A.A.C.P. v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 464 (S.D. Miss. 2024).  We gave the Mississippi Legislature an opportunity to remedy those violations by drawing new maps in three geographic interest areas.  The Legislature accepted that invitation, but Plaintiffs object to the results.  We find that the new maps remedy the violations except as to the Senate districts in the DeSoto County interest area.

I.      Background

At trial, Plaintiffs established a Section 2 violation under the *Thornburg v. Gingles* framework.  478 U.S. 30 (1986).  That required, among other things, proof that additional districts could be drawn allowing black Mississippians the opportunity to elect candidates of their choice.  *Miss. N.A.A.C.P.*, 739 F. Supp. 3d at 441.  Specifically, they proved that additional districts could be added in three instances:  Senate districts in the DeSoto County and Hattiesburg areas and a House district in northeastern Mississippi.  *Id.*

Having found a violation, the Court gave the Legislature the first opportunity to present new maps. *Id*. at 466. This the Legislature did on March 5, 2025. Sen. Plan [243-6]; House Plan [243-7]; *see* Adoption of Plans [243-1]. Nine days later, on March 14, Plaintiffs filed partial objections to the new plans, contesting only the remedial Senate districts in the DeSoto County interest area and the House districts in the northeast Mississippi interest area. Pls.' Objs. [243] at 6–7.[1] Plaintiffs accepted the new map in the Hattiesburg area.

While Plaintiffs acknowledge that the Legislature created new districts in those areas with majorities for the black voting-age population (BVAP), they say those margins are so slim that they fail to create a reasonable opportunity for black voters to elect their preferred candidates. *Id.* They also claim that the new lines were drawn at the expense of existing districts with significant BVAP majorities such that those districts no longer offer reasonable opportunities. *Id*. In other words, rather than adding opportunity districts, the Legislature either kept the status quo or reduced the number of opportunity districts.

For different reasons, DeSoto County also opposes the new Senate districts in that interest area. After receiving leave of Court, the county submitted an amicus brief alleging that the Legislature failed to follow traditional redistricting principles. DeSoto Br. [251] at 2.

Defendants disagree. Defs.' Resp. [249]. First, they deny that a majority-minority district can ever fail to be an opportunity district. *Id*. at 15. Second, they reject Plaintiffs' arguments about the effective voting strengths of black Mississippians in the new opportunity districts, in particular criticizing the analysis of Plaintiffs' expert witness Dr. Lisa Handley. *Id*. at 17–20. Finally, they say DeSoto County's objections "are simply irrelevant." *Id.* at 28 n.15. These issues were heard during oral argument on April 8, 2025.

---

[1] All citations are to CMECF pagination.

II.     Standards

Section 2 violations occur when, on account of race or color, citizens "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). "The essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47.

When voting-rights violations happen, "the court's 'first and foremost obligation' must be 'to correct the Section 2 violation.'" *Miss. N.A.A.C.P.*, 739 F. Supp. 3d at 464 (quoting *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009)). It must also adopt a remedy "sufficiently tailored to the circumstances giving rise to the Section 2 violation." *Id.* (quoting *Veasey v. Abbott*, 830 F.3d 216, 269 (5th Cir. 2016)).

In this case, the remedy is new "'opportunity' districts in which minority groups form '*effective* majorit[ies].'" *Abbott v. Perez*, 585 U.S. 579, 587 (2018) (emphasis added) (alteration in *Abbott*) (quoting *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 426 (2006)). That presents a difficult threshold issue—what is an "effective majority." *LULAC*, 548 U.S. at 426. No brightline test exists. Instead, "the question of the size of the majority necessary to ensure the likelihood of minority success at the polls cannot be determined by a set formula[] but must be evaluated on a case-by-case basis according to the political and other characteristics of the relevant population." *Monroe v. City of Woodville*, 819 F.2d 507, 510 n.1 (5th Cir. 1987) (per curiam) (*Monroe I*).

Though no formula exists, we can quickly set two boundaries. First, Defendants correctly note that "the ultimate right of [Section] 2 is equality of opportunity, not a guarantee of

electoral success for minority-preferred candidates." Defs.' Resp. [249] at 5 (quoting *LULAC*, 548 U.S. at 428). Second, a mere majority of minority voters in a district—like those in dispute—does not necessarily satisfy Section 2.

*Gingles* requires "a 'functional' view of the political process and . . . a searching and practical evaluation of reality." 478 U.S. at 66 (quoting S. Rep. No. 97-417, at 30 n.120 (1982)). Thus, "it may be possible for a citizen voting-age majority to lack real electoral opportunity . . . ." *LULAC*, 548 U.S. at 428. Consistent with that, the Fifth Circuit "has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution." *Monroe v. City of Woodville*, 881 F.2d 1327, 1333 (5th Cir. 1989) (*Monroe II*), *opinion corrected on reh'g*, 897 F.2d 763 (5th Cir. 1990); *see also Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1550 (5th Cir. 1992) (reaching same conclusion even with majorities for registered voters). In short, an *effective* majority is not always the same as a numeric majority.[2]

Because majorities are but part of the analysis, other issues influence the effectiveness of an opportunity district. That list includes the district's performance (i.e., how effective it will be in creating opportunities for minority voters to elect their chosen candidates). Such evidence is now commonplace. *See, e.g.*, *Abbott*, 585 U.S. at 617 (examining effectiveness testimony from expert witnesses to determine whether opportunity districts could be drawn). And this case is no exception; both sides offered expert testimony on the effectiveness of the disputed districts.

---

[2] A bare majority could allow equal opportunity—like when no barriers exist to voting. But that again depends on the facts, and we have already found impediments. *See Miss. N.A.A.C.P.*, 739 F. Supp. 3d at 460 (crediting Plaintiffs' expert testimony "that voting and political participation is influenced by financial resources, education, income, and unemployment" and "find[ing] that the record establishes black Mississippians' ability to participate effectively in Mississippi politics is hindered").

But that raises a related issue of how effective must the district be to remedy a Section 2 violation. "[C]ourts and experts in the field have phrased the [Section] 2 requirement (for both liability and remedy in many instances) as providing 'realistic opportunity,' 'reasonable opportunity,' 'practical opportunity,' 'effective opportunity,' and like terms." *Perez v. Abbott*, 253 F. Supp. 3d 864, 882 (W.D. Tex. 2017) (collecting cases and rejecting bright-line tests). And the Fifth Circuit has spoken at times in terms of "safe district[s]" defined as ones "in which a majority . . . is sufficiently large to make it likely that the district will elect a representative with the same characteristic or interest." *Monroe I*, 819 F.2d at 510.

The parties have grappled with this issue too. Defendants mostly argue that a BVAP majority creates an equal opportunity and that Plaintiffs seek impermissible guaranteed success rates. Defs.' Resp. [249] at 5, 11. According to Plaintiffs, "a performance analysis 'should demonstrate that the Black-preferred candidate often would win an election in the subject district.'" Pls.' Obj. [243] at 6 (quoting *Singleton v. Allen*, No. 2:21-CV-1291, 2023 WL 6567895, at *8 (N.D. Ala. Oct. 5, 2023)). But they also suggest a realistic-opportunity standard, Pls.' Reply [252] at 5, as does their expert, Handley 2025 Rep. [243-10] at 6. And elsewhere they track the third *Gingles* precondition—whether a "white majority votes sufficiently as a bloc to enable it . . . *usually* to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (emphasis added); *see* Pls.' Objs. [243] at 24 (citing *Robinson v. Ardoin*, 86 F.4th 574, 597 (5th Cir. 2023) (noting that "proper question" for third *Gingles* precondition "is this: 'If the state's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate usually to be defeated?'") (quotation marks deleted)).

These varying approaches are understandable given Section 2 jurisprudence. But the facts here don't require us to finetune the language. Even using Plaintiffs' various tests, the

5

remedial House districts survive their objections. As for the remedial Senate districts, any new district must necessarily remedy the Section 2 violation. *Brown*, 561 F.3d at 435. We have already concluded that Plaintiffs met their burden under *Gingles*, and we incorporate those findings here. *See Miss. N.A.A.C.P.*, 739 F. Supp. 3d at 441. As will be discussed, minority candidates of choice will usually lose in Remedial SD 1. Based on the totality of circumstances, we find that Remedial SD 1 offers neither an effective majority nor a remedy to the Section 2 violation.

III.    Discussion

The parties focus heavily on how well the remedial districts should be expected to perform based on their experts' opinions. Because neither side had legislative vote totals for these new districts (endogenous results), both examined exogenous election results for the precincts now forming the new districts.

Plaintiffs' expert Dr. Lisa Handley first considered how black-preferred candidates (all Democrats) performed in biracial elections between 2011 and 2024 (though her responsive report drops the elections before 2015). *See* Handley 2025 Rep. [243-10] at 6; Handley Responsive Rep. [252-1] at 5. She excluded races that offered no black candidates. From this data, she generated two scores. One is the effectiveness score, which "is simply the average vote share, expressed as a proportion, received by the 19 Black-preferred Black candidates in each of the proposed districts." Handley 2025 Rep. [243-10] at 5. The other measure is her percent-won score, "the number of contests the Black-preferred Black candidates won [in the new districts] divided by the total number of election contests (19)." *Id.* at 6.

Defendants' expert Dr. John Alford took the same approach using the same numbers. He just picked different elections. According to him, the two most recent statewide elections for

6

state offices (2019 and 2023) offer the most relevant comparisons. Alford Rep. [249-1] at 6. He included elections without black candidates but excluded federal contests. *Id.* at 6 & n.4.

We now consider two overarching questions: (1) which election years and elections are most relevant and (2) whether the remedial districts create an opportunity for black voters to elect candidates of their choice.

A.   The Relevant Evidence

As noted, the parties follow the same methods but select different elections. So which elections should we consider—biracial elections between 2011 and 2024 (Handley) or all statewide, state-office elections in 2019 and 2023 (Alford)? Those distinctions make little difference because they both yield the same conclusions.

As a general matter, we find that biracial elections are more probative but that the others are relevant. The Fifth Circuit "has consistently held that elections between white candidates are generally less probative in examining the success of minority-preferred candidates, generally on grounds that such elections do not provide minority voters with the choice of a minority candidate." *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc).

We also consider all election years but find that more recent elections better explain the opportunities that will exist in future elections. *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris County*, 601 F. App'x 255 (5th Cir. 2015) (finding that "[t]emporally, recent elections are more probative than elections in the distant past") (collecting cases). With that, we turn to the remedial districts.

B.   Senate Redistricting in the DeSoto County Area

The Court found that the 2022 Senate map violated Section 2 in the DeSoto County interest area. Under that map, SD 11 was the only opportunity district, with 62.4% BVAP.

7

Handley Trial Rep. (PTX 4) at 16.  Four nearby Senate districts—SD 1, 2, 10, and 19—had at most a 33.5% BVAP.  Cooper Trial Rep. (PTX 1) at 252, 255–56, 260.  Plaintiffs proved that another opportunity district could be added.

The 2025 Senate Remedial Plan tries to do that in part by reducing the BVAP in the previous opportunity district (SD 11).  The new map renames SD 11 as SD 1 and reduces its BVAP from 62.4% to 52.5%.  Handley 2025 Rep. [243-10] at 7.  The 2025 Remedial SD 11 is then added with a 50.9% BVAP.  *Id.*  The BVAP in the other districts remains below majority status:

| 2025 Remedial Districts | BVAP % |
|---|---|
| 1 | 52.5 |
| 2 | 25.0 |
| 10 | 29.3 |
| 11 | 50.9 |
| 19 | 24.0 |

*Id.*

To reach those results, the new SD 11 yokes high-turnout white communities in the Hernando area of DeSoto County to several poorer, predominantly black towns in the Mississippi Delta.  DeSoto County objected to this in its amicus brief, noting that the county had been joined "with several smaller towns throughout the heart of the Mississippi Delta that are more than 40 miles away, including Clarksdale, Marks, and Jonestown."  DeSoto Br. [251] at 5.

Plaintiffs offer no constitutional challenges to the new map.  They instead focus their Section 2 objection on Remedial SD 1—the old SD 11, which they say no longer offers black voters a realistic opportunity to elect candidates of their choice.  We agree.  Under Dr. Handley's analysis, SD 1 (with a slightly larger BVAP than the new SD 11) has an effectiveness score of .491, and its percent-won score is 42.1%.  Handley 2025 Rep. [243-10] at 7.  She attributes the

8

weaker performance of the precincts in SD 1 to "extremely small" white crossover voting and to "a decided turnout gap" between black and white voters in the area. *Id.* We credit her opinion.

Dr. Handley's scores for SD 1 fall below her benchmarks for an effective district. In her view, an effectiveness score under .500 "is not likely to provide Black voters with an opportunity to elect their candidates of choice." *Id.* at 6. The same is true when the percent-won score falls below 60%. *Id.* Plaintiffs therefore say the 2025 Senate Remedial Plan does not add a second opportunity district in the DeSoto County interest area as this Court ordered. It instead made an existing opportunity district more competitive without adding anything.

Dr. Alford criticizes Dr. Handley for including elections older than 2019 and federal elections, which he considers unrepresentative of legislative races. Alford Rep. [249-1] at 6 n.4; *id.* at 9. Focused only on 2019 and 2023, he generates higher effectiveness and percent-won scores in SD 1, but his percent-won score remains below 50%, with black-preferred candidates claiming 7 of 15 contests:

| Office | Democratic Candidate Race | Year | Senate District 1 Dem. % | Senate District 1 Dem. Win |
|---|---|---|---|---|
| Governor | White | 2019 | 55.4% | 1 |
| Lt. Governor | White | 2019 | 48.0% | 0 |
| Attorney General | Black | 2019 | 49.4% | 0 |
| Treasurer | Black | 2019 | 47.1% | 0 |
| Agriculture | White | 2019 | 48.9% | 0 |
| Insurance Commissioner | Black | 2019 | 46.8% | 0 |
| Secretary of State | Black | 2019 | 48.9% | 0 |
| Governor | White | 2023 | 58.0% | 1 |
| Lt. Governor | White | 2023 | 50.4% | 1 |
| Secretary of State | Black | 2023 | 49.4% | 0 |
| Attorney General | White | 2023 | 49.5% | 0 |
| Auditor | Black | 2023 | 50.1% | 1 |
| Treasurer | Black | 2023 | 51.7% | 1 |
| Agriculture | Black | 2023 | 52.8% | 1 |
| Insurance Commissioner | Black | 2023 | 50.2% | 1 |
| 2019-2023 Average | | | 50.4% | |
| 2023 Average | | | 51.5% | |
| Number of Democratic Wins | | | | 7 |

*Id.* at 9.

Defendants say this is enough to create an equal opportunity and remedy the Section 2 violation, especially if the Court focuses on the results in 2023 when the effectiveness score was .515 and the percent-won score was 80%. *Id.* at 10. The 2023 elections do show progress, and election opportunities are not static. *See LULAC*, 548 U.S. at 428 (discussing growing Latino voting power). But a single-year sample size is too small, and the results were less favorable for black voters in 2024 as Dr. Handley's data showed. Granted, those 2024 federal elections can be distinguished. But so can the elections Dr. Alford chose to include. For example, the gubernatorial elections in 2019 and 2023 were not biracial and included more sizable crossover votes for well-funded and well-known white Democratic candidates. Handley Responsive Rep. [252-1] at 4. We would not expect similar crossover in a legislative race.

In any event, Dr. Handley responded to Defendants' criticism in her reply report, dropping the pre-2015 contests and examining various combinations of elections—new and old, biracial and not:

**Table 7: Effectiveness Scores for Remedial Senate District 1 Using Different Combinations of Elections**

| Election Years | Candidates | Effectiveness Score | Percent Won |
|---|---|---|---|
| 2015-2024 | Biracial only (*Handley approach*) | 0.488 | 41.2% |
| 2015-2024 | Biracial and White-versus-White | 0.494 | 41.4% |
| 2015, 2019, 2023 | Biracial only | 0.485 | 33.3% |
| 2015, 2019, 2023 | Biracial and White-versus-White | 0.495 | 38.1% |
| 2018-2024 | Biracial only | 0.496 | 50.0% |
| 2018-2024 | Biracial and White-versus-White | 0.499 | 45.5% |
| 2019, 2023 | Biracial only | 0.496 | 44.4% |
| 2019, 2023 | Biracial and White-versus-White (*Alford Approach*) | 0.503 | 46.7% |

*Id.* at 9.

These results are telling. Considering biracial, non-federal elections in 2015, 2019, and 2023 nets a percent-won of just 33.3%. Even using Dr. Alford's selected elections in 2019 and

2023, the black-preferred candidate fails more often than not, and only one grouping produces a percent-won score equaling 50%; none surpass it. The effective scores aren't much better. Only one grouping (Dr. Alford's approach) produces an effectiveness score over .500 (.503), yet the percent-won score for that group is just 46.7%. Thus, the bloc-voting white population in this new district still "usually . . . defeat[s] the minority's preferred candidate." *Gingles*, 478 U.S. at 51.[3] Though we have not applied any per se tests and have considered the totality of the circumstances, we believe the past election results offer persuasive evidence that the Legislature failed to create an effective majority in SD 1.

In sum, "an additional majority-minority district does not necessarily establish an increased opportunity." *Harding v. County of Dallas*, 948 F.3d 302, 309 (5th Cir. 2020). Here it didn't. And as noted, we must "correct the Section 2 violation." *Brown*, 561 F.3d at 435 (quoting *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006)). Plaintiffs met all *Gingles* factors for this area at trial, and black-preferred candidates in SD 1 would still usually lose due to white bloc voting. 478 U.S. at 51; *see also United States v. Dall. Cnty. Comm'n*, 850 F.2d 1433, 1437 (11th Cir. 1988) ("[A]ny proposal to remedy a Section 2 violation must itself conform with Section 2."). SD 1 neither provides an effective majority nor remedies the Section 2 violation.

    C.    House Redistricting in Northeast Mississippi

The 2022 House Plan had two opportunity districts for black voters, HD 16 (62.3% BVAP) and HD 36 (61.2% BVAP). HD 27 and HD 22 had fewer than one-third BVAP. The

---

[3] This may explain why the map's principal architect stated during floor debate that white voters in the Hernando area would still be "getting the person of their choice, I would think." Pls.' Objs. [243] at 15 (quoting Senate Floor Video [243-3] at 4:55:55).

2025 Remedial House Plan adds a majority-minority district, HD 22, with a 51.2% BVAP. But it reduces HD 16 to 53.2%. Handley 2025 Rep. [243-10] at 10; Cooper Decl. [243-9] at 19–20.

The parties dispute whether HD 22 truly creates an opportunity and whether HD 16 lost that status. No one has challenged the new maps on constitutional grounds. We find that Remedial HD 22 creates a new opportunity district in the northeast Mississippi interest area and that, despite BVAP losses in HD 16, that district remains an effective opportunity district.

*HD 22:* Plaintiffs' expert Dr. Handley concludes that HD 22 "*will* provide Black voters with a realistic opportunity to elect their candidates of choice to the state house." Handley 2025 Rep. [243-10] at 10 (emphasis added). Both her original calculations (which include 2011 and 2012 election results) and her updated scores (which do not) support her conclusion:

| BVAP | Original Effectiveness Score | Original Percent-Won Score |
|---|---|---|
| 51.2 | .530 | 84.2 |

*Id.*

| BVAP | Updated Effectiveness Score | Updated Percent-Won Score |
|---|---|---|
| 51.2 | .526 | 82.4% |

Handley Responsive Rep. [252-1] at 7. Under either calculation, the effectiveness score for this majority-minority district easily exceeds Dr. Handley's .500 threshold for an effective district. Handley 2025 Rep. [243-10] at 6. The same is true for her 60% marker for the percent-won scores. *Id.*

Those margins expand when considering the most recent biracial elections. In biracial elections from 2018 to 2024 (which includes federal elections) the black-preferred candidates

won 92.9% of the time, and the effectiveness score was .538. Handley Responsive Rep. [252-1] at 16. Dr. Alford's results are even higher. Black-preferred candidates won every statewide election from 2019 to 2023 with an effectiveness score of .553. *See* Alford Rep. [249-1] at 6. Though more recent biracial elections carry more weight, we consider both reports relevant, and they tell the same story. HD 22 is an effective opportunity district, just as Dr. Handley concludes.

Plaintiffs acknowledge Dr. Handley's opinion but part ways with their expert on this one. According to them, the totality of the circumstances proves black voters still lack a meaningful opportunity to elect candidates of their choice in HD 22. They point to "contextual evidence" such as a white Republican incumbent in HD 22, socioeconomic disparities between white and black Mississippians, disenfranchisement, precinct splits, voter purges, and "the sense of hopelessness experienced by voters who historically have been denied legislative representation." Pls.' Objs. [243] at 33–36. While we have considered those arguments and the evidence supporting them, we do not find them as compelling as Dr. Handley's report. Despite other factors that might depress turnout, black-preferred candidates overwhelmingly prevail in HD 22.

That said, the incumbency issue is a little different because it seems logical that an incumbent might perform better. But incumbency effects could be viewed as idiosyncratic to a particular election cycle. That differs from socioeconomic barriers to voter turnout, which are more durable. Even considering the issue, incumbency does not outweigh the district's strong performance for black-preferred candidates. We acknowledge the incumbency opinions from Plaintiffs' expert Dr. Marvin King, but those opinions fail to demonstrate the extent of the impact—especially for black voters in HD 22 who for the first time will have the opportunity to

vote as a majority.  The evidence convincingly shows that black voters bloc vote against white Republicans.  The evidence also shows that black-preferred candidates have performed very well in HD 22 when challenging well-heeled statewide incumbents.  In fact, over two state-election cycles, every black-preferred candidate prevailed, most with comfortable margins.  *See* Alford Rep. [249-1] at 6.  Granted, local representatives may have stronger connections, but even if incumbency has an effect, the effectiveness scores seem high enough to absorb it.

Given the substantial degree of success within HD 22's precincts, we find that HD 22 constitutes an opportunity district where black voters have a realistic opportunity to elect candidates of their choice.

*HD 16:*  Finding a new opportunity district in HD 22 does not end the analysis—Plaintiffs still challenge the reconfigured HD 16.  As noted, the Legislature lowered HD 16's BVAP to form HD 22.  As a result, HD 16's BVAP dropped nearly 10 points from 62.29% to 53.21%.  Pls.' Objs. [243] at 16.  So Plaintiffs say even if black voters gained an opportunity in new HD 22, they lost one in HD 16—thus no remedy.

We are again persuaded by the historical evidence.  Dr. Handley calculated her effectiveness and percent-won scores twice.  She first included results from before 2015:

| BVAP | Original Effectiveness Score | Original Percent-Won Score |
|------|------------------------------|----------------------------|
| 53.2 | .503                         | 57.9                       |

Handley 2025 Rep. [243-10] at 10.  But in response to Dr. Alford, she dropped those older elections from her second report:

| BVAP | Updated Effectiveness Score | Updated Percent-Won Score |
|------|-----------------------------|---------------------------|
| 53.2 | .501                        | 58.8                      |

14

Handley Responsive Rep. [252-1] at 7 (excluding 2011 and 2012). Under both data sets, the effectiveness score exceeds Dr. Handley's measure for an effective district, though not by much. The problem, she says, is that HD 16 never reaches her 60% target for the percent-won score, a mark Dr. Alford dismisses as arbitrary. Alford Rep. [249-1] at 4.

We do too. While we have generally found Dr. Handley credible, she offers no logical basis for the 60% figure. Indeed, she acknowledges, "While the *line is not precise*, in my opinion a percent won score of less than 60% *can* indicate that the district is not likely to provide Black voters with a realistic opportunity to elect their candidates of choice." Handley 2025 Rep. [243-10] at 6 (emphasis added).

Those equivocations weaken her opinion, and she offers neither methodology nor rational explanation for selecting 60%—a figure just slightly above her reported percent-won figures for HD 16. Expert opinions supported "only by the *ipse dixit* of the expert" are generally inadmissible under Federal Rule of Evidence 702. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). And while we have considered her opinion, we find it unpersuasive.

We note too that the Legislature faces competing challenges and policy concerns when drawing new districts. We will not reject its efforts over a 1.2% deviation from Dr. Handley's 60% threshold, an unsupported and admittedly imprecise marker. *See LULAC*, 548 U.S. at 429 (noting that "States retain broad [but not unlimited] discretion in drawing districts to comply with the mandate of [Section] 2" (quoting *Shaw v. Hunt*, 517 U.S. 899, 917 n.9 (1996))).

Going beyond Dr. Handley's calculations, we also consider Dr. Alford's. Using Dr. Alford's more recent elections spikes HD 16's scores, even when considering just biracial contests as Dr. Handley advocates.

| Office | Democratic Candidate Race | Year | House District 16 Dem. % | House District 16 Dem. Win |
|---|---|---|---|---|
| Governor | White | 2019 | 57.1% | 1 |
| Lt. Governor | White | 2019 | 49.4% | 0 |
| Attorney General | Black | 2019 | 52.2% | 1 |
| Treasurer | Black | 2019 | 49.5% | 0 |
| Agriculture | White | 2019 | 51.8% | 1 |
| Insurance Commissioner | Black | 2019 | 48.6% | 0 |
| Secretary of State | Black | 2019 | 51.1% | 1 |
| Governor | White | 2023 | 61.3% | 1 |
| Lt. Governor | White | 2023 | 49.3% | 0 |
| Secretary of State | Black | 2023 | 51.5% | 1 |
| Attorney General | White | 2023 | 51.3% | 1 |
| Auditor | Black | 2023 | 52.4% | 1 |
| Treasurer | Black | 2023 | 53.1% | 1 |
| Agriculture | Black | 2023 | 53.8% | 1 |
| Insurance Commissioner | Black | 2023 | 50.7% | 1 |
| **2019-2023 Average** | | | 52.2% | |
| **2023 Average** | | | 52.9% | |
| **Number of Democratic Wins** | | | | 11 |

Alford Rep. [249-1] at 6. Dr. Alford arrives at a .522 effectiveness score and a 73% win-percentage score. *Id.* The numbers are comparable for these elections when using the biracial-election results—the effectiveness score is .514 with a 77.8% win-percentage score. *See id.* These scores all exceed those that Dr. Handley describes as effective. *See* Handley 2025 Rep. [243-10] at 6.[4]

Plaintiffs do make other arguments, but this data shows that black voters in HD 16 have a realistic opportunity to elect the candidates of their choice. *See Abbott*, 585 U.S. at 617

---

[4] While we do not believe the 2023 results should be viewed in isolation, those figures are even higher—every black candidate won with an effectiveness score of .529. Again though, the 2024 federal elections are not included in Dr. Alford's report. That raises the point that the scores can be manipulated depending on which elections the experts select. But we find that even under Dr. Handley's calculations—which are more generous for Plaintiffs—the numbers still reflect an opportunity district. And to the extent that incumbency is a factor, HD 16 includes a two-term black incumbent Democrat.

(considering performance evidence).  Their majority is effective, and the Legislature has remedied the Section 2 violation.  We accept the Legislature's new map for the House districts.

IV.   Next Steps

Defendants requested seven days, should this Court find remaining Section 2 violations, to submit a proposed map to remedy them.  This seems equitable because Defendants had no reason to object to the Legislature's plans but wish to counter Plaintiffs' submissions.  In addition, it is unlikely the Court would draw its own maps rather than adopt one submitted by a party.  We find that Defendants deserve an opportunity to make recommendations.

The timeline for that is tight.  We remain committed to special elections in November.  But as noted during oral argument, allowing Defendants to submit competing maps will necessarily require an opportunity for Plaintiffs to respond.  We need not address all that now, but, if necessary, the Court may be forced to order a revised pre-election schedule.  Finally, the parties are instructed to contact Courtroom Deputy Shone Powell within 24 hours of this Order to set a Zoom conference to explore a briefing schedule and whether the parties might find common ground to avoid further delay.

V.   Conclusion

We find the remedial Senate districts in the DeSoto County interest area fail to remedy the Section 2 violation.  Defendants have seven days to propose a new map.  We have considered Desoto County's arguments but decline to address them because they would not alter this result.  Nonetheless, when making a final decision about proper districts for this area, we may need to decide the relevance of traditional redistricting principles when imposing a remedy for a Section 2 violation.  The parties should therefore docket letter briefs on that issue by the same seven-day deadline.  As for HD 16 and HD 22 in northeast Mississippi, those districts remedy the Section 2

violation, and because Plaintiffs have not objected to the Legislature's remedial map for the Hattiesburg area, we accept that map as well.  The parties are instructed to contact the Courtroom Deputy within 24 hours to set a Zoom conference.

    It is SO ORDERED.