April 22, 2025

Chief Judge Sul Ozerden
Judge Daniel P. Jordan
Judge Leslie Southwick
Thad Cochran United States Courthouse
501 E. Court Street
Jackson, MS 39201

*Via ECF*

Re: *Mississippi State Conference of the NAACP v. State Board of Election Commissioners*, No. 22-734

Dear Chief Judge Ozerden and Judges Jordan and Southwick:

In its April 15, 2025 Findings of Fact and Conclusions of Law, the Court sustained Plaintiffs' objections as to the Senate Plan in the DeSoto County area, provided the State Defendants with seven days to submit alternative plans for consideration, and requested that the parties docket letter briefs regarding "the relevance of traditional redistricting principles when imposing a remedy for a Section 2 violation" to aid the Court in "making a final decision about proper districts for this area." ECF No. 254 at 17.

Plaintiffs now submit this letter brief on the issue, while reserving all rights to respond separately to any alternative plans offered by the State Defendants. *See* Text-Only Dkt. Order of April 17, 2025 (setting April 29, 2025 deadline for any such responses).

I.    **Relevant and Permissible Considerations for a Court-Ordered Remedial Plan**

As this Court has held, its "'first and foremost obligation'" at this stage "must be 'to correct the Section 2 violation.'" *Miss. N.A.A.C.P. v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 464 (S.D. Miss. 2024) (quoting *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009)). That means adopting a remedial plan that contains an additional opportunity district for Black voters in the DeSoto County area. *E.g.*, Findings of Fact and Conclusions of Law, ECF No. 254 at 3-6, 11. Moreover, when it comes to electoral performance, while Section 2 does not entitle Black voters to a "guarantee" of success in a remedial minority opportunity district, *id.* at 3-4 (citing *LULAC v. Perry*, 548 U.S. 399, 428 (2006)), it also does not set any inherent cap on the strength of the majority-minority districts that may be included in court-adopted

Plaintiffs' Letter Brief, *Miss. State Conf. of NAACP v. SBEC*, No. 22 Civ. 734

remedial plans. Thus, to remedy Section 2 violations, courts in practice can and do adopt remedial districts in which Black voters are highly likely to prevail. *E.g.*, *Singleton v. Allen*, No. 2:21-CV-1291, 2023 WL 6567895, at *16 (N.D. Ala. Oct. 5, 2023) (adopting remedial plan where performance analysis showed Black-preferred candidate had carried 16 of 17 recent statewide contests).

Correcting the Section 2 violation—that is, ensuring the addition of an opportunity district where Black voters will be able to usually elect candidates of choice in light of the political circumstances in the area at issue—thus takes precedence over the so-called traditional districting principles. *See, e.g.*, *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1358–59 (N.D. Ga. 2014) ("[A] [c]ourt-created plan should follow the traditional redistricting principles, though these principles have less precedence than 'the requirements of the Constitution and Voting Rights Act.'" (quoting *Larios v. Cox*, 314 F.Supp.2d 1357, 1360 (N.D.Ga.2004) (three-judge court)); *see also, e.g.*, *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1302 (N.D. Ala. 2023) (three-judge panel) ("The State cannot avoid the mandate of Section Two by improving its map on metrics *other than compliance with Section Two*." (emphasis in original)).

Beyond the paramount requirement of completely remedying vote dilution, a court-ordered remedial plan should generally follow the "policy judgments" identified by the Legislature to the extent that this can be done consistent with the Constitution and the Voting Rights Act. *Perry v. Perez*, 565 U.S. 388, 393 (2012) (per curiam); *accord Upham v. Seamon,* 456 U.S. 37, 40-41 (1982) (per curiam); *Singleton*, 2023 WL 6567895, at *12; *Georgia State Conf. of NAACP*, 996 F. Supp. 2d at 1358–59. "'[F]aced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying' a state plan— even one that was itself unenforceable—'to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.'" *Perry*, 565 U.S. at 393 (quoting *Abrams v. Johnson,* 521 U.S. 74, 79 (1997)).

Those goals may include the prioritization of particular traditional districting principles identified as important by the Legislature. *E.g.*, *Singleton*, 2023 WL 6567895, at *14 ("We next limit our analysis to the proposed plans that satisfy the Legislature's limit of six county splits. We do not find that we are required to defer to that cap, but we can completely remedy the vote dilution we found without exceeding it, … so we will not exceed it."). They may also involve the goal of minimizing changes to the existing plan. *E.g.*, *id.* at *13 ("Although the Legislature had the discretion to redraw every district in the state when it enacted the 2023 Plan, we do not have the discretion to redraw every district now. We limit our changes to districts that were challenged and found unlawful, and to those changes to adjacent districts that are necessary to satisfy applicable constitutional and statutory requirements.").

Plaintiffs' Letter Brief, *Miss. State Conf. of NAACP v. SBEC*, No. 22 Civ. 734

However, those goals cannot properly include nakedly political aims, such as the protection of favored incumbents, which are not expressible in terms of objective districting principles. "A court-ordered plan is subject to a more stringent standard than is a legislative plan. Many factors, such as the protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts." *Wyche v. Madison Par. Police Jury*, 769 F.2d 265, 268 (5th Cir. 1985) (citation omitted); *see also, e.g., Georgia State Conf. of NAACP*, 996 F. Supp. 2d at 1363 (explaining that incumbency protection is "a *distinctly subordinate* consideration" in a court-ordered plan) (quoting *Larios,* 314 F.Supp.2d at 1360).

Courts in the Section 2 remedial context thus can and should consider traditional districting principles, but only (1) once satisfied that the plan remedies the Section 2 violation and (2) while adhering to the overall priorities identified by the Legislature.

There is one other way in which traditional districting principles theoretically might come into play. There is no constitutional prohibition on considering race in the districting process, or in drawing majority-minority districts in order to ensure compliance with the Voting Rights Act. *E.g., Bush v. Vera*, 517 U.S. 952, 958 (1996) (plurality op.); *Shaw v. Hunt*, 517 U.S. 899, 904–05 (1996). But, if a districting plan "subordinate[s] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations," it must survive strict scrutiny. *E.g., Miller v. Johnson*, 515 U.S. 900, 916, 920 (1995). Courts, including the Supreme Court, have long presumed that remedying a Section 2 violation is a compelling interest sufficient to meet the strict scrutiny standard. *E.g., Shaw*, 517 U.S. at 915; *accord Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 279 (2015). But to be sufficiently tailored in those circumstances, a "district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability." *Bush*, 517 U.S. at 979 (citation omitted); *accord Abrams v. Johnson*, 521 U.S. 74, 83-86 (1997); *see also, e.g., Georgia State Conf. of NAACP*, 996 F. Supp. 2d at 1365-1366.

Plans that fall outside this outer boundary, as in *Bush, Miller*, and *Shaw v. Reno*, typically involve majority-minority districts that stretch between disparate communities to pick up voters solely on the grounds of race, resulting in lines that are "bizarrely shaped" in the extreme. *Bush*, 517 U.S. at 960-964; *Miller*, 515 U.S. at 908-908; *Shaw v. Reno*, 509 U.S. 630, 635-636; *cf. Allen v. Milligan*, 599 U.S. 1, 27-29 (2023) (discussing these cases in describing how the requirement to draw reasonably configured illustrative districts makes proving Section 2 liability "more difficult").

As explained at oral argument, Plaintiffs do not think that the Legislature's plan, let alone any of Plaintiffs' alternative plans, comes close to this constitutional boundary. April 8 Hrg. Tr. at 31:11-17, ECF No. 255. *Cf. Perry*, 565 U.S. at 394

Plaintiffs' Letter Brief, *Miss. State Conf. of NAACP v. SBEC*, No. 22 Civ. 734

(claimed "legal defects in the state plan" should be shown to be supported at least by "a likelihood of success on the merits"). Indeed, as explained below, *infra* Part II, Plaintiffs' alternative plans in particular fully comport with traditional districting principles while also remedying vote dilution. *See also* Pls.' Objections, ECF No. 243 at 24-27. But Plaintiffs acknowledge that issues relating to this constitutional line in the Section 2 remedial context are presently before the U.S. Supreme Court—albeit in a case involving a legislatively-enacted, rather than judicially-drawn, remedial plan. *See Callais v. Landry*, 732 F. Supp. 3d 574, 610-614 (W.D. La. 2024) (three-judge court) (concluding Louisiana Legislature's addition of Black-majority congressional district to remedy likely Section 2 violation was unconstitutional because newly-drawn majority-minority district "d[id] not comply with traditional districting principles"), *on appeal*, *Louisiana v. Callais*, No. 24-109 (U.S., argued Mar. 24).

Especially in light of the pending appeal in *Callais*, Plaintiffs submit that, in choosing from among those plans that meet the required criteria of (1) completely remedying the Section 2 violation and (2) adhering to the overall priorities identified by the Legislature, the Court can permissibly opt in favor of the plan or plans that most clearly comport with traditional districting principles, and against plans that neglect those principles. This approach is broadly consistent with that adopted by other courts in Section 2 remedial cases, such as the three-judge panel in the Alabama congressional case, and Chief Judge Batten in a Northern District of Georgia case from the last Census cycle. *See, e.g.*, *Singleton*, 2023 WL 6567895, at *14-*16 (analyzing those plans with sufficiently effective districts for similarity with the legislative plan in terms of traditional districting principles and then selecting a plan that "completely remedies the vote dilution we found and satisfies all applicable federal constitutional and statutory requirements while most closely approximating the policy choices the Alabama Legislature made in the 2023 Plan"); *Georgia State Conf. of NAACP*, 996 F. Supp. 2d at 1370 (explaining that the court's remedial plan largely "avoids upsetting [the defendant county's] policy preferences through the use of the traditional redistricting principles outlined above").

## II.    Applying these Considerations to Plaintiffs' Alternative Plans

Based on the principles set forth above, both of Plaintiffs' alternative plans are permissible options for the Court to select. *See* Pls.' Objections, ECF No. 243 at 24-27; Cooper Report, Ex. I to Pls.' Partial Objections ("Cooper Remedial Report"), ECF No. 243-9 at 10-17. Between the two, Plaintiffs' Senate Plan A is likely the best overall choice from a traditional districting principles perspective.

To start, there is no dispute that both of Plaintiffs' alternative Senate Plans add an *effective* Black-majority district in the DeSoto County area, as both Dr. Handley and Dr. Alford concluded. Handley Report, Ex. J to Pls.' Partial Objections, ECF No. 243-10 at 4-7; Alford Report, Ex. A to Defendants' Resp., ECF No. 249-1 at 10;

Plaintiffs' Letter Brief, *Miss. State Conf. of NAACP v. SBEC*, No. 22 Civ. 734

Handley Resp. Report, Ex. A to Pls.' Reply Br., ECF No. 252-1 at 4. Accordingly, both of Plaintiffs' alternative Senate plans satisfy the most important requirement: They completely remedy the unlawful vote dilution proven at trial. *E.g.*, *Miss. N.A.A.C.P.*, 739 F. Supp. 3d at 464.[1]

Moreover, both plans adhere to the key goals identified by the Legislature. The Legislature's goals, as identified in 2022 at the commencement of this redistricting cycle, are that:

(1) Each district's population should be less than 5 [percent] above or below the ideal population of the district.

(2) Districts should be composed of contiguous territory.

(3) The redistricting plan should comply with all applicable state and federal laws including Section 2 of the Voting Rights Act of 1965, as amended, and the Mississippi and United States Constitutions.

*Miss. N.A.A.C.P.*, 739 F. Supp. 3d at 402. Such "applicable state laws" in turn include Section 5-3-101 of the Mississippi Code, which provides that:

(a) Every district shall be compact and composed of contiguous territory and the boundary shall cross governmental or political boundaries the least number of times possible; and

(b) Districts shall be structured, as far as possible and within constitutional standards, along county lines; if county lines are fractured, then election district lines shall be followed as nearly as possible.

*Miss. N.A.A.C.P.*, 739 F. Supp. 3d at 401 (quoting Miss. Code Ann. § 5-03-01).

The Legislature's stated goals for redistricting this Census cycle thus incorporate many of the traditional districting principles, such as equal population, compactness, contiguity, minimizing county and precinct splits, and avoiding the fracturing of communities encompassed within official "governmental or political boundaries."

---

[1] Notably, the BVAP of Delta-based Senate District 1 in Plaintiffs' plans is similar to (indeed, lower than) the 58% BVAP Senate District 22 that was drawn by the Legislature as a remedy for vote dilution in the South Delta in the *Thomas* case from the last Census cycle. *See* Pl.'s Notice, *Thomas v. Reeves*, No. 18 Civ. 441, ECF No. 99 (April 4, 2019).

Plaintiffs' Letter Brief, *Miss. State Conf. of NAACP v. SBEC*, No. 22 Civ. 734

Beyond these goals, the Legislature identified additional priorities in redrawing the lines around DeSoto County in the 2025 Legislative Senate Plan. For one, the Senate prioritized minimizing the number of changed districts, so that fewer incumbents would be required to run for special elections. *See* Mississippi Senate Webcast Recording for February 26, 2025 ("Feb. 26 Senate Floor Video"), Ex. C to Pls.' Objections, ECF No. 243-3, at 4:31:12-4:32:35. Accordingly, it changed only five districts in the area: Districts 1, 2, 10, 11, and 19. The Senate also prioritized creating a new Black-majority District 11 with no incumbent, which it believed it was required to do. *See* Feb. 26 Senate Floor Video at 4:24:58 - 4:26:03 (Sen. Kirby) ("[W]e did exactly what the court asked us to do: To create a new, in the North and South, with a newly minority-majority minority district with no incumbent.").

As set forth in Plaintiffs' Partial Objections and in Mr. Cooper's reports analyzing the plans and providing detailed plan metrics, including reports on county, precinct, and municipal splits as well as numerical compactness, both of Plaintiffs' alternate plans adhere to all of these goals.

Specifically, and using the 2025 Legislative Senate Plan as a benchmark and an indicator of the Legislature's judgments and priorities:

- Both plans change only six districts—the same five that are changed in the 2025 Legislative Senate Plan, plus District 12 in the Delta. *See* Cooper Remedial Report at 4-6. Senator Derrick Simmons, the incumbent in District 12, has indicated that he would support the adoption of Plaintiffs' alternative plans even if it means running again in 2025. *See* Declaration of Senator Derrick T. Simmons, Ex. L to Pls.' Objections, ECF No. 243-12 at ¶ 6. These districts are generally located in the same areas as in the 2025 Legislative Senate Plan and involve the same group of counties in the same area of the State. *See* Cooper Remedial Report at 11-12 (Senate Plan A), 15-16 (Senate Plan B).

- Both plans leave Senate District 11 open. Plaintiffs' Senate Plan A leaves Black-majority District 11 open, and pairs Senator McLendon with Senator Blackwell, also of DeSoto County, in District 2. *See* Cooper Remedial Report at 11-12. And Plaintiffs' Senate Plan B also leaves SD 11 open, while pairing Senator McLendon with Senator Jackson (*i.e.*, the same two Senators paired under the 2025 Legislative Senate Plan). *See* Cooper Remedial Report at 14-15.

- Both plans are composed entirely of contiguous territory. *Miss. N.A.A.C.P.*, 739 F. Supp. 3d at 402.

- Both plans meet the five percent deviation threshold. *Miss. N.A.A.C.P.*, 739 F. Supp. 3d at 401; *see* Cooper Remedial Report at 12 (Senate Plan A), 16 (Senate Plan B). Indeed, Senate Plan A in particular is better than the 2025

Plaintiffs' Letter Brief, *Miss. State Conf. of NAACP v. SBEC*, No. 22 Civ. 734

Legislative Senate Plan on this metric.  The 2025 Legislative Senate Plan had multiple districts (Districts 1 and 11) that were at the very edge of the outer boundary for equal population (4.97% and 49.6%, respectively) and another district (District 19) with a 4.5% deviation. *See* Cooper Remedial Report at 9. By contrast, Plaintiffs' Senate Plan A keeps all of the altered districts within 4% deviation or less. *Id.* at 12.

- Both plans meet or beat the 2025 Legislative Plan with respect to geometric district compactness as measured by the Reock and Polsby-Popper scores. *See* Miss. Code Ann. § 5-03-01; Cooper Remedial Report at 13-14 (Senate Plan A), 16-17 (Senate Plan B).

- Both plans meet or beat the 2025 Legislative Plan with respect to splits of counties and the crossing of other "governmental or political boundaries" like city lines and precincts.  Miss. Code Ann. § 5-03-01; Cooper Remedial Report at 13-14 (Senate Plan A), 16-17 (Senate Plan B).  Indeed, both plans split the same number of counties (8) while splitting fewer municipalities (21 or 22 in Plaintiffs' Plans versus 26 in the 2025 Legislative Senate Plan) and *dramatically* fewer precincts (11 or 13 in Plaintiffs' Plans versus 32 in the 2025 Legislative Senate Plan). *See* Cooper Remedial Report at 13-14 (Senate Plan A), 16-17 (Senate Plan B).

Accordingly, either plan is a permissible remedy for vote dilution in the DeSoto County area.

As between the two, there is at least one reason to select Plaintiffs' Senate Plan A:  The treatment of DeSoto County as a community of interest.  In its amicus brief, DeSoto County assailed the 2025 Legislative Senate Plan for combining the City of Hernando, DeSoto County's seat, "with several smaller towns throughout the heart of the Mississippi Delta that are more than 40 miles away, including Clarksdale, Marks, and Jonestown." DeSoto Cnty. Amicus Br., ECF No. 251, at 5; *see also* Findings of Fact and Conclusions of Law, ECF No. 254 at 8 ("[T]he new SD 11 yokes high-turnout white communities in the Hernando area of DeSoto County to several poorer, predominantly black towns in the Mississippi Delta.").  This configuration may have been adopted to facilitate the pairing of Senator McClendon in Hernando with Senator Jackson in Marks.

Plaintiffs' Senate Plan A takes a slightly different approach, using the southern border of DeSoto County to mark the line between District 1 and District 2.  Cooper Remedial Report at 11.  As Mr. Cooper explains:

Like the 2025 Senate Plan, Plaintiffs Senate Plan A pairs two incumbents. But it does so with a different pairing of incumbents, allowing for overall more compact districts in the modified 6-district part of the map. Plaintiffs' Senate Plan A would pair incumbent Senator

Plaintiffs' Letter Brief, *Miss. State Conf. of NAACP v. SBEC*, No. 22 Civ. 734

> McClendon with Senator Kevin Blackwell, also of DeSoto County, in a
> reconfigured Senate  District 2. This configuration also allows for the
> creation of three Senate districts that are strongly based in DeSoto
> County: Two districts (SDs 2 and 19) that are majority-White and that
> are entirely within DeSoto County, and one (SD 11) that is majority-
> Black and that is 92.24% from DeSoto County by total population—
> while at the same time maintaining the North-Delta-based character of
> the Black-majority district to the south (SD 1). These are potentially
> significant communities-of-interest considerations.

Cooper Remedial Report at 11-12.

Accordingly, while either of Plaintiffs' alternative Senate plans can be adopted as a permissible court-ordered remedy for vote dilution, Plaintiffs' Senate Plan A addresses the specific communities-of-interest concern raised by DeSoto County.[2]  It also splits two fewer election districts and one fewer municipality than Senate Plan B (and many fewer than the benchmark 2025 Legislative Plan), Cooper Remedial Report at 13, 16.  *See* Miss. Code Ann. § 5-03-01.

## III.   Conclusion

The Court should adopt Plaintiffs Senate Plan A in order to ensure a remedial plan that fully remedies vote dilution, adheres to the policy judgments of the Legislature, and comports with traditional districting principles to the fullest extent, including by addressing the specific issue raised by amicus DeSoto County.

Respectfully submitted,

|  |  |
|---|---|
|  | /s/ *Ari J. Savitzky*    |
| Joshua Tom, MSB 105392 | Ari J. Savitzky |
| *jtom@aclu-ms.org* | *asavitzky@aclu.org* |
| ACLU OF MISSISSIPPI | Ming Cheung |
| 101 South Congress Street | *mcheung@aclu.org* |
| Jackson, MS 39201 | 125 Broad Street, 18th Floor |
| (601) 354-3408 | New York, New York 10004 |
|  | (212) 549-2500 |
| Robert B. McDuff, MSB 2532 |  |
| *rbm@mcdufflaw.com* | Jennifer Nwachukwu |
| MISSISSIPPI CENTER FOR JUSTICE | *jnwachukwu@lawyerscommittee.org* |

---

[2] To the extent that pairing two specific incumbents was a legislative priority that the Court seeks to adhere to, Plaintiffs' Senate Plan B also adheres to that priority. However, such political concerns are of little if any significance in a court-ordered plan. *See Wyche*, 769 F.2d at 268; *see also, e.g.*, *Larios,* 314 F.Supp.2d at 1360.

Plaintiffs' Letter Brief, *Miss. State Conf. of NAACP v. SBEC*, No. 22 Civ. 734

767 North Congress Street
Jackson, MS 39202
(601) 969-0802

Carroll Rhodes, MSB 5314
LAW OFFICES OF CARROLL RHODES
*crhodes6@bellsouth.net*
PO Box 588
Hazlehurst, MS 39083
(601) 894-1464

John P. Lavelle, Jr.
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-3007
Telephone:     +1.215.963.5000
Facsimile:     +1.215.963.5001
*john.lavelle@morganlewis.com*

David Rollins-Boyd
*drollins-boyd@lawyerscommittee.org*
Javon Davis
*jdavis@lawyerscommittee.org*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
(202) 662-8600

Drew Cleary Jordan
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Telephone:     +1.202.739.3000
Facsimile:     +1.202.739.3001
*drew.jordan@morganlewis.com*

*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I, Ari Savitzky, do certify that on this day I caused to be served a true and correct copy of the foregoing by electronic mail to all counsel of record.

This the 22nd day of 2025.

<u>/s/ *Ari J. Savitzky*        </u>
Ari J. Savitzky