# BUTLER | SNOW

*Via ECF*

Honorable Leslie H. Southwick, Halil Suleyman Ozerden, and Daniel P. Jordan III
U.S. District Court for the Southern District of Mississippi
501 E. Court Street
Jackson, MS 39201

    Re:    *Miss. N.A.A.C.P. v. State Bd. of Election Comm'rs*, 3:22-CV-734 Letter Brief

Dear Judge Southwick, Chief Judge Ozerden, and Judge Jordan:

This letter serves as Defendants' letter brief addressing the issue raised in this Court's Order [254] as well as suggesting a modified election schedule.

Traditional districting principles include "compactness, contiguity, and respect for political subdivisions." *Shaw v. Reno*, 509 U.S. 630, 647 (1993) ("*Shaw I*"); *see also Miller v. Johnson*, 515 U.S. 900, 916 (1995). Traditional districting principles are most relevant at the first *Gingles* precondition in relation to compactness and maintaining communities of interest. *See* [224] at 27; *see also League of United Latin American Citizens v. Perry*, 548 U.S. 399, 433 (2006). Traditional districting principles also arise in racial gerrymandering claims under the Fourteenth Amendment. *See Miller*, 515 U.S. at 916. Since no racial gerrymander claim exists in this case, all that is left is the consideration of traditional districting principles in the Section 2 analysis.

Once a Section 2 violation is established through the framework of *Gingles v. Thornburg*, 478 U.S. 30 (1986), courts must fashion a remedy that eliminates the defects while adhering to constitutional and statutory constraints. *See Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997) (citing *Upham v. Seamon*, 456 U.S. 37, 43 (1982)). Traditional districting principles are a consideration at the remedial stage of a Section 2 violation but are not the ultimate priority. *See Bush v. Vera*, 517 U.S. 952, 979 (1996) ("the district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability.").

The Supreme Court in *Bush* "established a two-part inquiry for determining whether a majority-minority district passes constitutional muster." *Clark v. Calhoun Cty., Miss.*, 88 F.3d 1393, 1407 (5th Cir.1996) (citing *Bush*, 517 U.S. at 962). If "race is the predominant motive in creating districts, strict scrutiny applies, and the districting plan must be narrowly tailored to serve a compelling governmental interest in order to survive" *Abrams*, 521 U.S. at 91 (citing *Bush*, 517 U.S. at 962). The Fifth Circuit summarized this concept in *Clark*:

> First, race-based redistricting, even that done for remedial purposes is subject to strict scrutiny. Second, compliance with § 2 of the Voting Rights Act constitutes a compelling governmental interest. Third, the State must have a strong basis in evidence for concluding that the three *Gingles* preconditions exist in order to claim that its redistricting plan is reasonably necessary to comply with § 2. Fourth, a tailored response to a found violation must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the wrong.

*Clark*, 88 F.3d at 1405-06.

Accordingly, at the remedial stage of proceedings, the Court should look to whether the district drawn to satisfy the Section 2 remedy "subordinate[s] traditional districting principles to race substantially more than is 'reasonably necessary.'" *Id.* As the district court held in *Perez v. Abbott*, "[o]n its face, this language makes clear that traditional districting principles may be subordinated to race when necessary to avoid § 2 liability (but not more than necessary)." 250 F. Supp.3d 123, 141 (W.D. Tex. 2017). And "Section Two does not mention, let alone elevate or emphasize, communities of interest [or other traditional districting principles] as a particular circumstance." *Singleton v. Allen*, 690 F. Supp.3d 1226, 1311 (N.D. Ala. 2023) (citing 52 U.S.C. § 10301(b)).

The Supreme Court held courts should respect "the importance in our federal system of each State's sovereign interest in implementing its redistricting plan." *Id.* at 978 (citing *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993); *Miller*, 515 U.S. at 915). And as the Supreme Court set out in *Shaw I*, the "Court never has held that race-conscious state decisionmaking is impermissible in *all* circumstances." 509 U.S. at 642. "When redistricting, a legislature may be aware of race when it draws district lines, just as it is aware of other demographic information such as age, economic status, religion, and political affiliation." *Callais v. Landry*, 732 F. Supp.3d 574, 599 (W.D. La. 2024) (citing *Shaw I*, 509 U.S. at 646). And "the district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race more than is 'reasonably necessary' to avoid § 2 liability." *Bush*, 517 U.S. at 979.

This Court should review the Plan submitted by Defendants in relation to traditional districting principles to confirm it does not subordinate to race more than is reasonably necessary. *See Bush*, 517 U.S. at 979. This Court's liability finding is "not a determination that the [ ] plaintiffs are entitled to a map of their choice, or to one of the remedial maps submitted to establish the first *Gingles* requirement." *Singleton v. Merrill*, 582 F. Supp.3d 924, 959 (N.D. Ala. 2022). "The Supreme Court [has] specifically ruled that [the Court] 'did not have to conduct a beauty contest between plaintiffs' maps and the State's." *Allen*, 690 F. Supp.3d at 1311. "The [State] retains 'flexibility' in their work, subject to the rule that a 'district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is reasonably necessary to avoid § 2 liability." *Merrill*, 582 F. Supp.3d at 959 (quoting *Bush*, 517 U.S. at 978-79).

The Plan submitted by Defendants does not subordinate traditional districting principles to race any more than reasonably necessary to comply with Section 2. Accordingly, the Plan properly employs traditional districting principles in the context of the Section 2 remedial draw and therefore should be approved.

**Modified Election Schedule**

With regard to suggested modifications to the proposed election schedule set forth in the Joint Resolution, Defendants believe it is important to afford local election officials sufficient time on the front end to minimize the likelihood of error which could significantly affect preparation of the ballots and actual voting. In this regard, Defendants have reviewed the proposed schedule and

concluded that there is about a week in the middle of the schedule and a week towards the end for compression to accommodate a workable schedule. Taking these compression points into consideration yields the following modified schedule:

- May 5 – Deadline to Share Detailed Maps & Address Libraries with Local Election Officials
- May 26 – Qualifying Begins
- May 30 – Qualifying Deadline
- June 6 – Deadline for State Executive Committee to Submit Names of Qualified Candidates
- June 21 – Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") Absentee Voting Begins for Primary Election
- August 5 – Special Primary Election Day
- September 2 – Special Primary Runoff Election Day
- September 20 – UOCAVA Absentee Voting Begins for General Election
- November 4 – Special General Election Day

In the event the May 5, 2025, deadline cannot be met, then the deadline for each state executive committee to submit the list of qualified candidates to the Secretary of State should be moved to June 13, 2025, and all previous deadlines moved back one (1) week, which would place the deadline to produce maps and address libraries on May 12, 2025.[1]

- May 12 – Deadline to Share Detailed Maps & Address Libraries with Local Election Officials
- June 2 – Qualifying Begins
- June 9 – Qualifying Deadline
- June 13 – Deadline for State Executive Committee to Submit Names of Qualified Candidates
- June 21 – Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") Absentee Voting Begins for Primary Election
- August 5 – Special Primary Election Day
- September 2 – Special Primary Runoff Election Day
- September 20 – UOCAVA Absentee Voting Begins for General Election
- November 4 – Special General Election Day

## Conclusion

Defendants respectfully request that the Court approve their proposed alternative Plan as compliant with the Court's order to achieve Section 2 compliance and that it order elections to proceed on the modified schedule set forth herein.

93399140.v1

---

[1] This modification maintains twenty-one (21) days from the adoption of maps to afford local election officials sufficient time to implement the Plan.