UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MISSISSIPPI STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, et al.                                                                                    PLAINTIFFS

V.                                                                CIVIL NO. 3:22-CV-734-DPJ-HSO-LHS

STATE BOARD OF ELECTION
COMMISSIONERS, et al.                                                                  DEFENDANTS

Before Southwick, *Circuit Judge*, Ozerden, *Chief District Judge*, and Jordan, *District Judge*

Per Curiam:

      This litigation challenges the Mississippi Legislature's redistricting of itself following the 2020 census.  Much has already been resolved.  In July 2024, this court rejected Plaintiffs' arguments that the redistricting plans violated the Equal Protection Clause of the Fourteenth Amendment but accepted that the plans ran afoul of Section 2 of the Voting Rights Act to a limited extent.  *See Mississippi NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 409, 466 (S.D. Miss. 2024).  After concluding that the State had too little time to create new district maps and conduct elections in 2024, the court held that the Legislature should be allowed an opportunity at its regular 2025 session to adopt revisions to the districts.  *Mississippi NAACP v. State Bd. Election Comm'rs*, 741 F. Supp. 3d 509, 515 (S.D. Miss. 2024).  The Legislature timely adopted a revised plan, *see* Formal Notice [241] at 1–2, and this court approved it with one exception.  *See* Apr. 15 Order [254] at 1.[1]  The exception was what the Legislature designated as Senate District 1 ("SD 1").  *Id.* at 8.

      The parties offer competing plans.  Our review of the evidence and controlling legal authorities convinces us that Defendants' plan should be adopted.  We also adopt the slight revision to the special elections schedule that all parties have endorsed.

---

[1] All citations are to CMECF pagination.

To explain our decision, we start by summarizing why the court previously rejected the Legislature's design of its SD 1, which will assist us in examining whether the shortcomings have been overcome.

I.    Shortcomings in Legislature's revised DeSoto County senate districts

The new plan for senate districts affects a few counties in northwest Mississippi – primarily DeSoto County.  The Legislature's 2025 plan configured SD 1 as a majority-minority district with a Black Voting Age Population ("BVAP") of 52.5 percent.  Handley 2025 Rep. [243-10] at 7. Despite having a BVAP over 50 percent, past election results indicated the district did not remedy the Section 2 violation.  Most combinations of election results analyzed by the experts supported that conclusion.  As shown below, only one set of results produced an effectiveness score above .500, and all but one had minority candidates losing most of the elections.

**Table 7: Effectiveness Scores for Remedial Senate District 1 Using Different Combinations of Elections**

| Election Years | Candidates | Effectiveness Score | Percent Won |
|---|---|---|---|
| 2015-2024 | Biracial only (*Handley approach*) | 0.488 | 41.2% |
| 2015-2024 | Biracial and White-versus-White | 0.494 | 41.4% |
| 2015, 2019, 2023 | Biracial only | 0.485 | 33.3% |
| 2015, 2019, 2023 | Biracial and White-versus-White | 0.495 | 38.1% |
| 2018-2024 | Biracial only | 0.496 | 50.0% |
| 2018-2024 | Biracial and White-versus-White | 0.499 | 45.5% |
| 2019, 2023 | Biracial only | 0.496 | 44.4% |
| 2019, 2023 | Biracial and White-versus-White (*Alford Approach*) | 0.503 | 46.7% |

Handley Resp. Rep. [252-1] at 9.  When viewed in isolation, results from the 2023 election showed an effectiveness score of .515 and a percent-won score of 80 percent for black candidates.[2]  Alford 2025 Rep. [249-1] at 10.  Defendants' expert Dr. John Alford relied on those results to show SD 1 was effective for black-preferred candidates.  *See id.*  We rejected Dr. Alford's reliance on the results of the 2023 election.  The success of minority-preferred candidates that year was a reversal of the outcomes in 2019 when such candidates won only one of seven races.  Apr. 15 Order [254] at 9-10.  We found that "a single-year sample size is too small, and the results were [also] less

---

[2] As noted in our prior orders, "effectiveness score" refers to "the average vote share, expressed as a proportion, received by the 19 Black-preferred Black candidates in each of the proposed districts." Handley 2025 Rep. [243-10] at 5.  "Percent-won score" refers to "the number of contests the Black-preferred Black candidates won divided by the total number of election contests." *Id.* at 6.

favorable for black voters in 2024 as Dr. Handley's data showed." *Id.* at 10.  Indeed, looking at the data from both experts, we found "the past election results offer[ed] persuasive evidence that the Legislature failed to create an effective majority in SD 1." *Id.* at 11.  Consequently, the Legislature's SD 1 did not remedy the Section 2 violation. *Id.* at 10–11.

We now consider the new, competing plans from the parties.

II.    Plaintiffs' proposed plan

Plaintiffs submit two plans — Plan A and Plan B.  Plaintiffs recognize that "[b]etween the two [proposed plans], Plaintiffs' Senate Plan A is likely the [better] overall choice from a traditional districting principles perspective." Pls.' Letter Br. [256] at 4; *see also* Pls.' Resp. [261] at 7 n.3.  They add that Plan A is "especially . . . designed to meet the relevant criteria at this stage in the case." Pls.' Resp. [261] at 9.  Defendants agree that Plaintiffs' Plan A is the more serious contender.  According to Defendants, the court's focus "should almost entirely be on the [Defendants'] SD 2 versus SD 11 in Plaintiffs' Plan A." Defs.' SBEC Plan [259] at 4.  We agree and will not consider Plaintiffs' Plan B.

Plaintiffs' Plan A alters six districts — 1, 2, 10, 11, 12 and 19. *See* Cooper Rep. [243-9] at 14.  The majority-minority districts are SD 11 and SD 1.  To avoid placing an incumbent in those districts, Plaintiffs paired incumbents in SD 2 — not a majority-minority district.  SD 11 has a BVAP of 50.15 percent, Defs.' SBEC Plan [259] at 4, and its "location is similar [to] Senate District 11 in the 2025 Legislative Plan" and SD 2 in Defendants' plan. Pls.' Resp. [261] at 4.  Dr. Handley conducted a functional analysis of Plaintiffs' Plan A, considering 17 biracial elections from 2015 to 2024 for both state and federal offices.  She determined Plaintiffs' SD 11 has an effectiveness score of .517 and a percent-won score of 82.4 percent.  Handley Rep. [261-2] at 5.

Plaintiffs' Plan A remedies the Section 2 violation.  Defendants insists the plan goes too far, though, and that it provides more than what this court may properly grant.  They argue the plan "increase[s] performance well beyond the 50% equal opportunity effectiveness threshold, and in many instances push[es] performance near or above 90%." Defs.' Resp. to Pls.' Objections [249] at 29.  In effect, Defendants say, "Plaintiffs seek unconstitutional guaranteed safe minority districts." *Id.* (citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (stating that race cannot be the predominant factor in the design of a district)).

We now consider whether the State Board of Election Commissioners' ("SBEC") competing map also remedies the Section 2 violation.

III.    Defendants' proposed plan

The SBEC submits a competing plan that affects four districts — 1, 2, 11, and 19 — two fewer than Plaintiffs' Plan A.  Defs.' SBEC Plan [259] at 1; *see also* Cooper Rep. [243-9] at 14. The SBEC Plan pairs no incumbents.  Defs.' SBEC Plan [259] at 2.  The two majority-minority districts are SBEC SD 2 and SD 11.  Plaintiffs agree that SBEC SD 11 "provides a realistic opportunity for Black voters to elect candidates of choice."  Pls.' Resp. [261] at 3–4; Handley Rep. [261-2] at 5.  No such agreement applies to SBEC SD 2.  It has a BVAP of 50.1 percent, and it contains a Republican incumbent.  Defs.' SBEC Plan [259] at 2, 4.  That district includes part of northern Tunica County and precincts in DeSoto County along the Tennessee line.  Pls.' Resp. [261] at 4.  Defendants assert and Plaintiffs agree that the SBEC SD 2 "is functionally SD 11 in the Plaintiffs' Plan."  *Id.*; Defs.' SBEC Plan [259] at 3.

Dr. Alford conducted a functional analysis of this district.  Our April 15 order rejected his reliance on one election (2023) as sufficient to show a district's trend.  He now relies on four elections in analyzing SBEC SD2.  *See* Defs.' SBEC Plan [259] at 5.

**Table 1: Reconstituted Election Analysis for Two State Senate Districts 2019-2024**

| Office | Democratic Candidate Race | Year | Senate District 2 Dem. % | Senate District 2 Dem. Win | Senate District 11 Dem. % | Senate District 11 Dem. Win |
|---|---|---|---|---|---|---|
| Governor | White | 2019 | 51.1% | 1 | 59.8% | 1 |
| Lt. Governor | White | 2019 | 46.8% | 0 | 54.0% | 1 |
| Attorney General | Black | 2019 | 48.4% | 0 | 55.9% | 1 |
| Treasurer | Black | 2019 | 46.0% | 0 | 53.4% | 1 |
| Agriculture | White | 2019 | 47.0% | 0 | 55.2% | 1 |
| Insurance Commissioner | Black | 2019 | 46.3% | 0 | 53.3% | 1 |
| Secretary of State | Black | 2019 | 47.5% | 0 | 55.5% | 1 |
| U.S. President | White | 2020 | 54.8% | 1 | 59.3% | 1 |
| U.S. Senate | Black | 2020 | 59.1% | 1 | 62.9% | 1 |
| Governor | White | 2023 | 57.6% | 1 | 64.1% | 1 |
| Lt. Governor | White | 2023 | 54.0% | 1 | 57.3% | 1 |
| Secretary of State | Black | 2023 | 53.1% | 1 | 56.2% | 1 |
| Attorney General | White | 2023 | 52.9% | 1 | 56.5% | 1 |
| Auditor | Black | 2023 | 53.7% | 1 | 56.5% | 1 |
| Treasurer | Black | 2023 | 53.8% | 1 | 58.8% | 1 |
| Agriculture | Black | 2023 | 54.6% | 1 | 59.7% | 1 |
| Insurance Commissioner | Black | 2023 | 53.1% | 1 | 57.3% | 1 |
| U.S. President | Black | 2024 | 53.2% | 1 | 55.8% | 1 |
| U.S. Senate | Black | 2024 | 53.0% | 1 | 54.5% | 1 |
| Average | | | 51.9% | | 57.2% | |
| Number of Democratic Wins | | | | 13 | | 19 |
| % of Democratic Wins | | | | 68% | | 100% |
| Black Dem. Candidate Average | | | 51.8% | | 56.7% | |
| Black Dem. Candidate # of Wins | | | | 8 | | 12 |
| Black Dem. Candidate % of Wins | | | | 67% | | 100% |

*Id.* Dr. Alford's analysis shows the black-preferred candidate, regardless of race, winning every contest in the last three elections.

The chart reveals that Dr. Alford considered 19 statewide contests in 2019, 2020, 2023, and 2024 for both state and federal offices. Alford Rep. [259-3] at 2. Twelve of those contests were biracial. *Id.* His analysis shows that the SBEC SD 2 has an effectiveness score of 51.9 percent and a percent-won score of 68 percent. *Id.* at 3. When considering biracial contests only, the effectiveness score is 51.8 percent, and the percent-won score is 67 percent. *Id.* at 3–4. If the four federal elections in 2020 and 2024 are excluded, the 2019 and 2023 elections for state offices show SBEC SD 2 has an effectiveness score of 50.7 percent and a percent-won score of 60 percent. Defs.' SBEC Plan [259] at 6. Finally, if only the biracial elections are considered, the SBEC SD 2 has an effectiveness score of 51.8 percent, and a percent-won score of 67 percent. *Id.* Although he excludes the 2015 election, Dr. Alford explains that the trend over time in SD 2 is favorable to black-preferred candidates. Alford Rep. [259-3] at 4.

Our prior order supported the need for a range of election years. *See* Apr. 15 Order [254] at 10. We also explained that (1) "biracial elections are more probative but [] the others are relevant," *id.* at 7; (2) "more recent elections better explain the opportunities that will exist in future elections," *id.*; (3) trends are relevant because "election opportunities are not static," *id.* at 10 (citing *League of United Latin Am. Citizens v. Perry* (*LULAC*), 548 U.S. 399, 428 (2006)); and (4) "a single-year sample size is too small," *id.* We rejected Dr. Alford's sole reliance on the 2023 results to show a district trend towards Democratic success. *Id.* at 9-10. We conclude that Dr. Alford's current analysis reflects consideration of each of the four principles we just summarized.

Dr. Lisa Handley also conducted a functional analysis of the SBEC SD 2. She relied on 17 biracial elections from 2015 to 2024. Handley Rep. [261-2] at 3. Her analysis of those elections shows that the SBEC SD 2 has an effectiveness score of .486 and a percent-won score of 58.8 percent. *Id.* at 4. The reason for the numerical differences is Dr. Handley included the 2015 statewide elections and Dr. Alford did not. According to Dr. Handley, her functional analysis "is more comprehensive" because she "incorporate[s] three sets of state election cycles (2015, 2019, and 2023)," while Dr. Alford incorporates "only two (2019 and 2023)." *Id.* Regardless of Dr. Handley's opinion about the proper range of elections, even her data demonstrates that the results

are improving and SBEC SD 2 is ineffective as an opportunity district only if the results from the 2015 election are included.  The following is the summary of her data:

|  |  | District 1 | | District 2 | |
| --- | --- | --- | --- | --- | --- |
| Election Years | Candidates | Effectiveness Score | Percent Won | Effectiveness Score | Percent Won |
| 2015-2024 | Biracial only (Handley approach) | 0.226 | 0.0% | 0.486 | 58.8% |
| 2015-2024 | Biracial and White-versus-White | 0.231 | 0.0% | 0.480 | 51.7% |
| 2015, 2019, 2023 | Biracial only | 0.217 | 0.0% | 0.465 | 41.7% |
| 2015, 2019, 2023 | Biracial and White-versus-White | 0.228 | 0.0% | 0.465 | 42.9% |
| 2018-2024 | Biracial only | 0.237 | 0.0% | 0.518 | 71.4% |
| 2018-2024 | Biracial and White-versus-White | 0.240 | 0.0% | 0.516 | 68.2% |
| 2019, 2023 | Biracial only | 0.230 | 0.0% | 0.508 | 55.6% |
| 2019, 2023 | Biracial and White-versus-White | 0.239 | 0.0% | 0.510 | 60.0% |
| 2019-2024 | Biracial only | 0.233 | 0.0% | 0.516 | 66.7% |
| 2019-2024 | Biracial and White-versus-White (new Allford approach) | 0.240 | 0.0% | 0.517 | 68.4% |

*Id.* at 7.  Multiple groupings of elections from 2018 to 2024 show that the SBEC SD 2 scores above 50 percent in both performance metrics.  All election combinations that exclude the 2015 election show an effectiveness score above .500.  All but one of the post-2015 election groupings show a percent-won score at or above 60 percent.  Even the one that falls below 60 percent still shows the black-preferred candidate wins 55.6 percent of the time.  We previously rejected Dr. Handley's 60 percent threshold for the percent-won score, Apr. 15 Order [254] at 15, and we do so again.

Because the data supports Dr. Alford's analysis that SD 2 has increasingly favored black-preferred candidates in every election starting in 2018, his exclusion of the 2015 election results is reasonable.  We reiterate that "more recent elections better explain the opportunities that will exist in future elections."  *Id.* at 7.  Here, the last four elections are the most relevant, and the three most recent elections in which the minority-preferred candidate won every time are particularly persuasive.  The biracial contests from those years produce an effectiveness score of 51.8 percent and a percent-won score of 67 percent.  Alford Rep. [259-3] at 4.[3]  Both scores pass the performance threshold for what Dr. Handley considers an effective district.  SBEC SD 2 therefore remedies the Section 2 violation identified.

---

[3] The inclusion of non-biracial contests for those years produces almost identical scores — an effectiveness score of 51.9 percent and a percent-won score of 68 percent.  Alford Rep. [259-3] at 4.

We now need to decide how to choose between plans that have been found to create opportunities for minority voters.

IV.    Considerations for selecting an appropriate remedy

In redistricting cases, the court must fashion a remedy "in the light of well-known principles of equity." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)).[4]  We conduct "an 'equitable weighing process' to select a fitting remedy for the legal violations . . . identified." *Id.* (quoting *NAACP v. Hampton Cnty. Election Comm'n*, 470 U.S. 166, 183 n.36 (1985)).  That process includes asking "what is necessary, what is fair, and what is workable." *Id.* (quoting *New York v. Cathedral Acad.*, 434 U.S. 125, 129 (1977)).  The *Covington* Court instructed lower courts to consider when imposing a remedy "[1] the severity and nature of the particular constitutional violation, [2] the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and [3] the need to act with proper judicial restraint when intruding on state sovereignty." *Id.*

Plaintiffs' Plan A and Defendants' SBEC Plan both remedy the Section 2 violation.  Defendants object that Plan A remedies it but goes too far — specifically, that it provides for guaranteed success by minority-preferred candidates when the Voting Rights Act only requires an opportunity for success.  Defs.' Resp. to Pls.' Objections [249] at 29.  In our previous rulings in this litigation, we have not answered the difficult question of how to define "opportunity" when selecting a proper remedy.  The issues of fashioning a remedy turn on the facts of each case.  Our resolution here ultimately does not depend on placing opportunity on a continuum between an equal chance on one end to a guarantee on the other.  Instead, we make our determination based on the following factors that are relevant in shaping a remedy for a Section 2 violation.

    *A. Legislature's policy judgments*

One consideration in choosing between plans comes from the Supreme Court's command that we consider the state policies relevant to redistricting:

> To avoid being compelled to make . . . standardless decisions, a district court should take guidance from the State's recently enacted plan in drafting an interim plan. That plan reflects the State's policy judgments on where to place new districts and how to shift existing ones in response to massive population growth.  This Court

---

[4] Although *Covington* dealt with constitutional violations, the factors it identifies apply equally to violations of Section 2.  *See Veasey v. Abbott*, 830 F.3d 216, 270 (5th Cir. 2016).

has observed before that "faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying" a state plan — even one that was itself unenforceable — "to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act."

*Perry v. Perez*, 565 U.S. 388, 393 (2012) (quoting *Abrams v. Johnson*, 521 U.S. 74, 79 (1997)).

Plaintiffs argue the State Legislature prioritized creating a black-majority district in DeSoto County with no incumbent; their plan is consistent with that policy while SBEC SD 2 is not. Pls.' Resp. [261] at 6. To support that this was a priority, Plaintiffs rely on a statement by Senator Dean Kirby, the Senate Majority Leader who led the redistricting process in the Senate. He said: "we did exactly what the court asked us to do — create a new, in North and South, a new[] . . . majority-minority district with no incumbent." Senate Floor Video [243-3] at 4:25:39–4:25:53. Plaintiffs interpret Senator Kirby's statement as expressing the Legislature's "significant plan-drawing judgment" to exclude incumbents from the newly created majority-minority districts. Pls.' Resp. [261] at 6.

First, it is not completely clear whether Senator Kirby was saying both parts of his statement were what this court had ordered, *i.e.*, to create new majority-minority districts and to do so without an incumbent in the districts. Second, and regardless of that, the senator was clear that the only policy he was referencing was the one he interpreted this court's prior orders as requiring. That was an incorrect interpretation, as no such insistence or suggestion appears in our two July 2024 orders. Moreover, a court's policy of not having an incumbent in a majority-minority district would not "reflect[] the State's policy judgments." *Perry*, 565 U.S. at 393. Therefore, *Perry* does not give the absence of an incumbent in only one of the offered plans a special status in our decision.

There is, however, a legislative policy to minimize conflicts between incumbents when possible. *See* Defs.' PFFCL [219] ¶ 82 ("[A] redistricting standard employed by the Legislature was the minimization of conflicts between incumbents."). Defendants most recently recognized this policy when they highlighted that the SBEC Plan pairs no incumbents. Defs.' SBEC Plan [259] at 2. Referring to this policy in the 2022 Senate hearing, Senator Kirby stated that he "want[ed] to make sure . . . that we don't have a lot of senators running against each other." JTX-011, 37:12–15. Our July 2, 2024 order recognized this as a valid policy and explained that "[s]eparating incumbents into different districts was an important factor the Mississippi

Legislature considered when drawing its plans." *Mississippi NAACP*, 739 F. Supp. 3d at 422 (citing JTX-010, 12:3–15, 20:19–24; JTX-011, 8:5–10).  Like our prior order, we recognize minimizing conflicts between incumbents as "a valid consideration." *Id.* (first citing *Bush v. Vera*, 517 U.S. 952, 963–64 (1996); and then citing *LULAC*, 986 F.2d at 763).  That policy is relevant here because Plaintiffs' Plan A pairs incumbents and the SBEC Plan does not.  True, a legislative policy cannot override a redistricting plan's violation of federal law, *Perez*, 565 U.S. at 393, but we have already concluded that both plans satisfy federal law.  Consequently, we will consider the no-incumbent-pairing policy when we later evaluate the plans.

### B.  Traditional redistricting factors

We requested briefing on the relevance of traditional redistricting principles at the Section 2 remedy phase.  We were provided with useful analysis of the issue.  As a precondition to establishing a Section 2 violation, a plaintiff must show that a majority-minority district can be drawn in accordance with traditional redistricting principles.  *See Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986).  Traditional redistricting principles include "compactness, contiguity, and respect for political subdivisions."  *Shaw v. Reno*, 509 U.S. 630, 647 (1993).  Because those principles are necessary for establishing Section 2 liability, it follows that such principles are not irrelevant when implementing the remedy.  It seems inconsistent to require a party pursuing a Section 2 violation to establish that illustrative maps can be drawn consistent with traditional redistricting principles only to allow remedial maps to violate those same principles.  We therefore find the traditional redistricting factors are relevant, but they do not override our primary task of remedying the Section 2 violation.

Plaintiffs offer charts that compare redistricting metrics associated with traditional redistricting principles:

Figure 3: Redistricting Metrics – SDs 1, 2, 10, 11, 12, and 19

|  | 2025 SBEC Plan | 2025 Legislative Plan | Plaintiffs' Senate Plan A | Plaintiffs' Senate Plan B |
|---|---|---|---|---|
| Total Split Counties | 8 | 8 | 8 | 8 |
| Total County Splits (populated) | 11 | 10 | 11 | 11 |
| VTD Splits (populated) | 15 | 32 | 11 | 13 |
| Municipal Splits (populated) | 23 | 26 | 21 | 22 |
| Mean Reock Compactness* | .30 | .28 | .32 | .33 |
| Mean Polsby Popper Compactness* | .16 | .17 | .18 | .23 |
| DeSoto District BVAP (non-dilution) | 50.1% | 50.92% | 50.15% | 50.15% |
| North Delta District BVAP (non-dilution) | 53.49% | 52.46% | 57.23% | 57.14% |

* Higher is better

Figure 4: Redistricting Metrics – North Delta Black-Majority Districts

|  | 2025 SBEC Plan | 2025 Legislative Plan | Plaintiffs' Senate Plan A | Plaintiffs' Senate Plan B |
|---|---|---|---|---|
| Total Split Counties | 4 | 4 | 5 | 4 |
| Total County Splits (populated) | 5 | 5 | 5 | 5 |
| VTD Splits (populated) | 14 | 29 | 8 | 11 |
| Municipal Splits (populated) | 15 | 11 | 0 | 9 |
| Mean Reock Compactness* | .22 | .25 | .26 | .31 |
| Mean Polsby Popper Compactness* | .13 | .13 | .14 | .15 |
| DeSoto District BVAP (non-dilution) | 50.1% | 50.92% | 50.15% | 50.15% |
| North Delta District BVAP (non-dilution) | 53.49% | 52.46% | 57.23% | 57.06% |

* Higher is better

Cooper Rep. [261-1] at 6–7. Ironically, perhaps, the 2025 legislative map was the most violative of the principles the Legislature usually embraces. The Legislature's response might be: "the court made us do it." In viewing the plans from the two parties, compliance with traditional factors does not strongly favor either plan. Plaintiffs perform slightly better in some respects, but not enough to tilt the scales in their favor. We see no reason to choose one plan over the other based on compliance with these principles.

C. *Deference to Defendants' map*

Plaintiffs argue "the SBEC Plan merits no more or less consideration than the Plaintiffs' Plans . . . [because] [o]nly plans passed *by the Legislature* can command deference." Pls.' Resp. [261] at 2. The argument draws on caselaw that explains "the Constitution vests redistricting responsibilities foremost in the legislatures of the States and in Congress, [so] a lawful, legislatively enacted plan should be preferable to one drawn by the courts." *LULAC*, 548 U.S. at 416. An earlier decision explains that even when a federal court is adopting its own revised maps,

it should "follow the policies and preferences of the State." *White v. Weiser*, 412 U.S. 783, 795 (1973). The Court in *Weiser* went on to say that those policies and preferences are the ones "expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *Id*.

In the case before us, the State Legislature did not adopt the SBEC map; indeed, the map has been offered in this litigation as a substitute for what the Legislature enacted. We accept that the significant deference to be given to legally compliant plans developed by a legislature, when state law empowers the legislature to create such plans, does not apply to the plan developed by a litigant. Indeed, to give the same level of deference to a plan developed by the three statewide officials who comprise the State Board of Election Commissioners could be seen as failing to demonstrate respect for state law. The Mississippi Constitution grants authority to the Legislature and no other state entity or official to "apportion the state in accordance with the Constitution of the state and of the United States into consecutively numbered senatorial and representative districts of contiguous territory." MISS. CONST. art. 13, § 254. We should defer to state legislative judgments if they satisfy the requirements of the Voting Rights Act and the United States Constitution, but to defer to others would create its own federalism concern.[5]

Even so, perhaps it would be appropriate to give some extra weight to a plan developed by state officials other than the legislature, weight less than would be given to a legislative plan. We need not consider that possibility for reasons that will become clear.

V.    The appropriate plan

We have found the following: (1) both of the competing plans remedy the Section 2 violation that we earlier found to exist in the DeSoto County area and some adjacent counties, but we did not decide if Plaintiffs' plan goes too far to ensure success for minority-preferred candidates; (2) there is no legislative policy of not placing an incumbent in a newly formed majority-minority district; (3) there is a legislative policy of not pairing incumbents; (4) the SBEC

---

[5] Issues of deference to redistricting decisions that are not made by a state legislature are explored in a recent article. *See* Erin Yonchak, Comment, *When Federal Courts Remediate Intrastate Redistricting Stalemates: Parsing What Is Owed Deference When State Policies Conflict*, 90 U. CHI. L. REV. 2055 (2023). It concludes, after a review of caselaw, that "a reapportionment plan devised by a state body that does not have the authority vested in it to reapportion is not owed deference." *Id.* at 2081.

plan would require elections in four districts while Plaintiffs' Plan A would require six; and (5) we must exercise restraint when intruding on the prerogatives of a state in redistricting, and that restraint requires us to avoid unnecessary disruptions to the operation of state government.

Based on those findings, we conclude that the SBEC plan is the proper remedy in this litigation. We repeat that the evidence from both experts supports that SBEC SD 2 gives a meaningful opportunity for minority voters to elect senators of their choice. The plan satisfies the one relevant legislative policy of not pairing incumbents without allowing that policy to override the requirements of Section 2. Further, it creates less of a disruption to State government, as the current senators were elected in 2023 for four-year terms, and the SBEC plan will nullify the effect under state law of the 2023 elections for fewer members.

State and local officials need time to implement this court's decision. Defendants proposed two schedules, and Plaintiffs preferred the second. The first schedule is no longer relevant, because its initial date is now behind us. We order the following as the schedule for the relevant events to conduct the required special elections.

- May 12 – Deadline to Share Detailed Maps & Address Libraries with Local Election Officials
- June 2 – Qualifying Begins
- June 9 – Qualifying Deadline
- June 13 – Deadline for State Executive Committee to Submit Names of Qualified Candidates
- June 21 – Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") Absentee Voting Begins for Primary Election
- August 5 – Special Primary Election Day
- September 2 – Special Primary Runoff Election Day
- September 20 – UOCAVA Absentee Voting Begins for General Election
- November 4 – Special General Election Day

It is SO ORDERED.

12