EXHIBIT NO. PTX-065 evid.
CAUSE NO. 3:22cv734-DPJ-HSO-LHS
WITNESS
CLERK: SHONE POWELL

MAR - 6 2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
Candice Crane, REPORTER



U.S. Dep. .ment of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

December 4, 1995

Jeffery M. Navarro, Esq.
Navarro & Barkley
P.O. Box 532
Aberdeen, Mississippi  39730

Dear Mr. Navarro:

    This refers to the 1994 redistricting plan for the City of
Aberdeen in Monroe County, Mississippi, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C.
1973c.  We received your response to our request for additional
information on August 14, September 28, and October 2 and 5,
1995; supplemental information was received on October 9, 1995.

    Based on our review of the information provided by the City
of Aberdeen, as well as information from the 1990 Census and
other sources, we understand the pertinent facts to be as
follows, and based on those facts we reach the following
conclusions:

    1.  According to the 1990 Census, Aberdeen has a total
population of 6,837, of whom 52 percent are black.  Blacks also
comprise 46 percent of the city's voting age population.
However, we understand that the demographic shifts that produced
an eight percentage point increase in the black percentage during
the 1980s have continued into this decade, and thus it appears
that the city's black population percentage now (almost six years
after the census was taken) has grown from the 52 percent figure.

    2.  Aberdeen is governed by a five-member board of aldermen,
elected from single-member districts, and an at-large elected
mayor.  Elections are partisan and there is a majority vote
requirement in the primary.  The Democratic primary continues to
be the decisive election in choosing city officials.  Currently,
one of the five aldermen is black, elected from overwhelmingly
black Ward 1.  The city changed from at large to single-member
districts in the late 1970s, and redistricted once previously in
1989.

3:22-cv-734

**PTX-065**

- 2 -

3.  In its submission, the city reports that the nonwhite population percentages (according to the 1990 Census) in the existing and new plans are as follows:

| Ward | Existing | New Plan |
|------|----------|----------|
| 1 | 93 | 87 |
| 2 | 44 | 54 |
| 3 | 76 | 76 |
| 4 | 23 | 23 |
| 5 | 23 | 23 |

Only Wards 1 and 2 were altered in adopting the new plan.

4.  As we previously advised you, during our review of the city's submission we determined that the city's demographer had erred in calculating the population data for Wards 3 and 5.  The demographer mistakenly counted in Ward 5's population totals four census blocks which actually are located in Ward 3.  Our recalculation indicates that Ward 3 (in the existing and new plans) is 73 percent nonwhite, and Ward 5 is 24 percent nonwhite. According to the data relied upon by the city, the existing plan has a total population deviation of 13.2 percent and the new plan has a total deviation of 7.8 percent.  Using the corrected data, the existing plan has a total deviation of 16.6 percent and the new plan has a total deviation of 11.7 percent.

5.  According to the information provided by the city in its submission of the 1989 redistricting, the black population growth is principally occurring in Wards 4 and 5, which also is the view that has been expressed to us by a local black leader.  This suggests that while the city's overall black percentage probably has increased since the 1990 Census was taken, the black percentages in the three black-majority wards in the new plan are not significantly different from the percentages calculated using the 1990 Census.

6.  There are two areas of black population concentration in Aberdeen, in the north-central and south-central portions of the city.

7.  The south-central black population concentration principally is located in overwhelming black Ward 1 in the new plan.  A portion is included in Ward 2, which has a bare black majority, and a few blocks are fragmented into white-majority Ward 5.

8.  The north-central black population concentration is mostly located in black-majority Ward 3, but also is fragmented into white-majority Wards 4 and 5.  The black population fragmented into Ward 4 is located in a large, heavily populated

- 3 -

census block that the city has split between the two wards. The eastern portion of this block entirely is occupied by black population while the far western portion of the block is virtually all white. The city divided the block so as to include 75 percent of its black population in Ward 3, but left the other 25 percent about a hundred yards over the district line in Ward 4. Immediately adjacent black population also is fragmented into Ward 5.

9. According to the city's submission letter, the "primary [redistricting] criteria" were: the one-person, one-vote requirement; no dilution of minority voting strength, and no unnecessary concentration of black population in a ward or fragmentation of black population between wards; and avoidance of partisan gerrymandering. In addition, the submission letter advises that another redistricting goal "was to avoid as much voter confusion as possible by moving a limited number of people and by eliminating as many unnecessary voter registration changes as possible."

10. However, the information provided by the city indicates that there was one other requirement that controlled the redistricting decisionmaking process. At the outset of the process, Ward 3's white alderman publicly announced that the black percentage in his district was high enough, and that he opposed increasing that percentage by any amount.

This alderman has been involved in a series of exceedingly close elections against black candidates. In the first election in Ward 3 following the change to district elections, in 1980, a black candidate defeated this alderman in the Democratic primary runoff, with 51.6 percent of the vote. In a 1984 rematch, the white alderman won his seat back, and in 1989 barely defeated the same black candidate by winning 50.4 percent of the vote in a runoff (a margin of three votes). Most recently, in 1992, he defeated another black candidate (in a runoff), winning 53.2 percent of the vote.

It is our understanding that the Ward 3 incumbent opposed any increase in the black percentage of his ward because he feared that any increase would lead to his defeat by a black candidate in the next election.

11. The city's demographer developed two other potential plans in addition to the submitted plan (Plan 2). Like Plan 2, neither of these plans altered Ward 3. These plans drew Ward 1 at a slightly lower black percentage than in the adopted plan, and increased the black percentage in Ward 2 more than in the adopted plan.

- 4 -

12. The three plans were presented to a citizens'
redistricting committee formed by the city. We understand that
the demographer discussed with the committee the goal of
minimizing the number of persons transferred between districts,
but did not discuss the extent to which the plans met the primary
criterion of avoidance of unnecessary fragmentation of black
population concentrations. In its second meeting, the committee
unanimously endorsed Plan 2 and the board of aldermen then
proceeded to adopt it.

13. Our review of city elections, and county elections as
well, indicates that voting among city residents is racially
polarized.

14. Under Section 5 of the Voting Rights Act, the
submitting authority has the burden of showing that a submitted
change has neither a discriminatory purpose nor a discriminatory
effect. Georgia v. United States, 411 U.S. 526 (1973);
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).

15. The Section 5 "effect" standard bars the implementation
of any change "that would lead to a retrogression in the position
of racial minorities with respect to their effective exercise of
the electoral franchise." Beer v. United States, 425 U.S. 130,
141 (1976); 28 C.F.R. 51.54.

16. To show the absence of discriminatory purpose, a
covered jurisdiction must demonstrate that the choices underlying
the submitted change were not made, even in part, for a
discriminatory purpose. It is not sufficient to establish that
there are some legitimate, nondiscriminatory reasons for the
change. Personnel Administrator of Massachusetts v. Feeney, 442
U.S. 256, 279 (1979); Village of Arlington Heights v.
Metropolitan Housing Development Corp., 429 U.S. 252, 265-66
(1977); Texas v. United States, 866 F. Supp. 20 (D.D.C. 1994);
Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982), aff'd
mem., 459 U.S. 1166 (1983). It also is insufficient to
demonstrate that the change is not retrogressive. Miller v.
Johnson, 115 S. Ct. 2475, 2492 (1995); City of Pleasant Grove v.
United States, 479 U.S. 462, 469, 471 & n.11 (1987). A
redistricting plan, for example, may fragment or pack minority
population for an invidious reason, although it is not
retrogressive. Busbee v. Smith, 549 F. Supp. at 516-517.
Overall, "[d]etermining whether invidious discriminatory purpose
was a motivating factor demands a sensitive inquiry into such
circumstantial and direct evidence of intent as may be
available." Village of Arlington Heights v. Metropolitan Housing
Development Corp., 429 U.S. at 266.

- 5 -

17.   The facts developed during our review of this
submission reveal that, in fashioning Ward 3 in the 1994
redistricting plan, the city did not fully adhere to its primary
redistricting criteria, specifically the criterion that there
should not be any unnecessary fragmentation of black population
concentrations.   This departure from the redistricting criteria
established by the city, as well as the fragmentation itself, are
significant indicia of discriminatory purpose.   28 C.F.R. 51.59.
Moreover, the unnecessary fragmentation affecting Ward 3 was the
direct result of the veto imposed by the Ward 3 alderman on any
increase in his ward's black population percentage.   While
incumbency protection per se is not prohibited by the Voting
Rights Act, drawing a district to specifically protect a white
incumbent, at the expense of the community of interest shared by
insular minorities and in the context of racially polarized
voting, also constitutes significant evidence of a discriminatory
purpose.   See, e.g., Garza v. Los Angeles County, 918 F.2d 763,
771 (9th Cir. 1990), cert. denied, 111 S. Ct. 681 (1991); Ketchum
v. Byrne, 740 F.2d 1398, 1408-09 (7th Cir. 1984), cert. denied,
471 U.S. 1135 (1985).   Finally, we are cognizant that the bi-
racial redistricting committee gave its blessing to the plan
subsequently adopted by the city; however, before the committee
convened it had been preordained that the fragmentation affecting
Ward 3 would not be cured.

18.   In light of these considerations, I cannot conclude, as
I must under the Voting Rights Act, that the city's burden has
been sustained in this instance.   Therefore, on behalf of the
Attorney General, I must object to the submitted redistricting
plan.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the redistricting plan has neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group.   In addition, you may request that the
Attorney General reconsider the objection.   However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the submitted redistricting plan
continues to be legally unenforceable.   Clark v. Roemer, 500 U.S.
(1991); 28 C.F.R. 51.10 and 51.45.

- 6 -

     To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the City of
Aberdeen plans to take concerning this matter.  If you have any
questions, you should call Special Section 5 Counsel Mark A.
Posner, at (202) 307-1388.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division