EXHIBIT NO. PTX-06 evid.
CAUSE NO. 3:22cv734-DPJ-HSO-LHS
WITNESS _____
CLERK: _____ SHONE POWELL _____

MAR -6 2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
Candice Crane, REPORTER



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

December 3, 2012

Kenneth Dreher, Esq.
111 Hillmont Circle
Clinton, Mississippi 39056

David Wade
Senior Planner
P.O. Box 4935
Jackson, Mississippi 39296-4935

Dear Messrs. Dreher and Wade:

    This refers to the 2012 redistricting plan for the City of Clinton in Hinds County, Mississippi, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. We received your response to our October 1, 2012, follow-up request for additional information on October 3; additional information was received on October 11 and November 30, 2012.

    We have carefully considered the information you have provided, as well as census data, comments and information from other interested parties, and other information, including the city's previous submissions. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color or membership in a language minority group. *Georgia v. United States*, 411 U.S. 526 (1973); *Procedures for the Administration of Section 5 of the Voting Rights Act of 1965*, 28 C.F.R. 51.52(c). For the reasons discussed below, I cannot conclude that the city's burden under Section 5 has been sustained in this instance. Therefore, on behalf of the Attorney General, I object to the 2012 redistricting plan for the board of aldermen.

    The board is comprised of seven aldermen, six of whom are elected from single-member wards and one of whom is elected at large. According to the 2010 Census, the city has a total population of 25,216 persons, of whom 8,603 (34.1%) are black, and a voting-age population of 19,011 persons, of whom 5,907 (31.1%) are black. Census data also indicate the city's total black population increased from 17.1 percent in 1990 to 34.1 percent in 2010.

3:22-cv-734
PTX-066

PTX-066-001

- 2 -

Our analysis of the city's ability to demonstrate that the plan was adopted without a prohibited purpose is guided by the framework established in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). There, the Court provided a non-exhaustive list of factors that bear on the determination of discriminatory purpose, including the impact of the action on minority groups; the historical background of the action; the sequence of events leading up to the action or decision; the legislative or administrative history regarding the action; departures from normal procedures; and evidence that the decision-maker ignored factors it has otherwise considered important or controlling in similar decisions. *Id.* at 266-68.

We look first at the racial impact of the proposed plan. Under the city's benchmark redistricting plan, adopted in 2005, none of the six wards provide black voters with the ability to elect candidates of choice to office. Under that plan, six minority candidates have run for various municipal offices and all lost. The proposed plan, like the benchmark plan, contains no districts in which African American voters have the ability to elect candidates of choice, notwithstanding that the African American population share in the city has doubled in the past two decades to over 34 percent. Despite this significant population increase, the city adopted a proposed plan in 2012 that continues to provide minority voters with no ability to elect a candidate of choice in any of the six wards, and does so by unnecessarily fragmenting minority population concentrations, with the result that three wards have black voting age populations between 37 and 43 percent.

According to the city's submission, it is not possible to devise a constitutionally valid ward in which African American voters have the ability to elect candidates of choice to office. However, our own analysis disproves this concern. There are significant minority population concentrations that now exist in the city, particularly in its southeast corner. In light of this population distribution, we were easily able to draw an illustrative redistricting plan in which this area could serve as the core of a compact ward with a black total population percentage of over 59 percent, and a black voting age population percentage of nearly 56 percent. Consistent with the city's electoral history, the experience of the city's demographers, and the views of knowledgeable members of the minority community, such a ward would provide black voters an ability to elect a candidate of choice. And such a map would pose no conflict with constitutional requirements or with the city's neutral redistricting criteria: the proposed ward is compact in shape, the configuration of all wards stays relatively unchanged from the proposed plan, and no incumbents would be paired or moved. *Guidance Concerning Redistricting under Section 5 of the Voting Rights Act*, 76 Fed. Reg. 7470, 7472 (Feb. 9, 2011).

Moreover, there is credible evidence that precludes the city from establishing that the sequence of events leading to the adoption of the proposed plan was not purposely designed to avoid the creation or public consideration of a plan that contained an ability-to-elect ward for African American voters. At the board's first meeting to consider the 2012 redistricting plan, on April 3, 2012, two members of the local NAACP requested that the board postpone a decision to allow that organization sufficient time to retain a demographer to determine whether it was possible to create a ward in which black voters had the ability to elect a candidate of choice. The board did stay its vote for two weeks. On April 17, however, when one of these NAACP members requested additional time because of the difficulty in obtaining the necessary assistance, the board denied the request and proceeded to adopt the proposed plan. The city has

- 3 -

not provided any "objectively verifiable, legitimate reasons" for the refusal to grant another extension. *City of Richmond* v. *United States*, 422 U.S. 358, 384 (1975) (Brennan, J., dissenting). Significantly, the city's submission notes there were "no factors" requiring the board to adopt the proposed plan on that day – and indeed, at that point a full eleven months remained until the March 2013 candidate qualifying deadline for the next municipal election. Additionally, at the time of the plan's adoption, the city was mulling a formal challenge to certain census data, which, if successful, might have necessitated drawing a new plan.

Some city officials have asserted the board was unaware that the basis for the delay requested by members of the NAACP was to determine the feasibility of creating an alternative plan with a ward in which black voters constituted a majority of the voting age population. But the city's own demographers spent the time period between the April 3 and April 17 board meetings attempting to create such a plan, which undermines any assertion that the city was ignorant of the basis for the requested delay. And the city's statement is also directly contradicted by media accounts of the April 3 board meeting, which reported that one of the NAACP members "appeared before aldermen April 3, telling them that he needed more time to get maps drawn up that would include a majority black ward." Ruth Ingram, *No majority black ward possible, aldermen say of redistricting*, Jackson Clarion-Ledger, April 19, 2012, at 4B.

Given this unusual sequence of events, we are left with the conclusion that the city unnecessarily rushed the redistricting process to avoid considering an alternative plan that would allow black voters the ability to elect a candidate of choice in one ward. This conclusion is reinforced by the city's publicity of the process, which consisted of nothing more than a single legal notice. The NAACP became aware of the April 3 meeting only through word-of-mouth, and not through any efforts of the city to solicit views from or even notify the minority community that the proposed redistricting map was under consideration.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor will have a discriminatory effect. *Georgia* v. *United States*, 411 U.S. 526 (1973); 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude that the city's burden has been sustained in this instance.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, until the objection is withdrawn or the city obtains the requisite judgment from that court, the submitted changes continue to be legally unenforceable. *Clark* v. *Roemer,* 500 U.S. 646 (1991); 28 C.F.R. 51.10. To enable us to meet our responsibility to enforce the Voting Rights Act, please inform

- 4 -

us of the action the City of Clinton plans to take concerning this matter. If you have any questions, you should contact Robert S. Berman, a deputy chief in the Voting Section, at 202/514-8690.

Sincerely,

Thomas E. Perez
Assistant Attorney General