EXHIBIT NO. PTX - 115 evid.
CAUSE NO. 3:22cv734-DPJ-HSO-LHS
WITNESS
CLERK: _____ SHONE POWELL

FEB 26 2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
Candice Crane, REPORTER

Page 1

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF MISSISSIPPI
 2                  NORTHERN DIVISION
 3   MISSISSIPPI STATE CONFERENCE OF THE    PLAINTIFFS
     NATIONAL ASSOCIATION FOR THE
 4   ADVANCEMENT OF COLORED PEOPLE; DR.
     ANDREA WESLEY; DR. JOSEPH WESLEY;
 5   ROBERT EVANS; GARY FREDERICKS;
     PAMELA HAMNER; BARBARA FINN; OTHO
 6   BARNES; SHIRLINDA ROBERTSON; SANDRA
     SMITH; DEBORAH HULITT; RODESTA
 7   TUMBLIN; DR. KIA JONES; MARCELEAN
     ARRINGTON; VICTORIA ROBERTSON
 8
     VS.                 No. 3:22-cv-734-DPJ-HSO-LHS
 9
     STATE BOARD OF ELECTION            DEFENDANTS
10   COMMISSIONERS; TATE REEVES, in his
     official capacity as Governor of
11   Mississippi; LYNN FITCH, in her
     official capacity as Attorney
12   General of Mississippi; MICHAEL
     WATSON, in his official capacity as
13   Secretary of State of Mississippi
     AND
14   MISSISSIPPI REPUBLICAN EXECUTIVE     INTERVENOR-
     COMMITTEE                           DEFENDANT
15   ****************************************************
                   VIDEO DEPOSITION OF
16        THE MISSISSIPPI SECRETARY OF STATE
              WITNESS:  KYLE KIRKPATRICK
17   ****************************************************
         Taken at the instance of the Plaintiffs at the
18      offices of Butler Snow, 1020 Highland Colony
            Parkway, Ridgeland, Mississippi, on
19                 December 20, 2023,
           beginning at approximately 9:01 a.m.
20
            (APPEARANCES NOTED HEREIN)
21
22
23              * * * * * * * *
24
         Reported Stenographically by:
25         Julie Brown, RPR, CCR 1587
```

3:22-cv-734

PTX-115



**Page 2**

1  APPEARANCES OF COUNSEL:
2
   For the Plaintiffs:
3
   JOHN P. LAVELLE, JR. (VIA ZOOM)
4  Morgan, Lewis & Bockius LLP
   1701 Market St.
5  Philadelphia, PA 19103
   (202) 739-3000
6  john.lavelle@morganlewis.com
7  JOSHUA TOM (Via Zoom)
   ACLU of Mississippi
8  101 South Congress St.
   Jackson, MS 39201
9  (601) 354-3408
   Jtom@aclu-ms.org
10
   SPENSER JAENICHEN (Via Zoom)
11 Morgan, Lewis & Bockius LLP
   110 North Wacker Drive
12 Boston, MA 02110
   (312) 324-1153
13 Spenser.jaenichen@morganlewis.com
14 BENJAMIN BHAMDEO (Via Zoom)
   Morgan, Lewis & Bockius LLP
15 1111 Pennsylvania Ave. NW
   Suite 900
16 Washington, D.C. 20005
   (202) 739-5544
17 Benjamin.bhamdeo@morganlewis.com
18 DREW CLEARY JORDAN (Via Zoom)
   Morgan, Lewis & Bockius LLP
19 1111 Pennsylvania Ave. NW
   Washington, D.C. 20004
20 (713) 890-5000
   Drew.jordan@morganlewis.com
21
22
23
24
25

**Page 3**

1  APPEARANCES CONTINUED
2  For the Defendants:
3  P. RYAN BECKETT
   Butler Snow LLP
4  Renaissance at Colony Park
   Suite 1400
5  Ridgeland, MS 39158
   (601) 985-4557
6  Ryan.Beckett@butlersnow.com
7  REX SHANNON III
   Mississippi Special Assistant
8  Attorney General
   P.O. Box 220
9  Jackson, MS 39205
   (601) 359-4184
10 Rex.shannon@ago.ms.gov
11 LEIGH TRICHE JANOUS
   Mississippi Secretary of State
12 General Counsel
   401 Mississippi St.
13 P.O. Box 136
   Jackson, MS 39205
14 (601) 359-6318
   Leigh.janous@sos.ms.gov
15
   TOMMIE S. CARDIN
16 Butler Snow LLP
   Renaissance at Colony Park
17 Suite 1400
   Ridgeland, MS 39158
18 (601) 985-4570
   Tommie.Cardin@butlersnow.com
19
20 ALSO PRESENT: Jason Hopkins, videographer
   Bailey Finnestad, exhibit tech
21 (Via Zoom)
22
23
24
25

**Page 4**

1
           INDEX         Page
2
3  Appearances                    2-3
   Certificate of Court Reporter   150
4
5
6      E X A M I N A T I O N    Page
7
   Examination By Mr. Lavelle       6
8
9      E X H I B I T S           Page
10
   Exhibit 1  Plaintiffs' Amended Notice of 30(b)(6)  9
11         Deposition - MS SOS
   Exhibit 2  Ex. A to Plaintiffs' Amended Notice of  10
12         30(b)(6) Deposition - MS SOS
   Exhibit 3  Emails with Collins and Lennep re:  29
13         Letter Delivered, 12/18/20, MS00000253
   Exhibit 4  Election Commissioner Orientation  42
14         Slide Decks, MLC07
   Exhibit 5  ECAM Meeting Slide Decks, MLC10  43
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1      THE VIDEOGRAPHER:  Good morning.  We are
2  going on the record at 9:00 a.m. Central Time on
3  December 20, 2023.  Please note that this deposition
4  is being conducted virtually and quality of
5  recording depends on the quality of the camera and
6  the internet connection of the participants.  What
7  is seen from the witness and heard on screen is what
8  will be recorded.  The audio and video recording
9  will continue to take place unless all parties agree
10 to go off the record.
11     This is a 30(b)(6) video-recorded
12 deposition of Mississippi Secretary of State Kyle
13 Kirkpatrick taken by counsel for the plaintiff in
14 the matter of Mississippi State Conference for the
15 National Association for the Advancement of Colored
16 People, et al., versus the State Board of Election
17 Commissioners, et al., filed in the United States
18 District Court for the Southern District of
19 Mississippi, Northern Division, case number
20 3:22-cv-734-DPJ-HSO-LHS.
21     The location of the deposition is 1020
22 Highland Colony Parkway, Ridgeland, Mississippi.
23 Appearances will be noted on the steno
24 record.  Our court reporter may now swear in the
25 witness and we may proceed.

2 (Pages 2 - 5)

**Page 6**

1    KYLE KIRKPATRICK,
2  having been first duly sworn, was examined and
3  testified as follows:
4      E X A M I N A T I O N
5  EXAMINATION BY MR. LAVELLE:
6      Q.  Good morning, Mr. Kirkpatrick.  My name
7  is John Lavelle.  Can you hear me okay?
8      A.  Yes, sir.  Good morning.
9      Q.  Good morning.  So we met just before we
10  went on the record here.  I'm an attorney at Morgan
11  Lewis in Philadelphia.  I am going to be taking your
12  deposition today, and I am representing the
13  plaintiffs in a lawsuit.  Could you please state
14  your full name and spell your last name for us?
15      A.  Kyle Kirkpatrick, K-I-R-K-P-A-T-R-I-C-K.
16      Q.  Mr. Kirkpatrick, are you a lawyer?
17      A.  Yes.
18      Q.  You're admitted to the bar in the state
19  of Mississippi?
20      A.  Yes.
21      Q.  Have you ever taken a deposition before?
22      A.  Yes.
23      Q.  So you're very familiar with the
24  procedures that we're about to go through this day;
25  correct?

**Page 7**

1      A.  Yes.
2      Q.  All right.  Well, I probably don't need
3  to go over the rules with you in detail, but I'd
4  like to just review them briefly so we got them on
5  the record and so we are all starting from the same
6  standpoint.  Is that all right?
7        I am going to ask you a series of
8  questions.  You have been designated as the
9  representative under Federal Rule of Civil Procedure
10  30(b)(6) of the Secretary of State's office of the
11  State of Mississippi, and you'll be testifying as
12  that office in this deposition.
13        Do you understand that?
14      A.  Yes.
15      Q.  You've taken an oath to tell the truth
16  here today, and we are going to expect you to uphold
17  that.  I need you to give me audible answers such as
18  yes, no, I don't know.  All right?
19      A.  Yeah.
20      Q.  I need the answers you give to be your
21  answers, which means you can't get help from anyone
22  else.  No phoning a friend here.  So I'm going to
23  ask you not to look at your phone during the time
24  that we're in the deposition.  I'm going to ask you
25  not to receive any answers or suggestions from

**Page 8**

1  anybody else who is there in the room with you.
2  We've agreed to take this deposition by Zoom so I am
3  not physically there in the room with you.  But you
4  need to answer the questions just as you would if I
5  were there in the room with you.  All right?
6      A.  Yes.
7      Q.  If I ask a question and you don't
8  understand it, let me know and I'll rephrase it.  If
9  I ask a question and you haven't heard it, let me
10  know and I'll repeat it or have the court reporter
11  read it back.  If I ask a question and you answer
12  it, I'm going to assume you've heard it, you
13  understand it, you answered to the best of your
14  ability.  All right?
15      A.  Okay.
16      Q.  There are a number of exhibits that I
17  plan to show you today during the course of the
18  deposition.  We have supplied to your counsel a
19  binder with hard copies of those exhibits.  In
20  addition, we'll be marking exhibits electronically
21  and they'll be appearing on a screen in front of
22  you.  And you'll have the option of looking either
23  on the screen or at the hard copy in order to answer
24  questions.  All right?
25      A.  Okay.

**Page 9**

1      Q.  Any questions for me on those
2  instructions?
3      A.  No, sir.
4      Q.  If you need to take a break at any time,
5  that will be permitted, of course.  The one
6  exception is any time I ask a question, I ask that
7  you answer that particular question.  All right?
8      A.  All right.
9      Q.  So let's mark our first exhibit?
10        MR. LAVELLE:  And I'll ask the concierge
11  who's on the call to mark as Exhibit 1 for
12  identification what is at Tab 1A.
13        (Exhibit 1 marked for identification.)
14        EXHIBIT TECH:  Please stand by.  And this
15  is Exhibit 1.
16  BY MR. LAVELLE:
17      Q.  Mr. Kirkpatrick, we've marked for
18  identification as Exhibit 1 the amended notice of
19  the 30(b)(6) deposition of the Mississippi Secretary
20  of State.
21        Do you recognize this notice, sir?
22      A.  Yes, sir.
23      Q.  You're here appearing as the 30(b)(6)
24  designee for the Secretary of State's office
25  pursuant to this notice; correct?

3 (Pages 6 - 9)

**Page 10**

1 A. Yes, sir.
2  MR. LAVELLE: Let's mark as the next
3 exhibit the document that's at 1B, which I believe
4 is the attachment to this notice.
5  (Exhibit 2 marked for identification.)
6  EXHIBIT TECH: That's Exhibit 2.
7 BY MR. LAVELLE:
8 Q. Mr. Kirkpatrick, we've marked for
9 identification as Exhibit 2 the document that was
10 attached to that deposition as Exhibit A.
11  Do you see that, sir?
12 A. Yes, sir.
13 Q. Do you recognize it?
14 A. I recognize this page, yes, sir.
15 Q. And you agree that you are the designee
16 of the Secretary of State's office with respect to
17 all of the topics that are identified in this
18 exhibit?
19 A. Yes, sir.
20 Q. And you're prepared to testify as the
21 Secretary of State's representative on those topics;
22 correct?
23 A. Yes, sir.
24 Q. Did you bring anything with you today for
25 your deposition?

**Page 11**

1 A. No, sir.
2 Q. So you have no materials that you're
3 planning to consult during the course of the
4 deposition; is that right?
5 A. That's correct, sir.
6 Q. All right. Why don't we start by getting
7 a little bit of background information concerning
8 you, Mr. Kirkpatrick. Are you currently employed in
9 the Secretary of State's office?
10 A. Yes, sir.
11 Q. What is your position there?
12 A. I'm the Assistant Secretary of State for
13 Elections.
14 Q. How long have you been in that position?
15 A. Since May of 2021.
16 Q. What are your responsibilities in that
17 role?
18 A. Oversee the elections division, which
19 includes training election officials, overseeing the
20 responsibilities of campaign financing in regards of
21 the Secretary of State's office, the lobbying
22 responsibilities with the Secretary of State's
23 office and advising the secretary on legal matters
24 regarding elections.
25  EXHIBIT TECH: Counsel, would you like me

**Page 12**

1 to take down this exhibit for now?
2  MR. LAVELLE: Yes, you can take that
3 down. Thanks. We will it bring back up from time
4 to time during the course of the deposition, but I
5 don't think I need it for the next few deposition
6 questions I'll be asking.
7 BY MR. LAVELLE:
8 Q. Did you have employment in the Secretary
9 of State's office prior to May of 2021, sir?
10 A. Yes, sir.
11 Q. All right. Why don't you tell us when
12 you first started working in the Secretary of
13 State's office.
14 A. I began working in the Secretary of
15 State's office in January of 2020.
16 Q. What was your initial position there?
17 A. Senior attorney.
18 Q. And what were your responsibilities
19 there?
20 A. The responsibilities were very similar to
21 the Assistant Secretary of State position now except
22 I assisted the Assistant Secretary of State in
23 performing those duties.
24 Q. Who was the Assistant Secretary of State
25 at that time?

**Page 13**

1 A. Hawley Robertson.
2 Q. Is Ms. Robertson still with the office?
3 A. No, sir.
4 Q. Is it a job requirement for the Assistant
5 Secretary of State for Elections to be a member of
6 the bar of the state of Mississippi?
7 A. To be honest, I'm not quite sure on that.
8 Q. How many people work in the Secretary of
9 State's office?
10 A. I don't know a total number. I believe
11 it's over a hundred employees.
12 Q. Who do you report to?
13 A. The Secretary of State and the chief of
14 staff.
15 Q. Do you know how many direct reports the
16 Secretary of State has?
17 A. Direct reports? No, sir.
18 Q. Yes. How many other Assistant Secretary
19 of States are there in the office?
20 A. Counting off the divisions in my head.
21 Q. Sure. Take your time.
22 A. There's business services, public lands,
23 charities, elections and publications all have
24 Assistant Secretaries of State.
25 Q. So it's four other areas where there are

4 (Pages 10 - 13)

Veritext Legal Solutions
www.veritext.com
212-267-6868   516-608-2400

**PTX-115-004**

Page 14

1  Assistant Secretaries of State; is that right?
2      A.  Yes.
3      Q.  All right. Let's get a little bit of
4  your educational background, shall we? Start with
5  high school. Where did you graduate from high
6  school?
7      A.  Gautier High School.
8      Q.  And where is that located?
9      A.  Gautier, Mississippi.
10     Q.  What year did you graduate from there?
11     A.  2011.
12     Q.  Did you attend college?
13     A.  Yes, sir.
14     Q.  Where did you attend college?
15     A.  University of Mobile.
16     Q.  Did you receive a degree from there?
17     A.  Yes.
18     Q.  And what was your degree in?
19     A.  Political science.
20     Q.  What year did you get your bachelor's
21  degree there?
22     A.  2015.
23     Q.  Did you go directly from University of
24  Mobile to law school?
25     A.  Yes, sir.

Page 15

1      Q.  And where did you attend law school?
2      A.  University of Mississippi School of Law.
3      Q.  Where is that located?
4      A.  Oxford, Mississippi.
5      Q.  When did you graduate from there?
6      A.  2018.
7      Q.  And you received the JD degree, I assume?
8      A.  Yes, sir.
9      Q.  All right. So you got your JD in 2018
10  and you started in the Secretary of State's office
11  in 2020. Did you have any employment between
12  graduating from law school and starting at the
13  Secretary of State's office?
14     A.  Motley Rice.
15     Q.  Which office of Motley Rice did you work
16  in?
17     A.  Charleston, South Carolina, office.
18     Q.  Motley Rice is a plaintiffs personal
19  injury law firm; is that correct?
20     A.  Yes, sir.
21     Q.  And is that the kind of law work you did
22  there?
23     A.  Yes, sir.
24     Q.  You're currently licensed in the state of
25  Mississippi to practice law; is that correct?

Page 16

1      A.  That's correct.
2      Q.  Do you have bar admissions in any other
3  state?
4      A.  No, sir.
5      Q.  All right. I want to spend a few
6  minutes, Mr. Kirkpatrick, getting a sense of how you
7  prepared to testify here today. When did you find
8  out that you were going to be appearing as the
9  30(b)(6) designee for the Secretary of State's
10  office in this matter?
11     A.  When I received the notice of deposition.
12     Q.  And when was that?
13     A.  I can't remember the exact day.
14     Q.  Within the last month?
15     A.  I believe so.
16     Q.  So we're taking your deposition here on
17  December 20, 2023; correct?
18     A.  Yes, sir.
19     Q.  All right. So sometime within the last
20  30 days, approximately, you learned that you were
21  going to be the 30(b)(6) designee; is that right?
22     A.  Yes, sir.
23     Q.  What did you do in order to prepare to
24  testify today?
25     A.  I reviewed the previous interrogatory and

Page 17

1  request for production responses, as well as the
2  notice of the deposition.
3      Q.  Do you have an understanding of what this
4  lawsuit is about, sir?
5      A.  Yes, sir.
6      Q.  What is your understanding of what this
7  litigation is about?
8      A.  2022 legislative redistricting.
9      Q.  And specifically anything about that
10  redistricting?
11     A.  Just that it's being challenged.
12     Q.  Were you yourself involved in the 2022
13  legislative redistricting process?
14     A.  No, sir.
15     Q.  Who was involved in that process from the
16  Secretary of State's office?
17     A.  The Secretary of State's office is not
18  involved in redistricting.
19     Q.  Well, the Secretary of State's office
20  does provide information that is used in
21  redistricting; correct?
22     A.  If we are asked for information, we will
23  provide it, but we are not involved in the actual
24  redistricting process.
25     Q.  Were you yourself, Mr. Kirkpatrick,

5 (Pages 14 - 17)

Page 18

1  involved in collecting or providing any information
2  to those who were responsible for redistricting in
3  connection with the 2022 legislative redistricting?
4      A.  No, sir.
5      Q.  Are you aware that the deposition of
6  Madalan Lennep was taken earlier this week in this
7  litigation?
8      A.  Yes, sir.
9      Q.  Did you sit in on that deposition?
10     A.  No, sir.
11     Q.  All right.  Are you aware of what we
12 asked Ms. Lennep about, generally, in that
13 deposition?
14     A.  No, sir.
15     Q.  Do you have any involvement in
16 supervising Ms. Lennep --
17     A.  Yes, sir.
18     Q.  -- in her -- okay.  And what is your role
19 in terms of supervising Ms. Lennep?
20     A.  As the Assistant Secretary of State, she
21 is a contractor for the elections division, so she
22 reports to me.
23     Q.  All right.  So I got a little bit off of the
24 topic there.  I wanted to ask you questions about
25 how you prepared for your deposition.  So you found

Page 19

1  out the deposition was going to be taken and that
2  you were going to be the designee sometime within
3  the last month; correct?
4      A.  Yes, sir.
5      Q.  Did you review any documents in order to
6  prepare for your deposition, other than the
7  interrogatory responses and the notice of the
8  deposition?
9      A.  No, sir.
10     Q.  Did you meet with anybody to prepare for
11 the deposition?
12     A.  I met with counsel.
13     Q.  Who did you meet with?
14     A.  Mr. Ryan Beckett and Mr. Rex Shannon.
15     Q.  I don't want to know about the substance
16 of any discussions you had with them, but I am
17 entitled to know and would like to know when you met
18 with them.
19     A.  December 13.
20     Q.  So that would be one week ago today?
21     A.  Yes, sir.
22     Q.  How long did you meet with them?
23     A.  I believe about an hour and a half to two
24 hours.
25     Q.  Did you look at any documents when you

Page 20

1  met with them?
2      A.  Yes, sir.
3      Q.  What did you look at?
4      A.  The notice of the deposition.
5      Q.  Anything else?
6      A.  No, sir.
7      Q.  Was there anybody else who participated
8  in that meeting other than those two lawyers who you
9  mentioned?
10     A.  Leigh Janous and Doug Miracle was in
11 there for a time.
12     Q.  And who is Mr. Miracle?
13     A.  He's an attorney with the Attorney
14 General's office.
15     Q.  Anybody else participate in the prep
16 session, other than people you've already mentioned?
17     A.  No, sir.
18     Q.  Any other discussions that you've had
19 with anybody in order to prepare for your deposition
20 other than that meeting that you described on the
21 13th of December?
22     A.  No, sir.
23     Q.  Have you looked at anything outside of
24 that meeting in order to prepare for the deposition?
25     A.  I reviewed those, the notice and the

Page 21

1  request for productions, again last night.
2      Q.  Have you ever testified on behalf of the
3  Secretary of State's office before?
4      A.  No, sir.  I've never been designated as a
5  30(b)(6) before.
6      Q.  All right.  Well, thank you for your
7  patience so far.  We'll try to make this not too
8  painful for you.  You've never testified in court
9  before, I take it?
10     A.  No, sir.
11     Q.  So you were in -- at your current
12 position at the time the 2022 legislative
13 redistricting work was done; correct?
14     A.  Yes, sir.
15     Q.  And you're aware, generally, that
16 Ms. Lennep provided some information to PEER in
17 connection with the redistricting process; is that
18 right?
19     MR. BECKETT:  Object to the form.
20     THE WITNESS:  Yes, sir.  I'm aware some
21 documents were provided.
22 BY MR. LAVELLE:
23     Q.  What is your involvement in reviewing
24 requests that are made to Ms. Lennep for data or
25 information in connection with the redistricting

6 (Pages 18 - 21)

1  process?
2      A.   I did not review any of the documents
3  that were requested at the time.
4      Q.   You're familiar with the statewide
5  elections management system, or SEMS; correct?
6      A.   Yes, sir.
7      Q.   Can you tell us what SEMS is?
8      A.   SEMS is the voter registration and
9  election management system for the State of
10  Mississippi.
11      Q.   It's an electronic database which
12  collects and organizes a range of information
13  relating to elections; correct?
14      A.   Yes, voter registration and other
15  election-related materials.
16      Q.   And you're aware that Ms. Lennep is a
17  contractor for the Secretary of State's office with
18  respect to the SEMS system; correct?
19      A.   Yes.
20      Q.   In fact, she's been referred to by at
21  least one person as the guru of SEMS; right?  Are
22  you aware of that?
23      A.   I don't know who may have referred to her
24  as the guru.
25      Q.   Well, when you have a SEMS question, who

1  do you ask?
2      A.   I'll go ask Madalan.
3      Q.   And that's true for other folks in your
4  office, too; correct?
5      A.   Yes, sir.
6      Q.   She's the go-to resource on SEMS?
7      A.   Yes, sir.
8      Q.   And she's known as the go-to resource,
9  not just within the Secretary of State's office, but
10  within other parts of the state government; isn't
11  that right?
12      A.   Yes, sir.  Counties will call her for
13  SEMS questions.
14      Q.   Do you know Ben Collins?
15      A.   Yes, sir.
16      Q.   Who is Mr. Collins?
17      A.   He is the GIS director for PEER.
18      Q.   And Mr. Collins is involved in the -- or
19  was involved in the redistricting process; isn't
20  that right?
21      A.   I know he was involved with PEER.  I
22  don't know to what extent he was involved in the
23  redistricting process.  I'm not familiar with that.
24      Q.   Were you aware that Mr. Collins made a
25  series of requests to Ms. Lennep for data from SEMS

1  in connection with the redistricting process?
2      A.   Yes.
3      Q.   How did you become aware of that?
4      A.   I was made aware of that when I provided
5  the emails in the request for production.
6      Q.   All right.  So let's take a step back.
7  The redistricting process started in 2020, didn't
8  it?
9      A.   I can't say when the redistricting
10  process began.
11      Q.   All right.  Let me ask the question a
12  different way:  Were you aware contemporaneously
13  that Mr. Collins was asking Ms. Lennep for
14  assistance from the SEMS database in connection with
15  redistricting?
16      A.   I don't recall knowing at the time of
17  2020 that that data had been requested.
18      Q.   So typically there's no need for those
19  kind of requests to be directed to you; is that
20  right?
21      A.   We do handle public records requests.  It
22  will depend on the records being requested and
23  what's actually requested, depending on if I need to
24  review or not.
25      Q.   All right.  Well, we've seen, and we

1  reviewed with Ms. Lennep, a number of email requests
2  that were sent by Mr. Collins to her for data from
3  SEMS.  And I think you were only copied on maybe one
4  or two of them.
5          Is your testimony here today that you were
6  not aware at the time that those requests were made
7  that they were being made?
8      A.   I don't recall those emails at the time.
9  The emails can reflect if I was copied on those or
10  not.
11      Q.   Okay.  If you weren't copied on it, you
12  weren't aware of it; is that fair?
13      A.   Like I said, I don't recall at the time
14  being aware of it, contemporaneously at the time
15  these requests were made.  If I was copied on it, I
16  was copied on it.
17      Q.   Do you remember yourself getting any
18  requests from Mr. Collins for data or information in
19  connection with redistricting?
20      A.   No, sir, I don't recall any direct
21  requests.
22      Q.   Do you remember having any discussions
23  with Ms. Lennep about requests that she'd received
24  from Mr. Collins for data from SEMS?
25      A.   I don't recall a conversation about that.

7 (Pages 22 - 25)

1    Q.   Do you know a gentlemen named Ted Booth?
2    A.   Yes, sir.
3    Q.   Who is Mr. Booth?
4    A.   I believe he is counsel for PEER.
5    Q.   Ms. Lennep described Mr. Booth in her
6    deposition testimony earlier this week as
7    Mr. Collins's boss. Is that your understanding?
8    A.   I'm not sure of the relationship there.
9    Q.   You know that Mr. Booth is also involved
10   in the redistricting process; correct?
11   A.   I know he's on the redistricting counsel.
12   I can't say of his full involvement. I don't know
13   his direct responsibilities.
14   Q.   Have you yourself, Mr. Kirkpatrick, had
15   any involvement in receiving requests by Mr. Booth
16   for information in connection with redistricting?
17   A.   I don't recall any requests.
18   Q.   Do you recall having any discussions with
19   Mr. Booth at all relating to redistricting during
20   the time that you've been in your current position?
21   A.   No, sir.
22   Q.   Are you aware that Mr. Booth directed
23   some requests to Ms. Lennep for data from SEMS in
24   connection with redistricting?
25   A.   Yes.

1    Q.   When did you become aware of that?
2    A.   I believe it was in those emails, when I
3    provided those for the request for production.
4    Q.   So it would be fair to say that the first
5    time you became aware of Mr. Booth's request or
6    requests to Ms. Lennep for data from SEMS in
7    connection with the redistricting process, the first
8    time you found out about that was when you collected
9    documents for production in the discovery process in
10   this litigation; is that fair?
11   MR. BECKETT: Object to the form.
12   THE WITNESS: That's the first time I
13   recall, if I was copied on any emails, I didn't
14   recall those requests until I pulled those.
15   BY MR. LAVELLE:
16   Q.   And you were not involved in those
17   requests; right?
18   A.   No, sir, I didn't pull any data.
19   Q.   You didn't pull the data, Ms. Lennep
20   didn't ask you for permission to pull the data, you
21   didn't direct her to pull the data, you just were
22   not involved; correct?
23   A.   Yeah. Not that I recall.
24   Q.   Is there a requirement to document in
25   some way that the commission has requested

1    information from the department -- from the
2    Secretary of State's office?
3    MR. BECKETT: Object to the form.
4    THE WITNESS: Generally we will have
5    public records request forms when the general public
6    ask for questions. But for other governmental
7    agencies, we typically just try to provide some
8    information if it's requested.
9    BY MR. LAVELLE:
10   Q.   Does there have to be a letter
11   memorializing the request?
12   A.   I'm not aware of any requirement that
13   there be a letter.
14   MR. LAVELLE: All right. Can we mark the
15   next exhibit, please, document that's at Tab 16.
16   EXHIBIT TECH: Please stand by.
17   MR. BECKETT: Hey, John, I'm going to
18   assume, as we did on Monday, that if there's a
19   difference in the documents, you'll let us know.
20   MR. LAVELLE: Yes, that's correct.
21   MR. BECKETT: Because it's hard for him
22   to scroll through the documents on the screen.
23   MR. LAVELLE: Understood. Understood.
24   That's why we supplied the print out.
25   MR. BECKETT: Which we are very grateful

1    for.
2    EXHIBIT TECH: This is Exhibit 3.
3    (Exhibit 3 marked for identification.)
4    BY MR. LAVELLE:
5    Q.   So, Mr. Kirkpatrick, we've marked as
6    Exhibit 3 for identification an email exchange
7    between Ben Collins and Madalan Lennep from
8    December 18, 2020.
9    Do you see this document, sir?
10   A.   Yes.
11   Q.   Is this one of the documents that you
12   were referring to in your testimony earlier that you
13   found in the course of collecting and producing
14   documents in the litigation process here?
15   A.   Yes.
16   Q.   So you've seen this prior to today;
17   right?
18   A.   Yes.
19   Q.   You are not copied on the letter; right?
20   A.   That's correct.
21   Q.   All right. In this letter, Mr. Collins
22   writes to Ms. Lennep "Ted wanted me to let you know
23   that the letter has been delivered. Let me know if
24   I can do anything to help."
25   And Ms. Lennep responds "Thanks for letting

8 (Pages 26 - 29)

**PTX-115-008**

Page 30

1  me know. Hope you and family have a Merry
2  Christmas. Regards, Madalan."
3      Have I read that correctly?
4   A.  Yes, sir.
5   Q.  Do you know what letter Mr. Collins is
6  referring to in this email exchange with Ms. Lennep?
7   A.  No, sir.
8   Q.  Ms. Lennep testified that it was a letter
9  from the standing joint legislative committee on
10  reapportionment, performance evaluation and
11  expenditure review to the Secretary of State's
12  office with respect to the request for data that
13  were planned to be made in connection with
14  redistricting.  Were you not aware of that prior to
15  my telling you that?
16   A.  I don't recall a letter from that time.
17   Q.  Have you ever seen such a letter?
18   A.  Like I said, I don't recall seeing a
19  letter from that time.
20   Q.  Were you aware that someone in the
21  Secretary of State's office had suggested that a
22  letter should be provided?
23   A.  I don't recall a discussion on the letter
24  being made.
25   Q.  Now, at the time in December of 2020,

Page 31

1  Hawley Robertson was in the position of senior
2  attorney, the position you currently hold; correct?
3      MR. BECKETT:  Object to form.
4      THE WITNESS:  No, sir.  She was the
5  Assistant Secretary of State.
6  BY MR. LAVELLE:
7   Q.  I'm sorry.  I apologize.  So Hawley
8  Robertson was, as of December 2020, the Assistant
9  Secretary of State for Elections; is that right?
10   A.  Yes, sir.
11   Q.  So she was in the position in December of
12  2020 that you currently hold?
13   A.  Yes, sir.
14   Q.  Right?  And she is the person who would
15  have been responsible for supervising Ms. Lennep;
16  correct?
17   A.  Yes, sir.
18   Q.  Are you aware whether Ms. Robertson
19  requested that a letter be sent to the Secretary of
20  State's office to memorialize the request for data
21  in connection with the redistricting?
22   A.  I am not aware.
23   Q.  You've never seen such a letter, have
24  you?
25   A.  No, sir, I don't recall seeing a letter.

Page 32

1   Q.  Let's look at -- well, let me ask the
2  question a different way.
3      You were involved in the collection of
4  documents for production in this litigation?
5   A.  Yes, sir.
6   Q.  How did you go about that process?
7   A.  I reviewed electronic records as well as
8  physical records.
9   Q.  Did you look for this letter that's
10  referred to in this email exchange?
11   A.  I looked for -- through all files that --
12  physical files that we have that could be responsive
13  to the request as well as any responsive records
14  that could be kept electronically.
15   Q.  Would you agree with me that, if there
16  were a letter, in fact, sent -- or let me rephrase
17  the question.
18      Would you agree with me that, if a letter
19  was delivered from the standing joint legislative
20  committee on reapportionment, performance evaluation
21  and expenditure review to the Secretary of State's
22  office with respect to data request for
23  redistricting, it would have been responsive to
24  discovery request in this litigation?  Would you
25  agree with me on that?

Page 33

1      MR. BECKETT:  Object to the form.
2      You can answer.
3      THE WITNESS:  I think anything regarding
4  redistricting could have been responsive.
5  BY MR. LAVELLE:
6   Q.  Including such a letter, the letter that
7  Mr. Collins says was delivered on December 18, 2020?
8   A.  Yes, sir.
9   Q.  All right.  But you haven't seen such a
10  letter?
11   A.  No, sir, not that I recall.
12   Q.  Have you seen any correspondence from
13  that committee to the Secretary of State's office in
14  connection with the redistricting process?
15   A.  These emails and I believe we may have
16  gotten a letter designating the splits after the
17  election -- or after the redistricting process.
18   Q.  I don't want to interrupt your answer.  I
19  apologize.
20   A.  I was finished, sir.
21   Q.  Okay.  Very good.
22      MR. LAVELLE:  Could I ask the court
23  reporter just to read back the answer to make sure
24  we have the full answer, because I did jump the gun
25  there.  I apologize.

9 (Pages 30 - 33)

PTX-115-009

**Page 34**

1  (The requested record was read back.)
2  BY MR. LAVELLE:
3  Q.  And so in that answer, you refer to
4  "these emails."  You mean the emails between
5  Ms. Lennep and Mr. Collins or Mr. Booth; right?
6  A.  Yes, sir, the ones that I pulled.
7  Q.  The ones that were produced in the
8  discovery process?
9  A.  Yes, sir.
10  Q.  And you believe there was also some
11  correspondence with respect to splits; is that
12  right?
13  A.  Yes, I believe that was in regards to the
14  congressional redistricting.
15  Q.  And that was conveying the information
16  about what districts would actually be split under
17  the new legislative districts; is that correct?
18  A.  Split precincts.
19  Q.  Spit precincts.  What is a split
20  precinct?
21  A.  That is a precinct divided into two
22  separate election districts.
23  Q.  How was that information conveyed to your
24  office?
25  A.  I believe it was a letter saying here are

**Page 35**

1  the precincts that are split.  It's also included in
2  the legislation, I believe it's designate with an
3  asterisk.
4  Q.  Is that a letter identifying the splits
5  been produced in the discovery process in this
6  litigation?
7  A.  I don't believe that was pulled because
8  it was relating to congressional redistricting.
9  Q.  All right.  So there are different
10  redistricting processes that occur periodically when
11  the census is done; correct?
12  A.  Yes, sir.
13  Q.  Federal Congress districts are redone;
14  correct?
15  A.  Yes, sir.
16  Q.  And that's congressional redistricting
17  that you referred to in your answer?
18  A.  Yes, sir, dealing with the U.S. House of
19  Representative districts.
20  Q.  And then, in addition, there is
21  redistricting of the state legislative districts,
22  the house and senate districts; correct?
23  A.  Yes, sir.
24  Q.  All right.  And as you -- you understand
25  that the litigation that we're here for today

**Page 36**

1  relates to state legislative redistricting, not the
2  federal congressional redistricting; correct?
3  A.  Yes, sir.
4  Q.  So that letter you referred to a moment
5  ago identifying splits, those were precinct splits
6  for congressional redistricting, not splits for
7  state legislative redistricting; is that correct?
8  A.  Yeah, I believe that's what I recall.
9  Q.  Was there any correspondence sent by this
10  committee identifying precinct splits in connection
11  with state legislative redistricting?
12  A.  Not that I recall.
13  Q.  Why not?
14  MR. BECKETT:  Object to the form.
15  THE WITNESS:  I can't speak to that.
16  That's not something that would have been -- that
17  would have been provided by PEER, not our office.
18  BY MR. LAVELLE:
19  Q.  So how did you implement the new
20  districts if you didn't have correspondence
21  identifying them?
22  A.  We don't implement districts.
23  Q.  So Ms. Lennep, in her deposition
24  testimony, referred to Mississippi as a bottom-up
25  state with respect to voting records.  Have you ever

**Page 37**

1  heard that term before?
2  A.  Yes, sir.
3  Q.  Do you have an understanding of what is
4  meant by "bottom up"?
5  A.  Yes, sir.
6  Q.  Tell me what your understanding of
7  "bottom up" is in that context?
8  A.  "Bottom up" in this context is a
9  decentralized election process in which the local
10  county election officials are responsible for
11  conducting and implementing elections.
12  Q.  So, for example, each county is
13  responsible for maintaining and updating voter
14  records; is that right?
15  A.  That's correct.
16  Q.  And each county is individually
17  responsible for updating records of where voters are
18  eligible to vote based on their location of their
19  address; correct?
20  A.  That's correct.
21  Q.  And typically a voter would be eligible
22  to vote in one state senate district, one state
23  house district based on what their address is;
24  correct?
25  A.  Yes, sir.

10 (Pages 34 - 37)

Page 38

1  Q.  So when state legislative redistricting
2  occurs, some of those voters may end up moving from
3  one district to another; is that fair?
4  A.  Yes, sir.
5  Q.  And is it your testimony today that each
6  county is responsible for updating those records?
7  A.  Yes, sir.
8  Q.  Those -- all right.  Your office, the
9  Secretary of State's office, does not have
10  responsibility to update those; is that right?
11  A.  No, sir.
12  Q.  Do you have any kind of supervising
13  responsibility with respect to what the individual
14  counties are doing in that process?
15  A.  No, sir, we don't have oversight.
16  Q.  Do you have the ability to monitor
17  whether the counties have completed that process?
18  A.  We do have access to SEMS.
19  Q.  And through that access to SEMS, are you
20  able to determine whether or not a county has
21  updated its records to reflect new districts when
22  redistricting occurs?
23  A.  We can view address libraries and what
24  addresses those districts are associated with.
25  Q.  All right.  So if you look back at what

Page 39

1  we marked as Exhibit 2.
2  MR. LAVELLE:  Let's pull that back up.
3  MR. BECKETT:  Not Tab 2, Exhibit 2, which
4  was the --
5  Pardon me, John, he was looking at the
6  wrong thing.
7  MR. LAVELLE:  That's all right.
8  MR. BECKETT:  Not Tab 2, Exhibit 2.
9  MR. LAVELLE:  It's Tab 1B in the binder.
10  MR. BECKETT:  Yeah, there weren't any
11  tabs on 1.  That's okay.  We've got it now.
12  MR. LAVELLE:  Okay.  We've all got --
13  we're at the same page now?
14  BY MR. LAVELLE:
15  Q.  We are now at what was identified as
16  Exhibit 2 for identification in this deposition, was
17  actually Exhibit A to the notice of deposition, and
18  it's the list of topics for your deposition today.
19  All right.  We've got that in front of you,
20  Mr. Kirkpatrick?
21  A.  Yes, sir.
22  Q.  So topic 1 is "Policies, procedures
23  regulations, guidance, and training regarding the
24  implementation of new state legislative district
25  maps, including but not limited to:  a.  Policies,

Page 40

1  processes, and procedures, as well as the time and
2  staff required, for allocating voters to their
3  districts by updating district information in
4  Mississippi's voter registration database, and for
5  requesting or mailing any notice or voter
6  information cards to voters including their precinct
7  information."
8  And then "b.  Policies, processes, and
9  procedures, as well as time and staff required, for
10  preparing the information to be printed on ballots;
11  for proofing, revising, printing, and sending
12  ballots, absentee ballots, and Uniformed Overseas
13  Citizens Absentee Voting Act ballots; and for
14  qualifying candidates for office."
15  There's a whole lot of stuff there, and
16  you're going to be the designee with respect to all
17  of these; right?
18  A.  Yes, sir.
19  MR. BECKETT:  Well --
20  BY MR. LAVELLE:
21  Q.  What we've just been asking about really
22  relates to this topic, and I think I understand your
23  testimony, but I want to make sure I've got it.
24  Your testimony today is that this process of
25  allocating voters to their districts by updating the

Page 41

1  district information in the voter registration
2  database, that's really done on an individual
3  county-by-county basis by officials in the counties;
4  correct?
5  A.  Yes, sir.
6  Q.  That is not done by your office, the
7  Secretary of State's office?
8  A.  Correct.  We provide training.
9  Q.  And can you describe for us what training
10  you provide to local county state election officers
11  as to how to do this?
12  A.  The training that is given is how to
13  update those address libraries in SEMS to reflect
14  the -- what is required by redistricting legislation
15  or local board supervisor orders.
16  Q.  Ms. Lennep testified during her
17  deposition about such trainings that she has
18  presented.  Are you aware that Ms. Lennep has
19  performed such trainings for local election
20  officials?
21  A.  Yes, sir.
22  Q.  Is Ms. Lennep, generally, designated by
23  the Secretary of State's office as the go-to person
24  for conducting these trainings?
25  A.  Yes, sir.

11 (Pages 38 - 41)

PTX-115-011

Page 42

1  Q. So in connection with the 2022
2  redistricting process, Ms. Lennep was responsible
3  for doing the training; correct?
4        MR. BECKETT: Object to the form.
5        THE WITNESS: Yes, sir.
6  BY MR. LAVELLE:
7  Q. How was that training conducted? Was it
8  done in person or by Zoom or video?
9  A. It was done largely in person with
10 PowerPoint, but there were also some videos created
11 along with some slides that could be sent to clerks
12 to review.
13       MR. LAVELLE: Let's mark as the next
14 exhibit the document that's at Tab 2 in the binder.
15       EXHIBIT TECH: This is Exhibit 4.
16       (Exhibit 4 marked for identification.)
17 BY MR. LAVELLE:
18 Q. All right. We marked as Exhibit 4
19 PowerPoint presentations that were -- that we found
20 online, I believe. Have you ever seen these before?
21 A. I believe I have seen these in looking at
22 older training manuals.
23 Q. And what do you understand these to be?
24 A. They appear to be PowerPoint
25 presentations for election commissioner orientation.

Page 43

1  Q. Election commissioner is the title for a
2  local county election official; is that right?
3  A. Yes.
4  Q. Each county has several election
5  commissioners who have responsibility for conducting
6  elections within their county; is that correct?
7  A. That's correct.
8  Q. There are five election commissioners per
9  county; is that correct?
10 A. Yes, sir.
11 Q. And your office, the Secretary of State's
12 office, provides periodic training programs for
13 those election commissioners; is that right?
14 A. That's correct.
15 Q. And this PowerPoint is an example of the
16 type of PowerPoints that are used in those training
17 sessions by your office for the election
18 commissioners; correct?
19 A. It appears to be, yes, sir.
20       MR. LAVELLE: Let's go to the next
21 exhibit, please, Tab 3 in the binder. We'll mark
22 that as the next exhibit.
23       (Exhibit 5 marked for identification.)
24       EXHIBIT TECH: This is Exhibit 5.
25 BY MR. LAVELLE:

Page 44

1  Q. All right. We have marked for
2  identification as Exhibit 5 another PowerPoint that
3  we found online. It is titled "SEMS Update,
4  Redistricting and New Features, ECAM Convention
5  2011, Presented by Madalan Lennep, PMP," and it's
6  got the Secretary of State's office name and logo at
7  the bottom.
8        Do you recognize this document, sir?
9  A. Yes.
10 Q. What is it?
11 A. It appears to be an update presentation,
12 update presentation from an older ECAM convention.
13 Q. An ECAM convention is a convention of
14 those county election officials we mentioned
15 earlier?
16 A. Yes, sir.
17 Q. ECAM stands for election commission?
18 A. Election Commissioners Association
19 meeting.
20 Q. And your office provides training
21 programs at those ECAM conventions when they occur;
22 correct?
23 A. Yes, sir.
24 Q. This appears to be dated 2011. Would you
25 agree with me?

Page 45

1  A. Yes, sir.
2  Q. So it predates your involvement, but
3  would you agree with me that it is typical of the
4  type of PowerPoint that's used in training programs
5  by the Secretary of State's office on SEMS
6  redistricting?
7  A. Yes, sir. I mean, it was from 2011, but
8  we typically use PowerPoint presentations.
9  Q. All right. Have you seen the current
10 version of this PowerPoint?
11 A. I don't recall seeing this version.
12 Q. All right. Have you ever seen this
13 before?
14 A. This 2011 ECAM orientation?
15 Q. Yes.
16 A. No, sir, I don't recall ever seeing it
17 before.
18 Q. Are you familiar, generally, with the
19 steps that have to be performed by the county
20 election officials in connection with redistricting?
21 A. I'm aware generally of some of the steps
22 that need to be taken, yes, sir.
23 Q. All right. So what are those steps that
24 need to be taken? And if you need to refer to this
25 PowerPoint in order to be able to answer that, feel

12 (Pages 42 - 45)

Page 46

1   free to do that.
2       A.   Just generally aware that the counties
3   will receive a map or addresses and that they will
4   then go into SEMS to make updates to those address
5   libraries and those address ranges in order to
6   reflect what the redistricting map or order of
7   legislation requires.
8       Q.   In this PowerPoint, Ms. Lennep described
9   that there was certain preparation that needed to be
10  done of records prior to actually doing the
11  redistricting update, cleaning up nonstandard
12  addresses and the like.  Are you familiar with those
13  steps?
14      A.   I can see that here.  I leave the
15  training to Madalan on how to perform the
16  redistricting, or all the detail steps that are
17  needed.
18      Q.   Right.  And then Ms. Lennep has a series
19  of PowerPoint slides in here that go over, point by
20  point, what the steps are in order to update the
21  records in SEMS for -- to reflect new districts;
22  correct?
23      A.   Yes, at the time this was created, yes,
24  sir.
25      Q.   And you'd defer to Ms. Lennep's

Page 47

1   PowerPoint and her testimony about what those steps
2   are; is that fair?
3       A.   Yes, sir.
4       Q.   Do you have an understanding of how long
5   this process takes?
6       A.   My understanding is it can take a varying
7   ability of time depending on the difficulty of the
8   lines, what is provided to the local counties can
9   affect how long it takes to actually complete this
10  process.
11      Q.   So it's dependent to some degree on how
12  extensive the changes are; is that fair?
13      A.   That's my understanding.
14      Q.   The more extensive the changes are, the
15  more work will have to be done by individual county
16  officials and presumably the longer that process
17  will take; correct?
18      A.   That's my understanding.
19          MR. LAVELLE:  All right.  We can take
20  this exhibit down.
21  BY MR. LAVELLE:
22      Q.   Does your office, the Secretary of
23  State's office, set any standards that are to be
24  followed by the county election officials in terms
25  of timing to complete redistricting work?

Page 48

1       A.   There's a practical limitation in SEMS
2   that requires redistricting be done for -- once an
3   election is created in SEMS, it prevents changes
4   from being made.
5       Q.   All right.  Can you explain to me what
6   you mean by that?
7       A.   So in SEMS, once an election is created
8   in the statewide election management system, it will
9   prevent certain changes from being made as to so it
10  doesn't affect absentee balloting, things like that.
11  So any redistricting would need to be completed
12  before an election and ballots are generated in
13  SEMS.
14      Q.   When does that deadline occur, when the
15  SEMS database is set and can't be updated?
16      A.   Counties create their own elections in
17  the statewide election management system.
18  Generally, in order to comply with various laws,
19  that needs to be done in advance of absentee voting
20  so ballot styles can be generated and UOCAVA and
21  absentee ballots can be prepared.  So more -- at
22  least more than 45 days out from an election.
23      Q.   Absentee ballots become available
24  beginning 45 days prior to an election; is that
25  right?

Page 49

1       A.   Yes, sir.
2       Q.   Is it an earlier date for military?
3       A.   No, sir.  45 days.
4       Q.   What is the registration deadline for a
5   voter prior to an election?
6       A.   30 days prior to an election.
7       Q.   So how does that registration deadline
8   jive with respect to setting the SEMS for an
9   election?  Obviously there is a 15-day window there
10  between that 45-day date that you gave earlier and
11  the 30-day registration cutoff.
12          MR. BECKETT:  Object to the form.
13          THE WITNESS:  Do you mind asking that
14  question again?  I don't quite understand what
15  you're asking.
16  BY MR. LAVELLE:
17      Q.   It was a very bad question,
18  Mr. Kirkpatrick, so I'm going to try to ask you a
19  better one.  How about that?
20      A.   Yes, sir.
21      Q.   So a voter has until 30 days prior to an
22  election in order to register to vote; correct?
23      A.   Yes, sir.
24      Q.   So that means that, if an election is
25  going to be held on November 1, say 30 days prior to

13 (Pages 46 - 49)

Page 50

1 that would typically be the deadline for voter
2 registration; is that right?
3    A.   Yes, sir.
4    Q.   When a voter registers, how long does it
5 take for their registration information to get into
6 the SEMS database?
7    A.   That can depend on the workload of the
8 county circuit clerk's office. They are the ones
9 who register the voters. So there is a two-week
10 window in which they have to have that entered. But
11 the amount of time it can take can fluctuate
12 depending on staff as well as what's
13 exactly going on that week due to the amount of
14 additional work circuit clerks may have.
15    Q.   It's not unusual to have a large number
16 of registrations right up on a deadline, especially
17 for a major election; is that correct?
18        MR. BECKETT:  Object to the form.
19        THE WITNESS:  We do typically see an
20 increase in voter registration getting close to
21 major elections, yes, sir.
22 BY MR. LAVELLE:
23    Q.   So, for example, in 2020, which was a
24 presidential election, you would have experienced a
25 large number of registrations up to and on the

Page 51

1 deadline for registration; correct?
2    A.   Yes, sir.
3    Q.   Now, you mentioned a two-week window for
4 the counties to get things done. Can you explain
5 how that works?
6    A.   Just, by law, a mail-in voter
7 registration application, the clerk has to process
8 that within two weeks of receipt. So if something
9 is received on the deadline, they have two weeks to
10 get that entered into SEMS.
11    Q.   So that would mean that roughly 16 days
12 before the actual election, all of that voter
13 information should be entered, is that -- that's
14 what happens if the law is followed; correct?
15    A.   That's correct. There could be delays in
16 postage, mail-in voter registration applications
17 could be delayed so they may be processed later into
18 that 16-week, but if something is received on the
19 deadline day, then about 16 days, yes, sir.
20    Q.   So that 30-day registration deadline that
21 you mentioned earlier, is that a postmarked date or
22 a received date?
23    A.   For mail-in, it is postmarked.
24    Q.   So it may be several days after the
25 30-day deadline when the county office actually

Page 52

1 receives some mail-in registration requests;
2 correct?
3    A.   That's correct.
4    Q.   What happens if the county doesn't make
5 the deadline?
6    A.   What do you mean?
7    Q.   I mean is there any -- are there any
8 consequences? Is there a penalty? Does the
9 election get delayed? What happens, if anything, if
10 the county doesn't make that deadline?
11    A.   Well, anybody who sends an application
12 and needs to be duly registered can. There are
13 some, I believe, criminal penalties if the clerk
14 does not register somebody who is duly qualified to
15 register to vote. So that would have to be a
16 deference to an DA or an AG about what may or may
17 not occur.
18    Q.   But typically the goal would be for the
19 voter to be able to vote, even if their registration
20 was not processed; correct?
21    A.   Yes, sir. Mississippi has affidavit
22 ballots where if a person goes and believes they
23 should be registered to vote and are not on the
24 rolls, they can complete an affidavit ballot and the
25 election officials can review that affidavit ballot

Page 53

1 and review if any application should have been
2 entered into SEMS then accept or reject that ballot
3 based on those circumstances.
4    Q.   So an affidavit ballot is a provisional
5 ballot essentially; is that correct?
6    A.   Yes, sir.
7    Q.   The way we got into this timing was
8 talking about what you said was a 45-day prior to
9 election deadline for counties to complete creating
10 their own elections. And I'm curious as to how that
11 could be the deadline if you have people still
12 registering closer to the election date than
13 45 days.
14    A.   I'm a little confused about the question.
15    Q.   Sure. Well, you said the counties have
16 to have their elections set 45 days prior to an
17 election; is that right?
18    A.   Yes, sir.
19    Q.   What do you mean by they have to have
20 their elections set?
21    A.   So a creation of an election in SEMS is
22 creation of what is going to be on the ballot,
23 important deadlines such as absentee voting, voter
24 registration deadlines, what will be the areas that
25 will be in that election, such as precincts. So

14 (Pages 50 - 53)

Page 54

1  that is set in time enough where ballots can be
2  generated based on the precincts in SEMS and the
3  districts associated with those precincts and
4  districts and those voters so that proper ballots
5  can be prepared in time for absentee voting.
6      Q.  Would you agree with me that, regularly,
7  individual voter records are updated closer to
8  elections than that 45-day deadline; correct?
9      A.  Yes, and they will be updated in SEMS at
10 the address they registered at.
11     Q.  So if someone, for example, files a
12 change of address, that could be processed and it
13 could be moved to their new district; is that right?
14     A.  Yeah.  Depending on some of the time
15 frames and what's occurring, they could be moved to
16 a new address.
17     Q.  What's the deadline for someone to change
18 their address prior to an election, or is there one?
19     A.  It depends what type of address change
20 we're talking about.
21     Q.  Okay.  Can you explain how it varies
22 depending on what kind of address change it is?
23     A.  A moving from one county to another will
24 be a 30-day deadline.  If it is a intra-county
25 change, then that be made within the 30-day deadline

Page 55

1  because that person is already a registered voter of
2  that county.
3      MR. BECKETT:  Hey, John, when you get to
4  a natural stopping point, can we take a short break?
5      MR. LAVELLE:  Sure.  Now is a fine time.
6      MR. BECKETT:  I don't want to push you.
7  If now is a good time, then let's take a quick
8  break.
9      MR. LAVELLE:  That's absolutely fine.
10 Let's do that.
11     THE VIDEOGRAPHER:  The time is 10:02 a.m.
12 We are off the record.
13     (Off the record.)
14     THE VIDEOGRAPHER:  We're back on record
15 at 10:14 a.m.
16 BY MR. LAVELLE:
17     Q.  All right.  Mr. Kirkpatrick, before we
18 took the break, we were discussing the process for
19 counties to update their records in connection with
20 elections.  And you told a deadline of at least
21 45 days prior to an election for an individual
22 county to get things set in SEMS for an election;
23 correct?
24     A.  Yes, sir.
25     Q.  That's true -- that 45-day deadline is

Page 56

1  true whether or not redistricting occurs; right?
2      A.  Yes, sir.  Absentee ballots are required
3  to be available 45 days before an election
4  regardless of whether redistricting has occurred or
5  not.
6      Q.  And that's a standard that's set by state
7  law; correct?
8      A.  State and federal law, UOCAVA is federal.
9      MR. BECKETT:  I'm sorry.  The court
10 reporter is asking a question.  U-O-C-A-V-A.
11 BY MR. LAVELLE:
12     Q.  When redistricting is done, does your
13 office conduct any supervision of the way the
14 counties are updating their records in SEMS?
15     A.  We provide training but we don't have
16 oversight over the counties.
17     Q.  Do you have any policies that you have
18 implemented with respect to redistricting, in terms
19 of making sure that SEMS has been updated?
20     A.  No, sir.  Once again, we provide the
21 training, but it's on the counties to make those
22 entries into the system.
23     Q.  No regulations that the Secretary of
24 State has adopted with respect to updating records
25 in connection with redistricting?

Page 57

1      A.  Just the processes in SEMS on how that
2  needs to be done.
3      Q.  All right.  And we looked earlier in your
4  deposition of the PowerPoint that's typical of the
5  type of PowerPoints that Ms. Lennep has presented to
6  election officials on those steps; right?
7      A.  Yes, sir.
8      Q.  Is there anything else other than that
9  that your office has generated to provide to
10 election officials on this process, on the
11 redistricting process?
12     A.  Make sure I understand the question
13 correctly.  Are you asking is there anything in
14 addition to this 2011 PowerPoint presentation?
15     Q.  Well, you've done more recent PowerPoints
16 than that; correct?
17     A.  Yes, sir.
18     Q.  Right.  They are done on a periodic
19 basis, I would assume?
20     A.  Yes, sir.
21     Q.  And there was a version of that, which I
22 don't have it to put in front of you, but there was
23 a version of that PowerPoint that would have been
24 done in connection with the 2022 redistricting;
25 right?

15 (Pages 54 - 57)

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400

PTX-115-015

Page 58

1   A.   Yes, sir.
2   Q.   And to the best of your knowledge,
3  Ms. Lennep conducted the training of county election
4  officials in connection with the 2022 redistricting?
5   A.   Yes, sir.
6   Q.   You're aware that that happened although
7  you yourself were not a participant in that
8  training?
9   A.   No, sir, I did not conduct that training.
10   Q.   All right.  Other than that training, is
11  there any other type of guidance, whether formal or
12  informal, that's provided by the Secretary of State
13  to county officials on how to update the records
14  when redistricting occurs?
15   A.   No, sir, we would just provide that
16  training and remind counties of that deadline for
17  entering information into SEMS.
18   Q.   How do you know if they got it right?
19      MR. BECKETT:  Object to the form.
20      THE WITNESS:  We don't review the lines
21  to make sure they got them right.  We don't have
22  that type of oversight authority.
23  BY MR. LAVELLE:
24   Q.   So that's up to -- a challenge for a
25  court to address.  Is that what is to happen?

Page 59

1   A.   Could you repeat that?  I don't know if
2  it maybe cut out for a second.
3   Q.   Sure.  If there's a problem with the way
4  that the county officials have done that
5  redistricting work, your office does not have any
6  ability to compel them to do it; is that fair?
7   A.   Yes, sir.  That would be the subject of
8  the judicial challenge of the election.
9   Q.   It would have to be challenged in some
10  other way, maybe by a voter or maybe in some other
11  court proceeding, but it wouldn't be involving the
12  Secretary of State's office; correct?
13   A.   That's correct.
14   Q.   Are you aware of any time that your
15  office has learned that county officials made
16  mistakes in the process of drawing -- of
17  redistricting?
18   A.   Yes, sir.
19   Q.   When has that occurred?
20   A.   I believe this past cycle, there were
21  some mistakes made.
22   Q.   How did your office become aware of those
23  mistakes?
24   A.   Calls from a voter.
25   Q.   Can you cite any specific examples?

Page 60

1   A.   I believe the call was from a Madison
2  County voter who looked at the redistricting maps
3  that we linked to on our website who typed in their
4  address and got information from the redistricting
5  map that was not matching by election day.  So they
6  called our office, and we just passed that along to
7  Madison County circuit clerk for them to review and
8  make sure everything was correct.
9   Q.   Do you know whether the Madison County
10  circuit clerk corrected the record?
11   A.   I believe it was corrected.
12   Q.   And how do you know that that was
13  corrected?
14   A.   I believe the voter called back and said
15  that the county circuit clerk had given them a call.
16   Q.   So in that particular circumstance that
17  you just described, your office did assist in
18  getting the record corrected, although didn't have
19  any formal authority to require it to be done; is
20  that fair?
21   A.   We passed along the call and let the
22  Madison County circuit court know that there may be
23  an issue and just to go back and look at the records
24  to see if there was an issue.
25   Q.   Were there any other mistakes that

Page 61

1  occurred in the most recent redistricting that
2  you're aware of?
3   A.   I believe there was also issue in Yazoo
4  County in which a senate district was not -- there
5  may be issues with the senate district, and we
6  passed along that information to the circuit clerk
7  as well to review the information and make sure --
8  go through and review all of the information to make
9  sure they had the lines entered correctly.
10   Q.   The issue that occurred in Madison
11  County, how close was that to the election?
12   A.   I can't recall how close it was.
13   Q.   Was it within that 45-day window that you
14  described?
15   A.   I believe so.
16   Q.   Closer than that?
17   A.   I believe it was within the 45 days.
18   Q.   How about the Yazoo County mistake that
19  you described?  Was that within the 45 days as well?
20   A.   I believe so.
21   Q.   Do you know whether both of those
22  mistakes were corrected prior to election day?
23   A.   I believe they were both corrected.
24   Q.   Any other mistakes that you're aware of
25  that occurred in the most recent redistricting that

16 (Pages 58 - 61)

PTX-115-016

Page 62

1  had to be addressed?
2      A.  I believe there were issues in Hinds
3  County as well.
4      Q.  What happened in Hinds County?
5      A.  I believe just there were some voters not
6  properly assigned to the correct district.
7      Q.  How many?
8      A.  I don't know the full extent.
9      Q.  What happened with respect to those
10  voters?
11      A.  I believe those voters were properly
12  moved to the correct district by the circuit clerks
13  office.
14      Q.  Do you recall whether the Hinds County
15  mistake came to your office's attention within that
16  45-day window?
17      A.  I believe it came to our attention on
18  election day.
19      Q.  So how is that corrected on election day?
20      A.  Voters can cast an affidavit ballot for
21  their correct district.  If they believe they should
22  be voting in one district and not the other, they
23  can cast an affidavit ballot, and those records can
24  be reviewed by the proper officials afterwards.
25      Q.  So your understanding is that some number

Page 63

1  of voters in Hinds County were required to vote by
2  affidavit ballot in order to be able to vote for the
3  correct state legislator?
4      A.  Yeah.  My understanding is there was an
5  mistake made and voters weren't assigned to the
6  correct district.
7      Q.  And you don't know the number of voters?
8      A.  No, sir.
9      Q.  More than a hundred?
10      A.  I can't say I know the number.
11      Q.  All right.  So we've identified three
12  mistakes that occurred during the last
13  redistricting, certainly not unprecedented for that
14  to happen; right?
15      A.  It's a complicated procedure so sometimes
16  there are human errors made.
17      Q.  All right.  Any other mistakes that
18  occurred that you're aware of in the most recent
19  redistricting?
20      A.  Those are the three that I can recall.
21      Q.  And would it be fair to say that, one way
22  or another, in each of those instances, they were
23  corrected by the county officials and voters were
24  able to vote in the correct districts?
25      A.  Yeah.  I believe the corrections were

Page 64

1  made in each of those examples.
2      Q.  Does your office have any communications
3  with county officials in connection with the
4  redistricting process?
5          MR. BECKETT:  The technology failed us a
6  little bit there.  You cut out, John.
7          MR. LAVELLE:  Okay.  I'm sorry about
8  that.
9      Q.  Does your office have any communications
10  with county officials when redistricting starts
11  about the need to update their records?
12      A.  If they have technical questions, we have
13  a help desk that they can call and ask questions if
14  they need technical help getting that put in.
15      Q.  How do the individual counties receive
16  the updated district information?
17      A.  I believe they receive that from PEER.
18      Q.  Your office is not involved in that?
19      A.  I don't believe we transport -- provide
20  that information.  We do have a link on our website
21  of the redistricting maps that anybody, including
22  the general public, can go look that links to the
23  PEER's maps.  But as far as a formal transmission to
24  the county, I believe that's PEER's?
25      Q.  And your office does not set any standard

Page 65

1  for how long it should take an individual county to
2  update their records to reflect new legislative
3  districts; is that right?
4      A.  Other than the practical deadline I
5  already mentioned in SEMS on having those lines put
6  in so the election can be properly built 45 days
7  before the election, that is the extent of any, I
8  guess, requirements that may be put in place.
9      Q.  And you don't set any -- your office does
10  not set any earlier or different deadline for the
11  individual counties to work against; is that fair?
12      A.  Yes, sir.
13      Q.  Does your office have involvement in
14  sending voter information cards to voters, including
15  their precinct information?
16      A.  No, sir.
17      Q.  Who does that?
18      A.  The county circuit clerk.
19      Q.  Does your office set any policies or
20  procedures or how that's supposed to be done?
21      A.  There are statutory requirements for how
22  that needs to be done about sending those voter
23  registration cards and other processes in SEMS to
24  allow for that.  We don't have any other procedures.
25      Q.  So the counties are required by state law

17 (Pages 62 - 65)

PTX-115-017

Page 66

1  to provide those information cards to voters, and
2  your office does not have any additional or
3  different requirements that have been set by
4  regulation, policy, procedure, what have you; is
5  that fair?
6       MR. BECKETT: Object to the form.
7       THE WITNESS: That's correct. We have
8  the voter registration card procedure set in SEMS to
9  allow for that to be sent out, but the requirements
10 are set forth in state statues.
11 BY MR. LAVELLE:
12      Q.  Does your office provide training to
13 county officials on how those are supposed to be
14 generated and sent out?
15      A.  We provide general SEMS training on a lot
16 of functionality in SEMS that would include voter
17 registration processes.
18      Q.  And that's that training that Ms. Lennep
19 provides on a periodic basis?
20      A.  That's correct.
21      Q.  Does your office have any ability to
22 supervise or review ballots that are prepared by
23 individual counties for elections?
24      A.  Yes, sir.
25      Q.  Describe for us, please, what role your

Page 67

1  office has in reviewing the proposed ballots for
2  elections.
3       A.  So once an election is created and the
4  candidates have been qualified, the SBEC for
5  statewide elections and state district elections
6  will approve the ballot. So prior to that, the
7  Secretary of State's office will -- we build the
8  statewide and state district elections in SEMS and
9  will push those down to counties, meaning we will
10 insert the statewide, state district, which includes
11 legislative candidates, into SEMS, generate a sample
12 ballot. We will review that for names and make sure
13 the candidates qualify with SBEC on that and provide
14 that to the SBEC for qualification and approval.
15      Q.  You referred a couple times to the
16 acronym SBEC. What does that stand for?
17      A.  Yes, sir. Sorry. State Board of
18 Election Commissioners.
19      Q.  And who is the State Board of Election
20 Commissioners?
21      A.  The Governor of Mississippi, the Attorney
22 General's office and the Mississippi Secretary of
23 State.
24      Q.  All right. So your boss is part of the
25 SBEC?

Page 68

1       A.  Yes, sir.
2       Q.  And when you said in your previous answer
3  that the Secretary of State's office builds the
4  elections in SEMS, can you give us more detail as to
5  what exactly you're referring to there?
6       A.  Yes, sir. Similar to how counties will
7  build the specific county election, we will build
8  the statewide and state district elections, which is
9  inserting the key dates, such as voter registration
10 deadlines, absentee voting deadlines and insert the
11 qualified candidates into SEMS so that ballots can
12 be created, information can be provided to the
13 various voting machine vendors to generate scannable
14 ballots and we can export a sample ballot from SEMS
15 to be signed off on by the State Board of Election
16 Commissioners.
17      Q.  How long does that process take?
18      A.  It can vary.
19      Q.  Can you give us a range of the high and
20 the low?
21      A.  Low can sometimes be a presidential year.
22 For example, if only presidential and congressional
23 candidates are on the ballot, that right there is
24 five offices. Highs are actually the statewide
25 years because of the number of offices -- you have

Page 69

1  statewide offices, you have state district offices
2  and you have 122 House of Representative and 52
3  Senators and all of the candidates that run for it
4  that need to be reviewed, double-checked,
5  triple-checked for corrections of names because, if
6  you get a name wrong, you will get a phone call from
7  an angry candidate.
8       Q.  Who is involved in your office in doing
9  this build-out of the elections?
10      A.  Myself, Madalan Lennep and Logan Witcher.
11      Q.  So for the most recent election that
12 occurred, that would have been the general election
13 2023. Were you involved in that process?
14      A.  Yes, sir.
15      Q.  How long did that process take in 2023
16 for the general election?
17      A.  I can speak for the Secretary of State's
18 office. I can't speak for the counties and building
19 their ballots and how many hours of review they
20 spent building the local ballots, which was -- it's
21 an addition of adding our ballots on top of the
22 local county officials.
23      For the Secretary of State's, it took
24 probably a couple or a few days' worth of hours in
25 getting the election and then going through and

18 (Pages 66 - 69)

PTX-115-018

Page 70

1 reviewing all of the names several times for all of
2 the offices to make sure everything was correct.
3   Q.   The couple working days' worth of hours,
4 did that occur over a more extended period of time
5 on the calendar?
6   A.   Yes.
7   Q.   And on the calendar, how long did that
8 take?
9   A.   Probably, I would say that was over a
10 span of two weeks maybe, a week or two.
11   Q.   Did you have visibility into how long
12 that process took at the county level?
13   A.   No.  That would be something to -- looked
14 at by the county circuit clerks and county election
15 commissioners, and that would vary, of course,
16 depending on how complicated their ballot is as
17 well, with how many local county officials are
18 running, how many county district officials are
19 running, as well as how many state districts and --
20 they may have in that particular county that are
21 going to be on the ballot.
22   Q.   Were you also involved in the same
23 process of building the election process in 2022?
24   A.   Yes, sir.
25   Q.   So you were involved with respect to the

Page 71

1 new legislative districts?
2   A.   In 2022, it would have been the
3 congressional.  I was involved with the new
4 congressional districts.  Yes, sir.
5   Q.   And the first election for the new state
6 legislative districts was when?
7   A.   2023.
8   Q.   All right.  So how did the timing that
9 was required for you compare in 2022?  How long did
10 it take you for the new congressional districts in
11 2022?
12   A.   It was much quicker.  We probably got
13 that done when -- in about two or three calendar
14 days.
15   Q.   Do you have an understanding, as we sit
16 here today, of how long it took individual counties
17 to update their records to reflect the new state
18 legislative districts when they became available in
19 2023?
20   A.   I do not.  I know it was sporadic.  There
21 are times when counties cannot make changes if they
22 have an election open with special elections that
23 occurred, municipal special elections that occurred
24 that interrupted the processes for counties.  So
25 things like that can, where a county can't start, it

Page 72

1 can delay and make that stretch on for much longer,
2 depending on localized issues.
3   Q.   When did the new state legislative
4 districts become available?
5   A.   I believe they were approved by the
6 Mississippi legislature at the end of the
7 legislative session.
8   Q.   And that would have been when on the
9 calendar?
10   A.   I believe that was March of 2023 I
11 believe was the end of the session.
12   Q.   Those same legislative districts were
13 used in the state primary this year; correct?
14   A.   That's correct.
15   Q.   And when was your state primary held in
16 2023?
17   A.   August.
18   Q.   Do you remember the date in August?
19   A.   You're going to embarrass me because I've
20 already started looking toward the 2024 election.  I
21 believe it was August 7.
22   Q.   It's always good to look forward.  So no
23 embarrassment necessary.
24     MR. BECKETT:  Hey, John, I think, to save
25 us some time, you said earlier it was the 2023

Page 73

1 legislative session.  I just -- I don't want to --
2 so it was 2022 legislative session.
3     THE WITNESS:  Yes, sorry.  2022
4 legislative session.
5     MR. BECKETT:  Sorry.  I was afraid we
6 were going to have a bad record.
7     THE WITNESS:  Sorry.
8 BY MR. LAVELLE:
9   Q.   All right.  So it was actually adopted in
10 March of 2022.  Is that your testimony?
11   A.   Yes.
12   Q.   All right.  And they had to be in place
13 for the primary that was held in August of 2023; is
14 that fair?
15   A.   Yes.
16   Q.   Were those new state legislative
17 districts relevant to any elections that were held
18 in 2022?
19   A.   No, they didn't affect any of the
20 congressional redistricting lines.  And the lines
21 did not go into effect until this cycle.  So any
22 special elections were held under the previous
23 lines.
24     MR. LAVELLE:  All right.  Let's go back
25 to Exhibit 2, please, the deposition topic list.

19 (Pages 70 - 73)

**Page 74**

1 We're now going to look at Number 2 on this list.
2 BY MR. LAVELLE:
3    Q.  Do you have that in front of you sir?
4    A.  Yes, sir.
5    Q.  Again, it's Tab 1B in your book. So
6 Topic 2 for today's deposition is "Voting and voter
7 registration procedures, including but not limited
8 to: A, voting and voter registration requirements
9 and policies, guidance, and regulations related to
10 those requirements, including signature
11 requirements, proof-of-residency requirements,
12 requirements for changes of address, and
13 distinctions between inter- and intra-county moves."
14      And "B, changes to voting or voter
15 registration policies and procedures discussed or
16 planned, and policies, guidance, and regulations
17 related to such changes, for the 2024 election
18 cycle."
19      And you're prepared to answer questions
20 about those topics?
21    A.  Yes, sir.
22    Q.  So what are the signature requirements,
23 if any, for voter registration?
24    A.  A voter must sign a voter registration
25 application.

**Page 75**

1    Q.  And who ensures compliance with that
2 requirement?
3    A.  The circuit clerks review any voter
4 registration applications that they receive.
5    Q.  Is there a comparison done of signatures
6 when individual voters present to vote?
7    A.  No, sir.
8    Q.  And the polling book that's at the
9 polling place, is there a facsimile of the
10 registration signature?
11    A.  No, sir. I don't believe so.
12    Q.  All right. So no one has to sign; is
13 that correct?
14    A.  They will have to sign a receipt book,
15 but there is no signature comparison at the polling
16 place.
17    Q.  There is a voter identification procedure
18 at the polling place; correct?
19    A.  That is correct.
20    Q.  And what is the voter ID requirement
21 under Mississippi state law?
22    A.  A voter must present an acceptable form
23 of photo ID to the poll manager, and that is to
24 verify that the name and the picture is
25 substantially similar to the name and the record and

**Page 76**

1 face of the person who's presenting themselves to
2 vote with the picture on the ID.
3    Q.  And it's up to individual officials at
4 the polling place to determine whether compliance
5 has occurred with those requirements; is that right?
6    A.  Yes, sir.
7    Q.  Now, the Secretary of State's office does
8 issue a form of photo ID to those who require one
9 for voting purposes; is that right?
10    A.  That's correct.
11    Q.  Do you have involvement in that process
12 that is processing and issuing requests for voter
13 ID?
14    A.  That does come through the elections
15 division of the Secretary of State's office.
16    Q.  How many voter IDs have been issued in
17 the state of Mississippi? Do you have a number?
18    A.  I believe at this time 8,962.
19    Q.  8,962 voter IDs of a total registration
20 population of voters of how many?
21    A.  There are roughly 1.9 million active
22 voters at the time in Mississippi.
23    Q.  You'd agree with me that it's a very
24 small percentage of voters who actually get these
25 voter IDs through your office; is that correct?

**Page 77**

1    A.  Yeah, those are the voters who have
2 requested an application through our office, through
3 the circuit clerk's office.
4    Q.  Is that the number that's currently
5 outstanding, or is that the number of requests that
6 have been received?
7    A.  Those are the total that have been
8 issued.
9    Q.  Over what period of time?
10    A.  Since the implementation of voter ID in
11 Mississippi.
12    Q.  Does your office keep statistics on the
13 number of voters who were turned away at polling
14 place because of inability to produce photo ID?
15    A.  That -- anyone who does not have an
16 acceptable form of photo ID should be provided an
17 affidavit ballot. So that would be kept through the
18 number of affidavit ballots processed by the local
19 election officials for reason of not having
20 acceptable form of photo ID present with them at the
21 polling place.
22    Q.  Does an affidavit ballot count if
23 somebody was unable to produce a form of photo ID at
24 the polling place?
25    A.  It can. They have five business days to

20 (Pages 74 - 77)

**PTX-115-020**

Page 78

1  bring it to the circuit clerk and present an
2  acceptable form of photo ID.
3      Q.  Does your office have access to any
4  statistics of the number of people who were turned
5  away at the most recent election because they were
6  unable to present voter ID?
7      A.  Once again, we would have information on
8  the number of affidavit ballots that were given. We
9  wouldn't have any information if someone was turned
10 away from the polling place or not.  But they should
11 have been provided an affidavit ballot.
12     Q.  There are proof-of-residency requirements
13 in -- under Mississippi state law for voter
14 registration; correct?
15     A.  You must be a resident of the district.
16     Q.  And you need to prove in some way that
17 you actually reside in the district; is that
18 correct?
19     A.  For a mail-in application, you'll provide
20 a driver's license or social security number, and
21 then you may be sent a voter registration card, and
22 if that's returned as undeliverable, then that is
23 seen as you not living at that address.
24     Q.  And that's the process under the state
25 law that's consistent with federal law; correct?

Page 79

1      A.  Yes.
2      Q.  If someone wants to change their address
3  of registration, how do they do that?
4      A.  They can send in a voter registration
5  application providing their previous registration
6  and their new place of registration.  They can --
7  which would include going through various NVRA,
8  National Voter Registration Act agencies, including
9  DPS, or they could use the online voter registration
10 update through the Secretary of State's website.
11     Q.  All right.  So your office may have
12 involvement in requests for change of address but
13 does not necessarily have to; is that fair?
14     A.  Yes, sir.  Some may come through our
15 office, but it's not a mandate to go through our
16 office to update your registration information.
17     Q.  Are requests for change of address
18 generally handled at the local county level?
19     A.  That's correct.  Any information that
20 comes through our website is immediately transmitted
21 through SEMS to the local county election officials
22 to process and handle.
23     Q.  And it's those local county officials who
24 determine whether or not the requirements for change
25 of address have been satisfied; is that fair?

Page 80

1      A.  Yes, sir.  They make those
2  determinations.
3      Q.  Now, you mentioned earlier in your
4  testimony that there may be a difference in handling
5  between whether a voter is moving within a county or
6  between counties.
7          Do you remember that testimony, sir?
8      A.  Yes, sir.
9      Q.  So if a voter moves from one county to
10 another, who is responsible for updating that
11 record?
12     A.  It would be the clerk who received the
13 information the latest.  So meaning the most recent
14 application where that voter moved to would process
15 that on SEMS.
16     Q.  So let's say, for example, a voter moved
17 from Madison County to Hinds County and updated
18 their driver's license record to reflect the new
19 home address.  Which county would be responsible for
20 updating SEMS in order to reflect that?
21     A.  If that voter indicated that -- at DPS
22 that they would like to register to vote with the
23 Hinds County address, then that would be transmitted
24 to the Hinds County circuit clerk to process as a
25 voter registration application.

Page 81

1      Q.  And when that happened, would SEMS
2  automatically remove the old voter registration in
3  Madison County?
4      A.  If it was designated as a duplicate and
5  the Hinds County circuit clerk indicated it was a
6  duplicate, then yes.  If they did not indicate it
7  was a duplicate voter, that registration could be
8  left in Madison County, and it would be up to the
9  Madison County officials to remove that.
10     Q.  What involvement, if any, does the
11 Secretary of State's office have in the voter
12 registration process?
13     A.  We develop or maintain the statewide
14 election management system, which is where voter
15 registration is done, and build in the processes as
16 required by law and provide the total through SEMS,
17 but the actual decision-making process is handled at
18 the legal level.
19     Q.  Are you aware of any changes to voting
20 registration policies and procedures that have been
21 proposed for the 2024 election?
22     A.  There have been discussions about online
23 voter registration.
24     Q.  Would that require a change in
25 legislation or is that something that could be

21 (Pages 78 - 81)

PTX-115-021

1  implemented by regulation?
2     A.   That would have to be a legislative
3  change. The legislature sets out voter registration
4  procedures.
5     Q.   So the best of your knowledge, there's
6  not been any new legislation adopted in Mississippi
7  that would change the voter registration, as we sit
8  here today on December 20, 2023?
9     A.   That's correct.
10    Q.   However, you're aware that there's been
11 at least some discussion of the potential to change
12 voter registration procedures -- to permit -- is
13 that fair?
14       MR. BECKETT: Sorry, John, you cut out
15 again.
16       MR. LAVELLE: Okay.
17 BY MR. LAVELLE:
18    Q.   You're aware that there's been at least
19 some discussion of proposed legislation that would
20 provide for online voter registration; is that fair?
21    A.   Yes, sir.
22    Q.   Has your office done any work in order to
23 determine how to do online voter registration in
24 connection with the proposed legislation?
25    A.   I have reviewed what other states have

1  done for the event that it does happen in
2  Mississippi, how our office may be able to implement
3  that as required by law.
4     Q.   How many other states have adopted online
5  voter registration?
6     A.   I don't know the exact number.
7     Q.   But several have; correct?
8     A.   I believe it's multiple, yes, sir.
9     Q.   And what have you learned from your study
10 of the processes that other states have adopted for
11 online voter registration?
12    A.   Generally, there's a requirement that
13 there are some matching against an existing state
14 database, most commonly a driver's license or
15 state-issued ID number in order to allow for online
16 registration.
17    Q.   Have you been asked to review or comment
18 on any proposed legislation?
19    A.   To review some potential legislation,
20 yes.
21    Q.   And would the proposed legislation
22 include that type of check against a state database?
23    A.   Yes.
24    Q.   Any other proposed changes that are being
25 considered potentially in the voter registration

1  process other than an online option?
2     A.   That's all that I'm aware of.
3     Q.   Any changes being contemplated to the
4  voting process for the 2024 election cycle that
5  you're aware of?
6     A.   Yes.
7     Q.   And what are those changes?
8     A.   A change to absentee voting for those who
9  are incarcerated but not convicted of a
10 disenfranchising crime.
11    Q.   And what changes are being contemplated
12 for that category of individual?
13    A.   To allow an express excuse under
14 Mississippi absentee voting law for those
15 individuals.
16    Q.   Under current Mississippi absentee ballot
17 law, you need a certain excuse in order to vote by
18 absentee; is that fair?
19    A.   Yes, sir.
20    Q.   You don't have "no excuse" absentee
21 balloting, in other words?
22    A.   That's correct.
23    Q.   But there has been a proposal to expand
24 absentee balloting to include this category of
25 individual "incarcerated but not convicted" voters?

1     A.   Yes. Yes, sir. Not convicted of a
2  disenfranchising crime.
3     Q.   Would that require a legislative change?
4     A.   Yes, sir.
5     Q.   Do you know whether proposed legislation
6  has been prepared on that topic?
7     A.   Yes, sir.
8     Q.   Have you reviewed proposed legislation on
9  that?
10    A.   Yes, sir.
11    Q.   Is your office prepared to implement that
12 if it were adopted by the State of Mississippi?
13    A.   Our office would not implement that.
14 That would be -- absentee voting is handled by the
15 local election officials, but we would be ready to
16 train on any changes in law that would be required.
17    Q.   Does your office maintain statistics on
18 the number of voters who vote by absentee ballot in
19 a given election?
20    A.   Yes, sir. We do receive absentee ballot
21 numbers through the statewide election management
22 system.
23    Q.   How many absentee ballots were cast in
24 the most recent election?
25    A.   I'd have to review that number to give

Page 86

1  you the exact amount.
2      Q.   All right.  Can you give us an
3  approximate or a percentage estimate?
4      A.   I believe it was close to 50,000 absentee
5  ballots.
6      Q.   And that's for the November 2023 general
7  election?
8      A.   That's correct.
9      Q.   50,000, approximately, absentee ballots
10 out of how many total ballots cast for that
11 election?
12     A.   There were roughly about 820,000 ballots
13 cast, probably a little bit more, but roughly about
14 820,000 ballots cast.
15     Q.   Mississippi does not allow what's
16 referred to in some states as early voting; is that
17 correct?
18     A.   That's correct in the sense that "early"
19 means "no excuse" absentee voting.
20     Q.   Polling places does not open on days
21 other than -- is that correct?
22         MR. BECKETT:  The last two words cut out,
23 John, for the court reporter.
24 BY MR. LAVELLE:
25     Q.   Polling places for elections are only

Page 87

1  open on election day; correct?
2      A.   Yes, sir.
3      Q.   Does the Secretary of State's office do
4  anything to encourage voter registration?
5      A.   Yes, sir.
6      Q.   What does your office do to encourage
7  voter registration?
8      A.   We provide a voter registration toolkit.
9  So anybody who would like to host a voter
10 registration drive can.  We have hosted several
11 voter registration drives, and we also publish
12 deadlines through an elections calendar as well as
13 through social media, letting voters know of
14 upcoming deadlines so they can register to vote and
15 have their voice heard.
16     Q.   Have those efforts been successful, in
17 your view?
18     A.   Yes, we have registered some voters,
19 which is always great.  And we've raised awareness
20 of upcoming elections and let people know when
21 deadlines are coming up so they can get registered
22 or update their information if necessary.
23     Q.   Are you aware of a distinction in the
24 electronic voter records between active and inactive
25 voters?

Page 88

1      A.   Yes, sir.
2      Q.   What distinguishes an active from an
3  inactive voter?
4      A.   An active voter is a what I kind of call
5  a "run of the mill" voter, what most of your
6  electorate is going to be.  It's someone who will
7  show up at a poll on election day.  An inactive
8  voter is a person who we have received some kind of
9  indication that they no longer live there, most
10 commonly by returned jury summons.  And under the
11 NVRA, they have been sent a confirmation card to
12 inquire whether they were there.  When they are sent
13 that confirmation card, they are made inactive.
14 Those voters will have to vote by affidavit ballot
15 at the precinct associated with their current
16 address.
17     Q.   If that happens, does their voting record
18 get updated to reflect their new address?
19     A.   If they cast an affidavit ballot and, on
20 that affidavit ballot, on the envelope, they put
21 their new address, then yes, after the election, the
22 local election officials should be updating their
23 address with the new address placed on that
24 affidavit ballot envelope.
25     Q.   And in that circumstance, you expect the

Page 89

1  affidavit ballot would count even though the
2  person's record was inactive?
3      A.   It could depend.  If they are voting at
4  the precinct associated with their address -- with
5  their current address, then yes, I would expect that
6  to count.
7      Q.   There may be circumstances where someone
8  votes in the wrong polling place and, therefore,
9  votes for the wrong race, they are voting for a
10 candidate that they are not eligible to vote for; is
11 that correct?
12     A.   That's correct.
13     Q.   In that circumstance, that ballot or at
14 least that part of the ballot would not count?
15     A.   Yes, the affidavit ballot would be
16 rejected.
17     Q.   Would the ballot be rejected in its
18 entirety or only with respect to the particular race
19 or races for which that voter was ineligible?
20     A.   The affidavit ballot is rejected in the
21 entirety.
22     Q.   Okay.  So anyone votes for any single
23 race that's incorrect, their entire ballot is thrown
24 out?
25     A.   If they vote in a precinct not associated

23 (Pages 86 - 89)

PTX-115-023

Page 90

1 with their address in affidavit, yes, that ballot is
2 rejected.
3    Q.   All right.  Going back to Exhibit 2,
4 let's look at Topic 3 for this deposition.
5 "Election-related resource requirements and
6 constraints, including but not limit to: A, the
7 election-related responsibilities of the Secretary
8 of State's office during an election cycle."
9        And "B, the number of polling places that
10 were changed or split from the beginning of the 2020
11 election cycle to present; processes and staffing
12 for changing a polling location; and the
13 availability of polling facilities for upcoming
14 elections."
15       Are you prepared to answer questions on
16 those topics, sir?
17    A.   Yes, sir.
18    Q.   You testified earlier about the
19 involvement that your office has in preparing for an
20 election that is held.  How many individuals in your
21 office are typically involved in preparing for a
22 given election cycle?
23    A.   In preparing for state board meetings and
24 approval of the ballots, I talked about earlier,
25 there's typically three individuals involved.

Page 91

1    Q.   And who are those individuals?
2    A.   Myself, Madalan Lennep -- I'm sorry,
3 four, my senior attorney as well -- Laura Courtney,
4 my senior attorney, and Logan Witcher, the election
5 compliance officer.
6    Q.   Are there any other individuals in the
7 Secretary of State's office who have to be involved
8 in setting up for an election?
9    A.   The Secretary of State, in his capacity
10 for the state board of election commission, will
11 obviously be part of the decision to qualify
12 candidates and to approve that ballot.
13    Q.   Are you familiar with something called an
14 official recapitulation sheet?
15    A.   Yes.
16    Q.   What is that?
17    A.   That is the form that officially
18 certifies the results for a particular election.
19    Q.   Who prepares those official
20 recapitulation sheets?
21    A.   For the local elections, they will be
22 completed by the county election commissioners.  For
23 the primary, it will be county executive committee.
24    Q.   Are they submitted to your office?
25    A.   Yes, each county submits a recapitulate

Page 92

1 report.
2    Q.   What kind of information does your office
3 maintain concerning voter participation?
4    A.   We will try and keep information on voter
5 turnout.
6    Q.   And do you report on voter turnout
7 regularly?
8    A.   Yes.  That is something we commonly talk
9 about, especially through social media and election
10 alerts, to try and get people more involved by
11 highlighting what voter turnout is.
12    Q.   Does your office collect this data based
13 on individual county election records?  How do you
14 compile it?
15    A.   Generally compile it as a -- at a
16 statewide level.  We have done some look at
17 county-by-county voter turnout.
18    Q.   So what was the overall voter
19 participation in the most recent general election,
20 the one that was held November 2023?
21    A.   I believe that was around 42 percent.
22    Q.   Is that typical for state of Mississippi?
23    A.   It will depend on the election.  Turnout
24 fluctuates depending on what election cycle we are
25 in.

Page 93

1    Q.   If a voter does not show up for voting
2 for a certain number of elections, does their
3 registration turn to inactive?
4    A.   Currently, no.  There is legislation that
5 will go into effect January 1st that would provide
6 for that.
7    Q.   All right.  Can you explain to us what
8 that legislation is and what it requires?
9    A.   Legislation requires if a person does not
10 vote in a period of four years, then they can be
11 made inactive, and then once inactive, they have two
12 federal general elections or a period containing two
13 federal general elections in which, if they have
14 some kind of contact and they update voter
15 registration or voting affidavits, that they can be
16 placed back on active voter roles.
17    Q.   And that will, you expect, be going into
18 effect for the 2024 elections; is that fair?
19    A.   Yes, sir.
20    Q.   What is your office doing in order to
21 prepare for that new requirement?
22    A.   We will be providing training to the
23 local county election officials at upcoming Election
24 Commissioners Association meeting.
25    Q.   Is it going to be up to individual

24 (Pages 90 - 93)

Page 94

1  counties to purge the records in order to comply
2  with this new law?
3      A.  Local election commissioners are always
4  responsible for voter roll maintenance in
5  Mississippi.
6      Q.  So your answer to my question is yes; is
7  that right?
8      A.  Yes, the local election officials will be
9  responsible.
10     Q.  And will your office have any oversight
11 over how they do that?
12     A.  We don't have oversight over local
13 election officials in the performance of their
14 duties.  We provide training.
15     Q.  You mentioned earlier that your office
16 gathers and reports information on voter
17 participation.  Do you track that by different
18 geographic locations?
19     A.  As I mentioned previously, we did that
20 by -- we have done that some by counties.  So...
21     Q.  Are you able to do that based on
22 demographics of voters such as age, gender or race?
23     A.  We have dates of birth in the statewide
24 election management system.  We do not have any
25 gender information nor racial data.

Page 95

1      Q.  So your office does not attempt to track
2  voter participation based on age or it does?
3      A.  We have not done anything that I'm aware
4  of regarding age.
5      Q.  And you haven't tried to do it based on
6  gender or race; is that fair?
7      A.  That's correct.  We don't have that data
8  in SEMS.
9      Q.  Do you know how many polling places were
10 changed or split in the -- since the 2020 election
11 cycle?
12     A.  I don't know the total number.  I can't
13 recall the total number.
14     Q.  Generally speaking, what involvement, if
15 any, does your office have in changes in polling
16 places?
17     A.  We receive the order from the local board
18 of supervisors stating that a change will be made,
19 but other than that, that is a local county
20 decision.
21     Q.  Who enters the information in the SEMS
22 database about a new polling location?
23     A.  The local election officials.
24     Q.  Is it up to the local election officials
25 also to make sure that those polling locations

Page 96

1  comply with the requirements of state and federal
2  law?
3      A.  Yes.
4      Q.  Does your office have any role in
5  supervising whether or not the counties have
6  complied with those requirements with respect to
7  individual polling places?
8      A.  We don't have oversight authority.
9      Q.  Have you ever become aware of any issues
10 with respect to polling places being moved?
11     A.  What do you mean by "issues"?
12     Q.  Concerns from voters that they didn't
13 know where to vote because their polling place had
14 moved, say?
15     A.  Generally, yeah, we have an elections
16 hotline.  We will receive calls asking about
17 information about where do I vote.  Maybe why was my
18 polling place changed.  Things like that.
19     Q.  How many polling places have to be
20 provided by a county?
21     A.  There is no express limit under law on a
22 minimum amount other than having at least maybe a
23 single one of the -- in each supervisors' districts,
24 but that would be set out by law, so the election
25 code could speak for itself on what that requirement

Page 97

1  is.
2      Q.  Is there any standard that you're aware
3  of with respect to the maximum number of registered
4  voters who can be addressed by a given polling
5  place?
6          MR. BECKETT:  Object to the form.
7          You can answer.
8          THE WITNESS:  There is a requirement
9  under law for 500 voters to be assigned to a
10 precinct unless there are voting machines used.  And
11 now every -- by law, every county must use voting
12 machines that have a voter-verifiable paper trail.
13 So each voting machine will have -- each precinct
14 will have a voting machine in it.
15 BY MR. LAVELLE:
16     Q.  Is there any standard that you're aware
17 of as to the number of voting machines that must be
18 offered for a particular precinct?
19     A.  No, sir.  Previously, for the older what
20 we call TSX machines, a county had to use 75 percent
21 of their inventory, but those touchscreen machines
22 will no longer be allowed to be utilized under
23 Mississippi law.
24     Q.  So voting is currently conducted how?
25     A.  Going forward, January 1st, 2024, every

25 (Pages 94 - 97)

**Page 98**

1 county is required to us a voting machine that has a
2 paper ballot that can be scanned and counted.
3    Q.   So individual voters will complete their
4 vote on a paper ballot which is then fed into a
5 machine to register the vote; is that fair?
6    A.   Yes, sir.
7    Q.   Is there any standard or requirement that
8 you're aware of as to the number of machines that
9 have to be available in a given polling place to
10 handle processing of ballots?
11    A.   No, sir.
12       MR. LAVELLE:  All right.  I think we're
13 at a convenient place to take a break.
14       MR. BECKETT:  Sounds good.
15       THE VIDEOGRAPHER:  The time is 11:11 a.m.
16 We are off the record.
17       (Off the record.)
18       THE VIDEOGRAPHER:  We're back on the
19 record.  The time is it 11:23 a.m.
20 BY MR. LAVELLE:
21    Q.   All right.  Mr. Kirkpatrick, I'd like to
22 put back in front of you again what we've marked
23 previously as Exhibit 2, that is the topic list for
24 today's deposition.  I think we're now at Topic 4.
25 "The timing of previous election cycles, including

**Page 99**

1 but not limited to," and there is a series of items.
2 Let's focus on the first one first.  And that is
3 "The procedures for and feasibility of moving the
4 qualifying and/or primary dates for the 2024
5 election cycle and of conducting special state
6 legislative elections in 2024."
7       I assume at this point the dates for the
8 primary and the general election of 2024 have
9 already been set; is that fair?
10    A.   Yes.
11    Q.   And they are mandated by state law;
12 correct?
13    A.   Yes, sir.
14    Q.   So those have already been communicated
15 to county election officials.  They are already
16 aware of those dates and know what they need to do
17 under the election calendar in order to meet those
18 deadlines; correct?
19    A.   That's correct.
20    Q.   What would the process be for changing
21 the election date?
22    A.   Well, as I previously mentioned, those
23 are set in statute.  So any mechanism would need to
24 be really a legislative change and the date for
25 those elections to be held.

**Page 100**

1    Q.   Has there ever been a circumstance in
2 which an election was required other than at the
3 standard timing, for example, to buy -- to fill a
4 special election?
5    A.   Yes.  Legislative seats can have a
6 special election day at a time other than the
7 regular special election day, which is the same time
8 as general elections.
9    Q.   So if, for example, a vacancy were to
10 occur in a particular state senate or house seat,
11 that vacancy could be filled by a special election;
12 is that fair?
13    A.   Yes, sir.
14    Q.   What is the process for scheduling an
15 election in that circumstance?
16    A.   If there is a vacancy in a legislative
17 seat, the governor will issue a writ of election
18 setting the time for the election within the time
19 frame set under the election code for legislative
20 vacancies.
21    Q.   Has that occurred during the time period
22 that you have been in your current position?
23    A.   Yes.
24    Q.   How many times has that happened during
25 the time that you have been in your current

**Page 101**

1 position?
2    A.   Sorry.  I'm going through the years.  I
3 believe that's happened two or three times.  It may
4 have been more, but I can think of at least two or
5 three occasions where that's happened.
6    Q.   Did you get approximately the same amount
7 of lead time each time, from the issuance of the
8 decree by the governor until the election was going
9 to be held, or did it vary?
10    A.   I can't recall exactly what all the lead
11 times were.  By law, there has to be at least a
12 60-day lead time in between the writ and for the
13 election to be held.
14    Q.   And why is 60-day lead time mandated by
15 state law, if you know?
16    A.   I can't speak to why that may have been
17 put in, that 60-day deadline.
18    Q.   Within that 60-day period, what happens?
19    A.   Candidates will submit their qualifying
20 paperwork.  Because it is a special election, that
21 will be submitted directly to the Secretary of
22 State's office.  The Secretary of State review those
23 materials, they prepare meetings for the state board
24 of election commissions.  The state board of
25 election commissioner meets, they qualify

26 (Pages 98 - 101)

1 candidates, they prepare and approve the ballots.
2 That election is built in SEMS. Data is transmitted
3 to the local election officials and they go about
4 doing all their preparations necessary to conduct
5 the election in their county or counties, if it's a
6 multicounty district.
7    Q. Are absentee ballots available for voters
8 to use in the circumstance of special elections like
9 this?
10    A. Yes.
11    Q. And when are those absentee ballots
12 prepared?
13    A. 45 days.
14    Q. You said earlier that 60 days was the
15 time frame typically given. Does that mean you're
16 able to qualify and determine who the candidates
17 will be within two weeks?
18    MR. BECKETT: Object to the form.
19    THE WITNESS: Yes, we are able to do
20 that. Largely because these are normally isolated
21 events, it makes it a lot easier to handle. It's
22 normally not set during a major election time when
23 candidates have already been qualified so it makes
24 it easier to focus on the handful of candidates that
25 may have qualified for a single vacancy race.

1 BY MR. LAVELLE:
2    Q. What role, if any, does your office play
3 in getting things ready for a state legislative
4 special election?
5    A. So we will build the election in SEMS, as
6 I previously mentioned. Candidates will qualify
7 with our office. We will do an initial review of
8 the qualifications and look for anything that we see
9 as a potential issue to highlight to the SBEC. If
10 we see something, we will send a letter to the
11 candidate letting them know that we see a potential
12 issue but that's not a final determination. We
13 provide materials to the State Board of Election
14 Commissioners so that we can meet and rule on
15 candidate qualifications and approve the sample
16 ballot so that an election can finally be pushed
17 down to local election officials.
18    Q. And who is involved in that process that
19 you just described from your office?
20    A. It will be myself; Laura Courtney, senior
21 attorney; Madalan Lennep; and Logan Witcher, our
22 elections compliance officer.
23    Q. Section B of the Topic 4 is "The State's
24 experience and procedures for implementing newly
25 drawn state legislative maps and for conducting

1 special legislative elections during election cycles
2 after 1990, including for implementing state
3 legislative maps drawn in response to a court
4 order."
5    Do you see that?
6    A. Yes, sir.
7    Q. All right. And you're familiar with this
8 area of questioning?
9    A. I'm aware that we have had to have some
10 specially drawn maps in Mississippi and implement
11 elections for those.
12    Q. You're aware there has been a history
13 here in Mississippi of electoral districts having to
14 be redrawn; is that correct?
15    MR. BECKETT: Object to the form.
16    THE WITNESS: Yes.
17 BY MR. LAVELLE:
18    Q. That's happened in previous election
19 cycles where a court has required electoral
20 districts to be redrawn; correct?
21    A. Yes.
22    Q. That's happened on multiple occasions, in
23 fact; right?
24    A. I believe so.
25    Q. Do you have a special set of procedures

1 in the Secretary of State's office as to how to
2 implement newly drawn state legislative maps if
3 ordered by a court?
4    A. No. Once again, we don't implement the
5 lines, that will be up to the county circuit clerks
6 and the county election officials. The local county
7 election officials actually implement whatever
8 court-drawn maps may be provided.
9    Q. Did your office provide guidance or
10 training to county officials in connection with
11 those newly drawn state legislative maps by court
12 order?
13    A. I'm not aware if any specific guidance
14 was given around the time of those redistricting
15 lines for those specially drawn maps.
16    Q. You would expect the counties to know
17 what to do and they would be able to do it based on
18 the training you provide on a regular basis; isn't
19 that fair?
20    A. Yes. Counties are provided with training
21 on how to conduct redistricting. From a general
22 sense, yes, sir.
23    Q. And if county officials don't do what
24 they are required to do, your office doesn't have
25 any enforcement capacity; is that fair?

27 (Pages 102 - 105)

PTX-115-027

Page 106

1  A.  That's fair, yes, sir.
2  Q.  Were you involved at all in the last time
3  that districts had to be redrawn in response to a
4  court order in Mississippi?
5  A.  I believe the last time may have been
6  prior to 2020, which was prior to my entering the
7  Secretary of State's office.
8  Q.  Do you know how long it took for the new
9  districts to be implemented in response to the court
10 order at that time?
11 A.  I'm not aware of how long it took the
12 county election officials to fully implement what
13 the court had ordered.
14 Q.  Your office doesn't have any records
15 about that; is that fair?
16 A.  That's correct.  We wouldn't have any
17 time frame of how long it took the counties to
18 complete that.
19 Q.  Okay.  So whether it took a day, a week,
20 a month, a year, you just don't have any idea; is
21 that fair?
22 A.  That's correct.
23 Q.  The next topic area is "Election
24 calendars for election cycles after 1990, and the
25 timing, including deadlines and actual completion

Page 107

1  dates, of relevant processes regarding the
2  implementation of new state legislative district
3  maps for election cycles after 1990, including all
4  necessary steps to implement state legislative
5  district maps."
6  We've already talked about this topic to
7  some extent, but it would be fair to say that your
8  office does not set or impose any particular
9  calendar on individual counties with respect to
10 implementing new state legislative district maps; is
11 that fair?
12 A.  That's correct.  As previously mentioned,
13 we will just remind counties of the practical
14 deadline for getting things ready in time to have
15 ballots prepared through SEMS.
16 Q.  So you communicate to them how to do it
17 and you communicate to them the deadline for them to
18 complete it, but you don't -- your office, the
19 Secretary of State's office doesn't do any type of
20 monitoring or follow-up to make sure that it's done
21 by the counties; fair?
22 A.  Yes, sir, we don't have any oversight.
23 Q.  And you don't have any calendar that you
24 push out to the counties to say, "Here's when it
25 needs to be done," other than the calendar for

Page 108

1  getting the elections ready as you do every year?
2  A.  Yes, sir, that's correct.  We don't have
3  any specific redistricting calendar.
4  Q.  All right.  The next topic area is D.
5  "Measures the State took to mitigate resource and
6  time constraints related to the implementation of
7  new state legislative maps during the 2023 election
8  cycle, whether it anticipates the recurrence of any
9  such constraints in future elections, and, if so,
10 any measures the State plans to take to mitigate
11 those constraints."
12 So let's start with the first part of this.
13 Are you aware of any measures that the State took to
14 mitigate resource and time constraints on
15 implementing the new state legislative district maps
16 this year, this past year?
17 A.  So -- and I guess the -- when you refer
18 to "the State" are you referring to the Secretary of
19 State's office or?
20 Q.  Let's start it there.  I'm assuming that
21 you're not knowledgeable about things that anyone
22 other than the Secretary of State's office did; is
23 that fair?
24 A.  Generally, yes, sir.
25 Q.  Okay.  So let's focus on what the

Page 109

1  Secretary of State's office did, if anything, to
2  mitigate resource and time constraints on
3  implementing those new state legislative maps.  Is
4  there anything that you can identify, as we sit here
5  today, that your office did in terms of initiative
6  to make it faster or easier for counties to
7  implement the new state legislative maps?
8  A.  No, sir.  If you are going to go back, we
9  don't have any involvement in the implementation.
10 That's a local election official thing.  So we just
11 make sure we timely provided training so the county
12 election officials can do the work they needed to
13 do.
14 Q.  It is fair to say that the Secretary of
15 State's office does maintain that SEMS database
16 which allows counties to update the records in an
17 electronic fashion which is efficient and modern; is
18 that fair?
19 A.  Can you repeat the question one more
20 time?  I'm sorry.
21 Q.  Sure.  The Secretary of State's office
22 does maintain this statewide SEMS database, which
23 enables counties to implement new state legislative
24 maps electronically in an efficient and modern
25 fashion; is that fair?

28 (Pages 106 - 109)

Page 110

1    A.   Yes, sir. We do house SEMS, and that's
2  where they will implement the lines.
3    Q.   It's not like they have to physically
4  move pieces of paper in order to make that happen.
5  They can do it in the electronic database, the SEMS
6  database; right?
7       MR. BECKETT: Object to the form.
8       You can answer.
9       THE WITNESS: Yes, sir.
10 BY MR. LAVELLE:
11   Q.   All right. Has your office received any
12 complaints from counties about how long it takes to
13 update the records in the SEMS database when
14 redistricting occurs?
15   A.   We have heard from counties generally
16 that it is just a cumbersome process to implement.
17   Q.   Are you aware of anybody who's made any
18 proposals or suggestions about things that could be
19 done to update the SEMS database or make it easier
20 for them or quicker for them to update records?
21   A.   I can't recall any suggestions that we've
22 gotten from counties.
23   Q.   Ms. Lennep testified that this current
24 SEMS database was originally implemented somewhere
25 around 2006, 2007. Does that sound accurate to you?

Page 111

1    A.   Yes, sir, that would be in line with Help
2  America Vote Act.
3    Q.   It's updated, I would expect,
4  periodically by the vendor that provides it; is that
5  fair?
6    A.   Yes, sir.
7    Q.   Hewlett-Packard is the company, the big
8  tech company that created this database system; is
9  that right?
10   A.   Yes, sir. I believe they were one of the
11 vendors. There was a time when a couple vendors
12 changed hands due to some buyouts and things like
13 that in the early implementation of SEMS, but
14 Hewlett-Packard was one of them.
15   Q.   Who's the current vendor that's
16 responsible for maintaining this SEMS database?
17   A.   Arrikan.
18   Q.   And the Secretary of State's office has a
19 contract with them to provide periodic updates of
20 it?
21   A.   Yes, sir.
22   Q.   Just as you have a contract with
23 Ms. Lennep's company, Pharos, to provide technical
24 support and assistance on SEMS; is that right?
25   A.   Yes, sir.

Page 112

1    Q.   Ms. Lennep testified that she's been
2  doing work and under subcontract with an entity
3  called Knowledge Services. Are you familiar with
4  Knowledge Services?
5    A.   Generally, yes.
6    Q.   What is Knowledge Services?
7    A.   My understanding, it's a provision of the
8  information and technology services that technology
9  contractors have to go through in order to work with
10 the State.
11   Q.   Is Knowledge Services a private entity?
12   A.   I'm not sure.
13   Q.   Is it a division of some part of the
14 State of Mississippi government?
15   A.   I'm not quite sure on the exact makeup or
16 its relationship with ITS. Only that contractors
17 will go through Knowledge Services to provide
18 services to the State.
19   Q.   Who in your office contracts with
20 Ms. Lennep's company, Pharos, to provide services to
21 the Secretary of State's office?
22   A.   Primarily technology contracts are
23 through our division of technology services and our
24 finance department with the --
25   Q.   Ms. Lennep -- I'm sorry. Ms. Lennep

Page 113

1  testified that she submits, periodically,
2  information with respect to the work she has done
3  and the amount of time it's taken her in order to
4  bill for that time. Are you familiar with that
5  process?
6    A.   Yes.
7    Q.   Do you review her bills?
8    A.   I believe that goes to our technology
9  services vendor, our director, our CIO, and our
10 finance director.
11   Q.   So when you say "our CIO," is that a CIO
12 or chief information officer within the Secretary of
13 State's office?
14   A.   Yes.
15   Q.   Who is that?
16   A.   Daniel Jordan.
17   Q.   Can you spell his last name, please?
18   A.   J-O-R-D-A-N.
19   Q.   And how long has he been in that
20 position?
21   A.   I believe he started around February or
22 March of this year.
23   Q.   Who preceded him in that role?
24   A.   Eric Yoakum.
25   Q.   How do you spell his last name?

29 (Pages 110 - 113)

Page 114

1    A.   I'm not quite sure. Y-O-A-K-U-M, I
2  believe.  Don't let Eric know I can't spell his last
3  name.
4    Q.   Have you reviewed any of Ms. Lennep's
5  time entries?
6    A.   I don't recall reviewing the time
7  entries.  I have seen some of her, in preparing the
8  contracts for the year, her proposals for what her
9  time allotment will be for the year.
10   Q.   All right.  Let's scroll down to the next
11 section of the notice.  Section 4E is "Anticipated
12 deadlines for 2024 election-related events,
13 including but not limited to candidate filing
14 deadlines, ballot production deadlines, nominating
15 period deadlines, and voting periods."
16        So these dates have all already been set in
17 accordance with state law; is that correct?
18   A.   Yes, sir.
19   Q.   Do you publish this calendar of these
20 various deadlines, either on the internet or through
21 some other means, to counties?
22   A.   Yes, sir.  We provide it to the general
23 public, including county election officials.
24   Q.   Where do you provide that?
25   A.   On the Mississippi Secretary of State's

Page 115

1  website.
2    Q.   So if any individual wants to see those
3  deadline, they go on the Secretary of State's
4  website, and you've published all the deadlines
5  calculated in accordance with state law; is that
6  right?
7    A.   Yes, sir.
8    Q.   Are you aware of any time that an
9  election was delayed because there was an inability
10 to implement new boundary maps?
11   A.   Not that I can recall.
12   Q.   Are you aware of any time that an
13 election had to be delayed because there was a
14 problem in distributing ballots?
15   A.   Not that I recall for an election being
16 delayed, no, sir.
17   Q.   Are you aware of any circumstance which
18 an election had to be delayed because of problems
19 getting the election ready, as we've described in
20 your deposition testimony?
21   A.   No, sir, I'm not aware of an election
22 being delayed.
23   Q.   All right.  Let's go to the next topic,
24 Topic 5.  Topic 5 is "Voter participation in
25 Mississippi, including but not limited to," and

Page 116

1  let's start with subsection A.  "Data and
2  information on voter registration, voter turnout
3  rates in Mississippi, including at the county level
4  and broken down by particular racial demographic
5  groups."
6        I think we've already covered this to some
7  extent, but let's make sure we got the record clear.
8  The Secretary of State's office does maintain
9  records on voter registration; correct?  That's done
10 in the SEMS database?
11   A.   Yes, sir.
12   Q.   And you report regularly on voter turnout
13 rates in the state of Mississippi; correct?
14   A.   Yes, sir.
15   Q.   You have occasionally reported
16 information at the county level on voter turnout
17 numbers; is that fair?
18   A.   Yes, sir.  We have looked at the numbers
19 broken down by county.
20   Q.   You have not looked, however, at the
21 numbers by particular racial demographic groups; is
22 that fair?
23   A.   Yes, sir, that's correct.
24   Q.   Has your office done any work to
25 determine the percentage of voter registration

Page 117

1  compared to the eligible population of voters?
2        MR. BECKETT:  Object to the form.
3        You can answer.
4        THE WITNESS:  Can you -- just to repeat
5  the question to make sure I understand which numbers
6  you're asking for.
7  BY MR. LAVELLE:
8    Q.   I think I need to adjust that question.
9  I don't think that was a well-stated question so let
10 me try to rephrase it.
11        Would you agree with me, sir, that only a
12 portion of those who would be eligible to register
13 to vote in the state of Mississippi are actually
14 registered voters?
15   A.   Sorry.  I don't mean to be.  I'm still a
16 little -- one more time.
17   Q.   Okay.  Sure.  The qualifications in order
18 to vote within the state of Mississippi is you need
19 to be at least 18 years old; correct?
20   A.   Yes.
21   Q.   Other than that, there's no particular
22 requirements.  You have to live within the state of
23 Mississippi and be at least 18 years old; correct?
24   A.   You have to be a citizen of the United
25 States and you have to be a resident of the county

30 (Pages 114 - 117)

Page 118

1  in the district that you're seeking to vote in.
2     Q.   Okay.  You would agree with me that not
3  every single person who is a -- meets those criteria
4  is actually registered to vote in the state of
5  Mississippi; is that right?
6     A.   Yes, sir.
7     Q.   There is a gap between voter registration
8  and the number of potentially eligible voters;
9  right?
10    A.   Yes, sir.
11    Q.   And we talked earlier about efforts that
12 the Secretary of State's office has made to increase
13 voter registration through outreach to the
14 community; correct?
15    A.   Yes, sir.
16    Q.   Do you have any access to information
17 about relative percentages of voter registration at
18 the county level?  In other words, are some counties
19 more successful than other counties in getting
20 voters to register?
21       MR. BECKETT:  Object to the form.
22       THE WITNESS:  Yes, we do provide a, I
23 believe it's an active voter count report showing
24 the number of registered voters in each county
25 compared to the number of people who may be able to

Page 119

1  be eligible according to this last census.
2  BY MR. LAVELLE:
3     Q.   And do you publish that anywhere?
4     A.   Yes.
5     Q.   Where do you publish that?
6     A.   On the Mississippi Secretary of State's
7  website.
8     Q.   As we sit here today, are you able to
9  identify any particular place where voter
10 registration is lagging in the state of Mississippi?
11    A.   I can't recall right now if there's any
12 particular county that's much further behind than
13 any other.
14       MR. BECKETT:  Something just popped up on
15 the screen.  Okay.  Never mind.  It's done.
16 BY MR. LAVELLE:
17    Q.   And you're not able to tell us today how
18 voter registration has trended based on particular
19 racial demographic groups in the state of
20 Mississippi?
21    A.   That's correct.  The Secretary of State's
22 office does not keep racial data on voters.
23    Q.   All right.  The next subsection of this
24 notice is "Data and information on racially
25 polarized voting in Mississippi."

Page 120

1        So I assume the answer to this is no, but
2  you tell me if I'm wrong.  The Secretary of State's
3  office does not maintain information about whether
4  voters tend to vote in particular ways based on
5  their race; is that fair?
6     A.   That's correct.  We would have no way to
7  determine that based on the data we have.
8     Q.   In fact, the Secretary of State's office,
9  while it's responsible for making sure elections are
10 conducted in accordance with state law, doesn't
11 track who anyone has voted for in any particular
12 election; correct?
13    A.   That's correct, yes, sir.
14    Q.   Voting is generally a private matter in
15 the state of Mississippi; correct?
16    A.   Yes, sir.
17    Q.   Subsection C is "Efforts by the Secretary
18 of State to encourage voter registration and
19 participation, including among Black
20 Mississippians."
21       All right.  So we talked earlier about
22 efforts to encourage voter registration.  What can
23 you tell me about efforts by the Secretary of
24 State's office, if any, to encourage voter
25 participation that is actual voter turnout?

Page 121

1     A.   So we have launched what we call
2  Elections 101, which is providing elections
3  material, voting information through social media.
4  We have also launched My Election Day, which is an
5  online program in which a person can enter their
6  address to find out important information such as
7  when voting is going to be occurring, what elections
8  they may be able to vote for and where they will
9  vote, as well as being able to track absentee ballot
10 and affidavit ballot processes through that system
11 in order to allow people to be more engaged and know
12 those important dates, even to able to view a
13 specific sample ballot, specific to that person so
14 they can prepare themselves long before election day
15 and start making those important decisions they need
16 to make on who to vote for.
17    Q.   And that's something you do on an ongoing
18 basis in connection with every election; is that
19 fair?
20    A.   Yes.  My Election Day was launched this
21 year, but it's a permanent addition to what's
22 available to voters.
23    Q.   Are there any special or additional
24 outreach efforts that are conducted by the Secretary
25 of State to encourage minority voter registration?

31 (Pages 118 - 121)

PTX-115-031

Page 122

1   A.  We don't specify any particular minority
2 group or any particular population.  We try and
3 encourage voter registration, voter turnout among
4 all Mississippians.
5   Q.  And same is true with respect to voter
6 participation, there's no special effort by the
7 Secretary of State's office to encourage voter
8 participation by minority voters; is that fair?
9   A.  No.  We generally encourage registration
10 turnout by all Mississippians.
11   Q.  Subsection D is "The Secretary of State's
12 role in activities in ensuring voting access in
13 Mississippi, including through the provision of
14 polling place information and other voting
15 information to the public, and advising and
16 furnishing resources and guidance to the local board
17 of election commissioners regarding election
18 administration."
19    So if an individual voter wants to find out
20 where their polling place is, how can she do that?
21   A.  They can visit My Election Day and type
22 in their address, and it will provide the polling
23 place that the county has entered into the statewide
24 election management system.
25   Q.  And that's drawing their information

Page 123

1 based on their address and the SEMS database?
2   A.  That's correct, yes, sir.
3   Q.  Is it possible for someone to determine
4 whether they themselves are registered to vote?
5   A.  Yes.  They can use the Secretary of
6 State's website.  We have a voter registration
7 lookup where they can type in certain categories of
8 information that will match against the databases
9 before we provide certain information to make sure
10 it's actually that voter, but they can look to see
11 if they are registered to vote.
12   Q.  And these ways of providing this
13 information to voters would be in addition to
14 whatever information was provided by county election
15 boards; is that fair?
16   A.  Correct.
17   Q.  Does the Secretary of State's office set
18 any type of standards about how individual counties
19 have to make that information available to voters?
20   A.  No.  We make that information available
21 through My Election Day and the online lookup, but
22 we don't have any oversight authority to dictate how
23 a county may provide resources, such as polling
24 place information, to the voters through, like, any
25 online lookup tool or et cetera.

Page 124

1   Q.  Does the Secretary of State's office
2 provide any type of funding to local counties with
3 respect to election administration?
4   A.  The Mississippi Secretary of State's
5 office does provide some funding.
6   Q.  All right.  And what can you tell us
7 about that?  What kind of funding and how is it
8 provided?
9   A.  The Mississippi Secretary of State
10 provides funding through the Help America Vote Act,
11 through subgrants to counties.  Also provided
12 through grant funding approved by the Mississippi
13 legislature, the Mississippi Voting Modernization
14 Act.  Funding for the purchase of voting equipment
15 that use voter-verifiable paper ballots.  And also
16 through the Election Support Fund, which is monies
17 generated through our office through foreign LLCs,
18 meaning out of state LLCs, find any reports will
19 generate funds that are now disbursed to the
20 counties at a dollar match.
21   Q.  And are there any plans to change that
22 level of support going forward for what they have
23 done in previous years?
24   A.  Well, we recently got that funding bumped
25 up to a hundred percent through some work with the

Page 125

1 legislature.  So we can't get that funding any
2 higher.  And as I'm aware of, any kind of subgrant
3 award through federal money will have to be
4 dependent on what the federal government budgets
5 through any HAVA appropriations if they give a
6 future disbursement.  So that would have to be
7 considered at the time that the federal government
8 releases more HAVA funding.
9   Q.  Subsection E here is "Voting policies and
10 procedures in Mississippi, and the impact of those
11 policies and procedures on Black voters, including:
12 The availability of early mail-in voting; voter
13 information made available by the Secretary of
14 State's office in advance of an election; lines at
15 polling places; changes in polling places;
16 disenfranchisement of people with felony
17 convictions; and the use of runoff elections."
18    Let's start with the general question,
19 which is:  Your office does occasionally have an
20 opportunity to comment on proposed changes in voting
21 policies and procedures in Mississippi; is that
22 fair?
23   A.  There have been times that we have
24 provided information to the legislature on various
25 policy changes.

32 (Pages 122 - 125)

Page 126

1    Q.   You mentioned a couple of those in your
2  testimony earlier today; correct?
3    A.   Yes, sir.
4    Q.   Some proposed changes that are being
5  contemplated, and at least one that's going to be
6  implemented for 2024, your office has been asked to
7  comment on them and provide input to the legislature
8  on those; is that fair?
9    A.   Yes, sir.
10    Q.   In that respect, have you been asked by
11  the legislature to provide any input or comment on
12  whether any current voting policies and procedures
13  disproportionately disenfranchise minority or Black
14  voters?
15    A.   I don't recall any specific discussions
16  on policies that would affect minority voters or how
17  a policy change would specifically affect those
18  minority voters.
19    Q.   Okay. On some of these specific issues,
20  let's talk through them. We talked earlier about
21  the availability of early voting, and actually there
22  is no early voting in Mississippi; correct?
23    A.   Yes, sir.
24    Q.   The only mail-in voting that is permitted
25  is absentee ballot by excuse, and those areas are

Page 127

1  defined by legislation; correct?
2    A.   Yes, sir, that's correct.
3    Q.   And the only change that's being
4  contemplated, that you're aware of, in those rules
5  is potential legislation to add an excuse for an
6  incarcerated individual who has not been convicted
7  of a disenfranchising felony; correct?
8    A.   Yes, sir, that's correct.
9    Q.   We talked earlier about voting
10  information that's made available by the Secretary
11  of State's office in advance of the election.
12  That's essentially through the SEMS database; is
13  that correct?
14    A.   Yes. So if you're referring to My
15  Election Day having their information, we have other
16  voter information available as well on our website.
17    Q.   What other information do you have
18  available for voters on your website?
19    A.   We have county election handbooks so they
20  can become aware of what the procedures are. We
21  have step-by-step absentee voting guides. We have
22  FAQ for general questions regarding absentee voting.
23  Of course we have the voter registration lookup as
24  well where people can check to see if they are
25  registered to vote, as well as the voter

Page 128

1  registration toolkit.
2    Q.   With respect to lines and polling places,
3  does your office receive reports of issues where
4  there are long lines forming at individual polling
5  places? Has that ever happened?
6    A.   Yes. We will occasionally get calls
7  throughout the election day about sometimes the
8  person having to wait in line at a polling place.
9    Q.   And what will, if any, does your office
10  have in resolving problems of lines forming at
11  polling places?
12    A.   We don't have any direct authority. Once
13  again, the local election officials are responsible
14  for running those elections and the precincts at the
15  polling place. If we hear of an issue, we will call
16  down to the county election commission and pass that
17  on, but it's up to them to get whatever issue is
18  resolved or whatever is causing those long lines to
19  get resolved as soon as possible to be resolved.
20    Q.   Has your office collected or attempted to
21  collect any data to determine whether or not lines
22  occur disproportionately at polling places where the
23  majority of voters are Black?
24    A.   No, sir.
25      MR. BECKETT: Object to the form.

Page 129

1      You can answer.
2      THE WITNESS: No, sir.
3  BY MR. LAVELLE:
4    Q.   Has your office undertaken at all to
5  determine whether there are any particular trends in
6  where lining at polling places form?
7      MR. BECKETT: Object to the form.
8      THE WITNESS: No, sir, not that I'm aware
9  of.
10  BY MR. LAVELLE:
11    Q.   Have there been any instances where your
12  office have suggested to county officials to make
13  different arrangements with respect to polling
14  places in order to reduce lines, such as increasing
15  the number of polling places, increasing the number
16  of staff members at the polling place, anything like
17  that?
18    A.   Not in the specific counties. Generally
19  during training, we will mention that it's good to
20  have -- make sure you have a sufficient number of
21  staff, poll managers, sufficient number of machines
22  that you feel are necessary in order to have a
23  smooth election day.
24    Q.   We talked earlier in your deposition
25  testimony about changes in polling places, and I

33 (Pages 126 - 129)

PTX-115-033

**Page 130**

1 think your testimony was that the location of
2 polling places is controlled by local county
3 officials, not by the Secretary of State's office;
4 correct?
5    A.   Yes, sir, that's correct.
6    Q.   They are required to report to you
7 changes in polling places and to make sure that
8 those are reflected in the SEMS database; is that
9 correct?
10    A.   That's correct.
11    Q.   And has your office undertaken to
12 determine whether or not there were changes in
13 polling places made that would disproportionately
14 affect voters of color?
15    A.   No, sir.
16    Q.   The next subcategory here is the
17 disenfranchising of people with felony convictions.
18 Generally speaking, under Mississippi state law, an
19 individual convicted of a felony is ineligible to
20 vote; is that correct?
21    A.   If they are convicted of a certain
22 disenfranchising crime, yes. It's not any felony.
23 It's certain disenfranchising crimes.
24    Q.   Okay. And which disenfranchising crimes
25 are those?

**Page 131**

1    A.   It's less than 23. I can't immediately
2 recite them all from memory. Some deal with murder,
3 robbery, et cetera, that fall under the
4 disenfranchising grounds.
5    Q.   Does the Secretary of State's office have
6 any statistics as to the percentages of voters, the
7 potential voters who are disenfranchised as a result
8 of those restrictions?
9    A.   Can you repeat the question?
10    Q.   Sure.
11    A.   What kind of --
12    Q.   Does your office maintain any statistics
13 with respect to who has been disenfranchised as a
14 result of a conviction of a disenfranchising crime?
15    A.   Persons convicted of a disenfranchising
16 crime are received through a tie-in. A tie-in is
17 where the statewide election management system
18 communicates with the administrator of the court's
19 office in which, when they enter that a person has
20 been convicted of a crime, those databases will be
21 matched to see if somebody is a registered voter.
22 So we do have a database of those who have been
23 entered by AOC as having been convicted of a
24 disenfranchising crime.
25    Q.   And is their data entry performed at a

**Page 132**

1 county level in connection with that or is this all
2 automated?
3    A.   So as far as the AOC, I can't exactly
4 speak what the AOC's operations are as far as
5 entering the disenfranchising crimes. From the
6 election perspective, it is matched through SEMS,
7 the database, and that match, potential match is
8 presented to the local election officials for them
9 to determine if any action is needed to be taken on
10 it.
11       MR. BECKETT: His mic fell off.
12       THE WITNESS: Sorry about that.
13 BY MR. LAVELLE:
14    Q.   No problem. Does your office maintain
15 statistics of the number of voters who are
16 disenfranchised as a result of being convict of a
17 disenfranchising crime?
18    A.   A person who is convicted of a
19 disenfranchising crime would be marked as purged in
20 SEMS, and the reason for the removal would be
21 designated as having been convicted of a
22 disenfranchising crime.
23    Q.   So you could generate a report if you
24 needed to or wanted to of the number of people who
25 fall in that category, couldn't you?

**Page 133**

1    A.   Possibly. Anything technical, I'd have
2 to consult with Madalan and our vendor on exactly
3 how that data can be pulled and retrieved.
4    Q.   Does the Secretary of State's office
5 provide any reporting on that topic? That is the
6 number of individual voters who have been
7 disenfranchised as a result of a conviction of a
8 disenfranchising crime.
9    A.   Not that I'm aware of, no.
10    Q.   Do you have any idea how many people are
11 disenfranchised as a result of that?
12    A.   No. I don't know the total number that
13 have been disenfranchised under that.
14    Q.   It would be thousands, wouldn't it? At
15 least, tens of thousands, hundreds of thousands?
16    A.   It could be.
17       MR. BECKETT: Object to the form.
18       THE WITNESS: I can't speculate as to a
19 number. But I can imagine it would be at least over
20 a thousand, but I can't speculate as to a total
21 number that would be --
22 BY MR. LAVELLE:
23    Q.   Understood. Is it possible for a voter
24 who has been convicted of a disenfranchising crime
25 to be reinstated?

34 (Pages 130 - 133)

1    A.  Yes.
2    Q.  And how does that reinstatement occur?
3    A.  They could be pardoned by the governor of
4  Mississippi or they could have their rights restored
5  by the Mississippi legislature.
6    Q.  How often does that happen?
7    A.  I can't speak to how often a pardon is
8  issued or a legislature approves a bill to
9  re-enfranchise somebody.
10    Q.  But other than those two instances, it's
11  a permanent disenfranchisement; correct?
12    A.  Yes, sir.
13    Q.  And the last section of this -- of this
14  topic is the use of runoff elections.  Are you
15  familiar with runoff elections?
16    A.  Yes, sir.
17    Q.  When are runoff elections used?
18    A.  They are used in the instance when
19  offices that are required to have the majority of
20  the vote do not receive -- a person does not receive
21  a majority of the vote and a runoff is going to be
22  held at the date set by legislature.
23    Q.  Are state legislative seats required --
24  do they ever require runoff elections?
25    A.  Only in the instance of a special

1  election.
2    Q.  And can you explain that?
3    A.  State law requires that, for special
4  elections, that if a -- no one receives a majority
5  on the first election, that a runoff is held for
6  general elections, they are simply required to
7  obtain a plurality of the vote, not a majority, so
8  most votes wins.
9    MR. LAVELLE:  All right.  Let's take a
10  break here, if that's okay with you.
11    MR. BECKETT:  Yeah.  Sure.  We can go off
12  the record.
13    THE VIDEOGRAPHER:  The time is 12:10 p.m.
14  We're off the record.
15    (Off the record.)
16    VIDEOGRAPHER:  We're back on the record.
17  The time is 12:46 p.m.
18  BY MR. LAVELLE:
19    Q.  All right.  Mr. Kirkpatrick, we're back
20  from the lunch break, and we're going to move to
21  Topic 6 of the 30(b)(6) topics.  If we could pull
22  up, once again, Exhibit 2.  Topic 6 is "The
23  Secretary of State's office's participation in the
24  process of drawing state legislative maps in 2022,
25  included but not limited to," and the first

1  subcategory of information is "Data, analyses,
2  studies, or information created and/or provided by
3  the Secretary of State's office, including its
4  employees, staff, and/or consultants, for use in the
5  2022 redistricting process."
6    All right.  So we discussed earlier that
7  you had collected and produced in discovery a series
8  of emails that Madalan Lennep had with either Ted
9  Booth or Mr. Collins.
10    Do you remember discussing that?
11    A.  Yes, sir.
12    Q.  And you're aware from collecting and
13  reviewing those records that there were a variety of
14  categories of information that were requested by
15  Mr. Collins or Mr. Booth from the Secretary of
16  State's office; correct?
17    A.  Yes, sir.
18    Q.  And while you yourself were not involved
19  in complying with those requests, you're aware that
20  Ms. Lennep did so; correct?
21    A.  Yes, sir.
22    Q.  And you're aware that Ms. Lennep, as a
23  vendor retained by the Secretary of State,
24  effectively did produce these documents and records
25  to Mr. Booth and Mr. Collins on behalf of the

1  Secretary of State's office; correct?
2    A.  Yes, sir.
3    Q.  So you're aware, for example, that
4  Ms. Lennep provided a listing of precinct polling
5  places to Mr. Collins at his request; right?
6    A.  Yes, sir.  I believe that was one of the
7  emails.
8    Q.  And you're aware that there was
9  information that was requested by Mr. Collins
10  relating to poll books, including the number of
11  voters in a poll book and voter turnout percentages
12  by district?  Are you aware of that?
13    A.  I'd have to review the email for all, but
14  I believe that was a request.
15    Q.  You're also aware that Mr. Collins and
16  Mr. Booth requested information from Ms. Lennep
17  concerning the turnout in a number of specific races
18  that were held on a statewide basis?  Are you aware
19  of that?
20    A.  Yes, sir.
21    Q.  So, for example, they requested
22  Ms. Lennep to provide information about the U.S.
23  Senate election turnout numbers, both the primary
24  and the general in 2020; correct?
25    A.  Yes, sir.  I believe that was one of the

35 (Pages 134 - 137)

Page 138

1  request.
2      Q.   They also requested Ms. Lennep to provide
3  information about the turnout for the gubernatorial
4  election; right?
5      A.   Yes, sir.  I believe some turnout data
6  regarding that election was requested as well.
7      Q.   And also requested information about
8  turnout numbers for the attorney general's office,
9  state attorney general's office race; correct?
10     A.   Yes, sir.
11     Q.   Are you aware of any requests that were
12  placed by Mr. Collins or Mr. Booth that Ms. Lennep
13  declined to fill?
14     A.   No, sir.
15     Q.   Are you aware of any requests that were
16  directed by Mr. Collins to anyone in the Secretary
17  of State's office for data, other than Ms. Lennep?
18     A.   No, sir.
19     Q.   How about Mr. Booth?  Are you aware of
20  any requests that he made to anyone in the Secretary
21  of State's office, other than Ms. Lennep, for data
22  or information in connection with redistricting?
23     A.   No, sir.  I believe all of those requests
24  were made to Ms. Lennep.
25     Q.   All right.  Subsection B is "Any analysis

Page 139

1  or consideration of any maps created or provided by
2  legislators, legislative staff, consultants, and/or
3  the public as part of the 2022 redistricting
4  process."
5      What involvement, if any, has the Secretary
6  of State's office had in the preparation or
7  consideration of maps for redistricting?
8      A.   The Mississippi Secretary of State's
9  office doesn't create the maps.  As I previously
10  mentioned, that's the legislature's duty.  Nor was
11  any analysis performed of those maps or proposed
12  maps by the Mississippi legislature.
13     Q.   So your office has not been asked by
14  anybody who is responsible for drafting those maps
15  for any input at all with respect to them; is that
16  fair?
17     A.   Yes, sir.
18     Q.   The first time that your office received
19  those maps was when they had actually been adopted
20  by the commission; correct?
21     MR. BECKETT:  Object to the form.
22     THE WITNESS:  Yes, sir.  We saw the final
23  legislative language along with everybody else on
24  what those maps would be.
25  BY MR. LAVELLE:

Page 140

1      Q.   Did the Secretary of State's office have
2  any input on any proposed alternative maps that had
3  been provided by anyone not in the legislature, such
4  as a member of the public?
5      A.   No, sir.
6      Q.   Has the Secretary of State's office ever
7  been asked to provide any input, whether or not it
8  actually did provide any input, but has it ever been
9  asked to provide any input on any proposed maps?
10     A.   No, I'm not aware of any request for
11  input on any proposed maps.
12     Q.   Subsection C here is "Communications with
13  legislators, legislative staff, consultants, and/or
14  the public about the 2022 redistricting process."
15     Are you aware of any communications that the
16  Secretary of State's office has had with legislators
17  or legislative staff concerning the 2022
18  redistricting process?
19     A.   As we mentioned in the interrogatories,
20  the Secretary of State recalls generally speaking
21  with some legislators regarding redistricting but
22  not about any of the input or the analysis of the
23  maps and can't recall who those legislators are.
24     Q.   So there were some conversations, we
25  don't know with whom and we don't know what they

Page 141

1  were about; is that fair?
2      MR. BECKETT:  Object to the form.
3      THE WITNESS:  Yes.  Can't recall what
4  those conversations were about.  Just they were
5  about redistricting generally.
6  BY MR. LAVELLE:
7      Q.   And who were the parties that you can
8  identify, as we sit here today, to those
9  communications?
10     A.   As I mentioned, the Secretary of State
11  had those communications.
12     Q.   All right.  And the Secretary of State
13  you're referring to specifically by name is?
14     A.   Michael Watson.
15     Q.   All right.  So Mr. Watson did have some
16  communications with legislators about the
17  redistricting process; is that fair?
18     A.   Generally speaking, yes.
19     Q.   Do you know when those conversations
20  occurred?
21     A.   No.
22     Q.   Were you involved in them,
23  Mr. Kirkpatrick?
24     A.   No.
25     Q.   Did you have a conversation with

36 (Pages 138 - 141)

PTX-115-036

Page 142

1 Mr. Watson to find out what was discussed?
2    A.   I did ask him about if he remembered who
3 those legislators were or what the topic of
4 conversation was, and as I previously mentioned, he
5 couldn't recall any specifics about the
6 conversation, just that it was about redistricting
7 in general.
8    Q.   How many such conversation occurred?
9    A.   Let's see.  I can't remember exactly who
10 he spoke to so I can't say exactly how many
11 conversations occurred.
12    Q.   But there were more than one?
13    A.   I believe at least more than one.
14    Q.   And do we know whether they occurred in
15 the course of the redistricting process, before the
16 redistricting was done, after it was done, all of
17 the above?
18    A.   I believe, and recalling the conversation
19 with the secretary, that it was after the
20 redistricting process had been finalized and the
21 final maps had been published.
22    Q.   Were there any communications that the
23 Secretary of State with anyone relating to this
24 litigation that we're here on currently?
25    A.   You are asking has there been in

Page 143

1 communication regarding the litigation?
2    Q.   Yes, the current litigation challenging
3 the state legislative districts.
4    A.   When we, of course, talked with counsel.
5    Q.   All right.  Other than privileged
6 communications with counsel, are you aware of any
7 discussions that the Secretary of State has had with
8 anybody about the -- about this litigation?
9    A.   I'm not aware of any communications
10 regarding this litigation.
11    Q.   How about with legislators about this
12 litigation?
13    A.   I'm not aware of any communications with
14 legislators regarding this litigation.
15    Q.   Okay.  Do you know whether there were any
16 communications that the Secretary of State had with
17 legislators during the course of the 2022
18 redistricting process?
19    A.   Other than the ones that I've previously
20 discussed, no.
21    Q.   So there were that were during the course
22 of the 2022 redistricting process, we just don't
23 know who they were with, how many there were or what
24 the subject matter was --
25       MR. BECKETT:  Object to the form.

Page 144

1 BY MR. LAVELLE:
2    Q.   -- beyond being about the 2022
3 redistricting process; is that fair?
4    A.   Well, I think what I had previously
5 mentioned was I believe they had occurred after the
6 legislative redistricting process, and I could not
7 remember who he had spoken to or the exact subject
8 matter, just that they were generally about
9 redistricting.
10    Q.   Does the Secretary of State have an
11 opinion with respect to the legislative districts
12 that were drawn up in 2022?
13       MR. BECKETT:  Object to the form.
14    A.   No, sir.
15    Q.   Do you know whether he has been asked by
16 anybody to opine on how long it would take to
17 implement new districts if the court were to
18 determine that new districts were mandated by the
19 law?
20       MR. BECKETT:  Object to the form.
21       THE WITNESS:  I'm not aware of any
22 requests to opine on how long it would take to
23 implement new districts.
24 BY MR. LAVELLE:
25    Q.   Do you have an understanding, as you sit

Page 145

1 here today, sir, of how long it would take to
2 implement changed districts if the court were to
3 determine that they were required either under the
4 Voting Rights Act or the U.S. Constitution?
5    A.   I think that would be hard to determine
6 until there's something proposed on what those
7 changes would be.  That could be very complex.
8 There's a lot of moving pieces.  So until there's a
9 proposal on what those lines would be, it's really
10 hard to determine how long that process would take.
11    Q.   It would be fair to say that you would do
12 everything in your power to comply with any court
13 order that was entered requiring adoption of new
14 districts; isn't that fair?
15       MR. BECKETT:  Object to the form.
16       THE WITNESS:  Yes.  The Mississippi
17 Secretary of State will follow any lawful order of
18 the court.
19 BY MR. LAVELLE:
20    Q.   Are you familiar with something called a
21 resolution board?
22    A.   Yes.
23    Q.   What is a resolution board?
24    A.   The resolution board is election
25 officials appointed at the county level, similar to

37 (Pages 142 - 145)



Page 146

1  poll managers, that process absentee ballots and
2  also look at ballots that could not be properly
3  scanned by a voting machine to determine the voter's
4  intent.
5      Q.   And what about the voter's intent has to
6  be determined from review?
7      A.   If a ballot is marked in a way that the
8  machine can't read, like, anything, when you put a
9  person in front of somebody, they are going to
10 figure out a hundred different ways to do it. So if
11 they don't properly fill in the bubble and then
12 maybe then a checkmark or circled the person's name
13 or some other indication that's who they are
14 choosing to vote for but it doesn't actually
15 properly fill in the bubble for the machine to read,
16 the resolution board can look at that. If they can
17 properly determine the voter's intent, transfer that
18 to a proper ballot properly designating it and let
19 that vote to be accepted and counted.
20     Q.   Who appoints the resolution board?
21     A.   The local county election officials.
22     Q.   What role, if any, does the Secretary of
23 State's office have with respect to training
24 resolution boards?
25     A.   We train the local election officials

Page 147

1  who, in turn, train the resolution boards.
2      Q.   Are you familiar with the process for
3  challenging a ballot under Mississippi law?
4      A.   Yes, sir.
5      Q.   What is the process for challenging a
6  ballot?
7      A.   A person who is eligible to challenge a
8  ballot can challenge a person's qualifications to
9  vote either at the precinct or they can do so in
10 front of a resolution board, if it's an absentee
11 voter.
12     Q.   And what is a possible basis for
13 challenging a voter?
14     A.   It could be that that person isn't the
15 person who is -- who they say they are, that they
16 are not eligible to vote, they don't live in the
17 district, they don't live in the precinct, they
18 aren't qualified to vote absentee are all reasons
19 for challenging the ballot or challenging the
20 qualifications of someone to vote.
21     Q.   Does the Secretary of State's office
22 track patterns or situations where challenges to
23 voters occur?
24     A.   No, sir.
25     Q.   Are you aware of any incidents that have

Page 148

1  occurred in Mississippi where voters have been
2  challenged in a racially discriminatory way?
3      MR. BECKETT:  Object to the form.
4      THE WITNESS:  No, sir.
5      MR. LAVELLE:  Let's take a short break.
6  I may be close to finished here, but I want to go
7  over my notes briefly.  Let's take a five-minute
8  break.
9      THE VIDEOGRAPHER:  The time is 1:02 p.m.
10 We are off the record.
11     (Off the record.)
12     THE VIDEOGRAPHER:  We're back on the
13 record.  The time is 1:09 p.m.
14     MR. LAVELLE:  All right.
15 Mr. Kirkpatrick, I do not have any further questions
16 for you.  I want to thank you very much for your
17 time and attention today and for your willingness to
18 walk through these areas with us and hope you and
19 your family have a wonderful holiday.
20     THE WITNESS:  Yes, sir.  You too.
21     MR. BECKETT:  Thank you, John.  We wish
22 the best to you during this holiday season.
23     We do want to read and sign, but I'm not
24 going to do any questioning today.
25     MR. LAVELLE:  Very good.

Page 149

1      MR. BECKETT:  All right.  Thank you.
2      THE VIDEOGRAPHER:  With nothing further,
3  the time is 1:10 p.m.  We're off the record.
4      (Whereupon, the above-entitled deposition was
5      concluded at 1:10 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

38 (Pages 146 - 149)

Page 150

```
1            CERTIFICATE OF COURT REPORTER
2      I, Julie Brown, Court Reporter and Notary
3   Public, in and for the State of Mississippi, do
4   hereby certify that the above and foregoing 150
5   pages, including this page, contain a true and
6   accurate transcription of the testimony of Kyle
7   Kirkpatrick contain a full, true and correct
8   transcript of the proceedings had in the aforenamed
9   case at the time and place indicated, which
10  proceedings were recorded by me to the best of my
11  skill and ability, remotely via videoconference.
12     I also certify that I placed the witness under
13  oath to tell the truth and that all answers were
14  given under that oath.
15     I certify that the witness has chosen his
16  right to the reading and signing of the deposition.
17  I certify that I have no interest, monetary or
18  otherwise, in the outcome of this case.
19     Witness my signature and seal this day,
20  January 5, 2024.
21
22        Julie Brown
23  JULIE BROWN,
    RPR, CCR 1587
24  My Commission Expires:
    April 6, 2024
25
```

Page 151

```
1   P. Ryan Beckett, Esq.
2   Ryan.Beckett@bulersnow.com
3         January 5, 2024
4   Mississippi NAACP v. State Board Of Election Commissioners Et Al
5   12/20/2023, Kyle  Kirkpatrick (#6326668)
6      The above-referenced transcript is available for
7   review.
8      Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25
```

Page 152

```
1   Mississippi NAACP v. State Board Of Election Commissioners Et Al
2   Kyle  Kirkpatrick (#6326668)
3            E R R A T A  S H E E T
4   PAGE____ LINE____ CHANGE_____
5   _____
6   REASON_____
7   PAGE____ LINE____ CHANGE_____
8   _____
9   REASON_____
10  PAGE____ LINE____ CHANGE_____
11  _____
12  REASON_____
13  PAGE____ LINE____ CHANGE_____
14  _____
15  REASON_____
16  PAGE____ LINE____ CHANGE_____
17  _____
18  REASON_____
19  PAGE____ LINE____ CHANGE_____
20  _____
21  REASON_____
22
23  _____    _____
24  Kyle  Kirkpatrick          Date
25
```

Page 153

```
1   Mississippi NAACP v. State Board Of Election Commissioners Et Al
2   Kyle  Kirkpatrick (#6326668)
3         ACKNOWLEDGEMENT OF DEPONENT
4      I, Kyle  Kirkpatrick, do hereby declare that I
5   have read the foregoing transcript, I have made any
6   corrections, additions, or changes I deemed necessary as
7   noted above to be appended hereto, and that the same is
8   a true, correct and complete transcript of the testimony
9   given by me.
10
11  _____    _____
12  Kyle  Kirkpatrick          Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18      _____
19      NOTARY PUBLIC
20
21
22
23
24
25
```

39 (Pages 150 - 153)