EXHIBIT NO. PTX - 127 evid.
CAUSE NO. 3:22cv734-DPJ-HSO-LSH
WITNESS
CLERK: _____ SHONE POWELL

FEB 2 6 2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
Candice Crane , REPORTER

Page 1

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF MISSISSIPPI
 2                  NORTHERN DIVISION
     MISSISSIPPI STATE CONFERENCE OF THE      PLAINTIFFS
 3   NATIONAL ASSOCIATION FOR THE
     ADVANCEMENT OF COLORED PEOPLE; DR.
 4   ANDREA WESLEY; DR. JOSEPH WESLEY;
     ROBERT EVANS; GARY FREDERICKS;
 5   PAMELA HAMNER; BARBARA FINN; OTHO
     BARNES; SHIRLINDA ROBERTSON; SANDRA
 6   SMITH; DEBORAH HULITT; RODESTA
     TUMBLIN; DR. KIA JONES; MARCELEAN
 7   ARRINGTON; VICTORIA ROBERTSON
 8   VS.               No.
                       3:22-cv-734-DPJ-HSO-LHS
 9
     STATE BOARD OF ELECTION               DEFENDANTS
10   COMMISSIONERS; TATE REEVES, in his
     official capacity as Governor of
11   Mississippi; LYNN FITCH, in her
     official capacity as Attorney
12   General of Mississippi; MICHAEL
     WATSON, in his official capacity as
13   Secretary of State of Mississippi
     AND
14   MISSISSIPPI REPUBLICAN EXECUTIVE      INTERVENOR-
     COMMITTEE                             DEFENDANT
15
     ****************************************************
16        VIDEO DEPOSITION OF MADALAN LENNEP
     ****************************************************
17     Taken at the instance of the Plaintiffs at the
     offices of the Mississippi Attorney General, 550
18        High Street, Jackson, Mississippi, on
                   December 18, 2023,
19        beginning at approximately 9:21 a.m.
              (APPEARANCES NOTED HEREIN)
20
21
              * * * * * * * *
22        Reported Stenographically by:
          Julie Brown, RPR, CCR 1587
23
24
25
```

3:22-cv-734

PTX-127

## Page 2

APPEARANCES OF COUNSEL:

For the Plaintiffs:

JOHN P. LAVELLE, JR. (VIA ZOOM)
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103
(202) 739-3000
john.lavelle@morganlewis.com
MCKENNA RANEY-GRAY (VIA ZOOM)
ACLU of Mississippi
101 South Congress St.
Jackson, MS 39201
(601) 354-3408
mraneygray@aclu-ms.org

CELINA ANTONELLIS (VIA ZOOM)
Morgan, Lewis & Bockius LLP
One Federal St.
Boston, MA 02110
(617) 341-7894
celina.antonellis@morganlewis.com

DAVID ROLLINS-BOYD (VIA ZOOM)
Lawyers' Committee for Civil Rights
1500 K Street NW
Suite 900
Washington, D.C. 20005
(202) 662-8600
drollins-boyd@lawyerscommittee.org

DREW CLEARY JORDAN (VIA ZOOM)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave. NW
Washington, D.C. 20004
(713) 890-5000
drew.jordan@morganlewis.com

## Page 3

For the Defendants:

P. RYAN BECKETT
Butler Snow LLP
Renaissance at Colony Park
Suite 1400
Ridgeland, MS 39158
(601) 985-4557
Ryan.Beckett@butlersnow.com

REX SHANNON III
Mississippi Special Assistant
Attorney General
P.O. Box 220
Jackson, MS 39205
(601) 359-4184
Rex.shannon@ago.ms.gov

LEIGH TRICHE JANOUS
Mississippi Secretary of State
General Counsel
401 Mississippi St.
P.O. Box 136
Jackson, MS 39205
(601) 359-6318
Leigh.janous@sos.ms.gov

ALSO PRESENT: Mike Wallace (Via Zoom)
Jason Hopkins, videographer
Bailey Finnestad, exhibit tech

## Page 4

INDEX     Page

Appearances                                      2
Certificate of Court Reporter                  155
Certificate of Deponent                        156
Errata Sheet                                   157

EXAMINATION     Page
Examination By Mr. Lavelle            7
EXHIBITS     Page
Exhibit 1   Subpoena to Testify to Madalan Lennep   11
Exhibit 2   Amended Notice of Deposition Subpoena   12
            to Madalan Lennep
Exhibit 3   Subpoena for Documents to Madalan       14
            Lennep
Exhibit 4   LinkedIn Profile, MLC01          33
Exhibit 5   Pharos Website, MLC03           47
Exhibit 6   True the Vote v. Hosemann Declaration,  52
            MLC25
Exhibit 7   Thomas v. Bryant Declaration, MLC34   59
Exhibit 8   Election Commissioner Orientation      68
            Slide Decks, MLC07, MLC13, MLC26,
            MLC30
Exhibit 9   Election Tips for the TSX Slide Deck,   72
            MLC12
Exhibit 10  Voter Roll Move, Merge, and Purge,    73
            MLC28
Exhibit 11  ECAM Meeting Slide Decks, MLC10,      75
            MLC17, MLC29
Exhibit 12  Email with Collins and Lennep re:     85
            Precinct Polling Places, 5/28/19,
            REL0000000078
Exhibit 13  2019 Precinct Polling Places,         90
            REL0000000078.0001
Exhibit 14  Email with Booth and Lennep re:       91
            Reports, 1/15/19, REL0000000087
Exhibit 15  Email with Booth and Lennep re:       92
            Reports, 1/15/19, REL0000000084
Exhibit 16  Email with Booth and Lennep re:       95
            Reports, 1/15/19, REL0000000071
Exhibit 17  2019 Primary Turnout Report,         103
            REL0000000071.0001

## Page 5

Exhibit 18  Email with Booth and Lennep re:      105
            Reports, 1/15/19, REL0000000069
Exhibit 19  Email with Booth and Lennep re: Data 106
            Request, 11/21/19, REL0000000089
Exhibit 20  Hinds Precinct 46 Address Library    107
            Report, REL0000000089.0001
Exhibit 21  Emails with Collins and Lennep re:   112
            SEMS Contact, 11/23/20, MS00000339
Exhibit 22  Emails with Collins and Lennep re:   115
            Conference Call, 12/15/20, MS00000337
Exhibit 23  Emails with Collins and Lennep re:   118
            Letter Delivered, 12/18/20, MS00000253
Exhibit 24  Emails with Collins and Lennep re:   120
            Data Request, 1/4/21, MS00000341
Exhibit 25  Emails with Collins and Lennep re:   122
            Back in Office, 1/25/21, MS00000005
Exhibit 26  Emails with Collins and Lennep re:   124
            Precinct Election Results, 1/25/21,
            MS00000340
Exhibit 27  2020 U.S. Senate Precinct-Level      126
            Election Results, MS00000340.0001
Exhibit 28  Emails with Collins and Lennep re:   127
            2019 Gov Race, 6/16/21, MS00000338
Exhibit 29  Emails with Collins and Lennep re:   129
            2019 Gov Race Results, 6/17/21,
            MS00000254
Exhibit 30  Emails with Collins and Lennep re:   131
            Phone Call, 7/8/21, MS00000001
Exhibit 31  Emails with Collins, Lennep, Booth,  133
            and Kirkpatrick re: Precinct Election
            Results, 7/9/21, MS00000342
Exhibit 32  2019 Attorney General Precinct-Level 135
            Election Results, MS00000342.0001
Exhibit 33  Emails with Collins and Lennep re:   137
            County Turnout Data, 7/20/21,
            MS00000002
Exhibit 34  Emails with Collins and Lennep re:   140
            2019 Gov Race Turnout, 7/26/21,
            MS00000344
Exhibit 35  Emails with Collins and Lennep re:   142
            2018 Senate Turnout Data, 7/26/21,
            MS00000003
Exhibit 36  Emails with Collins and Lennep re:   143
            2020 Senate Race Turnout, 7/26/21,
            MS00000343
Exhibit 37  Emails with Collins and Lennep re:   143
            2019 Attorney General Turnout Data,
            7/29/21, MS00000170
Exhibit 38  Clarion-Ledger Article, MLC15        151

2 (Pages 2 - 5)

Page 6

1    THE VIDEOGRAPHER: Good morning. We are
2  going on the record at 9:20 a.m. Central Time on
3  December 18, 2023.
4        Please note that this deposition is being
5  conducted virtually and quality of recording depends
6  on the quality of the camera and the internet
7  connection of the participants. What is seen from
8  the witness and heard on screen is what will be
9  recorded. The audio and video recording will
10  continue to take place unless all parties agree to
11  go off the record.
12       This is a video-recorded deposition of
13  Madalan Lennep taken by counsel for the plaintiff in
14  the matter of Mississippi State Conference of the
15  National Association for the Advancement of Colored
16  People, et al., versus the State Board of Election
17  Commissioners et al., filed in the United States
18  District Court for the Southern District of
19  Mississippi Northern Division, case number
20  3:22-cv-734-DPJ-FKB.
21       This deposition is being located at 550
22  High Street, Jackson, Mississippi.
23       My name is Jason Hopkins. I'm the
24  videographer. The court reporter is Julie Brown.
25  We are both from the firm Veritext New York. Our

Page 7

1  concierge today, also from Veritext New York, is
2  Bailey Finnestad.
3        I am not related to any party in this
4  action nor am I financially interested in the
5  outcome.
6        If there are any objections to the
7  proceedings, please state them after the witness is
8  sworn. The witness may now be sworn.
9        MADALAN LENNEP,
10  having been first duly sworn, was examined and
11  testified as follows:
12       E X A M I N A T I O N
13  EXAMINATION BY MR. LAVELLE:
14    Q.  Ms. Lennep, my name is John Lavelle. I
15  am an attorney at the law firm Morgan Lewis &
16  Bockius. I am one of the attorneys representing the
17  plaintiffs in the lawsuit in which your deposition
18  has been requested.
19       Have you ever had your deposition taken
20  before?
21    A.  I have.
22    Q.  All right. So you're familiar generally
23  with how this works, but because we are doing this
24  virtually, in other words, I am participating in
25  this deposition by Zoom from another location, from

Page 8

1  Philadelphia, while you are located in Jackson,
2  there are some additional rules that you may not be
3  familiar with that I'm going to want to go over with
4  you.
5        So you have taken an oath to tell the truth
6  this morning. And we're going to ask you questions
7  and going to expect you to answer to the best of
8  your ability and to uphold that oath and provide
9  truthful answers. Okay?
10    A.  Okay.
11    Q.  We're going to be showing you some
12  documents at certain points. They'll be provided to
13  you on a screen. I believe that, for most of them,
14  if not virtually all of them, we also have them in
15  paper form so you can review them in order to be
16  able to answer questions on them. But I want to
17  make sure that you avail yourself of that
18  opportunity before you answer questions about
19  documents. Okay?
20    A.  Yes.
21    Q.  If I ask a question and you don't
22  understand it, let me know, and I'll be happy to
23  rephrase it. If I ask a question and you haven't
24  heard it and you need it read back, let me know and
25  either I'll repeat it or have the court reporter

Page 9

1  read it back.
2        If I ask a question and you answer it, I'm
3  going to assume you heard it, you understand it and
4  you're answering it to the best of your ability.
5  Okay?
6    A.  Yes.
7    Q.  I need the answers that you provide today
8  to be your own answers. And what that means is you
9  cannot get assistance from anybody else to answer
10  the questions, even though we are doing this
11  deposition remotely. So I would ask you not to
12  consult your cell phone or communicate
13  electronically with anybody else during the course
14  of this deposition. Is that understood?
15    A.  Yes.
16    Q.  If you need to take a break at any time,
17  you'll be permitted to do that. Just let me know
18  and we'll be happy to take a break. The only
19  exception is between the time I ask a question and
20  the time you answer that particular question. Okay?
21    A.  Yes.
22    Q.  All right. Any questions on any of those
23  instructions?
24    A.  No.
25    Q.  All right. So would you please state

3 (Pages 6 - 9)

1  your full name and spell your last name for the
2  record?
3      A.   Yes.  It's Madalan Gemmill Lennep,
4  L-E-N-N-E-P.
5      Q.   Where do you work, Ms. Lennep?
6      A.   I work for Pharos consulting services.
7      Q.   Is that your business?
8      A.   It is.
9      Q.   How long have you had that business?
10     A.   Since -- under that business name, which
11 is a d/b/a for an S corp, since 1996.
12     Q.   And what kind of business do you do
13 through Pharos?
14     A.   Technology consulting and project
15 management.
16     Q.   In that role you've done work for the
17 Mississippi Secretary of State's office; is that
18 correct?
19     A.   Yes.
20     Q.   You've done quite a lot of consulting
21 work for the Secretary of State's office over the
22 years, haven't you?
23     A.   Yes.
24     Q.   In fact, you've been referred to as the
25 guru of the SEMS system, haven't you?

1      A.   I've heard that, yes.
2      Q.   I'm not going to ask you to agree or
3  disagree with it.  But that's really why we want to
4  take your deposition today is we have a number of
5  questions for you relating to the SEMS system and
6  the information that was used from the SEMS system
7  as part of the redistricting process.  So that is
8  why we are taking your deposition today.  You
9  understand you're here today pursuant to a subpoena;
10 is that correct?
11     A.   Yes.
12          MR. LAVELLE:  I'd ask the concierge to
13 mark as an exhibit for identification what we have
14 at Tab 1A.
15          EXHIBIT TECH:  Please stand by.  This is
16 Lennep Exhibit 1.
17          (Exhibit 1 marked for identification.)
18 BY MR. LAVELLE:
19     Q.   So, Ms. Lennep, we have marked as
20 Lennep 1 a copy of the subpoena that was served to
21 you in connection with this matter.
22          Do you recognize this document?
23     A.   Yes.
24     Q.   Do you agree with me that this is the
25 subpoena that you are testifying under today?

1      A.   You know, I received a number of
2  subpoenas from -- in relationship to this.  So this
3  is the subpoena to appear, yes.
4      Q.   So this one is titled "Subpoena to
5  Testify At a Deposition in a Civil Action."
6          Do you see that, Ms. Lennep?
7      A.   I do.
8      Q.   All right.  And you understand that to
9  mean this is the subpoena requiring you to testify
10 at the deposition we're taking here today; right?
11     A.   Yes.
12     Q.   And you had other subpoenas that were
13 served on you in connection with this matter; right?
14     A.   That's correct.
15     Q.   Let me show you another one of those just
16 so we've got it all in front of us.
17          MR. LAVELLE:  I'll ask the concierge to
18 go to -- it's in the same section, it would be
19 Tab 1B.
20          EXHIBIT TECH:  Please stand by.  This is
21 Lennep Exhibit 2.
22          (Exhibit 2 marked for identification.)
23 BY MR. LAVELLE:
24     Q.   All right.  Ms. Lennep, what we've marked
25 for identification as Exhibit Lennep 2 is

1  plaintiffs' amended notice of deposition subpoena on
2  you.  And this is a filing that was made in the
3  court system last week, on December 13.
4          Have you ever seen this document before?
5          MR. BECKETT:  Hey, John, you referenced
6  as Exhibit 2.  It's actually exhibit, in our book,
7  1B.
8          MR. LAVELLE:  Yes.  Just to be clear, I'm
9  marking the exhibits in order.  I'm not going to use
10 the B or the C.  I'm just going to mark them all in
11 order.  The tabs are for reference.
12          MR. BECKETT:  Okay.
13 BY MR. LAVELLE:
14     Q.   So, Ms. Lennep, do you need that question
15 repeated to you?
16     A.   I haven't seen this before, no.
17     Q.   Do you understand that we're here by
18 agreement of the parties to take this deposition of
19 you virtually; correct?
20     A.   Yes.
21          MR. LAVELLE:  I'd ask the concierge to
22 mark as the next exhibit for identification what's
23 at Tab 1C, the subpoena for documents.
24          EXHIBIT TECH:  Please stand by.  This is
25 Lennep Exhibit 3.

4 (Pages 10 - 13)

Page 14

1    (Exhibit 3 marked for identification.)
2 BY MR. LAVELLE:
3    Q.   Ms. Lennep, we've marked for
4 identification, Exhibit 3, Lennep 3, the subpoena to
5 produce documents, information or objects or to
6 permit inspection if premises in a civil action
7 addressed to you in this matter.
8        Have you seen this before?
9    A.   Yes.
10   Q.   You received this subpoena to produce
11 documents; right?
12   A.   Yes.
13   Q.   And you've actually produced documents
14 pursuant to the subpoena; correct?
15   A.   Correct.
16   Q.   Why don't you walk us through the process
17 by which you collected records responsive to the
18 subpoena.
19   A.   I went to my email account and I pulled
20 the emails that were responsive to the subpoena and
21 had them converted over to a file to put on a USB
22 drive and electronically through ShareFile with the
23 attorney general's office.
24   Q.   When did you do that?
25   A.   Last week.

Page 15

1    Q.   The documents were produced to us a week
2 ago, December 11, 2023.  Does that help you remember
3 when you actually did the search for the documents
4 that were responsive?
5    A.   Yes.  So it was the week before.  It was,
6 like, the Thursday before.  So what was that, the
7 7th?
8        MR. BECKETT: That would be the 7th.
9 That's correct.
10       THE WITNESS: Yeah.
11 BY MR. LAVELLE:
12   Q.   So December 7, 2023, is when you would
13 have searched your email inbox to find these emails
14 that you produced; is that right?
15   A.   Yes.
16   Q.   What else did you do other than going
17 through your email inbox in order to comply with
18 this subpoena?
19   A.   I just read over the list to identify the
20 things that were relative.
21   Q.   Did you look for any responsive records
22 other than emails?
23   A.   No.
24   Q.   Do you know whether there are any
25 responsive documents other than emails?

Page 16

1    A.   I do not believe there are because, if
2 there were, I would have included those.
3    Q.   Well, we'll ask you some specific
4 questions about some specific areas as we go through
5 the deposition today.
6        Let me ask you a couple questions generally
7 about the consulting work that you do for the
8 Department of State.  Is that pursuant to a contract
9 that Pharos has with the State?
10   A.   Yes.
11   Q.   Who is the contract actually between, who
12 are the parties to that contract?
13   A.   It's my company and a company called
14 Knowledge Services.
15   Q.   Contract between Pharos Consulting and a
16 company called Knowledge Services; is that correct?
17   A.   That's correct.
18   Q.   What is Knowledge Services?
19   A.   Knowledge Services is a procurement and
20 contract management company that has a contract with
21 the Department of Information Services that is a
22 division of the State Of Mississippi or a department
23 of the State Of Mississippi.
24   Q.   So is Knowledge Services a private
25 entity?

Page 17

1    A.   I can't answer that.  I don't know.
2    Q.   Is it part of the state government of
3 Mississippi?
4        MR. BECKETT: Object to the form.
5 BY MR. LAVELLE:
6    Q.   You can answer.
7        MR. BECKETT: You can answer.
8        THE WITNESS: I mean, they are a
9 contractor with the Department of Information
10 Services.
11 BY MR. LAVELLE:
12   Q.   Do you know who the principals are of
13 Knowledge Services?
14   A.   I do not.
15   Q.   During the entire time that you have done
16 contracting work for the Mississippi Secretary of
17 State's office, has it been through contracts
18 between Pharos and Knowledge Services?
19   A.   No.
20   Q.   How has that changed over time?
21   A.   As my contracts have gone generally
22 through the Department of Information Technology,
23 whether they had internal procurement and an
24 internal general RFP or whether they chose to
25 outsource that with a company like Knowledge

5 (Pages 14 - 17)

Page 18

1 Services depends on how those contracts are actually
2 handled.
3    Q.    So there have been other entities other
4 than Knowledge Services that have been in that
5 position over the course of time; correct?
6    A.    I've contracted with the Secretary of
7 State's office, with the Department of Information
8 Services, and most recently with Knowledge Services.
9    Q.    So just to wrap this piece of it up, the
10 work that you have done in connection with the most
11 recent redistricting in the State of Mississippi has
12 been pursuant to a contract between Pharos and
13 Knowledge Services; is that correct?
14    A.    That's correct.
15    Q.    The contract, I assume, provides for some
16 compensation for Pharos for the work that you're
17 doing; is that right?
18    A.    Yes.
19    Q.    And how is Pharos compensated?
20    A.    Through an hourly rate. I'm not sure I
21 understand the question.
22    Q.    So I think I follow you. You do specific
23 tasks, you keep records of your time, and then you
24 submit bills for that time to Knowledge Services; is
25 that right?

Page 19

1    A.    That's correct.
2    Q.    And so you do keep time records of the
3 work that you do; is that right?
4    A.    That's correct.
5    Q.    How do you keep your time records?
6    A.    In a notebook.
7    Q.    You write it down yourself?
8    A.    Yes.
9    Q.    On paper?
10    A.    Yes.
11    Q.    And then, from your notebook, what do you
12 do in order to generate records that Knowledge
13 Services can use to provide payment to you?
14    A.    I enter it into an application called
15 dotStaff where I enter the hours per day.
16    Q.    All right. So did you look at your
17 notebook or notebooks in connection with the
18 subpoena that was served on you to see if there was
19 any responsive information in them?
20    A.    No.
21    Q.    Did you look in your time records to see
22 if there was any responsive information in those?
23    A.    No. I mean, the time records are
24 literally hours. So it's just not relative.
25    Q.    You don't describe what you've actually

Page 20

1 done in those records?
2    A.    No.
3    Q.    It's just hours or minutes; is that
4 correct?
5    A.    That's correct.
6    Q.    In your notebook, do you keep notes of
7 what actually you're doing?
8    A.    Yes.
9    Q.    All right. Are the notebooks that you
10 use in the course of the work that you perform
11 consulting for the Secretary of State's office in
12 addition to keeping time records?
13    A.    Yes.
14    Q.    And what kind of records do you keep or
15 information do you keep in those notebooks?
16    A.    I keep my hours, the date, individual
17 phone calls, work product information, and then I do
18 provide a summary of that to the Secretary of
19 State's office.
20    Q.    Tell us more about that summary that you
21 provide to the Secretary of State's office. What
22 does that look like?
23    A.    It's a spreadsheet that lists the person
24 I talked to, the county of that individual and then
25 the major topic of that call or contact, along with

Page 21

1 other project management duties.
2    Q.    Do you recall whether you submitted a
3 spreadsheet or spreadsheets like that to the
4 Secretary of State's office with respect to the work
5 you did on redistricting?
6        MR. BECKETT: Object to form.
7        THE WITNESS: Specifically with a county
8 or, for instance, when I compile the reports for,
9 for instance, compiling the reports for the
10 subpoena, yes, that would be a line item on my time
11 sheet.
12 BY MR. LAVELLE:
13    Q.    And I take it from your previous answers,
14 you did not check, in the course of collecting
15 records for compliance with the subpoena, whether
16 there were any spreadsheets that you had that
17 contained information that would be responsive to
18 the subpoena; right?
19        MR. BECKETT: Object to the form.
20        THE WITNESS: The notes I keep are so
21 much more simple than that. I mean, no. I do not
22 write spreadsheets in my notebook. I mean, I
23 don't -- it's very high level just to give me an
24 outline that provides me with the activities for the
25 day.

6 (Pages 18 - 21)

Page 22

1  BY MR. LAVELLE:
2      Q.  Understood.  Well, I just want to have an
3  understanding of what other records there might be
4  that are responsive to the subpoena that we haven't
5  yet seen.  So it sounds like there may be some notes
6  that you've taken in notebooks; correct?
7          MR. BECKETT:  Object to form.
8          Are you specifically relating to the 2022
9  redistricting?  Because every single item in the
10  subpoena is tailored to that.
11         MR. LAVELLE:  Brian, I appreciate the
12  comment, but I'm not taking your deposition.  I'm
13  talking to Ms. Lennep.
14         MR. BECKETT:  I object to the form.
15  BY MR. LAVELLE:
16     Q.  Ms. Lennep, do you have an understanding
17  of whether or not there is information responsive to
18  the subpoena in your notes -- in the notebooks?
19     A.  I don't believe there is.
20     Q.  But you didn't review those notebooks in
21  order to determine whether or not they had
22  responsive information.  That's what you told me
23  earlier; right?
24     A.  That's correct.  I did not go back and
25  look in those notebooks.  Because of the information

Page 23

1  that is in those notebooks, I did not believe there
2  was anything responsive to your subpoena there.
3      Q.  Okay.  Is there any reason that you're
4  aware of today why you wouldn't be able to review
5  those notebooks in order to be able to determine
6  whether they had responsive information to the
7  subpoena?
8      A.  No.
9      Q.  They still exist; right?  It's not like
10  you've discarded them or that they've disappeared;
11  correct?
12     A.  They still exist, yes.
13     Q.  And the same for the spreadsheets that
14  you submit from time to time to the Secretary of
15  State's office, you haven't checked those
16  spreadsheets to see if they have any responsive
17  information to the subpoena; correct?
18     A.  I guess I would need you to be a little
19  more specific about what you believe is responsive.
20  Because when I read through it, I didn't see any
21  requests that, as I have said before, that I thought
22  would include looking at my daily notes.  So can you
23  be a little more specific about --
24     Q.  Sure.
25     A.  -- what you're asking for?

Page 24

1      Q.  Sure.  I will say, Ms. Lennep, the way
2  this works is I ask the questions and you answer
3  them.  But I will be happy to show you what I'm
4  specifically talking about.  Let's go to the
5  document request, which I believe is page 5, starts
6  page 5 of this document.  You're aware that there's
7  an attachment to the subpoena, right, that describes
8  in detail what's requested; right?  You've looked at
9  this?
10     A.  Yes.
11     Q.  All right.  So let's go down to, I think
12  it's page 10 of the PDF.  Sorry.  Back one page.
13     A.  Okay.
14     Q.  Let's look at the first document request.
15  "All documents and communications related to
16  assistance or data provided by the Secretary of
17  State's office to the joint committee during the
18  2022 redistricting process."  And then a detailed
19  description of what those are.
20     A.  Wait.  I'm sorry.
21     Q.  Do you see that?
22     A.  What page are you looking at?
23     Q.  Look at page 5 of this document.  If you
24  look up on the screen, you can see it.  It's the
25  section that's entitled "Document Request."  And

Page 25

1  then there's a numbered series of specific requests
2  for documents.
3      A.  Okay.  So it reads "But not limited to
4  any data, shape files, analysis of voting patterns,"
5  that section?
6      Q.  Yes.  So this is the first document
7  request; correct?
8      A.  "Election data."  Right.  Yeah.  And the
9  only --
10     Q.  So this is an example of what I'm
11  requesting and -- what we've requested.  And all I'm
12  trying to nail down, Ms. Lennep, is:  Did you look
13  at your notebooks or the spreadsheets in order to
14  determine whether or not you had documents that were
15  responsive to this request?  I think your answers
16  are no, but tell me if I'm misunderstanding.
17         MR. BECKETT:  Object to the form.
18         THE WITNESS:  No.
19  BY MR. LAVELLE:
20     Q.  Okay.  We can address that down the road.
21  And, again, there's no reason that you're aware of
22  that you couldn't review those things as -- the
23  notebooks and the spreadsheets to determine whether
24  or not they have any responsive information; right?
25     A.  There is no reason why I couldn't.

7 (Pages 22 - 25)

Page 26

1  But --
2      Q.   You assumed that there was not responsive
3  information?
4      A.   Yes, that's where we started, yes.  I
5  assumed there was not any relative information.  And
6  if you could even read it, if you saw what I keep,
7  you would have a better understanding of what --
8  it's not that detailed.  It doesn't have critical
9  information in it.  It's literally documentation for
10 my activities for the day.  Like if I pull a report,
11 I may say, "Pulled reports on X."  But that's very
12 seldom.
13      Generally it's -- as I said, it's county
14 names, county phone numbers and discussion of the
15 activity, which would be -- and the majority of the
16 work I do is in support of the counties.  So very
17 little information relative to this request.
18      Q.   Understood.  All right.  And I agree with
19 you.  It would probably be helpful if I just saw
20 those records and be able to determine for myself
21 whether there's anything responsive or not.  But
22 we'll take that up after the deposition.  I just
23 wanted to make sure we had on the record here today
24 what the search was that you conducted in order to
25 comply with the subpoena.

Page 27

1      Are there any other records that you
2  maintain in the course of the work that you do at
3  Pharos, other than ones we've already talked about,
4  that you did not look at in order to determine
5  whether or not they had information responsive to
6  the subpoena?
7      A.   No.
8      Q.   All right.  We can take that exhibit down
9  now.
10      All right.  Ms. Lennep, when did you first
11 find out that your deposition was being taken in
12 this matter?
13      A.   Several weeks ago.
14      Q.   We're sitting here on December 18, 2023;
15 correct?
16      A.   That's correct.
17      Q.   So within the last month or so you found
18 out your deposition had been requested?
19      A.   Honestly, it was a little confusing
20 because I got so many different subpoenas, but it
21 looks like the one where I'm commanded to appear was
22 dated by your team on 11/20.  So that would be
23 within the last month or so.
24      Q.   So about the timing of that, that
25 November 20th would have been when you first found

Page 28

1  out your deposition was going to be taken; is that
2  correct?
3      A.   Yes.
4      Q.   All right.  Who's representing you at the
5  deposition today?
6      A.   Ryan.
7      Q.   And when was it determined that Ryan was
8  going to represent you at your deposition?
9      A.   Probably -- it was after I received this
10 deposition -- I mean the subpoena.  And so probably,
11 let's say, three weeks ago.
12      Q.   All right.  Who is paying for Ryan's time
13 to represent you today, do you know?
14      A.   I don't know.
15      Q.   Are you being compensated for your time
16 testifying here today?
17      A.   Through my work with the Secretary of
18 State's office, yes.
19      Q.   So you expect that you'll be submitting
20 records in that format that we talked about earlier
21 to the Secretary of State's office to -- actually to
22 Knowledge Services and requesting reimbursement for
23 your time; correct?
24      A.   That's correct.
25      Q.   What is your current hourly rate?

Page 29

1      A.   $83 an hour.
2      Q.   Do you change that rate for testifying at
3  depositions as opposed to other work that you do?
4      A.   It's a flat rate that -- it's the only
5  rate that's in the contract.
6      Q.   So did you have a chance to prepare for
7  your deposition by speaking with anyone?
8      A.   Yes.
9      Q.   I don't want to know about the substance
10 of any discussions that you had with counsel, but I
11 am entitled to find out who you met with.  So can
12 you give me the names of the people you met with in
13 order to prepare for your deposition?
14      A.   Yes, Ryan and Rex and Leigh.  So the
15 attorneys that are with us in the room today.
16      Q.   Rex is the counsel from the attorney
17 general's office; correct?
18      A.   Yes, Rex Shannon.
19      Q.   And Leigh is the counsel from the
20 Secretary of State's office; is that correct?
21      A.   That's correct.
22      Q.   Anybody else you met with in addition to
23 Ryan, Rex and Leigh to prepare for your deposition?
24      A.   Doug Miracle, who was also with the
25 attorney general's office was also in the room with

8 (Pages 26 - 29)

Page 30

1 us.
2    Q.    Okay. There's a counsel who's on the
3 call today named Mike Wallace. Do you know
4 Mr. Wallace?
5    A.    I do.
6    Q.    Did Mr. Wallace participate in any of
7 your prep sessions?
8    A.    No, he did not.
9    Q.    Did you have anyone participating by
10 telephone or by video in your prep sessions in
11 addition to people who were there in person with
12 you?
13    A.    No.
14    Q.    Did you speak with anybody other than
15 counsel in order to prepare for your deposition?
16    A.    No.
17    Q.    How many prep sessions did you have for
18 your deposition?
19    A.    One.
20    Q.    When was that?
21    A.    On Friday -- Thursday. Sorry. Thursday
22 afternoon.
23    Q.    Today is Monday, December 18, 2023. We
24 established that earlier; right?
25    A.    Yes.

Page 31

1    Q.    So that would have been on Thursday,
2 December 14, 2023, you met with counsel to prepare
3 for the deposition?
4    A.    Yes.
5    Q.    How long was the meeting?
6    A.    About an hour and a half.
7    Q.    Did you review any documents in order to
8 prepare for your deposition?
9    A.    No.
10    Q.    Anyone else you speak to, other than
11 people we've already mentioned, in order to prepare
12 for your deposition?
13    A.    No.
14    Q.    What do you understand this lawsuit to be
15 about?
16        MR. BECKETT: Object to the form.
17        THE WITNESS: The lines that were drawn
18 for the legislative districts based on the census
19 information.
20 BY MR. LAVELLE:
21    Q.    And you understand that you provided
22 information to the Secretary of State's office and
23 to certain state officials in connection with the
24 redistricting process; correct?
25        MR. BECKETT: Object to the form.

Page 32

1        THE WITNESS: I understand that I
2 provided historical information from SEMS but not
3 related to drawing of the lines or the census data.
4 BY MR. LAVELLE:
5    Q.    You yourself, Ms. Lennep, were not
6 involved in drawing lines; is that correct?
7    A.    That's correct.
8    Q.    You were not given the opportunity to
9 review any proposed maps; is that right?
10    A.    That's correct.
11    Q.    You were not asked for any input on any
12 proposed maps?
13    A.    That's correct.
14    Q.    And you don't have any opinion, as we sit
15 here today, as to whether or not the maps that were
16 drawn were appropriately drawn or inappropriately
17 drawn; is that correct?
18        MR. BECKETT: Object to the form.
19        You can answer.
20        THE WITNESS: That's correct. I do not
21 have an opinion.
22 BY MR. LAVELLE:
23    Q.    And as we sit here today, you don't
24 expect to be testifying at trial on behalf of the
25 Secretary of State's office or the State of

Page 33

1 Mississippi in support of the proposed maps, do you?
2    A.    No.
3    Q.    All right. Let's get a little bit more
4 background information about your experience,
5 Ms. Lennep, if you wouldn't mind. Are you familiar
6 with a website called LinkedIn?
7    A.    Yes.
8    Q.    What is LinkedIn?
9    A.    It's a social media platform, primarily
10 for business.
11    Q.    And you use LinkedIn; is that correct?
12    A.    I have an account on LinkedIn, yes, I do.
13    Q.    Like many professionals, you've prepared
14 a profile of yourself in order to present your
15 experience and credentials to the world out there;
16 correct?
17    A.    Yes, correct.
18    Q.    All right. Let's go to the next exhibit.
19        MR. LAVELLE: I'd ask the concierge to
20 mark as the next exhibit for identification what is
21 at Tab 3.
22        EXHIBIT TECH: Please stand by. This is
23 Lennep Exhibit 4.
24        (Exhibit 4 marked for identification.)
25 BY MR. LAVELLE:

9 (Pages 30 - 33)

Page 34

1    Q.   All right. Ms. Lennep, what we marked as
2   Exhibit 4, Lennep 4, is a printout that we generated
3   from LinkedIn in your profile. I can tell you that
4   we did have some printing problems. So the physical
5   copy that is there with you may not be the best
6   copy. I think we did correct that in what we have
7   in the electronic file.
8         MR. BECKETT: Let's look at the screen.
9   He's saying that it's corrected.
10  BY MR. LAVELLE:
11   Q.   Right. So what I'd like to suggest is
12  maybe first if you can take a look at it, you can
13  scroll through the whole thing if you want to, but I
14  want to know whether you can identify whether or not
15  this is your LinkedIn profile.
16   A.   Yes, it appears to be my LinkedIn
17  profile.
18        MR. BECKETT: How many pages is it? I
19  can't see it. Pardon me. I don't mean to
20  interrupt.
21        THE WITNESS: It's four.
22        MR. BECKETT: It's four pages?
23        MR. LAVELLE: Yeah.
24  BY MR. LAVELLE:
25   Q.   And you prepared this profile,

Page 35

1   Ms. Lennep?
2    A.   Yes.
3    Q.   Do you maintain it from time to time,
4   update it as necessary?
5    A.   I don't think I've updated it in the past
6   probably four to five years. I don't know. It's
7   not something that I actively manage, no.
8    Q.   When you prepared it, you provided what
9   you believed to be accurate information; correct?
10   A.   Yes.
11   Q.   We'll go over a couple specific things in
12  here. I think it's just easier to go over your
13  background with something in front of us to guide
14  the discussion so that's why we pulled this up. And
15  if you wouldn't mind going down to your education
16  section of this, I think it's on the third page.
17  Let's start there.
18   A.   Yes.
19   Q.   All right. So there are two entries
20  under education. Tell us about your education as
21  identified here in your LinkedIn profile?
22   A.   I took classes at the University of
23  Southern Mississippi in the '84-'85 time frame, and
24  I attended Mississippi Gulf Coast Junior College and
25  have an associate's degree in general business and

Page 36

1   accounting.
2    Q.   And where is the associate's degree from,
3   which school?
4    A.   The Mississippi Gulf Coast Junior College
5   is what it was called at the time.
6    Q.   Does it have a different name now?
7    A.   I think nobody calls it junior college
8   anymore. They call it community college. But it's
9   the same thing.
10   Q.   Now, your current area of expertise is
11  project management and technology. Would you agree
12  with me?
13   A.   Yes.
14   Q.   Did you have any formal education in that
15  area or have you learned all of your expertise in
16  the course of your professional career?
17   A.   The -- my technology career started as an
18  offshoot of my accounting experience. So the first
19  company that I worked for that was computer based,
20  we actually sold and supported a billing system for
21  hospitals. So it grew out of the accounting. Back
22  in the '80s, most everybody bought computers
23  specifically for accounting. So that's where it
24  started.
25        Since then, I've also passed -- taken and

Page 37

1   have been certified as a project management
2   professional, which is an international
3   certification that provides for strategies and
4   education in the world of project management,
5   specifically in technology. Although there are
6   other aspects of it as well.
7    Q.   When did you become a certified project
8   management professional?
9    A.   Maybe 2009. It's been a while.
10   Q.   Understood. And obviously I'm going to
11  be asking you questions, especially in this part of
12  the deposition, that go back a while. Obviously we
13  just want the best of your recollection. That is
14  fine.
15        Can you describe for us briefly what the
16  process is in order to become a certified project
17  management professional?
18   A.   Yes. You attend a course, and then there
19  is a four-hour monitored exam that you have to pass
20  in order to receive the certification.
21   Q.   Is there any continuing certification
22  requirements such as education or retesting?
23   A.   Not retesting, but certainly, yes,
24  education. To maintain your certification, you have
25  to obtain a certain number of, they call it, instead

10 (Pages 34 - 37)

Page 38

1 of CL it's PL units, so project management learning
2 units in order to maintain the certification.
3    Q.   Now, scrolling backwards or up in the
4 LinkedIn profile, we now get to the information
5 about your professional history. And the first
6 entry that you have here is as senior account
7 representative for Wang Laboratories; is that right?
8    A.   That's correct.
9    Q.   So tell us about the work that you did at
10 Wang Laboratories as a senior account
11 representative. What did you do there?
12    A.   Development of sales plans and project
13 management for solution software and hardware
14 products, including the Wang product line and IBM
15 AS/400, RS/6000 and PCs.
16    Q.   Now, this work was done during 1985
17 through 1992, according to your LinkedIn profile; is
18 that right?
19    A.   That's correct.
20    Q.   I assume that this predates the
21 development of the current SEMS system?
22    A.   Yes.
23    Q.   Was this a precursor to that system that
24 you were working on, or were you working on
25 nonelection projects?

Page 39

1    A.   Nonelection projects.
2    Q.   But generally speaking, what was the type
3 of work that you were doing for the State of
4 Mississippi when you were working at Wang?
5    A.   I had some state department accounts, for
6 instance, Secretary of State was -- no, actually
7 they were a prospect at that time, I didn't actually
8 sell them an imaging system until Data General. But
9 the Department of Health, we had the system that
10 supported vital records. I had federal government
11 accounts like the naval air base in Pensacola. I
12 had commercial accounts like LDDS, which became
13 WorldCom, and MCCA, which became SkyTel.
14      So, I mean, we were selling hardware and
15 software solutions to both commercial and
16 governmental accounts. Had nothing to do with
17 elections or the Secretary of State at that point.
18    Q.   And then you left Wang Laboratories in
19 1992 and moved to Data General; is that right?
20    A.   That's correct.
21    Q.   And describe for us the type of work that
22 you did at Data General. Was it similar to what you
23 did at Wang or did it have a different focus?
24    A.   No, it was basically exactly the same,
25 just different products and software.

Page 40

1    Q.   You worked at Data General for a period
2 of approximately four years, is that right, through
3 1996?
4    A.   That's correct.
5    Q.   Did you do any work relating to voting
6 records or elections for the State of Mississippi
7 while you were at Data General?
8    A.   No.
9    Q.   Scrolling upwards in your LinkedIn
10 profile, we now get to the current work that you're
11 doing. And all of these next entries are under the
12 general title of Pharos Consulting Services; right?
13    A.   Yes.
14      MR. BECKETT: Can we scroll up? She
15 can't see that.
16      MR. LAVELLE: That's fine. Let's go up
17 to the top of that page.
18      MR. BECKETT: Okay. There. Thank you.
19 BY MR. LAVELLE:
20    Q.   So Pharos Consulting Services you started
21 in 1996; is that right?
22    A.   Yes.
23    Q.   Why did you decide to open your own
24 consulting service at that time?
25    A.   I had a baby, and the travel, when you're

Page 41

1 covering a three-state area with a major computer
2 company at that time, was more than I wanted to deal
3 with. And so I decided to resign from that career
4 and started doing independent consulting.
5    Q.   You have three different categories or
6 titles of information here of the different type of
7 work you do at Pharos. Maybe we can read them from
8 the bottom to the top. I see the one that's here
9 first is president/senior consultant. Maybe if
10 you'd just explain to us generally how you intended
11 to organize this. Why did you describe certain
12 types of work under that category as opposed to the
13 other two categories that you have here?
14      MR. BECKETT: Object to the form.
15      THE WITNESS: Yeah. I'm sorry. Can you
16 scroll up to the top again?
17 BY MR. LAVELLE:
18    Q.   Sure. Take your time and look at this.
19 I know you may not have looked at this recently. I
20 want to make sure you've had a chance to review the
21 whole page.
22    A.   I'm trying to see if there's...
23      MR. BECKETT: It looks different on the
24 screen. So you can put the paper aside.
25 BY MR. LAVELLE:

11 (Pages 38 - 41)

Page 42

1  Q.  Right. We had a problem with the
2  printout. I'll just explain to you, the printout
3  for some reason did not include all of the
4  information that you have here. So that's why we
5  put the full information in the electronic version.
6  So I apologize for the printing error.
7  A.  Okay. It was just a way in my mind to
8  break down the different activities by either --
9  yeah, the finance company was a newer project. So
10  it looks like probably around February 2020 was
11  probably the last time this was updated.
12  So -- and then the work with Secretary of
13  State is to have a project management consultant.
14  And then just general commercial is that third -- is
15  that third area. So information on what -- what
16  else, outside of those two very specific
17  opportunities, I have a skill set for. I mean, I
18  looked at LinkedIn as kind of a marketing piece.
19  Q.  Right. So the top entry here, the
20  program manager -- I'm sorry -- for
21  Southeastern-based finance company, that's obviously
22  not related to the work you do for the Secretary of
23  State's office; correct?
24  A.  That's correct.
25  Q.  A different project all together. The

Page 43

1  second entry that you have here is HAVA project
2  manager/consultant. HAVA is Help America Votes Act;
3  is that correct?
4  A.  That's correct.
5  Q.  So this second bullet point, the HAVA
6  project manager/consultant, captures the work that
7  you've done for the Secretary of State's office and
8  for counties in the state of Mississippi; correct?
9  A.  Yes.
10  Q.  All right. And then third bullet that
11  you have there, president/senior consultant, is a
12  general description of the various types of work
13  that you have done for all of your consulting
14  clients; correct?
15  A.  That's correct.
16  Q.  All right. So let's focus in. I want to
17  ask you a few follow-up questions about the HAVA
18  project manager/consultant entry that you have here.
19  You write "Since 2003, I provided project management
20  and consulting for the purchase, implementation, and
21  ongoing support of two statewide projects to
22  implement the federal HAVA legislation passed by
23  Congress in 2002."
24  Did I read that correctly?
25  A.  Yes.

Page 44

1  Q.  That's accurate; right?
2  A.  Yes.
3  Q.  So a follow-up question, did you start
4  doing work on election or voting record projects for
5  the Secretary of State's office prior to 2003, or
6  was 2003 when that work first started?
7  A.  No, prior to 2003.
8  Q.  What kind of work did you do in election
9  or voting records prior to 2003?
10  A.  Prior to HAVA, the Secretary of State's
11  responsibility with election was mainly just the
12  gathering of reports from the counties. So I worked
13  on a reporting -- an election reporting system where
14  we took the information the counties provided and
15  entered into a database.
16  Q.  And with the passage of HAVA in 2002,
17  there were some changes that were made to the way
18  that the records were kept; is that right?
19  A.  That's correct.
20  Q.  How would you describe what the changes
21  had to be made in order to comply with the new law
22  that was passed in 2002?
23  A.  Well, there had to be a statewide voter
24  registration system implemented. The State had to
25  replace any punch card lever machines. There were a

Page 45

1  number of requirements, as part of HAVA, to receive
2  the federal funds that were used to implement these
3  systems.
4  Q.  And you described these two projects, the
5  first one is the statewide voter registration
6  system; correct?
7  A.  Yes.
8  Q.  Is that another term for the SEMS system
9  or is it something different?
10  A.  No, that is SEMS.
11  Q.  So SEMS stand for statewide election
12  management system; is that right?
13  A.  That's correct.
14  Q.  And that's the formal title that you use
15  and that other folks use in Mississippi to refer to
16  Mississippi's statewide voter registration system;
17  is that right?
18  A.  That's correct.
19  Q.  And then the other related project that
20  you worked on was the statewide voting machine
21  system project?
22  A.  That's correct.
23  Q.  And that project related to the rollout
24  of HAVA-compliant voting machines throughout the
25  state?

12 (Pages 42 - 45)

Page 46

```
1     A.   That's correct.
2          MR. BECKETT: Hey, John, in the next five
3  or ten minutes, if you get to a natural stopping
4  point, we might want to take a small break.
5          MR. LAVELLE: This is a good time because
6  we're going to move to a different document,
7  different topic. So now would be a good time to
8  take a break.
9          THE VIDEOGRAPHER: The time is 10:14 a.m.
10 We're off the record.
11         (Off the record)
12         THE VIDEOGRAPHER: We're back on the
13 record. The time is 10:26 a.m.
14 BY MR. LAVELLE:
15    Q.   All right. Ms. Lennep, we're going to
16 move to another document here. We printed out a
17 page from another website. Do you maintain a
18 website for your business, for Pharos?
19    A.   Yes.
20         MR. LAVELLE: All right. Let's mark as
21 the next exhibit for identification what's at Tab 4.
22 I'll ask the concierge to mark that as the next
23 exhibit.
24         EXHIBIT TECH: Please stand by. This is
25 Lennep Exhibit 5.
```

Page 47

```
1     (Exhibit 5 marked for identification.)
2  BY MR. LAVELLE:
3     Q.   All right. Ms. Lennep, do you recognize
4  what we've marked for identification as Exhibit 5?
5     A.   Yes.
6     Q.   What is it?
7     A.   It's a page from the website.
8     Q.   Page from the website for your business,
9  Pharos Consulting; correct?
10    A.   Yes.
11    Q.   And specifically the portion of the
12 website that has a description called "About Our
13 Consultants" that describes you and your
14 professional background; correct?
15    A.   Correct.
16    Q.   And the information is all --
17    A.   Look, it says in 2009. I was right on
18 the PMP.
19    Q.   All right. So we've got confirmation.
20 Well, let me ask you a couple of questions.
21 Ms. Lennep, you prepared this description; right?
22    A.   Yes.
23    Q.   And you understood it to be accurate at
24 the time you prepared it; correct?
25    A.   Yes.
```

Page 48

```
1     Q.   And it's accurate today to the best of
2  your knowledge; right?
3     A.   Without reading over it because,
4  obviously, I mean, again, I don't constantly update
5  this information.
6     Q.   Let's just walk through it to make sure
7  that we --
8     A.   The copyright on this was 2018.
9     Q.   So --
10    A.   If you look down at the bottom.
11    Q.   I don't want to shortchange this. I just
12 want to make sure we had a record of this. I am
13 trying to use records that you've prepared because I
14 thought it would be the quickest way to establish
15 it. So you write here "Madalan Lennep, PMP, is
16 owner and lead consultant of Pharos"; right?
17    A.   Yes.
18    Q.   And that's accurate; correct?
19    A.   That's correct.
20    Q.   Can you read for us the next sentence
21 that is written there?
22    A.   "She began her work in election
23 consulting in 1996 with the Mississippi Secretary of
24 State's office." And that's when we implemented the
25 election reporting system I told you about earlier.
```

Page 49

```
1     Q.   And that statement is correct, right,
2  accurate?
3     A.   That is correct.
4     Q.   All right. Please read for us the next
5  sentence you wrote there. Starting with "Since
6  2003."
7     A.   "She has provided consulting for the
8  purchase, implementation and ongoing support of two
9  statewide election projects totalling over
10 $50 million; the statewide voting machine system and
11 statewide election management system" --
12         (Court reporter clarification.)
13 BY MR. LAVELLE:
14    Q.   I'm sorry. That statement is accurate;
15 correct?
16    A.   Yes.
17    Q.   All right. I'll read the next one just
18 to give you a little bit of a break. The next
19 sentence that you wrote here is "In both of these
20 projects, she provided consulting including the
21 development of specifications, the evaluation of
22 proposals, contract negotiation, software analysis
23 and customization, hardware implementation, quality
24 assurance and testing, monitor and control of
25 deliverables, risk management, training
```

13 (Pages 46 - 49)

Page 50

1  documentation and conducting training, voter
2  outreach education, database coding and election
3  support."
4      Did I read that correctly?
5      A.  Yes.
6      Q.  And all of that is accurate; correct?
7      A.  Yes.
8      Q.  All right.  So this has been a
9  substantial part of your professional life, hasn't
10  it, doing this work supporting the Secretary of
11  State's office?
12      MR. BECKETT:  Object to form.
13      You can answer.
14      THE WITNESS:  It has -- depending on the
15  time and the work that needs to be done, it has been
16  a considerable portion, although not a full-time
17  relationship.
18  BY MR. LAVELLE:
19      Q.  You have other clients you do work for in
20  addition to the Secretary of State's office, in
21  other words?
22      A.  Yes.
23      Q.  Do you have anybody else who works for
24  you at Pharos on the projects you work on for the
25  Secretary of State's office?

Page 51

1      A.  I have contractors.  I'm the only
2  employee.
3      Q.  And what kind of work do those
4  contractors do in connection with your projects for
5  the Secretary of State's office?
6      A.  They don't do any work with the Secretary
7  of State's office at all.
8      Q.  That's all you; is that right?
9      A.  That's all me.
10      Q.  So when we look a little later at the
11  requests that you receive from individuals in
12  connection with redistricting, those would have all
13  been handled by you individually and not been anyone
14  else at Pharos; is that right?
15      MR. BECKETT:  Object to the form.
16      THE WITNESS:  Yes, that's correct.
17  BY MR. LAVELLE:
18      Q.  All right.  We're finished with that
19  exhibit.
20      You have provided some written declarations
21  in connection with litigation from time to time for
22  the Secretary of State's office, haven't you?
23      A.  I have.
24      Q.  I want to show you a couple of those
25  because I think that there are some statements that

Page 52

1  you've made in there that will be helpful in terms
2  of making a record of what your background and
3  knowledge is, and hopefully it will speed up the
4  deposition here today.
5      A.  Okay.
6      Q.  So let's look, first, at what is in your
7  tab at 5A.
8      MR. LAVELLE:  And let's mark that for
9  identification, Ms. Concierge, as the next exhibit.
10  It's the declaration in a case called True the Vote
11  et al., versus the Honorable Delbert Hosemann.  I'm
12  sorry if I'm mispronouncing his name.
13      THE WITNESS:  No that's correct.
14      EXHIBIT TECH:  That will be Exhibit 6.
15      (Exhibit 6 marked for identification.)
16  BY MR. LAVELLE:
17      Q.  All right.  So we have in front of you,
18  Ms. Lennep, and we've marked for identification,
19  Exhibit 6, a declaration of Madalan Lennep in that
20  case, True the Vote versus the Honorable Delbert
21  Hosemann.
22      Do you recognize this?
23      A.  Yes.  I mean, I remember this case, yes.
24      Q.  Is this your declaration that you
25  provided to the court in that case?

Page 53

1      A.  I'm sure it is.  I signed it in 2014, so
2  ten years ago, yes.
3      Q.  So looking at the last page, do you see
4  at the bottom, there's a signature?
5      A.  Yes.
6      Q.  Is that your signature?
7      A.  Yes.
8      Q.  And right above the signature, you state
9  "I declare, under penalty of perjury, that the
10  foregoing is true and correct, executed on
11  August 14, 2014"; correct?
12      A.  Correct.
13      Q.  So does looking at this help you recall
14  that this is the declaration that you executed in
15  this case, True the Vote, plaintiffs, versus the
16  Honorable Delbert Hosemann?
17      A.  Yes.  Like I said, yes, I signed it ten
18  years ago, yes.
19      Q.  All right.  And when you signed it, you
20  understood and believed everything that was in here
21  to be accurate to the best of your knowledge;
22  correct?
23      A.  Of course.
24      Q.  Yes.  All right.  So let's go over a
25  couple of the things that you said in here just so

14 (Pages 50 - 53)

Page 54

1 we've got a record of it. Let's go to paragraph 2.
2 Can you read for us what you wrote in paragraph 2?
3     A.   "I'm a Mississippi voter and employed by
4 Pharos Consulting Services as a certified project
5 management professional and elections consultant.
6 In that capacity, I began working with the Secretary
7 of State's office, elections division staff, in 2003
8 on selection, implementation and installation of the
9 statewide election management system, SEMS, the
10 statewide voting machine system and other election
11 related projects. I currently work closely with the
12 elections division staff to provide support and
13 project assistance for those programs."
14     Q.   And that was accurate at the time you
15 signed this; correct?
16     A.   Correct.
17     Q.   Can you read for us what you wrote in
18 paragraph 3 of this declaration, please?
19     A.   "SEMS is a statewide election management
20 system used by all 82 counties for voter
21 registration, election management and other voter
22 roll-related activities."
23     Q.   And then the first sentence of the next
24 paragraph, paragraph 4?
25     A.   "SEMS is designed so that voter

Page 55

1 registration records are maintained in a manner that
2 complies with state and federal law, including the
3 National Voting Rights Act, NVRA."
4     Just the first sentence, that's it; right?
5     Q.   Yes, let's stop there.
6     And that's accurate in terms of the design
7 of SEMS; right?
8     A.   Yes.
9     Q.   Can you read for us the next sentence,
10 please?
11     A.   "A voter roll includes a list of all
12 registered voters, both active and inactive voters,
13 in a county and contains the voter's name, address,
14 date of registration, precinct, voting districts and
15 voting history."
16     Q.   Now, you're referring to a voter roll
17 here. A voter roll is a record that is used at an
18 individual polling place with respect to an election
19 that's being conducted; is that right?
20     A.   The voting roll is a list of all the
21 active and inactive voters.
22     Q.   What is the difference between an active
23 and inactive voter in Mississippi?
24     A.   An active voter has full voting rights
25 under NVRA. An inactive voter is an individual who

Page 56

1 there has been a trigger that they no longer live
2 where they are registered. So they can go to a
3 voting place, and if they go to the correct voting
4 place, they can cast an affidavit or provisional
5 ballot and have that ballot count, assuming that
6 they meet all of the legal requirements for voting.
7     Q.   What would cause a voter to be put on the
8 inactive voter list?
9     A.   That's actually covered in the National
10 Voting Rights Act. We call it a trigger. It is an
11 indication that they no longer live where they are
12 registered. So that could be a returned jury
13 summons, a returned voter registration card.
14 Generally it's mail -- returned mail related. And
15 it is the trigger that provides an opportunity to
16 put them on the inactive list so that, when they
17 vote provisional ballot, the election officials get
18 updated information so that they can make sure they
19 are placed in the right precinct and are receiving
20 the correct ballot when they vote.
21     Q.   There is a periodic updating of the voter
22 registration records to reflect, for example,
23 reported deaths of individuals; correct?
24     A.   That's correct.
25     Q.   How is that updating done in Mississippi?

Page 57

1     A.   We have an electronic interface with the
2 Department of Health, vital records division. They
3 send us a report, and we load that information into
4 SEMS so that the local election officials can review
5 it and, if they determine a match with that
6 information, then they can purge that voter.
7     Q.   So if a voter is identified as a
8 deceased, is that voter moved to inactive status or
9 is that voter's record removed entirely?
10     A.   No. Inactive status is only in
11 relationship to the National Voting Rights Act. So
12 you wouldn't make a deceased individual inactive.
13 Again inactivity is -- and it's a little confusing,
14 but it's the way the federal law was written.
15 Inactive means that we don't know where you live
16 anymore, basically. So that would not apply to a
17 deceased voter.
18     Q.   If the voter votes by provisional ballot
19 and that ballot is counted, does that voter get
20 restored to active status?
21     A.   Yes.
22     Q.   And how is that accomplished?
23     A.   Well, the information that's on the
24 affidavit envelope, which includes, under that
25 affidavit, their current address. So the voter

15 (Pages 54 - 57)

Page 58

1  registration record in SEMS is updated with the
2  current address, and the election officials in the
3  county returns that status of the voter to active.
4    Q.   Does the SEMS system record whether or
5  not an individual voter has attempted to vote by
6  provisional ballot in a particular election?
7    A.   It has the capability to record that,
8  yes.
9    Q.   Do you know whether, as a matter of
10  practice, that is recorded --
11    A.   Yes.
12    Q.   -- as a record that is kept and
13  maintained?
14    A.   We certainly encourage that. But that
15  action and activity is up to the local election
16  officials.
17    Q.   And by "local," you mean county by
18  county?
19    A.   Exactly, yes. Mississippi is what we
20  call a bottom-up state. All of the power for the
21  election is at the county level.
22    Q.   So the information of whether or not
23  someone has voted by provisional ballot, it would be
24  up to the individual county as to whether or not
25  they recorded that?

Page 59

1    A.   That is correct.
2    Q.   I think we're finished with this
3  document.
4      MR. LAVELLE: Let's now mark for
5  identification what is at 5B of the book. Mark that
6  as the next exhibit.
7      EXHIBIT TECH: This is Exhibit 7.
8      (Exhibit 7 marked for identification.)
9  BY MR. LAVELLE:
10    Q.   So, Ms. Lennep, I've marked for
11  identification as Exhibit 7, a motion package that
12  was filed in a case that was filed in federal court.
13  The case was called Thomas versus Bryant. You're
14  certainly welcome to look at the whole thing, but
15  what I want to ask you questions about is what's
16  marked as Exhibit B to this motion. It's an
17  affidavit of yours.
18      Let me know when you've had a chance to
19  look at that and are ready to answer questions about
20  it.
21    A.   Okay.
22    Q.   All right. So, Ms. Lennep, we are now at
23  the portion of this exhibit that is identified
24  within it as Exhibit B. It is an affidavit that you
25  provided.

Page 60

1      Do you recognize this?
2    A.   Yes.
3      MR. LAVELLE: All right. Turn to the
4  third page of this document. Scroll down to the
5  bottom a little bit there.
6  BY MR. LAVELLE:
7    Q.   And do you see there's a signature that
8  appears above your name. Is that your signature?
9      Take your time. Just let me know when
10  you've got it in front of you and can answer
11  questions about it.
12    A.   Yes, that is my signature.
13    Q.   And you signed it on the fourth day of
14  December 2018; correct?
15    A.   Yes.
16    Q.   And your signature, as you can see on the
17  next page, was notarized; right?
18    A.   Yes.
19    Q.   And this is an affidavit that you
20  submitted under oath in the case of Thomas versus
21  Bryant; correct?
22    A.   Correct.
23    Q.   And everything that you stated here was
24  truthful and accurate to the best of your ability;
25  isn't that right?

Page 61

1    A.   Yes.
2    Q.   Let's turn to paragraph 3 of this
3  document where there's a detailed description of the
4  SEMS system that I want to just go over with you and
5  make sure that you agree with it, that it's an
6  accurate description.
7      So the first sentence here is "SEMS, using
8  Hewlett-Packard's Electus Voter Registrations and
9  Election Management software was implemented in 2005
10  as part of the Help America Vote Act (HAVA)
11  initiative"; right?
12    A.   Yes.
13    Q.   "SEMS has been used as the voter
14  registration system for all 82 Mississippi counties
15  since February of 2006." And that's accurate;
16  right?
17    A.   Yes.
18    Q.   "SEMS provides statewide comprehensive
19  voter registration functionality, voter roll
20  maintenance functionality, election management, jury
21  management, petition management. Interfaces include
22  the Department of Public Safety, Department of
23  Health, Administrative Office of the Courts, Global
24  Election Management System (GEMS) result (for voting
25  machine system), the National Change of Address

16 (Pages 58 - 61)

Page 62

1 (NCOA) and Military/Overseas Voters (MOVE Act) for
2 ballots"; right?
3    A.    Correct.
4    Q.    And that's accurate; correct?
5    A.    Correct.
6    Q.    All right. And the second paragraph, you
7 write "The system currently contains 1.8 million
8 active voters with all registrations taking place at
9 each county circuit clerk's office"; is that right?
10    A.    That's correct.
11    Q.    Is there any registration work that is
12 done on a basis run by the Secretary of State's
13 office?
14    A.    No.
15    Q.    So if someone registers to vote, for
16 example, when they obtain a license to drive, how is
17 that handled?
18    A.    Well, the previous paragraph where it
19 says "interfaces include the department of public
20 safety," there is an electronic interface that
21 provides that information to SEMS. It's separated
22 out by county and it's loaded for the counties to
23 process, just like any other voter registration.
24    Q.    Let's go to paragraph 4. And can you
25 read what you wrote in paragraph 4, please, for the

Page 63

1 record?
2    A.    "Upon passage of any redistricting plans,
3 statewide or local, each counties' election
4 officials are responsible for redistricting in SEMS.
5 This is an extensive process which is implemented in
6 SEMS by changing district precinct split and address
7 range boundaries based on the information provided.
8 The Secretary of State's office provides training
9 and help desk support in these efforts but the work
10 is completed by the county."
11    Q.    All right. Let's just pause there. What
12 you wrote there that is still an accurate
13 description today of what happens upon
14 redistricting; is that right?
15    A.    That's right.
16    Q.    And that work is completed by the county,
17 although the Secretary of State's office does
18 provide training and support?
19    A.    That's correct.
20    Q.    Let's read what you wrote in paragraph 5
21 of your affidavit here.
22    A.    "Accordingly, changing the district line,
23 including those of district 22, could impact a
24 number of counties based on the impact of the change
25 on other districts. Each county with changes would

Page 64

1 require new maps and address range indexes. The
2 county election officials would need to implement
3 those in SEMS by modifying precinct splits and
4 address ranges."
5    Q.    And then the next paragraph, please?
6    A.    "Poll books would be impacted due to the
7 potential for new splits and new ballot styles
8 associated with the election. Voters would be moved
9 accordingly to the districts and precinct split
10 changes and address library changes."
11    Q.    Is that accurate as a description of what
12 would happen today if redistricting occurred?
13    A.    Yes.
14    Q.    All right. And then read, finally, for
15 what we have here, what you wrote in paragraph 6.
16    A.    "Once an election is created and ballot
17 styles are generated, no redistricting changes are
18 allowed in SEMS until the completion of that
19 particular -- of the particular election. The
20 timeline for election creation is generally about
21 55 days before an election day."
22    Q.    And that's accurate today as well; is
23 that right, Ms. Lennep?
24    A.    That's correct.
25    Q.    So can you explain to us what you meant

Page 65

1 by the timeline for election creation in this
2 paragraph?
3    A.    Yes. So the election is created in SEMS,
4 and once that information is entered with the
5 contests and the candidates and ballot styles are
6 generated, the system goes into what we refer to as
7 lockdown. You can't change address ranges and
8 precincts and splits because it would negatively
9 impact, for instance, if -- and it 55 days out at
10 least because we begin absentee voting 45 days
11 before the election.
12        So if somebody voted 45 days before the
13 election and then there was a potential to go in and
14 change district lines, there's no way to actually
15 track where that vote would land. So for security
16 reasons and for accuracy reasons, once an election
17 is created and ballot styles are generated, no
18 additional changes can be made from a redistricting
19 standpoint.
20    Q.    So another way to look at this would be,
21 if you had two months' lead time, you'd be able to
22 get the election set up if there were redistricting
23 that occurred?
24        MR. BECKETT: Object to the form.
25        THE WITNESS: Absolutely not. No.

17 (Pages 62 - 65)

Page 66

1 Because --
2 BY MR. LAVELLE:
3   Q.   Explain to me why that's not accurate.
4   A.   Because the process of redistricting
5 can't be done in a day, or even, in most cases, a
6 week because of the information and the process that
7 you have to go through in order to make those
8 changes.  And the size of the counties and how many
9 counties are impacted and it just, you know, it's
10 almost like a domino effect.
11   Q.   So it's really something that would
12 depend on the specific circumstances of what would
13 be required; is that right?
14   A.   You're saying what changes would be
15 required from a redistricting standpoint?
16   Q.   I'm really asking what the time frame
17 would be.  And it sounds to me -- and correct me if
18 I'm wrong about this -- that how long it would take
19 to get ready for an election would depend on the
20 scope of the redistricting; is that right?
21   A.   No.  How long it takes to get ready for
22 an election doesn't change.  I mean, it's generally
23 60 --about 60 days out.  Trying to force a
24 redistricting activity into that scenario could take
25 a couple of days.  It could take weeks.  It just

Page 67

1 depends on what the changes are.  And, again, and
2 how many counties are impacted and how good the data
3 is that we're being given to implement in SEMS.  So
4 it's -- sorry.  It's hard to give a specific answer
5 on that.
6   Q.   I think the answer you've given is very
7 helpful.  Obviously -- and I think you're aware of
8 this -- the litigation that we're currently engaged
9 in, that your deposition is being taken in concerns
10 whether or not the districts that have been drawn
11 for certain state elections in Mississippi need to
12 be changed.  And obviously a court is going to
13 decide whether or not that is the case, and, if so,
14 how they have to change.
15       The questions I'm focussing on with you
16 relate to timing.  And it sounds to me -- again,
17 correct me if I'm wrong -- you would not be able to
18 say here today that it would take a specific defined
19 time that you could predict with certainty no matter
20 how extensive or limited the changes are.  It would
21 really depend on the nature and extent of the
22 changes; is that right?
23   A.   Yes, that's correct.
24   Q.   All right.  Have you been asked to do any
25 work for the Secretary of State's office with

Page 68

1 respect to potential redistricting this year?
2   A.   No.
3   Q.   Have you discussed this lawsuit with
4 anyone other than the counsel who are representing
5 you in the deposition?
6   A.   No.
7       MR. LAVELLE:  We can take this exhibit
8 down.
9 BY MR. LAVELLE:
10   Q.   Now, in the course of your work for the
11 Department of State, you've provided assistance on
12 training programs; correct?
13   A.   Yes.
14   Q.   You've actually conducted training
15 programs on the statewide election management
16 system; right?
17   A.   Yes.
18   Q.   You've put together PowerPoints on those?
19   A.   Yes.
20   Q.   And you presented those; right?
21   A.   Correct.
22   Q.   Let's mark as the next exhibit what we
23 have at Tab 9 of the binder.
24       (Exhibit 8 marked for identification.)
25       EXHIBIT TECH:  Please stand by.  That's

Page 69

1 Lennep Exhibit 8.
2 BY MR. LAVELLE:
3   Q.   All right.  Ms. Lennep, we've marked as
4 Exhibit Lennep 8 for identification a series of
5 PowerPoint presentations.  And they are pretty
6 voluminous.  I don't propose to take you through
7 these page by page.  I don't think that would be a
8 good use of your time.  But I do want to just
9 determine and get you on the record from
10 you as to whether or not these are presentations
11 that you prepared in the course of your consulting
12 for the Secretary of State's office.
13       MR. BECKETT:  Hey, John, while she flips
14 through that, is what's on the screen the same as
15 what's in the binder?
16       MR. LAVELLE:  Yes.
17       MR. BECKETT:  Okay.
18       Take your time and just flip through that
19 and make sure those are your documents.
20 BY MR. LAVELLE:
21   Q.   And just for clarity, there is a series
22 of PowerPoints there, if we need to walk through
23 them individually, but I'm hoping you can identify
24 them generally because they are all pretty much the
25 same?

18 (Pages 66 - 69)

**Page 70**

1    A.   Yeah.  Hold on just a second.  So are the
2 first two the same ones?  Yeah.  The first two in
3 there are identical.  They are both from the 2011
4 ECAM presentation.
5    Q.   What is an ECAM presentation?
6    A.   Election Commissioners Association of
7 Mississippi.  So that's where we do the
8 certification training for election commissioners.
9    Q.   So the election commissioners are county
10 officials who are responsible for conducting
11 elections?
12    A.   That's right.  In Mississippi, they are
13 elected.  There are five in each county.
14    Q.   And you have -- you've provided these
15 training programs to the election commissioners on
16 an ongoing basis on behalf of the Secretary of
17 State's office; correct?
18    A.   Correct.
19    Q.   And the idea here is that you're
20 providing training to these officials in what
21 features SEMS has and how to use it; is that
22 correct?
23    A.   Yes, yes.
24    Q.   I'm oversimplifying here, but as a very
25 general basis, that's what you're doing?

**Page 71**

1    A.   Yes.
2    Q.   Did you prepare these slides?
3    A.   Yes.
4    Q.   This is a presentation you do
5 periodically to the election commissioners?
6    A.   Every year.
7    Q.   You update it from time to time?
8    A.   Every year, yes.  Yes.  I mean, when it
9 says "SEMS update," I mean, we make updates to the
10 program about four times a year.  So certainly when
11 I present in January, which their annual convention
12 and when we do their certification training, it
13 would have different information in it as far as the
14 updates go, and then we focus on whatever else is
15 important for that year.
16    Q.   Got it.  All right.  But just so we have
17 it clear on the record, what we've marked as
18 Exhibit 8 -- Lennep 8 are the PowerPoints that you
19 prepared for presentation to the election
20 commissioners as part of their ongoing training; is
21 that right?
22    A.   Yes.
23        MR. LAVELLE:  All right.  Let's mark as
24 the next exhibit -- I'm finished with this one.
25 Let's mark the next exhibit what we have at Tab 10.

**Page 72**

1 We'll mark that as the next exhibit for
2 identification, please.
3        EXHIBIT TECH:  Stand by.  This is Lennep
4 Exhibit 9.
5        (Exhibit 9 marked for identification.)
6 BY MR. LAVELLE:
7    Q.   All right.  Ms. Lennep, do you recognize
8 what we've marked for identification as Lennep 9?
9    A.   Yes.
10    Q.   What is it?
11    A.   Election tips for the TSX, that's the
12 name of the voting machine system.  I'm sorry.  Ask
13 me that again.
14    Q.   Is this a presentation that you prepared,
15 Ms. Lennep?
16    A.   Yes.
17    Q.   The fact it identifies you on the first
18 page as the creator of this training program; right?
19    A.   Yes.
20    Q.   Who is Derrick Cooper?
21    A.   He's an employee at the Secretary of
22 State.
23    Q.   Do you recall whether Mr. Cooper actually
24 provided this PowerPoint to the officials?
25    A.   I'm sure he did.

**Page 73**

1    Q.   Why did you end up being the person to
2 create this PowerPoint?
3    A.   I had created it and presented it
4 previously, and if I remember right, we had a
5 conflict that I couldn't be at this municipal
6 training, and so Derrick, who was also with
7 elections and worked in IT, did the presentations.
8        MR. LAVELLE:  We are finished with that
9 document.  Thank you.
10        Let's now go to what we have at Tab 11 of
11 the binder.  And could we mark that, Concierge, as
12 the next exhibit, please?
13        (Exhibit 10 marked for identification.)
14        EXHIBIT TECH:  Please stand by.  This is
15 Lennep Exhibit 10.
16 BY MR. LAVELLE:
17    Q.   Ms. Lennep, we have marked as Exhibit 10
18 for identification another PowerPoint presentation.
19        Do you recognize this?
20    A.   Yes.
21    Q.   What is this presentation?
22    A.   It's "Voter Roll Move, Merge, and Purge."
23 So it's a presentation on voter roll maintenance.
24    Q.   Who was this presentation provided to?
25    A.   Probably both circuit clerks and election

19 (Pages 70 - 73)

Page 74

1 commissioners because, in counties, they all
2 participate in this process.
3    Q.   When would you have provided this
4 presentation? Let me rephrase that.
5       When did you provide this presentation to
6 those individuals?
7    A.   I don't know. I hate that I didn't have
8 a date on it. But I can tell from the screenshots
9 that it was prior to 2020.
10    Q.   How do you know it was prior to 2020?
11    A.   Because we changed the format of the
12 dashboard -- or the home screen. Like the date on
13 the -- on one of the screenshots is 2017. The date
14 in the reports is 2017. So I'm going to say 2017.
15    Q.   Is this a presentation that you have
16 likewise provided periodically?
17    A.   Portions of it in different formats
18 because we constantly talk about voter roll
19 maintenance. But specifically, no. I wouldn't --
20 like, I wouldn't have shown this since we moved to
21 the new dashboard because it's outdated.
22    Q.   All right. We're finished with this
23 exhibit. The last one that's like this that we're
24 going to show you is at Tab 12 of your binder.
25    A.   Uh-huh.

Page 75

1    Q.   One last collection of PowerPoints.
2       MR. LAVELLE: And if I could ask the
3 concierge to please mark that as the next exhibit
4 for identification.
5       (Exhibit 11 marked for identification.)
6       EXHIBIT TECH: Please stand by.
7       MR. BECKETT: While she's doing that, I
8 can assume what she's going to put on the screen is
9 the same as what's in the binder?
10       MR. LAVELLE: Correct.
11       MR. BECKETT: Because Madalan is able to
12 flip through the binder a lot more easily.
13       MR. LAVELLE: Understood. That is why we
14 are glad to have the physical copies there in front
15 of the witness, to make it easier.
16       MR. BECKETT: Take your time. That's a
17 big document.
18       EXHIBIT TECH: This is Lennep Exhibit 11.
19 BY MR. LAVELLE:
20    Q.   Ms. Lennep, we have marked for
21 identification Lennep Exhibit 11, another PowerPoint
22 presentation. Can you tell us what this is?
23    A.   This was presented at the ECAM convention
24 in 2011. And it's SEMS update on redistricting and
25 new features. So in preparation for information

Page 76

1 that would be received from the 2010 census.
2    Q.   And what specifically were you training
3 these individuals about with respect to
4 redistricting?
5    A.   How they would implement the lines that
6 were drawn into SEMS.
7    Q.   Is this a type of presentation that you
8 have provided more than once?
9    A.   Yes.
10    Q.   How frequently have you presented this
11 presentation in one form or another?
12    A.   As far as implementation of redistricting
13 lines that were provided to the county, several
14 times in the 2012 to 2015 time frame and then
15 several times in the past couple of years.
16    Q.   There had to be redistricting work done a
17 couple of times during the 2012 to 2015 time frame;
18 correct?
19       MR. BECKETT: Object to form.
20       Can you be more specific about which kind
21 of redistricting? Are you talking about legislative
22 or the other positions in government? Just -- it
23 would be helpful, I think, if we knew a more
24 specific reference.
25       MR. LAVELLE: Let me ask the witness

Page 77

1 that.
2 BY MR. LAVELLE:
3    Q.   When you refer to redistricting
4 preparation, redistricting steps in your
5 presentation here, what kind of redistricting are
6 you referring to?
7    A.   Generic to the type, the same steps are
8 taken in SEMS.
9    Q.   So whatever the reason for the
10 redistricting, whether it be legislative or court or
11 what have you, there are a series of steps that have
12 to be done in SEMS; is that correct?
13    A.   That's correct.
14    Q.   And what are those steps that have to be
15 done?
16    A.   They have to be given -- the county would
17 have to be given maps and address ranges for the
18 changes. Generally information that would provide
19 what district they are coming from and what district
20 they are going to, what precinct they are in. And
21 then those address ranges, for instance, 100 to 500
22 Main Street, would be in one district, which would
23 require a specific split in a precinct so that then
24 the precinct and the address information would all
25 be associated to the voter through that address

20 (Pages 74 - 77)

Page 78

1  range. So it's automatically assigned once all of
2  the address library connections are made to those
3  individual precincts and splits.
4      Q.    So the specific steps that have to be
5  done, you have obviously covered them in this
6  presentation, you have provided training on those
7  steps to officials on a regular basis over the past
8  at least 12 years; is that correct?
9      A.    Sporadically. I mean, we don't
10 redistrict every year so, I mean, we didn't provide
11 any type of redistricting training for, I would say,
12 2015 through 2021 because there was no reason for
13 it.
14     Q.    But then when the new district lines were
15 drawn for the state legislature in 2022, training
16 was provided by you; correct?
17     A.    Yes.
18     Q.    Do you recall when you provided that
19 training for the 2022 redistricting?
20     A.    Yes. But, I mean, there were multiple --
21 there were multiple training classes, generally last
22 year in the summer. Because, again, you can only do
23 this work when there's not an open election.
24     Q.    All right. Let me ask you a little bit
25 more about that because I'm not sure I understand

Page 79

1  your answer.
2          You provided multiple training programs on
3  the redistricting steps during the summer of 2022.
4  Is that your recollection?
5      A.    Yes. We provided regional training. So,
6  like, we did a class in Hattiesburg, we did a class
7  in Jackson, we did a class in Oxford.
8      Q.    So the idea would be that you would go to
9  a location, and then the county officials from that
10 region would assemble so that you could provide the
11 training to them as a group?
12     A.    Correct.
13     Q.    How many of those group training sessions
14 did you do on redistricting steps during 2022?
15     A.    Three in-person.
16     Q.    Did you do a virtual one or more than one
17 as well?
18     A.    There is a virtual recorded training
19 session.
20     Q.    And that's available on demand for
21 anybody who needs to review it; is that right?
22     A.    That is correct.
23     Q.    And where would that be located? Is that
24 on a server that's available for the election
25 officials?

Page 80

1      A.    Yes, I believe that's the case. Although
2  our training coordinator at Secretary of State, I
3  mean, the individual has to contact them, sign up
4  for it, be given credentials. It's not something
5  that's just, like, out on a public-facing website.
6      Q.    Who is the training coordinator at the
7  Secretary of State's office currently?
8      A.    Logan Witcher.
9      Q.    Is it Mr. Or Ms. Witcher?
10     A.    Mister.
11     Q.    How long has Mr. Witcher been in that
12 position? A while?
13     A.    Yeah. A couple of years. I'm not
14 exactly sure.
15     Q.    To the best of your knowledge, that video
16 of the training on redistricting is available for
17 any of the election officials who would need it to
18 review currently?
19     A.    Yes.
20     Q.    Did anyone do that training or provide
21 that training along with you, or were you the only
22 one for the Secretary of State's office who provided
23 that training?
24     A.    I was the only one.
25          MR. LAVELLE: All right. We're at a

Page 81

1  point that would be a convenient time for a break.
2  Going to move to a different topic. So we can take
3  a break for five minutes if you'd like.
4          MR. BECKETT: That's great, John. Do you
5  want to go another hour and then do a later lunch?
6          MR. LAVELLE: That works for me, but it's
7  really -- we can go off the record and discuss the
8  scheduling.
9          THE VIDEOGRAPHER: The time is
10 11:17 a.m., and we are off the record.
11         (Off the record)
12         THE VIDEOGRAPHER: We're back on the
13 record. The time is 11:25 a.m.
14 BY MR. LAVELLE:
15     Q.    All right. Ms. Lennep, when did you
16 first get asked to do any consulting work with
17 respect to the redistricting process for the
18 redistricting done following the 2020 census?
19     A.    When did I get asked to do redistricting
20 work? For SEMS, I mean, it's not a specific
21 request. It's just an acknowledgment of part of the
22 project. So, I mean, from the Secretary of State's
23 standpoint, nobody came to me and said, "Hey, are
24 you going to do redistricting?" I mean, it's just a
25 standard part of the process. So I can't tell you

21 (Pages 78 - 81)

Page 82

1 that somebody specifically came to me and said,
2 "Here, do this."
3    Q.   Do you know Ben Collins?
4    A.   I do know Ben Collins.
5    Q.   All right.  What is Mr. Collins's
6 position?
7    A.   He works with PEER, which is -- I don't
8 know the acronym, what are the letters --
9    Q.   PEER is the committee that's involved in
10 the redistricting process; is that correct?
11       MR. BECKETT:  Object to the form.
12       THE WITNESS:  I can't honestly -- I don't
13 know.
14 BY MR. LAVELLE:
15    Q.   All right.  Well, I'll be able to show
16 you, I think, a document --
17    A.   There's a legislative review -- but my
18 understanding is they do a whole lot more than
19 redistricting.  I mean, they are a constant division
20 that works with the legislature, is my
21 understanding.
22    Q.   All right.  Let me ask the question a
23 different way.  What kind of work have you done with
24 Mr. Collins?
25    A.   So the Secretary of State's office has

Page 83

1 provided information to PEER on things like
2 precincts and voter turnout and that sort of thing.
3 I mean, as far as work, I don't do any work with
4 them.  I mean, I'm not involved in their process at
5 all other than to provide some information from
6 SEMS.
7    Q.   I think it's inherent in what you just
8 said, but let me just ask you the question to make
9 it clear.  You don't tell Mr. Collins what to ask
10 for, you just respond to requests by Mr. Collins for
11 information from SEMS.  Is that a fair statement?
12    A.   That's correct.
13    Q.   And you have provided information to
14 Mr. Collins at his request from time to time from
15 the SEMS system?
16    A.   That's correct.
17    Q.   What he does with that, you're not really
18 sure; is that fair?
19    A.   That is extremely fair and accurate.
20    Q.   All right.  Do you know Ted Booth?
21    A.   I do know Ted Booth.
22    Q.   All right.  How do you know Mr. Booth?
23    A.   He's Ben's boss.  He's the executive
24 director of PEER, I would assume.
25    Q.   And there have been times when Mr. Booth

Page 84

1 has asked you for information from SEMS?
2    A.   Maybe once or twice, but generally I work
3 with Ben.
4    Q.   When you have worked with Mr. Booth, has
5 it been the same as it was with Mr. Collins?  In
6 other words, you don't tell him what to ask for but
7 you just respond to requests that he has made for
8 information?
9    A.   Yes.
10    Q.   Has Mr. Booth ever asked you for input on
11 a proposed state legislative district?
12    A.   No.
13    Q.   Has Mr. Collins ever done that?
14    A.   No.
15    Q.   We have a number of documents that have
16 been produced, some that you produced to us and
17 others that were produced to us by the Secretary of
18 State's office directly.  So I'm going to try to go
19 through these in chronological order.  So we could
20 end up skipping around a little bit in this binder,
21 but my goal is to try to go through it in
22 chronological order because I think that's the
23 easiest way for me to follow what you did and what
24 you were asked to do.  Okay?
25    A.   Okay.

Page 85

1    Q.   So the earliest one that we have, or at
2 least I've seen, is at Tab 29.
3       MR. LAVELLE:  And I'll ask the concierge
4 to mark that as the next exhibit, please.
5       EXHIBIT TECH:  Please stand by.  This is
6 Lennep Exhibit 12.
7       (Exhibit 12 marked for identification.)
8 BY MR. LAVELLE:
9    Q.   So, Ms. Lennep we've marked for
10 identification as Exhibit 12, an email.
11       Do you recognize this?
12    A.   Yes.
13    Q.   Is this an email that you sent to
14 Mr. Collins?
15    A.   Yes.
16    Q.   And you sent this on May 28, 2019;
17 correct?
18    A.   Correct.
19    Q.   And the subject line of the email you
20 sent to Mr. Collins on that date is "SEMS listing of
21 precincts statewide 5/28/19"; right?
22    A.   Yes.
23    Q.   A couple questions for you here.  The
24 signature block of your email identifies you; right?
25 Madalan Lennep, PMP, elections consultant; right?

22 (Pages 82 - 85)

Page 86

1    A.   Yes.
2    Q.   And then there's Mississippi Secretary of
3 State's office and a phone number. What phone
4 number is that?
5    A.   That's the phone at the Secretary of
6 State's office.
7    Q.   So that's not your personal phone?
8    A.   No.
9    Q.   And then you have an email address
10 Madalan.Lennep@sos.ms.gov; right?
11   A.   Yes.
12   Q.   Is that the email address that you use
13 for your consulting work for the Secretary of
14 State's office?
15   A.   Yes.
16   Q.   Do you ever use any other email address,
17 such as one from Pharos or a personal email for
18 consulting work that you do for the Secretary of
19 State's office?
20   A.   No. Well, I'll take that back. For
21 instance, when I send them information, like,
22 related to my business, like a copy of a contract or
23 a statement of work, then yes, it comes from my
24 business account because it's me working as an
25 independent consultant with the Secretary of State.

Page 87

1 When I'm working for the Secretary of State, then I
2 use the credentials that they've provided to me.
3    Q.   Okay. Secretary of State's office gave
4 you an email address there?
5    A.   Correct.
6    Q.   Right. How do you access your Secretary
7 of State's office email?
8    A.   Through a laptop with the VPN connection
9 or in house using a docking station.
10   Q.   I asked you some questions earlier in the
11 deposition about the search of documents and
12 information in order to comply with the subpoena.
13       Do you remember those questions?
14   A.   Yes.
15   Q.   And you told me that you had reviewed
16 your inbox in order to find records that were
17 responsive to the subpoena; right?
18   A.   Correct.
19   Q.   When you looked at the inbox, did you
20 look at just the Secretary of State's inbox or also
21 your Pharos inbox or both?
22   A.   Just the Secretary of State because all
23 of the work I did in regards to communication with
24 PEER was through the Secretary of State's office.
25   Q.   So in other words, you did not check your

Page 88

1 Pharos email to see if there was anything responsive
2 there to the subpoena; correct?
3    A.   That is correct.
4    Q.   All right.
5    A.   But for good reason because I don't use
6 my Pharos account when I'm doing work for the
7 Secretary of State's office.
8    Q.   If there was an email in there that
9 related to the work that you did for the Secretary
10 of State, that would be a mistake; right?
11   A.   If there was an email in where?
12   Q.   In your Pharos email, that would not be
13 the way that you would typically conduct work;
14 correct?
15   A.   That's correct.
16   Q.   All right. So focussing on this email,
17 do you have a recollection, as we sit here today, of
18 why you provided a SEMS listing of precincts
19 statewide to Mr. Collins on May 28, 2018?
20   A.   Yes, because he requested it.
21   Q.   Why did he request it?
22   A.   I don't know specifically, but, I mean,
23 they are a fellow state agency and they asked for
24 the information. I would assume -- which we
25 shouldn't do -- but I would assume it was to make

Page 89

1 sure they have all the correct precinct names for
2 the counties because precincts change over time.
3 Precincts are opened, precincts are closed,
4 precincts are split by the county board of
5 supervisors. But that information is entered in
6 SEMS.
7    Q.   Do you have an understanding of how this
8 request related to the redistricting process?
9        MR. BECKETT: Object to the form.
10       THE WITNESS: I'm sorry. Ask me that
11 again. I didn't understand it.
12 BY MR. LAVELLE:
13   Q.   Sure. Do you understand how this
14 information, the listing of precincts, related to
15 the redistricting process?
16   A.   Except for the fact that, when they
17 actually provide or pass the joint resolution, many
18 of the districts are listed by county and precinct,
19 that that would be an assumption. But, I mean, I
20 know that precinct information is used in that
21 process.
22   Q.   You know it is used but you don't know
23 exactly how it's used?
24   A.   That's correct.
25   Q.   Let's go to the next exhibit, which is

23 (Pages 86 - 89)

1 Tab 30 in your binder.
2    A.   Uh-huh.
3          MR. LAVELLE:  And if we could mark that
4 for identification, Concierge, as our next exhibit,
5 I'd appreciate it.
6          EXHIBIT TECH:  Please stand by.
7          THE WITNESS:  I mean, I see it in the
8 folder.
9          MR. BECKETT:  Just wait for her to put it
10 up.
11         THE WITNESS:  Okay.
12         MR. BECKETT:  And, John --
13         EXHIBIT TECH:  This is going to be
14 Exhibit 13.
15    (Exhibit 13 marked for identification.)
16         MR. BECKETT:  -- I'll stop asking the
17 question, but I'm assuming you're going to let us
18 know if what's on the screen is different than
19 what's in the binder.  Is that okay?
20         MR. LAVELLE:  Yes.
21 BY MR. LAVELLE:
22    Q.   So we've marked for identification as
23 Exhibit Lennep 13, the attachment to the email we
24 previously looked at that was marked as Exhibit 12.
25         Do you recognize this, Ms. Lennep?

1    Q.   You sent it on November 15, 2019;
2 correct?
3    A.   Yes.
4    Q.   And the subject line is "Reports"; right?
5    A.   Yes.
6    Q.   Can you read for us what you wrote to
7 Mr. Booth on that day?
8    A.   "I am working on the best solution for
9 this.  Will be in touch."
10    Q.   Do you recall, Ms. Lennep, what you were
11 trying to provide a solution for for Mr. Booth?
12    A.   I do not.
13    Q.   Do you have an understanding, as we sit
14 here today, of how this related to the redistricting
15 process?
16    A.   I do not.
17    Q.   Very good.  We're finished with this
18 exhibit.  Let's go to the next one, which is at
19 Tab 32 in the binder.
20         EXHIBIT TECH:  This is Lennep Exhibit 15.
21    (Exhibit 15 marked for identification.)
22 BY MR. LAVELLE:
23    Q.   Ms. Lennep, we've marked for
24 identification as Exhibit 15 another email.
25         Do you recognize this?

1    A.   Yes.
2    Q.   What is it?
3    A.   It's the precinct polling place report
4 that's referred to in the email.
5    Q.   And this is the report that you generated
6 from SEMS and provided to Mr. Collins on May 20,
7 2019; correct?
8    A.   Correct.
9    Q.   All right.  Let's go to the next exhibit
10 please.  And that will be Tab 31 in the book.
11         MR. LAVELLE:  And let's mark that as the
12 next exhibit, please.
13         MR. BECKETT:  Just stay on the one he's
14 asking about.
15         EXHIBIT TECH:  This is Lennep Exhibit 14.
16    (Exhibit 14 marked for identification.)
17 BY MR. LAVELLE:
18    Q.   All right.  Ms. Lennep, we've marked for
19 identification as Exhibit 14 to your deposition an
20 email.
21         Do you recognize this?
22    A.   Yes.
23    Q.   Is this an email that you sent to Ted
24 Booth?
25    A.   Yes.

1    A.   Yes.
2    Q.   Is this an email that you sent to Ted
3 Booth copied to Kim Turner on November 5, 2019?
4    A.   Yes.
5    Q.   Who is Kim Turner?
6    A.   She was the Assistant Secretary of State
7 for Elections at that time.
8    Q.   And would you read, please, what you
9 wrote to Mr. Booth on that day in this email?
10    A.   "We are thinking the most efficient way
11 to get exact poll book numbers would be to have a
12 custom query written by our support company.  Can
13 you please send a request of the information you
14 need along with how it will be used."
15    Q.   So does looking at this help you recall
16 that Mr. Booth had asked to you get exact poll book
17 numbers?
18    A.   Yes.
19    Q.   As of November 2019?
20    A.   Yes.
21    Q.   What is an exact poll book number?
22    A.   It would be a list of all of the
23 precincts with the number of voters in each poll
24 book, and I guess potentially voting history, but
25 I'm not sure.  The exact poll book numbers.  But

24 (Pages 90 - 93)

Page 94

1 because that can't be pulled at the state level
2 because the state doesn't have any poll books in
3 SEMS. All of the poll books are pulled at the
4 county level.
5    Q.   Do you have a recollection of why
6 Mr. Booth asked you for this information?
7    A.   I don't.
8    Q.   You did ask him to send you a request for
9 the information and a description of how it would be
10 used; right?
11    A.   Yes. And that was a request by legal,
12 which Kim Turner was our -- of course, is also an
13 attorney, as it says, for elections.
14    Q.   Can you explain to me what you mean by
15 that was a request by legal?
16    A.   Yes. Kim Turner, who's an attorney, was
17 the Assistant Secretary of State for Elections at
18 the time. And so I ran this request by her, and she
19 asked that it be put in a formal request and
20 information on how it would be used.
21    Q.   And that was why you copied Kim Turner on
22 this email?
23    A.   Correct.
24    Q.   Let's go to the next tab, Tab 33.
25         MR. LAVELLE: And I'll ask the concierge

Page 95

1 to mark this as the next exhibit for identification,
2 please.
3         EXHIBIT TECH: Please stand by. This is
4 Lennep Exhibit 16.
5         (Exhibit 16 marked for identification.)
6 BY MR. LAVELLE:
7    Q.   Ms. Lennep, we've marked for
8 identification as Exhibit 16 an email exchange that
9 you had with Mr. Booth.
10         Do you recognize this?
11    A.   Yes.
12    Q.   And this is an email exchange you had
13 with Mr. Booth in November of 2019, November 5,
14 2019, to be precise?
15    A.   Yes.
16    Q.   In this printout, the email that we've
17 looked at previously that you sent to Mr. Booth is
18 at the bottom of the chain; right?
19    A.   Yes.
20    Q.   The one where you asked him to send a
21 request of the information he needed along with how
22 it will be used; right?
23    A.   Yes.
24    Q.   And then the email immediately above it
25 is Mr. Booth's response providing that information

Page 96

1 to you; correct?
2    A.   Yes.
3    Q.   Can you read for us what Mr. Booth told
4 you was the reason for his request?
5    A.   "We would like accurate
6 precinct-by-precinct registration information for
7 all Mississippi voting precincts as far as the
8 registration cutoff date for November 5, 2019,
9 general election. We will eventually be using this
10 information to help us design districts for the
11 house and senate following the 2020 census PL-94-171
12 data delivery.
13         "When we are looking at such data as voting
14 age population and minority voting age population,
15 it would be beneficial to have an understanding of
16 how many persons are actually registered in a
17 precinct. We also look at actual elections when we
18 devise districts as it would be instructive to see
19 percentages of registered voters who turn out in
20 given elections. Is this what you need? Thanks."
21    Q.   So a couple of follow-up questions for
22 you in terms of what Mr. Booth said in terms of his
23 request. What is the 2020 census PL-94-171 data
24 delivery?
25    A.   I have no idea. That's why I kind of

Page 97

1 stumbled across it. I don't know what that is.
2    Q.   Do you know what PL-94-171 is?
3    A.   I do not.
4    Q.   Do you know whether you have provided to
5 Mr. Booth or Mr. Collins data on voting age
6 population?
7    A.   I don't believe, in any of the reports,
8 we've provided -- it doesn't include voting age
9 population, that I can remember.
10    Q.   Does the data that you provided through
11 SEMS provide minority voting age population?
12    A.   SEMS doesn't capture any race or gender
13 information. So of course it does have age or birth
14 date, but I don't know how -- I mean, there's no way
15 that SEMS could provide any information on minority
16 voting age population. It doesn't exist in SEMS.
17    Q.   That would have to come from some other
18 source; is that correct?
19    A.   That's correct.
20    Q.   So SEMS does not have any record that
21 reflects a voter's race?
22    A.   No.
23    Q.   Has it ever contained that information?
24    A.   From some legacy data that was brought
25 over in 2005, there was some information as a result

25 (Pages 94 - 97)

Page 98

1 of jury, but all that data was wiped.
2    Q.   So when was race data eliminated from the
3 SEMS database?
4    A.   I would say probably 2010 maybe.
5    Q.   Would poll book numbering be useful for
6 what Mr. Booth is asking for in this email?
7    A.   I don't know how I would determine what
8 exactly they would find useful.  I know it's what he
9 asked for.
10    Q.   Where in his description does he refer to
11 exact poll book numbers?  Is that what he means by
12 "how many persons are actually registered in a
13 precinct"?
14        MR. BECKETT:  Object to the form.
15        THE WITNESS:  Yes.
16        MR. LAVELLE:  You can answer that.
17        MR. BECKETT:  Yeah.  You can answer that.
18        THE WITNESS:  Yes, I did.  Sorry.  We
19 were talking at the same time.
20 BY MR. LAVELLE:
21    Q.   Do you know whether it's possible to
22 determine minority voting age population by looking
23 at the exact poll book numbers in conjunction with
24 any other data?
25        MR. BECKETT:  Object to form.

Page 99

1        THE WITNESS:  No, I don't even -- no.  I
2 mean, the information is not contained in SEMS so I
3 don't know how someone else might perceive that
4 number.
5 BY MR. LAVELLE:
6    Q.   Well, census data includes capturing race
7 data for people who are recorded in the census;
8 correct?
9    A.   I don't have any experience with census
10 data.  So I'm assuming that's correct because, as an
11 individual, I answer those questions on the census
12 form.  But --
13    Q.   You fill out that census like everybody
14 else does every ten years; right?
15    A.   Exactly, yeah.  So yes, I know it's
16 asked.  I don't know what form it comes back in.
17    Q.   In your work for the Secretary of State's
18 office, have you ever done any work that uses census
19 data?
20    A.   The only thing would be voting age
21 population.
22    Q.   And how do you use census data for that?
23    A.   To make sure counties are staying below
24 the threshold of voting age population in their
25 voter roll maintenance efforts.

Page 100

1    Q.   Can you explain what you mean by that?
2    A.   Well, yes.  If an individual -- if a
3 county has a voting age population based on the
4 census of a hundred people, and they have 120 active
5 registered voters, then we encourage the local
6 election officials to look more closely at things
7 like their deceased records and duplicates.
8    Q.   Any other way in which census data would
9 be useful for voting age population?
10    A.   Not that I'm aware of, no.
11    Q.   Could it be used for minority voting age
12 population as Mr. Booth references in his email?
13        MR. BECKETT:  Object to form,
14 speculation.
15        THE WITNESS:  Again, I don't know how.
16        MR. BECKETT:  You can answer.
17        THE WITNESS:  Again, I don't know how
18 that would be the case because it's what we -- what
19 we provide in voting age population doesn't have a
20 minority aspect to it.
21 BY MR. LAVELLE:
22    Q.   It would have to come from some place
23 else; correct?
24    A.   Correct.
25    Q.   All right.  Let's scroll to the top of

Page 101

1 this email chain to take a look at your response to
2 Mr. Booth.
3    A.   Uh-huh.
4    Q.   What did you say in response to
5 Mr. Booth?
6    A.   "Thanks.  I found another report which
7 might be of interest, but the voting history numbers
8 won't be available for the general until each county
9 processes their poll book and closes the election in
10 SEMS.  This report includes all voting history,
11 whether the ballot was counted or not, absentee and
12 affidavits.  Take a look and let me know what you
13 think.  It will require some cleanup in Excel
14 formatting but probably a lot less data entry."
15    Q.   So what is it you're referring to here in
16 terms of this report?
17    A.   I'm referring to the poll book status and
18 turnout report.
19    Q.   Is that a standard form of report that
20 you generate from time to time out of SEMS?
21    A.   As required or requested, yes.
22    Q.   So SEMS is a database; right?  It has a
23 lot of data in it; correct?
24    A.   That's correct.
25    Q.   And there are certain forms of reports

26 (Pages 98 - 101)

Page 102

1 that can be generated collecting certain categories
2 of data out of SEMS; right?
3    A.   Correct.
4    Q.   And there are some, I would imagine, some
5 forms of report that you have predefined that you
6 know on a regular basis you need to be able to
7 generate; is that correct?
8    A.   Some, but there are also -- because,
9 remember, when we started off reading that SEMS
10 actually came from the product by Hewlett-Packard
11 called Electus.  There are literally hundreds of
12 reports out there that we've never used because this
13 product was actually developed and implemented in
14 eight or nine different states.
15    Q.   So when you say in your email to
16 Mr. Booth "I found another report," you're referring
17 to a report form that was in Electus?
18    A.   That was in SEMS, yes.  That I ran across
19 and thought, oh, okay, this one could help answer
20 the question because it gives you the number of
21 voters in the poll book as well as the processed
22 voter history and a percentage turnout for an
23 individual county and election.
24    Q.   I think that's a good lead-up for what we
25 want to mark as the next exhibit, which is the

Page 103

1 report you attached here.  You attached a 2018
2 primary report; right?
3    A.   Yes.
4        MR. LAVELLE:  Let's mark as the next
5 exhibit what you have at Tab 34 of your binder.
6        EXHIBIT TECH:  This will be Exhibit
7 Lennep 17.
8        (Exhibit 17 marked for identification.)
9 BY MR. LAVELLE:
10    Q.   Ms. Lennep, this is an Excel spreadsheet
11 that was attached to the email we looked at
12 previously?
13    A.   Yes.
14    Q.   Do you recognize this?
15    A.   Yes.
16    Q.   What is it?
17    A.   It's a poll book status and turnout
18 report.
19    Q.   And this is what you forwarded to
20 Mr. Booth as an example of something that might be
21 useful; correct?
22    A.   Correct.
23    Q.   Can you please walk us through this
24 report and explain what each of these columns refer
25 to?

Page 104

1    A.   Yeah.  This was for Hinds County.
2 Obviously just -- no, it is all three pages.  So the
3 first column for the 2019 primary election shows the
4 precinct name.  The second labeled column shows the
5 number of voters that are actually in the poll book.
6 The third shows the supplemental poll book.  And in
7 this case, they did not utilize the supplemental
8 poll book.  Then it shows the voter history
9 processed.  So how many individuals of those that
10 are active and in the poll book participated in the
11 primary election.  And then it shows a turnout
12 percentage of -- which basically is just the formula
13 for how many voted.
14    Q.   When you have a reference here to "voter
15 history processed," does that include the people who
16 voted both by provisional as well as on a machine?
17    A.   Yes.  In the previous email, the second
18 paragraph says "This report includes all voter
19 history, whether their ballot was counted or not,
20 absentees and affidavits."  So that would be regular
21 ballots voted on election day, absentee ballots and
22 affidavit ballots.  Whether they were actually
23 accepted or rejected, the individual still gets
24 voting history for participation.  It's basically a
25 participation award.

Page 105

1    Q.   Thank you.  All right.  Let's go to the
2 next exhibit, please, Tab 35 in the binder.
3        MR. LAVELLE:  We're finished with this
4 document.
5        EXHIBIT TECH:  Please stand by.  This is
6 Lennep Exhibit 18.
7        (Exhibit 18 marked for identification.)
8 BY MR. LAVELLE:
9    Q.   Ms. Lennep, we marked for identification
10 as Exhibit 18 an email exchange you had with
11 Mr. Booth.
12        Do you recognize this?
13    A.   Yes.
14    Q.   This is a follow-up exchange that you had
15 along the same lines that we were just discussing;
16 correct?
17    A.   Correct.
18    Q.   What did Mr. Booth write to you on
19 November 15, 2018?
20    A.   "This is an excellent report.  If we get
21 this after the general election information is
22 entered, that would be most helpful."
23    Q.   And then you responded; correct?
24    A.   Yes.
25    Q.   And what was your response?

27 (Pages 102 - 105)

Page 106

1    A.    "I will plan on providing these reports.
2 I will start as soon as each county closes their
3 general election, which should begin around
4 November" -- there's a punch hole through it. 15,
5 yes.
6    Q.    November 15; right?
7    A.    Yes.
8    Q.    All right. We can go to the next tab,
9 Tab 36.
10        EXHIBIT TECH: Please stand by. This is
11 Lennep Exhibit 19.
12        (Exhibit 19 marked for identification.)
13 BY MR. LAVELLE:
14    Q.    Ms. Lennep, we have marked as Exhibit 19
15 another email exchange that you had with Mr. Booth
16 on November 21, 2019.
17        Do you recognize this?
18    A.    Yes.
19    Q.    What did you write to Mr. Booth on that
20 day?
21    A.    "The number of active voters in the poll
22 book for Hinds precinct 46 in the 2019 general
23 election was 3,058. And then the address library
24 report you requested for precinct 46 is attached."
25    Q.    Do you recall, Ms. Lennep, why you

Page 107

1 provided this information to Mr. Booth on that day?
2    A.    Honestly, specifically no, but I'm
3 guessing he requested it.
4    Q.    The only reason you would have sent it to
5 him is because he had requested it; is that right?
6    A.    That's correct.
7    Q.    And then let's mark as the next exhibit
8 what's at Tab 37.
9        EXHIBIT TECH: This is Lennep Exhibit 20.
10        (Exhibit 20 marked for identification.)
11        MR. BECKETT: It looks different on the
12 screen so you may want to follow --
13        THE WITNESS: You really need to put it
14 in landscape.
15        MR. LAVELLE: Yeah, it's only showing
16 part of the whole page there. So probably need to
17 walk across it from page to page.
18        MR. BECKETT: That's correct.
19        MR. LAVELLE: But it's printed in
20 landscape in the book that you have.
21 BY MR. LAVELLE:
22    Q.    Do you recognize what we've marked for
23 identification as --
24        MR. LAVELLE: I'm sorry. What,
25 Concierge, what did we mark this for identification

Page 108

1 as? Number 19?
2        EXHIBIT TECH: This is Exhibit 20.
3        MR. LAVELLE: Exhibit 20. I'm sorry.
4 BY MR. LAVELLE:
5    Q.    Do you recognize this, Ms. Lennep?
6    A.    Yes.
7    Q.    What is Exhibit 20?
8    A.    It's the address library report for
9 precinct 46.
10    Q.    Is this a report that you generated?
11    A.    Yes.
12    Q.    Can you walk us through what is the
13 information that's captured here?
14    A.    Sure. This provides the house number
15 range in the first column. The -- it's kind of hard
16 to tell. That first line is not -- is actually a
17 description that's in the header. It shows the --
18 it looks like -- I'm not exactly sure what the dates
19 are, but where it says "Type" that's right under
20 "Constable," "Type" is a street type and it would be
21 either odd, even or all. So you see, as you go
22 down, for instance, if you go down to Colonial
23 Circle, only the even side of the street is in that
24 precinct. So that's why it has the type.
25        Then it has the street name, the city, the

Page 109

1 state, the zip, the precinct, the split code, and
2 then it has district information, the senate, the
3 house of representatives, the supervisor, election
4 commissioner, justice court, constable, the city
5 ward and the school board district.
6    Q.    And, again, this is a report that was
7 generated by you out of SEMS at Mr. Booth's request?
8    A.    Yes.
9    Q.    Do you know why he requested this from
10 you?
11    A.    I'm guessing it potentially was when the
12 district 22 was -- those lines were redrawn, but I
13 don't -- I don't remember specifically. That might
14 not be right. I don't know if 22 actually came into
15 Jackson -- I mean into Hinds County. I'm not sure.
16    Q.    District 22 was redrawn at some point?
17    A.    Yes.
18    Q.    Why was that?
19    A.    I believe it was a court order. I'm not
20 sure.
21        MR. BECKETT: Just tell him what you
22 know.
23        THE WITNESS: Yeah.
24        MR. LAVELLE: You can take that exhibit
25 down.

28 (Pages 106 - 109)

Page 110

1  All right. Let's go off the record here
2  for a minute.
3       THE VIDEOGRAPHER: The time is 12:10 p.m.
4  We're off the record.
5       (Off the record)
6       THE VIDEOGRAPHER: We're back on the
7  record. The time is 1:13 p.m.
8  BY MR. LAVELLE:
9  Q.  Good afternoon, Ms. Lennep. We're back
10 from the lunch break and ready to resume your
11 deposition. Are you ready to go?
12 A.  Yep.
13 Q.  Okay. Great.
14      So we have been going through your emails
15 with Mr. Collins and Mr. Booth relating to requests
16 for data from SEMS for redistricting.
17      Do you recall that?
18 A.  Yes.
19 Q.  And we're going through them
20 chronologically so we're going to pick up where we
21 left off before the lunch break. We left off in
22 November of 2019. The next email that I have
23 received in the discovery process is November 23,
24 2020. Before I show you that, can I ask you whether
25 you recall doing any work relating to supporting

Page 111

1  redistricting between November of 2019 and November
2  of 2020?
3  A.  Not specifically, no. I mean, I get
4  literally hundreds of emails a day. So I'm sorry.
5  I mean, I didn't specifically go back and review all
6  of these. So no. But I'm sure you'll show me.
7  Q.  I'll show you what I have.
8  A.  Okay.
9  Q.  I'm just trying to make sure that I've
10 got everything. Obviously I haven't seen all of
11 your emails, and I assume that when you reviewed
12 them for the purposes of the subpoena, you tried to
13 set aside the ones that related to redistricting,
14 put those in a pile for production, and separate out
15 the ones that relate to other projects you've been
16 asked to support and set those aside and didn't
17 produce those; is that fair?
18 A.  Yes.
19 Q.  All right. So I've got that window into
20 your emails and we're going to continue going
21 through what you've produced to me and what the
22 Secretary of State has produced to me.
23      So the next one that I have is at Tab 13 in
24 the binder?
25      MR. LAVELLE: And if I could ask the

Page 112

1  concierge to mark that as our next exhibit, please.
2  I'd appreciate it.
3       EXHIBIT TECH: Stand by. This is Lennep
4  Exhibit 21.
5       (Exhibit 21 marked for identification.)
6  BY MR. LAVELLE:
7  Q.  Ms. Lennep, we've marked as Exhibit 21
8  for identification an email you had with Ben Collins
9  in November of 2020.
10      Do you see that in front of you?
11 A.  I do.
12 Q.  Do you recognize this?
13 A.  I do.
14 Q.  Is this an email exchange that you had
15 with Mr. Collins in November of 2020?
16 A.  I believe it is.
17 Q.  Looking first at Mr. Collins's email to
18 you dated Monday, November 23, 2020, subject "Ben
19 Collins at redistricting."
20      Do you see that --
21 A.  I do.
22 Q.  -- Ms. Lennep?
23      Mr. Collins has in his signature block, GIS
24 director, Mississippi legislature, standing joint
25 legislative committee on reapportionment,

Page 113

1  performance evaluation and expenditure review.
2  A.  There's what PEER is.
3  Q.  Sorry. So that's your understanding of
4  what PEER is, right, performance evaluation and
5  expenditure review?
6  A.  Yes.
7  Q.  And it's part of the standing joint
8  legislative committee on reapportionment; is that
9  correct?
10      MR. BECKETT: Object to the form.
11      THE WITNESS: I would assume so. It's in
12 his signature line.
13 BY MR. LAVELLE:
14 Q.  Do you know what is meant by the title
15 "GIS director"?
16 A.  He has GIS experience.
17 Q.  And what is GIS an abbreviation for in
18 this context?
19 A.  Geographic information system.
20 Q.  So Mr. Collins writes to you "Madalan,
21 are you still the contact person for SEMS? It's
22 time to start farming your data."
23      Do you see that?
24 A.  I do.
25 Q.  And you respond to him; correct?

29 (Pages 110 - 113)

Page 114

1    A.   I did.
2    Q.   What did you say?
3    A.   "I'm still here. Please let me know
4 exactly what data will help and I will get it
5 going."
6    Q.   Have you ever heard that term before
7 "farming data"? "Farming your data"?
8    A.   Sure.
9    Q.   What does it mean?
10    A.   It means gathering data that would be
11 available in SEMS.
12    Q.   Is it a term that you've used previously
13 in communications with Mr. Collins about the
14 redistricting process?
15    A.   I don't think I've specifically said
16 "farming our data," no. I'm more specific when I
17 communicate with him on what information that is
18 available in SEMS that they are looking for.
19    Q.   All right. Do you remember what happened
20 next? Did you have any further requests from
21 Mr. Collins after this?
22    A.   I believe that we talked about getting
23 the voter turnout data. Just like we had looked at
24 earlier, because that's generally the information
25 that we provide.

Page 115

1    Q.   You had a call with Mr. Collins and with
2 Mr. Booth about what they wanted; correct?
3    A.   Yes.
4        MR. LAVELLE: Let's mark Tab 14 as the
5 next exhibit, please.
6        EXHIBIT TECH: This is Lennep Exhibit 22.
7        (Exhibit 22 marked for identification.)
8 BY MR. LAVELLE:
9    Q.   Ms. Lennep, we've marked as Exhibit 22 to
10 your deposition another email exchange you had with
11 Mr. Collins.
12        Do you recognize this?
13    A.   Yes.
14    Q.   Is this an email exchange you had with
15 Mr. Collins on December 15, 2020?
16    A.   Yes.
17    Q.   Mr. Collins writes to you "Madalan, Ted
18 and I are a go for a conference call at 1 o'clock
19 p.m. tomorrow, December 16th. Shall we call you or
20 shall you call us? Either way works for us. Look
21 forward to speaking with you."
22        And then you respond. What was your
23 response?
24    A.   I say "Yeah, that sounds good. We can
25 call you."

Page 116

1    Q.   All right. A couple questions here. Who
2 is "we" in your sentence there? Who is "we" that
3 you were planning to call Ben and Ted with?
4    A.   Generally I'm going to say that it's
5 usually me and probably the ASOS for elections.
6    Q.   Who is that, the ASOS for elections?
7    A.   Assistant Secretary of State for
8 Elections. Let's see, in December of 2020, it
9 probably was Hawley Robertson.
10    Q.   And why would Ms. Robertson be on the
11 phone with you?
12    A.   Because, as the assistant secretary for
13 elections, I report to her, and generally, with
14 these conversations, I have someone from legal with
15 me just to make sure that we are providing the
16 information that the Secretary of State's office is
17 comfortable with since I am an independent
18 consultant.
19    Q.   So you looped in the ASOS, or Assistant
20 Secretary of State, for those reasons; is that
21 correct?
22    A.   Yes.
23    Q.   All right. When you refer to a number
24 that was sent earlier in the week, what are you
25 talking about?

Page 117

1    A.   The phone number? "Should I use" --
2 because I said "We will" -- "we can call you.
3 Should I use the number you sent me early in the week."
4 So I'm pretty sure I'm talking about a phone number.
5    Q.   All right. Mr. Collins sent you a number
6 earlier in the week?
7    A.   I would assume so, yes.
8    Q.   When you did your search for responsive
9 emails, you didn't find any email which he sent a
10 phone number, did you?
11    A.   I don't believe I did. It might have
12 just been his -- it might have just been his
13 signature line. I mean, there's a phone number
14 associated with his signature, as we -- on some -- I
15 think on some of the emails.
16    Q.   Well, there's no phone number in the
17 signature line on this document, is there, in
18 Exhibit 22?
19    A.   There is not. Which is probably why I
20 said "Should I use the number you sent me earlier in
21 the week?"
22    Q.   Okay. And there wasn't one in the other
23 email that we just looked at, Exhibit 21, was there?
24    A.   I don't see one, no.
25    Q.   Did you end up speaking with Mr. Collins

30 (Pages 114 - 117)

Page 118

1 and Mr. Booth?
2    A.   I'm sure I did.
3    Q.   What do you remember about that
4 conversation?
5    A.   To the best of my recollection, it would
6 be discussion of when voter turnout and voter
7 history information is available.
8    Q.   Anything else?
9    A.   Not that I remember.
10       MR. LAVELLE:  Let's turn to Tab 15 and
11 mark that as the next exhibit, please.
12       EXHIBIT TECH:  This is Lennep Exhibit 23.
13    (Exhibit 23 marked for identification.)
14 BY MR. LAVELLE:
15    Q.   Ms. Lennep, we've marked as Exhibit 23
16 another email exchange you had with Mr. Collins.
17       Do you see that?
18    A.   I do.
19    Q.   And it's an email exchange you had with
20 Mr. Collins on December 18, 2020; correct?
21    A.   Correct.
22    Q.   Mr. Collins writes to you "Tim wanted me
23 to let you know that the letter has been delivered.
24 Let me know if I can do anything to help."
25       Did I read that correctly?

Page 119

1    A.   Yes.
2    Q.   And then you respond; right?
3    A.   Yes.
4    Q.   What was your response?
5    A.   "Thanks for letting me know.  Hope you
6 and family have a Merry Christmas."
7    Q.   And the subject line of this email
8 exchange is "Letter is delivered"; right?
9    A.   Yes.
10    Q.   What letter is he referring to there?
11    A.   I believe it's the same as that previous
12 email where the legal team requested an official --
13 an official request for the information they need --
14 that they were asking for, which, again, is voter
15 turnout information.
16    Q.   There's a letter, to the best of your
17 recollection, that memorializes what information is
18 being requested; right?
19    A.   Yes, it appears to be.
20    Q.   Do you have a copy of that letter?
21    A.   I don't know that that letter went to me.
22 It probably went to the assistant secretary, but I
23 don't have a copy of it that I know of.
24    Q.   Presumably the Secretary of State's
25 office would have such a letter; is that right?

Page 120

1    A.   I believe so since they said it was
2 delivered.
3    Q.   And from your standpoint, it was
4 important that that be delivered before you provide
5 anything in response so that there be a written
6 record of what was requested and why --
7       MR. BECKETT:  Object to form.
8 BY MR. LAVELLE:
9    Q.   -- correct?
10    A.   Yes.  That appears to be, in the work and
11 the information we were providing, that was the
12 protocol.
13       MR. LAVELLE:  Let's go to Tab 16, and we
14 can mark that as the next exhibit, please.
15       EXHIBIT TECH:  This is Lennep Exhibit 24.
16    (Exhibit 24 marked for identification.)
17 BY MR. LAVELLE:
18    Q.   Ms. Lennep, we've marked as Exhibit 24
19 another email exchange you had with Mr. Collins
20 that's on June -- sorry -- January 4, 2021.
21       Do you see that?
22    A.   I do.
23    Q.   And do you recognize this to be an email
24 exchange you had with Mr. Collins on January 4,
25 2021?

Page 121

1    A.   I do.
2    Q.   Subject line "Tally Ho"?
3    A.   Yes, it appears to be.
4    Q.   "Tally Ho" like what they say at the
5 start of a race, something like that?
6    A.   It appears so.  I mean, that email didn't
7 originate with me so I don't know -- I guess it's
8 just off we go.  So -- but I can't tell you why he
9 named the email "Tally Ho."  He was just having a
10 little holiday cheer, I guess, after the holidays
11 were over.
12    Q.   Very good.
13    A.   I don't know.
14    Q.   So Mr. Collins writes to you "Madalan,
15 Ted wanted me to follow up about the data
16 request.... less than an hour and a half after the
17 holiday is over.  Sorry.  Shrug."
18    A.   So now your "Tally Ho" makes a lot more
19 sense, doesn't it?  They were off to the races
20 again.
21    Q.   And your response is?
22    A.   "I took a few days off, but I will check
23 on the status today."
24    Q.   And these are the data requests to
25 support redistricting; correct?

31 (Pages 118 - 121)

Page 122

1  A.  This is the voter information that's
2  available in SEMS as far as voter turnout that we
3  provided, yes.
4     Q.  All right.  The next document I want to
5  show you, or the next couple of documents, some of
6  them did not end up in the book because of a
7  printing error.  But I can show them to you on the
8  screen, and that's what I want to show you is on
9  Tab 38?
10       MR. LAVELLE:  So if the concierge can
11  mark that as an exhibit, please, and we can take a
12  look at that on the screen.
13       EXHIBIT TECH:  Please stand by.  This is
14  Lennep Exhibit 25.
15     (Exhibit 25 marked for identification.)
16  BY MR. LAVELLE:
17     Q.  Ms. Lennep, we've marked for
18  identification as Exhibit 25 an email exchange that
19  you had.
20       Do you recognize this?
21     A.  Yes.
22     Q.  Is this an email exchange you had with
23  Mr. Collins on January 25, 2021?
24     A.  Yes.
25     Q.  Subject line "Checking in for

Page 123

1  redistricting"?
2     A.  Yes.
3     Q.  Mr. Collins writes to you "Madalan, are
4  you back in the office yet?"
5       And you respond; correct?
6     A.  I did.
7     Q.  And your response was?
8     A.  "I am back and working on your reports.
9  I can send over the vote total reports by precinct.
10  The turnout reports have to be pulled county at a
11  time, which has slowed me down a bit."
12     Q.  Why do the turnout reports have to be
13  pulled a county at a time?
14     A.  Because it's the way that SEMS is
15  designed.  It's designed to be -- to follow the
16  protocol and the law that we use here in
17  Mississippi, which is, as I explained earlier, what
18  we call bottom up.  So the counties have independent
19  data tables in SEMS.  And in many cases, even as a
20  state user, I can't cross over county lines to
21  provide consolidated information.  It has to be
22  pulled county at a time.
23     Q.  Is that what you ended up doing, pulling
24  the turnout reports county at a time?
25     A.  Uh-huh, yes.

Page 124

1     Q.  All right.  The next exhibit -- we're
2  finished with this one.  The next one is at Tab 24
3  in your binder.
4     A.  Yes.
5       MR. LAVELLE:  Let's mark that as the next
6  exhibit please.
7       EXHIBIT TECH:  24.  This is Lennep
8  Exhibit 26.
9     (Exhibit 26 marked for identification.)
10  BY MR. LAVELLE:
11     Q.  Ms. Lennep, we've marked as Exhibit 26
12  for identification another email exchange.
13       Do you see this?
14     A.  I do.
15     Q.  Do you recognize it?
16     A.  I do.
17     Q.  Is this an email exchange you had with
18  Mr. Collins on January 25, 2021?
19     A.  It is.
20     Q.  It's a follow-up to Mr. Collins's email
21  that we looked at just a moment ago; correct?
22     A.  Correct.
23     Q.  And what did you write to Mr. Collins in
24  your email at the top of this page?
25     A.  "Here are the vote results by precinct

Page 125

1  for the three races you requested.  Please take a
2  look and let me know if you have any questions.  I
3  will continue working on the voter turnout reports."
4     Q.  What are the three races that were
5  requested by Mr. Collins?
6     A.  They are listed there in the top of the
7  email, the attachments but it's U.S. Senate 2020,
8  U.S. Senate 2020 -- I guess one was the -- probably
9  the special.  The other maybe was the regular
10  election.  I'd have to look.  And then U.S.
11  Senate -- no, there's the special election -- 2018.
12  So it must have been the primary and the general.
13  I'll have to look.
14     Q.  We can show you the documents that were
15  attached next.  That will be the next exhibit.  But
16  in any event, these are voting results from U.S.
17  Senate races in 2018 and 2020; correct?
18     A.  That's correct.
19     Q.  All right.  So let's mark as the next
20  exhibit what's at Tab 25, which are the printouts of
21  the attachments to that email.
22     A.  Okay.  So the first one -- so this goes
23  through by precinct.
24       EXHIBIT TECH:  This is Exhibit 27.
25       MR. LAVELLE:  Yes.

32 (Pages 122 - 125)

Page 126

1    (Exhibit 27 marked for identification.)
2 BY MR. LAVELLE:
3    Q.   So, Ms. Lennep, can you tell us what's in
4 Exhibit 27?
5    A.   Yes. Yes -- wait -- yeah, what you're
6 showing me is just the attachments.
7    Q.   Those are the attachments to the email we
8 previously looked at, Exhibit 26?
9    A.   Yes, but the way you've scanned these or
10 whatever, it's --
11       MR. BECKETT:  It just presents
12 differently then it did in the binder.
13       MR. LAVELLE:  Unfortunately, I don't have
14 control of the way it looks on the electronic page,
15 but it's printed out in a way that it's, I think,
16 easier to read and it's in your binder in a way
17 that's easier to read.
18       THE WITNESS:  Yes.
19 BY MR. LAVELLE:
20    Q.   It should be identical. So just looking
21 at this, can you tell us what's in the reports or
22 attached to as Exhibit 27?
23    A.   Yes, it has the race title, the candidate
24 name, the political party, and then it has votes
25 cast for each of those candidates in each county by

Page 127

1 precinct in a spreadsheet format.
2    Q.   So these are the complete vote results by
3 precinct for the U.S. Senate elections that are
4 reported here; is that correct?
5    A.   Yes.
6    Q.   Then this is data that was pulled in the
7 form of reports from SEMS?
8    A.   Yes, in the form of an extract, yes.
9    Q.   Is there any data that you needed to add
10 to this report, or did it just come out of SEMS the
11 way that you requested it?
12    A.   No. This is just straight out of SEMS.
13    Q.   All right. Let's go to the next exhibit.
14 We're finished with this one. The next one is
15 another one that was a printing error and it's not
16 in the book, but it is at electronic Tab 39.
17       EXHIBIT TECH:  This is Exhibit Lennep 28.
18    (Exhibit 28 marked for identification.)
19 BY MR. LAVELLE:
20    Q.   Ms. Lennep, we've marked as Exhibit 28
21 for identification another email exchange.
22       Do you recognize this?
23       MR. BECKETT:  You don't have a Tab 39.
24 You're going to have to look at the screen.
25       THE WITNESS:  Yeah, I know. I don't know

Page 128

1 what I did with my glasses. Hold on just a second.
2 BY MR. LAVELLE:
3    Q.   Again, I apologize. There was a printing
4 error so a couple of documents did not end up in
5 that binder. So this one, I'm afraid you will have
6 to look at on the screen.
7    A.   Yes, just one second. I dropped them in
8 my bottomless pit of a purse.
9       Okay.
10    Q.   All right. The bottom email is one we
11 looked at earlier; correct?
12    A.   Yes.
13    Q.   An email from Mr. Collins to you,
14 January 25, 2021?
15    A.   Yes.
16    Q.   And the next email up is your response,
17 which we were looking at just a couple moments ago;
18 right?
19    A.   Yes.
20    Q.   All right. So above that one is an email
21 from Mr. Collins to you dated June 16, 2021;
22 correct?
23    A.   Yes.
24    Q.   And Mr. Collins writes to you, "Madalan,
25 we are building the data library, and the last email

Page 129

1 from January 25 has a duplicate file. I think we
2 are missing the Reeves/Hood 2019 governor's race
3 performance by precinct. Can you resend?"
4       Did I read that correctly?
5    A.   Yes.
6    Q.   And you respond; right?
7    A.   Yes.
8    Q.   What was your response?
9    A.   "I've been working on it now." So that's
10 why there were two of the same ones in the previous
11 email on this one.
12    Q.   All right. The next one is another one
13 that we have only in electronic form. That's
14 electronic Tab 40.
15       EXHIBIT TECH:  This is Lennep Exhibit 29.
16    (Exhibit 29 marked for identification.)
17 BY MR. LAVELLE:
18    Q.   Exhibit 29, Ms. Lennep, is another email
19 exchange you had with Mr. Collins; right?
20    A.   Yes.
21    Q.   Some of this we've seen before?
22    A.   Yes.
23    Q.   The bottom one. The bottom two we've
24 seen before; correct?
25    A.   Yes.

33 (Pages 126 - 129)

Page 130

1 Q. And then the next one from June 16 we
2 just looked at a moment ago; correct?
3 A. Yes.
4 Q. Now there's a new email on the top from
5 you to Mr. Collins on June 17, 2021; correct?
6 A. Yes.
7 Q. All right. What did you write to
8 Mr. Collins at that time?
9 A. "Sorry for the delay. Please see
10 attached. Are you still interested in voter turnout
11 by precinct? Here's a sample for Adams County 2020
12 general. This has to be done one county at a time
13 by election, but I will be happy to provide it if it
14 will be useful."
15 Q. And it looks like you attach two files to
16 your email to Mr. Collins; right?
17 A. Yes.
18 Q. What did you send him?
19 A. The governor's result that he said I was
20 missing in the previous email and then the Adams
21 County turnout report just like all the other
22 turnout reports we've looked at.
23 Q. Do you recall whether you ended up
24 sending him turnout reports for each county?
25 A. I did.

Page 131

1 MR. BECKETT: What's the date of that
2 email.
3 MR. LAVELLE: June 17, 2021.
4 MR. BECKETT: Thank you.
5 BY MR. LAVELLE:
6 Q. All right. We're ready for the next
7 exhibit. We can finish with this one. And the next
8 one is Tab 17 in the binder.
9 EXHIBIT TECH: This is Lennep Exhibit 30.
10 (Exhibit 30 marked for identification.)
11 BY MR. LAVELLE:
12 Q. Ms. Lennep we've marked for
13 identification as Exhibit 30 a email exchange you
14 had with Mr. Collins on July 8, 2021.
15 Do you recognize this?
16 A. Yes.
17 Q. Mr. Collins writes to you on July 8,
18 2021, "Madalan, I would like to speak with you by
19 phone. Is there a time and number that is
20 convenient for you"; right?
21 A. Yes.
22 Q. And you respond; right?
23 A. Yes. "You can call me anytime on my cell
24 phone."
25 Q. Then you give a cell phone number?

Page 132

1 A. Yes.
2 Q. Right?
3 A. Yes.
4 Q. Do you remember if Mr. Collins called you
5 in July of 2021?
6 A. I'm sure he did.
7 Q. Do you remember what he asked you about?
8 A. Other than data pertaining to the SEMS
9 reports, no.
10 Q. Did you remind Mr. Collins that he needed
11 to put the request in writing so there would be a
12 record of it?
13 MR. BECKETT: Object to the form.
14 THE WITNESS: I believe -- no, I did not
15 remind him.
16 BY MR. LAVELLE:
17 Q. Well, that was the standard practice,
18 right, was that the requests were supposed to be in
19 writing so there was a record of it; right?
20 MR. BECKETT: Same objection.
21 THE WITNESS: But the request, I believe,
22 was already in writing.
23 BY MR. LAVELLE:
24 Q. Which writing? The letter that we
25 haven't seen?

Page 133

1 A. Yes.
2 Q. So you think that this was a request for
3 some subset of what was requested in that letter?
4 A. Yes, because the -- based on my records,
5 the only thing I've sent to PEER are the things that
6 we've discussed today.
7 Q. If we look at that letter from back in
8 January of 2021, we're going to see references to
9 things like the Reeves/Hood 2019 governor's race
10 performance by precinct request.
11 A. I don't -- I can't answer that question.
12 Q. You don't recall whether the letter went
13 into that level of detail?
14 A. I don't.
15 Q. All right. Let's go to the next exhibit,
16 Tab 18, please.
17 EXHIBIT TECH: This is Lennep Exhibit 31.
18 (Exhibit 31 marked for identification.)
19 BY MR. LAVELLE:
20 Q. Ms. Lennep, we've marked as Exhibit 31
21 for identification another email exchange you had
22 with Mr. Collins.
23 A. Yes.
24 Q. Do you see it?
25 A. I do.

34 (Pages 130 - 133)

Page 134

1  Q.  All right. Mr. Collins writes to you on
2  July 9, 2021; correct?
3  A.  Yes.
4  Q.  And Mr. Collins writes to you "Hey,
5  Madalan" -- and this is -- the subject is "Follow-up
6  redistricting request." He writes "Hey, Madalan, as
7  a follow-up request, the redistricting committee
8  council directed that we gather the precinct level
9  election returns for the attorney general race in
10 2019 between Lynn Fitch and Jennifer Riley Collins.
11 The format of the previous returns you sent worked
12 well for us so please send in the same format.
13     "Additionally the county-level turnout
14 results that we previously discussed are also a
15 great utility and, therefore, we request the full 82
16 county record.
17     "Madalan, thank you so much for all you
18 have done for this office now and over many years.
19 It's good to know you're there."
20     Did I read that correctly?
21 A.  Yes.
22 Q.  All right. And did you respond to
23 Mr. Collins?
24 A.  Yes.
25 Q.  What was your response?

Page 135

1     MR. LAVELLE: You have to scroll up,
2  whoever is controlling the screen here.
3     THE WITNESS: "Sorry for the delay. Had
4  a technical difficulty, but please see the attached
5  Fitch/Collins result by precinct."
6  BY MR. LAVELLE:
7  Q.  And you can tell from the email that you
8  sent that you actually did attach the report from
9  the attorney general race from 2019; correct?
10 A.  That's correct. And it would be the same
11 report as under our Tab 19. It's just that voter --
12 the votes cast report for that race.
13 Q.  By county and by each precinct?
14 A.  That's correct.
15 Q.  All right. And just to confirm that,
16 we'll look at the next exhibit as Tab 19 in your
17 binder?
18     MR. LAVELLE: We'll mark that as the next
19 exhibit, please.
20     EXHIBIT TECH: This is Exhibit 32.
21     (Exhibit 32 marked for identification.)
22 BY MR. LAVELLE:
23 Q.  All right. And, again, the formatting
24 here on the electronic version is not ideal, but do
25 you recognize Exhibit 32?

Page 136

1  A.  Yes.
2  Q.  What is Exhibit 32?
3  A.  It's the race results for that contest by
4  county and precinct.
5  Q.  The state attorney general race for 2019?
6  A.  Yes. The vote totals for each candidate
7  by county and precinct in that election.
8  Q.  So on your email exchange with
9  Mr. Collins relating to this request, which we just
10 looked at as the previous exhibit, there was a Kyle
11 Kirkpatrick also copied on the email?
12 A.  Yes.
13 Q.  Do you know Kyle Kirkpatrick?
14 A.  I do.
15 Q.  Who is Mr. Kirkpatrick?
16 A.  He's the current Assistant Secretary of
17 State for Elections.
18 Q.  So he's looped into your communications
19 with Mr. Collins for legal purposes?
20 A.  Yes. And because, I mean, he directs my
21 work product.
22 Q.  Bottom line is he, or whoever holds that
23 office, has to approve whatever you are sending to
24 Mr. Collins; is that right?
25 A.  Yes. We -- yes. I mean, we communicate

Page 137

1  with each other and make sure we know what we're
2  doing. Yes.
3  Q.  How do you typically do that when you get
4  requests like this? Obviously we've been looking
5  at, for the past hour plus, a whole array of
6  requests that you received from Mr. Collins or
7  Mr. Booth or a combination thereof. How did you vet
8  those requests with the Secretary of State's office?
9  A.  Generally, it's just a discussion. I
10 mean, I'm in the office quite often and we discuss
11 it, and then you'll see that I copy them on the work
12 product. So...
13     MR. LAVELLE: All right. We're finished
14 with this exhibit. Let's mark as the next exhibit
15 Tab 20 in the binder.
16     EXHIBIT TECH: It's Lennep Exhibit 33.
17     (Exhibit 33 marked for identification.)
18 BY MR. LAVELLE:
19 Q.  Ms. Lennep, we've marked as Exhibit 33
20 another email exchange you had with Mr. Collins.
21     Do you recognize this?
22 A.  Yes.
23 Q.  Mr. Collins writes to you on July 20,
24 2021, "Hey, Madalan, thanks for the AG race data.
25 Awesome. Trying to finalize the data collection and

35 (Pages 134 - 137)

**Page 138**

1 wanted to follow up about the turnout data.
2 Thanks."
3      Did I read that correctly?
4   A.   Yes.
5   Q.   And what was your response?
6   A.   "Hi, Ben. Will try to have it finished
7 this week. A couple of questions: Do you want the
8 counties I have already done? Do you need turnout
9 for the AG's race as well as the others?"
10   Q.   And then he responds "End of week sounds
11 good. Wait until they are all done. Yes, if we're
12 getting the other three, we will need it for the AG
13 race as well. Thanks so much."
14      And then you send a response?
15   A.   "Hi, Ben. Did you receive the files I
16 sent last night? Three different emails."
17   Q.   And he responds "Yes, ma'am. I'm hot on
18 something else, so it might take a minute to circle
19 back it. Heady times."
20      And you respond?
21   A.   "No problem. Just wanted to make sure it
22 got through the email filters. Hope to send AG
23 soon."
24   Q.   Do you know what Mr. Collins meant when
25 he said "heady times"?

**Page 139**

1      MR. BECKETT: Object to the form.
2      THE WITNESS: That they are busy.
3 BY MR. LAVELLE:
4   Q.   We'll take a look at the three different
5 emails you sent momentarily, but do you remember
6 generally what those emails concerned?
7   A.   It appears that they're the AG
8 information as well as the county turnout reports.
9   Q.   These are turnout data reports; right?
10   A.   Yes.
11   Q.   Why would turnout data be important for
12 redistricting?
13      MR. BECKETT: Object to the form.
14      THE WITNESS: I can't answer that.
15 BY MR. LAVELLE:
16   Q.   No one has ever explained that to you?
17   A.   Not specifically, no.
18   Q.   How about generally?
19   A.   We've never discussed what they do with
20 turnout numbers.
21   Q.   Have you discussed with them what they do
22 with any of the data that you provide?
23   A.   Not specifically, other than the fact
24 that, like we talked about with precincts. I mean,
25 precincts change so they are trying to keep updated

**Page 140**

1 on precinct names and polling locations and that
2 sort of thing.
3   Q.   All right. I think we're finished with
4 this exhibit. Let's go to what is, again, this is
5 one that didn't print or due to a little printing
6 error. But it's electronic Tab 41.
7      EXHIBIT TECH: This is Lennep Exhibit 34.
8      (Exhibit 34 marked for identification.)
9 BY MR. LAVELLE:
10   Q.   All right. Ms. Lennep, we've marked as
11 Exhibit 34 for identification an email you sent to
12 Mr. Collins. Taking a look at the top, the date is
13 July 26, 2021. Is this one of the three separate
14 emails that you had referenced as having sent to
15 Mr. Collins with turnout data?
16   A.   So I sent them on the 26th, yes.
17   Q.   And this was the one that has the
18 governor's race turnout from 2019; right?
19      MR. BECKETT: Object to the form.
20      THE WITNESS: It says the subject is
21 "Turnout 2018 senate special election."
22 BY MR. LAVELLE:
23   Q.   Sorry. Are you looking at the screen
24 that I am looking at right now?
25   A.   No, sir. I was looking at the --

**Page 141**

1      MR. BECKETT: John, that's a different
2 document that's under Tab 21 that we have. So it is
3 a different document. This is --
4      MR. LAVELLE: Oh, I'm sorry.
5      MR. BECKETT: So it may be the printing
6 error. But the one in the binder, the subject line
7 is "Turnout 2018 senate special election." So if
8 she needs to look at the screen, we need to --
9      THE WITNESS: Just remind me.
10 BY MR. LAVELLE:
11   Q.   We'll come back to the one that's at
12 Tab 21. Let's look at this one right here that has
13 been marked as Exhibit 34.
14      This was sent on July 26, 2021; correct?
15   A.   Yes.
16   Q.   By you to Mr. Collins?
17   A.   Yes.
18   Q.   And what's the subject line that you
19 wrote here?
20   A.   "Turnout for governor 2019."
21   Q.   Would you agree with me, just by looking
22 at the -- what appears to be the listing of the
23 exhibits, that this is a series of spreadsheets,
24 county by county, showing the governor turnout
25 numbers?

36 (Pages 138 - 141)

Page 142

1    A.   Yes.
2    Q.   And that's typically how you would get
3 these kind of reports is individual county basis?
4    A.   Yes.
5    Q.   All right.  Let's go to Tab 21.
6        MR. LAVELLE:  And let's mark that as the
7 next exhibit, please.
8        EXHIBIT TECH:  This is Lennep Exhibit 35.
9        (Exhibit 35 marked for identification.)
10 BY MR. LAVELLE:
11   Q.   And this is the one you were looking at
12 earlier.  This is Exhibit Lennep 35.
13       MR. BECKETT:  Yeah, that's it.
14 BY MR. LAVELLE:
15   Q.   Do you recognize this?
16   A.   Yes.
17   Q.   This is another one of those emails that
18 you sent to Mr. Collins on July 26, 2021; right?
19   A.   Yes.
20   Q.   And this is the printout for the 2018
21 senate special election, according to the subject
22 line; right?
23   A.   Yes.
24   Q.   Same format we saw earlier, which is a
25 series of county-by-county spreadsheets?

Page 143

1    A.   Yes.
2    Q.   This was, again, something you sent to
3 Mr. Collins pursuant to his request?
4    A.   Yes.
5    Q.   All right.  And then last, but not least,
6 this is another one that we don't have in the binder
7 but I can show it to you in electronic form, Tab 42.
8        EXHIBIT TECH:  This is Lennep Exhibit 36.
9        (Exhibit 36 marked for identification.)
10 BY MR. LAVELLE:
11   Q.   Ms. Lennep, do you recognize what we've
12 marked for identification as Exhibit 36?
13   A.   Yes.
14   Q.   Is this an email you sent to Mr. Collins
15 on July 26, 2021?
16   A.   Yes.
17   Q.   Subject "Turnout for senate 2020"?
18   A.   Yes.
19   Q.   Again, county-by-county reports of the
20 turnout in the senate election in 2020?
21   A.   Yes.
22   Q.   All right.  We're finished with that one.
23 Now we can go to Tab 23 of the binder.
24       EXHIBIT TECH:  This is Lennep Exhibit 37.
25       (Exhibit 37 marked for identification.)

Page 144

1 BY MR. LAVELLE:
2    Q.   Ms. Lennep, we've marked as Exhibit 37
3 for identification an email from you to Mr. Collins
4 dated July 29, 2021.
5        Do you recognize this?
6    A.   Yes.
7    Q.   Is this an email you sent to Mr. Collins
8 on that day?
9    A.   Yes.
10   Q.   What's it about?
11   A.   The subject line is "Attorney general
12 2019 turnout numbers."
13   Q.   Again, a county-by-county series of
14 spreadsheets reporting the turnout in the 2019
15 attorney general race; correct?
16   A.   Correct.
17   Q.   Sent to Mr. Collins pursuant to his
18 request?
19   A.   Yes.
20   Q.   All right.  We can close that up.  I'm
21 finished with that exhibit.
22       Now, we've just spent some time going
23 through a number of specific races for which you
24 were requested to provide reports to Mr. Collins.
25 Do you know why Mr. Collins had selected and

Page 145

1 requested those particular races?
2        MR. BECKETT:  Object to the form.
3        THE WITNESS:  I do not.
4 BY MR. LAVELLE:
5    Q.   Were there any other reports that you
6 were requested to provide that you were not able to
7 provide?
8    A.   Not to my knowledge.
9    Q.   Were there any reports that were
10 requested of the Department of State that you were
11 not involved in fulfilling, either because you were
12 unavailable or because they required someone else's
13 input to provide?
14       MR. BECKETT:  Object to the form.
15       THE WITNESS:  I don't -- I don't know how
16 I could answer that.
17 BY MR. LAVELLE:
18   Q.   Were you aware of any requests that were
19 submitted to the Department of State that you didn't
20 have any involvement in responding to?
21   A.   No, not to my knowledge.
22   Q.   Is there anybody else who would have --
23 who, to your knowledge, was involved in generating
24 SEMS reports for the redistricting efforts, other
25 than yourself?

37 (Pages 142 - 145)

Page 146

1    A.  I don't really know that this reporting
2  could be specifically -- or that kind of reporting
3  could be specifically designated as redistricting.
4  So I'm not sure.  I mean, there are other
5  individuals at the Secretary of State's office that
6  can pull reports.  But to my knowledge, nothing --
7  nothing with PEER that I know of.
8    Q.  Do you have any other correspondence with
9  Mr. Collins during 2020 or 2021 that you haven't
10  produced to us pursuant to the subpoena?
11    A.  Not that I know of.
12    Q.  Were you looking for correspondence you
13  had with Mr. Collins?
14    A.  I did.
15    Q.  How about with Mr. Booth?  Did you have
16  any other correspondence with Mr. Booth during 2020
17  or 2021 that you did not produce pursuant to the
18  subpoena?
19    A.  Not that I know of.
20    Q.  Are you aware that there were public
21  hearings held concerning the redistricting process
22  in 2021 and 2022?
23    A.  Was I aware?
24    Q.  Yes.  Are you aware that there were
25  public hearings held?

Page 147

1    A.  Yes.
2    Q.  Were you asked to participate in any of
3  those?
4    A.  No.
5    Q.  Did you attend any of those?
6    A.  No.
7    Q.  Have you read the transcripts of any of
8  them?
9    A.  No.
10    MR. LAVELLE:  Why don't we take a brief
11  break here for, like, five minutes.
12    MR. BECKETT:  That will be fine.
13    John, do you have an idea about for
14  timing.
15    MR. LAVELLE:  Yeah, we're pretty close to
16  finished.  My guess is I've got maybe 10, 15 minutes
17  left.
18    MR. BECKETT:  That would be great.  Let's
19  take a quick break.
20    THE WITNESS:  Okay.
21    THE VIDEOGRAPHER:  The time is 2:07 p.m.
22  we're off the record.
23    (Off the record)
24    THE VIDEOGRAPHER:  We're back on the
25  record.  The time is 2:18 p.m.

Page 148

1  BY MR. LAVELLE:
2    Q.  Ms. Lennep, a few follow-up areas on what
3  kind of data there might be on certain things.  It
4  may well be things that there is no data on.  But
5  given your experience and expertise in the SEMS
6  database and in what records the Department of State
7  has access to, I want to ask you about them.
8    Do you know whether the Secretary of State
9  tracks historical trends in voter registration?
10    A.  We do not.
11    Q.  You did see that you are able to generate
12  reports on turnout?
13    A.  Yes.
14    Q.  Does the department -- Secretary of State
15  do any kind of tracking or analysis of changes in
16  turnout over time?
17    A.  No.  I mean, we have that information.
18  We report that information to the federal government
19  after every federal general election, all kinds of
20  statistics.  But as far as SEMS providing any type
21  of data mining or analysis of any of that
22  information that's contained in SEMS, no.
23    Q.  If someone wanted to, the data is there
24  and is retained and those reports could be
25  generated, in theory; correct?

Page 149

1    A.  In theory, with specialized queries
2  developed for a specific request, I guess so.
3    Q.  Do you know whether the Secretary of
4  State conducts any research related to voter
5  registration?
6    A.  Other than I know registration numbers
7  are included in, like, our annual report that is
8  produced each fiscal year, other than that, I mean,
9  like I said, there is no statistical analysis that I
10  know of that is done with that information.
11    Q.  You don't know, for example, whether the
12  Secretary of State's office has attempted to
13  determine the percentage of eligible voters who
14  have, in fact, registered to vote in different
15  districts?
16    A.  No, no.  I would have to think through
17  even the formula to get to that, but no.
18    Q.  Are you aware of any efforts by the
19  Secretary of State to increase voter turnout?
20    MR. BECKETT:  Object to the form.
21    THE WITNESS:  Based on the commercials
22  and the communications that are done by the
23  Secretary of State communication director just to
24  the general public, yes, I do see, not as part of my
25  role at Secretary of State, but I do see, as a

38 (Pages 146 - 149)

Page 150

1 resident of the state, that the secretary does make
2 an effort to promote voter registration and voter
3 roll -- and voter turnout in election cycles.
4 BY MR. LAVELLE:
5    Q.   Are you involved in that work?
6    A.   No.
7    Q.   Do you know whether the Secretary of
8 State's office has looked at geographic -- the
9 disparities in voter registration?
10       MR. BECKETT: Object to the form.
11       THE WITNESS: No.
12 BY MR. LAVELLE:
13    Q.   Whether the Secretary of State has looked
14 at racial disparities in voter registration?
15       MR. BECKETT: Object to the form.
16       THE WITNESS: Not that I know of, no.
17 BY MR. LAVELLE:
18    Q.   And has the Secretary of State ever
19 looked at whether or not polarized voting exists in
20 Mississippi elections?
21       MR. BECKETT: Object to the form.
22       THE WITNESS: No, not that I know of.
23 Again, making sure to clarify that, based on my
24 knowledge, no.
25 BY MR. LAVELLE:

Page 151

1    Q.   Understood. Understood. I wanted to
2 show you one last document that is at Tab 26 in your
3 binder. Do you have that in front of you?
4       MR. LAVELLE: And we'll mark that as the
5 next exhibit, please.
6       EXHIBIT TECH: This is Lennep Exhibit 38.
7       (Exhibit 38 marked for identification.)
8 BY MR. LAVELLE:
9    Q.   Ms. Lennep, we've marked as Exhibit 38
10 for identification an article from the
11 "Clarion-Ledger" from May 11, 2011. And the article
12 is titled "Judges Aware of Looming Elections, Vow to
13 Address Redistricting Quickly." Do you recall there
14 being a redistricting litigation before a
15 three-judge federal court back in 2011?
16    A.   Yes.
17    Q.   Do you remember being asked to comment at
18 that time about what would happen if the court
19 required redistricting to be done in terms of how
20 long it would take?
21    A.   I didn't comment to the press, but I was
22 a witness in that case.
23    Q.   You testified to the court on that topic;
24 is that right?
25    A.   That's correct.

Page 152

1    Q.   And what did you -- what do you remember
2 telling the three-judge panel of the court?
3    A.   It seems the central question at the
4 point I was testifying was how quickly redistricting
5 could be completed statewide. And what I told them
6 was that the three-day time frame that was thrown
7 away was -- that was thrown around during the
8 discussions was not reasonable.
9    Q.   Sorry. Three-day --
10    A.   Three-day.
11    Q.   -- time frame?
12    A.   Three-day, yes.
13    Q.   Can you explain what you mean by that?
14    A.   That all the redistricting for the state
15 could be done by each county in a three-day time
16 period.
17    Q.   And you testified that it would take
18 longer than that; correct?
19    A.   That's correct.
20    Q.   In your estimate, more like a couple of
21 months?
22    A.   Yes. Again, I mean, it's kind of like
23 how long is a piece of string? It depends on what
24 changes need to be made, how big the county is, how
25 good the address library or address index data is to

Page 153

1 be input into SEMS. So there are a lot of outside
2 factors that go into how long it can take.
3    Q.   What ended up happening in 2011 with
4 respect to redistricting, as you recall?
5    A.   The three-judge panel determined that it
6 was not reasonable, and the redistricting was
7 postponed until the 2015 time frame or election.
8    Q.   And then new districts were put in place
9 for the 2015 election?
10    A.   That's correct.
11    Q.   And how long did it take to do the work
12 in order to get the 2015 map in place?
13    A.   Months. Again, I mean, each county has
14 to determine how they approach the process. So the
15 lines change, the precinct lines may have been
16 changed by the county. Whether you can get good
17 address library data from your mapping company.
18 There are just numerous variables, but we did get it
19 all in place for -- prior to the 2015 election
20 cycle.
21    Q.   Ms. Lennep, I am finished the questions
22 that I wanted to ask with you -- ask of you today.
23 There are a couple areas that I will follow up with
24 your counsel on with respect to the subpoena. But I
25 want to thank you for your time and your attention

39 (Pages 150 - 153)

**Page 154**

1 and your willingness to answer questions today.

2    A.   Sure.  Thank you.

3        MR. BECKETT:  So this is Ryan Beckett.

4 We don't have anything.

5        THE VIDEOGRAPHER:  With nothing further,

6 the time is 2:29 p.m.  We're off the record.

7        (Whereupon, the above-entitled deposition was

8            concluded at 2:29 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 155**

1        CERTIFICATE OF COURT REPORTER

2        I, Julie Brown, Court Reporter and Notary

3 Public, in and for the State of Mississippi, do

4 hereby certify that the above and foregoing 157

5 pages, including this page, contain a true and

6 accurate transcription of the testimony of Madalan

7 Lennep contain a full, true and correct transcript

8 of the proceedings had in the aforenamed case at the

9 time and place indicated, which proceedings were

10 recorded by me to the best of my skill and ability,

11 remotely via videoconference.

12        I also certify that I placed the witness

13 under oath to tell the truth and that all answers

14 were given under that oath.

15        I certify that the witness has chosen her

16 right to the reading and signing of the deposition.

17        I certify that I have no interest, monetary

18 or otherwise, in the outcome of this case.

19        Witness my signature and seal this day,

20 December 29, 2023.

21

22    *Julie Brown*

23

24        JULIE BROWN, RPR, CCR 1587

25 My Commission Expires:  April 6, 2024

**Page 156**

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF MISSISSIPPI

2            NORTHERN DIVISION

3 MISSISSIPPI STATE CONFERENCE OF THE    PLAINTIFFS
  NATIONAL ASSOCIATION FOR THE

4 ADVANCEMENT OF COLORED PEOPLE; DR.
  ANDREA WESLEY; DR. JOSEPH WESLEY;

5 ROBERT EVANS; GARY FREDERICKS; PAMELA
  HAMNER; BARBARA FINN; OTHO BARNES;

6 SHIRLINDA ROBERTSON; SANDRA SMITH;
  DEBORAH HULITT; RODESTA TUMBLIN; DR.

7 KIA JONES; MARCELEAN ARRINGTON;
  VICTORIA ROBERTSON

8

9 VS.        No. 3:22-cv-734-DPJ-HSO-LHS

10 STATE BOARD OF ELECTION      DEFENDANTS
   COMMISSIONERS; TATE REEVES, in his

11 official capacity as Governor of
   Mississippi; LYNN FITCH, in her

12 official capacity as Attorney
   General of Mississippi; MICHAEL

13 WATSON, in his official capacity as
   Secretary of State of Mississippi

14 AND
   MISSISSIPPI REPUBLICAN EXECUTIVE    INTERVENOR-

15 COMMITTEE              DEFENDANT
         CERTIFICATE OF DEPONENT

16        I, Madalan Lennep, the deponent in the
   above deposition, do hereby acknowledge that I have

17 read the foregoing transcript of my testimony, and
   state under oath that it, together with any attached

18 Amendment to Deposition pages, constitutes my sworn
   testimony.

19        _____ I have made changes to my deposition

20        _____ I have NOT made any changes to my deposition

21        _____
         Madalan Lennep

22 Subscribed and sworn to before me, this

23 the ___ day of _____, 20____.

24        _____
         Notary Public

25 My Commission Expires: _____

**Page 157**

1        ERRATA SHEET

2 PAGE    LINE    CORRECTIONS (IF ANY)

3 ____    ____    _____

4 ____    ____    _____

5 ____    ____    _____

6 ____    ____    _____

7 ____    ____    _____

8 ____    ____    _____

9 ____    ____    _____

10 ____    ____    _____

11 ____    ____    _____

12 ____    ____    _____

13 ____    ____    _____

14 ____    ____    _____

15 ____    ____    _____

16 ____    ____    _____

17 ____    ____    _____

18 ____    ____    _____

19 ____    ____    _____

20 ____    ____    _____

21 ____    ____    _____

22 ____    ____    _____

23 ____    ____    _____

24 SIGNATURE:_____    DATE:_____

25        Madalan Lennep

40 (Pages 154 - 157)