EXHIBIT NO. C-2 evid.
CAUSE NO. 3:22cv734-DPJ-HSO-LHS
WITNESS
CLERK: _____ SHONE POWELL

FEB 28 2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
Candice Crane, REPORTER

Deposition Designation, Objections, Responses, and Counter Designations
MS NAACP Plaintiffs
February 12, 2024

**DEPOSITION OF MADALAN LENNEP**



| Plaintiffs' Designation Start | Plaintiffs' Designation Stop | Defendants' Objections to Plaintiffs' Designations | Defendants' Counter Designations | Plaintiffs' Objections to Defendants' Counter Designations |
|---|---|---|---|---|
| 54:17 | 59:1 | | 9:25 – 11:1 | |
| 61:2 | 67:23 | | 60:19 – 61:1 | |
| 70:5 | 71:22 | | 68:10 – 68:21 | |
| 73:21 | 74:21 | | 83:3 – 84:14 | |
| 75:20 | 80:24 | | 95:12 – 96:2 | |
| 82:22 | 83:2 | | 108:5 – 109:5 | |
| 96:3 | 100:24 | 100:11 – 100:24 Calls for Speculation. | 149:3 – 150:6 | |
| 102:15 | 106:7 | | 151:9 – 151:25 | |
| 106:10 | 107:6 | | | |
| 115:7 | 118:7 | | | |
| 122:15 | 123:25 | | | |
| 124:7 | 127:12 | | | |
| 127:17 | 130:25 | | | |
| 133:17 | 136:7 | | | |
| 137:16 | 139:10 | | | |
| 141:11 | 144:19 | | | |
| 150:7 | 150:16 | | | |
| 152:1 | 153:20 | | | |

Deposition Designation, Objections, Responses, and Counter Designations
MS NAACP Plaintiffs
February 12, 2024

## DEPOSITION OF MISSISSIPPI SECRETARY OF STATE 30(B)(6) - KYLE KIRKPATRICK

| Plaintiffs' Designation Start | Plaintiffs' Designation Stop | Defendants' Objections to Plaintiffs' Designations | Defendants' Counter Designations | Plaintiffs' Objections to Defendants' Counter Designations |
|---|---|---|---|---|
| 11:11 | 11:24 | | 6:13 – 6:20 | |
| 22:7 | 23:13 | | 14:3 – 15: 8 | |
| 36:23 | 38:24 | | 17:12 – 17: 24 | |
| 44:1 | 57:2 | 50:15 – 50:22 Calls for Speculation. | 57:3 – 58:17 | |
| 59:14 | 64:1 | | 64:9 – 64:24 | |
| 64:25 | 65:12 | | 65:13 – 65:24 | |
| 66:21 | 73:23 | | 66: 12 – 66:20 | |
| 75:20 | 78:11 | | 78:12 – 81:18 | |
| 86:15 | 87:2 | | 84:3 – 85:10 | 84:3 – 85:10 Relevance of unenacted legislation (FRE 401). |
| 93:1 | 93:19 | | 87:3 – 87:22 | |
| 98:21 | 102:1 | | 93:20 – 94:14 | |
| 103:2 | 103:22 | | 102:2 – 102:6 | |
| 103:23 | 105:22 | 104:12 – 104:24 Relevance. | 119:8 – 121:22 | |
| 106:2 | 106:22 | | 122:19 – 125:8 | |
| 108:25 | 110:9 | 108:25 – 110:9 Relevance. Assumes a duty that does not exist. | 127:9 – 128:8 | |

| Plaintiffs' Designation Start | Plaintiffs' Designation Stop | Defendants' Objections to Plaintiffs' Designations | Defendants' Counter Designations | Plaintiffs' Objections to Defendants' Counter Designations |
|---|---|---|---|---|
| 121:23 | 122:10 | | 129:11 – 130:7 | |
| 128:9 | 129:9 | 128:9 – 129:9 Relevance. Assumes a duty that does not exist. Calls for Speculation. | 139:5 – 140:11 | |
| 130:6 | 130:15 | | 147:25 – 148:4 | |
| 130:16 | 134:12 | 133:14 – 133:21 Calls for Speculation. | | |
| 134:13 | 135:8 | | | |
| 147:2 | 147:24 | | | |

3

# DEPOSITION OF MADALAN LENNEP

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF MISSISSIPPI
 2                    NORTHERN DIVISION
      MISSISSIPPI STATE CONFERENCE OF THE      PLAINTIFFS
 3    NATIONAL ASSOCIATION FOR THE
      ADVANCEMENT OF COLORED PEOPLE; DR.
 4    ANDREA WESLEY; DR. JOSEPH WESLEY;
      ROBERT EVANS; GARY FREDERICKS;
 5    PAMELA HAMNER; BARBARA FINN; OTHO
      BARNES; SHIRLINDA ROBERTSON; SANDRA
 6    SMITH; DEBORAH HULITT; RODESTA
      TUMBLIN; DR. KIA JONES; MARCELEAN
 7    ARRINGTON; VICTORIA ROBERTSON
 8    VS.                  No.
                           3:22-cv-734-DPJ-HSO-LHS
 9
      STATE BOARD OF ELECTION              DEFENDANTS
10    COMMISSIONERS; TATE REEVES, in his
      official capacity as Governor of
11    Mississippi; LYNN FITCH, in her
      official capacity as Attorney
12    General of Mississippi; MICHAEL
      WATSON, in his official capacity as
13    Secretary of State of Mississippi
      AND
14    MISSISSIPPI REPUBLICAN EXECUTIVE      INTERVENOR-
      COMMITTEE                              DEFENDANT
15
      *****************************************************
16          VIDEO DEPOSITION OF MADALAN LENNEP
      *****************************************************
17     Taken at the instance of the Plaintiffs at the
      offices of the Mississippi Attorney General, 550
18         High Street, Jackson, Mississippi, on
                   December 18, 2023,
19        beginning at approximately 9:21 a.m.
20            (APPEARANCES NOTED HEREIN)
21
                    * * * * * * * *
22            Reported Stenographically by:
              Julie Brown, RPR, CCR 1587
23
24
25
```

Page 6

1        THE VIDEOGRAPHER: Good morning. We are
2 going on the record at 9:20 a.m. Central Time on
3 December 18, 2023.
4        Please note that this deposition is being
5 conducted virtually and quality of recording depends
6 on the quality of the camera and the internet
7 connection of the participants. What is seen from
8 the witness and heard on screen is what will be
9 recorded. The audio and video recording will
10 continue to take place unless all parties agree to
11 go off the record.
12       This is a video-recorded deposition of
13 Madalan Lennep taken by counsel for the plaintiff in
14 the matter of Mississippi State Conference of the
15 National Association for the Advancement of Colored
16 People, et al., versus the State Board of Election
17 Commissioners et al., filed in the United States
18 District Court for the Southern District of
19 Mississippi Northern Division, case number
20 3:22-cv-734-DPJ-FKB.
21       This deposition is being located at 550
22 High Street, Jackson, Mississippi.
23       My name is Jason Hopkins. I'm the
24 videographer. The court reporter is Julie Brown.
25 We are both from the firm Veritext New York. Our

Page 7

1 concierge today, also from Veritext New York, is
2 Bailey Finnestad.
3        I am not related to any party in this
4 action nor am I financially interested in the
5 outcome.
6        If there are any objections to the
7 proceedings, please state them after the witness is
8 sworn. The witness may now be sworn.
9          MADALAN LENNEP,
10 having been first duly sworn, was examined and
11 testified as follows:
12       E X A M I N A T I O N
13 EXAMINATION BY MR. LAVELLE:
14    Q.   Ms. Lennep, my name is John Lavelle. I
15 am an attorney at the law firm Morgan Lewis &
16 Bockius. I am one of the attorneys representing the
17 plaintiffs in the lawsuit in which your deposition
18 has been requested.
19       Have you ever had your deposition taken
20 before?
21    A.   I have.
22    Q.   All right. So you're familiar generally
23 with how this works, but because we are doing this
24 virtually, in other words, I am participating in
25 this deposition by Zoom from another location, from

Page 8

1 Philadelphia, while you are located in Jackson,
2 there are some additional rules that you may not be
3 familiar with that I'm going to want to go over with
4 you.
5        So you have taken an oath to tell the truth
6 this morning. And we're going to ask you questions
7 and going to expect you to answer to the best of
8 your ability and to uphold that oath and provide
9 truthful answers. Okay?
10    A.   Okay.
11    Q.   We're going to be showing you some
12 documents at certain points. They'll be provided to
13 you on a screen. I believe that, for most of them,
14 if not virtually all of them, we also have them in
15 paper form so you can review them in order to be
16 able to answer questions on them. But I want to
17 make sure that you avail yourself of that
18 opportunity before you answer questions about
19 documents. Okay?
20    A.   Yes.
21    Q.   If I ask a question and you don't
22 understand it, let me know, and I'll be happy to
23 rephrase it. If I ask a question and you haven't
24 heard it and you need it read back, let me know and
25 either I'll repeat it or have the court reporter

Page 9

1 read it back.
2        If I ask a question and you answer it, I'm
3 going to assume you heard it, you understand it and
4 you're answering it to the best of your ability.
5 Okay?
6    A.   Yes.
7    Q.   I need the answers that you provide today
8 to be your own answers. And what that means is you
9 cannot get assistance from anybody else to answer
10 the questions, even though we are doing this
11 deposition remotely. So I would ask you not to
12 consult your cell phone or communicate
13 electronically with anybody else during the course
14 of this deposition. Is that understood?
15    A.   Yes.
16    Q.   If you need to take a break at any time,
17 you'll be permitted to do that. Just let me know
18 and we'll be happy to take a break. The only
19 exception is between the time I ask a question and
20 the time you answer that particular question. Okay?
21    A.   Yes.
22    Q.   All right. Any questions on any of those
23 instructions?
24    A.   No.
25    Q.   All right. So would you please state

3 (Pages 6 - 9)

Page 10

1 your full name and spell your last name for the
2 record?
3     A.    Yes.  It's Madalan Gemmill Lennep,
4 L-E-N-N-E-P.
5     Q.    Where do you work, Ms. Lennep?
6     A.    I work for Pharos consulting services.
7     Q.    Is that your business?
8     A.    It is.
9     Q.    How long have you had that business?
10    A.    Since -- under that business name, which
11 is a d/b/a for an S corp, since 1996.
12    Q.    And what kind of business do you do
13 through Pharos?
14    A.    Technology consulting and project
15 management.
16    Q.    In that role you've done work for the
17 Mississippi Secretary of State's office; is that
18 correct?
19    A.    Yes.
20    Q.    You've done quite a lot of consulting
21 work for the Secretary of State's office over the
22 years, haven't you?
23    A.    Yes.
24    Q.    In fact, you've been referred to as the
25 guru of the SEMS system, haven't you?

Page 11

1     A.    I've heard that, yes.
2     Q.    I'm not going to ask you to agree or
3 disagree with it.  But that's really why we want to
4 take your deposition today is we have a number of
5 questions for you relating to the SEMS system and
6 the information that was used from the SEMS system
7 as part of the redistricting process.  So that is
8 why we are taking your deposition today.  You
9 understand you're here today pursuant to a subpoena;
10 is that correct?
11    A.    Yes.
12        MR. LAVELLE:  I'd ask the concierge to
13 mark as an exhibit for identification what we have
14 at Tab 1A.
15        EXHIBIT TECH:  Please stand by.  This is
16 Lennep Exhibit 1.
17        (Exhibit 1 marked for identification.)
18 BY MR. LAVELLE:
19    Q.    So, Ms. Lennep, we have marked as
20 Lennep 1 a copy of the subpoena that was served to
21 you in connection with this matter.
22        Do you recognize this document?
23    A.    Yes.
24    Q.    Do you agree with me that this is the
25 subpoena that you are testifying under today?

Page 12

1     A.    You know, I received a number of
2 subpoenas from -- in relationship to this.  So this
3 is the subpoena to appear, yes.
4     Q.    So this one is titled "Subpoena to
5 Testify At a Deposition in a Civil Action."
6        Do you see that, Ms. Lennep?
7     A.    I do.
8     Q.    All right.  And you understand that to
9 mean this is the subpoena requiring you to testify
10 at the deposition we're taking here today; right?
11    A.    Yes.
12    Q.    And you had other subpoenas that were
13 served on you in connection with this matter; right?
14    A.    That's correct.
15    Q.    Let me show you another one of those just
16 so we've got it all in front of us.
17        MR. LAVELLE:  I'll ask the concierge to
18 go to -- it's in the same section, it would be
19 Tab 1B.
20        EXHIBIT TECH:  Please stand by.  This is
21 Lennep Exhibit 2.
22        (Exhibit 2 marked for identification.)
23 BY MR. LAVELLE:
24    Q.    All right.  Ms. Lennep, what we've marked
25 for identification as Exhibit Lennep 2 is

Page 13

1 plaintiffs' amended notice of deposition subpoena on
2 you.  And this is a filing that was made in the
3 court system last week, on December 13.
4        Have you ever seen this before?
5        MR. BECKETT:  Hey, John, you referenced
6 as Exhibit 2.  It's actually exhibit, in our book,
7 1B.
8        MR. LAVELLE:  Yes.  Just to be clear, I'm
9 marking the exhibits in order.  I'm not going to use
10 the B or the C.  I'm just going to mark them all in
11 order.  The tabs are for reference.
12        MR. BECKETT:  Okay.
13 BY MR. LAVELLE:
14    Q.    So, Ms. Lennep, do you need that question
15 repeated to you?
16    A.    I haven't seen this before, no.
17    Q.    Do you understand that we're here by
18 agreement of the parties to take this deposition of
19 you virtually; correct?
20    A.    Yes.
21        MR. LAVELLE:  I'd ask the concierge to
22 mark as the next exhibit for identification what's
23 at Tab 1C, the subpoena for documents.
24        EXHIBIT TECH:  Please stand by.  This is
25 Lennep Exhibit 3.

4 (Pages 10 - 13)

Page 58

1  registration record in SEMS is updated with the
2  current address, and the election officials in the
3  county returns that status of the voter to active.
4      Q.  Does the SEMS system record whether or
5  not an individual voter has attempted to vote by
6  provisional ballot in a particular election?
7      A.  It has the capability to record that,
8  yes.
9      Q.  Do you know whether, as a matter of
10 practice, that is recorded --
11     A.  Yes.
12     Q.  -- as a record that is kept and
13 maintained?
14     A.  We certainly encourage that.  But that
15 action and activity is up to the local election
16 officials.
17     Q.  And by "local," you mean county by
18 county?
19     A.  Exactly, yes.  Mississippi is what we
20 call a bottom-up state.  All of the power for the
21 election is at the county level.
22     Q.  So the information of whether or not
23 someone has voted by provisional ballot, it would be
24 up to the individual county as to whether or not
25 they recorded that?

Page 59

1      A.  That is correct.
2      Q.  I think we're finished with this
3  document.
4          MR. LAVELLE:  Let's now mark for
5  identification what is at 5B of the book.  Mark that
6  as the next exhibit.
7          EXHIBIT TECH:  This is Exhibit 7.
8      (Exhibit 7 marked for identification.)
9  BY MR. LAVELLE:
10     Q.  So, Ms. Lennep, I've marked for
11 identification as Exhibit 7, a motion package that
12 was filed in a case that was filed in federal court.
13 The case was called Thomas versus Bryant.  You're
14 certainly welcome to look at the whole thing, but
15 what I want to ask you questions about is what's
16 marked as Exhibit B to this motion.  It's an
17 affidavit of yours.
18     Let me know when you've had a chance to
19 look at that and are ready to answer questions about
20 it.
21     A.  Okay.
22     Q.  All right.  So, Ms. Lennep, we are now at
23 the portion of this exhibit that is identified
24 within it as Exhibit B.  It is an affidavit that you
25 provided.

Page 60

1      Do you recognize this?
2      A.  Yes.
3          MR. LAVELLE:  All right.  Turn to the
4  third page of this document.  Scroll down to the
5  bottom a little bit there.
6  BY MR. LAVELLE:
7      Q.  And do you see there's a signature that
8  appears above your name.  Is that your signature?
9      Take your time.  Just let me know when
10 you've got it in front of you and can answer
11 questions about it.
12     A.  Yes, that is my signature.
13     Q.  And you signed it on the fourth day of
14 December 2018; correct?
15     A.  Yes.
16     Q.  And your signature, as you can see on the
17 next page, was notarized; right?
18     A.  Yes.
19     Q.  And this is an affidavit that you
20 submitted under oath in the case of Thomas versus
21 Bryant; correct?
22     A.  Correct.
23     Q.  And everything that you stated here was
24 truthful and accurate to the best of your ability;
25 isn't that right?

Page 61

1      A.  Yes.
2      Q.  Let's turn to paragraph 3 of this
3  document where there's a detailed description of the
4  SEMS system that I want to just go over with you and
5  make sure that you agree with it, that it's an
6  accurate description.
7      So the first sentence here is "SEMS, using
8  Hewlett-Packard's Electus Voter Registrations and
9  Election Management software was implemented in 2005
10 as part of the Help America Vote Act (HAVA)
11 initiative"; right?
12     A.  Yes.
13     Q.  "SEMS has been used as the voter
14 registration system for all 82 Mississippi counties
15 since February of 2006."  And that's accurate;
16 right?
17     A.  Yes.
18     Q.  "SEMS provides statewide comprehensive
19 voter registration functionality, voter roll
20 maintenance functionality, election management, jury
21 management, petition management.  Interfaces include
22 the Department of Public Safety, Department of
23 Health, Administrative Office of the Courts, Global
24 Election Management System (GEMS) result (for voting
25 machine system), the National Change of Address

16 (Pages 58 - 61)

Page 62

1  (NCOA) and Military/Overseas Voters (MOVE Act) for
2  ballots"; right?
3      A.    Correct.
4      Q.    And that's accurate; correct?
5      A.    Correct.
6      Q.    All right.  And the second paragraph, you
7  write "The system currently contains 1.8 million
8  active voters with all registrations taking place at
9  each county circuit clerk's office"; is that right?
10     A.    That's correct.
11     Q.    Is there any registration work that is
12  done on a basis run by the Secretary of State's
13  office?
14     A.    No.
15     Q.    So if someone registers to vote, for
16  example, when they obtain a license to drive, how is
17  that handled?
18     A.    Well, the previous paragraph where it
19  says "interfaces include the department of public
20  safety," there is an electronic interface that
21  provides that information to SEMS.  It's separated
22  out by county and it's loaded for the counties to
23  process, just like any other voter registration.
24     Q.    Let's go to paragraph 4.  And can you
25  read what you wrote in paragraph 4, please, for the

Page 63

1  record?
2      A.    "Upon passage of any redistricting plans,
3  statewide or local, each counties' election
4  officials are responsible for redistricting in SEMS.
5  This is an extensive process which is implemented in
6  SEMS by changing district precinct split and address
7  range boundaries based on the information provided.
8  The Secretary of State's office provides training
9  and help desk support in these efforts but the work
10  is completed by the county."
11     Q.    All right.  Let's just pause there.  What
12  you wrote there that is still an accurate
13  description of what happens upon
14  redistricting; is that right?
15     A.    That's right.
16     Q.    And that work is completed by the county,
17  although the Secretary of State's office does
18  provide training and support?
19     A.    That's correct.
20     Q.    Let's read what you wrote in paragraph 5
21  of your affidavit here.
22     A.    "Accordingly, changing the district line,
23  including those of district 22, could impact a
24  number of counties based on the impact of the change
25  on other districts.  Each county with changes would

Page 64

1  require new maps and address range indexes.  The
2  county election officials would need to implement
3  those in SEMS by modifying precinct splits and
4  address ranges."
5      Q.    And then the next paragraph, please?
6      A.    "Poll books would be impacted due to the
7  potential for new splits and new ballot styles
8  associated with the election.  Voters would be moved
9  accordingly to the districts and precinct split
10  changes and address library changes."
11     Q.    Is that accurate as a description of what
12  would happen today if redistricting occurred?
13     A.    Yes.
14     Q.    All right.  And then read, finally, for
15  what we have here, what you wrote in paragraph 6.
16     A.    "Once an election is created and ballot
17  styles are generated, no redistricting changes are
18  allowed in SEMS until the completion of that
19  particular -- of the particular election.  The
20  timeline for election creation is generally about
21  55 days before an election day."
22     Q.    And that's accurate today as well; is
23  that right, Ms. Lennep?
24     A.    That's correct.
25     Q.    So can you explain to us what you meant

Page 65

1  by the timeline for election creation in this
2  paragraph?
3      A.    Yes.  So the election is created in SEMS,
4  and once that information is entered with the
5  contests and the candidates and ballot styles are
6  generated, the system goes into what we refer to as
7  lockdown.  You can't change address ranges and
8  precincts and splits because it would negatively
9  impact, for instance, if -- and it 55 days out at
10  least because we begin absentee voting 45 days
11  before the election.
12       So if somebody voted 45 days before the
13  election and then there was a potential to go in and
14  change district lines, there's no way to actually
15  track where that vote would land.  So for security
16  reasons and for accuracy reasons, once an election
17  is created and ballot styles are generated, no
18  additional changes can be made from a redistricting
19  standpoint.
20     Q.    So another way to look at this would be,
21  if you had two months' lead time, you'd be able to
22  get the election set up if there were redistricting
23  that occurred?
24         MR. BECKETT:  Object to the form.
25         THE WITNESS:  Absolutely not.  No.

17 (Pages 62 - 65)

Page 66

1 Because --
2 BY MR. LAVELLE:
3    Q.    Explain to me why that's not accurate.
4    A.    Because the process of redistricting
5 can't be done in a day, or even, in most cases, a
6 week because of the information and the process that
7 you have to go through in order to make those
8 changes.  And the size of the counties and how many
9 counties are impacted and it just, you know, it's
10 almost like a domino effect.
11    Q.    So it's really something that would
12 depend on the specific circumstances of what would
13 be required; is that right?
14    A.    You're saying what changes would be
15 required from a redistricting standpoint?
16    Q.    I'm really asking what the time frame
17 would be.  And it sounds to me -- and correct me if
18 I'm wrong about this -- that how long it would take
19 to get ready for an election would depend on the
20 scope of the redistricting; is that right?
21    A.    No.  How long it takes to get ready for
22 an election doesn't change.  I mean, it's generally
23 60 --about 60 days out.  Trying to force a
24 redistricting activity into that scenario could take
25 a couple of days.  It could take weeks.  It just

Page 67

1 depends on what the changes are.  And, again, and
2 how many counties are impacted and how good the data
3 is that we're being given to implement in SEMS.  So
4 it's -- sorry.  It's hard to give a specific answer
5 on that.
6    Q.    I think the answer you've given is very
7 helpful.  Obviously -- and I think you're aware of
8 this -- the litigation that we're currently engaged
9 in, that your deposition is being taken in concerns
10 whether or not the districts that have been drawn
11 for certain state elections in Mississippi need to
12 be changed.  And obviously a court is going to
13 decide whether or not that is the case, and, if so,
14 how they have to change.
15        The questions I'm focussing on with you
16 relate to timing.  And it sounds to me -- again,
17 correct me if I'm wrong -- you would not be able to
18 say here today that it would take a specific defined
19 time that you could predict with certainty no matter
20 how extensive or limited the changes are.  It would
21 really depend on the nature and extent of the
22 changes; is that right?
23    A.    Yes, that's correct.
24    Q.    All right.  Have you been asked to do any
25 work for the Secretary of State's office with

Page 68

1 respect to potential redistricting this year?
2    A.    No.
3    Q.    Have you discussed this lawsuit with
4 anyone other than the counsel who are representing
5 you in the deposition?
6    A.    No.
7        MR. LAVELLE:  We can take this exhibit
8 down.
9 BY MR. LAVELLE:
10    Q.    Now, in the course of your work for the
11 Department of State, you've provided assistance on
12 training programs; correct?
13    A.    Yes.
14    Q.    You've actually conducted training
15 programs on the statewide election management
16 system; right?
17    A.    Yes.
18    Q.    You've put together PowerPoints on those?
19    A.    Yes.
20    Q.    And you presented those; right?
21    A.    Correct.
22    Q.    Let's mark as the next exhibit what we
23 have at Tab 9 of the binder.
24      (Exhibit 8 marked for identification.)
25        EXHIBIT TECH:  Please stand by.  That's

Page 69

1 Lennep Exhibit 8.
2 BY MR. LAVELLE:
3    Q.    All right.  Ms. Lennep, we've marked as
4 Exhibit Lennep 8 for identification a series of
5 PowerPoint presentations.  And they are pretty
6 voluminous.  I don't propose to take you through
7 these page by page.  I don't think that would be a
8 good use of your time.  But I do want to just
9 determine and get you to answer on the record from
10 you as to whether or not these are presentations
11 that you prepared in the course of your consulting
12 for the Secretary of State's office.
13        MR. BECKETT:  Hey, John, while she flips
14 through that, is what's on the screen the same as
15 what's in the binder?
16        MR. LAVELLE:  Yes.
17        MR. BECKETT:  Okay.
18        Take your time and just flip through that
19 and make sure those are your documents.
20 BY MR. LAVELLE:
21    Q.    And just for clarity, there is a series
22 of PowerPoints there, if we need to walk through
23 them individually, but I'm hoping you can identify
24 them generally because they are all pretty much the
25 same?

18 (Pages 66 - 69)

Page 70

1    A.    Yeah.  Hold on just a second.  So are the
2  first two the same ones?  Yeah.  The first two in
3  there are identical.  They are both from the 2011
4  ECAM presentation.
5    Q.    What is an ECAM presentation?
6    A.    Election Commissioners Association of
7  Mississippi.  So that's where we do the
8  certification training for election commissioners.
9    Q.    So the election commissioners are county
10  officials who are responsible for conducting
11  elections?
12    A.    That's right.  In Mississippi, they are
13  elected.  There are five in each county.
14    Q.    And you have -- you've provided these
15  training programs to the election commissioners on
16  an ongoing basis on behalf of the Secretary of
17  State's office; correct?
18    A.    Correct.
19    Q.    And the idea here is that you're
20  providing training to these officials in what
21  features SEMS has and how to use it; is that
22  correct?
23    A.    Yes, yes.
24    Q.    I'm oversimplifying here, but as a very
25  general basis, that's what you're doing?

Page 71

1    A.    Yes.
2    Q.    Did you prepare these slides?
3    A.    Yes.
4    Q.    This is a presentation you do
5  periodically to the election commissioners?
6    A.    Every year.
7    Q.    You update it from time to time?
8    A.    Every year, yes.  Yes.  I mean, when it
9  says "SEMS update," I mean, we make updates to the
10  program about four times a year.  So certainly when
11  I present in January, which their annual convention
12  and when we do their certification training, it
13  would have different information in it as far as the
14  updates go, and then we focus on whatever else is
15  important for that year.
16    Q.    Got it.  All right.  But just so we have
17  it clear on the record, what we've marked as
18  Exhibit 8 -- Lennep 8 are the PowerPoints that you
19  prepared for presentation to the election
20  commissioners as part of their ongoing training; is
21  that right?
22    A.    Yes.
23        MR. LAVELLE:  All right.  Let's mark as
24  the next exhibit -- I'm finished with this one.
25  Let's mark the next exhibit what we have at Tab 10.

Page 72

1  We'll mark that as the next exhibit for
2  identification, please.
3        EXHIBIT TECH:  Stand by.  This is Lennep
4  Exhibit 9.
5        (Exhibit 9 marked for identification.)
6  BY MR. LAVELLE:
7    Q.    All right.  Ms. Lennep, do you recognize
8  what we've marked for identification as Lennep 9?
9    A.    Yes.
10    Q.    What is it?
11    A.    Election tips for the TSX, that's the
12  name of the voting machine system.  I'm sorry.  Ask
13  me that again.
14    Q.    Is this a presentation that you prepared,
15  Ms. Lennep?
16    A.    Yes.
17    Q.    The fact it identifies you on the first
18  page as the creator of this training program; right?
19    A.    Yes.
20    Q.    Who is Derrick Cooper?
21    A.    He's an employee at the Secretary of
22  State.
23    Q.    Do you recall whether Mr. Cooper actually
24  provided this PowerPoint to the officials?
25    A.    I'm sure he did.

Page 73

1    Q.    Why did you end up being the person to
2  create this PowerPoint?
3    A.    I had created it and presented it
4  previously, and if I remember right, we had a
5  conflict that I couldn't be at this municipal
6  training, and so Derrick, who was also with
7  elections and worked in IT, did the presentations.
8        MR. LAVELLE:  We are finished with that
9  document.  Thank you.
10        Let's now go to what we have at Tab 11 of
11  the binder.  And could we mark that, Concierge, as
12  the next exhibit, please?
13        (Exhibit 10 marked for identification.)
14        EXHIBIT TECH:  Please stand by.  This is
15  Lennep Exhibit 10.
16  BY MR. LAVELLE:
17    Q.    Ms. Lennep, we have marked as Exhibit 10
18  for identification another PowerPoint presentation.
19        Do you recognize this?
20    A.    Yes.
21    Q.    What is this presentation?
22    A.    It's "Voter Roll Move, Merge, and Purge."
23  So it's a presentation on voter roll maintenance.
24    Q.    Who was this presentation provided to?
25    A.    Probably both circuit clerks and election

19 (Pages 70 - 73)

Page 74

1  commissioners because, in counties, they all
2  participate in this process.
3     Q.   When would you have provided this
4  presentation?  Let me rephrase that.
5         When did you provide this presentation to
6  those individuals?
7     A.   I don't know.  I hate that I didn't have
8  a date on it.  But I can tell from the screenshots
9  that it was prior to 2020.
10    Q.   How do you know it was prior to 2020?
11    A.   Because we changed the format of the
12  dashboard -- or the home screen.  Like the date on
13  the -- on one of the screenshots is 2017.  The date
14  in the reports is 2017.  So I'm going to say 2017.
15    Q.   Is this a presentation that you have
16  likewise provided periodically?
17    A.   Portions of it in different formats
18  because we constantly talk about voter roll
19  maintenance.  But specifically, no.  I wouldn't --
20  like, I wouldn't have shown this since we moved to
21  the new dashboard because it's outdated.
22    Q.   All right.  We're finished with this
23  exhibit.  The last one that's like this that we're
24  going to show you is at Tab 12 of your binder.
25    A.   Uh-huh.

Page 75

1     Q.   One last collection of PowerPoints.
2         MR. LAVELLE:  And if I could ask the
3  concierge to please mark that as the next exhibit
4  for identification.
5     (Exhibit 11 marked for identification.)
6         EXHIBIT TECH:  Please stand by.
7         MR. BECKETT:  While she's doing that, I
8  can assume what she's going to put on the screen is
9  the same as what's in the binder?
10        MR. LAVELLE:  Correct.
11        MR. BECKETT:  Because Madalan is able to
12  flip through the binder a lot more easily.
13        MR. LAVELLE:  Understood.  That is why we
14  are glad to have the physical copies there in front
15  of the witness, to make it easier.
16        MR. BECKETT:  Take your time.  That's a
17  big document.
18        EXHIBIT TECH:  This is Lennep Exhibit 11.
19  BY MR. LAVELLE:
20    Q.   Ms. Lennep, we have marked for
21  identification Lennep Exhibit 11, another PowerPoint
22  presentation.  Can you tell us what this is?
23    A.   This was presented at the ECAM convention
24  in 2011.  And it's SEMS update on redistricting and
25  new features.  So in preparation for information

Page 76

1  that would be received from the 2010 census.
2     Q.   And what specifically were you training
3  these individuals about with respect to
4  redistricting?
5     A.   How they would implement the lines that
6  were drawn into SEMS.
7     Q.   Is this a type of presentation that you
8  have provided more than once?
9     A.   Yes.
10    Q.   How frequently have you presented this
11  presentation in one form or another?
12    A.   As far as implementation of redistricting
13  lines that were provided to the county, several
14  times in the 2012 to 2015 time frame and then
15  several times in the past couple of years.
16    Q.   There had to be redistricting work done a
17  couple of times during the 2012 to 2015 time frame;
18  correct?
19        MR. BECKETT:  Object to form.
20        Can you be more specific about which kind
21  of redistricting?  Are you talking about legislative
22  or the other positions in government?  Just -- it
23  would be helpful, I think, if we knew a more
24  specific reference.
25        MR. LAVELLE:  Let me ask the witness

Page 77

1  that.
2  BY MR. LAVELLE:
3     Q.   When you refer to redistricting
4  preparation, redistricting steps in your
5  presentation here, what kind of redistricting are
6  you referring to?
7     A.   Generic to the type, the same steps are
8  taken in SEMS.
9     Q.   So whatever the reason for the
10  redistricting, whether it be legislative or court or
11  what have you, there are a series of steps that have
12  to be done in SEMS; is that correct?
13    A.   That's correct.
14    Q.   And what are those steps that have to be
15  done?
16    A.   They have to be given -- the county would
17  have to be given maps and address ranges for the
18  changes.  Generally information that would provide
19  what district they are coming from and what district
20  they are going to, what precinct they are in.  And
21  then those address ranges, for instance, 100 to 500
22  Main Street, would be in one district, which would
23  require a specific split in a precinct so that then
24  the precinct and the address information would all
25  be associated to the voter through that address

Page 78

1 range. So it's automatically assigned once all of
2 the address library connections are made to those
3 individual precincts and splits.
4     Q.   So the specific steps that have to be
5 done, you have obviously covered them in this
6 presentation, you have provided training on those
7 steps to officials on a regular basis over the past
8 at least 12 years; is that correct?
9     A.   Sporadically. I mean, we don't
10 redistrict every year so, I mean, we didn't provide
11 any type of redistricting training for, I would say,
12 2015 through 2021 because there was no reason for
13 it.
14     Q.   But then when the new district lines were
15 drawn for the state legislature in 2022, training
16 was provided by you; correct?
17     A.   Yes.
18     Q.   Do you recall when you provided that
19 training for the 2022 redistricting?
20     A.   Yes. But, I mean, there were multiple --
21 there were multiple training classes, generally last
22 year in the summer. Because, again, you can only do
23 this work when there's not an open election.
24     Q.   All right. Let me ask you a little bit
25 more about that because I'm not sure I understand

Page 79

1 your answer.
2        You provided multiple training programs on
3 the redistricting steps during the summer of 2022.
4 Is that your recollection?
5     A.   Yes. We provided regional training. So,
6 like, we did a class in Hattiesburg, we did a class
7 in Jackson, we did a class in Oxford.
8     Q.   So the idea would be that you would go to
9 a location, and then the county officials from that
10 region would assemble so that you could provide the
11 training to them as a group?
12     A.   Correct.
13     Q.   How many of those group training sessions
14 did you do on redistricting steps during 2022?
15     A.   Three in-person.
16     Q.   Did you do a virtual one or more than one
17 as well?
18     A.   There is a virtual recorded training
19 session.
20     Q.   And that's available for on demand for
21 anybody who needs to review it; is that right?
22     A.   That is correct.
23     Q.   And where would that be located? Is that
24 on a server that's available for the election
25 officials?

Page 80

1     A.   Yes, I believe that's the case. Although
2 our training coordinator at Secretary of State, I
3 mean, the individual has to contact them, sign up
4 for it, be given credentials. It's not something
5 that's just, like, out on a public-facing website.
6     Q.   Who is the training coordinator at the
7 Secretary of State's office currently?
8     A.   Logan Witcher.
9     Q.   Is it Mr. Or Ms. Witcher?
10     A.   Mister.
11     Q.   How long has Mr. Witcher been in that
12 position? A while?
13     A.   Yeah. A couple of years. I'm not
14 exactly sure.
15     Q.   To the best of your knowledge, that video
16 of the training on redistricting is available for
17 any of the election officials who would need it to
18 review currently?
19     A.   Yes.
20     Q.   Did anyone do that training or provide
21 that training along with you, or were you the only
22 one for the Secretary of State's office who provided
23 that training?
24     A.   I was the only one.
25        MR. LAVELLE: All right. We're at a

Page 81

1 point that would be a convenient time for a break.
2 Going to move to a different topic. So we can take
3 a break for five minutes if you'd like.
4        MR. BECKETT: That's great, John. Do you
5 want to go another hour and then do a later lunch?
6        MR. LAVELLE: That works for me, but it's
7 really -- we can go off the record and discuss the
8 scheduling.
9        THE VIDEOGRAPHER: The time is
10 11:17 a.m., and we are off the record.
11        (Off the record)
12        THE VIDEOGRAPHER: We're back on the
13 record. The time is 11:25 a.m.
14 BY MR. LAVELLE:
15     Q.   All right. Ms. Lennep, when did you
16 first get asked to do any consulting work with
17 respect to the redistricting process for the
18 redistricting done following the 2020 census?
19     A.   When did I get asked to do redistricting
20 work? For SEMS, I mean, it's not a specific
21 request. It's just an acknowledgment of part of the
22 project. So, I mean, from the Secretary of State's
23 standpoint, nobody came to me and said, "Hey, are
24 you going to do redistricting?" I mean, it's just a
25 standard part of the process. So I can't tell you

21 (Pages 78 - 81)

Page 82

1 that somebody specifically came to me and said,
2 "Here, do this."
3    Q.  Do you know Ben Collins?
4    A.  I do know Ben Collins.
5    Q.  All right.  What is Mr. Collins's
6 position?
7    A.  He works with PEER, which is -- I don't
8 know the acronym, what are the letters --
9    Q.  PEER is the committee that's involved in
10 the redistricting process; is that correct?
11        MR. BECKETT:  Object to the form.
12        THE WITNESS:  I can't honestly -- I don't
13 know.
14 BY MR. LAVELLE:
15    Q.  All right.  Well, I'll be able to show
16 you, I think, a document --
17    A.  There's a legislative review -- but my
18 understanding is they do a whole lot more than
19 redistricting.  I mean, they are a constant division
20 that works with the legislature, is my
21 understanding.
22    Q.  All right.  Let me ask the question a
23 different way.  What kind of work have you done with
24 Mr. Collins?
25    A.  So the Secretary of State's office has

Page 83

1 provided information to PEER on things like
2 precincts and voter turnout and that sort of thing.
3 I mean, as far as work, I don't do any work with
4 them.  I mean, I'm not involved in their process at
5 all other than to provide some information from
6 SEMS.
7    Q.  I think it's inherent in what you just
8 said, but let me just ask you the question to make
9 it clear.  You don't tell Mr. Collins what to ask
10 for, you just respond to requests by Mr. Collins for
11 information from SEMS.  Is that a fair statement?
12    A.  That's correct.
13    Q.  And you have provided information to
14 Mr. Collins at his request from time to time from
15 the SEMS system?
16    A.  That's correct.
17    Q.  What he does with that, you're not really
18 sure; is that fair?
19    A.  That is extremely fair and accurate.
20    Q.  All right.  Do you know Ted Booth?
21    A.  I do know Ted Booth.
22    Q.  All right.  How do you know Mr. Booth?
23    A.  He's Ben's boss.  He's the executive
24 director of PEER, I would assume.
25    Q.  And there have been times when Mr. Booth

Page 84

1 has asked you for information from SEMS?
2    A.  Maybe once or twice, but generally I work
3 with Ben.
4    Q.  When you have worked with Mr. Booth, has
5 it been the same as it was with Mr. Collins?  In
6 other words, you don't tell him what to ask for but
7 you just respond to requests that he has made for
8 information?
9    A.  Yes.
10    Q.  Has Mr. Booth ever asked you for input on
11 a proposed state legislative district?
12    A.  No.
13    Q.  Has Mr. Collins ever done that?
14    A.  No.
15    Q.  We have a number of documents that have
16 been produced, some that you produced to us and
17 others that were produced to us by the Secretary of
18 State's office directly.  So I'm going to try to go
19 through these in chronological order.  So we could
20 end up skipping around a little bit in this binder,
21 but my goal is to try to go through it in
22 chronological order because I think that's the
23 easiest way for me to follow what you did and what
24 you were asked to do.  Okay?
25    A.  Okay.

Page 85

1    Q.  So the earliest one that we have, or at
2 least I've seen, is at Tab 29.
3        MR. LAVELLE:  And I'll ask the concierge
4 to mark that as the next exhibit, please.
5        EXHIBIT TECH:  Please stand by.  This is
6 Lennep Exhibit 12.
7        (Exhibit 12 marked for identification.)
8 BY MR. LAVELLE:
9    Q.  So, Ms. Lennep we've marked for
10 identification as Exhibit 12, an email.
11        Do you recognize this?
12    A.  Yes.
13    Q.  Is this an email that you sent to
14 Mr. Collins?
15    A.  Yes.
16    Q.  And you sent this on May 28, 2019;
17 correct?
18    A.  Correct.
19    Q.  And the subject line of the email you
20 sent to Mr. Collins on that date is "SEMS listing of
21 precincts statewide 5/28/19"; right?
22    A.  Yes.
23    Q.  A couple questions for you here.  The
24 signature block of your email identifies you; right?
25 Madalan Lennep, PMP, elections consultant; right?

22 (Pages 82 - 85)

Page 94

1 because that can't be pulled at the state level
2 because the state doesn't have any poll books in
3 SEMS. All of the poll books are pulled at the
4 county level.
5     Q. Do you have a recollection of why
6 Mr. Booth asked you for this information?
7     A. I don't.
8     Q. You did ask him to send you a request for
9 the information and a description of how it would be
10 used; right?
11    A. Yes. And that was a request by legal,
12 which Kim Turner was our -- of course, is also an
13 attorney, as it says, for elections.
14    Q. Can you explain to me what you mean by
15 that was a request by legal?
16    A. Yes. Kim Turner, who's an attorney, was
17 the Assistant Secretary of State for Elections at
18 the time. And so I ran this request by her, and she
19 asked that it be put in a formal request and
20 information on how it would be used.
21    Q. And that was why you copied Kim Turner on
22 this email?
23    A. Correct.
24    Q. Let's go to the next tab, Tab 33.
25        MR. LAVELLE: And I'll ask the concierge

Page 95

1 to mark this as the next exhibit for identification,
2 please.
3        EXHIBIT TECH: Please stand by. This is
4 Lennep Exhibit 16.
5     (Exhibit 16 marked for identification.)
6 BY MR. LAVELLE:
7     Q. Ms. Lennep, we've marked for
8 identification as Exhibit 16 an email exchange that
9 you had with Mr. Booth.
10    Q. Do you recognize this?
11    A. Yes.
12    Q. And this is an email exchange you had
13 with Mr. Booth in November of 2019, November 5,
14 2019, to be precise?
15    A. Yes.
16    Q. In this printout, the email that we've
17 looked at previously that you sent to Mr. Booth is
18 at the bottom of the chain; right?
19    A. Yes.
20    Q. The one where you asked him to send a
21 request of the information he needed along with how
22 it will be used; right?
23    A. Yes.
24    Q. And then the email immediately above it
25 is Mr. Booth's response providing that information

Page 96

1 to you; correct?
2     A. Yes.
3     Q. Can you read for us what Mr. Booth told
4 you was the reason for his request?
5     A. "We would like accurate
6 precinct-by-precinct registration information for
7 all Mississippi voting precincts as far as the
8 registration cutoff date for November 5, 2019,
9 general election. We will eventually be using this
10 information to help us design districts for the
11 house and senate following the 2020 census PL-94-171
12 data delivery.
13     "When we are looking at such data as voting
14 age population and minority voting age population,
15 it would be beneficial to have an understanding of
16 how many persons are actually registered in a
17 precinct. We also look at actual elections when we
18 devise districts as it would be instructive to see
19 percentages of registered voters who turn out in
20 given elections. Is this what you need? Thanks."
21    Q. So a couple of follow-up questions for
22 you in terms of what Mr. Booth said in terms of his
23 request. What is the 2020 census PL-94-171 data
24 delivery?
25    A. I have no idea. That's why I kind of

Page 97

1 stumbled across it. I don't know what that is.
2     Q. Do you know what PL-94-171 is?
3     A. I do not.
4     Q. Do you know whether you have provided to
5 Mr. Booth or Mr. Collins data on voting age
6 population?
7     A. I don't believe, in any of the reports,
8 we've provided -- it doesn't include voting age
9 population, that I can remember.
10    Q. Does the data that you provided through
11 SEMS provide minority voting age population?
12    A. SEMS doesn't capture any race or gender
13 information. So of course it does have age or birth
14 date, but I don't know how -- I mean, there's no way
15 that SEMS could provide any information on minority
16 voting age population. It doesn't exist in SEMS.
17    Q. That would have to come from some other
18 source; is that correct?
19    A. That's correct.
20    Q. So SEMS does not have any record that
21 reflects a voter's race?
22    A. No.
23    Q. Has it ever contained that information?
24    A. From some legacy data that was brought
25 over in 2005, there was some information as a result

25 (Pages 94 - 97)

**[Handwritten annotation, left margin]:** Overruled. She does say she does not know the answer to the question, but she she volunteers a response and the rest is related to what she said. She seems to have knowledge related to her answer.

**[Box, top right]:** Defendants' Objections to Tr: 100:11 - 100:24; Calls for Speculation.

---

Page 98

...ry, but all that data was wiped.

...So when was race data eliminated from the ...S database?

... I would say probably 2010 maybe.

... Would poll book numbering be useful for ...Mr. Booth is asking for in this email?

... I don't know how I would determine what ...ly they would find useful. I know it's what he ...d for.

10     Q.   Where in his description does he refer to
11 exact poll book numbers? Is that what he means by
12 "how many persons are actually registered in a
13 precinct"?
14     MR. BECKETT: Object to the form.
15     THE WITNESS: Yes.
16     MR. LAVELLE: You can answer that.
17     MR. BECKETT: Yeah. You can answer that.
18     THE WITNESS: Yes, I did. Sorry. We
19 were talking at the same time.
20 BY MR. LAVELLE:
21     Q.   Do you know whether it's possible to
22 determine minority voting age population by looking
23 at the exact poll book numbers in conjunction with
24 any other data?
25     MR. BECKETT: Object to form.

Page 99

1     THE WITNESS: No, I don't even -- no. I
2 mean, the information is not contained in SEMS so I
3 don't know how someone else might perceive that
4 number.
5 BY MR. LAVELLE:
6     Q.   Well, census data includes capturing race
7 data for people who are recorded in the census;
8 correct?
9     A.   I don't have any experience with census
10 data. So I'm assuming that's correct because, as an
11 individual, I answer those questions on the census
12 form. But --
13     Q.   You fill out that census like everybody
14 else does every ten years; right?
15     A.   Exactly, yeah. So yes, I know it's
16 asked. I don't know what form it comes back in.
17     Q.   In your work for the Secretary of State's
18 office, have you ever done any work that uses census
19 data?
20     A.   The only thing would be voting age
21 population.
22     Q.   And how do you use census data for that?
23     A.   To make sure counties are staying below
24 the threshold of voting age population in their
25 voter roll maintenance efforts.

Page 100

1     Q.   Can you explain what you mean by that?
2     A.   Well, yes. If an individual -- if a
3 county has a voting age population based on the
4 census of a hundred people, and they have 120 active
5 registered voters, then we encourage the local
6 election officials to look more closely at things
7 like their deceased records and duplicates.
8     Q.   Any other way in which census data would
9 be useful for voting age population?
10     A.   Not that I'm aware of, no.
11     Q.   Could it be used for minority voting age
12 population as Mr. Booth references in his email?
13     MR. BECKETT: Object to form,
14 speculation.
15     THE WITNESS: Again, I don't know how.
16     MR. LAVELLE: You can answer.
17     THE WITNESS: Again, I don't know how
18 that would be the case because it's what we -- what
19 we provide in voting age population doesn't have a
20 minority aspect to it.
21 BY MR. LAVELLE:
22     Q.   It would have to come from some place
23 else; correct?
24     A.   Correct.
25     Q.   All right. Let's scroll to the top of

Page 101

1 this email chain to take a look at your response to
2 Mr. Booth.
3     A.   Uh-huh.
4     Q.   What did you say in response to
5 Mr. Booth?
6     A.   "Thanks. I found another report which
7 might be of interest, but the voting history numbers
8 won't be available for the general until each county
9 processes their poll book and closes the election in
10 SEMS. This report includes all voting history,
11 whether the ballot was counted or not, absentee and
12 affidavits. Take a look and let me know what you
13 think. It will require some cleanup in Excel
14 formatting but probably a lot less data entry."
15     Q.   So what is it you're referring to here in
16 terms of this report?
17     A.   I'm referring to the poll book status and
18 turnout report.
19     Q.   Is that a standard form of report that
20 you generate from time to time out of SEMS?
21     A.   As required or requested, yes.
22     Q.   So SEMS is a database; right? It has a
23 lot of data in it; correct?
24     A.   That's correct.
25     Q.   And there are certain forms of reports

26 (Pages 98 - 101)

Page 102

1  that can be generated collecting certain categories
2  of data out of SEMS; right?
3    A.  Correct.
4    Q.  And there are some, I would imagine, some
5  forms of report that you have predefined that you
6  know on a regular basis you need to be able to
7  generate; is that correct?
8    A.  Some, but there are also -- because,
9  remember, when we started off reading that SEMS
10  actually came from the product by Hewlett-Packard
11  called Electus.  There are literally hundreds of
12  reports out there that we've never used because this
13  product was actually developed and implemented in
14  eight or nine different states.
15    Q.  So when you say in your email to
16  Mr. Booth "I found another report," you're referring
17  to a report form that was in Electus?
18    A.  That was in SEMS, yes.  That I ran across
19  and thought, oh, okay, this one could help answer
20  the question because it gives you the number of
21  voters in the poll book as well as the processed
22  voter history and a percentage turnout for an
23  individual county and election.
24    Q.  I think that's a good lead-up for what we
25  want to mark as the next exhibit, which is the

Page 103

1  report you attached here.  You attached a 2018
2  primary report; right?
3    A.  Yes.
4      MR. LAVELLE:  Let's mark as the next
5  exhibit what you have at Tab 34 of your binder.
6      EXHIBIT TECH:  This will be Exhibit
7  Lennep 17.
8      (Exhibit 17 marked for identification.)
9  BY MR. LAVELLE:
10    Q.  Ms. Lennep, this is an Excel spreadsheet
11  that was attached to the email we looked at
12  previously?
13    A.  Yes.
14    Q.  Do you recognize this?
15    A.  Yes.
16    Q.  What is it?
17    A.  It's a poll book status and turnout
18  report.
19    Q.  And this is what you forwarded to
20  Mr. Booth as an example of something that might be
21  useful; correct?
22    A.  Correct.
23    Q.  Can you please walk us through this
24  report and explain what each of these columns refer
25  to?

Page 104

1    A.  Yeah.  This was for Hinds County.
2  Obviously just -- no, it is all three pages.  So the
3  first precinct for the 2019 primary election shows the
4  precinct name.  The second labeled column shows the
5  number of voters that are actually in the poll book.
6  The third shows the supplemental poll book.  And in
7  this case, they did not utilize the supplemental
8  poll book.  Then it shows the voter history
9  processed.  So how many individuals of those that
10  are active in the poll book participated in the
11  primary election.  And then it shows a turnout
12  percentage of -- which basically is just the formula
13  for how many voted.
14    Q.  When you have a reference here to "voter
15  history processed," does that include the people who
16  voted both by provisional as well as on a machine?
17    A.  Yes.  In the previous email, the second
18  paragraph says "This report includes all voter
19  history, whether their ballot was counted or not,
20  absentees and affidavits."  So that would be regular
21  ballots voted on election day, absentee ballots and
22  affidavit ballots.  Whether they were actually
23  accepted or rejected, the individual still gets
24  voting history for participation.  It's basically a
25  participation award.

Page 105

1    Q.  Thank you.  All right.  Let's go to the
2  next exhibit, please, Tab 35 in the binder.
3      MR. LAVELLE:  We're finished with this
4  document.
5      EXHIBIT TECH:  Please stand by.  This is
6  Lennep Exhibit 18.
7      (Exhibit 18 marked for identification.)
8  BY MR. LAVELLE:
9    Q.  Ms. Lennep, we marked for identification
10  as Exhibit 18 an email exchange you had with
11  Mr. Booth.
12      Do you recognize this?
13    A.  Yes.
14    Q.  This is a follow-up exchange that you had
15  along the same lines that we were just discussing;
16  correct?
17    A.  Correct.
18    Q.  What did Mr. Booth write to you on
19  November 15, 2018?
20    A.  "This is an excellent report.  If we get
21  this after the general election information is
22  entered, that would be most helpful."
23    Q.  And then you responded; correct?
24    A.  Yes.
25    Q.  And what was your response?

27 (Pages 102 - 105)

Page 106

1    A.    "I will plan on providing these reports.
2  I will start as soon as each county closes their
3  general election, which should begin around
4  November" -- there's a punch hole through it.  15,
5  yes.
6    Q.    November 15; right?
7    A.    Yes.
8    Q.    All right.  We can go to the next tab,
9  Tab 36.
10        EXHIBIT TECH:  Please stand by.  This is
11  Lennep Exhibit 19.
12    (Exhibit 19 marked for identification.)
13  BY MR. LAVELLE:
14    Q.    Ms. Lennep, we have marked as Exhibit 19
15  another email exchange that you had with Mr. Booth
16  on November 21, 2019.
17        Do you recognize this?
18    A.    Yes.
19    Q.    What did you write to Mr. Booth on that
20  day?
21    A.    "The number of active voters in the poll
22  book for Hinds precinct 46 in the 2019 general
23  election was 3,058.  And then the address library
24  report you requested for precinct 46 is attached."
25    Q.    Do you recall, Ms. Lennep, why you

Page 107

1  provided this information to Mr. Booth on that day?
2    A.    Honestly, specifically no, but I'm
3  guessing he requested it.
4    Q.    The only reason you would have sent it to
5  him is because he had requested it; is that right?
6    A.    That's correct.
7    Q.    And then let's mark as the next exhibit
8  what's at Tab 37.
9        EXHIBIT TECH:  This is Lennep Exhibit 20.
10    (Exhibit 20 marked for identification.)
11        MR. BECKETT:  It looks different on the
12  screen so you may want to follow --
13        THE WITNESS:  You really need to put it
14  in landscape.
15        MR. LAVELLE:  Yeah, it's only showing
16  part of the whole page there.  So probably need to
17  walk across it from page to page.
18        MR. BECKETT:  That's correct.
19        MR. LAVELLE:  But it's printed in
20  landscape in the book that you have.
21  BY MR. LAVELLE:
22    Q.    Do you recognize what we've marked for
23  identification as --
24        MR. LAVELLE:  I'm sorry.  What,
25  Concierge, what did we mark this for identification

Page 108

1  as?  Number 19?
2        EXHIBIT TECH:  This is Exhibit 20.
3        MR. LAVELLE:  Exhibit 20.  I'm sorry.
4  BY MR. LAVELLE:
5    Q.    Do you recognize this, Ms. Lennep?
6    A.    Yes.
7    Q.    What is Exhibit 20?
8    A.    It's the address library report for
9  precinct 46.
10    Q.    Is this a report that you generated?
11    A.    Yes.
12    Q.    Can you walk us through what is the
13  information that's captured here?
14    A.    Sure.  This provides the house number
15  range in the first column.  The -- it's kind of hard
16  to tell.  That first line is not -- is actually a
17  description that's in the header.  It shows the --
18  it looks like -- I'm not exactly sure what the dates
19  are, but where it says "Type" that's right under
20  "Constable," "Type" is a street type and it would be
21  either odd, even or all.  So you see, as you go
22  down, for instance, if you go down to Colonial
23  Circle, only the even side of the street is in that
24  precinct.  So that's why it has the type.
25        Then it has the street name, the city, the

Page 109

1  state, the zip, the precinct, the split code, and
2  then it has district information, the senate, the
3  house of representatives, the supervisor, election
4  commissioner, justice court, constable, the city
5  ward and the school board district.
6    Q.    And, again, this is a report that was
7  generated by you out of SEMS at Mr. Booth's request?
8    A.    Yes.
9    Q.    Do you know why he requested this from
10  you?
11    A.    I'm guessing it potentially was when the
12  district 22 was -- those lines were redrawn, but I
13  don't -- I don't remember specifically.  That might
14  not be right.  I don't know if 22 actually came into
15  Jackson -- I mean into Hinds County.  I'm not sure.
16    Q.    District 22 was redrawn at some point?
17    A.    Yes.
18    Q.    Why was that?
19    A.    I believe it was a court order.  I'm not
20  sure.
21        MR. BECKETT:  Just tell him what you
22  know.
23        THE WITNESS:  Yeah.
24        MR. LAVELLE:  You can take that exhibit
25  down.

28 (Pages 106 - 109)

Page 114

1  A.  I did.
2  Q.  What did you say?
3  A.  "I'm still here.  Please let me know
4  exactly what data will help and I will get it
5  going."
6  Q.  Have you ever heard that term before
7  "farming data"?  "Farming your data"?
8  A.  Sure.
9  Q.  What does it mean?
10  A.  It means gathering data that would be
11  available in SEMS.
12  Q.  Is it a term that you've used previously
13  in communications with Mr. Collins about the
14  redistricting process?
15  A.  I don't think I've specifically said
16  "farming our data," no.  I'm more specific when I
17  communicate with him on what information that is
18  available in SEMS that they are looking for.
19  Q.  All right.  Do you remember what happened
20  next?  Did you have any further requests from
21  Mr. Collins after this?
22  A.  I believe that we talked about getting
23  the voter turnout data.  Just like we had looked at
24  earlier, because that's generally the information
25  that we provide.

Page 115

1  Q.  You had a call with Mr. Collins and with
2  Mr. Booth about what they wanted; correct?
3  A.  Yes.
4       MR. LAVELLE:  Let's mark Tab 14 as the
5  next exhibit, please.
6       EXHIBIT TECH:  This is Lennep Exhibit 22.
7  (Exhibit 22 marked for identification.)
8  BY MR. LAVELLE:
9  Q.  Ms. Lennep, we've marked as Exhibit 22 to
10  your deposition another email exchange you had with
11  Mr. Collins.
12      Do you recognize this?
13  A.  Yes.
14  Q.  Is this an email exchange you had with
15  Mr. Collins on December 15, 2020?
16  A.  Yes.
17  Q.  Mr. Collins writes to you "Madalan, Ted
18  and I are a go for a conference call at 1 o'clock
19  p.m. tomorrow, December 16th.  Shall we call you or
20  shall you call us?  Either way works for us.  Look
21  forward to speaking with you."
22      And then you respond.  What was your
23  response?
24  A.  I say "Yeah, that sounds good.  We can
25  call you."

Page 116

1  Q.  All right.  A couple questions here.  Who
2  is "we" in your sentence there?  Who is "we" that
3  you were planning to call Ben and Ted with?
4  A.  Generally I'm going to say that it's
5  usually me and probably the ASOS for elections.
6  Q.  Who is that, the ASOS for elections?
7  A.  Assistant Secretary of State for
8  Elections.  Let's see, in December of 2020, it
9  probably was Hawley Robertson.
10  Q.  And why would Ms. Robertson be on the
11  phone with you?
12  A.  Because, as the assistant secretary for
13  elections, I report to her, and generally, with
14  these conversations, I have someone from legal with
15  me just to make sure that we are providing the
16  information that the Secretary of State's office is
17  comfortable with since I am an independent
18  consultant.
19  Q.  So you looped in the ASOS, or Assistant
20  Secretary of State, for those reasons; is that
21  correct?
22  A.  Yes.
23  Q.  All right.  When you refer to a number
24  that was sent earlier in the week, what are you
25  talking about?

Page 117

1  A.  The phone number?  "Should I use" --
2  because I said "We will" -- "we can call you.
3  Should I use the number you sent early in the week."
4  So I'm pretty sure I'm talking about a phone number.
5  Q.  All right.  Mr. Collins sent you a number
6  earlier in the week?
7  A.  I would assume so, yes.
8  Q.  When you did your search for responsive
9  emails, you didn't find any email which he sent a
10  phone number, did you?
11  A.  I don't believe I did.  It might have
12  just been his -- it might have just been his
13  signature line.  I mean, there's a phone number
14  associated with his signature, as we -- on some -- I
15  think on some of the emails.
16  Q.  Well, there's no phone number in the
17  signature line on this document, is there, in
18  Exhibit 22?
19  A.  There is not.  Which is probably why I
20  said "Should I use the number you sent me earlier in
21  the week?"
22  Q.  Okay.  And there wasn't one in the other
23  email that we just looked at, Exhibit 21, was there?
24  A.  I don't see one, no.
25  Q.  Did you end up speaking with Mr. Collins

30 (Pages 114 - 117)

Page 118

1 and Mr. Booth?
2    A.   I'm sure I did.
3    Q.   What do you remember about that
4 conversation?
5    A.   To the best of my recollection, it would
6 be discussion of when voter turnout and voter
7 history information is available.
8    Q.   Anything else?
9    A.   Not that I remember.
10        MR. LAVELLE:  Let's turn to Tab 15 and
11 mark that as the next exhibit, please.
12        EXHIBIT TECH:  This is Lennep Exhibit 23.
13    (Exhibit 23 marked for identification.)
14 BY MR. LAVELLE:
15    Q.   Ms. Lennep, we've marked as Exhibit 23
16 another email exchange you had with Mr. Collins
17     Do you see that?
18    A.   I do.
19    Q.   And it's an email exchange you had with
20 Mr. Collins on December 18, 2020; correct?
21    A.   Correct.
22    Q.   Mr. Collins writes to you "Tim wanted me
23 to let you know that the letter has been delivered.
24 Let me know if I can do anything to help."
25        Did I read that correctly?

Page 119

1    A.   Yes.
2    Q.   And then you respond; right?
3    A.   Yes.
4    Q.   What was your response?
5    A.   "Thanks for letting me know.  Hope you
6 and family have a Merry Christmas."
7    Q.   And the subject line of this email
8 exchange is "Letter is delivered"; right?
9    A.   Yes.
10    Q.   What letter is he referring to there?
11    A.   I believe it's the same as that previous
12 email where the legal team requested an official --
13 an official request for the information they need --
14 that they were asking for, which, again, is voter
15 turnout information.
16    Q.   There's a letter, to the best of your
17 recollection, that memorializes what information is
18 being requested; right?
19    A.   Yes, it appears to be.
20    Q.   Do you have a copy of that letter?
21    A.   I don't know that that letter went to me.
22 It probably went to the assistant secretary, but I
23 don't have a copy of it that I know of.
24    Q.   Presumably the Secretary of State's
25 office would have such a letter; is that right?

Page 120

1    A.   I believe so since they said it was
2 delivered.
3    Q.   And from your standpoint, it was
4 important that that be delivered before you provide
5 anything in response so that there be a written
6 record of what was requested and why --
7        MR. BECKETT:  Object to form.
8 BY MR. LAVELLE:
9    Q.   -- correct?
10    A.   Yes.  That appears to be, in the work and
11 the information we were providing, that was the
12 protocol.
13        MR. LAVELLE:  Let's go to Tab 16, and we
14 can mark that as the next exhibit, please.
15        EXHIBIT TECH:  This is Lennep Exhibit 24.
16    (Exhibit 24 marked for identification.)
17 BY MR. LAVELLE:
18    Q.   Ms. Lennep, we've marked as Exhibit 24
19 another email exchange you had with Mr. Collins
20 that's on June -- sorry -- January 4, 2021.
21        Do you see that?
22    A.   I do.
23    Q.   And do you recognize this to be an email
24 exchange you had with Mr. Collins on January 4,
25 2021?

Page 121

1    A.   I do.
2    Q.   Subject line "Tally Ho"?
3    A.   Yes, it appears to be.
4    Q.   "Tally Ho" like what they say at the
5 start of a race, something like that?
6    A.   It appears so.  I mean, that email didn't
7 originate with me so I don't know -- I guess it's
8 just off we go.  So -- but I can't tell you why he
9 named the email "Tally Ho."  He was just having a
10 little holiday cheer, I guess, after the holidays
11 were over.
12    Q.   Very good.
13    A.   I don't know.
14    Q.   So Mr. Collins writes to you "Madalan,
15 Ted wanted me to follow up about the data
16 request.... less than an hour and a half after the
17 holiday is over.  Sorry.  Shrug."
18    A.   So now your "Tally Ho" makes a lot more
19 sense, doesn't it?  They were off to the races
20 again.
21    Q.   And your response is?
22    A.   "I took a few days off, but I will check
23 on the status today."
24    Q.   And these are the data requests to
25 support redistricting; correct?

31 (Pages 118 - 121)

Page 122

1    A.   This is the voter information that's
2 available in SEMS as far as voter turnout that we
3 provided, yes.
4    Q.   All right.  The next document I want to
5 show you, or the next couple of documents, some of
6 them did not end up in the book because of a
7 printing error.  But I can show them to you on the
8 screen, and that's what I want to show you is on
9 Tab 38?
10        MR. LAVELLE:  So if the concierge can
11 mark that as an exhibit, please, and we can take a
12 look at that on the screen.
13        EXHIBIT TECH:  Please stand by.  This is
14 Lennep Exhibit 25.
15    (Exhibit 25 marked for identification.)
16 BY MR. LAVELLE:
17    Q.   Ms. Lennep, we've marked for
18 identification as Exhibit 25 an email exchange that
19 you had.
20        Do you recognize this?
21    A.   Yes.
22    Q.   Is this an email exchange you had with
23 Mr. Collins on January 25, 2021?
24    A.   Yes.
25    Q.   Subject line "Checking in for

Page 123

1 redistricting"?
2    A.   Yes.
3    Q.   Mr. Collins writes to you "Madalan, are
4 you back in the office yet?"
5        And you respond; correct?
6    A.   I did.
7    Q.   And your response was?
8    A.   "I am back and working on your reports.
9 I can send over the vote total reports by precinct.
10 The turnout reports have to be pulled county at a
11 time, which has slowed me down a bit."
12    Q.   Why do the turnout reports have to be
13 pulled county at a time?
14    A.   Because it's the way that SEMS is
15 designed.  It's designed to be -- to follow the
16 protocol and the law that we use here in
17 Mississippi, which is, as I explained earlier, what
18 we call bottom up.  So the counties have independent
19 data tables in SEMS.  And in many cases, even as a
20 state user, I can't cross over county lines to
21 provide consolidated information.  It has to be
22 pulled county at a time.
23    Q.   Is that what you ended up doing, pulling
24 the turnout reports county at a time?
25    A.   Uh-huh, yes.

Page 124

1    Q.   All right.  The next exhibit -- we're
2 finished with this one.  The next one is at Tab 24
3 in your binder.
4    A.   Yes.
5        MR. LAVELLE:  Let's mark that as the next
6 exhibit please.
7        EXHIBIT TECH:  24.  This is Lennep
8 Exhibit 26.
9    (Exhibit 26 marked for identification.)
10 BY MR. LAVELLE:
11    Q.   Ms. Lennep, we've marked as Exhibit 26
12 for identification another email exchange.
13        Do you see this?
14    A.   I do.
15    Q.   Do you recognize it?
16    A.   I do.
17    Q.   Is this an email exchange you had with
18 Mr. Collins on January 25, 2021?
19    A.   It is.
20    Q.   It's a follow-up to Mr. Collins's email
21 that we looked at just a moment ago; correct?
22    A.   Correct.
23    Q.   And what did you write to Mr. Collins in
24 your email at the top of this page?
25    A.   "Here are the vote results by precinct

Page 125

1 for the three races you requested.  Please take a
2 look and let me know if you have any questions.  I
3 will continue working on the voter turnout reports."
4    Q.   What are the three races that were
5 requested by Mr. Collins?
6    A.   They are listed there in the top of the
7 email, the attachments but it's U.S. Senate 2020,
8 U.S. Senate 2020 -- I guess one was the -- probably
9 the special.  The other maybe was the regular
10 election.  I'd have to look.  And then U.S.
11 Senate -- no, there's the special election -- 2018.
12 So it must have been the primary and the general.
13 I'll have to look.
14    Q.   We can show you the documents that were
15 attached next.  That will be the next exhibit.  But
16 in any event, these are voting results from U.S.
17 Senate races in 2018 and 2020; correct?
18    A.   That's correct.
19    Q.   All right.  So let's mark as the next
20 exhibit what's at Tab 25, which are the printouts of
21 the attachments to that email.
22    A.   Okay.  So the first one -- so this goes
23 through by precinct.
24        EXHIBIT TECH:  This is Exhibit 27.
25        MR. LAVELLE:  Yes.

32 (Pages 122 - 125)

Page 126

```
1        (Exhibit 27 marked for identification.)
2   BY MR. LAVELLE:
3       Q.   So, Ms. Lennep, can you tell us what's in
4   Exhibit 27?
5       A.   Yes.  Yes -- wait -- yeah, what you're
6   showing me is just the attachments.
7       Q.   Those are the attachments to the email we
8   previously looked at, Exhibit 26?
9       A.   Yes, but the way you've scanned these or
10  whatever, it's --
11       MR. BECKETT:  It just presents
12  differently then it did in the binder.
13       MR. LAVELLE:  Unfortunately, I don't have
14  control of the way it looks on the electronic page,
15  but it's printed out in a way that it's, I think,
16  easier to read and it's in your binder in a way
17  that's easier to read.
18       THE WITNESS:  Yes.
19  BY MR. LAVELLE:
20       Q.   It should be identical.  So just looking
21  at this, can you tell us what's in the reports or
22  attached to as Exhibit 27?
23       A.   Yes, it has the race title, the candidate
24  name, the political party, and then it has votes
25  cast for each of those candidates in each county by
```

Page 127

```
1   precinct in a spreadsheet format.
2       Q.   So these are the complete vote results by
3   precinct for the U.S. Senate elections that are
4   reported here; is that correct?
5       A.   Yes.
6       Q.   Then this is data that was pulled in the
7   form of reports from SEMS?
8       A.   Yes, in the form of an extract, yes.
9       Q.   Is there any data that you needed to add
10  to this report, or did it just come out of SEMS the
11  way that you requested it?
12       A.   No.  This is just straight out of SEMS.
13       Q.   All right.  Let's go to the next exhibit.
14  We're finished with this one.  The next one is
15  another one that was a printing error and it's not
16  in the book, but it is at electronic Tab 39.
17       EXHIBIT TECH:  This is Exhibit Lennep 28.
18       (Exhibit 28 marked for identification.)
19  BY MR. LAVELLE:
20       Q.   Ms. Lennep, we've marked as Exhibit 28
21  for identification another email exchange.
22       Do you recognize this?
23       MR. BECKETT:  You don't have a Tab 39.
24  You're going to have to look at the screen.
25       THE WITNESS:  Yeah, I know.  I don't know
```

Page 128

```
1   what I did with my glasses.  Hold on just a second.
2   BY MR. LAVELLE:
3       Q.   Again, I apologize.  There was a printing
4   error so a couple of documents did not end up in
5   that binder.  So this one, I'm afraid you will have
6   to look at on the screen.
7       A.   Yes, just one second.  I dropped them in
8   my bottomless pit of a purse.
9       Okay.
10       Q.   All right.  The bottom email is one we
11  looked at earlier; correct?
12       A.   Yes.
13       Q.   An email from Mr. Collins to you,
14  January 25, 2021?
15       A.   Yes.
16       Q.   And the next email up is your response,
17  which we were looking at just a couple moments ago;
18  right?
19       A.   Yes.
20       Q.   All right.  So above that one is an email
21  from Mr. Collins to you dated June 16, 2021;
22  correct?
23       A.   Yes.
24       Q.   And Mr. Collins writes to you, "Madalan,
25  we are building the data library, and the last email
```

Page 129

```
1   from January 25 has a duplicate file.  I think we
2   are missing the Reeves/Hood 2019 governor's race
3   performance by precinct.  Can you resend?"
4       Did I read that correctly?
5       A.   Yes.
6       Q.   And you respond; right?
7       A.   Yes.
8       Q.   What was your response?
9       A.   "I've been working on it now."  So that's
10  why there were two of the same ones in the previous
11  email on this one.
12       Q.   All right.  The next one is another one
13  that we have only in electronic form.  That's
14  electronic Tab 40.
15       EXHIBIT TECH:  This is Lennep Exhibit 29.
16       (Exhibit 29 marked for identification.)
17  BY MR. LAVELLE:
18       Q.   Exhibit 29, Ms. Lennep, is another email
19  exchange you had with Mr. Collins; right?
20       A.   Yes.
21       Q.   Some of this we've seen before?
22       A.   Yes.
23       Q.   The bottom one.  The bottom two we've
24  seen before; correct?
25       A.   Yes.
```

33 (Pages 126 - 129)

Page 130

1  Q.  And then the next one from June 16 we
2 just looked at a moment ago; correct?
3  A.  Yes.
4  Q.  Now there's a new email on the top from
5 you to Mr. Collins on June 17, 2021; correct?
6  A.  Yes.
7  Q.  All right.  What did you write to
8 Mr. Collins at that time?
9  A.  "Sorry for the delay.  Please see
10 attached.  Are you still interested in voter turnout
11 by precinct?  Here's a sample for Adams County 2020
12 general.  This has to be done one county at a time
13 by election, but I will be happy to provide if it
14 will be useful."
15  Q.  And it looks like you attach two files to
16 your email to Mr. Collins; right?
17  A.  Yes.
18  Q.  What did you send him?
19  A.  The governor's result that he said I was
20 missing in the previous email and then the Adams
21 County turnout report just like all the other
22 turnout reports we've looked at.
23  Q.  Do you recall whether you ended up
24 sending him turnout reports for each county?
25  A.  I did.

Page 131

1  MR. BECKETT:  What's the date of that
2 email.
3  MR. LAVELLE:  June 17, 2021.
4  MR. BECKETT:  Thank you.
5 BY MR. LAVELLE:
6  Q.  All right.  We're ready for the next
7 exhibit.  We can finish with this one.  And the next
8 one is Tab 17 in the binder.
9  EXHIBIT TECH:  This is Lennep Exhibit 30.
10  (Exhibit 30 marked for identification.)
11 BY MR. LAVELLE:
12  Q.  Ms. Lennep we've marked for
13 identification as Exhibit 30 a email exchange you
14 had with Mr. Collins on July 8, 2021.
15  Do you recognize this?
16  A.  Yes.
17  Q.  Mr. Collins writes to you on July 8,
18 2021, "Madalan, I would like to speak with you by
19 phone.  Is there a time and number that is
20 convenient for you"; right?
21  A.  Yes.
22  Q.  And you respond; right?
23  A.  Yes.  "You can call me anytime on my cell
24 phone."
25  Q.  Then you give a cell phone number?

Page 132

1  A.  Yes.
2  Q.  Right?
3  A.  Yes.
4  Q.  Do you remember if Mr. Collins called you
5 in July of 2021?
6  A.  I'm sure he did.
7  Q.  Do you remember what he asked you about?
8  A.  Other than data pertaining to the SEMS
9 reports, no.
10  Q.  Did you remind Mr. Collins that he needed
11 to put the request in writing so there would be a
12 record of it?
13  MR. BECKETT:  Object to the form.
14  THE WITNESS:  I believe -- no, I did not
15 remind him.
16 BY MR. LAVELLE:
17  Q.  Well, that was the standard practice,
18 right, was that the requests were supposed to be in
19 writing so there was a record of it; right?
20  MR. BECKETT:  Same objection.
21  THE WITNESS:  But the request, I believe,
22 was already in writing.
23 BY MR. LAVELLE:
24  Q.  Which writing?  The letter that we
25 haven't seen?

Page 133

1  A.  Yes.
2  Q.  So you think that this was a request for
3 some subset of what was requested in that letter?
4  A.  Yes, because the -- based on my records,
5 the only thing I've sent to PEER are the things that
6 we've discussed today.
7  Q.  If we look at that letter from back in
8 January of 2021, we're going to see references to
9 things like the Reeves/Hood 2019 governor's race
10 performance by precinct request.
11  A.  I don't -- I can't answer that question.
12  Q.  You don't recall whether the letter went
13 into that level of detail?
14  A.  I don't.
15  Q.  All right.  Let's go to the next exhibit,
16 Tab 18, please.
17  EXHIBIT TECH:  This is Lennep Exhibit 31.
18  (Exhibit 31 marked for identification.)
19 BY MR. LAVELLE:
20  Q.  Ms. Lennep, we've marked as Exhibit 31
21 for identification another email exchange you had
22 with Mr. Collins.
23  A.  Yes.
24  Q.  Do you see it?
25  A.  I do.

34 (Pages 130 - 133)

Page 134

1    Q.   All right.  Mr. Collins writes to you on
2 July 9, 2021; correct?
3    A.   Yes.
4    Q.   And Mr. Collins writes to you "Hey,
5 Madalan" -- and this is -- the subject is "Follow-up
6 redistricting request."  He writes "Hey, Madalan, as
7 a follow-up request, the redistricting committee
8 council directed that we gather the precinct level
9 election returns for the attorney general race in
10 2019 between Lynn Fitch and Jennifer Riley Collins.
11 The format of the previous returns you sent worked
12 well for us so please send in the same format.
13    "Additionally the county-level turnout
14 results that we previously discussed are also a
15 great utility and, therefore, we request the full 82
16 county record.
17    "Madalan, thank you so much for all you
18 have done for this office now and over many years.
19 It's good to know you're there."
20    Did I read that correctly?
21    A.   Yes.
22    Q.   All right.  And did you respond to
23 Mr. Collins?
24    A.   Yes.
25    Q.   What was your response?

Page 135

1    MR. LAVELLE:  You have to scroll up,
2 whoever is controlling the screen here.
3    THE WITNESS:  "Sorry for the delay.  Had
4 a technical difficulty, but please see the attached
5 Fitch/Collins result by precinct."
6 BY MR. LAVELLE:
7    Q.   And you can tell from the email that you
8 sent that you actually did attach the report from
9 the attorney general race from 2019; correct?
10    A.   That's correct.  And it would be the same
11 report as under our Tab 19.  It's just that voter --
12 the votes cast report for that race.
13    Q.   By county and by each precinct?
14    A.   That's correct.
15    Q.   All right.  And just to confirm that,
16 we'll look at the next exhibit as Tab 19 in your
17 binder?
18    MR. LAVELLE:  We'll mark that as the next
19 exhibit, please.
20    EXHIBIT TECH:  This is Exhibit 32.
21    (Exhibit 32 marked for identification.)
22 BY MR. LAVELLE:
23    Q.   All right.  And, again, the formatting
24 here on the electronic version is not ideal, but do
25 you recognize Exhibit 32?

Page 136

1    A.   Yes.
2    Q.   What is Exhibit 32?
3    A.   It's the race results for that contest by
4 county and precinct.
5    Q.   The state attorney general race for 2019?
6    A.   Yes.  The vote totals for each candidate
7 by county and precinct in that election.
8    Q.   So on your email exchange with
9 Mr. Collins relating to this request, which we just
10 looked at as the previous exhibit, there was a Kyle
11 Kirkpatrick also copied on the email?
12    A.   Yes.
13    Q.   Do you know Kyle Kirkpatrick?
14    A.   I do.
15    Q.   Who is Mr. Kirkpatrick?
16    A.   He's the current Assistant Secretary of
17 State for Elections.
18    Q.   So he's looped into your communications
19 with Mr. Collins for legal purposes?
20    A.   Yes.  And because, I mean, he directs my
21 work product.
22    Q.   Bottom line is he, or whoever holds that
23 office, has to approve whatever you are sending to
24 Mr. Collins; is that right?
25    A.   Yes.  We -- yes.  I mean, we communicate

Page 137

1 with each other and make sure we know what we're
2 doing.  Yes.
3    Q.   How do you typically do that when you get
4 requests like this?  Obviously we've been looking
5 at, for the past hour plus, a whole array of
6 requests that you received from Mr. Collins or
7 Mr. Booth or a combination thereof.  How did you vet
8 those requests with the Secretary of State's office?
9    A.   Generally, it's just a discussion.  I
10 mean, I'm in the office quite often and we discuss
11 it, and then you'll see that I copy them on the work
12 product.  So...
13    MR. LAVELLE:  All right.  We're finished
14 with this exhibit.  Let's mark as the next exhibit
15 Tab 20 in the binder.
16    EXHIBIT TECH:  It's Lennep Exhibit 33.
17    (Exhibit 33 marked for identification.)
18 BY MR. LAVELLE:
19    Q.   Ms. Lennep, we've marked as Exhibit 33
20 another email exchange you had with Mr. Collins.
21    Do you recognize this?
22    A.   Yes.
23    Q.   Mr. Collins writes to you on July 20,
24 2021, "Hey, Madalan, thanks for the AG race data.
25 Awesome.  Trying to finalize the data collection and

35 (Pages 134 - 137)

Page 138

1 wanted to follow up about the turnout data.
2 Thanks."
3        Did I read that correctly?
4    A.    Yes.
5    Q.    And what was your response?
6    A.    "Hi, Ben. Will try to have it finished
7 this week. A couple of questions: Do you want the
8 counties I have already done? Do you need turnout
9 for the AG's race as well as the others?"
10    Q.    And then he responds "End of week sounds
11 good. Wait until they are all done. Yes, if we're
12 getting the other three, we will need it for the AG
13 race as well. Thanks so much."
14        And then you send a response?
15    A.    "Hi, Ben. Did you receive the files I
16 sent last night? Three different emails."
17    Q.    And he responds "Yes, ma'am. I'm hot on
18 something else, so it might take a minute to circle
19 back it. Heady times."
20        And you respond?
21    A.    "No problem. Just wanted to make sure it
22 got through the email filters. Hope to send AG
23 soon."
24    Q.    Do you know what Mr. Collins meant when
25 he said "heady times"?

Page 139

1        MR. BECKETT: Object to the form.
2        THE WITNESS: That they are busy.
3 BY MR. LAVELLE:
4    Q.    We'll take a look at the three different
5 emails you sent momentarily, but do you remember
6 generally what those emails concerned?
7    A.    It appears that they're the AG
8 information as well as the county turnout reports.
9    Q.    These are turnout data reports; right?
10    A.    Yes.
11    Q.    Why would turnout data be important for
12 redistricting?
13        MR. BECKETT: Object to the form.
14        THE WITNESS: I can't answer that.
15 BY MR. LAVELLE:
16    Q.    No one has ever explained that to you?
17    A.    Not specifically, no.
18    Q.    How about generally?
19    A.    We've never discussed what they do with
20 turnout numbers.
21    Q.    Have you discussed with them what they do
22 with any of the data that you provide?
23    A.    Not specifically, other than the fact
24 that, like we talked about with precincts. I mean,
25 precincts change so they are trying to keep updated

Page 140

1 on precinct names and polling locations and that
2 sort of thing.
3    Q.    All right. I think we're finished with
4 this exhibit. Let's go to what is, again, this is
5 one that didn't print or due to a little printing
6 error. But it's electronic Tab 41.
7        EXHIBIT TECH: This is Lennep Exhibit 34.
8    (Exhibit 34 marked for identification.)
9 BY MR. LAVELLE:
10    Q.    All right. Ms. Lennep, we've marked as
11 Exhibit 34 for identification an email you sent to
12 Mr. Collins. Taking a look at the top, the date is
13 July 26, 2021. Is this one of the three separate
14 emails that you had referenced as having sent to
15 Mr. Collins with turnout data?
16    A.    So I sent them on the 26th, yes.
17    Q.    And this was the one that has the
18 governor's race turnout from 2019; right?
19        MR. BECKETT: Object to the form.
20        THE WITNESS: It says the subject is
21 "Turnout 2018 senate special election."
22 BY MR. LAVELLE:
23    Q.    Sorry. Are you looking at the screen
24 that I am looking at right now?
25    A.    No, sir. I was looking at the --

Page 141

1        MR. BECKETT: John, that's a different
2 document that's under Tab 21 that we have. So it is
3 a different document. This is --
4        MR. LAVELLE: Oh, I'm sorry.
5        MR. BECKETT: So it may be the printing
6 error. But the one in the binder, the subject line
7 is "Turnout 2018 senate special election." So if
8 she needs to look at the screen, we need to --
9        THE WITNESS: Just remind me.
10 BY MR. LAVELLE:
11    Q.    We'll come back to the one that's at
12 Tab 21. Let's look at this one right here that has
13 been marked as Exhibit 34.
14        This was sent on July 26, 2021; correct?
15    A.    Yes.
16    Q.    By you to Mr. Collins?
17    A.    Yes.
18    Q.    And what's the subject line that you
19 wrote here?
20    A.    "Turnout for governor 2019."
21    Q.    Would you agree with me, just by looking
22 at the -- what appears to be the listing of the
23 exhibits, that this is a series of spreadsheets,
24 county by county, showing the governor turnout
25 numbers?

36 (Pages 138 - 141)

Page 142

1    A.    Yes.
2    Q.    And that's typically how you would get
3  these kind of reports is individual county basis?
4    A.    Yes.
5    Q.    All right.  Let's go to Tab 21.
6        MR. LAVELLE:  And let's mark that as the
7  next exhibit, please.
8        EXHIBIT TECH:  This is Lennep Exhibit 35.
9        (Exhibit 35 marked for identification.)
10 BY MR. LAVELLE:
11   Q.    And this is the one you were looking at
12 earlier.  This is Exhibit Lennep 35.
13       MR. BECKETT:  Yeah, that's it.
14 BY MR. LAVELLE:
15   Q.    Do you recognize this?
16   A.    Yes.
17   Q.    This is another one of those emails that
18 you sent to Mr. Collins on July 26, 2021; right?
19   A.    Yes.
20   Q.    And this is the printout for the 2018
21 senate special election, according to the subject
22 line; right?
23   A.    Yes.
24   Q.    Same format we saw earlier, which is a
25 series of county-by-county spreadsheets?

Page 143

1    A.    Yes.
2    Q.    This was, again, something you sent to
3  Mr. Collins pursuant to his request?
4    A.    Yes.
5    Q.    All right.  And then last, but not least,
6  this is another one that we don't have in the binder
7  but I can show it to you in electronic form, Tab 42.
8        EXHIBIT TECH:  This is Lennep Exhibit 36.
9        (Exhibit 36 marked for identification.)
10 BY MR. LAVELLE:
11   Q.    Ms. Lennep, do you recognize what we've
12 marked for identification as Exhibit 36?
13   A.    Yes.
14   Q.    Is this an email you sent to Mr. Collins
15 on July 26, 2021?
16   A.    Yes.
17   Q.    Subject "Turnout for senate 2020"?
18   A.    Yes.
19   Q.    Again, county-by-county reports of the
20 turnout in the senate election in 2020?
21   A.    Yes.
22   Q.    All right.  We're finished with that one.
23 Now we can go to Tab 23 of the binder.
24       EXHIBIT TECH:  This is Lennep Exhibit 37.
25       (Exhibit 37 marked for identification.)

Page 144

1  BY MR. LAVELLE:
2    Q.    Ms. Lennep, we've marked as Exhibit 37
3  for identification an email from you to Mr. Collins
4  dated July 29, 2021.
5        Do you recognize this?
6    A.    Yes.
7    Q.    Is this an email you sent to Mr. Collins
8  on that day?
9    A.    Yes.
10   Q.    What's it about?
11   A.    The subject line is "Attorney general
12 2019 turnout numbers."
13   Q.    Again, a county-by-county series of
14 spreadsheets reporting the turnout in the 2019
15 attorney general race; correct?
16   A.    Correct.
17   Q.    Sent to Mr. Collins pursuant to his
18 request?
19   A.    Yes.
20   Q.    All right.  We can close that up.  I'm
21 finished with that exhibit.
22       Now, we've just spent some time going
23 through a number of specific races for which you
24 were requested to provide reports to Mr. Collins.
25 Do you know why Mr. Collins had selected and

Page 145

1  requested those particular races?
2        MR. BECKETT:  Object to the form.
3        THE WITNESS:  I do not.
4  BY MR. LAVELLE:
5    Q.    Were there any other reports that you
6  were requested to provide that you were not able to
7  provide?
8    A.    Not to my knowledge.
9    Q.    Were there any reports that were
10 requested of the Department of State that you were
11 not involved in fulfilling, either because you were
12 unavailable or because they required someone else's
13 input to provide?
14       MR. BECKETT:  Object to the form.
15       THE WITNESS:  I don't -- I don't know how
16 I could answer that.
17 BY MR. LAVELLE:
18   Q.    Were you aware of any requests that were
19 submitted to the Department of State that you didn't
20 have any involvement in responding to?
21   A.    No, not to my knowledge.
22   Q.    Is there anybody else who would have --
23 who, to your knowledge, was involved in generating
24 SEMS reports for the redistricting efforts, other
25 than yourself?

37 (Pages 142 - 145)

Page 146

1    A.  I don't really know that this reporting
2  could be specifically -- or that kind of reporting
3  could be specifically designated as redistricting.
4  So I'm not sure.  I mean, there are other
5  individuals at the Secretary of State's office that
6  can pull reports.  But to my knowledge, nothing --
7  nothing with PEER that I know of.
8    Q.  Do you have any other correspondence with
9  Mr. Collins during 2020 or 2021 that you haven't
10 produced to us pursuant to the subpoena?
11   A.  Not that I know of.
12   Q.  Were you looking for correspondence you
13 had with Mr. Collins?
14   A.  I did.
15   Q.  How about with Mr. Booth?  Did you have
16 any other correspondence with Mr. Booth during 2020
17 or 2021 that you did not produce pursuant to the
18 subpoena?
19   A.  Not that I know of.
20   Q.  Are you aware that there were public
21 hearings held concerning the redistricting process
22 in 2021 and 2022?
23   A.  Was I aware?
24   Q.  Yes.  Are you aware that there were
25 public hearings held?

Page 147

1    A.  Yes.
2    Q.  Were you asked to participate in any of
3  those?
4    A.  No.
5    Q.  Did you attend any of those?
6    A.  No.
7    Q.  Have you read the transcripts of any of
8  them?
9    A.  No.
10       MR. LAVELLE:  Why don't we take a brief
11 break here for, like, five minutes.
12       MR. BECKETT:  That will be fine.
13 John, do you have an idea about for
14 timing.
15       MR. LAVELLE:  Yeah, we're pretty close to
16 finished.  My guess is I've got maybe 10, 15 minutes
17 left.
18       MR. BECKETT:  That would be great.  Let's
19 take a quick break.
20       THE WITNESS:  Okay.
21       THE VIDEOGRAPHER:  The time is 2:07 p.m.
22 we're off the record.
23       (Off the record)
24       THE VIDEOGRAPHER:  We're back on the
25 record.  The time is 2:18 p.m.

Page 148

1  BY MR. LAVELLE:
2    Q.  Ms. Lennep, a few follow-up areas on what
3  kind of data there might be on certain things.  It
4  may well be things that there is no data on.  But
5  given your experience and expertise in the SEMS
6  database and in what records the Department of State
7  has access to, I want to ask you about them.
8       Do you know whether the Secretary of State
9  tracks historical trends in voter registration?
10   A.  We do not.
11   Q.  You did see that you are able to generate
12 reports on turnout?
13   A.  Yes.
14   Q.  Does the department -- Secretary of State
15 do any kind of tracking or analysis of changes in
16 turnout over time?
17   A.  No.  I mean, we have that information.
18 We report that information to the federal government
19 after every federal general election, all kinds of
20 statistics.  But as far as SEMS providing any type
21 of data mining or analysis of any of that
22 information that's contained in SEMS, no.
23   Q.  If someone wanted to, the data is there
24 and is retained and those reports could be
25 generated, in theory; correct?

Page 149

1    A.  In theory, with specialized queries
2  developed for a specific request, I guess so.
3    Q.  Do you know whether the Secretary of
4  State conducts any research related to voter
5  registration?
6    A.  Other than I know registration numbers
7  are included in, like, our annual report that is
8  produced each fiscal year, other than that, I mean,
9  like I said, there is no statistical analysis that I
10 know of that is done with that information.
11   Q.  You don't know, for example, whether the
12 Secretary of State's office has attempted to
13 determine the percentage of eligible voters who
14 have, in fact, registered to vote in different
15 districts?
16   A.  No, no.  I would have to think through
17 even the formula to get to that, but no.
18   Q.  Are you aware of any efforts by the
19 Secretary of State to increase voter turnout?
20       MR. BECKETT:  Object to the form.
21       THE WITNESS:  Based on the commercials
22 and the communications that are done by the
23 Secretary of State communication director just to
24 the general public, yes, I do see, not as part of my
25 role at Secretary of State, but I do see, as a

38 (Pages 146 - 149)

Page 150

1 resident of the state, that the secretary does make
2 an effort to promote voter registration and voter
3 roll -- and voter turnout in election cycles.
4 BY MR. LAVELLE:
5    Q.   Are you involved in that work?
6    A.   No.
7    Q.   Do you know whether the Secretary of
8 State's office has looked at geographic -- the
9 disparities in voter registration?
10       MR. BECKETT:  Object to the form.
11       THE WITNESS:  No.
12 BY MR. LAVELLE:
13    Q.   Whether the Secretary of State has looked
14 at racial disparities in voter registration?
15       MR. BECKETT:  Object to the form.
16       THE WITNESS:  Not that I know of, no.
17 BY MR. LAVELLE:
18    Q.   And has the Secretary of State ever
19 looked at whether or not polarized voting exists in
20 Mississippi elections?
21       MR. BECKETT:  Object to the form.
22       THE WITNESS:  No, not that I know of.
23 Again, making sure to clarify that, based on my
24 knowledge, no.
25 BY MR. LAVELLE:

Page 151

1    Q.   Understood.  Understood.  I wanted to
2 show you one last document that is at Tab 26 in your
3 binder.  Do you have that in front of you?
4       MR. LAVELLE:  And we'll mark that as the
5 next exhibit, please.
6       EXHIBIT TECH:  This is Lennep Exhibit 38.
7       (Exhibit 38 marked for identification.)
8 BY MR. LAVELLE:
9    Q.   Ms. Lennep, we've marked as Exhibit 38
10 for identification an article from the
11 "Clarion-Ledger" from May 11, 2011.  And the article
12 is titled "Judges Aware of Looming Elections, Vow to
13 Address Redistricting Quickly."  Do you recall there
14 being a redistricting litigation before a
15 three-judge federal court back in 2011?
16    A.   Yes.
17    Q.   Do you remember being asked to comment at
18 that time about what would happen if the court
19 required redistricting to be done in terms of how
20 long it would take?
21    A.   I didn't comment to the press, but I was
22 a witness in that case.
23    Q.   You testified to the court on that topic;
24 is that right?
25    A.   That's correct.

Page 152

1    Q.   And what did you -- what do you remember
2 telling the three-judge panel of the court?
3    A.   It seems the central question at the
4 point I was testifying was how quickly redistricting
5 could be completed statewide.  And what I told them
6 was that the three-day time frame that was thrown
7 away was -- that was thrown around during the
8 discussions was not reasonable.
9    Q.   Sorry.  Three-day --
10    A.   Three-day.
11    Q.   -- time frame?
12    A.   Three-day, yes.
13    Q.   Can you explain what you mean by that?
14    A.   That all the redistricting for the state
15 could be done by each county in a three-day time
16 period.
17    Q.   And you testified that it would take
18 longer than that; correct?
19    A.   That's correct.
20    Q.   In your estimate, more like a couple of
21 months?
22    A.   Yes.  Again, I mean, it's kind of like
23 how long is a piece of string?  It depends on what
24 changes need to be made, how big the county is, how
25 good the address library or address index data is to

Page 153

1 be input into SEMS.  So there are a lot of outside
2 factors that go into how long it can take.
3    Q.   What ended up happening in 2011 with
4 respect to redistricting, as you recall?
5    A.   The three-judge panel determined that it
6 was not reasonable, and the redistricting was
7 postponed until the 2015 time frame or election.
8    Q.   And then new districts were put in place
9 for the 2015 election?
10    A.   That's correct.
11    Q.   And how long did it take to do the work
12 in order to get the 2015 map in place?
13    A.   Months.  Again, I mean, each county has
14 to determine how they approach the process.  So the
15 lines change, the precinct lines may have been
16 changed by the county.  Whether you can get good
17 address library data from your mapping company.
18 There are just numerous variables, but we did get it
19 all in place for -- prior to the 2015 election
20 cycle.
21    Q.   Ms. Lennep, I am finished the questions
22 that I wanted to ask with you -- ask of you today.
23 There are a couple areas that I will follow up with
24 your counsel on with respect to the subpoena.  But I
25 want to thank you for your time and your attention

39 (Pages 150 - 153)

# DEPOSITION OF MISSISSIPPI SECRETARY OF STATE 30(B)(6) - KYLE KIRKPATRICK

Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF MISSISSIPPI
2                  NORTHERN DIVISION
3    MISSISSIPPI STATE CONFERENCE OF THE      PLAINTIFFS
     NATIONAL ASSOCIATION FOR THE
4    ADVANCEMENT OF COLORED PEOPLE; DR.
     ANDREA WESLEY; DR. JOSEPH WESLEY;
5    ROBERT EVANS; GARY FREDERICKS;
     PAMELA HAMNER; BARBARA FINN; OTHO
6    BARNES; SHIRLINDA ROBERTSON; SANDRA
     SMITH; DEBORAH HULITT; RODESTA
7    TUMBLIN; DR. KIA JONES; MARCELEAN
     ARRINGTON; VICTORIA ROBERTSON
8
     VS.                   No. 3:22-cv-734-DPJ-HSO-LHS
9
     STATE BOARD OF ELECTION               DEFENDANTS
10   COMMISSIONERS; TATE REEVES, in his
     official capacity as Governor of
11   Mississippi; LYNN FITCH, in her
     official capacity as Attorney
12   General of Mississippi; MICHAEL
     WATSON, in his official capacity as
13   Secretary of State of Mississippi
     AND
14   MISSISSIPPI REPUBLICAN EXECUTIVE        INTERVENOR-
     COMMITTEE                               DEFENDANT
15   **************************************************
                  VIDEO DEPOSITION OF
16           THE MISSISSIPPI SECRETARY OF STATE
                 WITNESS:  KYLE KIRKPATRICK
17   **************************************************
         Taken at the instance of the Plaintiffs at the
18      offices of Butler Snow, 1020 Highland Colony
             Parkway, Ridgeland, Mississippi, on
19                  December 20, 2023,
           beginning at approximately 9:01 a.m.
20
                 (APPEARANCES NOTED HEREIN)
21
22
23
                    * * * * * * * *
24
                Reported Stenographically by:
25              Julie Brown, RPR, CCR 1587

Page 6

1         KYLE KIRKPATRICK,
2  having been first duly sworn, was examined and
3  testified as follows:
4         E X A M I N A T I O N
5  EXAMINATION BY MR. LAVELLE:
6     Q.   Good morning, Mr. Kirkpatrick.  My name
7  is John Lavelle.  Can you hear me okay?
8     A.   Yes, sir.  Good morning.
9     Q.   Good morning.  So we met just before we
10  went on the record here.  I'm an attorney at Morgan
11  Lewis in Philadelphia.  I am going to be taking your
12  deposition today, and I am representing the
13  plaintiffs in a lawsuit.  Could you please state
14  your full name and spell your last name for us?
15     A.   Kyle Kirkpatrick, K-I-R-K-P-A-T-R-I-C-K.
16     Q.   Mr. Kirkpatrick, are you a lawyer?
17     A.   Yes.
18     Q.   You're admitted to the bar in the state
19  of Mississippi?
20     A.   Yes.
21     Q.   Have you ever taken a deposition before?
22     A.   Yes.
23     Q.   So you're very familiar with the
24  procedures that we're about to go through this day;
25  correct?

Page 7

1     A.   Yes.
2     Q.   All right.  Well, I probably don't need
3  to go over the rules with you in detail, but I'd
4  like to just review them briefly so we got them on
5  the record and so we are all starting from the same
6  standpoint.  Is that all right?
7         I am going to ask you a series of
8  questions.  You have been designated as the
9  representative under Federal Rule of Civil Procedure
10  30(b)(6) of the Secretary of State's office of the
11  State of Mississippi, and you'll be testifying as
12  that office in this deposition.
13         Do you understand that?
14     A.   Yes.
15     Q.   You've taken an oath to tell the truth
16  here today, and we are going to expect you to uphold
17  that.  I need you to give me audible answers such as
18  yes, no, I don't know.  All right?
19     A.   Yeah.
20     Q.   I need the answers you give to be your
21  answers, which means you can't get help from anyone
22  else.  No phoning a friend here.  So I'm going to
23  ask you not to look at your phone during the time
24  that we're in the deposition.  I'm going to ask you
25  not to receive any answers or suggestions from

Page 8

1  anybody else who is there in the room with you.
2  We've agreed to take this deposition by Zoom so I am
3  not physically there in the room with you.  But you
4  need to answer the questions just as you would if I
5  were there in the room with you.  All right?
6     A.   Yes.
7     Q.   If I ask a question and you don't
8  understand it, let me know and I'll rephrase it.  If
9  I ask a question and you haven't heard it, let me
10  know and I'll repeat it or have the court reporter
11  read it back.  If I ask a question and you answer
12  it, I'm going to assume you've heard it, you
13  understand it, you answered to the best of your
14  ability.  All right?
15     A.   Okay.
16     Q.   There are a number of exhibits that I
17  plan to show you today during the course of the
18  deposition.  We have supplied to your counsel a
19  binder with hard copies of those exhibits.  In
20  addition, we'll be marking exhibits electronically
21  and they'll be appearing on a screen in front of
22  you.  And you'll have the option of looking either
23  on the screen or at the hard copy in order to answer
24  questions.  All right?
25     A.   Okay.

Page 9

1     Q.   Any questions for me on those
2  instructions?
3     A.   No, sir.
4     Q.   If you need to take a break at any time,
5  that will be permitted, of course.  The one
6  exception is any time I ask a question, I ask that
7  you answer that particular question.  All right?
8     A.   All right.
9     Q.   So let's mark our first exhibit?
10         MR. LAVELLE:  And I'll ask the concierge
11  who's on the call to mark as Exhibit 1 for
12  identification what is at Tab 1A.
13         (Exhibit 1 marked for identification.)
14         EXHIBIT TECH:  Please stand by.  And this
15  is Exhibit 1.
16  BY MR. LAVELLE:
17     Q.   Mr. Kirkpatrick, we've marked for
18  identification as Exhibit 1 the amended notice of
19  the 30(b)(6) deposition of the Mississippi Secretary
20  of State.
21         Do you recognize this notice, sir?
22     A.   Yes, sir.
23     Q.   You're here appearing as the 30(b)(6)
24  designee for the Secretary of State's office
25  pursuant to this notice; correct?

3 (Pages 6 - 9)

Page 10

1    A.   Yes, sir.
2        MR. LAVELLE:  Let's mark as the next
3    exhibit the document that's at 1B, which I believe
4    is the attachment to this notice.
5        (Exhibit 2 marked for identification.)
6        EXHIBIT TECH:  That's Exhibit 2.
7    BY MR. LAVELLE:
8    Q.   Mr. Kirkpatrick, we've marked for
9    identification as Exhibit 2 the document that was
10   attached to that deposition as Exhibit A.
11       Do you see that, sir?
12   A.   Yes, sir.
13   Q.   Do you recognize it?
14   A.   I recognize this page, yes, sir.
15   Q.   And you agree that you are the designee
16   of the Secretary of State's office with respect to
17   all of the topics that are identified in this
18   exhibit?
19   A.   Yes, sir.
20   Q.   And you're prepared to testify as the
21   Secretary of State's representative on those topics;
22   correct?
23   A.   Yes, sir.
24   Q.   Did you bring anything with you today for
25   your deposition?

Page 11

1    A.   No, sir.
2    Q.   So you have no materials that you're
3    planning to consult during the course of the
4    deposition; is that right?
5    A.   That's correct, sir.
6    Q.   All right.  Why don't we start by getting
7    a little bit of background information concerning
8    you, Mr. Kirkpatrick.  Are you currently employed in
9    the Secretary of State's office?
10   A.   Yes, sir.
11   Q.   What is your position there?
12   A.   I'm the Assistant Secretary of State for
13   Elections.
14   Q.   How long have you been in that position?
15   A.   Since May of 2021.
16   Q.   What are your responsibilities in that
17   role?
18   A.   Oversee the elections division, which
19   includes training election officials, overseeing the
20   responsibilities of campaign financing in regards of
21   the Secretary of State's office, the lobbying
22   responsibilities with the Secretary of State's
23   office and advising the secretary on legal matters
24   regarding elections.
25       EXHIBIT TECH:  Counsel, would you like me

Page 12

1    to take down this exhibit for now?
2        MR. LAVELLE:  Yes, you can take that
3    down.  Thanks.  We will it bring back up from time
4    to time during the course of the deposition, but I
5    don't think I need it for the next few deposition
6    questions I'll be asking.
7    BY MR. LAVELLE:
8    Q.   Did you have employment in the Secretary
9    of State's office prior to May of 2021, sir?
10   A.   Yes, sir.
11   Q.   All right.  Why don't you tell us when
12   you first started working in the Secretary of
13   State's office.
14   A.   I began working in the Secretary of
15   State's office in January of 2020.
16   Q.   What was your initial position there?
17   A.   Senior attorney.
18   Q.   And what were your responsibilities
19   there?
20   A.   The responsibilities were very similar to
21   the Assistant Secretary of State position now except
22   I assisted the Assistant Secretary of State in
23   performing those duties.
24   Q.   Who was the Assistant Secretary of State
25   at that time?

Page 13

1    A.   Hawley Robertson.
2    Q.   Is Ms. Robertson still with the office?
3    A.   No, sir.
4    Q.   Is it a job requirement for the Assistant
5    Secretary of State for Elections to be a member of
6    the bar of the state of Mississippi?
7    A.   To be honest, I'm not quite sure on that.
8    Q.   How many people work in the Secretary of
9    State's office?
10   A.   I don't know a total number.  I believe
11   it's over a hundred employees.
12   Q.   Who do you report to?
13   A.   The Secretary of State and the chief of
14   staff.
15   Q.   Do you know how many direct reports the
16   Secretary of State has?
17   A.   Direct reports?  No, sir.
18   Q.   Yes.  How many other Assistant Secretary
19   of States are there in the office?
20   A.   Counting off the divisions in my head.
21   Q.   Sure.  Take your time.
22   A.   There's business services, public lands,
23   charities, elections and publications all have
24   Assistant Secretaries of State.
25   Q.   So it's four other areas where there are

4 (Pages 10 - 13)

Page 14

1  Assistant Secretaries of State; is that right?
2      A.   Yes.
3      Q.   All right.  Let's get a little bit of
4  your educational background, shall we?  Start with
5  high school.  Where did you graduate from high
6  school?
7      A.   Gautier High School.
8      Q.   And where is that located?
9      A.   Gautier, Mississippi.
10     Q.   What year did you graduate from there?
11     A.   2011.
12     Q.   Did you attend college?
13     A.   Yes, sir.
14     Q.   Where did you attend college?
15     A.   University of Mobile.
16     Q.   Did you receive a degree from there?
17     A.   Yes.
18     Q.   And what was your degree in?
19     A.   Political science.
20     Q.   What year did you get your bachelor's
21  degree there?
22     A.   2015.
23     Q.   Did you go directly from University of
24  Mobile to law school?
25     A.   Yes, sir.

Page 15

1      Q.   And where did you attend law school?
2      A.   University of Mississippi School of Law.
3      Q.   Where is that located?
4      A.   Oxford, Mississippi.
5      Q.   When did you graduate from there?
6      A.   2018.
7      Q.   And you received the JD degree, I assume?
8      A.   Yes, sir.
9      Q.   All right.  So you got your JD in 2018
10  and you started in the Secretary of State's office
11  in 2020.  Did you have any employment between
12  graduating from law school and starting at the
13  Secretary of State's office?
14     A.   Motley Rice.
15     Q.   Which office of Motley Rice did you work
16  in?
17     A.   Charleston, South Carolina, office.
18     Q.   Motley Rice is a plaintiffs personal
19  injury law firm; is that correct?
20     A.   Yes, sir.
21     Q.   And is that the kind of law work you did
22  there?
23     A.   Yes, sir.
24     Q.   You're currently licensed in the state of
25  Mississippi to practice law; is that correct?

Page 16

1      A.   That's correct.
2      Q.   Do you have bar admissions in any other
3  state?
4      A.   No, sir.
5      Q.   All right.  I want to spend a few
6  minutes, Mr. Kirkpatrick, getting a sense of how you
7  prepared to testify here today.  When did you find
8  out that you were going to be appearing as the
9  30(b)(6) designee for the Secretary of State's
10  office in this matter?
11     A.   When I received the notice of deposition.
12     Q.   And when was that?
13     A.   I can't remember the exact day.
14     Q.   Within the last month?
15     A.   I believe so.
16     Q.   So we're taking your deposition here on
17  December 20, 2023; correct?
18     A.   Yes, sir.
19     Q.   All right.  So sometime within the last
20  30 days, approximately, you learned that you were
21  going to be the 30(b)(6) designee; is that right?
22     A.   Yes, sir.
23     Q.   What did you do in order to prepare to
24  testify today?
25     A.   I reviewed the previous interrogatory and

Page 17

1  request for production responses, as well as the
2  notice of the deposition.
3      Q.   Do you have an understanding of what this
4  lawsuit is about, sir?
5      A.   Yes, sir.
6      Q.   What is your understanding of what this
7  litigation is about?
8      A.   2022 legislative redistricting.
9      Q.   And specifically anything about that
10  redistricting?
11     A.   Just that it's being challenged.
12     Q.   Were you yourself involved in the 2022
13  legislative redistricting process?
14     A.   No, sir.
15     Q.   Who was involved in that process from the
16  Secretary of State's office?
17     A.   The Secretary of State's office is not
18  involved in redistricting.
19     Q.   Well, the Secretary of State's office
20  does provide information that is used in
21  redistricting; correct?
22     A.   If we are asked for information, we will
23  provide it, but we are not involved in the actual
24  redistricting process.
25     Q.   Were you yourself, Mr. Kirkpatrick,

5 (Pages 14 - 17)

Page 22

1 process?
2    A.   I did not review any of the documents
3 that were requested at the time.
4    Q.   You're familiar with the statewide
5 elections management system, or SEMS; correct?
6    A.   Yes, sir.
7    Q.   Can you tell us what SEMS is?
8    A.   SEMS is the voter registration and
9 election management system for the State of
10 Mississippi.
11    Q.   It's an electronic database which
12 collects and organizes a range of information
13 relating to elections; correct?
14    A.   Yes, voter registration and other
15 election-related materials.
16    Q.   And you're aware that Ms. Lennep is a
17 contractor for the Secretary of State's office with
18 respect to the SEMS system; correct?
19    A.   Yes.
20    Q.   In fact, she's been referred to by at
21 least one person as the guru of SEMS; right?  Are
22 you aware of that?
23    A.   I don't know who may have referred to her
24 as the guru.
25    Q.   Well, when you have a SEMS question, who

Page 23

1 do you ask?
2    A.   I'll go ask Madalan.
3    Q.   And that's true for other folks in your
4 office, too; correct?
5    A.   Yes, sir.
6    Q.   She's the go-to resource on SEMS?
7    A.   Yes, sir.
8    Q.   And she's known as the go-to resource,
9 not just within the Secretary of State's office, but
10 within other parts of the state government; isn't
11 that right?
12    A.   Yes, sir.  Counties will call her for
13 SEMS questions.
14    Q.   Do you know Ben Collins?
15    A.   Yes, sir.
16    Q.   Who is Mr. Collins?
17    A.   He is the GIS director for PEER.
18    Q.   And Mr. Collins is involved in the -- or
19 was involved in the redistricting process; isn't
20 that right?
21    A.   I know he was involved with PEER.  I
22 don't know to what extent he was involved in the
23 redistricting process.  I'm not familiar with that.
24    Q.   Were you aware that Mr. Collins made a
25 series of requests to Ms. Lennep for data from SEMS

Page 24

1 in connection with the redistricting process?
2    A.   Yes.
3    Q.   How did you become aware of that?
4    A.   I was made aware of that when I provided
5 the emails in the request for production.
6    Q.   All right.  So let's take a step back.
7 The redistricting process started in 2020, didn't
8 it?
9    A.   I can't say when the redistricting
10 process began.
11    Q.   All right.  Let me ask the question a
12 different way:  Were you aware contemporaneously
13 that Mr. Collins was asking Ms. Lennep for
14 assistance from the SEMS database in connection with
15 redistricting?
16    A.   I don't recall knowing at the time of
17 2020 that that data had been requested.
18    Q.   So typically there's no need for those
19 kind of requests to be directed to you; is that
20 right?
21    A.   We do handle public records requests.  It
22 will depend on the records being requested and
23 what's actually requested, depending on if I need to
24 review or not.
25    Q.   All right.  Well, we've seen, and we

Page 25

1 reviewed with Ms. Lennep, a number of email requests
2 that were sent by Mr. Collins to her for data from
3 SEMS.  And I think you were only copied on maybe one
4 or two of them.
5        Is your testimony here today that you were
6 not aware at the time that those requests were made
7 that they were being made?
8    A.   I don't recall those emails at the time.
9 The emails can reflect if I was copied on those or
10 not.
11    Q.   Okay.  If you weren't copied on it, you
12 weren't aware of it; is that fair?
13    A.   Like I said, I don't recall at the time
14 being aware of it, contemporaneously at the time
15 these requests were made.  If I was copied on it, I
16 was copied on it.
17    Q.   Do you remember yourself getting any
18 requests from Mr. Collins for data or information in
19 connection with redistricting?
20    A.   No, sir, I don't recall any direct
21 requests.
22    Q.   Do you remember having any discussions
23 with Ms. Lennep about requests that she'd received
24 from Mr. Collins for data from SEMS?
25    A.   I don't recall a conversation about that.

7 (Pages 22 - 25)

Page 34

1     (The requested record was read back.)
2  BY MR. LAVELLE:
3     Q.   And so in that answer, you refer to
4  "these emails." You mean the emails between
5  Ms. Lennep and Mr. Collins or Mr. Booth; right?
6     A.   Yes, sir, the ones that I pulled.
7     Q.   The ones that were produced in the
8  discovery process?
9     A.   Yes, sir.
10    Q.   And you believe there was also some
11 correspondence with respect to splits; is that
12 right?
13    A.   Yes, I believe that was in regards to
14 congressional redistricting.
15    Q.   And that was conveying the information
16 about what districts would actually be split under
17 the new legislative districts; is that correct?
18    A.   Split precincts.
19    Q.   Spit precincts. What is a split
20 precinct?
21    A.   That is a precinct divided into two
22 separate election districts.
23    Q.   How was that information conveyed to your
24 office?
25    A.   I believe it was a letter saying here are

Page 35

1  the precincts that are split.  It's also included in
2  the legislation, I believe it's designate with an
3  asterisk.
4     Q.   Is that a letter identifying the splits
5  been produced in the discovery process in this
6  litigation?
7     A.   I don't believe that was pulled because
8  it was relating to congressional redistricting.
9     Q.   All right.  So there are different
10 redistricting processes that occur periodically when
11 the census is done; correct?
12    A.   Yes, sir.
13    Q.   Federal Congress districts are redone;
14 correct?
15    A.   Yes, sir.
16    Q.   And that's congressional redistricting
17 that you referred to in your answer?
18    A.   Yes, sir, dealing with the U.S. House of
19 Representative districts.
20    Q.   And then, in addition, there is
21 redistricting of the state legislative districts,
22 the house and senate districts; correct?
23    A.   Yes, sir.
24    Q.   All right.  And as you -- you understand
25 that the litigation that we're here for today

Page 36

1  relates to state legislative redistricting, not the
2  federal congressional redistricting; correct?
3     A.   Yes, sir.
4     Q.   So that letter you referred to a moment
5  ago identifying splits, those were precinct splits
6  for congressional redistricting, not splits for
7  state legislative redistricting; is that correct?
8     A.   Yeah, I believe that's what I recall.
9     Q.   Was there any correspondence sent by this
10 committee identifying precinct splits in connection
11 with state legislative redistricting?
12    A.   Not that I recall.
13    Q.   Why not?
14        MR. BECKETT:  Object to the form.
15        THE WITNESS:  I can't speak to that.
16 That's not something that would have been -- that
17 would have been provided by PEER, not our office.
18 BY MR. LAVELLE:
19    Q.   So how did you implement the new
20 districts if you didn't have correspondence
21 identifying them?
22    A.   We don't implement districts.
23    Q.   So Ms. Lennep, in her deposition
24 testimony, referred to Mississippi as a bottom-up
25 state with respect to voting records.  Have you ever

Page 37

1  heard that term before?
2     A.   Yes, sir.
3     Q.   Do you have an understanding of what is
4  meant by "bottom up"?
5     A.   Yes, sir.
6     Q.   Tell me what your understanding of
7  "bottom up" is in that context?
8     A.   "Bottom up" in this context is a
9  decentralized election process in which the local
10 county election officials are responsible for
11 conducting and implementing elections.
12    Q.   So, for example, each county is
13 responsible for maintaining and updating voter
14 records; is that right?
15    A.   That's correct.
16    Q.   And each county is individually
17 responsible for updating records of where voters are
18 eligible to vote based on their location of their
19 address; correct?
20    A.   That's correct.
21    Q.   And typically a voter would be eligible
22 to vote in one state senate district, one state
23 house district based on what their address is;
24 correct?
25    A.   Yes, sir.

Page 38

1    Q.   So when state legislative redistricting
2    occurs, some of those voters may end up moving from
3    one district to another; is that fair?
4    A.   Yes, sir.
5    Q.   And is it your testimony today that each
6    county is responsible for updating those records?
7    A.   Yes, sir.
8    Q.   Those -- all right.  Your office, the
9    Secretary of State's office, does not have
10   responsibility to update those; is that right?
11   A.   No, sir.
12   Q.   Do you have any kind of supervising
13   responsibility with respect to what the individual
14   counties are doing in that process?
15   A.   No, sir, we don't have oversight.
16   Q.   Do you have the ability to monitor
17   whether the counties have completed that process?
18   A.   We do have access to SEMS.
19   Q.   And through that access to SEMS, are you
20   able to determine whether or not a county has
21   updated its records to reflect new districts when
22   redistricting occurs?
23   A.   We can view address libraries and what
24   addresses those districts are associated with.
25   Q.   All right.  So if you look back at what

Page 39

1    we marked as Exhibit 2.
2         MR. LAVELLE:  Let's pull that back up.
3         MR. BECKETT:  Not Tab 2, Exhibit 2, which
4    was the --
5         Pardon me, John, he was looking at the
6    wrong thing.
7         MR. LAVELLE:  That's all right.
8         MR. BECKETT:  Not Tab 2, Exhibit 2.
9         MR. LAVELLE:  It's Tab 1B in the binder.
10        MR. BECKETT:  Yeah, there weren't any
11   tabs on 1.  That's okay.  We've got it now.
12        MR. LAVELLE:  Okay.  We've all got --
13   we're at the same page now?
14   BY MR. LAVELLE:
15   Q.   We are now at what was identified as
16   Exhibit 2 for identification in this deposition, was
17   actually Exhibit A to the notice of deposition, and
18   it's the list of topics for your deposition today.
19   All right.  We've got that in front of you,
20   Mr. Kirkpatrick?
21   A.   Yes, sir.
22   Q.   So topic 1 is "Policies, procedures
23   regulations, guidance, and training regarding the
24   implementation of new state legislative district
25   maps, including but not limited to:  a.  Policies,

Page 40

1    processes, and procedures, as well as the time and
2    staff required, for allocating voters to their
3    districts by updating district information in
4    Mississippi's voter registration database, and for
5    requesting or mailing any notice or voter
6    information cards to voters including their precinct
7    information."
8         And then "b.  Policies, processes, and
9    procedures, as well as time and staff required, for
10   preparing the information to be printed on ballots;
11   for proofing, revising, printing, and sending
12   ballots, absentee ballots, and Uniformed Overseas
13   Citizens Absentee Voting Act ballots; and for
14   qualifying candidates for office."
15        There's a whole lot of stuff there, and
16   you're going to be the designee with respect to all
17   of these; right?
18   A.   Yes, sir.
19        MR. BECKETT:  Well --
20   BY MR. LAVELLE:
21   Q.   What we've just been asking about really
22   relates to this topic, and I think I understand your
23   testimony, but I want to make sure I've got it.
24   Your testimony today is that this process of
25   allocating voters to their districts by updating the

Page 41

1    district information in the voter registration
2    database, that's really done on an individual
3    county-by-county basis by officials in the counties;
4    correct?
5    A.   Yes, sir.
6    Q.   That is not done by your office, the
7    Secretary of State's office?
8    A.   Correct.  We provide training.
9    Q.   And can you describe for us what training
10   you provide to local county state election officers
11   as to how to do this?
12   A.   The training that is given is how to
13   update those address libraries in SEMS to reflect
14   the -- what is required by redistricting legislation
15   or local board supervisor orders.
16   Q.   Ms. Lennep testified during her
17   deposition about such trainings that she has
18   presented.  Are you aware that Ms. Lennep has
19   performed such trainings for local election
20   officials?
21   A.   Yes, sir.
22   Q.   Is Ms. Lennep, generally, designated by
23   the Secretary of State's office as the go-to person
24   for conducting these trainings?
25   A.   Yes, sir.

11 (Pages 38 - 41)

Page 42

```
1      Q.   So in connection with the 2022
2  redistricting process, Ms. Lennep was responsible
3  for doing the training; correct?
4          MR. BECKETT:  Object to the form.
5          THE WITNESS:  Yes, sir.
6  BY MR. LAVELLE:
7      Q.   How was that training conducted?  Was it
8  done in person or by Zoom or video?
9      A.   It was done largely in person with
10 PowerPoint, but there were also some videos created
11 along with some slides that could be sent to clerks
12 to review.
13         MR. LAVELLE:  Let's mark as the next
14 exhibit the document that's at Tab 2 in the binder.
15         EXHIBIT TECH:  This is Exhibit 4.
16     (Exhibit 4 marked for identification.)
17 BY MR. LAVELLE:
18     Q.   All right.  We marked as Exhibit 4
19 PowerPoint presentations that were -- that we found
20 online, I believe.  Have you ever seen these before?
21     A.   I believe I have seen these in looking at
22 older training manuals.
23     Q.   And what do you understand these to be?
24     A.   They appear to be PowerPoint
25 presentations for election commissioner orientation.
```

Page 43

```
1      Q.   Election commissioner is the title for a
2  local county election official; is that right?
3      A.   Yes.
4      Q.   Each county has several election
5  commissioners who have responsibility for conducting
6  elections within their county; is that correct?
7      A.   That's correct.
8      Q.   There are five election commissioners per
9  county; is that correct?
10     A.   Yes, sir.
11     Q.   And your office, the Secretary of State's
12 office, provides periodic training programs for
13 those election commissioners; is that right?
14     A.   That's correct.
15     Q.   And this PowerPoint is an example of the
16 type of PowerPoints that are used in those training
17 sessions by your office for the election
18 commissioners; correct?
19     A.   It appears to be, yes, sir.
20         MR. LAVELLE:  Let's go to the next
21 exhibit, please, Tab 3 in the binder.  We'll mark
22 that as the next exhibit.
23     (Exhibit 5 marked for identification.)
24         EXHIBIT TECH:  This is Exhibit 5.
25 BY MR. LAVELLE:
```

Page 44

```
1      Q.   All right.  We have marked for
2  identification as Exhibit 5 another PowerPoint that
3  we found online.  It is titled "SEMS Update,
4  Redistricting and New Features, ECAM Convention
5  2011, Presented by Madalan Lennep, PMP," and it's
6  got the Secretary of State's office name and logo at
7  the bottom.
8          Do you recognize this document, sir?
9      A.   Yes.
10     Q.   What is it?
11     A.   It appears to be an update presentation,
12 update presentation from an older ECAM convention.
13     Q.   An ECAM convention is a convention of
14 those county election officials we mentioned
15 earlier?
16     A.   Yes, sir.
17     Q.   ECAM stands for election commission?
18     A.   Election Commissioners Association
19 meeting.
20     Q.   And your office provides training
21 programs at those ECAM conventions when they occur;
22 correct?
23     A.   Yes, sir.
24     Q.   This appears to be dated 2011.  Would you
25 agree with me?
```

Page 45

```
1      A.   Yes, sir.
2      Q.   So it predates your involvement, but
3  would you agree with me that it is typical of the
4  type of PowerPoint that's used in training programs
5  by the Secretary of State's office on SEMS
6  redistricting?
7      A.   Yes, sir.  I mean, it was from 2011, but
8  we typically use PowerPoint presentations.
9      Q.   All right.  Have you seen the current
10 version of this PowerPoint?
11     A.   I don't recall seeing this version.
12     Q.   All right.  Have you ever seen this
13 before?
14     A.   This 2011 ECAM orientation?
15     Q.   Yes.
16     A.   No, sir, I don't recall ever seeing it
17 before.
18     Q.   Are you familiar, generally, with the
19 steps that have to be performed by election
20 election officials in connection with redistricting?
21     A.   I'm aware generally of some of the steps
22 that need to be taken, yes, sir.
23     Q.   All right.  So what are those steps that
24 need to be taken?  And if you need to refer to this
25 PowerPoint in order to be able to answer that, feel
```

12 (Pages 42 - 45)

Page 46

1  free to do that.
2  A.  Just generally aware that the counties
3  will receive a map or addresses and that they will
4  then go into SEMS to make updates to those address
5  libraries and those address ranges in order to
6  reflect what the redistricting map or order of
7  legislation requires.
8  Q.  In this PowerPoint, Ms. Lennep described
9  that there was certain preparation that needed to be
10  done of records prior to actually doing the
11  redistricting update, cleaning up nonstandard
12  addresses and the like.  Are you familiar with those
13  steps?
14  A.  I can see that here.  I leave the
15  training to Madalan on how to perform the
16  redistricting, or all the detail steps that are
17  needed.
18  Q.  Right.  And then Ms. Lennep has a series
19  of PowerPoint slides in here that go over, point by
20  point, what the steps are in order to update the
21  records in SEMS for -- to reflect new districts;
22  correct?
23  A.  Yes, at the time this was created, yes,
24  sir.
25  Q.  And you'd defer to Ms. Lennep's

Page 47

1  PowerPoint and her testimony about what those steps
2  are; is that fair?
3  A.  Yes, sir.
4  Q.  Do you have an understanding of how long
5  this process takes?
6  A.  My understanding is it can take a varying
7  ability of time depending on the difficulty of the
8  lines, what is provided to the local counties can
9  affect how long it takes to actually complete this
10  process.
11  Q.  So it's dependent to some degree on how
12  extensive the changes are; is that fair?
13  A.  That's my understanding.
14  Q.  The more extensive the changes are, the
15  more work will have to be done by individual county
16  officials and presumably the longer that process
17  will take; correct?
18  A.  That's my understanding.
19  MR. LAVELLE:  All right.  We can take
20  this exhibit down.
21  BY MR. LAVELLE:
22  Q.  Does your office, the Secretary of
23  State's office, set any standards that are to be
24  followed by the county election officials in terms
25  of timing to complete redistricting work?

Page 48

1  A.  There's a practical limitation in SEMS
2  that requires redistricting be done for -- once an
3  election is created in SEMS, it prevents changes
4  from being made.
5  Q.  All right.  Can you explain to me what
6  you mean by that?
7  A.  So in SEMS, once an election is created
8  in the statewide election management system, it will
9  prevent certain changes from being made as to so it
10  doesn't affect absentee balloting, things like that.
11  So any redistricting would need to be completed
12  before an election and ballots are generated in
13  SEMS.
14  Q.  When does that deadline occur, when the
15  SEMS database is set and can't be updated?
16  A.  Counties create their own elections in
17  the statewide election management system.
18  Generally, in order to comply with various laws,
19  that needs to be done in advance of absentee voting
20  so ballot styles can be generated and UOCAVA and
21  absentee ballots can be prepared.  So more -- at
22  least more than 45 days out from an election.
23  Q.  Absentee ballots become available
24  beginning 45 days prior to an election; is that
25  right?

Page 49

1  A.  Yes, sir.
2  Q.  Is it an earlier date for military?
3  A.  No, sir.  45 days.
4  Q.  What is the registration deadline for a
5  voter prior to an election?
6  A.  30 days prior to an election.
7  Q.  So how does that registration deadline
8  jive with respect to setting the SEMS for an
9  election?  Obviously there is a 15-day window there
10  between that 45-day date that you gave earlier and
11  the 30-day registration cutoff.
12  MR. BECKETT:  Object to the form.
13  THE WITNESS:  Do you mind asking that
14  question again?  I don't quite understand what
15  you're asking.
16  BY MR. LAVELLE:
17  Q.  It was a very bad question,
18  Mr. Kirkpatrick, so I'm going to try to ask you a
19  better one.  How about that?
20  A.  Yes, sir.
21  Q.  So a voter has until 30 days prior to an
22  election in order to register to vote; correct?
23  A.  Yes, sir.
24  Q.  So that means that, if an election is
25  going to be held on November 1, say 30 days prior to

13 (Pages 46 - 49)

Defendants' Objections to Tr: 50:15 - 50:22; Calls for Speculation.

Overruled.  The Question asks for historical trends, and he demonstrates personal knowledge.

Page 50

1  that would typically be the deadline for voter
2  registration; is that right?
3      A.   Yes, sir.
4      Q.   When a voter registers, how long does it
5  take for their registration information to get into
6  the SEMS database?
7      A.   That can depend on the workload of the
8  county circuit clerk's office.  They are the ones
9  who register the voters.  So there is a two-week
10  window in which they have to have that entered.  But
11  the amount of time it can take can fluctuate
12  depending on staff at the office as well as what's
13  exactly going on that week due to the amount of
14  additional work circuit clerks may have.
15      Q.   It's not unusual to have a large number
16  of registrations right up on a deadline, especially
17  for a major election; is that correct?
18          MR. BECKETT:  Object to the form.
19          THE WITNESS:  We do typically see an
20  increase in voter registration getting close to
21  major elections, yes, sir.
22  BY MR. LAVELLE:
23      Q.   So, for example, in 2020, which was a
24  presidential election, you would have experienced a
25  large number of registrations up to and on the

Page 51

1  deadline for registration; correct?
2      A.   Yes, sir.
3      Q.   Now, you mentioned a two-week window for
4  the counties to get things done.  Can you explain
5  how that works?
6      A.   Just, by law, a mail-in voter
7  registration application, the clerk has to process
8  that within two weeks of receipt.  So if something
9  is received on the deadline, they have two weeks to
10  get that entered into SEMS.
11      Q.   So that would mean that roughly 16 days
12  before the actual election, all of that voter
13  information should be entered, is that -- that's
14  what happens if the law is followed; correct?
15      A.   That's correct.  There could be delays in
16  postage, mail-in voter registration applications
17  could be delayed so they may be processed later into
18  that 16-week, but if something is received on the
19  deadline day, then about 16 days, yes, sir.
20      Q.   So that 30-day registration deadline that
21  you mentioned earlier, is that a postmarked date or
22  a received date?
23      A.   For mail-in, it is postmarked.
24      Q.   So it may be several days after the
25  30-day deadline when the county office actually

Page 52

1  receives some mail-in registration requests;
2  correct?
3      A.   That's correct.
4      Q.   What happens if the county doesn't make
5  the deadline?
6      A.   What do you mean?
7      Q.   I mean a two-way -- are there any
8  consequences?  Is there a penalty?  Does the
9  election get delayed?  What happens, if anything, if
10  the county doesn't make that deadline?
11      A.   Well, anybody who sends an application
12  and needs to be duly registered can.  There are
13  some, I believe, criminal penalties if the clerk
14  does not register somebody who is duly qualified to
15  register to vote.  So that would have to be a
16  deference to an DA or an AG about what may or may
17  not occur.
18      Q.   But typically the goal would be for the
19  voter to be able to vote, even if their registration
20  was not processed; correct?
21      A.   Yes, sir.  Mississippi has affidavit
22  ballots where if a person goes and believes they
23  should be registered to vote and are not on the
24  rolls, they can complete an affidavit ballot and the
25  election officials can review that affidavit ballot

Page 53

1  and review if any application should have been
2  entered into SEMS then accept or reject that ballot
3  based on those circumstances.
4      Q.   So an affidavit ballot is a provisional
5  ballot essentially; is that correct?
6      A.   Yes, sir.
7      Q.   The way we got into this timing was
8  talking about what you said was a 45-day prior to
9  election deadline for counties to complete creating
10  their own elections.  And I'm curious as to how that
11  could be the deadline if you have people still
12  registering closer to the election date than
13  45 days.
14      A.   I'm a little confused about the question.
15      Q.   Sure.  Well, you said the counties have
16  to have their elections set 45 days prior to an
17  election; is that right?
18      A.   Yes, sir.
19      Q.   What do you mean by they have to have
20  their elections set?
21      A.   So a creation of an election in SEMS is
22  creation of what is going to be on the ballot,
23  important deadlines such as absentee voting, voter
24  registration deadlines, what will be the areas that
25  will be in that election, such as precincts.  So

14 (Pages 50 - 53)

Page 54

1  that is set in time enough where ballots can be
2  generated based on the precincts in SEMS and the
3  districts associated with those precincts and
4  districts and those voters so that proper ballots
5  can be prepared in time for absentee voting.
6     Q.   Would you agree with me that, regularly,
7  individual voter records are updated closer to
8  elections than that 45-day deadline; correct?
9     A.   Yes, and they will be updated in SEMS at
10  the address they registered at.
11    Q.   So if someone, for example, files a
12  change of address, that could be processed and it
13  could be moved to their new district; is that right?
14    A.   Yeah.  Depending on some of the time
15  frames and what's occurring, they could be moved to
16  a new address.
17    Q.   What's the deadline for someone to change
18  their address prior to an election, or is there one?
19    A.   It depends what type of address change
20  we're talking about.
21    Q.   Okay.  Can you explain how it varies
22  depending on what kind of address change it is?
23    A.   A moving from one county to another will
24  be a 30-day deadline.  If it is a intra-county
25  change, then that be made within the 30-day deadline

Page 55

1  because that person is already a registered voter of
2  that county.
3        MR. BECKETT:  Hey, John, when you get to
4  a natural stopping point, can we take a short break?
5        MR. LAVELLE:  Sure.  Now is a fine time.
6        MR. BECKETT:  I don't want to push you.
7  If now is a good time, then let's take a quick
8  break.
9        MR. LAVELLE:  That's absolutely fine.
10  Let's do that.
11       THE VIDEOGRAPHER:  The time is 10:02 a.m.
12  We are off the record.
13       (Off the record.)
14       THE VIDEOGRAPHER:  We're back on record
15  at 10:14 a.m.
16  BY MR. LAVELLE:
17    Q.   All right.  Mr. Kirkpatrick, before we
18  took the break, we were discussing the process for
19  counties to update their records in connection with
20  elections.  And you told a deadline of at least
21  45 days prior to an election for an individual
22  county to get things set in SEMS for an election;
23  correct?
24    A.   Yes, sir.
25    Q.   That's true -- that 45-day deadline is

Page 56

1  true whether or not redistricting occurs; right?
2     A.   Yes, sir.  Absentee ballots are required
3  to be available 45 days before an election
4  regardless of whether redistricting has occurred or
5  not.
6     Q.   And that's a standard that's set by state
7  law; correct?
8     A.   State and federal law, UOCAVA is federal.
9        MR. BECKETT:  I'm sorry.  The court
10  reporter is asking a question.  U-O-C-A-V-A.
11  BY MR. LAVELLE:
12    Q.   When redistricting is done, does your
13  office conduct any supervision of the way the
14  counties are updating their records in SEMS?
15    A.   We provide training but we don't have
16  oversight over the counties.
17    Q.   Do you have any policies that you have
18  implemented with respect to redistricting, in terms
19  of making sure that SEMS has been updated?
20    A.   No, sir.  Once again, we provide the
21  training, but it's on the counties to make those
22  entries into the system.
23    Q.   No regulations that the Secretary of
24  State has adopted with respect to updating records
25  in connection with redistricting?

Page 57

1     A.   Just the processes in SEMS on how that
2  needs to be done.
3     Q.   All right.  And we looked earlier in your
4  deposition of the PowerPoint that's typical of the
5  type of PowerPoints that Ms. Lennep has presented to
6  election officials on those steps; right?
7     A.   Yes, sir.
8     Q.   Is there anything else other than that
9  that your office has generated to present to
10  election officials on this process, on the
11  redistricting process?
12    A.   Make sure I understand the question
13  correctly.  Are you asking is there anything in
14  addition to this 2011 PowerPoint presentation?
15    Q.   Well, you've done more recent PowerPoints
16  than that; correct?
17    A.   Yes, sir.
18    Q.   Right.  They are done on a periodic
19  basis, I would assume?
20    A.   Yes, sir.
21    Q.   And there was a version of that, which I
22  don't have it to put in front of you, but there was
23  a version of that PowerPoint that would have been
24  done in connection with the 2022 redistricting;
25  right?

15 (Pages 54 - 57)

Page 58

```
 1    A.   Yes, sir.
 2    Q.   And to the best of your knowledge,
 3  Ms. Lennep conducted the training of county election
 4  officials in connection with the 2022 redistricting?
 5    A.   Yes, sir.
 6    Q.   You're aware that that happened although
 7  you yourself were not a participant in that
 8  training?
 9    A.   No, sir, I did not conduct that training.
10    Q.   All right.  Other than that training, is
11  there any other type of guidance, whether formal or
12  informal, that's provided by the Secretary of State
13  to county officials on how to update the records
14  when redistricting occurs?
15    A.   No, sir, we would just provide that
16  training and remind counties of that deadline for
17  entering information into SEMS.
18    Q.   How do you know if they got it right?
19        MR. BECKETT:  Object to the form.
20        THE WITNESS:  We don't review the lines
21  to make sure they got them right.  We don't have
22  that type of oversight authority.
23  BY MR. LAVELLE:
24    Q.   So that's up to -- a challenge for a
25  court to address.  Is that what is to happen?
```

Page 59

```
 1    A.   Could you repeat that?  I don't know if
 2  it maybe cut out for a second.
 3    Q.   Sure.  If there's a problem with the way
 4  that the county officials have done that
 5  redistricting work, your office does not have any
 6  ability to compel them to do it; is that fair?
 7    A.   Yes, sir.  That would be the subject of
 8  the judicial challenge of the election.
 9    Q.   It would have to be challenged in some
10  other way, maybe by a voter or maybe in some other
11  court proceeding, but it wouldn't be involving the
12  Secretary of State's office; correct?
13    A.   That's correct.
14    Q.   Are you aware of any time that your
15  office has learned that county officials made
16  mistakes in the process of drawing -- of
17  redistricting?
18    A.   Yes, sir.
19    Q.   When has that occurred?
20    A.   I believe this past cycle, there were
21  some mistakes made.
22    Q.   How did your office become aware of those
23  mistakes?
24    A.   Calls from a voter.
25    Q.   Can you cite any specific examples?
```

Page 60

```
 1    A.   I believe the call was from a Madison
 2  County voter who looked at the redistricting maps
 3  that we linked to on our website who typed in their
 4  address and got information from the redistricting
 5  map that was not matching by election day.  So they
 6  called our office, and we just passed that along to
 7  Madison County circuit clerk for them to review and
 8  make sure everything was correct.
 9    Q.   Do you know whether the Madison County
10  circuit clerk corrected the record?
11    A.   I believe it was corrected.
12    Q.   And how do you know that that was
13  corrected?
14    A.   I believe the voter called back and said
15  that the county circuit clerk had given them a call.
16    Q.   So in that particular circumstance that
17  you just described, your office did assist in
18  getting the record corrected, although didn't have
19  any formal authority to require it to be done; is
20  that fair?
21    A.   We passed along the call and let the
22  Madison County circuit court know that there may be
23  an issue and just to go back and look at the records
24  to see if there was an issue.
25    Q.   Were there any other mistakes that
```

Page 61

```
 1  occurred in the most recent redistricting that
 2  you're aware of?
 3    A.   I believe there was also issue in Yazoo
 4  County in which a senate district was not -- there
 5  may be issues with the senate district, and we
 6  passed along that information to the circuit clerk
 7  as well to review the information and make sure --
 8  go through and review all of the information to make
 9  sure they had the lines entered correctly.
10    Q.   The issue that occurred in Madison
11  County, how close was that to the election?
12    A.   I can't recall how close it was.
13    Q.   Was it within that 45-day window that you
14  described?
15    A.   I believe so.
16    Q.   Closer than that?
17    A.   I believe it was within the 45 days.
18    Q.   How about the Yazoo County mistake that
19  you described?  Was that within the 45 days as well?
20    A.   I believe so.
21    Q.   Do you know whether both of those
22  mistakes were corrected prior to election day?
23    A.   I believe they were both corrected.
24    Q.   Any other mistakes that you're aware of
25  that occurred in the most recent redistricting that
```

16 (Pages 58 - 61)

Page 62

1  had to be addressed?
2      A.  I believe there were issues in Hinds
3  County as well.
4      Q.  What happened in Hinds County?
5      A.  I believe just there were some voters not
6  properly assigned to the correct district.
7      Q.  How many?
8      A.  I don't know the full extent.
9      Q.  What happened with respect to those
10  voters?
11      A.  I believe those voters were properly
12  moved to the correct district by the circuit clerks
13  office.
14      Q.  Do you recall whether the Hinds County
15  mistake came to your office's attention within that
16  45-day window?
17      A.  I believe it came to our attention on
18  election day.
19      Q.  So how is that corrected on election day?
20      A.  Voters can cast an affidavit ballot for
21  their correct district.  If they believe they should
22  be voting in one district and not the other, they
23  can cast an affidavit ballot, and those records can
24  be reviewed by the proper officials afterwards.
25      Q.  So your understanding is that some number

Page 63

1  of voters in Hinds County were required to vote by
2  affidavit ballot in order to be able to vote for the
3  correct state legislator?
4      A.  Yeah.  My understanding is there was an
5  mistake made and voters weren't assigned to the
6  correct district.
7      Q.  And you don't know the number of voters?
8      A.  No, sir.
9      Q.  More than a hundred?
10      A.  I can't say I know the number.
11      Q.  All right.  So we've identified three
12  mistakes that occurred during the last
13  redistricting, certainly not unprecedented for that
14  to happen; right?
15      A.  It's a complicated procedure so sometimes
16  there are human errors made.
17      Q.  All right.  Any other mistakes that
18  occurred that you're aware of in the most recent
19  redistricting?
20      A.  Those are the three that I can recall.
21      Q.  And would it be fair to say that, one way
22  or another, in each of those instances, they were
23  corrected by the county officials and voters were
24  able to vote in the correct districts?
25      A.  Yeah.  I believe the corrections were

Page 64

1  made in each of those examples.
2      Q.  Does your office have any communications
3  with county officials in connection with the
4  redistricting process?
5          MR. BECKETT:  The technology failed us a
6  little bit there.  You cut out, John.
7          MR. LAVELLE:  Okay.  I'm sorry about
8  that.
9      Q.  Does your office have any communications
10  with county officials when redistricting starts
11  about the need to update their records?
12      A.  If they have technical questions, we have
13  a help desk that they can call and ask questions if
14  they need technical help getting that put in.
15      Q.  How do the individual counties receive
16  the updated district information?
17      A.  I believe they receive that from PEER.
18      Q.  Your office is not involved in that?
19      A.  I don't believe we transport -- provide
20  that information.  We do have a link on our website
21  of the redistricting maps that anybody, including
22  the general public, can go look that links to the
23  PEER's maps.  But as far as a formal transmission to
24  the county, I believe that's PEER's?
25      Q.  And your office does not set any standard

Page 65

1  for how long it should take an individual county to
2  update their records to reflect new legislative
3  districts; is that right?
4      A.  Other than the practical deadline I
5  already mentioned in SEMS on having those lines put
6  in so the election can be properly built 45 days
7  before the election, that is the extent of any, I
8  guess, requirements that may be put in place.
9      Q.  And you don't set any -- your office does
10  not set any earlier or different deadline for the
11  individual counties to work against; is that fair?
12      A.  Yes, sir.
13      Q.  Does your office have involvement in
14  sending voter information cards to voters, including
15  their precinct information?
16      A.  No, sir.
17      Q.  Who does that?
18      A.  The county circuit clerk.
19      Q.  Does your office set any policies or
20  procedures or how that's supposed to be done?
21      A.  There are statutory requirements for how
22  that needs to be done about sending those voter
23  registration cards and other processes in SEMS to
24  allow for that.  We don't have any other procedures.
25      Q.  So the counties are required by state law

17 (Pages 62 - 65)

Page 66

1  to provide those information cards to voters, and
2  your office does not have any additional or
3  different requirements that have been set by
4  regulation, policy, procedure, what have you; is
5  that fair?
6       MR. BECKETT:  Object to the form.
7       THE WITNESS:  That's correct.  We have
8  the voter registration card procedure set in SEMS to
9  allow for that to be sent out, but the requirements
10  are set forth in state statues.
11  BY MR. LAVELLE:
12      Q.   Does your office provide training to
13  county officials on how those are supposed to be
14  generated and sent out?
15      A.   We provide general SEMS training on a lot
16  of functionality in SEMS that would include voter
17  registration processes.
18      Q.   And that's that training that Ms. Lennep
19  provides on a periodic basis?
20      A.   That's correct.
21      Q.   Does your office have any ability to
22  supervise or review ballots that are prepared by
23  individual counties for elections?
24      A.   Yes, sir.
25      Q.   Describe for us, please, what role your

Page 67

1  office has in reviewing the proposed ballots for
2  elections.
3      A.   So once an election is created and the
4  candidates have been qualified, the SBEC for
5  statewide elections and state district elections
6  will approve the ballot.  So prior to that, the
7  Secretary of State's office will -- we build the
8  statewide and state district elections in SEMS and
9  will push those down to counties, meaning we will
10  insert the statewide, state district, which includes
11  legislative candidates, into SEMS, generate a sample
12  ballot.  We will review that for names and make sure
13  the candidates qualify with SBEC on that and provide
14  that to the SBEC for qualification and approval.
15      Q.   You referred a couple times to the
16  acronym SBEC.  What does that stand for?
17      A.   Yes, sir.  Sorry.  State Board of
18  Election Commissioners.
19      Q.   And who is the State Board of Election
20  Commissioners?
21      A.   The Governor of Mississippi, the Attorney
22  General's office and the Mississippi Secretary of
23  State.
24      Q.   All right.  So your boss is part of the
25  SBEC?

Page 68

1      A.   Yes, sir.
2      Q.   And when you said in your previous answer
3  that the Secretary of State's office builds the
4  elections in SEMS, can you give us more detail as to
5  what exactly you're referring to there?
6      A.   Yes, sir.  Similar to how counties will
7  build the specific county election, we will build
8  the statewide and state district elections, which is
9  inserting the key dates, such as voter registration
10  deadlines, absentee voting deadlines and insert the
11  qualified candidates into SEMS so that ballots can
12  be created, information can be provided to the
13  various voting machine vendors to generate scannable
14  ballots and we can export a sample ballot from SEMS
15  to be signed off on by the State Board of Election
16  Commissioners.
17      Q.   How long does that process take?
18      A.   It can vary.
19      Q.   Can you give us a range of the high and
20  the low?
21      A.   Low can sometimes be a presidential year.
22  For example, if only presidential and congressional
23  candidates are on the ballot, that right there is
24  five offices.  Highs are actually the statewide
25  years because of the number of offices -- you have

Page 69

1  statewide offices, you have state district offices
2  and you have 122 House of Representative and 52
3  Senators and all of the candidates that run for it
4  that need to be reviewed, double-checked,
5  triple-checked for corrections of names because, if
6  you get a name wrong, you will get a phone call from
7  an angry candidate.
8      Q.   Who is involved in your office in doing
9  this build-out of the elections?
10      A.   Myself, Madalan Lennep and Logan Witcher.
11      Q.   So for the most recent election that
12  occurred, that would have been the general election
13  2023.  Were you involved in that process?
14      A.   Yes, sir.
15      Q.   How long did that process take in 2023
16  for the general election?
17      A.   I can speak for the Secretary of State's
18  office.  I can't speak for the counties and building
19  their ballots and how many hours of review they
20  spent building the local ballots, which was -- it's
21  an addition of adding our ballots on top of the
22  local county officials.
23      For the Secretary of State's, it took
24  probably a couple or a few days' worth of hours in
25  getting the election and then going through and

Page 70

1  reviewing all of the names several times for all of
2  the offices to make sure everything was correct.
3      Q.   The couple working days' worth of hours,
4  did that occur over a more extended period of time
5  on the calendar?
6      A.   Yes.
7      Q.   And on the calendar, how long did that
8  take?
9      A.   Probably, I would say that was over a
10 span of two weeks maybe, a week or two.
11     Q.   Did you have visibility into how long
12 that process took at the county level?
13     A.   No.  That would be something to -- looked
14 at by the county circuit clerks and county election
15 commissioners, and that would vary, of course,
16 depending on how complicated their ballot is as
17 well, with how many local county officials are
18 running, how many county district officials are
19 running, as well as how many state districts and --
20 they may have in that particular county that are
21 going to be on the ballot.
22     Q.   Were you also involved in the same
23 process of building the election process in 2022?
24     A.   Yes, sir.
25     Q.   So you were involved with respect to the

Page 71

1  new legislative districts?
2      A.   In 2022, it would have been the
3  congressional.  I was involved with the new
4  congressional districts.  Yes, sir.
5      Q.   And the first election for the new state
6  legislative districts was when?
7      A.   2023.
8      Q.   All right.  So how did the timing that
9  was required for you compare in 2022?  How long did
10 it take you for the new congressional districts in
11 2022?
12     A.   It was much quicker.  We probably got
13 that done when -- in about two or three calendar
14 days.
15     Q.   Do you have an understanding, as we sit
16 here today, of how long it took individual counties
17 to update their records to reflect the new state
18 legislative districts when they became available in
19 2023?
20     A.   I do not.  I know it was sporadic.  There
21 are times when counties cannot make changes if they
22 have an election open with special elections that
23 occurred, municipal special elections that occurred
24 that interrupted the processes for counties.  So
25 things like that can, where a county can't start, it

Page 72

1  can delay and make that stretch on for much longer,
2  depending on localized issues.
3      Q.   When did the new state legislative
4  districts become available?
5      A.   I believe they were approved by the
6  Mississippi legislature at the end of the
7  legislative session.
8      Q.   And that would have been when on the
9  calendar?
10     A.   I believe that was March of 2023 I
11 believe was the end of the session.
12     Q.   Those same legislative districts were
13 used in the state primary this year; correct?
14     A.   That's correct.
15     Q.   And when was your state primary held in
16 2023?
17     A.   August.
18     Q.   Do you remember the date in August?
19     A.   You're going to embarrass me because I've
20 already started looking toward the 2024 election.  I
21 believe it was August 7.
22     Q.   It's always good to look forward.  So no
23 embarrassment necessary.
24         MR. BECKETT:  Hey, John, I think, to save
25 us some time, you said earlier it was the 2023

Page 73

1  legislative session.  I just -- I don't want to --
2  so it was 2022 legislative session.
3         THE WITNESS:  Yes, sorry.  2022
4  legislative session.
5         MR. BECKETT:  Sorry.  I was afraid we
6  were going to have a bad record.
7         THE WITNESS:  Sorry.
8  BY MR. LAVELLE:
9      Q.   All right.  So it was actually adopted in
10 March of 2022.  Is that your testimony?
11     A.   Yes.
12     Q.   All right.  And they had to be in place
13 for the primary that was held in August of 2023; is
14 that fair?
15     A.   Yes.
16     Q.   Were those new state legislative
17 districts relevant to any elections that were held
18 in 2022?
19     A.   No, they didn't affect any of the
20 congressional redistricting lines.  And the lines
21 did not go into effect until this cycle.  So any
22 special elections were held under the previous
23 lines.
24         MR. LAVELLE:  All right.  Let's go back
25 to Exhibit 2, please, the deposition topic list.

19 (Pages 70 - 73)

Page 74

1  We're now going to look at Number 2 on this list.
2  BY MR. LAVELLE:
3      Q.   Do you have that in front of you sir?
4      A.   Yes, sir.
5      Q.   Again, it's Tab 1B in your book.  So
6  Topic 2 for today's deposition is "Voting and voter
7  registration procedures, including but not limited
8  to: A, voting and voter registration requirements
9  and policies, guidance, and regulations related to
10  those requirements, including signature
11  requirements, proof-of-residency requirements,
12  requirements for changes of address, and
13  distinctions between inter- and intra-county moves."
14      And "B, changes to voting or voter
15  registration policies and procedures discussed or
16  planned, policies, guidance, and regulations
17  related to such changes, for the 2024 election
18  cycle."
19      And you're prepared to answer questions
20  about those topics?
21      A.   Yes, sir.
22      Q.   So what are the signature requirements,
23  if any, for voter registration?
24      A.   A voter must sign a voter registration
25  application.

Page 75

1      Q.   And who ensures compliance with that
2  requirement?
3      A.   The circuit clerks review any voter
4  registration applications that they receive.
5      Q.   Is there a comparison done of signatures
6  when individual voters present to vote?
7      A.   No, sir.
8      Q.   And the polling book that's at the
9  polling place, is there a facsimile of the
10  registration signature?
11      A.   No, sir.  I don't believe so.
12      Q.   All right.  So no one has to sign; is
13  that correct?
14      A.   They will have to sign a receipt book,
15  but there is no signature comparison at the polling
16  place.
17      Q.   There is a voter identification procedure
18  at the polling place; correct?
19      A.   That is correct.
20      Q.   And what is the voter ID requirement
21  under Mississippi state law?
22      A.   A voter must present an acceptable form
23  of photo ID to the poll manager, and that is to
24  verify that the name and the picture is
25  substantially similar to the name and the record and

Page 76

1  face of the person who's presenting themselves to
2  vote with the picture on the ID.
3      Q.   And it's up to individual officials at
4  the polling place to determine whether compliance
5  has occurred with those requirements; is that right?
6      A.   Yes, sir.
7      Q.   Now, the Secretary of State's office does
8  issue a form of photo ID to those who require one
9  for voting purposes; is that right?
10      A.   That's correct.
11      Q.   Do you have involvement in that process
12  that is processing and issuing requests for voter
13  ID?
14      A.   That does come through the elections
15  division of the Secretary of State's office.
16      Q.   How many voter IDs have been issued in
17  the state of Mississippi?  Do you have a number?
18      A.   I believe at this time 8,962.
19      Q.   8,962 voter IDs of a total registration
20  population of voters of how many?
21      A.   There are roughly 1.9 million active
22  voters at the time in Mississippi.
23      Q.   You'd have me that it's a very
24  small percentage of voters who actually get these
25  voter IDs through your office; is that correct?

Page 77

1      A.   Yeah, those are the voters who have
2  requested an application through our office, through
3  the circuit clerk's office.
4      Q.   Is that the number that's currently
5  outstanding, or is that the number of requests that
6  have been received?
7      A.   Those are the total that have been
8  issued.
9      Q.   Over what period of time?
10      A.   Since the implementation of voter ID in
11  Mississippi.
12      Q.   Does your office keep statistics on the
13  number of voters who were turned away at polling
14  place because of inability to produce photo ID?
15      A.   That -- anyone who does not have an
16  acceptable form of photo ID should be provided an
17  affidavit ballot.  So that would be kept through the
18  number of affidavit ballots processed by the local
19  election officials for reason of not having
20  acceptable form of photo ID present with them at the
21  polling place.
22      Q.   Does an affidavit ballot count if
23  somebody was unable to produce a form of photo ID at
24  the polling place?
25      A.   It can.  They have five business days to

20 (Pages 74 - 77)

Page 78

1  bring it to the circuit clerk and present an
2  acceptable form of photo ID.
3      Q.  Does your office have access to any
4  statistics of the number of people who were turned
5  away at the most recent election because they were
6  unable to present voter ID?
7      A.  Once again, we would have information on
8  the number of affidavit ballots that were given.  We
9  wouldn't have any information if someone was turned
10  away from the polling place or not.  But they should
11  have been provided an affidavit ballot.
12     Q.  There are proof-of-residency requirements
13  in -- under Mississippi state law for voter
14  registration; correct?
15     A.  You must be a resident of the district.
16     Q.  And you need to prove in some way that
17  you actually reside in the district; is that
18  correct?
19     A.  For a mail-in application, you'll provide
20  a driver's license or social security number, and
21  then you may be sent a voter registration card, and
22  if that's returned as undeliverable, then that is
23  seen as you not living at that address.
24     Q.  And that's the process under the state
25  law that's consistent with federal law; correct?

Page 79

1      A.  Yes.
2      Q.  If someone wants to change their address
3  of registration, how do they do that?
4      A.  They can send in a voter registration
5  application providing their previous registration
6  and their new place of registration.  They can --
7  which would include going through various NVRA,
8  National Voter Registration Act agencies, including
9  DPS, or they could use the online voter registration
10  update through the Secretary of State's website.
11     Q.  All right.  So your office may have
12  involvement in requests for change of address but
13  does not necessarily have to; is that fair?
14     A.  Yes, sir.  Some may come through our
15  office, but it's not a mandate to go through our
16  office to update your registration information.
17     Q.  Are requests for change of address
18  generally handled at the local county level?
19     A.  That's correct.  Any information that
20  comes through our website is immediately transmitted
21  through SEMS to the local county election officials
22  to process and handle.
23     Q.  And it's those local county officials who
24  determine whether or not the requirements for change
25  of address have been satisfied; is that fair?

Page 80

1      A.  Yes, sir.  They make those
2  determinations.
3      Q.  Now, you mentioned earlier in your
4  testimony that there may be a difference in handling
5  between whether a voter is moving within a county or
6  between counties.
7          Do you remember that testimony, sir?
8      A.  Yes, sir.
9      Q.  So if a voter moves from one county to
10  another, who is responsible for updating that
11  record?
12     A.  It would be the clerk who received the
13  information the latest.  So meaning the most recent
14  application where that voter moved to would process
15  that on SEMS.
16     Q.  So let's say, for example, a voter moved
17  from Madison County to Hinds County and updated
18  their driver's license record to reflect the new
19  home address.  Which county would be responsible for
20  updating SEMS in order to reflect that?
21     A.  If that voter indicated that -- at DPS
22  that they would like to register to vote with the
23  Hinds County address, then that would be transmitted
24  to the Hinds County circuit clerk to process as a
25  voter registration application.

Page 81

1      Q.  And when that happened, would SEMS
2  automatically remove the old voter registration in
3  Madison County?
4      A.  If it was designated as a duplicate and
5  the Hinds County circuit clerk indicated it was a
6  duplicate, then yes.  If they did not indicate it
7  was a duplicate voter, that registration could be
8  left in Madison County, and it would be up to the
9  Madison County officials to remove that.
10     Q.  What involvement, if any, does the
11  Secretary of State's office have in the voter
12  registration process?
13     A.  We develop or maintain the statewide
14  election management system, which is where voter
15  registration is done, and build in the processes as
16  required by law and provide the total through SEMS,
17  but the actual decision-making process is handled at
18  the legal level.
19     Q.  Are you aware of any changes to voting
20  registration policies and procedures that have been
21  proposed for the 2024 election?
22     A.  There have been discussions about online
23  voter registration.
24     Q.  Would that require a change in
25  legislation or is that something that could be

21 (Pages 78 - 81)

Overruled.  It may prove only marginally relevant but shows state officials looking into it.

Plaintiffs' Objections to Tr: 84:3 - 85:10; Relevance of unenacted legislation (FRE 401).

Page 82

1  implemented by regulation?
2      A.    That would have to be a legislative
3  change.  The legislature sets out voter registration
4  procedures.
5      Q.    So the best of your knowledge, there's
6  not been any new legislation adopted in Mississippi
7  that would change the voter registration, as we sit
8  here today on December 20, 2023?
9      A.    That's correct.
10      Q.    However, you're aware that there's been
11  at least some discussion of the potential to change
12  voter registration procedures -- to permit -- is
13  that fair?
14          MR. BECKETT:  Sorry, John, you cut out
15  again.
16          MR. LAVELLE:  Okay.
17  BY MR. LAVELLE:
18      Q.    You're aware that there's been at least
19  some discussion of proposed legislation that would
20  provide for online voter registration; is that fair?
21      A.  Yes, sir.
22      Q.    Has your office done any work in order to
23  determine how to do online voter registration in
24  connection with the proposed legislation?
25      A.    I have reviewed what other states have

Page 83

1  done for the event that it does happen in
2  Mississippi, how our office may be able to implement
3  that as required by law.
4      Q.    How many other states have adopted online
5  voter registration?
6      A.    I don't know the exact number.
7      Q.    But several have; correct?
8      A.    I believe it's multiple, yes, sir.
9      Q.    And what have you learned from your study
10  of the processes that other states have adopted for
11  online voter registration?
12      A.    Generally, there's a requirement that
13  there are some matching against an existing state
14  database, most commonly a driver's license or
15  state-issued ID number in order to allow for online
16  registration.
17      Q.    Have you been asked to review or comment
18  on any proposed legislation?
19      A.    To review some potential legislation,
20  yes.
21      Q.    And would the proposed legislation
22  include that type of check against a state database?
23      A.    Yes.
24      Q.    Any other proposed changes that are being
25  considered potentially in the voter registration

Page 84

1  process other than an online option?
2      A.    That's all that I'm aware of.
3      Q.    Any changes being contemplated to the
4  voting process for the 2024 election cycle that
5  you're aware of?
6      A.    Yes.
7      Q.    And what are those changes?
8      A.    A change to absentee voting for those who
9  are incarcerated but not convicted of a
10  disenfranchising crime.
11      Q.    And what changes are being contemplated
12  for that category of individual?
13      A.    To allow an express excuse under
14  Mississippi absentee voting law for those
15  individuals.
16      Q.    Under current Mississippi absentee ballot
17  law, you need a certain excuse in order to vote by
18  absentee; is that fair?
19      A.    Yes, sir.
20      Q.    You don't have "no excuse" absentee
21  balloting, in other words?
22      A.    That's correct.
23      Q.    But there has been a proposal to expand
24  absentee balloting to include this category of
25  individual "incarcerated but not convicted" voters?

Page 85

1      A.    Yes.  Yes, sir.  Not convicted of a
2  disenfranchising crime.
3      Q.    Would that require a legislative change?
4      A.    Yes, sir.
5      Q.    Do you know whether proposed legislation
6  has been prepared on that topic?
7      A.    Yes, sir.
8      Q.    Have you reviewed proposed legislation on
9  that?
10      A.    Yes, sir.
11      Q.    Is your office prepared to implement that
12  if it were adopted by the State of Mississippi?
13      A.    Our office would not implement that.
14  That would be -- absentee voting is handled by the
15  local election officials, but we would be ready to
16  train on any changes in law that would be required.
17      Q.    Does your office maintain statistics on
18  the number of voters who vote by absentee ballot in
19  a given election?
20      A.    Yes, sir.  We do receive absentee ballot
21  numbers through the statewide election management
22  system.
23      Q.    How many absentee ballots were cast in
24  the most recent election?
25      A.    I'd have to review that number to give

22 (Pages 82 - 85)

Page 86

1  you the exact amount.
2      Q.   All right.  Can you give us an
3  approximate or a percentage estimate?
4      A.   I believe it was close to 50,000 absentee
5  ballots.
6      Q.   And that's for the November 2023 general
7  election?
8      A.   That's correct.
9      Q.   50,000, approximately, absentee ballots
10 out of how many total ballots cast for that
11 election?
12     A.   There were roughly about 820,000 ballots
13 cast, probably a little bit more, but roughly about
14 820,000 ballots cast.
15     Q.   Mississippi does not allow what's
16 referred to in some states as early voting; is that
17 correct?
18     A.   That's correct in the sense that "early"
19 means "no excuse" absentee vote.
20     Q.   Polling places does not open on days
21 other than -- is that correct?
22         MR. BECKETT:  The last two words cut out,
23 John, for the court reporter.
24 BY MR. LAVELLE:
25     Q.   Polling places for elections are only

Page 87

1  open on election day; correct?
2      A.   Yes, sir.
3      Q.   Does the Secretary of State's office do
4  anything to encourage voter registration?
5      A.   Yes, sir.
6      Q.   What does your office do to encourage
7  voter registration?
8      A.   We provide a voter registration toolkit.
9  So anybody who would like to host a voter
10 registration drive can.  We have hosted several
11 voter registration drives, and we also publish
12 deadlines through an elections calendar as well as
13 through social media, letting voters know of
14 upcoming deadlines so they can register to vote and
15 have their voice heard.
16     Q.   Have those efforts been successful, in
17 your view?
18     A.   Yes, we have registered some voters,
19 which is always great.  And we've raised awareness
20 of upcoming elections and let people know when
21 deadlines are coming up so they can get registered
22 or update their information if necessary.
23     Q.   Are you aware of a distinction in the
24 electronic voter records between active and inactive
25 voters?

Page 88

1      A.   Yes, sir.
2      Q.   What distinguishes an active from an
3  inactive voter?
4      A.   An active voter is a what I kind of call
5  a "run of the mill" voter, what most of your
6  electorate is going to be.  It's someone who will
7  show up at a poll on election day.  An inactive
8  voter is a person who we have received some kind of
9  indication that they no longer live there, most
10 commonly by returned jury summons.  And under the
11 NVRA, they have been sent a confirmation card to
12 inquire whether they were there.  When they are sent
13 that confirmation card, they are made inactive.
14 Those voters will have to vote by affidavit ballot
15 at the precinct associated with their current
16 address.
17     Q.   If that happens, does their voting record
18 get updated to reflect their new address?
19     A.   If they cast an affidavit ballot and, on
20 that affidavit ballot, on the envelope, they put
21 their new address, then yes, after the election, the
22 local election officials should be updating their
23 address with the new address placed on that
24 affidavit ballot envelope.
25     Q.   And in that circumstance, you expect the

Page 89

1  affidavit ballot would count even though the
2  person's record was inactive?
3      A.   It could depend.  If they are voting at
4  the precinct associated with their address -- with
5  their current address, then yes, I would expect that
6  to count.
7      Q.   There may be circumstances where someone
8  votes in the wrong polling place and, therefore,
9  votes for the wrong race, they are voting for a
10 candidate that they are not eligible to vote for; is
11 that correct?
12     A.   That's correct.
13     Q.   In that circumstance, that ballot or at
14 least that part of the ballot would not count?
15     A.   Yes, the affidavit ballot would be
16 rejected.
17     Q.   Would the ballot be rejected in its
18 entirety or only with respect to the particular race
19 or races for which that voter was ineligible?
20     A.   The affidavit ballot is rejected in the
21 entirety.
22     Q.   Okay.  So anyone votes for any single
23 race that's incorrect, their entire ballot is thrown
24 out?
25     A.   If they vote in a precinct not associated

23 (Pages 86 - 89)

Page 90

1  with their address in affidavit, yes, that ballot is
2  rejected.
3      Q.   All right.  Going back to Exhibit 2,
4  let's look at Topic 3 for this deposition.
5  "Election-related resource requirements and
6  constraints, including but not limit to:  A, the
7  election-related responsibilities of the Secretary
8  of State's office during an election."
9          And "B, the number of polling places that
10 were changed or split from the beginning of the 2020
11 election cycle to present; processes and staffing
12 for changing a polling location; and the
13 availability of polling facilities for upcoming
14 elections."
15         Are you prepared to answer questions on
16 those topics, sir?
17     A.   Yes, sir.
18     Q.   You testified earlier about the
19 involvement that your office has in preparing for an
20 election that is held.  How many individuals in your
21 office are typically involved in preparing for a
22 given election cycle?
23     A.   In preparing for state board meetings and
24 approval of the ballots, I talked about earlier,
25 there's typically three individuals involved.

Page 91

1      Q.   And who are those individuals?
2      A.   Myself, Madalan Lennep -- I'm sorry,
3  four, my senior attorney as well -- Laura Courtney,
4  my senior attorney, and Logan Witcher, the election
5  compliance officer.
6      Q.   Are there any other individuals in the
7  Secretary of State's office who have to be involved
8  in setting up for an election?
9      A.   The Secretary of State, in his capacity
10 for the state board of election commission, will
11 obviously be part of the decision to qualify
12 candidates and to approve that ballot.
13     Q.   Are you familiar with something called an
14 official recapitulation sheet?
15     A.   Yes.
16     Q.   What is that?
17     A.   That is the form that officially
18 certifies the results for a particular election.
19     Q.   Who prepares those official
20 recapitulation sheets?
21     A.   For the local elections, they will be
22 completed by the county election commissioners.  For
23 the primary, it will be county executive committee.
24     Q.   Are they submitted to your office?
25     A.   Yes, each county submits a recapitulate

Page 92

1  report.
2      Q.   What kind of information does your office
3  maintain concerning voter participation?
4      A.   We will try and keep information on voter
5  turnout.
6      Q.   And do you report on voter turnout
7  regularly?
8      A.   Yes.  That is something we commonly talk
9  about, especially through social media and election
10 alerts, to try and get people more involved by
11 highlighting what voter turnout is.
12     Q.   Does your office collect this data based
13 on individual county election records?  How do you
14 compile it?
15     A.   Generally compile it as a -- at a
16 statewide level.  We have done some look at
17 county-by-county voter turnout.
18     Q.   So what was the overall voter
19 participation in the most recent general election,
20 the one that was held November 2023?
21     A.   I believe that was around 42 percent.
22     Q.   Is that typical for state of Mississippi?
23     A.   It will depend on the election.  Turnout
24 fluctuates depending on what election cycle we are
25 in.

Page 93

1      Q.   If a voter does not show up for voting
2  for a certain number of elections, does their
3  registration turn to inactive?
4      A.   Currently, no.  There is legislation that
5  will go into effect January 1st that would provide
6  for that.
7      Q.   All right.  Can you explain to us what
8  that legislation is and what it requires?
9      A.   Legislation requires if a person does not
10 vote in a period of four years, then they can be
11 made inactive, and then once inactive, they have two
12 federal general elections or a period containing two
13 federal general elections in which, if they have
14 some kind of contact and they update voter
15 registration or voting affidavits, that they can be
16 placed back on active voter roles.
17     Q.   And that will, you expect, be going into
18 effect for the 2024 elections; is that fair?
19     A.   Yes, sir.
20     Q.   What is your office doing in order to
21 prepare for that new requirement?
22     A.   We will be providing training to the
23 local county election officials at upcoming Election
24 Commissioners Association meeting.
25     Q.   Is it going to be up to individual

24 (Pages 90 - 93)

Page 94

1 counties to purge the records in order to comply
2 with this new law?
3     A.   Local election commissioners are always
4 responsible for voter roll maintenance in
5 Mississippi.
6     Q.   So your answer to my question is yes; is
7 that right?
8     A.   Yes, the local election officials will be
9 responsible.
10     Q.   And will your office have any oversight
11 over how they do that?
12     A.   We don't have oversight over local
13 election officials in the performance of their
14 duties.  We provide training.
15     Q.   You mentioned earlier that your office
16 gathers and reports information on voter
17 participation.  Do you track that by different
18 geographic locations?
19     A.   As I mentioned previously, we did that
20 by -- we have done that some by counties.  So...
21     Q.   Are you able to do that based on
22 demographics of voters such as age, gender or race?
23     A.   We have dates of birth in the statewide
24 election management system.  We do not have any
25 gender information nor racial data.

Page 95

1     Q.   So your office does not attempt to track
2 voter participation based on age or it does?
3     A.   We have not done anything that I'm aware
4 of regarding age.
5     Q.   And you haven't tried to do it based on
6 gender or race; is that fair?
7     A.   That's correct.  We don't have that data
8 in SEMS.
9     Q.   Do you know how many polling places were
10 changed or split in the -- since the 2020 election
11 cycle?
12     A.   I don't know the total number.  I can't
13 recall the total number.
14     Q.   Generally speaking, what involvement, if
15 any, does your office have in changes in polling
16 places?
17     A.   We receive the order from the local board
18 of supervisors stating that a change will be made,
19 but other than that, that is a local county
20 decision.
21     Q.   Who enters the information in the SEMS
22 database about a new polling location?
23     A.   The local election officials.
24     Q.   Is it up to the local election officials
25 also to make sure that those polling locations

Page 96

1 comply with the requirements of state and federal
2 law?
3     A.   Yes.
4     Q.   Does your office have any role in
5 supervising whether or not the counties have
6 complied with those requirements with respect to
7 individual polling places?
8     A.   We don't have oversight authority.
9     Q.   Have you ever become aware of any issues
10 with respect to polling places being moved?
11     A.   What do you mean by "issues"?
12     Q.   Concerns from voters that they didn't
13 know where to vote because their polling place had
14 moved, say?
15     A.   Generally, yeah, we have an elections
16 hotline.  We will receive calls asking about
17 information about where do I vote.  Maybe why was my
18 polling place changed.  Things like that.
19     Q.   How many polling places have to be
20 provided by a county?
21     A.   There is no express limit under law on a
22 minimum amount other than having at least maybe a
23 single one of the -- in each supervisors' districts,
24 but that would be set out by law, so the election
25 code could speak for itself on what that requirement

Page 97

1 is.
2     Q.   Is there any standard that you're aware
3 of with respect to the maximum number of registered
4 voters who can be addressed by a given polling
5 place?
6         MR. BECKETT:  Object to the form.
7         You can answer.
8         THE WITNESS:  There is a requirement
9 under law for 500 voters to be assigned to a
10 precinct unless there are voting machines used.  And
11 now every -- by law, every county must use voting
12 machines that have a voter-verifiable paper trail.
13 So each voting machine will have -- each precinct
14 will have a voting machine in it.
15 BY MR. LAVELLE:
16     Q.   Is there any standard that you're aware
17 of as to the number of voting machines that must be
18 offered for a particular precinct?
19     A.   No, sir.  Previously, for the older what
20 we call TSX machines, a county had to use 75 percent
21 of their inventory, but those touchscreen machines
22 will no longer be allowed to be utilized under
23 Mississippi law.
24     Q.   So voting is currently conducted how?
25     A.   Going forward, January 1st, 2024, every

25 (Pages 94 - 97)

Page 98

1　county is required to us a voting machine that has a
2　paper ballot that can be scanned and counted.
3　　　Q.　So individual voters will complete their
4　vote on a paper ballot which is then fed into a
5　machine to register the vote; is that fair?
6　　　A.　Yes, sir.
7　　　Q.　Is there any standard or requirement that
8　you're aware of as to the number of machines that
9　have to be available in a given polling place to
10　handle processing of ballots?
11　　　A.　No, sir.
12　　　　　MR. LAVELLE:  All right.  I think we're
13　at a convenient place to take a break.
14　　　　　MR. BECKETT:  Sounds good.
15　　　　　THE VIDEOGRAPHER:  The time is 11:11 a.m.
16　We are off the record.
17　　　　　(Off the record.)
18　　　　　THE VIDEOGRAPHER:  We're back on the
19　record.  The time is it 11:23 a.m.
20　BY MR. LAVELLE:
21　　　Q.　All right.  Mr. Kirkpatrick, I'd like to
22　put back in front of you again what we've marked
23　previously as Exhibit 2, that is the topic list for
24　today's deposition.  I think we're now at Topic 4.
25　"The timing of previous election cycles, including

Page 99

1　but not limited to," and there is a series of items.
2　Let's focus on the first one first.  And that is
3　"The procedures for and feasibility of moving the
4　qualifying and/or primary dates for the 2024
5　election cycle and of conducting special state
6　legislative elections in 2024."
7　　　I assume at this point the dates for the
8　primary and the general election of 2024 have
9　already been set; is that fair?
10　　　A.　Yes.
11　　　Q.　And they are mandated by state law;
12　correct?
13　　　A.　Yes, sir.
14　　　Q.　So those have already been communicated
15　to county election officials.  They are already
16　aware of those dates and know what they need to do
17　under the election calendar in order to meet those
18　deadlines; correct?
19　　　A.　That's correct.
20　　　Q.　What would the process be for changing
21　the election date?
22　　　A.　Well, as I previously mentioned, those
23　are set in statute.  So any mechanism would need to
24　be really a legislative change and the date for
25　those elections to be held.

Page 100

1　　　Q.　Has there ever been a circumstance in
2　which an election was required other than at the
3　standard timing, for example, to buy -- to fill a
4　special election?
5　　　A.　Yes.  Legislative seats can have a
6　special election day at a time other than the
7　regular special election day, which is the same time
8　as general elections.
9　　　Q.　So if, for example, a vacancy were to
10　occur in a particular state senate or house seat,
11　that vacancy could be filled by a special election;
12　is that fair?
13　　　A.　Yes, sir.
14　　　Q.　What is the process for scheduling an
15　election in that circumstance?
16　　　A.　If there is a vacancy in a legislative
17　seat, the governor will issue a writ of election
18　setting the time for the election within the time
19　frame set under the election code for legislative
20　vacancies.
21　　　Q.　Has that occurred during the time period
22　that you have been in your current position?
23　　　A.　Yes.
24　　　Q.　How many times has that happened during
25　the time that you have been in your current

Page 101

1　position?
2　　　A.　Sorry.  I'm going through the years.  I
3　believe that's happened two or three times.  It may
4　have been more, but I can think of at least two or
5　three occasions where that's happened.
6　　　Q.　Did you get approximately the same amount
7　of lead time each time, from the issuance of the
8　decree by the governor until the election was going
9　to be held, or did it vary?
10　　　A.　I can't recall exactly what all the lead
11　times were.  By law, there has to be at least a
12　60-day lead time in between the writ and for the
13　election to be held.
14　　　Q.　And why is 60-day lead time mandated by
15　state law, if you know?
16　　　A.　I can't speak to why that may have been
17　put in, that 60-day deadline.
18　　　Q.　Within that 60-day period, what happens?
19　　　A.　Candidates will submit their qualifying
20　paperwork.  Because it is a special election, that
21　will be submitted directly to the Secretary of
22　State's office.  The Secretary of State review those
23　materials, they prepare meetings for the state board
24　of election commissions.  The state board of
25　election commissioner meets, they qualify

26 (Pages 98 - 101)

Overruled. The question is relevant to Senate factor 1. If D is making the same argument as in its proposed findings---that the Senate factors are irrelevant or that they are irrelevant unless PI prevail on the three Gingles prongs---we find that the factors are relevant under binding precedent and that under Rule 104(b) we can hear the evidence.

Defendants' Objections to Tr: 104:12 - 104:24; Relevance.

Page 102

```
1   candidates, they prepare and approve the ballots.
2   That election is built in SEMS. Data is transmitted
3   to the local election officials and they go about
4   doing all their preparations necessary to conduct
5   the election in their county or counties, if it's a
6   multicounty district.
7       Q.   Are absentee ballots available for voters
8   to use in the circumstance of special elections like
9   this?
10      A.   Yes.
11      Q.   And when are those absentee ballots
12  prepared?
13      A.   45 days.
14      Q.   You said earlier that 60 days was the
15  time frame typically given. Does that mean you're
16  able to qualify and determine who the candidates
17  will be within two weeks?
18      MR. BECKETT: Object to the form.
19      THE WITNESS: Yes, we are able to do
20  that. Largely because these are normally isolated
21  events, it makes it a lot easier to handle. It's
22  normally not set during a major election time when
23  candidates have already been qualified so it makes
24  it easier to focus on the handful of candidates that
25  may have qualified for a single vacancy race.
```

Page 103

```
1   BY MR. LAVELLE:
2       Q.   What role, if any, does your office play
3   in getting things ready for a state legislative
4   special election?
5       A.   So we will build the election in SEMS, as
6   I previously mentioned. Candidates will qualify
7   with our office. We will do an initial review of
8   the qualifications and look for anything that we see
9   as a potential issue to highlight to the SBEC. If
10  we see something, we will send a letter to the
11  candidate letting them know that we see a potential
12  issue but that's not a final determination. We
13  provide materials to the State Board of Election
14  Commissioners so that we can meet and rule on
15  candidate qualifications and approve the sample
16  ballot so that an election can finally be pushed
17  down to local election officials.
18      Q.   And who is involved in that process that
19  you just described from your office?
20      A.   It will be myself; Laura Courtney, senior
21  attorney; Madalan Lennep; and Logan Witcher, our
22  elections compliance officer.
23      Q.   Section B of the Topic 4 is "The State's
24  experience and procedures for implementing newly
25  drawn state legislative maps and for conducting
```

Page 104

```
1   special legislative elections during election cycles
2   after 1990, including for implementing state
3   legislative maps drawn in response to a court
4   order."
5       Do you see that?
6       A.   Yes, sir.
7       Q.   All right. And you're familiar with this
8   area of questioning?
9       A.   I'm aware that we have had to have some
10  specially drawn maps in Mississippi and implement
11  elections for those.
12      Q.   You're aware there has been a history
13  here in Mississippi of electoral districts having to
14  be redrawn; is that correct?
15      MR. BECKETT: Object to the form.
16      THE WITNESS: Yes.
17  BY MR. LAVELLE:
18      Q.   That's happened in previous election
19  cycles where a court has required electoral
20  districts to be redrawn; correct?
21      A.   Yes.
22      Q.   That's happened on multiple occasions, in
23  fact; right?
24      A.   I believe so.
25      Q.   Do you have a special set of procedures
```

Page 105

```
1   in the Secretary of State's office as to how to
2   implement newly drawn state legislative maps if
3   ordered by a court?
4       A.   No. Once again, we don't implement the
5   lines, that will be up to the county circuit clerks
6   and the county election officials. The local county
7   election officials actually implement whatever
8   court-drawn maps may be provided.
9       Q.   Did your office provide guidance or
10  training to county officials in connection with
11  those newly drawn state legislative maps by court
12  order?
13      A.   I'm not aware if any specific guidance
14  was given around the time of those redistricting
15  lines for those specially drawn maps.
16      Q.   You would expect the counties to know
17  what to do and they would be able to do it based on
18  the training you provide on a regular basis; isn't
19  that fair?
20      A.   Yes. Counties are provided with training
21  on how to conduct redistricting. From a general
22  sense, yes, sir.
23      Q.   And if county officials don't do what
24  they are required to do, your office doesn't have
25  any enforcement capacity; is that fair?
```

27 (Pages 102 - 105)

Defendants' Objections to Tr: 108:25 - 110:9; Relevance. Assumes a duty that does not exist.

Page 106

```
 1    A.   That's fair, yes, sir.
 2    Q.   Were you involved at all in the last time
 3  that districts had to be redrawn in response to a
 4  court order in Mississippi?
 5    A.   I believe the last time may have been
 6  prior to 2020, which was prior to my entering the
 7  Secretary of State's office.
 8    Q.   Do you know how long it took for the new
 9  districts to be implemented in response to the court
10  order at that time?
11    A.   I'm not aware of how long it took the
12  county election officials to fully implement what
13  the court had ordered.
14    Q.   Your office doesn't have any records
15  about that; is that fair?
16    A.   That's correct.  We wouldn't have any
17  time frame of how long it took the counties to
18  complete that.
19    Q.   Okay.  So whether it took a day, a week,
20  a month, a year, you just don't have any idea; is
21  that fair?
22    A.   That's correct.
23    Q.   The next topic area is "Election
24  calendars for election cycles after 1990, and the
25  timing, including deadlines and actual completion
```

Page 107

```
 1  dates, of relevant processes regarding the
 2  implementation of new state legislative district
 3  maps for election cycles after 1990, including all
 4  necessary steps to implement state legislative
 5  district maps."
 6        We've already talked about this topic to
 7  some extent, but it would be fair to say that your
 8  office does not set or impose any particular
 9  calendar on individual counties with respect to
10  implementing new state legislative district maps; is
11  that fair?
12    A.   That's correct.  As previously mentioned,
13  we will just remind counties of the practical
14  deadline for getting things ready in time to have
15  ballots prepared through SEMS.
16    Q.   So you communicate to them how to do it
17  and you communicate to them the deadline for them to
18  complete it, but you don't -- your office, the
19  Secretary of State's office doesn't do any type of
20  monitoring or follow-up to make sure that it's done
21  by the counties; fair?
22    A.   Yes, sir, we don't have any oversight.
23    Q.   And you don't have any calendar that you
24  push out to the counties to say, "Here's when it
25  needs to be done," other than the calendar for
```

Page 108

```
 1  getting the elections ready as you do every year?
 2    A.   Yes, sir, that's correct.  We don't have
 3  any specific redistricting calendar.
 4    Q.   All right.  The next topic area is D.
 5  "Measures the State took to mitigate resource and
 6  time constraints related to the implementation of
 7  new state legislative maps during the 2023 election
 8  cycle, whether it anticipates the recurrence of any
 9  such constraints in future elections, and, if so,
10  any measures the State plans to take to mitigate
11  those constraints."
12        So let's start with the first part of this.
13  Are you aware of any measures that the State took to
14  mitigate resource and time constraints on
15  implementing the new state legislative district maps
16  this year, this past year?
17    A.   So -- and I guess the -- when you refer
18  to "the State" are you referring to the Secretary of
19  State's office or?
20    Q.   Let's start it there.  I'm assuming that
21  you're not knowledgeable about things that anyone
22  other than the Secretary of State's office did; is
23  that fair?
24    A.   Generally, yes, sir.
25    Q.   Okay.  So let's focus on what the
```

Page 109

```
 1  Secretary of State's office did, if anything, to
 2  mitigate resource and time constraints on
 3  implementing those new state legislative maps.  Is
 4  there anything that you can identify, as we sit here
 5  today, that your office did in terms of initiative
 6  to make it faster or easier for counties to
 7  implement the new state legislative maps?
 8    A.   No, sir.  If you are going to go back, we
 9  don't have any involvement in the implementation.
10  That's a local election official thing.  So we just
11  make sure we timely provided training so the county
12  election officials can do the work they needed to
13  do.
14    Q.   It is fair to say that the Secretary of
15  State's office does maintain that SEMS database
16  which allows counties to update the records in an
17  electronic fashion which is efficient and modern; is
18  that fair?
19    A.   Can you repeat the question one more
20  time?  I'm sorry.
21    Q.   Sure.  The Secretary of State's office
22  does maintain this statewide SEMS database, which
23  enables counties to implement new state legislative
24  maps electronically in an efficient and modern
25  fashion; is that fair?
```

Objection withdrawn

Page 110

1    A.   Yes, sir.  We do house SEMS, and that's
2    where they will implement the lines.
3        Q.   It's not like they have to physically
4    move pieces of paper in order to make that happen.
5    They can do it in the electronic database, the SEMS
6    database; right?
7            MR. BECKETT:  Object to the form.
8            You can answer.
9            THE WITNESS:  Yes, sir.
10   BY MR. LAVELLE:
11       Q.   All right.  Has your office received any
12   complaints from counties about how long it takes to
13   update the records in the SEMS database when
14   redistricting occurs?
15       A.   We have heard from counties generally
16   that it is just a cumbersome process to implement.
17       Q.   Are you aware of anybody who's made any
18   proposals or suggestions about things that could be
19   done to update the SEMS database or make it easier
20   for them or quicker for them to update records?
21       A.   I can't recall any suggestions that we've
22   gotten from counties.
23       Q.   Ms. Lennep testified that this current
24   SEMS database was originally implemented somewhere
25   around 2006, 2007.  Does that sound accurate to you?

Page 111

1    A.   Yes, sir, that would be in line with Help
2    America Vote Act.
3        Q.   It's updated, I would expect,
4    periodically by the vendor that provides it; is that
5    fair?
6        A.   Yes, sir.
7        Q.   Hewlett-Packard is the company, the big
8    tech company that created this database system; is
9    that right?
10       A.   Yes, sir.  I believe they were one of the
11   vendors.  There was a time when a couple vendors
12   changed hands due to some buyouts and things like
13   that in the early implementation of SEMS, but
14   Hewlett-Packard was one of them.
15       Q.   Who's the current vendor that's
16   responsible for maintaining this SEMS database?
17       A.   Arrikan.
18       Q.   And the Secretary of State's office has a
19   contract with them to provide periodic updates of
20   it?
21       A.   Yes, sir.
22       Q.   Just as you have a contract with
23   Ms. Lennep's company, Pharos, to provide technical
24   support and assistance on SEMS; is that right?
25       A.   Yes, sir.

Page 112

1    Q.   Ms. Lennep testified that she's been
2    doing work and under subcontract with an entity
3    called Knowledge Services.  Are you familiar with
4    Knowledge Services?
5        A.   Generally, yes.
6        Q.   What is Knowledge Services?
7        A.   My understanding, it's a provision of the
8    information and technology services that technology
9    contractors have to go through in order to work with
10   the State.
11       Q.   Is Knowledge Services a private entity?
12       A.   I'm not sure.
13       Q.   Is it a division of some part of the
14   State of Mississippi government?
15       A.   I'm not quite sure on the exact makeup or
16   its relationship with ITS.  Only that contractors
17   will go through Knowledge Services to provide
18   services to the State.
19       Q.   Who in your office contracts with
20   Ms. Lennep's company, Pharos, to provide services to
21   the Secretary of State's office?
22       A.   Primarily technology contracts are
23   through our division of technology services and our
24   finance department with the --
25       Q.   Ms. Lennep -- I'm sorry.  Ms. Lennep

Page 113

1    testified that she submits, periodically,
2    information with respect to the work she has done
3    and the amount of time it's taken her in order to
4    bill for that time.  Are you familiar with that
5    process?
6        A.   Yes.
7        Q.   Do you review her bills?
8        A.   I believe that goes to our technology
9    services vendor, our director, our CIO, and our
10   finance director.
11       Q.   So when you say "our CIO," is that a CIO
12   or chief information officer within the Secretary of
13   State's office?
14       A.   Yes.
15       Q.   Who is that?
16       A.   Daniel Jordan.
17       Q.   Can you spell his last name, please?
18       A.   J-O-R-D-A-N.
19       Q.   And how long has he been in that
20   position?
21       A.   I believe he started around February or
22   March of this year.
23       Q.   Who preceded him in that role?
24       A.   Eric Yoakum.
25       Q.   How do you spell his last name?

29 (Pages 110 - 113)

Page 118

1  in the district that you're seeking to vote in.
2      Q.  Okay.  You would agree with me that not
3  every single person who is a -- meets those criteria
4  is actually registered to vote in the state of
5  Mississippi; is that right?
6      A.  Yes, sir.
7      Q.  There is a gap between voter registration
8  and the number of potentially eligible voters;
9  right?
10     A.  Yes, sir.
11     Q.  And we talked earlier about efforts that
12  the Secretary of State's office has made to increase
13  voter registration through outreach to the
14  community; correct?
15     A.  Yes, sir.
16     Q.  Do you have any access to information
17  about relative percentages of voter registration at
18  the county level?  In other words, are some counties
19  more registered than other counties in getting
20  voters to register?
21         MR. BECKETT:  Object to the form.
22         THE WITNESS:  Yes, we do provide a, I
23  believe it's an active voter count report showing
24  the number of registered voters in each county
25  compared to the number of people who may be able to

Page 119

1  be eligible according to this last census.
2  BY MR. LAVELLE:
3      Q.  And do you publish that anywhere?
4      A.  Yes.
5      Q.  Where do you publish that?
6      A.  On the Mississippi Secretary of State's
7  website.
8      Q.  As we sit here today, are you able to
9  identify any particular place where voter
10  registration is lagging in the state of Mississippi?
11     A.  I can't recall right now if there's any
12  particular county that's much further behind than
13  any other.
14         MR. BECKETT:  Something just popped up on
15  the screen.  Okay.  Never mind.  It's done.
16  BY MR. LAVELLE:
17     Q.  And you're not able to tell us today how
18  voter registration has trended based on particular
19  racial demographic groups in the state of
20  Mississippi?
21     A.  That's correct.  The Secretary of State's
22  office does not keep racial data on voters.
23     Q.  All right.  The next subsection of this
24  notice is "Data and information on racially
25  polarized voting in Mississippi."

Page 120

1         So I assume the answer to this is no, but
2  you tell me if I'm wrong.  The Secretary of State's
3  office does not maintain information about minority
4  voters tend to vote in particular ways based on
5  their race; is that fair?
6      A.  That's correct.  We would have no way to
7  determine that based on the data we have.
8      Q.  In fact, the Secretary of State's office,
9  while it's responsible for making sure elections are
10  conducted in accordance with state law, track who
11  anyone has voted for in any particular
12  election; correct?
13     A.  That's correct, yes, sir.
14     Q.  Voting is generally a private matter in
15  the state of Mississippi; correct?
16     A.  Yes, sir.
17     Q.  Subsection C is "Efforts by the Secretary
18  of State to encourage voter registration and
19  participation, including among Black
20  Mississippians."
21         All right.  So we talked earlier about
22  efforts to encourage voter registration.  What can
23  you tell me about efforts by the Secretary of
24  State's office, if any, to encourage voter
25  participation that is actual voter turnout?

Page 121

1      A.  So we have launched what we call
2  Elections 101, which is providing elections
3  material, voting information through social media.
4  We have also launched My Election Day, which is an
5  online program in which a person can enter their
6  address to find out important information such as
7  when voting is going to be occurring, what elections
8  they may be able to vote for and where they will
9  vote, as well as being able to track absentee ballot
10  and affidavit ballot processes through that system
11  in order to allow people to be more engaged and know
12  those important dates, even be able to view a
13  specific sample ballot, specific to that person so
14  they can prepare themselves long before election day
15  and start making those important decisions they need
16  to make on who to vote for.
17     Q.  And that's something you do on an ongoing
18  basis in connection with every election; is that
19  fair?
20     A.  Yes.  My Election Day was launched this
21  year, but it's a permanent addition to what's
22  available to voters.
23     Q.  Are there any special or additional
24  outreach efforts that are conducted by the Secretary
25  of State to encourage minority voter registration?

31 (Pages 118 - 121)

Page 122

1    A.   We don't specify any particular minority
2  group or any particular population.  We try and
3  encourage voter registration, voter turnout among
4  all Mississippians.
5    Q.   And same is true with respect to voter
6  participation, there's no special effort by the
7  Secretary of State's office to encourage voter
8  participation by minority voters; is that fair?
9    A.   No.  We generally encourage registration
10 turnout by all Mississippians.
11   Q.   Subsection D is "The Secretary of State's
12 role in activities in ensuring voting access in
13 Mississippi, including through the provision of
14 polling place information and other voting
15 information to the public, and advising and
16 furnishing resources and guidance to the local board
17 of election commissioners regarding election
18 administration."
19       So if an individual voter wants to find out
20 where their polling place is, how can she do that?
21   A.   They can visit My Election Day and type
22 in their address, and it will provide the polling
23 place that the county has entered into the statewide
24 election management system.
25   Q.   And that's drawing their information

Page 123

1  based on their address and the SEMS database?
2    A.   That's correct, yes, sir.
3    Q.   Is it possible for someone to determine
4  whether they themselves are registered to vote?
5    A.   Yes.  They can use the Secretary of
6  State's website.  We have a voter registration
7  lookup where they can type in certain categories of
8  information that will match against the databases
9  before we provide certain information to make sure
10 it's actually that voter, but they can look to see
11 if they are registered to vote.
12   Q.   And these ways of providing this
13 information to voters would be in addition to
14 whatever information was provided by county election
15 boards; is that fair?
16   A.   Correct.
17   Q.   Does the Secretary of State's office set
18 any type of standards about how individual counties
19 have to make that information available to voters?
20   A.   No.  We make that information available
21 through My Election Day and the online lookup, but
22 we don't have any oversight authority to dictate how
23 a county may provide resources, such as polling
24 place information, to the voters through, like, any
25 online lookup tool or et cetera.

Page 124

1    Q.   Does the Secretary of State's office
2  provide any type of funding to local counties with
3  respect to election administration?
4    A.   The Mississippi Secretary of State's
5  office does provide some funding.
6    Q.   All right.  And what can you tell us
7  about that?  What kind of funding and how is it
8  provided?
9    A.   The Mississippi Secretary of State
10 provides funding through the Help America Vote Act,
11 through subgrants to counties.  Also provided
12 through grant funding approved by the Mississippi
13 legislature, the Mississippi Voting Modernization
14 Act.  Funding for the purchase of voting equipment
15 that use voter-verifiable paper ballots.  And also
16 through the Election Support Fund, which is monies
17 generated through our office through foreign LLCs,
18 meaning out of state LLCs, find any reports will
19 generate funds that are now disbursed to the
20 counties at a dollar match.
21   Q.   And are there any plans to change that
22 level of support going forward for what they have
23 done in previous years?
24   A.   Well, we recently got that funding bumped
25 up to a hundred percent through some work with the

Page 125

1  legislature.  So we can't get that funding any
2  higher.  And as I'm aware of, any kind of subgrant
3  award through federal money will have to be
4  dependent on what the federal government budgets
5  through any HAVA appropriations if they give a
6  future disbursement.  So that would have to be
7  considered at the time that the federal government
8  releases more HAVA funding.
9    Q.   Subsection E here is "Voting policies and
10 procedures in Mississippi, and the impact of those
11 policies and procedures on Black voters, including:
12 The availability of early mail-in voting; voter
13 information made available by the Secretary of
14 State's office in advance of an election; lines at
15 polling places; changes in polling places;
16 disenfranchisement of people with felony
17 convictions; and the use of runoff elections."
18       Let's start with the general question,
19 which is:  Your office does occasionally have an
20 opportunity to comment on proposed changes in voting
21 policies and procedures in Mississippi; is that
22 fair?
23   A.   There have been times that we have
24 provided information to the legislature on various
25 policy changes.

32 (Pages 122 - 125)

**Objection withdrawn.**

Defendants' Objections to Tr. 128:9 - 129:9;
Relevance. Assumes a duty that does not
exist. Calls for Speculation.

109

Page 126

1    Q.   You mentioned a couple of those in your
2    testimony earlier today; correct?
3    A.   Yes, sir.
4    Q.   Some proposed changes that are being
5    contemplated, and at least one that's going to be
6    implemented for 2024, your office has been asked to
7    comment on them and provide input to the legislature
8    on those; is that fair?
9    A.   Yes, sir.
10   Q.   In that respect, have you been asked by
11   the legislature to provide any input or comment on
12   whether any current voting policies and procedures
13   disproportionately disenfranchise minority or Black
14   voters?
15   A.   I don't recall any specific discussions
16   on policies that would affect minority voters or how
17   a policy change would specifically affect those
18   minority voters.
19   Q.   Okay.  On some of these specific issues,
20   let's talk through them.  We talked earlier about
21   the availability of early voting, and actually there
22   is no early voting in Mississippi; correct?
23   A.   Yes, sir.
24   Q.   The only mail-in voting that is permitted
25   is absentee ballot by excuse, and those areas are

Page 127

1    defined by legislation; correct?
2    A.   Yes, sir, that's correct.
3    Q.   And the only change that's being
4    contemplated, that you're aware of, in those rules
5    is potential legislation to add an excuse for an
6    incarcerated individual who has not been convicted
7    of a disenfranchising felony; correct?
8    A.   Yes, sir, that's correct.
9    Q.   We talked earlier about voting
10   information that's made available by the Secretary
11   of State's office in advance of the election.
12   That's essentially through the SEMS database; is
13   that correct?
14   A.   Yes.  So if you're referring to My
15   Election Day having their information, we have other
16   voter information available as well on our website.
17   Q.   What other information do you have
18   available for voters on your website?
19   A.   We have county election handbooks so they
20   can become aware of what the procedures are.  We
21   have step-by-step absentee voting guides.  We have
22   FAQ for general questions regarding absentee voting.
23   Of course we have the voter registration lookup as
24   well where people can check to see if they are
25   registered to vote, as well as the voter

Page 128

1    registration toolkit.
2    Q.   With respect to lines and polling places,
3    does your office receive reports of issues where
4    there are long lines forming at individual polling
5    places?  Has that ever happened?
6    A.   Yes.  We will occasionally get calls
7    throughout the election day about sometimes the
8    person having to wait in line at a polling place.
9    Q.   And what will, if any, does your office
10   have in resolving problems of lines forming at
11   polling places?
12   A.   We don't have any direct authority.  Once
13   again, the local election officials are responsible
14   for running those elections and the precincts at the
15   polling place.  If we hear of an issue, we will call
16   down to the county election commission and pass that
17   on, but it's up to them to get whatever issue is
18   resolved or whatever is causing those long lines to
19   get resolved as soon as possible to be resolved.
20   Q.   Has your office collected or attempted to
21   collect any data to determine whether or not lines
22   occur disproportionately at polling places where the
23   majority of voters are Black?
24   A.   No, sir.
25       MR. BECKETT:  Object to the form.

Page 129

1        You can answer.
2        THE WITNESS:  No, sir.
3    BY MR. LAVELLE:
4    Q.   Has your office undertaken at all to
5    determine whether there are any particular trends in
6    where lining at polling places form?
7        MR. BECKETT:  Object to the form.
8        THE WITNESS:  No, sir, not that I'm aware
9    of.
10   BY MR. LAVELLE:
11   Q.   Have there been any instances where your
12   office have suggested to county officials to make
13   different arrangements with respect to polling
14   places in order to reduce lines, such as increasing
15   the number of polling places, increasing the number
16   of staff members at the polling place, anything like
17   that?
18   A.   Not in the specific counties.  Generally
19   during training, we will mention that it's good to
20   have -- make sure you have a sufficient number of
21   staff, poll managers, sufficient number of machines
22   that you feel are necessary in order to have a
23   smooth election day.
24   Q.   We talked earlier in your deposition
25   testimony about changes in polling places, and I

33 (Pages 126 - 129)

Defendants' Objections to Tr: 133:14 - 133:21; Calls for speculation.

Page 130

1  think your testimony was that the location of
2  polling places is controlled by local county
3  officials, not by the Secretary of State's office;
4  correct?
5      A.  Yes, sir, that's correct.
6      Q.  They are required to report to you
7  changes in polling places and to make sure that
8  those are reflected in the SEMS database; is that
9  correct?
10      A.  That's correct.
11      Q.  And has your office undertaken to
12  determine whether or not there were changes in
13  polling places made that would disproportionately
14  affect voters of color?
15      A.  No, sir.
16      Q.  The next subcategory here is the
17  disenfranchising of people with felony convictions.
18  Generally speaking, under Mississippi state law, an
19  individual convicted of a felony is ineligible to
20  vote; is that correct?
21      A.  If they are convicted of a certain
22  disenfranchising crime, yes.  It's not any felony.
23  It's certain disenfranchising crimes.
24      Q.  Okay.  And which disenfranchising crimes
25  are those?

Page 131

1      A.  It's less than 23.  I can't immediately
2  recite them all from memory.  Some deal with murder,
3  robbery, et cetera, that fall under the
4  disenfranchising grounds.
5      Q.  Does the Secretary of State's office have
6  any statistics as to the percentages of voters, the
7  potential voters who are disenfranchised as a result
8  of those restrictions?
9      A.  Can you repeat the question?
10      Q.  Sure.
11      A.  What kind of --
12      Q.  Does your office maintain any statistics
13  with respect to who has been disenfranchised as a
14  result of a conviction of a disenfranchising crime?
15      A.  Persons convicted of a disenfranchising
16  crime are received through a tie-in.  A tie-in is
17  where the statewide election management system
18  communicates with the administrator of the court's
19  office in which, when they enter that a person has
20  been convicted of a crime, those databases will be
21  matched to see if somebody is a registered voter.
22  So we do have a database of those who have been
23  entered by AOC as having been convicted of a
24  disenfranchising crime.
25      Q.  And is their data entry performed at a

Page 132

1  county level in connection with that or is this all
2  automated?
3      A.  So as far as the AOC, I can't exactly
4  speak what the AOC's operations are as far as
5  entering the disenfranchising crimes.  From the
6  election perspective, it is matched through SEMS,
7  the database, and that match, potential match is
8  presented to the local election officials for them
9  to determine if any action is needed to be taken on
10  it.
11      MR. BECKETT:  His mic fell off.
12      THE WITNESS:  Sorry about that.
13  BY MR. LAVELLE:
14      Q.  No problem.  Does your office maintain
15  statistics of the number of voters who are
16  disenfranchised as a result of being convict of a
17  disenfranchising crime?
18      A.  A person who is convicted of a
19  disenfranchising crime would be marked as purged in
20  SEMS, and the reason for the removal would be
21  designated as having been convicted of a
22  disenfranchising crime.
23      Q.  So you could generate a report if you
24  needed to or wanted to of the number of people who
25  fall in that category, couldn't you?

Page 133

1      A.  Possibly.  Anything technical, I'd have
2  to consult with Madalan and our vendor on exactly
3  how that data can be pulled and retrieved.
4      Q.  Does the Secretary of State's office
5  provide any reporting on that topic?  That is the
6  number of individual voters who have been
7  disenfranchised as a result of a conviction of a
8  disenfranchising crime.
9      A.  Not that I'm aware of, no.
10      Q.  Do you have any idea how many people are
11  disenfranchised as a result of that?
12      A.  No.  I don't know the total number that
13  have been disenfranchised under that.
14      Q.  It would be thousands, wouldn't it?  At
15  least, tens of thousands, hundreds of thousands?
16      A.  It could be.
17      MR. BECKETT:  Object to the form.
18      THE WITNESS:  I can't speculate as to a
19  number.  But I can imagine it would be at least over
20  a thousand, but I can't speculate as to a total
21  number that would be --
22  BY MR. LAVELLE:
23      Q.  Understood.  Is it possible for a voter
24  who has been convicted of a disenfranchising crime
25  to be reinstated?

Sustained.  The witness said he did not know and said he would have to speculate.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Page 134

1  A.  Yes.
2  Q.  And how does that reinstatement occur?
3  A.  They could be pardoned by the governor of
4  Mississippi or they could have their rights restored
5  by the Mississippi legislature.
6  Q.  How often does that happen?
7  A.  I can't speak to how often a pardon is
8  issued or a legislature approves a bill to
9  re-enfranchise somebody.
10  Q.  But other than those two instances, it's
11  a permanent disenfranchisement; correct?
12  A.  Yes, sir.
13  Q.  And the last section of this -- of this
14  topic is the use of runoff elections.  Are you
15  familiar with runoff elections?
16  A.  Yes, sir.
17  Q.  When are runoff elections used?
18  A.  They are used in the instance when
19  offices that are required to have the majority of
20  the vote do not receive -- a person does not receive
21  a majority of the vote and a runoff is going to be
22  held at the date set by legislature.
23  Q.  Are state legislative seats required --
24  do they ever require runoff elections?
25  A.  Only in the instance of a special

Page 135

1  election.
2  Q.  And can you explain that?
3  A.  State law requires that, for special
4  elections, that if a -- no one receives a majority
5  on the first election, that a runoff is held for
6  general elections, they are simply required to
7  obtain a plurality of the vote, not a majority, so
8  most votes wins.
9      MR. LAVELLE:  All right.  Let's take a
10  break here, if that's okay with you.
11      MR. BECKETT:  Yeah.  Sure.  We can go off
12  the record.
13      THE VIDEOGRAPHER:  The time is 12:10 p.m.
14  We're off the record.
15      (Off the record.)
16      VIDEOGRAPHER:  We're back on the record.
17  The time is 12:46 p.m.
18  BY MR. LAVELLE:
19  Q.  All right.  Mr. Kirkpatrick, we're back
20  from the lunch break, and we're going to move to
21  Topic 6 of the 30(b)(6) topics.  If we could pull
22  up, once again, Exhibit 2.  Topic 6 is "The
23  Secretary of State's office's participation in the
24  process of drawing state legislative maps in 2022,
25  included but not limited to," and the first

Page 136

1  subcategory of information is "Data, analyses,
2  studies, or information created and/or provided by
3  the Secretary of State's office, including its
4  employees, staff, and/or consultants, for use in the
5  2022 redistricting process."
6      All right.  So we discussed earlier that
7  you had collected and produced in discovery a series
8  of emails that Madalan Lennep had with either Ted
9  Booth or Mr. Collins.
10      Do you remember discussing that?
11  A.  Yes, sir.
12  Q.  And you're aware from collecting and
13  reviewing those records that there were a variety of
14  categories of information that were requested by
15  Mr. Collins or Mr. Booth from the Secretary of
16  State's office; correct?
17  A.  Yes, sir.
18  Q.  And while you yourself were not involved
19  in complying with those requests, you're aware that
20  Ms. Lennep did so; correct?
21  A.  Yes, sir.
22  Q.  And you're aware that Ms. Lennep, as a
23  vendor retained by the Secretary of State,
24  effectively did produce these documents and records
25  to Mr. Booth and Mr. Collins on behalf of the

Page 137

1  Secretary of State's office; correct?
2  A.  Yes, sir.
3  Q.  So you're aware, for example, that
4  Ms. Lennep provided a listing of precinct polling
5  places to Mr. Collins at his request; right?
6  A.  Yes, sir.  I believe that was one of the
7  emails.
8  Q.  And you're aware that there was
9  information that was requested by Mr. Collins
10  relating to poll books, including the number of
11  voters in a poll book and voter turnout percentages
12  by district?  Are you aware of that?
13  A.  I'd have to review the email for all, but
14  I believe that was a request.
15  Q.  You're also aware that Mr. Collins and
16  Mr. Booth requested information from Ms. Lennep
17  concerning the turnout in a number of specific races
18  that were held on a statewide basis?  Are you aware
19  of that?
20  A.  Yes, sir.
21  Q.  So, for example, they requested
22  Ms. Lennep to provide information about the U.S.
23  Senate election turnout numbers, both the primary
24  and the general in 2020; correct?
25  A.  Yes, sir.  I believe that was one of the

35 (Pages 134 - 137)

Page 138

1  request.
2      Q.   They also requested Ms. Lennep to provide
3  information about the turnout for the gubernatorial
4  election; right?
5      A.   Yes, sir. I believe some turnout data
6  regarding that election was requested as well.
7      Q.   And also requested information about
8  turnout numbers for the attorney general's office,
9  state attorney general's office race; correct?
10     A.   Yes, sir.
11     Q.   Are you aware of any requests that were
12 placed by Mr. Collins or Mr. Booth that Ms. Lennep
13 declined to fill?
14     A.   No, sir.
15     Q.   Are you aware of any requests that were
16 directed by Mr. Collins to anyone in the Secretary
17 of State's office for data, other than Ms. Lennep?
18     A.   No, sir.
19     Q.   How about Mr. Booth? Are you aware of
20 any requests that he made to anyone in the Secretary
21 of State's office, other than Ms. Lennep, for data
22 or information in connection with redistricting?
23     A.   No, sir. I believe all of those requests
24 were made to Ms. Lennep.
25     Q.   All right. Subsection B is "Any analysis

Page 139

1  or consideration of any maps created or provided by
2  legislators, legislative staff, consultants, and/or
3  the public as part of the 2022 redistricting
4  process."
5      What involvement, if any, has the Secretary
6  of State's office had in the preparation or
7  consideration of any requests for redistricting?
8      A.   The Mississippi Secretary of State's
9  office doesn't create the maps. As I previously
10 mentioned, that's the legislature's duty. Nor was
11 any analysis performed of those maps or proposed
12 maps by the Mississippi legislature.
13     Q.   So your office has not been asked by
14 anybody who is responsible for drafting those maps
15 for any input at all with respect to them; is that
16 fair?
17     A.   Yes, sir.
18     Q.   The first time that your office received
19 those maps was when they had actually been adopted
20 by the commission; correct?
21     MR. BECKETT: Object to the form.
22     THE WITNESS: Yes, sir. We saw the final
23 legislative language along with everybody else on
24 what those maps would be.
25 BY MR. LAVELLE:

Page 140

1      Q.   Did the Secretary of State's office have
2  any input on any proposed alternative maps that had
3  been provided by anyone not in the legislature, such
4  as a member of the public?
5      A.   No, sir.
6      Q.   Has the Secretary of State's ever
7  been asked to provide any input, whether or not it
8  actually did provide any input, but has it ever been
9  asked to provide any input on any proposed maps?
10     A.   No, I'm not aware of any request for
11 input on any proposed maps.
12     Q.   Subsection C here is "Communications with
13 legislators, legislative staff, consultants, and/or
14 the public about the 2022 redistricting process."
15 Are you aware of any communications that the
16 Secretary of State's office has had with legislators
17 or legislative staff concerning the 2022
18 redistricting process?
19     A.   As we mentioned in the interrogatories,
20 the Secretary of State recalls generally speaking
21 with some legislators regarding redistricting but
22 not about any of the input or the analysis of the
23 maps and can't recall who those legislators are.
24     Q.   So there were some conversations, we
25 don't know with whom and we don't know what they

Page 141

1  were about; is that fair?
2      MR. BECKETT: Object to the form.
3      THE WITNESS: Yes. Can't recall what
4  those conversations were about. Just they were
5  about redistricting generally.
6  BY MR. LAVELLE:
7      Q.   And who were the parties that you can
8  identify, as we sit here today, to those
9  communications?
10     A.   As I mentioned, the Secretary of State
11 had those communications.
12     Q.   All right. And the Secretary of State
13 you're referring to specifically by name is?
14     A.   Michael Watson.
15     Q.   All right. So Mr. Watson did have some
16 communications with legislators about the
17 redistricting process; is that fair?
18     A.   Generally speaking, yes.
19     Q.   Do you know when those conversations
20 occurred?
21     A.   No.
22     Q.   Were you involved in them,
23 Mr. Kirkpatrick?
24     A.   No.
25     Q.   Did you have a conversation with

36 (Pages 138 - 141)

Page 146

1  poll managers, that process absentee ballots and
2  also look at ballots that could not be properly
3  scanned by a voting machine to determine the voter's
4  intent.
5      Q.   And what about the voter's intent has to
6  be determined from review?
7      A.   If a ballot is marked in a way that the
8  machine can't read, like, anything, when you put a
9  person in front of somebody, they are going to
10 figure out a hundred different ways to do it.  So if
11 they don't properly fill in the bubble and then
12 maybe then a checkmark or circled the person's name
13 or some other indication that's who they are
14 choosing to vote for but it doesn't actually
15 properly fill in the bubble for the machine to read,
16 the resolution board can look at that.  If they can
17 properly determine the voter's intent, transfer that
18 to a proper ballot properly designating it and let
19 that vote to be accepted and counted.
20     Q.   Who appoints the resolution board?
21     A.   The local county election officials.
22     Q.   What role, if any, does the Secretary of
23 State's office have with respect to training
24 resolution boards?
25     A.   We train the local election officials

Page 147

1  who, in turn, train the resolution boards.
2      Q.   Are you familiar with the process for
3  challenging a ballot under Mississippi law?
4      A.   Yes, sir.
5      Q.   What is the process for challenging a
6  ballot?
7      A.   A person who is eligible to challenge a
8  ballot can challenge a person's qualifications to
9  vote either at the precinct or they can do so in
10 front of a resolution board, if it's an absentee
11 voter.
12     Q.   And what is a possible basis for
13 challenging a voter?
14     A.   It could be that that person isn't the
15 person who is -- who they say they are, that they
16 are not eligible to vote, they don't live in the
17 district, they don't live in the precinct, they
18 aren't qualified to vote absentee are all reasons
19 for challenging the ballot or challenging the
20 qualifications of someone to vote.
21     Q.   Does the Secretary of State's office
22 track patterns or situations where challenges to
23 voters occur?
24     A.   No, sir.
25     Q.   Are you aware of any incidents that have

Page 148

1  occurred in Mississippi where voters have been
2  challenged in a racially discriminatory way?
3          MR. BECKETT:  Object to the form.
4          THE WITNESS:  No, sir.
5          MR. LAVELLE:  Let's take a short break.
6  I may be close to finished here, but I want to go
7  over my notes briefly.  Let's take a five-minute
8  break.
9          THE VIDEOGRAPHER:  The time is 1:02 p.m.
10 We are off the record.
11         (Off the record.)
12         THE VIDEOGRAPHER:  We're back on the
13 record.  The time is 1:09 p.m.
14         MR. LAVELLE:  All right.
15 Mr. Kirkpatrick, I do not have any further questions
16 for you.  I want to thank you very much for your
17 time and attention today and for your willingness to
18 walk through these areas with us and hope you and
19 your family have a wonderful holiday.
20         THE WITNESS:  Yes, sir.  You too.
21         MR. BECKETT:  Thank you, John.  We wish
22 the best to you during this holiday season.
23         We do want to read and sign, but I'm not
24 going to do any questioning today.
25         MR. LAVELLE:  Very good.

Page 149

1          MR. BECKETT:  All right.  Thank you.
2          THE VIDEOGRAPHER:  With nothing further,
3  the time is 1:10 p.m.  We're off the record.
4  (Whereupon, the above-entitled deposition was
5          concluded at 1:10 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

38 (Pages 146 - 149)